

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 03, 2025.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-50900-CAG |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, et al., | § | |
| | § | |
| | § | |
| Debtors. | § | CHAPTER 7 |

| | | |
|---|---|---|
| DUNDON CAPITAL PARTNERS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Adversary NO. 22-05077-CAG |
| v. | § | |
| | § | |
| CHARLES EBERSOL, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 102)

On this date, the Court considers Charles Ebersol's ("Defendant") Motion for Summary

Judgment. (ECF No. 102).[1] For this ruling, the Court reviewed Dundon Capital Partner LLC's

---

[1] "ECF" refers to the electronic case file docket number.

("Plaintiff") Original Complaint (ECF No. 1), Plaintiff's Response to Defendant's Motion for Summary Judgment (ECF No. 124), Plaintiff's Revised (ECF No. 142), and Defendant's Reply in Support of His Motion for Summary Judgment (ECF No. 138). The Court took this matter under advisement after hearing on January 31, 2025. For the reasons stated herein, Defendant Ebersol's Motion for Summary Judgment is **GRANTED**.

## JURISDICTION

As a preliminary matter, the Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), (K), and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This case is referred to this Court by the Standing Order of Reference entered in this District. All parties consent to the Court's entry of final orders and final judgment. (ECF Nos. 14 & 18). This matter is within the Court's authority and jurisdiction pursuant to the Supreme Court's ruling in ***Wellness Int'l Network, Ltd. v. Sharif (In re Sharif)***, 575 U.S. 665 (2015).

## FINDINGS AND CONCLUSIONS

The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052(a), made applicable to this hearing by Federal Rule of Bankruptcy Procedure 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 allows parties to move for summary judgment by "identifying each claim or defense—or the part of each claim or defense—on which summary

judgment is sought." FED. R. CIV. P. 56(a). Rule 56 is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. FED. R. BANKR. P. 7056

Summary judgment may be granted when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.* To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some element of the non-moving party's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992) (en banc). If the crucial issue is one for which the non-moving party will bear the burden of proof at trial, the movant must merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Id.*

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Neither will "only a scintilla of evidence" meet the nonmovant's burden. *Liquid Air Corp.*, 37 F.3d at 1075. Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is

uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." ***Reeves v. Sanderson Plumbing Prods., Inc.***, 530 U.S. 133, 151 (2000). The court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment and must review all facts in the light most favorable to the nonmoving party. ***Id.*** at 150; ***First Colony Life Ins. Co. v. Sanford***, 555 F.3d 177, 181 (5th Cir. 2009).

FACTUAL AND PROCEDURAL BACKGROUND

This case arises from the creation and dissolution of an alternative professional football league called Alliance of American Football ("AAF"). The idea for the AAF was conceived by Charles Ebersol ("Ebersol") and others as a developmental football league for highly touted collegiate players and former NFL players to gain exposure and garner interest from NFL teams.

Ebersol was the CEO of Ebersol Sports Media Group ("ESMG") which owned and operated the AAF and its subsidiaries. (ECF No. 102, Ex. K). The league was designed to introduce cutting-edge technology that would allow for collection of instantaneous metric data from the games for fans to view via the AAF's app. The AAF envisioned that this data—in addition to being used by the teams for scouting and player evaluation—would create enhanced wagering opportunities for fans. (ECF No. 124, Ex. 3). These new ideas made the AAF attractive to potential investors, which was the league's primary source of capital at the time. (*Id.*, Ex 28 at 236).

Initially, Reginald Fowler ("Fowler"), a former part owner of the Minnesota Vikings of the NFL, promised to financially back the AAF by committing to fund up to $170 million through a combination of debt and equity. (ECF No. 124, Ex. 33). During the pendency of the AAF's first season, Fowler's investment commitment fell through because of accusations of financial crimes against him. (*Id.*, Ex. 23 at 198). In the market for new investors, Ebersol eventually encountered Thomas Dundon ("Dundon") and proposed an investment opportunity that would provide the AAF

with the funding it needed in the short term and potentially through the end of the season. (*Id.* at 79). Dundon is an owner of the Carolina Hurricanes National Hockey League club and representative of Dundon Capital Partners, LLC ("DCP"), which is the entity Dundon conducted negotiations on behalf of for the AAF investment deal. (*Id.*, Ex. 15).

Ebersol and Dundon spoke about the deal for the first time on February 13, 2019. (*Id.*, Ex. 23 at 212). The parties disputed the amount of capital required to stabilize AAF's finances. (*Id.*, at 232). Ebersol intimated to Dundon that a bridge loan of $10 million was necessary in the short term because the league needed an immediate $5.1 million monetary infusion to pay players and other expenses for the first week of games. (ECF No. 120, Ex. A). Later that day, Ebersol forwarded marketing materials to Dundon, including an investor deck, financial projections, and other documents for the league. (ECF No. 124, Ex. 3). After DCP conducted brief due diligence on the information Ebersol provided, Dundon, as a representative of DCP, agreed to cover the immediate payroll and expenses in exchange for majority control of ESMG.[2] (*Id.*, Ex. 28, at 160).

To help facilitate the parties' deal, John Zutter ("Zutter"), a partner of DCP, sent a draft term sheet ("Term Sheet") to Ebersol. (*Id.*, Ex. 6). The Term Sheet provided that DCP would fund an initial amount of $5.1 million and approve additional funding requests up to $70 million. (*Id.*, Ex. 1). The Term Sheet also stated that DCP would receive governance control of ESMG and 75 percent of ESMG's fully diluted capital stock. (*Id.*). The parties exchanged several variations of the Term Sheet, changing the funding amount and percent ownership DCP would take in ESMG. (*Id.*, Ex. 6). Each copy of the Term Sheet contained two identical provisions which required DCP pay the initial funding amount to ESMG and that both parties sign the Term Sheet to create a

---

[2] In a related adversary proceeding, Dundon disputes the max amount of money DCP agreed to inject into AAF. There, the Trustee alleges that DCP agreed to a total $250 million and that the $70 million listed in the Term Sheet was only part of the investment deal. (Adv. Case No. 22-05078, ECF No. 1).

binding agreement. (*Id.*). On February 14, 2019, Ebersol was the only party to sign the final iteration of the Term Sheet.[3] (*Id.*, Ex. 1).

Thereafter, ESMG received the initial funding from DDFS Partnership, LP ("DDFSP"), not DCP. (Def. Ex. K). On February 24, 2019, ESMG's board members formally approved the Term Sheet, confirming receipt of $12 million as of that date. (ECF No. 124, Ex. 4). Dundon and Zutter then took positions on ESMG's board of directors and began directing ESMG and the AAF. (*Id.*, Ex. 18). Despite this change in control of ESMG, no stock was ever issued or conveyed to DCP. (ECF No. 158, at 54). Throughout the following weeks, DDFSP wired a total of $69,966,695 to ESMG for the league. (ECF No. 124, Ex. 31) (showing capital loss from DDFSP passed through to Dundon individually).

Nevertheless, the significant value of capital injected by DDFSP did not resolve the AAF's financial issues, causing the AAF and its associated corporate entities to file for bankruptcy protection on April 17, 2019. (Bankr. Case No. 19-50900, ECF No. 1). The entities' bankruptcy cases were later consolidated. Thereafter, DCP initiated this adversary proceeding against Ebersol on November 14, 2022. (ECF No. 1).

DCP's complaint consists of three counts—fraudulent inducement, securities fraud, and statutory fraud. (ECF No. 1). The complaint alleges that Ebersol made various misrepresentations through omissions about the true financial standing of the AAF by not fully disclosing bills that were due at the time DCP allegedly made its investment. (*Id.* at 14–18). Furthermore, DCP claims Ebersol lacked authority to execute a contract to issue stock on behalf of ESMG or change the

---

[3] The parties previously used an email confirmation from DocuSign that indicated all parties executed the Term Sheet to prove that the Term Sheet was signed. (ECF No. 124, Ex. 1). Through discovery, however, DocuSign confirmed that it never received Dundon's signed version and no party claims to have seen a Term Sheet with both parties' signatures. (Def. Ex. I). The only version of the Term Sheet in evidence before the Court displays Ebersol's signature alone.

makeup of its board of directors. (*Id.*). As a result of these alleged misrepresentations, DCP claims Ebersol caused DCP to enter the Term Sheet to DCP's detriment. (*Id.* at 2). Accordingly, DCP alleges its damages are $70 million. (*Id.* at 18). After conducting discovery, Ebersol filed the present Motion for Summary Judgment on December 13, 2024. (ECF No. 102).

THE PARTIES' ARGUMENTS

Ebersol's Motion for Summary Judgment requests the Court dismiss this case for three primary reasons: (1) because DCP lacks Article III standing based on an absence of injury in fact; (2) because DCP did not justifiably rely on Ebersol's alleged misrepresentations to maintain a cause of action for common law and statutory fraud; and (3) because two of DCP's claims require a conveyance of stock and no stock was transferred to DCP. (*Id.*).

DCP responded, alleging that it possessed standing because it lost $70 million dollars and was a party to the Term Sheet. (ECF No. 124, at 18). To support this position, DCP argues that its signature under the Term Sheet was not a condition to creating a binding contract. (ECF No. 158, at 71). Further, DCP claims all monies paid to ESMG were owned by DCP because they were merely held by DDFSP for management purposes. (ECF No. 124, at 23). As to reliance, DCP asserts that it justifiably relied despite a lack of due diligence because there was insufficient time to properly review ESMG's finances due to the league's need for immediate funding. (ECF No. 158, at 68). Finally, DCP alleges that stock does not need to be transferred for a cause of action for securities or statutory fraud to arise. Rather, an attempt to transfer is sufficient. (ECF No. 124, at 24).

ANALYSIS

## I.    DCP Lacks Standing

The first argument in Defendant's Motion alleges that DCP lacks Article III standing to

7

maintain this adversary proceeding. (ECF No. 102, at 9). Article III standing requires a plaintiff show "(1) an 'injury in fact' that is (2) 'fairly traceable' to the 'conduct complained of' and that is (3) likely redressable by a favorable court decision." *Earl v. Boeing Co.*, 53 F.4th 897, 901 (5th Cir. 2022) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Because Ebersol only disputes the first element, the Court focuses on whether there is an injury in fact pled. (ECF No. 102, at 10–15).

The Supreme Court has held an injury is sufficient for Article III standing when the injury is "concrete" or "real, and not abstract." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021). In Texas, a "[p]laintiff does not lack standing simply because he cannot prevail on the merits of his claim; he lacks standing because his claim of injury is too slight for a court to afford redress." *Wallace v. Perry (In re Perry)*, 423 B.R. 215, 253 (Bankr. S.D. Tex. 2010) (citing *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008)). The party whose "primary legal right has been breached" has standing under a contract. *Id.*

Here, Ebersol argues DCP was not injured for two reasons. First, Ebersol claims the Term Sheet never created a binding contract because DCP failed to sign it. (ECF No. 138, at 8–9). According to Ebersol, DCP's signature was a condition precedent to forming a contract that DCP can seek relief under. (*Id.*). Secondly, Ebersol claims that DCP was not damaged because DDFSP was the entity that paid roughly $70 million allegedly under the Term Sheet. (ECF No. 102, at 10–15). As such, Ebersol contends DCP lacks an injury in fact to satisfy the requirements of Article III. (*Id.*).

DCP counters that it has standing because DCP owns the claims. (ECF No. 124, at 18). DCP contends that executing the Term Sheet by signature was not a condition precedent and when DDFSP sent the initial funding amount, DCP created a binding contract with ESMG. (ECF

No. 158, at 71). As such, DCP asserts that it is a party to the Term Sheet, stands to gain the benefit under the Term Sheet, and thus has a right to sue under the Term Sheet. (ECF No. 124, at 19). Further, DCP argues that DDFSP sent money to fulfill DCP's obligation and everyone accepted the payments as such. DCP claims DDFSP was authorized to make these payments because DDFSP operated as a treasury for the Dundon-related entities. (*Id.* at 23).

Accordingly, there are two primary issues the Court must assess to determine whether DCP has standing—(1) whether DCP's signature on the Term Sheet was a condition precedent to forming a binding contract and (2) whether DCP suffered an injury even though DCP never paid money pursuant to the Term Sheet. The Court addresses these issues in turn.

   a.  *The Term Sheet is Not a Binding Written Contract as a Matter of Delaware Law because DCP Failed to Sign it.*

Despite both parties presenting Texas case law on the issue of contract construction, validity, and enforcement, the Term Sheet states such issues shall be determined in accordance with Delaware law. (ECF No. 124, Ex. 1). The Court similarly applied Delaware law in a related adversary proceeding for the same Term Sheet at issue here. (Adv. Case No. 22-05078, ECF No. 54). Accordingly, the Court applies Delaware law to determine whether the parties' signatures were a condition precedent to creating an enforceable contract.

In Delaware, the "primary goal in contract interpretation is to fulfill, as nearly as possible, the reasonable shared expectations of the parties at the time they contracted." ***Schwartz v. Chase***, No. 4274, 2010 WL 2601608, at *13 (Del. Ch. June 29, 2010). "Delaware adheres to the objective theory of contracts and, [a]lthough the law . . . generally strives to enforce agreements in accord with their makers' intent, [this theory] considers objective acts (word, acts and context) the best evidence of that intent." ***Id.*** at 14–15 (internal quotations omitted). A contract will generally be

9

found when the parties' "objective conduct demonstrates, 'an offer, acceptance, and consideration.'" *Astellas Pharma Inc. v. MSN Pharms Inc.*, No. 23-689, 2025 WL 254577 at *7 (D. Del. Jan. 21, 2025) (citing *Trexler v. Billingsley*, 166 A.3d 101 (Del. 2017)).

Accordingly, "a signed and executed agreement is not a prerequisite for contract formation." *Id.* Delaware courts are "inclined toward finding the formation of a contract prior to the signing of the document unless the parties pretty clearly show that such a signing is a condition precedent to legal obligation." *Annand v. Brookmeade, Inc.*, No. 5009, 1979 WL 4640, at *13 (Del. Ch. Sep. 18, 1979). Delaware Courts refer to the creation of a signature condition precedent as a "positive agreement"[4] which is an agreement between the parties that "there will be no binding contract until the formal document is executed." *Loppert v. Windsortech, Inc.*, 865 A.2d 1282, 1287 (De. Ch. 2004). If the parties have a positive agreement, "no binding contract will arise until the conditions specified have occurred or been performed." *Lockwood v. Capano*, 105 A.3d 989, 989 (Del. 2014).

Ebersol claims the first paragraph of the Term Sheet is a positive agreement requiring representatives from both DCP and ESMG to sign the Term Sheet before it can be enforced. That paragraph provides:

> This Binding Term Sheet shall be a binding agreement of the signatories below enforceable by one party against the other, as set forth below, upon the company's (as defined below) receipt of the Initial Funding Amount (as defined below) by 2 pm PST on February 14, 2019 and each party hereto executing this Binding Term Sheet.

(ECF No. 124, Ex. 1). This paragraph is also repeated toward the end of the agreement. *Id.* Ebersol argues these provisions require two conditions precedent—(1) paying funds by a date certain and

---

[4] "Positive is defined as follows: Laid down, enacted, or prescribed. Express or affirmative. Direct, absolute, explicit." *Loppert v. Windsortech, Inc.*, 865 A.2d 1282, 1287 (Del. Ch. 2004) (internal quotations omitted) (quoting BLACK'S LAW DICTIONARY 1324 (4th ed. 1968)).

(2) executing the Term Sheet. According to Ebersol, this is a positive agreement. Nevertheless, DCP asks the Court to ignore these provisions because all parties acted like a contract existed. Under DCP's view, the conduct of the parties negates any signature requirement. Thus, the question before the Court is "whether the [p]arties positively agreed that there [would] be no binding contract until execution, either by both sides or by the Defendant." *Brady v. Huber*, No. 2019-0204, 2023 WL 3736371, at *16 (Del. Ch. May 31, 2023). "The intent of the parties is generally a question of fact." *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 155 (Del. 1998).

This test was applied in *Transamerican S.S. Corp v. Murphy* where the Court of Chancery of Delaware found a positive agreement between the parties to require the parties' signatures before being bound to a settlement agreement. No. 10511, 1989 Del Ch. LEXIS 13, at *7 (Del. Ch. Feb. 14, 1989). There, parties negotiated a settlement agreement and ultimately reached an agreement "upon all the substantive terms of a contract." *Id.* at *7. The court found, however, no binding contract because the parties made it "plain that they were not consenting to be bound by a contract until a writing, evidencing their agreement was executed." *Id.* at *1. According to the court, a party's insistence upon a writing was material to the creation of a binding contract and constituted a positive agreement that such writing would be signed before it became enforceable. *Id.* at *7; *see also* *Riblett v. Riblett*, No. 12786, 2018 WL 1352329, at *3 (Del. Ch. Mar. 15, 2018) (declining to enforce verbal agreements where the parties' mediation agreement required settlement agreements to be reduced to a signed writing).

An "observation that the parties manifested an intention that the . . . agreement would be memorialized in writing," however, is not enough to evidence a positive agreement to require signatures as a condition precedent. *Loppert*, 865 A.2d at 1288. For example, in *Brady v. Huber*, the Chancery Court of Delaware found an enforceable contract despite a lack of execution because

the only indication of a signature condition precedent "was in the final acceptance email" where "Defendant accepted the terms verbally, and just needed to sign." 2023 WL 3736371, at *18. Thus, if "the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract." ***Universal Prods. Co. v. Emerson***, 36 Del. 553, 569 (1935).

In this case, the words of the Term Sheet are clear. The document would be binding "upon" (1) DCP paying funds by a date certain and (2) executing the Term Sheet.[5] Under Delaware law, "to execute" is generally synonymous with "to sign."[6] *See **Brady***, 2023 WL 3736371 (using the word execute interchangeably with sign); ***Astellas Pharma Inc.***, 2025 WL 254577 (providing same). The provision in the Term Sheet does not merely define the effective date but creates additional requirements for enforceability. ***Brady***, 2023 WL 3736371, at *19 (finding the parties' request for a signature to be "a courtesy explanation that a signed document was forthcoming" rather than an additional requirement). "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions." ***Manti Hldgs., LLC v. Authentix Acq. Co.***, 261 A.3d 1199, 1208 (Del. 2021). While the intent of the parties is generally a question of fact for trial, the unambiguous words in Term Sheet here require a signature from a representative of DCP to create a binding contract between the parties. Accordingly, the Court declines to consider the parties subsequent conduct because DCP failed to execute the Term Sheet.

This is further supported by the parties' dispute about the amount DCP intended to invest,

---

[5] Under Delaware law, there "are no particular words that must be used to create a condition precedent," but "a condition precedent must be expressed clearly and unambiguously." ***Murphy Marine Servs. of Del. v. GT USA Wilm., LLC***, No. 2018-0664, 2022 WL 4296495, at *28 (Del. Ch. Sep. 19, 2022). "Parties' intent to set a condition precedent to performance may be evidenced by" a phrase that connotes an "intent for a condition rather than a promise." ***Id.*** (internal quotations omitted).

[6] This is contrary to the approach in Texas, where "execute" can mean more than "sign." ***Gaskins v. Navigator Oil & Minerals, Inc.***, 670 S.W.3d 391, 405 (Tex. App.—Eastland 2023, pet. denied) ("The term 'execute' is not limited to only mean 'sign.'"). Because the Court is required to interpret the Term Sheet under Delaware law, however, the Court interprets the two words to mean the same thing.

12

suggesting the parties did not have a meeting of minds before the agreement was put into writing and signed. In an email sent on February 13, 2019 (one day before the Term Sheet was purportedly executed), Ebersol lists the initial value of bridge loan to be $10 million. (ECF No. 124, Ex. 3). The next day, representatives from both parties continued to exchange emails and drafts of the Term Sheet concerning significant provisions such as funding amounts and the percentage ownership DCP would take in ESMG. (ECF No. 124, Ex. 6). These exchanges indicate the parties lacked a meeting of minds before the creation of the final draft. Additionally, each iteration retained the signature condition precedent and reflected a deadline for the initial funding amount to be deposited, revealing the provision was material to the deal and not boilerplate language. (*Id.*) Thus, the Term Sheet was not merely a convenient memorial of the parties' agreement, it was intended to serve as a binding contract when executed. As such, the Court concludes the signature provision was material to the parties' agreement and required execution by each side.

Because DCP failed to sign the Term Sheet, the Court finds that there is no binding written contract to provide DCP with standing to pursue this case. Additionally, DCP did not plead in its complaint or raise in its opposition to the Motion for Summary Judgment any potential defense to its failure to sign the Term Sheet or provide an alternative avenue for the Court to find a binding agreement. *Ali v. Coupe*, No. 15-1089, 2019 WL 6877906, at *11 (D. Del. Dec. 17, 2019) (citing *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.")); *see also Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005) (providing same). Rather, DCP staunchly took the position that there was a written and signed contract. As such, the Court finds that there was no binding written contract in this case.

  b. *DCP Cannot Prove Injury in Fact Because DCP Was Not the Party that Paid ESMG.*

While DCP may not rely on a contract to prove injury in fact, the Court must nevertheless determine if DCP can claim an injury in the form of money paid to ESMG. Ebersol argues that DCP lacks standing because DDFSP was the entity that paid roughly $70 million and thus DDFSP was the entity that suffered any alleged loss. (ECF No. 102, at 10–15). DCP counters that DDFSP played a treasury management function for the Dundon-related entities. (ECF No. 124, at 23). Because of this function, the money nevertheless was owned by DCP even though it originated from DDFSP. (*Id.*). According to DCP, the authorization for such an arrangement was evidenced by common ownership of the various entities. (*Id.*). Furthermore, DCP claims that because it was the party that stood to gain a benefit from the money, DCP has standing to bring a claim to recoup that money. (*Id.*).

The parties' arguments turn on issues of agency law. The general rule in Texas is "that one who contracts as an agent cannot maintain an action, in his own name and right, upon the contract." ***Tinsley v. Dowell***, 87 Tex. 23, 27–28 (1894). There are four exceptions to this rule:

> [F]irst, where the agent contracts in his own name; second, where the agent does not disclose his principal, who is unknown; third, where by the usages of trade the agent is authorized to act as owner of the property; fourth, where the agent has an interest in the subject matter of the contract, and in this case whether he professed to act as agent or not.

***Id.*** Because the Court finds that there is no contract, DCP cannot prevail under the first or fourth exception to the general rule.[7] *See **Id.*** ("To bring the case within the first exception, it must be held that this was Dowell's personal contract."). Similarly, DCP cannot prevail under the second

---

[7] DCP argued that the Court should follow ***Kakabadze v. M5 Int'l Co.***, where the court found that the plaintiff could maintain his action (even though his principals ultimately paid for his losses), because the plaintiff contracted in his own name. No. h-12-3701, 2014 WL 2547767, at *15 (S.D. Tex. 2014). Such a reasoning is inapplicable here because the Court finds there was no written contract between the parties.

exception because there was no allegation that DDFSP was not disclosed as an alleged principal, and the summary judgment evidence indicates that all parties were aware DDFSP was involved in paying funds to ESMG. Accordingly, DCP must fall under the third exception to have standing to maintain this case.

"The exception [is] applicable where the agent is authorized to act as the owner of the property [and] arises frequently by virtue of the custom or usages of the particular trade involved." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 260 (5th Cir. 1980). The Fifth Circuit considered this exception in *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.* and explained that the third exception requires "an additional aspect of the relationship, by reason of which the agent . . . may sue in his own name: as a party to the contract by virtue of being owed a performance." *Id.* There, the court found the exception applicable to the plaintiff because the plaintiffs were "authorized to collect payment" on behalf of their principals and "from those proceeds withhold reimbursement for any and all advances and charges arising from that agreement." *Id.* at 259. Although the principals were ultimately entitled to the purchase price under the contract, the plaintiffs were entitled to sue in their own name because "they had a beneficial interest by virtue of their advancements to their principals." *Id.*

In the instant case, DCP alleges a beneficial interest in the money paid by DDFSP by virtue of DDFSP's treasury management role for the Dundon-related entities. (ECF No. 124, at 20). To support this claim, DCP points to deposition testimony of Jeffery James Vanderbilt ("Vanderbilt") who testified on behalf of DCP as DCP's CFO. (ECF No. 124, Ex. 30). Vanderbilt explained that there was no formal agreement between DCP and DDFSP outlining the funding relationship for the investment, but claimed he did not believe one was necessary for such a relationship. (*Id.*). Instead, Vanderbilt stated the authorization for DDFSP's arrangement is evidenced by common

ownership and control of the Dundon-related entities. (*Id.*).

Ebersol countered that DDFSP was not paying on behalf of DCP because DDFSP reflected the investment loss on its tax forms, not DCP. (ECF No. 102, at 14). According to Vanderbilt, however, the entities were pass-through entities for federal tax purposes, meaning tax obligation and benefits are ultimately part of the individual tax return of the owner. (ECF No. 124, Ex. 31). Because DDFS and DCP are both partnerships, DCP claims that neither entity pays federal taxes or takes deductions. (*Id.*). Rather, income losses ultimately show up on the individual tax return for their owners. (*Id.*). This is supported by Dundon's individual tax return. (*Id.*).

Without more, the allegations that DDFSP operated as a treasury fails raise a fact issue concerning whether DCP had a legal right or interest in the money paid by DDFSP. Despite Vanderbilt denying that a written agreement is necessary for the entities' relationship, DCP cites no case law to help substantiate that claim or prove that a limited partnership can operate as a treasury. Even assuming no written agreement is necessary, DCP provides no evidence beyond Vanderbilt's testimony to support DDFSP's role as a treasury for the Dundon-related entities. There is no evidence of an agreement that DDFSP held money on behalf of DCP or how DCP would entrust money to DDFSP for DDFSP to manage.

There is not enough evidence to raise an issue of material fact on the issue of injury in fact for consideration of DCP's standing at trial. Rather, the uncontradicted evidence shows DDFSP paid ESMG and DDFSP took the loss, not DCP. Therefore, the Court finds DCP lacks an injury in fact under Article III and Ebersol's Motion for Summary Judgment is granted accordingly.

## II.     Even if DCP Had Standing, Summary Judgment is Appropriate.

a.  *DCP's Fraudulent Inducement Claim Fails Because No Contract Exists and Evidence Negates Justifiable Reliance as a Matter of Law.*

Count one in DCP's complaint requests relief for fraudulent inducement. (ECF No. 1, at 14–16). Ebersol argues that DCP lacks evidence to support this claim. (ECF No. 102, at 18–19). As the name implies, a claim for fraudulent inducement includes fraud which requires Plaintiff prove:

> (1) (a) a misrepresentation or (b) a concealment;(2) which is material to the transaction at hand; (3) (a) made with knowledge of its falsity or recklessness as to whether it is true or false (for a misrepresentation), or (b) calculated to deceive (for a concealment); (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by such reliance.

*SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 197 (3d Cir. 2022); *see also Tex. Architectural Aggregate, Inc. v. ACM-Texas, LLC (In re ACM-Texas, Inc.)*, 430 B.R. 371, 418 (Bankr. W.D. Tex. 2010) (applying the same standard).

Fraudulent inducement, however, is a specific kind of fraud that generally requires a plaintiff also prove the existence of a contract. *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). Because the Court found no contract existed, the Court finds summary judgment appropriate on DCP's fraudulent inducement claim.

Even if the Term Sheet formed a binding contract, Ebersol argues that DCP did not justifiably rely on any representations or omissions made by Ebersol. (ECF No. 138, at 17). Ebersol bases his argument on the fact that DCP failed to undertake any diligence before allegedly entering the Term Sheet. (*Id.* at 18). DCP, on the other hand, contends that its failure to undertake due diligence was caused by the urgency of the deal. (ECF No. 158, at 68). The Court finds this excuse unavailing.

"Justifiable reliance implies a duty upon the party to whom the representation is made to exercise ordinary and reasonable due diligence to protect their own interests." *Artho v. Happy State Bank (In re Artho)*, 587 B.R. 866, 884 (Bankr. N.D. Tex. 2018). The Fifth Circuit has explained "that reliance is not shown if based on the 'plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part." *Anarkali Enters. v. BP Chaney, LLC*, No. 4:18-cv-00796, 2019 WL 5537241, at *19 (N.D. Tex. 2019) (quoting *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 474 (5th Cir. 2018)). Thus, while justifiable reliance is "usually a question of fact," "the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *N. Cypress Med. Ctr. Operating Co., Ltd.*, 898 F.3d at 474.

"In determining whether justifiable reliance is negated as a matter of law, courts 'must consider the nature of the [parties'] relationship and the contract.'" *BMC Software, Inc. v. IBM*, No. H-17-2254, 2022 WL 1733106, at *142 (S.D. Tex. 2022). A failure to exercise due diligence "is not excused by mere confidence in the honesty and integrity of the other party." *Nat'l Prop. Holdings, L.P. v. Westergran*, 453 S.W.3d 419, 425 (Tex. 2015). In the absence of reasonable diligence, the plaintiff is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person reasonably situated." *AKB Hebdrick, LP v. Musgrave Enters.*, 380 S.W.3d 221, 232 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.).

ESMG and DCP are sophisticated entities with experience and knowledge in investment schemes. Importantly, the transaction at the heart of this case was no small deal. The Term Sheet listed a cost of up to $70 million and required an initial investment of $5.1 million.[8] (ECF No. 124,

---

[8] In a related adversary, there is a dispute that the investment was in fact for $250 million.

Ex. 1). "[W]orld-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 656 (Tex. 2018). The main red flag here was that all parties knew the league was in dire need of funding to maintain operations. (ECF No. 124, Ex. 25 at 68, 82, 83, 85). DCP agreed to the investment deal understanding that the AAF's financial position was poor.

Dundon, as an owner of another professional sports team, understood the risks of running a league such as the AAF. (*Id.* at 87–89). He admitted that no financial due diligence was completed but claimed that it was not an option based on the urgency of the deal. Instead of reviewing documents to confirm any questions about the league, Dundon relied solely on the assumptions he came to during conversations with Ebersol. Dundon knew a sports team needed to pay for certain services and admitted that he assumed all bills were current. (ECF No. 124, Ex. 25, at 88–89). Nevertheless, DCP stated in the moving papers that it discovered the true financial condition of the league shortly after making its investment. (ECF No. 124, at 13). This suggests that despite the short time frame to accept ESMG's offer, DCP could have performed enough diligence to discover the financial issues it complains Ebersol failed to disclose or misrepresented. Moreover, there was no requirement that DCP make the investment. Dundon did express a concern about losing the opportunity to be a part of the new league if DCP did not agree to the investment, but Dundon's testimony shows that he merely assumed the AAF would cease without immediate additional funding. (*Id.*, Ex. 25 at 86). In fact, emails from Zutter indicate DCP intended to more "fullsome diligence" after the immediate needs of AAF were meet, revealing DCP was prepared to run the risk that Ebersol's statements may not have been accurate. (*Id.*, Ex. 6).

Moreover, this was an arm's-length transaction. *See Arm's-Length Transaction*, BLACK'S LAW DICTIONARY (6th ed. 1990) ("Said of a transaction negotiated by unrelated parties, each acting in his or her own self-interest."). "The fact that negotiations took place at arm's length to create an agreement . . . has been held to be a red flag when analyzing justifiable reliance." ***Ly v. Maya Walnut LLC***, No. 05-21-01140, 2024 WL 260761, at *18 (Tex. App. Dallas Jan. 24, 2024, pet. filed). ESMG and DCP have not previously executed deals with one another, and the evidence shows that neither have their representatives. There was no reason for DCP to trust Ebersol's statements based on previous dealings. Rather, Dundon placed trust in Ebersol's statements based on Ebersol's title as CEO of ESMG.

Given DCP's characteristics, abilities, and appreciation of facts and circumstances, "it is extremely unlikely that there is actual reliance" on Ebersol's statements or omissions. *See **Ly v. Maya Walnut LLC***, No. 05-21-01140, 2024 WL 260761, at *16 (Tex. App. Dallas Jan. 24, 2024, pet. filed). Accordingly, the Court finds that even if the Term Sheet formed a binding contract between the parties, DCP's claim for fraudulent inducement fails as a matter of law because there was no justifiable reliance on any alleged misrepresentation made by Ebersol.

      b.   *DCP's Securities Fraud Claim Fails as a Matter of Law Because no Stock was Conveyed.*

Count two in DCP's complaint requests relief under section 33 of the Texas Securities Act ("TSA") which "establishes a cause of action for misrepresentations or omissions made in connection with a securities transaction." ***Kubbernus v. ECAL Partners, Ltd.***, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The TSA provides:

> A person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which that are made, not misleading, is liable to the person buying the security from him, who may sue

20

either in law or in equity for rescission, or for damages if the buyer no longer owns the security.

TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2).

The parties dispute whether DCP is required to demonstrate that an actual sale of securities occurred. Ebersol argues that a sale under the TSA requires an actual transfer of stock.[9] (ECF No. 102, at 17). On the other hand, DCP believes Ebersol's offer to sell stock is sufficient to fall in the purview of the Act. (ECF No. 124, at 27). Importantly, both parties agree that no stock of ESMG was transferred to DCP. (ECF No. 158, at 54). Thus, the question before the Court is legal rather than factual.

Ebersol is correct that the TSA contemplates an actual transfer of stock to the buyer before a seller becomes liable under the TSA. "Although the statute uses the language 'attempt to sell' and 'offer to sell' in its definition section, 'it is clear that article 581-33(1)(2) contemplates that the sale must have been effected because the buyer may sue either at law or in equity for rescission, or for damages.'" *Chase v. Hodge*, No. 1: 20-cv-0175, 2021 WL 1948470, at *27 (W.D. Tex. 2021). The phrase "one who offers" to sell refers to the individuals who are subject to liability for misrepresentations in connection with the actual sale of securities such as third parties and representatives. *See Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384, 2022 WL 179609, at *23–24 (N.D. Tex. 2022) (identifying various actors that qualify as a seller under the TSA even though they are not "the person who actually passes title to the security"). It does not imply that an action will lie where no transfer occurred, but rather contains broad language to reach a larger group of people when there is a conveyance. *Id.*

Because there is no dispute that no securities were transferred to DCP, DCP's claim for

---

[9] "[S]tock is a security even when purchased pursuant to a contract requiring the purchaser to participate in management of the company." *Adena Expl., Inc. v. Sylvan*, 860 F.2d 1242, 1254 (5th Cir. 1988).

relief under the TSA fails as a matter of law. Even if DCP had standing, summary judgment on count two in DCP's complaint is appropriate.

### c. *DCP's Statutory Fraud Claim Fails Because No Stock was Conveyed.*

Count three in DCP's complaint seeks relief under section 27 of the Texas Business and Commerce Code ("TBCC") which provides redress for fraud "in a transaction involving real estate or stock in a corporation." TEX. BUS. & COM. CODE § 27.01. "The elements of statutory fraud under section 27.01 are essentially identical to the elements of common law fraud except that the statute does not require proof of knowledge or recklessness as a prerequisite to the recovery of actual damages." ***Megatel Homes, LLC v. Moayedi***, No. 3:20-CV-00688, 2021 WL 5325919, at *25 (N.D. Tex. 2021) (quoting ***Brush v. Reata Oil & Gas Corp.***, 984 S.W.2d 720, 726 (Tex. App.— Waco 1998, pet. denied)).

The parties' arguments on statutory fraud are identical to the arguments made for securities fraud. Thus, the issue is whether the TBCC requires the actual conveyance of stock to maintain an action under section 27.01. The law is clear—"[n]umerous cases . . . hold that an actual conveyance of stock must occur in order for there to be an actionable claim under the statute." ***Ginsburg v. ICC Holdings, LLC***, No. 3:16-CV-2311, 2017 WL 5467688, at *57 (N.D. Tex. 2017). The Fifth Circuit has explained that a narrow reading of section 27.01 "is consistent with the Supreme Court of Texas' interpretation that the statute is penal in nature and thus must be strictly construed." ***U.S. Quest, Ltd. v. Kimmons***, 228 F.3d 399, 406 (5th Cir. 2000); *see also* ***Gin v. NCI Bldg. Sys.***, 472 S.W.3d 802, 823(Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Courts have 'strictly' interpreted this requirement, holding that for fraud in a transaction to be actionable under section 27.01, the contract must 'actually effect conveyance' of real estate or stock between the parties . . . .").

Here, there is neither a contract nor actual conveyance of stock for DCP to maintain statutory fraud under section 27.01. Accordingly, even if DCP had standing, count three in DCP's Complaint fails as a matter of law.

## CONCLUSION

Because the Term Sheet fails to create a binding written contract as a matter of Delaware law and because DCP lacks an injury in fact, the Court finds DCP lacks Article III standing. Furthermore, DCP's Original Complaint fails as a matter of law because DCP cannot show justifiable reliance on any alleged misrepresentation made by Ebersol and because no stock was conveyed to DCP.

It is therefore **ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 102) is **GRANTED**.

# # #