UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


| | | |
|---|---|---|
| DUNDON CAPITAL PARTNERS, LLC, | ) | CASE NO: 22-05077-cag |
| | ) | ADVERSARY |
| Plaintiff, | ) | |
| | ) | San Antonio, Texas |
| vs. | ) | |
| | ) | Wednesday, January 15, 2025 |
| CHARLES EBERSOL, ET AL, | ) | |
| | ) | 1:41 p.m. to 4:50 p.m. |
| Defendants. | ) | |
| RANDY OSHEROW, IN HIS CAPACITY | ) | |
| AS CHAPTER 7 TRUSTEE, ET AL, | ) | |
| | ) | |
| Plaintiffs, | ) | CASE NO: 22-05078-cag |
| vs. | ) | ADVERSARY |
| | ) | |
| THOMAS G. DUNDON, ET AL, | ) | |
| | ) | |
| Defendants. | ) | |

LEAD CASE: 19-50900-cag
LEGENDARY FIELD EXHIBITIONS, LLC
AND AAF PROPERTIES, LLC


MOTIONS HEARING

BEFORE THE HONORABLE CRAIG A. GARGOTTA,
CHIEF UNITED STATES BANKRUPTCY JUDGE


CALENDARED MOTIONS:        SEE PAGE 2

APPEARANCES:        SEE PAGES 2, 3

Deputy Clerk:        Roxanne Mujica

Court Recorder:        Danny Paez

Transcribed by:        Exceptional Reporting Services, Inc.
P.O. Box 8365
Corpus Christi, TX 78468
361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**CALENDARED MOTIONS:**</u>

<u>**RE 22-05077-cag**</u>:

**MOTION FOR LEAVE TO DESIGNATE RESPONSIBLE THIRD PARTY
(THOMAS DUNDON) [DKT.NO.96];**

**MOTION TO STRIKE DOCUMENT [DKT.NO.118]**

<u>**RE 22-05078-cag**</u>

**EMERGENCY MOTION TO STRIKE, AND IN THE ALTERNATIVE,
MOTION FOR CONTINUANCE [DKT.NO.184]**

<u>**APPEARANCES**</u>:

| | |
|---|---|
| For Charles Eberson: | TOM HORAN, ESQ.<br>Thompson Coe Cousins & Irons<br>700 N. Pearl Street<br>Suite 2500<br>Dallas, TX 75201<br>214-871-8241 |
| | MICHAEL J. SALTZ, ESQ.<br>Jacobson Russell Saltz Nassim, et al.<br>1800 Century Park East<br>Suite 900<br>Los Angeles, CA 90067<br>310-446-9900 |
| For Chapter 7 Trustee: | BORIS TREYZON, ESQ.<br>Abir Cohen Treyzon Salo<br>16001 Ventura Boulevard<br>Suite 200<br>Encino, CA 91436<br>424-288-4367 |
| | BRIAN S. ENGEL, ESQ.<br>Barrett Daffin Frappier Turner & Engel<br>3809 Juniper Trace<br>Suite 205<br>Austin, TX 78738<br>512-687-2500 |

3

<u>**APPEARANCES**</u>:            CONTINUED

For Chapter 7 Trustee:    NICOLE WILLIAMS, ESQ.
                          Thompson Coburn
                          2100 Ross Avenue
                          Suite 3200
                          Dallas, TX 75201
                          972-629-7113

                          JONATHON S. FARAHI, ESQ.
                          Abir Cohen Treyzon Sala
                          16001 Ventura Boulevard
                          Suite 200
                          Encino, CA 91436
                          424-288-4367

For DCP Parties:          JEFFREY S. LOWENSTEIN, ESQ.
                          TROY L. HALES, II, ESQ.
                          Bell Nunnally & Martin
                          2323 Ross Ave.
                          Suite 1900
                          Dallas, TX 75201
                          214-740-1410

                          BRENT D. HOCKADAY, ESQ.
                          K&L Gates
                          1717 Main St.
                          Suite 2800
                          Dallas, TX 75201
                          214-939-5677

4

1      **San Antonio, Texas; Wednesday, January 15, 2025; 1:41 p.m.**

2                                  --oOo--

3          **THE COURT:**  Adversary 22-05077, *Dundon Capital*

4   *Partners, LLC versus Ebersol*.

5          We have set this afternoon ECF Number 96, the motion

6   for leave to designate responsible third-party filed by

7   Defendant Ebersol; ECF Number 118, a motion to strike document

8   filed by counsel for Dundon Capital Partners.

9          And on page three, Adversary 22-05078, *Osherow as*

10  *Chapter 7 Trustee versus Dundon, et al*.  ECF Number 184, the

11  emergency motion to strike or, in the alternative, motion for

12  continuance.

13         I'll take appearances now, please.

14         **MR. TREYZON:**  Good afternoon, Your Honor.  Boris

15  Treyzon for Randy Osherow, the Trustee.

16         **MR. SALTZ:**  Good morning, Your Honor.  Michael Saltz

17  on behalf of Charlie Ebersol.

18         **MR. HORAN:**  Your Honor, Tommy Horan on behalf of

19  Charlie Ebersol.

20         **MR. ENGEL:**  Good afternoon, Judge.  Brian Engel,

21  E-N-G-E-L, for the Trustee today but probably most likely just

22  a witness.

23         **MS. WILLIAMS:**  Your Honor, Nicole Williams, also for

24  the Trustee.

25         **MR. FARAHI:**  Good afternoon, Your Honor.  Jonathan

5

1   Farahi for the Trustee.

2           **MR. HOCKADAY:**  Good afternoon, Your Honor.  Brent

3   Hockaday on behalf of Dundon Capital Partners, Tom Dundon, and

4   John Zutter.

5           **MR. LOWENSTEIN:**  Good afternoon, Your Honor.  Jeff

6   Lowenstein for Dundon Capital Partners, Tom Dundon, and John

7   Zutter.

8           **THE COURT:**  Thank you.

9           **MR. HALES:**  Good afternoon, Your Honor.  Troy Hales

10  on behalf of the same partners as Mr. Lowenstein.

11          **THE COURT:**  I didn't get your last name, I'm sorry.

12          **MR. HALES:**  Troy Hales, Your Honor.

13          **THE COURT:**  Could you spell that, please?

14          **MR. HALES:**  Yes, Your Honor.  It's H-A-L-E-S.

15          **THE COURT:**  It's like it sounds.  I just want to make

16  sure I got it.

17          Did we pick up everybody all right?  Okay.  Very

18  good.  Okay.

19          So thank you for the appearances.  I don't know

20  necessarily if there's any rhyme or reason to which one that

21  you all want to start with first.

22          But I think the Court's preference would be let's

23  deal with the third-party request to designate responsible

24  third-party first.

25          Then of course I'll hear the motion to strike

6

1    document.  We'll deal with that, then we'll move on to the

2    other matters.

3            So who am I going to hear from first on behalf of the

4    Movant under 96?

5            **MR. HORAN:**  Your Honor, that would be me, Tom Horan.

6            **THE COURT:**  All right.  Come forward, please.  I know

7    how to spell your name but would you spell it for the record,

8    please, sir?

9            **MR. HORAN:**  Sure, Your Honor.  It's H-O-R-A-N.

10           **THE COURT:**  Okay.  So before we get started, we tried

11   to do a little bit of preliminary work and so let me ask you a

12   couple questions.  I'm going to hear everything you have to

13   say.

14           But with regard to this motion, let's assume that I

15   grant the relief requested and you designate Mr. Dundon as a

16   third-party; does that necessitate you filing a third-party

17   complaint?

18           **MR. HORAN:**  No, sir.

19           **THE COURT:**  Why not?

20           **MR. HORAN:**  Under the 33 of the TRCP, the motion

21   to -- for leave to designate the responsible third-party allows

22   us to obviously designate Mr. Dundon, assuming the Court allows

23   that.

24           It's then up to the Plaintiff whether or not they

25   want to file a third-party complaint.  It's just their choice

7

1   to bring him in.

2          THE COURT:  Okay.  And then the follow-up question is

3   so let's assume tactically someone decides -- and I'm not

4   commenting other, just saying that a third-party complaint is

5   appropriate; what does that do to the trial setting in

6   February?

7          MR. HORAN:  I don't know.  I mean, my assumption

8   would be that it shouldn't -- well, considering that DCP has

9   already filed a motion for continuance before the Court, I

10  guess it would give them more fodder.

11         I don't believe that they would realistically bring

12  Mr. Dundon in given the alignment of the parties.

13         Theoretically that could shift it.  I don't see why

14  it would.  There's no new information that would necessarily

15  need to be devised or known through discovery.  The facts are

16  the same --

17         THE COURT:  But if I may, wouldn't you agree that if

18  a third-party complaint is filed, I have to allow for an

19  answer, right?

20         MR. HORAN:  You would, Your Honor.

21         THE COURT:  And then whether or not there would need

22  to be a scheduling order or discovery, putting that aside, that

23  could impact the trial depending on when the answer's filed;

24  wouldn't you agree?

25         MR. HORAN:  I would agree.  I think Your Honor's

8

1   concerns about the trial dating moving, though, however, could

2   be assuaged by simply asking Mr. Hockaday if they would -- you

3   know, if they intend to file a claim against Mr. Dundon should

4   Your Honor allow us to move to designate him as a responsible

5   third-party.

6          **THE COURT:**  All right.  So I just wanted to get that

7   out of the way.  I'm sure I'll have other questions.

8          **MR. HORAN:**  Sure.

9          **THE COURT:**  But it's -- go ahead.  I'll hear from you

10  now, sir.

11         **MR. HORAN:**  I appreciate it, Judge.

12         Your Honor, this is a motion for leave to designate a

13  responsible third party, specifically Mr. Dundon.  It's brought

14  under Chapter 33 of the Texas Rules of Civil Procedure.

15         The standards are set forth under the statute, Your

16  Honor.  And our burden is to plead enough facts.  This is a

17  fair notice type of pleading.  It's not an evidentiary

18  proceeding at this point.

19         The question is, is did our client, Mr. Ebersol,

20  plead enough facts to allow the Court to designate and/or give

21  fair notice --

22         **THE COURT:**  And let me interrupt you.

23         **MR. HORAN:**  Yeah.

24         **THE COURT:**  And you want me to ask some of these

25  questions.  So when we --

9

1          **MR. HORAN:** Yeah.

2          **THE COURT:** -- talk about a fair notice and pleading,

3   are we talking about with regard to the motion itself or we

4   talking about other pleadings?

5          **MR. HORAN:** It's the motion itself, Your Honor.

6          **THE COURT:** All right. Go ahead, please.

7          **MR. HORAN:** And whether or not DCT has fair notice of

8   what's being alleged. And what's being alleged here is -- and

9   the question is cause or harm or, I should say, it's harm

10  caused or contributed by the third party.

11         So in this case, the claims against Charlie Ebersol

12  are that he failed to disclose certain information related to

13  this transaction.

14         I believe the notice is fairly given within the

15  motion as to why Mr. Dundon is responsible, which is he was the

16  one that was communicating with Mr. Ebersol.

17         And to the extent information was offered that he did

18  not accept and DCP moved forward allegedly with entering into

19  this contract and making this purchase, well that's on him.

20  And I think that fairly falls within what the statute

21  contemplates.

22         I would point out, Your Honor, that at this point

23  then shifts to DCP to establish why we didn't plead enough

24  facts.

25         And then I think the statute also allows that if Your

10

1    Honor determines that enough facts are not pled, we get a

2    chance to replead I believe under the statute as well.

3           There is a question -- you saw we have a motion to

4    strike on there as well.  They filed an evidentiary witness

5    list.  At this point, Your Honor, I don't believe the statute

6    allows for evidence.

7           It's a fair notice pleading.  I think Your Honor

8    would have to designate first allow us leave to designate.  At

9    that point, they could file a motion to strike.

10          And at that point it's almost as if it's a no

11   evidence standard and we need to bring forth evidence as to why

12   Mr. Dundon is properly a responsible third party.

13          **THE COURT:**  ON that point, as I'm sure you read

14   closely the response, the response essentially says, in summary

15   form, that legally under the applicable statutes, you can't

16   seek the relief you're seeking because it's barred because of

17   provisions under the Texas security act and things like that.

18          So the question then begs itself, when do I deal with

19   that what I would essentially say is the functional equivalent

20   of a 12(b)(6), which is failure to state a claim upon which

21   relief can be granted?  When do I deal with that, at which

22   stage of the litigation would I have to deal with that?

23          **MR. HORAN:**  It could be a couple different junctures,

24   Your Honor.  Well, let me back up and first say I think the

25   case law, and I brought it with me today, is pretty clear that

1    it's not really looking at legal sufficiency or factual

2    sufficient at this point.  It really, truly is just the

3    pleadings.

4              But setting that aside, --

5              **THE COURT:**  Serve almost perfunctory in a way.

6              **MR. HORAN:**  Yes.  Yeah.

7              And setting aside that for a moment, though, Your

8    Honor, you could deal with that at various junctures.  It could

9    be when they file a motion to strike.  It could be at a motion

10   for summary judgment.

11             It could be at the -- you know, when you're taking --

12   when you're considering the charge of the Court, it could be

13   argued there.

14             There are different junctures for each -- we'll

15   address that at that point -- which is why I think when we

16   filed that motion to strike is our position is it is premature

17   to bring up those arguments at this juncture.  We're not there

18   yet.

19             **THE COURT:**  All right.  Thank you.  Who's going to

20   respond, please?

21             **MR. HALES:**  Your Honor, Troy Hales.

22             **THE COURT:**  All right, Mr. Hales.

23             **MR. HALES:**  Your Honor, may I proceed?

24             **THE COURT:**  You may.

25             **MR. HALES:**  Thank you, Your Honor.

12

1          Your Honor considers -- just to go back to one of the

2    questions you asked opposing counsel, Your Honor considers the

3    pleadings, which are the complaint and the answer, not just the

4    motion on this request.

5          **THE COURT:**  And based on what?  Counsel says it's the

6    motion.

7          I had actually an open-ended discussion with my law

8    clerk about what we should look at.  So does the statute

9    specify what the Court looks at or is there a Texas case that

10   instructs the Court on what it should look at?

11         **MR. HALES:**  There are cases that instruct the Court

12   on what to look at.  And those cases say that the Court should

13   look at the pleadings on file, which are not motions but are

14   the pleadings that the parties have filed stating their claims.

15         **THE COURT:**  So let's stop there because this is one

16   of the other things we talked about.

17         So the -- when we talk about pleadings as defined

18   under Rule 7 of the Federal Rules of Civil Procedure --

19         **MR. HALES:**  Yes, Your Honor.  When district courts

20   and other federal courts have looked at this question, they

21   typically look to that guidance, Your Honor.

22         **THE COURT:**  Okay.  And so how did that inform the

23   Court on what -- how the law is applied under that rule which

24   defines what a pleading is?

25         **MR. HALES:**  It informs the Court because what the

13

1   Court should be looking at here is what the DCP -- excuse me,

2   what DCP has pleaded in its complaint and then the answer that

3   was filed by Mr. Ebersol.

4          That is where the Court should be looking to see what

5   are the claims here that Mr. Ebersol is seeking to designate a

6   third -- responsible third party for.

7          And the motion says that they are seeking to

8   designate Mr. Dundon as a responsible third party on the claims

9   that the -- that DCP is bringing.

10          And before I go into some of the arguments we make in

11   our motion, I also wanted to address what Your Honor asked

12   opposing counsel a moment ago about the alignment of the

13   parties.

14          I can't answer today without consulting the client

15   what path we would take after today if Your Honor determined

16   that we would be allowed leave to file a third-party complaint.

17          But I can say, Your Honor, this dovetails very well

18   with our final argument in our brief, which is that this

19   statute does not apply for very obvious logical reasons, and

20   that is Dundon, Mr. Dundon, he was an agent of DCP at the time

21   this occurred.  That's evident from the pleadings themselves.

22          Because of that, under Texas law, a party's

23   negligence in conducting due diligence, it doesn't make them

24   liable for the acts of the principal.  Instead, this is just an

25   element of a fraud claim.

14

1          And so just to kind of back up for a moment, it would

2     make no sense for Mr. Dundon's negligence, alleged negligence

3     to be a basis to name him as a responsible third party.

4          The fraud claims require the DCP parties to prove

5     that they had justifiable reliance on Mr. Ebersol's

6     representations.  That's an element of the claim.

7          So by introducing this proportionate liability

8     argument, we're essentially shortcutting and distracting the

9     Court from the findings that the Court has to make in the first

10    instance on our claim.

11         So -- and that's why there are several cases that we

12    pointed Your Honor to that show that negligence -- a party's

13    negligence is not going to excuse the defendant from its

14    fraudulent activities.  Fraud --

15         **THE COURT:**  And I don't want to give an advisory

16    opinion on -- we've reviewed those cases.

17         But let's go back to the more salient point, which is

18    -- and I understand why you want to make the argument that

19    you're making is -- again, as I read the statute, it's fair

20    notice.

21         If they put you on notice that they want to designate

22    Mr. Dundon as a responsible third party, under the statute,

23    that's all they need to do.

24         And I'll say for your benefit on the record, if the

25    Court were inclined to grant that motion, it's certainly

15

1    without prejudice to raising what I would otherwise describe as

2    defenses.

3              So what's your response to that?

4         **MR. HALES:**  Your Honor, that is correct that we may

5    file a motion to strike, which is akin to a summary judgment

6    level of review.  At that point we would introduce evidence.

7    Likewise, as Mr. Horan pointed out, could challenge it at the

8    jury charge stage.

9              But that's not necessary.  In this case, we are

10   alleging that the statute does not apply at all, and as a

11   result Your Honor does not need to follow those strictures.

12             That's exactly what happened in the Northern District

13   of Texas case in *Stabilis* where Judge Boyle denied the motion

14   without leave to amend.  And that's because as a matter of law,

15   the statute did not apply.

16             Likewise, in the *Vladamir* case which was out of the

17   Western District of Texas, the movant was denied leave and

18   there was no opportunity to amend, and that's because the

19   statute did not apply.

20             That's exactly what we are alleging here.  The

21   statute doesn't apply for the reasons that I was just talking

22   about, namely that Mr. Dundon's negligence does not make him

23   responsible as a matter of law for Defendant Ebersol's alleged

24   fraud.

25             But then also the proportionate responsibility

16

1    statute does not apply to our Texas security act and Business

2    and Commerce Code claims, and that's because the <u>Texas</u>

3    <u>Securities Act</u> has a conflicting remedial scheme.

4         If Your Honor were to find that Mr. Dundon could be

5    held liable for even a percentage of the damages under the

6    Texas security act claim, that would be in direct contradiction

7    to what the Texas security act provides in terms of the joint

8    and several liability among sellers or issuers, persons who

9    directly or indirectly control, and persons who material aid in

10   the violation.

11        There is only one defense, and that is --

12        **THE COURT:**  Now, were these cases at the time when

13   the motion to designate was filed or after the designation was

14   made?

15        **MR. HALES:**  Your Honor, which cases?  I'm sorry.

16        **THE COURT:**  The cases that you just cited to the

17   Court.  Were they -- you said they were cases that -- and I'm

18   going to paraphrase it, that bar the Court's consideration

19   because as a matter of law, given the statutory scheme, your

20   client or Mr. Dundon could not be held liable.

21        And my question to you is you did cite a number of

22   cases, but it's our understanding those cases involved after

23   the designation was made.

24        In other words, the moving party was permitted to --

25   was granted leave to designate with subsequent to that the

17

1  ability of the responding party to say, no, as a matter of law,

2  this fails.

3          **MR. HALES:**  That is not correct with respect to

4  *Stabilis* or *Vladamir*.  Both of those cases were a motion to

5  designate a responsible party that was denied.

6          And so in the *Stabilis* case, Judge Boyle went through

7  the analysis of whether the statute applied and determined that

8  it did not in the first instance, and then denied the motion

9  without leave to amend.

10         And so in that case, just like in this case, the

11  Court was able to find that because the statute didn't apply,

12  there was essentially it was like a 12(b)(6) motion --

13         **THE COURT:**  Okay.

14         **MR. HALES:**  -- or a futile amendment, Your Honor.

15         **THE COURT:**  All right.

16         **MR. HALES:**  With respect to the Texas Securities Act

17  claim, a court called *Duperier* out of the Corpus Christi Court

18  of Appeals concluded that under the statute, the investor has

19  no duty of due diligence.  The statute merely requires proof of

20  the misrepresentation or omission by the seller.

21         And it is no defense that the investor could have

22  discovered the truth by exercising ordinary care.  That is very

23  clear.

24         It's saying that if Mr. Dundon could have exercised

25  ordinary care, well, it doesn't matter under the Texas security

18

1   act.  That's not a defense and so there's no reason why he

2   should be designated as a responsible third party.

3          Turning to the Business and Commerce Code claim, that

4   also is a -- assigns liability for anyone committing fraud in

5   relation to a securities transaction.

6          And in the *Kerrville HRH* opinion that we cited by the

7   San Antonio Court of Appeals, the court concluded that the

8   statutory defenses of the Business and Commerce Code would be

9   upset if the court were to apply the proportionate

10  responsibility act.

11         And so in both of these situations, those claims, the

12  Court should not apply the statute because it simply -- because

13  these statutes have contradicting remedial schemes.

14         **THE COURT:**  Right.

15         **MR. HALES:**  And then just to shortcut us a bit, Your

16  Honor, because I already addressed our last argument, our third

17  argument was about the exemplary damages claim.

18         **THE COURT:**  Right.

19         **MR. HALES:**  And the statute merely provides that a

20  claim --

21         **THE COURT:**  Just for clarity.

22         **MR. HALES:**  This is the Texas personal -- or, excuse

23  me, proportionate responsibility act.  That provides that a

24  claim for exemplary damages that are included in an action to

25  which this chapter otherwise applies are excluded.

19

1          And so we're asking Your Honor to find because we

2  seek exemplary damages on the fraudulent inducement and

3  Business and Commerce Code claims, that the statute does not

4  apply to those claims due to the -- due to our seeking

5  exemplary damages.

6          The Western District of Texas District Court found

7  that that provision bars the application of the statute as to

8  claims where a part is seeking exemplary damages.

9          And though Your Honor I'm sure is aware there is a

10  split of authority on whether that's binding on the Bankruptcy

11  Court, but it is considered highly --

12          **THE COURT:**  Persuasive.

13          **MR. HALES:**  -- persuasive, Your Honor.

14          **THE COURT:**  Yeah.

15          **MR. HALES:**  Yes.  And so because of that, Your Honor,

16  all of these reasons, the proportionate responsibility act does

17  not apply here.  It shouldn't be applied, and Your Honor should

18  deny the motion.

19          **THE COURT:**  So before you yield the podium, are there

20  any claims for relief -- based upon your understanding of the

21  motion and what's still at stake in this case, are there any

22  claims for relief, the 11 remaining claims for relief, where

23  your -- Mr. Dundon could be designated as a responsible third

24  party?

25          **MR. HALES:**  Your Honor, we responded to the claim as

20

1    -- excuse me.  We responded to the motion as to the three

2    claims that the Dundon Capital Partners is bringing in what was

3    before the consolidation just fraudulent inducement, Business

4    and Commerce Code, and Texas security act, Your Honor.

5           **THE COURT:**  Okay.  So what does that mean for the

6    Court, most simplistic terms?  Are there -- is there any area

7    which he could be deemed a responsible third party?

8           **MR. HALES:**  Not for any claims alleging fraud.  For

9    the reasons that I stated, negligence is not a defense to -- a

10   plaintiff's negligence is not a defense to the defendant's

11   fraudulent activities.

12          So for any of the claims that are seeking relief

13   based on alleged fraud, no, Mr. Dundon could not be a

14   responsible third party.

15          **THE COURT:**  But absent what you've just told the

16   Court, if there is -- and I don't have the complaint up in

17   front of me.  If the complaint alleged something else other

18   than that, what would your position be with regard to those

19   claims?

20          **MR. HALES:**  Your Honor, it would remain the same as

21   to any other claims that are based on statutes that have

22   competing remedial schemes.

23          And then like I was saying as to -- well, just to

24   broaden it, we were talking about a fraud claim.  But as to any

25   claims that require something more than mere negligence, it

1   also would not apply in this instance.

2            **THE COURT:**  All right.  Thank you.

3            **MR. HALES:**  Thank you.

4            **THE COURT:**  Like to respond?

5            **MR. HORAN:**  Yes, Your Honor, please.

6            Your Honor, as far as the claim related to exemplary

7   damages, I would agree that the statute says that when you've

8   got exemplary damages, it doesn't apply.

9            However, distinction is made, you don't throw the

10  baby out with the bath water.  Just means that -- because

11  obviously exemplary damages is a separate question.  So you

12  wouldn't be designated an RTP for the exemplary part.

13           As for the underlying cause of action, though, that

14  would still stand.

15           I would say that obviously we're getting into some of

16  the -- the question is whether or not even we get to this point

17  about arguing legal sufficiency, but I'll address some of the

18  points that opposing counsel made.

19           **THE COURT:**  Mr. Hale says -- and that's why I'm glad

20  he focused on it.  But his contention is that it's not

21  perfunctory, that there -- you've got to show that as a matter

22  of law, you're entitled to go forward.

23           We'll deal with -- the evidence is easy.  I think you

24  all will concede, if you look at the statute, I don't need to

25  take evidence on this.

22

1          **MR. HORAN:**  No, sir.

2          **THE COURT:**  Okay.  So let's deal with the legal

3    argument, though, which is, yes, Judge, you should deal with it

4    at this point in time.  What's your response to some of the

5    cases he's cited to the Court?

6          **MR. HORAN:**  Easy enough, Judge.

7          As far as *Stabilis*, which is Judge Boyle up in the

8    Northern District, she did deny leave and did not allow

9    repleading.

10         But that's because she found they were alleging a

11   breach of contract, which isn't a tort, and there was no

12   allegation in the pleadings as far as any negligent act that

13   would bring it under 33.  So that's why she said you didn't

14   replead, because there wasn't anything there to do.

15         **THE COURT:**  Okay.

16         **MR. HORAN:**  I would say as far as the cases, you

17   know, as far as the securities act and statutory fraud, the

18   cases that opposing counsel cited all were very similar in that

19   none of them, to my reading, Judge, invoked the RTP statute at

20   all.

21         It did deal with Chapter 33 but it was in the context

22   of comparative negligence.  And what they were looking at is

23   when you add a plaintiff that was 51 percent or more negligent,

24   could you then apply Chapter 33 of the -- Chapter 33.  And the

25   question was no.

23

1            That's not the situation here.  None of the cases --

2    I will say that I believe *Stabilis* dealt with an RTP.  I

3    believe *Cook* dealt with an RTP.  And there was a reference to

4    one other case, Valeria (phonetic), that might have dealt with

5    an RTP.

6            But as far as the cases that were cited by counsel

7    with regard to the statutory fraud and securities act, which

8    was Trevino (phonetic), *Duperier*, *Kerrville*, and Davis, none of

9    those dealt with an RTP at all.

10           I've got cases, judge, where in, for example, *In Re*

11   *Cook*, that citation is 629 Southwest Third 591.  That dealt

12   with -- that had an RTP designation with regard to both the

13   securities act and statutory fraud.

14           I think a look at the case law reveal that it -- that

15   is not a bar to Your Honor granting or denying the motion

16   today.

17           **THE COURT:**  We -- yeah, the language in *Cook* -- thank

18   you for jogging my memory -- it says -- according to *Cook*, it

19   says -- and I'm reading directly from the opinion:  instead at

20   this point in the proceedings the sole question is the

21   sufficiency of movant's pleading.  And the standard by which

22   that question is resolved is fair notice.

23           And so, you know, we read through the cases.  That's

24   why I asked Mr. Hales, okay, are you telling me that it's more

25   than that?  Because at least the way I read this case is it's

24

1   sufficiency.

2          We get beyond -- legal arguments remain but it's a

3   question of whether there's been sufficient pleading.  He

4   contends it's inclusive of the complaint and answer; do you

5   agree with that?

6          **MR. HORAN:**  I don't believe so, Judge.  If I read --

7   and I can go back and grab the statute.  As I read it, it's the

8   question of --

9          **THE COURT:**  I'll let you do that.

10         **MR. HORAN:**  Yeah.  The question is, is what did we

11   plead, Your Honor, as I read it.

12         **THE COURT:**  Yeah.  Go grab -- come back.  Don't talk

13   because we won't pick you up on the record.

14         **MR. HORAN:**  So I've got -- oh.

15         **THE COURT:**  Come to the podium, please.

16         **MR. HORAN:**  I'm walking.

17         **THE COURT:**  Take your time.

18         **MR. HORAN:**  I'm a walker and --

19         **THE COURT:**  Don't --

20         **MR. HORAN:**  -- a talker.

21         **THE COURT:**  Don't trip.  All right.  Go ahead.

22         **MR. HORAN:**  Thirty-three-oh-four, Your Honor, what it

23   says is -- this is 33.04(g).

24         An objection to the motion for leave is timely filed,

25   the court shall grant leave to designate the person as

25

1  responsible third party unless the objecting party establishes

2  the defendant did not plead sufficient facts concerning the

3  alleged responsibility of the person.

4          So, I mean, it's what did we plead, so you would be

5  looking at our pleadings, Your Honor.

6          **THE COURT:**  Okay.  Anything else, sir?  Mr. Hales,

7  you did such a good job the first time, I'll let you come up,

8  and if you want to say anything else -- I will tell you if you

9  don't have anything to say, then don't get up.  All right.

10          **MR. HALES:**  (Inaudible)

11          **THE COURT:**  Okay.  Good.  Now, both of you all did a

12  great job on this.  Let me compliment both lawyers.

13          I'm going to take a short break.  I want to talk to

14  my law clerk about this for just a minute, please.  And then

15  we'll get onto I guess the main event and we'll deal with that.

16          So give me five, ten minutes.  If you need to use the

17  facilities or get some water, I think you'll have time to do

18  that.

19          So let me step away for a couple minutes.  I'm going

20  to talk to my law clerk and then I'll come back and tell you

21  what I'm going to do.

22          **THE CLERK:**  All rise.

23      **(Recess from 2:06 p.m. to 2:28 p.m.)**

24          **THE COURT:**  So, Ms. Mujica advises me, Mr. Saltz, you

25  want to address the Court before I rule, which is frankly

26

1    unusual to say the least.

2          **MR. SALTZ:**  I've not been accused of being

3    conventional, Your Honor, I'm sorry.

4          **THE COURT:**  So for the record, please identify

5    yourself and who you represent.

6          **MR. SALTZ:**  Thank you, Your Honor.  Michael Saltz,

7    represent Charlie Ebersol.

8          **THE COURT:**  Okay.

9          **MR. SALTZ:**  Your Honor, we would ask the Court defer

10   its ruling on our motion until after we see what happens with

11   regard to the next proceeding.

12         And in that regard, our thinking is we do not want

13   our motion to be the reason if at all there would be a

14   continuance.  To have the trial heard as soon as possible is of

15   utmost importance to us.

16         And to the extent that your motion may or may not

17   delay any proceedings, we would like the ability to address

18   that after we see what happens with the next motion.

19         **THE COURT:**  So you -- I know how I'm going to rule.

20   I mean, I was -- I mean, we aren't back there just -- you know,

21   I wanted to clarify some points with my law clerk who, frankly,

22   has looked at this a little bit more closely than I have.  But

23   I'm confident in her reading of things.  So I know how I'm

24   going to rule.

25         So the reason why I'm telling you that is I can wait

27

1   until afterwards.  But I'm just telling you, it's up here.

2   It's not leaving my brain.  I mean, I'm old but I'm not that

3   old that I'm going to forget between now and the end of the

4   second motion.  I hope you appreciate what I'm saying.

5           **MR. SALTZ:**  I do, Your Honor.

6           **THE COURT:**  Okay.  Does anyone have any problem with

7   Mr. Saltz's request?

8       (No audible response.)

9           Okay.  I'll defer ruling on it and we'll come back to

10  it after we're done.  So are we ready to move on to the next

11  matter?

12          **MR. SALTZ:**  Thank you, Your Honor.

13          **THE COURT:**  All right.  Thank you.

14          Okay.  So the other matter that we have which appears

15  to be the main event for this afternoon -- and I'm in no way

16  trying to be silly -- is the emergency motion to strike, in the

17  alternative motion for continuance filed by Mr. Dundon, Dundon

18  Capital Partners, LLC, and Mr. Zutter.

19          So who's going to go first?

20          **MR. HOCKADAY:**  Think that'll be me, Your Honor.

21          **THE COURT:**  Okay.  And it appears from the Trustee's

22  perspective I'm going to be taking evidence.

23          **MR. TREYZON:**  Your Honor, --

24          **THE COURT:**  Well is that your intention?

25          **MR. TREYZON:**  Your Honor, Boris Treyzon for the

1    Trustee.

2            It certainly was our intention originally.  But we

3    have discussed between ourselves, and I think for efficiency

4    sake it makes sense for us to proceed by offer of proof.

5            And if it becomes necessary, we will move the

6    evidence into evidence or put Mr. Engel on as a witness.

7            **THE COURT:**  All right.  And these exhibit books all

8    relate to this matter; is that correct?

9            **MR. TREYZON:**  Correct, Your Honor, for this hearing.

10           **THE COURT:**  Okay.  No, you also provided us with some

11   sealed documents; are we going to get into some sealed

12   documents this afternoon?

13           **MR. HOCKADAY:**  It's not our intention, Your Honor.

14   Brent Hockaday on behalf of the Dundon -- may I refer to them

15   as the DCP parties, just for the records?

16           **THE COURT:**  Yes.

17           **MR. HOCKADAY:**  I know everybody in this room knows

18   what that is but I just want to be clear.

19           It is not our intention to get in there.  And, as

20   Your Honor may be aware, we filed a corresponding motion to

21   strike a lot of the exhibits which --

22           **THE COURT:**  Yes.

23           **MR. HOCKADAY:**  And I can also preview for the Court

24   Mr. Treyzon and I spoke with Mr. Engel before.  It is not our

25   intention to kind of go down the path of what I think those

29

1   exhibits would be relevant to.

2          However, if the Court wants to hear them or they move

3   to do that, we certainly stand ready to respond to them.  But

4   there's no intention on our end to go down anything that is

5   sealed.

6          All the exhibits that we have designated are either

7   public filings or the disclosures, interrogatories that are the

8   subject of our motion.

9          **THE COURT:**  Okay.  The only reason why I ask that, it

10  would really be of great assistance to the Court if we do get

11  into that, look, preview it for me, let's make sure we don't

12  say anything that we want on the record because I'll then seal

13  the record.

14         And also I'll make sure that any documents we look at

15  are appropriately -- we need to pull them out, we'll pull them

16  out to look at them, reseal them, and put them in the vault,

17  okay?

18         **MR. TREYZON:**  Your Honor, Boris Treyzon for the

19  Trustee.

20         From our standpoint, as obviously every

21  representation we're making to the Court we believe is

22  supported by either the evidence in the binders before the

23  Court or by testimony we would elicit from Mr. Engel should he

24  be called to testify, but I believe everybody is going to be in

25  agreement.

1          Things say what they say and we don't need to go

2     through hours long laborious process if it can be satisfied by

3     the parties' agreement to the representations.

4          **THE COURT:** All right. Thank you, sir. Before you

5     get started, I'm just curious.

6          Discussion purposes, this is not a ruling, let's

7     assume that the Court is inclined to grant your request and

8     feels that it's appropriate to continue the hearing and allow

9     you -- and we'll get into this in more detail -- what

10    dispositive motions, if any, you feel that you would be

11    thinking that you might want to file.

12         I've got three dispositive motions right now. So

13    does that impact the Court's consideration of those three

14    dispositive motions in any way?

15         **MR. HOCKADAY:** No, Your Honor.

16         **THE COURT:** All right. Go ahead, please.

17         **MR. HOCKADAY:** Thank you, Your Honor. Good

18    afternoon. And Brent Hockaday on behalf of the DCP parties.

19    Thank you for allowing me to abbreviate.

20         We're here today over two motions. The first one, as

21    Your Honor noted, is the emergency motion to strike and, in the

22    alternative, continue the case to allow appropriate time for

23    discovery and investigation into what the DCP parties claim to

24    be late-disclosed damages in the amount of $82.4 million, as

25    well as an additional number of witnesses including, but not

1    limited to, the lead plaintiff in the players case that the

2    Court disposed of three years ago, all of which were well

3    within the knowledge base of the Trustee more than three years

4    ago.

5         The second one is a motion to strike which I will if

6    it is okay with the Court, I will weave that into the

7    presentation of the motion to the -- excuse me, motion to

8    strike the exhibits, weave it into the presentation of the

9    motion to strike the disclosures.

10        **THE COURT:**  That's fine.  And let me just --

11        **MR. HOCKADAY:**  For efficiency purposes.

12        **THE COURT:**  Yes, sir.  One thing I wanted to get on

13   the record, though.

14        Is -- I want to just see where the motion to strike

15   exhibits is at so we have that on the record, ECF number.

16        **MR. HOCKADAY:**  Yes.  ECF, are we talking about -- oh,

17   the motion to strike exhibits.

18        **THE COURT:**  Yes.

19        **MR. HOCKADAY:**  That is ECF I believe 213.

20        **THE COURT:**  Okay.  Oh, I've got it.  All right.  Just

21   wanted to make sure.  Go ahead, please.

22        **MR. HOCKADAY:**  Thank you.  No, actually your new

23   clerk was helpful because we had an issue uploading, which I

24   apologize.

25        Yes, so the -- so it is -- I want to be very clear

32

1  before I get started in the presentation.  It is

2  Mr. Lowenstein's, Mr. Hales's, mine, our client's preference

3  that we -- and intent and plan all along that we'd be marching

4  forward to a trial setting that starts on February 18th.

5           All of that changed on December 13th, two hours

6  before the close of the discovery deadline, when we received a

7  supplemental disclosure from the Trustee.

8           Now, the two main issues that came to our attention

9  were, one, a computation of the damages which was no

10  insignificant amount of $82.4 million.  And then the second

11  were a number of third-party witnesses.

12           Now, I believe we've said this in the briefing, but

13  if we not -- if we haven't, let me be clear on the record.

14  Some of the individuals who they disclosed here everybody's

15  known of.

16           They were either part of interrogatory answers or, in

17  the case of Mr. Teitelman, deposed by agreement and everybody

18  had their opportunity to question them.  So that's not our

19  issue.

20           Our issue is there appears to be an attempt to stack

21  the damages and attribute the settlement amount from the

22  players' case onto Mr. Dundon.

23           And I'm going to explain why that's problematic kind

24  of just high level, and then kind of get into the details.

25           From a high level standpoint, it's undisputable that

33

1   they first presented the supplemental disclosures on December

2   13th.  And I don't know -- I know we were offering to proffer

3   this.  I'll direct the Court to Exhibit A, which was also the

4   Exhibit A that was attached to our motion.

5           I have a copy of it here for you, Boris, Mr. Treyzon.

6           **MR. TREYZON:**  Thank you.

7           **MR. HOCKADAY:**  I think there might be two copies.

8           And if you don't have it, Your Honor, I have an extra

9   and I'm happy to approach.

10          **THE COURT:**  Yes.  Could I have one, please?

11          **MR. HOCKADAY:**  Yes.  I (inaudible) --

12          **THE COURT:**  If you had two, that'd be lovely.

13      **(Mr. Hockaday/Mr. Speaker confer.)**

14          **MR. HOCKADAY:**  Oh, you want two, Your Honor?

15          **THE COURT:**  Hang on.  Let me see if I -- yes, if you

16  have one for my law clerk to follow along.  If you don't have

17  one, that's okay.

18          **MR. HOCKADAY:**  Okay.

19          **MR. TREYZON:**  It's okay, Your Honor.  We are well-

20  familiar with --

21      **(Laughter)**

22          **THE COURT:**  All right.

23          **MR. HOCKADAY:**  (Inaudible) in the least.

24          So if -- directing your attention, Your Honor, on

25  Exhibit A all the way to category "C," which starts on page 49

34

1   of 54, that is the part that addresses computation of damages.

2   We're all experienced litigators here so we'll well aware of

3   what our requirements are under Rule 26.

4          Absent from this disclosure is any reference to the

5   players' claims or a computation as to a dollar amount that

6   would signal notice for us that we know that that is a claim

7   that you are pursuing from a damages standpoint.  And this was

8   served on us February 5th of 2024.

9          Now, if you look at -- may I approach, Your Honor?

10          **THE COURT:**  Yes, you may.

11          **MR. HOCKADAY:**  I'm going to direct you to then

12   Exhibit B, which is the supplemental -- which are the

13   supplemental disclosures.  And we'll note for the record that

14   there's a 40-page difference.

15          Now, I understand counsel was doing some cleanup as

16   well.  That happens in every case.  That's not our concern.

17          What our concern is if we direct the Court's

18   attention to page 89 of the filing on that same computation of

19   damages and actually go two more pages -- three more pages to

20   page 92, there's a section titled:  player creditor damages

21   claimed against Defendants Dundon, Zutter -- and Zutter for

22   breaches of fiduciary duty, fraud, negligent misrepresentation,

23   and unjust enrichment against Defendant DCP for fraudulent

24   inducement.

25          And if you go all the way to the bottom part of that

35

1  section, it says the expert report of Sonia Desai calculates

2  the total amount of damages suffered by the players as a result

3  of Dundon, Zutter, and DCP's actions and forcing EMG to breach

4  all of their contracts to be approximately $82.4 million.

5         Now, respectfully, I don't know that that is a

6  computation.  I think it's just a declaration.

7         But essentially what they're doing and disclosing for

8  the first time -- and if we go to the page 95 on December 13th,

9  what they're disclosing for the first time is a computation or

10  a declaration of what the damages are that they're seeking for

11  an entirely new category.

12        Now, we're not slow.  They are basing this on

13  assigned claims from the settlement.

14        And we are aware that they pled in their initial

15  pleading or their -- or, excuse me, their amended pleading,

16  which is the operative pleading here, they intend to pursue

17  claims against Mr. Dundon that come -- that arise from those

18  assigned claims.

19        The problem with that is nothing in the actual

20  pleading identifies a damages amount anywhere in there.  And

21  before --

22             **THE COURT:**  Anywhere in where?

23             **MR. HOCKADAY:**  In the first amended complaint.

24             **THE COURT:**  Thank you.

25             **MR. HOCKADAY:**  Yes.

1          **THE COURT:**  Go ahead.

2          **MR. HOCKADAY:**  So as a result, the first time that we

3  are put on notice that this is a damages category is on

4  December 13th.

5          The -- 11 days earlier they served their expert

6  designations.  It was Ms. Desai who I just referenced earlier.

7  In her report she does reference an 82.4 million figure.  Now,

8  that'll be the subject of something else.

9          But if we want to give them the benefit of the doubt

10  that that was the first time that they disclosed it, then

11  that's still 11 days before the discovery deadline.

12          And the salient point here is that all of this --

13  Rule 26 requires you to provide a computation of damages.  And

14  it also puts a duty on you to supplement once you become aware

15  of it.

16          The basis for this all was known to the Trustee well

17  before this lawsuit was even filed.  It was the subject of the

18  objection and then ultimate hearings that we had, and then the

19  Court approving the settlement.

20          **THE COURT:**  And so when you -- when they the --

21  excuse me.  When you allege that the Trustee was on notice, you

22  were referring specifically to the adversary class action

23  lawsuit.

24          **MR. HOCKADAY:**  Yes, Your Honor.

25          **THE COURT:**  Go ahead, sir.

37

1          **MR. HOCKADAY:**  Now, the Trustee's position is

2     effectively there's three reasons why it shouldn't be here.

3          The first one is that they pled it initially in their

4     operative pleading that they were going to pursue these claims.

5          The second was that we objected -- we being

6     Mr. Dundon in this case objected to the players settlement as

7     part of that proceeding.

8          And the third is that these were made party of the

9     Desai part, kind of like I went through.

10         As the -- as we noted in the briefing and the

11    supporting authority, both in the response -- or, excuse me, in

12    our motion and in the reply, the duty of disclosure is not on

13    the recipient party.

14         And this idea that you should have known or could

15    have known is not the standard that Rule 26 accounts for.

16         So, I mean, taking the position all along that we

17    knew all along that they were going to pursue these -- those so

18    we should have known what the dollar amount is isn't tenable or

19    supported by any law.

20         On the objection to the settlement piece, what I'd

21    like to do is direct Your Honor's attention to Exhibit H.  May

22    I approach?

23              **THE COURT:**  You may.

24         **MR. HOCKADAY:**  Yeah.  Exhibit H.

25              **THE COURT:**  Thank you.

```
 1              MR. HOCKADAY:  And for this one, Your Honor, because

 2    I don't know if Mr. Treyzon and his team have it, I -- is it

 3    okay if we -- they hold on to this while I explain or --

 4              THE COURT:  Of course, yeah.

 5              MR. HOCKADAY:  -- would you like it now?  Just trying

 6    to give you all the benefit.

 7              MR. TREYZON:  Thank you.

 8              THE COURT:  For the record, you're -- what you're

 9    looking at, just to make the record clear --

10              MR. HOCKADAY:  I was just going to spell it out for

11    you.

12              THE COURT:  Go ahead.

13              MR. HOCKADAY:  Oh, yes.  This is in Case Number 19 --

14    or 19-05053-CAG, docket number 215.  The title of it is order

15    for, one, final approval of the settlement agreement, class

16    action certification pursuant to settlement agreement,

17    appointment of class counsel, and class representatives

18    pursuant to the settlement agreement.

19              And, four, approval of compensation for class counsel

20    and service awards for class representatives.

21              MR. TREYZON:  We got it.

22              MR. HOCKADAY:  Okay.

23              THE COURT:  Thank you.

24              MR. HOCKADAY:  May I approach?

25              THE COURT:  Yes, you may, sir.
```

1          **MR. HOCKADAY:**  So directing Your Honor's attention to

2     page eight of Exhibit F -- or, I'm sorry, of Exhibit H, which

3     is subsection "F," we highlighted this in our reply brief.

4          But I'd like to just read some of this into the

5     record why saying that we objected to the settlement does not

6     put us on notice for claims in the subsequent case.

7          In relevant part it reads neither the settlement

8     agreement nor the fact or any terms of settlement is evidence.

9          If you go a little bit further down, the settlement

10    agreement is not a finding or evidence of any validity or

11    invalidity of any claims or defenses in the class action, or

12    any damages or injury to any settlement class member.

13         And neither the settlement agreement nor any of the

14    terms and provisions of the settlement agreement, nor any of

15    the negotiations or proceedings in connection therewith, nor

16    any of the documents or statements referred to therein, nor the

17    settlement, nor the fact of settlement, nor the settlement

18    proceedings, nor any statements in connection therewith will be

19    argued, used, construed, offered, received in as -- in evidence

20    as or otherwise constituted admission, concession, presumption,

21    proof, evidence, or finding of liability, fault, wrongdoing,

22    injury, or damages.

23         That was a lot of words.

24         The reason why that's relevant, Your Honor, is

25    because the basis of their claims are pure contract claims.

40

1    They settled the case that Your Honor approved.  And what they

2    did was they settled the contract claims between the players

3    and the estate, pure and simple.

4              As part of that, the trustee -- the players assigned

5    certain claims to the estate that gave the estate the

6    opportunity to pursue them.  Those were claims that the players

7    had against Mr. Ebersol, one of the reasons we objected, and

8    why he's their star witness in this case.

9              And the other one are these actual contract claims.

10             What the Trustee is trying to do in this case is take

11   those contract claims or rights to damages there and attribute

12   those to Mr. Dundon, and do so as part of a fiduciary claim,

13   damages towards a fiduciary claim.

14             Now, part of the relief we ask for is dispositive

15   because this screams of a contort and a situation where you

16   can't fashion contract damages or impute contract damages on to

17   someone for a breach of a fiduciary duty.  That's just flat

18   wrong.

19             But nonetheless, if it is a damages model that they

20   are pleading, they can't do that.  And the Court specifically

21   said they can't use it as evidence.  And in doing so I would

22   argue is a violation of the Court's order.

23             So this notion that we objected to the settlement, we

24   were there, we participated, we knew all along, that doesn't

25   really pass muster.

1          And, you know, part of that was the -- one of the

2     other issues for this that I think is really hurtful to that

3     position is in tandem with the new computation of damages,

4     there were a number of individuals who were disclosed for the

5     first time.

6          Now, some of those I mentioned earlier we all knew

7     about.  It was just they were just cleaning it up.  And I don't

8     fault them for that.

9          **THE COURT:**  Talking about like the class

10    representatives --

11         **MR. HOCKADAY:**  Correct.

12         **THE COURT:**  -- and things like that?

13         **MR. HOCKADAY:**  The one that's most critical is Colton

14    Schmidt.  So if Your Honor remembers, he was the lead plaintiff

15    in the players case.

16         **THE COURT:**  Yes.

17         **MR. HOCKADAY:**  One of their arguments is that, oh, we

18    had a chance to depose him.  One of the exhibits they want to

19    use is his deposition transcript testimony.

20         Your Honor, I took the deposition.  I was there.  I

21    remember it very well.  At no point during that deposition was

22    there any indication that whatever his testimony was used for

23    or related to was going to be a future fiduciary claim against

24    Mr. Dundon.

25         In fact, at that point we were all frenemies because

42

1   Mr. Engel and I were on the same side for that purpose.  So --

2          **MR. ENGEL:**  Did you just call me a frenemy?

3          **MR. HOCKADAY:**  I think I did.

4      **(Laughter)**

5          **MR. ENGEL:**  Understood.

6          **MR. HOCKADAY:**  Fair enough.

7          So participating in something that happened three

8   years before an actual claim was filed is not sufficient

9   disclosure that I was going to file something in the future.

10         And it certainly doesn't excuse the eight-month --

11  or, excuse me, nine-month gap between February, when initial

12  disclosures were due, and December when supplemental

13  disclosures were due.

14         And at the very least, they could have done it at

15  some point throughout the discovery period.

16         The last piece that they focus on is Ms. Desai's

17  report.  So the first time in the history of this case that we

18  are aware of that the 82.4 figure was referenced was in

19  Ms. Desai's report.

20         That was served on December 2nd, so 11 days before

21  the discovery deadline is the -- one of the days that

22  Mr. Dundon was deposed.

23         Now, the problem with this is if you want -- first of

24  all, the case law that we cited says you can't tag onto an

25  expert disclosure to satisfy your obligations under Rule 26.

43

1    That -- you can't do that.

2            But, more importantly, let's just say we given them

3    the benefit of the doubt for that.  Well, I can't serve a

4    discovery request much less a third-party subpoena in 11 days

5    and expect to get any kind of discovery on that.

6            So that's not fair notice.  And we're basically

7    caught with our heels -- we have an order where the Court

8    precludes them from using these damages.

9            And we go, you know, through a very expedited

10   discovery period, taking depositions all across the country,

11   fishing through two million documents that have been produced

12   in this case.

13           We think we know what has been alleged from a damages

14   standpoint.  We can't at the eleventh hour then go shift and

15   move gears and expect to have a fair opportunity to defend

16   ourselves with that.

17           And that's our -- oh, I'm sorry.

18           **THE COURT:**  Excuse me.  No, I just want to get this

19   on the record at the risk of have you repeat something that is

20   obvious.

21           You -- prior to the submission of the expert report

22   did -- were you provided with the opportunity to depose

23   Ms. Desai?

24           **MR. HOCKADAY:**  No, Your Honor.

25           **THE COURT:**  Okay.  Go ahead, please.

1          **MR. HOCKADAY:** I believe that was the first time we

2    knew of her.

3          There was somebody -- there was an -- there was a

4    deposition of Tom Veit (phonetic) like the week before, and

5    there was --

6          **THE COURT:** Sorry, counsel, did you want to say

7    something?

8          **MR. LOWENSTEIN:** We are going to depose Ms. Desai so

9    I don't --

10          **MR. HOCKADAY:** Yeah.

11          **MR. LOWENSTEIN:** -- want it to be left the Court to

12    (inaudible) --

13          **THE CLERK:** And you are for the record?

14          **THE COURT:** I'm sorry, go ahead.

15          **MR. LOWENSTEIN:** I'm sorry, Your Honor. Jeff

16    Lowenstein.

17          I didn't want to let it go but we are going to be

18    deposing Ms. Desai. We're setting up expert depositions so we

19    are going to depose her.

20          **THE COURT:** Now, to -- since you raised it, counsel,

21    was that agreement reached -- what was the timing when you all

22    decided we needed to depose her? I assume it was after the

23    report was provided.

24          **MR. HOCKADAY:** So as part -- if you recall, Your

25    Honor, in early December we had our -- on December 2nd, we had

45

1  that call. We said we're almost done with discovery but

2  there's a few things that we need to do with experts.

3          Between counsel, I know Mr. Engel and I had multiple

4  conversations, we agreed to move the expert designations to the

5  2nd and the 31st, and that we would depose them in January when

6  we did. So it was all by agreement --

7          THE COURT: Okay.

8          MR. HOCKADAY: -- that we would depose them.

9          And just to be clear, the reason why -- thank you for

10  Mr. Lowenstein bringing that up. But that was -- my

11  understanding of the question was did we have an opportunity to

12  know of her before December 2nd, and the answer is no.

13          THE COURT: Okay. That -- yes, that was --

14          MR. HOCKADAY: Yeah.

15          THE COURT: -- the point.

16          MR. HOCKADAY: So and I want to finally -- so, I

17  mean, it is our position here based on the law that we've cited

18  and the evidence that is in the record here that it warrants

19  striking, and that is our first and primary request here.

20          Alternatively, though, should the Court allow the

21  Trustee the opportunity to pursue those claims, we would want

22  an opportunity to file dispositive motion on them and conduct

23  the appropriate discovery tailored as to those claims so we can

24  have a fair opportunity to be heard.

25          And if I could (inaudible) if I may approach, Your

1  Honor?  Oh, sorry.

2          **THE COURT:**  Yes, you may, --

3          **MR. HOCKADAY:**  Oh, okay.

4          **THE COURT:**  -- sir, go ahead.

5          **MR. HOCKADAY:**  Want to direct the Court's attention

6  to what is Exhibit G.  And Exhibit G is the Trustee's objection

7  to claim number 214-2.

8          If you recall, Your Honor, five years ago now --

9          **THE COURT:**  It's hard to believe.

10         **MR. HOCKADAY:**  I know.

11    **(Laughter)**

12         **THE COURT:**  One of my law clerks was in college five

13  years ago.

14         **MR. HOCKADAY:**  It's funny, Your Honor.  I've been

15  doing calculations on part of my career with this and very

16  similar so, yes, that's --

17         **THE COURT:**  (Inaudible)

18         **MR. HOCKADAY:**  -- I can relate.

19         But directing your attention to Exhibit G, I only

20  bring this up because if you recall, Your Honor, the Trustee,

21  back when we were still frenemies, filed a 76-page objection to

22  the players case.

23         And one of the issues that he brought up, which is

24  one of the reasons that we were fighting class certification,

25  was there's so many individualized inquiries that are required

47

1  with that.

2          So if you are going to assume 416 people are alike

3  and you're going to aggregate their alleged damages and use

4  that as a damages model, we need the opportunity to investigate

5  that.

6          We need to depose Colton Schmidt as it pertains to

7  this.  We need to depose Reggie Northrup.  We need to depose

8  some of these other folks that they intend to rely on to prove

9  that.

10          And what is important here is that there is no --

11  there -- as part of the settlement there was no actual finding

12  of liability.  And I think that's what -- I think -- I don't

13  want that to get missed here.

14          So part of the Trustee's theory with you breached the

15  contract, you were running the league, and I'm going to use

16  that beach as damage for you violating your fiduciary duty.

17          Well, there's been no establishment as a matter of

18  law by this Court or anywhere that there is a violation there.

19  The Court approved the settlement just for the purpose of

20  settlement.  That was it.  There was no finding of liability or

21  anything.

22          So to allow this to go forward, you have to

23  presuppose that there was a liability and that we're

24  responsible for it.  And I think that's problematic.

25          **THE COURT:**  So let -- before you continue, let's talk

48

1  about it because that was -- I'm going to go through my notes

2  on the pleadings.

3          But so on this whole argument about we need to know

4  what the damages are, we talked a little bit about that in

5  chambers because the law clerk sitting out here was a sophomore

6  at Texas A and M at that time and not a graduate of Saint

7  Mary's Law School.  And so just to give you a perspective, and

8  so trying to fill her in on what's transpired.

9          So here's what I recall, and then I'll ask the

10  question.  What I recall is the uniqueness of this league --

11  I'm not commenting on the merits of the case was -- whether you

12  played offense, defense, lineman, linebacker, or quarterback,

13  you got the same employment contract, the same pay.  It didn't

14  matter.  And the teams were league-owned.

15          And as I understood it, we spent a great deal of

16  time.  At first, Mr. Engel was of the considered opinion that

17  they're not priority wage claimants.  And we had an interesting

18  discussion about that.

19          And thankfully for the Court, only from the working

20  perspective there was an agreement reached that, yes, indeed

21  they were priority wage claimants.

22          So we've established what their claims were

23  prepetition.  What I'm trying to understand -- and I actually

24  am pretty good at math -- is why these are individualized

25  claims.

49

1          And here's how I -- I'll just share this with you.  I

2   said, okay, one player was a lawyer.  One player was a ditch

3   digger.  Another player was something else.  And this is my

4   sense of things.  This is just my sense, this is not evidence.

5          All these players were on the fringe, good enough to

6   play college, not good enough to play in the NFL, but the

7   appeal to them was if you play, you might get that chance.

8          And probably most, if not all, of these guys, that's

9   -- that was what they did their whole life, from peewee league

10  to today.

11         And so I acknowledge it -- I'm a sports fanatic.  If

12  I had that chance to play, I'd probably -- I might even leave

13  this job to do it, okay?  I'm -- just for illustration

14  purposes.  So I understand that they're differently situated.

15  They all come in.

16         And so with that kind of my sense of things, can you

17  explain to me what it is you need to know in terms of the

18  alleged damages -- I haven't read Ms. Desai's report, I don't

19  know what it contains -- but why those are particularized

20  claims?  That's what I need to understand and I don't.

21         **MR. HOCKADAY:**  That's an excellent question, Your

22  Honor.

23         So if you recall -- I will start by touching on the

24  settlement briefly --

25         **THE COURT:**  Right.

1          **MR. HOCKADAY:**  -- and then going through here.  So --

2          **THE COURT:**  And I do remember the settlement.

3          **MR. HOCKADAY:**  Yeah.  If you recall from the

4    settlement, the way they kind of worked around that problem was

5    they said, okay, it's a guaranteed contract for the first year

6    but not years two and three.  And it's clear --

7          **THE COURT:**  You're right.

8          **MR. HOCKADAY:**  -- because they performed some

9    services they're entitled to all the pay for the remaining, and

10   there were two weeks you didn't pay so you pay those two weeks.

11   And that was how they kind of clumped it in.

12         The problem is, is that whenever you do an analysis

13   on contract claims, there are mitigation issues, there are

14   performance issues.

15         I don't think this Court ruled as a matter of law

16   that it was a guaranteed contract and that they're entitled to

17   it.

18         And the only way that you get to that 82.4 million

19   figure is if you credit 100 percent of the contract damages or

20   amount for each player and that -- and guarantee that they

21   played three years.

22         **THE COURT:**  Okay.

23         **MR. HOCKADAY:**  So I think that's a big issue as it

24   pertains to the contract.  And we can't just presume,

25   especially when there hasn't been a finding of liability, that

51

1   they're all the same.

2        **THE COURT:**  Okay.  So let's assume, again, you're not

3   conceding this for discussion purposes, there is liability.

4   What's involved?  I mean, again, I'm going to -- we have 400

5   players, they're all getting paid the same, same contract.

6        What I'm trying to understand is acknowledging they

7   all came from different walks of life, different circumstances,

8   what -- how do we particularize the damages as -- because the

9   way the Court has to examine it, correct me if I'm wrong, is

10  each player would have to be evaluated for what that player

11  lost as a result of the breach.

12       And then that would be all subsumed in the claim that

13  was assigned to the Trustee.  Would you agree with that

14  statement?

15       **MR. HOCKADAY:**  Yes.

16       **THE COURT:**  Or do I have it wrong?

17       **MR. HOCKADAY:**  With the caveat of conceptually they

18  would be in there.  But when you actually get to computing the

19  actual amounts, it's problematic because a lot of these players

20  wound up playing for the XFL.  They mitigated their damages.

21       **THE COURT:**  And you've anticipated my next question.

22  So what I recall -- and I'm a student of hearsay.

23       But what I recall is fact I might have caught a

24  couple of these games on TV because I love sports, where I'm

25  going -- I said to my wife, I think that guy was one of the

52

1   players in the AAF.

2           So what you're arguing is one of the things you need

3   to look at is that, well, okay, all well and good, but some of

4   these guys may have as a result of starting out in the league

5   and the fact they didn't perform under that contract,

6   ultimately played.  Is that one of your arguments?

7           **MR. HOCKADAY:**  Yes, Your Honor.

8           And the other salient point that I don't want to get

9   lost on here --

10          **THE COURT:**  Please.

11          **MR. HOCKADAY:**  -- is that this league started and

12  ended in 2019 from a playing standpoint.  There was a big thing

13  that happened in 2020 called Covid that shut everything down.

14          There's no guarantee that a fledgling league that

15  couldn't even pay its bills before we came in and had multiple

16  existential crises where they should have shut it down before

17  we even got here, that they would have survived Covid.

18          I mean, you look at the NBA, the NFL, and some of

19  these other big leagues, they were losing money hand over fist

20  because a third of their revenue stream was cut with no gate

21  revenue.

22          So there are -- there is an assortment of issues that

23  would have to be investigated at the very least in order for

24  you to justify that damage model.

25          And before we even get there, you got to presume that

53

1    we were liable in the first place, which I don't know of how

2    we're liable for a contract claim if the business isn't viable.

3    It just ends, period.

4            **THE COURT:**  Okay.

5            **MR. HOCKADAY:**  So I -- so on the individualized

6    piece, our position is this.  We would really -- we request the

7    Court to strike the disclosure all together, allow us to

8    proceed to trial with the damages that were disclosed.

9            In the alternative, if the Court is inclined to give

10   them the opportunity, we request 120 days.  We need opportunity

11   to depose Colton Schmidt on this, and any of these other folks

12   that they intend to rely on to support that $82.4 million

13   figure.

14           And I can tell you, Your Honor, before they get up

15   and say that we're trying to delay, personally I do not want

16   this to go 120 days.

17           I -- my -- I haven't said this before, but my wife is

18   pregnant and is due in mid-May.  And I'd really not like to pay

19   child support because I'm in a two-week trial.  So we are

20   motivated to move this thing forward in February if possible.

21           And as far as the other stuff, I will -- I told

22   Mr. Horan I would do this.  I inadvertently copied and pasted

23   the certificate of conference.  I did not confer with him

24   before I filed that, so I apologize to the Court and him.

25           But it is our position that he was aligned with the

54

1  Trustee when it came to this motion, as evidenced by

2  Mr. Saltz's presentation before and not wanting to move there.

3  So just making that clear for Mr. Horan.

4          **THE COURT:** All right.

5          **MR. HOCKADAY:** And then, finally, as it pertains to

6  the exhibits, you know, our position is the focus of the motion

7  really is on disclosure and disclosure itself.

8          As outlined in our brief, these -- we categorized it

9  to make it easy for the Court. The amount of the -- most of

10 these exhibits are related to discovery matters that happen

11 before.

12         I understand why they went that route. We threw a

13 few strays at them in our footnotes, talking about before, so

14 we acknowledge that. I don't really think that's germane to

15 this case. We're certainly not relying on that.

16         However, if the Court does want to entertain that or

17 hear that, I have a whole stack of exhibits that have rebuttal

18 emails, and I'm happy to answer any questions as an officer of

19 the Court.

20         **THE COURT:** Okay. Thank you. And I hope we don't

21 have to go down that road. If we do, we do.

22         Let me look at my notes for a minute. Yes.

23         **MR. HOCKADAY:** Oh, I think --

24         **THE COURT:** Go ahead, you can --

25         **MR. HOCKADAY:** -- Mr. Lowenstein wanted to --

1          **THE COURT:**  Sure.

2          **MR. HOCKADAY:**  -- chime in a little bit if that's

3     okay.

4          **THE COURT:**  Come to the podium, please.

5          **MR. LOWENSTEIN:**  Yes.  Congratulations.

6          **MR. HOCKADAY:**  Thank you.

7          **THE COURT:**  Which -- is this your first?

8          **MR. HOCKADAY:**  My second.

9          **THE COURT:**  Was the first born during --

10         **MR. HOCKADAY:**  No, my first is -- he's 12 so --

11         **THE COURT:**  Oh.

12         **MR. HOCKADAY:**  -- this is like season two of life

13    so --

14         **THE COURT:**  Congratulations.

15         **MR. HOCKADAY:**  Story for another day not on the

16    record.

17              **(Laughter)**

18         **THE COURT:**  All right.

19         **MR. SPEAKER:**  Spring league.

20         **THE COURT:**  For the record, please.

21         **MR. LOWENSTEIN:**  Jeff Lowenstein, Your Honor, --

22         **THE COURT:**  Yes, sir.

23         **MR. LOWENSTEIN:**  -- for the DCP parties.

24         So I agree with everything Mr. Hockaday said.  I just

25    -- I wanted to emphasize one point.  This you should have known

56

1  analysis of disclosures, I mean, there is a duty to calculate

2  damages.

3          This is a case with crazy numbers in the hundreds of

4  millions, so maybe in this case 82.4 million doesn't sound like

5  a big number to people.

6          But it is a massive amount of damages being sought

7  that were never disclosed with a dollar number until December

8  2nd, at the very end of discovery.

9          And this you should have known we were going to do

10  that, it just doesn't add up.  As Mr. Hockaday pointed out, the

11  Court's order on the settlement agreement says they don't get

12  to use that for evidence, which they're doing now or trying to

13  do now and saying, you just look at that settlement and we

14  automatically get the max amount owed under these contracts.

15          But also the Court dismissed all of the Trustee's

16  tort claims to the extent that he sought contract damages.

17  They were given an opportunity to leave and to assert

18  noncontract damages.

19          What they're doing here is trying to turn contract

20  damages into somehow fiduciary duty damages.  But they're still

21  contract damages.

22          They're the right to get paid under these contracts

23  which are barred by the contort elements the Court considered

24  in the motion to dismiss.

25          So whether you agree with me or not and whether

1  you'll grant our dispositive motion, we were shocked to see

2  them simply calculate the total amount owed under all of these

3  426 contracts and say, that's the damage amount that they're

4  entitled to.

5         And my -- I mean, my preference is the Court takes

6  them and we go to trial as scheduled because we're ready to get

7  this tried.

8         If the Court doesn't do that, I believe the Court

9  will dismiss it after a motion for summary judgment based on

10  the Court's prior rulings and many other factors.

11         But if not, we simply deserve to have the opportunity

12  to take discovery on this.  And it was very -- not our

13  obligation to figure out what their damage claims are when they

14  don't disclose them.

15         But even if it were, we were genuinely surprised to

16  see that number up here.  I just didn't think -- especially

17  with what Mr. Engel had pointed out to the Court in briefing

18  that Mr. Hockaday cited to where he pointed out all the

19  individualized -- I think it's paragraphs 41 through 48 in that

20  brief where all the individualized issues with respect to those

21  contracts and the damages for each of those players would be

22  pertinent.

23         And we certainly want to explore how to defend an

24  $82.4 million claim through discovery.  That's all I wanted to

25  add.  I appreciate it.

1          **THE COURT:**  Again, I haven't heard the other side.  I

2    -- but as I listen to this, I think Mr. Engel actually answered

3    my question.

4          Is my understanding that how many witnesses do we

5    have?  Just roughly ballpark it for me right now for trial.

6          **MR. LOWENSTEIN:**  I'm guessing thirtyish with experts.

7          **MR. ENGEL:**  Twenty-two or 23 plus five experts.

8          **THE COURT:**  But my understanding was that -- so we'll

9    say between 20 and 30, all well and good

10          But one of the things I -- that I did express some

11    concern, because I love sports, and I really like hockey, is

12    that, you know, I know Mr. Dundon owns the Hurricane.

13          And I think you told me that his availability and

14    maybe Mr. Ebersol's would not be an issue because you were

15    going to introduce their testimony by video.  Or did I have

16    that wrong?

17          **MR. LOWENSTEIN:**  No.  Mr. Dundon will be here live.

18          **MR. HOCKADAY:**  He'll be here live.  I think --

19          **THE COURT:**  Okay.

20          **MR. HOCKADAY:**  -- one of the things, Your Honor, that

21    we talked about with everybody is because a lot of these maybe

22    come by video, coordinating maybe and asking the Court its

23    preference as far as specific days that certain people have to

24    be here.

25          **THE COURT:**  (Inaudible)

59

1       **MR. HOCKADAY:**  (Inaudible) may be difficult for

2  Mr. Dundon and Mr. Ebersol to be (inaudible).

3       **THE COURT:**  So not present here in the courtroom but

4  appearing by video for examination.

5       **MR. HOCKADAY:**  Oh, no, they'd be present for their

6  examination.  But maybe certain days where they're not on the

7  stand or testifying --

8       **THE COURT:**  Okay.

9       **MR. LOWENSTEIN:**  Not sitting in court through the

10 entire trial I think was the plan.

11      **MR. ENGEL:**  This is Engel, E-N-G-E-L.  Mr. Ebersol is

12 anticipated to be here for his testimony --

13      **THE COURT:**  Okay.

14      **MR. ENGEL:**  -- as well, and perhaps throughout trial.

15 I haven't worked that out.  But he'll certainly be here when

16 he's testifying.

17      **THE COURT:**  Okay.  And I misunderstood that, and I

18 apologize.  But I just needed to know that so -- okay.

19 Anything else, Mr. Lowenstein?

20      **MR. LOWENSTEIN:**  No.  I appreciate you letting me

21 talk in addition for the same parties.  Thank you.

22      **THE COURT:**  Who's next, please, Mr. Treyzon.

23      **MR. TREYZON:**  Yes, Your Honor.  Thank you.

24      **THE COURT:**  All right.

25      **MR. TREYZON:**  If you will, just give me just a

1   second.

2          **THE COURT:**  Of course.  When you're ready, sir.

3          **MR. TREYZON:**  Thank you very much, Your Honor.  Once

4   again, Boris Treyzon for the Trustee.

5          Your Honor, I'm going to start by commenting on

6   something Mr. Lowenstein said in the very end of it.  There are

7   large numbers in this case.  There's large number of dollars.

8          There is large numbers of players' lives who've been

9   upended as a result of this case, a large number of vendors

10  who've been greatly affected as this.  So it's not surprising

11  we're dealing with millions of dollars.

12         **THE COURT:**  What are some of the claims in this case,

13  if you know off the top of your head roughly?

14         **MR. TREYZON:**  I believe it's about $170 million I'm

15  going to say.

16         **MR. ENGEL:**  Well, leaving Mr. Dundon's claims aside,

17  Judge, it's -- the claim the estate had to give to the players

18  is the number in Ms. Desai's report, 82.4, and there are $60

19  million in other claims.

20         **THE COURT:**  Okay.  So $150,000 million roughly.

21         **MR. ENGEL:**  Yeah, something like that.  The Trustee

22  has been through one round of objecting to claims.  And I think

23  we basically caught everything so --

24         **MR. TREYZON:**  I believe (inaudible).

25         **MR. ENGEL:**  Other than, you know, Mr. Dundon's

61

1    objections, Mr. Dundon's objection. But the Court, if it

2    looked at the docket, would be aware that we filed an omnibus

3    objection --

4              **THE COURT:** Right.

5              **MR. ENGEL:** -- as is usual to kind of clear the decks

6    of the garbage. And I shouldn't say it that way, of the non-

7    meritorious stuff. And that has already been done, so I expect

8    those claims will look about like that in the final claims

9    analysis.

10             **THE COURT:** So -- and for the record, that was

11   Mr. Engel.

12             So this is interesting. And I will tell you before I

13   ask this question. I'm dealing with a similar issue in another

14   Chapter 7 case that actually is taking more time than this one

15   is.

16             But here's the question. If -- let -- we're going to

17   -- just for discussion purposes, let's assume the claims are at

18   150 million. I assume that doesn't include professional fees,

19   correct?

20             **MR. TREYZON:** It does not, Your Honor.

21             **THE COURT:** Okay. But at what point is there a

22   surplus, and who gets it?

23             **MR. TREYZON:** Your Honor, I believe my understanding

24   of the waterfall that exists would be administrative claims,

25   professional fees, all the claims get satisfied.

62

1          To the extent it gets -- there is a surplus, it goes

2     to the equity holders of which Mr. Dundon potentially is one of

3     them.

4          But there is an existing waterfall that exists for

5     how the money is to be distributed.  And it's very

6     straightforward, it's not controversial.

7          You go with highest seniority claims, lowest senior

8     claims; when everything is exhausted, it goes to the equity

9     holders because that becomes the value of the business that has

10    been shut down in a Chapter 7 bankruptcy.

11         **THE COURT:**  And so the reason why I ask that

12    obviously -- Mr. Engel, I will give you a chance to respond in

13    just a minute -- is I can't go into a lot of detail.

14         But I do have a case in which the curious prospect is

15    that there could be a benefit to equity.  Now, I'm not going to

16    say anything else on the merits.

17         The other interesting thing is -- and forgive me for

18    asking this but it caught my attention in one of the footnotes

19    -- is that in that case, Trustee's counsel is of the opinion

20    that basically counsel gets a dividend, a huge dividend in that

21    case, yes.

22         **MR. TREYZON:**  Counsel gets a dividend?

23         **THE COURT:**  Yes, counsel.  And I'm not going to

24    discuss the merits with you.

25         I assume are you, the professionals in this case, are

63

1    just getting paid, going to be -- they're going to be

2    compensated for hourly work; is that right, or is it

3    contingency?

4           MR. TREYZON:  No, Your Honor, we are in this case --

5    and the Court signed that order -- we're contingency.

6           THE COURT:  So conceivably you could --

7    notwithstanding how much time you got in the case, you could

8    get, for lack of a better word, a surplus.

9           MR. TREYZON:  No, Your Honor, we cannot.  We can only

10   get a percentage of what we recover.  The equity holders can

11   get a surplus of the net amounts.

12          THE COURT:  Okay.  Thank you.

13          Did you want to say something, Mr. Engel?

14          MR. ENGEL:  I was just going to give you the numbers,

15   Judge, --

16          THE COURT:  Sure, go ahead.

17          MR. ENGEL:  -- so that you have them.  There's about

18   $70 million --

19          THE COURT:  I don't want to make you move too much

20   but could we -- I want to make sure -- would you talk in the

21   microphone at your desk?

22          MR. ENGEL:  No, I'll come right up here because I

23   enjoy this space.  I was just going to give you the numbers,

24   Judge.  There's about $70 million of equity that was

25   contributed separate and apart from whatever Mr. Dundon put in.

64

1          So my appreciation of these cases and my appreciation

2  of this case is the Trustee brings the whole claim, and if

3  there's a surplus, there's a surplus.

4          You know, since the lawyers here are paid on

5  contingent fee, could the lawyers get a bigger fee if they

6  recover a surplus?  Yes.

7          Would the Court have jurisdiction to decide what fees

8  were reasonable if it awarded fees against Mr. Dundon?  Yes.

9          In other words, it's possible that the amount the

10  lawyers were entitled to under their agreement to represent is

11  a bigger number than the court would include in a judgment.  Am

12  I making --

13          **THE COURT:**  You are making --

14          **MR. ENGEL:**  -- some sense?

15          **THE COURT:**  Yes, you are making sense.

16          **MR. ENGEL:**  That's twice today.

17          **THE COURT:**  All right.

18          **MR. ENGEL:**  Anyway, I just wanted you to have the

19  numbers.  So Mr. Dundon is somewhere around 69 or $70 million.

20  And the other equity is around $70 million.

21          And the surplus, as I appreciate it, would go back to

22  equity.  And, frankly, that equity would include Mr. Dundon.

23  And there's not much I can do about that.

24          **THE COURT:**  Curious aspect of this case.

25          **MR. ENGEL:**  Sure is.

1          **THE COURT:**  All right.  Thank you, Mr. Engel.

2          **MR. ENGEL:**  Sorry.

3          **THE COURT:**  No, I appreciate -- Mr. Treyzon, I'll try

4    not to interrupt you again.  But I think you could at least see

5    why I wanted to get that question answered so --

6          **MR. TREYZON:**  I do, Your Honor.  And I appreciate it.

7    And actually I invite the Court to interrupt me because I --

8    this is a complicated case with a lot of data and a lot of

9    moving pieces.  And I think a Socratic discussion is probably

10   the best way to get to the end of it.

11         I do want to correct one thing that Mr. Engel has

12   said.  He said that Mr. Dundon contributed.

13         Actually, who contributed what is actually going to

14   be one of the topics of the discussion because the agreement to

15   contribute money was made with Mr. Dundon and Mr. Ebersol in a

16   meeting.

17         However, the subsequent documents that were

18   presented, none of which were signed by Mr. Dundon, raise an

19   issue.  I don't -- it's a preview almost of what's coming.

20   It's not germane to what we're talking about.  I just wanted to

21   correct something --

22         **THE COURT:**  Okay.

23         **MR. TREYZON:**  -- that Mr. Engel has said.

24         Having said that, Your Honor, the whole point of the

25   Rule 26 is to avoid an unfair surprise.

1          As a matter of fact, most of the cases cited by DCP

2     parties deal with complete either failure to disclosure or

3     disclosure after time.  None of this is applicable here.

4     Everything the Trustee has done has been done on time.

5          And the only reason a supplemental was filed was to

6     clarify and summarize everything that has been learned

7     throughout the discovery proceedings, which were extremely

8     extensive.

9          Mr. Hockaday referenced I think -- I believe was

10    something like 20 depositions.  Your Honor, several million

11    pages of documents, everything has been uploaded into software

12    that allows you to tab and correlate and search for documents.

13         As a matter of fact, in preparation for today's

14    hearing, we went through the software.  And for virtually every

15    single person that DCP's parties are complained of -- and I

16    have a list, Your Honor, and if called upon I would actually

17    move it into evidence.

18         Every single one of them is either revealed in a

19    document and we have Bates stamps number, or has been discussed

20    in deposition and has been brought attention to.

21         Not only that, the DCP parties themselves in their

22    12(b)(6) motions -- and, Your Honor, this is the docket number

23    18.  On page 26 and 27 --

24         **THE COURT:**  Which case, please?

25         **MR. TREYZON:**  I apologize, 22-05078-CAG.

67

1          **THE COURT:**  All right.  Let me follow along with you

2   if I may.  Just one minute.

3          **MR. TREYZON:**  It's a 12(b)(6) motion, Your Honor.

4          **THE COURT:**  Right.  But I just want to be -- and you

5   said this is at 18; is that correct?

6          **MR. TREYZON:**  Correct.

7          **THE COURT:**  Okay.  And are you referring to the main

8   document?

9          **MR. TREYZON:**  I am, Your Honor.

10         **THE COURT:**  Okay.  And that page again, please, sir?

11         **MR. TREYZON:**  Your Honor, on the document page, it's

12  page 26, the very last three words, and going on to page 27.

13         **THE COURT:**  Okay.  Twenty-six at the bottom or 26 at

14  the top?

15         **MR. TREYZON:**  Twenty-six at the very bottom, Your

16  Honor.

17         **THE COURT:**  All right.  Thank you.  And I just want

18  to follow along with you so --

19         **MR. TREYZON:**  I appreciate it.

20         **THE COURT:**  -- go ahead, please.

21         **MR. TREYZON:**  So I'm going to read it into the

22  record.

23         The claims in paragraphs 176 through 180 are claims

24  asserted by the Trustee as an assignee of player creditors.

25         Because the players had no direct claim against

68

1 Dundon for breach of fiduciary duty based on their status as

2 creditors of the league, the assignment of those claims is

3 meaningless.  The claims must be dismissed.

4   I'm not quite sure how it is that the DCP parties

5 claim surprise at the fact that claims are being presented as

6 if this were already adjudicated by the Court.

7   Not only that, if their argument is, yes, we knew the

8 claims were coming but we did not know that the claims -- what

9 the amount of the claims is, I would respectfully direct to I

10 believe it's page 51 of our original declaration but I could be

11 wrong.  I'm doing it from memory.

12   That states when we get towards the end -- and I'm

13 paraphrasing -- the damages are going to be calculated.

14   Your Honor, you were actually -- your memory was

15 extremely precise.  When we brought -- we as original counsel

16 for the players brought before this Court our prayer for class

17 certification, Your Honor was skeptical.  You said, it's not

18 very usual that we see class action in Bankruptcy Court.

19   And I pointed out to the Court, Your Honor, this is

20 an extremely unusual case.  We have in totality 415 or 17

21 contracts that says with no difference -- the only difference

22 is the name of the player and the address where the check is

23 sent to.

24   Everybody's playing the same amount of games.

25 Everybody's getting paid to a dollar the same amount of money.

1  Everybody is bound by the same term of the contract.

2          Ther is only two ways that those contracts could be

3  terminated by the league -- well, in this case, the Debtor.

4  Players' performance.  No such evidence exists because the

5  players were not playing.  They could not have been terminated

6  for performance.

7          Or violation of the moral code or the players'

8  guidebook.  If the Court remembers, nobody could actually find

9  that guidebook so we know they cannot be terminated for

10  violation of something that doesn't exist.

11          And Your Honor during that hearing asked me a very

12  interesting question.  Says, well, Mr. Treyzon, what about

13  COVID?  How do we know that the league would survive?  And this

14  is exactly that my esteemed colleague just argued.

15          And I answered Your Honor, well, we have a very

16  unique situation.  And in fairness of that time, I reacted

17  tongue-in-cheek.  They're playing in gloves, they're wearing

18  masks, and they're helmeted, so I don't think that they would

19  even be subject to COVID.

20          I'm not -- I'm mentioning that probably to remind the

21  Court that because the Court was actually laughing at that

22  suggestion at the time.

23          The whole point, Your Honor, we don't get to judge

24  backwards what is -- what would have happened.  We know that

25  the breach occurred from our standpoint in April of 2019.  And

70

1   when that did occur, some of the contracts became due and

2   payable.

3           Whether some of the players played somewhere else,

4   that's going to become a topic of a discussion during trial.

5   It's not going to become a topic of a discussion right now.

6           Their entitlement to compensation based on the

7   contract that was canceled essentially reached a form I guess

8   of rejection would be based on that contract.  And it would be

9   up to Court to determine what is the fair compensation.

10          There is absolutely no sense to take 413 depositions

11  which would all amount to the same questions.  Did you sign

12  this agreement?  Were -- did you intend to play going forward?

13  That's it.

14          We -- there's -- we have as many witnesses as we do.

15  It makes absolutely no sense.

16          But, Your Honor, the important thing is here.  There

17  isn't a single instance that we can see that going through all

18  the pleadings where information was not made available to DCP

19  parties.

20          It was disclosed in paragraph 12 of the first amended

21  complaint saying that's what we're doing.  In our initial

22  disclosure it says it will be calculated.

23          I will represent to you that if I put Mr. Engel on

24  the stand, he would testify in his -- one of his very initial

25  conversations with Mr. Hockaday, he informed him that I intend

71

1   to proceed for all of the player claims.  Every claim that's

2   been filed in this case, I intend to go against you.

3         Your Honor, every single claim --

4         **THE COURT:**  Well, but he -- when speaking to

5   Mr. Hockaday, he was telling -- Mr. Engel was telling

6   Mr. Hockaday that he was going to do what again?  Could you --

7         **MR. TREYZON:**  Try to recover from Dundon Capital

8   Partners --

9         **THE COURT:**  Okay.

10         **MR. TREYZON:**  -- for everything that was lost or

11   everything that is charged to the estate because perception of

12   the time was that Dundon Capital Partners is responsible, or

13   Dundon parties.

14         And, Your Honor, the important thing to mention here

15   is we're not trying to prejudge a trial.  The only thing this

16   proceeding is designed to address is whether there was an

17   unfair surprise against the Defendant.  And we respectfully

18   submit there was not.

19         If called upon and a evidentiary hearing became

20   necessary, I can literally go through every single thing

21   complained of, and I can point out where there was notice,

22   direct or indirect, in the proceedings of this case, either in

23   the documents or in the witness testimony or in the

24   depositions.

25         Everything is always up and up.  We don't intend to

72

1    put on 400 witnesses.  We're -- Your Honor would never be able

2    to retire.  We would be here forever with just listening to

3    people, person after person.

4            This has to be a streamlined proceeding.

5            The -- are the player claims in issue?  Yes.  Were

6    there how many of them?  Four hundred I believe 13.

7            Do we know how many of them were priority claims?  We

8    do.  That's part of the settlement agreement.  Do we know how

9    many of them are nonpriority claims?  We do.  That's also up to

10   this Court to decide.

11           But we are dealing with an unfair surprise.  There is

12   absolutely no unfair surprise.  In our initial disclosure, we

13   said the experts, when they're going to be hired, are going to

14   be talking about damages.

15           The calculation of damages is the province of the

16   experts because they have to take all available information --

17   in this case all of the contract -- sum them up, add them up.

18           As Mr. Lowenstein said, Ms. Desai is going to be

19   deposed.  She'll be asked, how did you do this, and she will

20   explain her methodology.

21           The expert witnesses were not challenged under

22   Daubert challenges so obviously they're going to be testifying.

23   So they're not in a position to limit what they are testifying

24   about if they're not challenging the witnesses.

25           So, Your Honor, I can go into great detail about

73

 1   everything else, but I believe that's enough for the Court to

 2   make its decision right now.

 3            **THE COURT:**  All right.  Thank you.  And I appreciate

 4   that.

 5            One thing I just want to get clarification on is at

 6   what -- just the raw number, the $82.4 million in damages, as

 7   you understand it, when was it actually disclosed to the other

 8   side?

 9            **MR. TREYZON:**  I -- the actual number?

10            **THE COURT:**  Yes.  The --

11            **MR. TREYZON:**  It was put in the expert report, Your

12   Honor.

13            **THE COURT:**  Right.  On --

14            **MR. TREYZON:**  But --

15            **THE COURT:**  -- December 2nd.

16            **MR. TREYZON:**  Right.  But that number I believe is

17   calculated in the claims filed --

18            **MS. WILLIAMS:**  (Inaudible)

19            **MR. TREYZON:**  Yeah, Your Honor, --

20            **MR. SPEAKER:**  Okay.  We got way too many people

21   standing up.

22            **MR. TREYZON:**

23            **THE COURT:**  For the record, please.

24            **MS. WILLIAMS:**  Yes, Your Honor.  Nicole Williams.

25   And Mr. Engel can clarify from a bankruptcy perspective if he

74

1    needs to, but since I did the class settlement agreement, I

2    thought it might make sense.

3            So the settlement agreement is very specific about

4    what claims are being assigned.  And the only claims that are

5    being assigned are those for damages in the amount of the

6    alleged nonpayment under the standard player agreements.

7            So we didn't receive, for example, the players'

8    personal injury claims or anything like that.  All we received

9    were claims against Dundon in that amount, and the right to

10   seek those damages.

11           So in the pleading, Mr. Treyzon referenced in

12   paragraph 12 of our first amended complaint, it says on behalf

13   of the players, we're seeking damages -- and this is the quote

14   -- specifically for the amounts not paid under the SPAs.

15           And so the 82.4 million number isn't there, but it

16   tells you exactly what we're doing.  And to get to that number,

17   and what Ms. Desai did, all you have to do is look at the

18   settlement agreement and the 413 claims made and do the math.

19           So did we say 82.4 in the pleading?  In some of the

20   prior things we didn't.  But was the way to calculate that

21   number easily available and readily disclosed as early as the

22   first amended pleading?  Absolutely, Your Honor.

23           **THE COURT:**  All right.  Thank you.

24           **MR. TREYZON:**  I'm done, Your Honor.  I just want

25   to --

75

1            **THE COURT:**  And I just want to give you a chance to

2   retrieve your materials first.

3            **MR. TREYZON:**  Thank you so much.

4            **MR. ENGEL:**  You don't know how hard it is, Judge, for

5   me to not stand up right now and make the correct bankruptcy

6   citations.

7            **THE COURT:**  I have no doubts about that.

8            **MR. HOCKADAY:**  I'm going to stay firmly planted in my

9   chair.

10           **THE COURT:**  And the Court appreciates because the

11  lawyers that are arguing are doing a splendid job.

12           **MR. HOCKADAY:**  Yeah.

13           **THE COURT:**  All right.

14           **MR. HOCKADAY:**  It is 437 claims, however, not --

15           **THE COURT:**  All right.

16           **MR. HOCKADAY:**  -- 438.

17           **THE COURT:**  Four thirty-seven, fair enough.

18           **MR. SPEAKER:**  (Inaudible) do it instead.

19           **MR. HOCKADAY:**  (Inaudible)

20               **(Laughter)**

21           **THE COURT:**  All right.  For the record, please?

22           **MR. HOCKADAY:**  Thank you, Your Honor.  Brent

23  Hockaday, just very briefly.

24           The only thing germane to this motion that I heard

25  was the first time that the 82.4 figure was disclosed was

76

1    December 2nd, 2024.  And as Ms. Williams articulated, because

2    she did the settlement, all this was knowable to the Trustee

3    three years ago.

4         End of story.  They had the opportunity and they had

5    the obligation on February 5th, when they did their

6    disclosures, or sometime much before the end of discovery, to

7    do so.

8         And as far as my -- I've had a lot of conversations

9    with Mr. Engel.  And I enjoy every one of them truly.

10        I don't remember specifically what he's talking

11   about.  But I -- Mr. Engel and I having a conversation and him

12   telling me what I -- he may or may not pursue is not tantamount

13   to Rule 40 -- Rule 26 disclosures.  There's a lot of things we

14   say that aren't pursued.

15        So that's not a disclosure.  And stuff that happened

16   in prior proceedings, especially ones that are closed, are not

17   sufficient notice under Rule 26.  And as we've put in our

18   briefing, expert reports aren't either.

19        **THE COURT:**  All right.

20        **MR. HOCKADAY:**  Thank you, Your Honor.

21        **THE COURT:**  Thank you.  I very much appreciate the

22   fact that we did not have to go through volumes of exhibits, he

23   said, she said.  I really do appreciate that.

24        I love my job, but that's one component when we get

25   into bickering that I don't particularly enjoy.  I had enough

1     of that as a parent for a number of years.

2              I'm going to take a short recess and then I'm going

3     to come back and tell you what I'm going to do.

4              Let's assume that we'll be out at least ten minutes,

5     so if you need to step away, feel free to do that, please.  So

6     a short -- we're in recess, ladies and gentlemen.

7              **THE CLERK:**  All rise.

8          **(Recess taken from 3:27 p.m. to 4:00 p.m.)**

9          **(Hearing in progress.)**

10             **THE COURT:**  -- there is good reason for it, so I do

11    want to apologize for making you wait.  Let me just log back

12    onto my computer and then I'll tell you all what the Court's

13    going to do.

14             **MR. ENGEL:**  We were becoming frenemies again, Judge,

15    so --

16             **THE COURT:**  Oh, that's splendid.

17         **(Laughter)**

18             **MR. ENGEL:**  -- don't worry about it at all.

19             **THE COURT:**  I'm delighted to hear that.

20         **(Mr. Engel/Mr. Speaker confer.)**

21             **THE COURT:**  For what it's worth, this has -- this is

22    not dispositive of anything.  But for what it's worth, how do I

23    -- did anyone here serve as a law clerk before?  Who did you

24    clerk for, Mr. Hales?

25             **MR. HALES:**  Judge Nowak in the Eastern District.

1          **THE COURT:**  Okay.  So -- oh, Christine?

2          **MR. HALES:**  Yes, Your Honor.

3          **THE COURT:**  Oh, fighting Texas Aggie.

4      **(Laughter)**

5          I think very highly of Christine.  She is a wonderful

6  person and a very fine jurist.  And now she's moved to the

7  State Court.

8          But she's a -- I genuinely mean it, I've gotten to

9  know her through Aggie events and I just have -- think the

10 world of her.  I think she's a -- you were lucky to clerk for

11 her.  And I really mean that.

12         **MR. ENGEL:**  I believe that.

13         **THE COURT:**  Okay.  So let's talk about the first one,

14 which is the -- I want to get it right.  The DCP parties'

15 emergency motion to strike and, in the alternative, motion for

16 continuance at ECF Number 184.

17         The ruling that I'm about to give does incorporate --

18 I've considered all the pleadings and the arguments of counsel,

19 so I want to say that first.

20         I will tell you that, yes, I have been on you all

21 about getting to trial.  I think it was Mr. Treyzon said, gosh,

22 he might actually retire and we'll -- you know, we'll -- what's

23 going to happen.

24         And we need not worry about that at this point in

25 time.  That really wasn't an issue before we walked out today

1    so don't let -- but I will tell you this.

2            The only one that has the institutional memory of

3    this case in my chambers now is me.  Ms. Elizondo retired.

4    Great memory.  And I think three or four law clerks have worked

5    on this case.

6            And so there's a reason why I'm sharing that with

7    you.  I do recall the settlement.  I do recall the amount of

8    work that was employed at the time the settlement was made.

9            I was aware of the provisions that Mr. Hockaday cited

10   to the Court.  But, frankly, until today, for what it's worth,

11   it never occurred to me that part of the Plaintiff's recovery

12   was these contract claim damages.  I just wasn't aware of that.

13           I had assumed it was all premised upon other forms of

14   liability.  And, in fact, you know, as I read the moving papers

15   real closely, I was a bit surprised by the revelations

16   regarding Ms. Desai's expert report and the calculations.  And

17   it's a significant number.  I'm sorry, it just is.

18           And up until that point of time, if you had asked the

19   Court -- and, again, I'm not involved in the case day-to-day.

20   I'm not involved in the back and forth.

21           But if you ask the Court, Judge, did you know that we

22   were including an amount for the player claims, I would have

23   frankly shown surprise.  I'll just be honest with you.  It was

24   not on my radar that this was part of the Trustee's recovery.

25           And I read the pleadings real closely.  And it's one

80

1  thing -- you know, Rule 26, you both have argued back and forth

2  what the Court should look at.

3          But there's one thing to say it's in the pleadings

4  versus it's another thing to say this is what we're actually

5  seeking in damages.

6          And I say this with respect to the lawyers

7  representing the Trustee.  You all are really good lawyers.

8  I'm not attributing any bad conduct or anything like this.

9          I will say, you know, there are cases in which I

10  really look forward to having the lawyers in the courtroom.

11  And this is one of the cases because the lawyers are so good

12  and so professional and, for the most part, civil.  And so it's

13  a real privilege to preside over these cases.

14          But, you know, I went back and I really -- I read

15  each pleading probably three times in preparation for this

16  afternoon, and really thought about it because, as I have told

17  you, my mantra's been let's get to trial, let's get to trial,

18  let's get to trial.

19          Heck, somebody's wife might get pregnant and that

20  might be an issue, you know, something like that.  But life

21  events happen and we just don't know what's going to happen

22  down the road.

23          But I walked out here with the sense that what I

24  needed to do reluctantly was to continue trial but permit the

25  disclosures to stand.

81

1          You know, we're not going to -- if I'm going to

2     continue trial, I'm going to let the disclosure stand and allow

3     the Trustee as part of his case, subject to further pleading,

4     that those claims for relief.

5          But I must tell you, and I say this with the greatest

6     respect, it did not occur to me in reading any of the moving

7     papers that this was going to be part of your sought recovery.

8     Now, that could be just an absence of knowledge on my part or

9     an inability to understand your case.

10         But when I read through the chronology of events and

11    I've heard -- you all did not waste my time this afternoon.

12    You were very direct in your arguments to the Court.

13         I really never got the sense of, well, we identified

14    it is in the Court's judgment under Rule 26 different than

15    actually disclosing the amount of damages.

16         More importantly -- I actually had this issue come up

17    on a counterclaim recently in another case -- is there's a

18    difference between supplementing and amending.

19         This is not a supplement in the Court's judgment.

20    This is entirely different than what the Court understood the

21    damage model to be in this case.

22         I want to be clear, I'm not criticizing the Trustee.

23    We avoided who did what, that sort of thing.  I'm just simply

24    telling you that based upon what's been argued to the Court,

25    I'm of the opinion that there wasn't sufficient disclosure to

82

1   put the Trustee's or rather the DC parties on notice.

2          So reluctantly I'm going to grant the continuance.

3   But I'm not going to strike any of the disclosure.  So let's --

4   Mr. Hockaday, let's you and I talk for just a minute, if you

5   can come to the podium.

6          **MR. HOCKADAY:**  Yes, Your Honor.

7          **THE COURT:**  So, you know, this upset the apple cart,

8   so to speak.  I can tell you even on 120 days I'm -- the Lord

9   willing, I'll still be here.  It's my intention to finish this

10   case out, regardless whenever that date is that I'm going to

11   retire.  So that's not the issue.

12          What I need to know from you with some level of

13   precision is if I'm going to give you the 120 days, just

14   identify to the Court two things:  in general terms, the

15   discovery you're seeking and then, second, the motion that you

16   think you'll want to employ based upon discovery that you

17   undertake.

18          **MR. HOCKADAY:**  Thank you, Your Honor.

19   We would be seeking third-party subpoenas of the various

20   players, the deposition of Colton Schmidt, and potentially

21   other players.

22          I would need to confer with Mr. Lowenstein the depth

23   that we would need to go.  I don't believe we're going to need

24   to get all 437, but there are many players that we would need

25   to actually talk to to get some kind of critical mass.

1      And then the dispositive -- we would be then looking

2  to file a dispositive motion, largely on legal issues that I

3  previewed a little bit during my argument.

4      **THE COURT:**  Okay.  So you -- to Mr. Engel's statement

5  that we have 437 players, you agree that we can't -- well, if I

6  was 25 today or -- I couldn't get to these.

7      So I gave some understanding.  I can't let you do --

8  depose 437 people between -- over 120 days.  That's just not

9  feasible.

10      Also, I want to just identify this on the record.

11  It's not lost on me the inherent cost of this litigation for

12  both sides.  I have an acute understanding of that.

13      So can you give the Court maybe some further guidance

14  on what you're looking at?  Mr. Lowenstein, sure, you can come

15  up here.

16      **MR. HOCKADAY:**  Wants to talk.

17      **THE COURT:**  He wants to talk.  But you understand

18  what my reluctance is.  I give you 120 days, you get into it

19  and you go, oh, my gosh, I'm going to need more time.

20      I really, really, really don't want to do that

21  because I've continued this before at your request.

22      **MR. HOCKADAY:**  Yes, Your Honor.  So two things and

23  then I'll let Mr. Lowenstein talk because I know he's been --

24  he's wanting to.  Sorry, Your Honor.

25      So, yes, I do think -- I don't -- it is not our

84

1    intent to go into and relitigate the entire Plaintiff's case.

2           But for those individualized inquiries that I

3    highlighted during my argument are relevant and germane to our

4    defense if the Trustee is going to be allowed to pursue those.

5           And we need to be able to talk to Colton Schmidt,

6    Reggie Northrup, and a few of these other folks who are doing

7    that to see if there is any actual liability.

8           **THE COURT:**  Yes, sir.  For the record?

9           **MR. LOWENSTEIN:**  Jeff Lowenstein, Your Honor.

10          So following Mr. Engel's guidance from that brief

11   that he submitted, there were different issues that were

12   relevant to mitigation and other things like that.

13          My intent is to find a handful of players that fall

14   into different categories and try to find them, subpoena them,

15   taking their depositions.  And hopefully we can get a critical

16   mass of less than ten that represent those issues.  That's --

17          **THE COURT:**  Okay.

18          **MR. LOWENSTEIN:**  -- me talking way more than I should

19   about my strategy for doing this.

20          But it's going to be their burden to establish --

21   it's the Trustee's burden to establish the damages.  I intend

22   to put up some witnesses that are going to poke holes in them

23   just trying to *en masse* give a damage number.

24          So I am thinking in the six to ten max player depos

25   that could be by Zoom that would take 45 minutes.  But it's

85

1   going to be limited by us being able to find them, subpoena

2   them, and get them done.  That's why we asked for 120 days,

3   because we need that time to do that.

4         **THE COURT:**  A hundred and 20 days in which to conduct

5   discovery and file --

6         **MR. LOWENSTEIN:**  A motion, yeah.

7         **THE COURT:**  -- dispositive motion at the end?

8         **MR. LOWENSTEIN:**  No.  We don't need the discovery for

9   the dispositive motion.  Those are -- the damages and the issue

10  and the dispositive motion are totally separate.  I think we

11  have -- we can file a dispositive motion in the next couple

12  weeks because --

13        **THE COURT:**  Okay.

14        **MR. LOWENSTEIN:**  -- we've behind the scenes been

15  doing the research on what are the dispositive issues we've got

16  there.

17        And there is bankruptcy-related issues and just

18  general other claims, including the Court's prior order

19  dismissing the tort -- the contract-based tort claims.  But we

20  can get that done in a couple weeks so that the Court can

21  consider that with the other summary judgments.

22        But the discovery is what we just need to focus on

23  and try to find these players, subpoena them, and do a handful.

24  I don't want to depose 426 players, and I don't think we need

25  to as a defendant do that.

86

1          I just need them -- I need enough witnesses to show

2     the Court that there are unique situations that is going to

3     mean that the Plaintiffs cannot carry their burden on damages.

4          **THE COURT:**  All right.  So 120 days to do what you

5     need to do because we have to talk about resetting the trial

6     date.  And that's why at the beginning I had an open mind when

7     I came out.  I want to be clear on that.

8          I had to think, okay, 120 days from today, just

9     example we're in -- that's four months.  We're in January, now

10    we're in May, okay.

11         And now we have to go back I'm sure, and particularly

12    from the Plaintiff's perspective, we've got to go back and now

13    tell all these witnesses the judge or words, adjectives to

14    describe the judge has reset the trial and now we've got to get

15    -- everyone's got -- there's -- was a certain amount of emotion

16    or inertia to get here, that's all got to be reestablished.

17         That's not lost on me.  And so should we look for a

18    May trial date?  Because I need to know when to reserve some

19    time?

20         **MR. SPEAKER:**  When's your baby due?

21         **MR. HOCKADAY:**  May.

22             **(Laughter)**

23         I would request June, Your Honor, just either --

24         **MR. SPEAKER:**  To get a baby out of the --

25         **MR. HOCKADAY:**  Or we do it --

1          **MR. SPEAKER:**  Hospital.

2          **THE COURT:**  -- in April if we can get it done.  I

3    mean, can we have two minutes to --

4          **THE COURT:**  So why don't we take -- Mr. Treyzon, did

5    you want to say --

6          **MR. TREYZON:**  Yeah, Your Honor.  You know what, if

7    that's the way the Court is going, I want to talk to the

8    Trustee about possibly waiving that claim and leaving the trial

9    as is.  Obviously need to get permission for that.

10          As the Court pointed out, the expense and the

11    inconvenience of moving the witnesses and giving the financial

12    position of what would result if that was recovered in addition

13    to everything and the word surplus that you mentioned.

14          So maybe if we can take five minutes and maybe we'll

15    alleviate this whole issue.

16          **THE COURT:**  I wish you'd have told me at the

17    beginning.

18          **MR. TREYZON:**  Well, we -- I thought --

19          **THE COURT:**  Well, so we have one former law clerk

20    here, okay.  So let me cut to the chase, okay.

21          Have you really studied those -- I mean, you've done

22    the briefing on it.  How long do you think it's going to take

23    me to work through those three summary judgment motions?

24    Thousands of pages of exhibits.

25          **MR. ENGEL:**  I think they're trial briefs frankly at

88

1   this point, Judge.

2          **THE COURT:** But I can't treat them as trial briefs.

3   I have an obligation under the rules to rule on the merits,

4   don't I?

5          **MR. ENGEL:** Well, I think you can carry them with the

6   trial frankly. I don't think the rules require you to rule on

7   them separate and apart from trial. They also were filed at

8   the last minute. And I'm not --

9          **THE COURT:** No. That --

10         **MR. ENGEL:** -- disparaging anyone.

11         **THE COURT:** But you -- speaking directly as a former

12  law clerk, that's a -- if we didn't have anything else to do

13  between now and the trial date, we could probably do a fair

14  amount.

15         But given my current schedule right now and the fact

16  that I've got other people that aren't getting along, it's

17  going to be very difficult for me to give rulings on that.

18         **MR. TREYZON:** Your Honor, one second.

19         **MR. ENGEL:** Well, Your Honor, couple of points. And,

20  again, I'm pointing this way so I'm not pointing this way or

21  this way. I didn't start that ball rolling down the hill,

22  right?

23         **THE COURT:** Right. But it is -- it's --

24         **MR. ENGEL:** And I didn't --

25         **THE COURT:** -- under the rules --

1       **MR. ENGEL:** -- have a -- oh, I'm sorry, Your Honor.

2       **THE COURT:** Under the standing order, that was their

3  right the 13th to file it.

4       **MR. ENGEL:** No doubt.  And I didn't have a choice but

5  to respond.

6       **THE COURT:** Oh, I completely agree with that, yes,

7  sir.

8       **MR. ENGEL:** So when those were filed, we knew what

9  the trial date was going to be.

10       **THE COURT:** Yes, sir.

11       **MR. ENGEL:** And, you know, if the Defendants were

12  thinking about filing omnibus motions on issues that could have

13  been brought up more granularly, then, you know, I don't see

14  why we don't go to trial and those things just become trial

15  briefs.

16       I'm not aware of any rule that requires the Court to

17  rule on them before trial.  Summary judgments are for the

18  purpose of eliminating cases that shouldn't go to trial, that

19  is true.

20       But the judge has already ruled primarily on all

21  those matter of law arguments in the motion to dismiss.  And

22  that's been a long time ago.

23       So, you know, I don't think the Court needs to, is

24  obligated to, or should stop the presses just because the

25  Plaintiffs or the Defendants decided to file an omnibus motion

1    for summary judgment.

2          That said, Your Honor, I'm going to now point the

3    finger at me.  You know, I have always viewed the $82.4 million

4    as the estate's claim that was fixed as a number that the

5    estate now owes people, right.

6          It doesn't necessarily, although it -- we did receive

7    assigned claims.  It's not the only reason that number is a

8    relevant number.

9          I have always thought that it is also -- and this was

10   the subject of I think Ms. Desai's expert report.

11         I have always thought that the Trustee ought to be

12   able to recover those damages in estoppel or in fiduciary duty

13   because Mr. Dundon's disloyalty to company put me in a -- me

14   euphemistically, Judge -- me in a position where I now owe

15   people $82.4 million that perhaps I wouldn't have owed them

16   before.

17         And that wasn't discussed here today, and I let it

18   go.  And I probably should have got up and, you know, pumped my

19   fist in the air.

20         This case is still a very large case numerically,

21   right, on the contract claim, regardless of whether that $82

22   million is in there or not.

23         Moreover, Your Honor, I think that there are some

24   circumstances in which, for example, if the judge were to award

25   relief on the contract claim, I don't necessary think I get to

91

1   keep all of that and the $82.4 million, right?

2           I don't think I get to do additur on that to just

3   keep stacking damages on damages.

4           I think at some point assume the Court said, hey,

5   Engel, that's the greatest case anyone ever tried, I'm going to

6   award relief on all your theories, there are going to be

7   elections for the Court to make.  That is why Mr. Treyzon just

8   got up and said, well, you know, what if we abandoned that.

9           And fingers pointing at me, I probably should have

10  got up and did -- done that before you took your break, to be

11  honest, Judge.

12          **THE COURT:**  Okay.

13          **MR. ENGEL:**  So but now I'm done yelling at myself.

14          **THE COURT:**  So --

15          **MR. ENGEL:**  I need to get to trial.  I'd like to get

16  to trial.  I'm checking with the Trustee now about what --

17  that's why I'm holding this phone.

18          **THE COURT:**  That's fine.

19          **MR. ENGEL:**  I emailed him about what he would like to

20  do because I feel like I owe him a call on that.  I don't --

21          **THE COURT:**  I would encourage you to do that.

22          **MR. ENGEL:**  Yeah.  I don't feel like if I want to

23  live very long I should just do stuff like that on my own

24  recognizance.  But I'll know the answer to that in a second or

25  two.

92

1          Mr. Hockaday said earlier we'd like to try this in

2    February, and we can if the $82.4 million is gone away.  Well,

3    I'm proposing that within the next five minutes we make it go

4    away.

5          **THE COURT:**  Okay.  So, Mr. Hockaday, to the issue on

6    the summary judgment motions, can I carry those to trial?  Is

7    here anything that precludes the Court from doing that?

8          **MR. HOCKADAY:**  I don't know of any rule that

9    precludes the Court from doing that.  But I think the Court can

10   rule on them at any point in time, even if it's the start of

11   trial or during trial.

12         And I don't think it takes much for us to convert to

13   directed verdicts if necessary.  But do you want to --

14         **MR. LOWENSTEIN:**  I'm sorry, Your Honor, for the --

15         **THE COURT:**  No, that's fine, sir.

16         **MR. LOWENSTEIN:**  -- tag-teaming.  But, I mean, I view

17   summary judgments as a way for the Court to narrow the issues

18   for trial.  We expended --

19         **THE COURT:**  Right.

20         **MR. LOWENSTEIN:**  -- a whole lot of the client's money

21   pursuing that to try to narrow the issues for trial.  And I

22   think there's very clear ways to do that that will

23   significantly decrease the number of facts that come in,

24   depending on what the Court rules on.

25         They are very specific issues, such as this oral

93

1   contract, where if the Court grants summary judgment on that,

2   there's a whole lot less to talk about in terms of the contract

3   side of things.

4            And there's a lot more to talk about the fiduciary

5   duty side.  So if he Court rules on the fiduciary duty side

6   about their conduct during the operations of the league but

7   wants to still hear about the contract, they're very different

8   cases.

9            So we expended a whole lot of our client's money to

10  bring those to the Court's -- by the Court's deadline so that

11  the Court could consider those and potentially narrow the

12  issues for trial, which it significantly would do.

13           So I don't know the federal rules well enough off the

14  top of my head to know what it says about that, whether the

15  Court can carry it.  I'm sure the Court can carry it if the

16  Court wants to.

17           Out of fairness to us who I guess relied on the idea

18  that summary judgments were there for the purpose of narrowing

19  issues for trial that we ask under the Court's equitable powers

20  at least that the Court would consider and rule on those

21  before.

22           **MR. HOCKADAY:**  And just to add to that, one -- if

23  Mr. Engel is able to get the damages total dismissed

24  effectively, or they cease pursuing it, and the Court needs a

25  little bit more time, it seems like there's potentially

94

1  opportunity, depending on the Court's availability, to do a

2  continuance somewhere in the middle, like a March or something

3  along those lines, depending on --

4        **THE COURT:**  What I'm thinking -- and the -- I'll let

5  you all talk -- is what I'm thinking, I'm a rules guy.  And my

6  instincts tell me I should rule on them before.

7        So here's what I was thinking is if I could accept

8  your suggestion of maybe an interim is if Mr. Engel waives

9  that, is set the summary judgments for argument like February

10  17th, for example, and we get through it and then I'll have

11  some time to look at them in detail.

12        You all have kind of kept us busy the last couple of

13  days with all these pleadings.  And I say that with respect.

14  But my attention's been diverted completely away to these

15  matters.

16        But if I, for example, just set the summary judgments

17  for a day, and then I'm fairly confident if between today, the

18  17th, and then a resetting into maybe March -- I do have a

19  trial set in March -- I could get to the summary judgments and

20  narrow the issue.

21        **MR. HOCKADAY:**  I think that would work.  I think that

22  would work for our side.

23        **THE COURT:**  And I know that's not what the Plaintiffs

24  want, but it's not 120 days.  And, you know, I get to go

25  through these issues.  It's not for your benefit, but at least

95

1   then you've got a record so if I screw up, you've got something

2   that you can appeal.

3           Mr. Treyzon, do you want to talk amongst yourselves

4   about that?

5           **MR. TREYZON:**  We do, Your Honor.

6           **MR. ENGEL:**  Yeah, let me go in the hall where I can

7   use --

8           **THE COURT:**  Yeah.

9           **MR. ENGEL:**  -- this phone, Judge.

10          **THE COURT:**  That's what I'm thinking is.  I just --

11          **MR. SPEAKER:**  Do we want to rule on ours first before

12  we break?

13          **MR. ENGEL:**  Leave that aside for a second.  Let' get

14  through this.

15          **THE COURT:**  I haven't forgotten about that.  I

16  haven't forgotten about that.  I will get to that.

17          I'm trying to adhere to what I've been trying to do

18  is to get you to trial --

19          **MR. SPEAKER:**  Yeah.

20          **THE COURT:**  -- on the merits but also do my job,

21  notwithstanding take this case and multiply it by three.

22  That's what I'm dealing with on some other matters.  I'm just

23  really, really busy so --

24          **MR. ENGEL:**  Judge, look, you're Solomon and you're

25  Pontius Pilate here, right?  What you want --

96

1        **THE COURT:**  You didn't call me the antichrist like

2   one of the litigants from --

3        **MR. TREYZON:**  Don't wash your hands of this, Your

4   Honor.

5        **THE COURT:**  Yeah, I know.

6        **MR. ENGEL:**  Frankly, Judge, I still remember that

7   picture of you in the leisure suit sport coat in the

8   convertible.

9        **THE COURT:**  Oh, you liked that, huh?

10       **MR. ENGEL:**  It was the best.

11       **THE COURT:**  Yeah.

12       **MR. ENGEL:**  Best ever.

13       **THE COURT:**  Well, they don't know about that.  Don't

14  tell them what the circumstances are.

15       **MR. ENGEL:**  Got it.  So you're in charge of what

16  happens.

17       I want to get to trial, too.  These creditors deserve

18  to get to trial.  As quickly as that can happen is what I want

19  to happen.  So I'm going to step out in the hall now and mash

20  the buttons on this phone and see if I can speed that along.

21       **THE COURT:**  Okay.

22       **MR. ENGEL:**  But I understand, Judge, that you're

23  going to do what in your judgment is the best thing to do.  And

24  that's why you wear the robe.

25       **THE COURT:**  Yeah.  I don't want to -- I -- I'm

97

1   confessing a lot of things to day.

2          I was a little bit surprised by the magnitude -- I

3   say this with respect -- of the summary judgment motions,

4   having spent the entire summer working on the motions to

5   dismiss.  But they were absolutely within their right.

6          And I'm just of the opinion that I don't want to do a

7   rush thing.  That's not on the merits.  I just want to be able

8   to do my job.

9          **MR. ENGEL:**  Yeah.  That's like I said, Judge.  You're

10  in charge.  And we'll respect what you decide because that is

11  totally a question for you.

12         **THE COURT:**  Okay.

13         **MR. ENGEL:**  You know your calendar, we don't.  You

14  know your burdens, we don't.

15         You know, I know Mr. Pettit's name and that's it.  So

16  -- and I try to know as little about that as possible, although

17  I have heard that it is a taxing endeavor.

18         So let me go out in the hall and do this, Judge.

19         **THE COURT:**  Okay.

20         **MR. ENGEL:**  And we'll be right back.  Can we take

21  five minutes?

22         **THE COURT:**  Right.  What I want to do before you

23  do --

24         **MR. ENGEL:**  Yeah.

25         **THE COURT:**  -- I'm guessing you all got to catch a

98

1   plane.

2          **MR. SPEAKER:**  No, Your Honor.  My plane is tomorrow

3   morning.

4          **THE COURT:**  Okay.  What I want to try and do is as

5   you're -- is give you a potential date --

6          **MR. ENGEL:**  Yeah.

7          **THE COURT:**  -- for trial.  So, let's see, so it looks

8   like we have spring -- and I don't have young children any --

9   now.  March 10th to the 14th or April 14th to the 25th.

10         **MR. TREYZON:**  For the trial, Your Honor.

11         **THE COURT:**  Yeah, for the trial.

12         **MR. ENGEL:**  Tenth through the 14th, can we get it

13  done in four days?

14         **MR. TREYZON:**  Yeah.

15         **THE COURT:**  Well, we could give you two weeks in

16  April.  We can't give you two weeks in March because I

17  potentially have a five to six-day trial at the end of March.

18         **MR. ENGEL:**  So April.

19         **THE COURT:**  April.

20         **MR. ENGEL:**  April would be best because as much as

21  the lawyers -- and we do work together pretty well, despite the

22  fact that, you know, in the pleadings there's some tatters on

23  stability around some of it.  But we are all frenemies and

24  joking about that.

25              But despite our best efforts to knock it down to a

1    week, we may not be able to get there.

2          **THE COURT:**  Okay.  Well, if I gave you April 14th

3    through the 25th and then set you for argument in February

4    during that timeframe to argue the summary judgments, I'm

5    pretty confident we could give you dispositions well in --

6    advance, not well in advance of the trial, and you know exactly

7    what you're going to trial on.

8          So why don't you all talk amongst yourselves there?

9    And then to Mr. Saltz's point, if he still wants me to rule, I

10   got it.  So I will rule after we're done with this.  Does that

11   give you all sort of a plan?

12         And, Ms. Mujica, I'm going to ask her to stay out

13   here so if you say, well, what about this, that, and the other,

14   is the judge available, she will know with precision.

15         **MR. ENGEL:**  Yeah.

16         **THE COURT:**  Okay?

17         **MR. ENGEL:**  We'll tend to this right now.

18         **THE COURT:**  All right.  Short recess, ladies and

19   gentlemen.  Thank you, gentlemen -- lady and gentlemen.

20         **THE CLERK:**  All rise.

21      **(Recess taken from 4:28 p.m. to 4:30 p.m.)**

22         **THE COURT:**  Thank you, everyone.

23         **MR. ENGEL:**  Your point is not without merit.

24         **THE COURT:**  All right.  So with what -- where are we

25   on this, please?  Mr. Engel?

1      **MR. ENGEL:** Yes, Your Honor. Thank you. I was able

2  to speak with Mr. Osherow, and he's in agreement that we should

3  serve an amended disclosure response and wipe that $82.4

4  million section out of it.

5      **THE COURT:** Okay.

6      **MR. ENGEL:** And that will not be a damage theory

7  pursued at trial. That should alleviate much of the concern

8  with additional witnesses and individual facts which

9  Mr. Hockaday was outlining and articulating, and Mr. Lowenstein

10 as well.

11     And I think from our perspective, our thought would

12 be to try to grab that March date and see if we can't get it

13 done, you know, in four trial days.

14     I'm not sure we'll be able to do that but we could

15 always come back in April and finish it if we had to. But

16 we're totally open to the Court's prerogative on that.

17     **THE COURT:** Okay. If we do that then what I think we

18 need to do is move up the summary judgment argument. And I was

19 looking at maybe on February 5th, which is a Wednesday, to have

20 you all come in.

21     I have a short trial, a very short trial I anticipate

22 at 10:00 o'clock. I could have you come in at 10:30, --

23     **MR. ENGEL:** Yeah.

24     **THE COURT:** -- and we would do all three summary

25 judgment motions that day, and then that would give me

1    sufficient time to work on them.

2            **MR. ENGEL:**  I can't think of a better day to do it,

3    Judge.

4            **MR. TREYZON:**  Well, Your Honor, it's -- actually it's

5    causing some issues over here.

6            **THE COURT:**  Okay.

7            **MR. TREYZON:**  -- before.  Is it possible then perhaps

8    the day we have currently reserved for trial, which is February

9    18th, we use that as a date?

10           **THE COURT:**  Well, the problem with that is then I

11   have -- I listened to -- I'll tell you exactly what I said in

12   chambers.

13           I really think it would help the Court immensely to

14   hear an oral argument on this, okay, because I could then maybe

15   break down what I think are the critical issues I really need

16   to focus on.

17           And just hear me out.  But if we go to the 18th, that

18   only gives me ten -- less than 20 days to work through this and

19   give you a ruling.  I have to give you a ruling that morning

20   maybe.

21           That's why if I could get it to early February, just

22   for oral argument, then I'm more confident that I can rule in

23   advance of trial and you know what the game is.

24           **MS. WILLIAMS:**  Your Honor, even if we could do the

25   6th or 7th, Katie Clark and I have a Fifth Circuit argument on

1   the 5th.

2         **THE COURT:**  No, I -- let's see.  Where are we looking

3   at in the 6th or 7th?

4         **MR. ENGEL:**  That's a Thursday and a Friday.

5         **THE COURT:**  Yeah.

6         **MR. TREYZON:**  My trouble is I'm starting trial on

7   February 3rd.

8         **THE COURT:**  I'm sorry?

9         **MR. TREYZON:**  I'm starting trial on --

10         **THE COURT:**  Okay.

11         **MR. TREYZON:**  Sorry, Your Honor.  I'm starting trial

12   on February 3rd in Los Angeles.

13         **THE COURT:**  What about could we do it before the 5th?

14   Is there any -- do you all have time at the end of the month?

15   I mean, today is only the 15th.  It should be -- and I'm not

16   being sarcastic, it should be fairly fresh in your mind.  You

17   just went through all this extensive briefing.

18         **MS. WILLIAMS:**  Your Honor, I could do January 29th,

19   30th, or 31st.

20         **MR. SPEAKER:**  Same.

21         **MR. SPEAKER:**  Same.

22         **THE COURT:**  Oh, that's splendid.  You're all -- would

23   you -- could you -- would you be okay with that?

24         **MR. TREYZON:**  Your Honor, I'm going to defer because

25   as long as vast majority of the people are here, I mean, I can

103

1    attend --

2              **MR. SPEAKER:**  Thirtieth.

3              **MR. TREYZON:**  -- remotely.  I have something -- let's

4    take January 30th, Your Honor.

5              **THE COURT:**  Do we have the 30th open?  No, that's the

6    one -- oh, yeah.  We've got a lot of -- we -- my -- could we do

7    it possibly on the 31st?  That's a Friday.

8              But I'm -- yeah, I can work around that, yeah.  So I

9    can work around that so that's not a problem.

10                  **(Multiple voices confer about available date.)**

11             **MR. SPEAKER:**  Can we do it in the morning, Judge, on

12   the 31st?

13             **THE COURT:**  Oh, yeah, we could start in the morning.

14             **MR. SPEAKER:**  Okay.

15             **THE COURT:**  I just -- I have a board meeting for the

16   ABLJ at noon or something.  So I can break -- it'd be just over

17   lunch.  It wouldn't impede this.

18             **MR. SPEAKER:**  And if they need to go first for theirs

19   (inaudible) --

20             **MR. SPEAKER:**  I'm already -- yeah, I mean, I'm

21   already canceling a trip to New York for spring break for my

22   daughter.  If I missed a father/daughter dance on her birthday

23   on the 31st, I'll be in real trouble.  So the morning would

24   help.

25             **THE COURT:**  Of course.  I can -- if you want to go

```
 1   first, Mr. Horan, we can do that.  That will be fine.  So,

 2   yeah, we'll accommodate that request.  So the 31st?

 3          MR. SPEAKER:  I believe so.

 4          MR. ENGEL:  Yes, sir, Judge.  You've got yesses.

 5   Everybody stop talking before they turn to nos.

 6          THE COURT:  Okay.  So for the record then -- and

 7   we'll issue a notice -- all three motions for summary judgment

 8   will set -- be set for oral argument on 31st.  Can we start

 9   early?  Not like super early but 8:30?

10          MR. ENGEL:  Sure.

11          MS. WILLIAMS:  That's fine, Your Honor.  We'll come

12   down the night before.

13          THE COURT:  Yeah.  I figure if I set it -- for a lot

14   of you to travel, you'll come in the night before so your

15   preference would be -- it's a Friday -- to get out as quick as

16   possible.

17          So let's say 8:30.  And then we'll -- we're going to

18   -- we'll take up Mr. Horan on behalf of -- and your client, for

19   the record, Mr. Horan?

20          MR. HORAN:  Charlie Ebersol.

21          THE COURT:  Mr. Ebersol.  We'll take up yours first.

22   And then the other two will sit and just -- we'll just deal

23   with them.

24          Okay.  As to the issue of trial, we're going to reset

25   trial to March 10th, which is what day of the week, please?
```

105

1          **MR. SPEAKER:**  Monday.

2          **THE COURT:**  Monday.  And we're going to give them the

3    week.  And we'll give you the full week.

4          And if we don't finish, that's okay, we'll figure it

5    out.  But I -- actually I think this is a great resolution.

6    You'll get -- I'll be able to do my job and rule on the summary

7    judgments in advance of trial.  You'll get to start trial.

8          Heaven forbid if we don't finish, we'll know at that

9    point how much more time you're going to need and we'll work to

10   accommodate you all's schedules.

11         Anything else?

12         **MR. ENGEL:**  No.

13         **THE COURT:**  All right.  So do you want me to rule on

14   the motion to designate third party?

15         **MR. SPEAKER:**  Yes, Your Honor.

16         **THE COURT:**  All right.  So for purpose of the record,

17   I want to say I thought both Mr. Hales and Mr. Horan did a

18   great job arguing that.

19         But with all due respect, I think it's a fairly

20   straightforward argument on the designation.  All I'm doing is

21   granting leave to designate.  I'm not making any findings on

22   liability.

23         And while I looked very closely at the Texas cases on

24   this, which of course are back on my desk, but the *Cook* case

25   and what was the other case?  You can speak on the record.

1          **MS. SPEAKER:**  Galbraith.

2          **THE COURT:**  Galbraith.  We looked at those and I

3    think they're pretty straightforward.  They say if there's

4    sufficient pleading, it's notice only, then the Court should

5    grant motion to leave.

6          The party resisting it reserves every right to claim

7    any defenses they've got.

8          But for the record I'm going to find that the motion

9    for leave is well-taken based upon the authorities that have

10   been presented to the Court.  I think under the operation of

11   the statute it's pretty straightforward.

12         This is not in any way a finding on the merits of any

13   arguments in opposition.  It's just a -- merely a finding that

14   they've met the threshold requirement in terms of the pleading

15   elements, the notice.  I think it's clear on that.

16         So may I sign the proposed order?

17         **MR. SPEAKER:**  Yes, Your Honor.

18         **THE COURT:**  All right.  It's granted on that basis.

19         What happens after that, that's up to you all, okay?

20         **MR. ENGEL:**  Thank you, Your Honor.

21         **THE COURT:**  And what's been provided to the Court.

22   But we did look very closely at that.  And I say this with

23   respect, while there was some really good arguments on the

24   other side, maybe another day.  And we'll leave it at that,

25   okay?

1      So the motion is granted.  I'll sign the proposed

2 order.

3      And what -- on the motion to continue trial and

4 strike disclosures, I think the way -- we do need a disposition

5 on that.

6      So, first of all, on your motion to strike exhibits,

7 that's rendered moot, okay.

8      On the motion to continue trial, the motion to grant

9 -- continue is granted.  The motion to strike disclosures is

10 moot now, right?

11      **MR. ENGEL:**  Correct.

12      **THE COURT:**  Or withdrawn.

13      **MR. ENGEL:**  We're going to -- so the record is

14 clear, --

15      **THE COURT:**  Please.

16      **MR. ENGEL:**  -- we, the Trustee, is going to file an

17 amended disclosure that eliminates that paragraph or two that

18 contains that damage theory.  So it will no longer be part of

19 the damages sought.  That's consistent with our discussion,

20 right?

21      **THE COURT:**  Right.

22      **MR. HOCKADAY:**  Yes, Your Honor.  This --

23      **THE COURT:**  So --

24      **MR. HOCKADAY:**  -- is Brent Hockaday.  Yes.

25      **THE COURT:**  Thank you.  So what I'll need is just a

1    simple order, Mr. Hockaday, that grants the continuance to the

2    date we discussed, March 10th at 10:00 o'clock.

3              **MR. ENGEL:** Yeah.

4              **MR. HOCKADAY:** That works for us.

5              **THE COURT:** And then the -- on the issue of

6    disclosures, that is just -- the relief you're seeking on that

7    to strike them is now moot, right?

8              **MR. HOCKADAY:** Yes. Pursuant to Mr. Engel's

9    representations.

10             **THE COURT:** Exactly.

11             **MR. HOCKADAY:** Yes.

12             **THE COURT:** Yes.

13             **MR. ENGEL:** Judge, we had previously set aside time

14   with the February 18th for us to get together need be for a

15   pretrial hearing on one day a week or so out. I don't know if

16   your court -- Your Honor remembers that.

17             Is there still time in the week before March 10th if

18   we need it if there are evidentiary rulings and stuff --

19             **THE COURT:** You mean like motions in limine and

20   things like that?

21             **MR. ENGEL:** Yeah. I mean, --

22             **THE COURT:** Yes.

23             **MR. ENGEL:** -- I don't think motions in limine mean a

24   whole lot in a bench trial but --

25             **THE COURT:** I've received them before.

1          **MR. ENGEL:**  I know.  But --

2          **MR. SPEAKER:**  I just responded to one.

3          **THE COURT:**  Okay.

4          **MR. ENGEL:**  But there may be evidentiary type things,

5     objection, rulings, things like that that would clear the --

6     make the trial proceed more efficiently.

7          And, you know, we're pretty good about talking about

8     that stuff and coming to the Court when we need it.  So would

9     we be able to get some time in the week before --

10         **THE COURT:**  Mujica, do we have any time on March 3rd?

11    That's a week precise --

12         **MR. ENGEL:**  Yeah.

13         **THE COURT:**  -- before trial.  I should have never put

14    my calendar up.

15         **MR. ENGEL:**  It may be that we don't end up needing

16    it, Judge.  But it seems like --

17         **THE COURT:**  No.  We'll put it as a placeholder.

18         **MR. ENGEL:**  Yeah.

19              **(Judge/Clerk confer.)**

20         **THE COURT:**  So why don't we say we'll give you the

21    afternoon?  We'll just put it -- make a notation on the docket

22    not to set anything at 1:30.  And I assume we can do this

23    telephonically.

24         **MR. ENGEL:**  That's what we were just talking --

25         **MR. SPEAKER:**  Yes, Your Honor.

110

1          **MR. ENGEL:** -- about, and I think that's probably

2    right.

3          **THE COURT:** All right.  Anything else the Court needs

4    to focus on?

5          **MR. ENGEL:** Anybody else got anything?  We're good to

6    go.

7          For all the lawyers, Your Honor, look, you know,

8    we're getting down to the lick log on a case that's of some

9    size.

10         And the parties do really try to get along.  We don't

11   always.  But it's really gratifying actually, and we appreciate

12   you taking so much care.

13         **THE COURT:** Well, I mean, I just -- I want to do my

14   job as best I can.  Your clients deserve it, you deserve it.

15         **MR. ENGEL:** Understood.

16         **THE COURT:** Public service is a privilege.  All

17   right.

18         **MR. ENGEL:** Understood.

19         **MR. SPEAKER:** Thank you, Your Honor.

20         **MR. ENGEL:** Thank you, Judge.

21         **THE COURT:** All right.  Safe travels back to wherever

22   you're going.  And I look forward to the arguments on the

23   summary judgment.  And then we'll see where we go from there.

24         All right.  Thank you.  You all take care.

25         **THE CLERK:** All rise.

1          **THE COURT:**  Oh, what do we want to do with these

2  beautiful exhibit books?

3          **MR. TREYZON:**  Is there a mechanism to dispose of

4  them, Your Honor?

5          **THE COURT:**  We generally like to give them back.  If

6  you could work with us, maybe we can mail them back.

7          **MR. TREYZON:**  Oh, no, we don't need to mail them

8  back.  We would prefer probably to --

9          **MR. ENGEL:**  This -- is that all of them?

10          **THE COURT:**  We have -- we've got --

11          **MS. SPEAKER:**  (Inaudible) I can probably (inaudible)

12  get them and shred them.  Do you all want me to do that?

13          **THE COURT:**  That would be excellent, that would be

14  most appreciated.

15          **MS. SPEAKER:**  Okay.

16          **THE COURT:**  On your schedule.

17          **MS. SPEAKER:**  Yeah, I'll work on that.

18      **(This proceeding was adjourned at 4:50 p.m.)**

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **March 12, 2025**

        **Signed**                                                   **Dated**

*TONI HUDSON, TRANSCRIBER*