**APPEAL**

# U.S. Bankruptcy Court
## Western District of Texas (San Antonio)
## Adversary Proceeding #: 22–05077–cag

*Assigned to:* Chief Bkrpcy Judge Craig A Gargotta          *Date Filed:* 11/14/22
*Lead BK Case:* 19–50900
*Lead BK Title:* Legendary Field Exhibitions, LLC and AAF
Properties, LLC
*Lead BK Chapter:* 7
*Demand:* $70000000
  *Nature[s] of Suit:*   02 Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)

*Plaintiff*
—————————————————
**Dundon Capital Partners LLC**          represented   **Troy L Hales, II**
                                         by   Bell Nunnally & Martin LLP
                                              2323 Ross Ave.
                                              Ste. 1900
                                              Dallas, TX 75201
                                              241–740–1456
                                              Fax : 214–740–5756
                                              Email: thales@bellnunnally.com

                                              **Brent D. Hockaday**
                                              K&L Gates, LLP
                                              1717 Main St #2800
                                              Dallas, TX 75201
                                              214–939–5677
                                              Fax : 214–939–5849
                                              Email: brent.hockaday@klgates.com

                                              **Jeffrey S Lowenstein**
                                              Bell Nunnally & Martin LLP
                                              2323 Ross Ave., Ste. 1900
                                              Dallas, TX 75201
                                              214–740–1410
                                              Fax : 214–740–1499
                                              Email: jlowenstein@bellnunnally.com

                                              **Brent A. Turman**
                                              Bell Nunnally & Martin LLP
                                              2323 Ross Ave.
                                              Ste. 1900
                                              Dallas, TX 75201
                                              214–740–1487
                                              Email: bturman@bellnunnally.com

                                              **Brent A. Turman**
                                              Bell Nunnally & Martin
                                              2323 Ross Avenue
                                              Suite 1900
                                              Dallas, TX 75201

1

214−740−1487
Fax : 223−740−1499
Email: bturman@bellnunnally.com

**Gwen Irene Walraven**
Bell Nunnally & Martin
2323 Ross Avenue
Suite 1900
Dallas, TX 75201
214−740−1400
Fax : 214−740−1499
Email: gwalraven@bellnunnally.com

**Beverly Whitley**
Bell Nunnally Martin LLP
2323 Ross Ave
Suite 1900
Dallas, TX 75201
214−770−1473
Email: bwhitley@bellnunnally.com

V.

*Defendant*
_____

**Charles Ebersol**                    represented   **Tom Horan**
1700 Northside NW Dr, #A7         by          Thompson, Coe, Cousins & Irons, L.L.P.
Atlanta, GA 30318                             700 North Pearl Street
                                              Suite 2500
                                              Dallas, TX 75201
                                              214−871−8241
                                              Fax : 214−871−8209
                                              Email: thoran@thompsoncoe.com

                                              **Simone E Poyourow**
                                              Jacobson Russell Saltz Nassim et al
                                              1880 Century Park E #900
                                              Los Angeles, CA 90067
                                              310 446 9900 #290

                                              **William N Radford**
                                              Thompson, Coe, Cousins & Irons, L.L.P.
                                              700 N. Pearl Street
                                              25th Floor
                                              Dallas, TX 75201
                                              214−871−8212
                                              Fax : 214−871−8209
                                              Email: wradford@thompsoncoe.com
                                              *TERMINATED: 08/09/2024*

                                              **Michael J Saltz**
                                              Jacobson, Russell, Saltz, Nassim & de la Torre, LLP
                                              1880 Century Park East
                                              Suite 900
                                              Los Angeles, CA 90067
                                              310−446−9900
                                              Fax : 310−446−9909
                                              Email: msaltz@jrsnd.com

*Trustee*

————————————————————
**Randolph N. Osherow, in his**
**capacity as Chapter 7 Trustee**

represented **Brian S. Engel**
by Engel, PLLC
100 Commons Road, Suite 7
Box 172
Dripping Springs, TX 78620
(512) 565–5521
Email: brianengel@me.com

**Jonathon S. Farahi**
Abir Cohen Treyzon Sala, LLP
16001 Ventura Blvd., Suite 200
Encino, CA 91436
424–288–4367
Fax : 424–2288–4368
Email: JFarahi@actslaw.com

**Boris Treyzon**
Abir Cohen Treyzon Salo LLP
16001 Ventura Blvd.
Suite 200
Encino, CA 91436
424–288–4367
Fax : 424–288–4368
Email: btreyzon@actslaw.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 11/14/2022 | | 1 | Original Complaint filed by Dundon Capital Partners LLC (attorneys Jeffrey S Lowenstein, Brent A. Turman, Brent D. Hockaday) against Charles Ebersol (Filing Fee: $350.00) (Nature(s) of Suit:(02 (Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy)))). (Attachments: # 1 Adversary Coversheet) (Hockaday, Brent) |
| 03/06/2023 | | 11 | Answer filed by William N Radford for Defendant Charles Ebersol (Radford, William) (related document(s): 1 Original Complaint filed by Dundon Capital Partners LLC (attorneys Jeffrey S Lowenstein, Brent A. Turman, Brent D. Hockaday) against Charles Ebersol) |
| 06/21/2024 | | 57 | Modified Pre–Trial Scheduling Order (related document(s): 56 Motion to Enter Modified Pre–Trial Scheduling Order filed by Brent D. Hockaday for Plaintiff Dundon Capital Partners LLC). ***Dispositive Motions due by 10/14/2024, Discovery due 11/11/2024, Pre–Trial Order due by 11/22/2024, and Docket Call is set for 12/2/2024 at 1:30 p.m.*** (Order entered on 6/21/2024) (Luna, Emilio) |
| 11/26/2024 | | 85 | Joint Motion To Consolidate Actions For Joint Trial Filed by Brian S. Engel for Trustee Randolph N. Osherow, in his capacity as Chapter 7 Trustee. (Attachments: # 1 Proposed Order Exhibit A) (Engel, Brian) Modified on 11/27/2024 (Paez, Daniel). |
| 12/13/2024 | | 102 | Motion For Summary Judgment and Brief in Supoort Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order) (Horan, Tom) |
| 01/10/2025 | | 124 | Response Filed by Beverly Whitley for Plaintiff Dundon Capital Partners LLC. (Attachments: # 1 Exhibit 1 – Depo Exhibit 7 [DCP Term Sheet (effective February 14, 2019)] # 2 Exhibit 2 – Depo Exhibit 116 # 3 |

| | | | |
|---|---|---|---|
| | | | Exhibit 3 – Depo Exhibit 6 # 4 Exhibit 4 – Depo Exhibit 23 [Email from C. Ebersol to J. Zutter, 2.25.19, attaching meeting min # 5 Exhibit 5 – Depo Exhibit 93 # 6 Exhibit 6 – Depo Exhibit 74 # 7 Exhibit 7 – Depo Exhibit 98 # 8 Exhibit 8 – Depo Exhibit 117 # 9 Exhibit 9 – Depo Exhibit 19 # 10 Exhibit 10 – TR0001311603 # 11 Exhibit 11 – Depo Exhibit 95 [Email with Pottruck] # 12 Exhibit 12 – Stockholder Agreement # 13 Exhibit 13 – Draft omnibus waiver # 14 Exhibit 14 – First Report of Erica Bramer # 15 Exhibit 15 – Second Report of Erica Bramer # 16 Exhibit 16 – Vanech Demand Letter, dated July 31, 2018 # 17 Exhibit 17 – Vanech Demand Letter, dated January 24, 2019 # 18 Exhibit 18 – Peter's Gap Analysis # 19 Exhibit 19 – TR0001384597 # 20 Exhibit 20 – TR0001595392 # 21 Exhibit 21 – TR0001704400 # 22 Exhibit 22 – Email from C. Ebersol to T. Dundon, 2.13.19 attaching Marketing Materials # 23 Exhibit 23 – Excerpts from the Deposition of Charlie Ebersol Volume 1 # 24 Exhibit 24 – Excerpts from the Deposition of Charlie Ebersol Volume II # 25 Exhibit 25 – Excerpts from the Deposition of Thomas Dundon Volume I # 26 Exhibit 26 – Excerpts from the Deposition of Thomas Dundon Volume II # 27 Exhibit 27 – Excerpts from the Deposition of Kevin Farrell # 28 Exhibit 28 – Excerpts from the Deposition of John Zutter # 29 Exhibit 29 – Excerpts from the Deposition of Jason Kulas # 30 Exhibit 30 – Excerpts from the Deposition of Jeffrey Vanderbilt # 31 Exhibit 31 – Vanderbilt Declaration, dated January 6, 2025 # 32 Exhibit 32 – (DCP) Exhibit 20 # 33 Exhibit 33 – Alan Kantowitz Rough # 34 Exhibit 34 – 20_Kantowitz # 35 Exhibit 35 – 92_Kantowitz # 36 Exhibit 36 – 518_Kantowitz # 37 Exhibit 37 – 520_Kantowitz # 38 Exhibit 38 – 522_Kantowitz # 39 Exhibit 39 – 523_Kantowitz # 40 Exhibit 40 – 524_Kantowitz # 41 Exhibit 41 – 532_Kantowitz # 42 Exhibit 42 – 516_Kantowitz # 43 Proposed Order Denying Defendant Charles Ebersol's Motion for Summary Judgment) (Whitley, Beverly) (related document(s): 102 Motion For Summary Judgment and Brief in Supoort Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order)) |
| 01/21/2025 | | 137 | Objection to Dundon Capital Partners, LLC's Evidence in Support of Summary Judgment Response Filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Proposed Order) (Horan, Tom). Related document(s) 124 Response (Adversary) filed by Plaintiff Dundon Capital Partners LLC. Modified on 1/22/2025 (Sosa, Alma). |
| 01/21/2025 | | 138 | Reply in Support of His Motion for Summary Judgment filed by Tom Horan for Defendant Charles Ebersol (Horan, Tom). Related document(s) 101 Motion For Summary Judgment filed by Defendant Charles Ebersol. |
| 01/22/2025 | | 141 | Hearing to Consider and Act Upon the Following: (related document(s): 137 Objection to Dundon Capital Partners, LLC's Evidence in Support of Summary Judgment Response Filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol. Related document(s) 124 Response (Adversary) filed by Plaintiff Dundon Capital Partners LLC. **Hearing Scheduled For 1/31/2025 at 08:30 AM at SA Courtroom 3** (Mujica, Roxanne) |
| 01/22/2025 | | 142 | Plaintiff's Notice of Filing Revised Response to Defendant Charles Ebersol's Motion for Summary Judgment filed by Beverly Whitley for Plaintiff Dundon Capital Partners LLC (Attachments: # 1 Exhibit 1 – Revised Plaintiff Dundon Capital Partners, LLC's Response to Defendant Charles Ebersol's # 2 Exhibit A – Corrected Kantowitz Deposition Excerpts) (Whitley, Beverly) (related document(s): 124 Response Filed by Beverly Whitley for Plaintiff Dundon Capital Partners LLC. |

| | | | |
|---|---|---|---|
| | | | (Attachments: # 1 Exhibit 1 – Depo Exhibit 7 [DCP Term Sheet (effective February 14, 2019)] # 2 Exhibit 2 – Depo Exhibit 116 # 3 Exhibit 3 – Depo Exhibit 6 # 4 Exhibit 4 – Depo Exhibit 23 [Email from C. Ebersol to J. Zutter, 2.25.19, attaching meeting min # 5 Exhibit 5 – Depo Exhibit 93 # 6 Exhibit 6 – Depo Exhibit 74 # 7 Exhibit 7 – Depo Exhibit 98 # 8 Exhibit 8 – Depo Exhibit 117 # 9 Exhibit 9 – Depo Exhibit 19 # 10 Exhibit 10 – TR0001311603 # 11 Exhibit 11 – Depo Exhibit 95 [Email with Pottruck] # 12 Exhibit 12 – Stockholder Agreement # 13 Exhibit 13 – Draft omnibus waiver # 14 Exhibit 14 – First Report of Erica Bramer # 15 Exhibit 15 – Second Report of Erica Bramer # 16 Exhibit 16 – Vanech Demand Letter, dated July 31, 2018 # 17 Exhibit 17 – Vanech Demand Letter, dated January 24, 2019 # 18 Exhibit 18 – Peter's Gap Analysis # 19 Exhibit 19 – TR0001384597 # 20 Exhibit 20 – TR0001595392 # 21 Exhibit 21 – TR0001704400 # 22 Exhibit 22 – Email from C. Ebersol to T. Dundon, 2.13.19 attaching Marketing Materials # 23 Exhibit 23 – Excerpts from the Deposition of Charlie Ebersol Volume 1 # 24 Exhibit 24 – Excerpts from the Deposition of Charlie Ebersol Volume II # 25 Exhibit 25 – Excerpts from the Deposition of Thomas Dundon Volume I # 26 Exhibit 26 – Excerpts from the Deposition of Thomas Dundon Volume II # 27 Exhibit 27 – Excerpts from the Deposition of Kevin Farrell # 28 Exhibit 28 – Excerpts from the Deposition of John Zutter # 29 Exhibit 29 – Excerpts from the Deposition of Jason Kulas # 30 Exhibit 30 – Excerpts from the Deposition of Jeffrey Vanderbilt # 31 Exhibit 31 – Vanderbilt Declaration, dated January 6, 2025 # 32 Exhibit 32 – (DCP) Exhibit 20 # 33 Exhibit 33 – Alan Kantowitz Rough # 34 Exhibit 34 – 20_Kantowitz # 35 Exhibit 35 – 92_Kantowitz # 36 Exhibit 36 – 518_Kantowitz # 37 Exhibit 37 – 520_Kantowitz # 38 Exhibit 38 – 522_Kantowitz # 39 Exhibit 39 – 523_Kantowitz # 40 Exhibit 40 – 524_Kantowitz # 41 Exhibit 41 – 532_Kantowitz # 42 Exhibit 42 – 516_Kantowitz # 43 Proposed Order Denying Defendant Charles Ebersol's Motion for Summary Judgment) (Whitley, Beverly) (related document(s): 102 Motion For Summary Judgment and Brief in Supoort Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order))) |
| 01/31/2025 | | | Hearing Held: *** **UNDER ADVISEMENT** ***. . (related document(s): 102 Motion For Summary Judgment and Brief in Supoort Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order)) (Paez, Daniel) (Entered: 02/03/2025) |
| 01/31/2025 | | | Under Advisement 1/31/25 (related document(s): 102 Motion For Summary Judgment and Brief in Supoort Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order)) (Paez, Daniel) (Entered: 02/03/2025) |
| 02/06/2025 | | 158 | Transcript regarding Hearing Held 1/31/25 THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 05/7/2025. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Transcriber EXCEPTIONAL REPORTING, Telephone number 361 949–2988. – NAME OF PURCHASER: CHIEF JUDGE CRAIG A. GARGOTTA. Notice of Intent to Request Redaction Deadline Due By 02/13/2025. Redaction Request Due By02/27/2025. Redacted Transcript Submission Due By 03/10/2025. Transcript access will be restricted through 05/7/2025. (Hudson, Toni) |

| | | | |
|---|---|---|---|
| 02/21/2025 | | 165 | Order Regarding (related document(s): 137 Objection to Dundon Capital Partners, LLC's Evidence in Support of Summary Judgment Response Filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Proposed Order) (Horan, Tom). Related document(s) 124 Response (Adversary) filed by Plaintiff Dundon Capital Partners LLC. Modified on 1/22/2025 .) (Order entered on 2/21/2025) (Boyd, Laurie) |
| 02/27/2025 | | 169 | ** **PREVIOUSLY TRANSCRIBED** ** Transcript Request by Jonathon Farahi. (Farahi, Jonathon) (related document(s): 102 Motion For Summary Judgment and Brief in Suoport Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order), **Hearing to Consider and Act Upon the Following**: (related document(s): 102 Motion For Summary Judgment and Brief in Suoport Thereof Filed by Tom Horan for Defendant Charles Ebersol. **Hearing Scheduled For 1/31/2025 at 08:30 AM at SA Courtroom 3** ***SET IN OPEN COURT ON 1/15/25 – NFN***, Hearing Held: *** **UNDER ADVISEMENT** ***.. (related document(s): 102 Motion For Summary Judgment and Brief in Suoport Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order)) )Modified on 2/28/2025 (Paez, Daniel). |
| 03/03/2025 | | 171 | Memorandum Opinion and Order Granting Defendant's Motion For Summary Judgment (related document(s): 102 Motion For Summary Judgment and Brief in Suoport Thereof Filed by Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Exhibit G # 3 Exhibit J # 4 Exhibit K # 5 Proposed Order Proposed Order)) (Order entered on 3/3/2025) (Paez, Daniel) |
| 04/10/2025 | | 176 | Motion for Entry of Final Judgment filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol (Attachments: # 1 Exhibit A # 2 Proposed Order) (Horan, Tom) |
| 05/05/2025 | | 178 | Response Filed by Beverly Whitley for Plaintiff Dundon Capital Partners LLC. (Whitley, Beverly) (related document(s): 176 Motion for Entry of Final Judgment Filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol. (Attachments: # 1 Exhibit A # 2 Proposed Order)) |
| 05/06/2025 | | 179 | Order Granting (related document(s): 176 Motion for Entry of Final Judgment filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol) (Order entered on 5/6/2025) (Luna, Emilio) |
| 05/07/2025 | | 180 | Final Judgment (related document(s): 176 Motion for Entry of Final Judgment filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol) (Order entered on 5/7/2025) (Paez, Daniel) |
| 05/20/2025 | | 183 | Notice of Appeal filed by Beverly Whitley for Plaintiff Dundon Capital Partners LLC (Filing Fee:$298.00) (Whitley, Beverly) (Attachments: # 1 Exhibit Final Judgment) (related document(s): 180 Final Judgment (related document(s): 176 Motion for Entry of Final Judgment filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol)) |
| 06/03/2025 | | 194 | Appellant's Designation of Contents and Issues for Inclusion in Record on Appeal filed by Beverly Whitley for Plaintiff Dundon Capital Partners LLC (Whitley, Beverly) (related document(s): 183 Notice of Appeal filed by Beverly Whitley for Plaintiff Dundon Capital Partners LLC (Whitley, Beverly) (related document(s): 180 Final Judgment (related document(s): |

| | | | |
|---|---|---|---|
| | | | [176](#) Motion for Entry of Final Judgment filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol))) |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE | § | |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, | § | **CASE NO. 19-50900-CAG** |
| | § | **CHAPTER 7** |
| | § | |
| DEBTOR. | § | |

| | | |
|---|---|---|
| DUNDON CAPITAL PARTNERS LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | **Adversary No. _____** |
| v. | § | |
| | § | **Judge: Craig A. Gargotta** |
| CHARLES EBERSOL, | § | |
| | § | |
| Defendant. | § | |

<u>**PLAINTIFF'S ORIGINAL COMPLAINT**</u>

Plaintiff Dundon Capital Partners LLC ("DCP") complains of Defendant Charles Ebersol ("Ebersol").

## I.    INTRODUCTION

1.    This lawsuit stems from the failed experiment that was a spring football league known as the Alliance of American Football ("AAF").  One week into the league's inaugural season, Ebersol, a founder of the league, solicited DCP to invest $70 million in the AAF on the premise that the league was viable.  Ebersol represented to DCP that the $70 million would cover expenses for the duration of the AAF's inaugural season, make it self-sustaining, and place it on that path to profitability.  None of that was true.

2.    In reality, the AAF was on life support and there was no path to viability. Even though Ebersol knew $70 million could not cover the AAF's pre-existing debts and future expenses for season one, he focused DCP on the forward-looking cash needs of the league for

**PLAINTIFF'S ORIGINAL COMPLAINT**                                      **PAGE 1**

the remainder of the season (though he greatly understated them), and lied to DCP about the debts the league had already incurred. Ebersol told DCP about player salaries the AAF owed, but he failed to disclose the AAF had millions in pre-existing debt to vendors and lenders. The AAF could not ignore the vendors (travel partners, venues, and food and beverage providers) because they controlled the AAF's ability to play games—the AAF's primary business.

3.      The league's financial situation became dire when its initial funding source failed to meet commitments and backed out suddenly. The league was mired in debt and had no ability to cover salaries or game-related expenses. At that point, Ebersol reached out to Tom Dundon, DCP's principal, in a last-ditch effort to keep the AAF alive.

4.      Based on Ebersol's disclosures and representations, DCP became interested in assisting the AAF. Ebersol insisted DCP act immediately on the opportunity to invest for the league to survive. Based on what Ebersol told DCP, things were so dire, only an immediate infusion of cash would keep the league from immediate collapse. Based on the information Ebersol provided, DCP agreed to invest $70 million and Dundon authorized DCP to inject emergency funding within 48 hours to prevent the players from walking out after not receiving pay for the first two games of the season. DCP signed a Binding Term Sheet for Series 2 Preferred Stock Financing, outlining DCP's commitment to fund the league (the "Term Sheet").

5.      Soon thereafter, DCP learned the $70 million Ebersol said the AAF needed would not be enough. DCP nonetheless fulfilled its $70 million investment commitment and kept the failed league on life support as long as it could.

6.      In the end, DCP learned Ebersol had not been truthful. He made multiple false representations to DCP and failed to disclose important information that would have caused DCP not to invest in the AAF. More importantly, Ebersol knew DCP would not have invested if Ebersol had been honest about the AAF's actual financial condition. Ebersol had a duty to

disclose the AAF liabilities, because paying those liabilities was going to fall on DCP, the sole source of funding at that time.

7.      DCP also later discovered Ebersol misrepresented his authority to take the investment from DCP and promise DCP preferred equity. In reality, neither Ebersol nor Ebersol Sports Media Group, Inc., the company in which DCP acquired ownership, had authority to effectuate the investment at the time.

8.      After DCP gained access to the true facts about the AAF's finances, it became apparent that Ebersol knew DCP's $70 million investment was insufficient to keep the AAF afloat, and that Ebersol knew disclosing the true financial condition of the AAF would have dissuaded DCP from making any investment at all. Ebersol lied and omitted facts necessary for DCP to make an informed investment decision. Ebersol's actions cost DCP at least $70 million.

## II.      PARTIES

9.      Plaintiff Dundon Capital Partners LLC is a Delaware limited liability company with its principal office in Dallas County, Texas.

10.     Defendant Charles Ebersol is an individual residing in Atlanta, Georgia. Ebersol may be served with process at his residence, 1700 Northside NW Dr., #A7, Atlanta, Georgia 30318, or wherever he may be found.

## III.      JURISDICTION AND VENUE

11.     The Court has over this adversary proceeding pursuant to 28 U.S.C. § 157(a) and 28 U.S.C. § 1334(b) because this case relates to a case under title 11.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1409(a).

## IV.    STATEMENT OF FACTS

**A.    Ebersol Established the AAF and the AAF Failed to Make Payroll After the First Week of the AAF's Inaugural Season.**

13.    Ebersol and Bill Polian, a former NFL executive, co-founded Ebersol Sports Media Group, Inc. ("ESMG") in 2017. Ebersol was a shareholder of ESMG.

14.    ESMG created, owned, and operated the AAF and its subsidiaries.

15.    The AAF provided a professional spring football league option in the United States. The league was to operate its season between the weekends following the Super Bowl in February through the NFL draft in April.

16.    The AAF consisted of eight teams, many located in non-NFL cities (San Diego, San Antonio, Birmingham, Memphis, Orlando, Salt Lake City, Atlanta, and Phoenix). The teams would be run like NFL franchises, with experienced coaching and training staff (many with prior NFL experience). Games would be played in major stadiums and televised on major broadcast networks (NFL Network, CBS, Turner, etc.) and live-streamed through the AAF's application.

17.    On February 9, 2019, the AAF debuted with its first week of scheduled games. But when its initial funding source failed to honor commitments, the AAF failed to pay the players for the first week of play.

**B.    Ebersol Solicited DCP and Made Material Misrepresentations to DCP for an Investment in the AAF.**

18.    On or about February 12, 2019, having lost the initial source of funding for the league, Ebersol reached out to Dundon, to solicit DCP to make an investment in the AAF.

19.    Ebersol premised his pitch to Dundon on the AAF being a developmental league for the NFL that needed an investment to cover payroll from the first week of the season and to cover the expenses for the remainder of the inaugural season of 2019. Ebersol told Dundon the

22-90077-cgg Doc#251 Filed 11/14/25 Entered 11/14/25 09:11:19 Main Document Pg 5 of 11
2:25-cv-00127-D Document 2 Filed 04/25/25 Page 12 of 1466
Documents Pg 12 of 1466

AAF needed funding because the AAF's most significant investor failed to meet his funding commitments.

20.     During the ensuing 48 hours, Ebersol made a series of material misrepresentations to Dundon to induce DCP to contribute substantial capital into the AAF.

21.     During telephone calls between February 12 and 14, 2019, Ebersol represented to Dundon and DCP that the AAF needed $70 million from DCP. Ebersol represented to Dundon that the $70 million would cover the player salaries for the first week of play and then all additional and necessary expenses and costs to maintain league operations through the remainder of the 2019 season, which had two months remaining.

22.     Ebersol represented to DCP that the AAF could likely survive the first season with only $55 million, and the remaining amounts would leave the AAF with substantial capital to prepare for an even more successful second season.

23.     Ebersol represented the AAF's anticipated revenue growth would make it a viable, self-sustaining business by as early as the third season.

24.     Ebersol represented the AAF had multiple revenue sources and additional investors ready to join.

25.     Ebersol disclosed the AAF's outstanding payroll for the first week of the season was the only substantial outstanding liability facing the AAF. Ebersol made no disclosure to DCP of the magnitude of outstanding debts to third parties. Based on Ebersol's representations and material undisclosed facts, DCP was led to believe $5.1 million of its investment would cover past-due player salaries and the remaining funds would pay for future league expenses.

C. **Relying on Ebersol's Representations, DCP Invested $70 Million of Emergency Funding to Avoid the AAF's Imminent Failure.**

26.　　Two days after his initial communication, on February 14, 2019, Ebersol represented to DCP the AAF's financial reality was more dire than Ebersol indicated originally, and the AAF needed DCP to inject capital by the following day for the league to survive.

27.　　Due to business and financial realities of the AAF at that moment in time, and acting in reliance on Ebersol's representations, DCP negotiated a $70 million commitment for the 2019 season.

28.　　DCP agreed to make a total of $70 million in capital contributions, based on Ebersol's representations and without the benefit or knowledge of material information that Ebersol withheld from DCP. The Term Sheet memorialized this agreement provided for the future execution of comprehensive transaction documentation in any form DCP provided.

29.　　Ebersol further represented to DCP the AAF had the proper authority from its shareholders and investors to consummate the transaction with DCP. This was important because the AAF offered to give DCP 75% ownership of the company through preferred stock and voting control of the AAF's Board of Directors.

30.　　To be clear, DCP knew the AAF was struggling and its investment in the AAF was risky. But DCP agreed to assume that risk, on an emergency basis, in reliance on Ebersol's factual representations concerning the AAF's financial needs. DCP did not have the opportunity to conduct its own in-depth diligence concerning the AAF's financial status because Ebersol convinced DCP the investment needs were extremely urgent.

31.　　On February 14, 2019, DCP and Dundon completed the Term Sheet, and DCP wired $5.1 million to the AAF the next day to allow the AAF to make payroll.

### D. DCP Learned Ebersol Made Affirmative Misrepresentations and Omitted Material Facts Regarding the True Financial Reality of the AAF.

32. Following DCP's initial investment and continuing for the following eight weeks, the AAF's entire leadership team met with DCP in Dallas to determine how to salvage the AAF.

33. During that period, DCP learned a number of alarming facts that indicated Ebersol misrepresented and concealed material information from DCP prior to DCP's investment and the completion of the Term Sheet.

34. Among other things, DCP discovered:

- DCP's $70 million capital injection was insufficient to cover the league's financial needs for the entire season because the AAF previously incurred tens of millions of undisclosed debts prior to DCP's investment;

- Ebersol knew significant funds would need to be spent on past-due vendor obligations, and true weekly cash needs were closer to $10 million, which would mean the $70 million investment would not cover expenses for the duration of the season;

- Ebersol had no alternative sources to cover the shortfall, and the AAF had no other funding options as Ebersol represented prior to the completion of the Term Sheet;

- The AAF had an additional eight figures in debt it incurred and failed to disclose to DCP;

- DCP's funding would cause a breach of lending arrangements;

- The AAF granted security interests in important assets;

- A past associate had threatened litigation related to his claim to be a co-founder of the league and sought a 50% interest in the AAF;

- The AAF did not have the requisite consent to enter the Term Sheet with DCP because the AAF Board had not formally approved the transaction, as required by company governing documents, and the transaction was not authorized by the requisite shareholders as required by investment agreements;

- Although the Term Sheet promised preferred stock to DCP as an option for its equity investment, the AAF did not have enough shares authorized to satisfy the issuance required under the Term Sheet; and

- The NFL and the NFL Players Association (NFLPA) were unwilling to agree to terms required for the AAF to take the form of an NFL developmental league.

35. DCP had no opportunity to conduct any meaningful due diligence to uncover this information prior to the investment given Ebersol's representation of the urgency of the immediate liquidity needed for the AAF to avoid imminent demise.

36. DCP structured its investment in installments. Based on Ebersol's representations, DCP originally budgeted to break up the installments in such a way to cover the $70 million as the expenses came due for the remainder of the season.

37. Each week after the completion of the Term Sheet, however, the AAF's leadership slowly disclosed additional and substantial amounts of outstanding vendor invoices and other outstanding debts owed to third parties. The AAF incurred these liabilities prior to DCP's investment. The avalanche of debt ate away at DCP's funding quickly.

38. For example, DCP first learned the AAF owed approximately $8 million to the following vendors, creditors, and individuals, who required immediate payment:

- Aramark;

- Texas Workers' Compensation Insurance;

- James D. Edgeworth (broker);

- SMT Broadcast Technology;

- Miami Air (partial debt owed immediately);

- Alliance Productions Day Labor Payroll;

- Arbiter referee payroll;

- Bill.com;

- Expensify;

- Media buys for eight markets;

- Carey Bus Transportation;

- SIS Security;

- TC Hotels (partial debt owed immediately);

- In Season Lodging;

- Miscellaneous credit cards;

- Catering;

- Medical supplies;

- Bill Polian;

- Vokkero; and

- Barnicle.

39.     The AAF owed an additional approximate $2.8 million to the following vendors, who also required quick payment:

- XOS;

- Miami Air;

- Werqwise;

- SIS Security;

- TC Hotels;

- Morgan Lewis;

- Joe Bosack;

- Proptology;

- Daversa;

- Kore;

**PLAINTIFF'S ORIGINAL COMPLAINT**                                **PAGE 9**

- Montag;

- MWW;

- Teamworks;

- Fenwick & West; and

- Muscular Moving Men.

40.     Ebersol failed to disclose any of these expenses—much less the precariousness of

the vendor relationships—prior to the signing of the Term Sheet. Rather, these past due expenses

were disclosed to DCP slowly after DCP began transferring funds to the AAF. Many of the

transfer requests were presented as emergencies that would cause the AAF's demise if they were

not paid.

41.     In the ensuing weeks, the AAF slowly disclosed millions of dollars in past due

vendor obligations that had not been paid prior to the completion of the Term Sheet and that

required immediate payment for the following vendors:

- McGarry Bowen;

- Sneaky Big;

- Security Industry Sp.;

- CBS;

- Carey;

- BexelESS;

- Henry Shein, Inc.;

- The Ebersol Lanigan Company LLC;

- 1954 Productions, LLC;

- New Era Cap;

- Bluemedia;

- Undefined Creative Inc.;

- iHeartMedia Ent. Inc.;

- Media2, Inc. dba m2;

- G&G Outfitters Inc.;

- PCS Production Company, LP;

- Barnicle Brothers;

- Prospect Productions LLC dba Barnicle;

- Olympic Case Co.;

- Proscout;

- eClinicalWorks LLC;

- Shock Doctor, Inc.;

- ACO Medical Supply, Inc.;

- MWW;

- KORE Interactive Systems;

- Vicis;

- Salus Labs, Inc (dba Triplebyte);

- Montage Group;

- DVSport, Inc.;

- SocialFlow, Inc.;

- Accolade USA Inc.;

- Daversa Partners;

- Clear Channel Outdoor;

- AMER Sports;

- Teamworks Innovations, Inc.;

- Won Worldwide;

- Zoominfo Inc.;

- TRI-C Club Supply Inc.;

- KFMB-TV;

- Savor & Black Tie;

- OUTFRONT Media Inc.;

- Adidas;

- Texon II Inc.;

- School of Health Corp.;

- Sinclair Broadcasting WBMA WTTC;

- Simplified Coach, Inc.;

- CORT Business Services Corp.;

- Silverman Group;

- Pioneer Manufacturing Company;

- Outdoor America Images, Inc.;

- Office Depot;

- KongBasileConsulting, LLC;

- Desert Digital Media, Inc.;

- Salesforce;

- PSAV;

- Mind Over Media LC;

- CP Communications;

- Liquid Soul Media, LLC;

- Performance Health Supply Inc.;

- Coach Comm; and

- Vokkero.

42.     The AAF disclosed additional vendors during the following weeks. None of the financial information Ebersol disclosed prior to the completion of the Term Sheet contained historical vendor debt; he disclosed only the unpaid payroll.

43.     The total debts were significant not only in raw dollar amount, but also because they were necessary for the league to operate. Because the AAF owed the amounts above, critical vendors threatened to limit the AAF's ability to put on games if they did not receive payment. The magnitude of that reality forced DCP to direct investment funds into the tens of millions of dollars in pre-existing debts at the expense of what DCP understood its investment would cover prior to signing the Term Sheet—player salary and regular operations through the end of the season.

44.     In addition, the overwhelming debts indicated Ebersol knew the financial condition and viability of the AAF was far more dire than he represented. DCP believed it was picking up where other investors dropped off. DCP did not know the other funding sources had long since dried up and the AAF stiffed crucial vendors in addition to players.

45.     By the end of March 2019, DCP transferred $61 million of its $70 million commitment. Yet, the AAF still had historical accounts payable of millions of dollars, leaving a multi-million dollar shortfall from aging payables, not inclusive of ongoing expenses and operations. In total, the AAF had aging accounts payable due to more than 400 vendors. The weekly cash flow commitment needed to keep the league afloat required greater revenue that was unavailable.

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    **PAGE 13**

46. Despite DCP's best efforts to salvage the league, the AAF's pre-existing, undisclosed debts became insurmountable, and DCP's $70 million was exhausted before the end of the season. With no additional revenue sources or other capital to pay for the league to operate through the rest of the season, DCP's investment was drained by week 8.

47. At that point, the AAF filed bankruptcy because it had no viable path to sustainability moving forward.

## V. CAUSES OF ACTION

### COUNT ONE – FRAUDULENT INDUCEMENT

48. Each of the foregoing paragraphs are incorporated and reasserted herein by reference.

49. Ebersol made fraudulent misrepresentations and omissions to DCP in the course of inducing DCP to enter the Term Sheet.

50. During telephone calls with Dundon between February 12 and 14, 2019, Ebersol represented to DCP that a $70 million investment would allow the AAF to pay all financial obligations to maintain league operations for the inaugural season of 2019, and the AAF could likely survive the first season with just $55 million from DCP. Those representations were false.

51. Ebersol represented to DCP that the AAF had future revenue sources and investors that would supplement DCP's investment and further ensure the AAF could become a viable, self-sustaining business. Those representations were false.

52. By executing the term sheet on February 14, 2019, Ebersol represented he, on behalf of the various AAF entities, had the authority to enter and consummate the transaction with DCP. Those representations were false.

53. Ebersol concealed that the AAF incurred eight figures in pre-existing secured and unsecured loans and had granted security interests in vital league assets to these lenders.

54.     Ebersol concealed, in addition to owing players $5.1 million in salary, the AAF owed vital vendors tens of millions of dollars that would need to be paid from DCP's investment.

55.     Ebersol concealed that funding sources and cash had long since dried up and the AAF had not paid a majority of its debts leading up to DCP's investment.

56.     Ebersol concealed the AAF needed an additional tens of millions to cover both preexisting liabilities and the expenses to maintain league operations during the inaugural season.

57.     Ebersol concealed the AAF had been threatened with litigation by a former associate who was seeking to obtain 50% ownership in the AAF.

58.     Ebersol concealed there were not enough available shares of the preferred stock Ebersol promised to DCP in the Term Sheet.

59.     Ebersol's affirmative representations—that $70 million would be sufficient to get the AAF through the 2019 season and the only debts owed at the time consisted of the $5.1 million in player salary—were false.

60.     Ebersol had a duty to disclose the concealed facts detailed above and all outstanding debts, liabilities, and threats facing the AAF. Ebersol made partial disclosures that created a false impression by voluntarily disclosing some information, creating a duty to disclose the whole truth.

61.     Ebersol's representations and omissions were material. They concerned the financial and legal viability of the AAF, and whether any investment would be capable of saving the organization.

62.     Ebersol knew his representations were false and knew the concealed facts were vital information DCP needed before it made the decision to invest. Ebersol also knew he had not obtained the authority for the stock transaction, which neither ESMG's board nor its

shareholders approved the transaction, and that promised shares of preferred stock did not exist. Ebersol knew that taking on DCP's investment without lender approval would trigger events of default with the AAF's lenders, putting the AAF's secured assets at risk.

63.     Ebersol made the foregoing misrepresentations and omissions with the intent that DCP rely upon them in entering the Term Sheet.

64.     DCP relied on Ebersol's misrepresentations and omissions to its detriment. DCP entered the Term Sheet and invested $70 million into the AAF when, but for Ebersol's representations and omissions, DCP would not have entered the Term Sheet or invested money into the AAF.

65.     Ebersol's conduct caused DCP damages of at least $70 million, which exceeds the minimum jurisdictional limits of this Court, and for which DCP hereby sues.

66.     DCP is further entitled to exemplary damages because Ebersol's conduct was committed with fraud, malice, or gross negligence.

### COUNT TWO – SECTION 33 OF THE TEXAS SECURITIES ACT

67.     Each of the foregoing paragraphs are incorporated and reasserted herein by reference.

68.     Ebersol offered and sold a security to DCP in the form of a preferred equity interest in ESMG.

69.     Ebersol failed to disclose the unpaid pre-existing and outstanding debts the AAF owed to third parties prior to accepting an investment from DCP.

70.     Ebersol made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by disclosing the player payroll as the only outstanding liability owed by the AAF.

71.     During telephone calls with Dundon between February 12 and 14, 2019, Ebersol represented to DCP that a $70 million investment would enable the AAF to pay for all financial obligations and to maintain league operations for the inaugural season of 2019, and the AAF could likely survive the first season with just $55 million from DCP. Those representations were false.

72.     Ebersol represented to DCP that the AAF had future revenue sources and investors that would supplement DCP's investment and further ensure the AAF could become a viable, self-sustaining business.

73.     By negotiating and executing the Term Sheet on February 14, 2019, Ebersol represented he, on behalf of the various AAF entities, had the authority to enter and consummate the transaction with DCP. Those representations were false.

74.     Ebersol concealed the AAF incurred eight figures in pre-existing secured and unsecured loans and had granted security interests in vital league assets to lenders.

75.     Ebersol concealed that, in addition to owing players $5.1 million in salary, the AAF owed vital vendors tens of millions of dollars that would need to be paid from DCP's investment.

76.     Ebersol concealed that funding sources and cash had long since dried up and the AAF had not paid a majority of its debts leading up to DCP's investment.

77.     Ebersol concealed the AAF needed an additional tens of millions to cover both preexisting liabilities and the expenses to maintain league operations during the inaugural season.

78.     Ebersol concealed the AAF faced threatened litigation with a former associate who was seeking to obtain 50% ownership in the AAF.

79.     Ebersol concealed there were not enough available shares of the preferred stock Ebersol promised to DCP in the Term Sheet.

80.     Ebersol's affirmative representations—that $70 million would be sufficient to get the AAF through the 2019 season and the only debts owed at the time consisted of the $5.1 million in player salary—were false.

81.     Ebersol failed to disclose the concealed facts detailed above and all outstanding debts, liabilities, and threats facing the AAF. Ebersol made partial disclosures that created a false impression by voluntarily disclosing some information, creating a duty to disclose the whole truth.

82.     DCP did not know the untruths and omissions Ebersol made to DCP.

83.     Ebersol's conduct caused DCP to suffer damages of at least $70 million, which exceeds the minimum jurisdictional limits of this Court, for which DCP hereby sues.

### COUNT THREE – SECTION 27 OF THE
### TEXAS BUSINESS AND COMMERCE CODE

84.     Each of the foregoing paragraphs are incorporated and reasserted herein by reference.

85.     Ebersol offered and sold a security to DCP in the form of a preferred equity interest (preferred stock) in ESMG.

86.     Ebersol made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, by disclosing the player payroll as the only outstanding liability owed by the AAF.

87.     During telephone calls with Dundon between February 12 and 14, 2019, Ebersol represented to DCP that a $70 million investment would enable the AAF to pay for all financial obligations and to maintain league operations for the inaugural season of 2019, and the AAF

could likely survive the first season with substantially less than $70 million from DCP. Those representations were false.

88.     Ebersol represented to DCP that the AAF had future revenue sources and investors that would supplement DCP's investment and further ensure the AAF could become a viable, self-sustaining business.  Those representations were false.

89.     By negotiating and executing the Term Sheet on February 14, 2019, Ebersol represented that he, on behalf of the various AAF entities, had the authority to enter and consummate the transaction with DCP. Those representations were false.

90.     Ebersol concealed the AAF incurred well over eight figures in pre-existing secured and unsecured loans and had granted security interests in vital league assets to lenders.

91.     Ebersol failed to disclose the unpaid pre-existing and outstanding debts the AAF owed to third parties prior to accepting an investment from DCP.

92.     Ebersol concealed that, in addition to owing players $5.1 million in salary, the AAF owed vital vendors tens of millions of dollars that would need to be paid from DCP's investment.

93.     Ebersol concealed that funding sources and cash had long since dried up and the AAF had not paid a majority of its debts leading up to DCP's investment.

94.     Ebersol concealed the AAF needed an additional tens of millions to cover both preexisting liabilities and the expenses to maintain league operations during the inaugural season.

95.     Ebersol concealed the AAF faced threatened litigation with a former associate who was seeking to obtain 50% ownership in the AAF.

96.     Ebersol concealed there were not enough available shares of the preferred stock Ebersol promised to DCP in the Term Sheet.

97.     Ebersol's affirmative representations—that $70 million would be sufficient to get the AAF through the 2019 season and the only debts owed at the time consisted of the $5.1 million in player salary—were false.

98.     Ebersol made the false representations for the purpose of inducing DCP to enter into a contract, and DCP relied on Ebersol's representations in entering that contract.

99.     Ebersol's false promises were material, made with intention of not fulfilling, made to DCP for the purpose to enter into the Term Sheet, and DCP relied on Ebersol in entering that Term Sheet.

100.    DCP suffered actual damages and is entitled to exemplary damages.

101.    DCP is entitled to cover its reasonable and necessary attorney's fees, expert witness fees, costs of depositions, and costs of court.

## PRAYER FOR RELIEF

**WHEREFORE,** Dundon Capital Partners LLC prays Defendant Charles Ebersol be cited to appear and answer herein, and that, on final trial, the Court award DCP actual damages, exemplary damages, costs of court, and such other and further relief, at law or in equity, to which it may have shown itself entitled or the Court deems proper.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:    /s/ *Brent D. Hockaday*
        Jeffrey S. Lowenstein
        Texas Bar No. 24007574
        jlowenstein@bellnunnally.com
        Brent D. Hockaday
        Texas Bar No. 24071295
        bhockaday@bellnunnally.com
        Brent A. Turman
        Texas Bar No. 24077506
        bturman@bellnunnally.com
        (*application pending*)
        Sydnie A. Shimkus
        Texas Bar No. 24093783
        sshimkus@bellnunnally.com
        (*application pending*)
        2323 Ross Ave., Ste. 1900
        Dallas, Texas 75201
        (214) 740-1400
        (214) 740-1499 Fax

        and

        Patrick H. Autry
        Texas Bar No. 01447600
        pautry@branscomblaw.com
        4360 North Loop 1604 W.
        Suite 206
        San Antonio, Texas 78249
        (210) 598-5400

        **ATTORNEYS FOR PLAINTIFF**
        **DUNDON CAPITAL PARTNERS LLC**

6966922_1.docx

**PLAINTIFF'S ORIGINAL COMPLAINT**        **PAGE 21**

FORM 104 (10/06)

| ADVERSARY PROCEEDING COVER SHEET<br>(Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER<br>(Court Use Only) |
|---|---|

| PLAINTIFFS<br>Dundon Capital Partners LLC | DEFENDANTS<br>Charles Ebersol |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.)<br>Bell Nunnally & Martin LLP,<br>2323 Ross Avenue, Suite 1900, | ATTORNEYS (If Known)<br>Michael J. Satlz,<br>Jacobson, Russell, Saltz, Nassim & de la Torre, LLP |
| **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☑ Creditor ☐ Other<br>☐ Trustee | **PARTY** (Check One Box Only)<br>☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☑ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Defendant Ebersol solicited Dundon Capital Partners LLC ("DCP") to invest $70 million in the Alliance of American Football ("AAF") based on false representations. Ebersol represented that, among other things, DCP's investment

**NATURE OF SUIT**
(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – reinstatement of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☐ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☑ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 70,000,000.00 |

Other Relief Sought
Exemplary damages, costs of court, such other and further relief, at law or in equity, to which DCP may show itself entitled to or the Court deems proper.

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR <br> Legendary Field Exhibitions, LLC | | BANKRUPTCY CASE NO. <br> 19-50900-CAG |
| DISTRICT IN WHICH CASE IS PENDING <br> Western District of Texas | DIVISIONAL OFFICE <br> San Antonio | NAME OF JUDGE <br> J. Gargotta |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISIONAL OFFICE | NAME OF JUDGE |

SIGNATURE OF ATTORNEY (OR PLAINTIFF)

| DATE <br> November 14, 2022. | PRINT NAME OF ATTORNEY (OR PLAINTIFF) <br> Brent D. Hockaday |
|---|---|

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 104, the Adversary Proceeding Cover Sheet, if it is required by the court. In some courts, the cover sheet is not required when the adversary proceeding is filed electronically through the court's Case Management/Electronic Case Files (CM/ECF) system. (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and the defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and in the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS,** | § | |
| **LLC,** | § | **CASE NO. 19-50900-CAG** |
| | § | **CHAPTER 7** |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | **ADV. NO. 22-05077** |
| v. | § | |
| | § | **Judge: Craig A. Gargotta** |
| **CHARLES EBERSOL,** | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO**
**PLAINTIFF'S ORIGINAL COMPLAINT**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

      Defendant Charles "Charlie" Ebersol ("Defendant" or "Ebersol") files this Original Answer to Plaintiff's Original Complaint (the "Complaint") filed by Plaintiff Dundon Capital Partners LLC ("Plaintiff").

**<u>INTRODUCTION</u>**

1.      Defendant denies the allegations contained in paragraph 1.

2.      Defendant denies the allegations contained in paragraph 2.

3.      Defendant denies the allegations contained in paragraph 3.

4.      Defendant denies the allegations contained in paragraph 4.

5.      Defendant denies the allegations contained in paragraph 5.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO**
**<u>PLAINTIFF'S ORIGINAL COMPLAINT – Page 1</u>**
12110747v2
08011.671

6.      Defendant denies the allegations contained in paragraph 6.

7.      Defendant denies the allegations contained in paragraph 7.

8.      Defendant denies the allegations contained in paragraph 8.

## PARTIES

9.      Defendant admits that Dundon Capital Partners LLC is a Delaware limited liability company and lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 9, and therefore denies same.

10.      Defendant admits the allegations contained in paragraph 10.

## JURISDICTION AND VENUE

11.      Defendant denies the allegations contained in paragraph 11.

12.      Defendant denies the allegations contained in paragraph 12.

### General Allegations

13.      Defendant denies the allegations contained in paragraph 13.

14.      Defendant denies the allegations contained in paragraph 14.

15.      Defendant denies the allegations contained in paragraph 15.

16.      Defendant denies the allegations contained in paragraph 16.

17.      Defendant denies the allegations contained in paragraph 17.

18.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 18, and therefore denies same.

19.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19, and therefore denies same.

20.      Defendant denies the allegations contained in paragraph 20.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO**
**PLAINTIFF'S ORIGINAL COMPLAINT – Page 2**
12110747v2
08011.671

32

21.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 21, and therefore denies same.

22.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 22, and therefore denies same.

23.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 23, and therefore denies same.

24.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 24, and therefore denies same.

25.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 25, and therefore denies same.

26.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 26, and therefore denies same.

27.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 27, and therefore denies same.

28.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 28, and therefore denies same.

29.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 29, and therefore denies same.

30.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 30, and therefore denies same.

31.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 31, and therefore denies same.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO**
**PLAINTIFF'S ORIGINAL COMPLAINT – Page 3**
12110747v2
08011.671

32.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 32, and therefore denies same.

33.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 33, and therefore denies same.

34.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of all the allegations contained in paragraph 34, and therefore denies same.

35.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 35, and therefore denies same.

36.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 36, and therefore denies same.

37.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 37, and therefore denies same.

38.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of all the allegations contained in paragraph 38, and therefore denies same.

39.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 39, and therefore denies same.

40.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 40, and therefore denies same.

41.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 41, and therefore denies same.

42.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 42, and therefore denies same.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO**
**PLAINTIFF'S ORIGINAL COMPLAINT – Page 4**
12110747v2
08011.671

43.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 43, and therefore denies same.

44.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 44, and therefore denies same.

45.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 45, and therefore denies same.

46.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 46, and therefore denies same.

47.     Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 47, and therefore denies same.

## CAUSES OF ACTION

### Count I – Fraudulent Inducement

48.     Defendant incorporates by reference all of the foregoing paragraphs as if set forth herein.

49.     Defendant denies the allegations contained in paragraph 49.

50.     Defendant denies the allegations contained in paragraph 50.

51.     Defendant denies the allegations contained in paragraph 51.

52.     Defendant denies the allegations contained in paragraph 52.

53.     Defendant denies the allegations contained in paragraph 53.

54.     Defendant denies the allegations contained in paragraph 54.

55.     Defendant denies the allegations contained in paragraph 55.

56.     Defendant denies the allegations contained in paragraph 56.

57.     Defendant denies the allegations contained in paragraph 57.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT – Page 5**
12110747v2
08011.671

35

58.     Defendant denies the allegations contained in paragraph 58.

59.     Defendant denies the allegations contained in paragraph 59.

60.     Defendant denies the allegations contained in paragraph 60.

61.     Defendant denies the allegations contained in paragraph 61.

62.     Defendant denies the allegations contained in paragraph 62.

63.     Defendant denies the allegations contained in paragraph 63.

64.     Defendant denies the allegations contained in paragraph 64.

65.     Defendant denies the allegations contained in paragraph 65.

66.     Defendant denies the allegations contained in paragraph 66.

### Count II – Section 33 of the Texas Securities Act

67.     Defendant incorporates by reference all of the foregoing paragraphs as if set forth herein.

68.     Defendant denies the allegations contained in paragraph 68.

69.     Defendant denies the allegations contained in paragraph 69.

70.     Defendant denies the allegations contained in paragraph 70.

71.     Defendant denies the allegations contained in paragraph 71.

72.     Defendant denies the allegations contained in paragraph 72.

73.     Defendant denies the allegations contained in paragraph 73.

74.     Defendant denies the allegations contained in paragraph 74.

75.     Defendant denies the allegations contained in paragraph 75.

76.     Defendant denies the allegations contained in paragraph 76.

77.     Defendant denies the allegations contained in paragraph 77.

78.     Defendant denies the allegations contained in paragraph 78.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO**
**PLAINTIFF'S ORIGINAL COMPLAINT – Page 6**
12110747v2
08011.671

79.     Defendant denies the allegations contained in paragraph 79.

80.     Defendant denies the allegations contained in paragraph 80.

81.     Defendant denies the allegations contained in paragraph 81.

82.     Defendant denies the allegations contained in paragraph 82.

83.     Defendant denies the allegations contained in paragraph 83.

### Count III – Section 27 of the Texas Business and Commerce Code

84.     Defendant incorporates by reference all of the foregoing paragraphs as if set forth herein.

85.     Defendant denies the allegations contained in paragraph 85.

86.     Defendant denies the allegations contained in paragraph 86.

87.     Defendant denies the allegations contained in paragraph 87.

88.     Defendant denies the allegations contained in paragraph 88.

89.     Defendant denies the allegations contained in paragraph 89.

90.     Defendant denies the allegations contained in paragraph 90.

91.     Defendant denies the allegations contained in paragraph 91.

92.     Defendant denies the allegations contained in paragraph 92.

93.     Defendant denies the allegations contained in paragraph 93.

94.     Defendant denies the allegations contained in paragraph 94.

95.     Defendant denies the allegations contained in paragraph 95.

96.     Defendant denies the allegations contained in paragraph 96.

97.     Defendant denies the allegations contained in paragraph 97.

98.     Defendant denies the allegations contained in paragraph 98.

99.     Defendant denies the allegations contained in paragraph 99.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT – Page 7**
12110747v2
08011.671

100.    Defendant denies the allegations contained in paragraph 100.

101.    Defendant denies the allegations contained in paragraph 101.

## PRAYER FOR RELIEF

Defendant is not required to admit or deny the allegations or requests for relief under the paragraph entitled "PRAYER FOR RELIEF," but Defendant denies that Plaintiff is entitled to any relief sought therein.

## ADDITIONAL DEFENSES

1.    Defendant asserts that this Court lacks subject matter jurisdiction over this matter.

2.    Plaintiff fails to state a claim upon which relief can be granted with regard to its claims against Defendant for fraudulent inducement, violation of Section 33 of the Texas Securities Act, and Section 27 of the Texas Business and Commerce Code.

3.    Plaintiffs' claims are barred, in whole or in part, under the doctrines of estoppel, waiver, and laches.

4.    Plaintiffs' claims against Defendant are barred in whole or in part because Defendant satisfied all obligations, if any, under applicable law.

5.    Plaintiffs' claims are barred in whole or in part because, at all material times, Defendant acted reasonably, in good faith, and without malice based upon all relevant facts and circumstances known by Defendant at the time.

6.    Plaintiff's recovery is limited in whole or in part by Plaintiff's failure to mitigate its alleged damages, if any, and also by the doctrine of avoidable consequences and all similar and equivalent doctrines.

7.    Plaintiff is barred from recovery against Defendant due to the intentional intervening acts of a third party, which shield Defendant from liability.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO**
**PLAINTIFF'S ORIGINAL COMPLAINT – Page 8**
12110747v2
08011.671

8.     Plaintiffs' claims are barred based on the doctrine of unclean hands.

9.     Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' failure to mitigate damages, if any.

10.    Any acts or omissions by Defendant were not a proximate cause of any injuries alleged by Plaintiff.

11.    Plaintiffs' claims are barred to the extent Plaintiff was not employed by Defendant.

12.    Plaintiffs' claims are barred, in whole or in part, because there is no individual liability for the alleged acts or omissions of Defendant.

13.    Plaintiffs' claims are barred because Defendant has appropriately, completely and fully performed and discharged any and all obligation and legal duties arising out of the matters alleged in the Complaint.

14.    Plaintiffs' claims are barred because Plaintiff lacks standing to prosecute the purported claims set forth in the Complaint.

15.    Plaintiff is barred from prosecuting the claims alleged in the Complaint by the doctrine of ratification.

16.    To the extent Plaintiff suffered any damages, such damages should be offset in an amount to be proven.

## **PRAYER**

Defendant Charles Ebersol prays that Plaintiff takes nothing by the Complaint; and that the Court awards Defendant his costs incurred herein, including attorneys' fees as allowable by law; and for such other and further relief, at law or in equity, which the Court deems proper.

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT – Page 9**
12110747v2
08011.671

Respectfully submitted,

THOMPSON, COE, COUSINS & IRONS, L.L.P.

By: _/s/ William N. Radford_
William N. Radford
Texas State Bar No. 16455200
wradford@thompsoncoe.com

700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201-2832
Telephone: (214) 871-8200
Facsimile: (214) 871-8209

JACOBSON, RUSSELL, SALTZ, NASSIM & DE
LA TORRE, LLP

1880 Century Park East, Suite 900
Los Angeles, California 90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909
Michael J. Saltz
_Pro Hac Vice Application Pending_
msaltz@jrsnd.com

**ATTORNEYS FOR DEFENDANT CHARLES "CHARLIE" EBERSOL**

**CERTIFICATE OF SERVICE**

The undersigned counsel of record hereby certifies that on March__, 2023, true and correct copies of the foregoing document were served electronically via the Court's CM/ECF system to all those entitled to receive service in this adversary proceeding and to all counsel of record via email, as follows:

Brent D. Hockaday
Jeffrey S. Lowenstein
Brent A. Turman
BELL, NUNNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
bhockaday@bellnunnally.com
jlowenstein@bellnunnally.com
bturman@bellnunnally.com
**Attorneys for Dundon Capital
Partners LLC**

William A. "Trey" Wood, III
Steve Turner
BRACEWELL, LLP
711 Louisiana, Suite 2300
Houston, Texas 77002
Trey.wood@bracewell.com
**Attorneys for Chapter 7 Trustee**

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO PLAINTIFF'S ORIGINAL COMPLAINT – Page 10**
12110747v2
08011.671

Brian S. Engel
BARRETT DAFFIN FRAPPIER TURNER &
ENGEL, LLP
3809 Juniper Trace, Suite 205
Austin, Texas 78738
brianen@bdfgroup.com
wdecf@bdfgroup.com
**Attorneys for Chapter 7 Trustee**

Randolph N. Osherow
342 West Woodlawn Avenue, Suite 100
San Antonio, Texas 78212
rosherow@hotmail.com
**Chapter 7 Trustee**

*/s/ William N. Radford*
William N. Radford

**DEFENDANT CHARLES "CHARLIE" EBERSOL'S ORIGINAL ANSWER TO
PLAINTIFF'S ORIGINAL COMPLAINT – Page 11**
12110747v2
08011.671



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: June 21, 2024.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7 |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, | § | CASE NO. 19-50900-CAG |
| | § | |
| _DEBTORS._ | § | (And Substantively Consolidated Cases: |
| | § | 19-50902-CAG, 19-50903-CAG, 19-50904- |
| | § | CAG, 19-50905-CAG, 19-50906-CAG) |

| | | |
|---|---|---|
| | § | |
| DUNDON CAPITAL PARTNERS LLC, | § | |
| | § | |
| _PLAINTIFF,_ | § | |
| | § | Adversary Proceeding No. 22-05077-cag |
| v. | § | |
| | § | Judge: Craig A. Gargotta |
| CHARLES EBERSOL, | § | |
| | § | |
| _DEFENDANT._ | § | |

## <u>MODIFIED PRE-TRIAL SCHEDULING ORDER</u>

At the outset of the case, the Parties conferred, agreed, and the Court ordered the

consolidation of the pretrial discovery scheduling with "Related Adversary" Proceeding, _Randolph_

_N. Osherow, Chapter 7 Trustee, and the Bankruptcy Estates of Legendary Field Exhibitions, LLC;_

_AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LFE 2, LLC; and_

*We are Realtime, LLC v. Thomas Dundon, John Zutter, and Dundon Capital Partners LLC*, Case No. 19-05078-cag (the "Trustee Proceeding"), also pending before this Court.

On this day, the Court considered the Opposed Motion for Continuance filed by Plaintiff in the Ebersol Proceeding, Dundon Capital Partners LLC, and Defendants in this matter, Thomas Dundon, John Zutter, and Dundon Capital Partners LLC, ECF No. 90 (the "Opposed Motion"), and the Motion to Modify and/or Amend Scheduling Order (Corrected), filed by Plaintiff Randolph Osherow, as Chapter 7 Trustee of the Bankruptcy Estates of Legendary Field Exhibitions, LLC, AAF Players, LLC, AAF Properties, LLC, Ebersol Sports Media Group, Inc., LFE 2, LLC, and We Are Realtime, LLC, ECF No. 95. Having considered each motion, the responses, arguments of counsel, and the law, the Court is of the opinion that the Opposed Motion is well-taken and should be **GRANTED.**

It is therefore, **ORDERED**, the Scheduling order for this matter and the Ebersol Proceeding shall be updated as follows below. Should any of the deadlines fall on a weekend or federal court holiday, such as a Saturday or July 4 by way of example, the deadline shall roll to the following Monday or regular business day the Court is open after such holiday.

With due regard to the parties' recommendations and other pertinent matters, the Court enters the following scheduling deadlines and order.

**IT IS ORDERED THAT THE FOLLOWING DEADLINES SHALL APPLY:**

|  |  |
|---|---|
|  | **Depositions.** Each Party may notice and take up 35 depositions without leave of court. Depositions taken in this Adversary Proceeding or in the Related Adversary Proceeding will be considered taken in and may be used in both proceedings. The parties will coordinate to ensure that a witness is deposed only once. |
| November 11, 2024 | **Mediation.** The Parties will mediate on or before this date. |
| September 30, 2024 | **Plaintiffs' Expert Witnesses**. Plaintiff will designate* retained testifying expert witnesses, if any. |

| October 4, 2024 | **Expert Depositions**. Plaintiff will tender their designated experts, if any, on or before this date, but the Defendants may take those depositions at any time before discovery closes. |
|---|---|
| November 1, 2024 | **Defendants' Expert Witnesses**. Defendants to designate* retained expert witnesses. |
| November 4, 2024 | **Expert Depositions**. Defendants will tender their designated experts, if any, on or before this date, but Plaintiffs may take those depositions at any time before discovery closes. |
| November 11, 2024 | **Discovery Completed**. The parties will complete discovery on or before this date. Counsel may, by agreement, amend, extend, or otherwise alter the dates and deadlines for discovery, or for certain discovery and may by agreement extend discovery beyond the deadlines set in this Order, but there will be no intervention by the Court except in extraordinary circumstances. |
| | **Discovery Disputes.** Counsel are encouraged to resolve discovery disputes by agreement. Motions to compel, motions for protective orders and similar motions, while not prohibited, may result in sanctions being imposed on the losing party or both parties as provided in Fed. R. Bankr. P. 7037 & 9011 or 28 U.S.C. section 1927, if a hearing is required thereon.<br><br>All discovery shall be commenced at a time which allows for the full response time provided by applicable rules on or before the discovery deadline. E.g., if the discovery deadline is November 11, interrogatories must be actually delivered, on or before November 11, in order to allow thirty days for answers. If the interrogatories are mailed, then they must be mailed on or before November 8, pursuant to Fed. R. Bankr. P. 9006(f), to allow three additional days for service by mail. |
| October 14, 2024 | **Dispositive Motions.** All dispositive motions will be filed and served on all other parties on or before this date and shall be limited to 30 pages unless otherwise authorized by the court. *See* L. Rule 7007(a) for the definition of dispositive motions and page limits. Responses shall be filed and served on all other parties not later than 21 days of the service of the motion and shall be limited to 30 pages. *See* L. Rule 7007(b) (2). Any replies shall be filed and served on all other parties not later than 7 days of the service of the response and shall be limited to 10 pages, but the Court need not wait for the reply before ruling on the motion. *See* L. Rule 7007(c). |
| | **Other Motions.** Motions other than Rule 7012 or 7056 are governed by L. Rule 7007, 9013, and 9014 where applicable. |
| 10 days before Docket Call | **Joint Pre-trial Order.** A joint pre-trial order and proposed findings of fact and conclusions of law are due. *See* L. Rule 7016(c) and (d). |

| December 2, 2024 | **Docket Call for Trial.**  Per the Court, Docket Call will be via phone at 1:30 p.m. |
|---|---|
| | Call-In No. 650-479-3207 |
| | Access Code: 160 591 1937 |
| | Parties will be required to discuss at docket call any objections to the use of deposition testimony and stipulations regarding the use of experts for trial.  At docket call, the Court will set a date to commence trial. |
| | **Failure to attend docket call may result in dismissal or rendition of final judgment. Any party may, however, authorize any member of the Bar of this Court, including opposing counsel, to make an appearance on your behalf at docket call, if there are no contested motions for continuance, motions for default judgment or motions under Fed. R. Civ. P. 12 and Fed. R. Bankr. P. 7012.** |
| | **Exhibits.**  Exhibits and a witness list are to be exchanged seven business days in advance of trial. *See* L. Rule 7016(f). In addition, counsel are encouraged to present and provide electronic versions of exhibits where practicable. Use and presentation of electronic exhibits should be coordinated through the courtroom deputy. |

*The parties' expert designations shall identify the expert by name and address and shall also state the opinions the expert intends to offer at trial and in general the factual and legal bases for those opinions.  Documents made available to the expert shall be made available to the opposing side a reasonable time before deposition.

**Sides as "Parties" for Discovery.**  For the purposes of the discovery limitations in this scheduling order, the Trustee, as Chapter 7 Trustee of the consolidated bankruptcy estates of Legendary Field Exhibitions, LLC, AAF Players, LLC, AAF Properties, LLC, Ebersol Sports Media Group, Inc., LFE2, LLC and We Are Realtime, LLC are considered to be single Party; Thomas Dundon, Dundon Capital Partners, LLC and John Zutter are considered to be a single Party and Charles Ebersol is considered to be a single Party.

**Redaction.**  Counsel are reminded that, with regard to any paper that is filed, compliance with Fed. R. Civ. P. 5.2 is mandatory. As such, counsel should ensure that appropriate redactions are made.

**Production of Electronic Images.** Documents may be produced and served as electronic images. Neither paper copies nor originals are required absent a specific request by a party.

**Electronically Stored Information.**  This Scheduling Order does not specifically address the discovery of electronically stored information (ESI). To the extent the parties believe that ESI is subject to discovery, the parties are directed to reach an agreement on production of ESI. The parties are encouraged to consider the template developed by the Seventh Circuit Electronic

Discovery Pilot Program. See (http://www.discoverypilot.com). Any party may bring any dispute regarding the discovery of ESI.

**Modification and Amendment.** The Court may, upon its own motion or motion for cause shown, extend, reduce, or otherwise modify the deadlines set out in the Scheduling Order. Mere agreement of the parties to such extensions or modifications is not of itself sufficient cause.

**Foreign Counsel.** Counsel residing outside the State of Texas may designate local counsel in writing, giving the street address, telephone number and mailing address. The designation shall be filed with the Clerk of the Court in this proceeding, and a copy shall be sent to all other counsel of record in this proceeding. This provision may be waived by the Court upon motion of counsel and service upon other parties.

**Alternative Dispute Resolution.** The parties will mediate in prior to the date the Pre−Trial Order is required to be filed, to fully explore the possibility of settlement. The Pre-Trial Order will contain a certificate that such mediation was held.

**Counsel to Confer.** Prior to the date the Pre-Trial Order is required to be filed, Counsel will confer in good faith to consider stipulation to matters not in dispute and to simplify the issues for trial. The Pre-Trial Order shall contain a certificate to the effect that the conference of counsel has been held. Counsel must also confer to determine whether the original time estimate for trial is correct or should be revised. If the parties wish to have a pre−trial conference with the Court, a pre−trial conference should be requested as early as possible, but at least 60 days prior to the trial.

**Matters Considered at Docket Call.** Docket call is set on the docket call date provided in the scheduling order. The only matters to be considered by the Court at docket call are as follows:

   a.  Date, time and place of trial following docket call.

   b.  Properly and timely−filed motions for continuance or for default judgment.

   c.  Motions not previously ruled on under Fed. R. Civ. P. 12 and Fed. R. Bankr. P. 7012.

   d.  Settlement announcements. Failure to attend docket call may result in dismissal or rendition of final judgment. You may, however, authorize any member of the Bar of this Court, including opposing counsel, to make an appearance on your behalf at docket call, if there are no contested motions for continuance, motions for default judgment or motions under Fed. R. Civ. P. 12 and Fed. R. Bankr. P. 7012.

**SO ORDERED**

<div align="center">###</div>

Submitted by:

Brent D. Hockaday
K&L Gates, LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 19-50900-CAG-7** |
| **LEGENDARY FIELD** | § | |
| **EXHIBITIONS, LLC, ET AL.,** | § **CHAPTER 7** | |
| *Debtors.* | § | |
| | § | |

| | | |
|---|---|---|
| | § | |
| **RANDOLPH N. OSHEROW,** | § | |
| **Chapter 7 Trustee of the Bankruptcy** | § | |
| **Estates of Legendary Field Exhibitions, LLC;** | § | |
| **ET AL.** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **ADV. PROC. NO. 22-05078-cag** |
| | § | |
| **DUNDON CAPITAL PARTNERS, LLC;** | § | |
| **THOMAS DUNDON; AND JOHN ZUTTER** | § | |
| | § | |
| **DEFENDANTS.** | § | |

## JOINT MOTION TO CONSOLIDATE ACTIONS FOR JOINT TRIAL

**TO THE HONORABLE CRAIG A. GARGOTTA, CHIEF U.S. BANKRUPTCY JUDGE:**

**COME NOW** all the parties plaintiff and defendant the above-styled and numbered proceeding, and joined by all parties in related Adversary Proceeding 22-05077 and file this their Joint Motion to Consolidate Actions for Joint Trial, and respectfully show:

### I.
### FACTUAL BACKGROUND

1. Randolph N. Osherow filed this Adversary Proceeding 22-05078 ("AP 05078") on November 14, 2022, alleging causes of action against Thomas G. Dundon ("Dundon"), Dundon Capital Partners, LLC ("DCP") and John Zutter ("Zutter") related to the funding and operation of the Alliance of American Football league ("AAF").

2. The Trustee's various legal theories sound in contract, misrepresentations, fiduciary duties and equity related to funding and funding commitments to the AAF and to Dundon's and Zutter's actions as ESMG's only voting directors.

3. The Trustee also objected to the proofs of claim Dundon and DCP respectively filed

alleging that AAF made misrepresentations to induce them to fund and invest in the ESMG.

4. On the same day, DCP filed separate Adversary Proceeding 22-05077 ("AP 05077") against Charlie Ebersol ("Ebersol") alleging that Ebersol made substantially the same misrepresentations to DCP as those described in the proofs of claim.

5. Dundon, DCP and Zutter answered the Trustee's complaint, denying the Trustee's allegations and asserting as an affirmative defense that AAF made substantially the same misrepresentations as asserted in the proofs of claim.

6. Following a status conference in AP 05077, the Court granted DCP's and Ebersol's joint motion to stay all deadlines stayed all deadlines in the action in expectation that AP 05077 and AP 05078 would be consolidated for pretrial proceedings. (Docket No.s 24, 29 in AP 05077).

7. After a status conference and with agreement of all parties in AP 05077 and AP 05078, the Court ordered that discovery and other pretrial matters in both actions proceed according to a unified scheduling order. (Docket No.s 66 and 67 in AP 05078). Discovery and other pretrial matters proceeded on a consolidated basis.

8. Discovery is nearing completion, and the parties are cooperating to prepare a single pretrial order encompassing both AP 05077 and AP 05078.

## III.
## ARGUMENT

9. Federal Rule of Civil Procedure 42(a), incorporated in adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7042, governs consolidation:

(a) Consolidation. If actions before the court involve a common question of law or fact, the court may:

   (1) join for hearing or trial any or all matters at issue in the actions;
   (2) consolidate the actions; or
   (3) issue any other orders to avoid unnecessary cost or delay.

Fed. R. Civ. P. 42(a).

10. Rule 42 vests courts with "very broad" authority and discretion to determine whether and to what extent to consolidate or join actions or issues for trial. *Mills v. Beech Aircraft Corp.*, 886 F.2d 758, 761–62 (5th Cir. 1989); *C.W. v. James Zirus*, No. SA-10-CA-1044-XR, 2012 WL 12919097, at *2 (W.D. Tex. Aug. 7, 2012).

11. . Courts should use Rule 42(a) to expedite trial and eliminate unnecessary repetition and confusion and to avoid the chance of inconsistent adjudications. *In re Air Crash Disaster at Fla.*

*Everglades on Dec. 29, 1972*, 549 F.2d 1006, 1013 (5th Cir. 1977) (quoting *Gentry v. Smith*, 487 F.2d 571, 581 (5th Cir. 1973)).

12. In exercising that discretion courts consider:

(1) whether the actions are pending in the same court;

(2) whether there are common parties;

(3) whether there are common questions of law or fact;

(4) whether there is risk of prejudice or confusion versus a risk of inconsistent adjudications if the cases are tried separately; and

(5) whether consolidation will promote judicial economy.

*Casillas v. McDonough*, No. SA-22-CV-00959-JKP, 2023 WL 4356689, at *1 (W.D. Tex. June 30, 2023)

13. All these factors favor consolidation for trial here. AP 05078 and AP 05077 are both pending in this Court, were filed the same day, and concern the same parties and related entities. DCP is a named party in both actions. *JFP Services, L.L.C. v. Torans*, No. SA-17-CV-00210-FB, 2017 WL 9362704, at *2 (W.D. Tex. Dec. 21, 2017) (finding consolidations for trial where separate actions involved the same business transaction and claims sounding in contract, misrepresentation and fiduciary duty).

14. AP 05078 and AP 05077 are consolidated for coordinated discovery and pretrial purposes and the parties have developed the cases side by side through the same documents and witnesses on the same schedule.

15. AP 05078 and AP 05077, as well as the proofs of claim involve the same operative facts and interactions and arise out of the same business transactions and the same operative facts and interactions between the same persons.

16. Through the progression of discovery, it has become apparent that, as expected, there is a high degree of overlap in the evidence that will be offered at trial informing the parties' claims and defenses, especially related to the claims grounded in alleged misrepresentations and the dealings among the parties and their agents. Considering this significant overlap, the parties concur that conducting separate trials involving the substantially the same witnesses and evidence would create unnecessary cost and delay and that joining the cases for trial would reduce and avoid cost and delay.

PAGE 3

17. There is no appreciable risk that consolidating AP 05078 and AP 05077 for joint trial will result in any confusion or procedural prejudice to the parties. This is not a jury trial, and the Court has had the benefit of extensive briefing on legal and factual issues involved. The cases were simultaneously filed; pretrial matters have proceeded on the same schedule and the cases are at the same stage. They will likely be mediated together.

18. There is also no appreciable risk that the parties in the respective actions will lose any substantive rights by consolidation for trial. Consolidation is a matter of procedural convenience; it will not deprive a party of any substantial rights the party may have had if the actions had been tried separately. Cases consolidated for trial are not merged. They maintain their separate identities and require separate judgments. *Miller v. U.S. Postal Serv.*, 729 F.2d 1033, 1036 (5th Cir. 1984). *Id*.

19. Jointly trying AP 05078 and AP 05077 will allow the Court to receive evidence once, preserving the time and resources of the Court and the parties, avoid the need to call witnesses multiple times or require them to return to court for a subsequent trial. A consolidated trial will enhance the convenience and efficiency and speed of adjudication.

## IV.
## RELIEF REQUESTED

**FOR THE FOREGOING REASONS**, the parties in AP 05078 and AP 05077 jointly request that Court procedurally consolidate AP 05078 and AP 05077 for joint trial, render separate findings and judgments, and grant the parties such other and further relief to which they show themselves justly entitled.

Dated: November 26, 2024

Respectfully submitted,

**BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP**

/s/ Brian S. Engel
Brian S. Engel (SBN 00789279)
4004 Belt Line Rd. Suite 100
Addison, TX 75001
Phone: (512) 687-2500
Fax: (512) 477-1112
brianengel@me.com

PAGE 4

**ABIR COHEN TREYZON SALO, LLP**

Jonathon Farahi (CA SBN 324316)
16001 Ventura Boulevard, Suite 200
Encino, California 91436
Phone: (424) 288-4367
Fax: (424) 288-4368
btreyzon@actslaw.com
jfarahi@actslaw.com

**THOMPSON COBURN LLP**

Nicole L. Williams (SBN 24041784)
Katharine Battaia Clark (SBN 24046712)
John P. Atkins (SBN 24097326)
1919 McKinney Avenue, Suite 100
Dallas, Texas 75201
Phone: (972) 629-7100
Fax: (972) 629-7171
nwilliams@thompsoncoburn.com
KClark@ThompsonCoburn.com
JAtkins@thompsoncoburn.com

**ATTORNEYS FOR CHAPTER 7 TRUSTEE
RANDOLPH N. OSHEROW**

**BELL NUNNALLY & MARTIN**

/s/ Jeff Lowenstein
Jeffrey S. Lowenstein (SBN 24007574)
Brent A. Turman (SBN 24077506)
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201
Phone: (214) 740-1400
Fax: (214) 740-1499
jlowenstein@bellnunnally.com
bturman@bellnunnally.com

**K&L Gates, LLP**

Brent D. Hockaday (SBN 24071295)
1717 Main St #2800
Dallas, TX 75201
214-939-5677
Fax: 214-939-5849
Email: brent.hockaday@klgates.com

PAGE 5

**ATTORNEYS FOR DEFENDANT THOMAS G. DUNDON, DUNDON CAPITAL PARTNERS, LLC AND JOHN ZUTTER**

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**

/s/ Michael J. Saltz

Michael J Saltz
Simone E Poyourow
1880 Century Park East
Suite 900
Los Angeles, CA 90067
310-446-9900
Fax: 310-446-9909
Email: msaltz@jrsnd.com
        spoyourow@jrsnd.com

**THOMPSON, COE, COUSINS & IRONS, L.L.P.**
Tom Horan
700 North Pearl Street, Suite 2500
Dallas, TX 75201
214-871-8241
Fax: 214-871-8209
Email: thoran@thompsoncoe.com

**ATTORNEYS FOR CHARLIE EBERSOL**

PAGE 6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 26, 2024, a true and correct copy of the foregoing document was transmitted to the counsel involved in the case by via the court's ECF electronic notification system or by electronic mail to the email address shown below:

Jonathon Farahi
Boris Treyzon
16001 Ventura Boulevard, Suite 200
Encino, California 91436
Phone: (424) 288-4367
Fax: (424) 288-4368
btreyzon@actslaw.com
jfarahi@actslaw.com

Nicole L. Williams, Esq.
Katharine Battaia Clark, Esq.
John Atkins, Esq.
2100 Ross Avenue Suite 3200
Dallas, Texas 75201
*nwilliams@thompsoncoburn.com*
*KClark@ThompsonCoburn.com*
*JAtkins@thompsoncoburn.com*

Brian S. Engel, Esq.
4004 Beltline Road, Suite 100
Addison, TX 75001-4320
*brianen@bdfgroup.com*

Brent Hockaday, Esq.
1717 Main Street, Suite 2800
Dallas, TX 75201-7342
*brent.hockaday@klgates.com*

Michael J Saltz
Simone E Poyourow
1880 Century Park East, Suite 900
Los Angeles, CA 90067
msaltz@jrsnd.com
Spoyourow@jrsnd.com

Tom Horan 700 North Pearl
Street, Suite 2500
Dallas, TX 75201
214-871-8241
Fax: 214-871-8209
Email: thoran@thompsoncoe.com

Jeffrey S. Lowenstein, Esq.
Beverly A. Whitley, Esq.
Brent A. Turman, Esq.
Sydnie A. Shimkus, Esq.
2323 Ross Avenue, Suite 1900
Dallas, TX 75201
*jlowenstein@bellnunnally.com*
*bwhitley@bellnunnally.com*
*bturman@bellnunnally.com*
*sshimkus@bellnunnally.com*

*/s/ Brian S. Engel* _____
Brian Engel

PAGE 7

53

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 19-50900-CAG-7 |
| **LEGENDARY FIELD** | § | |
| **EXHIBITIONS, LLC, ET AL.,** | § | |
| *Debtors.* | § | **CHAPTER 7** |
| **RANDOLPH N. OSHEROW,** | § | |
| **Chapter 7 Trustee of the Bankruptcy** | § | |
| **Estates of Legendary Field Exhibitions, LLC,** | § | |
| **ET AL.** | § | |
| *Plaintiff,* | § | **ADV. PROC. NO. 22-05078-cag** |
| **v.** | § | |
| | § | |
| **DUNDON CAPITAL PARTNERS, LLC;** | § | |
| **THOMAS DUNDON; AND JOHN ZUTTER** | § | |
| **D*efendants.*** | § | |

## ORDER GRANTING
## JOINT MOTION TO CONSOLIDATE ACTIONS FOR JOINT TRIAL

The Court has considered the Parties Joint Motion to Consolidate Actions for Joint Trial, the record and other pertinent matters determined that the Motion should be in all things **GRANTED:**

**IT IS THEREFORE:**

**ORDERED** that this Adversary Proceeding 22-05078 and related Adversary Proceeding 22-05077 are hereby consolidated for joint trial and otherwise to remain separate and maintain their separate identities for judgment.

### ###

PAGE 1



**EXHIBIT**
**A**

54

Submitted by:

Brian S. Engel
Barrett Daffin Frappier Turner & Engel, LP
4004 Belt Line Rd., Suite 100
Addison,Texas 75001.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| | § | |
| *Debtor.* | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **ADV. NO. 22-05077** |
| | § | |
| **CHARLES EBERSOL,** | § | **Judge: Craig A. Gargotta** |
| | § | |
| *Defendant.* | § | |

### DEFENDANT CHARLES EBERSOL'S MOTION FOR
### SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF

Pursuant to Federal Rule of Civil Procedure 56, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012(b), Defendant Charles Ebersol ("Ebersol") moves for summary judgment against Plaintiff Dundon Capital Partners LLC ("DCP"), as there is no triable issue of material fact and Ebersol is entitled to judgment as a matter of law.

In support of said Motion, Ebersol provides his Memorandum in Support, below:

## I. INTRODUCTION

This lawsuit arises from the failure of the Alliance of American Football (the "AAF" or the "League"), a professional football minor league that was intended to serve as a counterpart to the National Football League (the "NFL"). After the AAF's primary investor faltered on his financial commitments, Ebersol, one of the League's founders, began searching for alternative investment partners. As part of his efforts, Ebersol met Thomas Dundon ("Dundon"), a sophisticated investor

and principal of DCP, who negotiated on behalf of DCP to commit at least $70 million to the AAF in exchange for majority control of Ebersol Sports Media Group ("ESMG"), the parent company of several entities that together ran the AAF.[1] To document this commitment, DCP drafted a term sheet which, among other things, provided that DCP would approve funding requests submitted by ESMG, control ESMG's board of directors, and receive seventy-five percent of ESMG's stock upon execution. However, the term sheet was never executed, as DCP never signed it, DCP never paid to the AAF a single dollar, and DCP was never officially issued any ownership shares.

To be certain, from February 14, 2019 to April 16, 2019, ESMG submitted funding requests to DCP per Dundon's instructions. Although DCP managed these requests, it did not pay by wire or otherwise any of the requested funds to ESMG; instead, all of these funds were paid by DDFS Partnership, LP ("DDFS"), an entity that is legally distinct from DCP. Eventually, after determining that continued operation of the League was not financially feasible, DCP caused the League to file for bankruptcy without ever signing any agreements with ESMG or having any stock associated with the AAF issued to it. Years later, and despite the aforementioned undisputed facts, DCP filed this lawsuit, asserting claims for fraudulent inducement, securities fraud under the Texas Securities Act (the "TSA"), and statutory fraud under Section 27 of the Texas Business and Commerce Code (the "TBCC"). DCP's claims are premised on the allegation that Ebersol misrepresented, failed to disclose, and/or concealed material information concerning the League's financial viability.

As detailed below, summary judgment should be granted in favor of Ebersol for several reasons. At the outset, DCP lacks Article III standing to prosecute its claims, which are based on DCP's allegation that it lost $70 million due to Ebersol's allegedly fraudulent conduct. However, as the record shows, this allegation is false: even though DCP may claim to have made the decision

---

[1] The other entities are as follows: We Are Realtime, LLC; AAF Properties, LLC; Legendary Field Exhibitions, LLC; LFE Field Exhibitions, LLC; and AAF Players, LLC.

to invest in the League, it never actually invested any of its own funds pursuant to that decision; DDFS did. Accordingly, because DCP suffered no injury in fact, and because DCP cannot rely on any injury allegedly suffered by DDFS to provide standing for itself, its claims fail for lack of standing. Even assuming, *arguendo*, that DCP has standing, its claims fail on the merits. First, DCP's fraudulent inducement and statutory fraud claims fail for the same reason that it lacks standing: DCP did not suffer any injury. Its statutory and securities fraud claims also fail because no stock in ESMG was ever conveyed to it. Finally, DCP's fraudulent inducement, statutory fraud, and securities fraud claims fail because there is no competent evidence to support these claims.

## II. <u>SUMMARY JUDGMENT EVIDENCE</u>

In support of this Motion, Ebersol relies upon the following competent summary judgment evidence, which are attached to this Motion and fully incorporated herein by reference:

**Exhibit A:** Excerpts from Transcript of Deposition of Charles Ebersol taken on September 19, 2024

**Exhibit B:** Excerpts from Transcript of Deposition of Jeffrey Vanderbilt

**Exhibit C:** Excerpts from Transcript of Deposition of Thomas Dundon taken on June 4, 2021

**Exhibit D:** Excerpts of 2018 Tax Return of DDFS Partnership, LP

**Exhibit E:** Excerpts from Transcript of Deposition of Thomas Dundon taken on December 3, 2024

**Exhibit F:** Excerpts from Transcript of Deposition of John Zutter

**Exhibit G:** Excerpts from Transcript of Deposition of Jason Kulas

**Exhibit H:** Binding Term Sheet for Series 2 Preferred Stock Financing

**Exhibit I:** E-mail message from DocuSign dated December 2, 2024 containing documents produced in response to subpoena

      **Exhibit I-1:** DocuSign Certificate of Completion

Exhibit I-2:   DocuSign Envelope History

Exhibit J:   Investment Agreement between Carvana and DDFS

Exhibit K:   Sworn Declaration of Charles Ebersol

Exhibit K-1:   ESMG Banking Statements

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.   EBERSOL AND OTHERS CREATE THE AAF; THE AAF BEGINS TO EXPERIENCE FINANCIAL ISSUES AFTER FUNDING FROM ITS PRIMARY INVESTOR FAILS TO MATERIALIZE**

Ebersol is the former Chief Executive Officer of ESMG, the parent company of several entities that together operated the AAF. The AAF was a springtime developmental football league that was intended, among other things, to provide its athletes with a potential path to play in or return to the NFL. Ebersol and others began developing the concept of the AAF in February, 2017.

From the inception of the AAF, its executives knew it would need investor support for at least its first five years and raised capital accordingly. One such investor was Reginald Fowler ("Fowler") who agreed to provide $50 million in equity financing and $120 million in convertible line of credit financing. Fowler's commitments, together with the proceeds of the AAF's other financing rounds, gave the AAF more than $200 million in capital as it entered its inaugural season.

However, beginning in or around November, 2018, Fowler's funding did not materialize as his financial commitments required; it was sporadic and in less than the requested amounts. This unpredictable funding became problematic for the AAF and created concerns that the AAF would not be able to pay its debts as they became due, including, and especially, player payroll liabilities.[2]

Accordingly, as the opening day of the AAF's inaugural season—February 9, 2019—approached,

---

[2] Unbeknownst to Ebersol or the AAF, Fowler's wire transfers to the AAF were being intercepted by the United States Department of Justice due to Fowler's undisclosed criminal activity for which Fowler has since pleaded guilty. *See Former Co-Owner of Minnesota Vikings Sentenced to 75 Months In Prison for Providing Shadow Banking Services to Cryptocurrency Exchanges*, U.S. DEP'T OF JUSTICE (June 5, 2023), https://www.justice.gov/usao-sdny/pr/former-co-owner-minnesota-vikings-sentenced-75-months-prison-providing-shadow-banking.

---

*EBERSOL'S MOTION FOR SUMMARY JUDGMENT*                                              PAGE 4
16637877v1 / 12946.003

the AAF began to seek new funding sources to ensure it had sufficient capital to fund its inaugural

season, and particularly to pay its player payroll liabilities, which were due on a weekly basis.

**B.** **EBERSOL AND DUNDON DISCUSS $10 MILLION BRIDGE LOAN TO COVER THE LEAGUE'S PLAYER PAYROLL OBLIGATIONS AND POSSIBILITY OF LARGER INVESTMENT**

As part of the AAF's efforts to find alternative investors, Ebersol contacted Erik Anderson

("Anderson"), an investor who had previously expressed interest in the AAF and who was familiar

with its financial condition, about obtaining a $10 million bridge loan to cover the player payroll

liabilities for the second and third weeks of the inaugural season. Anderson suggested that Dundon,

a majority owner of the Carolina Hurricanes National Hockey League club and principal of DCP—

a Delaware limited liability company whose sole member is DDFS Management, LLC—could

provide a better investment solution than him. Exhibit A, 205:11-205:17; Exhibit B, 44:12-44:17.

On February 13, 2019, Ebersol and Dundon spoke for the first time. Exhibit C, 12:3-12:18.

During that conversation, Dundon asked why Ebersol was only seeking $10 million, in response

to which Ebersol told him the League had been unable to access the capital Fowler had committed

and the $10 million was needed to cover player payroll obligations for the next two weeks. Exhibit

A, 212:18-212:23, 213:12-213:20. Dundon stated he was willing to lend the $10 million Ebersol

had requested but thought the League needed a long-term capital solution and asked what other

data Ebersol could give him beyond what he had been given by Anderson to determine whether to

make a larger investment. *Id.*, 214:1-214:8, 214:16-214:22, 215:23-216:9, 217:6-217:15. Ebersol

responded by offering to send him the AAF's investor deck, which gave a general overview of the

League, and financial projections for the AAF's first five seasons. *Id.*, 214:1-214:8. Ebersol also

offered to give Dundon access to the League's virtual data room, which contained the League's

income and cash flow statements, balance sheets, and financing agreements with earlier investors.

*Id.*, 214:1-214:8. However, Dundon stated he did not want to need access to the data room, nor did

he need to speak with anyone on Ebersol's team. *Id.*, 214:23-215:3, 215:17-215:20. Ebersol later sent Dundon the League's investor deck, financial projections, and a summary capitalization table. *Id.*, 99:24-100:8, 101:4-101:14, 201:23-202:17, 220:15-221:13; <u>Exhibit C</u>, 40:3-40:15.

### C. DUNDON PROPOSES $5.1 MILLION LOAN TO COVER PLAYER PAYROLL LIABILITIES AND $250 MILLION COMMITMENT IN EXCHANGE FOR MAJORITY CONTROL OF ESMG

The next day, Ebersol had another conversation with Dundon in which Dundon threatened to withdraw his offer for the $10 million loan, calling it a "waste of time." <u>Exhibit A</u>, 252:15-253:1. Exasperated, Ebersol stated he needed at least $5.1 million by 1:30 p.m. to pay player salaries for that week or else he would have to pay for them with his own funds. *Id.*, 253:2-253:4.

In response, Dundon stated he would cover the $5.1 million provided that Ebersol agreed to a deal whereby Dundon invested $250 million into the League in exchange for majority control of ESMG. *Id.*, 253:4-253:12. Given the imminency of the payroll deadline, and given that Ebersol would have no option but to fund payroll himself if he rejected the offer, Ebersol agreed to the deal on behalf of ESMG. *Id.*, 253:13-253:17. Regarding the $5.1 million, Dundon told Ebersol to contact John Zutter ("<u>Zutter</u>"), who would work to transfer the funds to ESMG.[3] *Id.*, 253:4-253:6.

Later that morning, Zutter sent Ebersol a draft term sheet (the "<u>Term Sheet</u>") explaining the effect of the $5.1 million payment that was proposed to come from DCP and providing that DCP would approve funding requests submitted by a Dundon-controlled ESMG of up to $70 million. <u>Exhibit H</u>.[4] The Term Sheet also provided that DCP would obtain governance control of ESMG, receive seventy-five percent of ESMG's fully diluted capital stock upon execution of the Term Sheet, and draft and present for signing all required documentation to effectuate the change

---

[3] Although not relevant to this Motion, it is Ebersol's position that the entire commitment from Dundon was for $250 million and that the $70 million set forth in the Term Sheet represented a portion of that commitment.

[4] The Term Sheet provided that Dundon and another appointee by Dundon would have the only voting positions on ESMG's board and would therefore be in control of any and all requests for funds under the Term Sheet. <u>Exhibit H</u>.

in governance and the transfer of stock, all along with a long form agreement properly documenting the transaction. *Id.*; Exhibit F, 208:17-208:22. ████████████████

████████████████████████████████████████████████████████████

████████████████████████ When Ebersol later asked Dundon why the commitment was for $70 million rather than the $250 million he had agreed to commit, Dundon stated the amount in the Term Sheet was a formality to get the deal documented and ensure the League had the $5.1 million ahead of the player payroll deadline. Exhibit A, 266:4-266:24. Based on Dundon's representations, Ebersol, on behalf of ESMG, signed the Term Sheet; however, DCP did not sign the Term Sheet. Exhibit H; Exhibit I-1, Exhibit I-2. Later that afternoon, ESMG received the $5.1 million payment by wire. Yet, that payment did not come from DCP. Rather, it came from DDFS, a Delaware limited partnership and in which Dundon and DDFS Management, LLC, but not DCP, hold an interest.

On February 15, 2019, following ESMG's signing of the Term Sheet, Ebersol and several key AAF executives flew to Dundon's office, located at 2100 Ross Avenue, Suite 500 in Dallas, Texas to meet with him and his team to ensure a transition in leadership of the League from ESMG to DCP, which involved a review of the AAF's inner-most workings, including its finances and open accounts payable.[5] ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

### D.     DCP CAUSES THE LEAGUE TO FILE FOR BANKRUPTCY AND LATER FILES SUIT AGAINST EBERSOL

Over the next several weeks, ESMG submitted multiple funding requests to Zutter, one of Dundon's representatives and the Vice President of DDFS, each of which he approved. Exhibit G,

---

[5] The Court should take judicial notice of the fact that this is the same address listed as DDFS's address according to its business filings with the Office of the Texas Secretary of State.

273:19-274:6; Exhibit J. However, like the initial $5.1 million wire to ESMG, these funds came from DDFS. Exhibit K-1. ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ As such, and in addition to DCP never paying ESMG any monies, no paperwork was ever presented to ESMG by DCP as delineated in the unsigned Term Sheet to effectuate the transfer of any shares of stock to DCP or to memorialize the transaction via a long-form agreement. *See* Exhibit K. Accordingly, on April 17, 2019, Dundon caused ESMG, as well as the other entities that operated the AAF, to file Chapter 7 bankruptcy petitions; the entities' estates were later consolidated and are being administered in this court under Case No. 19-50900-CAG. Two and a half years later, DCP filed this lawsuit.

## IV.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A "material" fact is one that might affect the outcome of the suit under the governing law. *Thomas v. Empire Indem. Ins. Co.*, 206 F. App'x 397, 399 (5th Cir. 2006). A dispute is "genuine if the evidence is such that a reasonable jury could return a verdict for the [nonmovant]." *Taylor v. HD & Assocs., L.L.C.*, 45 F.4th 833, 837 (5th Cir. 2022).

The movant bears the initial burden of informing the court of the basis for its motion, and identifying the portions of the record which show the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may either (1) submit summary judgment evidence which conclusively negates the existence of at least one material element of the nonmovant's claim, or (2) after adequate time for discovery has passed, identify at least one essential element of the nonmovant's claim for which the nonmovant has presented insufficient evidence to raise a genuine issue of material fact. *Id.* at 330.

Once the movant has identified the challenged elements of the nonmovant's claim, the burden shifts to the nonmovant to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585-87 (1986). To meet this burden, the nonmovant must come forward with significant probative evidence showing a triable issue of fact. *Celotex*, 477 U.S. at 325. Improbable inferences, conclusory allegations, unsubstantiated assertions, and unsupported speculation are insufficient to meet this burden. *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Summary judgment is mandatory unless the nonmovant makes a sufficient showing on each challenged element. *Id.* at 322-25.

## V.  ARGUMENTS AND AUTHORITIES

### A.  EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF DCP'S CLAIMS BECAUSE DCP LACKS STANDING TO PURSUE THEM

#### 1.  Traditional Principles of Standing

Standing addresses the question of who may properly bring suit in federal court, and "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992). Article III standing has three components: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Supreme Court has repeatedly describe Article III standing

as a "bedrock requirement" for maintaining suit in federal court. *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks and citation omitted).

To establish injury in fact, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 338 (quoting *Lujan*, 504 U.S. at 560). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way," meaning the plaintiff must have suffered the alleged injury. *Id.*; *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art[icle] III power exists only to redress or otherwise protect against injury to the complaining party."); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 224  n. 14 (1974) ("[T]o satisfy the Art[icle] III prerequisite the complaining party . . . [must] allege a specific invasion of [a] right *suffered by him*.") (emphasis added); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (observing a party may invoke the court's authority only in order to "seek redress for injury *done to him* . . . not [to] seek redress for injuries *done to others*") (emphasis added).

Each element of standing must be proved in the same way "as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Thus, at the summary judgment stage, a plaintiff cannot rely on "mere allegations" but must set forth "by affidavit or other evidence specific facts" demonstrating standing. *Id.* Moreover, "[t]he plaintiff *must* establish standing *at the time [the] suit is filed* and cannot manufacture standing afterwards." *Pennell v. Global Trust Mgmt., LLC*, 990 F.3d 1041, 1044 (7th Cir. 2021) (emphasis added). Thus, the beginning of the case is the time to determine whether standing exists. *Id.*

### 2.  DCP Lacks Article III Standing Because It Did Not Suffer An Injury in Fact

As discussed above, Article III requires that the plaintiff, not some other party, has suffered the injury for which relief is sought. *See Warth*, 422 U.S. at 490; *Schlesinger*, 418 U.S. at 224 n. 14; *Irvis*, 407 U.S. at 166. In other words, a plaintiff must have a legal right to recover individually on the claims asserted in its complaint. Here, DCP alleges the actual damages it suffered are the approximately $70 million it paid to the AAF from February to April, 2019, which payments it alleges it made based on Ebersol's allegedly fraudulent conduct. Specifically, DCP alleges it wired $5.1 million on February 15, 2019, to cover the AAF's outstanding player payroll liabilities, and made payments over the next eight weeks, totaling approximately $64 million. Doc. No. 512, ¶¶ 32, 36, 45-46, 64, 83, 87. No other claims of damage are articulated. *Id.*

DCP's allegations are directly contradicted by the undisputed record, which shows that it suffered no injury, financial or otherwise, in connection with the AAF investment. Even though the parties to the Term Sheet were DCP and ESMG, each time funding requests submitted by the AAF, they were approved by individuals that worked at DDFS, and the requested funds were paid *by DDFS*, a wholly separate entity. Exhibit G, 273:19-274:6; Exhibit K-1. I████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████
██████████████████████████████
████████████████████████████████
████████████████████████████████████████████████
██████████████████████████
████████████████████████████
████████████████████████████



\*\*\*

\*\*\*

\*\*\*



\*\*\*

\*\*\*

[BY MR. TREYZON] I was also told by various witnesses that there is no formal, like, written relationship regarding treasury functions between DDFS, LP and Dundon Capital Partners. Are you aware of that?

[BY MR. KULAS] I don't know what formal treasury relationship means.

[BY MR. TREYZON] Some sort of a contract that says, hey, we will pay this on your behalf, you will reimburse later, or something like that?

[BY MR. KULAS] I am not aware of a contract that existed.

*Id.* at 41:14-41:20, 42:1-42:3, 141:23-142:22, 165:10-165:14; Exhibit G, 145:2-145:11. And the

Term Sheet, which DCP did not sign, imposes no such obligation on DDFS either. *See* Exhibit H;

Exhibit I-1; Exhibit I-2. Consistent with such testimony that DCP has no right, title, or interest as

a matter of law in the monies paid by DDFS to ESMG, it was DDFS—not DCP—that declared as

business losses in its tax returns the monies that DDFS transferred to ESMG. *See* Exhibit D.

Moreover, to the extent DCP argues there is no legal distinction between whether the funds

paid to the AAF were paid by DCP or DDFS because Dundon, either directly or indirectly, holds

an interest in both entities, this argument also fails. Under Texas *and* Delaware law, partnership

property belongs to the partnership itself and is not considered the property of individual partners.

TEX. BUS. ORGS. CODE § 154.001(c) ("A partner is not a co-owner of partnership property."); 6

DEL. CODE § 15-501 ("[A] partner is not a co-owner of partnership property and has no interest in

specific partnership property."). Thus, that Dundon and DDFS Management, LLC—the latter of

which Dundon is the sole member—are partners of DDFS is of no legal consequence because all

funds held by DDFS are its property, not the property of its individual partners—let alone a further

step removed such as the property of other businesses in which the individual partners may also

have a direct or indirect ownership interest.

As the above indisputably demonstrates, as a matter of law, DCP did not incur the damages

it alleges it did. Rather, DDFS incurred these damages, as every payment comprising DCP's

alleged $70 million investment was made by DDFS—an entirely separate entity that is not a party

to this suit, that has no legal interest in DCP, and that DCP has no obligation to compensate for the

funds it paid to the AAF. What is more, the applicable case law is firm in holding that DCP may

not rely on DDFS's injury to provide standing for itself. For example, in *Indemnified Capital

Investments, SA v. R.J. O'Brien & Associates, Inc.*, the plaintiff, a financial services firm, argued

it had standing to prosecute claims against a commodities futures trader to recover losses to

accounts it maintained for its clients. 12 F.3d 1406, 1407-08 (7th Cir. 1993). The Seventh Circuit

rejected this argument, observing a party may assert third-party standing "only in rare occasions"

and holding that only the named accountholders had standing to pursue claims seeking to recover

these losses. *Id.* at 1409.

The Second Circuit reached the exact same conclusion in *W.R. Huff Asset Management Co.

v. Deloitte & Touche, LP*. There, the plaintiff, an investment firm whose clients had invested in a

telecommunications company, sued a consortium of tax, law, and underwriting firms for allegedly

certifying inaccurate disclosures made by that company, whose collapse caused its clients to suffer

significant financial losses. 549 F.3d 100, 104 (2d Cir. 2008). In addressing the plaintiff's standing

argument, the Court noted the "minimum requirement for an injury-in-fact is that the plaintiff have

legal title to . . . the claim." *Id.* at 108 (internal citation omitted). Because the plaintiff had no legal

interest in its clients' claims, the Court held it had no standing to pursue them. *Id.* at 109.

This Court should reach the same conclusion here. DCP's own testimony demonstrates that

it made the decision to invest in the AAF but did not actually invest any of its own funds pursuant

to that investment decision. Exhibit B, 142:6-142:17, 165:7-165:9. DCP likewise never was issued

any shares of stock in ESMG or otherwise despite Dundon and his representatives having full

control of ESMG, further confirming that DCP has never received any beneficial right, title, or

interest in the monies paid by DDFS to ESMG. Exhibit K; Exhibit E, 376:21-376:24. Accordingly,

because DCP has not suffered an injury in fact, it lacks Article III standing to pursue its claims.

**B.     EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S FRAUDULENT INDUCEMENT
AND STATUTORY FRAUD CLAIMS BECAUSE DCP SUFFERED NO DAMAGES**

Even if this Court determines that DCP has standing, which it does not, DCP's fraudulent

inducement and statutory fraud claims fail on the merits for the same reason: DCP was not injured

by Ebersol's alleged conduct because it did not suffer any damages. In Texas, to prevail on a claim

for fraudulent inducement, a plaintiff must prove they were injured by the fraud. *Ernst & Young*,

51 S.W.3d 573, 580 (Tex. 2001); *see also Med. Protective Co. v. Herrin*, 235 S.W.3d 866, 871

(Tex. App.—Texarkana 2007, no pet.) (reversing trial court's judgment that defendant was liable

for fraudulent inducement because there was insufficient evidence plaintiff was injured by alleged

fraud). Similarly, to prevail on a claim for statutory fraud under Section 27.01 of the TBCC, a

plaintiff must prove they were injured by the defendant's misrepresentation or false promise. TEX.

BUS. & COM. CODE § 27.01; *Fidelity Nat. Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp.

2d 604, 632 (E.D. Tex. 2011) (observing that "[i]n order to establish a cause of action for statutory

fraud, [a plaintiff] must prove . . . the reliance caused [the plaintiff] injury."); *see also Scott v. Sebree*, 986 S.W.2d 365, 371 (Tex. App.—Austin 1999, pet. denied) (same).

As discussed above, DCP suffered no injury attributable to Ebersol's allegedly fraudulent conduct because the approximately $70 million in funds it alleges it paid to ESMG were paid by DDFS, not DCP. Exhibit B, 142:6-142:17, 165:7-165:9; Exhibit K-1. This is further verified by the fact that DCP never was issued any shares of stock in ESMG or otherwise despite Dundon and his representatives having full control of ESMG, and DDFS—not DCP—claimed the subject monies as a business loss, thus further confirming DCP has never actually received any beneficial right, title, or interest in the monies paid by DDFS to ESMG. Exhibit K; Exhibit D; *see also* Exhibit E, 376:21-376:24. Thus, even if DCP can prove the remaining elements of its fraudulent inducement and statutory fraud claims, which it cannot, summary judgment is nonetheless proper on these claims because DCP cannot prove the essential element of damages for either claim.

## C.     EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S STATUTORY AND SECURITIES FRAUD CLAIMS BECAUSE NO STOCK WAS ACTUALLY SOLD OR CONVEYED TO DCP

The TSA applies to persons that offer or sell unregistered securities. *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 115 (Tex. 1971). Under Section 33 of the TSA, any person who offers or sells a security by means of an "untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading" is liable to the buyer. TEX. GOV'T CODE § 4008.052. Thus, to prevail on a securities fraud claim, a plaintiff-buyer must demonstrate that the defendant-seller sold a security by means of (1) an untrue statement of material fact or (2) an omission to state a material fact necessary to make the statement made not misleading in context. *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Additionally, a plaintiff-buyer must demonstrate that an actual sale of securities occurred. *See Chase v. Hodge*, 2021 WL 1948470, at *9 (W.D. Tex. May 14, 2021) ("Although the [TSA] uses the language 'attempt to sell' and 'offer to sell' in its definition section, 'it is clear that [the TSA] contemplates that the sale *must have been effected* because the buyer may sue either law or in equity for rescission, or for damages.'") (quoting and citing *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 603-04 (S.D. Tex. 2003)) (emphasis added). Indeed, the TSA expressly contemplates that the disputed securities must have been conveyed by the seller to the buyer for a securities fraud claim under the TSA to be actionable:

(a)     In damages under this subchapter, a buyer . . . shall recover the consideration the buyer paid for the security plus interest on the consideration at the legal rate from the date the buyer made the payment, less the greater of:

(1)     the value of the security at the time the buyer *disposed of the security* plus . . . any income the buyer received on the security; or

(2)     the actual consideration received for the security at the time the *buyer disposed of the security* plus . . . any income the buyer received on the security.

TEX. GOV'T CODE § 4008.057(a) (emphasis added).

The same is true of a statutory fraud claim brought under Section 27 of the TBBC. As the Fifth Circuit and the Supreme Court of Texas have observed, Section 27.01(a) only applies when there has been an actual conveyance of real property or stock. *See U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000) ("Section 27.01(a) . . . applies only to situations where there is an actual conveyance of the stock, and not to situations where there is merely a breach of contract to convey stock."); *Stanfield v. O'Boyle*, 462 S.W.2d 270, 271 (Tex. 1971). In *Stanfield*, the defendant had pledged shares of stock in a company he owned to the plaintiff in consideration for a $50,000 loan. 462 S.W.2d at 270. The defendant later promised to sell real property he purported to own to the plaintiff in exchange for a release of those shares. *Id.* at 271. Yet, after the plaintiff released the

shares, he learned the defendant did not actually own the property, and thus the property was never conveyed to him. *Id.* The Supreme Court of Texas held that the plaintiff had failed to state a claim for statutory fraud because statutory fraud "is applicable *only when a conveyance of the property has been made*, and not where there is merely a contract to convey." *Id.* (emphasis added).

Various Texas courts of appeals have followed the *Stanfield* court's reasoning by strictly construing Section 27.01(a) to require an actual conveyance of real property or stock. For example, in *Stephanz v. Laird*, the First District Court of Appeals held that a former employee whose stock options failed to vest due to his failure to satisfy certain conditions precedent in his employment contract was barred from asserting a claim for statutory fraud. 846 S.W.2d 895, 905 (Tex. App.—Houston [1st Dist.] 1993, writ denied). And in *Okumus v. Mouton*, the Fourteenth District Court of Appeals reversed a trial court's finding the defendant had committed statutory fraud because even though the parties signed a real estate sale agreement, "an actual conveyance of real property never occurred." 2020 WL 6278664, at *5 (Tex. App.—Houston [14th Dist.] Oct. 27, 2020, no pet.).

Here, DCP alleges it entered the Term Sheet, which purported to issue seventy-five percent of ESMG's fully diluted capital stock to DCP upon execution, based on Ebersol's allegedly fraudulent conduct. Doc. No. 512, ¶¶ 67-101. Putting aside the fact that DCP never signed the Term Sheet, and thus the obligation to issue the stock referenced therein never became binding, it is undisputed that no stock shares in ESMG were ever issued to DCP, even after DCP assumed control of ESMG's board of directors. Exhibit K-1; *see also* Exhibit E, 376:21-376:24. Accordingly, because no conveyance of stock actually occurred, DCP's statutory and securities fraud claims are not actionable as a matter of law.

**D.  EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S FRAUDULENT INDUCEMENT CLAIM BECAUSE THERE IS NO COMPETENT EVIDENCE OF ANY ELEMENT OF SUCH CLAIM.**

To prevail on its claim for fraudulent inducement, DCP must prove the following elements: (1) Ebersol made a material misrepresentation; (2) Ebersol knew the representation was false or made it recklessly; (3) Ebersol intended for DCP to rely or act on the misrepresentation; (4) DCP relied on the misrepresentation; and (5) DCP's reliance caused its injuries. *See Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

Here, DCP can produce no evidence to support the elements of its fraudulent inducement claim. Specifically, DCP can produce no evidence that Ebersol made a material misrepresentation, that he knowingly or recklessly made any alleged misrepresentations, that he intended for DCP to rely or act on any alleged misrepresentations, that DCP relied on any alleged misrepresentations, or that DCP's alleged reliance caused it to suffer any injuries. Accordingly, this Court should grant summary judgment in favor of Ebersol on DCP's fraudulent inducement claim.

### E. EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S STATUTORY FRAUD CLAIM BECAUSE THERE IS NO COMPETENT EVIDENCE OF ANY ELEMENT OF SUCH CLAIM.

To prevail on its claim for statutory fraud, DCP must prove the following elements: (1) there was a transaction involving real estate or stock; (2) during the transaction, Ebersol made a false representation of fact or false promise; (3) the false representation or promise was made for the purpose of inducing DCP to enter into a contract; (4) DCP relied on the false representation or promise by entering into the contract; and (5) the reliance caused DCP injury. *See* TEX. BUS. & COM. CODE § 27.01; *Fidelity Nat. Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 632 (E.D. Tex. 2011). DCP must also prove there has been an actual conveyance of stock. *See U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000).

Here, DCP can produce no evidence to support the elements of its statutory fraud claim. Specifically, DCP can produce no evidence that Ebersol made a false representation of fact or false promise during the transaction at issue, that the false representation or promise was made for the

purpose of inducing DCP to enter into a contract, that DCP relied on the false representation or promise by entering into a contract, that its alleged reliance caused it to suffer any injuries, or that there was an actual conveyance of stock to DCP. Accordingly, this Court should grant summary judgment in favor of Ebersol on DCP's fraudulent inducement claim.

F. **EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S SECURITIES FRAUD CLAIM BECAUSE THERE IS NO COMPETENT EVIDENCE OF ANY ELEMENT OF SUCH CLAIM.**

To prevail on its claim for securities fraud, DCP must prove that (1) Ebersol was a "seller" within the meaning of the TSA and (2) Ebersol offered or sold a security to DSP by means of (a) an untrue statement of fact or (b) an omission to state a material fact that is necessary to make the statement made not misleading in context. *See* TEX. GOV'T CODE § 4008.052; *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). DCP must also demonstrate that an actual sale of securities occurred. *See Chase v. Hodge*, 2021 WL 1948470, at *9 (W.D. Tex. May 14, 2021); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 603-04 (S.D. Tex. 2003).

Here, DCP can produce no evidence to support the elements of its securities fraud claim. Specifically, DCP can produce no evidence that Ebersol is a "seller" under the TSA or that Ebersol offered or sold a security to DCP by means of an untrue statement of fact or by an omission to state a material fact necessary to make the statement made not misleading in context. Accordingly, this Court should grant summary judgment in favor of Ebersol on DCP's securities fraud claim.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, this Court should enter an order granting summary judgment in favor of Defendant Charles Ebersol and dismissing the claims of Plaintiff Dundon Capital Partners, LLC with prejudice.

Respectfully submitted,

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**

By: */s/ Michael J. Saltz*
      Michael J. Saltz
      Admitted *pro hac vice*
      msaltz@jrsnd.com

1800 Century Park East, Suite 900
Los Angeles, California 90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909

**THOMPSON, COE, COUSINS & IRONS, LLP**

By: */s/ Thomas M. Horan II*
      Thomas M. Horan II
      State Bar No. 24063938
      thoran@thompsoncoe.com

700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209

**ATTORNEYS FOR DEFENDANT CHARLES EBERSOL**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that, on December 13, 2024, a true and correct copy of the foregoing was delivered to the following counsel of record by electronic service:

Brett D. Hockaday
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201

Jeffrey S. Lowenstein
Beverly A. Whitley
Brent A. Turman
Sydnie A. Shimkus
BELL NUNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201

Nicole L. Williams
Katherine B. Clark
THOMPSON COBURN LLP
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201

Boris Treyzon
Jonathon Farahi
ABIR COHEN TREYZON SALO, LLP
16001 Ventura Boulevard, Suite 200
Encino, California 91436

Brian S. Engel
Steve P. Turner
BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP
580 La Ventana Boulevard
Driftwood, Texas 78619

1                    UNITED STATES BANKRUPTCY
          COURT FOR THE WESTERN DISTRICT OF TEXAS
2                     SAN ANTONIO DIVISION

3

4    IN RE:                        )
                                   )
5    LEGENDARY FIELD EXHIBITIONS,  )
     LLC, ET AL.,                  )
6                                  ) Case No.
          DEBTORS.                 ) 19-50900-CAG-7
7    _____)
                                   )
8    RANDOLH N. OSHEROW, Chapter 7 )
     Trustee of the Bankruptcy     )
9    Estates of Legendary Field    )
     Exhibitions, LLC; ET AL.,     )
10                                 )
          PLAINTIFF,               )
11                                 )
      v.                           )
12                                 )
     DUNDON CAPITAL, PARTNER, LLC; )
13   THOMAS DUNDON; AND JOHN       )
     ZUTTER                        )
14                                 )
          DEFENDANTS.              )
15   _____)

16

17            DEPOSITION OF CHARLIE EBERSOL

18                    (Confidential)

19        THURSDAY, SEPTEMBER 19, 2024, 8:54 A.M.

20                  ENCINO, CALIFORNIA

21

22

23

24      Reported by Michelle Somers, CSR No. 13674

25                  Job No. 1174241

```
 1                UNITED STATES BANKRUPTCY
          COURT FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION

 3

 4   IN RE:                          )
                                     )
 5   LEGENDARY FIELD EXHIBITIONS,    )
     LLC, ET AL.,                    )
 6                                   ) Case No.
          DEBTORS.                   ) 19-50900-CAG-7
 7   _____  )
                                     )
 8   RANDOLH N. OSHEROW, Chapter 7   )
     Trustee of the Bankruptcy       )
 9   Estates of Legendary Field      )
     Exhibitions, LLC; ET AL.,       )
10                                   )
          PLAINTIFF,                 )
11                                   )
      v.                             )
12                                   )
     DUNDON CAPITAL, PARTNER, LLC;   )
13   THOMAS DUNDON; AND JOHN         )
     ZUTTER                          )
14                                   )
          DEFENDANTS.                )
15   _____  )

16

17

18

19   DEPOSITION OF CHARLIE EBERSOL, taken at 16001

20   Ventura Boulevard, Suite 200, Encino, California,

21   on Thursday, September 19, 2024, at 8:54 A.M.,

22   before Michelle Somers, Certified Shorthand

23   Reporter in and for the State of California.

24

25   APPEARANCES:
```

CHARLIE EBERSOL                                                      JOB NO. 1174241
SEPTEMBER 19, 2024                    CONFIDENTIAL

```
 1   For the Plaintiff:

 2      ABIR COHEN TREYZON SALO, LLP
        BY:  BORIS TREYZON, ESQ.
 3           JONATHON FARAHI, ESQ.
        16001 Ventura Boulevard
 4      Suite 200
        Encino, California 91436
 5      (424)228-4367
        (424)288-4368(fax)
 6      Btreyzon@actslaw.com

 7

        BARETT DOFFIN FRAPPER TURNER & ENGEL LLP
 8      BY BRIAN ENGEL, ESQ.
        4004 Belt Line Road
 9      Suite 100
        Austin, Texas 75001
10      (972)833-6328
        Brianengel@me.com

11

12   For the Charlie Ebersol:

13      JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE LLP
        BY:  MICHAEL J. SALTZ, ESQ.
14           SIMONE POYOUROW, ESQ. (Zoom)
        1800 Century Park East
15      Suite 900
        Los Angeles, California 90067
16      (310)466-9900
        (310)446-9900(fax)
17      Msaltz@jrsnd.com

18

        THOMPSON, COE, COUSINS & IRONS, LLP
19      BY: THOMAS M. HORAN, ESQ.
        700 North Pearl Street
20      25th Floor
        Dallas, Texas 75201
21      Thoran@thompsoncoe.com
        (Via Zoom)
22

23

24

25
```

CHARLIE EBERSOL

JOB NO. 1174241

SEPTEMBER 19, 2024                    CONFIDENTIAL

```
 1   APPEARANCES:  (Continued)

 2

 3       For the Defendants:

 4           BELL, NUNNALLY & MARTIN LLP
             BY:  JEFFERY S. LOWENSTEIN, ESQ.
                  BRENT A. TURMAN, ESQ.
 5           2323 Ross Avenue
             Suite 1900
 6           Dallas, Texas 75201
             Jlowenstein@bellnunnally.com
 7

 8       For Defendants:

 9           K&L GATES LLP
             BY:  BRENT HOCKADAY, ESQ.
10           1717 Main Street
             Suite 2800
11           Dallas, Texas 75201
             Brent.hockaday@klgates.com
12

13

14

15       Videographer:  Joseph Smithey

16       Also Present:  John Atkins

17

18

19

20

21

22

23

24

25
```

```
 1   of the league were at the end of 2018

 2          MR. TREYSON:  Objection to form.

 3          MR. SALTZ:  Same.

 4          THE WITNESS:  Same with respect to time I m

 5   not -- I don t recall.

 6   BY MR. LOWENSTEIN:

 7      Q    Did you know at the end of 2018 what the

 8   league s actual expenses were

 9      A    No.

10      Q    Was there a process in place, to your

11   knowledge, at ESMG for tracking the leagues expenses

12      A    I don t know.

13      Q    So when you were having conversations with

14   potential investors, you could not speak to how the

15   actual performance was crea -- was in compar -- let me

16   just start over.

17          When you were speaking to potential investors,

18   you were not someone that could speak to how the league

19   was performing actually compared to projections, right
```

12:00PM
```
20          MR. SALTZ:  Object to form.

21          THE WITNESS:  I m sorry, I m not sure how to

22   answer that  uestion.

23   BY MR. LOWENSTEIN:

24      Q    If Reggie Fowler called up and said you
```

12:01PM
```
25   predicted 46 million dollars of expenses in these
```

 1    projections for 2018, we re in the end of June 2018 how

 2    much money have you -- has the league actually spent in

 3    2018, Charlie Ebersol couldn t answer that  uestion,

 4    correct

 5            MR. TREYSON:  Object.

 6            MR. SALTZ:  Object to form.

 7            THE WITNESS:  Charlie Ebersol would not be

 8    able to answer a  uestion about the financials.

 9    BY MR. LOWENSTEIN:

10       Q    Right.  But what I m really getting at is you

11    would not be able to say hey, investor, the actual

12    performance is here the projected performance was here,

13    correct

14            MR. TREYSON:  Objection to form.

12:01PM 15            MR. SALTZ:  Join.

16            THE WITNESS:  Sorry, can you repeat the

17     uestion.

18            (Unintelligible).

19            MR. LOWENSTEIN:  No, I got it.

20            THE REPORTER:  Sorry, Counsel, I just can t

21    see --

22            MR. LOWENSTEIN:  (Simultaneously speaking) I

23    totally understand.

24            THE REPORTER:  -- I can t see counsel, they

25    are totally blocking each other, I can t see and

CHARLIE EBERSOL                                                    JOB NO. 1174241
SEPTEMBER 19, 2024                    CONFIDENTIAL

```
 1   they re speaking at the same time.  So that s why I m

 2   just trying to...

 3   BY MR. LOWENSTEIN:

 4       Q    If an investor had to  uestion at any point

 5   when you were the CEO of ESMG tell me -- compare for me

 6   the actual performance of the league to the projected

 7   performance of the league, that is not something that

 8   you could have done

 9       A    That is correct.

10       Q    And if the investor had that  uestion, who did

11   you refer them to

12       A    Depending on when you re asking, what time

13   frame I would have said Alan Kantowitz, Kevin Farrell,

14   Kevin Freedman or our accounting firm.

15       Q    And who was the leagues accounting firm

16       A    I don t know.

17       Q    Who was the person that you had contact with,

18   do you know that for the league

19       A    At the accounting firm.

20       Q    Yeah.

21       A    I don t know.

22       Q    Let me show you the projections that you sent

23   to Mr. Dundon which were in Exhibit 6 and have you

24   compare them to the projections you sent to Mr. Fowler

25   in Exhibit 15
```

Column times:
- 12:02PM  line 5
- 12:02PM  line 10
- 12:02PM  line 15
- 12:03PM  line 20
- 12:04PM  line 25

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

          1   with him, correct

          2       A    Erik connected -- Erik definitely connected

          3   Tom and I text exchange and he told me that he

          4   had -- Erik told me that he had told Tom the situation.

03:35PM   5       Q    But you weren t a party to the conversation

          6   between Erik and Mr. Dundon, correct

          7       A    I was not party to the conversation with Erik

          8   it was recounted to me by Erik.

          9       Q    What did Erik tell you about his conversation

03:36PM  10   with Mr. Dundon

         11       A    That we were seeking a bridge loan of 10

         12   million dollars, and that my existing primary investor

         13   Reggie Fowler had not followed through on the full

         14   amount of his commitment, and that he thought -- Erik

03:36PM  15   told me that he told Tom that he thought there was an

         16   opportunity for Tom to it step in Erik s words in a big

         17   way.

         18       Q    Anything else you remember about Erik s

         19   description of his conversation with Tom

03:37PM  20       A    Yeah, I asked Erik if -- what, if anything, he

         21   had told Tom in text and he responded with something to

         22   the effect of I told him what I know we re transparent

         23   partners or open partners or some variation or

         24   transparent with each other.

03:37PM  25       Q    You and Erik are transparent with each other

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

```
          1        Q    And why was that the deadline it

          2        A    Erik felt that Tom would be a -- Erik told me

          3   that he felt Tom would be attracted to the situation

          4   because it was -- again his words, not mine, a

03:39PM   5   distressed situation and that he would have an

          6   opportunity to -- again his words, "participate in a

          7   big way" based on my timing needs -- or excuse me,

          8   based on the timing needs of the Alliance of American

          9   Football Ebersol Sports Media Group, et cetera.

03:39PM  10        Q    Did you disagree with the way -- any of the

         11   ways Erik told you he described things to Mr. Dundon

         12        A    I don t believe so.

         13        Q    Anything else you recall in telling you about

         14   his conversation with Mr. Dundon

03:40PM  15        A    That Tom was uni uely capable of moving

         16    uickly, that he liked sports -- that he was a highly

         17   li uid billionaire and interested in arbitrage, his

         18   word.

         19        Q    Whose word

03:40PM  20        A    Erik Anderson s word.

         21        Q    What was magic about the morning of February

         22   14th in terms of the timing of the investment

         23        A    Payroll, we had switched payroll companies and

         24   payroll -- to the new payroll company was due

03:41PM  25   uni uely -- it was due -- I believe the number was
```

```
 1    remember from Anderson s that -- your conversation with

 2    Anderson about his conversation with Dundon

 3        A    I don t believe so.

 4        Q    Okay.  And then the next thing that happens if

 5    you have a call with Mr. Dundon

 6        A    Correct.

 7        Q    Okay.  Tell me when did that call happen

 8        A    Very early in the morning on the 13th.

 9        Q    Where were you

10        A    I am my home in San Francisco.

11        Q    Where was he

12        A    I don t recall.

13        Q    Okay.  Tell me everything you remember about

14    the call

15        A    Sure.  Erik introduced us via text message,

16    Tom asked me to called him I called him, he was a

17    person -- first and foremost it s a very long phone

18    call.  It was nearly an hour.  Tom asked me -- Tom had

19    watched -- he told me that he d watched the first

20    weekend of games.  He s very impressed with the  uality

21    of the games.  He said that he had had friends in the

22    media business who told him that this was exceptional

23    in terms of its outcome or whatever.

24             He told me that he had been looking at the

25    business, his words, for  uite sometime because of
```

03:48PM appears at lines 5, 10, 15, 20
03:49PM appears at line 25

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

 1   Mr. Anderson and so he was familiar with my approach,

 2   he laughed at the audacity of trying to start a

 3   football league.  He said something to the effect of I

 4   wouldn t have done that, but now that you have maybe I

03:49PM  5   can get involved he -- he made jokes about -- and he

 6   jokes about the challenges of being a founder, you

 7   know, trying get things off the ground.

 8          He said "Are you being sued yet "  And

 9   I -- and laughed, and he said, "If you re not being

03:50PM 10   sued, you re not doing anything right," and I said I

11   was not being sued yet, but that there were certainly

12   people who were threatening it.  He asked me why I was

13   asking for 10 million dollars, which was the number

14   that Erik had told him I was looking for, and I told

15   him it was a bridge loan because Reggie was not

16   performing to the degree that he said he was going to

17   but that he continued to per -- to perform as evidence

18   by which I told him I had literally just received -- I

19   said literally just received a text message from Reggie

03:50PM 20   saying that another 1.7 million dollars was coming in.

21          And he asked how much Reggie put in, and I

22   told him I didn t know, but I could get him that

23   information he asked me what if anything I could send

24   him to look at.

03:50PM 25          Sorry, I ll slow down, I apologize.

CHARLIE EBERSOL
SEPTEMBER 19, 2024                CONFIDENTIAL                JOB NO. 1174241

1    He asked me what, if anything, I had that I

2  could share with him.  He implied that Erik had showed

3  him material -- or said he d seen some material from

4  Erik, and so I offered him that we had a dec and

03:51PM  5  a -- like projections, but if he was serious about

6  investigating then I would put him in touch with my

7  team and I would share access to the VDR, the virtual

8  data room.  He said --

9    Q    Let me just pause you  cause I got distracted

10  by the acronym and missed what you were saying.  What

11  did he tell you about -- you said we have a dec and

12  projections --

13    A    (Simultaneously speaking) and I --

14    Q    Hold on -- that I can send you and then you

15  said something else about the VDR say that part again.

16    A    He asked me what I could send him beyond what

17  he had from Erik.  I told him that I could send him

18  whatever he wanted, if he wanted financials then I had

19  a -- I had a dec and projections that we ve been

20  sending to investors particularly with respect to that

21  convertible note that the 10 million dollars bridge

22  loan would have been a part of.

23    And he -- and I said, but I can send you the

24  virtual theater room which was what we traditionally

25  sent to people that were concerned e uity investments

1  and Tom said send me the dec and the financials,

2  I m -- the -- the details don t matter to me with

3  respect to your virtual room, et cetera.

4        Erik s given me sort of the high level of what

5  the opportunity is.  I need to make some phone calls.

6  I offered to connect him with various people because he

7  wanted to talk to people in media and in sports.  He

8  was particularly interested in talking to the heads of

9  networks.

10        We discovered on the phone call that we had

11  several mutual relationships, for example, the Pete

12  Bevac ua B-e-v-a-c- -u-a, Gary Bettman and others he

13  asked me to connect him with Jonathan Kraft, Kraft,

14  David Zaslav, Z-a-s-l-a-v, Jeff Zucker, he had a

15  preexisting relationship with Greg Maffei, M-a-f-f-e-i

16  and said he wanted to cal a number of those people

17        He was not interested -- he said he was not

18  interested in talking to anyone on my team, he wanted

19  to understand the perception of the league and company

20  by, my words, not his, important people.  He didn t

21  understand why I was only asking for 10 million dollars

22  and said he wanted to think about that.

23        And he said based on his conversations with

24  Erik and what he had seen that he felt that I needed to

03:55PM  25  start -- I needed to stop thinking about this piecemeal

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

```
 1   and start thinking about this holistically as one

 2   source of capital.  He according to term -- he asked me

 3   how I raised money, and I told him I d raised

 4   him -- we d done a series 1, this was really gonna be a

03:55PM  5   series 2, and he said, you could do a series 1 and

 6   series 2 or you know A or B or whatever, but I m series

 7   infinity, that s what you need.  And I said I don t

 8   know what that means, and he said you need one amount

 9   of money forever which sounded good.

03:56PM 10         Like I said, it was a 30, 40, 50-minute call

11   so -- but as I m sitting here this is my recollection

12   that it may have been other things that were discussed

13   on the call.

14      Q    Let me pause you a second, it was just you and

03:56PM 15   Mr. Dundon on a call right

16      A    Yeah, yeah, yeah.

17      Q    So all we ve got and there s no recording or

18   anything else of this call, correct

19      A    I did not record the call.

03:56PM 20      Q    So all we ve got is your memory and

21   Mr. Dundon s memory so I understand that that s the

22   best we re gonna get.  So with that in mind proceed.

23      A    I mean, as you re asking more  uestions I may

24   remember more of the call, but as we re sitting here

03:56PM 25   right now this is my memory of the call.  And then he
```

```
 1   this is why I think Tom -- that the reason for the one

 2   source versus the venture capital --

 3        A    I don t recall whether or not Erik told me

 4   Tom s reason for saying that he thought he needed to

 5   come (unintelligible)

 6        Q    He said Tom said it, he just didn t --

 7        A    Yeah.

 8        Q    -- give you a reason

 9        A    Yes.

10        Q    Anything else you remember from that second

11   call with Erik Anderson

12        A    Again, I -- as I m sitting here that s my best

13   memory and if I remember other things I ll tell you.

14        Q    All right.  What happened next

15        A    I called Kevin Freedman and Kevin -- excuse

16   me, Alan Kantowitz and Kevin Freedman and maybe Kevin

17   Farrell, and I sent Tom -- I called them, told them the

18   conversation that I had.  I sent Tom the dec and

19   projections that we -- that were available to me at the

20   time and began calling my board members and my

21   preferred investors.  So I called --

22        Q    Hang on.  You said you sent the dec in

23   projections that were available to you at the time,

24   what does that mean

25        A    We had -- whatever the dec and projections
```

04:01PM 5
04:01PM 10
04:02PM 15
04:02PM 20
04:02PM 25

 1   that I sent where the dec and projection that either

 2   Kevin or -- Kevin or Adam -- Alan had sent to me or we

 3   had been sending to investors.  For example, I had sent

 4   those or some version, I believed to -- actually I

04:03PM  5   don t know if that s true, never mind.

 6       Q    Well -- I mean, were they -- was it a dec and

 7   projections that had been sent a while before or was

 8   that something you re uested and got that day from Alan

 9   or somebody else

04:03PM 10       A    I don t remember.

11       Q    Do you know how up-to-date those projections

12   and dec were that were in that email

13       A    No, I wouldn t have known that.

14       Q    Did you ask -- and when you called Alan

04:03PM 15   Kantowitz and Kevin Freedman, did you ask him how up to

16   date is this dec and projections that I m about to send

17   Dundon

18       A    I don t remember.

19       Q    Okay.  Then you said you started calling other

04:04PM 20   people and you said other investors, shareholder or

21   something like that, but I don t want to put words in

22   your mouth, who did you start calling after you sent

23   the dec and projections to Tom

24       A    So the board at that point was Reggie Fowler,

25   myself or I -- my father Duncan Ebersol, Keith Rabois

 1  part where there s some deal on the phone made with

 2  Tom.

 3       A    Keep going.

 4       Q    So -- so what happens next, we ve got Zaslav

 5  he says he s all in for 250 you  uote "Payback."  What

 6  happens next

 7       A    So I went to sleep.  I laid down in bed

 8  (unintelligible) the next morning I woke up to a text

 9  from Tom saying, "Are we doing this deal or not "  Or

10  some version of that.  I m sure there s a record.  And

11  I had two cell phones at the time, I had my 646 phone

12  number and then I had a AAF issued phone that was a 310

13  number and AAF phone was --

14            MR. SALTZ:  Flip

05:17PM 15            THE WITNESS:  -- thank you.  A flip phone and

16  Tom was texting me on my iPhone tab, whatever my Apple

17  phone, and I was trying to tell my team like he s

18  saying he wants to do a deal but I don t know if

19  (unintelligible) 250 million dollars (unintelligible)

20  deal.  And my team is saying like, call him, so I m

21  calling him on the flip phone while I m trying to get

22  my team to like figure out what we re doing.  And I

23  called Tom and I say what -- "What deal  Are you

24  putting the 10 million dollars "

25            And he said, "Forget the 10 million dollars,

```
 1   it s a waste of time."  And I said "It s not a waste of

 2   time.  I need 5.1 -- the company needs 5.1 million

 3   dollars by 1:30 and I need to know if I m -- I m

 4   hitting send on my own money," and he said "No, I will

 5   take care of the 5.1 million dollars deal with John

 6   Zutter on that, but we re -- you need to go for 250

 7   million dollars, and if you re willing to agree to a

 8   deal for 250 million dollars then we ll take care of

 9   your payments for today and I ll pay.

10            And I said, "I don t know what that means,"

11   and he said "I need majority control, I need the board,

12   and if you can agree to that we ll get a deal done."

13   And I said, "If you are telling me that you are willing

14   to put in 250 million dollars for control of the
```

05:19PM
```
15   company but my investors get to keep some piece of the

16   company I can get that deal done with my board and my

17   investors."

18            And he said, "That s what I m telling you,

19   right now" -- this is his words "right now -- right now
```

05:19PM
```
20   on this call do we have a deal or not  If we don t I m

21   walking."  And I said I need you to give me 45 minutes

22   an hour whatever, I got to call and so we -- he

23   connected me to John Zutter, it might have been on

24   email, I text messaged and I -- and that was the end of
```

05:20PM
```
25   that call.
```

CHARLIE EBERSOL                                    JOB NO. 1174241
SEPTEMBER 19, 2024                    CONFIDENTIAL

```
 1   BY MR. LOWENSTEIN:

 2        Q     Did you ask John Zutter why 70 million

 3        A     Oh, yes.

 4        Q     And what did he say

 5        A     That s the amount of money that we feel

 6   comfortable in this document.  I said, "That s not what

 7   was discussed with Tom," and he said "You should bring

 8   that up with Tom."

 9        Q     So all this -- okay.  So then let s skip to

10   that, so did you talk to -- before the term sheet was

11   signed on February 14th, did you talk to Tom about why

12   are we signing a term sheet for 70 versus 250

13        A     Yes, I did.

14        Q     When was that

15        A     After that -- the conversation I referenced

16   with John Zutter.

17        Q     What time is your conversation with Zutter

18        A     It was in the morning, if I had to call logs I

19   would tell you specifically the time.

20        Q     In the morning of the 14th

21        A     Yeah, through the 14th, yes.

22        Q     And then you had a call with Tom after

23   that -- after Mr. Zutter brought up the idea of 70

24   million dollars

25        A     Yes.
```

Timestamps (left margin): 05:39PM (line 5), 05:39PM (line 10), 05:40PM (line 15)

```
 1   signed with Dundon and Capital Partners," that happened

 2   in a that meeting

 3        A    Yes.

 4        Q    And then it says, "As well as an update on the

 5   funding to date from DCP and ongoing negotiations

 6   regarding the detailed terms for such financing," fair

 7        A    Yes.

 8        Q    And it says where are we -- in the whereas --

 9             MR. SALTZ:  Excuse me one second.

10             THE WITNESS:  What am I looking

11   BY MR. LOWENSTEIN:

12        Q    Just say what you re thinking.

13             MR. SALTZ:  Yes, yes.

14             THE WITNESS:  All right.

15             MR. SALTZ:  You can say that.

16             THE WITNESS:  Okay.  Thank you.

17             MR. SALTZ:  Would you like to know what he was

18   pointing at

19   BY MR. LOWENSTEIN:

20        Q    I want him to say it, that s fine.

21             MR. SALTZ:  Okay.  Go ahead.  He doesn t want

22   to speak out of turn that s why so...

23             THE WITNESS:  Sorry, it s says Mr. Charlie

24   Ebersol and Ms. Belt presented, and so I was asking

25   first and foremost was it privileged because Ms. Belt
```

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

```
 1
 2                      REPORTER S CERTIFICATION
 3
 4          I, Michelle Somers, Certified Shorthand
 5   Reporter in and for the State of California, do hereby
 6   certify:
 7
 8          That the foregoing witness was by me duly
 9   sworn; that the deposition was then taken before me at
10   the time and place herein set forth; that the testimony
11   and proceedings were reported stenographically by me
12   and later transcribed into typewriting under my
13   direction; that the foregoing is a true record of the
14   testimony and proceedings at that time.
15
16          IN WITNESS WHEREOF, I have subscribed my name
17   on this date:
18
19
20
21
22          _____Michelle Somers_____
23              Michelle Somers, CSR No. 13674
24
25
```

```
 1              UNITED STATES BANKRUPTCY COURT
             FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION
    IN RE: LEGENDARY FIELD    ) CASE NO. 19-50900-CAG-7
 3
    EXHIBITIONS, LLC, ET AL., )
 4       DEBTORS             ) CHAPTER 7
                             )
 5                           )
    RANDOLPH N. OSHEROW,     )
 6   Chapter 7 Trustee of the )
    Bankruptcy Estates of    )
 7   Legendary Field         )
    Exhibitions, LLC; AAF    )
 8   Players, LLC; AAF        )
    Properties, LLC; Ebersol )
 9   Sports Media Group, Inc.; )
    LFE 2, LLC; and We Are    )
10   Realtime, LLC,           )
                             )
11       PLAINTIFF,          )
                             ) ADVERSARY PROC. NO.
12   v.                      ) 22-05078-cag
                             )
13   DUNDON CAPITAL PARTNERS, )
    LLC; THOMAS DUNDON; and  )
14   JOHN ZUTTER,            )
                             )
15       DEFENDANTS.         )
16
17
18       ORAL AND VIDEOTAPED DEPOSITION OF
19                  JASON KULAS
20                 INDIVIDUALLY
21                     AND
22   AS 30(b)(6) of DUNDON CAPITAL PARTNERS, LLC
23              NOVEMBER 14, 2024
24
25
```

Page 1

1       ORAL AND VIDEOTAPED DEPOSITION OF JASON KULAS,

2   INDIVIDUALLY AND AS 30(b)(6) of DUNDON CAPITAL PARTNERS,

3   LLC, produced as a witness at the instance of the

4   Plaintiffs, and duly sworn, was taken in the

5   above-styled and numbered cause on the 14th day of

6   November, 2024, from 9:12 a.m. to 1:32 p.m., before

7   Julie C. Brandt, RMR, CRR, and CSR in and for the State

8   of Texas, reported by machine shorthand at Bell Nunnally

9   & Martin, LLP, 2323 Ross Avenue, Suite 1900, Dallas,

10  Texas, pursuant to the Federal Rules of Civil Procedure

11  and the provisions stated on the record or attached

12  hereto.

13

14

15

16

17

18

19

20

21

22

23

24

25

                                            Page 2

```
 1                    APPEARANCES

 2

 3   FOR THE PLAINTIFF RANDOLPH N. OSHEROW:

 4        Boris Treyzon

 5        Jonathan Farahi

 6        ABIR COHEN TREYZON SALO, LLP

 7        16001 Ventura Boulevard, Suite 200

 8        Encino, California 91436

 9        btreyzon@actslaw.com

10        jfarahi@actslaw.com

11   -and-

12        Brian Engel

13        BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP

14        4001 Belt Line Road, Suite 100

15        Addison, Texas 75001

16        brianengel@me.com

17   -and-

18        John Atkins

19        THOMPSON COBURN LLP

20        2100 Ross Avenue, Suite 3200

21        Dallas, Texas 75201

22        jatkins@thompsoncoburn.com

23

24   FOR CHARLIE EBERSOL EBERSOL SPORTS MEDIA GROUP, INC.:

25        Michael J. Saltz
```

                                              Page  3

```
 1        Simone Poyourow (remote via Zoom)

 2        JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP

 3        1880 Century Park East, Suite 900

 4        Los Angeles, California 90067

 5        msaltz@jrsnd.com

 6   -and-

 7        Thomas M. Horan II

 8        THOMPSON, COE, COUSINS & IRONS, LLP

 9        700 N. Pearl Street, 25th Floor

10        Dallas, Texas 75201

11        thoran@thompsoncoe.com

12

13   FOR THE DEFENDANTS:

14        Brent Hockaday

15        BELL NUNNALLY

16        2323 Ross Avenue, Suite 1900

17        Dallas, Texas 75201

18        bhockaday@bellnunnally.com

19

20   ALSO PRESENT:

21        Stephen Wiley - ACTS Law (remote via Zoom)

22        Mati Jarmis (remote via Zoom)

23        Nicole Williams (remote via Zoom)

24        Patrick Salvant - Veritext Videographer

25
```

Page 4

```
 1        A.    Yes.

 2        Q.    Okay.  I was also told by various witnesses

 3   that there is no formal, like, written relationship

 4   regarding treasury functions between DDFS, LP and Dundon

 5   Capital Partners.  Are you aware of that

 6        A.    I don t know what formal treasury relationship

 7   means.

 8        Q.    Some sort of a contract that says, hey, we

 9   will pay this on your behalf, you will reimburse us

10   later, or something like that

11        A.    I am not aware of a contract that existed.

12        Q.    Got it.

13        A.    Yeah.

14        Q.    Did Dundon Capital Partners remit any funds to

15   AAF

16              MR. HOCKADAY:  Hold on.  What topic is

17   this

18              MR. TREYZON:  Claim.  Proofs of claim.

19              MR. HOCKADAY:  Oh.  Yeah, I guess he can

20   answer that.  I m going to object to form the way the

21    uestion was asked and assumptions.

22              But you can answer.

23        Q.    (BY MR. TREYZON)  Let me ask a different

24    uestion.

25              Did any of the money that went to AAF
```

Page 145

```
 1              REPORTER S CERTIFICATE
 2          The undersigned Certified Shorthand Reporter
 3    licensed in the State of Texas does hereby certify:
 4          I am authorized to administer oaths or
 5    affirmations, and prior to being examined, the witness
 6    was duly administered an oath by me.
 7          I am not a relative or employee or attorney or
 8    counsel of any of the parties, nor am I a relative or
 9    employee of such attorney or counsel, nor am I
10    financially interested in the outcome of this action.
11          I am the deposition officer who
12    stenographically recorded the testimony in the foregoing
13    deposition, and the foregoing transcript is a true
14    record of the testimony given by the witness.
15          Before completion of the deposition, review of
16    the transcript  X  was    was not re uested.  If
17    re uested, any changes made by the deponent (and
18    provided to the reporter) during the period allowed are
19    appended hereto.
20          In witness whereof, I have subscribed my name
21    this 18th day of NOVEMBER, 2024.
22
23
24
             Julie C. Brandt, CSR, RMR, CRR
25           TX CSR No. 4018, Exp. 10 31 25

                                         Page 181
```

EX-10.1 2 d491113dex101.htm EX-10.1

**Exhibit 10.1**

INVESTMENT AGREEMENT

by and between

CARVANA CO.

and

DDFS PARTNERSHIP LP

Dated as of December 4, 2017

**EBERSOL 000082**

TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| | **ARTICLE I** | |
| | Definitions | |
| SECTION 1.01. | Definitions | 1 |
| | **ARTICLE II** | |
| | Purchase and Sale | |
| SECTION 2.01. | Purchase and Sale | 6 |
| SECTION 2.02. | Closing | 6 |
| | **ARTICLE III** | |
| | Representations and Warranties of the Company | |
| SECTION 3.01. | Organization; Standing | 7 |
| SECTION 3.02. | Capitalization | 7 |
| SECTION 3.03. | Authority; Noncontravention; Voting Requirements | 9 |
| SECTION 3.04. | Governmental Approvals | 10 |
| SECTION 3.05. | Company SEC Documents; Undisclosed Liabilities | 10 |
| SECTION 3.06. | Absence of Certain Changes | 11 |
| SECTION 3.07. | Legal Proceedings | 11 |
| SECTION 3.08. | Compliance with Laws; Permits | 12 |
| SECTION 3.09. | Tax Matters | 12 |
| SECTION 3.10. | Employee Benefits | 12 |
| SECTION 3.11. | Labor Matters | 13 |
| SECTION 3.12. | Environmental Matters | 13 |
| SECTION 3.13. | Intellectual Property | 13 |
| SECTION 3.14. | Real Property | 14 |
| SECTION 3.15. | Sale of Securities | 15 |
| SECTION 3.16. | Broker Fees and Expenses | 15 |
| SECTION 3.17. | Listing and Maintenance Requirements | 15 |
| | **ARTICLE IV** | |
| | Representations and Warranties of the Investor | |
| SECTION 4.01. | Organization and Authority | 15 |
| SECTION 4.02. | Authorization; Enforceability | 15 |

EBERSOL 000083

| | | |
|---|---|---|
| SECTION 4.03. | No Conflict | 16 |
| SECTION 4.04. | Governmental Approvals | 16 |
| SECTION 4.05. | Broker Fees and Expenses | 16 |
| SECTION 4.06. | Purchase for Investment | 17 |
| SECTION 4.07. | No Other Company Representations or Warranties | 17 |
| SECTION 4.08. | Non-Reliance on Company Estimates, Projections, Forecasts, Forward-Looking Statements and Business Plans | 18 |
| SECTION 4.09. | Ownership of Company Securities | 18 |
| SECTION 4.10. | Arm's Length Transaction | 18 |
| SECTION 4.11. | Private Placement Consideration | 18 |
| SECTION 4.12. | Purchase Price | 19 |

ARTICLE V

Additional Agreements

| | | |
|---|---|---|
| SECTION 5.01. | Public Announcements | 19 |
| SECTION 5.02. | Commercially Reasonable Efforts | 19 |
| SECTION 5.03. | Filings; Consents | 19 |
| SECTION 5.04. | Corporate Action | 20 |
| SECTION 5.05. | Adjustment of Conversion Price | 20 |
| SECTION 5.06. | NYSE Listing of Shares | 20 |
| SECTION 5.07. | Use of Proceeds | 20 |
| SECTION 5.08. | Expenses | 20 |
| SECTION 5.09. | Restrictions on Transfer | 20 |
| SECTION 5.10. | Information Statement | 21 |
| SECTION 5.11. | Registration | 21 |

ARTICLE VI

Conditions to Closing

| | | |
|---|---|---|
| SECTION 6.01. | Conditions to the Obligations of the Company and the Investor | 21 |
| SECTION 6.02. | Conditions to the Obligations of the Company | 22 |
| SECTION 6.03. | Conditions to the Obligations of the Investor | 22 |
| SECTION 6.04. | Frustration of Closing Conditions | 23 |

ARTICLE VII

Termination; Survival; Limitation on Damages

| | | |
|---|---|---|
| SECTION 7.01. | Termination | 23 |
| SECTION 7.02. | Effects of Termination | 24 |
| SECTION 7.03. | Survival | 24 |
| SECTION 7.04. | Limitation on Damages | 24 |

EBERSOL 000084

ARTICLE VIII

Miscellaneous

| | | |
|---|---|---|
| SECTION 8.01. | Notices | 24 |
| SECTION 8.02. | Amendments, Waivers, etc. | 25 |
| SECTION 8.03. | Counterparts and Facsimile | 25 |
| SECTION 8.04. | Further Assurances | 26 |
| SECTION 8.05. | Governing Law; Specific Enforcement; Submission to Jurisdiction; Waiver of Jury Trial | 26 |
| SECTION 8.06. | Interpretation | 27 |
| SECTION 8.07. | Severability | 27 |
| SECTION 8.08. | No Third-Party Beneficiaries | 28 |
| SECTION 8.09. | Assignment | 28 |
| SECTION 8.10. | Acknowledgment of Securities Laws | 28 |

Exhibits

| | |
|---|---|
| Form of Certificate of Designation | Exhibit A |
| Form of Restrictive Legend | Exhibit B |

EBERSOL 000085

INVESTMENT AGREEMENT, dated as of December 4, 2017 (this "Agreement"), between CARVANA CO., a Delaware corporation (the "Company"), and DDFS PARTNERSHIP LP, a Delaware limited partnership (the "Investor").

WHEREAS, the Company desires to issue, sell and deliver to the Investor, and the Investor desires to purchase and acquire from the Company, pursuant to the terms and subject to the conditions set forth in this Agreement, an aggregate of 100,000 shares of the Company's Class A Convertible Preferred Stock, par value $0.01 per share (the "Preferred Shares"), having the powers, preferences and rights, and the qualifications, limitations and restrictions, as set forth in the form of Certificate of Designations, Preferences, Powers and Rights of Class A Convertible Preferred Stock of Carvana Co., attached hereto as Exhibit A (the "Certificate of Designation"); and

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

<div align="center">

ARTICLE I

Definitions

</div>

SECTION 1.01. Definitions. (a) As used in this Agreement (including the recitals hereto), the following terms shall have the following meanings:

"13D Group" means any group of Persons formed for the purpose of acquiring, holding, voting or disposing of Voting Stock that would be required under Section 13(d) of the Exchange Act (as in effect on, and based on legal interpretations thereof existing on, the date hereof), to file a statement on Schedule 13D with the SEC as a "person" within the meaning of Section 13(d)(3) of the Exchange Act if such group beneficially owned Voting Stock representing more than 5% of any class of Voting Stock then outstanding.

"Affiliate" means, with respect to any specified Person, any other Person directly or indirectly controlling or controlled by, or under direct or indirect common control with, such specified Person; provided, that the Company and its Subsidiaries shall not be deemed to be Affiliates of the Investor or any of its Affiliates. For the purposes of this definition, "control", when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

Any Person shall be deemed to "beneficially own", to have "beneficial ownership" of, or to be "beneficially owning" any securities (which securities shall also be deemed "beneficially owned" by such Person) that such Person is deemed to "beneficially own" within the meaning of Rules 13d-3 and 13d-5 under the Exchange Act as in effect on the date hereof; provided that any Person shall be deemed to beneficially own any securities that such Person has the right to acquire, whether or not such right is exercisable immediately.

EBERSOL 000086

"<u>Board</u>" means the board of directors of the Company.

"<u>Business Day</u>" means any weekday that is not a day on which banking institutions in New York, New York are authorized or required by law, regulation or executive order to be closed.

"<u>Bylaws</u>" means the Amended and Restated Bylaws of the Company, dated April 27, 2017, as may be further amended and restated from time to time.

"<u>Certificate of Incorporation</u>" means the Amended and Restated Certificate of Incorporation of the Company, dated April 27, 2017, as may be further amended and restated from time to time.

"<u>Code</u>" means the United States Internal Revenue Code of 1986.

"<u>Common Stock</u>" means the Class A common stock, par value $0.001 per share, of the Company.

"<u>Company Charter Documents</u>" means the Certificate of Incorporation and Bylaws.

"<u>Company Documents</u>" means all contracts, indentures, mortgages, deeds of trust, loan or credit agreements, bonds, notes, debentures, evidences of indebtedness, swap agreements, hedging agreements, leases or other instruments or agreements to which the Company or any of its Subsidiaries is a party or by which the Company or any of its Subsidiaries is bound or to which any of the property or assets of the Company or any of its Subsidiaries is subject.

"<u>Company Stock Plans</u>" means the 2017 Omnibus Incentive Plan and the Carvana Group Equity Incentive Plan, each as amended from time to time.

"<u>Conversion Shares</u>" means the Company's Class A common stock, par value $0.001 per share, issuable upon conversion or exchange of the Preferred Shares.

"<u>DGCL</u>" means the General Corporation Law of the State of Delaware.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"<u>Exchange Act</u>" means the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder.

"<u>Exchange Agreement</u>" means that certain Exchange Agreement, dated April 27, 2017, by and among Carvana Co., Carvana Group, LLC, Carvana Co. Sub LLC and the holders from time to time of Carvana Group, LLC's common units.

2

EBERSOL 000087

"GAAP" means generally accepted accounting principles in the United States, consistently applied.

"Governmental Entity" means any federal, state or local, domestic or foreign governmental or regulatory (including any stock exchange) authority, agency, court, commission or other entity or self-regulatory organization.

"Guarantee" means any guarantee, letter of credit, surety bond (including any performance bond), credit support agreement or other assurance of payment.

"Hedging Transaction" means any transaction, agreement or arrangement (or series of transactions, agreements or arrangements) involving a security linked to any of the Company Securities or any security that would be deemed to be a "derivative security" (as defined in Rule 16a-1(c) under the Exchange Act) with respect to any of the Company Securities or any transaction (even if not a security) which would (were it a security) be considered such a derivative security, or that hedges or transfers, directly or indirectly, some or all of the economic risk of ownership of any of the Company Securities, including any forward contract, equity swap, put or call, put or call equivalent position, collar, non-recourse loan, sale of exchangeable security or similar transaction or is otherwise based on the value of any of the Company Securities.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder.

"Judgment" means any judgment, injunction, order or decree of any Governmental Entity.

"Liens" means any pledges, liens, charges, mortgages, encumbrances or security interests of any kind or nature.

"Laws" means all state or federal laws, statutes, common laws, ordinances, codes, rules, orders, judgments, injunctions, writs, decrees, governmental guidelines or interpretations having the force of law, Permits, regulations, decrees and orders of Governmental Entities.

"Material Adverse Effect" means any effect, change, event or occurrence that, individually or in the aggregate, has a material adverse effect on the business, results of operations, assets or financial condition of the Company and its Subsidiaries taken as a whole; provided, however, that none of the following, and no effect, change, event or occurrence arising out of, or resulting from, the following, shall constitute or be taken into account, individually or in the aggregate, in determining whether a Material Adverse Effect has occurred or may occur: any effect, change, event or occurrence that results from or arises in connection with (i) changes or conditions generally affecting the industry in which the Company and its Subsidiaries operate, (ii) general economic or regulatory, legislative or political conditions or securities, credit, financial or other capital markets conditions in any jurisdiction, (iii) exchange rate conditions or fluctuations in any jurisdiction, (iv) any failure, in and of itself, by the Company to meet any internal or published projections, forecasts, estimates or predictions in respect of revenues, earnings

3

EBERSOL 000088

or other financial or operating metrics for any period, (v) geopolitical conditions, the outbreak or escalation of hostilities, any acts of war (whether or not declared), sabotage, terrorism or man-made disaster, or any escalation or worsening of any of the foregoing, (vi) any volcano, tsunami, pandemic, hurricane, tornado, windstorm, flood, earthquake or other natural disaster, (vii) the execution and delivery of this Agreement or the public announcement or pendency of the Transactions, including the impact thereof on the relationships, contractual or otherwise, of the Company or any of its Subsidiaries with employees, independent sales representatives and contractors, labor unions, customers, brokers, agents, financing sources, business partners or regulators, and including any lawsuit, action or other proceeding with respect to any of the Transactions, (viii) any change or announcement of a potential change, in and of itself, in the Company's or any of its Subsidiaries' credit or financial strength or the ratings of any of the Company's or its Subsidiaries' businesses, (ix) any change, in and of itself, in the market price, credit ratings or trading volume of the Company's or any of its Subsidiaries' securities, (x) any change in applicable Law or GAAP (or authoritative interpretation thereof), including accounting and financial reporting pronouncements by the SEC and the Financial Accounting Standards Board or (xi) any action required to be taken by the Company, or that the Company is required to cause one of its Subsidiaries to take, pursuant to, or any failure of the Company or any of its Subsidiaries to take an action prohibited by, the terms of this Agreement (it being understood that the exceptions in clauses (iv), (viii) and (ix) shall not be taken into account in determining whether or not the underlying cause of any such failure or change referred to therein (if not otherwise falling within any of the exceptions provided by clauses (i) through (xi) hereof) gives rise to a Material Adverse Effect); <u>provided further</u>, that any effect, change, event or occurrence referred to in clause (i), (ii), (v), (vi) or (x) may be taken into account in determining whether or not there has been a Material Adverse Effect to the extent such effect, change, event or occurrence has a materially disproportionate adverse effect on the Company and its Subsidiaries, taken as a whole, relative to other participants in the industry in which the Company and its Subsidiaries operate.

"<u>NYSE</u>" means the New York Stock Exchange and its successors.

"<u>Option</u>" means an unexercised option to purchase shares of Common Stock granted under the Company Stock Plans or otherwise.

"<u>Performance RSU</u>" means a restricted stock unit in respect of shares of Common Stock that is subject to performance-based vesting or forfeiture conditions (whether granted under the Company Stock Plans or otherwise).

"<u>Person</u>" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Governmental Entity or other entity.

"<u>Related Agreements</u>" means the Certificate of Designation and any other agreements between or among the Company, the Investor and any of their respective Affiliates entered into to give effect to the transactions contemplated by this Agreement.

4

EBERSOL 000089

"Representative" means, with respect to any Person, the directors, officers, employees, investment bankers, financial advisors, attorneys, accountants or other advisors, agents or representatives of such Person.

"Restricted Share" means a share of Common Stock that is subject to vesting or forfeiture conditions (whether time-based or performance-based and whether granted under the Company Stock Plans or otherwise).

"SEC" means the Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"Service-Based RSU" means a restricted stock unit in respect of shares of Common Stock that is solely subject to service-based vesting or forfeiture conditions (whether granted under the Company Stock Plans or otherwise).

"Subsidiary" means, with respect to any Person, another Person, an amount of the voting securities, other voting rights or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, more than 50% of the equity interests of which) is owned directly or indirectly by such first Person.

"Transaction Documents" means this Agreement and the Related Agreements.

"Transactions" means the transactions contemplated by this Agreement and the Related Agreements.

"Voting Stock" means capital stock of the Company having the right to vote generally in any election of members of the Board.

(b) In addition to the terms defined in Section 1.01(a), the following terms have the meanings assigned thereto in the Sections set forth below:

| Term | Section |
| --- | --- |
| Action | 3.07 |
| Agreement | Preamble |
| Balance Sheet Date | 3.05(c) |
| Bankruptcy and Equity Exception | 3.01(a) |
| Capitalization Date | 3.02(a) |
| Certificate of Designation | Recitals |
| Closing | 2.02(a) |
| Closing Date | 2.02(a) |
| Company | Preamble |
| Company Preferred Stock | 3.02(a) |
| Company SEC Documents | 3.05(a) |

5

EBERSOL 000090

| Term | Section |
|------|---------|
| Company Securities | 3.02(b) |
| Environmental Laws | 3.12 |
| Hazardous Materials | 3.12 |
| Intellectual Property | 3.13 |
| Filed SEC Documents | Article III |
| Information Statement | 5.9 |
| Investor | Preamble |
| Permits | 3.08 |
| Plan | 3.10 |
| Preferred Shares | Preamble |
| Purchase | 2.01 |
| Purchase Price | 2.01 |

ARTICLE II

Purchase and Sale

SECTION 2.01. Purchase and Sale. On the terms and subject to the conditions set forth in this Agreement, at the Closing, the Investor shall purchase and acquire from the Company, and the Company shall issue, sell and deliver to the Investor, 100,000 Preferred Shares, at a purchase price per share of $1,000, for an aggregate purchase price of $100,000,000.00 (the "Purchase Price"). The purchase of the Preferred Shares pursuant to this Section 2.01 is referred to as the "Purchase".

SECTION 2.02. Closing. (a) The closing of the Purchase (the "Closing") shall take place at the offices of Kirkland & Ellis LLP, 300 N. LaSalle Street, Chicago, Illinois 60654, or remotely via the exchange of documents and signature pages, promptly following the satisfaction (or, to the extent permitted by Law, the waiver by the party entitled to the benefit thereof) of the conditions set forth in Article VI, other than those conditions that by their nature are to be satisfied as of the Closing (but subject to the satisfaction or waiver of such conditions at the Closing), or at such other place, time and date as shall be agreed between the Company and the Investor; provided, that the parties hereto expressly agree that the Closing shall occur no later than three Business Days following the date of this Agreement. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date". The Closing shall be deemed to occur and be effective as of 12:01 a.m. New York City time on the Closing Date.

(b) At the Closing, to effect the purchase and sale of the Preferred Shares, (i) the Investor shall pay to the Company, by wire transfer to a bank account designated in writing by the Company of immediately available funds, the Purchase Price, (ii) the Company shall deliver to the Investor physical share certificates representing the Preferred Shares and (iii) the Company shall make the filing described in Section 6.01(b).

6

EBERSOL 000091

## ARTICLE III

### Representations and Warranties of the Company

The Company represents and warrants to the Investor that, except as disclosed in any report, schedule, form, statement or other document (including exhibits) filed with, or furnished to, the SEC and publicly available prior to the date hereof (the "Filed SEC Documents"), other than any non-specific predictive or forward-looking disclosures contained therein under the heading "Risk Factors":

SECTION 3.01. <u>Organization; Standing.</u> (a) The Company is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware and has all requisite corporate power and corporate authority necessary to carry on its business as it is now being conducted, except (other than with respect to the Company's due organization and valid existence) as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. The Company is duly licensed or qualified to do business (where such concept is recognized under applicable Law) in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned or leased by it makes such licensing or qualification necessary, except where the failure to be so licensed or qualified, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect. True and complete copies of the Company Charter Documents (as amended to the date hereof) are included in the Filed SEC Documents.

(b) Each of the Company's Subsidiaries is duly organized, validly existing and in good standing (where such concept is recognized under applicable Law) under the Laws of the jurisdiction of its organization, except where the failure to be so organized, existing or in good standing, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.02. <u>Capitalization.</u> (a) The authorized capital stock of the Company consists of 500,000,000 shares of Common Stock, 125,000,000 shares of Class B common stock, par value $0.001 per share and 50,000,000 shares of undesignated preferred stock, with a par value per share that may be established by the Board in the applicable certificate of designation ("Company Preferred Stock"). At the close of business on December 1, 2017 (the "Capitalization Date"), (i) 16,070,521   shares of Common Stock were issued and outstanding (including 398,391 Restricted Shares), (ii) 116,686,826 shares of Class B common stock were issued and outstanding (iii) no shares of Common Stock were held by the Company in its treasury, (iv) 12,870,365 shares of Common Stock were reserved and available for issuance pursuant to the Company Stock Plans, (v) a total of 596,043 shares of Common Stock were subject to outstanding vested and unvested Options, (vi) no shares of Common Stock were subject to outstanding Service-Based RSUs, (vii) no shares of Common Stock were subject to outstanding Performance RSUs (assuming that applicable performance goals have been attained at maximum levels) and (viii) no shares of Company Preferred Stock were issued or outstanding. Since the Capitalization Date through the date hereof, neither the Company

7

EBERSOL 000092

nor any of its Subsidiaries has (A) issued any Company Securities (as defined below) or incurred any obligation to make any payments based on the price or value of any Company Securities or dividends paid thereon, other than in connection with the vesting, settlement or exercise of the Options, Service-Based RSUs and Performance RSUs referred to above that were outstanding as of the Capitalization Date or as expressly contemplated by this Agreement or (B) established a record date for, declared, set aside for payment or paid any dividend on, or made any other distribution in respect of, any shares of the Company's capital stock. Additionally, as of the Capitalization Date, there were 165,776,684 Class A common units and 7,421,223 Class B common units of Carvana Group, LLC issued and outstanding. Pursuant to the Exchange Agreement, the Class A common units were exchangeable for 116,686,826 shares of the Company's Common Stock and the Class B common units were exchangeable for 4,725,496 shares of the Company's Common Stock, in each case as of the Capitalization Date.

(b) Except as described in this <u>Section 3.02</u>, as of the Capitalization Date, there were (i) no outstanding shares of capital stock of, or other equity or voting interests in, the Company, (ii) no outstanding securities of the Company convertible into or exchangeable for shares of capital stock of, or other equity or voting interests in, the Company, (iii) no outstanding options, warrants, stock appreciation rights, phantom stock rights, rights or other commitments or agreements to acquire from the Company, or that obligate the Company to issue, any capital stock of, or other equity or voting interests in, or any securities convertible into or exchangeable for shares of capital stock of, or other equity or voting interests in, the Company, (iv) no obligations of the Company to grant, extend or enter into any subscription, warrant, right, convertible or exchangeable security or other similar agreement or commitment relating to any capital stock of, or other equity or voting interests in, the Company (the items in clauses (i), (ii), (iii) and (iv) being referred to collectively as "<u>Company Securities</u>") and (v) no other obligations by the Company or any of its Subsidiaries to make any payments or provide any economic value based on the price or value of any Company Securities or dividends paid thereon. Except with respect to the Company Stock Plans, there are no outstanding agreements of any kind which obligate the Company or any of its Subsidiaries to repurchase, redeem or otherwise acquire any Company Securities, or obligate the Company to grant, extend or enter into any such agreements relating to any Company Securities, including any agreements granting any preemptive rights, subscription rights, anti-dilutive rights, rights of first refusal or similar rights with respect to any Company Securities. None of the Company or any Subsidiary of the Company is a party to any stockholders' agreement, voting trust agreement, registration rights agreement or other similar agreement or understanding relating to any Company Securities or any other agreement relating to the disposition, voting or dividends with respect to any Company Securities. All outstanding shares of Common Stock have been duly authorized and validly issued and are fully paid, nonassessable and free of preemptive rights. The Preferred Shares and the Conversion Shares will be, when issued, duly authorized and validly issued, fully paid and nonassessable and issued in compliance with all applicable federal and state securities Laws, and such shares will not be issued in violation of any purchase option, call option, preemptive right, resale right, subscription right, right of first refusal or similar right. The Preferred Shares, when issued, and the Conversion Shares, if and when issued, will have the terms and conditions and entitle the holders thereof to the rights set forth in the Company Charter Documents, as amended by the Certificate of Designation.

8

EBERSOL 000093

(c) All of the issued and outstanding shares of capital stock of each Subsidiary that is a corporation, all of the issued and outstanding partnership interests of each Subsidiary that is a limited or general partnership and all of the issued and outstanding limited liability company interests, membership interests or other similar interests of each Subsidiary that is a limited liability company have been duly authorized and validly issued, are fully paid and (except in the case of general partnership interests) non-assessable and are owned by the Company directly or through Subsidiaries, free and clear of all Liens, except for such Liens as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and none of the issued and outstanding shares of capital stock of any Subsidiary that is a corporation, none of the issued and outstanding partnership interests of any Subsidiary that is a limited or general partnership, and none of the issued and outstanding limited liability company interests, membership interests or other similar interests of any Subsidiary that is a limited liability company were issued in violation of any preemptive rights, rights of first refusal or other similar rights of any securityholder of such Subsidiary or any other person that have not been waived in writing.

SECTION 3.03. <u>Authority; Noncontravention; Voting Requirements.</u> (a) The Company has all necessary corporate power and corporate authority to execute and deliver this Agreement and the Related Agreements and to perform its obligations hereunder and thereunder and to consummate the Transactions. All corporate action on the part of the Company, its officers, Board, and shareholders necessary for the authorization, execution, and delivery of this Agreement and any other Transaction Document to which the Company is a party, the performance of all obligations of the Company under this Agreement and any other Transaction Document, and the authorization, issuance (or reservation for issuance), sale, and delivery of (i) the Preferred Shares being sold hereunder and (ii) subject to the mailing of the Information Statement pursuant to <u>Section 5.9</u>, the Conversion Shares issuable upon the conversion of the Preferred Shares has been taken. This Agreement and the Related Agreements have been duly executed and delivered by the Company and, assuming due authorization, execution and delivery hereof and thereof by the Investor, this Agreement and the Related Agreements constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except that such enforceability (i) may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and other similar Laws of general application affecting or relating to the enforcement of creditors' rights generally and (ii) is subject to general principles of equity, whether considered in a proceeding at law or in equity (the "<u>Bankruptcy and Equity Exception</u>").

(b) The Company and its Subsidiaries are not in violation of their organizational documents or in default in the performance or observance of any obligation, agreement, covenant or condition contained in any Company Document, except for such defaults that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this

9

EBERSOL 000094

Agreement and compliance by the Company with its obligations under this Agreement do not and will not, whether with or without the giving of notice or passage of time or both, conflict with or constitute a breach of, or default, under, or result in the creation or imposition of any Lien upon any property or assets of the Company or its Subsidiaries pursuant to, any Company Documents, except for such conflicts, breaches, defaults or Liens that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, nor will such action result in any violation of (i) the provisions of the organizational documents of Company or any of its Subsidiaries or (ii) any applicable law, statute, rule, regulation, judgment, order, writ or decree of any government, government instrumentality or court, domestic or foreign, having jurisdiction over the Company or any of its Subsidiaries or any of their respective assets, properties or operations, except, in the case of clause (ii) only, for such violations as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect..

SECTION 3.04. <u>Governmental Approvals.</u> Except for (a) compliance with the rules and regulations of the NYSE, (b) the filing of the Certificate of Designation with the Secretary of State of the State of Delaware pursuant to the DGCL, (c) the filing with the SEC of such current reports and other documents, if any, required to be filed with the SEC under the Exchange Act or Securities Act in connection with the Transactions, (d) the mailing of the Information Statement pursuant to <u>Section 5.9</u> and (e) compliance with any applicable securities or blue sky laws of the various states, no consent or approval of, or filing, license, permit or authorization, declaration or registration with, any Governmental Entity or any stock market or stock exchange on which shares of Common Stock are listed for trading are necessary for the execution and delivery of this Agreement by the Company, the performance by the Company of its obligations hereunder and the consummation by the Company of the Transactions, other than such consents, approvals, filings, licenses, permits, authorizations, declarations or registrations the failure of which to obtain, make or give, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.05. <u>Company SEC Documents; Undisclosed Liabilities.</u> (a) The Company has filed with the SEC all material reports, schedules, forms, statements and other documents required to be filed by the Company with the SEC pursuant to the Securities Act or the Exchange Act since April 24, 2017 (collectively, the "<u>Company SEC Documents</u>"). As of their respective effective dates (in the case of Company SEC Documents that are registration statements filed pursuant to the requirements of the Securities Act) and as of their respective SEC filing dates (in the case of all other Company SEC Documents), the Company SEC Documents complied as to form in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, applicable to such Company SEC Documents, and none of the Company SEC Documents as of such respective dates (or, if amended prior to the date hereof, the date of the filing of such amendment, with respect to the disclosures that are amended) contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

10

EBERSOL 000095

(b) The consolidated financial statements of the Company (including all related notes or schedules) included or incorporated by reference in the Company SEC Documents (i) complied as to form, as of their respective dates of filing with the SEC, in all material respects with the published rules and regulations of the SEC with respect thereto, (ii) present fairly, in all material respects, the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods covered thereby (subject, in the case of unaudited quarterly financial statements, to normal year-end adjustments) and (iii) have been prepared in all material respects in accordance with GAAP (except, in the case of unaudited quarterly financial statements, as permitted by Form 10-Q of the SEC or other rules and regulations of the SEC) applied on a consistent basis during the periods covered thereby (except (A) as may be indicated in the notes thereto or (B) as permitted by Regulation S-X).

(c) Neither the Company nor any of its Subsidiaries has any liabilities of any nature (whether accrued, absolute, contingent or otherwise) that would be required under GAAP, as in effect on the date hereof, to be reflected on a consolidated balance sheet of the Company (including the notes thereto) except liabilities (i) reflected or reserved against in the balance sheet (or the notes thereto) of the Company and its Subsidiaries as of September 30, 2017 (the "Balance Sheet Date") included in the Filed SEC Documents, (ii) incurred after the Balance Sheet Date in the ordinary course of business, (iii) as contemplated by this Agreement or otherwise incurred in connection with the Transactions, (iv) as relate to Taxes or (v) as, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect.

(d) The Company has established and maintains disclosure controls and procedures and a system of internal controls over financial reporting (as such terms are defined in paragraphs (e) and (f), respectively, of Rule 13a-15 under the Exchange Act) as required by Rule 13a-15 under the Exchange Act. Since September 30, 2017, neither the Company nor, to the Company's knowledge, the Company's independent registered public accounting firm, has identified or been made aware of any "significant deficiency" or "material weakness" (as defined by the Public Company Accounting Oversight Board) in the design or operation of the Company's internal controls over financial reporting which would reasonably be expected to adversely affect in any material respect the Company's ability to record, process, summarize and report financial data, in each case which has not been subsequently remediated.

SECTION 3.06. Absence of Certain Changes. Since September 30, 2017 there has not been any effect, change, event or occurrence that has resulted in, or would reasonably be expected to result in, a Material Adverse Effect.

SECTION 3.07. Legal Proceedings. As of the date hereof, there is no pending or, to the knowledge of the Company, threatened legal or administrative proceeding, suit, arbitration, action or, to the knowledge of the Company, investigation (an "Action") against the Company or any of its Subsidiaries, in each case except as, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

11

EBERSOL 000096

SECTION 3.08. <u>Compliance with Laws; Permits.</u> The Company and each of its Subsidiaries are in compliance with all Laws applicable to the Company or any of its Subsidiaries, in each case except for instances of non-compliance that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect. The Company and each of its Subsidiaries hold all licenses, permits, certificates, approvals and authorizations from Governmental Entities necessary for the lawful conduct of their respective businesses (collectively, "<u>Permits</u>"), except where the failure to hold the same, individually or in the aggregate, has not had and would not reasonably be expected to have a Material Adverse Effect.

SECTION 3.09. <u>Tax Matters.</u> The Company and its Subsidiaries have filed all non-U.S., federal, state and local tax returns that are required to be filed or have obtained extensions thereof, except where the failure so to file would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, and have paid all taxes (including, without limitation, any estimated taxes) required to be paid and any other assessment, fine or penalty, to the extent that any of the foregoing is due and payable, except for any such tax, assessment, fine or penalty that is currently being contested in good faith by appropriate actions and except for such taxes, assessments, fines or penalties the nonpayment of which would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

SECTION 3.10. <u>Employee Benefits.</u> None of the following events has occurred or exists: (i) a failure to fulfill the obligations, if any, under the minimum funding standards of Section 302 of ERISA with respect to a Plan (as defined below) determined without regard to any waiver of such obligations or extension of any amortization period; (ii) an audit or investigation by the Internal Revenue Service, the U.S. Department of Labor, the Pension Benefit Guaranty Corporation or any other federal, state or foreign governmental or regulatory agency with respect to the employment or compensation of employees by the Company or any of its Subsidiaries that might reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or (iii) any breach of any contractual obligation, or any violation of law or applicable qualification standards, with respect to the employment or compensation of employees by the Company or any of its Subsidiaries that might reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. None of the following events has occurred or is reasonably likely to occur: (i) a material increase in the aggregate amount of contributions required to be made to all Plans in the current fiscal year of the Company or any of its Subsidiaries compared to the amount of such contributions made in the Company's most recently completed fiscal year; (ii) a material increase in the "accumulated post-retirement benefit obligations" (within the meaning of Statement of Financial Accounting Standards 106) of the Company or any of its Subsidiaries compared to the amount of such obligations in the Company's most recently completed fiscal year; (iii) any event or condition giving rise to a liability under Title IV of ERISA that might reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect; or (iv) the filing of a claim by one or more employees or former employees of the Company or any of its Subsidiaries related to its or their employment that might reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. For purposes of this paragraph and the definition of ERISA, the term "Plan" means a plan (within the meaning of Section 3(3) of ERISA) with respect to which the Company or any of its Subsidiaries may have any liability.

12

EBERSOL 000097

SECTION 3.11. <u>Labor Matters.</u> No labor dispute with the employees of the Company or any of its Subsidiaries exists or, to the knowledge of the Company, is imminent, and the Company is not aware of any existing or imminent labor disturbance by the employees of any of the principal suppliers, manufacturers, customers or contractors of the Company or any of its Subsidiaries which might reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 3.12. <u>Environmental Matters.</u> Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (A) neither the Company nor any of its Subsidiaries is in violation of any federal, state, local or foreign statute, law, rule, regulation, ordinance, code, policy or rule of common law or any judicial or administrative interpretation thereof, including any judicial or administrative order, consent, decree or judgment, relating to pollution or protection of human health, the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata) or wildlife, including, without limitation, laws and regulations relating to the release or threatened release of chemicals, pollutants, contaminants, wastes, toxic substances, hazardous substances, petroleum or petroleum products (collectively, "<u>Hazardous Materials</u>") or to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials (collectively, "<u>Environmental Laws</u>"), (B) the Company and its Subsidiaries have all permits, authorizations and approvals required under any applicable Environmental Laws and are each in compliance with their requirements, (C) there are no pending or, to the knowledge of the Company, threatened administrative, regulatory or judicial actions, suits, demands, demand letters, claims, Liens, notices of noncompliance or violation, investigation or proceedings relating to any Environmental Law against the Company or any of its Subsidiaries and (D) to the knowledge of the Company, there are no events or circumstances that might reasonably be expected to form the basis of an order for clean-up or remediation, or an action, suit or proceeding by any private party or governmental body or agency, against or affecting the Company or any of its Subsidiaries relating to Hazardous Materials or any Environmental Laws.

SECTION 3.13. <u>Intellectual Property.</u> The Company and its Subsidiaries own and possess or have valid and enforceable licenses to use, all patents, patent rights, patent applications, licenses, copyrights, inventions, know-how (including trade secrets and other unpatented and/or unpatentable proprietary or confidential information, systems or procedures), trademarks, service marks, trade names, service names, software, internet addresses, domain names and other intellectual property (including all goodwill associated with, and all registrations and applications for registration of, the foregoing) (collectively, "Intellectual Property") that is necessary for the conduct of their respective businesses as currently conducted; neither the Company nor its Subsidiaries has received any notice or is otherwise aware of any infringement of or conflict with rights of others with respect to any Intellectual Property, which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. The Company and its Subsidiaries are not aware of any facts or circumstances which would reasonably be

13

EBERSOL 000098

expected to render any Intellectual Property invalid, which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. There is no pending or, to the knowledge of the Company, threatened action, suit, proceeding or claim by any third party challenging the Company's or its Subsidiaries' rights in or to any such Intellectual Property, or challenging the validity, enforceability or scope of any such Intellectual Property, or asserting that the Company or its Subsidiaries infringes or otherwise violates Intellectual Property rights of any third party, in each in each instance that would be materially adverse to the Company, and the Company is unaware of any facts which could form a reasonable basis for any such action, suit, proceeding or claim, in each instance that would be materially adverse to the Company. To the knowledge of the Company and its Subsidiaries, no third party has infringed, misappropriated or otherwise violated any Intellectual Property owned by or exclusively or co-exclusively licensed to the Company in any material respects; the Company and its Subsidiaries have in all material respects complied with the terms of each agreement pursuant to which any Intellectual Property has been licensed to the Company or its Subsidiaries, all such agreements are in full force and effect, and no event or condition has occurred or exists that gives or, with notice or passage of time or both, would give any person the right to terminate any such agreement; and to the knowledge of the Company, there is no patent or patent application that contains claims that interfere with the issued or pending claims of any such Intellectual Property of the Company or its Subsidiaries that could reasonably be used to challenge the validity, enforceability or scope of any such Intellectual Property, which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 3.14. <u>Real Property.</u> The Company and its Subsidiaries have good and marketable title in fee simple to all real property owned by any of them (if any) and good title to all other properties and assets owned by any of them, in each case, free and clear of all Liens except such as are not, individually or in the aggregate, material to the Company and its Subsidiaries taken as a whole, do not, individually or in the aggregate, materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by the Company and its Subsidiaries; all real property, buildings and other improvements, and all equipment and other property, held under lease or sublease by the Company or its Subsidiaries is held by them under valid, subsisting and enforceable leases or subleases, as the case may be, with, solely in the case of leases or subleases relating to real property, buildings or other improvements, such exceptions as are not material and do not materially interfere with the use made or proposed to be made of such property and buildings or other improvements by the Company or its Subsidiaries, and all such leases and subleases are in full force and effect; and neither of the Company nor its Subsidiaries has received any notice of any claim of any sort that has been asserted by anyone adverse to the rights of the Company or its Subsidiaries under any of the leases or subleases mentioned above or affecting or questioning the rights of the Company and its Subsidiaries to the continued possession of the leased or subleased premises, or to the continued use of the leased or subleased equipment or other property, except for such claims which, if successfully asserted against the Company or its Subsidiaries, would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect.

14

EBERSOL 000099

SECTION 3.15. <u>Sale of Securities.</u> Assuming the accuracy of the representations and warranties set forth in <u>Section 4.06</u>, the sale of the Preferred Shares pursuant to this Agreement is exempt from the registration requirements of the Securities Act. Without limiting the foregoing, neither the Company nor, to the knowledge of the Company, any other Person authorized by the Company to act on its behalf, has engaged in a general solicitation or general advertising (within the meaning of Regulation D of the Securities Act) of or to investors with respect to offers or sales of the Preferred Shares, and neither the Company nor, to the knowledge of the Company, any Person acting on its behalf has made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause the offering or issuance of Preferred Shares under this Agreement to be integrated with prior offerings by the Company for purposes of the Securities Act that would result in none of Regulation D or any other applicable exemption from registration under the Securities Act to be available, nor will the Company take any action or steps that would cause the offering or issuance of Preferred Shares under this Agreement to be integrated with other offerings by the Company.

SECTION 3.16. <u>Broker Fees and Expenses.</u> No agent, broker, investment banker, financial advisor or other firm or Person other than Wells Fargo Securities, LLC, the fees and expenses of which will be paid by the Company, is or will be entitled to any broker's or finder's fee or any other commission or similar fee in connection with any of the Transactions based upon arrangements made by, or on behalf of, the Company or any of its Subsidiaries.

SECTION 3.17. <u>Listing and Maintenance Requirements.</u> The Common Stock is registered pursuant to Section 12(b) of the Exchange Act and listed on the NYSE, and the Company has taken no action designed to, or which, to the knowledge of the Company, is reasonably likely to have the effect of, terminating the registration of the Common Stock under the Exchange Act or delisting the Common Stock from the NYSE, nor has the Company received, as of the date hereof, any notification that the SEC or the NYSE is contemplating terminating such registration or listing.


ARTICLE IV

Representations and Warranties of the Investor

The Investor represents and warrants to the Company:

SECTION 4.01. <u>Organization and Authority.</u> The Investor is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has all requisite limited partnership power and authority to carry on its business as presently conducted.

SECTION 4.02. <u>Authorization; Enforceability.</u> The Investor has all requisite limited partnership power and authority to execute and deliver this Agreement and to consummate the Transactions. The execution and delivery of this Agreement by the Investor and the consummation of the Transactions, and compliance with the

15

EBERSOL 000100

provisions of this Agreement, by the Investor have been duly authorized by all necessary limited partnership action on the part of the Investor (and, as of the date hereof, the resolutions giving effect to such limited partnership actions have not been rescinded, modified or withdrawn in any way). This Agreement has been duly executed and delivered by the Investor and, assuming the due authorization, execution and delivery hereof and thereof by the Company, constitutes a legal, valid and binding obligation of the Investor, enforceable against the Investor in accordance with its terms, subject, as to enforceability, to the Bankruptcy and Equity Exception.

SECTION 4.03. <u>No Conflict.</u> The execution and delivery by the Investor of this Agreement do not and will not, and the consummation of the Transactions and compliance with the provisions of this Agreement will not, conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation or acceleration of any obligation or to the loss of a benefit under, or result in the creation of any right or benefit on the part of any third party under, or result in the creation of any Lien upon any of the properties or assets of the Investor under (i) the organizational or governing documents of the Investor or (ii) assuming that the authorizations, consents and approvals referred to in <u>Section 4.04</u> are obtained prior to the Closing Date and the filings referred to in <u>Section 4.04</u> are made and any waiting periods thereunder have terminated or expired prior to the Closing Date, (A) any term, condition or provision of any Contract to which the Investor or any of its Affiliates is a party or by which any of its properties or assets are bound and that is material to the business of the Investor and its Affiliates, taken as a whole, (B) any Law that is material to the Investor and its Affiliates, taken as a whole, or (C) any Judgment, permit, concession, grant or franchise, in each case, applicable to the Investor or any of its Affiliates or any of its properties or assets, other than, in the case of clause (ii) above, any such conflicts, violations, breaches, defaults, rights, losses or Liens that, individually or in the aggregate, have not had and would not reasonably be expected to have a material adverse effect on the Investor's ability to consummate the Transactions.

SECTION 4.04. <u>Governmental Approvals.</u> Except for the filing by the Company of the Certificate of Designation with the Secretary of State of the State of Delaware pursuant to the DGCL, no consent or approval of, or filing, license, permit or authorization, declaration or registration with, any Governmental Entity or any stock market or stock exchange is necessary for the execution and delivery of this Agreement by the Investor, the performance by the Investor of its obligations hereunder and thereunder and the consummation by the Investor of the Transactions, other than such other consents, approvals, filings, licenses, permits, authorizations, declarations or registrations that, if not obtained, made or given, have not had and would not reasonably be expected to have a material adverse effect on the Investor's ability to consummate the Transactions.

SECTION 4.05. <u>Broker Fees and Expenses.</u> No agent, broker, investment banker, financial advisor or other firm or Person other than Citigroup Global Markets Inc., the fees and expenses of which will be paid by the Company, is entitled to any broker's, finder's, financial advisor's or other similar fee or any other commission or similar fee, or the reimbursement of expenses in connection therewith, in connection with any of the Transactions based upon arrangements made by or on behalf of the Investor or any of its Affiliates.

16

EBERSOL 000101

SECTION 4.06. <u>Purchase for Investment.</u> The Investor acknowledges that the Preferred Shares will not have been registered under the Securities Act or under any state or other applicable securities laws. The Investor (a) acknowledges that (i) it is acquiring the Preferred Shares (and the Conversion Shares) pursuant to an exemption from registration under the Securities Act solely for investment and for the Investor's own account, not as nominee or agent, and with no present intention or view to distribute any of the Preferred Shares (or the Conversion Shares) to any Person in violation of the Securities Act and (ii) it is not party to any co-investment, joint venture, partnership or other understanding or arrangement with any other Person relating to the Preferred Shares (or the Conversion Shares) or the Transactions, (b) will not sell or otherwise dispose of any of the Preferred Shares or the Conversion Shares, except in compliance with the registration requirements or exemption provisions of the Securities Act and any other applicable securities laws, (c) is knowledgeable, sophisticated and experienced in financial and business matters, has previously invested in securities similar to the Preferred Shares and the Conversion Shares, fully understands the limitations on transfer and the restrictions on sales of such Preferred Shares and Conversion Shares and is able to bear the economic risk of its investment and afford the complete loss of such investment, (d) (i) has such knowledge and experience in financial and business matters and in investments of this type, that it is capable of evaluating the merits and risks of its investment in the Preferred Shares and the Conversion Shares and of making an informed investment decision, (ii) has conducted an independent review and analysis of the business and affairs of the Company and its Subsidiaries that it considers sufficient and reasonable for purposes of making its investment in the Preferred Shares and the Conversion Shares and (iii) based thereon and on its own knowledge, has formed an independent judgment concerning the advisability of the Transactions, (e) is an "accredited investor" (as such term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act) and (f) is not a broker-dealer registered with the SEC under the Exchange Act or an entity engaged in a business that would require it to be so registered.

SECTION 4.07. <u>No Other Company Representations or Warranties.</u> Except for the representations and warranties expressly set forth in <u>Article III</u>, the Investor hereby acknowledges that neither the Company nor any of its Subsidiaries, nor any other Person, (a) has made or is making any other express or implied representation or warranty with respect to the Company or any of its Subsidiaries or their respective businesses, operations, assets, liabilities, condition (financial or otherwise) or prospects, including with respect to any information provided or made available to the Investor or any of its Representatives or any information developed by the Investor or any of its Representatives or (b) will have or be subject to any liability or indemnification obligation to the Investor resulting from the delivery, dissemination or any other distribution to the Investor or any of its Representatives, or the use by the Investor or any of its Representatives, of any information, documents, estimates, projections, forecasts, forward-looking information, business plans or other oral or written information provided or made available to or developed by the Investor or any of its Representatives in the course of their due diligence investigation of the Company (including in the Data Room or management presentations), the negotiation of the Transaction Documents or the contemplation of any of the Transactions.

<p style="text-align:center">17</p>

EBERSOL 000102

SECTION 4.08. <u>Non-Reliance on Company Estimates, Projections, Forecasts, Forward-Looking Statements and Business Plans.</u> In connection with the due diligence investigation of the Company by the Investor, the Investor has received and may continue to receive from the Company, its Affiliates and its and their respective Representatives certain estimates, projections, forecasts and other forward-looking information, as well as certain business plan information, regarding the Company and its Subsidiaries and their respective businesses and operations. The Investor hereby acknowledges that there are uncertainties inherent in attempting to make such estimates, projections, forecasts and other forward-looking statements, as well as in such business plans, with which the Investor is familiar, that the Investor is taking full responsibility for making its own evaluation of the adequacy and accuracy of all estimates, projections, forecasts and other forward-looking information, as well as such business plans, so furnished to the Investor (including the reasonableness of the assumptions underlying such estimates, projections, forecasts, forward-looking information or business plans), and that the Investor has not relied on such information and will have no claim against the Company or any of its Subsidiaries, or any of their respective Representatives, with respect thereto.

SECTION 4.09. <u>Ownership of Company Securities.</u> The Investor and its Affiliates hold no shares of Voting Stock, do not belong to any 13D Group and are not, directly or indirectly, party to any Hedging Transaction.

SECTION 4.10. <u>Arm's Length Transaction.</u> The Investor is acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the Transactions. Additionally, without limiting the representations and warranties of the Company in <u>Article III</u>, the Investor (a) is not relying on the Company for any legal, tax, investment, accounting or regulatory advice, (b) has consulted with its own advisors concerning such matters and (c) shall be responsible for making its own independent investigation and appraisal of the Transactions.

SECTION 4.11. <u>Private Placement Consideration.</u> The Investor understands and acknowledges that: (a) its representations and warranties contained herein are being relied upon by the Company as a basis for availing itself of such exemption and other exemptions under the securities Laws of all applicable states and for other purposes, (b) no U.S. state or federal agency has made any finding or determination as to the fairness of the terms of the sale of the Preferred Shares or any recommendation or endorsement thereof, (c) the Preferred Shares are "restricted securities" under the Securities Act inasmuch as they are being acquired from the Company in a transaction not involving a public offering and that under applicable securities Laws such Preferred Shares (and the Conversion Shares) may be resold without registration under the Securities Act only in certain limited circumstances and (d) each certificate evidencing the Preferred Shares held by the Investor will be endorsed with a legend substantially in the form on <u>Exhibit B</u> attached hereto.

18

EBERSOL 000103

SECTION 4.12. <u>Purchase Price</u>. The Investor has and will continue to have through the Closing funds sufficient and legally available to pay the Purchase Price.

<div align="center">

ARTICLE V

<u>Additional Agreements</u>

</div>

SECTION 5.01. <u>Public Announcements</u>. The Company and the Investor agree that the initial public announcement by the parties or any of their Affiliates of the execution and delivery of this Agreement shall be in such form or forms as shall be mutually agreed by the Company and the Investor. Subject to each party's disclosure obligations imposed by Law or the rules of any stock exchange upon which its securities are listed (compliance with which shall not require consultation with, or the consent of, the other party), neither the Company nor the Investor will make any public news release or other public disclosure with respect to this Agreement or the Transactions in which the other party is named without first consulting with the other, and, in each case, also receiving the other's consent (which consent shall not be unreasonably withheld, conditioned or delayed).

SECTION 5.02. <u>Commercially Reasonable Efforts</u>. Each of the Investor and the Company will cooperate and consult with each other and use commercially reasonable efforts to prepare and file all necessary documentation, to effect all necessary applications, notices, petitions, filings and other documents, and to obtain all necessary permits, consents, orders, approvals and authorizations of, or any exemption by, all third Persons required to consummate the Transactions.

SECTION 5.03. <u>Filings; Consents</u>. (a) Without limiting the generality of <u>Section 5.02</u>, upon the terms and subject to the conditions of this Agreement and in accordance with applicable Law, each of the Company and the Investor shall, and shall cause its Affiliates to, use reasonable best efforts to as promptly as practicable (i) obtain any consents, approvals or other authorizations, and make any filings and notifications, required in connection with the Transaction and (ii) make any other submissions either required or reasonably deemed appropriate by the Company or the Investor in connection with the Transactions under the Securities Act, the Exchange Act, the HSR Act, the rules and regulations of the NYSE and any other applicable Law. The Company and the Investor shall, and shall cause their respective Affiliates to, cooperate and consult with each other in connection with the making of all such filings and notifications, including by providing copies of all relevant documents (except to the extent containing confidential information of such Person) to the non-filing party and its Representatives before filing.

(b) Without limiting the generality of <u>Sections 5.02</u> and <u>5.03(a)</u>, the Company and the Investor shall as promptly as practicable, but in any event within 10 Business Days following the date hereof, cause its Affiliates to, furnish to the other party such necessary information and reasonable assistance as the other party may request in connection with its preparation of any filing that is necessary under the HSR Act.

<div align="center">19</div>

EBERSOL 000104

(c) Each of the Company and the Investor shall, and shall cause its Affiliates to, keep the other party apprised of the status of any communications by such party or any of its Affiliates with, and any inquiries or requests for additional information from any Governmental Entity with respect to the Transactions and shall comply as promptly as practicable with any such inquiry or request and provide any supplemental information requested in connection with the filings made hereunder pursuant to the HSR Act or any other applicable Law. No party hereto or any of their respective Affiliates shall participate in any meeting or engage in any material substantive conversation with any Governmental Entity with respect to the Transactions without giving the other party prior notice of the meeting or conversation.

SECTION 5.04. Corporate Action. At any time that any Preferred Shares are outstanding, the Company shall from time to time take all lawful action within its control to cause the authorized capital stock of the Company to include a sufficient number of authorized but unissued shares of Common Stock to satisfy the conversion requirements of all of the Preferred Shares then outstanding.

SECTION 5.05. Adjustment of Conversion Price. If any occurrence since the date of this Agreement until the Closing would have resulted in an adjustment to the Conversion Price (as defined in the Certificate of Designation) pursuant to the Certificate of Designation if the Preferred Shares had been issued and outstanding since the date of this Agreement, the Company shall adjust the Conversion Price, effective as of the Closing, in the same manner as would have been required by the Certificate of Designation if the Preferred Shares had been issued and outstanding since the date of this Agreement.

SECTION 5.06. NYSE Listing of Shares. To the extent the Company has not done so prior to the date of this Agreement, the Company shall promptly apply to cause the Conversion Shares to be approved for listing on the NYSE, subject only to shareholder approval and official notice of issuance.

SECTION 5.07. Use of Proceeds. The Company shall use the proceeds from the issuance and sale of the Preferred Shares for general corporate purposes and to pay any costs, fees and expenses incurred by it in connection with the Transactions.

SECTION 5.08. Expenses. Except as otherwise expressly provided in this Agreement, each party shall bear and pay its own costs, fees and expenses incurred by it in connection with this Agreement and the Transactions; provided, that the Company shall reimburse the Investor for reasonable fees and expenses incurred in connection with filings made hereunder pursuant to the HSR Act.

SECTION 5.09. Restrictions on Transfer. Prior to the date that is 180 calendar days following the Closing Date, neither the Investor nor any of its Affiliates may directly or indirectly sell, transfer, pledge, encumber, assign or otherwise dispose of any Preferred Shares or Conversion Shares to any Person without the prior written consent of the Company (which consent may be given or withheld, or made subject to such conditions as are determined by the Company, in its sole discretion) other than any

20

EBERSOL 000105

Permitted Transfer (as defined below). Any purported transfer which is not in accordance with the terms and conditions of this Section 5.9 shall be, to the fullest extent permitted by law, null and void ab initio and, in addition to other rights and remedies at law and in equity, the Company shall be entitled to injunctive relief enjoining the prohibited action. The following transfers ("Permitted Transfers") shall be permitted without the Company's consent: (i) to an Affiliate of the Investor who executes a written joinder agreement pursuant to which such Affiliate agrees to be bound by the terms of this Agreement, (ii) in a Reorganization Event (as defined in the Certificate of Designation), (iii) in connection with a redemption by the Company pursuant to the terms of the Certificate of Designation and (iv) of interests in the Investor, provided, that such transfer does not result in a change of the beneficial owner (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, as amended) of any Preferred Shares.

SECTION 5.10. Information Statement. As promptly as practicable after the date hereof, but in any event within 30 days after the date of this Agreement, the Company shall, at its sole expense, prepare and file with the SEC, and the Investor shall reasonably cooperate with the Company in such preparation and filing of, a preliminary information statement on Schedule 14C relating to the Preferred Shares and the transactions contemplated by this Agreement, and the Company shall, in reasonable consultation with the Investor, use its commercially reasonable efforts to furnish the information required to respond promptly to any comments made by the SEC with respect to the preliminary information statement and thereafter, within five days of receiving SEC clearance, to mail the information statement to the Company's stockholders. Such preliminary information statement as filed with the SEC and the information statement subsequently mailed to the stockholders of the Company (as amended and supplemented from time to time) is herein referred to as the "Information Statement." The Investor hereby agrees to provide the Company with all information concerning it which is required or reasonably appropriate to be included in the Information Statement.

SECTION 5.11. Registration. If requested by the Purchaser, the Company will use commercially reasonable efforts to prepare and file with the SEC, at the Company's sole cost and expense, a Registration Statement on Form S-3 relating to the resale by the Purchaser of the Common Stock into which the Preferred Shares may be converted, provided that the Company is then eligible to utilize Form S-3.

ARTICLE VI

Conditions to Closing

SECTION 6.01. Conditions to the Obligations of the Company and the Investor. The respective obligations of each of the Company and the Investor to effect the Transactions are subject to the satisfaction or (to the extent permitted by Law) waiver by each of the Company and the Investor on or prior to the Closing Date of the following conditions:

(a) No Governmental Entity shall have issued any order, decree or ruling, and no Law shall be in effect, enjoining, restraining or otherwise prohibiting any of the Transactions;

21

EBERSOL 000106

(b) the Company shall have duly adopted and caused to be filed with the Secretary of State of the State of Delaware the Certificate of Designation; and

(c) the Company shall have obtained requisite shareholder approval by written consent of the consummation of the Transactions, including the issuance of the Preferred Shares and Conversion Shares in accordance with the Company Charter Documents.

SECTION 6.02. <u>Conditions to the Obligations of the Company.</u> The obligations of the Company to effect the Transactions are further subject to the satisfaction or (to the extent permitted by Law) waiver by the Company on or prior to the Closing Date of the following conditions:

(a) all representations and warranties of the Investor set forth in this Agreement shall be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) in all material respects at and as of the Closing Date, with the same force and effect as if made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on such earlier date);

(b) the Investor shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing; and

(c) the Company shall have received a certificate, signed by a duly authorized officer of the Investor, certifying as to the matters set forth in <u>Sections 6.02(a)</u> and <u>6.02(b)</u>.

SECTION 6.03. <u>Conditions to the Obligations of the Investor.</u> The obligations of the Investor to effect the Transactions are further subject to the satisfaction or (to the extent permitted by Law) waiver by the Investor on or prior to the Closing Date of the following conditions:

(a) (i) the representations and warranties of the Company set forth in <u>Section 3.01</u> (Organization; Standing), <u>Section 3.02</u> (Capitalization), <u>Section 3.03(a)</u> (Authority) and <u>Section 3.16</u> (Broker Fees and Expenses) shall be true and correct (without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect" set forth in such representations and warranties) in all material respects at and as of the Closing Date, with the same force and effect as if made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on such earlier date),

<div align="center">22</div>

EBERSOL 000107

provided that in no event will a discrepancy of less than 10,000 shares of Common Stock be considered to be material for purposes of Section 3.02, (ii) the representation and warranty of the Company set forth in Section 3.06 (Absence of Certain Changes) shall be true and correct at and as of the Closing Date, with the same force and effect as if made on the Closing Date and (iii) the other representations and warranties of the Company in this Agreement shall be true and correct (without giving effect to any limitation or qualification as to "materiality" or "Material Adverse Effect" set forth in such representations and warranties) at and as of the Closing Date, with the same force and effect as if made on the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties shall be true and correct on such earlier date), except, in the case of this clause (iii), for such failures to be true and correct that, individually or in the aggregate, have not had and would not reasonably be expected to have a Material Adverse Effect;

(b) the Company shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing; and

(c) the Investor shall have received a certificate, signed by a duly authorized officer of the Company, certifying as to the matters set forth in Sections 6.03(a) and 6.03(b).

SECTION 6.04. Frustration of Closing Conditions. The Company may not rely on the failure of any condition set forth in Section 6.01 or Section 6.02 to be satisfied if its failure to perform in all material respects any of its obligations under this Agreement, to act in good faith or to use, in accordance with the terms of this Agreement, its required efforts to cause the Closing to occur shall have been a principal cause of, or shall have resulted in, the failure of such condition. The Investor may not rely on the failure of any condition set forth in Section 6.01 or Section 6.03 to be satisfied if the failure of the Investor to perform in all material respects any of its obligations under this Agreement, to act in good faith or to use, in accordance with the terms of this Agreement, its required efforts to cause the Closing to occur shall have been a principal cause of, or shall have resulted in, the failure of such condition

## ARTICLE VII

### Termination; Survival; Limitation on Damages

SECTION 7.01. Termination. This Agreement may be terminated at any time prior to the Closing Date:

(a) by mutual written consent of the Company and the Investor;

(b) by either the Company or the Investor, if any Governmental Entity issues an order, decree or ruling or has taken any other action permanently enjoining, restraining or otherwise prohibiting any of the Transactions and such order, decree, ruling or other action shall have become final and nonappealable;

23

EBERSOL 000108

(c) by the Investor upon written notice to the Company, if any of the conditions set forth in Section 6.03(a) or 6.03(b) shall have become incapable of being satisfied and shall not have been waived by the Investor; and

(d) by the Company upon written notice to the Investor, if any of the conditions set forth in Section 6.02(a) or 6.02(b) shall have become incapable of being satisfied and shall not have been waived by the Company;

provided, however, that the right to terminate this Agreement pursuant to Section 7.01(b), (c), (d) and (e) shall not be available to any party whose material breach of any of its representations, warranties, covenants or agreements contained in this Agreement shall have been the principal cause of, or shall have resulted in, the failure of any such condition.

SECTION 7.02. Effects of Termination. In the event of the termination of this Agreement as provided for in Section 7.01, this Agreement shall forthwith become wholly void and of no further force and effect without any liability or obligation on the part of the Company or the Investor, except that the provisions of Section 5.08, this Section 7.02 and Article VIII (other than Section 8.04) shall survive any termination of this Agreement; provided that the termination of this Agreement shall not relieve any party from any liability for any intentional breach by a party of the terms and provisions of this Agreement.

SECTION 7.03. Survival. The representations and warranties of the parties set forth in this Agreement shall not survive the Closing Date.

SECTION 7.04. Limitation on Damages. Notwithstanding any other provision of this Agreement, except in the case of fraud, no party shall have any liability to the other in excess of the Purchase Price, and no party shall be liable for any consequential, incidental, indirect, special, exemplary, punitive or multiplier damages or any lost profits, in each case with respect to this Agreement.

## ARTICLE VIII

### Miscellaneous

SECTION 8.01. Notices. All notices, requests, permissions, waivers or other communications required or permitted to be given under this Agreement shall be in writing and shall be delivered by hand or sent by facsimile or email or sent, postage prepaid, by registered, certified or express mail or overnight courier service and shall be deemed given when so delivered by hand, by facsimile (which is confirmed), by email (which is confirmed) or if mailed, three days after mailing (one Business Day in the case of express mail or overnight courier service) to the parties at the following addresses or facsimiles or emails (or at such other address or facsimile or email for a party as shall be specified by like notice):

(a) If to the Company:

Carvana, LLC

1930 W. Rio Salado Pkwy
Tempe, AZ 85281

Attention:          Legal Department

Email:              dl-carvanalegal@carvana.com

24

https://www.sec.gov/Archives/edgar/data/1690820/000119312517359604/d491113dex101.htm

with a copy to (which copy alone shall not constitute notice):

Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654

| | |
|---|---|
| Attention: | Robert M. Hayward, P.C. |
| | Robert E. Goedert |
| | |
| Facsimile: | (312) 862-2200 |
| | |
| Email: | robert.hayward@kirkland.com |
| | robert.goedert@kirkland.com |

(b) If to the Investor:

Dundon Capital Partners
2100 Ross Avenue, Suite 3300
Dallas, Texas 75201

| | |
|---|---|
| Attention: | Legal Department |
| | |
| Email: | Legal@dundon.co |

SECTION 8.02. <u>Amendments, Waivers, etc.</u> This Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed by the party against whom such amendment or waiver shall be enforced. The failure of any party hereto to exercise any right, power or remedy provided under this Agreement or otherwise available in respect hereof at law or in equity, or to insist upon compliance by any other party hereto with its obligations hereunder, shall not constitute a waiver by such party of its right to exercise any such other right, power or remedy or to demand such compliance. <u>Counterparts and Facsimile.</u> This Agreement may be executed in two or more identical counterparts (including by facsimile or electronic transmission), each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument, and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, electronic transmission or otherwise) to the other parties.

25

EBERSOL 000110

SECTION 8.04. <u>Further Assurances.</u> Each party hereto shall execute and deliver after the Closing such further certificates, agreements and other documents and take such other actions as any other party hereto may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and to consummate or implement the Transactions.

SECTION 8.05. <u>Governing Law; Specific Enforcement; Submission to Jurisdiction; Waiver of Jury Trial.</u> (a) This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to agreements made and to be performed entirely within such state, without regard to the conflicts of law principles of such state.

(b) The parties hereto acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties hereto shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement in any court of competent jurisdiction, in each case without proof of damages or otherwise (and each party hereto hereby waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. The parties hereto agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy.

(c) Each of the parties hereto irrevocably and unconditionally submits to the exclusive jurisdiction of the Supreme Court of the State of New York, New York County, and the United States District Court for the Southern District of New York, for the purposes of any Action or other proceeding arising out of this Agreement and the rights and obligations arising hereunder, and irrevocably and unconditionally waives any objection to the laying of venue of any such Action or proceeding in any such court, and further irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such Action or proceeding has been brought in an inconvenient forum. Each party hereto agrees that service of any process, summons, notice or document by registered mail to such party's respective address set forth in <u>Section 8.01</u> shall be effective service of process for any such Action or proceeding.

(d) EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY ACTION, CLAIM OR OTHER PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (i) CERTIFIES THAT NO REPRESENTATIVE OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN

26

EBERSOL 000111

THE EVENT OF ANY ACTION, CLAIM OR OTHER PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER AND (ii) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.05(d)</u>.

SECTION 8.06. <u>Interpretation.</u> When a reference is made in this Agreement to an Article or Section, such reference shall be to an Article or Section of this Agreement unless otherwise indicated. The table of contents and headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation". The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. The words "date hereof" shall refer to the date of this Agreement. The word "or" shall not be exclusive. The word "extent" in the phrase "to the extent" shall mean the degree to which a subject or other thing extends, and shall not simply mean "if". The words "made available to the Investor" and words of similar import refer to documents (a) posted to the Data Room by or on behalf of the Company on or prior to the date hereof or (b) delivered in person or electronically to the Investor on or prior to the date hereof. All references to "$" mean the lawful currency of the United States of America. The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such term. Except as specifically stated herein, any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein. Except as otherwise specified herein, references to a Person are also to its permitted successors and assigns. Each of the parties hereto has participated in the drafting and negotiation of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement must be construed as if it is drafted by all the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authorship of any of the provisions of this Agreement.

SECTION 8.07. <u>Severability.</u> If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced because of any Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner materially adverse to any party hereto. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the greatest extent possible.

27

EBERSOL 000112

SECTION 8.08. <u>No Third-Party Beneficiaries.</u> This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing expressed or referred to in this Agreement will be construed to give any Person, other than the parties to this Agreement and such permitted assigns, any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement, whether as third party beneficiary or otherwise.

SECTION 8.09. <u>Assignment.</u> Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any of the parties hereto (whether by operation of Law or otherwise) without the prior written consent of the other parties.

SECTION 8.10. <u>Acknowledgment of Securities Laws.</u> The Investor hereby acknowledges that it is aware, and that it will advise its Affiliates and Representatives who are provided material non-public information concerning the Company or its securities, that the United States securities Laws prohibit any Person who has received from an issuer material, non-public information from purchasing or selling securities of such issuer or from communication of such information to any other Person under circumstances in which it is reasonably foreseeable that such Person is likely to purchase or sell such securities.

*[Remainder of page intentionally left blank]*

28

EBERSOL 000113

IN WITNESS WHEREOF, the parties hereto have executed this Investment Agreement as of the day and year first above written.

                                        CARVANA CO.,

                                        By /s/ Paul Breaux
                                        _____
                                            Name: Paul Breaux
                                            Title:   Vice President, General Counsel and
                                                     Secretary

                                        DDFS PARTNERSHIP LP,

                                        By /s/ John Zutter
                                        _____
                                            Name: John Zutter
                                            Title:   Partner, VP & Secretary

EBERSOL 000114

EXHIBIT A

FORM OF CERTIFICATE OF DESIGNATIONS

EBERSOL 000115

## CERTIFICATE OF DESIGNATIONS, PREFERENCES, POWERS
## AND RIGHTS
### OF
## CLASS A CONVERTIBLE PREFERRED STOCK
### OF
## CARVANA CO.

Pursuant to Section 151(g) of the General Corporation Law of the State of Delaware (the "**DGCL**"), CARVANA CO., a Delaware corporation (the "**Corporation**"), certifies that, pursuant to the authority conferred upon its Board by the Certificate of Incorporation, as amended, of the Corporation, the Board on [•] adopted the following resolution creating a series of Preferred Stock:

RESOLVED, that pursuant to the authority expressly granted to and vested in the Board of the Corporation by the provisions of ARTICLE FOUR of the Certificate of Incorporation of the Corporation, and in accordance with the provisions of Section 151 of the DGCL, the Board hereby creates and provides for the issue of a series of Preferred Stock, with an initial stated value of $1,000.00 per share, of the Corporation to be known and designated as Class A Convertible Preferred Stock, and that the designation and number of shares, and the relative rights, powers, preferences, and limitations thereof (in addition to the provisions set forth in the Certificate of Incorporation of the Corporation, as amended, that are applicable to Preferred Stock generally) shall be as follows:

A. Certain Definitions. When used in this Certificate of Designations, the following terms shall have the meanings specified:

"**10 Day VWAP**" means the average of the VWAP per share of Common Stock for each of ten consecutive full Trading Days.

"**14C Expiration Date**" means the date immediately following the expiration of the 20 calendar day period commencing on the stated date of distribution to the Corporation's stockholders in accordance with Rule 14c-2 of Regulation 14C promulgated under the Exchange Act of a definitive Information Statement on Schedule 14C filed by the Corporation with the SEC relating to the issuance of the Convertible Preferred Stock.

"**Accumulated Dividends**" means, with respect to any share of Convertible Preferred Stock, as of any date, the aggregate accumulated and unpaid dividends on such share from the Issue Date until such date. There shall be no Accumulated Dividends with respect to any share of Convertible Preferred Stock prior to the Issue Date.

"**Board**" means the board of directors of the Corporation.

"**Business Day**" means a day, other than a Saturday or Sunday, on which banks in New York City are open for the general transaction of business.

"**Bylaws**" means the Corporation's Amended and Restated Bylaws, as may be amended from time to time.

EBERSOL 000116

"*Capital Stock*" means any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) Common Stock, Preferred Stock or other equity interests issued by the Corporation, any Subsidiary of the Corporation or any other Person, as applicable.

"*Certificate of Incorporation*" means the Corporation's Amended and Restated Certificate of Incorporation, as it may be amended from time to time.

"*Change of Control*" means the occurrence of one of the following:

(i) a "person" or "group" within the meaning of Section 13(d) of the Exchange Act obtains direct or indirect ultimate beneficial ownership of Voting Stock representing more than 50% of the voting power of the outstanding Voting Stock, other than any transaction in which the Persons that beneficially owned, directly or indirectly, Voting Stock immediately prior to such transaction beneficially own, directly or indirectly, shares representing a majority of the total voting power of all outstanding classes of shares of the continuing or surviving Person or the ultimate resulting parent entity immediately after the transaction; or

(ii) consummation of any consolidation, merger or share exchange of the Corporation or any sale, lease or other transfer of all or substantially all of the consolidated assets of the Corporation and its Subsidiaries, taken as a whole, to any Person other than one or more of the Corporation's Subsidiaries, in each case pursuant to which the Common Stock will be converted into, or receive a distribution of the proceeds in, cash, securities or other property, other than any such consolidation, merger, share exchange or similar extraordinary transaction in which the Persons that beneficially owned, directly or indirectly, Voting Stock immediately prior to such transaction beneficially own, directly or indirectly, shares representing a majority of the total voting power of all outstanding classes of shares of the continuing or surviving Person or the ultimate resulting parent entity immediately after the transaction.

"*Change of Control Effective Date*" has the meaning set forth in <u>Section I.1</u>.

"*Change of Control Exchange*" has the meaning set forth in <u>Section I.1</u>.

"*Class B Common Stock*" means the Corporation's Class B common stock, par value $0.001 per share.

"*Closing Price*" of the Common Stock on any date of determination means the closing sale price or, if no closing sale price is reported, the last reported sale price, of the shares of the Common Stock on the NYSE on such date. If the Common Stock is not traded on the NYSE on any date of determination, the Closing Price of the Common Stock on such date of determination means the closing sale price as reported in the composite transactions for the principal United States securities exchange or automated quotation system on which the Common Stock is so listed or quoted, or, if no closing sale price is reported, the last reported sale price on the principal United States securities exchange or automated quotation system on which the Common Stock is so listed or quoted, or if the Common Stock is not so listed or quoted on a

2

EBERSOL 000117

United States securities exchange or automated quotation system, the last quoted bid price for the Common Stock in the over-the-counter market as reported by OTC Market Group, Inc. or any similar organization, or, if that bid price is not available, the market price of the Common Stock on that date as determined by a nationally recognized investment banking firm (unaffiliated with the Corporation) retained by the Corporation for such purpose.

"***Common Stock***" means the Corporation's Class A Common Stock, par value $0.001 per share.

"***Conversion Date***" means the date on which a Holder complies with the procedures in <u>Section H.1</u>, with regard to shares of Convertible Preferred Stock subject to such conversion.

"***Conversion Price***" means, for each share of Convertible Preferred Stock, $19.6945, subject to adjustment as set forth herein.

"***Convertible Preferred Stock***" has the meaning set forth in <u>Section B</u>.

"***Constituent Person***" has the meaning set forth in <u>Section K.1</u>.

"***Current Market Price***" means, for each share of Common Stock as of any applicable Record Date for any issuance, distribution, dividend or other action, the arithmetic average of the VWAP per share of Common Stock for each of the five consecutive full Trading Days ending on the Trading Day immediately preceding the Record Date with respect to such issuance, distribution, dividend or other action, as the case may be, appropriately adjusted to take into account the occurrence during such period of any event described in <u>Section J</u>.

"***Distributed Property***" has the meaning set forth in <u>Section J.3</u>.

"***Dividend Payment Date***" means March 15, June 15, September 15 and December 15 of each year, commencing on March 15, 2018.

"***Distribution Transaction***" means any transaction by which a Subsidiary of the Corporation ceases to be a Subsidiary of the Corporation by reason of the distribution of such Subsidiary's equity securities to holders of Common Stock, whether by means of a spin-off, split-off, redemption, reclassification, exchange, stock dividend, share distribution, rights offering or similar transaction.

"***Dividend Period***" means the period from, and including, each Dividend Payment Date to, but excluding, the next succeeding Dividend Payment Date, except for the initial "***Dividend Period***," which shall be the period from, and including, the Issue Date to, but excluding, March 15, 2018.

"***Dividend Rate***" means the rate per annum of 5.5% per share of Convertible Preferred Stock on the Liquidation Preference.

3

EBERSOL 000118

"**Dividend Record Date**" means, with respect to any Dividend Payment Date, the March 1, June 1, September 1 or December 1, as the case may be, immediately preceding such Dividend Payment Date.

"**Equivalent Securities**" means a number of shares of Common Stock calculated by dividing the amount of the Change of Control Price to be paid in Equivalent Securities by the 10 Day VWAP ending on the second Trading Day immediately preceding the Change of Control.

"**Exchange Act**" means the U.S. Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder.

"**Exchange Agreement**" means the Exchange Agreement, dated April 27, 2017, by and among the Corporation, Carvana Group LLC, Carvana Co. Sub LLC and the holders of the LLC Units party thereto.

"**Exchange Property**" has the meaning set forth in Section K.1.

"**Expiration Date**" has the meaning set forth in Section J.2.

"**Fair Market Value**" means:

(i) with respect to any asset constituting cash or cash equivalents, the amount of such cash or cash equivalents, and

(ii) with respect to any security or other property (other than cash or cash equivalents), the fair market value of such security or other property, as reasonably determined by a majority of the Board or an authorized committee thereof, in each case acting in good faith.

"**Holder**" or "**holder**" means a holder of record of the Convertible Preferred Stock.

"**Issue Date**" means [        ], 2017, the original date of issuance of the Convertible Preferred Stock.

"**Junior Securities**" has the meaning set forth in Section C.

"**Liquidation Preference**" means $1,000.00 per share of Convertible Preferred Stock.

"**Liquidation Preference Amount**" has the meaning set forth in Section G.1.

"**LLC Unit Exchange**" means any exchange of LLC Units and, if applicable, Class B Common Stock, for Common Stock or cash pursuant to the Exchange Agreement.

"**LLC Units**" means the Class A common units and Class B common units of Carvana Group LLC.

4

"**_Market Disruption Event_**" means any of the following events:

(i) any suspension of, or limitation imposed on, trading of the Common Stock by any exchange or quotation system on which the Closing Price is determined pursuant to the definition of the term "Closing Price" (the "**_Relevant Exchange_**") during the one-hour period prior to the close of trading for the regular trading session on the Relevant Exchange (or for purposes of determining the VWAP per share of Common Stock, any period or periods aggregating one half-hour or longer during the regular trading session on the relevant day) and whether by reason of movements in price exceeding limits permitted by the Relevant Exchange as to securities generally, or otherwise relating to the Common Stock or options contracts relating to the Common Stock on the Relevant Exchange; or

(ii) any event that disrupts or impairs (as determined by the Corporation in its reasonable discretion) the ability of market participants during the one-hour period prior to the close of trading for the regular trading session on the Relevant Exchange (or for purposes of determining the VWAP per share of Common Stock, any period or periods aggregating one half-hour or longer during the regular trading session on the relevant day) in general to effect transactions in, or to obtain market values for, the Common Stock on the Relevant Exchange or to effect transactions in, or to obtain market values for, options contracts relating to the Common Stock on the Relevant Exchange.

"**_Nonpayment_**" has the meaning set forth in Section E.3.

"**_Nonpayment Directors_**" has the meaning set forth in Section E.3.

"**_Nonpayment Remedy_**" has the meaning set forth in Section E.3.

"**_NYSE_**" means the New York Stock Exchange and its successors.

"**_Parity Securities_**" means any class or series, or any shares of any class or series, of Capital Stock of the Corporation (other than the Convertible Preferred Stock) that ranks equally with the Convertible Preferred Stock with respect to priority of dividend rights and rights on liquidation, winding up and dissolution of the Corporation (in each case, without regard to whether dividends accrue cumulatively or non-cumulatively).

"**_Person_**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, limited liability company, government or other entity.

"**_Preferred Stock_**" means the Corporation's class of authorized Preferred Stock, $0.01 par value per share.

"**_Record Date_**" means, with respect to any dividend, distribution or other transaction or event in which the holders of the Common Stock have the right to receive any cash, securities or other property or in which the Common Stock (or other applicable security) is

5

exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of the Common Stock entitled to receive such cash, securities or other property (whether such date is fixed by the Board or by statute, contract or otherwise).

"*Relevant Exchange*" has the meaning set forth in the definition of the term "Market Disruption Event".

"*Reorganization Event*" has the meaning set forth in Section K.1.

"*SEC*" means the Securities and Exchange Commission.

"*Subsidiary*" of the Corporation means:

(i) any corporation, association or other business entity of which more than 50% of the total voting power of shares of Capital Stock entitled (without regard to the occurrence of any contingency and after giving effect to any voting agreement or stockholders' agreement that effectively transfers voting power) to vote in the election of directors, managers or trustees of the corporation, association or other business entity is at the time owned or controlled, directly or indirectly, by the Corporation or one or more of the other Subsidiaries of the Corporation (or a combination thereof); and

(ii) any partnership (i) the sole general partner or the managing general partner of which is the Corporation or a Subsidiary of the Corporation or (ii) the only general partners of which are the Corporation or one or more Subsidiaries of the Corporation (or any combination thereof).

"*Trading Day*" means a Business Day on which the Relevant Exchange is scheduled to be open for business and on which there has not occurred a Market Disruption Event.

"*Trigger Event*" has the meaning set forth in Section J.4.

"*Voting Stock*" as of any date means the Capital Stock of the Corporation that is at the time entitled to vote in the election of the Board. For the avoidance of doubt, the Convertible Preferred Stock does not constitute Voting Stock.

"*VWAP*" per share of Common Stock on any Trading Day means the per share volume-weighted average price as displayed under the heading Bloomberg VWAP on Bloomberg (or, if Bloomberg ceases to publish such price, any successor service reasonably chosen by the Corporation) page "Carvana Co." (or its equivalent successor if such page is not available) in respect of the period from the scheduled open of trading on the relevant Trading Day until the scheduled close of trading on such Trading Day (or if such volume-weighted average price is unavailable, the market price of one share of Common Stock on such Trading Day determined, using a volume-weighted average method, by a nationally recognized investment banking firm (unaffiliated with the Corporation) retained by the Corporation for such purpose).

6

EBERSOL 000121

B. <u>Designation and Amount</u>. The shares of the series of Preferred Stock designated hereby shall be designated as "Class A Convertible Preferred Stock" (the "***Convertible Preferred Stock***"), and the number of shares constituting such series shall be one-hundred thousand (100,000). Such number of shares may be decreased by resolution of the Board as provided in the Certificate of Incorporation; <u>provided</u>, that no decrease shall reduce the number of shares of Convertible Preferred Stock to a number less than that of the shares then outstanding plus the number of shares reserved for issuance upon the exercise of outstanding options, rights or warrants or upon the conversion of any outstanding securities issued by the Corporation exercisable for or convertible into the Convertible Preferred Stock. Shares of the Convertible Preferred Stock shall be issued in certificated form in restricted accounts at the Corporation or its transfer agent and registered in the Holders' respective names.

C. <u>Ranking</u>. The Convertible Preferred Stock shall, with respect to dividend rights and rights on the liquidation, winding up and dissolution of the Corporation, rank senior to: (i) the Common Stock, (ii) all other classes and series, and all shares of all other classes and series, of Capital Stock of the Corporation now authorized, issued or outstanding and (iii) all other classes and series, and all shares of all other classes and series, of Capital Stock of the Corporation hereafter authorized, issued or outstanding that do not not expressly rank pari passu or senior to the Convertible Preferred Stock (collectively, the "***Junior Securities***").

D. <u>Dividends.</u>

1. Holders shall be entitled to receive, when, as and if declared by the Board out of funds of the Corporation legally available for payment, cumulative dividends in cash at the Dividend Rate. To the extent that the Corporation is legally permitted to pay dividends, the Corporation's Board shall declare and the Corporation shall pay dividends in cash on each Dividend Payment Date.

Dividends on the Convertible Preferred Stock shall be payable quarterly in arrears at the Dividend Rate, and shall accumulate, whether or not earned or declared, from the most recent date to which dividends have been paid, or, if no dividends have been paid, from the Issue Date (whether or not in any Dividend Period or Periods any agreements of the Corporation prohibit the current payment of dividends, there shall be funds of the Corporation legally available for the payment of such dividends or the Corporation declares the payment of dividends), and shall be paid in cash. Dividends shall be payable in arrears on each Dividend Payment Date (commencing on March 15, 2018) to the Holders as they appear on the Corporation's stock register at the close of business on the relevant Dividend Record Date. Accumulations of dividends on shares of Convertible Preferred Stock for any past Dividend Periods may be declared and paid at any time to Holders not more than 30 nor less than 10 calendar days immediately preceding any Dividend Payment Date and shall not bear interest.

The Corporation shall provide not less than 10 Trading Days' notice prior to any such Dividend Payment Date. Dividends payable for any period less than a full quarterly Dividend Period (based upon the number of days elapsed during the period) shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

<div align="center">7</div>

EBERSOL 000122

2. No dividend shall be declared or paid upon, or any sum set apart for the payment of dividends upon, any outstanding share of the Convertible Preferred Stock with respect to any Dividend Period unless all dividends for all preceding Dividend Periods have been declared and paid, or declared and a sufficient sum has been set apart for the payment of such dividend, upon all outstanding shares of Convertible Preferred Stock.

3. No dividends or other distributions (other than a dividend or distribution payable solely in shares of Junior Securities and cash in lieu of fractional shares) may be declared, made or paid, or set apart for payment upon, any Parity Securities or Junior Securities, nor may any Parity Securities or Junior Securities be redeemed, purchased or otherwise acquired for any consideration (or any money paid to or made available for a sinking fund for the redemption of any Parity Securities or Junior Securities) by the Corporation or on behalf of the Corporation at any time when Accumulated Dividends are outstanding except by:

(i) conversion into or exchange for shares of Junior Securities and cash solely in lieu of fractional shares of Parity Securities or Junior Securities (in the case of Parity Securities) or Junior Securities (in the case of Junior Securities);

(ii) payments in connection with the satisfaction of employees' tax withholding obligations pursuant to employee benefit plans or outstanding awards (and payment of any corresponding requisite amounts to the appropriate governmental authority), unless all Accumulated Dividends shall have been or contemporaneously are declared and paid, or are declared and a sum sufficient for the payment thereof is set apart for such payment, on the Convertible Preferred Stock and any Parity Securities for all dividend payment periods ending on or prior to the date of such declaration, payment, redemption, purchase or acquisition; and

(iii) cancellation of Class B Common Stock and issuance of new Common Stock or payment of cash in connection with any LLC Unit Exchange.

Notwithstanding the foregoing, if Accumulated Dividends are outstanding on the Convertible Preferred Stock, dividends may be declared and paid on the Convertible Preferred Stock and any Parity Securities so long as the dividends are declared and paid pro rata so that the amounts of dividends declared per share on the Convertible Preferred Stock and such Parity Securities shall in all cases bear to each other the same ratio that Accumulated Dividends per share on the shares of Convertible Preferred Stock and accumulated and unpaid dividends on such Parity Securities bear to each other at the time of declaration.

4. Holders shall not be entitled to any dividend in excess of full cumulative dividends, and shall not participate in dividends on the Common Stock.

5. If any Dividend Payment Date falls on a day that is not a Business Day, the required payment will be on the next succeeding Business Day and no interest or dividends on such payment will accrue or accumulate as the case may be, in respect of the delay.

8

EBERSOL 000123

6. Holders at the close of business on a Dividend Record Date shall be entitled to receive the dividend payment on those shares on the corresponding Dividend Payment Date notwithstanding the conversion of such shares in accordance with <u>Section H.1</u> or <u>Section L.1</u> following such Dividend Record Date or the Corporation's default in payment of the dividend due on such Dividend Payment Date. Except as provided in <u>Sections H, J and K</u>, the Corporation shall make no payment or allowance for unpaid dividends, whether or not in arrears, on converted shares of Convertible Preferred Stock or for dividends on the shares of Common Stock issued upon conversion.

E. <u>No Voting Rights</u>.

1. The Convertible Preferred Stock shall have no voting rights and no right to vote as a separate class, except as required by, and cannot be waived under, the DGCL, and except that the terms and provisions of this Certificate of Designation may not be altered, amended or repealed in whole or in part, by merger or otherwise, so as to adversely affect the powers, preferences or special rights of the shares of Convertible Preferred Stock without the affirmative vote of the Holders of a majority of the outstanding shares of Convertible Preferred Stock, voting together as a separate class on an as-converted basis for the shares of Convertible Preferred Stock held by such Holder. For purposes of clarification, the Convertible Preferred Stock will not have a right to vote on any merger or consolidation in which the Holders are entitled to receive the amount and kind of consideration such Holders would have been entitled to receive if the Convertible Preferred Stock had been converted to Common Stock immediately prior to the merger or consolidation becoming effective, including the right to make an election of consideration to the same extent as the holders of Common Stock are afforded such right. The Convertible Preferred Stock does not constitute Voting Stock.

2. So long as any shares of Convertible Preferred Stock shall be outstanding, and unless the consent or approval of a greater number of shares shall then be required by law, without first obtaining the consent, waiver or approval of the Holders of at least a majority of the shares of the Convertible Preferred Stock then outstanding, the Corporation shall not, either directly or indirectly by amendment, merger, consolidation or otherwise and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect: (i) amend, alter, change or repeal the Certificate of Incorporation, or waive any provisions thereof, in a manner that would reasonably be expected to adversely affect the rights, preferences or powers of the Holders, (ii) amend, alter, change or repeal the rights, preferences or powers of Convertible Preferred Stock or (iii) authorize, create, increase the authorized amount of, reclassify into, Parity Securities, or any class or series, or any shares of any class or series, of Capital Stock of the Corporation ranking senior in priority to the Convertible Preferred Stock with respect to the right to dividends or preference on liquidation (including additional shares of Preferred Stock); <u>provided, however</u>, that for all purposes of this <u>Section E.2</u>, any increase in the amount of the Corporation's authorized Convertible Preferred Stock or the creation or issuance of any shares of Junior Securities,

9

EBERSOL 000124

or any increase in the amount of authorized shares of Junior Securities, shall not be deemed to materially and adversely affect the rights, preferences, privileges or voting powers of Holders as specified herein. Without the consent of the Holders, the Corporation may amend, alter, supplement or repeal any terms of the Convertible Preferred Stock by amending or supplementing the Certificate of Incorporation, this Certificate of Designations or any stock certificate representing shares of the Convertible Preferred Stock: (i) to cure any ambiguity, omission, inconsistency or mistake in any such agreement or instrument; or (ii) to make any other change that does not affect the rights, preferences, privileges or voting powers of any Holder (other than any Holder that consents to such change).

3. Whenever dividends on any shares of Convertible Preferred Stock have not been declared and paid for the equivalent of six or more Dividend Periods (including, for the avoidance of doubt, the Dividend Period beginning on, and including, the Issue Date and ending on, but excluding, March 15, 2018), whether or not for consecutive Dividend Periods (a "***Nonpayment***"), the Holders shall be entitled at the Corporation's next special or annual meeting of stockholders to vote for, as a separate class, the election of a total of two additional members of the Board (any directors elected pursuant to this <u>Section E.3</u>, the "***Nonpayment Directors***").

(i) Holders representing a majority of the Convertible Preferred Stock shall have the right to designate for nomination by the Board nominees for election as Nonpayment Directors (the "***Nonpayment Director Nominees***"). Notwithstanding anything to the contrary, neither the Board nor any committee thereof shall be under any obligation to nominate and recommend a Nonpayment Director Nominee to the extent it determines (a "**Disqualification Determination**"), in good faith and after consideration of specific written advice of outside counsel (a copy of which will be provided to nominating Holders), that such recommendation would reasonably be expected to violate their duties under applicable law because (A) such nominee is unfit to serve as a director of a company listed or quoted on the primary stock exchange or quotation system on which the Corporation's Common Stock is listed or quoted or (B) service by such nominee as a Director would reasonably be expected to violate applicable law, the NYSE Listed Company Manual or, if the Corporation is not listed on the NYSE, any comparable rule or regulation of the primary stock exchange or quotation system on which the Common Stock is listed or quoted, in which case the Corporation shall provide the Holders with a reasonable opportunity to designate an alternate Nonpayment Director Nominee.

(ii) In the event of a Nonpayment, the number of directors then constituting the Board shall be increased by two, and the Nonpayment Directors Nominees shall be nominated for election at a special meeting of stockholders called by the Board at the request of the Holders of at least 20% of the then outstanding shares of Convertible Preferred Stock (provided that such request is received at least 90 calendar days before the date fixed for the next annual or special meeting of the stockholders, failing which such election shall be held at such next annual or special meeting of stockholders), and at each subsequent annual meeting, so long as the Holders continue to have the rights to elect a Nonpayment Director.

10

EBERSOL 000125

(iii) For purposes of this Section E.3, whether a plurality, majority or other portion of the Convertible Preferred Stock has been voted in favor of any matter shall be determined by reference to the Liquidation Preference Amounts of the Convertible Preferred Stock voted.

(iv) Any request to call a special meeting for the initial election of any Nonpayment Directors shall be made by written notice, signed by the requisite Holders, and delivered to the Corporation in the manner set forth in the Certificate of Incorporation or as may otherwise be required by law.

(v) If and when all accumulated and unpaid dividends on the Convertible Preferred Stock have been paid in full, or declared and a sum sufficient for such payment shall have been set aside (a "***Nonpayment Remedy***"), the Holders shall immediately and, without any further action by the Corporation, be divested of the voting rights described in this Section E.3, subject to the revesting of such rights in the event of each subsequent Nonpayment.

(vi) If such voting rights for the Holders shall have terminated, the term of office of each Nonpayment Director so elected shall terminate at such time immediately and without any further action from the Corporation and the number of directors on the Board shall automatically decrease by two.

(vii) Any Nonpayment Director may be removed at any time without cause by the Holders (voting together as a single class), in each case, when they have the rights to elect Nonpayment Directors described in this Section E.

(viii) In the event that a Nonpayment shall have occurred and there has not been a Nonpayment Remedy, a vacancy in the office of a Nonpayment Director (other than prior to the initial election of a Nonpayment Director) may be filled by the written consent of any Nonpayment Director remaining in office or, if none remains in office, by a vote of the Holders of a majority of the shares of the Convertible Preferred Stock then outstanding when they have the rights to elect a Nonpayment Director described in this Section E.3, subject in each case to the right of the Board to make a Disqualification Determination with respect to such replacement Nonpayment Director, in which case the applicable party shall select a different candidate acceptable to the Board. Any such vote of the Holders to remove, or to fill a vacancy in the office of, a Nonpayment Director may be taken only at a special meeting of stockholders of the Corporation, called as provided above for an initial election of a Nonpayment Director (provided that such request is received at least 90 calendar days before the date fixed for the next annual or special meeting of the stockholders of the Corporation, failing which election shall be held at such next annual or special meeting of stockholders of the Corporation).

11

EBERSOL 000126

(ix) The Nonpayment Directors shall each be entitled to one vote per director on any matter that shall come before the Board for a vote. Each Nonpayment Director elected at any special meeting of stockholders of the Corporation or by written consent of the other Nonpayment Director shall hold office until the next annual meeting of the stockholders of the Corporation if such office shall not have previously terminated and such Nonpayment Director shall not have been removed from such office, in each case as above provided.

F. Reacquired Shares. Any shares of Convertible Preferred Stock redeemed, purchased, or otherwise acquired by the Corporation in any manner whatsoever shall be retired promptly after the acquisition thereof, and, if necessary to provide for the lawful redemption or purchase of such shares, the capital represented by such shares shall be reduced in accordance with the DGCL. The Corporation shall take all such action as are necessary to cause all such shares (and compliance with any applicable provisions of the laws of the State of Delaware) to become authorized but unissued shares of Preferred Stock and may be redesignated and reissued as part of any other series of Preferred Stock, subject to the conditions or restrictions on authorizing, or creating, or issuing any class or series, or any shares of any class or series, set forth in Section E.2.

G. Liquidation, Dissolution, or Winding Up.

1. In the event of any liquidation, winding-up or dissolution of the Corporation, whether voluntary or involuntary, each Holder shall be entitled to receive and to be paid out of the assets of the Corporation available for distribution to its stockholders or the proceeds thereof the Liquidation Preference plus Accumulated Dividends on the date fixed for liquidation, winding-up or dissolution (collectively, the "***Liquidation Preference Amount***") in preference to the holders of, and before any payment or distribution is made on, any Junior Securities, including, without limitation, the Common Stock.

2. Neither the sale (for cash, shares of stock, securities or other consideration) of all or substantially all the assets or business of the Corporation (other than in connection with the liquidation, winding-up or dissolution of the Corporation) nor the merger or consolidation of the Corporation into or with any other Person shall be deemed to be a liquidation, winding-up or dissolution, voluntary or involuntary, for the purposes of this Section G.

3. After payment to the Holders of full preferential amounts provided for in this Section G, the Holders as such shall have no right or claim to any of the remaining assets of the Corporation.

4. In the event the assets of the Corporation available for distribution to the Holders and holders of shares of Parity Securities upon any liquidation, winding-up or dissolution of the Corporation, whether voluntary or involuntary, shall be insufficient to pay in full all amounts to which such Holders are entitled pursuant to this Section G, no such distribution shall be made on account of any shares of Parity Securities upon such liquidation, dissolution or winding-up unless proportionate distributable amounts shall be

12

EBERSOL 000127

paid on account of the shares of Convertible Preferred Stock, equally and ratably, in proportion to the full distributable amounts for which Holders of all Convertible Preferred Stock and of any Parity Securities are entitled upon such liquidation, winding-up or dissolution.

H. <u>Conversion</u>.

1. Subject to the provisions of <u>Section H.2</u>, beginning on the 14C Expiration Date, each Holder shall have the right, at any time and from time to time, at such Holder's option, to convert any or all of such Holder's shares of Convertible Preferred Stock, in whole or in part, into fully paid and non-assessable shares of Common Stock at the Conversion Price. Each share of Convertible Preferred Stock shall be convertible into: (i) the number of shares of Common Stock (calculated as to each conversion to the nearest 1/10,000th of a share) determined by dividing (A) $1,000.00 by (B) the Conversion Price in effect at the close of business on the applicable Conversion Date, plus (ii) cash in lieu of fractional shares in accordance with <u>Section J.12</u>.

(i) The Corporation shall at all times reserve and keep available out of its authorized and unissued Common Stock, solely for issuance upon the conversion of the Convertible Preferred Stock, such number of shares of Common Stock as shall from time to time be issuable upon the conversion of all the shares of Convertible Preferred Stock then outstanding. Any shares of Common Stock issued upon conversion of Convertible Preferred Stock: (i) shall be duly authorized, validly issued and fully paid and non-assessable, (ii) shall rank pari passu with the other shares of Common Stock outstanding from time to time and (iii) shall be approved for listing on the NYSE if shares of Common Stock generally are so listed (or the other principal United States securities exchange or automated quotation system on which the Common Stock is listed, quoted or admitted to trading, if any).

2. A Holder must do each of the following in order to convert shares of Convertible Preferred Stock pursuant to this <u>Section H.2</u>:

(i) complete and manually sign the conversion notice provided by the Corporation (the form of which is attached hereto as Exhibit A), and deliver such notice to the Corporation;

(ii) deliver to the Corporation the certificate or certificates representing the shares of Convertible Preferred Stock to be converted;

(iii) if required, furnish appropriate endorsements and transfer documents; and

(iv) if required, pay any stock transfer, documentary, stamp or similar taxes.

3. Effective immediately prior to the close of business on the Conversion Date applicable to any shares of Convertible Preferred Stock, such shares of Convertible

13

EBERSOL 000128

Preferred Stock shall cease to be outstanding, and any Accumulated Dividends on such Convertible Preferred Stock shall be cancelled, other than Accumulated Dividends, if any, that have been declared but not yet paid, which shall be paid out in accordance with Section D.6. For the avoidance of doubt, any cancellation of Accumulated Dividends pursuant to this Section H.3 shall not affect the right of a converting Holder to receive shares of Common Stock pursuant to Section H.5.

4. The Person or Persons entitled to receive the Common Stock and, to the extent applicable, cash, securities or other property issuable upon conversion of Convertible Preferred Stock on a Conversion Date shall be treated for all purposes as the record holder(s) of such shares of Common Stock and/or cash, securities or other property as of the close of business on such Conversion Date. As promptly as practicable on or after the Conversion Date and compliance by the applicable Holder with the relevant conversion procedures contained in Section H.2 (and in any event no later than three Trading Days thereafter), the Corporation shall issue the number of whole shares of Common Stock issuable upon conversion (and deliver payment of cash in lieu of fractional shares as set out in Section J.12) and, to the extent applicable, any cash, securities or other property issuable thereon. Such delivery of shares of Common Stock, securities or other property shall be made by book-entry. In the event that a Holder shall not by written notice designate the name in which shares of Common Stock (and payments of cash in lieu of fractional shares) and, to the extent applicable, cash, securities or other property to be delivered upon conversion of shares of Convertible Preferred Stock should be registered or paid, or the manner in which such shares, cash, securities or other property should be delivered, the Corporation shall be entitled to register and deliver such shares, securities or other property, and make such payment, in the name of the Holder and in the manner shown on the records of the Corporation.

5. No adjustment to shares of Convertible Preferred Stock being converted on a Conversion Date or to the shares of Common Stock deliverable to the Holders upon the conversion thereof shall be made in respect of dividends payable to holders of the Common Stock as of any date prior to the close of business on such Conversion Date. On any Conversion Date, the Corporation shall (i) at the Corporation's sole election, declare all or a portion of any Accumulated Dividends on the Convertible Preferred Stock in cash, out of funds of the Corporation legally available for payment of such Accumulated Dividends, in accordance with Section D and (ii) issue to the Holders converting such Preferred Stock the number of shares of Common Stock (rounded down to the nearest whole share) determined by dividing (A) the Accumulated Dividends (other than Accumulated Dividends, if any, that have been declared by the Board but not yet paid, including pursuant to prong (i) above) on such Convertible Preferred Stock being converted by (B) the 10 Day VWAP ending on the second Trading Day immediately preceding the Conversion Date.

6. Shares of Convertible Preferred Stock converted in accordance with this Certificate of Designations, or otherwise acquired by the Corporation in any manner whatsoever, shall be retired promptly after the conversion or acquisition thereof. All such shares shall upon their retirement become authorized but unissued shares of Preferred Stock, without designation as to series until such shares are once more designated as part of a particular series by the Board pursuant to the provisions of the Certificate of Incorporation.

14

EBERSOL 000129

I. Change of Control Exchange.

1. Upon the occurrence of a Change of Control, each Holder as of the Change of Control Effective Date shall have the option, during the period beginning on the effective date of the Change of Control (the "***Change of Control Effective Date***") and ending on the date that is 20 Business Days after the Change of Control Effective Date, to require the Corporation (or its successor) to purchase, out of funds legally available therefor, any or all of its shares of Convertible Preferred Stock at a purchase price per share, payable at the Corporation's option in cash or, beginning on the 14C Expiration Date, Equivalent Securities or a combination thereof, in each case in an aggregate amount (such amount, the "***Change of Control Price***") equal to 1.01 multiplied by the Liquidation Preference, plus Accumulated Dividends (a "***Change of Control Exchange***").

2. On or before the 20th Business Day prior to the date on which the Corporation anticipates consummating a Change of Control (or, if later, promptly after the Corporation discovers that a Change of Control will occur or has occurred), a written notice shall be sent by or on behalf of the Corporation, by overnight courier to the Holders as they appear in the records of the Corporation. Such notice shall contain:

(i) the date on which the Change of Control is anticipated to be effected (or, if applicable, the date on which a Change of Control has occurred); and

(ii) the date, which shall be 20 Business Days after the Change of Control Effective Date, by which the Holder must elect to effect a Change of Control Exchange.

3. On the Change of Control Effective Date (or if the Corporation discovers that a Change of Control has occurred, promptly following the date of such discovery), a final written notice shall be sent by or on behalf of the Corporation, by overnight courier to the Holders as they appear in the records of the Corporation. Such notice shall contain:

(i) the date, which shall be 20 Business Days after the Change of Control Effective Date, by which the Holder must elect to effect a Change of Control Exchange;

(ii) the combination of cash and Equivalent Securities the Corporation intends to settle any Change of Control Exchange with;

15

EBERSOL 000130

(iii) the purchase or exchange date for such shares, which shall be no less than 10 and no greater than 20 Business Days from the date by which the Holder must elect to effect a Change of Control Exchange; and

(iv) the instructions a Holder must follow to effect a Change of Control Exchange in connection with such Change of Control.

4. To exercise a Change of Control Exchange, a Holder must, no later than 5:00 p.m., New York City time, on the date by which such election must be made, surrender to the Corporation the certificates representing the shares of Convertible Preferred Stock to be sold or exchanged and indicate in writing that it is electing to effect a Change of Control Exchange pursuant to Section I(i) or Section I(ii), as applicable.

5. Upon a Change of Control Exchange, the Corporation shall deliver or cause to be delivered to the Holder the amount of cash and Equivalent Securities to to be delivered to such Holder in exchange for its shares of Convertible Preferred Stock.

6. If a Holder does not elect to effect a Change of Control Exchange pursuant to this Section I with respect to all of its shares of Convertible Preferred Stock, the shares of Convertible Preferred Stock held by it and not surrendered for exchange will remain outstanding until otherwise subsequently converted, redeemed, reclassified or canceled.

7. In the event that a Change of Control Exchange is effected with respect to shares of Convertible Preferred Stock representing less than all the shares of Convertible Preferred Stock held by a Holder, upon such Change of Control Exchange, the Corporation shall execute and deliver to such Holder, at the expense of the Corporation, a certificate evidencing the shares of Convertible Preferred Stock held by the Holder as to which a Change of Control Exchange was not effected.

8. No fractional shares of Common Stock will be delivered to the Holders upon any Change of Control Exchange that the Corporation has elected to settle, in whole or in part, with Equivalent Securities. In lieu of fractional shares otherwise issuable, the Holders will be entitled to receive, at the Corporation's sole discretion, either: (i) an amount in cash equal to the fraction of a share of Common Stock multiplied by the 10 Day VWAP ending on the second Trading Day immediately preceding the Change of Control or (ii) one additional whole share of Common Stock.

J. Anti-Dilution Adjustments. The Conversion Price will be subject to adjustment, without duplication, under the following circumstances, except that the Corporation shall not make any adjustment to the Conversion Price in respect of any dividend or distribution covered by this Section J to the extent a Holder participates in such dividend or distribution equally and ratably on an as-converted basis for the shares of Convertible Preferred Stock held by such Holder.

1. In the event of an issuance of Common Stock as a dividend or distribution to all or substantially all holders of Common Stock, or a subdivision or combination of Common Stock or a reclassification of Common Stock into a greater or lesser number of shares of Common Stock, the Conversion Price shall be adjusted based on the following formula:

16

EBERSOL 000131

$$CP1 = CP0 \times (OS0 / OS1)$$

CP0  =  the Conversion Price in effect immediately prior to the close of business on: (i) the Record Date for such dividend or distribution or (ii) the effective date of such subdivision, combination or reclassification

CP1  =  the new Conversion Price in effect immediately after the close of business on (i) the Record Date for such dividend or distribution or (ii) the effective date of such subdivision, combination or reclassification

OS0  =  the number of shares of Common Stock outstanding immediately prior to the close of business on: (i) the Record Date for such dividend or distribution or (ii) the effective date of such subdivision, combination or reclassification

OS1  =  the number of shares of Common Stock that would be outstanding immediately after, and solely as a result of, the completion of such event

Any adjustment made pursuant to this Section J.1 shall be effective immediately prior to the open of business on the Trading Day immediately following the Record Date, in the case of a dividend or distribution, or the effective date, in the case of a subdivision, combination or reclassification.

If any such event is declared but does not occur, the Conversion Price shall be readjusted, effective as of the date on which the Board announces that such event shall not occur, to the Conversion Price that would then be in effect if such event had not been declared.

2. In the event that the Corporation or one or more of its Subsidiaries purchases Common Stock pursuant to a tender offer or an exchange offer (other than an exchange offer that constitutes a Distribution Transaction subject to Section J.4 or an LLC Unit Exchange) by the Corporation or a Subsidiary of the Corporation for all or any portion of the Common Stock, if the cash and value of any other consideration included in the payment per share of Common Stock validly tendered or exchanged exceeds the Closing Price of the Common Stock on the Trading Day next succeeding the last day on which tenders or exchanges may be made pursuant to such tender or exchange offer (as it may be amended) (the "***Expiration Date***"), the Conversion Price in effect immediately prior to the close of business on the fifth full Trading Day immediately following, and including, the Conversion Price shall be adjusted based on the following formula:

$$CP1 = CP0 \times [(SP1 \times OS0) / (FMV + (SP1 \times OS1))]$$

CP0  =  the Conversion Price in effect immediately prior to the close of business on the fifth full Trading Day immediately following, and including, the Expiration Date

CP1  =  the new Conversion Price in effect immediately after the close of business on the fifth full Trading Day immediately following, and including, the Expiration Date

17

EBERSOL 000132

FMV = the Fair Market Value, on the Expiration Date, of all cash and any other consideration paid or payable for all shares validly tendered or exchanged and not withdrawn as of the Expiration Date

OS0 = the number of shares of Common Stock outstanding immediately prior to the last time tenders or exchanges may be made pursuant to such tender or exchange offer (including the shares to be purchased in such tender or exchange offer)

OS1 = the number of shares of Common Stock outstanding immediately after the last time tenders or exchanges may be made pursuant to such tender or exchange offer (after giving effect to the purchase of shares in such tender or exchange offer)

SP1 = the arithmetic average of the VWAP for each of the five consecutive full Trading Days commencing with, and including, the Expiration Date

Such adjustment shall occur on the fifth full Trading Day immediately following, and including, the Expiration Date, and notwithstanding anything to the contrary in Section H, the Holders shall not be entitled to convert any shares of Convertible Preferred Stock prior to such fifth Trading Day.

3. In the event that the Corporation shall, by dividend or otherwise, distribute to all or substantially all holders of its Common Stock (subject to an exception for cash in lieu of fractional shares), cash, shares of any class of Capital Stock, evidences of its indebtedness, assets, other property or securities, but excluding: (i) dividends or distributions referred to in Section J.1 hereof, (ii) rights, options or warrants distributed in connection with a stockholder rights plan or (iii) Distribution Transactions as to which Section J.4 shall apply (any of such shares of Capital Stock, indebtedness, assets or property that are not so excluded are hereinafter called the "**Distributed Property**"), then, in each such case, the Conversion Price shall be adjusted based on the following formula:

$$CP1 = CP0 \text{ x } [(SP0 - FMV) / SP0]$$

CP0 = the Conversion Price in effect immediately prior to the close of business on the Record Date for such dividend or distribution

CP1 = the new Conversion Price in effect immediately after the close of business on the Record Date for such dividend or distribution

SP0 = the Current Market Price as of the Record Date for such dividend or distribution

FMV = the Fair Market Value of the portion of Distributed Property (or, with respect to dividends or distributions paid exclusively in cash, the amount in cash) distributed with respect to each outstanding share of Common Stock on the Record Date for such dividend or distribution

If any such event is declared but does not occur, the Conversion Price shall be readjusted, effective as of the date on which the Board announces that such event shall not occur, to the Conversion Price that would then be in effect if such event had not been declared.

18

EBERSOL 000133

4. In the event that the Corporation effects a Distribution Transaction, in which case the Conversion Price in effect immediately prior to the close of business on the fifth full Trading Day immediately following, and including, the effective date of the Distribution Transaction, the Conversion Price shall be adjusted based on the following formula:

$$CP1 = CP0 \times [MP0 / (FMV + MP0)]$$

CP0   =   the Conversion Price in effect immediately prior to the close of business on the fifth full Trading Day immediately following, and including, the effective date of the Distribution Transaction

CP1   =   the new Conversion Price in effect immediately after the close of business on the fifth full Trading Day immediately following, and including, the effective date of the Distribution Transaction

FMV   =   the arithmetic average of the volume-weighted average prices for a share of the capital stock or other interest distributed to holders of Common Stock on the principal United States securities exchange or automated quotation system on which such capital stock or other interest trades, as reported by Bloomberg, L.P. (or, if Bloomberg ceases to publish such price, any successor service reasonably chosen by the Corporation) in respect of the period from the open of trading on the relevant Trading Day until the close of trading on such Trading Day (or if such volume-weighted average price is unavailable, the market price of one share of such capital stock or other interest on such Trading Day determined, using a volume-weighted average method, by a nationally recognized investment banking firm (unaffiliated with the Corporation) retained by the Corporation for such purpose), for each of the five consecutive full Trading Days commencing with, and including, the effective date of the Distribution Transaction

MP0   =   the arithmetic average of the VWAP for each of the five consecutive full Trading Days commencing with, and including, the effective date of the Distribution Transaction

Such adjustment shall occur on the fifth full Trading Day immediately following, and including, the effective date of the Distribution Transaction, and notwithstanding anything to the contrary in <u>Section H</u>, the Holders shall not be entitled to convert any shares of Convertible Preferred Stock prior to such fifth Trading Day.

If the Corporation has a stockholder rights plan in effect with respect to the Common Stock on any Conversion Date, upon conversion of any shares of the Convertible Preferred Stock, Holders of such shares will receive, in addition to the applicable number of shares of Common Stock, the rights under such rights plan relating to such Common Stock, unless, prior to such Conversion Date, the rights have: (i) become exercisable or (ii) separated from the shares of Common Stock (the first of such events to occur, a "***Trigger Event***"), in which case, the Conversion Price will be adjusted, effective automatically at the time of such Trigger Event, as if the Corporation had made a distribution of such rights to all holders of Common Stock as described in <u>Section J.3</u>,

19

https://www.sec.gov/Archives/edgar/data/1690820/000119312517359604/d491113dex101.htm

subject to appropriate readjustment in the event of the expiration, termination or redemption of such rights prior to the exercise, deemed exercise or exchange thereof. Notwithstanding the foregoing, to the extent any such stockholder rights are exchanged by the Corporation for shares of Common Stock or other property or securities, the Conversion Price shall be appropriately readjusted as if such stockholder rights had not been issued, but the Corporation had instead issued such shares of Common Stock or other property or securities as a dividend or distribution of shares of Common Stock pursuant to Section J.1 or Section J.3, as applicable.

To the extent that such rights are not exercised prior to their expiration, termination or redemption, the Conversion Price shall be readjusted to the Conversion Price that would then be in effect had the adjustments made upon the occurrence of the Trigger Event been made on the basis of the issuance of, and the receipt of the exercise price with respect to, only the number of shares of Common Stock actually issued pursuant to such rights. Notwithstanding the foregoing, to the extent any such rights are exchanged by the Corporation for shares of Common Stock, the Conversion Price shall be appropriately readjusted as if such rights had not been issued, but the Corporation had instead issued the shares of Common Stock issued upon such exchange as a dividend or distribution of shares of Common Stock subject to Section J.1.

Notwithstanding anything to the contrary in the preceding two paragraphs of this Section J, no adjustment shall be required to be made to the Conversion Price with respect to any Holder which is, or is an "affiliate" or "associate" of, an "acquiring person" under such stockholder rights plan or with respect to any direct or indirect transferee of such Holder who receives Convertible Preferred Stock in such transfer after the time such Holder becomes, or its affiliate or associate becomes, such an "acquiring person".

5. All adjustments to the Conversion Price shall be calculated by the Corporation to the nearest 1/10th of a cent and all conversions based thereon shall be calculated by the Corporation to the nearest 1/10,000th of one share of Common Stock (or if there is not a nearest 1/10,000th of a share, to the next lower 1/10,000th of a share). No adjustment to the Conversion Price will be required unless such adjustment would require an increase or a decrease to the Conversion Price of at least $0.01; provided, however, that any such adjustment that is not required to be made will be carried forward and taken into account in any subsequent adjustment; provided, further, that any such adjustment of less than $0.01 that has not been made will be made upon any Conversion Date.

6. (i) Except as otherwise provided in this Section J, the Conversion Price will not be adjusted for the issuance of Common Stock or any securities convertible into or exchangeable for Common Stock or carrying the right to purchase any of the foregoing, or for the repurchase of Common Stock.

(ii) Except as otherwise provided in this Section J, the Conversion Price will not be adjusted as a result of the issuance of, the distribution of separate certificates representing, the exercise or redemption of, or the termination or invalidation of, rights pursuant to any stockholder rights plans.

20

EBERSOL 000135

(iii) No adjustment to the Conversion Price will be made:

(1) upon the issuance of any shares of Common Stock pursuant to any present or future plan providing for the reinvestment of dividends or interest payable on securities of the Corporation and the investment of additional optional amounts in Common Stock under any plan in which purchases are made at market prices on the date or dates of purchase, without discount, and whether or not the Corporation bears the ordinary costs of administration and operation of the plan, including brokerage commissions;

(2) upon the issuance of any shares of Common Stock or options or rights to purchase such shares pursuant to any present or future employee, director or consultant benefit plan or program of or assumed by the Corporation or any of its Subsidiaries or of any employee agreements or arrangements or programs;

(3) upon the issuance of any shares of Common Stock pursuant to any option, warrant, right or exercisable, exchangeable or convertible security;

(4) upon the issuance of any shares of Common Stock or payment of cash pursuant to an LLC Unit Exchange; or

(5) for a change in the par value of the Common Stock.

7. After an adjustment to the Conversion Price under this Section J, any subsequent event requiring an adjustment under this Section J shall cause an adjustment to each such Conversion Price as so adjusted.

8. For the avoidance of doubt, if an event occurs that would trigger an adjustment to the Conversion Price pursuant to this Section J under more than one subsection hereof, such event, to the extent fully taken into account in a single adjustment, shall not result in multiple adjustments hereunder; provided, however, that if more than one subsection of this Section J is applicable to a single event, the subsection shall be applied that produces the largest adjustment.

9. The Corporation may, but shall not be required to, make such reductions in the Conversion Price, in addition to those required by this Section J, as a majority of the Board considers to be advisable in order to avoid or diminish any income tax to any holders of shares of Common Stock resulting from any dividend or distribution of stock or issuance of rights or warrants to purchase or subscribe for stock or from any event treated as such for income tax purposes or for any other reason.

21

EBERSOL 000136

10. The Corporation may, but shall not be required to, from time to time, to the extent permitted by applicable law and in its sole discretion, reduce the Conversion Price by any amount for any period of at least 20 Business Days if a majority of the Board (taking into account, among other considerations, the impact of possible income or withholding taxes on the Holders) has determined that such reduction would be in the Corporation's best interests.

11. Whenever the Conversion Price is adjusted as provided under this Section J, the Corporation shall as soon as reasonably practicable following the occurrence of an event that requires such adjustment (or if the Corporation is not aware of such occurrence, as soon as reasonably practicable after becoming so aware) or the date the Corporation makes an adjustment pursuant to Section J.9 or Section J.10:

(i) compute the adjusted applicable Conversion Price in accordance with this Section J; and

(ii) provide a written notice to the Holders of the occurrence of such event and a statement in reasonable detail setting forth the method by which the adjustment to the applicable Conversion Price was determined and setting forth the adjusted applicable Conversion Price.

12. No fractional shares of Common Stock will be delivered to the Holders upon conversion. In lieu of fractional shares otherwise issuable, the Holders will be entitled to receive, at the Corporation's sole discretion, either: (i) an amount in cash equal to the fraction of a share of Common Stock multiplied by the Closing Price of the Common Stock on the Trading Day immediately preceding the applicable Conversion Date or (ii) one additional whole share of Common Stock. In order to determine whether the number of shares of Common Stock to be delivered to a Holder upon the conversion of such Holder's shares of Convertible Preferred Stock will include a fractional share, such determination shall be based on the aggregate number of shares of Convertible Preferred Stock of such Holder that are being converted on any single Conversion Date.

K. Adjustment for Reorganization Events.

1. In the event of:

(i) any reclassification, statutory exchange, merger, consolidation or other similar business combination of the Corporation with or into another Person, in each case pursuant to which the Common Stock (but not the Convertible Preferred Stock) is changed or converted into, or exchanged for, cash, securities or other property of the Corporation or another Person;

(ii) any sale, transfer, lease or conveyance to another Person of all or substantially all the property and assets of the Corporation, in each case pursuant to which the Common Stock (but not the Convertible Preferred Stock) is converted into cash, securities or other property; or

22

EBERSOL 000137

(iii) any statutory exchange of securities of the Corporation with another Person (other than in connection with a merger or acquisition) or reclassification, recapitalization or reorganization of the Common Stock (but not the Convertible Preferred Stock) into other securities (each of the foregoing clauses (i) through (iii) is referred to as a "***Reorganization Event***"),

each share of Convertible Preferred Stock outstanding immediately prior to such Reorganization Event will, without the consent of the Holders and subject to <u>Section K.4</u>, remain outstanding but shall become convertible into, out of funds legally available therefor, the number, kind and amount of securities, cash and other property (the "***Exchange Property***") (without any interest on such Exchange Property and without any right to dividends or distributions on such Exchange Property which have a record date that is prior to the applicable Conversion Date) that the Holder of such share of Convertible Preferred Stock would have received in such Reorganization Event had such Holder converted its shares of Convertible Preferred Stock into the applicable number of shares of Common Stock immediately prior to the effective date of the Reorganization Event using the Conversion Price applicable immediately prior to the effective date of the Reorganization Event and the Liquidation Preference Amount applicable at the time of such subsequent conversion; provided, that, the foregoing shall not apply if such Holder is a Person with which the Corporation consolidated or into which the Corporation merged or which merged into the Corporation or to which such sale or transfer was made, as the case may be (any such Person, a "Constituent Person"), or an Affiliate of a Constituent Person, to the extent such Reorganization Event provides for different treatment of Common Stock held by such Persons. If the kind or amount of securities, cash and other property receivable upon such Reorganization Event is not the same for each share of Common Stock held immediately prior to such Reorganization Event by a Person (other than a Constituent Person or an Affiliate thereof), then for the purpose of this <u>Section K.1</u>, the kind and amount of securities, cash and other property receivable upon conversion following such Reorganization Event will be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock.

2. The above provisions of this <u>Section K</u> shall similarly apply to successive Reorganization Events and the provisions of <u>Section J </u>shall apply to any shares of Capital Stock (or capital stock of any other Person) received by the holders of the Common Stock in any such Reorganization Event.

3. The Corporation (or any successor) shall, no less than 20 Business Days prior to the occurrence of any Reorganization Event, provide written notice to the Holders of such occurrence of such event and of the kind and amount of the cash, securities or other property that constitutes the Exchange Property. Failure to deliver such notice shall not affect the operation of this <u>Section K</u>.

4. The Corporation shall not enter into any agreement for a transaction constituting a Reorganization Event unless: (i) such agreement provides for, or does not interfere with or prevent (as applicable), conversion of the Convertible Preferred Stock into the Exchange Property in a manner that is consistent with and gives effect to this

23

EBERSOL 000138

Section K and (ii) to the extent that the Corporation is not the surviving corporation in such Reorganization Event or will be dissolved in connection with such Reorganization Event, proper provision shall be made in the agreements governing such Reorganization Event for the conversion of the Convertible Preferred Stock into stock of the Person surviving such Reorganization Event or such other continuing entity in such Reorganization Event.

L. Mandatory Conversion.

1. At any time on or after the later of (x) the one year anniversary of the Issue Date and (y) the 14C Expiration Date, the Corporation shall have the right, at its option, to give notice of its election to cause all outstanding shares of Convertible Preferred Stock to be automatically converted into: (i) the number of fully paid and non-assessable shares of Common Stock (calculated as to each conversion to the nearest 1/10,000th of a share) (such amount, the "**Conversion Shares**"), determined for each share of Convertible Preferred Stock by dividing (A) $1,000.00 by (B) the Conversion Price in effect at the close of business on the applicable Conversion Date, plus (ii) cash in lieu of fractional shares in accordance with Section J.12. The Corporation may exercise its right to cause a mandatory conversion pursuant to this Section L only if the 10 Day VWAP ending on the second Trading Day immediately preceding the Mandatory Conversion Notice Date equals or exceeds 150% of the Conversion Price.

2. To exercise the mandatory conversion right described in Section L.1, the Corporation must send notice of its intention to convert the Convertible Preferred Stock to all Holders by first class mail prior to the open of business on the first Trading Day following any date on which the condition described in Section L.1 is met (the "**Mandatory Conversion Notice Date**"). The conversion date will be a date selected by the Corporation (the "**Mandatory Conversion Date**") and will be no later than 10 calendar days after the date on which the Corporation sends notice as described in this Section L.2.

3. At its sole option, the Corporation may settle any whole number of Conversion Shares in cash in lieu of issuing shares of Common Stock. The amount of any such cash payment (the "**Cash Payment Amount**") for each share of Common Stock shall be the 10 Day VWAP ending on the second Trading Day immediately preceding the Mandatory Conversion Notice Date.

4. In addition to any information required by applicable law or regulation, the notice of a mandatory conversion described in Section L.2 shall state, as appropriate:

(i) the Mandatory Conversion Date;

(ii) the number of shares of Common Stock to be issued upon conversion of each share of Convertible Preferred Stock, the number of shares (if any) to be settled in cash in lieu of Common Stock, and the corresponding Cash Payment Amount per each share of Common Stock; and

24

EBERSOL 000139

(iii) that dividends on the Convertible Preferred Stock to be converted will cease to accrue on the Mandatory Conversion Date.

5. Effective immediately prior to the close of business on the Mandatory Conversion Date applicable to any shares of Convertible Preferred Stock, such shares of Convertible Preferred Stock shall cease to be outstanding.

6. On and after the Mandatory Conversion Date, dividends shall cease to accrue on the Convertible Preferred Stock called for a mandatory conversion pursuant to this Section L and all rights of Holders of such Convertible Preferred Stock shall terminate except for the right to receive the whole shares of Common Stock issuable upon conversion thereof with a cash payment in lieu of any fractional share of Common Stock in accordance with Section J.12.

7. No payment or adjustment shall be made upon conversion of Convertible Preferred Stock for Accumulated Dividends or dividends with respect to the Common Stock issued upon such conversion thereof.

8. The Corporation may not authorize, issue a press release or give notice of any mandatory conversion pursuant to this Section L unless, prior to giving the mandatory conversion notice, all Accumulated Dividends on the Convertible Preferred Stock (whether or not declared) for all Dividend Periods ended prior to the date of such mandatory conversion notice shall have been paid.

M. Notices. All notices or communications in respect of the Convertible Preferred Stock shall be sufficiently given if given in writing and delivered in person or by first-class mail, postage prepaid, to any Holder at such Holder's last address appearing on the books of the Corporation, or if given in such other manner, as may be permitted by the terms hereof, in the Certificate of Incorporation or Bylaws or by applicable law.

N. Procedures for Voting and Consents. The rules and procedures for calling and conducting any meeting of the Holders (including, without limitation, the fixing of a record date in connection therewith), the solicitation and use of proxies at such a meeting, the obtaining of written consents and any other aspect or matter with regard to such a meeting or such consents shall be governed by any rules that the Board (or a duly authorized committee of the Board), in its discretion, may adopt from time to time, which rules and procedures shall conform to the requirements of the Certificate of Incorporation, Bylaws or the DGCL.

O. Record Holders. To the fullest extent permitted by applicable law, the Corporation and the transfer agent, if any, for the Convertible Preferred Stock may deem and treat the record holder of any share of Convertible Preferred Stock as the true and lawful owner thereof for all purposes, and neither the Corporation nor such transfer agent shall be affected by any notice to the contrary.

P. Legends. All certificates or other instruments representing Convertible Preferred Stock or Common Stock issuable upon conversion thereof will bear a legend in substantially the following form (excluding the first sentence thereof in the case of any such Common Stock:

1. for which a registration statement covering such Common Stock has been declared effective by the SEC and that has been disposed of pursuant to such effective registration statement; or

25

https://www.sec.gov/Archives/edgar/data/1690820/000119312517359604/d491113dex101.htm

EBERSOL 000140

2. sold under circumstances in which all of the applicable conditions of Rule 144 (or any similar provisions then in force) under the Securities Act are met):

THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR ANY NON-U.S. OR STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH. THIS SECURITY IS ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AS SET FORTH IN THE INVESTMENT AGREEMENT DATED AS OF DECEMBER 4, 2017, COPIES OF WHICH MAY BE OBTAINED UPON REQUEST FROM CARVANA CO. OR ANY SUCCESSOR THERETO, AND THIS SECURITY MAY NOT BE VOTED OR OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH.

Q. <u>Effectiveness</u>. This Certificate of Designations shall be effective upon the filing of the same with the Secretary of State of Delaware.

<p style="text-align:center">*   *   *   *</p>

<p style="text-align:center">26</p>

EBERSOL 000141

IN WITNESS WHEREOF, CARVANA CO. has caused this Certificate of Designations, Preferences, Powers and Rights of Class A Convertible Preferred Stock to be duly executed by its duly authorized officer, this [•]th day of [•], 2017.

CARVANA CO.

By: _____
Name: _____
Title: _____

27

EBERSOL 000142

## Exhibit A

### FORM OF NOTICE OF CONVERSION

**(TO BE EXECUTED BY THE REGISTERED HOLDER IN ORDER TO CONVERT
SHARES OF SERIES A PREFERRED STOCK)**

The undersigned hereby elects to convert the number of shares of Series A Convertible Preferred Stock, par value $0.01 per share ("Convertible Preferred Stock"), of Carvana Co., a Delaware corporation (the "Corporation"), indicated below into shares of Class A common stock, par value $0.001 per share ("Common Stock"), of the Corporation according to the conditions hereof, as of the date written below. If shares of Common Stock are to be issued in the name of a Person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates and opinions as may be required by the Corporation. No fee will be charged to the Holders for any conversion, except as described in the Corporation's Certificate of Designations, Preferences, Powers and Rights classifying the Convertible Preferred Stock (the "Certificate of Designations").

**Conversion calculations:**

Date to Effect Conversion: _____

Number of shares of Convertible Preferred Stock owned prior to Conversion: _____

Number of shares of Convertible Preferred Stock to be Converted: _____

Number of shares of Series A Preferred Stock subsequent to Conversion: _____

Address for Delivery: _____

_____

OR

DWAC Instruction:

Broker No.: _____

Account No. _____

Capitalized terms used but not defined herein have the respective meaning assigned thereto in the Certificate of Designations.

[HOLDER]

By: _____

Name: _____

Title: _____

EBERSOL 000143

EXHIBIT B

FORM OF RESTRICTIVE LEGEND

"THIS SECURITY HAS NOT BEEN REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, OR ANY NON-U.S. OR STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH. THIS SECURITY IS ALSO SUBJECT TO ADDITIONAL RESTRICTIONS ON TRANSFER AS SET FORTH IN THE INVESTOR AGREEMENT DATED AS OF DECEMBER 4, 2017, COPIES OF WHICH MAY BE OBTAINED UPON REQUEST FROM CARVANA CO. OR ANY SUCCESSOR THERETO, AND THIS SECURITY MAY NOT BE VOTED OR OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN COMPLIANCE THEREWITH"

I-1

EBERSOL 000144

SC 13D/A 1 tv503381_sc13da.htm SC 13D/A

<div align="center">

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**WASHINGTON, DC 20549**

**SCHEDULE 13D**
**Under the Securities Exchange Act of 1934**

(Amendment No. 4)*

# Carvana Co.

(Name of Issuer)

</div>

<div align="center">

Class A Common Stock, par value $0.001 per share

(Title of Class of Securities)

</div>

<div align="center">

146869 102

(CUSIP number)

</div>

<div align="center">

John Zutter, 2100 Ross Avenue, Suite 2300, Dallas, Texas 75201; (972) 590-4616

(Name, address and telephone number of person authorized to receive notices and communications)

</div>

<div align="center">

September 20, 2018

(Date of event which requires filing of this statement)

</div>

If the filing person has previously filed a statement on Schedule 13G to report the acquisition that is the subject of this Schedule 13D, and is filing this schedule because of §§240.13d-1(e), 240.13d-1(f) or 240.13d-1(g), check the following box. ☐

---

**Note**: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See §240.13d-7 for other parties to whom copies are to be sent.

* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 ("Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

CUSIP No. **146869 102**

| 1. | NAMES OF REPORTING PERSONS <br><br> DDFS Partnership LP; EIN 26-0834527 | | |
|---|---|---|---|
| 2. | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) ☐ <br> (b) ☐ |
| 3. | SEC USE ONLY | | |
| 4. | SOURCE OF FUNDS* <br><br> WC | | |
| 5. | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) or 2(e) <br><br> ☐ | | |
| 6. | CITIZENSHIP OR PLACE OF ORGANIZATION <br><br> Delaware | | |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7. | SOLE VOTING POWER: <br><br> 0 |
|---|---|---|
| | 8. | SHARED VOTING POWER: <br><br> 2,410,927 |
| | 9. | SOLE DISPOSITIVE POWER: <br><br> 0 |
| | 10. | SHARED DISPOSITIVE POWER: <br><br> 2,410,927 |

| 11. | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON: <br><br> 2,410,927 |
|---|---|
| 12. | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES <br><br> ☐ |
| 13. | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11) <br><br> 6.1%* |
| 14. | TYPE OF REPORTING PERSON* <br><br> PN |

\* Calculations of the percentage of shares of Class A Common Stock beneficially owned assumes a total of 34,256,765 shares of Class A Common Stock outstanding, as set forth in the Issuer's Quarterly Report on Form 10-Q filed with the SEC on August 8, 2018, and account for the number of shares of Class A Common Stock issuable upon conversion of the Class A Convertible Preferred Stock held by the Reporting Person.

EBERSOL 000146

EBERSOL 000147

CUSIP No. __146869 102__

| 1. | NAMES OF REPORTING PERSONS<br><br>DDFS Management Company LLC |
|---|---|
| 2. | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP*<br>(a) ☐<br>(b) ☐ |
| 3. | SEC USE ONLY |
| 4. | SOURCE OF FUNDS*<br><br>WC |
| 5. | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) or 2(e)<br>☐ |
| 6. | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Delaware |

| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7. | SOLE VOTING POWER:<br><br>0 |
|---|---|---|
| | 8. | SHARED VOTING POWER:<br><br>2,410,927 |
| | 9. | SOLE DISPOSITIVE POWER:<br><br>0 |
| | 10. | SHARED DISPOSITIVE POWER:<br><br>2,410,927 |

| 11. | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON:<br><br>2,410,927 |
|---|---|
| 12. | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES<br>☐ |
| 13. | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.1%* |
| 14. | TYPE OF REPORTING PERSON*<br><br>OO |

\*    Calculations of the percentage of shares of Class A Common Stock beneficially owned assumes a total of 34,256,765 shares of Class A Common Stock outstanding, as set forth in the Issuer's Quarterly Report on Form 10-Q filed with the SEC on August 8, 2018, and account for the number of shares of Class A Common Stock issuable upon conversion of the Class A Convertible Preferred Stock held by the Reporting Persons.

EBERSOL 000148

EBERSOL 000149

CUSIP No.  **146869 102**

| 1. | NAMES OF REPORTING PERSONS<br><br>Thomas G. Dundon | | |
|---|---|---|---|
| 2. | CHECK THE APPROPRIATE BOX IF A MEMBER OF A GROUP* | | (a) ☐<br>(b) ☐ |
| 3. | SEC USE ONLY | | |
| 4. | SOURCE OF FUNDS*<br><br>WC | | |
| 5. | CHECK BOX IF DISCLOSURE OF LEGAL PROCEEDINGS IS REQUIRED PURSUANT TO ITEM 2(d) or 2(e)<br><br>☐ | | |
| 6. | CITIZENSHIP OR PLACE OF ORGANIZATION<br><br>Delaware | | |
| NUMBER OF SHARES BENEFICIALLY OWNED BY EACH REPORTING PERSON WITH | 7. | SOLE VOTING POWER:<br><br>0 | |
| | 8. | SHARED VOTING POWER:<br><br>2,410,927 | |
| | 9. | SOLE DISPOSITIVE POWER:<br><br>0 | |
| | 10. | SHARED DISPOSITIVE POWER:<br><br>2,410,927 | |
| 11. | AGGREGATE AMOUNT BENEFICIALLY OWNED BY EACH REPORTING PERSON:<br><br>2,410,927 | | |
| 12. | CHECK BOX IF THE AGGREGATE AMOUNT IN ROW (11) EXCLUDES CERTAIN SHARES<br><br>☐ | | |
| 13. | PERCENT OF CLASS REPRESENTED BY AMOUNT IN ROW (11)<br><br>6.1%* | | |
| 14. | TYPE OF REPORTING PERSON*<br><br>IN | | |

\*   Calculations of the percentage of shares of Class A Common Stock beneficially owned assumes a total of 34,256,765 shares of Class A Common Stock outstanding, as set forth in the Issuer's Quarterly Report on Form 10-Q filed with the SEC on August 8, 2018, and account for the number of shares of Class A Common Stock issuable upon conversion of the Class A Convertible Preferred Stock held by the Reporting Persons.

EBERSOL 000150

EBERSOL 000151

EXPLANATORY NOTE:

This Amendment No. 4 ("Amendment No. 4") to Schedule 13D is filed jointly by DDFS Partnership LP, DDFS Management Company LLC and Thomas G. Dundon (the "Reporting Persons"), with respect to shares of Class A Common Stock, $0.001 par value per share ("Common Stock"), of Carvana Co. (the "Company") issuable upon conversion of the Company's Class A Convertible Preferred Stock, par value $0.01 per share (the "Preferred Stock"). Pursuant to the Joint Filing Agreement dated December 18, 2017, the Reporting Persons filed the Schedule 13D with the United States Securities and Exchange Commission (the "SEC") on December 18, 2017 (as amended on September 14, 2018, September 17, 2018 and September 19, 2018, the "Original Schedule 13D"). Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Original Schedule 13D. Except as specifically provided herein, this Amendment No. 4 does not modify any of the information previously reported in the Original Schedule 13D.

Item 5. Interest in Securities of the Issuer.

Item 5 (a) - (b) of the Original Schedule 13D is hereby amended and restated in its entirety as follows:

Calculations of the percentage of shares of Common Stock beneficially owned assumes a total of 34,256,765 shares of Common Stock outstanding, as set forth in the Issuer's Quarterly Report on Form 10-Q filed with the SEC on August 8, 2018, and account for the number of shares of Common Stock issuable upon conversion of the Preferred Stock held by the Reporting Persons.

The aggregate number and percentage of shares of Common Stock beneficially owned by the Reporting Persons and, for each Reporting Person, the number of shares of Common Stock as to which there is sole power to vote or to direct the vote, shared power to vote or to direct the vote, sole power to dispose or to direct the disposition, or shared power to dispose or to direct the disposition are set forth on rows 7 through 11 and row 13 of the cover pages of this Schedule 13D and are incorporated herein by reference.

As of the date hereof, DDFS directly holds 35,000 shares of Preferred Stock that are convertible into 1,777,145 shares of Common Stock. As of the date hereof, DDFS directly holds 633,782 shares of Common Stock. DMC is the sole general partner of DDFS and holds a 1% general interest in DDFS and Dundon directly holds 100% of the membership interests in DMC.

After reasonable inquiry and to the best of my knowledge and belief, I certify that the information set forth in this statement is true, complete and correct.

Date: September 24, 2018

DDFS PARTNERSHIP LP

By: DDFS Management Company LLC
Its: General Partner

By: /s/ Thomas G. Dundon
      Thomas G. Dundon, President

DDFS MANAGEMENT COMPANY LLC

By: /s/ Thomas G. Dundon
      Thomas Dundon, President

/s/ Thomas G. Dundon
Thomas G. Dundon, individually

EBERSOL 000152

EBERSOL 000153

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| | § | |
| *Debtor.* | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **ADV. NO. 22-05077** |
| | § | |
| **CHARLES EBERSOL,** | § | **Judge: Craig A. Gargotta** |
| | § | |
| *Defendant.* | § | |

## UNSWORN DECLARATION OF CHARLES EBERSOL

1.      My name is Charles Ebersol. I am over eighteen (18) years of age, of sound mind, and fully capable of making this Unsworn Declaration in accordance with 28 U.S. Code § 1746. I have personal knowledge of the facts stated herein, and they are all true and correct.

2.      I was the Chief Executive Officer of Ebersol Sports Media Group ("ESMG"), from December 2017 to April 2019 and am authorized to testify on its behalf. Moreover, by virtue of my duties and responsibilities as the Chief Executive Officer of ESMG, I am familiar with the manner in which ESMG's records were created and maintained during the time period referenced herein.

3.      During my tenure as the Chief Executive Officer of ESMG, no shares of stock in ESMG were issued to Dundon Capital Partners LLC ("DCP"), Plaintiff in the above-styled lawsuit, nor did Thomas Dundon or any employee or representative of DCP ever present documents to me or any employee or representative of ESMG that would effect the issuance of any shares of stock in ESMG.

4.      Attached hereto as Exhibit K-1 are true and correct copies of thirteen (13) pages of bank statements for an operating account held by ESMG at Silicon Valley Bank.

5.      The documents attached hereto as Exhibit K-1 are true and correct copies of records kept by ESMG in the regular course of business, and it was in the regular course of business of ESMG for an employee or representative of ESMG with knowledge of the act, event, or condition,

---

**AFFIDAVIT OF CHARLES EBERSOL**                                                                 **PAGE 1**
16744636v1 / 12946.003

or opinion recorded, to make the record or to transmit information thereof to be included in such records; and the records were made at or near the time or reasonably soon thereafter. The records attached hereto are exact duplicates of the original documents ESMG maintained in its business records.

I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on the 13th day of December, 2024. _____

CHARLES EBERSOL

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS, LLC,** | § | **CASE NO. 19-50900-CAG** |
| | § | **CHAPTER 7** |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| Plaintiff, | § | |
| | § | **ADV. NO. 22-05077** |
| **v.** | § | |
| | § | **Judge: Craig A. Gargotta** |
| **CHARLES EBERSOL,** | § | |
| Defendant. | § | |

## ORDER GRANTING DEFENDANT CHARLES EBERSOL'S
## MOTION FOR SUMMARY JUDGMENT

On this day, came to be considered Defendant Charles Ebersol's Motion for Summary

Judgment (the "Motion"). Having considered the Motion, Plaintiff's response, Defendant's reply,

1

and arguments of counsel, if any, the Court finds that the Motion is meritorious and should be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Charles Ebersol's Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that all claims brought against Charles Ebersol by Plaintiff in this matter are hereby DISMISSED WITH PREJUDICE and that all costs shall be borne by the parties incurring the same.

Signed on this the ___ day of _____, 2024.

### END OF ORDER ###

**Prepared by:**
Michael J. Saltz
Admitted *pro hac vice*
J𝖠𝖢𝖮𝖡𝖲𝖮𝖭, R𝖚𝖘𝖘𝖊𝖑𝖑, S𝖆𝖑𝖙𝖟, N𝖆𝖘𝖘𝖎𝖒 & 𝖉𝖊 𝖑𝖆 T𝖔𝖗𝖗𝖊, LLP
1800 Century Park East, Suite 900
Los Angeles, California  90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909
msaltz@jrsnd.com

-        **and –**

Thomas M. Horan, II
State Bar No. 24063938
T𝖍𝖔𝖒𝖕𝖘𝖔𝖓, C𝖔𝖊, C𝖔𝖚𝖘𝖎𝖓𝖘 & I𝖗𝖔𝖓𝖘, LLP
700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas  75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209
thoran@thompsoncoe.com

**ATTORNEYS FOR DEFENDANT CHARLES EBERSOL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 22-05077-CAG-7** |
| | § | |
| **CHARLES EBERSOL,** | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF DUNDON CAPITAL PARTNERS, LLC'S
RESPONSE TO DEFENDANT CHARLES EBERSOL'S**

**K&L GATES LLP**

Brent D. Hockaday
Texas Bar No. 24071295
Brent.hockaday@klgates.com
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5677
(214) 939-5849 Fax

**BELL NUNNALLY & MARTIN LLP**

Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Beverly A. Whitley
Texas Bar No. 21374500
bwhitley@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
Sydnie A. Shimkus
Texas Bar No. 24093783
sshimkus@bellnunnally.com
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

**ATTORNEYS FOR
DUNDON CAPITAL PARTNERS LLC**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... 3

SUMMARY OF RESPONSE......................................................................................... 5

BACKGROUND ............................................................................................................ 8

ARGUMENT AND AUTHORITIES.......................................................................... 17

    A.    DCP has standing to prosecute its claims because DCP owns the claims. ...............18

    B.    DCP suffered a loss of $70 million...........................................................................23

    C.    Ebersol offered and sold securities by means of untrue statements..........................24

    D.    The summary judgment evidence supports each element of DCP's claims
            against Ebersol. .......................................................................................................26

            1.    Ebersol made knowingly false representations to DCP and failed to
                 disclose material facts. .....................................................................................27

            2.    Ebersol made the representations and omissions to induce DCP to enter
                 the Term Sheet and invest in ESMG..................................................................30

            3.    DCP relied on Ebersol's misrepresentations and omissions when it
                 entered the Term Sheet and invested in ESMG. ...............................................31

            4.    DCP was damaged by Ebersol's conduct. .........................................................31

CONCLUSION.............................................................................................................. 31

PRAYER FOR RELIEF ............................................................................................... 31

CERTIFICATE OF SERVICE ..................................................................................... 33

# TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE**

*Alt Platform, Inc. v. Beckett Collectibles, LLC*,
  No. 3:22-CV-02867-N, 2024 WL 4376156 (N.D. Tex. Oct. 1, 2024) ...................................18

*Anderson v. Durant*,
  550 S.W.3d 605 (Tex. 2018)..............................................................................................................26

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)..........................................................................................................................17

*Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*,
  993 F.2d 1178 (5th Cir. 1993) ......................................................................................................27

*Chase v. Hodge*,
  No. 1:20-CV-0175-RP, 2021 WL 1948470 (W.D. Tex. May 14, 2021) ..........................24, 25

*Matter of Davidson*,
  947 F.2d 1294 (5th Cir. 1991) ......................................................................................................22

*Fid. Nat. Title Ins. Co. v. Doubletree Partners, L.P.*,
  866 F. Supp. 2d 604 (E.D. Tex. 2011), *aff'd in part, rev'd in part and
  remanded sub nom. Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739
  F.3d 848 (5th Cir. 2014) ................................................................................................................27

*Indemnified Capital Invs., SA v. R. J. O'Brien & Assocs., Inc.*,
  12 F.3d 1406 (7th Cir. 1993)....................................................................................................18, 19

*Kakabadze v. M5 Int'l Co.*,
  No. H-12-3701, 2014 WL 2547767 (S.D. Tex. 2014) ............................................................22

*Kubbernus v. ECAL Partners, Ltd.*,
  574 S.W.3d 444 (Tex. App.—Houston [1st Dist.] 2018, pet. denied)....................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..........................................................................................................................17

*McCardell v. U.S. Dep't of Hous. & Urban Dev.*,
  794 F.3d 510 (5th Cir. 2015) ........................................................................................................18

*Okumus v. Mouton*,
  No. 14-18-00220-CV, 2020 WL 6278664 (Tex. App.—Houston [14th Dist.]
  Oct. 27, 2020, no pet.)....................................................................................................................25

*Reeves v. Sanderson Plumbing Prods., Inc.*,
  530 U.S. 133 (2000)..........................................................................................................................17

184

**CASES** (continued)                                                                 **PAGE**

*In re Skyport Glob. Comms., Inc.,*
    No. 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011), *aff'd sub*
    *nom. In re SkyPort Glob. Comms., Inc.,*
    528 B.R. 297 (S.D. Tex. 2015), *aff'd in part sub nom. In re Skyport Glob.*
    *Comms., Inc.,* 642 Fed. Appx. 301 (5th Cir. 2016), *aff'd sub nom. Matter of*
    *Skyport Glob. Comms., Inc.,*
    661 Fed. Appx. 835 (5th Cir. 2016) ...................................................................24

*Sprint Communications Co. v. APCC Servs., Inc.,*
    554 U.S. 269 (2008) ...........................................................................................19

*Stephanz v. Laird,*
    846 S.W.2d 895 (Tex. App.—Houston [1st Dist.] 1993, writ denied) ...................25

*Stanfield v. O'Boyle,* 462 S.W.2d 270 (Tex. 1971) ....................................................25

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ...........................................................................................18

*Tukua Investments, LLC v. Spenst,*
    413 S.W.3d 786 (Tex. App.—El Paso 2013, pet. denied) ....................................25

*U.S. Quest Ltd. v. Kimmons,*
    228 F.3d 399 (5th Cir. 2000) .............................................................................25

*Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.,*
    247 F.3d 574 (5th Cir. 2001) ........................................................................26, 27

*W.R. Huff Mgmt. Co. v. Deloitte & Touche LLP,*
    549 F.3d 100 (2nd Cir. 2008) ............................................................................19

**STATUTES AND RULES**

TEX. BUS. & COM. CODE § 27.01 ...............................................................................24

TEX. GOV. CODE § 4008.052 ......................................................................................27

FED. R. BANKR. P. 7056 ..............................................................................................17

FED. R. CIV. P. 56 .......................................................................................................17

**MISCELLANEOUS**

https://www.irs.gov/forms-pubs/about-form-1065 .......................................................12

## SUMMARY OF RESPONSE

No attempt to start a professional spring football league has ever succeeded. The AAF never had a chance to be the exception to that rule because of the poor decisions and gross mismanagement of the league by Charlie Ebersol and the board of Ebersol Sports Media Group, Inc. (ESMG") that ran the league prior to the investment by Dundon Capital Partners LLC ("DCP").

Ebersol and his board rushed to put football on the field following the 2019 Super Bowl to beat the premiere of the XFL slated for 2020. In May of 2018 (just 8 months before its intended launch), the league was still in a formative phase. It had little of its infrastructure put together, lacked a legitimate funding source, and had not cemented any relationships with the NFLPA or broadcast partners. Worse yet, Ebersol and his team did not try to build a start-up. Instead, the AAF was described by one of its board members as having an expense and salary structure that looked more like a 10-year mature company than a first-year startup.

To make matters worse, the AAF, which was almost entirely reliant on outside funding, bet its future on a $170 million funding commitment from Reggie Fowler to fund the league to viability. Ebersol and his board did virtually no diligence on Fowler but learned in December 2018 that Fowler had defaulted on tens of millions in debts and had been involved in litigation as a result. Fowler ultimately ended up in federal prison as a result of financial crimes.

Two months before Ebersol made the decision to go forward with launching the AAF's football season, Fowler had defaulted on his funding obligations, but Ebersol and his board plowed forward, incurring tens of millions in debts to critical vendors without cash in the bank or any legitimate source of outside funding. Ebersol considered shuttering the league in December 2018 or delaying its opening to 2020, but pride got in the way, and he pressed forward. Ebersol slashed

marketing efforts and ran up millions of dollars in bills with critical vendors that would be essential

to putting football on the field in February 2019.  The result of Ebersol plowing forward with a

league structured as a 10-year mature company, with no money in the bank and no legitimate

funding source, destroyed the league's projected revenues but did little to reduce the expenses

required to get football on the field.

In May 2018, the AAF's projected revenues were $176 million for 2018 and 2019. By

January of 2019, just weeks before launching the inaugural games, the projected revenue was

closer to $59 million. But the expenses had not been substantially reduced. Ebersol conceded that

the cratering projected revenues were the result of a lack of marketing, failure to sell sponsorship,

and a lack of ticket sales due to a general unawareness of the AAF in the marketplace.  Despite all

of this, Ebersol had 400+ players, referees and other football related staff show up to play games

in the first week of February. He made commitments to stadiums, broadcast partners, and countless

others to pay them for their services to put on football. Yet there was still not enough money in the

bank or a funding source in place to cover any of that. Ultimately, the AAF, with Ebersol at the

helm, had dug a more than $20 million hole before the first snap was taken in a football game.

The hole was simply too large to ever dig out of.  The AAF was dead, and Ebersol should have

followed through with his plan to shutter the league in December 2018, but ego won out.

In an effort to prolong the inevitable, Ebersol desperately reached out to investors to dump

more money in the league.  Ebersol knew that disclosing the true picture about the state of things

and the destructive path he had put the AAF on would scare off any investor.  So, instead, he

carefully crafted a story to get someone else to come in and continue dumping funds into a lost

cause.  DCP and Dundon entered the picture after the first week of games.  All Ebersol told them

was that the league needed $5.1 million to pay the players and related expenses for the first week

6

of games, $55 to $70 million total to finish the first season, and that the ratings were great. Ebersol hid that the league's projected revenues had fallen by $120 million as a result of his decisions to cut marketing and sponsorships, that there was no digital product in place that could generate revenue, that ticket sales were far below expectations, and that there was a general lack of awareness of the AAF. He hid that, in addition to the $5.1 million owed for player salaries and related expenses, there was another $18 million owed to critical vendors and a $5 million note that was immediately due. Ebersol withheld information about legal claims and contracts in place that would make it impossible for the league to deliver the 75% of the company it promised. And Ebersol knew he had no authority at the time he signed the term sheet with DCP from the board, the shareholders, the lenders, or the warrant holders of the AAF to do the deal he promised. He also knew that given the urgency of the situation, Dundon and DCP would have no time to dig in and do sufficient diligence to find out the truth.

The deal went forward. DCP poured $12 million into the AAF within four days of signing the term sheet. When DCP's team finally got a chance to start digging into the reality of the AAF, it was too late. DCP made a commitment and followed through with it. The AAF burned through the entire $70 million agreed to in the term sheet in just 46 days. By that point, considering the quickly waning interest in the AAF and the realistic revenue and expense projections, and not the fantasy Ebersol had envisioned, it became clear that more than $550 million was the reality of the outside funding needed to get the AAF to viability. More likely, there was no amount of money that would have gotten the AAF to viability given that every prior attempt at spring football had failed, the 2020 Covid outbreak, and the XFL entering the scene. Shutting it down in April 2019, when the AAF again ran out of funding, was precisely what needed to be done and what should

have been done in December 2018 before the long list of vendors and lenders amassed were duped by Ebersol.

DCP and Dundon were lied to and never would have invested anything in the AAF had Ebersol disclosed the true state of the league's affairs. DCP filed this suit to recoup its $70 million based on Ebersol's false representations about the league and his failure to disclose the real facts. The evidence of those facts (detailed below) precludes summary judgment on the fraud claims.

Ebersol also argues that DCP lacks standing because the $70 million payment was wired from a bank account in the name DDFS Partnership, LP, an entity related to DCP by common ownership and control. Ebersol's origin of funds theory is not supported by law or fact because DCP entered the Term Sheet with ESMG, DCP owns the right to sue Ebersol, and DCP sustained an injury in fact because of Ebersol's false representations.

## BACKGROUND

1. Charles Ebersol was CEO of "ESMG" from December 2017 to April 2019. ECF 102, Ex. K ¶ 2. ESMG owned and operated the AAF and its subsidiaries, each of which are debtors in this action. Ex. 23 at 89:5-90:9.

2. The AAF was structured to rely almost exclusively on outside investment up to the time of the league launch in February 2019. Ex. 33 at 47:16-23.[1] The AAF had no significant investor until Reggie Fowler agreed to fund up to $170 million through a combination of debt and equity. Case No. 22-05078-cag ECF 173, Ex. 4. The AAF built its go forward plan on Fowler's promise to fund the league, but Fowler almost immediately defaulted on his funding obligations and at least some of the board members and leaders of the AAF did not believe the

---

[1] Exhibit 33 contains excerpts from the rough draft of the deposition of Alan Kantowitz. The deposition was taken on January 7, 2025, and only a rough draft was available in time to file with this response. When the final versions become available, DCP will update the excerpts if it varies substantially from the rough draft.

AAF should trust that Fowler would fulfill his funding commitment.  Ex. 34; Ex. 36 at 2; Ex. 33 at 67:1-5, 68:17-69:1.  And many (including Ebersol) questioned whether the AAF should press forward with launching the league, given that Fowler was the only significant investor who had made a commitment.  Ex. 33 at 64:4-16, 65:18-23, 68:10-16, 92:17-93:8.  Ebersol was aware of the dire financial condition of the AAF in December 2018.  Ex. 38 at 2; Ex. 33 at 90:8-91:15.

3.  Despite direct personal knowledge of the financial condition of the league, Ebersol pressed forward.  But along the way, Ebersol completely undermined the league's future by cutting production and national marketing and sponsorship at the most critical juncture when the league needed to raise awareness, sell advertising, sell tickets, and sell sponsorships.  Ex. 5; Ex. 33 at 101:1-17.  Instead, Ebersol made the decision to cut marketing, which in his words "screwed" the AAF.  Ex. 36 at 1; Ex. 33 at 72:7-73:12, 98:10-15, 98:21-99:2, 99:7-13; Ex. 93. Revenues were also trailing far behind projections based on other factors entirely within the Ebersol run AAF's control, including having no revenue generating digital products available and falling way behind on ticket sales and sponsorships.  Ex. 5; Ex. 33 at 100:14-21, 103:25-106:13. As a result, the AAF went from projecting in May 2018 that the AAF would earn $176 million in revenue through the end of 2019, to projecting in January 2019 only $59 million in revenue through the end of the 2019 season.  Ex. 33 at 107:9-25, 108:14-24; Ex. 42 at 6.

4.  At the end of December, Ebersol's team projected the league would run its bank account down to $0 by the end of December but needed more than $24 million to get through most of January 2019, which was still the month before the league launch.  Ex. 37 at 6; Ex. 33 at 79:1-4, 80:14-17, 80:24-81:4.  By mid-January, the league, at Ebersol's direction, still had no committed investor, continued pushing off obligations to critical vendors, and continued making commitments to incur new debts to players, vendors, stadiums and all the others required to put

games on the field. Ex. 9; Ex. 39; Ex. 40; Ex. 33 at 114:24-119:9, 119:21-120:23, 122:12-22. All of these decisions were made at Ebersol's direction. Ex. 9; Ex. 33 at 123:5-18, 125:5-17. And Ebersol doubled down by pressing to incur all of the expenses of the first week of play again without any committed funding source. Ex. 33 at 124:2-11. This was the condition of the AAF after the first week of play and Ebersol was aware of every detail.

5.      One week into its only season, the AAF under Ebersol's leadership did not have sufficient funds to pay players or any of the other expenses for the first week of games and had virtually no funds to start the second week. Ex. 2; Ex. 23 at 208:12-15; Ex. 24 at 71:21-72:10; Ex. 25 at 84:23-86:12, 87:13-88:7, 98:7-18; Ex. 27 at 185:10-187:17; Ex. 28 at 210:17-24.

6.      Ebersol sought additional capital for the league, and, through a mutual acquaintance, was introduced to Tom Dundon as a potential source of capital. Ex. 23 at 199:9-24, 201:11-202:8, 204:10-16.

7.      On February 13, 2019, Ebersol and Dundon spoke for the first time, and discussed a potential financial aid scenario. Ex. 23 at 212:4-8, 217:3-15. During a series of calls, Ebersol conveyed to Dundon that the AAF needed money very quickly to pay players and that, if the league could not quickly secure additional funds, the league would be in trouble. Ex. 25 at 82:20-83:3. Ebersol represented to Dundon that the AAF needed an immediate injection of $5.1 million to cover payroll and related expenses for services performed during the first week of the season. Ex. 23 at 207:21-208:4, 208:12-15; Ex. 24 at 71:21-72:10.

8.      Later that day, Ebersol sent Dundon marketing materials consisting of an investor deck, a cap table, and financial projections for the league attached to an e-mail touting the league's ratings from the first week of play. Ex. 23 at 78:19-79:2; Ex 3 at 1, 3-60.

10

9. During a series of phone calls over the ensuing 24 hours, Ebersol and Dundon discussed multiple financial aid scenarios. Ex. 23 at 232:7-16. Dundon introduced Ebersol to John Zutter, who further negotiated the structure of a potential deal between DCP and ESMG. Ex. 23 at 261:3-24.

10. Because Ebersol represented the AAF needed funds immediately, and that any delay would essentially result in the league's collapse, DCP lacked time to perform the due diligence it normally would perform on an investment with a longer time horizon and justifiably relied on Ebersol's representations as he was ESMG's CEO. Ex. 25 at 68:20-25; Ex. 28 at 210:17-211:11, 352:16-353:10; Ex. 33 at 149:10-17.

11. DCP asked Ebersol to provide it with all documentation relevant to any potential investment in the league and conducted due diligence to the extent it was able considering the time constraints. Ex. 29 at 66:5-18. Ex. 28 at 160:8-161:1. Ebersol provided only a limited amount of documentation in response to DCP's requests. Ex. 29 at 47:6-17. But, given the time constraints, DCP was largely forced to rely on Ebersol's representations concerning the league. Ex. 29 at 47:6-17; Ex. 27 at 392:19-24.

12. Negotiations culminated in ESMG and DCP entering the Term Sheet. Ex. 1; Ex. 28 at 25:11-19; Ex. 24 at 261:3-24.

13. The Term Sheet contemplated that DCP would fund an initial amount of $5.1 million by 1:30 p.m. PST on February 14, 2019; ESMG had the right to submit equity funding requests to DCP up to "a maximum cumulative commitment of $70 million." Ex. 1 at 1. Ebersol executed the Term Sheet on behalf of ESMG, and DCP treated the Term Sheet as a binding document and performed its obligations set out in the agreement. Ex. 1 at 6; Ex. 25 at 157:1-11.

11

14.     DCP transferred $5.1 million to ESMG after the Term Sheet was entered.  Ex. 26 at 378:15-18.  While another entity ultimately controlled by Tom Dundon (DDFS) wired the funds to ESMG, it did so in the performance of a treasury relationship with DCP.  Ex. 30 at 141:6-13.  Nevertheless, DCP made the investment, and DCP was the party to the Term Sheet. Ex. 30 at 140:12-141:13, 165:7-9.

15.     DCP is a Delaware LLC; Dundon is its manager.  Ex. 28 at 36:7-11.  DDFS Management, LLC is DCP's sole member.  Ex. 30 at 32:12-33:13, 36:23-37:3.  Dundon owns and serves as manager for DDFS Management.  Ex. 30 at 37:11-14.  DDFS Partnership is a Delaware limited partnership owned by Dundon, the Dundon Children's Trust, and DDFS Management.  Ex. 30 at 40:5-41:11.  The graphic below illustrates how the entities are related.



DCP and DDFS are pass-through tax entities.  Ex. 31 ¶ 3.  Neither of them pays federal taxes or takes deductions.  *Id.; See* https://www.irs.gov/forms-pubs/about-form-1065 ("A partnership does not pay tax on its income but "passes through" any profits or losses to its partners. Partners must include partnership items on their tax or information returns.").  DCP's and DDFS's income and losses ultimately show up on the individual tax return for their owners.  *Id*.  Dundon's tax return shows that the loss related to the ESMG investment was claimed by him.  Ex. 31 ¶ 6, Ex. A.

16.     On February 24, 2019, Ebersol and ESMG's other board members held a board meeting, during which the Term Sheet was formally approved by the company.  Ex. 2 at 285:5-12. The meeting minutes state:

> Mr. Charlie Ebersol and Ms. Belt[2] presented a summary of the Series 2 Preferred Stock binding term sheet negotiated with Dundon Capital Partners LLP ("DCP"), as well as an update on the funding to date from DCP.

Ex. 4 at 12.  The minutes confirm that ESMG had, at that time, already received $12 million from DCP.  *Id.*  Conspicuously absent from the meeting minutes is any reference to DDFS Partnership or any claim or contention that DCP failed to fund the $5.1 million in compliance with its obligations in the Term Sheet.

17.     Absent any funding, the AAF would have folded within days.  Ex. 23 at 192:6-18; Ex. 27 at 32:17-33:12; Ex. 28 at 210:17-24.

18.     After entering the Term Sheet, DCP quickly learned that key representations Ebersol made between February 13th and 14th were false and that Ebersol had failed to disclose a host of material information relevant to any potential investment in the league.  Ex. 28 at 184:7-14.

19.     Ebersol had represented that he was authorized to execute the Term Sheet by signing it.  Ex. 1.  But Ebersol failed to obtain authority from the ESMG board or the stockholders until after he signed the Term Sheet, as evidenced by the board minutes and the stockholder agreement.  Ex. 4 at 12; Ex. 12 at 2.  Ebersol failed to disclose his lack of authority to DCP.  Ex. 26 at 387:11-388:9; Ex. 29 at 79:9-15.  Ebersol never obtained authority to enter the Term Sheet from the other debt holders and acknowledged that he lacked the authority to sell ESMG stock without approval.  Ex. 13 at 7-8, 10-12; Ex. 23 at 140:12-25.

---

2 Dawn Belt was a partner at Fenwick & West.  She specializes in startup financing and acted as secretary for the ESMG board meeting.

20.     Ebersol had falsely led Dundon to believe that expenses previously incurred by the league from inception through the first week of play—for items such as stadium fees, hotel accommodations for players, advertising expenses, and back-office expenses—had already been paid and that the only remaining previously incurred obligation that remained outstanding was $5.1 million for player payroll.  Ex. 25 at 87:13-89:16; Ex. 29 at 45:24-46:16; 48:17-49:3.  In reality, at the time the Term Sheet was signed, the league had more than $18 million in delinquent accounts payable in addition to the $5.1 million it needed for payroll. Ex. 29 at 48:17-49:3.

21.     Ebersol falsely represented that between $55 million and $70 million was enough capital for the AAF to make it through the rest of the first season.  Ex. 25 at 148:5-24; Ex. 29 at 45:24-46:16, 151:20-152:7; Ex. 26 at 350:22-351:2.  Ebersol did not know the basis for representing to potential investors that $70 million was needed to complete the first season. Ex. 23 at 201:11-202:10.  And, even if it were true that the AAF only needed $70 million to complete the season, Ebersol did not disclose that an additional $23 million at a minimum would have been required to cover the delinquent accounts payable and immediately due debt.  Ex. 14 at 11 ¶ 8.  This meant that the best-case scenario was that $93 million at a minimum would have been required to complete the first season.

22.     The marketing materials Ebersol sent to Dundon contained projections that were materially overstated and unrealistic. Ex. 29 at 138:5-18.  Ebersol had no idea how the league projections were derived although he was aware that there were substantial discrepancies between the projections and reality. Ex. 23 at 62:20-63:2; Ex. 5 at 3.  ESMG's finance committee met a month before the Dundon investment.  In that meeting, there was a determination that season one revenue had been grossly overestimated and needed substantial adjustment to revenue expectations due to a variety of factors discussed above, including substantial cuts Ebersol had made to national

14

marketing and production, lagging ticket sales and sponsorship, and a failure to develop a digital product that would be ready to generate revenue in the first season. Ex. 5 at 3; Ex. 35 at 1. Inaccuracies in the projections were far-reaching, and the projections did not disclose how Ebersol's decisions to make the substantial cuts weeks before had damaged the league. Ex. 15 at 21, 29-37.

23. Ebersol knew about the discrepancies but hid them from DCP. With respect to omissions, before DCP entered the Term Sheet, Ebersol disclosed to Dundon that the AAF needed $5.1 million to cover player salaries and related expenses for the first week of games that had already been played. Ex. 28 at 71:17-72:6; 117:24-118:22; 122:21-123:16; Ex. 25 at 87:13-89:16; Ex. 6. Ebersol also told Dundon (as well as another potential investor) that $10 million would get the league through week two of the season. Ex. 3; Ex. 32. Although Ebersol may not have known the full extent of the delinquent accounts payable the AAF had incurred up through the time of the DCP investment, he understood the AAF was in a deep whole to vendors and had been continuing to incur obligations at a staggering rate. Ex. 29 at 109:14-110:14; Ex. 27 at 167:14-168:10; Ex. 28 at 285:1-6, 287:4-19; Ex. 8 at 7. Just a few weeks prior to DCP's investment, Alan Kantowitz, the person Ebersol relied on to track financials, reported to Ebersol exactly what he believed the league financial condition would be after the start of the season. Ex. 9 ("If MGM funds their $3.5m, we will need another ~$7m to get through the first weekend . . . I would be remiss if I did not point out the following. We have about $8m of invoices that are overdue and maybe and probably another ~$8m that we will continue to push past opening weekend eve[n] though they will arise between now and then."). Consistent with Kantowitz's estimations, the league had delinquent accounts payable to vendors of approximately $18 million by February 14, 2019. Ex. 14 at 11 ¶ 8. Ebersol failed to disclose these facts to DCP.

15

24.     Ebersol represented that DCP would receive 75% of ESMG's undiluted stock pursuant to the terms of the Term Sheet.  Ex. 1 at 1.  At the time Ebersol made the representation, there was an existing claim from Bob Vanech that he owned 50% of the AAF.  Ex. 16 at 1, 3, 9; Ex. 17.  There were warrant holders and other contractual stock rights that conflicted with the AAF's ability to fulfill the 75% obligation.  Ex. 13 at 7, 8; Ex. 18 at 4, 6-7.    Ebersol received Vanech's initial demand letter.  Exs. 16, 17.  He was also signatory to each agreement issuing the competing stock rights.   He knew that his representation that ESMG could issue 75% of its undiluted stock was impossible.  And he hid any information related to the competing stock rights and claims to ownership from DCP.  Ex. 26 at 388:19-389:7, 390:9-23; Ex. 29 at 79:9-15; Ex. 7 (first disclosure of Vanech to Dundon was on January 20, 2019).

25.     Additional debts at the time the Term Sheet was executed included amounts owed to unpaid vendors, including media companies that had threatened to stop performing services.  Exs. 19, 20, 21.  The AAF had also failed to pay airlines, hotels, security companies, and CBS, the network that was airing its games.  Ex. 26 at 390:24- 392:24; Ex. 8 at 1, 7.  Ebersol also knew of at least another $5 million obligation.  *See* Ex. 11 at 1 (referencing an additional $5 million due a week after the Term Sheet was executed).  Ebersol had also received an email from Kantowitz on January 22, 2019, stating that there would be "~$10m-$11m of critical cash out the door between now and opening weekend," and referring to the league pushing debts — meaning delaying payment — as a "game of chicken."  Ex. 9.  Ebersol failed to disclose any of these other debts to DCP.  Ex. 25 at 89:4-23.; Ex. 26 at 389:8-15; Ex. 29 at 78:7-79:8.

26.     Had DCP known about the delinquent debts, the faulty projections, the inability of Ebersol to deliver the 75% ownership in ESMG, and how the failure to secure financing had

16

obliterated league revenue projections, DCP would not have entered the Term Sheet, nor would it have invested in the AAF.  Ex. 26 at 392:11-24.

27.  Between February 14, 2019, and April 16, 2019, ESMG submitted funding requests to DCP, and DCP responded to the requests.  ECF 102 at 2.

28.  Despite DCP's best efforts, the AAF's preexisting debts were insurmountable, and the AAF exhausted DCP's $70 million long before the end of the season. To make matters worse, the AAF had no viable revenue sources.  Ex. 28 at 201:1-202:22; 236:11-237:19; 307:9-23.

29.  With no viable path to sustainability moving forward or alternative source of capital, ESMG filed for bankruptcy protection. Ex. 28 at 307:9-23.

30.  DCP ultimately invested and lost approximately $70 million in the league.  Ex. 29 at 154:10-16; Ex. 25 at 253:9-16.

31.  The evidence in the appendix attached is incorporated by reference.

## ARGUMENT AND AUTHORITIES

Rule 7056 of the Federal Rules of Bankruptcy Procedure adopts Rule 56 of the Federal Rules in adversary proceedings.  In considering a motion for summary judgment, courts view inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Courts "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).  Even if a moving party satisfies the standards of Rule 56, a court may, as a matter of discretion, deny a motion for summary judgment if it finds that "the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

A.      **DCP has standing to prosecute its claims because DCP owns the claims.**

DCP entered a contract with ESMG by which DCP agreed to invest a maximum cumulative amount of $70 million in ESMG in exchange for majority ownership and control of ESMG. Though the Trustee claims DCP fell almost $300,000 short of the $70 million commitment, no one disputes that DCP fulfilled at least $69.7 million of it.  In its Complaint, DCP seeks to recover for the loss of its investment caused by Ebersol's failure to disclose the true nature of the league's financial problems before DCP entered the term sheet.  ECF 1 at 16 ¶ 64.

Despite the foregoing, Ebersol claims that DCP lacks standing to assert a claim for the lost investment.  Standing generally requires proof of (1) an injury in fact, (2) caused by the defendant's conduct, (3) that is redressable by a favorable court decision.  *Alt Platform, Inc. v. Beckett Collectibles, LLC*, No. 3:22-CV-02867-N, 2024 WL 4376156, at *5 (N.D. Tex. Oct. 1, 2024).  The only standing element Ebersol challenges is injury in fact.  ECF 102 at 10-15.  The injury in fact must be both concrete and particularized as well as actual or imminent.  *Id.*  "If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)).  "In reviewing standing at the summary judgment stage, any specific facts . . . set forth by affidavit or other evidence . . . will be taken to be true." *McCardell v. U.S. Dep't of Hous. & Urban Dev.*, 794 F.3d 510, 518 (5th Cir. 2015) (internal citations omitted).

Ebersol bases his standing argument on two broker cases in which the courts held that non-owner brokers could not sue to recover losses suffered by their customers.  ECF at 102 at 14-15. In *Indemnified Capital Invs., SA v. R. J. O'Brien & Assocs., Inc.*, 12 F.3d 1406 (7th Cir. 1993), the broker-plaintiff sued to recover losses to its customers' accounts.  The broker did not allege that it owned the accounts that lost money, it did not allege that it was injured by the losses to those accounts, and it did not allege that customers had assigned their claims to the broker.  *Id.* at 1409.

18

The court held that the broker lacked standing to pursue claims that belonged to its customers. *Id.* at 1409-10.

Similarly, in *W.R. Huff Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2nd Cir. 2008), the broker sued to recover losses to its customers' accounts. The court held that the broker could not pursue claims for its clients' losses absent an assignment of ownership of the claims. *Id.* at 108. Relying on the Supreme Court opinion in *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008), the *W.R. Huff* court concluded that an injury-in-fact requires the plaintiff to have legal title to or a proprietary interest in the claim asserted. 549 F.3d at 108. The *Sprint* court held that a plaintiff with legal title to a claim acquired by assignment could sue even if the original claim owner retained a beneficial interest in the proceeds of the litigation. 554 U.S. at 285. None of the above cases focuses on the origin of funds used to acquire the injured interest.

In this case, DCP entered the Term Sheet (and thereby acquired an interest in ESMG). Ex. 1. No one — not even Ebersol — has ever claimed that DDFS acquired an interest in ESMG or had an obligation to transfer funds to ESMG. DCP negotiated the term sheet with ESMG. The distinction between *RJ O'Brien* and *W.R. Huff* and this case is that, in those cases, the plaintiffs were attempting to recover monies invested by their clients for the clients' own benefit, whereas, here, DCP seeks to recover funds that originated from a DDFS Partnership account for the purpose of fulfilling a contractual obligation of DCP (*i.e.*, funds delivered on DCP's behalf). In *R.J. O'Brien* and *W.R. Huff,* the clients would reap the rewards of any successful investment, whereas, here, regardless of who wired the funds, DCP—the party to the Term Sheet who obtained an equity interest in ESMG—owned the benefit of the agreement DDFS fulfilled by wiring the funds.

Jeffrey Vanderbilt of DCP testified that the reason that the wire transfers to ESMG came from a DDFS Partnership account, rather than a DCP account, was that DDFS Partnership functioned as treasury management for DCP:

> Q.    I will also represent to you that in our review of records, it appeared that all of the funds for the AAF investment came from DDFS. That's how the wiring was done.
>
> A.    Partnership?
>
> Q.    Correct. Does that make sense?
>
> A.    Yes.
>
> Q.    How is [sic] that DCP is taking the loss for its investment if all the money came from DDFS?
>
> A.    DCP was the party making the investment. DDFS Partnership functioned as treasury management.

Ex. 30 at 15:9-16; 16:5-12; 140:24-141:13.

The money DDFS sent to ESMG was sent to satisfy DCP's obligation in the term sheet. The minutes of the ESMG board meeting and the stockholder agreement confirm receipt of funds as a result of DCP signing the Term Sheet.  Ex. 4 at 12; Ex. 12 at 2.

Who paid ESMG is not the issue because the payments were identified by the payor and the payee as being sent pursuant to the contract.  DDFS paid the money to ESMG on behalf of DCP, not as a gift from DDFS to ESMG.  The result would be the same if a car salesman duped a college student into buying a lemon (of a car).  If the student's parents wired the funds for the purchase, the student would nonetheless have standing to sue the salesman for fraudulent inducement.  The student would have an injury in the form of the loss of price of the car even though the money came from his parents.  The injury would have been caused by the salesman, and a favorable decision in the form of a monetary judgment would remedy the injury.

Ebersol argues nonetheless that "DCP has testified there are no agreements of any kind between DCP and DDFS, written or oral, that would tie or connect DCP in any manner to said funds wired by DDFS to ESMG or otherwise allow DCP to receive any benefits therefrom" to show that DCP lacked any interest in the funds paid by DDFS. In support of this argument, Ebersol references testimony by Vanderbilt that no formal agreement exists between DCP and DDFS. ECF 102 at 8. But Ebersol never explains why the origin of funds makes a difference in the injury in fact determination. DCP made a written commitment to provide funds. The funds were provided, and ESMG accepted the funds and acknowledged those funds as a fulfillment of DCP's commitment. There is no legal requirement that the beneficiary of a transfer of funds have a formal agreement with the transferor, especially when the transferor is a related entity with common ownership and control.

Ebersol also references testimony by Jason Kulas that he is unaware of a "formal . . . written relationship regarding treasury functions" between "DDFS, LP and Dundon Capital Partners." Ex. 29 at 145:2-11. There is no legal requirement that related entities have written agreements to govern internal dealings.

Vanderbilt testified a treasury relationship exists between DCP and DDFS and disputed that a formal agreement would be required to document that relationship:

> Q. All right. So when somebody functions a treasury management, there has to be some sort of formal agreement that says, I am making this investment on your behalf, correct?
>
> A. I wouldn't say that's correct.

Ex. 30 141:14-22 (cleaned up and emphasis added).

Finally, Ebersol argues that an informational federal tax form prepared by DDFS Partnership that references the AAF loss somehow proves that DCP lacks any right, title, or interest

in the funds.  There is no explanation for why the Court should hold DCP responsible for what DDFS reported on an informational form.  Nonetheless, it appears from Ebersol's argument that he is asking the Court to invoke tax estoppel against DCP.

Tax estoppel is a form of quasi-estoppel that prevents a party from taking an inconsistent position from a characterization of income or expenses on its tax return if it accepted a benefit from the characterization (in the form of a deduction, for instance).  *See generally Matter of Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991).  The doctrine is often used in divorce cases (like *Davidson*) on the issue of whether past payments were alimony or something else.  *See generally id.*  Because tax estoppel is based on quasi-estoppel, the party asserting it must show that the party against whom the doctrine is invoked took the prior inconsistent position and accepted a benefit from it.  *Id.*  Ebersol has shown neither.  DDFS is responsible for the information on the form attached to Ebersol's motion, not DCP—meaning that DCP did not take a prior inconsistent position.  DCP got no benefit from DDFS reporting the loss for the ESMG investment.  DCP did not file a return because it is a pass-through entity.  Vanderbilt Decl. ¶ 4.  The loss ended up on Dundon's return as shown in the exhibits to the Vanderbilt declaration.  *Id.* at ¶ 6, Ex. A.  Tax estoppel does not apply in this case because DCP got no benefit from a prior inconsistent position.

Ebersol's argument that DCP lacks any right, title, or interest in the funds paid on its behalf is premised on the assumption that a party to a contract cannot recover funds paid thereunder if the funds came from a third party.  In *Kakabadze v. M5 Int'l Co.,* No. H-12-3701, 2014 WL 2547767, at *15 (S.D. Tex. 2014), the court rejected the argument that Kakabadze had not suffered damages and did not have standing to assert a claim because he was fully reimbursed by a third party.  Kakabadze had entered the contract at issue in his own name, though he did so as an agent

22

for others. The court held that Kakabadze could sue in his own name (even though his principals ultimately paid for his losses) because Kakabadze was the party to the contract. *Id.*

Ebersol has not shown a lack of an injury in fact as a matter of law, and Ebersol has not conclusively disproved Vanderbilt's testimony that DCP, not DDFS Partnership, invested its own funds in ESMG and suffered the losses at issue. Because standing in the sense argued by Ebersol turns on ownership, and because none of Ebersol's cases depend on the origin of funds as the basis for determining ownership of a claim or standing, the Court should deny Ebersol's motion for summary judgment.

**B.      DCP suffered a loss of $70 million.**

Ebersol next argues that DCP suffered no loss because DDFS conveyed the money to ESMG. Like his standing argument, this argument depends on the Court accepting that DDFS sending the money to ESMG means that DCP had nothing to do with the funding. DDFS had no contract with ESMG and did not send ESMG a $70 million gift. Vanderbilt testified that DDFS sent the funding as part of treasury management for DCP, an entity with common ownership. Ex. 30 at 141:6-13. The technical source of the wire is not proof that DCP did not own the funds or suffered no loss, especially where Vanderbilt identified DCP as the contracting party, testified that DCP suffered the loss, and explained why DDFS originated the wire to ESMG. Also, ESMG recognized the funds received as coming from DCP and fulfilling DCP's commitment in the Term Sheet. Ex. 4 at 12; Ex. 12 at 2; Ex. 41 at 2. There is no basis upon which Ebersol could argue that DDFS owns the position of DCP with respect to the Term Sheet. DCP signed up to fund the league up to $70 million and caused that commitment to be paid. How DDFS and DCP handle allocation of the monies internally does not negate DCP's claim of a loss.

23

C. **Ebersol offered and sold securities by means of untrue statements.**

Ebersol made material misrepresentations and failed to disclose multiple material facts when he offered and sold an equity interest in ESMG to DCP. Ex. 26 at 387:11- 392:24; Ex. 29 at 78:7-79:15. There is no real dispute about whether DCP purchased an equity interest in ESMG. Ebersol's own sworn testimony demonstrates his understanding of that fact:

> Q. What I was to know is not what happened first, second, third in this agreement, I want to know the total consideration each side was committing to in this agreement.

> A. My understanding of this document the binding term sheet for the series 2 preferred stock financing…is that in exchange for 5.1 million dollars, Dundon Capital Partners received among other thing 75 percent of the company's fully diluted stock…"

Ex. 23 at 301:12-302:3.

Section 27.01 of the Texas Business and Commerce Code requires proof that a person relied on a false statement in entering a contract to buy stock. TEX. BUS. & COM. CODE § 27.01(a)(1)(B). The language of Section 27.01 considers only the events up to and including the execution of the contract. *In re Skyport Glob. Comms., Inc.*, No. 08-36737, 2011 WL 111427, at *49 (Bankr. S.D. Tex. Jan. 13, 2011), *aff'd sub nom. In re SkyPort Glob. Comms., Inc.*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part sub nom. In re Skyport Glob. Comms., Inc.*, 642 Fed. Appx. 301 (5th Cir. 2016), *aff'd sub nom. Matter of Skyport Glob. Comms., Inc.*, 661 Fed. Appx. 835 (5th Cir. 2016). Nothing in Section 27.01 requires issuance and delivery of a stock certificate as a condition to suit.

Ebersol nonetheless argues that because no shares of stock were physically issued, no sale occurred. ECF 102 at 18. None of the cases Ebersol cites require a physical issuance of stock. In *Chase v. Hodge*, No. 1:20-CV-0175-RP, 2021 WL 1948470, at *9 (W.D. Tex. May 14, 2021), report and recommendation adopted, No. 1:20-CV-175-RP, 2021 WL 8017993 (W.D. Tex. June

24

23, 2021), Chase alleged that he and the defendant, Hodge, agreed to treat a limited liability company, Helping Hands Capital, LLC, as an equal partnership. Chase's pleading acknowledged that Hodge retained a 100% interest in Helping Hands. *Id*. at 9. The court held that because Helping Hands was not a seller, the Texas Securities Act did not apply. *Id*. *Stephanz v. Laird*, 846 S.W.2d 895, 905 (Tex. App.—Houston [1st Dist.] 1993, writ denied), held that Section 27.01(a) of the Texas Business and Commerce Code did not apply to unvested stock options where the conditions precedent to vesting had not occurred. *Okumus v. Mouton*, No. 14-18-00220-CV, 2020 WL 6278664, at *5 (Tex. App.—Houston [14th Dist.] Oct. 27, 2020, no pet.), held that "for a real estate transaction to be actionable under section 27.01 . . . an actual conveyance of real property must occur."

None of Ebersol's cases involved a sale of securities where the buyer entered a contract to buy stock and paid the price for the security. In *Chase*, Chase merely thought he would be an owner of the company at issue. 2021 WL 1948470, at *9-10. In *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000), there was no contract to buy stock, only an alleged agreement by which a party could earn stock. *Stanfield v. O'Boyle*, 462 S.W.2d 270 (Tex. 1971), was a case about conveyance of stock as collateral, not a sale.

This case is more like *Tukua Investments, LLC v. Spenst*, 413 S.W.3d 786, 797 (Tex. App.—El Paso 2013, pet. denied), involving a claim for fraud in a real estate transaction based on Section 27.01 of the Texas Business and Commerce Code. In *Tukua*, the parties signed an agreement to buy real estate, but the buyer withdrew from it prior to the sale because of nondisclosures by the real estate agent. The court held that the contract for sale enabled the buyers to invoke Section 27.01 because Section 27.01 required only that the party suing enter a contract.

The court added that the statute applies to a transaction, not a consummated sale with a transfer of title. *Id.*

The main distinction between this case and the cases Ebersol cites is that DCP paid for the purchase of a security and there was a written contract that required ESMG to convey the security. The sales transaction was consummated by DCP's payment of the price. The board of ESMG approved the transaction, and ESMG accepted the funds and spent them. Thus, under the Texas Securities Act and Section 27.01 of the Texas Business and Commerce Code, DCP has satisfied the requirement that a transaction for the sale of a security occurred.

## D.    The summary judgment evidence supports each element of DCP's claims against Ebersol.

The no-evidence sections of Ebersol's motions address DCP's fraud claims. The elements of DCP's fraud claims are similar. Fraudulent inducement requires:

> (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury.

*Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). Fraud may also arise from a failure to disclose. *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (examining fraud claim under Texas law.

> A duty to speak arises by operation of law when (1) a confidential or fiduciary relationship exists between the parties; or (2) one party learns later that his previous affirmative statement was false or misleading; or (3) one party knows that the other party is relying on a concealed fact, provided that the concealing party also knows that the relying party is ignorant of the concealed fact and does not have an equal opportunity to discover the truth; or (4) one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth, i.e., all material facts, lest his partial disclosure convey a false impression.

*Id.*

26

Section 27.01 of the Business and Commerce Code requires that:

> (1) there was a transaction involving real estate or stock, (2) during the transaction [the defendant] made a false representation of fact, a false promise, or benefitted by not disclosing that a third party's representation or promise was false, (3) the false representation or promise was made for the purpose of inducing [the plaintiff] to enter into a contract, (4) [the plaintiff] relied on the false representation or promise by entering into the contract, and (5) the reliance caused [the plaintiff] injury.

*Fid. Nat. Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 632 (E.D. Tex. 2011),

*aff'd in part, rev'd in part and remanded sub nom. Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739 F.3d 848 (5th Cir. 2014).  The Texas Securities Act requires:

> The security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary in order to make the statements made not misleading.

*Kubbernus v. ECAL Partners, Ltd.,* 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).  DCP must also show Ebersol offered or sold the security at issue. *See* TEX. GOV. CODE § 4008.052.

Courts rarely grant summary judgment in fraud cases.  *See generally Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1185 (5th Cir. 1993) (analyzing a fraud claim under Texas law).  Fraud turns on intent, which may be shown by circumstantial evidence, and which is a question of fact that depends on the credibility of witnesses and the weight given their testimony.  *Id.* A court should not grant summary judgment in a fraud case where the nonmovant offers evidence that the defendant made a partial but misleading disclosure that the plaintiff relied on in entering an agreement.  *Union Pac. Res. Group, Inc.*, 247 F.3d at 587.

1. **Ebersol made knowingly false representations to DCP and failed to disclose material facts.**

Ebersol's false representations and omissions support each of the claims at issue.  First, Ebersol represented that he was authorized to execute the Term Sheet by signing it.  Ex. 1.  Ebersol

failed to obtain authority until after he signed the Term Sheet, as evidenced by the board minutes and the stockholder agreement. Ex. 4 at 11-12; Ex. 12 at 2. At the time, the Series 2 preferred stock did not even exist and had not even been authorized. Ebersol failed to disclose his lack of authority to DCP. Ex. 26 at 387:11-388:9; Ex. 29 at 79:9-15. Ebersol never obtained authority to enter the Term Sheet from the other debt holders. Ex. 13 at 7-8, 10-12. Ebersol acknowledged that he lacked the authority to sell ESMG stock without approval. Ex. 23 at 140:12-25. Together, these facts show that Ebersol knew he did not have authority to enter the Term Sheet when he made the representation to the contrary.

Ebersol represented to DCP that the only previously incurred obligation that remained outstanding was $5.1 million for player payroll and related week one expenses. Ex. 23 at 207:21-208:4; 208:12-15; Ex. 24 at 71:21-72:10; Ex. 25 at 87:13-89:16; Ex. 29 at 45:24-46:16; 48:17-49:3. In reality, at the time the Term Sheet was signed, the league had more than $18 million in delinquent accounts payable in addition to the $5.1 million it needed for payroll. Ex. 29 at 48:17-49:3; Ex. 14 at 11 ¶ 8. As CEO of ESMG, Ebersol knew about an additional $18 million in accounts payable. Ex. 29 at 109:14-110:14; Ex. 27 167:14-168:10; Ex. 28 at 285:1-6; 287:4-19. The additional debts included unpaid vendors and media companies that had threatened to stop performing services. Exs. 19, 20, 21. The AAF had failed to pay airlines, hotels, security companies, and CBS, the network that was airing its games. Ex. 26 at 390:24- 392:24; Ex. 9. Ebersol knew of at least another $5 million obligation. *See* Ex. 11 at 1 (referencing an additional $5 million due a week after the Term Sheet was executed). Ebersol had received an email from Kantowitz on January 22, 2019, stating that there would be "~$10m-$11m of critical cash out the door between now and opening weekend," that the league had $8 million in overdue invoices, and that the league had another $8 million that would be incurred through the first weekend of play.

Ex. 9.  Ebersol failed to disclose any of these other debts to DCP.  Ex. 25 at 89:4-23; Ex. 26 at 389:8-15; Ex. 29 at 78:7-798.  Thus, Ebersol knew his representation that only $5.1 million was required to keep the AAF afloat was false.  Ex. 29 at 48:17-49:3.

Ebersol represented that between $55 million and $70 million was enough capital for the AAF to make it through the rest of the first season.  Ex. 25 at 148:5-24; Ex. 29 at 45:24-46:16; 151:20-152:7; Ex. 26 at 350:22-351:2.  Ebersol did not know the basis for representing to potential investors that $70 million was needed to complete the first season.  Ex. 23 at 201:11-202:10.  And, even if it were true that the AAF only needed $70 million to complete the season moving forward, Ebersol did not disclose that any additional $23 million at a minimum would have been required to cover the delinquent accounts payable and immediately due debt.  Ex. 14 at 11 ¶ 8.  This meant that the best-case scenario was that the league needed $93 million to complete the first season.  These facts demonstrate that Ebersol knowingly misrepresented that he had a basis for the $70 million requested from DCP.

On February 13, 2019, Ebersol provided DCP with projections related to the AAF, representing at least an honest belief in their accuracy.  Ex. 22.  The projections were materially overstated and unrealistic.  Ex. 29 at 138:5-18; Ex. 15 at 21, 29-37.  Ebersol had no idea how the league projections were derived although he was aware that there were substantial discrepancies between the projections and reality.  Ex. 23 at 62:20-63:2; Ex. 5 at 3. Ebersol failed to disclose that recent changes had been made to the projected revenues, including the decision to reduce projected revenues of the league by $30 million for the first season due to lack of marketing and the failure to develop digital products.  Ex. 15 at 76; Ex. 5 at 3; Ex. 26 at 389:16-390:5; Ex. 10 at 1.  All Ebersol disclosed was the need for funds to pay the players and that the league had good ratings in week one.  Ex. 3 at 1.  He said nothing about the crippling effect his mismanagement

29

and the lack of funding had had on the league in the year-plus he spent running it. Ebersol's actions in making incomplete and misleading disclosures demonstrate that he made them knowingly and intended that DCP would rely on what he did disclose.

Ebersol represented that DCP would receive 75% of ESMG's undiluted stock, pursuant to the terms of the Term Sheet. Ex. 1. At the time Ebersol made that representation, there was an existing claim from Vanech that he owned 50% of the AAF. Ex. 16 at 1, 3, 9. There were also warrant holders and other contractual stock rights that conflicted with the AAF's ability to fulfill the 75% obligation. Ex. 13 at 7-8; Ex. 18 at 4, 6-7. Vanech sent his initial demand letter to Ebersol. Ex. 16, 17. He was also signatory to each agreement issuing the competing stock rights. He knew that his representation that ESMG could issue 75% of its undiluted stock was impossible without the agreement of competing claims to equity in the league, which in large part were never obtained. Ex. 13 at 7-12. And he intentionally hid information related to the competing stock rights and claims to ownership. Ex. 26 at 388:19-389:7; 390:9-23; Ex. 29 at 79:9-15; Ex. 7 (first disclosure of Vanech to Dundon was on January 20, 2019).

### 2. Ebersol made the representations and omissions to induce DCP to enter the Term Sheet and invest in ESMG.

Facts supporting Ebersol's intent to induce DCP to enter the Term Sheet and invest in ESMG include Ebersol's testimony that, when he sought DCP's investment in the league, he was seeking an investment in ESMG. Ex. 23 at 90:6-21. Ebersol testified that he was trying to "urgently raise capital" the week he solicited Dundon's investment. Ex. 23 at 198:3-15. And Ebersol did, in fact, seek investment in ESMG. Ex. 25 at 68:20-25.

   **3.**    **DCP relied on Ebersol's misrepresentations and omissions when it entered the Term Sheet and invested in ESMG.**

Because Ebersol represented the AAF needed funds immediately, and any delay would essentially result in the league's collapse, DCP was unable to perform the due diligence it normally would perform on an investment with a longer time horizon. Ex. 25 at 68:20-25; Ex. 28 at 210:17-211:11, 352:16-353:10. Ebersol provided only a limited amount of documentation in response to DCP's requests. Ex. 29 at 47:6-17. Given the time constraints, DCP was largely forced to rely on Ebersol's representations concerning the league. Ex. 29 at 47:6-17; Ex. 26 at 392:19-24. Had DCP known the truth, it would not have entered the Term Sheet, nor would it have invested in the AAF. Ex. 26 at 392:11-24.

   **4.**    **DCP was damaged by Ebersol's conduct.**

DCP ultimately invested and lost approximately $70 million in the league. Ex. 29 at 154:10-16; Ex. 25 at 253:9-16.

## CONCLUSION

The evidence cited above shows that Ebersol made disclosures to Dundon that were either false or misleading because they were incomplete. DCP relied on Ebersol's disclosures in investing $70 million in the league, which DCP eventually lost. There is no legal bar to DCP's recovery as a result of DCP having directed the wire to come from DDFS instead of sending it directly, especially where the evidence plausibly explains what happened. Based on these facts, the Court should deny Ebersol's summary judgment.

## PRAYER FOR RELIEF

**WHEREFORE,** Defendant Dundon Capital Partners LLC prays the Court deny Charles Ebersol's motion for summary judgment in its entirety, and grant such other and further relief, legal or equitable, to which DCP may be justly entitled or the Court deems proper.

Respectfully submitted,

**K&L GATES LLP**

By:   */s/Brent D. Hockaday*
       Brent D. Hockaday
       Texas Bar No. 24071295
       Brent.hockaday@klgates.com
       1717 Main Street, Suite 2800
       Dallas, Texas 75201
       (214) 939-5677
       (214) 939-5849 Fax

and

**BELL NUNNALLY & MARTIN LLP**

*/s/ Beverly A. Whitley*
Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Beverly A. Whitley
Texas Bar No. 21374500
bwhitley@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
Sydnie A. Shimkus
Texas Bar No. 24093783
sshimkus@bellnunnally.com
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

**ATTORNEYS FOR**
**DUNDON CAPITAL PARTNERS LLC**

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies a true and correct copy of the foregoing was served by delivering the same to the person listed below in the manner and on the date indicated.

William N. Radford
Thomas M. Horan II
Thompson Coe
700 N. Pearl Street, 25th Floor
Dallas, TX 75201
wradford@thompsoncoe.com
thoran@thompsoncoe.com

Michael Saltz
Jacobson, Russell, Saltz, Nassim & De La Torre, LLP
1880 Century Park East, Suite 900
Los Angeles, CA 90067
msaltz@jrsnd.com

***Attorneys for Charles Ebersol***

Dated January 10, 2025.

*/s/ Beverly A. Whitley*
Beverly A. Whitley

10465887.1  04251-00025

DocuSign Envelope ID: AD295A2E1-B1E5-4EE9-9687-70517003C3CE

**EXHIBIT**

**1**

## BINDING TERM SHEET FOR SERIES 2 PREFERRED STOCK FINANCING

This Binding Term Sheet (the "Agreement") outlines a summary of terms for a proposed financing of the company set forth below. This Binding Term Sheet shall be a binding agreement of the signatories below enforceable by one party against the other, as set forth below, upon the Company's (as defined below) receipt of the Initial Funding Amount (as defined below) by 2pm PST on February 14, 2019 and each party hereto executing this Binding Term Sheet.

**Offering Terms:**

| | |
|---|---|
| **Issuer:** | Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"). |
| **Securities:** | Series 2 Preferred Stock (the "**Series 2**"). |
| **Investor:** | Dundon Capital Partners LLC (the "**Investor**"). |
| **Initial Funding Amount:** | The Investor will invest $5,100,000 (the "**Initial Funding Amount**") by 1:30pm PST on February 14, 2019. |
| **Funding Commitment:** | During the period from the effectiveness of this Binding Term Sheet through June 30, 2019, the Company will have the right to submit an equity funding request to the Investor, which shall state the amount of funding requested and include a supporting budget, subject to a maximum cumulative commitment of $70,000,000. Within 5 calendar days of receipt of each such request, the Investor will invest into the Company the full funding amount listed on such request. |
| **Investor Ownership:** | Upon the execution of this Agreement and Funding of the Initial Funding Amount, the Company will issue the Investor a number of shares of Series 2 such that immediately after the Closing, the Investor will own 75% of the Company's fully diluted capital stock. |
| **Available Equity Pool:** | The Investors and the Company's current management team will work in good faith to mutually determine and approve the issuance of equity compensation to the Company's service providers, but such amount shall not impact the Investor's ownership percentage on a fully diluted basis.. |
| **Participating Liquidation Preference:** | With respect to any cash flow distributions to owners of the Company, whether from a sale, dividend, liquidation, dissolution or winding up of the Company or any other source, the holders of the Series 2 shall be entitled to receive in preference to the holders of the existing Preferred Stock and Common Stock an aggregate liquidation preference amount equal their funded capital plus a preferred return equal of 20% per year, calculated using the XIRR function in Microsoft Excel.. After the payment of all Preferred Stock liquidation preferences, the holders of the Series 2 shall also participate together with the holders of Common Stock on an as-converted to Common Stock basis. |
| **PIK Dividends:** | The Investor will accrue dividends at a rate of 20% per annum based on its actual aggregate Series 2, with such amount payable either in cash or in kind, at the discretion of the Company. Such dividends will be paid before any dividends, redemptions or other distributions are otherwise payable on any class of stock, unless approved by the Investor. |
| **Board of Directors and Governance:** | Upon the execution of this Agreement, the authorized size of the Board shall immediately be set at four members, two of which shall be voting members |



DocuSign Envelope ID: AD295AB0-8DBE-4EBD-9887-7D271CB36685

and two shall be non-voting members, consisting of members two voting members designated by the holders of a majority of the Series 2 (initially John Zutter and Tom Dundon) and two non-voting members designated by Charlie Ebersol. The Board shall have full authority over all aspects of the Company. The Investor shall have the right to make any and all day-to-day business decisions for or on behalf of the Company, including but not limited to determining capital required to be drawn under this Agreement, to bind the Company or to enter into any agreement on behalf of the Company. The Investor shall have the further right to define or limit any authorities of any employee, Director, advisor, representative, vendor, consultant or officer of the Company, up to and including terminating such individual or entity. To the maximum extent permissible under Delaware law, the parties agree that the Investor, in its role as such or as a director, officer or any other related role to the Company, shall have no fiduciaries obligations to the Company or its owners.

**Closing:** The Investor shall provide definitive documentation ("Definitive Documentation") as soon as practicable, and the Company and its representatives shall be obligated to sign such documentation provided the liquidation preference, preferred rate and fully diluted ownership defined therein is no worse than that described in this Agreement. The Company is bound under this Agreement to agree to any other provisions provided for in such documentation.

**Counsel and Expenses:** Investor shall provide definitive documents. Any transaction costs borne by the Investor associated with the transaction shall be reimbursed by the Company, including any costs associated with enforcing this Agreement.

**Confidentiality:** The terms of this Binding Term Sheet and any related discussions shall be kept confidential by the Company and shall be disclosed by the Company only to such parties as have a need to know as part of the legal and due diligence and related usual and customary processes related to preparing and executing the definitive agreements that will consummate the transactions contemplated hereby.

This Binding Term Sheet shall be effective upon the Investor's funding of the Initial Funding Amount and upon execution and delivery hereof by all the parties hereto and may be executed in two or more counterparts (including but not limited to in .pdf (portable document format) and via facsimile), each of which may be executed by one or more of the parties hereto, but all of which when taken together shall constitute one agreement binding upon all of the parties hereto.

The terms and provisions of this Binding Term Sheet may be modified or amended only by written agreement executed by all parties hereto and shall be binding upon the successors and permitted assigns of the parties hereto; neither party shall assign its obligations under this Binding Term Sheet to any other person or entity without the prior written consent of the Investor.

All issues and questions concerning the construction, validity, enforcement and interpretation of this Binding Term Sheet shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this Binding Term Sheet, even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Each of the parties submits to the exclusive jurisdiction of any state or federal court sitting in the State of Texas, in Dallas, Texas, in any action or proceeding arising out of or relating to this Binding Term Sheet, agrees that all claims

DocuSign Envelope ID: AD293AB2-1D25-4E65-9687-70C27A3C1C8D

in respect of the action or proceeding may be heard and determined in any such court and agrees not to bring any action or proceeding arising out of or relating to this Binding Term Sheet in any other court. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto. Nothing in this paragraph shall affect the right of any party to serve legal process in any other manner permitted by law. Each party agrees that a judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law, including in any court of competent jurisdiction.

EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS BINDING TERM SHEET OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

This Binding Term Sheet shall terminate only upon execution of Definitive Documentation.

**Acknowledged and agreed:**

**Dundon Capital Partners LLC**

By:_____

Name:_____

Title:_____

**Ebersol Sports Media Group, Inc.**

By:_____

Name: Charles Ebersol

Title: Chief Executive Officer

DocuSign Envelope ID: AD295AB2-1D25-4E85-9687-70C27A5C105D

| From: | DocuSign NA3 System[dse_NA3@docusign.net] |
| From: | DocuSign NA3 System[dse_NA3@docusign.net] |
| Sent: | Thur 2/14/2019 9:28:00 PM (UTC) |
| To: | John Zutter[jz@dundon.co] |
| Subject: | Completed: FW_10589776_2_ESMG - Series 2 Term Sheet[2] |
| Attachment: | FW_10589776_2_ESMG - Series 2 Term Sheet[2].docx.pdf |



Your document has been completed

VIEW COMPLETED DOCUMENT

**Alan Kantowitz**
alan@aaf.com

All parties have completed FW_10589776_2_ESMG - Series 2 Term Sheet[2].

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code
with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
8D3353D615674C4D98E890B52EBE9A733

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in
an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted

solution for Digital Transaction Management™.

**Questions about the Document?**

If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Alan Kantowitz who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

EXHIBIT

**2**

Message

| | |
|---|---|
| **From:** | Alan Kantowitz [alan@aaf.com] |
| **Sent:** | 1/22/2019 6:01:36 PM |
| **To:** | Charlie Ebersol [ce@aaf.com] |
| **CC:** | Kevin Freedman [kevin@aaf.com]; Kevin Farrell [kevin.farrell@aaf.com] |
| **Subject:** | Critical Payments through Feb 9th |

Charlie/Kevin,

Farrell and I just spent the last few hours going through this exercise. By our estimation it looks like there will be about ~$10m - $11m of critical cash out the door between now and the opening weekend (see the first tab on the attached google sheet for reference but please do not play around or make edits as I need this info for the board deck as is).

Please note that this is my estimation of what is critical along with Farrell as a second pair of eyes. I did not include the majority of CBS fees and other large vendors like XOs and SMT that we owe. I would consider these "critical" given they have raised them to us and they are long overdue. But in the interest of this exercise and this game of chicken, I have assumed we continue to push a bunch these when in reality I have no clue whether or not we will be able to.

There will also probably be several critical invoices that pop up over the course of the next three weeks that amount to about $1m that are not accounted for in here. That is just the nature of how fluid this business has been and our lack of accounting/invoice processing.

**By my estimation, and based on this analysis. If MGM funds their $3.5m, we will need another ~$7m to get through the first weekend. That can come from a variety of sources (Dick, Dave, ticket sales etc).**

Again, I would be remiss if I did not point out the following. We have about $8m of invoices that are overdue and maybe and probably another ~$8m that we will continue to push past opening weekend eve though they will arise between now and then.

https://docs.google.com/spreadsheets/d/1dXwuhjHw0DKyLqJO5ONllKIMhs1K3Qm70p8-0tnmddY/edit#gid=190540961

Best,
Alan
--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com



**EXHIBIT**

**3**

| | |
|---|---|
| **From:** | Charlie Ebersol[ce@aaf.com] |
| **Sent:** | Wed 2/13/2019 4:50:40 PM (UTC) |
| **To:** | Tom Dundon[td@dundon.co] |
| **Cc:** | Kevin Freedman[kevin@aaf.com]; alan@aaf.com[alan@aaf.com]; Dawn Belt[dbelt@fenwick.com] |
| **Subject:** | Ebersol Sports Media Group // AAF |
| **Attachment:** | ESMG Updated Investor Deck_2019.02.pdf |
| **Attachment:** | ESMG Financial Projections Model vF.xlsx |
| **Attachment:** | ebersol-sports-media-group-inc_2019-02-11_summary_cap_intermediate_cap.xlsx |

Tom,

Per our conversation, here is the package on the company. The parent company is called Ebersol Sports Media Group (ESMG). ESMG controls 100% of the league, the technology company and all the IP.

We will be sending the term sheet for the $10M bridge as soon as it is drafted by our attorneys who are writing it right now. In the interest of time and simplicity, we will structure this as a convertible promissory note.
- Conversion price: 20% discount to pre-money valuation of next equity financing, with a cap of $90M
- Closing: today


**_Attached to this email are:_**
- Overview materials deck
- Financial projection model
- Cap Table

**_Opening Night Highlights_**
- #1 trending sports app in the app in both the Apple and Google Play App Stores (#33 in full App Store)
- #1 PrimeTime television program on Saturday night; 2.1 rating on CBS (beat the PrimeTime NBA (OKC v Houston) game on ABC)
- 125,000 active users on mobile
- 5M users for the weekend (web and app)
- Responsible for 11 of the 20 top trending topics on Twitter in the US during the opening weekend (and 5 of the top 10)
- San Antonio attendance: 27,875
- Orlando attendance: 21,187



- History of the league https://vimeo.com/315016769/19a1eb31dd

Look forward to speaking soon.

All my best

C

Charlie Ebersol
Founder & CEO


AAF.com



DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**EBERSOL SPORTS MEDIA GROUP ANNUAL FINANCIAL PROJECTIONS**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Teams | # | 8 | 10 | 12 | 14 | 16 | 16 | 16 | 16 | 16 | 16 |
| # of Players | | 416 | 520 | 624 | 728 | 832 | 832 | 832 | 832 | 832 | 832 |

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| League Revenue | $15,350,000 | $25,421,000 | $59,355,588 | $75,716,459 | $94,948,776 | $111,040,843 | $139,630,046 | $163,499,565 | $206,112,494 | $241,654,125 |
| Team Revenue | 44,800,000 | 74,690,000 | 151,488,288 | 204,041,470 | 263,292,963 | 283,819,076 | 301,140,562 | 319,536,591 | 339,075,036 | 359,828,148 |
| Digital Revenue | 4,160,760 | 32,296,547 | 56,200,033 | 81,501,047 | 108,333,025 | 136,821,987 | 167,108,060 | 199,347,203 | 233,713,076 | 270,399,291 |
| **Total Revenue** | **$64,310,760** | **$132,407,547** | **$267,043,909** | **$361,258,975** | **$466,574,765** | **$531,681,908** | **$607,878,668** | **$682,383,358** | **$778,900,607** | **$871,881,564** |
| | | | | | | | | | | |
| Digital Expenses | $13,217,050 | $15,973,761 | $18,128,379 | $18,493,947 | $18,860,766 | $19,237,981 | $19,622,741 | $20,015,196 | $20,415,500 | $20,823,810 |
| Football Expenses | 64,668,212 | 84,949,056 | 99,818,399 | 114,967,582 | 130,154,470 | 130,677,739 | 131,211,473 | 131,755,881 | 132,311,178 | 132,877,581 |
| Player Relations Expenses | 2,227,900 | 3,424,446 | 3,436,068 | 3,447,922 | 11,177,334 | 11,189,667 | 11,202,247 | 11,215,078 | 11,228,166 | 11,241,516 |
| Marketing/Branding Expenses | 21,984,486 | 21,861,356 | 22,240,810 | 22,685,626 | 23,139,339 | 23,602,126 | 24,074,168 | 24,555,651 | 25,046,764 | 25,547,700 |
| Production Expenses | 17,999,418 | 16,049,106 | 16,356,869 | 16,684,007 | 17,017,687 | 17,358,041 | 17,705,201 | 18,059,305 | 18,420,491 | 18,788,901 |
| League Expenses | 28,428,067 | 33,500,880 | 38,271,789 | 43,090,061 | 47,911,251 | 48,114,353 | 48,322,812 | 48,536,656 | 48,755,916 | 48,980,630 |
| Team Expenses | 25,395,399 | 38,026,520 | 45,631,824 | 53,237,128 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 |
| Medical Expenses | 8,462,900 | 13,462,096 | 15,414,093 | 17,367,186 | 19,321,397 | 27,115,228 | 27,174,542 | 27,235,043 | 27,296,753 | 27,359,698 |
| Corporate Expenses | 5,986,000 | 6,712,620 | 6,797,790 | 6,933,746 | 7,073,421 | 7,213,869 | 7,358,147 | 7,505,309 | 7,655,416 | 7,808,524 |
| Digital Payment Fees | 1,248,228 | 5,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,045,596 | 50,132,418 | 59,806,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,133 | 5,709,386 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total Expenses** | **$190,345,793** | **$249,538,201** | **$292,791,088** | **$335,617,002** | **$386,955,243** | **$410,341,879** | **$426,890,091** | **$444,410,469** | **$462,986,329** | **$482,710,455** |
| | | | | | | | | | | |
| Total Operating Income (Loss) | ($126,035,033) | ($116,630,654) | ($25,746,725) | $25,641,973 | $79,619,482 | $121,340,028 | $180,588,577 | $237,972,879 | $315,914,278 | $389,171,109 |
| % Margin | -196.0% | -87.8% | -9.6% | 7.1% | 17.1% | 22.8% | 29.8% | 34.9% | 40.6% | 44.6% |
| | | | | | | | | | | |
| Cumulative Net Cash Flow | ($126,035,033) | ($242,665,687) | ($268,412,416) | ($242,770,443) | ($163,150,962) | ($41,810,934) | $139,177,643 | $377,150,522 | $893,064,800 | $1,082,235,910 |

**Memo: Expense Reporting**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| Payroll | 90,037,450 | 136,944,319 | 160,064,463 | 183,835,010 | 211,368,455 | 220,016,066 | 220,946,235 | 221,895,008 | 222,862,757 | 223,849,860 |
| Professional Services | 1,699,661 | 1,870,659 | 1,955,135 | 2,040,255 | 2,126,031 | 2,190,185 | 2,195,022 | 2,230,555 | 2,266,800 | 2,303,769 |
| Advertising & Promotions | 20,741,953 | 19,484,292 | 19,984,478 | 20,496,207 | 21,013,631 | 21,413,904 | 21,822,182 | 22,238,626 | 22,663,398 | 23,096,666 |
| Travel | 23,529,116 | 26,870,073 | 30,213,224 | 33,559,205 | 36,908,454 | 37,129,886 | 37,357,042 | 37,589,856 | 37,828,668 | 38,073,221 |
| Office & Facility Costs | 4,009,592 | 5,811,834 | 6,880,945 | 7,950,264 | 9,019,794 | 9,030,790 | 9,042,006 | 9,053,446 | 9,065,115 | 9,077,017 |
| Other General & Administrative Costs | 48,351,661 | 42,978,665 | 46,995,777 | 51,023,065 | 55,042,350 | 55,500,604 | 56,151,276 | 56,712,961 | 57,285,880 | 57,870,258 |
| Digital Payment Fees | 1,248,228 | 5,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,806,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,133 | 5,709,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total** | **$190,345,793** | **$249,538,201** | **$292,791,088** | **$335,617,002** | **$386,955,243** | **$410,341,879** | **$426,890,091** | **$444,410,469** | **$462,986,329** | **$482,710,455** |
| | | | | | | | | | | |
| Payroll | 47% | 55% | 55% | 54% | 55% | 54% | 52% | 50% | 48% | 46% |
| Professional Services | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 0% |
| Advertising & Promotions | 11% | 8% | 7% | 6% | 5% | 5% | 5% | 5% | 5% | 5% |
| Travel | 12% | 11% | 10% | 10% | 10% | 9% | 9% | 8% | 8% | 8% |
| Office & Facility Costs | 2% | 2% | 2% | 2% | 2% | 2% | 1% | 2% | 2% | 2% |
| Other General & Administrative Costs | 25% | 17% | 16% | 15% | 14% | 14% | 13% | 13% | 12% | 12% |
| Digital Payment Fees | 1% | 4% | 6% | 7% | 8% | 10% | 12% | 13% | 15% | 17% |
| AAF Player Digital Distributions | 0% | 2% | 3% | 4% | 5% | 6% | 7% | 6% | 9% | 10% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |
| | | | | | | | | | | |
| Memo: Average Player Bonuses | $1,750 | $11,037 | $15,761 | $19,592 | $22,786 | $28,779 | $35,249 | $41,930 | $49,158 | $56,815 |

## EBERSOL SPORTS MEDIA GROUP MONTHLY FINANCIAL PROJECTIONS THROUGH SEASON 1

| | 11/30/18 | 12/31/18 | 1/31/19 | 2/28/19 | 3/31/19 | 4/30/19 | 5/31/19 |
|---|---|---|---|---|---|---|---|
| League Revenue Seasononality | 0% | 2% | 10% | 25% | 25% | 18% | 20% |
| Team Revenue Seasononality | 3% | 8% | 12% | 17% | 20% | 20% | 20% |
| Digital Revenue Seasononality | 0% | 0% | 0% | 33% | 33% | 33% | 0 |
| | | | | | | | |
| | 11/30/18 | 12/31/18 | 1/31/19 | 2/28/19 | 3/31/19 | 4/30/19 | 5/31/19 |
| League Revenue | $0 | $307,000 | $1,535,000 | $3,837,500 | $3,837,500 | $2,763,000 | $3,070,000 |
| Team Revenue | 1,344,000 | 3,584,000 | 5,376,000 | 7,616,000 | 8,960,000 | 8,960,000 | 8,960,000 |
| Digital Revenue | 0 | 0 | 0 | 1,386,920 | 1,386,920 | 1,386,920 | 0 |
| **Total Revenue** | **$1,344,000** | **$3,891,000** | **$6,911,000** | **$12,840,420** | **$14,184,420** | **$13,109,920** | **$12,030,000** |
| | | | | | | | |
| Digital Expenses | $777,000 | $706,000 | $719,000 | $2,620,000 | $2,620,000 | $2,620,000 | $685,500 |
| Football Expenses | 3,574,074 | 5,931,647 | 5,182,897 | 17,595,927 | 11,879,833 | 11,854,833 | 2,521,500 |
| Player Relations Expenses | 172,100 | 213,100 | 212,600 | 237,600 | 249,900 | 249,900 | 247,500 |
| Marketing/Branding Expenses | 957,762 | 2,541,524 | 4,059,700 | 4,850,700 | 3,018,700 | 4,443,700 | 253,700 |
| Production Expenses | 470,333 | 1,778,333 | 5,730,611 | 3,185,897 | 3,185,897 | 2,792,564 | 74,000 |
| League Expenses | 533,848 | 730,272 | 3,179,724 | 11,023,006 | 7,034,226 | 4,447,956 | 274,006 |
| Team Expenses | 996,000 | 1,707,755 | 1,707,755 | 4,407,459 | 6,002,459 | 6,002,459 | 1,707,755 |
| Medical Expenses | 101,000 | 1,601,320 | 2,261,320 | 1,430,760 | 737,000 | 737,000 | 721,000 |
| Corporate Expenses | 281,750 | 301,750 | 381,750 | 381,750 | 881,750 | 881,750 | 881,750 |
| Digital Payment Fees | 0 | 0 | 0 | 416,076 | 416,076 | 416,076 | 0 |
| AAF Player Digital Distributions | 0 | 0 | 0 | 242,711 | 242,711 | 242,711 | 0 |
| **Total Expenses** | **$7,863,867** | **$15,511,701** | **$23,435,357** | **$46,391,887** | **$36,268,553** | **$34,688,950** | **$7,366,711** |
| | | | | | | | |
| **Total Operating Income (Loss)** | **($6,519,867)** | **($11,620,701)** | **($16,524,357)** | **($33,551,467)** | **($22,084,133)** | **($21,579,030)** | **$4,663,289** |
| % Margin | -485% | -299% | -239% | -261% | -156% | -165% | 39% |
| | | | | | | | |
| **Cumulative Net Cash Flow** | **($6,519,867)** | **($18,140,568)** | **($34,664,925)** | **($68,216,391)** | **($90,300,524)** | **($111,879,554)** | **($107,216,265)** |
| | | | | | | | |
| Memo: Expense Reporting | | | | | | | |
| Payroll | 4,567,350 | 5,287,350 | 5,886,850 | 17,854,690 | 18,579,190 | 18,600,920 | 5,702,850 |
| Professional Services | 119,679 | 157,110 | 161,110 | 161,110 | 161,110 | 161,110 | 161,110 |
| Advertising & Promotions | 817,762 | 2,443,191 | 3,957,667 | 4,748,667 | 2,916,667 | 4,341,667 | 151,667 |
| Travel | 516,759 | 1,426,183 | 3,404,162 | 9,167,474 | 5,359,994 | 2,934,994 | 53,317 |
| Office & Facility Costs | 42,327 | 188,994 | 188,994 | 683,994 | 1,178,994 | 1,178,994 | 188,994 |
| Other General & Administrative Costs | 1,799,990 | 6,008,875 | 9,836,575 | 13,117,166 | 7,413,812 | 6,812,479 | 1,108,775 |
| Digital Payment Fees | 0 | 0 | 0 | 416,076 | 416,076 | 416,076 | 0 |
| AAF Player Digital Distributions | 0 | 0 | 0 | 242,711 | 242,711 | 242,711 | 0 |
| **Total** | **$7,863,867** | **$15,511,701** | **$23,435,357** | **$46,391,887** | **$36,268,553** | **$34,688,950** | **$7,366,711** |
| | | | | | | | |
| Payroll | 58% | 34% | 25% | 38% | 51% | 54% | 77% |
| Professional Services | 2% | 1% | 1% | 0% | 0% | 0% | 2% |
| Advertising & Promotions | 10% | 16% | 17% | 10% | 8% | 13% | 2% |
| Travel | 7% | 9% | 15% | 20% | 15% | 8% | 1% |
| Office & Facility Costs | 1% | 1% | 1% | 1% | 3% | 3% | 3% |
| Other General & Administrative Costs | 23% | 39% | 42% | 28% | 20% | 20% | 15% |
| Digital Payment Fees | 0% | 0% | 0% | 1% | 1% | 1% | 0% |
| AAF Player Digital Distributions | 0% | 0% | 0% | 1% | 1% | 1% | 0% |
| **Total** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |

225

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| **National Sponsorship Revenue** | $3,000,000 | $12,500,000 | $21,875,000 | $32,812,500 | $39,375,000 | $47,250,000 | $56,700,000 | $68,040,000 | $81,648,000 | $97,977,600 |
| % Growth | | 250% | 75% | 50% | 20% | 20% | 20% | 20% | 20% | 20% |
| **Broadcasting Revenue** | $0 | $0 | $12,000,000 | $12,000,000 | $18,000,000 | $18,000,000 | $27,000,000 | $27,000,000 | $40,500,000 | $40,500,000 |
| % Growth | | 0% | 0% | 0% | 50% | 0% | 50% | 0% | 50% | 0% |
| **League Merchandise Revenue** | $1,250,000 | $1,875,000 | $2,250,000 | $2,475,000 | $2,722,500 | $2,994,750 | $3,294,225 | $3,623,648 | $3,986,012 | $4,384,613 |
| % Growth | | 50% | 20% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| **Regular Season Revenue** | $6,250,000 | $14,375,000 | $36,125,000 | $47,287,500 | $60,097,500 | $68,244,750 | $86,994,225 | $98,663,648 | $126,134,012 | $142,862,213 |
| | | | | | | | | | | |
| *Number of Playoff Games* | 2 | 2 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | | | | | | | | | | |
| Tickets per game | 25,000 | 27,500 | 30,250 | 33,275 | 36,603 | 40,263 | 44,289 | 48,718 | 53,590 | 58,949 |
| % Growth | | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Average Price | $60.00 | $69.00 | $79.35 | $91.25 | $104.94 | $120.68 | $138.78 | $159.60 | $183.54 | $211.07 |
| % Growth | | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| **Total Playoff Ticket Revenue** | $3,000,000 | $3,795,000 | $9,601,350 | $12,145,709 | $15,364,520 | $19,433,845 | $24,586,369 | $31,101,757 | $39,343,723 | $49,769,810 |
| | | | | | | | | | | |
| Playoff Merchandise net per cap | $10.00 | $10.50 | $11.03 | $11.58 | $12.16 | $12.76 | $13.40 | $14.07 | $14.77 | $15.51 |
| % Growth | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| **Playoff Merchandise Revenue** | $500,000 | $577,500 | $1,334,615 | $1,540,799 | $1,779,623 | $2,055,464 | $2,374,061 | $2,742,041 | $3,167,057 | $3,657,951 |
| | | | | | | | | | | |
| Playoff Sponsorship | $500,000 | $600,000 | $900,000 | $1,080,000 | $1,296,000 | $1,555,200 | $1,866,240 | $2,239,488 | $2,687,386 | $3,224,863 |
| % Growth | | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% |
| **Playoff Sponsorship Revenue** | $1,000,000 | $1,200,000 | $1,600,000 | $4,320,000 | $5,184,000 | $6,220,800 | $7,464,960 | $8,957,952 | $10,749,542 | $12,899,451 |
| | | | | | | | | | | |
| Playoff Broadcasting | $500,000 | $500,000 | $900,000 | $1,080,000 | $1,296,000 | $1,555,200 | $1,866,240 | $2,239,488 | $2,687,386 | $3,224,863 |
| % Growth | | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% |
| **Playoff Broadcast Revenue** | $1,000,000 | $1,200,000 | $3,600,000 | $4,320,000 | $5,184,000 | $6,220,800 | $7,464,960 | $8,957,952 | $10,749,542 | $12,899,451 |
| **Total Playoff Revenue** | $5,500,000 | $6,772,500 | $16,135,375 | $22,326,507 | $27,511,943 | $33,930,929 | $41,890,351 | $51,759,702 | $64,009,865 | $79,226,662 |
| | | | | | | | | | | |
| Total Sold per game | 30,000 | 33,000 | 36,300 | 39,930 | 43,923 | 48,315 | 53,147 | 58,462 | 64,308 | 70,738 |
| % Growth | | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| Average Price | $60.00 | $69.00 | $79.35 | $91.25 | $104.94 | $120.68 | $138.78 | $159.60 | $183.54 | $211.07 |
| % Growth | | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% | 15% |
| **Championship Ticket Revenue** | $1,800,000 | $2,277,000 | $2,880,405 | $3,643,712 | $4,609,250 | $5,830,760 | $7,375,911 | $9,330,527 | $11,803,117 | $14,930,943 |
| | | | | | | | | | | |
| Championship Merchandise net pc | $10.00 | $10.50 | $11.03 | $11.58 | $12.16 | $12.76 | $13.40 | $14.07 | $14.77 | $15.51 |
| % Growth | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| **Championship Merchandise Reve** | $300,000 | $346,500 | $400,208 | $462,240 | $533,887 | $616,639 | $712,218 | $822,412 | $950,117 | $1,097,385 |
| | | | | | | | | | | |
| **Championship Sponsorship** | $750,000 | $825,000 | $907,500 | $998,250 | $1,098,075 | $1,207,883 | $1,328,671 | $1,461,538 | $1,607,692 | $1,768,461 |
| % Growth | | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| | | | | | | | | | | |
| **Broadcasting** | $750,000 | $825,000 | $907,500 | $998,250 | $1,098,075 | $1,207,883 | $1,328,671 | $1,461,538 | $1,607,692 | $1,768,461 |
| % Growth | | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% | 10% |
| | | | | | | | | | | |
| **Total Championship Revenue** | $3,600,000 | $4,273,500 | $5,095,613 | $6,102,452 | $7,339,333 | $8,863,164 | $10,745,471 | $13,076,215 | $15,968,617 | $19,565,250 |
| | | | | | | | | | | |
| **Total League Revenue** | $15,350,000 | $25,421,000 | $59,355,988 | $75,716,459 | $94,948,776 | $111,040,843 | $139,630,046 | $163,499,565 | $206,112,494 | $241,654,125 |

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| *Number of Home Games* | 5 | 5 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Tickets per game | 17,500 | 21,000 | 25,200 | 27,720 | 30,492 | 32,017 | 32,977 | 33,966 | 34,985 | 36,035 |
| % Growth | | 20% | 20% | 10% | 10% | 5% | 3% | 3% | 3% | 3% |
| Average Price | $50.00 | $51.50 | $53.05 | $54.64 | $56.28 | $57.96 | $59.70 | $61.49 | $63.34 | $65.24 |
| % Growth | | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| **Total Ticket Revenue** | $4,375,000 | $5,407,500 | $9,357,138 | $10,601,637 | $12,011,655 | $12,990,605 | $13,781,733 | $14,621,040 | $15,511,462 | $16,456,110 |
| Playoff Merchandise net per cap | $6.00 | $6.30 | $6.62 | $6.95 | $7.29 | $7.66 | $8.04 | $8.44 | $8.86 | $9.31 |
| % Growth | | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| **Merchandise Revenue** | $525,000 | $661,500 | $1,166,886 | $1,347,753 | $1,556,655 | $1,716,212 | $1,856,084 | $2,007,354 | $2,170,954 | $2,347,886 |
| Jersey Sponsorship | $350,000 | $700,000 | $1,050,000 | $1,312,500 | $1,443,750 | $1,515,938 | $1,591,734 | $1,671,321 | $1,754,887 | $1,842,632 |
| % Growth | | 100% | 50% | 25% | 10% | 5% | 5% | 5% | 5% | 5% |
| In-Stadium Sponsorship | $175,000 | $350,000 | $525,000 | $656,250 | $721,875 | $757,969 | $795,867 | $835,661 | $877,444 | $921,316 |
| % Growth | | 100% | 50% | 25% | 10% | 5% | 5% | 5% | 5% | 5% |
| Local TV/Digital Promo | $175,000 | $350,000 | $525,000 | $656,250 | $721,875 | $757,969 | $795,867 | $835,661 | $877,444 | $921,316 |
| % Growth | | 100% | 50% | 25% | 10% | 5% | 5% | 5% | 5% | 5% |
| **Team Sponsorship Revenue** | $700,000 | $1,400,000 | $2,100,000 | $2,625,000 | $2,887,500 | $3,031,875 | $3,183,469 | $3,342,642 | $3,509,774 | $3,685,263 |
| **Total Per Team Revenue** | $5,600,000 | $7,469,000 | $12,624,024 | $14,574,391 | $16,455,810 | $17,738,692 | $18,821,285 | $19,971,037 | $21,192,190 | $22,489,259 |
| *Number of Teams* | 8 | 10 | 12 | 14 | 16 | 16 | 16 | 16 | 16 | 16 |
| **Total Revenue - All teams** | $44,800,000 | $74,690,000 | $151,488,284 | $204,041,670 | $263,292,963 | $283,819,078 | $301,140,562 | $319,536,591 | $339,075,036 | $359,828,148 |

**AAF Digital Revenue**

| Assumptions | | |
|---|---|---|

**Premium Subscriber Assumptions**   0  <---Switch

| | |
|---|---|
| FY19E Paid Subscribers (000s) | 25.0 |
| FY28E Paid Subscribers (000s) | 2,500.0 |
| Starting ARPU/month | $2.00 |
| ARPU Growth | 5.0% |

**Social Gamers Assumptions**

| | |
|---|---|
| US/CA Fantasy Market (millions) | 60.0 |
| % Market Active | 2.0% |
| % Market Escalator | 2.0% |
| % Active Paying | 2.0% |
| % Active Paying Escalator | 2.0% |
| Starting ARPU | $4.99 |
| ARPU Growth | 2.0% |

**In-App Purchase Assumptions**

| | |
|---|---|
| Beginning Avg. Audience / game | 1.2 |
| Audience Escalator | 5.0% |
| % audience participating | 1.0% |
| Participation Escalator | 5.0% |
| ARPPU | $8.99 |
| ARPU Growth | 5.0% |

**External Gamer Assumptions**

| | |
|---|---|
| % Gamers | 20.0% |
| $/User | $100.00 |
| $/User Growth | 5.0% |

**Sponsorship Assumptions**

| | |
|---|---|
| $/Download | $1.00 |
| $/Downlaod Growth | 5.0% |
| advertiser clients | 2.0 |

**AAF Digital Revenue**

## Model

| Period | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date | 6/30/18 | 6/30/19 | 6/30/20 | 6/30/21 | 6/30/22 | 6/30/23 | 6/30/24 | 6/30/25 | 6/30/26 | 6/30/27 | 6/30/28 | |
| Number of Games | 0 | 43 | 75 | 75 | 75 | 89 | 89 | 103 | 103 | 117 | 117 | |
| Number of Weeks | 12 | 12 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | |
| Season Months | 3 | 3 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | |
| $ in millions | 2018E | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E | Total |

### Forecast

**Operating Drivers**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subscribers (000s) | | 25.0 | 300 | 575 | 850 | 1,125 | 1,400 | 1,675 | 1,950 | 2,225 | 2,500.0 | |
| % Growth | | | 1100.0% | 91.7% | 47.8% | 32.4% | 24.4% | 19.6% | 16.4% | 14.1% | 12.4% | |
| (x) ARPU ($/month) | | 2.00 | 2.1 | 2.2 | 2.3 | 2.4 | 2.6 | 2.7 | 2.8 | 3.0 | 3.1 | |
| % Growth | | | 5.0% | 5.0% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | |
| AAF Premium Subs Revenue | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 |
| | | | | | | | | | | | | |
| Social Gamers (000s) | | 24.0 | 299 | 574 | 849 | 1,124 | 1,400 | 1,675 | 1,950 | 2,225 | 2,500.0 | |
| % Growth | | | 1146.3% | 92.0% | 47.9% | 32.4% | 24.5% | 19.7% | 16.4% | 14.1% | 12.4% | |
| (x) ARPU ($/weekend) | | 4.99 | 5.09 | 5.19 | 5.30 | 5.40 | 5.51 | 5.62 | 5.73 | 5.85 | 5.96 | |
| % Growth | | | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | 2.0% | |
| AAF Social Gaming Revenue | | 1.4 | 21.3 | 41.7 | 63.0 | 85.0 | 107.9 | 131.8 | 156.5 | 182.1 | 208.7 | 999.5 |
| | | | | | | | | | | | | |
| Paying Customers (000s) | | 12.0 | 75.6 | 145.5 | 222.3 | 306.3 | 398.2 | 498.5 | 607.9 | 726.9 | 856.3 | |
| % Growth | | | 530.0% | 92.5% | 52.7% | 37.8% | 30.0% | 25.2% | 21.9% | 19.6% | 17.8% | |
| (x) ARPU ($/month) | | 8.99 | 9.44 | 9.91 | 10.41 | 10.93 | 11.47 | 12.05 | 12.65 | 13.28 | 13.95 | |
| % Growth | | | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | |
| AAF In-App Purchase Revenue | | 0.3 | 2.9 | 5.8 | 9.3 | 13.4 | 18.3 | 24.0 | 30.8 | 38.6 | 47.8 | 191.0 |
| | | | | | | | | | | | | |
| Unique External Gamers | | | 59.8 | 55.0 | 55.0 | 55.0 | 55.0 | 55.0 | 55.0 | 55.0 | 55.0 | |
| Gaming CPA | | | 100.00 | 105.00 | 110.25 | 115.76 | 121.55 | 127.63 | 134.01 | 140.71 | 147.75 | |
| % Growth | | | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | |
| AAF Gaming Revenue | | | 6.0 | 5.8 | 6.1 | 6.4 | 6.7 | 7.0 | 7.4 | 7.7 | 8.1 | 61.2 |
| | | | | | | | | | | | | |
| Downloads (000s) | | 1,200.0 | 1,260.0 | 1,323.0 | 1,389.2 | 1,458.6 | 1,531.5 | 1,608.1 | 1,688.5 | 1,772.9 | 1,861.6 | |
| % Growth | | | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | |
| $/Download | | 1.00 | 1.05 | 1.10 | 1.16 | 1.22 | 1.28 | 1.34 | 1.41 | 1.48 | 1.55 | |
| % Growth | | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | |
| AAF Sponsorship Revenue | | 2.4 | 2.6 | 2.9 | 3.2 | 3.5 | 3.9 | 4.3 | 4.8 | 5.2 | 5.8 | 38.7 |
| | | | | | | | | | | | | |
| **Total Gross Revenue** | | 4.2 | 32.8 | 56.2 | 81.5 | 108.3 | 136.8 | 167.1 | 199.3 | 233.7 | 270.4 | 1,290.4 |
| Payment Fees | | (1.2) | (9.8) | (16.9) | (24.5) | (32.5) | (41.0) | (50.1) | (59.8) | (70.1) | (81.1) | |
| **Total Net Revenue** | | 2.9 | 23.0 | 39.3 | 57.1 | 75.8 | 95.8 | 117.0 | 139.5 | 163.6 | 189.3 | 903.3 |



22-22505077 ... Case 22-50737 Filed 06/24/22 ... Entered 06/24/22 ... Desc
Document ... Exhibits ... Pg 231 of 1466

| Date | 6/30/19 | 6/30/20 | 6/30/21 | 6/30/22 | 6/30/23 | 6/30/24 | 6/30/25 | 6/30/26 | 6/30/27 | 6/30/28 |
|---|---|---|---|---|---|---|---|---|---|---|
| Annual | 2019E | 2020E | 2021E | 2022E | 2023E | 2024E | 2025E | 2026E | 2027E | 2028E |

**(Section 1)**

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Headcount | 5,998,500 | 8,610,840 | 10,618,200 | 10,830,564 | 11,047,175 | 11,268,119 | 11,493,481 | 11,723,351 | 11,957,818 | 12,196,974 |
| Payroll | 129,000 | 131,580 | 134,212 | 136,896 | 139,634 | 142,426 | 145,275 | 148,180 | 151,144 | 154,167 |
| Professional Services | 87,500 | 89,250 | 91,035 | 92,856 | 94,713 | 96,607 | 98,539 | 100,510 | 102,520 | 104,571 |
| Advertising & Promotions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Travel | 71,500 | 72,930 | 74,389 | 75,876 | 77,394 | 78,942 | 80,521 | 82,131 | 83,774 | 85,449 |
| Office & Facility Costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other General & Administrative Co | 6,936,550 | 7,080,161 | 7,220,144 | 7,324,753 | 7,501,810 | 7,633,867 | 7,826,382 | 7,891,025 | 8,120,248 | 8,182,649 |
| Total | $13,223,050 | $15,973,761 | $18,128,379 | $18,490,947 | $18,860,766 | $19,337,981 | $19,622,741 | $20,019,196 | $20,419,500 | $20,823,810 |
| % headcount | 45% | 45% | 45% | 41% | 41% | 41% | 41% | 41% | 41% | 41% |
| % non headcount | 54% | 45% | 41% | 41% | 41% | 41% | 41% | 41% | 41% | 41% |

*(Remaining sections: Football, Player Relations, Marketing, Production, Legal, Tech, Medical, Corporate, Total — dense financial projection rows of Headcount, Payroll, Professional Services, Advertising & Promotions, Travel, Office & Facility Costs, Other General & Administrative Costs, Total, % headcount, % non headcount across fiscal years 2019E–2028E. Values not legibly reproducible at source resolution.)*

231

| Headcount | Timing | Group | Role | Base | 20% Burdened | Monthly | 6/30/19 2019E | 6/30/20 2020E (2%) | 6/30/21 2021E (2%) | 6/30/22 2022E (2%) | 6/30/23 2023E (2%) | 6/30/24 2024E (2%) | 6/30/25 2025E (2%) | 6/30/26 2026E (2%) | 6/30/27 2027E (2%) | 6/30/28 2028E (2%) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Head of Platform | 3/31/2018 | Platform | lead | 200,000 | 240,000 | 20,000 | 240,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 2 Security Lead | 3/31/2018 | Platform | engineer | 190,000 | 228,000 | 19,000 | 228,000 | 232,560 | 232,560 | 237,211 | 241,955 | 246,795 | 251,730 | 256,765 | 261,900 | 267,138 |
| 3 Lead Platform Engineer | 3/31/2018 | Platform | vp Eng | 240,000 | 288,000 | 24,000 | 288,000 | 293,760 | 293,760 | 299,635 | 305,628 | 311,740 | 317,975 | 324,335 | 330,821 | 337,438 |
| 4 Lead Mobile Engineer | 3/31/2018 | Platform | engineer | 195,000 | 234,000 | 19,500 | 234,000 | 238,680 | 238,680 | 243,454 | 248,323 | 253,289 | 258,355 | 263,522 | 268,792 | 274,168 |
| 5 Platform Engineer | 3/31/2018 | Platform | engineer | 195,000 | 234,000 | 19,500 | 234,000 | 238,680 | 238,680 | 243,454 | 248,323 | 253,289 | 258,355 | 263,522 | 268,792 | 274,168 |
| 6 Kevin Killough | 3/31/2018 | Platform | support | 115,000 | 138,000 | 11,500 | 138,000 | 140,760 | 140,760 | 143,575 | 146,447 | 149,376 | 152,363 | 155,410 | 158,519 | 161,689 |
| 7 iOS 1 | 7/1/2018 | Platform | engineer | 185,000 | 222,000 | 18,500 | 222,000 | 226,440 | 226,440 | 230,969 | 235,588 | 240,300 | 245,106 | 250,008 | 255,008 | 260,108 |
| 8 iOS 2 | 7/1/2018 | Platform | engineer | 175,000 | 210,000 | 17,500 | 210,000 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 9 Web Backend engineer | 7/1/2018 | Platform | engineer | 180,000 | 216,000 | 18,000 | 216,000 | 220,320 | 220,320 | 224,726 | 229,221 | 233,805 | 238,481 | 243,251 | 248,116 | 253,078 |
| 10 Web Frontend engineer (tools) 1 | 7/1/2018 | Platform | engineer | 160,000 | 192,000 | 16,000 | 192,000 | 195,840 | 195,840 | 199,757 | 203,752 | 207,827 | 211,984 | 216,223 | 220,548 | 224,959 |
| 11 C++ engineer | 7/1/2018 | Platform | engineer | 175,000 | 210,000 | 17,500 | 210,000 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 12 B2B/API Tools design | 7/1/2018 | Platform | design | 165,000 | 198,000 | 16,500 | 198,000 | 201,960 | 201,960 | 205,999 | 210,119 | 214,322 | 218,608 | 222,980 | 227,440 | 231,989 |
| 13 Web Frontend engineer | 8/1/2018 | Platform | engineer | 150,000 | 180,000 | 15,000 | 165,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 14 QA 1 | 8/1/2018 | Platform | QA | 160,000 | 192,000 | 16,000 | 176,000 | 195,840 | 195,840 | 199,757 | 203,752 | 207,827 | 211,984 | 216,223 | 220,548 | 224,959 |
| 15 Program management | 8/1/2018 | Platform | program | 150,000 | 180,000 | 15,000 | 165,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 16 In-house recruiting | 9/1/2018 | Platform | recruiting | 120,000 | 144,000 | 12,000 | 120,000 | 146,880 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 |
| 17 Web Frontend engineer (tools) 2 | 9/1/2018 | Platform | engineer | 150,000 | 180,000 | 15,000 | 150,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 18 DevOps | 9/1/2018 | Platform | engineer | 160,000 | 192,000 | 16,000 | 160,000 | 195,840 | 195,840 | 199,757 | 203,752 | 207,827 | 211,984 | 216,223 | 220,548 | 224,959 |
| 19 Full stack engineer | 10/1/2018 | Platform | engineer | 150,000 | 180,000 | 15,000 | 135,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 20 QA 2 | 10/1/2018 | Platform | QA | 120,000 | 144,000 | 12,000 | 108,000 | 146,880 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 |
| 21 Mobile engineer | 10/1/2018 | Platform | engineer | 175,000 | 210,000 | 17,500 | 157,500 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 22 Machine Learning/DataSci | 12/1/2018 | Platform | engineer | 210,000 | 252,000 | 21,000 | 147,000 | 257,040 | 257,040 | 262,181 | 267,424 | 272,773 | 278,228 | 283,793 | 289,469 | 295,258 |
| 23 Jr IT (K3) | 12/1/2018 | Platform | support | 90,000 | 108,000 | 9,000 | 63,000 | 110,160 | 110,160 | 112,363 | 114,610 | 116,903 | 119,241 | 121,626 | 124,058 | 126,539 |
| 24 Web Backend engineer | 5/1/2019 | Platform | engineer | 180,000 | 216,000 | 18,000 | 36,000 | 220,320 | 220,320 | 224,726 | 229,221 | 233,805 | 238,481 | 243,251 | 248,116 | 253,078 |
| 25 Web Frontend engineer (tools) 3 | 5/1/2019 | Platform | engineer | 150,000 | 180,000 | 15,000 | 30,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 26 Web Frontend engineer | 5/1/2019 | Platform | engineer | 150,000 | 180,000 | 15,000 | 30,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 27 C++ engineer | 5/1/2019 | Platform | engineer | 175,000 | 210,000 | 17,500 | 35,000 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 28 iOS 3 | 6/1/2019 | Platform | engineer | 175,000 | 210,000 | 17,500 | 17,500 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 29 OTT 1 | 6/1/2019 | Platform | engineer | 175,000 | 210,000 | 17,500 | 17,500 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 30 QA 3 | 6/1/2019 | Platform | QA | 120,000 | 144,000 | 12,000 | 12,000 | 146,880 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 |
| 31 Android 3 | 6/1/2019 | Platform | engineer | 175,000 | 210,000 | 17,500 | 17,500 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 32 OTT 2 | 6/1/2019 | Platform | engineer | 175,000 | 210,000 | 17,500 | 17,500 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 33 B2B/API Tools design | 6/1/2019 | Platform | design | 165,000 | 198,000 | 16,500 | 16,500 | 201,960 | 201,960 | 205,999 | 210,119 | 214,322 | 218,608 | 222,980 | 227,440 | 231,989 |
| 34 Web Backend engineer | 5/1/2021 | Platform | engineer | 180,000 | 216,000 | 18,000 | 0 | 0 | 220,320 | 224,726 | 229,221 | 233,805 | 238,481 | 243,251 | 248,116 | 253,078 |
| 35 Web Frontend engineer (tools) 3 | 5/1/2021 | Platform | engineer | 150,000 | 180,000 | 15,000 | 0 | 0 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 36 Web Frontend engineer | 5/1/2021 | Platform | engineer | 150,000 | 180,000 | 15,000 | 0 | 0 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 37 C++ engineer | 5/1/2021 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 38 iOS 3 | 5/1/2021 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 39 OTT 1 | 5/1/2021 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 40 QA 3 | 5/1/2021 | Platform | QA | 120,000 | 144,000 | 12,000 | 0 | 0 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 |
| 41 Android 3 | 5/1/2021 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 42 OTT 2 | 5/1/2021 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 43 B2B/API Tools design | 5/1/2021 | Platform | design | 165,000 | 198,000 | 16,500 | 0 | 0 | 201,960 | 205,999 | 210,119 | 214,322 | 218,608 | 222,980 | 227,440 | 231,989 |
| 44 Web Backend engineer | 5/1/2023 | Platform | engineer | 180,000 | 216,000 | 18,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 45 Web Frontend engineer (tools) 3 | 5/1/2023 | Platform | engineer | 150,000 | 180,000 | 15,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 46 Web Frontend engineer | 5/1/2023 | Platform | engineer | 150,000 | 180,000 | 15,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 47 C++ engineer | 5/1/2023 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 48 iOS 3 | 5/1/2023 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 49 OTT 1 | 5/1/2023 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 50 QA 3 | 5/1/2023 | Platform | QA | 120,000 | 144,000 | 12,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 51 Android 3 | 5/1/2023 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 52 OTT 2 | 5/1/2023 | Platform | engineer | 175,000 | 210,000 | 17,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 53 B2B/API Tools design | 5/1/2023 | Platform | design | 165,000 | 198,000 | 16,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 54 Product Manager | 8/1/2018 | Product | | 180,000 | 216,000 | 18,000 | 198,000 | 220,320 | 220,320 | 224,726 | 229,221 | 233,805 | 238,481 | 243,251 | 248,116 | 253,078 |
| 55 Associate Product Manager | 8/1/2018 | Product | | 120,000 | 144,000 | 12,000 | 132,000 | 146,880 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 |
| 56 Game Designer | 3/19/2018 | Product | | 145,000 | 174,000 | 14,500 | 174,000 | 177,480 | 177,480 | 181,030 | 184,650 | 188,343 | 192,110 | 195,952 | 199,871 | 203,869 |
| 57 Lead UI/UX Designer | 3/19/2018 | Product | | 120,000 | 144,000 | 12,000 | 144,000 | 146,880 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 |
| 58 UI Artist | 7/16/2018 | Product | | 110,000 | 132,000 | 11,000 | 132,000 | 134,640 | 134,640 | 137,333 | 140,079 | 142,881 | 145,739 | 148,653 | 151,627 | 154,659 |
| 59 UI Designer | 9/15/2018 | Product | | 100,000 | 120,000 | 10,000 | 100,000 | 122,400 | 122,400 | 124,848 | 127,345 | 129,892 | 132,490 | 135,139 | 137,842 | 140,599 |
| 60 Data Analyst | 9/15/2018 | Product | | 175,000 | 210,000 | 17,500 | 175,000 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 61 Live Event Product Manager | 9/15/2018 | Product | | 160,000 | 192,000 | 16,000 | 160,000 | 195,840 | 195,840 | 199,757 | 203,752 | 207,827 | 211,984 | 216,223 | 220,548 | 224,959 |
| 62 Live Event Operator | 10/1/2018 | Product | | 75,000 | 90,000 | 7,500 | 67,500 | 91,800 | 91,800 | 93,636 | 95,509 | 97,419 | 99,367 | 101,355 | 103,382 | 105,449 |
| 63 Head of Sales | 9/30/2018 | Biz Dev | | 150,000 | 180,000 | 15,000 | 135,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 64 Head of Client Services | 9/30/2018 | Client Services | | 150,000 | 180,000 | 15,000 | 135,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 65 Jr. Account Manager | 12/31/2018 | Client Services | | 100,000 | 120,000 | 10,000 | 60,000 | 122,400 | 122,400 | 124,848 | 127,345 | 129,892 | 132,490 | 135,139 | 137,842 | 140,599 |
| **Total** | | | | **$5,998,500** | | | **$8,610,840** | **$10,618,200** | **$10,830,564** | **$11,047,175** | **$11,268,119** | **$11,493,481** | **$11,723,351** | **$11,957,818** | **$12,196,974** | |

| Headcount | Timing | Group | Role | Base | 20% Bur Gened | Monthly | 8 2% 6/30/19 2019E | 10 2% 6/30/20 2020E | 12 2% 6/30/21 2021E | 14 2% 6/30/22 2022E | 16 2% 6/30/23 2023E | 16 2% 6/30/24 2024E | 16 2% 6/30/25 2025E | 16 2% 6/30/26 2026E | 16 2% 6/30/27 2027E | 16 2% 6/30/28 2028E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Bill Polian | 3/31/2018 | League | Founder | 400,000 | 480,000 | 40,000 | 480,000 | 489,600 | 499,392 | 509,380 | 519,567 | 529,959 | 540,558 | 551,369 | 562,397 | 573,645 |
| 2 John Kasin (medical) | 3/31/2018 | League | Medical | 60,000 | 72,000 | 6,000 | 72,000 | 73,440 | 74,909 | 76,407 | 77,935 | 79,494 | 81,084 | 82,705 | 84,359 | 86,046 |
| 3 Toni Miller | 8/1/2018 | League | EA | 65,000 | 78,000 | 6,500 | 71,500 | 79,560 | 79,560 | 81,151 | 82,774 | 84,430 | 86,118 | 87,841 | 89,597 | 91,389 |
| 4 JK McKay | 3/31/2018 | League | Football | 275,000 | 330,000 | 27,500 | 330,000 | 336,600 | 336,600 | 343,332 | 350,199 | 357,203 | 364,347 | 371,634 | 379,066 | 386,648 |
| 5 Annie Gerhart | 3/31/2018 | League | COS | 150,000 | 180,000 | 15,000 | 180,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 6 Steve Champlin/Chud Rundel/Jan | 3/31/2018 | League | Operations | 250,000 | 300,000 | 25,000 | 300,000 | 306,000 | 306,000 | 312,120 | 318,362 | 324,730 | 331,224 | 337,849 | 344,606 | 351,498 |
| 7 Chris Baugh | 3/31/2018 | League | Operations | 70,000 | 84,000 | 7,000 | 84,000 | 85,680 | 85,680 | 87,394 | 89,141 | 90,924 | 92,743 | 94,598 | 96,490 | 98,419 |
| 8 Bill Kohurich | 3/31/2018 | League | Player Pers | 250,000 | 300,000 | 25,000 | 300,000 | 306,000 | 306,000 | 312,120 | 318,362 | 324,730 | 331,224 | 337,849 | 344,606 | 351,498 |
| 9 Tony Softli | 3/31/2018 | League | Player Pers | 150,000 | 180,000 | 15,000 | 180,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 10 Russ Giglio | 3/31/2018 | League | Player Pers | 125,000 | 150,000 | 12,500 | 150,000 | 153,000 | 153,000 | 156,060 | 159,181 | 162,365 | 165,612 | 168,924 | 172,303 | 175,749 |
| 11 Joey Roberts | 3/31/2018 | League | Player Pers | 125,000 | 150,000 | 12,500 | 150,000 | 153,000 | 153,000 | 156,060 | 159,181 | 162,365 | 165,612 | 168,924 | 172,303 | 175,749 |
| 12 Equipment Manager (Clay Hampton | 1/1/2019 | League | Foot Ball | 150,000 | 180,000 | 15,000 | 90,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 13 Video Manager (Mike Dougherty w | 12/1/2018 | League | Football | 150,000 | 180,000 | 15,000 | 105,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 14 Brian Woods (Spring League) | 7/1/2018 | League | Operations | 240,000 | 288,000 | 24,000 | 288,000 | | | | | | | | | |
| 15 Steve Spurrier | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 16 Brad Childress | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 17 Rick Neuheisel | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 18 Derrick Erickson | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 19 Mike Martz | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 20 Mike Singletary | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 21 Mike Riley | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 22 Tim Lewis | 10/1/2018 | Team | Coach | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 23 Will Lewis | 10/1/2018 | Team | GM | 500,000 | 600,000 | 50,000 | 450,000 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 24 Tim Ruskell | 10/1/2018 | Team | GM | 200,000 | 240,000 | 20,000 | 180,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 25 Billy Devaney | 10/1/2018 | Team | GM | 200,000 | 240,000 | 20,000 | 180,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 26 Trey Brown | 10/1/2018 | Team | GM | 200,000 | 240,000 | 20,000 | 180,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 27 Daryl Johnson | 10/1/2018 | Team | GM | 200,000 | 240,000 | 20,000 | 180,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 28 Dave Boller | 10/1/2018 | Team | GM | 200,000 | 240,000 | 20,000 | 180,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 29 Randy Mueller | 10/1/2018 | Team | GM | 200,000 | 240,000 | 20,000 | 180,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 30 Joe Pendry | 10/1/2018 | Team | GM | 200,000 | 240,000 | 20,000 | 180,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 31 Trey Brown | 10/1/2018 | Team | GM | 175,000 | 210,000 | 17,500 | 157,500 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 32 Asst Coaches | 10/1/2018 | Team | Staff | 1,200,000 | 1,440,000 | 120,000 | 8,640,000 | 14,688,000 | 17,625,600 | 20,563,200 | 23,500,800 | 23,500,800 | 23,500,800 | 23,500,800 | 23,500,800 | 23,500,800 |
| 33 Coaching Assistant | 10/1/2018 | Team | Staff | 60,000 | 72,000 | 6,000 | 432,000 | 734,400 | 881,280 | 1,028,160 | 1,175,040 | 1,175,040 | 1,175,040 | 1,175,040 | 1,175,040 | 1,175,040 |
| 34 Personnel Director | 11/1/2018 | Team | Staff | 75,000 | 90,000 | 7,500 | 540,000 | 918,000 | 1,101,600 | 1,285,200 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 |
| 35 Operations Director | 11/1/2018 | Team | Staff | 75,000 | 90,000 | 7,500 | 480,000 | 918,000 | 1,101,600 | 1,285,200 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 |
| 36 Equipment Manager | 11/1/2018 | Team | Staff | 100,000 | 120,000 | 10,000 | 640,000 | 1,224,000 | 1,468,800 | 1,713,600 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 |
| 37 Asst Equipment | 11/1/2018 | Team | Staff | 50,000 | 60,000 | 5,000 | 320,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 |
| 38 Video Director | 11/1/2018 | Team | Staff | 100,000 | 120,000 | 10,000 | 680,000 | 1,224,000 | 1,468,800 | 1,713,600 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 |
| 39 Asst Video | 11/1/2018 | Team | Staff | 50,000 | 60,000 | 5,000 | 320,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 |
| 40 Security League | 12/1/2018 | Team | Staff | 200,000 | 240,000 | 20,000 | 160,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 41 Security – Team | 12/1/2018 | Team | Staff | 200,000 | 120,000 | 10,000 | 560,000 | 1,224,000 | 1,468,800 | 1,713,600 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 |
| 42 Players | 2/1/2019 | Team | Players | 3,500,000 | 4,200,000 | 350,000 | 28,000,000 | 42,840,000 | 51,408,000 | 59,976,000 | 68,544,000 | 68,544,000 | 68,544,000 | 68,544,000 | 68,544,000 | 68,544,000 |
| 43 Expansion Team 9 Head Coach | 10/1/2019 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 44 Expansion Team 9 GM | 10/1/2019 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 45 Expansion Team 10 Head Coach | 10/1/2019 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 612,000 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 46 Expansion Team 10 GM | 10/1/2019 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 47 Expansion Team 11 Head Coach | 10/1/2020 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 0 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 48 Expansion Team 11 GM | 10/1/2020 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 0 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 49 Expansion Team 12 Head Coach | 10/1/2020 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 0 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 | 702,996 |
| 50 Expansion Team 12 GM | 10/1/2020 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 0 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 51 Expansion Team 13 Head Coach | 10/1/2021 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 0 | 0 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 |
| 52 Expansion Team 13 GM | 10/1/2021 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 0 | 0 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 |
| 53 Expansion Team 14 Head Coach | 10/1/2021 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 0 | 0 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 | 689,211 |
| 54 Expansion Team 14 GM | 10/1/2021 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 0 | 0 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 |
| 55 Expansion Team 15 Head Coach | 10/1/2022 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 0 | 0 | 0 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 |
| 56 Expansion Team 15 GM | 10/1/2022 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 0 | 0 | 0 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 |
| 57 Expansion Team 16 Head Coach | 10/1/2022 | Team | Coach | 500,000 | 600,000 | 50,000 | 0 | 0 | 0 | 0 | 612,000 | 624,240 | 636,725 | 649,459 | 662,448 | 675,697 |
| 58 Expansion Team 16 GM | 10/1/2022 | Team | GM | 200,000 | 240,000 | 20,000 | 0 | 0 | 0 | 0 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 |
| Total | | | | $46,580,000 | | | $77,115,880 | $91,818,360 | $106,809,342 | $121,831,229 | $132,551,973 | $122,551,973 | $123,303,192 | $123,303,455 | $123,684,400 | $123,684,466 |

2:22-cv-05077-Paga Doc #291-14 Filed 06/24/25 Entered 06/24/25 09:19:04 9225-5077 3 Depaged Document - Exhibits Pg 235 of 1466



2:20-cv-05070-... Case 2:20-cv-05070 ... Filed 06/24/21 ... Entered 06/24/21 ... Desc ... Document ... Exhibits Pg 236 of 1466

| Headcount | Timing | Group | Role | Base | 20% Burdened | Monthly | 6/30/19 2019E | 6/30/20 2020E | 6/30/21 2021E | 6/30/22 2022E | 6/30/23 2023E | 6/30/24 2024E | 6/30/25 2025E | 6/30/26 2026E | 6/30/27 2027E | 6/30/28 2028E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | # | | 10 2% | 12 2% | 14 2% | 16 2% | 16 2% | 16 2% | 16 2% | 16 2% | 16 2% |
| 1 Head of Player Operations | 3/31/2018 | Admin | | 225,000 | 270,000 | 22,500 | 270,000 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 |
| 2 Head of Wellness | 7/1/2018 | Admin | | 225,000 | 270,000 | 22,500 | 270,000 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 | 275,400 |
| 3 Head of Medicine | 7/1/2018 | Admin | | 200,000 | 240,000 | 20,000 | 240,000 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 |
| 4 Head of Player Administration | 6/1/2019 | Admin | | 250,000 | 300,000 | 25,000 | 25,000 | 306,000 | 306,000 | 306,000 | 306,000 | 306,000 | 306,000 | 306,000 | 306,000 | 306,000 |
| 5 Organizational Development | 3/1/2019 | Admin | | 120,000 | 144,000 | 12,000 | 48,000 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 |
| 6 Director Holistic Medicine (Integral) | 11/1/2018 | League | | 110,000 | 132,000 | 11,000 | 88,000 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 |
| 7 Asst Director of Integrative Medicine | 6/1/2023 | | | 175,000 | 210,000 | 17,500 | 0 | 0 | 0 | 0 | 214,200 | 214,200 | 214,200 | 214,200 | 214,200 | 214,200 |
| 8 Human Experience Director | 6/1/2023 | | | 100,000 | 120,000 | 10,000 | 0 | 0 | 0 | 0 | 122,400 | 122,400 | 122,400 | 122,400 | 122,400 | 122,400 |
| 9 Project Manager | 6/1/2023 | | | 90,000 | 108,000 | 9,000 | 0 | 0 | 0 | 0 | 110,160 | 110,160 | 110,160 | 110,160 | 110,160 | 110,160 |
| 10 Team - Masters RN Mind Body Trainer | 6/1/2023 | | | 55,000 | 66,000 | 5,500 | 0 | 0 | 0 | 0 | 67,320 | 67,320 | 67,320 | 67,320 | 67,320 | 67,320 |
| 11 Team - Acupuncturist | 6/1/2023 | | | 75,000 | 90,000 | 7,500 | 0 | 0 | 0 | 0 | 91,800 | 91,800 | 91,800 | 91,800 | 91,800 | 91,800 |
| 12 Director Massage | 9/1/2018 | League | | 110,000 | 132,000 | 11,000 | 110,000 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 |
| 13 League - Asst Director Massage Therapy | 9/1/2018 | League | | 70,000 | 84,000 | 7,000 | 70,000 | 85,680 | 85,680 | 85,680 | 85,680 | 85,680 | 85,680 | 85,680 | 85,680 | 85,680 |
| 14 Team - Massage Coordinator | 6/1/2023 | Team | | 55,000 | 66,000 | 5,500 | 0 | 0 | 0 | 0 | 1,077,120 | 1,077,120 | 1,077,120 | 1,077,120 | 1,077,120 | 1,077,120 |
| 15 Team - Massage Therapist | 6/1/2023 | Team | | 35,000 | 42,000 | 3,500 | 0 | 0 | 0 | 0 | 685,440 | 685,440 | 685,440 | 685,440 | 685,440 | 685,440 |
| 16 Team - Stretch-to-Win Therapist | 6/1/2023 | | | 40,000 | 48,000 | 4,000 | 0 | 0 | 0 | 0 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 |
| 17 Director - Psychologist | 11/1/2018 | League | | 180,000 | 216,000 | 18,000 | 144,000 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 |
| 18 Director - Strength and Conditioning | 9/1/2018 | League | | 180,000 | 216,000 | 18,000 | 180,000 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 |
| 19 Director - Spa Therapy | 6/1/2023 | | | 110,000 | 132,000 | 11,000 | 0 | 0 | 0 | 0 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 | 134,640 |
| 20 Asst Director Spa Therapy | 6/1/2023 | | | 60,000 | 72,000 | 6,000 | 0 | 0 | 0 | 0 | 73,440 | 73,440 | 73,440 | 73,440 | 73,440 | 73,440 |
| 21 Director - Xue Flow | 11/1/2019 | League | | 80,000 | 96,000 | 8,000 | 0 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 |
| 22 Asst Director - Xue Flow | 6/1/2023 | | | 60,000 | 72,000 | 6,000 | 0 | 0 | 0 | 0 | 73,440 | 73,440 | 73,440 | 73,440 | 73,440 | 73,440 |
| 23 Team Xue Flow | 6/1/2023 | | | 40,000 | 48,000 | 4,000 | 0 | 0 | 0 | 0 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 |
| 24 Director - Family Therapy and Services | 11/1/2019 | League | | 220,000 | 264,000 | 22,000 | 0 | 269,280 | 269,280 | 269,280 | 269,280 | 269,280 | 269,280 | 269,280 | 269,280 | 269,280 |
| 25 Team - Navigator | 6/1/2023 | | | 62,000 | 74,400 | 6,200 | 0 | 0 | 0 | 0 | 75,888 | 75,888 | 75,888 | 75,888 | 75,888 | 75,888 |
| 26 Team - Family Therapist (Family Services Professional) | 6/1/2023 | | | 51,000 | 61,200 | 5,100 | 61,200 | 62,424 | 62,424 | 62,424 | 62,424 | 62,424 | 62,424 | 62,424 | 62,424 | 62,424 |
| 27 Director - Nutrition | 12/1/2018 | League | | 80,000 | 96,000 | 8,000 | 56,000 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 | 97,920 |
| 28 Asst Director of Nutrution | 6/1/2023 | | | 52,000 | 62,400 | 5,200 | 0 | 0 | 0 | 0 | 63,648 | 63,648 | 63,648 | 63,648 | 63,648 | 63,648 |
| 29 Team - Nutrition | 6/1/2023 | Team | | 90,000 | 108,000 | 9,000 | 0 | 0 | 0 | 0 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 |
| 30 Family/Community Nutrition | 6/1/2023 | | | 60,000 | 72,000 | 6,000 | 0 | 0 | 0 | 0 | 73,440 | 73,440 | 73,440 | 73,440 | 73,440 | 73,440 |
| 31 Team Chef | 6/1/2023 | | | 90,000 | 108,000 | 9,000 | 0 | 0 | 0 | 0 | 110,160 | 110,160 | 110,160 | 110,160 | 110,160 | 110,160 |
| 32 Sous Chef | 6/1/2023 | | | 45,000 | 54,000 | 4,500 | 0 | 0 | 0 | 0 | 55,080 | 55,080 | 55,080 | 55,080 | 55,080 | 55,080 |
| 33 Nutrition Intern | 6/1/2023 | | | 15,000 | 18,000 | 1,500 | 0 | 0 | 0 | 0 | 18,360 | 18,360 | 18,360 | 18,360 | 18,360 | 18,360 |
| 34 Director of Sports Psychology | 11/1/2018 | League | | 120,000 | 144,000 | 12,000 | 96,000 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 | 146,880 |
| 35 Team - sports psych | 6/1/2023 | | | 100,000 | 120,000 | 10,000 | 0 | 0 | 0 | 0 | 122,400 | 122,400 | 122,400 | 122,400 | 122,400 | 122,400 |
| 36 Team - Mental Health Clinician | 6/1/2023 | Team | | 75,000 | 90,000 | 7,500 | 0 | 0 | 0 | 0 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 |
| 37 IT and Data Entry | 8/1/2019 | League | | 40,000 | 48,000 | 4,000 | 0 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 | 48,960 |
| 38 League - Director of Spiritual Care | 8/1/2019 | League | | 62,000 | 74,400 | 6,200 | 0 | 75,888 | 75,888 | 75,888 | 75,888 | 75,888 | 75,888 | 75,888 | 75,888 | 75,888 |
| 39 Team - Chaplaincy | 6/1/2023 | Team | | 51,000 | 61,200 | 5,100 | 0 | 0 | 0 | 0 | 998,784 | 998,784 | 998,784 | 998,784 | 998,784 | 998,784 |
| 40 Director - Continuing Education | 6/1/2023 | | | 180,000 | 216,000 | 18,000 | 0 | 0 | 0 | 0 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 | 220,320 |
| **Total** | | | | | | | $1,658,200 | $2,843,352 | $2,843,352 | $2,843,352 | $10,560,672 | $10,560,672 | $10,560,672 | $10,560,672 | $10,560,672 | $10,560,672 |

| # | Headcount | Timing | Group | Role | Base | 20% Burdened | Monthly | 2% 6/30/19 2019E | 2% 6/30/20 2020E | 2% 6/30/21 2021E | 2% 6/30/22 2022E | 2% 6/30/23 2023E | 2% 6/30/24 2024E | 2% 6/30/25 2025E | 2% 6/30/26 2026E | 2% 6/30/27 2027E | 2% 6/30/28 2028E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Head of Marketing | 7/1/2018 | | | 240,000 | 288,000 | 24,000 | 288,000 | 293,760 | 293,760 | 299,635 | 305,628 | 311,740 | 317,975 | 324,335 | 330,821 | 337,438 |
| 2 | Head of Brand | 3/31/2018 | | | 200,000 | 240,000 | 20,000 | 240,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 3 | Head of Communications | 3/31/2018 | | | 200,000 | 240,000 | 20,000 | 240,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 4 | Director Content Marketing | 8/15/2018 | | Content Ma | 150,000 | 180,000 | 15,000 | 165,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 5 | Director Content Production | 7/1/2018 | | Production | 125,000 | 150,000 | 12,500 | 150,000 | 153,000 | 153,000 | 156,060 | 159,181 | 162,365 | 165,612 | 168,924 | 172,303 | 175,749 |
| 6 | Sr. Director Media | 11/1/2018 | | Performanc | 175,000 | 210,000 | 17,500 | 140,000 | 214,200 | 214,200 | 218,484 | 222,854 | 227,311 | 231,857 | 236,494 | 241,224 | 246,048 |
| 7 | Martech Engineer | 9/1/2018 | | MarTech / | 125,000 | 150,000 | 12,500 | 125,000 | 153,000 | 153,000 | 156,060 | 159,181 | 162,365 | 165,612 | 168,924 | 172,303 | 175,749 |
| 8 | Web Designer / Product Marketing | 9/1/2018 | | Performanc | 75,000 | 90,000 | 7,500 | 75,000 | 91,800 | 91,800 | 93,636 | 95,509 | 97,419 | 99,367 | 101,355 | 103,382 | 105,449 |
| 9 | Partnership Marketing Manager | 10/1/2019 | | Content Ma | 80,000 | 96,000 | 8,000 | 0 | 97,920 | 97,920 | 99,878 | 101,876 | 103,913 | 105,992 | 108,112 | 110,274 | 112,479 |
| 10 | Director Engagement/ CRM | 9/15/2019 | | Performanc | 150,000 | 180,000 | 15,000 | 0 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 11 | Social Teams Coordinator | 12/1/2019 | | Content Ma | 50,000 | 60,000 | 5,000 | 0 | 61,200 | 61,200 | 62,424 | 63,672 | 64,946 | 66,245 | 67,570 | 68,921 | 70,300 |
| 12 | Email Coordinator | 10/1/2019 | | Performanc | 60,000 | 72,000 | 6,000 | 0 | 73,440 | 73,440 | 74,909 | 76,407 | 77,935 | 79,494 | 81,084 | 82,705 | 84,359 |
| 13 | Copywriter | 10/1/2019 | | Production | 95,000 | 114,000 | 9,500 | 0 | 116,280 | 116,280 | 118,606 | 120,978 | 123,397 | 125,865 | 128,383 | 130,950 | 133,569 |
| 14 | Intern 1/2 | 9/1/2019 | | Content Ma | 35,000 | 42,000 | 3,500 | 0 | 42,840 | 42,840 | 43,697 | 44,571 | 45,462 | 46,371 | 47,299 | 48,245 | 49,210 |
| 15 | Video Editor | 9/1/2019 | | Production | 75,000 | 90,000 | 7,500 | 0 | 91,800 | 91,800 | 93,636 | 95,509 | 97,419 | 99,367 | 101,355 | 103,382 | 105,449 |
| 16 | East Ad Graphic Designer | 10/1/2019 | | Production | 75,000 | 90,000 | 7,500 | 0 | 91,800 | 91,800 | 93,636 | 95,509 | 97,419 | 99,367 | 101,355 | 103,382 | 105,449 |
| 17 | West Ad Graphic Designer | 10/1/2019 | | Production | 75,000 | 90,000 | 7,500 | 0 | 91,800 | 91,800 | 93,636 | 95,509 | 97,419 | 99,367 | 101,355 | 103,382 | 105,449 |
| 18 | Creative Director | 10/1/2019 | | Production | 150,000 | 180,000 | 15,000 | 0 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 19 | Sr Manager SEO | 10/1/2019 | | Performanc | 125,000 | 150,000 | 12,500 | 0 | 153,000 | 153,000 | 156,060 | 159,181 | 162,365 | 165,612 | 168,924 | 172,303 | 175,749 |
| 20 | Marketing Analyst | 12/1/2019 | | MarTech / | 100,000 | 120,000 | 10,000 | 0 | 122,400 | 122,400 | 124,848 | 127,345 | 129,892 | 132,490 | 135,139 | 137,842 | 140,599 |
| | **Total** | | | | | | | $1,423,000 | $2,888,640 | $2,888,640 | $2,946,413 | $3,005,341 | $3,065,448 | $3,126,757 | $3,189,292 | $3,253,078 | $3,318,139 |



| Headcount | Timing | Group | Role | Base | 20% Burdened | Monthly | 6/30/19 2019E | 2% 6/30/20 2020E | 2% 6/30/21 2021E | 2% 6/30/22 2022E | 2% 6/30/23 2023E | 2% 6/30/24 2024E | 2% 6/30/25 2025E | 2% 6/30/26 2026E | 2% 6/30/27 2027E | 2% 6/30/28 2028E | 2% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Head of Production | 7/1/2018 | | | 170,000 | 204,000 | 17,000 | 204,000 | 208,080 | 208,080 | 212,242 | 216,486 | 220,816 | 225,232 | 229,737 | 234,332 | 239,019 | |
| 2 Production Hire 1 | 12/1/2018 | | | 120,000 | 144,000 | 12,000 | 84,000 | 146,880 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 | |
| 3 Production Hire 2 | 12/1/2018 | | | 100,000 | 120,000 | 10,000 | 70,000 | 122,400 | 122,400 | 124,848 | 127,345 | 129,892 | 132,490 | 135,139 | 137,842 | 140,599 | |
| 4 Production Hire 3 | 12/1/2018 | | | 75,000 | 90,000 | 7,500 | 52,500 | 91,800 | 91,800 | 93,636 | 95,509 | 97,419 | 99,367 | 101,355 | 103,382 | 105,449 | |
| 5 Production Hire 4 | 12/1/2018 | | | 75,000 | 90,000 | 7,500 | 52,500 | 91,800 | 91,800 | 93,636 | 95,509 | 97,419 | 99,367 | 101,355 | 103,382 | 105,449 | |
| Total | | | | | | | $463,000 | $660,960 | $660,960 | $674,179 | $687,663 | $701,416 | $715,444 | $729,733 | $744,348 | $759,235 | |



| Headcount | Timing | Group | Role | Base | 20% Burdened | Monthly | 2% 6/30/19 2019E | 2% 6/30/20 2020E | 2% 6/30/21 2021E | 2% 6/30/22 2022E | 2% 6/30/23 2023E | 2% 6/30/24 2024E | 2% 6/30/25 2025E | 2% 6/30/26 2026E | 2% 6/30/27 2027E | 2% 6/30/28 2028E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 CBO | 3/31/2018 | | | 250,000 | 300,000 | 25,000 | 300,000 | 306,000 | 306,000 | 312,120 | 318,362 | 324,730 | 331,224 | 337,849 | 344,606 | 351,498 |
| 2 SVP Partnership Sales | 7/1/2018 | | | 225,000 | 270,000 | 22,500 | 270,000 | 275,400 | 275,400 | 280,908 | 286,526 | 292,257 | 298,102 | 304,064 | 310,145 | 316,348 |
| 3 VP Human Resources | 7/1/2018 | | | 105,000 | 126,000 | 10,500 | 126,000 | 128,520 | 128,520 | 131,090 | 133,712 | 136,386 | 139,114 | 141,896 | 144,734 | 147,629 |
| 4 HR Coordinator | 9/1/2018 | | | 45,000 | 54,000 | 4,500 | 45,000 | 55,080 | 55,080 | 56,182 | 57,305 | 58,451 | 59,620 | 60,813 | 62,029 | 63,270 |
| 5 VP Team Services | 9/1/2018 | | | 150,000 | 180,000 | 15,000 | 150,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 6 Director Operation and Logistics | 9/1/2018 | | | 125,000 | 150,000 | 12,500 | 125,000 | 153,000 | 153,000 | 156,060 | 159,181 | 162,365 | 165,612 | 168,924 | 172,303 | 175,749 |
| 7 Director of Business Operations | 9/1/2018 | | | 85,000 | 102,000 | 8,900 | 85,000 | 104,040 | 104,040 | 106,121 | 108,243 | 110,408 | 112,616 | 114,869 | 117,166 | 119,509 |
| 8 VP Operations | 9/1/2018 | | | 130,000 | 156,000 | 13,000 | 130,000 | 159,120 | 159,120 | 162,302 | 165,548 | 168,859 | 172,237 | 175,681 | 179,195 | 182,779 |
| 9 Partnership Service | 9/1/2018 | | | 50,000 | 60,000 | 5,000 | 50,000 | 61,200 | 61,200 | 62,424 | 63,672 | 64,946 | 66,245 | 67,570 | 68,921 | 70,300 |
| 10 VP Media Relations | 9/1/2018 | | | 150,000 | 180,000 | 15,000 | 150,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 11 Dir Team Ticket Sales | 9/1/2018 | | | 200,000 | 240,000 | 20,000 | 200,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 12 Eastern Regional Ticket Sales | 9/1/2018 | | | 160,000 | 192,000 | 16,000 | 160,000 | 195,840 | 195,840 | 199,757 | 203,752 | 207,827 | 211,984 | 216,223 | 220,548 | 224,959 |
| 13 Western Regional Ticket Sales | 9/1/2018 | | | 150,000 | 180,000 | 15,000 | 150,000 | 183,600 | 183,600 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| 14 Admin Asst | 9/1/2018 | | | 45,000 | 54,000 | 4,500 | 45,000 | 55,080 | 55,080 | 56,182 | 57,305 | 58,451 | 59,620 | 60,813 | 62,029 | 63,270 |
| Total | | | | | | | $1,946,000 | $2,288,880 | $2,288,880 | $2,334,658 | $2,381,351 | $2,428,978 | $2,477,557 | $2,527,108 | $2,577,651 | $2,629,204 |



22-05077-agd Doc#201-1 Filed 06/24/2025 Entered 06/24/2025 19:04:42-50707 Desc Exhibits Pg 244 of 1466

| Headcount | Timing | Group | Role | Base | 20% Burdened | Monthly | 8 2% 6/30/19 2019E | 10 2% 6/30/20 2020E | 12 2% 6/30/21 2021E | 14 2% 6/30/22 2022E | 16 2% 6/30/23 2023E | 16 2% 6/30/24 2024E | 16 2% 6/30/25 2025E | 16 2% 6/30/26 2026E | 16 2% 6/30/27 2027E | 16 2% 6/30/28 2028E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 President | 9/1/2018 Team | Staff | 200,000 | 240,000 | 20,000 | 1,600,000 | 2,448,000 | 2,937,600 | 3,427,200 | 3,916,800 | 3,916,800 | 3,916,800 | 3,916,800 | 3,916,800 | 3,916,800 | |
| 2 VP Marketing | 10/1/2018 Team | Staff | 100,000 | 120,000 | 10,000 | 720,000 | 1,224,000 | 1,468,800 | 1,713,600 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | |
| 3 VP Ticket Sales | 10/1/2018 Team | Staff | 100,000 | 120,000 | 10,000 | 720,000 | 1,224,000 | 1,468,800 | 1,713,600 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | |
| 4 Vp Sponsorship Sales | 10/1/2018 Team | Staff | 100,000 | 120,000 | 10,000 | 720,000 | 1,224,000 | 1,468,800 | 1,713,600 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | 1,958,400 | |
| 5 Dir Operseration | 10/1/2018 Team | Staff | 50,000 | 60,000 | 5,000 | 360,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | |
| 6 Dir Finance | 10/1/2018 Team | Staff | 50,000 | 60,000 | 5,000 | 360,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | |
| 7 Media Relations Manager | 10/1/2018 Team | Staff | 50,000 | 60,000 | 5,000 | 360,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | |
| 8 Ticket Operations Manager | 10/1/2018 Team | Staff | 50,000 | 60,000 | 5,000 | 360,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | |
| 9 Web Master | 10/1/2018 Team | Staff | 50,000 | 60,000 | 5,000 | 360,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | |
| 10 Social Media Manager | 10/1/2018 Team | Staff | 35,000 | 42,000 | 3,500 | 252,000 | 428,400 | 514,080 | 599,760 | 685,440 | 685,440 | 685,440 | 685,440 | 685,440 | 685,440 | |
| 11 Content Writer | 10/1/2018 Team | Staff | 35,000 | 42,000 | 3,500 | 252,000 | 428,400 | 514,080 | 599,760 | 685,440 | 685,440 | 685,440 | 685,440 | 685,440 | 685,440 | |
| 12 Graphic Arts Coordinator | 10/1/2018 Team | Staff | 40,000 | 48,000 | 4,000 | 288,000 | 489,600 | 587,520 | 685,440 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | |
| 13 Promotions Coordinator | 10/1/2018 Team | Staff | 45,000 | 54,000 | 4,500 | 324,000 | 550,800 | 660,960 | 771,120 | 881,280 | 881,280 | 881,280 | 881,280 | 881,280 | 881,280 | |
| 14 Senior Ticket Lead | 10/1/2018 Team | Staff | 40,000 | 48,000 | 4,000 | 288,000 | 489,600 | 587,520 | 685,440 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | |
| 15 Senior Ticket Lead | 10/1/2018 Team | Staff | 40,000 | 48,000 | 4,000 | 288,000 | 489,600 | 587,520 | 685,440 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | |
| 16 Ticket Account Executive | 10/1/2018 Team | Staff | 30,000 | 36,000 | 3,000 | 216,000 | 367,200 | 440,640 | 514,080 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | |
| 17 Ticket Account Executive | 10/1/2018 Team | Staff | 30,000 | 36,000 | 3,000 | 216,000 | 367,200 | 440,640 | 514,080 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | |
| 18 Ticket Account Executive | 10/1/2018 Team | Staff | 30,000 | 36,000 | 3,000 | 216,000 | 367,200 | 440,640 | 514,080 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | |
| 19 Ticket Account Executive | 10/1/2018 Team | Staff | 30,000 | 36,000 | 3,000 | 216,000 | 367,200 | 440,640 | 514,080 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | 587,520 | |
| 20 Partnership Sales/Service | 10/1/2018 Team | Staff | 50,000 | 60,000 | 5,000 | 360,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | |
| 21 Video Coordinator | 10/1/2018 Team | Staff | 50,000 | 60,000 | 5,000 | 360,000 | 612,000 | 734,400 | 856,800 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 | |
| 22 Admin Asst | 10/1/2018 Team | Staff | 40,000 | 48,000 | 4,000 | 288,000 | 489,600 | 587,520 | 685,440 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | 783,360 | |
| **Total** | | | | | | | 9,324,000 | 15,238,800 | 18,286,560 | 21,334,320 | 24,382,080 | 24,382,080 | 24,382,080 | 24,382,080 | 24,382,080 | 24,382,080 |



| | | | | | 20% | | 8 2% 6/30/19 2019E | 10 2% 6/30/20 2020E | 12 2% 6/30/21 2021E | 14 2% 6/30/22 2022E | 16 2% 6/30/23 2023E | 16 2% 6/30/24 2024E | 16 2% 6/30/25 2025E | 16 2% 6/30/26 2026E | 16 2% 6/30/27 2027E | 16 2% 6/30/28 2028E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Headcount | Timing | Group | Role | Base | Burdened | Monthly | | | | | | | | | | |
| 1 Head of Medicine | 7/1/2018 | Admin | | 200,000 | 240,000 | 20,000 | 240,000 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 | 244,800 |
| 2 Executive Assistant, Head of Medic | 11/1/2018 | Admin | | 85,000 | 102,000 | 8,500 | 68,000 | 104,040 | 104,040 | 104,040 | 104,040 | 104,040 | 104,040 | 104,040 | 104,040 | 104,040 |
| 3 Director of Neuro Health | 10/1/2018 | League | | 150,000 | 180,000 | 15,000 | 135,000 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 |
| 4 Director of Internal Medicine/Sport | 10/1/2018 | League | | 150,000 | 180,000 | 15,000 | 135,000 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 |
| 5 Director of Orthopedics | 10/1/2018 | League | | 150,000 | 180,000 | 15,000 | 135,000 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 |
| 6 Physical Therapy (Haydn Thompson | 10/1/2018 | League | | 150,000 | 180,000 | 15,000 | 135,000 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 | 183,600 |
| 7 Physical Therapy Lead - Kris Tomso | 10/1/2018 | League | | 125,000 | 150,000 | 12,500 | 112,500 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 | 153,000 |
| 8 Team - Ortho | 12/1/2018 | Team | | 90,000 | 108,000 | 9,000 | 0 | 0 | 0 | 0 | 0 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 |
| 9 | 12/1/2023 | Team | | 75,000 | 90,000 | 7,500 | 0 | 0 | 0 | 0 | 0 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 | 1,468,800 |
| 10 Team - Sports Med/GP | 12/1/2023 | Team | | 90,000 | 108,000 | 9,000 | 0 | 0 | 0 | 0 | 0 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 |
| 11 | 12/1/2023 | Team | | 50,000 | 60,000 | 5,000 | 0 | 0 | 0 | 0 | 0 | 979,200 | 979,200 | 979,200 | 979,200 | 979,200 |
| 12 Team - Neuro health | 12/1/2023 | Team | | 90,000 | 108,000 | 9,000 | 0 | 0 | 0 | 0 | 0 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 |
| 13 Team - Head Physical Therapist | 12/1/2018 | Team | | 140,000 | 168,000 | 14,000 | 784,000 | 1,713,600 | 2,056,320 | 2,399,040 | 2,741,760 | 2,741,760 | 2,741,760 | 2,741,760 | 2,741,760 | 2,741,760 |
| 14 Team - Physical Therapist | 12/1/2018 | Team | | 85,000 | 102,000 | 8,500 | 476,000 | 1,040,400 | 1,248,480 | 1,456,560 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 |
| 15 Team - Head Athletic Trainer | 12/1/2018 | Team | | 150,000 | 180,000 | 15,000 | 840,000 | 1,836,000 | 2,203,200 | 2,570,400 | 2,937,600 | 2,937,600 | 2,937,600 | 2,937,600 | 2,937,600 | 2,937,600 |
| 16 Team - Assistant Athletic Trainer 1 | 12/1/2018 | Team | | 90,000 | 108,000 | 9,000 | 504,000 | 1,101,600 | 1,321,920 | 1,542,240 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 | 1,762,560 |
| 17 Team - Assistant Athletic Trainer 2 | 12/1/2018 | Team | | 85,000 | 102,000 | 8,500 | 476,000 | 1,040,400 | 1,248,480 | 1,456,560 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 |
| 18 Team - Strength & Conditioning Co. | 12/1/2018 | Team | | 140,000 | 168,000 | 14,000 | 784,000 | 1,713,600 | 2,056,320 | 2,399,040 | 2,741,760 | 2,741,760 | 2,741,760 | 2,741,760 | 2,741,760 | 2,741,760 |
| 19 Team - Asst. Strength & Conditionir | 12/1/2018 | Team | | 85,000 | 102,000 | 8,500 | 476,000 | 1,040,400 | 1,248,480 | 1,456,560 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 | 1,664,640 |
| Total | | | | | | | 5,300,500 | 10,722,240 | 12,619,440 | 14,516,640 | 16,413,840 | 24,149,520 | 24,149,520 | 24,149,520 | 24,149,520 | 24,149,520 |

| Headcount | Timing | Group | Role | Base | 20% Burdened | Monthly | 2% 6/30/19 2019E | 2% 6/30/20 2020E | 2% 6/30/21 2021E | 2% 6/30/22 2022E | 2% 6/30/23 2023E | 2% 6/30/24 2024E | 2% 6/30/25 2025E | 2% 6/30/26 2026E | 2% 6/30/27 2027E | 2% 6/30/28 2028E |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 CEO | 3/31/2018 | | | 350,000 | 420,000 | 35,000 | 420,000 | 428,400 | 428,400 | 436,988 | 445,707 | 454,622 | 463,714 | 472,988 | 482,448 | 492,097 |
| 2 Head of Operations | 3/31/2018 | | | 250,000 | 300,000 | 25,000 | 300,000 | 306,000 | 306,000 | 312,120 | 318,362 | 324,730 | 331,224 | 337,849 | 344,606 | 351,498 |
| 3 Strategy & Analytics Lead | 5/1/2018 | | | 135,000 | 162,000 | 13,500 | 162,000 | 165,240 | 165,240 | 168,545 | 171,916 | 175,354 | 178,861 | 182,438 | 186,087 | 189,809 |
| 4 Executive Assistant | 6/1/2018 | | | 120,000 | 144,000 | 12,000 | 144,000 | 146,880 | 146,880 | 149,818 | 152,814 | 155,870 | 158,988 | 162,167 | 165,411 | 168,719 |
| 5 CFO | 12/31/2018 | | | 200,000 | 240,000 | 20,000 | 120,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 6 CMO | 12/31/2018 | | | 200,000 | 240,000 | 20,000 | 120,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 7 Head of Security | 12/31/2018 | | | 200,000 | 240,000 | 20,000 | 120,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 8 General Counsel | 12/31/2018 | | | 200,000 | 240,000 | 20,000 | 120,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 9 Corporate Social Responsibility | 12/1/2018 | | | 200,000 | 240,000 | 20,000 | 140,000 | 244,800 | 244,800 | 249,696 | 254,690 | 259,784 | 264,979 | 270,279 | 275,685 | 281,198 |
| 10 Franchise Broker | 8/1/2018 | | | 150,000 | 180,000 | 15,000 | 165,000 | 183,500 | 183,500 | 187,272 | 191,017 | 194,838 | 198,735 | 202,709 | 206,763 | 210,899 |
| Total | | | | | | | $1,811,000 | $2,454,120 | $2,454,120 | $2,503,202 | $2,553,266 | $2,604,332 | $2,656,418 | $2,709,547 | $2,763,738 | $2,819,012 |




**Confidential**

## ESMG: Combines the best of sports and technology



Owned & Operated Football League
**Alliance of American Football**

Integrated Live Video, Data & Gaming
**PRODUCT**

2



2:22-cv-05077-agad Doc#201-14 Filed 06/24/25 Entered 06/24/25 19:04:22-5877 Desc Disputed Document SRoc Exhibits Pg 253 of 1466

## Fundamentals of the Alliance of American Football



**1**
Single Entity

**8**
Teams

**$35**
Quality Seats

**10**
Games

**2**
Hour Games

**Feb 9**
Launch on CBS

4

2:22-cv-05077-agr Doc #201-14 Filed 06/24/25 Entered 06/24/25 19:04:42 Esbit 3 Demanded Document SPg 254 of 1466

## Alliance of American Football Executives

Led by some of the most experienced and respected football minds with over 475 years of NFL experience, the Alliance of American Football will include elite professional talent fueled by a dynamic alliance between players, fans and the game. We believe that putting high-quality, top-flight football on the field is of the utmost importance.



**Bill Polian**, *Co-founder, Head of Football*:
- Hall of Famer and the only 6x NFL executive of the year
- Oversees all league & game ops, rules & regulations as well as all coaching and player/personnel decisions



**Troy Polamalu**, *Head of Player Relations*:
- 2x Super Bowl champion and 5x Pro Bowler
- Oversees player health and wellness on and off the field



**Hines Ward**, *Head of Football Development*:
- 2x Super Bowl champion and 4x Pro Bowler
- Oversees player development and diversity hiring



**Tom Veit**, *Head of Business*:
- Former CRO of United Soccer League & fmr EVP of Global Events for WWE
- Oversees all live event revenue streams (including but not limited to ticket sales, merchandise and sponsorships), stadium and city negotiations, and recruitment of front office team personnel



**Mike Pereira**, *Head of Officiating*:
- FOX Sports NFL Rules analyst and former VP of NFL Officiating
- Oversees rules and regulations and manages officiating crews

5

## Inaugural teams and identities launched











6

## Coaches and stadiums locked down

Multi-year stadium contracts in all our cities and with all 8 of our head coaches with complete staffs hired



**Dennis Erickson**
**Salt Lake City** *Stallions*
**Rice-Eccles Stadium**

**Mike Martz**
**San Diego** *Fleet*
**SDCCU Stadium**

**Rick Neuheisel**
**Phoenix** *Hot Shots*
**Sun Devil Stadium**

**Mike Riley**
**San Antonio**
Commanders
**Alamodome**

**Kevin Coyle**
**Atlanta** *Legends*
**Georgia State Stadium**

**Tim Lewis**
**Birmingham** *Iron*
**Legion Field**

**Steve Spurrier**
**Orlando** *Apollos*
**Spectrum Stadium**

**Mike Singletary**
**Memphis** *Express*
**Liberty Bowl**

2:22-cv-05076-... Document 201-24 Filed 06/24/25 Entered 06/24/25 ... Desc
Exhibits Pg 257 of 1466

## Secured partnerships with Las Vegas and San Antonio as well

**Championship Game in Las Vegas**
- Multi-year partnership with the city of Las Vegas to host the Alliance championship game
- Inaugural championship will be played in Sam Boyd Stadium, home of the Las Vegas Bowl and the UNLV Rebels airing on CBS, Saturday night April 27th



**Training Camp in San Antonio**
- All 8 of our teams will be in San Antonio from January 4th through 30th for training camp
- Ancillary shoulder content available to film and air throughout the course of training camp with coaches, players and league executives available



8

2:22-cv-05070-D Doc #201-24 Filed 06/24/25 Entered 06/24/25 19:04:42 Desc Exhibits Pg 258 of 1466

## Local business and operational structure and staff in place

- Each team's "local front office" is comprised of approximately 15-20 full-time staff supplemented by part-time/seasonal staff as needed

- The front office staff is responsible for overseeing: marketing, ticket sales, public relations, event presentation, electronic broadcast, sponsorship sales, etc.



9

## League business operations in place as well

The League will provide each team with additional support at the team level through our team service unit

**Areas of support include:**

- Ticket Sales
- Ticket Operation
- Marketing
- Creative
- Broadcasting
- Media Buying
- Sponsorship Sales
- HR
- Finance



10

## Partnered with Iconic Brands

### MGM
- Partnership includes 3 year sponsorship as the official sports betting sponsor of The Alliance and exclusive gaming partner as well as an investment in the business



### STARTER
- Multi-year partnership with Starter to be the official on-field apparel and game day uniform supplier for all eight teams



### New Era
- Partnership with New Era as the official on-field headwear partner



11

# And significant distribution and broadcast partners

All 43 of our games will be covered on broadcast



**CBS and CBSSN**
- 4 year deal with CBS with our first two games, one playoff game and Championship on CBS Network
- CBSSN will carry a weekly regular season game



**NFL Network**
- NFL Network to televise 19 Alliance of American Football Games throughout the season



**Turner and B/R Live**
- TNT will televise one regular season and one playoff game each season.
- B/R Live will carry a weekly regular season game





12

## Top Flight Production Team

Designed to deliver productions that fans are used to, excited by, and that test new grounds and talent



**Mark Teitelman**
Production
Fox Sports
NBC SNF

**Ken Aagaard**
Production
CBS Sports

**Dick Ebersol**
Board of Directors
NBC Sports, Chairman
SNL, Co-creator

13

## ~700 players have signed with The Alliance

Including former NFL players and college stars like Trent Richardson, Denard Robinson and Zach Mettenberger



**Complementary to NFL**

Season: Super Bowl to NFL Draft

"NFL-Out" clause in all contracts
Draft players in September after
NFL cuts ~800 players

**Player Safety and Support**

Independent concussion group

Pro-level training

No on-side kicks or kickoffs

**Competitive Salary**

3 year contracts worth $250k

Fan-integration bonuses

Earned Scholarships

**Regional Allocation**

Creates fan affinity

League parity

QB draft

14

# A fan-centric experience at every touch point

## FASTER, BETTER GAMES

No TV Time-Outs

No Extra Points

Onside kick out, 4th and 10 in

## GAMIFIED VIEWERSHIP

In-Game fantasy

Tech-driven real time data

Live Social Experience

## LOCAL AFFINITY

Regional draft

"Super Fan" participation

Brand name Head Coaches

## AFFORDABLE

$35 quality seats

Free to play gaming

Free to watch

15

22-10507 aga Doc 291-1 Filed 06/24/25 Entered 06/24/25 19:04:22 Desc Exhibits Pg 265 of 1466

# Player Relations: Led by Troy Polamalu

What makes us different? A unique player experience, on and off the field

### Player Participation Pool
- Unique , first-of-its- kind bonus system based on both on-field performance and off-field

### Insurance and Care
- Health insurance for players, their spouses, and their dependents at no cost to the players
- Dental insurance and vision coverage for players, their spouses, and their dependents at no cost to players
- Injury protection in the form of full wage continuation during the season in which an on-field injury occurs
- Workers compensation coverage for on-field injuries

### Additional Benefits
- 401(k) program that allows players to save for retirement
- In-Season housing available to players at no cost
- Financial literacy and career development programs designed by industry leaders
- Post-secondary education program
- Year-round access to strength and conditioning staff
- Meals curated by top sports dietitians

16

# Player Points System and Bonusing

Designed to track and measure an individual player's engagements with fans and commercial partners to enable AAF Properties to calculate a player's share of the Player Participation Pool

- Points are earned through various actions designed to incentivize players and align interests with fans
- At the conclusion of the season, each player's points will be measured and used determine a player's share of the Player Participation Pool
- All of the Player Points will be tracked through the player database
- Each player has a unique ID where the associate data is stored
- Representatives at the team and league level are responsible for both the administration and advocation of the program



**Player Points Generation**

Football Performance

Alliance App Engagement

Corp Social Responsibility

Marketing & Promotion

Merchandise Sales

**Program Administration & Tracking**

League Admin

Team Admin

Player Database

17



## Current sports data ecosystem is outdated

NFL uses outmoded, latency filled systems with multiple intermediaries resulting in significant opportunity cost



# Future of Sports Data

Proprietary data packaging and management platform creating reliable, scalable and actionable data



**Future of Data Capture, Manifestation, and Packaging**

20

# The key elements to the future of the sports data ecosystem



Acquisition

Manifestation

Packaging

*Data captured at near zero latency*

*Processed using machine learning algorithms*

*Consumable by the end users*

21

## Our vision: Faster data capture, real-time unique stats, new revenue streams



22

# The Alliance App



**News**

**Teams**





**Home**

**Navigation Menu**



**About**

**Schedule**

**Games**

## STATcast, DataCast, and the like are slow and limited...
## Significant latency & minimal information





# Alliance app revolutionizes the sports experience
## Truly Real-time & Fully Animated Data with Predictive Analytics



3D Players - AAF team textures



Playing Field - pre-snap camera angle



Game Flow - post snap camera angle



Game Flow - possession circle



Game Flow - football ballistics tail

# Digital teams with experience from seed to scale



**Erik Schwartz**
Platform
Bittorent LIVE, CPO
Early @YHOO



**Andrew Pedersen**
Product
SI Video, CPO
GSN Social Casino, CPO



**Mark Teitelman**
Production
Fox Sports
NBC SNF



**Bob Bowman**
Non-Executive Product Chair
MLBAM, CEO



**Mike Maquin**
Engineering
Bittorent LIVE
Tesla



**Jack Ahern**
Product
GSN Social Casino, Sr.
Designer



**Ken Aagaard**
Production
CBS Sports



**Kevin Freedman**
Operations
Quid CEO
Google, Paypal, eBay

26



**APPENDIX**

# High margin business, with scaled revenue at kickoff

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| League Revenue | $15,350,000 | $25,421,000 | $59,355,988 | $75,716,459 | $94,948,776 | $111,040,843 | $139,630,046 | $163,499,565 | $206,112,494 | $241,654,125 |
| Team Revenue | 44,800,000 | 74,690,000 | 151,488,288 | 204,041,470 | 263,292,963 | 283,819,076 | 301,140,562 | 319,536,591 | 339,075,036 | 359,828,148 |
| Digital Revenue | 4,160,760 | 32,796,547 | 56,200,033 | 81,501,047 | 108,333,025 | 136,821,987 | 167,108,060 | 199,347,193 | 233,713,076 | 270,399,291 |
| **Total Revenue** | **$64,310,760** | **$132,907,547** | **$267,044,309** | **$361,258,975** | **$466,574,765** | **$531,681,906** | **$607,878,668** | **$682,383,348** | **$778,900,607** | **$871,881,564** |
| | | | | | | | | | | |
| Digital Expenses | $13,217,050 | $15,973,761 | $18,128,379 | $18,490,947 | $18,860,766 | $19,237,981 | $19,622,741 | $20,015,196 | $20,415,500 | $20,823,810 |
| Football Expenses | 65,792,852 | 86,096,189 | 100,988,475 | 116,160,859 | 131,371,817 | 131,919,432 | 132,478,000 | 133,047,739 | 133,628,873 | 134,221,630 |
| Player Relations Expenses | 2,227,900 | 3,424,446 | 3,436,068 | 3,447,922 | 11,177,334 | 11,189,667 | 11,202,247 | 11,215,078 | 11,228,166 | 11,241,516 |
| Marketing/Branding Expenses | 21,984,486 | 21,861,356 | 22,240,810 | 22,685,626 | 23,139,339 | 23,602,126 | 24,074,168 | 24,555,651 | 25,046,764 | 25,547,700 |
| Production Expenses | 17,999,418 | 16,049,106 | 16,356,869 | 16,684,007 | 17,017,687 | 17,358,041 | 17,705,201 | 18,059,305 | 18,420,491 | 18,788,901 |
| League Expenses | 28,536,717 | 33,636,693 | 38,434,764 | 43,280,199 | 48,128,551 | 48,331,653 | 48,540,112 | 48,753,956 | 48,973,216 | 49,197,930 |
| Team Expenses | 25,103,733 | 37,401,520 | 44,881,824 | 52,362,128 | 59,842,432 | 59,842,432 | 59,842,432 | 59,842,432 | 59,842,432 | 59,842,432 |
| Medical Expenses | 8,462,900 | 13,462,096 | 15,414,093 | 17,367,186 | 19,321,397 | 27,115,228 | 27,174,542 | 27,235,043 | 27,296,753 | 27,359,698 |
| Corporate Expenses | 5,986,000 | 6,712,620 | 6,797,790 | 6,933,746 | 7,072,421 | 7,213,869 | 7,358,147 | 7,505,309 | 7,655,416 | 7,808,524 |
| Digital Payment Fees | 1,248,228 | 9,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,804,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,133 | 5,739,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total Expenses** | **$191,287,416** | **$250,196,146** | **$293,374,088** | **$336,125,617** | **$387,389,929** | **$410,800,872** | **$427,373,918** | **$444,919,627** | **$463,521,324** | **$483,271,803** |
| | | | | | | | | | | |
| **Total Operating Income (Loss)** | ($126,976,656) | ($117,288,599) | ($26,329,780) | $25,133,358 | $79,184,835 | $120,881,034 | $180,504,750 | $237,463,721 | $315,379,283 | $388,609,760 |
| *% Margin* | *-197.4%* | *-88.2%* | *-9.9%* | *7.0%* | *17.0%* | *22.7%* | *29.7%* | *34.8%* | *40.5%* | *44.6%* |
| | | | | | | | | | | |
| **Cumulative Net Cash Flow** | ($126,976,656) | ($244,265,255) | ($270,595,035) | ($245,461,677) | ($166,276,842) | ($45,395,807) | $135,108,942 | $372,572,663 | $687,951,947 | $1,076,561,707 |

28

**Ebersol Sports Media Group, Inc. Summary Capitalization Table**

As of 02/11/2019 · Generated by Alan Kantowitz (alan@aaf.com) at 02/11/2019 11:54:59

carta

| | Shares Authorized | Shares Issued and Outstanding | Fully Diluted Shares | Fully Diluted Ownership | Cash Raised |
|---|---|---|---|---|---|
| **Common Stock classes** | | | | | |
| Common Stock | 43,403,801 | 8,658,648 | 8,658,648 | 22.9714% | $ - |
| Series FF Preferred Stock | 2,000,000 | 2,000,000 | 2,000,000 | 5.3060% | $ 40,000.00 |
| Total Common Stock issued and outstanding | | | 10,658,648 | 28.2774% | $ 40,000.00 |
| | | | | | |
| **Preferred Stock classes** | | | | | |
| Series 1 Preferred Stock | 18,676,040 | 14,309,214 | 14,309,214 | 37.9623% | $ 49,999,999.31 ←To date, Series 1 invesostor has only funded $22m of the $50m total Series 1 Equity comm |
| Series Seed Preferred Stock | 3,846,154 | 3,846,154 | 3,846,154 | 10.2038% | $ 7,000,000.28 |
| Total Preferred Stock issued and outstanding | | | 18,155,368 | 48.1662% | $ 56,999,999.59 |
| | | | | | |
| **Common Stock Warrants** | | | | | |
| FO2 Common Stock Warrant | | | 1 | 0.0000% | $ - |
| MGM Warrant to Purchase Stock | | | 573,784 | 1.5222% | $ 3.34 |
| Total Common Stock Warrants issued and outstanding | | | 573,785 | 1.5223% | $ 3.34 |
| | | | | | |
| **Series 1 Preferred Stock Stock Warrants** | | | | | |
| December 2018 Warrants | | | 49,632 | 0.1317% | $ - |
| January 2018 Warrant | | | 248,169 | 0.6584% | $ - |
| January 2019 Warrants (WPS-1) | | | 496,338 | 1.3168% | $ - |
| MGM Series 1 Preferred Stock Warrant | | | 1,520,978 | 4.0352% | $ - |
| Total Series 1 Preferred Stock Stock Warrants issued and outstanding | | | 2,315,117 | 6.1420% | $ - |
| | | | | | |
| **Convertibles** | | | | | |
| Fall 2018 Note Financing | | | | | $ 6,500,000.00 |
| 2018 Note Financing | | | | | $ 9,265,000.00 |
| Total Convertibles issued | | | | | $ 15,765,000.00 |
| | | | | | |
| 2017 Equity Incentive Plan | 5,990,267 | | | | |
| RSAs not purchased | | | 0 | 0.0000% | |
| Options and RSUs issued and outstanding | | | 1,058,017 | 2.8069% | |
| Shares available for issuance under the plan | | | 4,932,250 | 13.0853% | |
| | | | | | |
| **Totals** | | 37,693,185 | | 100.0000% | $ 72,805,002.93 |

itment

**Ebersol Sports Media Group, Inc. Intermediate Capitalization Table**

As of 03/11/2019 - Generated by Alan Kantrowitz (alan@esal.com) at 03/11/2019 11:54:59

| Name | Common (CS) | Series FF Preferred (SFFP) | Series 1 Preferred Stock (P1) | Series 1 Preferred Stock (P1) 1:1 Conversion Ratio | Series Seed Preferred (SSP) | Series Seed Preferred (SSP) 1:1 Conversion Ratio | Options and RSU's Outstanding Under 2017 Equity Incentive Plan | Common Warrants | Series 1 Preferred Block Warrants | Outstanding Shares | Fully Diluted Shares | Outstanding Ownership | Fully Diluted Ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Alan Kantowitz | 879 | 0 | 4,368 | 4,368 | 0 | 0 | 0 | 0 | 0 | 5,247 | 5,247 | 0.0182% | 0.0139% |
| David S Petrozza Revocable Trust | 76,732 | 0 | 434,815 | 434,815 | 0 | 0 | 0 | 0 | 769,323 | 511,547 | 1,280,870 | 1.7753% | 3.3381% |
| Ebersol-Saint James Family Trust Dated Nov | 220,461 | 0 | 1,094,539 | 1,094,539 | 0 | 0 | 0 | 0 | 24,816 | 1,315,000 | 1,339,816 | 4.5636% | 3.5545% |
| F&W Investments LP - Series 2016 | 0 | 0 | 0 | 0 | 10,989 | 10,989 | 0 | 0 | 0 | 10,989 | 10,989 | 0.0381% | 0.0292% |
| FO2 LLC | 0 | 0 | 10,864,133 | 10,864,133 | 0 | 0 | 0 | 1 | 0 | 10,864,133 | 10,864,134 | 37.7043% | 28.8223% |
| Jared Allen | 0 | 0 | 0 | 0 | 10,989 | 10,989 | 0 | 0 | 0 | 10,989 | 10,989 | 0.0381% | 0.0292% |
| Keith Raboa | 0 | 0 | 0 | 0 | 549,450 | 549,450 | 0 | 0 | 0 | 549,450 | 549,450 | 1.9069% | 1.4571% |
| Kenneth Kantrowitz | 884 | 0 | 4,384 | 4,384 | 0 | 0 | 0 | 0 | 0 | 5,268 | 5,268 | 0.0183% | 0.0140% |
| Kids 42 Investments, L.P. | 3,836 | 0 | 21,735 | 21,735 | 0 | 0 | 0 | 0 | 0 | 25,571 | 25,571 | 0.0887% | 0.0678% |
| Kovick ASC Holdings LLC | 6,623 | 0 | 32,884 | 32,884 | 0 | 0 | 0 | 0 | 0 | 39,507 | 39,507 | 0.1371% | 0.1048% |
| Lavanco LLC | 0 | 0 | 0 | 0 | 27,476 | 27,476 | 0 | 0 | 0 | 27,476 | 27,476 | 0.0954% | 0.0729% |
| M Ventures Fund II, LP | 11,128 | 0 | 50,249 | 55,249 | 192,307 | 192,307 | 0 | 0 | 0 | 258,684 | 258,684 | 0.9076% | 0.6863% |
| Mark V Houghton-Berry | 44,239 | 0 | 219,640 | 219,640 | 0 | 0 | 0 | 0 | 0 | 263,879 | 263,879 | 0.9158% | 0.7001% |
| MGM Resorts International Operations, Inc. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 573,784 | 1,520,978 | 0 | 2,094,762 | 0.0000% | 5.5574% |
| Moonad Schick Partners LLC | 38,385 | 0 | 217,514 | 217,514 | 0 | 0 | 0 | 0 | 0 | 255,899 | 255,899 | 0.8881% | 0.6789% |
| Plexo Capital I, L.P. | 11,098 | 0 | 55,097 | 55,097 | 0 | 0 | 0 | 0 | 0 | 66,195 | 66,195 | 0.2297% | 0.1756% |
| Public Partners, LLC | 0 | 0 | 0 | 0 | 307,692 | 307,692 | 0 | 0 | 0 | 307,692 | 307,692 | 1.0679% | 0.8163% |
| RAS 175 Acquisitions LLC | 11,056 | 0 | 54,887 | 54,887 | 0 | 0 | 0 | 0 | 0 | 65,943 | 65,943 | 0.2289% | 0.1749% |
| Romar Investments, LP, a Nevada limited pa | 44,013 | 0 | 218,514 | 218,514 | 0 | 0 | 0 | 0 | 0 | 262,527 | 262,527 | 0.9111% | 0.6965% |
| Robert Davis Noel and Slader Wilson Noell | 4,401 | 0 | 21,851 | 21,851 | 0 | 0 | 0 | 0 | 0 | 26,252 | 26,252 | 0.0911% | 0.0696% |
| Shadulle O'neal Revocable Trust Agreemen | 5,507 | 0 | 27,341 | 27,341 | 0 | 0 | 0 | 0 | 0 | 32,848 | 32,848 | 0.1140% | 0.0871% |
| Slow Ventures III, LP | 50,925 | 0 | 288,577 | 288,577 | 781,802 | 781,802 | 0 | 0 | 0 | 1,121,104 | 1,121,104 | 3.8906% | 2.9743% |
| Slow Ventures III-A, LP | 2,774 | 0 | 15,718 | 15,718 | 42,573 | 42,573 | 0 | 0 | 0 | 61,065 | 61,065 | 0.2119% | 0.1620% |
| TCG Digital, LLC | 0 | 0 | 0 | 0 | 274,725 | 274,725 | 0 | 0 | 0 | 274,725 | 274,725 | 0.9534% | 0.7288% |
| The Founders Fund VII Entrepreneurs Fund, | 1,197 | 0 | 6,472 | 6,472 | 16,269 | 16,269 | 0 | 0 | 0 | 23,938 | 23,938 | 0.0831% | 0.0635% |
| The Founders Fund VII Principals Fund, LP | 23,801 | 0 | 128,739 | 128,739 | 323,555 | 323,555 | 0 | 0 | 0 | 476,095 | 476,095 | 1.6523% | 1.2631% |
| The Founders Fund VII, LP | 96,257 | 0 | 520,652 | 520,652 | 1,308,527 | 1,308,527 | 0 | 0 | 0 | 1,925,436 | 1,925,436 | 6.6823% | 5.1082% |
| The Mille Kutcher/Ashton Kutcher Family Tru | 4,452 | 0 | 22,105 | 22,105 | 0 | 0 | 0 | 0 | 0 | 26,557 | 26,557 | 0.0922% | 0.0705% |
| Other common holders | 8,000,000 | 2,000,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000,000 | 10,000,000 | 34.7053% | 26.5300% |
| Other option holders | 0 | 0 | 0 | 0 | 0 | 0 | 1,058,017 | 0 | 0 | 0 | 1,058,017 | 0.0000% | 2.8069% |
| Options and RSU's Issued and outstanding | | | | | | | 1,058,017 | | | | | | |
| Shares available for Issuance under the plan | | | | | | | 4,932,250 | | | | | | |
| Fully diluted shares | 8,955,848 | 2,000,000 | 14,508,214 | | 3,846,154 | | 5,990,267 | 573,786 | 2,315,117 | | 37,693,186 | | 100.0000% |
| Fully Diluted Owners hip | 22.9714% | 5.3040% | 37.9823% | | 10.2038% | | 15.8923% | 1.5223% | 6.1429% | | 100.0000% | | |
| Total Shares Outstanding | 8,858,868 | 2,000,000 | 14,508,214 | | 3,846,154 | | | | | 28,914,816 | | 100.0000% | |
| Percentage Outstanding | 30.0501% | 6.9411% | 49.6809% | | 13.5682% | | | | | 100.0000% | | | |
| Price per share | | | $4.6023 | $4.6023 | $1.82 | $1.82 | | | | | | | |

**EXHIBIT**

**4**

| | |
|---|---|
| From: | Charlie Ebersol |
| Sent: | Monday, February 25, 2019 11:45 AM CST |
| To: | John Zutter |
| CC: | Tom Dundon; Dawn Belt; Kevin Freedman |
| Subject: | Re: |
| Attachments: | attachment_1[2].pdf, SSpiral_Cop19022315200.pdf, FW_10603030_1_ESMG_ Board Meeting Minutes (2019-02-24)[2].DOCX |

See attached.

Charlie Ebersol
Founder & CEO

████████
AAF.com



DISCLAIMER:

This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**From:** John Zutter <jz@dundon.co>
**Date:** Monday, February 25, 2019 at 9:09 AM
**To:** Charlie Ebersol <ce@aaf.com>
**Cc:** Tom Dundon <td@dundon.co>
**Subject:** RE: Re:

Following up on documentation.

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, Texas 75201
Phone: (917) 861-5424

**From:** Charlie Ebersol [mailto:ce@aaf.com]
**Sent:** Sunday, February 24, 2019 6:58 PM
**To:** John Zutter <jz@dundon.co>
**Cc:** Tom Dundon <td@dundon.co>
**Subject:** Re: Re:

Yes. I'm at the game so I'll send all to you tonight.


Charlie Ebersol
Founder & CEO



[AAF.com](AAF.com)




DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential
information. Unless stated to the contrary, any opinions or comments are personal to the writer and do
not represent the official view of the company. If you have received this e-mail in error, please notify us
immediately by reply e-mail and then delete this message from your system. Please do not copy it or use
it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.



On Feb 24, 2019 at 4:57 PM, <John Zutter> wrote:

Can you provide us with documentation on both the Reggie thing and the board resolutions.  Thanks
Charlie – this is important.  Now we just need to get to MGM to have them subordinate to DCP and we
are back on track.

**From:** Charlie Ebersol [mailto:ce@aaf.com]
**Sent:** Sunday, February 24, 2019 6:56 PM
**To:** John Zutter <jz@dundon.co>
**Cc:** Tom Dundon <td@dundon.co>
**Subject:** Re:

Yes and we had the board resolution vote and it was approved. So i have the votes and voting
authority.


Charlie Ebersol

**CLASSIFIED**

Founder & CEO



AAF.com



DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

On Feb 24, 2019 at 6:26 AM, <John Zutter> wrote:

Did you get Reggie signatures yesterday?

CLASSIFIED

DocuSign Envelope ID: 4F7ACB55-E71A-45BE-901E-09FCE6CC885B

## HOLDER VOTING AGREEMENT

This Holder Voting Agreement (this "*Agreement*") is made as of the [✗] day of February, 2019, by and among Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), FO2 LLC, a Delaware limited liability company (together with its successors, "*Stockholder*"), and Charlie Ebersol ("*Proxyholder*").

## RECITALS

A.    Stockholder currently holds shares of capital stock of the Company and/or securities convertible into shares of capital stock of the Company.

B.    Stockholder is entering into that certain Release Agreement dated on the date hereof by and among the Company and Stockholder (the "*Release*") pursuant to which the Company and Investor are agreeing, among other things, to enter into a mutual release.

C.    This Agreement, among other things, requires Stockholder to vote all shares of capital stock of the Company which Stockholder currently owns or hereafter acquires or as to which Stockholder otherwise exercises voting or dispositive authority (together, all such shares referred to in this sentence and any securities of the Company issued with respect to, upon conversion of, or in exchange or substitution of such shares, and any other voting securities of the Company subsequently acquired by Stockholder, the "*Shares*") in the manner set forth herein.

D.    This Agreement is being entered into as a condition to the consummation of the transactions described in the Release, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged and agreed.

## AGREEMENT

The parties agree as follows:

1.    **Voting Arrangements.**  Stockholder hereby agrees that Proxyholder shall have the right to vote the Shares, in his sole discretion, on all matters submitted to a vote of stockholders of the Company at a meeting of stockholders or through the solicitation of a written consent of stockholders (whether of any individual class of stock or of multiple classes of stock voting together) other than Excluded Stockholder Matters.  "*Excluded Stockholder Matters*" include:

(a)    approvals required by the terms of Section 280G(b)(5)(B) of the Internal Revenue Code of 1986, as amended (the "*Code*"), regarding any Proxyholder payments and/or benefits that may separately or in the aggregate, constitute "parachute payments" pursuant to Section 280G of the Code.

2.    **Stockholder to Abstain from Voting**.  Stockholder agrees that, unless Proxyholder provides explicit written instruction to vote the Shares under this Agreement or Proxyholder provides explicit written notice that Stockholder shall be permitted by Proxyholder

Exhibit 23 [Email from Crdemon to Pg 286 of 1466

to vote in a manner other than as Proxyholder instructs, Stockholder shall abstain from voting any of the Shares (in person, by proxy or by action by written consent, as applicable) on all matters that are not Excluded Stockholder Matters. For clarity, each of the parties hereto agrees and acknowledges that nothing in this Agreement limits, modifies or abridges Stockholder's rights to vote or consent with respect to Excluded Stockholder Matters, which rights Stockholder shall fully retain with respect to the Shares.

3. **Irrevocable Proxy and Power of Attorney**. To secure Stockholder's obligations to vote the Shares in accordance with this Agreement and to comply with the other terms hereof, Stockholder hereby appoints Proxyholder, or his designees, as Stockholder's true and lawful proxy and attorney, with the power to act alone and with full power of substitution, to vote or act by written consent with respect to all the Shares in accordance with the provisions set forth in this Agreement, and to execute all appropriate instruments consistent with this Agreement on behalf of Stockholder. The proxy and power granted by Stockholder pursuant to this Section 3 are coupled with an interest and are given to secure the performance of Stockholder's duties under this Agreement. The proxy and power will be irrevocable for the term hereof. The proxy and power will survive the merger, consolidation, conversion or reorganization of Stockholder or any other entity holding the Shares.

4. **Additional Representations, Covenants and Agreements**.

4.1 *Transfers by Stockholder*. Stockholder may not transfer, assign, pledge or otherwise dispose of or encumber the Shares (collectively, a "*Transfer*") until the pledgee, transferee or donee of such Shares (the "*Transferee*") furnishes Proxyholder and the Company with a written agreement to be bound by the terms of this Agreement (an "*Assumption Agreement*") and any additional agreement required under any other applicable agreements between the parties hereto, it being understood and agreed that the Company shall be entitled to issue stop transfer instructions in respect of such Shares to preclude any transfer of Shares in contravention of the foregoing. Upon satisfaction of the provisions of this Section 4.1, such pledgee, transferee or donee shall be treated as a "Stockholder" for purposes of this Agreement.

4.2 *No Revocation*. The voting agreements contained in this Agreement are coupled with an interest and may not be revoked during the term of this Agreement.

4.3 *Legends.* The Company shall cause each certificate representing the Shares to bear the following legend, in addition to any legends that may be required by state or federal securities laws or the terms of any voting or other agreements that apply:

THE SHARES EVIDENCED HEREBY ARE SUBJECT TO A HOLDER VOTING AGREEMENT BY AND AMONG THE COMPANY AND CERTAIN STOCKHOLDERS OF THE COMPANY, DATED AS OF FEBRUARY [ 2 5 ], 2019 (COPIES OF WHICH MAY BE OBTAINED FROM THE COMPANY) WHICH INCLUDES PROVISIONS POTENTIALLY RESTRICTING THE STOCKHOLDER'S RIGHT TO VOTE OR TRANSFER AN INTEREST IN THE SHARES EVIDENCED HEREBY, AND BY ACCEPTING ANY INTEREST IN SUCH SHARES THE PERSON ACCEPTING SUCH INTEREST SHALL BE DEEMED

2

CLASSIFIED

DocuSign Envelope ID: 4F7ACB55-E71A-45BE-901E-09FCE6CC885B

TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SAID HOLDER VOTING AGREEMENT.

4.4 **Stock Splits, Dividends, Etc.** In the event of any issuance of shares of the Company's voting securities hereafter to Stockholder (including, without limitation, in connection with any stock split, stock dividend, recapitalization, reorganization, or the like), such shares shall automatically become subject to this Agreement and shall be endorsed with the legend set forth in Section 4.3.

4.5 **Specific Enforcement.** It is agreed and understood that monetary damages would not adequately compensate an injured party for the breach of this Agreement by any party, that this Agreement shall be specifically enforceable, and that any breach or threatened breach of this Agreement shall be the proper subject of a temporary or permanent injunction or restraining order. Further, each party hereto waives any claim or defense that there is an adequate remedy at law for such breach or threatened breach.

4.6 **Securities Laws, Rules and Regulations**. Stockholder, the Company and Proxyholder agree and understand that Stockholder, the Company and/or Proxyholder may become subject to the registration and/or reporting requirements, rules and regulations of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), the Securities Act of 1933, as amended (the "**Securities Act**") and/or any state and federal securities laws (collectively with the Exchange Act and the Securities Act, the "**Securities Laws**"). Stockholder, the Company and Proxyholder agree to use their respective commercially reasonable efforts to comply with the Securities Laws and to reasonably assist each other in complying with the Securities Laws in a timely and prompt manner. Such compliance may include, for example and without limiting the foregoing, the filing and updating and maintaining of Form 13G and/or Form 13D under the Exchange Act.

4.7 **Proxyholder's Liability.** In voting the Shares in accordance with Section 1 hereof, Proxyholder shall not be liable for any error of judgment nor for any act done or omitted, nor for any mistake of fact or law nor for anything which Proxyholder may do or refrain from doing in good faith, nor shall Proxyholder have any accountability hereunder, except for his own bad faith, fraud or willful misconduct. Furthermore, upon any judicial or other inquiry or investigation of or concerning Proxyholder's acts pursuant to his rights and powers as Proxyholder, such acts shall be deemed reasonable and in the best interests of Stockholder unless proved to the contrary by clear and convincing evidence.

4.8 **No Ownership Interest.** Except as expressly provided for in this Agreement, nothing herein shall be deemed to vest in any party other than Stockholder any direct or indirect ownership, or incidence of ownership of, or with respect to, any of the Shares held by the Stockholder and all rights, ownership and economic benefits of and relating to such Shares shall remain vested in and belong to the Stockholder.

5. **Termination**.

5.1 **Termination Events.** This Agreement shall automatically and immediately terminate:

3

CLASSIFIED

DCP Parties0245

DocuSign Envelope ID: ...

(a)    upon the liquidation, dissolution or winding up of the business operations of the Company; or

(b)    in the sole discretion of Proxyholder, upon the express written consent of Proxyholder (which Proxyholder shall be under no obligation to provide).

5.2    *Legends Following Termination of Agreement.*  At any time after termination of any of the Agreement, any holder of a stock certificate may surrender such certificate to the Company for appropriate modifications to the legend, and the Company shall, as promptly as reasonably practicable, reissue a new certificate with any legends that may be required by state or federal securities laws or the terms of any voting or other agreements that remain applicable.

5.3    *Survival.*  Section 5.2 shall survive the termination of this Agreement.

6.    **Miscellaneous.**

6.1    *Successors and Assigns.*  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the Company, Stockholder and Proxyholder. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or the respective successors and assigns of the Company, Stockholder and Proxyholder any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. Except for an assignment by the Company (i) by operation of law, or (ii) in connection with an acquisition, consolidation or merger of the Company or sale of all or substantially all of the Company's assets (which shall be permitted with only the written consent and notice of the Company), this Agreement (or any of the rights hereunder) may not be assigned (by any party) without the written consent of Proxyholder, the Company and Stockholder.

6.2    *Amendments and Waivers.*  Any term hereof may be amended or waived only with the written consent of Stockholder, Proxyholder and the Company; provided any consent of the Company shall require the prior approval of the Board of Directors of the Company. Any amendment or waiver effected in accordance with this Section 6.2 shall be binding upon the Company, Proxyholder and Stockholder, and each of the respective successors and assigns to the Company or Proxyholder.

6.3    *Notices.*  Notwithstanding anything to the contrary contained herein, any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient and received on the earlier of (a) the date of delivery, when delivered personally, by overnight mail, courier or sent by electronic mail (e-mail) or fax, or (b) forty-eight (48) hours after being deposited in the U.S. mail, as certified or registered mail, with postage prepaid, and addressed to the party to be notified at such party's address, e-mail address or fax number as set forth on the signature page hereto, or as subsequently modified by written notice. Any electronic mail (e-mail) communication shall be deemed to be "in writing" for purposes of this Agreement.

6.4    *Severability.*  If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for

4

CLASSIFIED

DocuSign Envelope ID: 4F7ACB55-E71A-45BE-901E-09FCE6CC885B

such provision, then (a) such provision shall be excluded from this Agreement, (b) the balance of the Agreement shall be interpreted as if such provision were so excluded, and (c) the balance of the Agreement shall be enforceable in accordance with its terms.

6.5     *Governing Law; Jurisdiction; Venue*. This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to conflict of law principles. In addition, each of the parties hereto (i) consents to submit itself to the exclusive jurisdiction of the Court of Chancery or other courts of the State of Delaware in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (ii) agrees that it will not attempt to deny or defeat such jurisdiction by motion or other request for leave from such court, (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than the Court of Chancery or other courts of the State of Delaware, and (iv) hereby waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

6.6     *Counterparts*.     This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

6.7     *Titles and Subtitles*.     The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

6.8     *Counsel to the Company*.     Each party to this Agreement acknowledges and agrees that Fenwick & West, LLP is acting as counsel solely to the Company and does not represent either Stockholder or Proxyholder in connection with this Agreement or any other agreement. Each party to this Agreement has had the opportunity and has been encouraged to consult with the own independent counsel.

*[Signature page follows]*

5

CLASSIFIED

DocuSign Envelope ID: ...

IN WITNESS WHEREOF the parties have executed this Holder Voting Agreement as of the date first set forth above.

**THE COMPANY**

Ebersol Sports Media Group, Inc.

By: Charlie Ebersol

Title: CEO

Address: 149 New Montgomery Street, 4th Floor, San Francisco, CA 94105

Email: ce@aaf.com

**PROXYHOLDER**

By: Charlie Ebersol

Address: 149 New Montgomery Street, 4th Floor, San Francisco, CA 94105

Email: ce@aaf.com

[SIGNATURE PAGE TO HOLDER VOTING AGREEMENT]

**CLASSIFIED**

DocuSign Envelope ID: 4F7ACB55-E71A-45BE-901E-09FCE6CC885B

IN WITNESS WHEREOF the parties have executed this Holder Voting Agreement as of the date first set forth above.

**STOCKHOLDER**

FO2 LLC

By: _____

Name: _____

Title: _____

Address: _____

_____

Email: _____

[SIGNATURE PAGE TO HOLDER VOTING AGREEMENT]

**CLASSIFIED**

## MINUTES OF A SPECIAL MEETING
## OF THE BOARD OF DIRECTORS OF
## EBERSOL SPORTS MEDIA GROUP, INC.

DATE:               February 24, 2019

TIME:               4:00 PM PST

DIRECTORS PRESENT:  Charlie Ebersol
                    Dick Ebersol
                    Jeff Moorad

DIRECTORS ABSENT:   Keith Rabois

OTHERS PRESENT      Kevin Freedman
                    Alan Kantowitz
                    Dawn Belt, Fenwick & West LLP

A telephonic meeting of the Board of Directors (the "**Board**") of Ebersol Sports Media Group, Inc. (the "**Company**") was called to order with a quorum of the Board present, at approximately 4:00 p.m. Pacific time. The meeting was held pursuant to notice duly given or waived. Mr. Ebersol acted as the Chairman and called the meeting to order. Ms. Belt acted as the Secretary of the meeting and kept the minutes. Mr. Ebersol covered the agenda for the meeting.

1.  **Update on FO2 LLC**

Mr. Charlie Ebersol updated the Board on the current status of the Company's relationship with FO2 LLC ("**FO2**") and Mr. Reggie Fowler, and confirmed that: (a) Mr. Fowler has resigned from the Board, effective February 23, 2019; (b) FO2 signed and delivered a Release Agreement to the Company, in the form attached hereto as <u>Exhibit A,</u> pursuant to which the Company and FO2 agreed to a mutual release of claims in exchange for termination of the Series 1 Preferred Stock Purchase Agreement and certain other rights and obligations under the related financing agreements; and (c) FO2 signed and delivered the Holder Voting Agreement, in the form attached to the Release Agreement, whereby FO2 assigned its voting rights to Mr. Charlie Ebersol. Following further discussion and motion duly made and seconded, the Board unanimously approved the following resolutions:

> **RESOLVED**, that the Board hereby accepts Mr. Reggie Fowler's resignation from the Board, effective February 23, 2019.

> **RESOLVED FURTHER,** approves and ratifies the Release Agreement and the Holder Voting Agreement.

2.  **Fundraising Update**

**CLASSIFIED**

Mr. Charlie Ebersol and Ms. Belt presented a summary of the Series 2 Preferred Stock binding term sheet negotiated and signed with Dundon Capital Partners LLP ("*DCP*"), as well as an update on the funding to date from DCP and ongoing negotiations regarding the detailed terms for such financing. In particular, the Board discussed the need to offer existing investors an opportunity to participate in the new financing, with Mr. Charlie Ebersol confirming that Tom Dundon has verbally indicated that he will offer such an opportunity to the Company's existing stockholders, with details to be negotiated and confirmed. The Board directed management to continue discussions with DCP accordingly. Following further discussion and motion duly made and seconded, the Board unanimously approved the following resolutions:

**WHEREAS**, the Binding Term Sheet for Series 2 Preferred Stock Financing attached hereto as <u>Exhibit A</u> (the "**Term Sheet**") was previously circulated and discussed by the Board and management.

**WHEREAS,** the Term Sheet provides for an investment of up to $70,000,000 from Dundon Capital Partners LLC, on terms that significantly dilute the ownership and significantly impact the economic and control rights of the Corporation's existing stockholders, and the Corporation has already received over $12,000,000 from Dundon Capital Partners under these terms.

**WHEREAS**, given the Corporation's financial position, cash reserves, accrued but unpaid liabilities, near and long-term prospects, strategic goals and objectives, current product development and business development efforts, financing alternatives and other relevant considerations, the Board believes that it is advisable and in the best interests of the Corporation and its stockholders to raise additional working capital and effect a recapitalization of the Corporation's capital stock in accordance with the Term Sheet.

**NOW, THEREFORE, BE IT RESOLVED,** that the Board hereby approves and ratifies the Term Sheet.

**RESOLVED FURTHER,** that the officers of the Corporation, and each of them with full authority to act without the others, are hereby authorized, in the name of and on behalf of the Corporation, to execute and deliver, and to cause the Corporation to enter into and perform all its obligations under, the Term Sheet, together with such changes therein and to the schedules and exhibits thereto as any officer may in his or her discretion approve (such approval being conclusively evidenced by such officer's execution thereof).

**RESOLVED FURTHER,** that the officers of the Corporation, and each of them with full authority to act without the others, are hereby authorized, in the name of and on behalf of the Corporation, to negotiate the definitive agreements reasonably necessary or advisable to implement the transactions contemplated by the Term Sheet.

**RESOLVED,** that the Board hereby ratifies, confirms, approves and adopts all actions previously taken by officers or directors of the Corporation that are

CLASSIFIED

approved by the foregoing resolutions, including without limitation the negotiation and preparation of the Term Sheet.

**RESOLVED**, that each of the officers of the Corporation is authorized to do or cause to be done any and all such further acts and to execute and deliver any and all such additional documents as such officer may deem necessary or appropriate in order to carry into effect the purposes and intent of the foregoing resolutions.

3.    **Adjournment**

There being no further business to come before the meeting, upon motion duly made, seconded and unanimously carried, the meeting was adjourned.

_____

Dawn Belt, Secretary of the Meeting

**CLASSIFIED**

## EXHIBIT A

### TERM SHEET

DCP Parties0253

## EXHIBIT B

### RELEASE AGREEMENT

CLASSIFIED

CLASSIFIED

DocuSign Envelope ID:

## RELEASE AGREEMENT

This Release Agreement (this "*Agreement*") is made and entered into effective as of February 23rd 2019 (the "*Effective Date*") by and between Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), and FO2 LLC, a Delaware limited liability company (the "*Investor*").

### R E C I T A L S

Reference is hereby made to (a) the Series 1 Preferred Stock Purchase Agreement dated November 21, 2018 (the "*Purchase Agreement*") between the Company and Investor, (b) the letter sent by the Company to Investor on February 18, 2019, notifying Investor that it is in breach of the Purchase Agreement, (c) the Line of Credit Agreement dated November 21, 2018 (the "*Credit Agreement*") and (d) the Warrant to Purchase Stock dated November 21, 2018 (the "*Warrant*").

The Company and Investor wish to release one another from any claims relating to the Purchase Agreement, Credit Agreement and Warrant and provide a covenant not to sue in exchange in accordance with the terms set forth herein. Any capitalized terms not defined herein will have the meaning as set forth in the Purchase Agreement.

NOW THEREFORE, the parties hereby agree as follows:

1. **Release of Claims and Covenants Not to Sue by Investor.**

(a)       On behalf of itself and its Affiliates, Investor hereby fully and forever releases and discharges the Company and the Company's directors, officers, stockholders, employees, agents, attorneys, representatives, predecessors, successors and assigns, and any person acting by or through any of them (collectively, the "*Company Released Parties*"), of and from any and all claims, actions, causes of action, losses, debts, judgments, awards, guarantees, warranties, express or implied, balances, damages, compensation, royalties, agreements, promises liabilities, demands, obligations, costs, expenses, damages and liens of every nature, kind and character whatsoever, whether known or unknown, suspected or unsuspected, fixed or contingent, and whether sounding in contract or tort, or amounts of any nature whatsoever (collectively "*Claims*") which Investor now has, ever has had, or ever claimed to have had against the Company and/or any of the released parties, including (but not limited to) Claims arising out of, based upon or related in any manner whatsoever to (a) the Purchase Agreement, the Transaction Agreements, the Credit Agreement, the Warrant, or any transaction contemplated thereunder, (b) contributions made by Investor to the Company's business, (c) equity, rights to acquire equity or other ownership interests with respect to the Company, (d) the Recapitalization (as defined below), any transaction contemplated thereunder or any action taken in connection therewith, (e) control, approval or others similar rights related to Investor's prior investments in the Company (collectively, the "*Company Released Matters*").

(b) Investor acknowledges that it may hereafter discover facts in addition to, or different from, those which they now know or believe to be true with respect to the releases given in this Agreement, that it may have sustained or may yet sustain damages, costs or expenses that are presently unknown and that relate to the releases given in this Agreement. Investor acknowledges, however, that it has negotiated, agreed upon, and entered into this Agreement in light of such possibilities. It is Investor's intention that the foregoing release shall be effective as a bar to any and all Claims herein above specified to be so barred. In furtherance of this intention, Investor waives any and all rights that they have under state or federal statute or common law principles that would otherwise limit the effect of this Agreement to claims known or suspected as of the Effective Date. Specifically, Investor waives the effect and protections of Section 1542 of the California Civil Code which provides:

34405/00600/FW/10594127.4

**CLASSIFIED**

DCP Parties0256

DocuSign Envelope ID: 4F7ACB55-E7FA-45BE-901E-09FCE6CC885B

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO
EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING
THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST
HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT
WITH THE DEBTOR.**

Investor acknowledges, warrants and represents that it is familiar with Section 1542 of the California Civil Code, and that the effect and import of that provision has been fully explained to them by its attorneys. Investor further acknowledges that the foregoing waiver of the provisions of Section 1542 of the California Civil Code is part of the consideration hereunder. Investor expressly consents that the releases set forth herein shall be given full force and effect in accordance with each and all of its express terms and provisions, including those terms and provisions relating to unknown or unsuspected claims, demands, and causes of action, if any, to the same effect as those terms and provisions relating to any other claims, demands, and causes of action hereinabove specified. Investor further agrees and covenants that if the facts to which this Agreement is executed are found to be different from the facts now believed to be true, Investor expressly accepts and assumes the risk of such possible difference in the facts and agrees that this Agreement shall be and remain fully effective notwithstanding such difference in facts.

(c)     On itself and its Affiliates, Investor hereby covenants not to sue the Company Released Parties for any Claims arising out of, based upon or related in any manner whatsoever, to the Company Released Matters on or after the Effective Date. In the event any such suit is instituted, this Agreement may be pleaded as a defense.

2.      **Release of Claims and Covenants Not to Sue by Company.**

(a)     On behalf of itself and successors and assigns, the Company hereby releases and forever discharges Investor and the Investor's officers, members, employees, agents, attorneys, representatives, predecessors, successors and assigns, and any person acting by or through any of them (collectively, the "***Investor Released Parties***"), from any and all Claims which the Company now has, ever has had, or ever claimed to have had against Investor, based upon or related in any manner whatsoever to the Purchase Agreement, the Transaction Agreements, or any transaction contemplated thereunder (collectively, the "***Investor Released Matters***").

(b) The Company acknowledges that it may hereafter discover facts in addition to, or different from, those which they now know or believe to be true with respect to the releases given in this Agreement, that it may have sustained or may yet sustain damages, costs or expenses that are presently unknown and that relate to the releases given in this Agreement. The Company acknowledges, however, that it has negotiated, agreed upon, and entered into this Agreement in light of such possibilities. It is the Company's intention that the foregoing release shall be effective as a bar to any and all Claims herein above specified to be so barred. In furtherance of this intention, the Company waives any and all rights that they have under state or federal statute or common law principles that would otherwise limit the effect of this Agreement to claims known or suspected as of the Effective Date. Specifically, the Company waives the effect and protections of Section 1542 of the California Civil Code which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO
EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING
THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST
HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT
WITH THE DEBTOR.**

34405/00600/FW/10594127.4

CLASSIFIED

DocuSign Envelope ID: ...

The Company acknowledges, warrants and represents that it is familiar with Section 1542 of the California Civil Code, and that the effect and import of that provision has been fully explained to them by its attorneys. The Company further acknowledges that the foregoing waiver of the provisions of Section 1542 of the California Civil Code is part of the consideration hereunder. The Company expressly consents that the releases set forth herein shall be given full force and effect in accordance with each and all of its express terms and provisions, including those terms and provisions relating to unknown or unsuspected claims, demands, and causes of action, if any, to the same effect as those terms and provisions relating to any other claims, demands, and causes of action hereinabove specified. The Company further agrees and covenants that if the facts to which this Agreement is executed are found to be different from the facts now believed to be true, the Company expressly accepts and assumes the risk of such possible difference in the facts and agrees that this Agreement shall be and remain fully effective notwithstanding such difference in facts.

(c)     The Company hereby covenants not to sue Investor for any Claims arising out of, based upon or related in any manner whatsoever, to the Investor Released Matters on or after the Effective Date. In the event any such suit is instituted, this Agreement may be pleaded as a defense.

3.     **Mutual Non-Disparagement.** Investor agrees that it will not, and will cause its Affiliates to not, disparage the Company Released Parties or their products, services, agents, representatives, directors, officers, shareholders, attorneys, employees, vendors, affiliates, successors or assigns, or any person acting by, through, under or in concert with any of them. The Company will direct its directors and officers not to disparage Investor or its products, services, agents, representatives, directors, officers, shareholders, attorneys, employees, vendors, affiliates, successors or assigns, or any person acting by, through, under or in concert with Investor. Notwithstanding the foregoing, statements made in the course of sworn testimony in administrative, judicial or arbitral proceedings or required for legitimate business purposes (including, without limitation, depositions in connection with such proceedings) shall not be subject to this paragraph.

4.     **Confirmation; Assignment of Voting Rights.** The Company and Investor hereby confirm that (a) Investor has fully paid for, and currently owns 5,153,759 shares of the Company's Series 1 Preferred Stock (the "**Shares**"), (b) the Shares are the only ownership interests that Investor holds in the Company, (c) Investor has not funded any amounts and there is no outstanding balance under the Credit Agreement and (d) the Warrant is not exercisable for any shares of the Company's capital stock. The Company and Investor hereby agree that Investor has no further obligation or right to buy from the Company, and the Company has no further obligation to sell to Investor, any Shares under the Purchase Agreement and the Purchase Agreement is hereby terminated. The Company and Investor hereby agree that Investor has no further obligation to fund, and the Company has no further right to borrow, any amounts under the Credit Agreement and the Credit Agreement is hereby terminated. The Company and Investor hereby agree that Investor has no further right to exercise, and the Company has no further obligation to issue shares of capital stock upon exercise, of the Warrant and the Warrant is hereby terminated. Investor hereby agrees it has no rights to designate any directors to the Company's Board of Directors, and that Section 1.2(b) of the Amended and Restated Voting Agreement dated November 21, 2018 between the Company, Investor and certain of the Company's stockholders (the "*Voting Agreement*"), is hereby terminated. Investor hereby agrees it has no right or obligation to confer with Charlie Ebersol ("*Ebersol*") on any matter presented for a vote of the Company's stockholders, and that Section 4 of the Voting Agreement is hereby terminated. Investor hereby agrees it has no rights to designate (i) any officers or other service providers of the Company (including without limitation the Company's Chief Financial Officer and Vice President of Legal Affairs/Corporate Counsel) or (ii) any member of any of the Company's committees (including without limitation any committee relating to the American Alliance of Football), and that Sections 5.6 and 5.7 of the Amended and Restated Investors' Rights Agreement dated November 21, 2018 between the Company, Investor and certain of the Company's stockholders, is hereby terminated. Pursuant to this Agreement and the Holder Voting Agreement attached hereto as Exhibit A, Investor hereby agrees to assign all voting rights associated with the Shares to Ebersol.

3

34405/00600/FW/10594127.4

CLASSIFIED

DocuSign Envelope ID: 4F7ACB55-E71A-45BE-901E-09FCE6CC885B

5. **Recapitalization.** Investor understands that the Company is currently in negotiations regarding a new investment in and recapitalization of the Company in accordance with the Binding Term Sheet (the "*Term Sheet*") signed by the Company on February 14, 2019 (the "*Recapitalization*"). In connection with the Recapitalization, the Company expects that all existing investors in the Company, including Investor, will lose significant (and potentially all) economic, control and other rights associated with their prior investments and current ownership interests in the Company. The Company has limited bargaining power in its negotiations with the new investor regarding the Recapitalization, and there is no guarantee that the Company will be able to arrange a satisfactory outcome for its current investors and stockholders, including Investor. With a full acknowledgment of the Company's situation with respect to the Recapitalization, Investor hereby agrees to approve, vote in favor of, and enter into (as applicable) any amendments to the Company's Restated Certificate of Incorporation, Bylaws or Transaction Agreements, any resolutions or consents, resignations or any other agreements required to bring the Recapitalization into effect, as determined in the sole discretion of the Company; provided that Investor's economic rights will not be impacted in a disproportionately adverse manner as compared to other holders of the Company's Series Seed Preferred Stock or Series 1 Preferred Stock.

6. **Authority; Covenant.** Investor confirms that Investor has the sole authority to enter into and perform all of its obligations under this Agreement, including releasing the Claims. Investor is the sole and lawful owner of the Claims, and has not assigned or transferred any right, title or interest in the Claims. Investor will not bring or voluntarily aid any legal or equitable action or proceeding against or otherwise sue the Company or any successor to the Company with respect to any Claims. Investor hereby represents and warrants that the execution, delivery and performance of all of its obligations under this Agreement will not violate any agreement or other obligation which Investor may be subject to. Investor further confirms and agrees that other than as expressly set forth in this Agreement, the Company does not have any liability or obligation to Investor relating to or arising in connection with the Company Released Matters or otherwise.

7. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and all of which together shall constitute one and the same agreement.

8. **Governing Law; Injunctive Relief.** This Agreement will be governed by and construed in accordance with the laws of the State of California, without giving effect to that body of laws pertaining to conflict of laws. Investor understands that in the event of a breach or threatened breach of this Agreement by Investor, the Company may suffer irreparable harm and other damage that cannot be remedied through the payment of money, and will therefore be entitled to injunctive relief.

9. **Entire Agreement.** This Agreement and the documents referred to herein, including but not limited to the Holder Voting Agreement, constitute the entire agreement and understanding of the parties with respect to the subject matter of this Agreement, and supersede all prior understandings and agreements, whether oral or written, between or among the parties hereto with respect to the specific subject matter hereof.

10. **Successors and Assigns; Assignment.** Except as otherwise provided in this Agreement, this Agreement, and the rights and obligations of the parties hereunder, will be binding upon and inure to the benefit of their respective successors, assigns, heirs, executors, administrators and legal representatives. The Company may assign any of its rights and obligations under this Agreement. No other party to this Agreement may assign, whether voluntarily or by operation of law, any of its rights and obligations under this Agreement, except with the prior written consent of the Company.

11. **Severability.** If any provision of this Agreement is determined by any court or arbitrator of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such provision will be enforced to the maximum extent possible given the intent of the parties hereto. If such clause or provision

4

34405/00600/FW/10594127.4

DocuSign Envelope ID:

cannot be so enforced, such provision shall be stricken from this Agreement and the remainder of this Agreement shall be enforced as if such invalid, illegal or unenforceable clause or provision had (to the extent not enforceable) never been contained in this Agreement.

**12.** **Amendment and Waivers.** This Agreement may be amended only by a written agreement executed by each of the parties hereto. Any amendment effected in accordance with this section will be binding upon all parties hereto and each of their respective successors and assigns. No delay or failure to require performance of any provision of this Agreement shall constitute a waiver of that provision as to that or any other instance. No waiver granted under this Agreement as to any one provision herein shall constitute a subsequent waiver of such provision or of any other provision herein, nor shall it constitute the waiver of any performance other than the actual performance specifically waived.

**13.** **Confidentiality.** Each party agrees that it shall not publicly disclose this Agreement or the terms hereof; provided that, to the extent required by applicable law, judicial, administrative, tax or audit process or otherwise compelled by any governmental or regulatory authority, or reasonably necessary to conduct the Company's business, this Agreement and the content herein may be disclosed accordingly.

**14.** **Construction.** Investor and the Company acknowledge that each of them and its respective counsel have reviewed this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendment or exhibits hereto.

**15.** **Understanding of Terms**. The parties each hereby affirm and acknowledge that they have read this Agreement, they know and understand its terms, and they have signed it voluntarily, after having been advised by counsel. The parties have had a full and unhindered opportunity to consult with their attorneys, accountants, financial advisors and such other consultants as they may have desired prior to executing this Agreement.

[remainder of page intentionally left blank]

34405/00600/FW/10594127.4

CLASSIFIED

DocuSign Envelope ID: 4F7ACB55-E71A-45BE-901E-09FCE6CC885B

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement effective as of the date and year first above written.

**COMPANY**
EBERSOL SPORTS MEDIA GROUP, INC.

Charlie Ebersol, CEO
Address:

**INVESTOR**
FO2 LLC

Name: Reginald D. Fowler
Address: 9920 S. Rural Rd. #108-95
           Tempe, AZ 85284

6

34405/00600/FW/10594127.4

CLASSIFIED

DCP Parties0261

EXHIBIT A

HOLDER VOTING AGREEMENT

34405/00600/FW/10594127.4

CLASSIFIED

DocuSign Envelope ID: 4F7ACB55-E71A-45BE-901E-09FCE6CC885B

February 23, 2019

Ebersol Sports Media Group, Inc.

Dear Board of Directors:

    Effective immediately, I hereby voluntarily resign from any and all positions that I may hold as a director, manager, officer, employee or consultant of Ebersol Sports Media Group, Inc., a Delaware corporation (the "*Company*"), and any subsidiary of the Company, including, without limitation, my position as a member of the Board of Directors of the Company and any committees thereof.

_____

Reginald D. Fowler

23769/00600/FW/10602870.1

**EXHIBIT**

**5**

| | |
|---|---|
| **Message** | |
| **From:** | Alan Kantowitz [alan@aaf.com] |
| **Sent:** | 1/7/2019 2:55:05 PM |
| **To:** | Jeff Moorad [jmoorad@mooradsportspartners.com]; Dave Pottruck [dave@redeagleventures.com]; Reggie Fowler [fo2@spiral-global.com]; Jim Davis [jim@spiral-kairos.com] |
| **CC:** | Charlie Ebersol [ce@aaf.com]; Kevin Freedman [kevin@aaf.com] |
| **Subject:** | Finance Committee Materials |
| **Attachments:** | 2019.01.07 Finance Committee Discussion Materials vF.pdf |

All,

In advance of today's call, attached please find materials that will use too hep drive the discussion. Looking forward to a productive conversation.

Best,
Alan


--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com



TR0001343161



January 7, 2019 Finance Committee Materials

TR0001343162

# Executive Overview

**December/January:**
- <mark>Expenditures are tracking ~$4.5M ahead of plan</mark> primarily due to delayed timing of various expenses (most notably equipment and marketing)
- <mark>Revenue tracking $5.5M behind</mark> plan due to lower than budgeted ticket sale caused by a lack of awareness and general marketing
- <mark>Net cash expenditures ($30.3M) projected $1M unfavorable to plan</mark>

**Through end of season 1:**
- Expenditures projected to be $21M favorable to budget largely due to reductions in production, national marketing, player relations and wellness departments and travel
- <mark>Revenue projected to be $30M unfavorable to budget</mark>
- *League revenue projected to be $15M (-$7M vs. $22M budgeted due to sponsorships lacking)*
- *Digital revenue projected to be $4M (-$14M vs. $18M budgeted due to lack of marketing and business model shift)*
- *Team revenue projected to be $40M (-$10M vs $49M budgeted due to lack of local sponsorships)*

2

TR0001343163

# December 2018 spending ~$2.5m ahead of budget



TR0001343164

# January 2019 spending projected to be ~$2.0m ahead of budget



# Ticket Sales History and Projections Through January



*Budgeted $6.0m through December originally*

*Budgeted $12.7m through January originally*

TR0001343166

311

# Revised Budget Through Season

| | 1/31/19 | 2/28/19 | 3/31/19 | 4/30/19 | 5/31/19 | Through Season |
|---|---|---|---|---|---|---|
| League Revenue | $1,535,000 | $3,837,500 | $3,837,500 | $2,763,000 | $3,070,000 | **$15,043,000** |
| Team Revenue | 5,376,000 | 7,616,000 | 8,960,000 | 8,960,000 | 8,960,000 | **39,872,000** |
| Digital Revenue | 0 | 1,386,920 | 1,386,920 | 1,386,920 | 0 | **4,160,760** |
| **Total Revenue** | **$6,911,000** | **$12,840,420** | **$14,184,420** | **$13,109,920** | **$12,030,000** | **$59,075,760** |
| | | | | | | |
| Digital Expenses | $719,000 | $2,620,000 | $2,620,000 | $2,620,000 | $685,500 | **$9,264,500** |
| Football Expenses | 5,182,897 | 17,595,927 | 11,879,833 | 11,854,833 | 2,521,500 | **49,034,991** |
| Player Relations Expenses | 212,600 | 237,600 | 249,900 | 249,900 | 247,500 | **1,197,500** |
| Marketing/Branding Expenses | 4,059,700 | 4,850,700 | 3,018,700 | 4,443,700 | 253,700 | **16,626,500** |
| Production Expenses | 5,730,611 | 3,185,897 | 3,185,897 | 2,792,564 | 74,000 | **14,968,969** |
| League Expenses | 3,179,724 | 11,023,006 | 7,034,226 | 4,447,956 | 274,006 | **25,958,917** |
| Team Expenses | 1,707,755 | 4,407,459 | 6,002,459 | 6,002,459 | 1,707,755 | **19,827,889** |
| Medical Expenses | 2,261,320 | 1,430,760 | 737,000 | 737,000 | 721,000 | **5,887,080** |
| Corporate Expenses | 381,750 | 381,750 | 881,750 | 881,750 | 881,750 | **3,408,750** |
| Digital Payment Fees | 0 | 416,076 | 416,076 | 416,076 | 0 | **1,248,228** |
| AAF Player Digital Distributions | 0 | 242,711 | 242,711 | 242,711 | 0 | **728,133** |
| **Total Expenses** | | **$23,435,357** | **$46,391,887** | **$36,268,553** | **$34,688,950** | **$7,366,711** | **$148,151,457** |
| | | | | | | |
| Total Operating Income (Loss) | ($16,524,357) | ($33,551,467) | ($22,084,133) | ($21,579,030) | $4,663,289 | |
| % Margin | -239% | -261% | -156% | -165% | 39% | |
| | | | | | | |
| Cumulative Net Cash Flow | ($16,524,357) | ($50,075,823) | ($72,159,956) | ($93,738,986) | ($89,075,697) | |

6

TR0001343167

# Original Budget Through Season

| | 1/31/19 | 2/28/19 | 3/31/19 | 4/30/19 | 5/31/19 | Through Season |
|---|---|---|---|---|---|---|
| League Revenue | $2,260,000 | $5,650,000 | $5,650,000 | $4,068,000 | $4,520,000 | $22,148,000 |
| Team Revenue | 6,624,000 | 9,384,000 | 11,040,000 | 11,040,000 | 11,040,000 | 49,128,000 |
| Digital Revenue | 0 | 6,013,400 | 6,013,400 | 6,013,400 | 0 | 18,040,200 |
| **Total Revenue** | **$8,884,000** | **$21,047,400** | **$22,703,400** | **$21,121,400** | **$15,560,000** | **$89,316,200** |
| | | | | | | |
| Digital Expenses | $769,000 | $2,670,000 | $2,670,000 | $2,670,000 | $735,500 | $9,514,500 |
| Football Expenses | 5,382,897 | 17,595,927 | 11,879,833 | 11,854,833 | 2,521,500 | 49,234,991 |
| Player Relations Expenses | 492,600 | 517,600 | 529,900 | 529,900 | 527,500 | 2,597,500 |
| Marketing/Branding Expenses | 4,666,700 | 8,157,700 | 3,825,700 | 5,650,700 | 360,700 | 22,661,500 |
| Production Expenses | 6,480,611 | 4,435,897 | 4,435,897 | 4,042,564 | 74,000 | 19,468,969 |
| League Expenses | 3,179,724 | 11,866,466 | 7,877,686 | 4,869,686 | 274,006 | 28,067,567 |
| Team Expenses | 1,123,928 | 3,731,898 | 5,326,898 | 5,326,898 | 1,123,928 | 16,633,551 |
| Medical Expenses | 3,109,320 | 1,954,760 | 1,117,000 | 1,117,000 | 1,101,000 | 8,399,080 |
| Corporate Expenses | 381,750 | 881,750 | 881,750 | 881,750 | 881,750 | 3,908,750 |
| Digital Payment Fees | 0 | 1,804,020 | 1,804,020 | 1,804,020 | 0 | 5,412,060 |
| AAF Player Digital Distributions | 0 | 1,052,345 | 1,052,345 | 1,052,345 | 0 | 3,157,035 |
| **Total Expenses** | **$25,586,529** | **$54,668,364** | **$41,401,030** | **$39,799,697** | **$7,599,884** | **$169,055,503** |
| | | | | | | |
| **Total Operating Income (Loss)** | **($16,702,529)** | **($33,620,964)** | **($18,697,630)** | **($18,678,297)** | **$7,960,116** | |
| *% Margin* | *-188%* | *-160%* | *-82%* | *-88%* | *51%* | |
| | | | | | | |
| **Cumulative Net Cash Flow** | **($16,702,529)** | **($50,323,493)** | **($69,021,123)** | **($87,699,420)** | **($79,739,303)** | |

7

TR0001343168

**EXHIBIT**

**6**

| | |
|---|---|
| **From:** | Kevin Freedman |
| **To:** | "John Zutter" |
| **Cc:** | "Dawn Belt"; "Charlie Ebersol"; "alan@aaf.com"; "Jordan Roberts"; "maddie@itcrowdmarketing.com" |
| **Subject:** | Re: Dundon // ESMG |
| **Date:** | Thursday, February 14, 2019 12:09:18 PM |
| **Attachments:** | FW_10589776_2_ESMG - Series 2 Term Sheet.docx |

John, Per our discussion, please see attached draft of a binding term sheet covering our understanding of the terms you've proposed. Please give me a call to discuss if you have any questions.

==Also, we did a review on payments needed to ensure this weekend happens without any material issues and the total amount needed is $5.1M.== This consists of the following items:

$4.1M player/coach payroll

$0.1M referees

$0.3M production crews

$0.2M credit card pay down

$0.2M hotels and housing for players

$0.2M city of san diego, expenses, and misc. consultants

I'll send the wiring info under separate email. Look forward to getting this over the line.

Thx,
Kevin

---

**From:** John Zutter <jz@dundon.co>
**Date:** Thursday, February 14, 2019 at 10:32 AM
**To:** Kevin Freedman <kevin@aaf.com>
**Cc:** Dawn Belt <dbelt@fenwick.com>, Charlie Ebersol <ce@aaf.com>, "alan@aaf.com" <alan@aaf.com>, Jordan Roberts <jroberts@fenwick.com>, "maddie@itcrowdmarketing.com" <maddie@itcrowdmarketing.com>
**Subject:** Re: Dundon // ESMG

Removing Tom as we work through this.

I'd also like to make sure the guarantee offered yesterday is in the picture, at least until we get through fulsome diligence and with respect to the immediate needs during that time period.

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, TX 75201
Phone: (917) 861-5424



**EXHIBIT**

**74**

Freedman 10-1K-61

On Feb 14, 2019, at 11:28 AM, Kevin Freedman <kevin@aaf.com> wrote:

John, Dawn's flight is being delayed a bit. Can you and I jump on the phone in 15 minutes (9.45PT)?

Thx,
Kevin
415.846.9002

**From:** John Zutter <jz@dundon.co>
**Date:** Thursday, February 14, 2019 at 8:41 AM
**To:** Dawn Belt <dbelt@fenwick.com>
**Cc:** Charlie Ebersol <ce@aaf.com>, Kevin Freedman <kevin@aaf.com>, Tom Dundon <td@dundon.co>, "alan@aaf.com" <alan@aaf.com>, Jordan Roberts <jroberts@fenwick.com>
**Subject:** Re: Dundon // ESMG

Look forward to talking. FYI, I'm not an attorney but will manage this deal for DCP.

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, TX 75201
Phone: (917) 861-5424

On Feb 14, 2019, at 10:15 AM, Dawn Belt <dbelt@fenwick.com> wrote:

Good to meet you, John. I am on a plane about to take off. Scheduled to land at 9:40. I am also adding my colleague, Jordan Roberts, to this thread.

Thanks,
Dawn

Please pardon typos and brevity - sent from mobile.


On Feb 14, 2019, at 8:10 AM, Charlie Ebersol <ce@aaf.com<mailto:ce@aaf.com>> wrote:

Dawn Belt and Kevin Freedman,

Please meet John Zutter. John is Tom Dundon's attorney who will be running the process for Tom Dundon's investment. He has the proposed structure for Tom and I would you to talk to him directly.

Dawn is our outside counsel and Kevin is the head of Ops.

The three of you should get on a call asap.

All my best
C


Charlie Ebersol
Founder & CEO


██████████
AAF.com<https://urldefense.proofpoint.com/v2/url?u=http-3A__aaf.com_&d=DwMF-g&c=l5YmaygVL_uloFyEjsA1Ww&r=Ck5k5eYsvrGmU4Uc-yk5u3ptOIpP0vkwqNE40DKUq5I&m=QkxdY-z1AGuGaoyWNjsT2WyCZXSyDFcH-kMHpJ_dhIw&s=PWLd4vLKMIxc_XsGHoqtRmf4eFltDDnUTMe6dh4ioAk&e=>

<image001.jpg>


DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.


From: John Zutter <jz@dundon.co<mailto:jz@dundon.co>>
Date: Thursday, February 14, 2019 at 7:52 AM
To: Charlie Ebersol <ce@aaf.com<mailto:ce@aaf.com>>, Tom Dundon <td@dundon.co<mailto:td@dundon.co>>
Subject: RE: RF Guarantor Information

Calling you in 5 minutes.

John Zutter
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, Texas 75201

Phone: (917) 861-5424

From: Charlie Ebersol [mailto:ce@aaf.com]
Sent: Thursday, February 14, 2019 9:51 AM
To: Tom Dundon <td@dundon.co<mailto:td@dundon.co>>
Cc: John Zutter <jz@dundon.co<mailto:jz@dundon.co>>
Subject: Re: RF Guarantor Information

We have not. My number is ▮▮▮▮▮▮▮▮


Charlie Ebersol
Founder & CEO

▮▮▮▮▮▮▮ <tel:(▮▮▮▮▮▮▮▮>
AAF.com<https://urldefense.proofpoint.com/v2/url?u=http-
3A__aaf.com_&d=DwMF-
g&c=I5YmaygVL_uIoFyFjsA1Ww&r=Ck5k5eYsvrGmU4Uc-
yk5u3ptOIpP0ykwqNE40DKUq5I&m=QkxdY-
z1AGuGaoyWNjsT2WyCZXSyDFcH-
kMHpJ_dhIw&s=PWLd4vLKMlxc_XsGHoqtRmf4eFltDDnUTMe6dh4ioAk&e=>

[cidii_jm8ap34i0_165eed166b2ab5d6]


DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and
may contain confidential information. Unless stated to the contrary, any
opinions or comments are personal to the writer and do not represent
the official view of the company. If you have received this e-mail in error,
please notify us immediately by reply e-mail and then delete this message
from your system. Please do not copy it or use it for any purposes, or
disclose its contents to any other person. Thank you for your cooperation.


On Feb 14, 2019 at 7:42 AM, <Tom Dundon<mailto:td@dundon.co>>
wrote:
Have u guys talked. Need to know if we r trying to get this done so i can
plan my day.

On Feb 14, 2019, at 9:04 AM, John Zutter
<jz@dundon.co<mailto:jz@dundon.co>> wrote:
Charlie – just rang you.  Give me a shout at your convenience.

John Zutter

Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, Texas 75201
Phone: (917) 861-5424

From: Tom Dundon
Sent: Thursday, February 14, 2019 8:18 AM
To: Charlie Ebersol <ce@aaf.com<mailto:ce@aaf.com>>; John Zutter
<jz@dundon.co<mailto:jz@dundon.co>>
Subject: Re: RF Guarantor Information

John
Pls work w Charlie.
Thx

On Feb 13, 2019, at 3:10 PM, Charlie Ebersol
<ce@aaf.com<mailto:ce@aaf.com>> wrote:
Reggie,

Will write a personal guarantee against the attached assets for the $10M
loan from you, in addition to the paperwork I sent you earlier.

Best
C

Charlie Ebersol
Founder & CEO

████████

AAF.com<https://urldefense.proofpoint.com/v2/url?u=http-
3A__aaf.com_&d=DwMF-
g&c=l5YmavgVL_uIoFvEjsA1Ww&r=Ck5k5eYsvrGmU4Uc-
yk5u3ptOIpP0ykwqNE40DKUg5I&m=QkxdY-
z1AGuGaoyWNjsT2WyCZXSyDFcH-
kMHpJ_dhIw&s=PWLd4vLKMIxc_XsGHoqtRmf4eFltDDnUTMe6dh4ioAk&e=>

<image001.jpg>

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and
may contain confidential information. Unless stated to the contrary, any
opinions or comments are personal to the writer and do not represent

the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.


From: Kevin Freedman <kevin@aaf.com<mailto:kevin@aaf.com>>
Date: Wednesday, February 13, 2019 at 12:28 PM
To: Charlie Ebersol <ce@aaf.com<mailto:ce@aaf.com>>, Alan Kantowitz <alan@aaf.com<mailto:alan@aaf.com>>
Subject: Fwd: RF Guarantor Information


---------- Forwarded message ---------
From: Jim Davis <jim@spiral-kairos.com<mailto:jim@spiral-kairos.com>>
Date: Wed, Feb 13, 2019 at 12:23 PM
Subject: RF Guarantor Information
To: Kevin Freedman <kevin@aaf.com<mailto:kevin@aaf.com>>

This should get you started.  I am standing by to do documentation and make this happen ASAP.

Jim Davis

_____
Director of Legal/Business Administration
Spiral Global Development LLC
9920 South Rural Road, #108-95
Tempe, AZ  85284
Mobile: (318) 816-6968
Office Tel: (480) 961-9610
Officr Fax: (480) 961-9614

NOTICE OF CONFIDENTIALITY. This email and any attachments are confidential, except where the email states it can be disclosed,  and are intended solely for the individual or entity to whom the email is addressed. It may also be privileged even though the sender is not a licensed attorney. If you are not the intended recipient and have received this email in error, please do not disclose the contents to anyone, but notify the sender by return email and delete this email (and any attachments) from your system. Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.


<General Info (RF + Bank Account).pdf>

--------------------------------------------

NOTICE:

This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed.  However, mistakes sometimes happen in addressing emails.  If you believe that you are not an intended recipient, please stop reading immediately.  Do not copy, forward, or rely on the contents in any way.  Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments.  Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

## BINDING TERM SHEET FOR SERIES 2 PREFERRED STOCK FINANCING

This Binding Term Sheet outlines a summary of terms for a proposed financing of the company set forth below. This Binding Term Sheet shall be a binding agreement of the signatories below enforceable by one party against the other, as set forth below, upon the Company's (as defined below) receipt of the Initial Funding Amount (as defined below) by 2pm PST on February 14, 2019 and each party hereto executing this Binding Term Sheet.

**Offering Terms:**

| | |
|---|---|
| **Issuer:** | Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"). |
| **Securities:** | Series 2 Preferred Stock (the "**Series 2**"). |
| **Investor:** | Dundon Capital Partners LLC (the "**Investor**"). |
| **Initial Funding Amount:** | The Investor will invest $5,100,000 (the "**Initial Funding Amount**") by 1:30pm PST on February 14, 2019. |
| **Funding Commitment:** | During the period from the effectiveness of this Binding Term Sheet through June 30, 2019, the Company will have the right to submit an equity funding request to the Investor, which shall state the amount of funding requested and include a supporting budget. Within 1 calendar day of receipt of each such request, the Investor will invest into the Company the full funding amount listed on such request. |
| **Investor Ownership:** | Upon the Closing (as defined below), the Company will issue the Investor a number of shares of Series 2 such that immediately after the Closing, the Investor will own 70% of the Company's fully diluted capital stock. |
| **Available Equity Pool:** | The Investors and the Company's current management team will work in good faith to mutually determine and approve the issuance of equity compensation to the Company's service providers. |
| **Participating Liquidation Preference:** | In the event of any liquidation, dissolution or winding up of the Company, the holders of the Series 2 shall be entitled to receive in preference to the holders of the existing Preferred Stock and Common Stock an aggregate liquidation preference amount equal to 1.15 *times* the original aggregate purchase price of the Series 2. After the payment of all Preferred Stock liquidation preferences, the holders of the Series 2 shall also participate together with the holders of Common Stock on an as-converted to Common Stock basis. |
| **PIK Dividends:** | The Investor will accrue dividends at a rate of 10% per annum based on its actual aggregate Series 2 investment amount until the 2-year anniversary of the Closing, payable in all cases in additional shares of Common Stock. Such dividends will be paid in kind before any dividends, redemptions or other distributions are otherwise payable on any class of stock (except for repurchases of Common Stock held by employees or other service providers of the Company upon termination of service). |
| **Board of Directors:** | The authorized size of the Board shall initially be set at five members, consisting of: (a) three people designated by the holders of a majority of the Series 2 (initially [____]), and (b) two persons elected solely by the holders of Common Stock, both of which shall be designated by Charlie Ebersol (initially Charlie Ebersol and [____]). |

| | |
|---|---|
| **Closing:** | The initial closing shall occur as soon as practicable, upon mutual completion of amending the Company's existing governance and investment documents (the "**Closing**"). |
| **Counsel and Expenses:** | Company counsel to draft definitive financing documents. Each party to pay their own legal and financial fees. |
| **Confidentiality:** | The terms of this Binding Term Sheet and any related discussions shall be kept confidential by the Company and shall be disclosed by the Company only to such parties as have a need to know as part of the legal and due diligence and related usual and customary processes related to preparing and executing the definitive agreements that will consummate the transactions contemplated hereby. |

This Binding Term Sheet shall be effective the Investor's funding of the Initial Funding Amount and upon execution and delivery hereof by all the parties hereto and may be executed in two or more counterparts (including but not limited to in .pdf (portable document format) and via facsimile), each of which may be executed by one or more of the parties hereto, but all of which when taken together shall constitute one agreement binding upon all of the parties hereto.

The terms and provisions of this Binding Term Sheet may be modified or amended only by written agreement executed by all parties hereto and shall be binding upon the successors and permitted assigns of the parties hereto; neither party shall not assign its obligations under this Binding Term Sheet to any other person or entity without the prior written consent of the other party.

All issues and questions concerning the construction, validity, enforcement and interpretation of this Binding Term Sheet shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this Binding Term Sheet, even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Each of the parties submits to the exclusive jurisdiction of any state or federal court sitting in the State of Delaware, in Wilmington, Delaware, in any action or proceeding arising out of or relating to this Binding Term Sheet, agrees that all claims in respect of the action or proceeding may be heard and determined in any such court and agrees not to bring any action or proceeding arising out of or relating to this Binding Term Sheet in any other court. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto. Nothing in this paragraph shall affect the right of any party to serve legal process in any other manner permitted by law. Each party agrees that a judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law, including in any court of competent jurisdiction.

EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS BINDING TERM SHEET OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

This Binding Term Sheet shall terminate upon the last to occur of the Closing, unless mutually agreed by the Company and the Investor.

323

Acknowledged and agreed:

**Dundon Capital Partners LLC**

By:_____

Name:_____

Title:_____

**Ebersol Sports Media Group, Inc.**

By:_____

Name: Charles Ebersol

Title: Chief Executive Officer



**Alan Kantowitz**
alan@aaf.com

All parties have completed FW_10589776_2_ESMG - Series 2 Term Sheet[2].

**Do Not Share This Email**
This email contains a secure link to DocuSign. Please do not share this email, link, or access code with others.

**Alternate Signing Method**
Visit DocuSign.com, click 'Access Documents', and enter the security code:
8D3353D615674C4D98E890B52EBE9A733

**About DocuSign**
Sign documents electronically in just minutes. It's safe, secure, and legally binding. Whether you're in an office, at home, on-the-go -- or even across the globe -- DocuSign provides a professional trusted solution for Digital Transaction Management™.

**Questions about the Document?**
If you need to modify the document or have questions about the details in the document, please reach out to the sender by emailing them directly.

If you are having trouble signing the document, please visit the Help with Signing page on our Support Center.

Download the DocuSign App

This message was sent to you by Alan Kantowitz who is using the DocuSign Electronic Signature Service. If you would rather not receive email from this sender you may contact the sender with your request.

DocuSign Envelope ID: AD293AB2-1D25-4E85-9887-70C27A3C1C8D

**BINDING TERM SHEET FOR SERIES 2 PREFERRED STOCK FINANCING**

This Binding Term Sheet (the "Agreement") outlines a summary of terms for a proposed financing of the company set forth below. This Binding Term Sheet shall be a binding agreement of the signatories below enforceable by one party against the other, as set forth below, upon the Company's (as defined below) receipt of the Initial Funding Amount (as defined below) by 2pm PST on February 14, 2019 and each party hereto executing this Binding Term Sheet.

**Offering Terms:**

| | |
|---|---|
| **Issuer:** | Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Company**"). |
| **Securities:** | Series 2 Preferred Stock (the "**Series 2**"). |
| **Investor:** | Dundon Capital Partners LLC (the "**Investor**"). |
| **Initial Funding Amount:** | The Investor will invest $5,100,000 (the "**Initial Funding Amount**") by 1:30pm PST on February 14, 2019. |
| **Funding Commitment:** | During the period from the effectiveness of this Binding Term Sheet through June 30, 2019, the Company will have the right to submit an equity funding request to the Investor, which shall state the amount of funding requested and include a supporting budget, subject to a maximum cumulative commitment of $70,000,000. Within 5 calendar days of receipt of each such request, the Investor will invest into the Company the full funding amount listed on such request. |
| **Investor Ownership:** | Upon the execution of this Agreement and Funding of the Initial Funding Amount, the Company will issue the Investor a number of shares of Series 2 such that immediately after the Closing, the Investor will own 75% of the Company's fully diluted capital stock. |
| **Available Equity Pool:** | The Investors and the Company's current management team will work in good faith to mutually determine and approve the issuance of equity compensation to the Company's service providers, but such amount shall not impact the Investor's ownership percentage on a fully diluted basis.. |
| **Participating Liquidation Preference:** | With respect to any cash flow distributions to owners of the Company, whether from a sale, dividend, liquidation, dissolution or winding up of the Company or any other source, the holders of the Series 2 shall be entitled to receive in preference to the holders of the existing Preferred Stock and Common Stock an aggregate liquidation preference amount equal their funded capital plus a preferred return equal of 20% per year, calculated using the XIRR function in Microsoft Excel.. After the payment of all Preferred Stock liquidation preferences, the holders of the Series 2 shall also participate together with the holders of Common Stock on an as-converted to Common Stock basis. |
| **PIK Dividends:** | The Investor will accrue dividends at a rate of 20% per annum based on its actual aggregate Series 2, with such amount payable either in cash or in kind, at the discretion of the Company. Such dividends will be paid before any dividends, redemptions or other distributions are otherwise payable on any class of stock, unless approved by the Investor. |
| **Board of Directors and Governance:** | Upon the execution of this Agreement, the authorized size of the Board shall immediately be set at four members, two of which shall be voting members |

DocuSign Envelope ID: AD293AB2-1D25-4E85-9887-70C27A3C1C8D

and two shall be non-voting members, consisting of members two voting members designated by the holders of a majority of the Series 2 (initially John Zutter and Tom Dundon) and two non-voting members designated by Charlie Ebersol. The Board shall have full authority over all aspects of the Company. The Investor shall have the right to make any and all day-to-day business decisions for or on behalf of the Company, including but not limited to determining capital required to be drawn under this Agreement, to bind the Company or to enter into any agreement on behalf of the Company. The Investor shall have the further right to define or limit any authorities of any employee, Director, advisor, representative, vendor, consultant or officer of the Company, up to and including terminating such individual or entity. To the maximum extent permissible under Delaware law, the parties agree that the Investor, in its role as such or as a director, officer or any other related role to the Company, shall have no fiduciaries obligations to the Company or its owners.

**Closing:** The Investor shall provide definitive documentation ("Definitive Documentation") as soon as practicable, and the Company and its representatives shall be obligated to sign such documentation provided the liquidation preference, preferred rate and fully diluted ownership defined therein is no worse than that described in this Agreement. The Company is bound under this Agreement to agree to any other provisions provided for in such documentation.

**Counsel and Expenses:** Investor shall provide definitive documents. Any transaction costs borne by the Investor associated with the transaction shall be reimbursed by the Company, including any costs associated with enforcing this Agreement.

**Confidentiality:** The terms of this Binding Term Sheet and any related discussions shall be kept confidential by the Company and shall be disclosed by the Company only to such parties as have a need to know as part of the legal and due diligence and related usual and customary processes related to preparing and executing the definitive agreements that will consummate the transactions contemplated hereby.

This Binding Term Sheet shall be effective upon the Investor's funding of the Initial Funding Amount and upon execution and delivery hereof by all the parties hereto and may be executed in two or more counterparts (including but not limited to in .pdf (portable document format) and via facsimile), each of which may be executed by one or more of the parties hereto, but all of which when taken together shall constitute one agreement binding upon all of the parties hereto.

The terms and provisions of this Binding Term Sheet may be modified or amended only by written agreement executed by all parties hereto and shall be binding upon the successors and permitted assigns of the parties hereto; neither party shall assign its obligations under this Binding Term Sheet to any other person or entity without the prior written consent of the Investor.

All issues and questions concerning the construction, validity, enforcement and interpretation of this Binding Term Sheet shall be governed by, and construed in accordance with, the laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal law of the State of Delaware shall control the interpretation and construction of this Binding Term Sheet, even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

Each of the parties submits to the exclusive jurisdiction of any state or federal court sitting in the State of Texas, in Dallas, Texas, in any action or proceeding arising out of or relating to this Binding Term Sheet, agrees that all claims

DocuSign Envelope ID: AD293AB2-1D25-4E85-9887-70C27A3C1C8D

in respect of the action or proceeding may be heard and determined in any such court and agrees not to bring any action or proceeding arising out of or relating to this Binding Term Sheet in any other court. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought and waives any bond, surety or other security that might be required of any other party with respect thereto. Nothing in this paragraph shall affect the right of any party to serve legal process in any other manner permitted by law. Each party agrees that a judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law, including in any court of competent jurisdiction.

EACH OF THE PARTIES HERETO WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS BINDING TERM SHEET OR ANY COURSE OF CONDUCT, COURSE OF DEALING, VERBAL OR WRITTEN STATEMENT OR ACTION OF ANY PARTY HERETO.

This Binding Term Sheet shall terminate only upon execution of Definitive Documentation.

**Acknowledged and agreed:**

**Dundon Capital Partners LLC**

By:_____

Name:_____

Title:_____

**Ebersol Sports Media Group, Inc.**

By:_____
A0ECD4DEC0E44F2...

Name: Charles Ebersol

Title: Chief Executive Officer

DCP Parties02346

EXHIBIT

7

| From: | Tom Dundon |
|---|---|
| Sent: | Wednesday, February 20, 2019 8:26 PM CST |
| To: | Kevin Freedman |
| CC: | John Zutter; Charlie Ebersol |
| Subject: | Re: Vanech Memo |

Agree.

On Feb 20, 2019, at 8:04 PM, Kevin Freedman <kevin@aaf.com> wrote:

Tom/John, per your conversations with Charlie, please see below for a summary of the threats being made by Bob Vanech. Our counsel at Morgan Lewis is prepared to move forward however we would like.

In March of 2016, while Charlie directed the 30 for 30 about the original XFL (in which Dick and Vince discuss/contemplate relaunching the XFL) he explored the idea of relaunching the XFL with the help of future AAF CRO Tom Veit. After the film premiered on ESPN in February of 2017, Bob Vanech, a friend of Charlie, approached Charlie and proposed a way to crowd fund the relaunch of the XFL through Regulation A raises. Vanech prepared pitch materials to present to Vince to acquire the IP of the XFL (a key factor in his plan to do a regulation A) Vanech claims they had a verbal agreement to split the company 50/50 out of the gate via handshake (who does that?). Vanech says there were no witnesses or corroborating sources. After Vince told Charlie in the early summer of 2017 that he would NEVER sell the XFL IP, Charlie told Vanech in writing that it was not going to happen and when Vanech said they had a deal, Charlie said in writing that they did not (this is the only recorded conversation either has regarding a deal). They stopped talking. In June of 2018, Vanech came out of the shadows seeking 50% of the company. The Board of Directors attempted to mediate to eliminate the distraction, but he continues to demand millions of $$$ in cash + significant equity. After yesterday's announcement, Vanech's attorneys resurfaced with a demand for a written offer from us by Friday or else. ´

We believe it's time to tell him we're done engaging with him. Please let us know if you'd like to discuss further.

Kevin



CLASSIFIED

DCP Parties0173

Message

| | |
|---|---|
| **From:** | Kevin Farrell [kevin.farrell@aaf.com] |
| **Sent:** | 2/4/2019 7:43:08 PM |
| **To:** | Thomas, Brian C [bcthomas@cbs.com] |
| **Subject:** | Re: Alliance invoice payments |

<table>
<tr><td>EXHIBIT<br><br>8<br>_____</td></tr>
</table>

Hi Brian

Playing catch up here. Plan is still to get the two payments to you this week.

We ran into some items to clear with our Board from last week, which slowed things down a bit, but still on track for this week.
Charlie connected with Dan to provide an update as well.

I will update again tomorrow—next payment expected to release.

Kevin

On Feb 4, 2019, at 1:00 PM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Hi Kevin,

Following up – can you please provide a status update today on the two payments this week?

Thanks,

Brian

**From:** Thomas, Brian C
**Sent:** Monday, February 04, 2019 11:05 AM
**To:** 'Kevin Farrell'
**Subject:** RE: Alliance invoice payments

Good morning Kevin,

Please provide an update on the 2nd and 3rd payments as discussed. I am in the office today and can be reached at 212-975-0976.

Thank you,

Brian

**From:** Kevin Farrell [mailto:kevin.farrell@aaf.com]
**Sent:** Thursday, January 31, 2019 3:17 PM
**To:** Thomas, Brian C
**Subject:** Re: Alliance invoice payments

Hi Brian

I am returning back to the Bay Area after a successful trip down to San Antonio. In the office tomorrow and I can provide the full update.

EXHIBIT
117

TR0001575952

330

Still on track to provide the 3 payments before our Game 1.

Kevin

On Jan 31, 2019, at 12:03 PM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Hello Kevin,

I know you're busy ramping up for the start of the season but wanted to confirm that the second payment as discussed is scheduled for tomorrow. Please let me know.

Thank you,

Brian

**From:** Thomas, Brian C
**Sent:** Tuesday, January 29, 2019 9:49 AM
**To:** 'Kevin Farrell'
**Subject:** RE: Alliance invoice payments

Good morning Kevin,

I'm confirming that the first payment hit our bank late last night. We'll look out for the next payment on Friday.

I hope football is going well.

Thanks,

Brian

**From:** Thomas, Brian C
**Sent:** Monday, January 28, 2019 5:12 PM
**To:** 'Kevin Farrell'
**Subject:** RE: Alliance invoice payments

Great, thanks Kevin. I will let you know once the payment is received on our end.

**From:** Kevin Farrell [mailto:kevin.farrell@aaf.com]
**Sent:** Monday, January 28, 2019 4:55 PM
**To:** Thomas, Brian C
**Subject:** Re: Alliance invoice payments

Hi Brian

Wire en route

And football on the field in San Antonio!

Best,
Kevin

TR0001575953

On Jan 28, 2019, at 2:41 PM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Hello Kevin,

I hope you had a nice weekend.  Can you please confirm that the first payment was processed for today?

Thank you,

Brian

---

**From:** Kevin Farrell [mailto:kevin.farrell@aaf.com]
**Sent:** Friday, January 25, 2019 11:15 AM
**To:** Thomas, Brian C
**Subject:** Re: Alliance invoice payments

Thanks Brian

Nice connecting with you finally.

Message received.

Cheers,
Kevin

On Jan 25, 2019, at 9:37 AM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Hello Kevin,

Attached are the wire instructions for the four approx. $483K payments we discussed earlier this morning.  We will look out for the first payment on Monday.  Please let me know if you need anything else.

Thanks,

Brian

---

**From:** Kevin Farrell [mailto:kevin.farrell@aaf.com]
**Sent:** Thursday, January 24, 2019 6:14 PM
**To:** Thomas, Brian C
**Subject:** Re: Alliance invoice payments

Thanks Brian

Reach me at 650.823.4670

Kevin

On Jan 24, 2019, at 4:49 PM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Hi Kevin,

TR0001575954

Sorry you had a tough flight. 8:30 your time works for me. What is the best number to reach you?

Thanks,

Brian

On Jan 24, 2019, at 5:29 PM, Kevin Farrell <kevin.farrell@aaf.com> wrote:

Hey Brian

Just arrived to SAT. Had a screaming kid behind me on the flight and my ears are still ringing.

Tomorrow is great for me. Morning good. How is 830 CT?

Kevin

On Jan 24, 2019, at 3:48 PM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Ok, is there another time later tonight we can talk? If not, I am very flexible tomorrow (especially in the morning). Can we lock something in?

**From:** Kevin Farrell [mailto:kevin.farrell@aaf.com]
**Sent:** Thursday, January 24, 2019 4:01 PM
**To:** Thomas, Brian C
**Subject:** Re: Alliance invoice payments

Hi Brian

Still scheduled to be in the air at that time.

Likely off the plane right around 430 CT

On Jan 24, 2019, at 9:50 AM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Any chance we can do 4:00 CT?

**From:** Kevin Farrell [mailto:kevin.farrell@aaf.com]
**Sent:** Thursday, January 24, 2019 12:47 PM
**To:** Thomas, Brian C
**Subject:** Re: Alliance invoice payments

Hi Brian

Hopping on a flight to SAT now. Can you do 430 CT?

Kevin

On Jan 24, 2019, at 9:31 AM, Thomas, Brian C <bcthomas@cbs.com> wrote:

TR0001575955

Hi Kevin,

I'm following up to see if we can arrange a time to connect today?  Please let me know if there is a time that works for you.

Thank you,

Brian

---

**From:** Thomas, Brian C
**Sent:** Thursday, January 24, 2019 9:06 AM
**To:** 'Kevin Farrell'
**Subject:** RE: Alliance invoice payments

Hi Kevin,

Thank you for your note.  Can we connect today at 9:00 PT?  I can be reached at 212-975-0976.

I look forward to speaking with you.

Brian

---

**From:** Kevin Farrell [mailto:kevin.farrell@aaf.com]
**Sent:** Wednesday, January 23, 2019 7:14 PM
**To:** Thomas, Brian C
**Subject:** Re: Alliance invoice payments

Hi Brian

Very sorry for my delayed response.  Between back and forth trips to San Antonio and getting ready for our pre-season, I am way behind.

I spoke with Charlie just now.  I will be the point person for the financial relationship and I am looking forward to working with you.

First—are you the best point of contact for me at CBS?
I have received emails from a half-dozen people and can't be sure who I should circle back with here?

Invoices to the tune of ~$1.93M net have been received and entered into our billing system.  From my read on the email threads, the $1.6M was intended to be spread across several payments dating back to 2018.
Two issues to work through with you:
    —Our standard terms are N30 ARO.  With a receipt date of Jan 9, we have them in our system with a Feb 9 due date.  I am working on this to revise and don't see this as the main issue.
    —More importantly, payments greater than $500K are now with Board approval.  Read that to me a process hurdle that I would like to work with you to overcome.
        >If we can redraw the payment schedule, over an abbreviated term, I can get these through more easily and quickly.  Here I am thinking of payments of $482,500 over the next 4 weeks.
        >Operationally, this is under my control and payments will happen on schedule versus holding for Board review and approval.

Good if we can connect live.  I do have a flight tomorrow, but can find time between 9:00 and 10am PT if that works for you?

TR0001575956

Best Regards,
Kevin

On Jan 22, 2019, at 9:27 AM, Thomas, Brian C <bcthomas@cbs.com> wrote:

Hi Kevin,

Nice to meet you. I am checking in on the status of the open invoices. Please provide an update when you have a moment.

Thank you,

Brian

**From:** Charlie Ebersol [mailto:ce@aaf.com]
**Sent:** Friday, January 18, 2019 3:07 PM
**To:** Thomas, Brian C; Weinberg, Dan; Kevin Farrell
**Cc:** Barfuss, Brian; Hillman, David
**Subject:** Re: Alliance invoice payments

Nice to meet you Brian.

I am adding Kevin Farrell who oversees our accounting departments. Kevin has been on the road for the past several days, so he and I just caught up on this. He will respond ASAP.

All my best
C

Charlie Ebersol
Founder & CEO

████████
AAF.com

<image002.jpg>

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

TR0001575957

**From:** "Thomas, Brian C" <bcthomas@cbs.com>
**Date:** Thursday, January 17, 2019 at 1:00 PM
**To:** Dan Weinberg <dan.weinberg@cbs.com>, Charlie Ebersol <charlie@lfeus.com>
**Cc:** "Barfuss, Brian" <BBarfuss@cbs.com>, "Hillman, David" <david.hillman@cbs.com>
**Subject:** RE: Alliance invoice payments

Hello Charlie,

Attached are the wire instructions.  Please let us know if there is someone on your team who we should contact directly.

Thank you,

Brian

---

**From:** Weinberg, Dan
**Sent:** Thursday, January 17, 2019 3:41 PM
**To:** Charlie Ebersol
**Cc:** Thomas, Brian C; Barfuss, Brian; Hillman, David
**Subject:** Alliance invoice payments

Charlie,

Per our discussion earlier today I'm connecting you with Brian Thomas and Brian Barfuss of our Finance group.  They can pass along wiring instructions to Kevin on your team so that payment can be arranged for early next week.  Look forward to getting this sorted out in short order – given we're only weeks away from the start of the season.

Thanks and good seeing you at the seminar Tuesday.  I thought it was a really productive session for everyone.
Dan
<Wire Info[2].docx>


<Wire Info.docx>

TR0001575958

**EXHIBIT**

**9**

Message

| | |
|---|---|
| **From:** | Alan Kantowitz [alan@aaf.com] |
| **Sent:** | 1/22/2019 6:01:36 PM |
| **To:** | Charlie Ebersol [ce@aaf.com] |
| **CC:** | Kevin Freedman [kevin@aaf.com]; Kevin Farrell [kevin.farrell@aaf.com] |
| **Subject:** | Critical Payments through Feb 9th |

Charlie/Kevin,

Farrell and I just spent the last few hours going through this exercise. By our estimation it looks like there will be about ~$10m - $11m of critical cash out the door between now and the opening weekend (see the first tab on the attached google sheet for reference but please do not play around or make edits as I need this info for the board deck as is).

Please note that this is my estimation of what is critical along with Farrell as a second pair of eyes. I did not include the majority of CBS fees and other large vendors like XOs and SMT that we owe. I would consider these "critical" given they have raised them to us and they are long overdue. But in the interest of this exercise and this game of chicken, I have assumed we continue to push a bunch these when in reality I have no clue whether or not we will be able to.

There will also probably be several critical invoices that pop up over the course of the next three weeks that amount to about $1m that are not accounted for in here. That is just the nature of how fluid this business has been and our lack of accounting/invoice processing.

**By my estimation, and based on this analysis. If MGM funds their $3.5m, we will need another ~$7m to get through the first weekend. That can come from a variety of sources (Dick, Dave, ticket sales etc).**

Again, I would be remiss if I did not point out the following. We have about $8m of invoices that are overdue and maybe and probably another ~$8m that we will continue to push past opening weekend eve though they will arise between now and then.

https://docs.google.com/spreadsheets/d/1dXwuhjHw0DKyLqJO5ONllKIMhs1K3Qm70p8-0tnmddY/edit#gid=190540961

Best,
Alan
--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com



EXHIBIT

10

| Message | |
|---|---|
| **From**: | Charlie Ebersol [ce@aaf.com] |
| **Sent**: | 1/3/2019 12:10:18 AM |
| **To**: | Alan Kantowitz [alan@aaf.com] |
| **Subject**: | Re: Player Participation Pool Questions |

Taking every one off. Remind me to talk to you about this tomorrow.

Charlie Ebersol
Founder & CEO



AAF.com



DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

---

**From:** Alan Kantowitz <alan@aaf.com>
**Date:** Wednesday, January 2, 2019 at 12:33 PM
**To:** Charlie Ebersol <ce@aaf.com>
**Cc:** Kevin Freedman <kevin@aaf.com>
**Subject:** Re: Player Participation Pool Questions

Charlie, two quick thoughts in response (removed Andrew).

1.      Will it be ready to go by training camp and will they be educated in time?

2.      We need to be extremely careful here not to mislead players and lose their trust. No one will be making hundreds of thousands of dollars in year 1. Maybe a few players will make over $100K. ==Our digital revenue projections are way lower then we thought. Frankly==, we do not even have a business model set in stone for that side of the business. I currently have ~$3.5m of projected net digital revenue (after app vendor fees of 30%) for the year (Kevin thinks it will be closer to $1m). Assuming net digital revenue is in in the neighborhood of $3.5m, and we assume 25% of that is paid out into the participation pool, that means the average one of our 400 players is making an additional ~$2,000.

On Wed, Jan 2, 2019 at 11:58 AM Charlie Ebersol <ce@aaf.com> wrote:

I think it should start in training camp

I think we want message that they could make hundreds of thousands if they fully tap the system. I believe we need to have some big winners this year to validate the system

Charlie Ebersol
Founder & CEO

███████████

AAF.com



DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

---

**From:** Alan Kantowitz <alan@aaf.com>
**Date:** Wednesday, January 2, 2019 at 11:42 AM
**To:** Andrew Pedersen <andrewp@aaf.com>
**Cc:** Kevin Freedman <kevin@aaf.com>, Charlie Ebersol <ce@aaf.com>
**Subject:** Re: Player Participation Pool Questions

Hi Andrew. Looping in Kevin and Charlie here. I do not have those answers unfortunately.

On Wed, Jan 2, 2019 at 11:29 AM Andrew Pedersen <andrewp@aaf.com> wrote:

> Hey Alan,
>
> Happy New Year! I am working on a player participation pool handout intended for the players. I have a few questions for you/Charlie.
>
> 1) When are we planning to start the program? Training Camp? Start of Season?
>
> 2) How much potential money can players earn? Is this something we want to share with them?
>
> Let me know if you can help me get answers to these questions.

TR0001311604

--

Andrew Pedersen

Head of Product

415.488.7669

AAF.com

--

Alan Kantowitz

Strategy Lead

516.680.0478

AAF.com

--

Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

EXHIBIT

11

| | |
|---|---|
| Message | |
| **From:** | Kevin Freedman [kevin@aaf.com] |
| **Sent:** | 1/24/2019 7:38:12 PM |
| **To:** | Dave Pottruck [dave@redeagleventures.com] |
| **CC:** | Charlie Ebersol [ce@aaf.com]; Michael Kagnoff [Michael.Kagnoff@dlapiper.com] |
| **Subject:** | Re: Extending Line of credit |

All, wanted to confirm Fenwick is working on updated docs incorporating the items below for intended execution of a $2M note tomorrow.

thx,
kevin

On Thu, Jan 24, 2019 at 8:46 AM Dave Pottruck <dave@redeagleventures.com> wrote:
Charlie, i just spoke to my attorney about this new note. He made a suggestion which i think is quite reasonable.

This additional 2 million puts my total exposure at 2 million equity and ==5 million debt.== Total 7 million (2+1+2+2). Frankly, this makes me rather uncomfortable as this is more exposure than i would like to extend to a cash burning start up. Even one whose business is incredibly appealing and exciting to me.

I do have faith that Reggie will come up with the money, but as we both know he is a very strange dude. Given he's already in for almost 20 million does give me some comfort.

Here's what i would like to propose. These new terms are all premised on your assertion to me that this new loan should be outstanding for less than a week.

If i am not paid back the principal plus interest on my three loans within 10 business days of the issuance or this latest note (presumably tomorrow) the interest rate on all three loans becomes 10% and the latest loan only (this latest 2 million) has an origination fee of 2%.

Quite frankly, my terms for these previous loans are not "market based financing rates" as i believed when i made them that they were quite temporary. But this is getting bigger and bigger and i do need to move this amount of money to market based terms.

Obviously, we all are expecting Reggie's 22 million to be arriving within a matter fo a few days at most, hopefully by the end of next week at the latest. I've added an extra week of cushion before the heavier terms kick in. All of the basic terms will be the same as the latest 2 million i lent to the company.

Pls confirm this meets with your approval and we will get Michael moving forward with your attorneys. If you have any issues or questions pls feel free to call me.

Dave Pottruck
415-860-6048 (C)

On Jan 23, 2019, at 5:55 PM, Charlie Ebersol <ce@aaf.com> wrote:

Dave,



EXHIBIT
95
Freedman 10-18-24

TR0001493087

Per our conversation, we now believe, based on the documents you and Jeff have seen last night as well as conversations Kevin had with Jim, Reggie will be sending us $22M in the next 2-3 business days. However, as we discussed, with our payroll due Monday, we are nervous that we are $2M short. To that end, I appreciate you agreeing to lend us another $2M tomorrow under the same terms as your last loan. Our plan is to pay you back as soon as Reggie's money clears.


All my best
C



Charlie Ebersol
Founder & CEO


AAF.com



**DISCLAIMER:**
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

TR0001493088

EXHIBIT

**12**

| | |
|---|---|
| From: | Dawn Belt |
| Sent: | Thursday, March 28, 2019 2:12 PM CDT |
| To: | Peter J. Kosydar III |
| CC: | Jordan Roberts; James A. Skochdopole; Jason Kulas; John Zutter; Jeff Vanderbilt; Charlie Ebersol |
| Subject: | Re: fraudulent conveyance indemnity side letter [IWOV-LAWDOCS.FID1708176] |
| Attachments: | image001.jpg, image002.gif, attachment 1.pdf, ATT00001.htm |

---------------------------------------------

NOTICE:

This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed. However, mistakes sometimes happen in addressing emails. If you believe that you are not an intended recipient, please stop reading immediately. Do not copy, forward, or rely on the contents in any way. Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments. Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.



CLASSIFIED

# ACTION BY WRITTEN CONSENT
## OF THE
## STOCKHOLDERS OF
## EBERSOL SPORTS MEDIA GROUP, INC.
### (a Delaware Corporation)

### March 27, 2019

The undersigned, being the stockholders of Ebersol Sports Media Group, Inc., a Delaware corporation (the "**Corporation**"), do hereby consent to and approve the adoption of the following resolution(s), without a meeting, pursuant to Section 228 of the Delaware General Corporation Law (the "**DGCL**") and the Bylaws of the Corporation (the "**Bylaws**"), effective as of the date first set forth above (unless otherwise noted in the resolution):

1. **Dundon Capital Term Sheet**

   **WHEREAS**, the Binding Term Sheet for Series 2 Preferred Stock Financing attached hereto as <u>Exhibit A</u> (the "**Term Sheet**") was previously approved by the Corporation's Board of Directors (the "**Board**") and executed by the Corporation.

   **WHEREAS**, among other things, the Term Sheet provides for an investment of up to $70,000,000 from Dundon Capital Partners LLC ("**DCP**"), on terms that significantly dilute the ownership and significantly impact the economic and control rights of the Corporation's existing stockholders, and the Corporation has already received approximately $50,000,000 from DCP under these terms.

   **WHEREAS**, the Term Sheet is a binding agreement enforceable by DCP against the Corporation.

   **WHEREAS**, pursuant to the Corporation's Restated Certificate of Incorporation (the "**Restated Certificate**") and the DGCL, the written consent or affirmative vote of the holders of at least a majority of (i) the outstanding capital stock of the Corporation (voting together on an as-converted basis) and/or (ii) the outstanding Preferred Stock of the Corporation (voting together on an as-converted basis) (together, the "**Requisite Majority**") is required to implement certain of the transactions described in the Term Sheet.

   **NOW, THEREFORE, BE IT RESOLVED**, that that the undersigned stockholders, who constitute the Requisite Majority, hereby approve and ratify the Term Sheet.

   **RESOLVED FURTHER**, that the officers of the Corporation, and each of them with full authority to act without the others, are hereby authorized, in the name of and on behalf of the Corporation, to execute and deliver, and to cause the Corporation to enter into and perform all its obligations under, the Term Sheet, together with such changes therein and to the schedules and exhibits thereto as any

**WHEREAS**, subject to the approval of the Preferred Requisite Majority, the Board (i) approved the Term Sheet Board Structure and (ii) appointed each of John Zutter and Tom Dundon as a Voting Director and Charles Ebersol as a Non-Voting Director, to serve until his successor is duly elected and qualified, or until the earlier of his death, resignation or removal.

**WHEREAS**, in connection with the implementing, and upon approval of the Term Sheet Board Structure and election of Messrs. Zutter and Dundon as Voting Directors and Charles Ebersol as a Non-Voting Director, Charles Ebersol, Dick Ebersol, Keith Rabois and Jeff Moorad resigned as directors of the Board.

**NOW, THEREFORE, BE IT, RESOLVED**, that the undersigned stockholders, who constitute the Preferred Requisite Majority, hereby (i) approve the Term Sheet Board Structure, (ii) elect each of John Zutter and Tom Dundon as a Voting Director and Charles Ebersol as a Non-Voting Director, effective as of February 24, 2019, to serve until his successor is duly elected and qualified, or until the earlier of his death, resignation or removal and (iii) approves the termination of the Voting Agreement.


[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

3

CLASSIFIED

In witness whereof, by executing this Action by Written Consent, each undersigned stockholder is giving written consent with respect to all shares of the capital stock of the Corporation held by such stockholder. This Action by Written Consent may be executed in any number of counterparts, each of which shall constitute an original and all of which together shall constitute one action. Any copy, facsimile or other reliable reproduction of this action may be substituted or used in lieu of the original writing for any and all purposes for which the original writing could be used. This written consent shall be filed in the minute book of the Corporation and shall be effective for all purposes as of the date first set forth above.

**STOCKHOLDERS:**

**FO2 LLC**

By: _Charles Ebersol_____

Name: Charlie Ebersol

Title: Proxyholder

Date: 3/27/2019 _____

[SIGNATURE PAGE TO THE WRITTEN CONSENT OF THE STOCKHOLDERS OF EBERSOL SPORTS MEDIA GROUP, INC.]

CLASSIFIED

# EXHIBIT A

## TERM SHEET

CLASSIFIED

Jim and Peter,

After getting additional input, the majority stockholders are not comfortable signing the set of waivers and side letters being presented.  The focus on trying to scope an indemnity in light of an unknown transaction feels like a futile exercise.  But, everyone agrees the Binding Term Sheet controls, so the majority stockholders are willing to confirm that through the stockholder consent that we previewed with you last week.

So, with the combination of the board resolutions adopted in February and the attached stockholder consent, DCP can see that the then-serving board and majority stockholders have approved the Binding Term Sheet and the transactions described therein.  The majority stockholders aren't comfortable making any other representations or waiving any other rights at this point.  If the Board reviews and approves a more detailed deal around an asset transfer or other type of transaction, that they then want to submit to stockholders for further approval (if determined to be necessary at that point), then we can consider that accordingly.

Thanks,
Dawn

Direct Dial: (650) 335-7830


On Mar 27, 2019, at 3:36 PM, Peter J. Kosydar III <pkosydar@bellnunnally.com> wrote:

Dawn,

Attached for your review are the following documents:

1.  Investor Consent, Waiver, and Approval (clean and redlined against the draft that Jordan circulated on Sunday, 3/24, at 10:33 PM CST).
2.  Side Letter - Charles and Richard Ebersol (clean and redlined against the draft that Jordan circulated on Sunday, 3/24, at 10:33 PM CST).
3.  Side Letter - ESMG to DCP (This is a new document that was prepared based on the changes made to the Investor Consent, Waiver, and Approval.)

Please feel free to give us a call if you would like to discuss.

Thanks,

Peter


**Peter J. Kosydar III**  |  Associate
<image001.jpg><image002.gif> pkosydar@bellnunnally.com
Tel 214-740-1477 | Fax 214-740-5777

CLASSIFIED

2) in doing so, I'm happy to rep that we won't use our board roles to nullify any preexisting indemnifications from the company to officers or investors. This shouldn't be a carpet perpetualization of those protections but simply a preservation of what already was there. To be clear, DCP isn't stepping into those, it's simply repping it won't kill them. In an asset sale structure, RemainCo would be the indemnifier. Any new indemnifications from one or several NewCo(s) would be subject to future discussions.

3) any indemnification defense covered related to the company will be jointly managed, with selections, strategies, etc to be jointly defined and decided, with such agreements not to be unreasonably withheld. Practically, we expect the company or DCP to lead such activities.

4) for pre-existing indemnification matters, the company would be the indemnifier, and would have control/approval rights, not to be unreasonably withheld.

Jim - Charlie and I agreed it may be most efficient for you and your team to take the next turn with the goal of signing this tomorrow AM or COB latest.

Thanks all.

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, TX 75201
Phone: (917) 861-5424

On Mar 24, 2019, at 11:32 PM, Jordan Roberts <jroberts@fenwick.com> wrote:

> Jim —
>
> Attached are updated drafts of the Side Letter (Dick will enter into a similar form of agreement) and the Investor Consent. Let us know if you have questions or would like to discuss.
>
> ## JORDAN ROBERTS
>
> **Associate | Fenwick & West LLP | 650-335-7149 | jroberts@fenwick.com**
> Admitted to practice only in California.
>
> ---
>
> **From:** Charlie Ebersol [mailto:ce@aaf.com]
> **Sent:** Sunday, March 24, 2019 7:19 PM
> **To:** John Zutter <jz@dundon.co>
> **Cc:** Dawn Belt <dbelt@fenwick.com>; James A. Skochdopole <jskochdopole@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>
> **Subject:** Re: fraudulent conveyance indemnity side letter [IWOV-LAWDOCS.FID1708176]
>
> Working in that yes. Redlines back shortly.

**From:** James A. Skochdopole
[mailto:JSkochdopole@bellnunnally.com]
**Sent:** Sunday, March 24, 2019 11:04 AM
**To:** Dawn Belt <dbelt@fenwick.com>; Jordan Roberts
<jroberts@fenwick.com>
**Cc:** Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III
<pkosydar@bellnunnally.com>; John Zutter <jz@dundon.co>
**Subject:** fraudulent conveyance indemnity side letter [IWOV-
LAWDOCS.FID1708176]

Dawn and Jordan,

Attached please find a side letter pursuant to which Dundon
Capital Partners would indemnify Charlie Ebersol against a
claim by Reggie against Charlie in connection with a vote by
Charlie of Reggie's shares in favor of an asset sale if the asset
sale transaction were a fraudulent conveyance.

Please let me know as soon as possible if you have any
question or comments – I understand this clears the last
impediment to Charlie executing the Investor Consent, Waiver
and Approval today. My cell number is 214-991-1387.

-- Jim.

**James A. Skochdopole** | Managing Partner
jskochdopole@bellnunnally.com
Tel 214-740-1434 | Fax 214-740-5734
**2323 Ross Avenue, Suite 1900 | Dallas, Texas 75201***
www.bellnunnally.com
*Please note our new address*

IMPORTANT \ CONFIDENTIAL: This message contains information from the law firm of Bell Nunnally & Martin LLP that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 740-1400.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230. Thank you.

-------------------------------------------
NOTICE:
This email and all attachments are confidential, may be legally
privileged, and are intended solely for the individual or entity to whom
the email is addressed. However, mistakes sometimes happen in
addressing emails. If you believe that you are not an intended
recipient, please stop reading immediately. Do not copy, forward, or
rely on the contents in any way. Notify the sender and/or Fenwick &

EXHIBIT

13

| | |
|---|---|
| From: | Jordan Roberts |
| Sent: | Wednesday, February 27, 2019 8:04 PM CST |
| To: | Charlie Ebersol; James A. Skochdopole; Dawn Belt; John Zutter |
| CC: | Peter J. Kosydar III |
| Subject: | RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176] |
| Attachments: | ESMG - Omnibus Amendment and Waiver to Notes (Dundon).DOC |

Jim –

Attached is a draft of an amendment and waiver to the outstanding Promissory Notes issued by ESMG from December through February. The agreement extends the maturity date of the December Notes to May 1, 2019 (previously it was March 10, 2019) and waives all Events of Default under all Notes that have occurred to date or may occur in the future through May 1, 2019 in connection with our transaction (including any Change of Control or Qualified Additional Investment).

Please let us know if you have any questions or comments before we send to Dave for review.

**JORDAN ROBERTS**

Associate | Fenwick & West LLP | 650-335-7149 | jroberts@fenwick.com
Admitted to practice only in California.

---

**From:** Charlie Ebersol [mailto:ce@aaf.com]
**Sent:** Tuesday, February 26, 2019 3:25 PM
**To:** James A. Skochdopole <JSkochdopole@bellnunnally.com>; Dawn Belt <dbelt@fenwick.com>; 'John Zutter' <jz@dundon.co>
**Cc:** Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>
**Subject:** Re: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Jim,

Had a good call with Dawn on this. I am going to discuss options with Tom D tomorrow on how he wants to handle Pottruck and will circle back on that after.

Thanks
C

Charlie Ebersol
Founder & CEO

AAF.com



DISCLAIMER:

This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

---

**From:** "James A. Skochdopole" <JSkochdopole@bellnunnally.com>
**Date:** Tuesday, February 26, 2019 at 3:31 PM
**To:** Dawn Belt <dbelt@fenwick.com>, John Zutter <jz@dundon.co>
**Cc:** Charlie Ebersol <ce@aaf.com>, "Peter J. Kosydar III" <pkosydar@bellnunnally.com>, Jordan Roberts <jroberts@fenwick.com>
**Subject:** RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

*Thanks, Dawn.  Please let us know as soon as you have talked to Charlie about Pottruck – that is our first priority and may affect funding going forward.  – Jim.*

---

**From:** Dawn Belt <dbelt@fenwick.com>
**Sent:** Tuesday, February 26, 2019 2:59 PM
**To:** James A. Skochdopole <JSkochdopole@bellnunnally.com>; 'John Zutter' <jz@dundon.co>
**Cc:** Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>
**Subject:** RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Jim and Peter –

Thanks for the call.  Just a quick confirmation that all of the November 2018 noteholders did in fact sign the Series 1 Stock Purchase Agreement, and thereby converted all of their notes pursuant to Section 1.2.3 of the SPA.  Not all of the April-September 2018 noteholders signed the SPA, but their notes automatically converted pursuant to their own terms.

I'll discuss the Pottruck questions with Charlie today.

Thanks,
Dawn

Dawn Belt
Direct: (650) 335-7830

**From:** James A. Skochdopole [mailto:JSkochdopole@bellnunnally.com]
**Sent:** Monday, February 25, 2019 5:08 PM
**To:** Dawn Belt <dbelt@fenwick.com>; 'John Zutter' <jz@dundon.co>
**Cc:** Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts
<jroberts@fenwick.com>
**Subject:** RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-
LAWDOCS.FID1708176]

Thanks, Dawn.  It will be good to at least start the conversation.  – Jim.

**From:** Dawn Belt <dbelt@fenwick.com>
**Sent:** Monday, February 25, 2019 7:06 PM
**To:** James A. Skochdopole <JSkochdopole@bellnunnally.com>; 'John Zutter' <jz@dundon.co>
**Cc:** Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts
<jroberts@fenwick.com>
**Subject:** RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-
LAWDOCS.FID1708176]

I have to head out now for an event this evening, but I can call you from the road to just briefly connect.
I will not have had a chance to review the document.

Thanks,
Dawn

Dawn Belt
Direct: (650) 335-7830

**From:** James A. Skochdopole [mailto:JSkochdopole@bellnunnally.com]
**Sent:** Monday, February 25, 2019 5:05 PM
**To:** 'John Zutter' <jz@dundon.co>; Dawn Belt <dbelt@fenwick.com>
**Cc:** Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts
<jroberts@fenwick.com>
**Subject:** RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-
LAWDOCS.FID1708176]

Dawn,

I'm available now if that works for you.  My directly dial is 214-740-1434 and my cell is 214-991-1387.

-- Jim.

DCP Parties0343



**James A. Skochdopole** | Managing Partner
jskochdopole@bellnunnally.com
Tel 214-740-1434 | Fax 214-740-5734
**2323 Ross Avenue, Suite 1900 | Dallas, Texas 75201\***
www.bellnunnally.com
*\*Please note our new address*

IMPORTANT \ CONFIDENTIAL: This message contains information from the law firm of Bell Nunnally & Martin LLP that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 740-1400.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

Thank you.

**From:** John Zutter <jz@dundon.co>
**Sent:** Monday, February 25, 2019 7:00 PM
**To:** Dawn Belt <dbelt@fenwick.com>
**Cc:** Charlie Ebersol <ce@aaf.com>; James A. Skochdopole <JSkochdopole@bellnunnally.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>
**Subject:** Re: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Can you connect tonight?  This is mission critical.  Thanks.

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, TX 75201
Phone: (917) 861-5424

On Feb 25, 2019, at 6:58 PM, Dawn Belt <dbelt@fenwick.com> wrote:

Thanks, John.  We will take a look.

Jim – can we set a time to talk on Wednesday between 9 and 12 Pacific?  I'm completely booked tomorrow.  Also adding Jordan from my team, who has been working closely with me on all ESMG matters.

Thanks,
Dawn

Dawn Belt
Direct: (650) 335-7830

**From:** John Zutter [mailto:jz@dundon.co]
**Sent:** Monday, February 25, 2019 4:35 PM
**To:** Charlie Ebersol <ce@aaf.com>; Dawn Belt <dbelt@fenwick.com>; James Skochdopole <jims@bellnunnally.com>; pkosydar@bellnunnally.com
**Subject:** Fwd: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Dawn and Jim - please sync up.

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, TX 75201
Phone: (917) 861-5424

Begin forwarded message:

> **From:** "James A. Skochdopole" <JSkochdopole@bellnunnally.com>
> **Date:** February 25, 2019 at 6:32:34 PM CST
> **To:** 'John Zutter' <jz@dundon.co>
> **Cc:** "Peter J. Kosydar III" <pkosydar@bellnunnally.com>
> **Subject: FW: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]**
>
> John,
>
> Please see Peter's email below and the attached "gap analysis" we discussed earlier this afternoon.
>
> -- Jim.

---

**From:** Peter J. Kosydar III
**Sent:** Monday, February 25, 2019 6:19 PM
**To:** James A. Skochdopole <JSkochdopole@bellnunnally.com>
**Subject:** Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Jim,

Please see the attached summary of the provisions that would be triggered in the various investment documents upon a Change of Control of Ebersol Sports Media Group, Inc. (the "Company"). This summary is based on the financing documents uploaded to folder 008 in the data room, and the NFL term sheet we received from Fenwick.

Assuming that the Company obtains the written consent of: (1) the Ebersol-Saint James Family Trust Date November 14, 2017, (2) F02 LLC, and (3) Teddy Bright Pictures, Inc., it will have the necessary stockholder consent to authorize the sale of the Company's asset pursuant to Section

DCP Parties0345

271 of the Delaware General Corporation Law (which requires a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon).

Thanks,

Peter

-------------------------------------------
NOTICE:
This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed. However, mistakes sometimes happen in addressing emails. If you believe that you are not an intended recipient, please stop reading immediately. Do not copy, forward, or rely on the contents in any way. Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments. Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

**EBERSOL SPORTS MEDIA GROUP, INC.**

**OMNIBUS AMENDMENT AND WAIVER**

This Omnibus Amendment and Waiver (this "***Amendment and Waiver***") to the Unsecured Promissory Notes (as amended, the "***December 2018 Notes***") issued pursuant to the Note and Warrant Purchase Agreement dated December 10, 2018 by and among the Ebersol Sports Media Group, Inc. (the "***Company***") and the Requisite Signatories (as defined below) (the "***December 2018 Purchase Agreement***"), the Unsecured Promissory Notes (as amended, the "***January 2019 Notes***") issued pursuant to the Note and Warrant Purchase Agreement dated January 17, 2019 by and among the Company and the Requisite Signatories (as amended, the "***January 2019 Purchase Agreement***") and the Unsecured Promissory Note (the "***February 2019 Note***" and together with the December 2018 Notes and the January 2019 Notes, the "***Notes***") issued pursuant to the Note and Warrant Purchase Agreement dated February 11, 2019 by and among the Company and the Requisite Signatories (the "***February 2019 Purchase Agreement***" and together with the December 2018 Purchase Agreement and the January 2019 Purchase Agreement, the "***Purchase Agreements***") is made as of February [ ], 2019 (the "***Effective Date***") (except as otherwise provided herein) by and among the Company and the parties listed on the signature pages hereto (the "***Requisite Signatories***"). Capitalized terms not defined herein shall have the meanings given to such terms in the applicable Notes.

<u>RECITALS</u>

WHERAS, the Requisite Signatories are each party to certain of the Notes issued and sold by the Company pursuant to the Purchase Agreements.

WHERAS, in connection with and pursuant to that certain Binding Term Sheet for Series 2 Preferred Stock Financing dated February 14, 2019 by and between Dundon Capital Partners LLC and the Company, Dundon Capital Partners LLC, or one or more of its affiliates (including affiliates of Thomas G. Dundon) (collectively, "***Dundon***") has committed to invest up to $70,000,000 in the Company, in exchange for Dundon receiving, among other things, 75% of the Company's fully-diluted capital stock, with the final structure of the investment to be determined by Dundon and the Company (which structure may include a contribution of assets, recapitalization, sale of equity, sale of assets, merger, or other transaction) (the "***Dundon Transaction***") and Dundon has already made certain payments to the Company in connection with the Dundon Transaction.

WHERAS, the December 2018 Notes may be amended, and the observance of any term of the December 2018 Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the holders of the December 2018 Notes representing at least a majority of the aggregate Principal Balances (as defined in the December 2018 Notes) of all December 2018 Notes currently outstanding (the "***December 2018 Majority Holders***"), and any amendment or waiver effected in accordance with the terms of the December 2018 Notes shall be binding upon each holder of the December 2018 Notes currently outstanding, each future holder of such securities and the Company.

WHERAS, the January 2019 Notes may be amended, and the observance of any term of the January 2019 Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the holders of the January 2019 Notes representing at least a majority of the aggregate Principal Balances (as defined in the January 2019 Notes) of all January 2019 Notes currently outstanding (the "***January 2019 Majority Holders***"), and any amendment or waiver effected in accordance with the terms of the January 2019 Notes shall be binding

CLASSIFIED

DCP Parties0347

upon each holder of the January 2019 Notes currently outstanding, each future holder of such securities, and the Company.

WHERAS, the February 2019 Notes may be amended, and the observance of any term of the February 2019 Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), with the written consent of the Company and the holders of the February 2019 Notes representing at least a majority of the aggregate Principal Balances (as defined in the February 2019 Notes) of all February 2019 Notes currently outstanding (the "*February 2019 Majority Holders*" and together with the December 2018 Majority Holders and the January 2019 Majority Holders, the "*Majority Holders*"), and any amendment or waiver effected in accordance with the terms of the February 2019 Notes shall be binding upon each holder of the February 2019 Notes currently outstanding, each future holder of such securities, and the Company.

WHEREAS, the Company and the Requisite Signatories, which together represent the Majority Holders, desire to amend the December 2018 Notes and waive certain provisions under the Notes related to the Dundon Transaction as set forth herein.

AGREEMENT

NOW, THEREFORE, BE IT RESOLVED, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1.**    **Amendment of the December 2018 Notes.**   The definition of "Maturity Date" in Section 1 of the December 2018 Notes is hereby amended and restated in its entirety to read as follows:

""***Maturity Date***" means the earlier of (a) May 1, 2019 and (b) the time at which the Balance of this Note is due and payable upon an Event of Default; provided, however that if the Event of Default is cured as permitted in this Note, then the Maturity Date shall not thereafter be deemed to have occurred with regard to such Event of Default under this clause (b)."

**2.**    **Waiver of Events of Default.** Each Requisite Signatory, for itself and on behalf of its heirs, successors, beneficiaries, affiliates, agents, and assigns, hereby fully waives any existing Event of Default that has arisen as of the Effective Date, or that may arise on or prior to May 1, 2019, due to payments made to the Company in connection with the Dundon Transaction, including any failure by the Company to pay any accrued but unpaid expenses, accrued but unpaid interest, all principal and any other amounts outstanding under this Note in connection with a Change of Control or a Qualified Additional Investment. The waivers granted by the Requisite Signatories hereby shall be effective on the Effective Date.

**3.**    **Miscellaneous.**

    3.1.    **Governing Law.**  This Amendment and Waiver shall be governed by and construed under the internal laws of the State of California as applied to agreements to be performed entirely within California, without reference to principles of conflict of laws or choice of laws.

    3.2.    **Entire Agreement; Amendment; Other Agreements.**

       (i)    Except as expressly set forth herein, this Amendment and Waiver sets forth the entire agreement and understanding of the parties relating to the subject matter herein and merges all prior discussions between them.

CLASSIFIED

DCP Parties0348

(ii)     No modification of or amendment to this Amendment and Waiver, nor any waiver of any rights under this Amendment and Waiver, shall be effective unless in writing signed by the Company and the Requisite Signatories.

(iii)     Except as expressly amended by this Amendment and Waiver, all of the terms of the Notes shall remain in full force and effect, as amended to date.

(iv)     The parties hereto hereby covenant and agree to execute and deliver any additional documents reasonably necessary, at the reasonable request of any of the parties hereto, to carry out the intent of this Amendment and Waiver.

3.3.     **Counterparts.** This Amendment and Waiver may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

[Signature Pages Follow]

34405/00600/FW/10609203.3

**IN WITNESS WHEREOF**, the parties have executed this Amendment and Waiver as of the Effective Date.

**EBERSOL SPORTS MEDIA GROUP, INC.**

By: _____

Name: Charlie Ebersol

Its: Chief Executive Officer

**SIGNATURE PAGE TO OMNIBUS AMENDMENT AND WAIVER**

34405/00600/FW/10609203.3

CLASSIFIED

**IN WITNESS WHEREOF**, the parties have executed this Amendment and Waiver as of the Effective Date.

**REQUISITE SIGNATORY:**

**DAVID S. POTTRUCK REVOCABLE TRUST**


By:  _____

Name: Dave Pottruck

Its: Trustee

**SIGNATURE PAGE TO OMNIBUS AMENDMENT AND WAIVER**

34405/00600/FW/10609203.3

CLASSIFIED

**IN WITNESS WHEREOF**, the parties have executed this Amendment and Waiver as of the Effective Date.

**REQUISITE SIGNATORY:**

**EBERSOL-SAINT JAMES FAMILY TRUST DATED NOVEMBER 14, 2007**

By: _____

Name: Dick Ebersol

Its: Trustee

**SIGNATURE PAGE TO OMNIBUS AMENDMENT AND WAIVER**

34405/00600/FW/10609203.3

CLASSIFIED

EXHIBIT

14

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 22-05077-CAG-7** |
| | § | |
| **CHARLES EBERSOL,** | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF DUNDON CAPITAL PARTNERS, LLC'S
## EXPERT DISCLOSURES PURSUANT TO F.R.C.P. 26(a)(2)

In accordance with Rule 26(a)(2) of the Federal Rules of Civil Procedure, and the Joint Stipulation, filed and confirmed by the Court on December 2, 2024 (Dkt. 165-1), Plaintiff Dundon Capital Partners LLC ("DCP") provides the following expert disclosure of individuals whom it may use at trial to present evidence under Federal Rules of Evidence.

The following disclosures are based upon the information reasonably available to DCP currently. Pursuant to Rule 26(e) of the Federal Rules of Civil Procedure, DCP reserves the right to supplement its expert disclosures at the appropriate time, if and when additional information becomes available.

## RULE 26(a)(2)(B) WITNESSES

1.   Erica Bramer[1]

   a.   Identity of Expert Witness:

Erica Bramer, CFA, CVA, CIRA; BVA Group, 7250 Dallas Parkway Suite 200, Plano, Texas 75024.

   b.   Qualifications of Expert Witness:

Ms. Bramer is Managing Partner of BVA Group, a business consulting and financial advisory firm. She provides consulting services in the areas of strategy, operations, and corporate finance/valuation, and has done so for nearly 30 years. Prior to working at BVA, she worked for AlixPartners, Bain & Company, and Price Waterhouse.

Ms. Bramer holds an MBA from the Wharton School and an MA from the University of Pennsylvania. She earned her undergraduate degrees, with high honors and Phi Beta Kappa, from the University of Texas at Austin, including a BBA in the Honors Business Program and Finance, and a BA in the Plan II Honors Program. Ms. Bramer is a CFA (Chartered Financial Analyst) charterholder, a Certified Valuation Analyst, and a Certified Insolvency and Restructuring Advisor.

Attached as **Exhibit A** to the Bramer Report is a copy of Ms. Bramer's *curriculum vitae*, which is incorporated by reference herein.

   c.   Expert Report and Opinions:

Without limiting the substance or scope of the Bramer Report, which speaks for itself, the opinions Ms. Bramer intends to offer, and, in general, the factual and legal bases for those opinions can be summarized as follows:

---

[1] The Expert Report of Erica Bramer, CFA, CVA, CIRA dated December 2, 2024 (the "Bramer Report") is being served concurrently herewith and is incorporated by reference as if set forth fully herein.

Ms. Bramer was asked to perform analyses relevant to DCP's claim it would not have made its $70 million investment into AAF on February 14, 2019, had Mr. Ebersol (individually and on behalf of the Debtors) made accurate financial representations and made full and proper disclosure. Specifically, she was asked to analyze the allegedly undisclosed debts as of February 14, 2019, to assess DCP's claim that Mr. Ebersol misrepresented that $70 million would cover all necessary expenses for the remainder of the 2019 season.

Ms. Bramer calculates that on February 14, 2019, the day DCP made its subject investment, AAF and/or its affiliates had incurred at least $17.9 million in accounts payable that Mr. Ebersol allegedly did not disclose to DCP. That amount was in addition to $5.1 million that was the only disclosed obligation, largely to cover payroll from the previous week, and $1.7 million in obligations that had been incurred but not invoiced as of February 14, 2019.

Ms. Bramer opines that if DCP had been made aware of AAF's undisclosed accounts payable, it would have realized $70 million was insufficient to cover AAF's necessary expenses for the rest of the anticipated season, and even assuming Mr. Ebersol's revenue projections and cost projections had been reasonable and accurate, AAF's undisclosed accounts payable were sufficiently large that DCP would have anticipated the AAF would run out of cash well before the end of the 2019 season.

The Bramer Report, which is incorporated herein by reference, expounds upon Ms. Bramer's opinions, and the legal and factual bases, therein.

d.  Facts or Data Considered:

In connection with her analysis, Ms. Bramer considered the documents and sources of information referenced in the Bramer Report and the information listed in Appendix B thereto, which is incorporated by reference herein. In addition, Ms. Bramer relied on her education,

background, skills, and experience, including a body of knowledge derived from numerous other treatises and case law not specifically identified in the Bramer Report.

       e.     <u>Prior Expert Testimony and Publications</u>:

Ms. Bramer's curriculum vitae, which is attached as **<u>Exhibit A</u>** to the Bramer Report and incorporated by reference herein, contains a list of Ms. Bramer's testimony history over the last four years and presentations and publications over the last ten years.

       f.     <u>Expert Witness Compensation</u>:

BVA Group has been compensated for Ms. Bramer's time at the rate of $1,125 per hour. Ms. Bramer has also received assistance from other BVA Group team members working under her supervision, for which BVA Group has been compensated at rates ranging from $325 to $950 per hour. BVA Group's compensation does not depend upon the results of Ms. Bramer's analysis in her report, any related testimony, or the outcome of this matter.

## RESERVATION OF RIGHTS

Pursuant to Rule 26(e)(1) of the Federal Rules of Civil Procedure, DCP reserves the right to amend, modify and/or supplement its expert disclosures as new or additional information, documents, data or other evidence becomes available, or as necessitated by the facts and circumstances of this case. DCP reserves the right to disclose additional experts and rebuttal experts consistent with the Federal Rules of Civil Procedure.

Respectfully submitted,

**K&L GATES LLP**

By:    */s/Brent D. Hockaday*
          Brent D. Hockaday
          Texas Bar No. 24071295
          Brent.hockaday@klgates.com
          1717 Main Street, Suite 2800
          Dallas, Texas 75201
          (214) 939-5677
          (214) 939-5849 Fax

AND

**BELL NUNNALLY & MARTIN LLP**

          */s/Jeff S. Lowenstein*
          Jeffrey S. Lowenstein
          Texas Bar No. 24007574
          jlowenstein@bellnunnally.com
          Beverly A. Whitley
          Texas Bar No. 21374500
          bwhitley@bellnunnally.com
          Brent A. Turman
          Texas Bar No. 24077506
          bturman@bellnunnally.com
          Sydnie A. Shimkus
          Texas Bar No. 24093783
          sshimkus@bellnunnally.com
          2323 Ross Ave., Ste. 1900
          Dallas, Texas 75201
          (214) 740-1400
          (214) 740-1499 Fax

**ATTORNEYS FOR DUNDON CAPITAL PARTNERS LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies a true and correct copy of the foregoing was served by delivering the same to the person listed below in the manner and on the date indicated.

Nicole L. Williams (SBN 24041784)
Katharine Battaia Clark (SBN 24046712)
**Thompson Coburn LLP**
2100 Ross Avenue, Suite 3200
Dallas, TX 75201
Phone: (972) 629-7113
Fax: (927) 629-7171
nwilliams@thompsoncoburn.com
kclark@thompsoncoburn.com

- and –

Boris Treyzon (CA SBN 18893)
Jonathon Farahi (CA SBN 324316)
**Abir Cohen Treyzon Salo, LLP**
16001 Ventura Boulevard, Suite 200
Encino, CA 91436
Phone: (424) 288-4367
Fax: (424) 288-4368
btreyzon@actslaw.com
jfarahi@actslaw.com

- and  -

Brian S. Engel (SBN 00789279)
Steve P. Turner (SBN 20314700)
**Barrett Daffin Frappier  Turner & Engel, LLP**
580 La Ventana Blvd.
Driftwood, TX 78619
Phone:  512-687-2503
Fax: (512) 477-0008
briannen@bdfgroup.com
stevet@bdfgroup.com

**ATTORNEYS FOR PLAINTIFFS
RANDOLPH N. OSHEROW, CHAPTER 7
TRUSTEE, DEBTORS' ESTATE**

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**

Michael J Saltz
Simone E Poyourow
1880 Century Park East, Suite 900
Los Angeles, CA 90067
310-446-9900
Fax: 310-446-9909
Email: msaltz@jrsnd.com
spoyourow@jrsnd.com

-and-

**THOMPSON, COE, COUSINS & IRONS, L.L.P.**
Tom Horan
700 North Pearl Street, Suite 2500
Dallas, TX 75201
214-871-8241
Fax: 214-871-8209
Email: thoran@thompsoncoe.com

**ATTORNEYS FOR CHARLIE EBERSOL**

Dated December 2, 2024.

/s/Brent D. Hockaday
Brent D. Hockaday

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **IN RE** § | | |
| § | | |
| **LEGENDARY FIELD EXHIBITIONS, LLC,** § | **CASE NO. 19-50900-CAG** | |
| § | **CHAPTER 7** | |
| **DEBTOR.** § | | |

---

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** § | | |
| § | | |
| **Plaintiff,** § | | |
| § | | |
| **v.** § | **ADVERSARY NO. 22-05077-CAG** | |
| § | | |
| **CHARLES EBERSOL,** § | | |
| § | | |
| **Defendant.** § | | |

---

| | |
|---|---|
| **RANDOLPH N. OSHEROW, Chapter 7 Trustee, and the BANKRUPTCY ESTATES OF LEGENDARY FIELD EXHIBITIONS, LLC; AAF PLAYERS, LLC; AAF PROPERTIES, LLC; EBERSOL SPORTS MEDIA GROUP, INC.; LFE2, LLC; and WE ARE REALTIME, LLC., PLAINTIFFS,** § | **ADVERSARY NO. 22-05078-CAG-7** |
| **v.** § | |
| **THOMAS DUNDON, JOHN ZUTTER, and DUNDON CAPITAL PARTNERS, LLC,** § | |
| **DEFENDANTS.** § | |



**EXHIBIT A**

369



# EXPERT REPORT OF
# ERICA BRAMER, CFA, CVA, CIRA

## DECEMBER 2, 2024

I.     Scope of the Engagement ................................................................................................ 1

II.    Credentials and Compensation ...................................................................................... 1

III.   Information Considered .................................................................................................. 2

IV.   Executive Summary of Opinions .................................................................................... 2

V.    Background .................................................................................................................... 3

      A.      Parties in the DCP Proceeding ............................................................................ 3

      B.      Parties in the Osherow Proceeding ...................................................................... 3

      C.      Claims .................................................................................................................. 3

VI.   Analysis ......................................................................................................................... 5

      A.      ESMG's Allegedly Undisclosed Debts ................................................................ 6

      B.      ESMG Obligations Incurred but Not Recorded as Accounts Payable before February 14, 2019 ........................................................................................................................... 7

           1)      Unbilled Stadium Rental Costs for First Week's Home Games ........................... 7

           2)      Other Costs Incurred but not Invoiced as of February 14, 2019 .......................... 8

      C.      Effect of Mr. Ebersol Allegedly Concealing Debts on DCP's Assessment of Whether the AAF Would Run Out of Cash After DCP's Investment ...................................... 9



| 7250 Dallas Parkway | 1000 Louisiana Street | 405 Lexington Avenue |
| Suite 200 | Suite 1150 | Floor 9 |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10174 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

Re: In re: Legendary Field Exhibitions, LLC, et al., Debtors, United States Bankruptcy Court Western District of Texas, San Antonio Division, Case No. 19-50900-CAG and Dundon Capital Partners LLC v. Charles Ebersol, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05077-CAG and Randolph N. Osherow, Chapter 7 Trustee and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LFE 2, LLC; and We Are Realtime, LLC v. Thomas Dundon, John Zutter, and Dundon Capital Partners, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05078-CAG-7

## I. Scope of the Engagement

1. I have been retained by counsel to Thomas Dundon, John Zutter, and Dundon Capital Partners LLC ("DCP") (collectively, the "Dundon Parties")[1] to opine on certain issues relating to DCP's investment in the Alliance of American Football ("AAF") and the AAF's subsequent failure and bankruptcy.

2. My opinions are preliminary and based on information I have had the opportunity to analyze. Furthermore, I understand discovery is ongoing, and I may supplement my analysis as warranted by future production of documents, testimony, or other information. Conclusions and analysis contained in this report may be supplemented through deposition, live testimony, or future response or supplemental reports. For trial in this matter, I may prepare demonstrative aids such as charts, graphs, or other summaries of information presented in this report or contained in my work file.

## II. Credentials and Compensation

3. I am Managing Partner of BVA Group ("BVA"), a business consulting and financial advisory firm. I provide consulting services in the areas of strategy, operations, and corporate finance/valuation, and have done so for nearly 30 years. I am often designated as an expert witness in matters of finance, valuation, and economic damages, and I have testified on numerous occasions in state, federal, and bankruptcy courts, as well as domestic and international arbitration venues. Prior to working at BVA, I worked for AlixPartners, Bain & Company, and Price Waterhouse.

4. I hold an MBA from the Wharton School and an MA from the University of Pennsylvania. I earned my undergraduate degrees, with high honors and Phi Beta Kappa, from the University of Texas at Austin, including a BBA in the Honors Business Program and Finance, and a BA in the Plan II Honors Program. I am a CFA® (Chartered Financial Analyst) charterholder, a Certified Valuation Analyst, and a

---

[1] DCP is the Plaintiff in Adversary Proceeding No: 22-05077-cag, *Dundon Capital Partners LLC v. Charles Ebersol* (the "DCP Proceeding"). Thomas Dundon, John Zutter, and DCP are Defendants in Adversary Proceeding No: 22-05078, *Randolph N. Osherow et al. v. Thomas Dundon et al* (the "Osherow Proceeding"). I understand that the opinions I express in this report may be relevant to each of these cases, and that counsel for the Dundon Parties may seek to combine the two proceedings.

Certified Insolvency and Restructuring Advisor. These accreditations are granted by the CFA Institute, the National Association of Certified Valuation Analysts, and the Association of Insolvency and Restructuring Advisors, respectively.

5.    Attached as **Appendix A** to this report is my curriculum vitae and testimony history for the last four years. DCP has compensated BVA for my time at the rate of $1,125 per hour. I also received assistance from other BVA team members working under my supervision, for which DCP compensated BVA at rates ranging from $325 to $950 per hour. BVA's compensation does not depend upon the results of my analysis in this report, any related testimony, or the outcome of this matter.

### III.    Information Considered

6.    In connection with my analysis, I reviewed numerous documents and sources of information.[2] The information I considered in preparation of my analysis is listed in **Appendix B** and/or referenced in my report.[3] I also spoke to Elisa Lee, Private Equity Analyst at DCP.

### IV.    Executive Summary of Opinions

7.    I have been asked to perform certain analyses relevant to DCP's claim that DCP would not have made its $70 million capital investment into AAF on February 14, 2019 had Mr. Ebersol (individually and on behalf of the Debtors) made accurate financial representations and made full and proper disclosure. Specifically, I have been asked to analyze the allegedly undisclosed outstanding debts as of February 14, 2019 in order to assess DCP's claim that Mr. Ebersol misrepresented that $70 million would cover all necessary expenses for the remainder of the 2019 season.

8.    I calculate that on February 14, 2019, the day that DCP made its subject investment, AAF and/or its affiliates had incurred at least $17.9 million in accounts payable that Mr. Ebersol allegedly did not disclose to DCP. That amount of allegedly undisclosed debt was in addition to $5.1 million that was the only disclosed obligation, largely to cover payroll from the previous week, and $1.7 million in obligations that had been incurred but not invoiced as of February 14, 2019.

9.    Had DCP been made aware of AAF's undisclosed accounts payable, it would have realized that $70 million was not sufficient to cover AAF's necessary expenses for the rest of the anticipated season. Even assuming that Mr. Ebersol's revenue projections and cost projections had been reasonable and accurate, AAF's undisclosed accounts payable were sufficiently large that DCP would have anticipated that the AAF would run out of cash well before the end of the 2019 season.

---

[2]    Use of the first person "I" in my report refers either to me or to those working under my direct supervision.

[3]    In addition to documents referenced in this report and attached appendices, I relied on my education, background, skills, and experience, including a body of knowledge derived from numerous other treatises and case law not specifically identified herein.

## V.    Background

### A.    Parties in the DCP Proceeding

10.    Dundon Capital Partners, LLC is a Delaware limited liability corporation with its principal offices in Texas.[4] According to its webpage, DCP is a private investment firm founded in 2015 focused on private equity and credit investments across a range of industries.[5] DCP is the Plaintiff in the DCP Proceeding.[6]

11.    Charles Ebersol is the co-founder of the Ebersol Sports Media Group, Inc. ("ESMG").[7] ESMG owned and operated the spring football league known as the AAF.[8] Mr. Ebersol is the Defendant in the DCP Proceeding.[9]

### B.    Parties in the Osherow Proceeding

12.    The consolidated bankruptcy estates of Legendary Field Exhibitions, LLC ("LFE"); AAF Players, LLC; AAF Properties, LLC; ESMG; LFE 2, LLC; and We Are Realtime, LLC are collectively the "Debtors."[10] Together with Randolph N. Osherow, the Chapter 7 Trustee of the bankruptcy estate of the Debtors, they are the Plaintiffs in the Osherow Proceeding.[11]

13.    Thomas Dundon is the founder, Chairman and Managing Partner of DCP.[12]

14.    John Zutter is a Partner of DCP.[13]

15.    DCP, Mr. Dundon and Mr. Zutter are the Defendants in the Osherow Proceeding. [14]

### C.    Claims

16.    DCP alleges the following causes of action against Mr. Ebersol in the DCP Proceeding:

    a.    Fraudulent Inducement;[15]

---

[4]    *See* First Amended Complaint in Adversary Proceeding No: 22-05078, *Randolph N. Osherow et al. v. Thomas Dundon et al.*, dated November 27, 2023 ("Osherow Complaint"), at ¶ 5.

[5]    *See* "About," *Dundon Capital Partners*, https://www.dundoncapitalpartners.com/about/.

[6]    *See* Plaintiff's Original Complaint in Adversary Proceeding No: 22-05077-cag, *Dundon Capital Partners LLC v. Charles Ebersol*, dated November 14, 2022 ("DCP Complaint").

[7]    *See* DCP Complaint, at ¶ 13.

[8]    *See* DCP Complaint, at ¶¶ 1, 14.

[9]    *See* DCP Complaint.

[10]    *See* Osherow Complaint, at cover page.

[11]    *See* Osherow Complaint, at ¶¶ 1-2.

[12]    *See* "About," *Dundon Capital Partners*, https://www.dundoncapitalpartners.com/about/.

[13]    *See* "Team," *Dundon Capital Partners*, https://www.dundoncapitalpartners.com/team.

[14]    *See* Osherow Complaint.

[15]    *See* DCP Complaint, at ¶¶ 48-66.

     b.    Violation of Section 33 of the Texas Securities Act;[16] and

     c.    Violation of Section 27 of the Texas Business and Commerce Code.[17]

17.    Mr. Dundon[18] and DCP[19] have filed Proofs of Claim against LFE.  In DCP's Proof, it "asserts a claim against the debtor herein to recover its $70,000,000 investment."[20]

18.    The Plaintiffs in the Osherow Proceeding allege the following causes of action in the Osherow Proceeding:[21]

     a.    Breach of Oral Contract (against Mr. Dundon);[22]

     b.    Breach of Contract (against DCP);[23]

     c.    Breach of Covenant of Good Faith and Fair Dealing (against Mr. Dundon and DCP);[24]

     d.    Promissory Estoppel (against Mr. Dundon);[25]

     e.    Breach of Fiduciary Duty (against Mr. Dundon and Mr. Zutter);[26]

     f.    Common Law Fraud; Fraudulent Misrepresentation; Fraud by Non-Disclosure; Constructive Fraud (against Mr. Dundon);[27]

     g.    Fraud in the Inducement (against Mr. Dundon and DCP);[28]

     h.    Negligent Misrepresentation (against Mr. Dundon);[29]

     i.    Unjust Enrichment (against Mr. Dundon, Mr. Zutter and DCP);[30]

     j.    Disallowance of Defendants' Claims (11 U.S.C. § 502(d)) (against Mr. Dundon and DCP);[31] and

---

[16] *See* DCP Complaint, at ¶¶ 67-83.

[17] *See* DCP Complaint, at ¶¶ 84-101.

[18] *See* Form 410 Proof of Claim for Thomas G. Dundon, dated June 24, 2019, In re: Legendary Field Exhibitions, LLC, et al., Debtors, United States Bankruptcy Court Western District of Texas, San Antonio Division, Case No. 19-50900-CAG ("Dundon Form 410").

[19] *See* Dundon Form 410.

[20] *See* Dundon Form 410, at ¶ 12 and DCP 410, at ¶ 12.

[21] In addition to these causes of action, Plaintiffs in the Osherow Proceeding previously asserted additional causes of action now removed pursuant to court order.  *See* Osherow Complaint, at ¶¶ 184, 214.

[22] *See* Osherow Complaint, at ¶¶ 140-146.

[23] *See* Osherow Complaint, at ¶¶ 147-152.

[24] *See* Osherow Complaint, at ¶¶ 153-158.

[25] *See* Osherow Complaint, at ¶¶ 159-163.

[26] *See* Osherow Complaint, at ¶¶ 164-184.

[27] *See* Osherow Complaint, at ¶¶ 185-199.

[28] *See* Osherow Complaint, at ¶¶ 200-207.

[29] *See* Osherow Complaint, at ¶¶ 208-214.

[30] *See* Osherow Complaint, at ¶¶ 215-216.

[31] *See* Osherow Complaint, at ¶¶ 217-219.

k.      Equitable Subordination (11 U.S.C. § 510(c)) (against Mr. Dundon and DCP).[32]

## VI.  Analysis

19.     DCP asserts that Mr. Ebersol contacted Mr. Dundon soliciting an investment on February 13, 2019.[33]  According to DCP, it was not given an opportunity to conduct its own in-depth diligence in the 48-hour period between Mr. Ebersol's initial solicitation and DCP's signing of the Binding Term Sheet for Series 2 Preferred Stock Financing, which outlined DCP's $70 million funding for the AAF (the "Term Sheet"), because Mr. Ebersol convinced DCP that the investment needs were extremely urgent.[34] The Term Sheet generally stated that DCP would own 75 percent of ESMG's fully diluted capital stock in exchange for DCP's commitment to fund ESMG up to a maximum amount of $70 million.[35]

20.     Without an opportunity to conduct its own due diligence, DCP alleges it was reliant on the financial representations made by Mr. Ebersol, individually and on behalf of the Debtors.  Among the key representations that Mr. Ebersol allegedly made were:

a.      AAF needed $70 million to cover all necessary expenses for the remaining two months of the 2019 season (and most urgently the player payroll);[36]

b.      AAF could likely survive the first season with only $55 million in additional financing;[37] and

c.      The only substantial liability facing the AAF was $5.1 million in outstanding player payroll for the first week of the season.[38]

21.     I have been asked by counsel to the Dundon Parties to opine on issues related to the financial condition of the AAF at or around February 14, 2019, the date that DCP entered into the Term Sheet.[39] Specifically, I have been asked to evaluate DCP's claim that "Ebersol misrepresented and concealed material information from DCP prior to DCP's investment and the completion of the term sheet," and that DCP's $70 million capital investment was not sufficient to cover the league's financial needs for the remainder of the 2019 season.[40]  To that end, I was asked to consider:

---

[32]   *See* Osherow Complaint, at ¶¶ 220-223.
[33]   *See* DCP Complaint, at ¶ 18; discussions with counsel.
[34]   *See* DCP Complaint, at ¶¶ 4, 18-21, 30.
[35]   *See* Osherow Complaint, at Exhibit B.
[36]   *See* DCP Complaint, at ¶ 21.
[37]   *See* DCP Complaint, at ¶ 22.
[38]   *See* DCP Complaint, at ¶ 25.  *See also* ESMG Financial Projections Model vF.xlsx and ebersol-sports-media-group-inc_2019-02-11_summary_cap_intermediate_cap.xlsx, which were provided to Mr. Dundon by Mr. Ebersol on February 13, 2019, but which I understand DCP intends to prove were out of date when they were provided.
[39]   *See* DCP Complaint, at ¶¶ 4 and 31, and Osherow Complaint, at Exhibit B.
[40]   *See* DCP Complaint, at ¶¶ 33-34.

a. The amount of debt AAF owed but allegedly did not disclose to DCP at the time of the Term Sheet; and

b. The impact of undisclosed debt on the DCP's assessment of whether the AAF would run out of cash before the end of the 2019 season after a $70 million cash infusion by DCP in connection with the Term Sheet.

## A.  ESMG's Allegedly Undisclosed Debts

22.  According to DCP, "Ebersol disclosed the AAF's outstanding payroll for the first week of the season was the only substantial outstanding liability facing the AAF.  Ebersol made no disclosure to DCP of the magnitude of outstanding debts to third parties."[41]

23.  I understand that the debts associated with LFE, like those of the AAF, are ultimately subsumed within ESMG.  As shown in this chart attached to the Osherow Complaint, ESMG was the sole owner of AAF Properties, LLC and LFE (among other entities).  For the purpose of this analysis and based on discussions with counsel, I understand that ESMG is responsible for all debts listed as incurred by LFE.

**Chart 1.  ESMG Organizational Structure Chart as of February 20, 2019[42]**



EBERSOL SPORTS MEDIA GROUP, INC.

ORGANIZATIONAL STRUCTURE CHART

(Post-Mergers of IP Holding Companies)

(As of February 20, 2019)

Ebersol Sports Media Group, Inc.
a Delaware corporation

100%      100%      100%      100%

We Are Realtime, LLC
a Delaware limited liability company

AAF Properties, LLC
a Delaware limited liability company

Legendary Field Exhibitions, LLC
a Delaware limited liability company

LFE 2, LLC
a Delaware limited liability company

100%

AAF Players, LLC
a Delaware limited liability company

---

41  *See* DCP Complaint, at ¶ 25.
42  *See* Osherow Complaint, at Exhibit A.

24.  In **Exhibit 1**, I calculate that through February 14, 2019, ESMG had incurred approximately **$17.9 million** in debts before February 14, 2019 that were allegedly not disclosed to DCP before the signing of the Term Sheet.[43,44]

25.  This calculation does not include any penalties or interest that may be associated with ESMG's allegedly undisclosed debts, and also does not include the value of any debts incurred on or before February 14, 2019 which were settled after February 14, 2019 for less than their full amounts. Therefore, it may underestimate the total of ESMG's allegedly undisclosed debts on February 14, 2019.

**B.    ESMG Obligations Incurred but Not Recorded as Accounts Payable before February 14, 2019**

26.  In addition to the allegedly undisclosed accounts payable incurred through February 14, 2019, ESMG had incurred other obligations that were allegedly not disclosed to DCP before the signing of the Term Sheet, and that were not recorded as accounts payable before February 14, 2019. These obligations may include the following:

**Table 1.  Summary Of ESMG Obligations Incurred but Not Recorded as Accounts Payable Before February 14, 2019[45]**

| | |
|---|---:|
| Unbilled Stadium Rental Costs For First Week's Home Games | $    353,357 |
| Other Costs Incurred Before February 14, 2019 But Not Invoiced Until After | 1,345,151 |
| **Total** | **$  1,698,508** |

**1)    Unbilled Stadium Rental Costs for First Week's Home Games**

27.  I understand from my study of the profile of AAF expenses (the "Profile")[46] and discussions with Ms. Lee that ESMG and/or the AAF teams signed a series of rental contracts with football stadiums. Some of the stadiums had not invoiced ESMG prior to February 14, 2019, meaning that the rental costs for the first week's games had been incurred but not included in the calculations of undisclosed accounts payable.

---

[43]  *See also,* **Exhibit 2**, in which I calculate allegedly undisclosed debts to over 300 vendors that remain unpaid as of the date of the data provided by the Trustee at Rog-2 01384a Legendary+Field+Exhibitions+LLC_AP+Aging+Detail.xlsx. These calculations include certain debts to individual AAF players but do not include regular payroll expenses that were allegedly disclosed to DCP. As a cross-check, in **Exhibit 3**, I review a record of unpaid vendor invoices as of March 29, 2019, and calculate the sum of debts which had been incurred on or before February 14, 2019. (*See* DCP Parties11597/Dundon03865 (AP as of 3/29/19), tab "UnpaidBills (17).") In **Exhibit 4**, I calculate the sum of allegedly undisclosed debts paid after February 14, 2019 by comparing bills and expenses incurred on or before February 14, 2019 to payments made after February 14, 2019.

[44]  I note that this amount is reasonably close to the reported "Total Current Liabilities" of $18.4 million listed on the Ebersol Sports Media Group Balance Sheet as of 1/31/19. *See* ESMG Financials_1.31.2019_DRAFT (1).xls, tab "QBO BS".

[45]  *See* **Exhibit 5**.

[46]  *See* TR0001900142.

28.     Specifically, I understand that the AAF had four games on February 9, 2019, the first week of the season (prior to DCF's investment) at Orlando, Florida (at the University of Central Florida's Spectrum Stadium), San Antonio, Texas (at the University of Texas at San Antonio's Alamo Dome), Birmingham, Alabama (at the University of Alabama at Birmingham's Legion Field), and Tempe, Arizona (at Arizona State University's Sun Devil Stadium).[47]

29.     Based on my review of the record, I conclude that ESMG incurred the obligation to pay for the first week's stadium rental at (at least) these four stadiums, and that each of the four stadiums does not appear to have invoiced ESMG prior to February 14, 2019.

> a.     I have not identified any invoice records for Arizona State University's Sun Devil Stadium or University of Alabama at Birmingham's Legion Field.  I understand from the Profile that these stadiums cost AAF $100,000 and $15,000 to rent per game, respectively.[48]

> b.     I have identified one invoice record from the UCF Athletics Association which contains information about the cost to ESMG of renting the University of Central Florida's Spectrum Stadium. On March 27, 2019, the UCF Athletics Association invoiced ESMG $778,883.[49]  On a per-game basis over a season of five home games, the cost for the first game was $155,777.[50]

> c.     ESMG was invoiced $82,580 in rental fees by "City of San Antonio – Alamodome" on February 25, 2019.[51]

30.     Between the AAF's first week's home games in Arizona, Birmingham, Orlando, and San Antonio, ESMG incurred **$353,357** in stadium rental obligations that may be additive to my prior analysis of accounts payable records.[52]

### 2)     Other Costs Incurred but not Invoiced as of February 14, 2019

31.     I identified a series of invoice records recorded in February 2019 and March 2019 which refer, wholly or in part, to charges incurred before February 14, 2019.  I calculate in __Exhibit 5.B__ that the portion of charges that relate to the period before February 14, 2019 is **$1,345,151**.

32.     I note that these calculations do not include *all* costs incurred before February 14, 2019 and invoiced in March: it only includes invoice records with memos that indicate that all or some of the services

---

[47]   *See* Profile, tab "TeamAssumptions1," rows 17- 23; "AAF Football: 2019 Season Schedule for Alliance of American Football," *Athlon Sports*, 5/28/19, https://athlonsports.com/aaf/aaf-season-schedule-alliance-american-football-2019.

[48]   *See* Profile tab "TeamAssumptions1," row 203.

[49]   *See* Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Vendor.xlsx, rows 31025 and 31026.

[50]   $778,883.11 / 5 =$155,776.62.  Five home games per season per Profile (TR00001900142), tab "Team Assumptions1", row 48.

[51]   *See* Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Vendor.xlsx, rows 5852 and 5865.  This is generally consistent with Ms. Lee's notes in the Profile that the cost per game to rent the Alamo Dome was "$50k rent + expenses" (*see* Profile tab "TeamAssumptions1," row 203),

[52]   *See* __Exhibit 5.A__.

performed relate to the period before February 14, 2019. Where an invoice memo describes services performed before and after February 14, 2019, I only include the portion on or before February 14, 2019 in my calculations.

### C. Effect of Mr. Ebersol Allegedly Concealing Debts on DCP's Assessment of Whether the AAF Would Run Out of Cash After DCP's Investment

33.     Mr. Ebersol's representations between February 13 and February 14, 2019 that the AAF would have been had sufficient cash to get the AAF through the 2019 season after DCP made a $70 million investment were not consistent with ESMG's existing debts as of that date. Mr. Ebersol's representations inherently rely on assumptions that the AAF had no significant liabilities other than player payroll.[53] If that had been true (and if Mr. Ebersol's assumptions about projected revenues had also been correct), AAF would not have been expected to run out of cash by the end of April 2019.

**Table 2. AAF Expected Cash Flows Based on Mr. Ebersol's Representations[54]**

|                                       | Feb-2019      | Mar-2019      | Apr-2019      |
| ------------------------------------- | ------------- | ------------- | ------------- |
| Cash balance at beginning of month    | $ 70,000,000  | $ 44,836,400  | $ 22,752,267  |
| Plus Ebersol projected revenues       | 9,630,315     | 14,184,420    | 13,109,920    |
| Less Ebersol projected expense        | (34,793,915)  | (36,268,553)  | (34,688,950)  |
| **Cash balance at end of month**      | **$ 44,836,400** | **$ 22,752,267** | **$ 1,173,238** |

34.     If DCP had been made aware of AAF's debts and obligations before signing the Term Sheet, it would have realized that $70 million was not sufficient to cover AAF's necessary expenses for the rest of the anticipated season. Temporarily putting aside any questions about Mr. Ebersol's revenue and cost projections and incorporating those revenue and cost assumptions without any changes, DCP would have expected that AAF would run out of cash as of approximately the first week of April 2019 if it had been aware of AAF's allegedly undisclosed debts even after receiving a $70 million cash infusion.

---

[53]   *See* ESMG Financial Projections Model vF.xls, tab "Monthly Summary."
[54]   *See* **Exhibit 6.** I understand there were significant questions within ESMG prior to February 14, 2019 about the reasonableness of the revenue projections that Mr. Ebersol provided to Mr. Dundon. Mr. Ebersol's projected revenues and expenses for February adjusted for a 75 percent fraction of the month, but using an alternative 50 percent fractional month does not change the nature of my conclusions that if Mr. Ebersol's representations about debts, cost and revenues had been correct, AAF would not have been expected to run out of cash by the end of April 2019. *See* **Exhibit 6.A**.

**Table 3. AAF Expected Cash Flows Considering Undisclosed Debts**[55]

|                                      | Feb-2019 | | Mar-2019 | | Apr-2019 | |
|--------------------------------------|---|---:|---|---:|---|---:|
| Cash balance at beginning of month   | $ | 70,000,000 | $ | 26,963,616 | $ | 4,879,483 |
| Less undisclosed liabilities         |   | (17,872,784) |   |  |   |  |
| Plus Ebersol projected revenues      |   | 9,630,315 |   | 14,184,420 |   | 13,109,920 |
| Less Ebersol projected expense       |   | (34,793,915) |   | (36,268,553) |   | (34,688,950) |
| **Cash balance at end of month**     | $ | **26,963,616** | $ | **4,879,483** | $ | **(16,699,547)** |

35.     My opinions are preliminary and based on information I have had the opportunity to analyze. In particular, I may supplement my analysis if I am provided access to Quickbooks transaction-level data for AAF and/or affiliated companies that would allow me to analyze transactions in more detail.  I also understand that I may be asked to provide additional opinions and analysis.

_(signature)_

Erica Bramer, CFA, CVA, CIRA
BVA Group
Managing Partner

---

[55]    *See* **Exhibit 7**.  Mr. Ebersol's projected revenues and expenses for February are adjusted for a 75 percent fraction of the month, but using an alternative 50 percent fractional month does not change the nature of my conclusions that DCP would have expected that AAF would run out of cash in April 2019 if it had been aware of AAF's allegedly undisclosed debts.  *See* **Exhibit 7.A**.  I also calculate that DCP would have expected that AAF would run out of cash as of the beginning of April 2019 if it had been aware of AAF's allegedly undisclosed debts and obligations incurred but not recorded as Accounts Payable at **Exhibit 8** and **Exhibit 8.A**.

# APPENDICES

22-50507-cag Doc#2024-1 Filed 06/24/25 Entered 06/24/25 19:04:42 Exhibit 1 - First Report of Ferris Pages 383 Pg 1 of 87

22-50507-cag Doc#2012-14 Filed 06/24/25 Entered 06/24/25 19:04:42 E507 Designated Proof of Exhibits Page 383 of 466

**APPENDIX A – CURRICULUM VITAE**

# APPENDIX A

Erica Bramer is deeply experienced in finance and valuation, having supported a wide variety of clients in disputes/litigation, restructuring, and management consulting assignments.  Ms. Bramer has testified dozens of times as an expert witness on matters of finance, valuation, damages, and solvency in venues across the country and internationally.

Ms. Bramer has provided expert opinions and other litigation consulting in the context of claims such as breach of contract, breach of fiduciary duty, misappropriation of trade secrets, patent and copyright infringement, trademark and/or trade dress infringement, tortious interference, fraud, wrongful death/termination, antitrust, preferences and fraudulent conveyance, and securities law violations.  Ms. Bramer has a particular interest in international disputes and has been engaged on several high-profile international matters.

Ms. Bramer has also provided valuation expertise for purposes of buy/sell agreements, solvency opinions, lending decisions, and tax support.  Ms. Bramer has participated in various cash-tracing and financial forensic investigations, including money-laundering investigations in Colombia.

Ms. Bramer has been actively involved in the restructuring of various entities, both within the Chapter 11 process as well as out-of-court workouts and has worked as a management consultant to advise companies on many aspects of strategy and operations.

Ms. Bramer also has years of experience working in Latin America, Europe, and Asia as a financial restructuring advisor and/or management consultant, advising on issues such as profit improvement, working capital optimization, and strategic negotiations with suppliers and lenders.  For example, Ms. Bramer worked on the restructuring of a large Thai conglomerate at the onset of the Asian financial crisis of the 1990s.  She participated on one of the seminal cases which contributed to the establishment of Thai restructuring and insolvency law, as the Thai economy was frozen in a collective state of insolvency without laws allowing for options other than liquidation.  She also participated in a money-laundering investigation in Colombia, led a team of consultants on a pro-bono project in Guatemala, and testified on a number of high-profile international arbitration matters.  Ms. Bramer also has such experience in Mexico, El Salvador, Guatemala, Colombia, Peru, Chile, Argentina, Brazil, and Spain; she is a fluent Spanish speaker and has basic proficiency in Brazilian Portuguese.

Ms. Bramer earned dual graduate degrees from the Wharton School (Master of Business Administration) and the University of Pennsylvania (Master of Arts in International Studies and Spanish).  Ms. Bramer graduated with high honors, Phi Beta Kappa, and Beta Gamma Sigma from the University of Texas with dual degrees in Liberal Arts (Plan II Honors) and Business (Honors Business Program and Finance).

Ms. Bramer is active in a variety of local and international charitable endeavors.  In 2013, Ms. Bramer was recognized by the Dallas Business Journal as one of the region's "40 under 40" business and community leaders.  She is a member of the National Association of Certified Valuation Analysts, the CFA Institute, the Association of Insolvency and Restructuring Advisors, the International Women's Insolvency and Restructuring Confederation, the American Bankruptcy Institute, and the Turnaround Management Association.

**TESTIMONY HISTORY**

**DEPOSITION (last four years):**

*Newmark Real Estate of Dallas, LLC v. David Fasano, Jeffrey Ross Sanders, and Berkadia Real Estate Advisors, LLC*
Cause No. DC-23-06101
192nd Judicial District Court, Dallas County, Texas

*Right Value Drug Stores, LLC d/b/a Carie Boyd's Prescription Shop n/k/a Carie Boyd Pharmaceuticals v. BioTE Medical, LLC*
Cause No. DC-24-01642
162nd Judicial District Court, Dallas County, Texas

*Caliber Home Loans, Inc. v. Lee Cove and Cardinal Financial Company, LP*
Civil Action No. 3:22-cv-02298-M
United States District Court for the Northern District of Texas, Dallas Division

*EBG, LLC v. Meyer Capital, Ltd. and Jerry Meyer, individually v. EBG Growth Corporation, et al.*
Case No. 01-23-0000-5605
American Arbitration Association

*Capital Storage Holdings, LLC v. SpareBox Self Storage, LLC, et al.*
Cause No. 2022-71323
151st Judicial District Court, Harris County, Texas

*Mayor & City Counsel of Baltimore v. Purdue Pharma L.P., et al.*
Case No. 24C18000515
Circuit Court of Maryland for Baltimore City

*Meridian Bank v. Sandy Spring Bank, et al.*
Case No. 22-cv-03951
United States District Court for the Eastern District of Pennsylvania

*Extreme Technologies, LLC, et al. v. Stabil Drill Specialties, LLC*
Civil Action H-19-1977
United States District Court for the Southern District of Texas, Houston Division

*BioTE Medical, LLC v. Dr. Gary S. Donovitz and Lani Hammonds Donovitz, individually and dba Lani D. Consulting; Dr. Gary S. Donovitz and Lani Hammonds Donovitz, individually and dba Lani D. Consulting v. BioTE Medical, LLC, Teresa S. Weber, and Mary Elizabeth Conlon*
Cause No. DC-22-08737
134th Judicial District Court, Dallas County, Texas

*Everett Financial, Inc. d/b/a Supreme Lending v. Steven Cantrell, et al.*
Cause No. DC-21-15697
44th Judicial District Court, Dallas County, Texas

*Nabors Drilling Technologies USA, Inc. v. Helmerich & Payne Int'l Drilling Co., Helmerich & Payne Technologies, LLC, and Motive Drilling Technologies, Inc.*
Civil Action No. 3:20-cv-03126-M
United States District Court for the Northern District of Texas, Dallas Division

*J. Kelly Gray v. Dominion Harbor Enterprises, LLC*
Case No. DC-21-08821
134th Judicial District Court, Dallas County, Texas

*Estate of James Monroe Freeman, Deceased*
*Joshua James Freeman and Jacob Monroe Freeman v. Jerald Wayne Freeman, Jr. and Freeman Financial Company*
No. PR-19-00041-3
Probate Court No. 3 of Dallas County, Texas

*In re: The LaSalle Group, Inc., Debtor*
*Diane G. Reed, Chapter 7 Trustee v. TIB – The Independent BankersBank*
Case No. 19-31484-SGJ-7
United States Bankruptcy Court, Northern District of Texas, Dallas Division

*State of Georgia v. Purdue Pharma L.P., et al.*
Case No. 19-A-00060-2
Superior Court, Business Case Division of Gwinnett County, Georgia

*State of Nevada v. McKesson Corporation, et al.*
Case No. A-19-796755-B
District Court, Clark County, Nevada

*Traxcell Technologies, LLC v. Cello Partnership d/b/a Verizon Wireless and Ericsson Inc.*
Case No. 6:20-cv-01175-ADA
United States District Court, Western District of Texas, Waco Division

*Hi Technology Corp. f/k/a InComm Holdings, Inc. v. Quality Investment Properties Suwanee, LLC*
Civil Action File No. 20-A03466-2
Superior Court of Gwinnett County, State of Georgia

*State of New Mexico, ex rel., Hector Balderas, Attorney General v. Purdue Pharma, L.P., et al.*
Case No. D-101-CV-2017-02541
First Judicial District Court, County of Santa Fe, State of New Mexico

*Stiles E2 Ohio Holding GP and E2 Ohio B Holdings GP v. EnLink Midstream Operating LP and E2 Ohio Compression, LLC*
Case No. DC-20-07004
191st Judicial District Court, Dallas County, Texas

*In Re: Black Elk Energy Offshore Operations, LLC, Debtor*
*Richard Schmidt, Litigation Trustee v. Barbara Nordlicht, as Representative of the Estate of Jules Nordlicht, et al.*
Case No. 15-34287 (MI)
United States Bankruptcy Court Southern District of Texas, Houston Division

*State of West Virginia ex rel. Patrick Morrisey, Attorney General, v. Teva Pharmaceutical Industries, Ltd., et al.*
Civil Action No. 19-C-104
The Circuit Court of Kanawha County, West Virginia

*Maxus Liquidating Trust v. YPF S.A., et al.*
Adversary Proceeding No. 18-50489 (CSS)
United States Bankruptcy Court for the District of Delaware

*The City and County of San Francisco, California and The People of The State of California, Acting by and Through San Francisco City Attorney, Dennis J. Herrera v. Purdue Pharma L.P., et al.*
Case No. 3:18-cv-07591-CRB
United States District Court, Northern District of California

*State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma L.P., et al.*
Case No. 2018-CA-001438
The Circuit Court of the 6th Judicial Circuit, Pasco County, West Pasco Division, New Port Richey, Florida

*Triton Value Partners, LLC, Donald Gasgarth, Paul Freischlag Jr., and Jeff Zwitter v. Steve Urvan, TVP Investments, LLC, Gunbroker.com, LLC, IA Tech, LLC.*
Civil File Action No. 18104869
The Superior Court of Cobb County, State of Georgia

*EMR (USA Holdings) Inc., et al. v. Richard Goldberg, et al.*
Cause No. DC-17-14064
160th Judicial District Court, Dallas County, Texas

*EMR (USA Holdings) Inc., et al. v. Ken Goldberg and Neil Goldberg*
Case No. 1:18-cv-07849-ER
United States District Court Southern District of New York

*Eddystone Rail Company, LLC v. Julio Rios, Jeremy Gamboa, Bridger Logistics, LLC, Ferrellgas, L.P., et al.*
Civil Action No. 17-CV-00495
United States District Court for the Eastern District of Pennsylvania

*Ronald Lickteig v. Cerberus Capital Management, L.P., Covis Pharmaceuticals, Inc. Covis Management Investors LLC, and Covis Holdings, L.P.*
Case No. 1:19-cv-05263-GWH
United States District Court Southern District of New York

*Heritage Plastics, Inc. v. Gaston Construction, Inc., Glenn E. Stockdale, Christopher E. Varnado, and Plastical LLC*
Case No. 1:20-cv-374-CLM
United States District Court for the Northern District of Alabama

*Dallas Police & Fire Pension System v. Townsend Holdings, LLC. d/b/a The Townsend Group, Richard Brown, Martin Rosenberg, and Gary B. Lawson*
Cause No. DC-17-11306
298th Judicial District Court, Dallas County, Texas

**TRIAL AND HEARING (last four years)**

*Melissa D. Abel f/k/a Melissa Hicks v. Texas Capital Bankcshares, Inc. and Texas Capital Bank, N.A.*
JWA No. 3370-A 2022
Judicial Workplace Arbitrations

*United States of America v. David Gentile and Jeffry Schneider*
Case No. 1:21-cr-00054
United States District Court, Eastern District of New York

*J. Kelly Gray v. Dominion Harbor Enterprises, LLC*
Case No. DC-21-08821
134th Judicial District Court, Dallas County, Texas

*Nabors Drilling Technologies USA, Inc. v. Helmerich & Payne Int'l Drilling Co., Helmerich & Payne Technologies, LLC, and Motive Drilling Technologies, Inc.*
Civil Action No. 3:20-cv-03126-M
United States District Court for the Northern District of Texas, Dallas Division

*Eddystone Rail Company, LLC v. Julio Rios, Jeremy Gamboa, Bridger Logistics, LLC, Ferrellgas, L.P., et al.*
Civil Action No. 17-CV-00495
United States District Court for the Eastern District of Pennsylvania

*Enterprise Financial Group, Inc. v. Santander Consumer USA, Inc.*
Cause No. DC-18-08119
193rd Judicial District Court, Dallas County, Texas

*Dallas Police & Fire Pension System v. Townsend Holdings, LLC. d/b/a The Townsend Group, Richard Brown, Martin Rosenberg, and Gary B. Lawson*
Cause No. DC-17-11306
298th Judicial District Court, Dallas County, Texas

*Heritage Plastics, Inc. v. Gaston Construction, Inc., Glenn Stockdale, Christopher Varnado, and PlastiCal LLC*
Civil Action No. 1:20-cv-00374-CLM
United States District Court for the Northern District of Alabama, Eastern Division

*In Re: Morrow Park Holding LLC*
Consolidated Civil Action No. 2017-0036-PAF
The Court of Chancery of the State of Delaware

**PRESENTATIONS AND PUBLICATIONS (last ten years)**

Contributing author, along with James Hitchner and others, *Financial Valuation: Applications and Models, 5th Edition*, December 2024.

Contributor, "Bridging the Gap: Practical Resources and Suggestions for Promoting and Retaining Female Attorneys in the Legal Profession," *Dallas Women Lawyers Association*, October 2017 - http://dallaswomenlawyers.org/bridging-the-gap/

*Managing the Courtroom*, panel presentation with Craig Simon and Matthew Cavenaugh, AIRA 33rd Annual Bankruptcy & Restructuring Conference, Irving, TX, June 2017.

*Numbers for First Day Hearings and Confirmation*, panel presentation with Judge Marvin Isgur, Judge Tony Davis, and Rakhee Patel, State Bar of Texas Bankruptcy Law Section's Forensic Finance: Better Bankruptcies Through Better Numbers CLE, Austin, TX, September 2016.

*International Arbitration: A Topical Update*, presentation to the Dallas Bar Association International Law and Alternative Dispute Resolution Sections, Dallas, TX, September 2016.

# APPENDIX B-1 – INFORMATION CONSIDERED

## In re: Legendary Field Exhibitions, LLC, et al.
**Appendix B-1 - Information Considered [*]**

Bates range*:

| Bates Begin** | Bates End** |
|---|---|
| 0010019 | 0010019 |
| 0017023 | 0017023 |
| 0017333 | 0017333 |
| TR0002022928 | TR0002023855 |
| TR0002026521 | TR0002042434 |

*Bates range may include documents labeled as deposition exhibits.

**Court Documents - In re: Legendary Field Exhibitions, LLC, et al., Debtors, United States Bankruptcy Court Western District of Texas, San Antonio Division, Case No. 19-50900-CAG**

(1) Official Form 201 - Voluntary Petition for Non-Individuals Filing for Bankruptcy with Schedules, dated April 17, 2019
(2) Official Form 207 - Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, dated April 17, 2019
(3) Official Form 410 - Proof of Claim of Dundon Capital Partners, LLC, dated June 24, 2019
(4) Official Form 410 - Proof of Claim of Thomas G. Dundon, dated June 24, 2019

**Court Documents - Dundon Capital Partners LLC v. Charles Ebersol, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05077-CAG**

(1) Plaintiff's Original Complaint, dated November 14, 2022
(2) Defendant Charles Ebersol's Initial Disclosures Pursuant to FRCP 26(a)(1), dated February 5, 2024
(3) Defendant Charles Ebersol's Responses to Plaintiff Dundon Capital Partners' First Request for Production, dated March 25, 2024
(4) Defendant Charles Ebersol's Responses to Plaintiff Dundon Capital Partners' First Set of Interrogatories, dated March 25, 2024

**Court Documents - Randolph N. Osherow, Chapter 7 Trustee and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LFE 2, LLC; and We Are Realtime, LLC v. Thomas Dundon, John Zutter, and Dundon Capital Partners, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05078-CAG-7**

(1) Original Complaint, dated November 14, 2022
(2) First Amended Complaint, dated November 27, 2023
(3) Chapter 7 Trustee's Initial Disclosures Pursuant to FRCP 26(a)(1), dated February 5, 2024
(4) Plaintiff Randolph N. Osherow, Trustee's Answers and Objections to Defendants Thomas Dundon, John Zutter and Dundon Capital Partners, LLC's First Set of Interrogatories, dated March 21, 2024
(5) Plaintiff Randolph N. Osherow, Trustee's Answers and Objections to Defendants Thomas Dundon, John Zutter and Dundon Capital Partners, LLC's First Request for Production, dated March 21, 2024
(6) Defendant Thomas Dundon's Amended Objections and Answers to Randolph N. Osherow, Trustee's Interrogatories (Set One), dated April 29, 2024

**Other:**

(1) ATT00001.htm
(2) ATT00002.htm
(3) ATT00003.htm
(4) ebersol-sports-media-group-inc_2019+02+11_summary_cap_intermediate_cap.xlsx
(5) ESMG Financial Projections Model vF.xlsx
(6) ESMG Updated Investor Deck_2019.02.pdf
(7) AP Tracker_030619.xlsx
(8) Cash Flow_Week of 2.18.19 (1).xlsx
(9) Cash Flow_Week of 2.18.19 (2).xlsx
(10) Cash Flow_Week of 2.18.19.xlsx
(11) Cash Flow_Week of 2.25.19v3.xlsx
(12) ESMG Financials_1.31.2019_DRAFT (1).xlsx
(13) ESMG Financials_1.31.2019_DRAFT.xlsx
(14) Team Sponsorship Deals 2.8.19.xlsx
(15) Vendor Settlement Tracker_2019.02.26 (1).pdf



**In re: Legendary Field Exhibitions, LLC, et al.**
**Appendix B-1 - Information Considered [*]**

(16) Vendor Settlement Tracker_2019.02.26.pdf
(17) Legendary+Field+Exhibitions+LLC_Trial+Balance.xlsx
(18) Legendary+Field+Exhibitions+LLC_Vendor+Contact+List (1).xlsx
(19) Rog-2 01384a Legendary+Field+Exhibitions+LLC_AP+Aging+Detail.xlsx
(20) Rog-2 01385 Legendary+Field+Exhibitions+LLC_AR+Aging+Detail_as of 11.23.2021.xlsx
(21) Rog-2 01386 Legendary+Field+Exhibitions+LLC_Balance+Sheet.xlsx
(22) Rog-2 01387 Legendary+Field+Exhibitions+LLC_Bill+Payment+List (1).xlsx
(23) Rog-2 01388 Legendary+Field+Exhibitions+LLC_Bills+and+Applied+Payments (2).xlsx
(24) Rog-2 01389 Legendary+Field+Exhibitions+LLC_Check+Detail (4).xlsx
(25) Rog-2 01390 Legendary+Field+Exhibitions+LLC_Invoices+and+Received+Payments_as of 11.23.2021.xlsx
(26) Rog-2 01391 Legendary+Field+Exhibitions+LLC_Invoice+List+by+Date_as of 11.23.2021.xlsx
(27) Rog-2 01392 Legendary+Field+Exhibitions+LLC_Journal.xlsx
(28) Rog-2 01393 Legendary+Field+Exhibitions+LLC_Open+Invoices_as of 11.23.2021.xlsx
(29) Rog-2 01394 Legendary+Field+Exhibitions+LLC_Open+Purchase+Order+List+by++Vendor.xlsx
(30) Rog-2 01395 Legendary+Field+Exhibitions+LLC_Open+Purchase+Orders+Detail.xlsx
(31) Rog-2 01396 Legendary+Field+Exhibitions+LLC_Transaction+Detail+by++Account.xlsx
(32) Rog-2 01397 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Customer.xlsx
(33) Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Vendor.xlsx
(34) Rog-2 01399 Legendary+Field+Exhibitions+LLC_Transaction+List+by+Date.xlsx
(35) Rog-2 01400 Legendary+Field+Exhibitions+LLC_Transaction+List+with+Splits.xlsx
(36) Rog-2 01402 Legendary+Field+Exhibitions+LLC_Unpaid+Bills.xlsx
(37) Rog-2 01403 Legendary+Field+Exhibitions+LLC_Vendor+Balance+Detail.xlsx
(38) Ex. 208 - 3.27.19 Valuation Model,XLSX

**Documents Independently Obtained:**
(1) "About," Dundon Capital Partners, https://www.dundoncapitalpartners.com/about/
(2) "Team," Dundon Capital Partners, https://www.dundoncapitalpartners.com/team
(3) "AAF Football: 2019 Season Schedule for Alliance of American Football," Athlon Sports, 5/28/19, https://athlonsports.com/aaf/aaf-season-schedule-alliance-american-football-2019

*In addition to documents referenced in this appendix, I was granted access to the DISCO database system.



**APPENDIX B-2 – PRODUCTION DOCUMENTS**

**In re: Legendary Field Exhibitions, LLC, et al.**
**Appendix B-2 - Production Documents (Database)**

Bates range*:

| Bates Begin** | Bates End** |
|---|---|
| DCP Parties0001 | DCP Parties26049 |
| TR0000000001 | TR0002009729 |

*Bates range may include documents labeled as deposition exhibits.
**Certain documents may contain overlapping Bates numbers or be labelled with multiple Bates numbers with different Bates prefixes.  The above reflects documents to which I had access and could search.



**EXHIBITS**

**In re: Legendary Field Exhibitions, LLC, et al.**
**Exhibit Index**

| Exhibit Number | Exhibit Title |
|---|---|
| 1 | Summary of Undisclosed Liabilities |
| 2 | Undisclosed Unpaid Liabilities by Vendor |
| 3 | Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019 |
| 4 | Undisclosed Paid Liabilities by Invoice |
| 5 | Summary Of ESMG Obligations Incurred But Not Recorded As Accounts Payable Before February 14, 2019 |
| 5.A | Unbilled Stadium Rental Costs For First Week's Home Games |
| 5.B | Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019 |
| 6 | Expected Cash Flows Between February and April 2019 Based on Mr. Ebersol's Representations |
| 6.A | Alternate Expected Cash Flows Between February and April 2019 Based on Mr. Ebersol's Representations |
| 7 | Expected Cash Flows Between February and April 2019 Including Undisclosed Liabilities |
| 7.A | Alternate Expected Cash Flows Between February and April 2019 Including Undisclosed Liabilities |
| 8 | Expected Cash Flows Between February and April 2019 Including Undisclosed and Unrecorded Liabilities |
| 8.A | Alternate Expected Cash Flows Between February and April 2019 Including Undisclosed and Unrecorded Liabilities |

**bva**group®

**Exhibit 1**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Summary of Undisclosed Liabilities**

*(in USD unless otherwise noted)*

| | Allegedly Undisclosed Liabilities | Source |
|---|---|---|
| Unpaid Allegedly Undisclosed Liabilities | $ 12,176,114 | Exhibit 2 |
| Paid Allegedly Undisclosed Liabilities | 5,696,670 | Exhibit 4 |
| **Total Allegedly Undisclosed Liabilities** | **$ 17,872,784** | |

bvagroup®

**Exhibit 2**

**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 1 | | 1175 PEACHTREE EPAY dba WeWorks | $ 0 | $ (9,193) | $ (9,193) |
| 2 | 1 | 1954 Productions, LLC | 178,851 | 0 | 178,851 |
| 3 | | 6x7 Networks, LLC | 0 | 3,700 | 3,700 |
| 4 | 2 | A Bounce Above | 1,161 | 2,322 | 3,482 |
| 5 | 3 | Aaron Larrimore dba All American Flags and Banners, LLC | 1,094 | 0 | 1,094 |
| 6 | | Aaron Peck | (303) | 0 | (303) |
| 7 | | AC Technology Consultants | 0 | 242 | 242 |
| 8 | 4 | Accolade  USA Inc. | 67,930 | 1,175 | 69,106 |
| 9 | 5 | Accu-Print San Antonio | 9,988 | 237 | 10,224 |
| 10 | 6 | Ace Parking Management Inc. | 521 | 0 | 521 |
| 11 | | ACE RECYCLING AND DISPOSAL, INC | 0 | (345) | (345) |
| 12 | 7 | ACM HUB, LLC dba Titan Sign Company | 23,705 | 2,165 | 25,870 |
| 13 | 8 | ACO Medical Supply, Inc. | 48,637 | 2,966 | 51,603 |
| 14 | | Adam Striker | 0 | 124 | 124 |
| 15 | | adam.boliek@aaf.com | 0 | 220 | 220 |
| 16 | 9 | Adidas | 66,041 | 2,497 | 68,538 |
| 17 | | Adrian Aye-Darko | 0 | 4 | 4 |
| 18 | 10 | ADVANCED FRAMING CONCEPTS | 608 | 0 | 608 |
| 19 | | Aerial Video Systems dba Randy Hermes Productions Inc. | 0 | 955 | 955 |
| 20 | | AFLANNY INC. | 0 | 40,075 | 40,075 |
| 21 | 11 | Agron, Inc. | 11,473 | 4,311 | 15,784 |
| 22 | 12 | Air Cannons | 3,750 | 0 | 3,750 |
| 23 | | AirSign, Inc. | (3,212) | 0 | (3,212) |
| 24 | | Akshith Mogulla | 0 | 4,485 | 4,485 |
| 25 | | Al Lunsford | 0 | 137 | 137 |
| 26 | 13 | Alabama Graphics | 6,913 | 3,027 | 9,940 |
| 27 | 14 | Alabama Media Group | 4,500 | 0 | 4,500 |
| 28 | | Alan Kantowitz | 0 | 65 | 65 |
| 29 | | ALERT SERVICES, INC. | 0 | 662 | 662 |
| 30 | | Alex Cheng | 0 | 10,048 | 10,048 |
| 31 | | Alicia Jessop | 0 | 940 | 940 |
| 32 | 15 | All Star Lettering | 526 | 0 | 526 |
| 33 | | Alliance Productions | 0 | 128,026 | 128,026 |
| 34 | | Aoft Tempe | 0 | 25,263 | 25,263 |
| 35 | 16 | Alpha Media | 14,394 | 6,018 | 20,412 |
| 36 | 17 | ALT Systems Inc. | 147,988 | 11,305 | 159,293 |
| 37 | | Amar Shah | 0 | 369 | 369 |

bvagroup®

**Exhibit 2**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 38 | 18 | AMAZON WEB SERVICES- AWS | 41,132 | 156,464 | 197,596 |
| 39 | 19 | AMER Sports | 48,930 | 35,841 | 84,771 |
| 40 | 20 | American Laundry Distributors | 4,388 | 14,789 | 19,177 |
| 41 | | Amy Goodson | 0 | 3,478 | 3,478 |
| 42 | | Amy Wise | 0 | 574 | 574 |
| 43 | | Andrew David Siciliano dba ADS Sports, Inc | 0 | 22,965 | 22,965 |
| 44 | | Andrew George Francis | 0 | 1,850 | 1,850 |
| 45 | | Angela Denogean | 0 | 378 | 378 |
| 46 | | anna@aaf.com | 0 | 1,201 | 1,201 |
| 47 | 21 | Anthem Inc | 183,296 | 168,349 | 351,646 |
| 48 | | Anthony Inzillo | 0 | 237 | 237 |
| 49 | | Anthony Sarao | (205) | 0 | (205) |
| 50 | 22 | APPLE | 19,802 | 2,379 | 22,181 |
| 51 | | Architectural Surfaces & Design Inc. | 0 | 15,739 | 15,739 |
| 52 | | Archuleta Entertainment LLC | 0 | 23,478 | 23,478 |
| 53 | | Arizona Cardinals Football Club | 0 | 500 | 500 |
| 54 | | ARIZONA CHRISTIAN UNIVERSITY | 0 | 55,109 | 55,109 |
| 55 | | Arizona State University | 0 | 987,794 | 987,794 |
| 56 | | Arkansas Graphics Inc. | 0 | 1,728 | 1,728 |
| 57 | | Art F/X | 0 | 1,425 | 1,425 |
| 58 | 23 | Artemax Inc dba WRISTBAND RESOURCES dba | 1,994 | 0 | 1,994 |
| 59 | 24 | AT&T | 107 | 15,581 | 15,688 |
| 60 | | Athletes for Hope | 0 | (120) | (120) |
| 61 | 25 | ATLANTA CONCOURSE RENAISSANCE | 55,370 | 0 | 55,370 |
| 62 | 26 | Audio Visual Management Solutions Inc. | 534 | 0 | 534 |
| 63 | | Avadim Health, Inc | 0 | 875 | 875 |
| 64 | | AY Productions LLC | 0 | 30,272 | 30,272 |
| 65 | | B&B Ice of Tampa Bay, Inc | 0 | 1,575 | 1,575 |
| 66 | | Barbara Farkas | 0 | 250 | 250 |
| 67 | 27 | BaseCamp Franchising, LLC | 74 | 19,373 | 19,447 |
| 68 | 28 | Becker Boards Small, LLC | 754 | 0 | 754 |
| 69 | | Belinda Upton Carlisle | 0 | 833 | 833 |
| 70 | 29 | Belz Construction Service LLC | 81,530 | 0 | 81,530 |
| 71 | | Ben Dolan | 0 | 1,872 | 1,872 |
| 72 | | Ben Holden - WME Entertainment, LLC | 0 | 7,700 | 7,700 |
| 73 | | Ben Leishman | 0 | 376 | 376 |
| 74 | | ben.holland@aaf.com | 0 | 1,189 | 1,189 |

bvagroup®

**Exhibit 2**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 75 | | BexelESS | 2,636 | 939,178 | 941,814 |
| 76 | 31 | Big Fogg, Inc. | 14,800 | 124,771 | 139,571 |
| 77 | | Big Rock Plumbing Corp | 0 | 14,577 | 14,577 |
| 78 | | Big Ticket Inc. (Rich Waltz) | 0 | 7,500 | 7,500 |
| 79 | | Billy Devaney | 0 | 498 | 498 |
| 80 | 32 | Birmingham Business Journal | 3,500 | 0 | 3,500 |
| 81 | | Blake Beddingfield | 0 | 135 | 135 |
| 82 | 33 | bluemedia | 82,499 | 330,888 | 413,387 |
| 83 | | BluSite Solutions of Southwest Florida | 0 | 590 | 590 |
| 84 | | Bobby Bohn | 0 | 164 | 164 |
| 85 | | Bobby.Bridges@aaf.com | 0 | 404 | 404 |
| 86 | | BPM Concerts, LLC dba Ballpark Music | 0 | 4,356 | 4,356 |
| 87 | | Brad Sternberg | 0 | 600 | 600 |
| 88 | | Bradley Bryant | 0 | 2,765 | 2,765 |
| 89 | 34 | Brandiose Studios, Inc | 5,000 | 0 | 5,000 |
| 90 | | Brendan McQuillan | 0 | 4,954 | 4,954 |
| 91 | | Brent Bauer | 0 | 2,500 | 2,500 |
| 92 | | Brett Calkins | 0 | 240 | 240 |
| 93 | | Brian Barrington | 0 | 1,678 | 1,678 |
| 94 | 35 | Brian Molina | 676 | 0 | 676 |
| 95 | | Brian Zettler | 0 | 862 | 862 |
| 96 | 36 | Broadway Media, LLC dba KXRK, KEGA, KYMV, KUUU, KUDD, K | 3,420 | 10,800 | 14,220 |
| 97 | | Bruno Event Team LLC | 0 | 31,541 | 31,541 |
| 98 | | Bryan Woodfork | 0 | 15 | 15 |
| 99 | | Bryant H. Koedding | 0 | 51 | 51 |
| 100 | 37 | BSN Sports | 15,983 | 5,975 | 21,959 |
| 101 | 38 | BUCK'S BAGS Inc. | 1,120 | 0 | 1,120 |
| 102 | | Bud Godown | 0 | 43 | 43 |
| 103 | | Business Electronics Corp. | 0 | 2,135 | 2,135 |
| 104 | 39 | BZ Clarity Holdings, LLC dba Base 1836, LLC | 1,000 | 0 | 1,000 |
| 105 | | CalVenture Party Rentals | 0 | 1,875 | 1,875 |
| 106 | | Camden County PSA Leisure Services | 0 | 5,400 | 5,400 |
| 107 | | Cameron Kovach | 0 | 522 | 522 |
| 108 | 40 | Cameron Nizialek | 205 | 0 | 205 |
| 109 | | Campbell Clinic Orthopedics | 0 | 50,000 | 50,000 |
| 110 | | Candlewood Suites Birmingham | 0 | 21,318 | 21,318 |
| 111 | | Carey International Inc. | 0 | 28,527 | 28,527 |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 112 | | Carlton Hawkins | 0 | 7,813 | 7,813 |
| 113 | | Carly Mitchell | 0 | 120 | 120 |
| 114 | | CartMart | 0 | 7,899 | 7,899 |
| 115 | | Casey Carter | 0 | 1,339 | 1,339 |
| 116 | | Catering by Rosemary, Ink dba The RK Group | 0 | 203,001 | 203,001 |
| 117 | | Cayla Jung | 0 | 304 | 304 |
| 118 | | CBS Television Network | 0 | 1,700,333 | 1,700,333 |
| 119 | | ccbrown@aaf.com | 0 | 63 | 63 |
| 120 | | Central Catholic High School | 0 | 52,500 | 52,500 |
| 121 | | Central Florida Sports Commission dba Greater Orlando Sports C | 0 | 2,500 | 2,500 |
| 122 | 41 | CENTURY CLUB OF SAN DIEGO DBA FARMERS INSURANCE ( | 6,000 | 0 | 6,000 |
| 123 | 42 | CESD dba PG Productions FSO | 2,000 | 0 | 2,000 |
| 124 | 43 | Chad Breedlove Productions, LLC | 2,500 | 0 | 2,500 |
| 125 | | Chad Dennis | 0 | 200 | 200 |
| 126 | | Chad Klunder | 0 | 5,838 | 5,838 |
| 127 | | Chantel Buchi | 0 | 202 | 202 |
| 128 | | Charlene Vasquez | 0 | 450 | 450 |
| 129 | | Charles Arbuckle | 0 | 351 | 351 |
| 130 | | Charles E. Johnson dba Vortex Productions Inc | 0 | 2,152 | 2,152 |
| 131 | 44 | Chief Zebra Productions - Mike Pereira | 4,197 | 56,301 | 60,498 |
| 132 | | Chris Brown | 0 | 19 | 19 |
| 133 | | Chris Crocker | 0 | 750 | 750 |
| 134 | | Chris Crooks | 0 | 128 | 128 |
| 135 | | Chris Givens | (405) | 0 | (405) |
| 136 | | Chris Thompson | 0 | 19 | 19 |
| 137 | | chris.blaszka@aaf.com | 0 | 6 | 6 |
| 138 | | chris@aaf.com | 0 | 1,443 | 1,443 |
| 139 | | christopher.kuehn@aaf.com | 0 | 492 | 492 |
| 140 | | Chuck Bresnahan | 0 | 2,485 | 2,485 |
| 141 | 45 | City of Birmingham Park & Rec Board | 2,648 | 8,600 | 11,248 |
| 142 | 46 | City of San Antonio - Alamodome | 109,789 | 59,830 | 169,619 |
| 143 | 47 | City of San Diego - SDCCU Stadium | 400 | 225,156 | 225,556 |
| 144 | 48 | Classic Traditions, Inc. | 2,855 | 0 | 2,855 |
| 145 | | Clay Hampton | 0 | 5,000 | 5,000 |
| 146 | 49 | Clear Channel Outdoor | 59,311 | 0 | 59,311 |
| 147 | 50 | Clear Gear | 7,340 | 0 | 7,340 |
| 148 | | Cliff Keen | 0 | 786 | 786 |

bva group®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 149 | 51 | CM+PR dba Cardenas Marketing + Public Relations | 600 | 0 | 600 |
| 150 | | CMAXIII Entertainment/ Charles Sloan Jr. | 0 | 545 | 545 |
| 151 | | Cole Entertainment Services | 0 | 2,900 | 2,900 |
| 152 | | Cole's Screen Printing | 0 | 7,200 | 7,200 |
| 153 | | Colin Clark | 0 | 46 | 46 |
| 154 | | Colors Agency - Bruce LLC | 0 | 2,580 | 2,580 |
| 155 | | Comcast Spotlight | 8,250 | 10,274 | 18,524 |
| 156 | 52 | Comcast Spotlight - Los Angeles | 255 | 0 | 255 |
| 157 | 53 | Contemporary Media, Inc | 3,728 | 1,158 | 4,885 |
| 158 | 54 | Contemporary Services Corporation - CSC | 0 | 63,703 | 63,703 |
| 159 | | Control Dynamics Corp. | 0 | 4,000 | 4,000 |
| 160 | | Corey Sery | 0 | 74 | 74 |
| 161 | | CORT BUSINESS SERVICES CORP | 0 | 41,120 | 41,120 |
| 162 | | Cortez Liquid Waste Services | 0 | 9,348 | 9,348 |
| 163 | | Cortez Robinson | 0 | 134 | 134 |
| 164 | | Courtney Kramer | 0 | 202 | 202 |
| 165 | | Courtyard Birmingham Downtown | 0 | 20,043 | 20,043 |
| 166 | | Courtyard By Marriott Atlanta Alpharetta | 0 | 184,854 | 184,854 |
| 167 | 55 | Courtyard By Marriott San Antonio River Center | 71,765 | 0 | 71,765 |
| 168 | | Cox Business | 0 | 1,407 | 1,407 |
| 169 | | COX ENTERPRISES, INC dba ATLANTA JOURNAL-CONSTITUT | 0 | 18,500 | 18,500 |
| 170 | 56 | COX Media - West Arizona | 7,181 | 0 | 7,181 |
| 171 | | Cox Media LLC San diego dba Cox Media - West | 0 | 500 | 500 |
| 172 | 57 | Cox Media TV, Orlando - COX MEDIA GROUP; WRDQ INC; EFT\ | 4,000 | 0 | 4,000 |
| 173 | | Cox Radio, Inc dba KSRV-FM | 0 | 5,500 | 5,500 |
| 174 | | CP Communications | 0 | 100,143 | 100,143 |
| 175 | 58 | CRC Broadcasting Company Inc. dba KFNN-AM;Money Radio 151 | 1,913 | 0 | 1,913 |
| 176 | | Creative Artists Agency (CAA) | 0 | 30,000 | 30,000 |
| 177 | | Creative Business Techniques West dbs CBT-West | 0 | 2,700 | 2,700 |
| 178 | 59 | Creek Entertainment Inc. - Riot Parade | 2,575 | 0 | 2,575 |
| 179 | | Crew Line Inc. | 0 | 3,000 | 3,000 |
| 180 | | Crew One Productions | 0 | 7,303 | 7,303 |
| 181 | | Culinary Crafts Catering LLC | 0 | 9,617 | 9,617 |
| 182 | 60 | Cumulus Media - WGKX-FM | 14,134 | 6,057 | 20,191 |
| 183 | | Cynthia Frelund - WME Entertainment, LLC | 0 | 50,000 | 50,000 |
| 184 | | D C | 0 | 3,062 | 3,062 |
| 185 | | D.J. May | (865) | 0 | (865) |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 186 | | Dalis Boyette | 0 | 169 | 169 |
| 187 | | Dan Braner | 0 | 1,772 | 1,772 |
| 188 | | Daniel Kurish | 0 | 50 | 50 |
| 189 | | Daniel McAdams | 0 | 443 | 443 |
| 190 | | Daniel Moran | 0 | 43 | 43 |
| 191 | 61 | Daniel Williams | 205 | 0 | 205 |
| 192 | | Daniela Posso | 0 | 43 | 43 |
| 193 | | Danny Ezechukwu | (288) | 0 | (288) |
| 194 | | Darktronics Inc | 0 | 6,000 | 6,000 |
| 195 | | Darren Krein | 0 | 91 | 91 |
| 196 | | Darryl Harvey | 0 | 254 | 254 |
| 197 | | Darryl MaGee | 0 | 1,108 | 1,108 |
| 198 | | Daryl Johnston | 0 | 3,955 | 3,955 |
| 199 | 62 | Database Builders Inc./Full House Sports Marketing | 1,582 | 0 | 1,582 |
| 200 | 63 | Datacomm Services Corporation (DSC) | 9,954 | 0 | 9,954 |
| 201 | | Dave Boller | 0 | 374 | 374 |
| 202 | | Dave Fox | 0 | 3,559 | 3,559 |
| 203 | | Dave Levy | 0 | 1,370 | 1,370 |
| 204 | | David Thomas | 0 | 80 | 80 |
| 205 | | David Voth | 0 | 5,000 | 5,000 |
| 206 | | DB Services, LLC | 0 | 569 | 569 |
| 207 | | Dean Blandino | 0 | 45,000 | 45,000 |
| 208 | 64 | Dental Choice holdings LLC | 7,750 | 0 | 7,750 |
| 209 | 65 | DESERET DIGITAL MEDIA Inc. (dba KSL.com, Deseretnews.com | 27,206 | 0 | 27,206 |
| 210 | 66 | Dex Imaging | 257 | 1,488 | 1,746 |
| 211 | | Dickey Broadcasting Company | 0 | 31,600 | 31,600 |
| 212 | 67 | Dicon dba Private Diagnostic Clinic, PLLC | 1,005 | 0 | 1,005 |
| 213 | | Dillon Smith | 0 | 361 | 361 |
| 214 | | Dinn Mann | 0 | 51,813 | 51,813 |
| 215 | | DJO, LLC | 47,239 | 8,453 | 55,692 |
| 216 | 68 | DLA Piper LLP | 6,000 | 0 | 6,000 |
| 217 | 69 | DMS Color - Digital Marketing Services Inc | 208 | 12,057 | 12,265 |
| 218 | 70 | Documann, Inc. dba Documation of San Antonio | 498 | 0 | 498 |
| 219 | 71 | Donald Hawkins | (195) | 0 | (195) |
| 220 | | Donnie Miles | (205) | 0 | (205) |
| 221 | | Doubletree By Hilton Salt Lake City Airport | 0 | 29,913 | 29,913 |
| 222 | 72 | Douglas Miller | 3,950 | 0 | 3,950 |

bva group®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 223 | | Down In Front Productions, LLC | 0 | 17,850 | 17,850 |
| 224 | 73 | Downtown Tempe Authority | 42 | 74 | 116 |
| 225 | 74 | Dr. Jill's Foot Pads, Inc. | 15,350 | 776 | 16,126 |
| 226 | | Drake Leichtfuss | 0 | 799 | 799 |
| 227 | | Drive Marketing dna Drive Fulfillment / DNA Cycling | 0 | 1,535 | 1,535 |
| 228 | | DTN, LLC | 0 | 2,999 | 2,999 |
| 229 | 75 | Dumac, LLC | 935 | 563 | 1,498 |
| 230 | | Dustin Kadri | 0 | 200 | 200 |
| 231 | | DVSport, Inc. | 0 | 39,000 | 39,000 |
| 232 | | dylan.rubino@aaf.com | 0 | 47 | 47 |
| 233 | 76 | eClinicalWorks LLC | 91,000 | 30,434 | 121,434 |
| 234 | 77 | Edward Lepp dba Leppdesign, LLC | 4,500 | 0 | 4,500 |
| 235 | 78 | EEG Enterprises, Inc. | 33,377 | 45,697 | 79,075 |
| 236 | | Eli Jeffries | 0 | 1,866 | 1,866 |
| 237 | | Elijah Walker | 0 | 250 | 250 |
| 238 | | Elijah Wilson | 0 | 38 | 38 |
| 239 | | Elior, Inc. dba Aladdin Food Management Services, LLC | 0 | 37,125 | 37,125 |
| 240 | | Elisabeth Osmeloski | 0 | 1,353 | 1,353 |
| 241 | | Ellen Bankhead | 0 | 44 | 44 |
| 242 | | Ellen Carter Stagg | 0 | 1,250 | 1,250 |
| 243 | 79 | EM Printing, LLC | 7,609 | 4,299 | 11,908 |
| 244 | | Embassy Suites by Hilton Atlanta Buckhead | 0 | 21,816 | 21,816 |
| 245 | | Embassy Suites by Hilton South Jordan Salt Lake City | 0 | 115,010 | 115,010 |
| 246 | 80 | Embassy Suites San Antonio Landmark | 140,270 | 299,568 | 439,839 |
| 247 | | Embassy Suites San Antonio Riverwalk Downtown | 0 | 133,159 | 133,159 |
| 248 | 81 | Encore Event Technologies | 8,668 | 0 | 8,668 |
| 249 | | Enfold I.T. | 0 | 5,925 | 5,925 |
| 250 | | Entercom Atlanta dba WSTR, WZGC, WVEE, WAOK, DIG Atlanta | 0 | 16,410 | 16,410 |
| 251 | 82 | Entercom Tennessee LLC | 8,724 | 2,932 | 11,656 |
| 252 | | ENTERPRISE RENTACAR | 0 | 3,289 | 3,289 |
| 253 | | eric.blanc@aaf.com | 0 | 1,310 | 1,310 |
| 254 | | eriks@aaf.com | 0 | 168 | 168 |
| 255 | | Erin Sierer | 0 | 758 | 758 |
| 256 | 83 | Escondido Golf Cart Center | 1,675 | 0 | 1,675 |
| 257 | 84 | exhibit experts | 46,106 | 1,872 | 47,978 |
| 258 | 85 | ExpandaBrand, Inc | 635 | 0 | 635 |
| 259 | 86 | Express KCS | 5,033 | 0 | 5,033 |

bvagroup®

**Exhibit 2**

**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 260 | | EyeKing | 512 | 0 | 512 |
| 261 | | F&F Productions | 0 | 104,109 | 104,109 |
| 262 | | FAIRFIELD INN & SUITES BY MARRIOTT KINGSLAND | 0 | 14,657 | 14,657 |
| 263 | 88 | FedEx Custom Critical | 24,066 | 0 | 24,066 |
| 264 | | FELDMAN EQUITIES | 0 | 30,473 | 30,473 |
| 265 | | Fenwick & West LLP | 0 | 173 | 173 |
| 266 | 89 | Filmwerks LLC. | 12,152 | 47,625 | 59,777 |
| 267 | | FireEye | 0 | 13,200 | 13,200 |
| 268 | | First Insurance Funding | 0 | 598,854 | 598,854 |
| 269 | | Fitz Ollison | 0 | 139 | 139 |
| 270 | 90 | Five Marketing & Management LLC | 11,747 | 2,804 | 14,551 |
| 271 | | Fletcher Group, LLC | 0 | 14,954 | 14,954 |
| 272 | 91 | Flinn Broadcasting dba KXHT-FM;WHBQ-FM;WIVG-FM;WHBQ-AI | 8,008 | 2,002 | 10,010 |
| 273 | 92 | Florida Citrus Sports Events Inc. | 10,000 | 0 | 10,000 |
| 274 | | Florida Medical Distributors, LLC | 0 | 4,000 | 4,000 |
| 275 | 93 | Flying V Group | 3,500 | 5,375 | 8,875 |
| 276 | 94 | Foot Management, Inc. | 710 | 500 | 1,210 |
| 277 | 95 | Foundation for Orange County Public Schools | 1,884 | 0 | 1,884 |
| 278 | 96 | Fox 5 San Diego | 18,693 | 11,308 | 30,000 |
| 279 | | Frank Kleha | 0 | 319 | 319 |
| 280 | | Fritz Jordan | 0 | 999 | 999 |
| 281 | | Fritz Martin Management, LLC | 0 | 60,000 | 60,000 |
| 282 | 97 | G&G Outfitters Inc. | 215,485 | 119,127 | 334,612 |
| 283 | | Galaxy Productions LLC | 0 | 1,800 | 1,800 |
| 284 | | Georgia Officials Association | 0 | 1,800 | 1,800 |
| 285 | | Georgia State University Athletics | 0 | 200,764 | 200,764 |
| 286 | | Georgia State University dba GSU Panther Dining | 0 | 179,093 | 179,093 |
| 287 | 98 | GHP Media | 22,604 | 0 | 22,604 |
| 288 | | Gibralter Partners LLC dba Smokin' Hot BBQ | 0 | 1,340 | 1,340 |
| 289 | | Gibson Graphics, LLC | 0 | 325 | 325 |
| 290 | 99 | G-III Leather Fashions | 41,766 | 30,500 | 72,266 |
| 291 | | gilbert fong | 0 | 1,924 | 1,924 |
| 292 | | Gleason Electrick | 0 | 35,000 | 35,000 |
| 293 | | Godfrey Torrance | 0 | 197 | 197 |
| 294 | 100 | Graham Media Group DBA KSAT-TV;NSAT-TV;KSAT | 2,000 | 0 | 2,000 |
| 295 | | GRAVITY Sports Marketing | 0 | 16,000 | 16,000 |
| 296 | 101 | Graybar Electric Company | 948 | 0 | 948 |

bvagroup®

22-50507-cag Doc#2012-1 Filed 06/24/25 Entered 06/24/25 19:04:42 Desc First Report of Errata Exhibits Part 5 Pg 406 of 87

22-50507-cag Doc#2012-1 Filed 06/24/25 Entered 06/24/25 19:04:42 Main Document Pg 405 of 1466

Exhibit 2
In re: Legendary Field Exhibitions, LLC, et al.
Undisclosed Unpaid Liabilities by Vendor

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 297 | | Greenhouse Software Inc. | 0 | 6,400 | 6,400 |
| 298 | | Greg Herring | 0 | 170 | 170 |
| 299 | | Greg McMillen | 0 | 225 | 225 |
| 300 | | Grey Seal Puppets | 5,425 | 5,425 | 5,425 |
| 301 | 102 | Guido Construction | 58,675 | 0 | 58,675 |
| 302 | | Hal Mumme | 0 | 30,000 | 30,000 |
| 303 | | Haley Stesiak | 0 | 623 | 623 |
| 304 | 103 | Hands On Atlanta | 50 | 0 | 50 |
| 305 | | haydn.thompson@aaf.com | 0 | 851 | 851 |
| 306 | 104 | Hearst Media Solutions dba San Antonio Express News | 19,900 | 0 | 19,900 |
| 307 | 105 | HENRY SCHEIN, Inc. | 167,282 | (1,162) | 166,120 |
| 308 | | Hewitt's Flooring & Demo, LLC | 0 | 7,806 | 7,806 |
| 309 | | Hicks Conventions Services & Special Events, Inc. | 0 | 5,821 | 5,821 |
| 310 | | High Rise Audio | 0 | 4,035 | 4,035 |
| 311 | | Highmark Electric LLC | 0 | 16,027 | 16,027 |
| 312 | 106 | Hilton Garden Inn Downtown Birmingham | 837 | 0 | 837 |
| 313 | | Hilton Garden Inn Orlando EastUCF Area | 0 | 29,266 | 29,266 |
| 314 | | Hilton Salt Lake City Center | 0 | 80,796 | 80,796 |
| 315 | | Hilton San Diego Mission Valley | 0 | 12,758 | 12,758 |
| 316 | 107 | Hiregy | 15,000 | 0 | 15,000 |
| 317 | | HiWire Communication | 0 | 6,012 | 6,012 |
| 318 | | Hog Wild –Real Memphis Barbeque, LLC | 0 | 116,700 | 116,700 |
| 319 | | Holiday Inn Downtown Memphis | 0 | 47,288 | 47,288 |
| 320 | 108 | Holiday Inn San Antonio Riverwalk | 318,148 | 0 | 318,148 |
| 321 | 109 | Home2 Suites by Hilton Birmingham Downtown | 732 | 0 | 732 |
| 322 | 110 | Hubbard Radio Phoenix dba KSLX-FM, KAZG-AM, KDKB-FM, KUI | 11,118 | 0 | 11,118 |
| 323 | 111 | Hyatt Regency Riverwalk San Antonio | 103,194 | 13,167 | 116,361 |
| 324 | | Iain Nelson | 0 | 5,490 | 5,490 |
| 325 | | ICM Partners - Terrell Davis | 0 | 84,000 | 84,000 |
| 326 | 112 | iHeartMedia Ent. Inc. | 176,283 | 79,326 | 255,609 |
| 327 | | Image Cam, Inc | 0 | 80,793 | 80,793 |
| 328 | 113 | IMG College, LLC | 3,500 | 0 | 3,500 |
| 329 | | Infinite Scale Design Group LLC | 0 | 30,700 | 30,700 |
| 330 | 114 | Integrated Sports Specialties, LLC | 3,375 | 0 | 3,375 |
| 331 | 115 | IPFS Corporation | 10,134 | 0 | 10,134 |
| 332 | 116 | iQ Graphics | 14,245 | 8,150 | 22,394 |
| 333 | | IsoLynx | 0 | 3,191 | 3,191 |

bvagroup®

**Exhibit 2**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 334 | 117 | J&S Audio Visual | 766 | 0 | 766 |
| 335 | | Jack Freeman | 0 | 4,455 | 4,455 |
| 336 | | Jack Swope | 0 | 1,029 | 1,029 |
| 337 | | Jacob Radlich | 0 | 60 | 60 |
| 338 | | Jacob Widerschein | 0 | 85 | 85 |
| 339 | | Jake Gellerman | 0 | 320 | 320 |
| 340 | | Jakobi Smith | (1,315) | 0 | (1,315) |
| 341 | | James Brunt | 0 | 80 | 80 |
| 342 | | James Carter | 0 | 588 | 588 |
| 343 | 118 | James Jones | 5,000 | 0 | 5,000 |
| 344 | | James Strom | 0 | 818 | 818 |
| 345 | | Jamination Productions, Inc. | 0 | 1,500 | 1,500 |
| 346 | | Jared Mostowsky | 0 | 92 | 92 |
| 347 | | Jason Zone Fisher | 0 | 10,471 | 10,471 |
| 348 | | Javier Dyer | (410) | 0 | (410) |
| 349 | | Jay Roberson | 0 | 634 | 634 |
| 350 | | Jaylon Thompson | 0 | 125 | 125 |
| 351 | | JDH Broadcasting LLC - Dan Hellie | 0 | 54,811 | 54,811 |
| 352 | | Jeff Bower | 0 | 413 | 413 |
| 353 | | Jeff Garner | 0 | 339 | 339 |
| 354 | | Jeff Godfrey | (405) | 0 | (405) |
| 355 | | Jeff Hager | 0 | 36 | 36 |
| 356 | | Jeff Munn | 0 | 433 | 433 |
| 357 | | Jen Darmstadt-Holm | 0 | 50 | 50 |
| 358 | | Jennifer Wagner | 0 | 146 | 146 |
| 359 | 119 | Jeremy Cutrer | 405 | 0 | 405 |
| 360 | 120 | Jerron Searles | 205 | 0 | 205 |
| 361 | 121 | Jessamen Dunker | 405 | 0 | 405 |
| 362 | | Jim Braun | 0 | 685 | 685 |
| 363 | | Jim N Nicks Management, LLC | 0 | 12,718 | 12,718 |
| 364 | | jk@aaf.com | 0 | 162 | 162 |
| 365 | | Joe Furmanski | 0 | 280 | 280 |
| 366 | | Joe Hollister | 0 | 396 | 396 |
| 367 | | Joey Artigue | 0 | 49 | 49 |
| 368 | 122 | John Gaw dba Hi-Wire Communications Products Inc | 585 | 6,012 | 6,597 |
| 369 | | John Howard | 0 | 247 | 247 |
| 370 | | John Peterson | 0 | 158 | 158 |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 371 | | John Schriffen | 0 | 8,451 | 8,451 |
| 372 | | Jon Lotulelei | (205) | 0 | (205) |
| 373 | | Jonathan Thomas | (205) | 0 | (205) |
| 374 | | jose.romero@aaf.com | 0 | 54 | 54 |
| 375 | | Joseph Ahern | 0 | 629 | 629 |
| 376 | 123 | Jude Adjei-Barimah | 205 | 0 | 205 |
| 377 | | Justin Huntman | 0 | 194 | 194 |
| 378 | | Justin Kirk | 0 | 10 | 10 |
| 379 | | JW Marriott Hotel Buckhead Atlanta | 0 | 31,586 | 31,586 |
| 380 | | JW Marriott Phoenix Desert Ridge Resort & Spa | 0 | 20,398 | 20,398 |
| 381 | | Kaci Demarest | 0 | 249 | 249 |
| 382 | | Kaiser Foundation Health Plan | 0 | 43,598 | 43,598 |
| 383 | 124 | Kareem Are | 405 | 0 | 405 |
| 384 | 125 | Karick Enterprises, LLC dba Signarama - Salt Lake City | 109 | 0 | 109 |
| 385 | | Kathleen Selman | 0 | 81 | 81 |
| 386 | | Katie Hubert | 0 | 93 | 93 |
| 387 | 126 | Keith McGill | 205 | 0 | 205 |
| 388 | | Keith Williams | 0 | 200 | 200 |
| 389 | | Kellie Vugrincic | 0 | 14,778 | 14,778 |
| 390 | | Kelly MacDonald | 0 | 28,276 | 28,276 |
| 391 | | Ken Isaacson | 0 | 2,770 | 2,770 |
| 392 | 127 | Ken Mack | 2,761 | 0 | 2,761 |
| 393 | | Ken Schanzer | 0 | (5,000) | (5,000) |
| 394 | | ken.zampese@aaf.com | 0 | 3,826 | 3,826 |
| 395 | | Kenneth Walker III | (205) | 0 | (205) |
| 396 | | Kerwin Lonzo | 0 | 959 | 959 |
| 397 | | Kevin Farrell | 0 | 8,330 | 8,330 |
| 398 | | Kevin Pham | 0 | 2,763 | 2,763 |
| 399 | | kevin@aaf.com | 0 | 780 | 780 |
| 400 | | kevink@aaf.com | 0 | 5,890 | 5,890 |
| 401 | 128 | KFMB-TV | 43,690 | 23,780 | 67,470 |
| 402 | | Khalil Bass | (205) | 0 | (205) |
| 403 | 129 | Kilpatrick Townsend & Stockton LLP | 15,000 | 5,000 | 20,000 |
| 404 | 130 | Kinematic Sports, LLC | 49,018 | 0 | 49,018 |
| 405 | 131 | KongBasileConsulting, LLC | 20,000 | 6,698 | 26,698 |
| 406 | 132 | KORE Interactive Systems | 85,200 | 0 | 85,200 |
| 407 | | Kosha Irby | 0 | 5,381 | 5,381 |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 408 | | KPHO Broadcasting Corporation dba KPHO-TV; KTVK-TV; AZFAM | (6,918) | 0 | (6,918) |
| 409 | 133 | KRANOS CORPORATION / Schutt Sports | 65,392 | 415 | 65,807 |
| 410 | 134 | Krausto LLC | 415 | 0 | 415 |
| 411 | | Kris Thomson | 0 | 206 | 206 |
| 412 | | Kristen Nielson | 0 | 344 | 344 |
| 413 | | Krueger International, Inc. | 0 | 12,296 | 12,296 |
| 414 | 135 | KSL NewsRadio - Bonneville | 32,250 | 6,856 | 39,106 |
| 415 | | Kwasi Crawford | 0 | 57 | 57 |
| 416 | | Kyle Sheppard | 0 | 1,524 | 1,524 |
| 417 | | Ladds | 0 | 2,655 | 2,655 |
| 418 | 136 | LAMAR | 39,570 | 0 | 39,570 |
| 419 | | Lance Austin | (405) | 0 | (405) |
| 420 | 137 | Language of Caring, LLC | 9,058 | 0 | 9,058 |
| 421 | | Larry Antonucci | 0 | 2,666 | 2,666 |
| 422 | | Law Enforcement Specialists Inc | 0 | 3,047 | 3,047 |
| 423 | 138 | Lazser Down LLC | 23,600 | 0 | 23,600 |
| 424 | | Lee Williams | 0 | 21 | 21 |
| 425 | | Lexington Hotel  Conference Center  Jacksonville Riverwalk | 0 | 326,054 | 326,054 |
| 426 | | Liberty Bowl Memorial Stadium | 0 | 143,790 | 143,790 |
| 427 | 139 | LinkedIn Corp. | 6,608 | 0 | 6,608 |
| 428 | 140 | LIQUID SOUL MEDIA, LLC | 25,000 | 0 | 25,000 |
| 429 | 141 | Logicopy | 658 | 1,417 | 2,075 |
| 430 | | Loomis | 0 | 439 | 439 |
| 431 | 142 | Lotus Broadcasting Corporation dba KOMP, KXPT, KWID, KWWN | 5,840 | 2,760 | 8,600 |
| 432 | 143 | LSI Graphics, LLC | 1,388 | 4,352 | 5,741 |
| 433 | | Lynn Brown | 0 | 5,558 | 5,558 |
| 434 | 144 | M&M Productions, Inc | 1,392 | 1,135 | 2,527 |
| 435 | 145 | M3 Commercial Moving and Logistics, LLC | 5,150 | 33,836 | 38,986 |
| 436 | 146 | MAC Printing | 379 | 0 | 379 |
| 437 | | Maddie Dobbins | 0 | 152 | 152 |
| 438 | | Major Promotions | 0 | 1,672 | 1,672 |
| 439 | | Mark Malone | 0 | 13,000 | 13,000 |
| 440 | | Mark Teitelman | 0 | 2,234 | 2,234 |
| 441 | | Mark Witty | 0 | 100 | 100 |
| 442 | | Marq Burnett | 0 | 36 | 36 |
| 443 | 147 | Marquis Bundy | 237 | 0 | 237 |
| 444 | | Marquis Lucas | (405) | 0 | (405) |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 445 | | Marriott Hotel Services IncDBA --Scottsdale Marriott at Mcdowell N | 0 | 92,196 | 92,196 |
| 446 | | MARRIOTT ORLANDO DOWNTOWN | 0 | 48,347 | 48,347 |
| 447 | 148 | Marriott Plaza San Antonio | 113,671 | 0 | 113,671 |
| 448 | 149 | Marriott San Antonio Northwest | 600,995 | 0 | 600,995 |
| 449 | 150 | Marvin Hart | 205 | 0 | 205 |
| 450 | | MARVIN LEWIS | 0 | 135,617 | 135,617 |
| 451 | 151 | Mary Eubanks | 555 | 758 | 1,313 |
| 452 | | Mason Phillips | 0 | 20 | 20 |
| 453 | | Masque Sound & Recording DBA Professional Wireless Systems | 0 | 15,791 | 15,791 |
| 454 | | Matalon Media, LLC | 0 | 2,781 | 2,781 |
| 455 | | Matt Fahr | 0 | 392 | 392 |
| 456 | | Matt Jackson | 0 | 588 | 588 |
| 457 | | Matt Meyer | 0 | 688 | 688 |
| 458 | | Matt Singletary | 0 | 533 | 533 |
| 459 | | Matthew Lotocki | 0 | 1,580 | 1,580 |
| 460 | | Matthew Smith dba MMS Media LLC | 0 | 38,435 | 38,435 |
| 461 | | Maurice Jones-Drew | 0 | 20,026 | 20,026 |
| 462 | | Maven Imaging | 0 | 6,000 | 6,000 |
| 463 | 152 | Media2, Inc. dba m2 | 58,500 | 70,358 | 128,858 |
| 464 | | Meffy Koloamatangi | (205) | 0 | (205) |
| 465 | | Megan Hanson | 0 | 850 | 850 |
| 466 | | Memphis Marriott East | 0 | 41,946 | 41,946 |
| 467 | 153 | Memphis United Fitness, LLC dba The Box | 4,500 | 0 | 4,500 |
| 468 | | mer-maid clean service llc | 0 | 1,000 | 1,000 |
| 469 | | Methodist Hospital | 0 | 5,766 | 5,766 |
| 470 | 154 | Metro Broadcast Services, LLC | 5,129 | 0 | 5,129 |
| 471 | 155 | Miami Air International Inc | 33,373 | 110,471 | 143,844 |
| 472 | 156 | Michael Harris | 2,189 | 1,653 | 3,842 |
| 473 | | Michael Micca | 0 | 320 | 320 |
| 474 | 157 | Michael Waddell | 2,622 | 2,999 | 5,622 |
| 475 | | Michelle Abnet | 0 | 197 | 197 |
| 476 | | Mike Stevens | (780) | 0 | (780) |
| 477 | | mike@aaf.com | 0 | 1,693 | 1,693 |
| 478 | 158 | Mind Over Media LLC | 25,946 | 0 | 25,946 |
| 479 | 159 | Mission Cloud Services | 21,800 | 0 | 21,800 |
| 480 | | Mitch Ried | 0 | 82 | 82 |
| 481 | | mjake@aaf.com | 0 | 19,139 | 19,139 |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 482 | 160 | Mobile Mini Solutions | 765 | 757 | 1,522 |
| 483 | 161 | Mobile Modular | 75,631 | 0 | 75,631 |
| 484 | | Modco Media | (41,176) | 0 | (41,176) |
| 485 | | Monarch Trophy Studio | 0 | 11,933 | 11,933 |
| 486 | | Morale, Welfare and Recreation - Commander, Navy Region, Sout | 0 | 500 | 500 |
| 487 | 162 | Morale, Welfare and Recreation CNRSE | 828 | 0 | 828 |
| 488 | 163 | Morgan, Lewis & Bockius | 1,500,488 | 1,162,182 | 2,662,670 |
| 489 | | MULDER FIRE PROTECTION, INC. | 0 | 13,600 | 13,600 |
| 490 | 164 | Multimedia Holdings Corportion dba KPNX-TV; Channel 12; 12 Ne | 8,713 | 6,928 | 15,641 |
| 491 | 165 | Muncie Novelty | 712 | 0 | 712 |
| 492 | | Mustache Pretzels, LLC | 0 | 1,000 | 1,000 |
| 493 | 166 | MWW Group LLC | 58,524 | 10,887 | 69,411 |
| 494 | | Nate Tice | 0 | 400 | 400 |
| 495 | | Nathan Peck | 0 | 598 | 598 |
| 496 | | Nathan Tajalle | 0 | 231 | 231 |
| 497 | 167 | National Car Rental | 188 | 0 | 188 |
| 498 | 168 | Nationwide Referral Company, Inc. dba Apartment & Relocation C | 44,330 | 57,629 | 101,959 |
| 499 | 169 | NBC Universal, LLC dba Telemundo of Texas, LLC (KDVA) | 4,250 | 20,350 | 24,600 |
| 500 | 170 | Nelsons Tents and Events | 3,217 | 3,138 | 6,355 |
| 501 | | NEP II, Inc dba NEP Supershooters, LP | 0 | 615,332 | 615,332 |
| 502 | | nerdimatics | 0 | 17,651 | 17,651 |
| 503 | 171 | New Era Cap | 144,172 | (33,897) | 110,275 |
| 504 | 172 | New Memphis Institute | 2,000 | 0 | 2,000 |
| 505 | | Next Level Films, LLC dba Tory Weeks | 0 | 3,063 | 3,063 |
| 506 | 173 | NFL Alumni Inc. - Charity | 5,000 | 0 | 5,000 |
| 507 | | NFL Network | 0 | 1,000,000 | 1,000,000 |
| 508 | | Nicole Priem | 0 | 168 | 168 |
| 509 | 174 | Northside Education Foundation | 3,500 | 0 | 3,500 |
| 510 | 175 | Norvision LLC | 14,379 | 0 | 14,379 |
| 511 | 176 | NRG Park | 1,900 | 0 | 1,900 |
| 512 | 177 | Oakwood Sports | 22,547 | 0 | 22,547 |
| 513 | 178 | OFFICE DEPOT | 37,704 | 18,298 | 56,002 |
| 514 | | Office Resale Solutions, LLC | 0 | 6,000 | 6,000 |
| 515 | 179 | Officials Flags and Bags USA | 2,069 | 0 | 2,069 |
| 516 | 180 | Ogletree Deakins | 24,541 | 0 | 24,541 |
| 517 | 181 | Olympic Case Co | 118,538 | 0 | 118,538 |
| 518 | 182 | Omni Colonnade | 545,648 | 0 | 545,648 |

bva group®

**Exhibit 2**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 519 | 183 | On-Air Sports Marketing LLC | 850 | 0 | 850 |
| 520 | | Open net Inc. dba Bway.net | 0 | 1,155 | 1,155 |
| 521 | | Opendorse Inc. | 72,500 | 72,500 | 72,500 |
| 522 | 184 | Orange County Public Schools | 1,884 | 0 | 1,884 |
| 523 | | Orange County Sheriff's Office Fiscal Management | 0 | 837 | 837 |
| 524 | | Orlando Food Service Partners dba Levy Restaurants | 0 | 40,141 | 40,141 |
| 525 | 185 | Orlando Sentinel Media Group | 4,000 | 0 | 4,000 |
| 526 | 186 | Outdoor America Images, Inc.  OAI | 245,917 | 544,915 | 790,832 |
| 527 | 187 | OUTFRONT Media Inc. | 60,448 | 0 | 60,448 |
| 528 | 188 | Overlook Networks | 2,800 | 0 | 2,800 |
| 529 | | Oxylabs | 0 | 1,100 | 1,100 |
| 530 | 189 | Pac-Van | 423 | 360 | 783 |
| 531 | | Paden Evelanc | 0 | 39 | 39 |
| 532 | | Park Place Printing, Inc, dba Alphagraphics | 0 | 13,282 | 13,282 |
| 533 | | Pat Kersey | 0 | 358 | 358 |
| 534 | | Pat Morris | 0 | 200 | 200 |
| 535 | | Patrick Burnham | 0 | 663 | 663 |
| 536 | | Paul M Halsey dba Admiral Video, LLC | 0 | 11,170 | 11,170 |
| 537 | | Paul Pabst | 0 | 20,000 | 20,000 |
| 538 | 190 | Pavilion Management Company dba Hilton Phoenix Mesa Hotel | 41,108 | 129,329 | 170,438 |
| 539 | | Pawel Czarnecki | 0 | 1,969 | 1,969 |
| 540 | | PCH TRIBUNE LLC DBA NUMBER SIX LLC | 0 | 20,653 | 20,653 |
| 541 | 191 | PCS Production Company, LP | 583 | 12,413 | 12,996 |
| 542 | 192 | Performance Health Supply Inc. dba, Medco Supply Company | 29,605 | 0 | 29,605 |
| 543 | | Peter Chalmers | 0 | 253 | 253 |
| 544 | | PHG Birmingham Perimeter Park, LLC dba Hilton Birmingham Per | 0 | 66,317 | 66,317 |
| 545 | | Phil Hedrick | 0 | 23 | 23 |
| 546 | | Phil Savage | 0 | 4,072 | 4,072 |
| 547 | 193 | Pinnacle Communications | 412 | 0 | 412 |
| 548 | 194 | Pioneer Manufacturing Company dba Pioneer Athletics & Revere F | 50,595 | 0 | 50,595 |
| 549 | 195 | Pixels2Press | 816 | 0 | 816 |
| 550 | | Power Plus Sound & Lighting, Inc. | 0 | 20,000 | 20,000 |
| 551 | 196 | Precision Medical Services | 12,500 | 0 | 12,500 |
| 552 | 197 | Present Creative | 6,615 | 0 | 6,615 |
| 553 | | Prince Shonola | (1,115) | 0 | (1,115) |
| 554 | | Prismic | 0 | 10,010 | 10,010 |
| 555 | 198 | Pro Orthopedic Devices, Inc. | 21,874 | 0 | 21,874 |

bva group®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 556 | 199 | Professional Travel Inc | 1,562 | 480 | 2,042 |
| 557 | | Proof of the Pudding by MGR Inc. | 0 | 159,604 | 159,604 |
| 558 | 200 | Proptology FX Inc. dba Set Masters | 1,313 | 0 | 1,313 |
| 559 | 201 | ProShow Systems LLC | 12,488 | 0 | 12,488 |
| 560 | 202 | Prospect Productions LLC dba Barnicle | 99,550 | 0 | 99,550 |
| 561 | 203 | PSAV | 26,007 | 0 | 26,007 |
| 562 | | Push Button Films | 0 | 1,500 | 1,500 |
| 563 | 204 | Pyro Shows of Alabama, Inc. | 17,800 | 0 | 17,800 |
| 564 | 205 | Pyro Shows of Texas, Inc | 5,240 | 10,480 | 15,720 |
| 565 | | Pyro Spectaculars Inc. | 0 | 51,350 | 51,350 |
| 566 | 206 | Pyrotecnico FX, LLC | 19,415 | 0 | 19,415 |
| 567 | | Rachel Sharpe | 0 | 27 | 27 |
| 568 | | Radio One Atlanta | 0 | 375 | 375 |
| 569 | | Ralph Colella dba Queso Good by Ralph's Snack Bar | 0 | 2,785 | 2,785 |
| 570 | | Randy Campbell | 0 | 243 | 243 |
| 571 | | Randy Darrington | 0 | 286 | 286 |
| 572 | | Randy Woody Ribbeck | 0 | 1,750 | 1,750 |
| 573 | | Raphael's Party Rentals | 0 | 7,248 | 7,248 |
| 574 | 207 | Raycom Media Inc. dba WMC-TV | 8,105 | 0 | 8,105 |
| 575 | | Rehab Associates, LLC | 0 | 11,000 | 11,000 |
| 576 | | Rhino California, LLC | 0 | 2,213 | 2,213 |
| 577 | | Rhino Florida LLC | 0 | 2,280 | 2,280 |
| 578 | 208 | Rhino Georgia, LLC | 1,158 | 6,575 | 7,732 |
| 579 | | Rhino Utah, LLC | 0 | 6,675 | 6,675 |
| 580 | | Rice Eccles Stadium | 0 | 55,242 | 55,242 |
| 581 | | Rich Muirbrook | 0 | 225 | 225 |
| 582 | | Richard darling | 0 | 2,769 | 2,769 |
| 583 | | richard.lazalde@aaf.com | 0 | 200 | 200 |
| 584 | | Rick Hamilton | 0 | 3,755 | 3,755 |
| 585 | | Rick Mikulic dba Two Fat Guys Grilled Cheese LLC | 0 | 1,000 | 1,000 |
| 586 | 209 | RIDDELL SPORTS GROUP INC. | 493,813 | 510 | 494,323 |
| 587 | 210 | Right Choice Digital | 6,260 | 0 | 6,260 |
| 588 | | Rob Kiese | 0 | 630 | 630 |
| 589 | | Robert Agusta | 0 | 104 | 104 |
| 590 | 211 | Robert Half | 11,829 | 4,732 | 16,560 |
| 591 | | Robert Myers * | (405) | 0 | (405) |
| 592 | | robert.knapp@aaf.com | 0 | 18 | 18 |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 593 | | Robertson and Associates, Inc. dba Colonnade Group | 0 | 18,000 | 18,000 |
| 594 | | Rod Woodson | 0 | 80,000 | 80,000 |
| 595 | | Rodney Asistin | 0 | 995 | 995 |
| 596 | 212 | Ron Selesky | 461 | 0 | 461 |
| 597 | | roscoe.myrick@aaf.com | 0 | 1,234 | 1,234 |
| 598 | | Rosie Shmyel | 0 | 58 | 58 |
| 599 | | Royal Restrooms Mountain West, LLC | 0 | 17,725 | 17,725 |
| 600 | | Rural Metro of San Diego Inc.  DBA American Medical Response | 0 | 7,000 | 7,000 |
| 601 | | Russell Giglio | 0 | 265 | 265 |
| 602 | 213 | Ryan Hollern | 298 | 0 | 298 |
| 603 | | Ryan Motsenbocker | 0 | 124 | 124 |
| 604 | 214 | Ryan Murphy | 205 | 0 | 205 |
| 605 | | Rykeem Yates | (205) | 0 | (205) |
| 606 | 215 | S O S Global Express | 250 | 20,390 | 20,640 |
| 607 | | S2 Global Inc. | 0 | 39,448 | 39,448 |
| 608 | 216 | Safari Jeffries dba Jeffries Media Enterprises LLC | 152 | 0 | 152 |
| 609 | 217 | SAFC Management | 97,415 | 0 | 97,415 |
| 610 | 218 | Safety Services, Inc. dba U.S. Safety Services | 2,383 | 2,451 | 4,834 |
| 611 | 219 | Salesforce | 26,208 | 0 | 26,208 |
| 612 | 220 | SALSBURY INDUSTRIES | 19,663 | 0 | 19,663 |
| 613 | 221 | Salt Lake City Weekly | 2,020 | 0 | 2,020 |
| 614 | 222 | Salus Labs, Inc (dba Triplebyte) | 78,000 | 0 | 78,000 |
| 615 | | Sam Irwin-Hill | (685) | 0 | (685) |
| 616 | | Sam Maniar | 0 | 151 | 151 |
| 617 | | Sam Schwartz | 0 | 44 | 44 |
| 618 | | Samuel Pugh | 0 | 72 | 72 |
| 619 | 223 | San Antonio Bowl Association dba Valero Alamo Bowl | 5,750 | 0 | 5,750 |
| 620 | 224 | San Antonio Business Journal dba American City Business Journa | 6,387 | 1,104 | 7,491 |
| 621 | 225 | San Antonio River Walk Association | 300 | 0 | 300 |
| 622 | 226 | San Antonio Sports | 10,000 | 12,500 | 22,500 |
| 623 | 227 | San Diego Regional Chamber | 4,500 | 0 | 4,500 |
| 624 | 228 | San Diego Sportservice, Inc. dba Delaware North | 10,282 | 110,654 | 120,936 |
| 625 | | Sarah Proctor | 0 | 135 | 135 |
| 626 | | Sarah T | 0 | 17 | 17 |
| 627 | 229 | SBR Technologies Vision Graphics | 6,906 | 8,300 | 15,205 |
| 628 | | Scenic Property Management, LLC | 0 | 10,190 | 10,190 |
| 629 | 230 | School of Health Corp. | 31,345 | 16,857 | 48,202 |

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 630 | | Score Atlanta | 0 | 225 | 225 |
| 631 | | Scott Brewster | 0 | 193 | 193 |
| 632 | | Scott Brubaker | 0 | 560 | 560 |
| 633 | | Scott Fillmore | 0 | 1,743 | 1,743 |
| 634 | | Scott Porter | 0 | 175 | 175 |
| 635 | | Scott Rolier | 0 | 806 | 806 |
| 636 | | SD Design, LLC | 5,013 | 0 | 5,013 |
| 637 | 231 | Security Industry Specialists Inc. - SIS | 53,250 | 434,930 | 488,179 |
| 638 | 232 | serena.xu@aaf.com | 0 | 1,613 | 1,613 |
| 639 | | Seth Gibson | 0 | 200 | 200 |
| 640 | 233 | SewWrite | 553 | (1,343) | (790) |
| 641 | | Shaun O'Hara dba 60 Soho Consulting, LLC c/o WME Entertainme | 0 | 100,000 | 100,000 |
| 642 | | Shepherds Locksmith Services | 0 | 128 | 128 |
| 643 | | Sheraton Mission Valley | 0 | 33,570 | 33,570 |
| 644 | 234 | Shock Doctor, Inc. dba United Sports Brands, Cutter Gloves, McDz | 46,689 | 240 | 46,929 |
| 645 | | Signal Wiz - Technical Services | 0 | 4,800 | 4,800 |
| 646 | 235 | Silverman Group | 87,300 | 7,650 | 94,950 |
| 647 | 236 | Simplified Coach, Inc. | 25,875 | 33,336 | 59,211 |
| 648 | 237 | Sinclair Broadcasting WBMA WTTO WABM | 37,215 | 17,220 | 54,435 |
| 649 | 238 | Sir Speedy | 320 | 2,735 | 3,055 |
| 650 | 239 | SkyCam/Outdoor Channel | 69,164 | 908,316 | 977,480 |
| 651 | 240 | Skymail International, Inc. | 807 | 2,298 | 3,105 |
| 652 | 241 | Sloane, Offer, Weber and Dern, LLP | 10,000 | 15,000 | 25,000 |
| 653 | 242 | SMG–State Farm Stadium | 22,500 | 0 | 22,500 |
| 654 | | SmithPrint | 0 | 189 | 189 |
| 655 | | Sneaky Big Studios, LLC | 0 | 795,000 | 795,000 |
| 656 | 243 | SocialFlow, Inc. | 70,000 | 35,000 | 105,000 |
| 657 | 244 | Sodexo | 11,380 | 201,880 | 213,260 |
| 658 | | Solmaz VanDale | 0 | 3,142 | 3,142 |
| 659 | | Southern Foodservice Management, Inc. | 0 | 3,853 | 3,853 |
| 660 | | Southland electric Company Inc. | 0 | 356 | 356 |
| 661 | 245 | Spark Printing | 1,254 | 144 | 1,399 |
| 662 | 246 | Spectrum Business/Time Warner Cable | 430 | 2,325 | 2,754 |
| 663 | 247 | Spectrum Reach / Charter | 71,218 | 28,499 | 99,717 |
| 664 | 248 | Sports and Healthcare Solutions LLC | 63 | 0 | 63 |
| 665 | | Sports Imaging Consultants a.k.a. Raquel McBurney | 0 | 1,600 | 1,600 |
| 666 | | Sports Medicine Associates of San Antonio, PA | 0 | 37,500 | 37,500 |

bva group®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 667 | 249 | Sports360az LLC | 1,500 | 0 | 1,500 |
| 668 | | SportsMEDIA Technology Corp (SMT) | 0 | 339,842 | 339,842 |
| 669 | 250 | SportSoft | 5,669 | 0 | 5,669 |
| 670 | 251 | Sportstar Athletics | 14,035 | 0 | 14,035 |
| 671 | | Stacie Johnson | 0 | 69 | 69 |
| 672 | | State Compensation Insurance Fund | 0 | 86,511 | 86,511 |
| 673 | 252 | STATSports | 100,000 | 0 | 100,000 |
| 674 | | Staybridge Suites Downtown Convention Center | 0 | 21,952 | 21,952 |
| 675 | | Stephanie Pinder-Amaker | 0 | 109 | 109 |
| 676 | 253 | Steve Nguyen dba Forwin Group | 300 | 300 | 600 |
| 677 | | Steve Xing | 0 | 9,403 | 9,403 |
| 678 | | steve@aaf.com | 0 | 743 | 743 |
| 679 | 254 | Storm Johnson | 226 | 0 | 226 |
| 680 | 255 | Summit Media | 32,349 | 5,315 | 37,664 |
| 681 | | SUMO LOGIC | 0 | 6,797 | 6,797 |
| 682 | 256 | swirl | mcgarrybowen | 1,937,674 | 0 | 1,937,674 |
| 683 | | Sydney Sloas | 0 | 69 | 69 |
| 684 | 257 | T&MG, LLC dba Fastsigns/Accuprint | 1,379 | 0 | 1,379 |
| 685 | 258 | T.O.P Marketing USA | 32,216 | 1,785 | 34,001 |
| 686 | 259 | Tag Up by Rischard Marketing, Inc | 15,896 | 1,224 | 17,120 |
| 687 | | Tanner Roush | 0 | 48 | 48 |
| 688 | 260 | Team Fitz Graphics | 965 | 0 | 965 |
| 689 | 261 | TeamWork Online | 5,000 | 0 | 5,000 |
| 690 | 262 | Teamworks Innovations, Inc. | 54,350 | 0 | 54,350 |
| 691 | 263 | Terence Garvin | 205 | 0 | 205 |
| 692 | | Thad Rivers | 0 | 1,040 | 1,040 |
| 693 | | The City of San Diego | 0 | 111,352 | 111,352 |
| 694 | | The Commercial Appeal | 0 | 20,874 | 20,874 |
| 695 | 264 | The Ebersol Lanigan Company LLC | 182,851 | 0 | 182,851 |
| 696 | 265 | The Emblem Source LLC | 1,019 | 0 | 1,019 |
| 697 | 266 | The Emily Morgan Hotel a Doubletree by Hilton | 324,416 | 0 | 324,416 |
| 698 | | The Emory Clinic | 0 | 45,065 | 45,065 |
| 699 | | The Enterprise-Utah's Business Journal | 5,000 | 0 | 5,000 |
| 700 | | The Highland Mint | 672 | 0 | 672 |
| 701 | 269 | The Montag Group | 60,000 | 40,000 | 100,000 |
| 702 | | The Switch Enterprises, LLC | 0 | 41,800 | 41,800 |
| 703 | | Theta Chi Fraternity | 0 | 1,000 | 1,000 |

bvagroup®

Exhibit 2
In re: Legendary Field Exhibitions, LLC, et al.
Undisclosed Unpaid Liabilities by Vendor

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 704 | | Thomas Reprographics, Inc. d/b/a Thomas Printworks | 0 | 1,638 | 1,638 |
| 705 | | Thomas-Logan, LLC | 0 | 2,000 | 2,000 |
| 706 | 270 | Threaded Agency | 12,500 | 0 | 12,500 |
| 707 | | Three Sisters Partnership | 0 | 8,767 | 8,767 |
| 708 | 271 | THRIFTY Car rental | 247 | 0 | 247 |
| 709 | 272 | Thunderbird Executive Inn | 17,930 | 0 | 17,930 |
| 710 | 273 | Ticketmaster LLC | 15,462 | 44,113 | 59,575 |
| 711 | | Tiffany Hardison | 0 | 121 | 121 |
| 712 | 274 | Timeline Productions LLC | 4,045 | 0 | 4,045 |
| 713 | | Tina Kelly | 0 | 16 | 16 |
| 714 | | TNT Game Truck, LLC | 0 | 1,298 | 1,298 |
| 715 | | Todd Champlin | 0 | 6,268 | 6,268 |
| 716 | | Tom Alexander | 0 | 2,069 | 2,069 |
| 717 | | Tony Softli | 0 | 1,077 | 1,077 |
| 718 | 275 | Total Traffic Network | 4,105 | 0 | 4,105 |
| 719 | | Trent Richardson | (467) | 0 | (467) |
| 720 | | TRI-C Club Supply Inc. | (19,188) | 2,177 | (17,011) |
| 721 | | TS2 Holdings, LLC | 15,000 | 0 | 15,000 |
| 722 | 276 | Tucker Castleberry Printing, Inc. | 11,707 | 13,425 | 25,132 |
| 723 | 277 | Ty Martin | 0 | 1,193 | 1,193 |
| 724 | | Tyrone King | 0 | 68 | 68 |
| 725 | | U.S. Security Associates Inc. dba Advance Security | 0 | 966 | 966 |
| 726 | | UAB Blazers | 0 | 8,000 | 8,000 |
| 727 | | UCF Athletics Assn., Inc | 0 | 778,883 | 778,883 |
| 728 | | UFC Athletics Bands | 0 | 3,000 | 3,000 |
| 729 | 278 | Ultimate Tailgating | 10,000 | 5,000 | 15,000 |
| 730 | 279 | UNCF | 7,500 | 0 | 7,500 |
| 731 | | United Rentals North America, Inc | 0 | 2,638 | 2,638 |
| 732 | | University of Central Florida (UCF) | 0 | 80 | 80 |
| 733 | 280 | University of San Diego Athletics Facilities - Kirby Uranich | 1,000 | 1,000 | 2,000 |
| 734 | | University of Utah | 0 | 1,229 | 1,229 |
| 735 | | University of Utah Department of Orthopedic Surgery | 0 | 112,500 | 112,500 |
| 736 | | University of Utah Health dba AnnDrea Ricci, University of Utah He | 0 | 619 | 619 |
| 737 | | Univision Radio Phoenix, Inc. | 1,726 | 0 | 1,726 |
| 738 | 281 | UPS Store | 2,347 | 0 | 2,347 |
| 739 | 282 | UTSA Alumni Association | 1,000 | 0 | 1,000 |
| 740 | 283 | valdez.crouse@aaf.com | 0 | 368 | 368 |

bvagroup®

Exhibit 2
In re: Legendary Field Exhibitions, LLC, et al.
Undisclosed Unpaid Liabilities by Vendor

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|
| 741 | | Valerie Alou | 0 | 10 | 10 |
| 742 | | Venture Technologies | 0 | 10,704 | 10,704 |
| 743 | | Vic Gregovits | 0 | 266 | 266 |
| 744 | 284 | Vicis | 8,227 | 332 | 8,559 |
| 745 | 285 | Violet Crown Independent | 2,000 | 0 | 2,000 |
| 746 | | Vision Service Plan - VSP | 0 | 14,463 | 14,463 |
| 747 | | VITAC Corporation | 0 | 13,230 | 13,230 |
| 748 | | Vokkero by Adeunis NA, Inc. | 0 | 59,008 | 59,008 |
| 749 | | Vulcan Park and Museum | 100 | 0 | 100 |
| 750 | | W David Livingston | 0 | 2,418 | 2,418 |
| 751 | | WAIT | 0 | 500 | 500 |
| 752 | 287 | Walter John Ellis dba Sports and Broadcast Services, LLC | 800 | 4,627 | 5,427 |
| 753 | | WAMJ-FM/WUMJ-FM | 0 | 14,625 | 14,625 |
| 754 | 288 | War Machine Inc dba TSHIRTGUN.COM | 8,500 | 0 | 8,500 |
| 755 | 289 | Watermark Group | 2,748 | 0 | 2,748 |
| 756 | 290 | WBRC | 8,470 | 0 | 8,470 |
| 757 | 291 | Wehbe Marketing, Inc. DBA Make it Happen | 6,620 | 0 | 6,620 |
| 758 | 292 | Weldon Williams & Lick Inc. | 3,914 | 0 | 3,914 |
| 759 | 293 | Werqwise, Inc | 96,524 | 48,757 | 145,281 |
| 760 | 294 | WHBQ-TV - Cox Media Group NE, Inc. | 6,067 | 2,688 | 8,755 |
| 761 | | Wholesale Commercial Laundry Equipment, SE LLC | 0 | 5,997 | 5,997 |
| 762 | | WILDMOKA SAS | 0 | 6,500 | 6,500 |
| 763 | 295 | Wiley Graphics | 3,573 | 0 | 3,573 |
| 764 | 296 | Willcam Inc / Vanguard Cleaning Systems | 2,045 | 4,387 | 6,432 |
| 765 | | William Kuharich | 0 | 484 | 484 |
| 766 | 297 | wincraft | 2,243 | 8,209 | 10,452 |
| 767 | 298 | Won Worldwide LLC | 25,000 | 27,500 | 52,500 |
| 768 | | WREG-TV | 0 | 525 | 525 |
| 769 | | Wright Fitness Inc. dba Wright Equipment | 0 | 3,390 | 3,390 |
| 770 | | WTMR, LLC. | 0 | 980 | 980 |
| 771 | 299 | WTP Service BPM 326634 | 4,140 | 1,380 | 5,520 |
| 772 | | XOS Digital | 0 | 164,526 | 164,526 |
| 773 | 300 | Xzavier Dickson | 393 | 0 | 393 |
| 774 | | YarTay Company, Inc. dba Y-Cater | 0 | 125,443 | 125,443 |
| 775 | | Z21 Creative, LLC. | 0 | 6,627 | 6,627 |
| 776 | 301 | Zoominfo Inc. | 49,900 | 0 | 49,900 |
| | | **Total** | **$ 12,176,114** | **$ 20,509,322** | **$ 32,685,436** |

bvagroup®

bvagroup®

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor**

*(in USD unless otherwise noted)*

| Count | Count with open balance on or before 2/14/2019 | Vendor | Open balance of debt incurred on or before 2/14/2019 | Open balance of debt incurred after 2/14/2019 | Total |
|---|---|---|---|---|---|

**Sources and Notes:**
Amounts represent the sum of open balances by vendor based on whether the date of each expense is on or before 2/14/2019, the date of the Term Sheet, or after 2/14/2019. Data derived from Rog-2 0138-4a Legendary+Field+Exhibitions+LLC_AP+Aging+Detail.xlsx.

**Exhibit 3**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred On or before 2/14/2019 | Open balance of debt incurred After 2/14/2019 | Total |
|---|---|---|---|
| 1954 Productions, LLC | $ 178,851 | $ 0 | $ 178,851 |
| A Bounce Above | 1,161 | 1,161 | 2,322 |
| Aaron Larimore dba All American Flags and Banners, LLC | 1,094 | 0 | 1,094 |
| Accolade USA Inc. | 67,930 | 0 | 67,930 |
| Accu-Print San Antonio | 9,988 | 0 | 9,988 |
| Ace Parking Management Inc. | 521 | 0 | 521 |
| ACM HUB, LLC dba Titan Sign Company | 23,705 | 2,165 | 25,870 |
| ACO Medical Supply, Inc. | 48,637 | 2,970 | 51,607 |
| Adidas | 56,741 | 0 | 56,741 |
| ADVANCED FRAMING CONCEPTS | 608 | 0 | 608 |
| Aerial Video Systems | 2,170 | 0 | 2,170 |
| Air Cannons | 3,750 | 0 | 3,750 |
| Airtime Lighting Group | 0 | 7,906 | 7,906 |
| Alabama Graphics | 13,827 | 1,966 | 15,792 |
| Alabama Media Group | 4,500 | 0 | 4,500 |
| Alliance Productions | 1 | 1,121,315 | 1,121,316 |
| Alpha Media | 14,394 | 5,883 | 20,277 |
| ALT Systems Inc. | 159,293 | 0 | 159,293 |
| AMAZON WEB SERVICES- AWS | 41,132 | 0 | 41,132 |
| AMER Sports | 49,099 | 22,922 | 72,021 |
| Anthem Inc | 0 | 4,378 | 4,378 |
| Anthony Scott Long dba Scotty Long's Music | 300 | 0 | 300 |
| APPLE | 21,219 | 2,379 | 23,597 |
| Aramark | 0 | 41,154 | 41,154 |
| Arizona Cardinals Football Club | 0 | 500 | 500 |
| ARIZONA CHRISTIAN UNIVERSITY | 0 | 55,109 | 55,109 |
| Arkansas Graphics Inc. | 0 | 1,728 | 1,728 |
| Art F/X | 2,850 | 0 | 2,850 |
| Artemax Inc dba WRISTBAND RESOURCES dba | 1,994 | 0 | 1,994 |
| AT&T | 107 | 17,566 | 17,673 |
| ATLANTA CONCOURSE RENAISSANCE | 55,370 | 0 | 55,370 |
| Audio Visual Management Solutions Inc. | 534 | 0 | 534 |
| AY Productions LLC | 0 | 15,332 | 15,332 |
| B&B Ice of Tampa Bay, Inc. | 0 | 490 | 490 |
| BaseCamp Franchising, LLC | 0 | 9,709 | 9,709 |
| Becker Boards Small, LLC | 754 | 0 | 754 |
| Belz Construction Service LLC | 81,530 | 0 | 81,530 |
| BexelESS | 2,636 | 415,593 | 418,229 |
| Big Fogg, Inc. | 14,800 | 92,799 | 107,599 |
| Birmingham Business Journal | 6,500 | 0 | 6,500 |



419

# Exhibit 3
## In re: Legendary Field Exhibitions, LLC, et al.
## Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred On or before 2/14/2019 | Open balance of debt incurred After 2/14/2019 | Total |
|---|---|---|---|
| bluemedia | 63,027 | 319,711 | 382,737 |
| BPM Concerts, LLC dba Ballpark Music | 0 | 4,356 | 4,356 |
| Brandiose Studios, Inc | 5,000 | 0 | 5,000 |
| Brian Molina | 676 | 0 | 676 |
| Broadway Media, LLC dba KXRK, KEGA, KYMV, KUUU, KUDD, K | 3,420 | 10,760 | 14,180 |
| Bruno Event Team LLC | 15,707 | 0 | 15,707 |
| BSN Sports | 15,983 | 6,273 | 22,256 |
| BUCK'S BAGS Inc. | 560 | 0 | 560 |
| Business Electronics Corp. | 291 | 0 | 291 |
| BZ Clarity Holdings, LLC dba Base 1836, LLC | 1,000 | 0 | 1,000 |
| CallVenture Party Rentals | 0 | 1,875 | 1,875 |
| Cameron Nizialek | 205 | 0 | 205 |
| Campbell Clinic Orthopedics | 0 | 25,000 | 25,000 |
| Canto Inc. | 5,000 | 0 | 5,000 |
| Catering by Rosemary, Ink dba The RK Group | 0 | 70,355 | 70,355 |
| CBS Television Network | 0 | 1,450,000 | 1,450,000 |
| Central Florida Sports Commission dba Greater Orlando Sports C | 0 | 2,500 | 2,500 |
| CENTURY CLUB OF SAN DIEGO DBA FARMERS INSURANCE ( | 6,000 | 0 | 6,000 |
| CESD dba PG Productions FSO | 2,000 | 0 | 2,000 |
| Charles E. Johnson dba Vortex Productions Inc | 0 | 2,152 | 2,152 |
| Chris Crocker | 0 | 2,250 | 2,250 |
| Chris Thompson FB | 0 | 205 | 205 |
| City of San Antonio - Alamodome | 103,894 | 150 | 104,044 |
| City of San Diego - SDCCU Stadium | 400 | 200,156 | 200,556 |
| Classic Traditions, Inc. | 2,855 | 0 | 2,855 |
| Clear Channel Outdoor | 59,311 | 0 | 59,311 |
| Clear Gear | 7,340 | 0 | 7,340 |
| Cliff Keen | 0 | 786 | 786 |
| CM+PR dba Cardenas Marketing + Public Relations | 600 | 0 | 600 |
| CMAXIII Entertainment/ Charles Sloan Jr. | 0 | 150 | 150 |
| Coleâ€™s Screen Printing | 0 | 7,200 | 7,200 |
| Comcast Spotlight | 8,250 | 0 | 8,250 |
| Comcast Spotlight - Los Angeles | 255 | 0 | 255 |
| Contemporary Media, Inc | 2,175 | 0 | 2,175 |
| Contemporary Services Corporation - CSC | 0 | 63,703 | 63,703 |
| CORT BUSINESS SERVICES CORP | 0 | 40,072 | 40,072 |
| Courtyard by Marriott San Antonio River Center | 71,765 | 0 | 71,765 |
| Cox Business | 0 | 775 | 775 |
| COX ENTERPRISES, INC dba ATLANTA JOURNAL-CONSTITUT | 0 | 18,500 | 18,500 |
| COX Media - West Arizona | 7,181 | 0 | 7,181 |



**Exhibit 3**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred On or before 2/14/2019 | Open balance of debt incurred After 2/14/2019 | Total |
|---|---|---|---|
| Cox Media LLC San diego dba Cox Media - West | 0 | 500 | 500 |
| Cox Radio, Inc dba KSRV-FM | 0 | 5,500 | 5,500 |
| CP Communications | 0 | 10,221 | 10,221 |
| CRC Broadcasting Company Inc. dba KFNN-AM;Money Radio 151 | 1,913 | 0 | 1,913 |
| Creative Broadcast Techniques | 45,000 | 0 | 45,000 |
| Creek Entertainment Inc. - Riot Parade | 2,575 | 0 | 2,575 |
| Crew Line Inc. | 0 | 500 | 500 |
| Crew One Productions | 0 | 2,961 | 2,961 |
| Cumulus Media - WGKX-FM | 13,594 | 6,057 | 19,651 |
| Daniel Williams | 205 | 0 | 205 |
| Database Builders Inc./Full House Sports Marketing | 1,582 | 0 | 1,582 |
| Datacomm Services Corporation (DSC) | 9,954 | 0 | 9,954 |
| Daversa Partners | 30,000 | 0 | 30,000 |
| David Moala | 205 | 0 | 205 |
| Dental Choice holdings LLC | 7,750 | 0 | 7,750 |
| DESERET DIGITAL MEDIA Inc. (dba KSL.com, Deseretnews.com | 27,206 | 0 | 27,206 |
| Devin Lucien | 205 | 0 | 205 |
| Dex Imaging | 323 | 0 | 323 |
| Dickey Broadcasting Company | 0 | 31,600 | 31,600 |
| Dicon dba Private Diagnostic Clinic, PLLC | 1,005 | 0 | 1,005 |
| DJO, LLC | 47,239 | 6,910 | 54,149 |
| DLA Piper LLP | 6,000 | 0 | 6,000 |
| DMS Color - Digital Marketing Services Inc | 4,922 | 4,484 | 9,406 |
| Documation, Inc. dba Documation of San Antonio | 498 | 0 | 498 |
| Doubletree By Hilton Salt Lake City Airport | 0 | 6,413 | 6,413 |
| Down In Front Productions, LLC | 0 | 12,100 | 12,100 |
| Downtown Tempe Authority | 42 | 0 | 42 |
| Dr. Jill's Foot Pads, Inc. | 15,350 | 776 | 16,126 |
| Drive Marketing dna Drive Fulfillment / DNA Cycling | 0 | 1,294 | 1,294 |
| DTN, LLC | 0 | 1,500 | 1,500 |
| Dumac, LLC | 935 | 563 | 1,498 |
| eClinicalWorks LLC | 91,000 | 0 | 91,000 |
| Edward Lepp dba Leppdesign, LLC | 4,500 | 0 | 4,500 |
| EEG Enterprises, Inc. | 42,636 | 27,282 | 69,918 |
| Elior, Inc. dba Aladdin Food Management Services, LLC | 0 | 14,850 | 14,850 |
| EM Printing, LLC | 7,609 | 2,574 | 10,183 |
| Embassy Suites by Hilton South Jordan Salt Lake City | 0 | 177,399 | 177,399 |
| Embassy Suites San Antonio Landmark | 168,056 | 271,783 | 439,839 |
| Embassy Suites San Antonio Riverwalk Downtown | 0 | 133,159 | 133,159 |
| Emilio Rojas | 3,247 | 0 | 3,247 |



421

# Exhibit 3
# In re: Legendary Field Exhibitions, LLC, et al.
## Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred On or before 2/14/2019 | After 2/14/2019 | Total |
|---|---|---|---|
| Encore Event Technologies | 8,668 | 0 | 8,668 |
| Entercom Atlanta dba WSTR, WZGC, WVEE, WAOK, DIG Atlanta | 0 | 16,410 | 16,410 |
| Entercom Tennessee LLC | 8,074 | 2,932 | 11,006 |
| exhibit experts | 46,106 | 1,872 | 47,978 |
| ExpandaBrand, Inc | 635 | 0 | 635 |
| Express KCS | 5,033 | 0 | 5,033 |
| EyeKing | 512 | 0 | 512 |
| F&F Productions | 0 | 28,250 | 28,250 |
| FedEx Custom Critical | 24,066 | 0 | 24,066 |
| FELDMAN EQUITIES | 0 | 15,237 | 15,237 |
| Filmwerks LLC. | 12,152 | 10,801 | 22,953 |
| First Insurance Funding | 0 | 89,079 | 89,079 |
| Five Marketing & Management LLC | 11,747 | 0 | 11,747 |
| Flinn Broadcasting dba KXHT-FM;WHBQ-FM;WIVG-FM;WHBQ-AI | 8,008 | 2,002 | 10,010 |
| Florida Citrus Sports Events Inc. | 10,000 | 0 | 10,000 |
| Florida Medical Distributors, LLC | 0 | 4,000 | 4,000 |
| Flying V Group | 3,500 | 0 | 3,500 |
| Foot Management, Inc. | 710 | 0 | 710 |
| Foundation for Orange County Public Schools | 1,884 | 0 | 1,884 |
| Fox 5 San Diego | 18,693 | 11,308 | 30,000 |
| Fritz Martin Management, LLC | 0 | 60,000 | 60,000 |
| G&G Outfitters Inc. | 259,801 | 66,919 | 326,720 |
| Galaxy Productions LLC | 1,800 | 0 | 1,800 |
| Gary Brashear | 0 | 1,600 | 1,600 |
| Georgia Officials Association | 0 | 600 | 600 |
| Georgia State University dba GSU Panther Dining | 0 | 39,450 | 39,450 |
| GHP Media | 22,604 | 0 | 22,604 |
| G-III Leather Fashions | 41,766 | 4,320 | 46,086 |
| Gleason Electrick | 0 | 35,000 | 35,000 |
| Goalline Communications dba Jessica Carter | 0 | 1,500 | 1,500 |
| Graham Media Group DBA KSAT-TV;NSAT-TV;IKSAT | 2,000 | 0 | 2,000 |
| GRAVITY Sports Marketing | 0 | 8,000 | 8,000 |
| Graybar Electric Company | 948 | 0 | 948 |
| Guido Construction | 58,675 | 0 | 58,675 |
| Hal Mumme | 0 | 30,000 | 30,000 |
| Hearst Media Solutions dba San Antonio Express News | 19,900 | 0 | 19,900 |
| HENRY SCHEIN, Inc. | 167,282 | 2,792 | 170,074 |
| Hewitt's Flooring & Demo, LLC | 0 | 7,806 | 7,806 |
| Hicks Conventions Services & Special Events, Inc. | 0 | 5,821 | 5,821 |
| High Rise Audio | 0 | 705 | 705 |



**Exhibit 3**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred On or before 2/14/2019 | After 2/14/2019 | Total |
|---|---|---|---|
| Hilton Garden Inn Downtown Birmingham | 837 | 0 | 837 |
| Hiregy | 15,000 | 3,632 | 18,632 |
| HiWire Communication | 0 | 375 | 375 |
| Hog Wild â€˜Real Memphis Barbeque, LLC | 0 | 4,870 | 4,870 |
| Holiday Inn San Antonio Riverwalk | 478,148 | 0 | 478,148 |
| Home2 Suites by Hilton Birmingham Downtown | 4,602 | 0 | 4,602 |
| Howard Balzer | 0 | 2,000 | 2,000 |
| Hubbard Radio Phoenix dba KSLX-FM, KAZG-AM, KDKB-FM, KUI | 11,118 | 0 | 11,118 |
| Hyatt Regency Riverwalk San Antonio | 104,140 | 13,167 | 117,307 |
| iHeartMedia Ent. Inc. | 179,083 | 59,160 | 238,243 |
| Image Cam, Inc | 0 | 6,068 | 6,068 |
| IMG College, LLC | 3,500 | 0 | 3,500 |
| Infinite Scale Design Group LLC | 0 | 30,700 | 30,700 |
| Integrated Sports Specialties, LLC | 3,375 | 0 | 3,375 |
| IPFS Corporation | 10,134 | 0 | 10,134 |
| iQ Graphics | 14,972 | 7,422 | 22,394 |
| J&S Audio Visual | 766 | 0 | 766 |
| Jason Rood | 0 | 3,196 | 3,196 |
| Jeremy Cutrer | 405 | 0 | 405 |
| Jerron Searles | 205 | 0 | 205 |
| Jerry Pate Turf & Irrigation, Inc | 0 | 1,198 | 1,198 |
| Jessamen Dunker | 405 | 0 | 405 |
| Jim N Nicks Management, LLC | 0 | 5,940 | 5,940 |
| John Gaw dba Hi-Wire Communications Products Inc | 585 | 0 | 585 |
| Jude Adjei-Barimah | 205 | 0 | 205 |
| Kareem Are | 405 | 0 | 405 |
| Karick Enterprises, LLC dba Signarama - Salt Lake City | 109 | 0 | 109 |
| Keith McGill | 205 | 0 | 205 |
| Kellie Brady | 5,000 | 0 | 5,000 |
| Ken Schanzer | 5,000 | 0 | 5,000 |
| KFMB-TV | 43,690 | 19,280 | 62,970 |
| Kilpatrick Townsend & Stockton LLP | 15,000 | 5,000 | 20,000 |
| Kinematic Sports, LLC | 49,018 | 0 | 49,018 |
| KongBasileConsulting, LLC | 20,000 | 0 | 20,000 |
| KORE Interactive Systems | 85,200 | 0 | 85,200 |
| KPHO Broadcasting Corporation dba KPHO-TV; KTVK-TV; AZFAM | 3,390 | 0 | 3,390 |
| KRANOS CORPORATION / Schutt Sports | 65,519 | 0 | 65,519 |
| Krausko LLC | 415 | 0 | 415 |
| Krueger International, Inc. | 0 | 12,296 | 12,296 |
| KSL NewsRadio - Bonneville | 32,250 | 6,856 | 39,106 |



**Exhibit 3**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred On or before 2/14/2019 | Open balance of debt incurred After 2/14/2019 | Total |
|---|---|---|---|
| Ladds | 0 | 721 | 721 |
| LAMAR | 39,570 | 0 | 39,570 |
| Language of Caring, LLC | 9,058 | 0 | 9,058 |
| Lazser Down LLC | 23,600 | 0 | 23,600 |
| LinkedIn Corp. | 6,608 | 0 | 6,608 |
| LIQUID SOUL MEDIA, LLC | 25,000 | 0 | 25,000 |
| Logicopy | 1,016 | 0 | 1,016 |
| Loren Odell | 0 | 177 | 177 |
| Lotus Broadcasting Corporation dba KOMP, KXPT, KWID, KWWN | 5,840 | 0 | 5,840 |
| LSI Graphics, LLC | 1,388 | 0 | 1,388 |
| M&M Productions, Inc | 1,392 | 0 | 1,392 |
| M3 Commercial Moving and Logistics, LLC | 0 | 9,795 | 9,795 |
| MAC Printing | 379 | 0 | 379 |
| Major Promotions | 0 | 1,672 | 1,672 |
| Marquis Bundy | 237 | 0 | 237 |
| MARRIOTT ORLANDO DOWNTOWN | 0 | 48,347 | 48,347 |
| Marriott Plaza San Antonio | 113,671 | 0 | 113,671 |
| Marriott San Antonio Northwest | 600,995 | 0 | 600,995 |
| Martin E. Lucas dba EZ Event Entertainment | 2,500 | 0 | 2,500 |
| Marvin Hart | 205 | 0 | 205 |
| McDowell Security Services, LLC | 0 | 2,788 | 2,788 |
| Media2, Inc. dba m2 | 58,500 | 59,100 | 117,600 |
| Memphis Marriott East | 0 | 41,946 | 41,946 |
| mer-maid clean service llc | 0 | 500 | 500 |
| Miami Air International Inc | 33,373 | 110,471 | 143,844 |
| Michael Rocha | 0 | 10,000 | 10,000 |
| Mind Over Media LLC | 30,051 | 0 | 30,051 |
| Mission Cloud Services | 21,800 | 0 | 21,800 |
| Mobile Mini Solutions | 765 | 246 | 1,011 |
| Mobile Modular | 75,631 | 0 | 75,631 |
| Morale, Welfare and Recreation - Commander, Navy Region, Sout | 0 | 500 | 500 |
| Morgan, Lewis & Bockius | 1,132,359 | 879,727 | 2,012,086 |
| Multimedia Holdings Corportion dba KPNX-TV; Channel 12; 12 Ne | 8,713 | 6,928 | 15,641 |
| MWW Group LLC | 58,524 | 0 | 58,524 |
| National Car Rental | 188 | 0 | 188 |
| Nationwide Referral Company, Inc. dba Apartment & Relocation C | 44,330 | 0 | 44,330 |
| NBC Universal, LLC dba Telemundo of Texas, LLC (KDVA) | 4,250 | 18,050 | 22,300 |
| Nelsons Tents and Events | 3,217 | 3,138 | 6,355 |
| NEP II, Inc dba NEP Supershooters, LP | 0 | 336,379 | 336,379 |
| New Era Cap | 162,630 | 25,627 | 188,257 |



Exhibit 3

**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred On or before 2/14/2019 | Open balance of debt incurred After 2/14/2019 | Total |
|---|---|---|---|
| New Memphis Institute | 2,000 | 0 | 2,000 |
| NFL Alumni Inc. - Charity | 5,000 | 0 | 5,000 |
| Northside Education Foundation | 3,500 | 0 | 3,500 |
| Norvision LLC | 14,379 | 0 | 14,379 |
| NRG Park | 1,900 | 0 | 1,900 |
| Oakwood Sports | 22,547 | 0 | 22,547 |
| OFFICE DEPOT | 39,253 | 9,232 | 48,485 |
| Office Resale Solutions, LLC | 0 | 6,000 | 6,000 |
| Officials Flags and Bags USA | 2,069 | 0 | 2,069 |
| Ogletree Deakins | 24,541 | 0 | 24,541 |
| Olympic Case Co | 118,538 | 0 | 118,538 |
| Omni Colonnade | 545,648 | 0 | 545,648 |
| On-Air Sports Marketing LLC | 850 | 0 | 850 |
| Onin Staffing | 2,142 | 0 | 2,142 |
| Open net Inc. dba Bway.net | 0 | 1,155 | 1,155 |
| Opendorse Inc. | 0 | 14,500 | 14,500 |
| Orange County Public Schools | 1,884 | 0 | 1,884 |
| Orange County Sheriff's Office Fiscal Management | 0 | 837 | 837 |
| Orlando Sentinel Media Group | 4,000 | 0 | 4,000 |
| Outdoor America Images, Inc.  OAI | 245,917 | 310,129 | 556,046 |
| OUTFRONT Media Inc. | 60,448 | 0 | 60,448 |
| Overlook Networks | 2,800 | 0 | 2,800 |
| Park Place Printing, Inc. dba Alphagraphics | 0 | 10,167 | 10,167 |
| Paul M Halsey dba Admiral Video, LLC | 0 | 12,560 | 12,560 |
| Pavilion Management Company dba Hilton Phoenix Mesa Hotel | 41,108 | 78,465 | 119,574 |
| Performance Health Supply Inc. dba. Medco Supply Company | 29,605 | 0 | 29,605 |
| Pioneer Manufacturing Company dba Pioneer Athletics & Revere F | 50,595 | 0 | 50,595 |
| Power Plus Sound & Lighting, Inc. | 0 | 15,000 | 15,000 |
| Precision Medical Services | 12,500 | 0 | 12,500 |
| Present Creative | 6,615 | 0 | 6,615 |
| Pro Orthopedic Devices, Inc. | 21,874 | 0 | 21,874 |
| Professional Travel Inc | 1,562 | 0 | 1,562 |
| Program Productions, Inc | 0 | 63,817 | 63,817 |
| Proptology FX Inc. dba Set Masters | 1,313 | 0 | 1,313 |
| Proscout | 100,000 | 0 | 100,000 |
| ProShow Systems LLC | 12,488 | 0 | 12,488 |
| Prospect Productions LLC dba Barnicle | 99,550 | 0 | 99,550 |
| PSAV | 26,007 | 0 | 26,007 |
| Pyro Shows of Alabama, Inc. | 18,040 | 0 | 18,040 |
| Pyro Shows of Texas, Inc | 5,240 | 10,480 | 15,720 |



**Exhibit 3**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred | | Total |
|---|---|---|---|
| | On or before 2/14/2019 | After 2/14/2019 | |
| Pyro Spectaculars Inc. | 16,925 | 17,213 | 34,138 |
| Pyrotecnico FX, LLC | 19,415 | 0 | 19,415 |
| Randy Woody Ribbeck | 0 | 10,500 | 10,500 |
| Raphael's Party Rentals | 0 | 7,248 | 7,248 |
| Raycom Media Inc. dba WMC-TV | 8,105 | 0 | 8,105 |
| Rehab Associates, LLC | 0 | 11,000 | 11,000 |
| Rhino Arizona, LLC | 603 | 494 | 1,097 |
| Rhino California, LLC | 0 | 7,583 | 7,583 |
| Rhino Florida LLC | 0 | 4,742 | 4,742 |
| Rhino Georgia, LLC | 0 | 8,789 | 8,789 |
| Rhino Texas, LLC | 0 | 3,266 | 3,266 |
| Rhino Utah, LLC | 0 | 9,650 | 9,650 |
| Rich Rose | 912 | 799 | 1,711 |
| Rick Hamilton | 0 | 3,493 | 3,493 |
| RIDDELL SPORTS GROUP INC. | 10,749 | 510 | 11,259 |
| Right Choice Digital | 6,260 | 0 | 6,260 |
| Robert Half | 11,829 | 4,732 | 16,560 |
| Robert Morris | 0 | 172 | 172 |
| Robert Myers * | 405 | 0 | 405 |
| Ryan Murphy | 205 | 0 | 205 |
| S O S Global Express | 250 | 7,801 | 8,051 |
| S2 Global Inc. | 17,704 | 50,369 | 68,073 |
| Safari Jeffries dba Jeffries Media Enterprises LLC | 152 | 0 | 152 |
| SAFC Management | 97,415 | 0 | 97,415 |
| Safety Services, Inc. dba U.S. Safety Services | 2,383 | 2,451 | 4,834 |
| Salesforce | 26,208 | 0 | 26,208 |
| SALSBURY INDUSTRIES | 19,663 | 0 | 19,663 |
| Salt Lake City Weekly | 2,020 | 0 | 2,020 |
| Salus Labs, Inc (dba Tripletyte) | 78,000 | 0 | 78,000 |
| Samuel Farber | 3,064 | 0 | 3,064 |
| San Antonio Bowl Association dba Valero Alamo Bowl | 5,750 | 0 | 5,750 |
| San Antonio Business Journal dba American City Business Journa | 6,387 | 0 | 6,387 |
| San Antonio Sports | 10,000 | 12,500 | 22,500 |
| San Diego Regional Chamber | 4,500 | 0 | 4,500 |
| San Diego Sportservice, Inc. dba Delaware North | 10,282 | 36,284 | 46,566 |
| SBR Technologies Vision Graphics | 6,906 | 527 | 7,433 |
| School of Health Corp. | 31,345 | 14,210 | 45,555 |
| SD Design, LLC | 5,013 | 0 | 5,013 |
| Security Industry Specialists Inc. - SIS | 53,250 | 247,062 | 300,312 |
| SewWrite | 553 | 0 | 553 |



**Exhibit 3**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred | | Total |
|---|---|---|---|
| | On or before 2/14/2019 | After 2/14/2019 | |
| Shock Doctor, Inc. dba United Sports Brands, Cutter Gloves, McDa | 98,569 | 240 | 98,809 |
| Silverman Group | 87,300 | 0 | 87,300 |
| Simplified Coach, Inc. | 25,875 | 0 | 25,875 |
| Sinclair Broadcasting WBMA WTTO WABM | 37,215 | 0 | 37,215 |
| Sir Speedy | 15,306 | 2,682 | 17,988 |
| SkyCam/Outdoor Channel | (266,836) | 316,827 | 49,991 |
| Skymail International, Inc. | 807 | 2,298 | 3,105 |
| Sloane, Offer, Weber and Dern, LLP | 10,000 | 5,000 | 15,000 |
| SmithPrint | 0 | 189 | 189 |
| SocialFlow, Inc. | 70,000 | 0 | 70,000 |
| Sodexo | 0 | 66,965 | 66,965 |
| SOL Studio Architects, LLC | 850 | 0 | 850 |
| Southland electric Company Inc. | 0 | 356 | 356 |
| Spark Printing | 1,399 | 0 | 1,399 |
| Spectrum Business/Time Warner Cable | 430 | 1,575 | 2,004 |
| Spectrum Reach / Charter | 71,218 | 27,671 | 98,889 |
| Sports and Healthcare Solutions LLC | 63 | 0 | 63 |
| Sports Imaging Consultants a.k.a. Raquel McBurney | 1,600 | 0 | 1,600 |
| Sports360az LLC | 1,500 | 0 | 1,500 |
| SportsMEDIA Technology Corp (SMT) | 6,119 | 0 | 6,119 |
| SportSoft | 5,669 | 0 | 5,669 |
| Sportstar Athletics | 14,035 | 0 | 14,035 |
| State Compensation Insurance Fund | 0 | 86,511 | 86,511 |
| STATSports | 100,000 | 0 | 100,000 |
| Steve Stirling | 0 | 1,971 | 1,971 |
| Steven Lee Hennessey dba Mountain Pictures, LLC | 0 | 6,585 | 6,585 |
| Storm Johnson | 226 | 0 | 226 |
| Summit Media | 32,349 | 3,420 | 35,768 |
| swirl | mcgarrybowen | 2,275,602 | 0 | 2,275,602 |
| T&MG, LLC dba Fastsigns/Accuprint | 1,379 | 0 | 1,379 |
| T.O.P Marketing USA | 19,773 | 1,785 | 21,558 |
| Taco Santo, LLC | 0 | 950 | 950 |
| Tag Up by Rischard Marketing, Inc | 15,100 | 1,224 | 16,324 |
| Tailgate Guys dba Pre Event Resources | 2,114 | 1,841 | 3,954 |
| Team Fitz Graphics | 965 | 0 | 965 |
| TeamWork Online | 5,000 | 0 | 5,000 |
| Teamworks Innovations, Inc. | 54,350 | 0 | 54,350 |
| Terence Garvin | 205 | 0 | 205 |
| The City of San Diego | 0 | 56,832 | 56,832 |
| The Club | 15,706 | 0 | 15,706 |



**Exhibit 3**

**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred | | Total |
| --- | --- | --- | --- |
| | On or before 2/14/2019 | After 2/14/2019 | |
| The Commercial Appeal | 0 | 20,874 | 20,874 |
| The Ebersol Lanigan Company LLC | 182,851 | 0 | 182,851 |
| The Emblem Source LLC | 1,019 | 0 | 1,019 |
| The Emily Morgan Hotel a Doubletree by Hilton | 324,416 | 0 | 324,416 |
| The Enterprise-Utah's Business Journal | 5,000 | 0 | 5,000 |
| The Highland Mint | 672 | 0 | 672 |
| The Montag Group | 60,000 | 0 | 60,000 |
| The Switch Enterprises, LLC | 16,720 | 8,360 | 25,080 |
| Threaded Agency | 12,500 | 0 | 12,500 |
| THRIFTY Car rental | 247 | 0 | 247 |
| Ticketmaster LLC | 15,462 | 0 | 15,462 |
| Timeline Productions LLC | 4,045 | 0 | 4,045 |
| TNT Game Truck, LLC | 0 | 1,298 | 1,298 |
| Tom Ward | 3,770 | 0 | 3,770 |
| Trent Morue | 956 | 0 | 956 |
| TRI-C Club Supply Inc. | 44,510 | 2,177 | 46,687 |
| TRO Crewing, Inc | 0 | 900 | 900 |
| TS2 Holdings, LLC | 15,000 | 0 | 15,000 |
| Tucker Castleberry Printing, Inc. | 2,689 | 0 | 2,689 |
| Ultimate Tailgating | 10,000 | 0 | 10,000 |
| UNCF | 7,500 | 0 | 7,500 |
| United Rentals North America, Inc | 0 | 1,816 | 1,816 |
| University of San Diego Athletics Facilities - Kirby Uranich | 1,000 | 1,000 | 2,000 |
| University of Utah Health dba AnnDrea Ricci, University of Utah He | 0 | 619 | 619 |
| Univision Radio Phoenix, Inc. | 1,726 | 0 | 1,726 |
| UTSA Alumni Association | 1,000 | 0 | 1,000 |
| Vicis | 8,227 | 0 | 8,227 |
| Violet Crown Independent | 2,000 | 0 | 2,000 |
| Vokkero by Adeunis NA, Inc. | 0 | 59,008 | 59,008 |
| Vulcan Park and Museum | 100 | 0 | 100 |
| Walter John Ellis dba Sports and Broadcast Services, LLC | 800 | 2,016 | 2,816 |
| War Machine Inc dba TSHIRTGUN.COM | 8,500 | 0 | 8,500 |
| Watermark Group | 2,748 | 0 | 2,748 |
| WBRC | 8,470 | 0 | 8,470 |
| Weldon Williams & Lick Inc. | 3,914 | 0 | 3,914 |
| Werqwise, Inc | 96,524 | 48,757 | 145,281 |
| WHBQ-TV - Cox Media Group NE, Inc. | 6,067 | 2,688 | 8,755 |
| Wholesale Commercial Laundry Equipment, SE LLC | 0 | 2,856 | 2,856 |
| Wiley Graphics | 3,573 | 0 | 3,573 |
| Wilcam Inc / Vanguard Cleaning Systems | 2,104 | 0 | 2,104 |



**Exhibit 3**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Unpaid Liabilities by Vendor as of March 29, 2019**

*(in USD unless otherwise noted)*

| Vendor | Open balance of debt incurred | | |
| --- | --- | --- | --- |
| | On or before 2/14/2019 | After 2/14/2019 | Total |
| wincraft | 10,446 | 0 | 10,446 |
| Won Worldwide LLC | 25,000 | 25,000 | 50,000 |
| WTP Service BPM 326634 | 0 | 1,380 | 1,380 |
| Xzavier Dickson | 393 | 0 | 393 |
| YarTay Company, Inc. dba Y-Cater | 0 | 46,123 | 46,123 |
| Zoominfo Inc. | 49,900 | 0 | 49,900 |
| **Total** | **$ 11,759,371** | **$ 8,755,580** | **$ 20,514,951** |

**Sources and Notes:**
Amounts represent the sum of open balances by vendor based on whether the date of each expense is on or before 2/14/2019, the date of the Term Sheet, or after 2/14/2019. Data from DCP Parties11597/Dundon003865.xlsx, AP as of 3/29/19.

bvagroup®

**Exhibit 4**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Paid Liabilities by Invoice**

*(in USD unless otherwise noted)*

| Vendor | Date | Transaction Type | Num | Amount | Payment Memo/ Description | Amount of payments post 2/14/19 for bills pre 2/14/19 (1) |
|---|---|---|---|---|---|---|
| | | | **Bill/Expense Incurred On or Before 2/14/2019** | | **Corresponding Payments After 2/14/2019** | |
| Abed Belkhous | 2/13/2019 | Bill | 2019-02-13 | 5,000 | Inv #2019-02-13 | (5,000) |
| ADT / Protection 1 | 1/10/2019 | Bill | 126811891 | 109 | Inv #126811891 | (109) |
| Alaina Donatiello Murray | 1/1/2019 | Bill | 1 | 8,000 | Inv #001 | (8,000) |
| Alaina Donatiello Murray | 1/1/2019 | Bill | 2 | 8,000 | Inv #002 | (8,000) |
| Alaska Airlines (deleted) | 1/13/2019 | Expense | 77MSIGXC4ZL2P2L5ODH | 267 | Eric BlancLast 4: 1654 | (267) |
| Alexandra Ellington | 1/29/2019 | Bill | 12919 | 2,100 | Inv #012919 | (2,100) |
| Alicia Jessop | 2/13/2019 | Bill | 2019-02-13 | 5,000 | Inv #2019-02-13 | (5,000) |
| Alliance Productions | 2/14/2019 | Bill | 24388 | 250,000 | multiple invoices | (250,000) (2) |
| Alliance Productions | 2/14/2019 | Bill | 24387 | 250,000 | Inv #24387 | (250,000) (2) |
| American Society of Composers, Au | 1/24/2019 | Bill | 01.24.19 | 3,870 | Inv #01.24.19 | (3,870) |
| ankleaid | 12/27/2018 | Bill | AA1052 | 448 | Inv #AA1052 | (448) |
| Anthony Scotty Long dba Scotty Long | 2/6/2019 | Bill | 38 | 300 | Inv #0000038 | (300) |
| Arkansas Graphics Inc. | 1/31/2019 | Bill | 50601 | 1,943 | Inv #50601 | (1,943) |
| Art F/X | 2/6/2019 | Bill | 19-017 | 2,850 | Inv #19-017 | (2,850) |
| Arthur Rodriguez | 2/8/2019 | Bill | 1003 | 10,700 | Inv #1003 | (10,700) |
| ASU 365 Community Union | 1/4/2019 | Bill | 103 | 1,898 | Inv #103 | (1,898) |
| Athletes for Hope | 1/15/2019 | Bill | 1 | 12,532 | Inv #1 | (12,532) |
| Barry Horn | 2/1/2019 | Bill | 2 | 500 | Inv #2 | (500) |
| Ben Platt | 1/30/2019 | Bill | 2 | 11,200 | Inv #002 | (11,200) |
| BexelESS | 2/6/2019 | Bill | 61007 | 156,676 | Inv #0000061007 | (156,676) |
| Birmingham Business Journal | 1/3/2019 | Bill | 10166917 | 3,000 | Inv #0000001 | (3,000) |
| Blake McClain | 12/21/2018 | Bill | Minicamp384 | 205 | Inv #Minicamp384 | (205) |
| Brad Childress | 2/13/2019 | Bill | 02-13-19 | 1,436 | Inv #March 2019 | (1,436) |
| Brandon Michael Raderstorf dba Bra | 2/6/2019 | Bill | #1 | 2,250 | Inv #1 | (2,250) |
| Brent Bauer | 2/13/2019 | Bill | 2019-02-13 | 2,500 | Inv #2019-02-13 | (2,500) |
| Broadcast Music Inc. dba BMI | 2/2/2019 | Bill | 34082734 | 7,200 | Inv #34082734 | (7,200) |
| Bruno Event Team LLC | 1/17/2019 | Bill | 9301 | 15,500 | Inv #9301 | (15,500) |
| Business Electronics Corp. | 1/25/2019 | Bill | 306544 | 291 | | (291) |
| Caryn Marie Nichols | 1/30/2019 | Bill | 1 | 2,100 | Inv #0000001 | (2,100) |
| Catering by Rosemary, Ink dba The | 2/5/2019 | Bill | RKG02120 | 6,907 | Inv #RKG02120 | (6,907) |
| Catering by Rosemary, Ink dba The | 2/11/2019 | Bill | RKG02216 | 156 | Inv #RKG02216 | (156) |
| Catering by Rosemary, Ink dba The | 2/14/2019 | Bill | 1 | 36,604 | Inv #001 | (36,604) |
| CFO Partners dba CrossFit Orlando | 2/7/2019 | Bill | 1025 | 3,000 | Inv #1025 | (3,000) |
| Christian Demuth | 2/11/2019 | Bill | 19207 | 135 | Inv #19207 | (135) |
| City of San Antonio - Alamodome | 2/4/2019 | Bill | 1_1_2019 | 600 | Inv #1_1_2019 | (600) |
| City of San Diego - SDCCU Stadium | 2/8/2019 | Bill | Feb17SDFleet | 25,000 | Inv #02-17-19 | (25,000) |
| Clifton Larson Allen LLP | 1/10/2019 | Bill | 1992335 | 12,743 | Inv #1992335 | (12,743) |

bvagroup®

**Exhibit 4**

**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Paid Liabilities by Invoice**

*(in USD unless otherwise noted)*

| | | Bill/Expense Incurred On or Before 2/14/2019 | | | Corresponding Payments After 2/14/2019 | | |
|---|---|---|---|---|---|---|---|
| Vendor | Date | Transaction Type | Num | Amount | Payment Memo/ Description | Amount of payments post 2/14/19 for bills pre 2/14/19 (1) | |
| Clifton Larson Allen LLP | 1/23/2019 | Bill | 1994681 | 12,893 | Inv #1994681 | (12,893) | |
| COMMON LOGIC | 1/1/2019 | Bill | 19-AAF-01 | 600 | Inv #19-AAF-01 | (600) | |
| CORT BUSINESS SERVICES COR | 2/2/2019 | Bill | 6714661 | 1,715 | Inv #6714661 | (1,715) | |
| Creative Broadcast Techniques | 2/12/2019 | Bill | 5.6,7 | 45,000 | Inv #5.6,7 | (45,000) | |
| Credit Card Misc. | 10/11/2018 | Expense | 36737598NR | 36 | Eric Expenses to 2019-03- | (36) | |
| Daversa Partners | 12/10/2018 | Bill | 9242 | 30,000 | Inv #9242 | (30,000) | |
| David Moala | 12/21/2018 | Bill | Minicamp409 | 205 | Inv #Minicamp409 | (205) | |
| David Voth | 1/29/2019 | Bill | 2019-02-13 | 5,000 | Inv #2019-02-13 | (5,000) | |
| Deion Holliman | 1/31/2019 | Bill | 1.31.19Pmt75 | 780 | Inv #1.31.19Pmt75 | (780) | |
| DELTA | 2/14/2019 | Expense | 0 | 778 | DELTA 0067247530967 | (778) | |
| Delta Airlines | 11/25/2018 | Expense | IL2FHNGLOGEPF3E2KV3 | 645 | Anne GerhartLast 4: 1159 | (645) | |
| Devin Lucien | 12/21/2018 | Expense | Minicamp359 | 205 | Inv #Minicamp359 | (205) | |
| DiFebo Company LLC | 1/1/2019 | Bill | OA-001 (2) | 2,500 | Inv #OA-001 (2) | (2,500) | |
| Document Strategies Inc. | 2/1/2019 | Bill | IN7954, IN7988 | 3,642 | Inv #IN7954, IN7988 | (3,642) | |
| Don McPherson Enterprises | 1/14/2019 | Bill | 1 | 19,500 | Inv #001 | (19,500) | |
| Edgar Evan dba Edgar Evan Moore | 2/2/2019 | Bill | 20190202 | 2,450 | Inv #20190202 | (2,450) | |
| Emilio Rojas | 2/7/2019 | Bill | 02.07.19 | 3,247 | Inv #02.07.19 | (3,247) | |
| FireEye | 12/27/2018 | Bill | 10170756 | 13,200 | Inv #10170756 | (13,200) | |
| First in TV | 2/11/2019 | Bill | 1901 | 2,700 | Inv #1901 | (2,700) | |
| First Insurance Funding | 2/1/2019 | Bill | 900-7792351002.14.19 | 509,776 | Inv #900-7889256.03.01.1 | (509,776) | |
| First Insurance Funding | 2/11/2019 | Bill | 900-7889256.03.01.19 | 89,079 | Inv #900-7889256.03.01.1 | (89,079) | |
| Fitness International, LLC | 2/12/2019 | Bill | 02.11.19 | 6,000 | Inv #02.11.19 | (6,000) | |
| Five Marketing & Management LLC | 2/1/2019 | Bill | 6012 | 9,359 | Inv #6012 | (9,359) | |
| Forrest Lewis Crocker | 1/3/2019 | Bill | 01.03.19 | 1,400 | Inv #01.03.19 | (1,400) | |
| Francesca Matano | 1/7/2019 | Bill | 1 | 76 | Inv #1 | (76) | |
| Gabriel Bermea | 1/19/2019 | Bill | 2/18/19 | 251 | Inv #2/18/19 | (251) | |
| Gleason Electrick | 2/12/2019 | Bill | 21219 | 8,640 | Inv #021219 | (8,640) | |
| GovX Inc | 1/12/2019 | Bill | INV00073112 | 42 | Inv #INV00073112 | (42) | |
| Gregory Hayden Mays | 2/7/2019 | Bill | 02.07.19 | 1,050 | Inv #02.07.19 | (1,050) | |
| GTZ Machine & Welding Shop Inc. | 2/7/2019 | Bill | 1498 | 3,150 | Inv #1498 | (3,150) | |
| HEB | 2/1/2019 | Bill | 10025 | 3,927 | Inv #10025 | (3,927) | |
| ICM Partners - Trent Green | 2/14/2019 | Bill | 1096437 | 20,000 | Inv #1096437 | (20,000) | |
| James Pawelczyk | 1/22/2019 | Bill | 12219 | 320 | Inv #12219 | (320) | |
| James Pawelczyk | 2/6/2019 | Bill | 02-05-19 | 1,000 | Inv #02-05-19 | (1,000) | |
| Jason Zone Fisher | 1/14/2019 | Bill | 4 | 9,195 | Inv #004 | (9,195) | |
| Jay Valanju | 2/13/2019 | Bill | 2019-02-13 | 10,000 | Inv #2019-02-13 | (10,000) | |
| JDH Broadcasting LLC - Dan Hellie | 2/12/2019 | Bill | AAFWeek1 | 7,924 | Inv #AAFWeek1 | (7,924) | |



431

22-50507-tagg Doc 2012-4-1 Filed 06/21/25 Entered 06/21/25 19:04:42 Exhibit Desig-Fixed Report of Facts Pg 432 Pg 176 of 87

**Exhibit 4**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Paid Liabilities by Invoice**

*(in USD unless otherwise noted)*

| | | | | Bill/Expense Incurred On or Before 2/14/2019 | Corresponding Payments After 2/14/2019 | |
|---|---|---|---|---|---|---|
| Vendor | Date | Transaction Type | Num | Amount | Payment Memo/ Description | Amount of payments post 2/14/19 for bills pre 2/14/2019 (1) |
| jeff costa | 1/29/2019 | Bill | AAF-01-19 | 875 | Inv #AAF-01-19 | (875) |
| Jeff Ortiz | 1/25/2019 | Bill | 182201 | 808 | Inv #182201 | (808) |
| Jesse R. McGuire dba PowerTrump | 1/11/2019 | Bill | 01.11.19 | 500 | Inv #01.11.19 | (500) |
| Jim N Nicks Management, LLC | 1/11/2019 | Bill | 01.11.19 | 5,940 | Inv #AGIRON20190216 | (5,940) |
| John J. Kasik | 2/13/2019 | Bill | 2019-02-13 | 5,000 | Inv #2019-02-13 | (5,000) |
| John Murray | 2/1/2019 | Bill | Expense report 2/1/19 | 1,953 | Inv #Expense report 2/1/19 | (1,953) |
| Jonathan Grisham | 1/25/2019 | Bill | 327 | 338 | Inv #0327 | (338) |
| Jonathan Grisham | 1/28/2019 | Bill | 328 | 200 | Inv #0328 | (200) |
| Jonathan Muro | 1/16/2019 | Bill | 5 | 800 | Inv #5 | (800) |
| Josh Howard | 2/8/2019 | Bill | 2020-02-16 | 30 | Inv #2020-02-16 | (30) |
| Josh Howard | 2/13/2019 | Bill | 2020-02-15 | 31 | Inv #2020-02-15 | (31) |
| Kenneth White | 2/13/2019 | Bill | 2019-02-13 | 5,000 | Inv #2019-02-13 | (5,000) |
| Kenny White | 2/14/2019 | Bill | 1 | 882 | Inv #1 | (882) |
| Kevin Sullivan Communications, Inc. | 1/9/2019 | Bill | 12 | 1,750 | Inv #12 | (1,750) |
| Kevin Sullivan Communications, Inc. | 2/6/2019 | Bill | 13 | 1,750 | Inv #13 | (1,750) |
| Kristen Lange | 1/28/2019 | Bill | 1001 | 3,979 | Inv #1001 | (3,979) |
| Lisa Farrell | 2/5/2019 | Bill | LFO2032019 | 800 | Inv #LFO2032019 | (800) |
| M-F Athletic Co, Inc dba MFAC, LLC | 1/22/2019 | Bill | Q30472 | 8,066 | Inv #Q30472 | (8,066) |
| Mark Mayer | 1/14/2019 | Bill | 2019-02-13 | 20,000 | Inv #2019-02-13 | (20,000) |
| Mark Mayer | 2/11/2019 | Bill | 2019-03-13 | 20,000 | Inv #2019-03-13 | (20,000) |
| Martin E. Lucas dba EZ Event Enter | 2/12/2019 | Bill | 527 | 2,500 | Inv #527 | (2,500) |
| Matthew Metcalf | 1/29/2019 | Bill | 1.29.19 Expense Repor | 1,248 | Inv #1.29.19 Expense Rep | (1,248) |
| Media Right | 2/13/2018 | Expense | YXLCZLLCQSM2FMOOK76 | 598 | Akshth MogullaLast 4: 48' | (598) |
| Media2, Inc. dba m2 | 12/3/2018 | Bill | 10781 | 4,000 | Inv #10781 | (4,000) |
| Media2, Inc. dba m2 | 1/16/2019 | Bill | 10804 | 33,000 | Inv #10804 | (33,000) |
| Medtel | 1/22/2019 | Bill | 818019 | 4,506 | Inv #818019 | (4,506) |
| Memphis United Fitness, LLC dba | 12/13/2019 | Bill | 02.01.19 | 3,000 | Inv #02.01.19 | (3,000) |
| Memphis United Fitness, LLC dba | 12/13/2019 | Bill | 03.01.19 | 3,000 | Inv #03.01.19 | (3,000) |
| mer-maid clean service llc | 1/15/2019 | Bill | january | 500 | Inv #january | (500) |
| Miami Air International Inc | 1/10/2019 | Bill | 131888 | 2,332 | Inv #131888 | (2,332) |
| Miami Air International Inc | 1/31/2019 | Bill | 132011 | 500,000 | | (500,000) |
| Miami Air International Inc | 2/6/2019 | Bill | 132049 | 411,692 | Inv #132049 | (411,692) |
| Miami Air International Inc | 2/13/2019 | Bill | 132096 | 376,675 | Inv #132096 | (376,675) |
| Michael Dersam, MD, PC | 12/1/2018 | Bill | 1 | 20,000 | Inv #2019-03-01 | (20,000) |
| Michael J. Berghauer | 2/4/2019 | Bill | SDF001 | 320 | Inv #SDF001 | (320) |
| Midway Television Productions | 1/22/2019 | Bill | 19002 | 3,000 | Multiple inv. (details on stu | (3,000) |
| Mike Dougherty | 2/12/2019 | Bill | Expense report 1/2/19 | 197 | Inv #Expense report 1/2/19 | (197) |

**Exhibit 4**

## In re: Legendary Field Exhibitions, LLC, et al.
## Undisclosed Paid Liabilities by Invoice

*(in USD unless otherwise noted)*

| Vendor | Bill/Expense Incurred On or Before 2/14/2019 | | | | Corresponding Payments After 2/14/2019 | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Date | Transaction Type | Num | Amount | Payment Memo/Description | Amount | Amount of payments post 2/14/19 for bills pre 2/14/19 (1) |
| Mike Dougherty | 2/13/2019 | Bill | 2019-02-13 | 5,000 | Inv #2019-02-13 | 5,000 | (5,000) |
| Mike Stevens | 1/31/2019 | Bill | 1.31.19Pmt169 | 780 | Inv #1.31.19Pmt169 | 780 | (780) |
| Mike Van Ermen | 1/29/2019 | Bill | 1.29 expense report | 1,057 | Inv #1.29 expense report | 1,057 | (1,057) |
| Mobile Modular | 1/13/2019 | Bill | 1849534 | 20,744 | Inv #1849534 | 20,744 | (20,744) |
| MWW Group LLC | 11/14/2018 | Bill | 48596 | 28,000 | Inv #048596 | 28,000 | (28,000) |
| NEP II, Inc dba NEP Supershooters, | 2/6/2019 | Bill | 61015 | 381,000 | Inv #61015 | 381,000 | (381,000) |
| Oakwood Sports | 1/21/2019 | Bill | 2019-203 | 22,547 | multiple invoices | 22,547 | (22,547) |
| Office Resale Solutions, LLC | 1/29/2019 | Bill | 2734 | 3,000 | Inv #2734 | 3,000 | (3,000) |
| Onin Staffing | 1/11/2019 | Bill | 636896 | 2,142 | Inv #636896 | 2,142 | (2,142) |
| Orlando Food Service Partners dba | 2/7/2019 | Bill | 68575-1 | 22,938 | Inv #68575-1 | 22,938 | (22,938) |
| Orthotech Sports - Medical Equipme | 2/8/2019 | Bill | 186792 | 2,414 | Inv #186792 | 2,414 | (2,414) |
| PCS Production Company, LP | 1/23/2019 | Bill | 5890 | 73,209 | Inv #00005890 | 73,209 | (73,209) |
| Performance Health Supply Inc. dba | 1/1/2019 | Bill | IN90986027 | 20,362 | Inv #IN90986027 | 20,362 | (20,362) |
| Phil Savage | 2/14/2019 | Bill | Expensify reimburse | 1,186 | Inv #Expensify reimburse | 1,186 | (1,186) |
| Philadelphia Grating Co., Inc. dba R | 12/31/2018 | Bill | 1910231150 | 7,100 | Inv #020119 | 7,100 | (7,100) |
| Philip Ramsey | 1/29/2019 | Bill | Jan19 payments | 3,000 | multiple invoices | 3,000 | (3,000) |
| Priority Sports & Entertainment | 11/19/2018 | Bill | 1 | 60,000 | Inv #02192019KW | 60,000 | (60,000) |
| Proscout | 10/9/2018 | Bill | 0 | 100,000 | | 100,000 | (100,000) |
| Prospect Productions LLC dba Barni | 11/29/2018 | Bill | 1111 | 20,000 | Inv #1111 | 20,000 | (20,000) |
| Quest Staffing Services, LLC / Comr | 12/19/2018 | Bill | 44766 | 1,165 | Inv #44766 | 1,165 | (1,165) |
| Ralph Colella dba Queso Good by R | 2/1/2019 | Bill | 20119 | 2,162 | Inv #020119 | 2,162 | (2,162) |
| Rhino Florida LLC | 2/9/2019 | Bill | FL6080 | 604 | Inv #FL6080 | 604 | (604) |
| Rich Rose | 1/31/2019 | Bill | 11.16.18 | 852 | Inv #01.31.19 | 852 | (852) |
| Richard darling | 2/4/2019 | Bill | 5 | 8,125 | Inv #5 | 8,125 | (8,125) |
| Richard darling | 2/4/2019 | Bill | 6 | 19,000 | Inv #6 | 19,000 | (19,000) |
| Rick Hamilton | 1/29/2019 | Bill | Jan Expenses | 1,248 | Inv #Jan Expenses | 1,248 | (1,248) |
| Rick Hamilton | 1/31/2019 | Bill | 2019-02-15 | 10,000 | Inv #2019-02-15 | 10,000 | (10,000) |
| Rick Hamilton | 2/2/2019 | Bill | Expense report 1/29 | 1,248 | Inv #Expense report 1/29 | 1,248 | (1,248) |
| Rick Mikulic dba Two Fat Guys Grill | 2/11/2019 | Bill | 02.08.19 | 1,000 | Inv #02.08.19 | 1,000 | (1,000) |
| Robert Morris | 2/2/2019 | Bill | Ex report 1/15 | 184 | Inv #Ex report 1/15 | 184 | (184) |
| Rod Woodson | 2/14/2019 | Bill | 02.10.19 | 10,000 | Inv #1 | 10,000 | (10,000) |
| Safety Services, Inc. dba U.S. Safet | 1/31/2019 | Bill | 4521 | 10,127 | Inv #4521 | 10,127 | (10,127) |
| Samuel Farber | 2/2/2019 | Bill | 02.07.19 | 3,064 | Inv #02.07.19 | 3,064 | (3,064) |
| San Diego Sportservice, Inc. dba De | 2/1/2019 | Bill | 1 | 59,287 | Inv #000001 | 59,287 | (59,287) |
| Sandra Bryant | 1/23/2019 | Bill | 1.23.19 | 22 | Inv #1.23.19 | 22 | (22) |
| Savor & Black Tie | 2/6/2019 | Bill | E00991 | 11,671 | Inv #E00991 | 11,671 | (11,671) |
| Savor & Black Tie | 2/6/2019 | Bill | E00958 | 6,976 | Inv #E00958 | 6,976 | (6,976) |

bvagroup®

**Exhibit 4**

**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Paid Liabilities by Invoice**

*(in USD unless otherwise noted)*

| Vendor | Bill/Expense Incurred On or Before 2/14/2019 | | | | Corresponding Payments After 2/14/2019 | |
| --- | --- | --- | --- | --- | --- | --- |
| | Date | Transaction Type | Num | Amount | Payment Memo/ Description | Amount of payments post 2/14/19 for bills pre 2/14/2019 (1) |
| Sean Daniel Brady | 11/18/2018 | Bill | 11.18.18 | 50 | Inv #11.18.18 | (50) |
| SewWrite | 10/24/2018 | Bill | 6110 | 1,343 | Inv #6110 | (1,343) |
| Simon Wade | 2/9/2019 | Bill | 19201 | 135 | Inv #19201 | (135) |
| Simplified Coach, Inc. | 2/8/2019 | Bill | SC9029i | 10,800 | Inv #SC9029i | (10,800) |
| Sneaky Big Studios, LLC | 1/31/2019 | Bill | 170673SB | 180,986 | Inv #170673SB | (180,986) |
| Sodexo | 2/1/2019 | Bill | 1076 | 27,576 | Inv #1076 | (27,576) |
| Sodexo | 2/11/2019 | Bill | 1080 | 9,831 | Inv #1080 | (9,831) |
| Sonesta ES Suites Memphis | 2/8/2019 | Bill | 9010219 | 102,753 | Inv #9010219 | (102,753) |
| Southern Foodservice Management | 2/11/2019 | Bill | 13318S303A | 3,451 | Inv #13318S303A | (3,451) |
| Southwest Airlines | 12/15/2018 | Expense | KQ7UQBYH6TJLF6WA6IC | 256 | Anne GerhartLast 4: 2877 | (256) |
| Southwest Airlines | 1/9/2019 | Expense | 0 | 6 | Anne GerhartLast 4: 2877 | (6) |
| Southwest Airlines | 1/9/2019 | Expense | 0 | 6 | Anne GerhartLast 4: 2877 | (6) |
| Southwest Airlines | 1/17/2019 | Expense | MCK6YC2GACG3H6M75G7 | 528 | Eric BlancLast 4: 1654 | (528) |
| Southwest Airlines | 1/22/2019 | Expense | 0 | 6 | Anne GerhartLast 4: 2877 | (6) |
| SportsMEDIA Technology Corp (SM | 1/1/2019 | Bill | 0011905-IN | 465,186 | Inv #0011905-IN | (465,186) |
| SportsMEDIA Technology Corp (SM | 1/1/2019 | Bill | 0021902-IN | 182,208 | Inv #0021902-IN | (182,208) |
| SportsMEDIA Technology Corp (SM | 2/11/2019 | Bill | 0021902-IN (1) | 150,000 | Inv #0021902-IN (1) | (150,000) |
| STF Enterprises, dba Southern Tailc | 2/14/2019 | Bill | 02.14.19 | 1,142 | Inv #02.14.19 | (1,142) |
| Suzan Ramsey | 2/11/2019 | Bill | 02.11.19 | 2,400 | Inv #3 | (2,400) |
| Texon II Inc. | 11/19/2018 | Bill | SI-110448 | 18,255 | Inv #SI-110448 | (18,255) |
| The Club | 1/8/2019 | Bill | 23803 | 15,706 | Inv #023803 | (15,706) |
| Third Eye Media - John Rosales | 1/20/2019 | Bill | 165 | 2,100 | Inv #165 | (2,100) |
| Toby Graff | 1/27/2019 | Bill | 2019-01-16 | 515 | Inv #2019-01-16 | (515) |
| Trent Morue | 1/27/2019 | Bill | 24 | 531 | Inv #24 | (531) |
| Trent Morue | 2/11/2019 | Bill | 27 | 425 | Inv #27 | (425) |
| TRO Crewing, Inc | 2/5/2019 | Bill | 19-109 | 12,620 | Inv #19-109 | (12,620) |
| TRO Crewing, Inc | 2/10/2019 | Bill | 19-109 (2) | 17,693 | Inv #19-109 (2) | (17,693) |
| Undefined Creative Inc. | 2/13/2019 | Bill | 1788 | 102,500 | Inv #1788 | (102,500) |
| Vicis | 1/18/2019 | Bill | IN1-1819-22 | 70,750 | Inv #IN1-1819-22 | (70,750) |
| Vokkero by Adeunis NA, Inc. | 1/27/2019 | Bill | 2019-01-27 | 29,504 | Inv #2019-01-27 | (29,504) |
| WALTERS INC | 2/1/2019 | Bill | 1347 | 2,000 | Inv #1347 | (2,000) |
| WCF Mutual Insurance | 2/1/2019 | Bill | 7222510 | 138,269 | Inv #7222510 | (138,269) |
| WCF Mutual Insurance | 2/4/2019 | Bill | 7213298 | 138,269 | Inv #7232228 | (138,269) |
| Whitney Stroup | 1/23/2019 | Bill | 1.23.19 | 51 | Inv #1.23.19 | (51) |
| Wright Fitness Inc. dba Wright Equip | 2/5/2019 | Bill | 221003 | 1,695 | Inv #FebRental | (1,695) |
| XOS Digital | 10/2/2018 | Bill | Sales order AAF2 - 1 | 463,342 | | (463,342) |
| **Subtotal** | | | | | | (6,196,670) |

**bva**group®

434

**Exhibit 4**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Undisclosed Paid Liabilities by Invoice**

*(in USD unless otherwise noted)*

| Vendor | | | | | Corresponding Payments After 2/14/2019 | |
|---|---|---|---|---|---|---|
| | | Bill/Expense Incurred On or Before 2/14/2019 | | | | |
| | Date | Transaction Type | Num | Amount | Payment Memo/ Description | Amount of payments post 2/14/19 for bills pre 2/14/2019 (1) |
| Add back: AAF Payroll | | | | | | 500,000  (2) |
| Total | | | | | | (5,696,670) |

**Sources and Notes:**

Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Vendor.xlsx.

(1) I compare the entries described in the "Transaction Type" column as "Bills" or "Expense" associated with Legendary Field Exhibitions, LLC that were incurred on or before February 14, 2019 to the payments made after February 14, 2019. In this exhibit, in the absence of Quickbooks data with transaction numbers, I join bills and expenses to payments using the VLOOKUP function concatenating the vendor and the amount. I then manually compare the invoice number and payment memo to ensure where possible that the payments corresponds to the bill or expense.

(2) Expenses for "Alliance Productions" are described in their memo as AAF payroll, which DCP might reasonably have expected and so are deducted from the calculation of undisclosed liabilities.

bvagroup®

**Exhibit 5**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Summary Of ESMG Obligations Incurred But Not Recorded As Accounts Payable Before February 14, 2019**

*(in USD unless otherwise noted)*

| ESMG Obligations Incurred But Not Recorded As Accounts Payable Before February 14, 2019 | | Source |
|---|---|---|
| Unbilled Stadium Rental Costs For First Week's Home Games | $ 353,357 | Exhibit 5.A |
| Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019 | 1,345,151 | Exhibit 5.B |
| **Total** | **$ 1,698,508** | |

bvagroup®

**Exhibit 5.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Unbilled Stadium Rental Costs For First Week's Home Games**

*(in USD unless otherwise noted)*

| | Total Stadium Rental Costs | Uninvoiced Stadium Rental Costs in First Week | Source |
|---|---|---|---|
| Arizona State University's Sun Devil Stadium | | $ 100,000 | See TR0001900142 (1).xlsx, tab "TeamAssumptions1," row 203. |
| University of Alabama at Birmingham's Legion Field | | $ 15,000 | See TR0001900142 (1).xlsx, tab "TeamAssumptions1," row 203. |
| UCF Athletics Association (University of Central Florida's Spectrum Stadium) | $ 778,883 | $ 155,777 | See Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+ by+Vendor.xlsx, rows 31025 and 31026. First week calculated as $778,883.11 / 5 =$155,776.62.  Five home games per season per TR0001900142 (1).xlsx, tab "Team Assumptions1" row ... |
| City of San Antonio - Alamo Dome | | $ 82,580 | See Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+ by+Vendor.xlsx, row 5852 and 5865. See also TR0001900142 (1).xlsx, tab "TeamAssumptions1," row 203; cost to rent Alamo Dome is "$50k rent + expenses". |
| **Total** | | $ 353,357 | |

bvagroup®

**Exhibit 5.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019**

*(in USD unless otherwise noted)*

| Vendor | Date | Memo | Amount | Fraction of Invoice Before 2/14/2019 | Cost Incurred Before 2/14/2019 |
|---|---|---|---|---|---|
| Wesly Lynn Snell | 2/15/2019 | Mini Camp 12/14/18-12/15/18 | $ 270 | 100% | $ 270 |
| PCS Production Company, LP | 2/15/2019 | SAC190217: Event Day crew; AAF Game Rehearsal Jan 23-28, 2019 | 23,417 | 100% | 23,417 |
| Rich Rose | 2/15/2019 | Expense report 2/5/19-2/15/19 | 912 | 91% 10 of 11 days on or before 2/14/2019 | 829 |
| The Montag Group | 2/15/2019 | Pay to Spero Dedes. 1 game for AAF 2/9/19 | 17,500 | 100% | 17,500 |
| The Switch Enterprises, LLC | 2/15/2019 | Network services between 02.01.19-02.15.19 | 16,720 | 94% 15 of 16 days on or before 2/14/2019 | 15,675 |
| AC Technology Consultants | 2/16/2019 | Local IT consultants in Tampa. Feb 1 - 15 112.5 hours | 7,313 | 94% 15 of 16 days on or before 2/14/2019 | 6,855 |
| Broadway Media, LLC dba KXRK, KEGA, K... | 2/17/2019 | Advertising 1/15-1/27 KUDD | 2,370 | 100% | 2,370 |
| Cumulus Media - WGKX-FM | 2/17/2019 | FEB 2019: 2/1-2/17 | 4,607 | 83% 15 of 18 days on or before 2/14/2019 | 3,839 |
| Cumulus Media - WGKX-FM | 2/17/2019 | FEB 2019: 1/28-2/17 | 1,450 | 86% 18 of 21 days on or before 2/14/2019 | 1,243 |
| Down In Front Productions, LLC | 2/18/2019 | BI190210: Iron vs Memphis 2/10/19 | 4,975 | 100% | 4,975 |
| Summit Media | 2/18/2019 | FEB Broadcast: FEB 11 WK 95.7 JAMZ | 1,190 | 57% 4 of 7 days in week on or before 2/14/2019 | 680 |
| Summit Media | 2/18/2019 | FEB Broadcast: FEB 11 WK 106.9 THE EAGLE | 986 | 57% 4 of 7 days in week on or before 2/14/2019 | 563 |
| Summit Media | 2/18/2019 | FEB Broadcast: FEB 11 WK WZZK | 1,244 | 57% 4 of 7 days in week on or before 2/14/2019 | 711 |
| Down In Front Productions, LLC | 2/19/2019 | BI190210: Postgame Presser 2/10/19 | 1,375 | 100% | 1,375 |
| Priority Sports & Entertainment | 2/19/2019 | Kurt Warner appearance. 2/8/19 | 60,000 | 100% | 60,000 |
| Amy Schwartz | 2/20/2019 | Copy editing 296 hours (1/20/19-2/20/19) | 5,920 | 81% 26 of 32 days on or before 2/14/2019 | 4,810 |
| Fritz Martin Management, LLC | 2/21/2019 | Ron Woodson's AAF Services for first 3 weekends of games | 60,000 | 33% 1 of 3 weeks | 20,000 |
| Alliance Productions | 2/21/2019 | Stats Training 1/26 | 16,330 | 100% | 16,330 |
| Energy United | 2/21/2019 | 12/17/18 to 01/16/19 Electric NC | 142 | 100% | 142 |
| Energy United | 2/21/2019 | 01/17/19 to 02/17/19 Electric NC | 161 | 91% 29 of 32 days on or before 2/14/2019 | 146 |
| Robert Half | 2/21/2019 | legal consulting Wk end date 2/15/19 | 2,957 | 86% 6 of 7 days in week on or before 2/14/2019 | 2,535 |
| ICM Partners - Andrew Catalon | 2/22/2019 | Payment for services on 2/9/19 | 10,000 | 100% | 10,000 |
| Jose Fuentes | 2/22/2019 | Lighting contractor. hours 12/26-1/21 | 2,550 | 100% | 2,550 |
| Arthur Rodriguez | 2/22/2019 | Hours and Travel Expenses. 1/8-1/31 | 2,150 | 100% | 2,150 |
| Arthur Rodriguez | 2/22/2019 | Hours and Travel Expenses. 1/1-1/31 | 2,003 | 100% | 2,003 |
| Multimedia Holdings Corporation dba KPNX-T... | 2/22/2019 | FEB 2018 1/28-2/10 | 6,928 | 100% | 6,928 |

bvagroup

**Exhibit 5.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019**

*(in USD unless otherwise noted)*

| Vendor | Date | Memo | Amount | Fraction of Invoice Before 2/14/2019 | | Cost Incurred Before 2/14/2019 |
|---|---|---|---|---|---|---|
| Cox Radio, Inc dba KSRV-FM | 2/24/2019 | FEB 2019: 1/28/19-2/24/18 | 5,500 | 64% | 18 of 28 days on or before 2/14/2019 | 3,536 |
| Radio One Atlanta | 2/24/2019 | Social media FEB 2019 (1/28-2/24) | 375 | 64% | 18 of 28 days on or before 2/14/2019 | 241 |
| Broadway Media, LLC dba KXRK, KEGA, K1 | 2/24/2019 | 1/28-2/24 | 800 | 64% | 18 of 28 days on or before 2/14/2019 | 514 |
| Flinn Broadcasting dba KXHT-FM;WHBQ-FN | 2/24/2019 | 02.11.19-02.17.19 Radio Ads | 2,002 | 57% | 4 of 7 days in week on or before 2/14/2019 | 1,144 |
| KSL NewsRadio - Bonneville | 2/24/2019 | FEB 2019 air time 1/28/19-2/24/19 | 6,856 | 64% | 18 of 28 days on or before 2/14/2019 | 4,407 |
| Spectrum Reach / Charter | 2/24/2019 | FEB ads: Billing Cycle 1/28/19-2/24/19 | 7,647 | 64% | 18 of 28 days on or before 2/14/2019 | 4,916 |
| Spectrum Reach / Charter | 2/24/2019 | FEB ads: Billing Cycle 1/28/19-2/24/19 | 3,018 | 64% | 18 of 28 days on or before 2/14/2019 | 1,940 |
| Spectrum Reach / Charter | 2/24/2019 | Feb: Billing Cycle 1/28/19-2/24/19 | 17,006 | 64% | 18 of 28 days on or before 2/14/2019 | 10,932 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Partitioning video feed | 5,491 | 100% | | 5,491 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Method for tracking & white board positioning during game play | 5,741 | 100% | | 5,741 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Method for tracking & white board making use of Telemetry trackers | 21,731 | 100% | | 21,731 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: PLAYRS Disbursements | 275 | 100% | | 275 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Method for predicting future outcome | 18,372 | 100% | | 18,372 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Healthcare Matters fees | 792 | 100% | | 792 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: PRECAST fees & disbursements | 671 | 100% | | 671 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Alliance btw fans, players & game | 1,320 | 100% | | 1,320 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: General patent prosecution | 18,336 | 100% | | 18,336 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (SA) - Canada | 695 | 100% | | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SA Commanders - Canada | 659 | 100% | | 659 |

bvagroup®

**Exhibit 5.B**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019**

*(in USD unless otherwise noted)*

| Vendor | Date | Memo | Amount | Fraction of Invoice Before 2/14/2019 | Cost Incurred Before 2/14/2019 |
|---|---|---|---|---|---|
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (SD) - Canada | 695 | 100% | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SD Fleet - Canada | 691 | 100% | 691 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (SLC) - Canada | 695 | 100% | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SLC Stallions - Canada | 691 | 100% | 691 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (Orlando) - Canada | 695 | 100% | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Orlando Apollos - Canada | 691 | 100% | 691 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (Memphis) - Canada | 691 | 100% | 691 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Memphis Express - Canada | 695 | 100% | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (Birmingham) - Canada | 686 | 100% | 686 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Birmingham Iron - Canada | 752 | 100% | 752 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (Atlanta) - Canada | 695 | 100% | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Atlanta Legends - Canada | 695 | 100% | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Primary logo (Arizona) - Canada | 695 | 100% | 695 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Arizona Hotshots - Canada | 33 | 100% | 33 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: THEAFF - Canada | 33 | 100% | 33 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Logo - Canada | 33 | 100% | 33 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Logo - Madrid | 149 | 100% | 149 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: AAF - Canada | 33 | 100% | 33 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Alliance AF - Canada | 33 | 100% | 33 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SA Commanders Stylized | 721 | 100% | 721 |

bva group®

**Exhibit 5.B**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019**

*(in USD unless otherwise noted)*

| Vendor | Date | Memo | Amount | Fraction of Invoice Before 2/14/2019 | Cost Incurred Before 2/14/2019 |
|---|---|---|---|---|---|
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SA Commanders | 721 | 100% | 721 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Design (ship inside shield | 721 | 100% | 721 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SD Fleet Stylized | 572 | 100% | 572 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SD Fleet | 820 | 100% | 820 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Design (horse head) | 622 | 100% | 622 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SLC Stallions stylized | 523 | 100% | 523 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: SLC Stallions | 473 | 100% | 473 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "O" | 248 | 100% | 248 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Orlando Apollos Stylized | 198 | 100% | 198 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Orlando Apollos | 99 | 100% | 99 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "M" | 99 | 100% | 99 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "E" | 396 | 100% | 396 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Memphis Express Stylized | 198 | 100% | 198 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Memphis Express | 99 | 100% | 99 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "B" & "I" | 99 | 100% | 99 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: AZ Hotshots Stylized "A&Z" | 572 | 100% | 572 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: AZ Hotshots | 473 | 100% | 473 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: PLAYR and Logo | 149 | 100% | 149 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Logo | 149 | 100% | 149 |

bva group®

**Exhibit 5.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019**

*(in USD unless otherwise noted)*

| Vendor | Date | Memo | Amount | Fraction of Invoice Before 2/14/2019 | Cost Incurred Before 2/14/2019 |
|---|---|---|---|---|---|
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: ALLIANCE OF AMERICAN FOOTBALL | 15,198 | 100% | 15,198 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: AAF | 6,640 | 100% | 6,640 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: ALLIANCE | 1,206 | 100% | 1,206 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: GENERAL TRADEMARK | 49,779 | 100% | 49,779 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Vanech Litigation | 13,166 | 100% | 13,166 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Leasing | 138,353 | 100% | 138,353 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: General Corporate | 98,063 | 100% | 98,063 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: General Labor & Employment Advice | 58,721 | 100% | 58,721 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "B" | 594 | 100% | 594 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Birmingham Stylized | 198 | 100% | 198 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Birmingham Iron | 99 | 100% | 99 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "A" | 99 | 100% | 99 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: ATL Stylized | 248 | 100% | 248 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Legend Stylized | 2,746 | 100% | 2,746 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Atlanta Legend Stylized | 347 | 100% | 347 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Atlanta Legends | 99 | 100% | 99 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "A" & "Z" (shield) | 820 | 100% | 820 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "A" & "Z" | 721 | 100% | 721 |
| Morgan, Lewis & Bockius | 2/27/2019 | Service for period ending 1/31/19 Re: Stylized "A" & "Z" | 721 | 100% | 721 |
| State Compensation Insurance Fund | 2/28/2019 | CA workers Comp 1/11-2/11/19 | 88,457 | 100% | 88,457 |

bvagroup®

**Exhibit 5.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Other Significant Costs Incurred Before February 14, 2019 But Not Invoiced Until March 2019**

*(in USD unless otherwise noted)*

| Vendor | Date | Memo | Amount | Fraction of Invoice Before 2/14/2019 | Cost Incurred Before 2/14/2019 |
|---|---|---|---|---|---|
| Morgan, Lewis & Bockius | 2/28/2019 | Service for period ending 1/31/19 Re: SKY/JUDGE fees & disbursements | 820 | 100% | 820 |
| Morgan, Lewis & Bockius | 2/28/2019 | Service for period ending 1/31/19 Re: Logo (shield & sword) | 721 | 100% | 721 |
| Morgan, Lewis & Bockius | 2/28/2019 | Service for period ending 1/31/19 Re: THEAAF | 149 | 100% | 149 |
| Morgan, Lewis & Bockius | 2/28/2019 | Service for period ending 1/31/19 Re: Merchandising and licensee | 62,773 | 100% | 62,773 |
| MWW Group LLC | 2/28/2019 | PR Services for month of December 15-31 | 1,770 | 100% | 1,770 |
| Sinclair Broadcasting WBMA WTTO WABM | 2/28/2019 | 02.02.19-02.10.19 Advertising | 180 | 100% | 180 |
| Sinclair Broadcasting WBMA WTTO WABM | 2/28/2019 | 02.01.19-02.09.19 Advertising | 185 | 100% | 185 |
| Sinclair Broadcasting WBMA WTTO WABM | 2/28/2019 | 02.01.19-02.08.19 Advertising | 2,500 | 100% | 2,500 |
| Sinclair Broadcasting WBMA WTTO WABM | 2/28/2019 | 02.11.19-02.16.19 Advertising | 705 | 67% 4 of 6 days on or before 2/14/2019 | 470 |
| Sinclair Broadcasting WBMA WTTO WABM | 2/28/2019 | 02.11.19-02.13.19 Advertising | 380 | 100% | 380 |
| Sinclair Broadcasting WBMA WTTO WABM | 2/28/2019 | 02.11.19-02.14.19 Advertising | 4,770 | 100% | 4,770 |
| Sinclair Broadcasting WBMA WTTO WABM | 2/28/2019 | 02.11.19-02.14.19 Advertising | 8,500 | 100% | 8,500 |
| Sneaky Big Studios, LLC | 2/28/2019 | Game day productions: Weeks 1-3 | 478,610 | 33% 1 of 3 weekly games before 2/14/2019 | 159,537 |
| NFL Network | 3/28/2019 | AAF/NFL Agreement 1st installment | 330,000 | 13% First week out of 8 week season | 41,250 |
| NFL Network | 3/28/2019 | AAF/NFL Agreement 2nd installment | 670,000 | 13% First week out of 8 week season | 83,750 |
| Travelers | 3/25/2019 | 12.07.18-12.07.19 Insurance | 586,218 | 13% First week out of 8 week season | 73,277 |
| PCH TRIBUNE LLC DBA NUMBER SIX LLC | 3/8/2019 | Media Placements Nov 2018 | 20,653 | 100% | 20,653 |
| PCH TRIBUNE LLC DBA NUMBER SIX LLC | 3/9/2019 | Media Placements Dec 2018 | 75,000 | 100% | 75,000 |
| nerdmatics | 3/5/2019 | Weeks 1-5 | 26,275 | 20% 1 out of 5 weeks | 5,255 |
| | | **Total** | | | **$ 1,345,151** |

Source:
Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Vendor.xlsx.

bvagroup®

# Exhibit 6

## In re: Legendary Field Exhibitions, LLC, et al.

### Expected Cash Flows Between February and April 2019 Based on Mr. Ebersol's Representations

*(in USD unless otherwise noted)*

| | | Feb-2019 | Mar-2019 | Apr-2019 |
|---|---|---|---|---|
| Cash balance at beginning of month | (1) $ | 70,000,000 | $ 44,836,400 | $ 22,752,267 |
| Plus Ebersol projected revenues | (2) | 9,630,315 | 14,184,420 | 13,109,920 |
| Less Ebersol projected expense | (2) | (34,793,915) | (36,268,553) | (34,688,950) |
| **Cash balance at end of month** | **$** | **44,836,400** | **$ 22,752,267** | **$ 1,173,238** |

**Sources and Notes:**

(1) February $70 M starting balance from Term Sheet (Osherow Complaint, Exhibit B). March and April cash balances based on cash balances at the end of previous months.

(2) See ESMG Financial Projections Model vF.xls, tab "Monthly Summary." I calculate this schedule using an allocation that 75% of Ebersol's projected revenue and expenses for February are applicable.

| | Feb-19 | Allocation | | Applicable Feb-19 |
|---|---|---|---|---|
| Ebersol projected revenues | $12,840,420 * | 75% | = $ | 9,630,315 |
| Ebersol projected expenses | $46,391,887 * | 75% | = $ | 34,793,915 |

I show on Exhibit 6.A that a different allocation that 50% of February's projected revenues and expenses are applicable does not change the nature of my conclusions that if Mr. Ebersol's representations about debts, cost and revenues had been correct, AAF would not have been expected to run out of cash by the end of April 2019.



**Exhibit 6.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Alternate Expected Cash Flows Between February and April 2019 Based on Mr. Ebersol's Representations**

*(in USD unless otherwise noted)*

|  |  | Feb-2019 | Mar-2019 | Apr-2019 |
|---|---|---|---|---|
| Cash balance at beginning of month | (1) | $ 70,000,000 | $ 53,224,267 | $ 31,140,134 |
| Plus Ebersol projected revenues | (2) | 6,420,210 | 14,184,420 | 13,109,920 |
| Less Ebersol projected expense | (2) | (23,195,943) | (36,268,553) | (34,688,950) |
| Cash balance at end of month |  | $ 53,224,267 | $ 31,140,134 | $ 9,561,104 |

|  | Feb-19 | Allocation |  | Applicable Feb-19 |
|---|---|---|---|---|
| Ebersol projected revenues | $12,840,420 * | 50% | = $ | 6,420,210 |
| Ebersol projected expenses | $46,391,887 * | 50% | = $ | 23,195,943 |

**Sources and Notes:**
(1) February $70 M starting balance from Term Sheet (Osherow Complaint, Exhibit B).
March and April cash balances based on cash balances at the end of previous months.
(2) See ESMG Financial Projections Model vF.xls, tab "Monthly Summary." I calculate this schedule using an allocation
that 50% of Ebersol's projected revenue and expenses for February are applicable.

bvagroup®

22-2507, Doc 2024-1-1, Filed 06/24/25, Entered 06/24/25 19:04:42, Title Page of Exhibits Page 446 of 87
22-2507-cag Doc 2012-1-1 Filed 06/24/25 Entered 06/24/25 19:04:42 Exhibits Designated
Reproduction of Exhibits Page 446 of 1466

**Exhibit 7**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Expected Cash Flows Between February and April 2019 Including Undisclosed Liabilities**

*(in USD unless otherwise noted)*

| | | Feb-2019 | Mar-2019 | Apr-2019 |
|---|---|---|---|---|
| Cash balance at beginning of month | (1) | $ 70,000,000 | $ 26,963,616 | $ 4,879,483 |
| Less undisclosed liabilities | (2) | (17,872,784) | | |
| Plus Ebersol projected revenues | (3) | 9,630,315 | 14,184,420 | 13,109,920 |
| Less Ebersol projected expense | (3) | (34,793,915) | (36,268,553) | (34,688,950) |
| **Cash balance at end of month** | | **$ 26,963,616** | **$ 4,879,483** | **$ (16,699,547)** |

**Sources and Notes:**

(1) February $70 M starting balance from Term Sheet (Osherow Complaint, Exhibit B). March and April cash balances based on cash balances at the end of previous months.

(2) See Exhibit 1.

(3) See ESMG Financial Projections Model vF.xls, tab "Monthly Summary." I calculate this schedule using an allocation that 75% of Ebersol's projected revenue and expenses for February are applicable.

| | Feb-19 | Allocation | | Applicable Feb-19 |
|---|---|---|---|---|
| Ebersol projected revenues | $12,840,420 | 75% | * = $ | 9,630,315 |
| Ebersol projected expenses | $46,391,887 | 75% | * = $ | 34,793,915 |

I show on Exhibit 7.A that a different allocation than 50% of February's projected revenues and expenses are applicable does not change the nature of my conclusions that DCP would have expected that AAF would run out of cash in April 2019 if it had been aware of AAF's allegedly undisclosed debts.

bva group®

**Exhibit 7.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Alternate Expected Cash Flows Between February and April 2019 Including Undisclosed Liabilities**

*(in USD unless otherwise noted)*

| | | Feb-2019 | Mar-2019 | Apr-2019 |
|---|---|---|---|---|
| Cash balance at beginning of month | (1) | $ 70,000,000 | $ 35,351,483 | $ 13,267,350 |
| Less undisclosed liabilities | (2) | (17,872,784) | | |
| Plus Ebersol projected revenues | (3) | 6,420,210 | 14,184,420 | 13,109,920 |
| Less Ebersol projected expense | (3) | (23,195,943) | (36,268,553) | (34,688,950) |
| **Cash balance at end of month** | | **$ 35,351,483** | **$ 13,267,350** | **$ (8,311,680)** |

**Sources and Notes:**
(1) February $70 M starting balance from Term Sheet (Osherow Complaint, Exhibit B).
   March and April cash balances based on cash balances at the end of previous months.
(2) See Exhibit 1.
(3) See ESMG Financial Projections Model vF.xls, tab "Monthly Summary." I calculate this schedule using an allocation
   that 50% of Ebersol's projected revenue and expenses for February are applicable.

| | Feb-19 | Allocation | | Applicable Feb-19 |
|---|---|---|---|---|
| Ebersol projected revenues | $12,840,420 * | 50% | = $ | 6,420,210 |
| Ebersol projected expenses | $46,391,887 * | 50% | = $ | 23,195,943 |

bva group®

**Exhibit 8**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Expected Cash Flows Between February and April 2019 Including Undisclosed and Unrecorded Liabilities**

*(in USD unless otherwise noted)*

| | | Feb-2019 | Mar-2019 | Apr-2019 |
|---|---|---|---|---|
| Cash balance at beginning of month | (1) | $ 70,000,000 | $ 25,265,108 | $ 3,180,975 |
| Less undisclosed liabilities | (2) | (17,872,784) | | |
| Less undisclosed obligations incurred but not recorded as Accounts Payable before February 14, 2019 | (3) | $ (1,698,508) | | |
| Plus Ebersol projected revenues | (4) | 9,630,315 | 14,184,420 | 13,109,920 |
| Less Ebersol projected expense | (4) | (34,793,915) | (36,268,553) | (34,688,950) |
| Cash balance at end of month | | $ 25,265,108 | $ 3,180,975 | $ (18,398,055) |

**Sources and Notes:**

(1) February $70 M starting balance from Term Sheet (Osherow Complaint, Exhibit B).
March and April cash balances based on cash balances at the end of previous months.

(2) See Exhibit 1.

(3) See Exhibit 5.

(4) See ESMG Financial Projections Model vF.xls, tab "Monthly Summary." I calculate this schedule using an allocation that 75% of Ebersol's projected revenue and expenses for February are applicable.

| | Feb-19 | Allocation | | Applicable Feb-19 |
|---|---|---|---|---|
| Ebersol projected revenues | $12,840,420 * | 75% | = $ | 9,630,315 |
| Ebersol projected expenses | $46,391,887 * | 75% | = $ | 34,793,915 |

I show on Exhibit 8.A that a different allocation that 50% of February's projected revenues and expenses are applicable does not change the nature of my conclusions that DCP would have expected that AAF would run out of cash in April 2019 if it had been aware of AAF's allegedly undisclosed debts.

bva group®

**Exhibit 8.A**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Alternate Expected Cash Flows Between February and April 2019 Including Undisclosed and Unrecorded Liabilities**

*(in USD unless otherwise noted)*

| | | Feb-2019 | Mar-2019 | Apr-2019 |
|---|---|---|---|---|
| Cash balance at beginning of month | (1) $ | 70,000,000 | $ 33,652,975 | $ 11,568,842 |
| Less undisclosed liabilities | (2) | (17,872,784) | | |
| Less undisclosed obligations incurred but not recorded as Accounts Payable before February 14, 2019 | (3) $ | (1,698,508) | | |
| Plus Ebersol projected revenues | (4) | 6,420,210 | 14,184,420 | 13,109,920 |
| Less Ebersol projected expense | (4) | (23,195,943) | (36,268,553) | (34,688,950) |
| Cash balance at end of month | $ | 33,652,975 | $ 11,568,842 | $ (10,010,188) |

**Sources and Notes:**

(1) February $70 M starting balance from Term Sheet (Osherow Complaint, Exhibit B).
March and April cash balances based on cash balances at the end of previous months.
(2) See Exhibit 1.
(3) See Exhibit 5.
(4) See ESMG Financial Projections Model vF.xls, tab "Monthly Summary." I calculate this schedule using an allocation that 50% of Ebersol's projected revenue and expenses for February are applicable.

| | Feb-19 | | Allocation | | Applicable Feb-19 |
|---|---|---|---|---|---|
| Ebersol projected revenues | $12,840,420 | * | 50% | = $ | 6,420,210 |
| Ebersol projected expenses | $46,391,887 | * | 50% | = $ | 23,195,943 |

bva group®

EXHIBIT

**15**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS, LLC,** | § | **CASE NO. 19-50900-CAG** |
| | § | |
| | § | **Chapter 7** |
| *Debtor.* | § | |

| | | |
|---|---|---|
| **RANDOLPH N. OSHEROW, Chapter 7 Trustee, and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LFE 2, LLC; and We Are Realtime, LLC,** | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | **Adversary No. 22-05078-CAG-7** |
| **v.** | § | |
| | § | |
| **THOMAS DUNDON; JOHN ZUTTER; and DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS THOMAS DUNDON, DUNDON CAPITAL PARTNERS, LLC, AND JOHN ZUTTER'S REBUTTAL EXPERT DESIGNATIONS

Pursuant to the Federal Rules of Civil Procedure and the Joint Stipulation, filed and confirmed by the Court on December 2, 2024 (Dkt. 165-1), Dundon Capital Partners LLC ("DCP"), Thomas Dundon ("Dundon"), and John Zutter ("Zutter") provide the following expert disclosure of individuals whom it may use at trial to present evidence under the Federal Rules of Evidence.

The following disclosures are based upon the information reasonably available to DCP, Dundon, and Zutter currently. Pursuant to the Federal Rules of Civil Procedure, DCP, Dundon and Zutter reserve the right to supplement their expert disclosures at the appropriate time, if and when additional information becomes available.

---

**DEFENDANTS' EXPERT DISCLOSURE**        **PAGE 1**

# EXPERT WITNESSES

## 1.     Erica Bramer[1]

### a.     Identity of Expert Witness:

Erica Bramer, CFA, CVA, CIRA; BVA Group, 7250 Dallas Parkway Suite 200, Plano, Texas 75024.

### b.     Qualifications of Expert Witness:

Ms. Bramer is Managing Partner of BVA Group, a business consulting and financial advisory firm. She provides consulting services in the areas of strategy, operations, and corporate finance/valuation, and has done so for nearly 30 years. Prior to working at BVA, she worked for AlixPartners, Bain & Company, and Price Waterhouse.

Ms. Bramer holds an MBA from the Wharton School and an MA from the University of Pennsylvania. She earned her undergraduate degrees, with high honors and Phi Beta Kappa, from the University of Texas at Austin, including a BBA in the Honors Business Program and Finance, and a BA in the Plan II Honors Program. Ms. Bramer is a CFA (Chartered Financial Analyst) charterholder, a Certified Valuation Analyst, and a Certified Insolvency and Restructuring Advisor. Attached as Exhibit A to the Bramer Report is a copy of Ms. Bramer's *curriculum vitae*, which is incorporated by reference herein.

### c.     Expert Report and Opinions:

Without limiting the substance or scope of the Bramer Report,[2] attached hereto as **Exhibit 1** which speaks for itself, the opinions Ms. Bramer intends to offer, and in general, the factual and legal bases for those opinions can be summarized as follows:

---

[1] Expert Report of Erica Bramer, CFA, CVA, CIRA dated December 30, 2024 (the "Bramer Report") is being  served concurrently herewith and is incorporated by reference as if set forth fully herein.

[2] Dundon Capital Partners, LLC also expressly incorporates by reference the Expert Report of Erica Bramer, CFA, CVA, CIRA dated December 2, 2024.

---

Ms. Bramer was asked to review, analyze and provide observations regarding the Sonia Desai Report (the "Desai Report") and Joseph R. Petrucelli Report (the "Petrucelli Report"), both dated December 2, 2024.

Ms. Bramer opines the Desai Report is fundamentally flawed for several reasons, including, without limitation: (i) the Desai Report is foundationally flawed because it fails to consider loss causation and employs an improper measurement of value; (ii) the Desai Report's inputs, assumptions, and methodology in the enterprise value calculations are flawed and unreliable because, among other things, the market approach analysis relies on equity transactions that are not comparable or informative to the valuation scenarios, the income approach analyses are based on forecasts replete with unreliable and erroneous inputs, rendering them unreliable, the Desai Report purported EVs are inconsistent with each other and fundamentally flawed; (iii) the Desai Report's projections, together with record evidence, indicate that $250 million in capital was inadequate for the AAF to reach viability; (iv) the other general observations as detailed in the Bramer report, which include addressing the Desai Report's purported tracing not employing commonly accepted tracing methodologies, rendering Desai's conclusions speculative, highlighting that DCP was not "unjustly enriched" by losing $70 million, and any purported damage related to the Debtors' Estate's outstanding claims against it were minimized by Mr. Dundon's decision to cease business operations.

Regarding the Petrucelli Report, Ms. Bramer opines that it is unclear what evidence underlies Mr. Petrucelli's conclusions, which are inconsistent with other documents produced and testimony given in this case; and (ii) based on information Ms. Bramer relied upon, the Dundon Parties had sufficient assts to fund an additional $180 million investment, had they had an obligation to do so.

The Bramer Report, which is incorporated herein by reference, expounds upon Ms. Bramer's opinions, and the legal and factual bases, therein.

---

d.      Facts or Data Considered:

In connection with her analysis, Ms. Bramer considered the documents and sources of information referenced in the Bramer Report and the information listed in Appendix B thereto, which is incorporated by reference herein. In addition, Ms. Bramer relied on her education, background, skills, and experience, including a body of knowledge derived from numerous other treatises and case law not specifically identified in the Bramer Report.

e.      Prior Expert Testimony and Publications:

Ms. Bramer's *curriculum vitae*, which is attached as Exhibit A to the Bramer Report and incorporated by reference herein, contains a list of Ms. Bramer's testimony history over the last four years and presentations and publications over the last ten years.

f.      Expert Witness Compensation:

BVA Group has been compensated for Ms. Bramer's time at the rate of $1,125 per hour. Ms. Bramer has also received assistance from other BVA Group team members working under her supervision, for which BVA Group has been compensated at rates ranging from $325 to $950 per hour. BVA Group's compensation does not depend upon the results of Ms. Bramer's analysis in her report, any related testimony, or the outcome of this matter.

**2.      Robert J. Whitsitt[3]**

a.      Identity of Expert Witness:

Robert J. Whitsitt; Whitsitt Enterprises, LLC, 1617 73rd Ave. NE, Medina, WA 98039.

b.      Qualifications of Expert Witness:

Mr. Whitsitt is the CEO of Whitsitt Enterprises, a sports, entertainment and business consulting firm. Whitsitt Enterprises provides consulting services in the areas of negotiations and

---

[3] The Expert Report of Robert J. Whitsitt dated December 30, 2024 (the "Whitsitt Report") is being served concurrently herewith and is incorporated by reference as if set forth fully herein.

business acquisitions, sports franchise management and consulting, and has done so for nearly 20 years. Whitsitt has over 40 years of experience in professional sports management and operations, including experience in the National Football League, National Basketball Association, and a collection of regional sports television networks. Whitsitt is also a best-selling author of *Game Changer—An Insider's Story of the Sonics' Resurgence, the Trail Blazers' Turnaround, and the Deal that Saved the Seahawks.*

Mr. Whitsitt holds a Master of Arts in Sports Administration from The Ohio State University, as well as a Juris Doctorate from Mitchell Hamline School of Law. He earned his undergraduate Bachelor of Science degree from the University of Wisconsin—Stevens Point.

Attached to the Whitsitt Report is a copy of Mr. Whitsitt's *curriculum vitae*, which is incorporated by reference herein.

c.    <u>Expert Report and Opinions</u>:

Without limiting the substance or scope of the Whitsitt Report, attached hereto as **Exhibit 2**, which speaks for itself, the opinions Mr. Whitsitt intends to offer, and, in general, the factual and legal bases for those opinions can be summarized as follows:

Mr. Whitsett was asked to opine on why the AAF league failed in 2019 and whether Dundon Capital Partners, Dundon, and Zutter exercised proper business judgment during the brief period they held the exclusive voting rights on ESMG's board of directors.

Mr. Whitsitt's opinions on why the AAF failed, include: (i) the AAF business model was flawed; (ii) the AAF management rushed the league's launch; and (iii) the AAF was launched in a very saturated sports market. The AAF was not financially self-sustaining due to its dependence upon external funding and its inability to secure a significant media rights fee agreement. Moreover, attendance was weak and sponsor revenue was minimal, due in part to a lack of star power and a lack of an affiliation with the National Football League. The AAF's launch was rushed in an attempt

---

**DEFENDANTS' EXPERT DISCLOSURE**                                              **PAGE 5**

to pre-empt the 2020 launch of another spring football minor league—the XFL. As a result of this rush, the AAF lacked sufficient lead time to sell sponsorships, solidify operations, negotiate affordable vendor agreements, and create brand awareness through community outreach. The AAF burned through cast faster than anticipated, due to a lack of revenue and high costs associated with the league. Moreover, the AAF was launched against a plethora of established sports leagues and events which existed during the months of February – April.

Mr. Whitsitt also concluded that Dundon and Zutter exercised good business judgment during its involvement with the AAF's operations. The AAF was out of cash and ready to fold prior to Dundon Capital Partners, LLC' injection of capital into the business. DCP's investment occurred after the AAF season was already underway. Dundon, and Zutter took prudent financial steps during the remaining weeks of operations to slow the cash burn and generate revenue, through various initiatives, including negotiating a reduction in accounts payable, attracting potential new broadcast advertisers, and attempting to create a partnership with the NFL Players Association.

The Whitsitt Report, which is incorporated herein by reference, expounds upon Mr. Whitsitt's opinions, and the legal and factual bases, therein.

d.    <u>Facts or Data Considered</u>:

In connection with his analysis, Mr. Whitsitt considered the documents and sources of information referenced in the Whitsitt Report, which is incorporated by reference herein. In addition, Mr. Whitsitt relied on his education, background, skills, and experience, including a body of knowledge derived from numerous other treatises and authorities not specifically identified in the Whitsitt Report.

e.    <u>Prior Expert Testimony and Publications</u>:

Mr. Whitsitt's *curriculum vitae*, which is attached to the Whitsitt Report and incorporated by reference herein, contains a list of Mr. Whitsitt's presentations and publications over the last ten

---

years.  Mr. Whitsitt has not testified, by deposition or at trial, as an expert during the past four years.

      f.      <u>Expert Witness Compensation</u>:

Whitsitt Enterprises has been compensated for Mr. Whitsitt's time at the rate of $1,995 per hour. Whitsitt Enterprises' compensation does not depend upon the results of Mr. Whitsitt's analysis in his report, any related testimony, or the outcome of this matter.

**3.**      **Michael J. Quilling**[4]

      a.      <u>Identity of Expert Witness</u>:

Michael J. Quilling; Quilling, Selander, Lownds, Winslett & Moser, P.C., 2001 Bryan Street, Suite 1800, Dallas, Texas 75201.

      b.      <u>Qualifications of Expert Witness</u>:

Mr. Quilling is a name partner at Quilling, Selander, Lownds, Winslett & Moser, P.C. He functions as a receiver in cases throughout the United States and Canada. He also represents companies, individuals and creditor committees in all aspects of bankruptcy matters under Chapters 11 and 7 of the Bankruptcy Code.

Mr. Quilling holds an J.D. and undergraduate degrees from the University of Georgia. Attached to the Quilling Report is a copy of Mr. Quilling's *curriculum vitae*, which is incorporated by reference herein.

      c.      <u>Expert Report and Opinions</u>:

Without limiting the substance or scope of the Quilling Report, attached hereto as **<u>Exhibit 3</u>**, which speaks for itself, the opinions Mr. Quilling intends to offer, and, in general, the factual and legal bases for those opinions can be summarized as follows:

- Mr. Quilling was asked to perform an analysis and an opinion regarding whether or not certain actions and inactions taken by Tom Dundon and John Zutter constitute breaches of fiduciary duties as alleged by the Trustee. Mr. Quilling opines that, in the context

---

[4] The Expert Report of Michael J. Quilling dated December 30, 2024 (the "Quilling Report") is being  served concurrently herewith and is incorporated by reference as if set forth fully herein.

of Dundon Capital Partners, LLC's capital infusion, shortly after making the initial $5.1 million wire, DCP began to learn the true financial mess they had inherited from prior leadership of the insolvency of AAF. Against this backdrop, DCP, Dundon, and Zutter tried to put responsible financial procedures and controls in place, but the situation was so bad it quickly became apparent the league could not be saved and the situation was hopeless, short of defrauding other potential investors. Mr. Quilling further opines that Dundon and Zutter did not breach their respective fiduciary duties based on the allegations in the Trustee's Complaint.

The Quilling Report, which is incorporated herein by reference, expounds upon Mr. Quilling's opinions, and the legal and factual bases, therein.

> d.     Facts or Data Considered:

In connection with his analysis, Mr. Quilling considered the documents and sources of information referenced in the Quilling Report, which is incorporated by reference herein. In addition, Mr. Quilling relied on his education, background, skills, and 42 plus years of experience, including a body of knowledge derived from numerous other treatises and case law not specifically identified in the Quilling Report.

> e.     Prior Expert Testimony and Publications:

Mr. Quilling has not testified, by deposition or at trial, as an expert during the past four years. Mr. Quilling has not authorized any publications in the last 10 years.

> f.     Expert Witness Compensation:

Michael J. Quilling has been compensated for his time at the rate of $650 per hour. Should Mr. Quilling need to testify by deposition or at trial, his hourly rate shall increase to $1,000 per hour. Mr. Quilling's compensation does not depend upon the results of his analysis in his report, any related testimony, or the outcome of this matter.

## 4.     Jeffrey S. Lowenstein

Mr. Lowenstein is an attorney for Dundon Capital Partners LLC, Thomas Dundon, and John Zutter in this matter. Mr. Lowenstein may be called to testify as to what amounts constitute reasonable and necessary attorneys' fees incurred by any party in connection with this litigation.

---

Mr. Lowenstein will testify in response or rebuttal to any purported expert designated within his field of expertise, including as to the necessity and reasonableness of the attorneys' fees and litigation expenses that any other party may seek to recover from Dundon Capital Partners LLC, Thomas Dundon, and/or John Zutter. To the extent Dundon Capital Partners LLC, Thomas Dundon, and/or John Zutter may be entitled to recover their attorneys' fees and litigation expenses from any party in this matter, Mr. Lowenstein will also testify as to the necessity and reasonableness of the attorneys' fees and litigation expenses incurred by them in this matter, as well as the necessary and reasonable fees and expenses associated with the appeal(s), if any, of this matter.

A true and correct copy of Mr. Lowenstein's current *curriculum vitae* and bibliography may be found at https://www.bellnunnally.com/people/jeffrey-s-lowenstein/.

## 5. Brent D. Hockaday

Brent D. Hockaday is an attorney for Dundon Capital Partners, LLC Thomas Dundon, and John Zutter in this matter. Mr. Hockaday may be called to testify as to what amounts constitute reasonable and necessary attorneys' fees incurred by any party in connection with this litigation. Mr. Hockaday will testify in response or rebuttal to any purported expert designated within his field of expertise, including as to the necessity and reasonableness of the attorneys' fees and litigation expenses that any other party may seek to recover from Dundon Capital Partners LLC, Thomas Dundon, and/or John Zutter. To the extent Dundon Capital Partners LLC, Thomas Dundon, and John Zutter may be entitled to recover their attorneys' fees and litigation expenses from any party in this matter, Mr. Hockaday will testify as to the necessity and reasonableness of the attorneys' fees and litigation expenses incurred by them in this matter, as well as the necessary and reasonable fees and expenses associated with the appeal(s), if any, of this matter.

A true and correct copy of Mr. Hockaday's current *curriculum vitae* and bibliography may be found at https://www.klgates.com/Brent-D-Hockaday.

---

**DEFENDANTS' EXPERT DISCLOSURE** **PAGE 9**

**RESERVATION OF RIGHTS**

Pursuant to the Federal Rules of Civil Procedure, Dundon Capital Partners LLC, Thomas Dundon, and John Zutter reserve the right to amend, modify and/or supplement its expert disclosures as new or additional information, documents, data or other evidence becomes available, or as necessitated by the facts and circumstances of this case. Dundon Capital Partners LLC, Thomas Dundon, and John Zutter reserve the right to disclose additional experts and rebuttal experts consistent with the Federal Rules of Civil Procedure and the orders of this Court.

Respectfully submitted,

**K&L GATES LLP**

By:   */s/Brent D. Hockaday*
       Brent D. Hockaday
       Texas Bar No. 24071295
       Brent.hockaday@klgates.com
       1717 Main Street, Suite 2800
       Dallas, TX 75201
       (214) 939-5677
       (214) 939-5849 Fax

AND

**BELL NUNNALLY & MARTIN LLP**

By:   */s/Jeff S. Lowenstein*
       Jeffrey S. Lowenstein
       Texas Bar No. 24007574
       jlowenstein@bellnunnally.com
       Beverly A. Whitley
       Texas Bar No. 21374500
       bwhitley@bellnunnally.com
       Brent A. Turman
       Texas Bar No. 24077506
       bturman@bellnunnally.com
       Sydnie A. Shimkus
       Texas Bar No. 24093783
       sshimkus@bellnunnally.com

       2323 Ross Ave., Ste. 1900
       Dallas, TX 75201
       (214) 740-1400
       (214) 740-1499 Fax

**ATTORNEYS FOR DUNDON CAPITAL
PARTNERS LLC**

---

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies a true and correct copy of the foregoing was served by delivering the same to the person listed below in the manner and on the date indicated.

Nicole L. Williams (SBN 24041784)
Katharine Battaia Clark (SBN 24046712)
**THOMPSON COBURN LLP**
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201
Phone: (972) 629-7113
Fax: (927) 629-7171
nwilliams@thompsoncoburn.com
kclark@thompsoncoburn.com

- and –

Boris Treyzon (CA SBN 18893)
Jonathon Farahi (CA SBN 324316)
**ABIR COHEN TREYZON SALO, LLP**
16001 Ventura Boulevard, Suite 200
Encino, CA 91436
Phone: (424) 288-4367
Fax: (424) 288-4368
btreyzon@actslaw.com
jfarahi@actslaw.com

- and  -

Brian S. Engel (SBN 00789279)
Steve P. Turner (SBN 20314700)
**BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP**
580 La Ventana Blvd.
Driftwood, Texas 78619
Phone:  512-687-2503
Fax: (512) 477-0008
briannen@bdfgroup.com
stevet@bdfgroup.com

**ATTORNEYS FOR PLAINTIFFS RANDOLPH N. OSHEROW, CHAPTER 7 TRUSTEE, DEBTORS' ESTATE**

Michael J Saltz
Simone E Poyourow
**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**
1880 Century Park East, Suite 900
Los Angeles, CA 90067
Phone: 310-446-9900
Fax: 310-446-9909
msaltz@jrsnd.com
spoyourow@jrsnd.com

-and-

Tom Horan
**THOMPSON, COE, COUSINS & IRONS, LLP**
700 North Pearl Street, Suite 2500
Dallas, TX 75201
Phone: 214-871-8241
Fax: 214-871-8209
Email: thoran@thompsoncoe.com

**ATTORNEYS FOR CHARLIE EBERSOL**

Dated December 31, 2024.

_/s/Brent D. Hockaday_
Brent D. Hockaday

---

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

|  |  |  |
|---|---|---|
| **IN RE** § § § § **LEGENDARY FIELD EXHIBITIONS, LLC,** § § **DEBTOR.** § § § § § | | **CASE NO. 19-50900-CAG** **CHAPTER 7** |

_____

|  |  |  |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** § §     **Plaintiff,** § § **v.** § § **CHARLES EBERSOL,** § §     **Defendant.** § § | | **ADVERSARY NO. 22-05077-CAG** |

_____

|  |  |  |
|---|---|---|
| **RANDOLPH N. OSHEROW, Chapter 7** § **Trustee, and the BANKRUPTCY** § **ESTATES OF LEGENDARY FIELD** § **EXHIBITIONS, LLC; AAF PLAYERS,** § **LLC; AAF PROPERTIES, LLC;** § **EBERSOL SPORTS MEDIA GROUP,** § **INC.; LFE2, LLC; and WE ARE** § **REALTIME, LLC.,** § **PLAINTIFFS,** § § **v.** § § **THOMAS DUNDON, JOHN ZUTTER, and** § **DUNDON CAPITAL PARTNERS, LLC,** § §     **DEFENDANTS.** | | **ADVERSARY NO. 22-05078-CAG-7** |

**bvagroup**® | Valuation. Disputes. Advisory.

**EXHIBIT 1**

# EXPERT REBUTTAL EXPERT REPORT OF
## ERICA BRAMER, CFA, CVA, CIRA

### DECEMBER 30, 2024

**TABLE OF CONTENTS**

<div align="right">**Page**</div>

I.      Scope of the Engagement ................................................................................. 1

II.     Information Considered ..................................................................................... 2

III.    Executive Summary of Opinions ....................................................................... 2

IV.     Analysis of Desai Report .................................................................................. 4

        A.      The Desai Report is foundationally flawed .......................................... 4

                1)      The Desai Report fails to consider loss causation .................. 4

                2)      The Desai Report employs an improper measurement of value, or at best, employs such measurement improperly ...................................................... 6

        B.      The Desai Report's inputs, assumptions, and methodology in the enterprise value calculations are also flawed and unreliable ............................................ 7

                1)      The Desai Report's market approach analysis relies on equity transactions that are not comparable or informative to the valuation scenarios ............................... 7

                        a)      The Series 1 Agreement ........................................... 8

                        b)      The 32 Equity Agreement ........................................ 10

                2)      The Desai Report's income approach analyses are based on forecasts replete with unreliable and erroneous inputs, rendering them unreliable ........................ 13

                        a)      The Desai Purported April EV relies entirely on a financial forecast that is replete with unrealistic assumptions, baseless inputs, and outright errors ........................................................................... 13

                        b)      The Desai Purported February EV calculates an "income approach" model based on a forecast replete with unreliable and erroneous inputs ......... 18

                        c)      The Desai Report's income approach analysis relies on an unrealistic discount rate which understates DCP's "expected rate of return" .......... 21

                        d)      The Desai Report's income approach analyses contain other flaws and errors ............................................................................ 24

                3)      The Desai Purported EVs are inconsistent with each other and fundamentally flawed .......................................................................................... 26

                        a)      The Desai Purported February EV improperly relies only on the market approach while ignoring the income approach ...................................... 26

                        b)      The Desai Purported April EV improperly relies only on the income approach while ignoring the market approach ...................................... 27

        C.      The Desai Report's projections, together with record evidence, indicate that $250 million in capital was inadequate for the AAF to reach viability .................................... 28

        D.      Other opinions and observations regarding the Desai Report ........................... 29



**TABLE OF CONTENTS**

Page

1) The Desai Report's purported tracing does not employ commonly accepted tracing methodologies, rendering its conclusions speculative ............................ 29

2) DCP was not "unjustly enriched" by losing $70 million ......................................... 30

3) To the extent that the Debtors' Estate was damaged as a result of $82.4 million in outstanding claims against it, this damage was minimized by Mr. Dundon's decision to cease business operations ................................................................. 31

V. Analysis of Petrucelli Report ....................................................................................... 31





| 7250 Dallas Parkway | 1000 Louisiana Street | 405 Lexington Avenue |
| Suite 200 | Suite 1150 | Floor 9 |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10174 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

Re: In re: Legendary Field Exhibitions, LLC, et al., Debtors, United States Bankruptcy Court Western District of Texas, San Antonio Division, Case No. 19-50900-CAG and Dundon Capital Partners LLC v. Charles Ebersol, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05077-CAG and Randolph N. Osherow, Chapter 7 Trustee and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc. ("ESMG"); LFE 2, LLC; and We Are Realtime, LLC (collectively, the "Debtors") v. Thomas Dundon, John Zutter, and Dundon Capital Partners, (collectively, the "Dundon Parties"), United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05078-CAG-7

## I.    Scope of the Engagement

1.      I previously submitted an expert report in the matter dated December 2, 2024 (the "Bramer Report") in which I observed that on February 14, 2019, the day that Dundon Capital Partners LLC ("DCP") made its subject investment, AAF and/or its affiliates had incurred at least $17.9 million in accounts payable that Mr. Ebersol allegedly did not disclose to DCP.  That amount of allegedly undisclosed debt was in addition to $5.1 million that was the only disclosed obligation, largely to cover payroll from the previous week, and $1.7 million in obligations that had been incurred but not invoiced as of February 14, 2019.  I further concluded that had DCP been made aware of undisclosed accounts payable of the Alliance of America Football ("AAF"), it would have realized that $70 million was not sufficient to cover AAF's necessary expenses for the rest of the anticipated season, even assuming that Mr. Ebersol's revenue projections and cost projections had been reasonable and accurate.

2.      On December 2, 2024, the Trustee designated as an expert witness Sonia Desai and submitted the Expert Report of Sonia Desai dated December 2, 2024 (the "Desai Report").[1]  The Trustee also designated as an expert witness Joseph R. Petrucelli and submitted the Expert Report of Joseph R. Petrucelli dated December 2, 2024 (the "Petrucelli Report").  I have been asked by counsel to review, analyze and provide observations regarding the Desai Report and the Petrucelli Report.

3.      My opinions are preliminary and based on information I have had the opportunity to analyze. Furthermore, I understand discovery is ongoing, and I may supplement my analysis as warranted by future production of documents, testimony, or other information.  Conclusions and analysis contained in this report may be supplemented through deposition, live testimony, or future response or supplemental reports.  For trial in this matter, I may prepare demonstrative aids such as charts, graphs, or other summaries of information presented in this report or contained in my work file.

---

[1]    To the extent that Ms. Desai intends to offer opinions or testimony about the background of this matter, I reserve the right to respond to such opinions and/or testimony.



## II.    Information Considered

4.      In connection with my analysis, I reviewed numerous documents and sources of information.[2] The information I considered in preparation of my analysis is listed in **Appendix B** and/or referenced in my report.[3]  I also spoke to Matthew Turney, Chief Financial Officer of Dundon Capital Partners, and Elisa Lee, Private Equity Analyst at Dundon Capital Partners.

## III.    Executive Summary of Opinions

5.      The Desai Report is fundamentally flawed, and the conclusions and calculations included therein are not reliable.  More specifically:

a.      The Desai Report claims without basis that the entire claimed lost value of the AAF would represent economic damages owed by the Dundon Parties.  It does not attempt to causally link the Dundon Parties' alleged wrongful conduct to the total loss of the league's business value, and does not consider any other factors that could have contributed to the loss, including factors that are unrelated to and/or precede any asserted acts by the Dundon Parties with regard to the AAF.  Instead, it implicitly assumes, but does not attempt to prove, that any and all loss of value associated with the AAF could only be caused by the Dundon Parties.

b.      The Desai Report improperly calculates damages on the basis of purported lost enterprise value (including debt) without evidence or support, and does so inappropriately, rendering her analysis unreliable and not meaningful.

c.      The Desai Report includes purported market approach analyses based on two AAF equity transactions that are not comparable or informative to the valuation scenarios.

i.      The first transaction (with Reginald Fowler, whose failure to provided promised liquidity and subsequent arrest for criminal activity contributed to the AAF's crisis in February 2019) significantly predates the valuation scenarios: it was entered into at a time that the AAF was not in imminent financial crisis with a different and higher set of financial forecasts, before any games had been played, before the AAF had incurred the cost overruns or working capital deficits that accumulated shortly thereafter.  Even if the timing or projections were on-point, *arguendo*, the Fowler transaction also included rights and preferences that do not pertain to Ms. Desai's valuation analyses, yet she fails to account or adjust for them.

---

[2]    Use of the first person "I" in my report refers either to me or to those working under my direct supervision.

[3]    In addition to documents referenced in this report and attached appendices, I relied on my education, background, skills, and experience, including a body of knowledge derived from numerous other treatises and case law not specifically identified herein.



467

ii. The second transaction improperly uses the upper bound of the NFL's warrant exercise price as if it were a transaction price for ESMG stock, when it is not a transaction price at all. It ignores that that exercise price was based on months' old information, and does not consider that the transaction was a small transaction with the corporate venture capital arm of the NFL (and thus is not representative of an arm's length transaction between unrelated parties), and included potential benefits, rights and privileges to both parties that do not pertain to Ms. Desai's valuation analyses, yet she fails to account or adjust for them.

d. The Desai Report also includes purported income approach analyses that are unreliable and not informative.

i. They are based on two financial forecasts prepared by AAF that are replete with unreliable, baseless and/or erroneous inputs, some of which contradict information that was known or knowable at the time that they were prepared. These errors include, for example, projecting team revenues greatly in excess of those actually experienced, double-counting revenues, assuming massive cost savings on the basis of contracts not in existence (or on no apparent basis whatsoever), and assuming broadcast revenues that had not materialized.

ii. The analyses use a discount rate that misstates the Dundon Parties' expected rate of return and does not capture the industry or company-specific risks of the AAF.

iii. The analyses have other errors, such as an artificially low tax rate, no analysis or inclusion of capital expenditures whatsoever, and unsupported net working capital.

iv. The use of the income approach at all for such an early stage of development is challenging to reliably estimate value with any degree of certainty and valuation best practices suggest the use of other methods as a basis of comparison, at a minimum.

e. The Desai Report includes other opinions that are unsupported and do not make sense.

i. The Desai Report's opinions about fund tracing are speculative and unreliable, as there is no evidence of any commonly accepted tracing analyses to support its findings.

ii. The Desai Report's claim that the DCP was "unjustly enriched" by losing $70 million is uneconomic and nonsensical.

iii. To the extent that the debtor's estate was damaged by outstanding claims against it, that damage was minimized by the Dundon Parties' decision to shutter the league and stop incurring additional liabilities.



6.     Partially correcting some of the errors in the Desai Report's income and cost projections illustrates that $180 million in hypothetical additional investment would not have been enough to make the AAF viable.

7.     The Petrucelli Report's assertion that the Dundon Parties' liquidity was impaired to the point that it would not have been able to raise $180 million timely is contradicted by the Dundon Parties' balance sheet at the end of March 2019, as well as by Mr. Dundon's testimony and my conversation with DCP's Chief Financial Officer.

## IV.   Analysis of Desai Report

### A.     The Desai Report is foundationally flawed

#### 1)     The Desai Report fails to consider loss causation

8.     The Desai Report states that "*as a result of the alleged actions described in Plaintiffs' Claims*, the Plaintiffs have incurred damages of $144.1 million, representing the total loss of the League's business value."[4]

9.     While an assumption of liability is necessary to calculate damages (without liability, the topic of damages is moot), economic damages must be shown to have resulted from the alleged wrongful conduct and not other causes.  Ms. Desai undertakes no such analysis and instead claims, without basis, that the entire clamed lost value would represent economic damages owed by the Dundon Parties.  Her position is wholly unsupported.

10.     The Desai Report claims that the enterprise value of the AAF was $144.1 million as of February 13, 2019 (the "Desai Purported February EV"), and that the loss of this purported business value was the result of the Dundon Parties' actions.[5,6]  This does not make sense.  On February 13, 2019, prior to any involvement with the Dundon Parties, the AAF did not have sufficient cash to make payroll and was on the verge of imminent collapse.[7]  Had the Dundon Parties taken no action, the AAF would not have been able to pay its players and would have collapsed within days, retaining little or no business value.  If this collapse had happened, it would have happened for reasons unrelated to any purported actions or inactions of the

---

[4]     *See* Desai Report, at p. 36 (emphasis added).

[5]     *See* Desai Report, at p. 36.

[6]     As discussed later in this report, Ms. Desai provides no explanation or support as to why enterprise value is the appropriate measure for her analysis of alleged damages.  My rebuttal points regarding the execution of her analysis should not be misconstrued to imply that I believe she has measured the appropriate standard of value.

[7]     *See, e.g.,* C. Ebersol Dep., 207:21-209:20 (September 19, 2024); T. Dundon Dep., 84:12-87:11; 91:8-91:18 (December 2, 2014); J. Zutter Dep., 352:19-353:7 (November 12, 2024); Wickersham, Seth and Rothstein, Michael, "Inside the short, unhappy life of the Alliance of American Football," *ESPN.com*, 6/13/2019, https://www.espn.com/espn/print?id=26957796.



Page 4 of 33

469

Dundon Parties, who at that point in time had not entered into any agreements with AAF and had no obligations whatsoever to fund it.

11.    Similarly, the Desai Report claims that the purported loss of $63.3 million of "Desai Purported April EV" as of April 2, 2019 was the result of the Dundon Parties' actions.  This also does not make sense.  By April 2, 2019, I understand that DCP's investment had been exhausted, and the AAF was once again on the verge of collapse, out of money and unable to meet payroll.[8]  I understand that by April 2, 2019, the Dundon Parties made $70 million in capital contributions to the AAF based in part on Mr. Ebersol's alleged representation to Mr. Dundon that $70 million was sufficient to cover all necessary expenses for the remainder of the 2019 season.[9]

12.    By April 2, 2019, I understand that the Dundon Parties had determined that this representation was not accurate.  In my prior report, I detailed my opinion that at the time that DCP entered into the Term Sheet, AAF and/or its affiliates had incurred at least $17.9 million in accounts payable that Mr. Ebersol allegedly did not disclose to DCP.  Even assuming that Mr. Ebersol's revenue projections and cost projections had been reasonable and accurate, AAF's undisclosed accounts payable were sufficiently large that DCP would have anticipated that the AAF would run out of cash well before the end of the 2019 season.[10]  However, Mr. Ebersol's revenue projections were highly inaccurate.  By the end of March 2019, instead of the $39.2 million in revenues forecast by Mr. Ebersol,[11] DCP's team had recorded less than $10 million in AAF revenue in ticket sales and cash sponsorships.[12]

13.    The Desai Report does not explain why it fails to consider the AAF's imminent collapse on the February 2019 valuation date.  It also does not consider any factors that could have contributed to the claimed loss of business value, including factors that are unrelated to and/or precede any asserted acts by the Dundon Parties with regard to the AAF.  These factors include but are not limited to:

    a.    the actions of Mr. Ebersol and his colleagues as directors, managers and employees of the AAF;

    b.    the failure of Reginald Fowler to provide the AAF with $170 million in financing that he had agreed to provide on or around August 31, 2018;[13]

---

[8]    *See* Plaintiff's Original Complaint in Adversary Proceeding No: 22-05077-cag, Dundon Capital Partners LLC v. Charles Ebersol, dated November 14, 2022 ("DCP Complaint"), at ¶¶ 45-47.

[9]    *See* DCP Complaint, at ¶¶ 21, 28,

[10]   For instance, Mr. Ebersol contacted an investor, Dave Pottruck, on January 23, 2019 asking for an additional $2 million loan the next day, noting that they were unable to make payroll.  Mr. Pottruck wrote back on January 24, 2019, requesting that the interest rate on his three loans totaling $5 million would become 10 percent if not paid back within 10 days.  *See* email chain from Kevin Freedman dated January 24, 2019, TR0001493087- TR0001493088.

[11]   *See* ESMG Financial Projections Model vF, tab "Monthly Summary," DCP Parties0004.  As described further in this report, these forecasts were based on outdated information and failed to consider information available as of February 13, 2019, the date that they were provided to Mr. Dundon, including information from the first week's games.

[12]   *See* **Exhibit 1** and **Exhibit 5**.

[13]   *See* Desai Report, ¶¶ 27-28, 35-36; K. Farrell Dep. 21:5-22:5 (November 4, 2024).



Page 5 of 33

c.  the chaotic financial management of the AAF, including undisclosed liabilities;[14]

d.  the lack of a partnership agreement with the NFL to serve as a development league;[15]

e.  the overpromise and underdelivery of the AAF digital products;[16] and

f.  the history of failure of many other startup professional football leagues.[17]

14.  Further, the Desai Report does not attempt to analyze the difference between the projections in the ESMG Financial Projections Model vF.xlsx (the "AAF Pro Forma")[18] sent on February 13, 2019 and the 2019-3-27 ESMG Valuation Model v02 (the "Revised AAF Pro Forma"),[19] prepared on or around March 27, 2019.  Ms. Desai relies on the financial projections in the AAF Pro Forma (which forms the basis of her income approach analysis as of February 13, 2019) and the lower financial projections in the Revised AAF Pro Forma (which forms the basis of her income approach analysis as of April 2, 2019), but at no point does she demonstrate the extent to which the deterioration in financial projections was allegedly caused by the actions of the Dundon Parties, separating out other non-cause of action factors.  Instead, the implicit assumption throughout the Desai Report is that any loss of value associated with the AAF could only be caused by the Dundon Parties.  This critical assumption of causal nexus of alleged damages is not remotely proven or even explored in the Desai Report.

### 2)  The Desai Report employs an improper measurement of value, or at best, employs such measurement improperly

15.  Ms. Desai provides no explanation or support as to why enterprise value is the appropriate measure for her analysis of alleged damages.  For example, she adds $37.9 million in "debt" as a dollar-for-dollar addition to her alleged equity value as of February 2019.[20]  I am unaware of $37.9 million of

---

[14]  *See, e.g.,* T. Dundon Dep., 92:7-92:15, 140:12-141:9, 182:13-182:23 (December 2, 2024); E. Lee Dep., 64:5-65:1; 65:25-66:23; 106:13-108:3 (November 6, 2024).  *See also* Bramer Report, at ¶¶ 7-9.

[15]  *See, e.g.,* R. Goodell Dep., 13:14-13:25, 23:2-24:9 (September 27, 2024); T. Dundon Dep., 264:14-267:5 (December 2, 2024); J. Vanderbilt Dep., 164:5-165:6 (November 11, 2024); K. Farrell Dep., 130:5-131:21 (November 4, 2024) ("When there's no deal to be struck with the NFL is when it was game over for the league"); Wickersham, Sean, and Rothstein, Michael, "Inside the short, unhappy life of the Alliance of American Football," *ESPN.com,* 6/13/19, https://www.espn.com/espn/print?id=26957796.

[16]  *See, e.g.,* Orr, Conor, "The Curious Rise and Spectacular Crash of the Alliance of American Football," *Sports Illustrated,* 5/1/19, https://www.si.com/nfl/2019/05/01/alliance-american-football-aaf-collapse-charlie-ebersol-tom-dundon ("Last July... a small number of early hire employees hopped on a video conference call to preview an artist's rendering of the technology their outfit hoped to develop.  First they were shown a smartphone, which in this demo displayed a Steelers game shot from a low SkyCam angle, playing out on a large video tile in the center.  Flanking that were four smaller tiles, each showing the same action, zoomed in on an individual player.  Touching a player's tile brought up a display at the bottom of the screen where you could view his energy bar, showing his level of fatigue, or engage in a variety of gambling-type activities.... One employee who saw the presentation remembers thinking, If fans can gamble on this, you're pretty much printing money.  This is the golden ticket...

What did launch—what fans at home and in stadiums found on the AAF mobile app this spring— didn't quite live up to the July demo.  There was a live streaming video element, but it was separated from the predictive/gambling element where live game footage was replaced with simple digital renderings... After experimenting with tracking players' fatigue levels, engineers couldn't find a way to keep heart monitors in place through heavy hits.  One engineer says he understands how someone might have felt the user experience "kind of sucked" (even if the team was regularly adding features).").

[17]  *See* **Appendix C**.

[18]  *See* AAF Pro Forma, DCP Parties0004.

[19]  *See* Revised AAF Pro Forma, TR0002012126.

[20]  *See* Desai Report, Exhibit A, Schedule 2.



471

interest-bearing debt that would possibly be appropriate for such consideration. Ms. Desai's sole support is an obscure reference to a QuickBooks file that has been inaccessible in discovery thus far. She references no bank documents or loan agreements whatsoever.

16.     Furthermore, she undertakes no analysis of whether such debt has had any recovery in the bankruptcy. This failure has the potential to result in double recovery, even if it were proper for inclusion in the first place. I do not observe any evidence that it was.

17.     More basically, the Desai Report claims to measure the purported value of the AAF at two points of time when it was in dire crisis. First, the February 2019 valuation date reflects the time period when the AAF was reeling from the abrupt withdrawal of the primary equity holder, coupled with significant cost overruns, utter failures of internal cost controls, and disappointing market reception. Second, the April 2019 valuation date reflects two more months of troubled operations, notwithstanding attempts to mitigate the bleeding, when the viability of the AAF had run its course and further continuation would have required upwards of half a billion dollars.[21] The errors and flaws scattered throughout the projections the Desai Report relies upon makes clear the quantitative conclusions are utterly unreliable, but the context surrounding the Desai Report valuation dates render the construct meaningless from a qualitative standpoint as well. The AAF was in crisis, Dundon Capital Partners prolonged its life, but ultimately hundreds upon hundreds of millions more would have been needed, calling into question whether the AAF could ever be economically feasible at all.

**B.    The Desai Report's inputs, assumptions, and methodology in the enterprise value calculations are also flawed and unreliable**

  **1)    The Desai Report's market approach analysis relies on equity transactions that are not comparable or informative to the valuation scenarios**

18.     According to the Desai Report, the EV of the AAF was $144.1 million as of February 13, 2019.[22] The Desai Purported February EV relies entirely on the implied pre-money valuations from only two transactions: (i) the November 2018 Series 1 Agreement in which certain investors either purchased Series 1 Preferred Stock or converted outstanding indebtedness into Series 1 Preferred Stock and Common Stock (the "Series 1 Agreement"); and (ii) the January 30, 2019 binding term sheet in which ESMG agreed to grant to 32 Equity LLC a warrant to purchase an equity interest representing 15.0 percent of ESMG's fully-diluted capitalization (the "32 Equity Agreement").[23]

---

[21] See **Exhibits 13 and 14.**

[22] See Desai Report, ¶ 66 and Exhibit A.

[23] See Desai Report, ¶¶ 82-83, 90-93, and Exhibit A, Schedule 2. See also Series 1 Agreement, TR0000003994 - TR0000004066, and 32 Equity Agreement, TR0001648047 - TR0001648055.



### a) The Series 1 Agreement

19.     The Series 1 Agreement called for Reginald Fowler to invest $50.0 million in exchange for 10,864,133 shares of Series 1 Preferred Stock, representing a purchase price of $4.6023 per share. Following the Series 1 Preferred Stock Purchase Agreement and funding commitment from Mr. Fowler in November 2018, along with proceeds from prior financing rounds from early-stage investors, the AAF had sufficient committed capital to fund the first season's operating requirements.[24]

20.     At the time of the Series 1 Agreement in fall 2018, Mr. Fowler invested prior to the AAF's first game based in part on AAF business plans from June 2018,[25] before the AAF had any information to share from its operating experience, and before the AAF had incurred the cost overruns or working capital deficits that accumulated shortly thereafter.  In contrast, at the February 13, 2019 valuation date, the AAF was in quite a different position: it had lower projected revenues and profits, and was in need of immediate funding in order to continue operating, citing a need for "$10M to get through the next 2 weeks and an additional $60M to get through the end of the season."[26]  From AAF management's own acknowledgement the company was at risk as a going concern without immediate funding in February 2019, it is clear the November 2018 Series 1 Preferred Stock Purchase Agreement occurred under significantly different circumstances than the circumstances at the February 13, 2019 valuation date and is simply not comparable or appropriate for valuation purposes.

21.     The difference in operating results and cost overruns relative to expectations would alone make the Series 1 Agreement irrelevant and inappropriate for a February 2019 valuation date, but the dramatic exit of the prior investor also created a crisis which could also unilaterally make the Series 1 Agreement fundamentally incomparable to the February 2019 condition of the AAF.  Initially, the AAF operated under the assurance that its funding needs would be predominantly met by Mr. Fowler, who had committed $170 million in financing through the Series 1 Agreement and through a line of credit.[27]  According to Mr. Ebersol, the AAF had called on Mr. Fowler's commitment twice in January 2019, and Mr. Fowler had fallen nearly $50 million behind in his funding commitment at the beginning of the season.[28]  I understand that Mr. Fowler deceived Mr. Ebersol and the AAF about the reasons for his inability to fund, offering a series of excuses.[29]  In fact, the funds that Mr. Fowler purportedly intended to use to fund the AAF were frozen and seized by

---

[24]     *See* Desai Report, ¶ 28; Series 1 Agreement, TR0000003994 - TR0000004066; TR0002014459; and ESMG Financial Projections Model vF, DCP Parties0004.

[25]     *See* C. Ebersol Dep., 90:23-92:3 (September 19, 2024) and email and attachments of Alan Kantowitz, dated June 28, 2019, TR0000560187 - TR0000560192.  I note that the business plan provided in June 2018 projected that the AAF would earn $96 million in revenues in 2019 (*see* page 10), more than $30 million more than Mr. Ebersol projected in 2019 revenues in February 2019 (*see* AAF Pro Forma, tab "Summary P&L"), and that revenue and profit expectations in the June 2018 business plan are generally higher than in the AAF Pro Forma.

[26]     *See* Desai Report, at ¶ 36.

[27]     *See* Desai Report, ¶¶ 27-28, 35-36; K. Farrell Dep. 21:5-22:5 (November 4, 2024).

[28]     *See* Defendant Charles Ebersol's Responses to Plaintiff Dundon Capital Partners' First Set of Interrogatories, dated March 25, 2024, at pp. 17-18.

[29]     *See* Defendant Charles Ebersol's Responses to Plaintiff Dundon Capital Partners' First Set of Interrogatories, dated March 25, 2024, at pp. 17-18.



the United States government for Mr. Fowler's alleged role in a scheme involving charges of bank fraud and operating an unlicensed money transmitting business.[30]  Comparing the AAF in the wake of this crisis to the AAF that was a prospective untarnished concept months earlier is wholly unsupported, even if operations had been according to expectations which, as discussed above, was certainly not the case.

22.    Mr. Fowler pled guilty to the charges and was sentenced to 75 months in prison in 2023 for his role in the scheme.[31]  As part of the plea deal, Mr. Fowler admitted to defrauding the AAF and was ordered to pay restitution of $53 million to the AAF.[32]  The Desai Report does not consider this restitution order, including any potential double recovery that may be implicit in her damage calculations by failing to consider or even analyze the impact of Mr. Fowler's actions, abrupt departure, and subsequent compensation owed to the AAF.

23.    Furthermore, the Desai Purported February EV simplistically relies only on pre-money and post-money valuations to form an opinion of value.  The pre-money and post-money valuations relied upon in the Desai Report are estimated by multiplying pre-transaction or post-transaction fully diluted shares by a proposed transaction price, or alternatively, by simply selecting a desired pre-money valuation and similarly solving for the implied fully diluted per-share price.  However, this overly simplistic methodology fails to account for the unique privileges, rights, and preferences of the various classes of equity of the company.

24.    Such unique privileges, rights, and preferences, include, for example: (i) liquidation preferences, wherein the equity holder is guaranteed payment prior to other holders in the event of distributions or a liquidation, dissolution, or winding up of the business; (ii) dividends; (iii) the ability to convert and participate as a common shareholder; and (iv) participation in dividends, distributions, or liquidation proceeds in addition to stated liquidation preferences.

25.    In the event of any liquidation, dissolution, or winding up of the Company, the holders of the Series 1 Preferred Stock were entitled to receive in preference to the holders of the Series Seed Preferred Stock and Common Stock a per share amount equal to the original purchase price of the Series 1 Preferred Stock plus any declared but unpaid dividends (the "Series 1 Liquidation Preference").[33]  Additionally, each share of Series 1 Preferred Stock was convertible into one share of Common Stock at the option of the

---

30    *See* press release, "Arizona Man And Israeli Woman Charged In Connection With Providing Shadow Banking Services To Cryptocurrency Exchanges," *United States Attorney's Office, Southern District of New York*, 6/30/19.  *See also,* Defendant Charles Ebersol's Responses to Plaintiff Dundon Capital Partners' First Set of Interrogatories, dated March 25, 2024, at pp. 17-18.

31    *See* Collins, Terry, "Ex-Minnesota Vikings co-owner sent to prison in $700M cyrptocurrency [*sic*] shadow bank scam," *USA Today*,    6/5/23,    https://www.usatoday.com/story/news/nation/2023/06/05/ex-nfl-owner-sentenced-prison-crypto-scheme/70290248007/; Murphy, Margi, et al., "Revealed: London bank accounts that could hold key to dead crypto tycoon's lost millions," *The Telegraph*,  3/15/20,  https://www.telegraph.co.uk/technology/2020/03/15/revealed-london-bank-accounts-could-hold-key-dead-crypto-tycoons/?ICID=continue_without_subscribing_reg_first.

32    *See* Collins, Terry, "Ex-Minnesota Vikings co-owner sent to prison in $700M cyrptocurrency [*sic*] shadow bank scam," *USA Today*,    6/5/23,    https://www.usatoday.com/story/news/nation/2023/06/05/ex-nfl-owner-sentenced-prison-crypto-scheme/70290248007/.

33    See Term Sheet for Series 1 Preferred Stock Financing, Ebersol 00031 - Ebersol 00058, at Ebersol 00031- Ebersol 00032.



holder, providing optionality to the holder in the form of the ability to remain a Preferred shareholder and receive priority liquidation preference or to convert and participate as a common shareholder, whichever would provide the greatest economic benefit at a hypothetical liquidation event date.[34]

26. The Series 1 Preferred Stock also carried a series of protective provisions requiring consent of the holders of a majority of the company's Preferred Stock voting together as a single class in order to:

a. alter or change the rights, powers or preferences of the Preferred Stock;

b. change the authorized number of shares of Preferred Stock or Common Stock;

c. authorize or create any new class or series of capital stock having rights, powers, or preferences senior to or on a parity with any series of Preferred Stock;

d. authorize or create any security convertible into or exercisable for any such new class or series of capital stock;

e. redeem or repurchase any shares;

f. declare or pay any other distribution or dividend; or

g. otherwise amend, alter, restate, or repeal any provision of the company's certificate of incorporation or bylaws, affect any merger, consolidation, or liquidation event, or change the authorized number of directors, among others.[35]

27. Holders of the Series 1 Preferred Stock were entitled to receive in preference to the holders of the Series Seed Preferred Stock and Common Stock a per share amount equal to the original purchase price of the Series 1 Preferred Stock plus any declared but unpaid dividends. This seniority suggests a prudent investor would pay a different price for a share of Series 1 Preferred Stock as compared to other classes of equity of the company. Accordingly, using the Series 1 Preferred Stock issuance price to derive a pre-money valuation inherently overvalues the total equity by ascribing the privileges, rights, and preferences of the Series 1 Preferred Stock to all classes of stock.

### b) The 32 Equity Agreement

28. The Desai Report crucially misstates the terms of the 32 Equity Agreement. According to the Desai Report, in the 32 Equity Agreement:

---

[34] See Term Sheet for Series 1 Preferred Stock Financing, Ebersol 00031 - Ebersol 00058, at Ebersol 00032.

[35] *See* Term Sheet for Series 1 Preferred Stock Financing, Ebersol 00031 - Ebersol 00058, at Ebersol 00032.



> ESMG issued warrants for the NFL and/or 32 Equity to acquire a 15% stake in ESMG **at the same $4.6023 share price of ESMG's Series 1 financing**. Given the "ESMG Current Per Share Price" was defined to be $4.6023, which was determined using a pre-money valuation of $115 million, **the NFL/32 Equity Agreement indicates that the equity value (i.e., pre-money valuation) of the AAF was $115 million on or around January 30, 2019.**[36]

29.     This is not accurate, and the actual terms of the transaction undermine the entire basis for using the agreement as an indication of value.  In the 32 Equity Agreement, ESMG agreed to grant to 32 Equity LLC provided a $100,000 cash payment in exchange for warrants to purchase an equity interest representing 15.0 percent of ESMG's fully-diluted capitalization at the time of exercise.[37]  The exercise price of these warrants is defined as *the lower of* (a) $4.6023 per share or (b) "the ESMG FMV, as of the applicable [date that 32 Equity delivers notice that it intends to exercise the ESMG warrants]."[38]

30.     Therefore, the 32 Equity Agreement does not represent an agreement to transact at $4.6023 per share.  Rather, that price represents an *upper bound* of the exercise price for a warrant for 32 Equity to buy ESMG shares.  When the fair market value of ESMG shares was lower than $4.6023 per share, 32 Equity could buy shares at the lower price; when the fair market value of ESMG shares was higher than $4.6023 per share, 32 Equity could buy shares at $4.6023 per share (and potentially enjoy a risk-free profit).  There is nothing about the terms of this transaction that indicates that the parties agreed to transact at $4.6023 per share, and it is simply wrong to calculate the valuation of ESMG equity on this basis.

31.     Considering Ms. Desai's acknowledgment of the AAF's urgent capital needs as of the February 13, 2019 valuation date, it stands to reason a third-party valuation firm may likely have determined the ESMG FMV to be less than the Series 1 price of $4.6023 per share, in which case the pre-money valuation implied by the January 30, 2019 warrant agreement would not be instructive to the equity value as of February 13, 2019.  The pre-money valuation implied by the "ESMG Current Value" failed to consider the economic reality of the ESMG Exercise Price potentially being lower than the Series 1 share price, in which event the warrant would exercise into a completely different and senior class of equity at terms different than those presumed by the Desai Report.

32.     I note that the value of $4.6023 per share is the same share price used in the Series 1 Agreement from November 2018, even though several months had passed between the two transactions, the league had had its training camp, and other events and developments.  If the $4.6023 per share were a transaction price (which it was not), it would not have represented any additional information, but instead would have merely reflected back the metrics and information behind the November 2018 Series 1 transaction.

---

[36]     *See* Desai Report, ¶ 83 (emphasis added).

[37]     *See* 32 Equity Agreement, TR0001648047-TR0001648055, at TR0001648049.

[38]     See 32 Equity Agreement, TR0001648047-TR0001648055, at TR0001648049- TR0001648050.



Page 11 of 33

33.    I also note that 32 Equity LLC is the corporate venture capital arm of the National Football League ("NFL"),[39] and that the AAF sought to partner and serve as a development league to the NFL.[40] ESMG management hoped that the NFL might eventually replace its "outdated" technology with ESMG-developed technology,[41] and the AAF hoped to televise 19 of its games throughout the season on the NFL Network[42] and hoped to draft players in September after NFL roster cuts.[43]   Because of contemplated contracts and business relationships between the AAF and NFL, they cannot be considered unrelated parties conducting an arms-length transaction, meaning that their transaction is not necessarily indicative of the price at which unrelated parties would transact, and therefore is not informative as to fair market value.

34.    Finally, there are other factors that affect the value of the transaction that the Desai Report does not adequately contemplate.  The 32 Equity Agreement includes a warrant to purchase a proportional share of TechCo (an ESMG subsidiary to be spun out as a separate entity subsequent to this agreement) on substantially the same terms as ESMG equity.[44]  Additionally, in the event the ESMG FMV was lower than ESMG Current Value upon exercise of the warrant, the shares to be acquired by 32 Equity would be in the form of a new series and class of shares with senior preferences and rights:

> (1) that is senior to the Company's then-existing most senior series or class of issued and outstanding capital stock in terms of rights, privileges and preferences, in each case, concerning liquidation or deemed liquidation, and dividends and distributions, and (2) that otherwise has rights, privileges and preferences that are no less favorable (e.g., without limitation, anti-dilution protections, preferred rights, pre-emptive rights, co-sale rights, information rights and registration rights) than such most senior series and class of shares.[45]

The Desai Report does not adequately consider any of these factors.

35.    In conclusion, the Desai Report's market approach analyses as applied are based on transactions that are not informative of the conditions or value of the AAF on the valuation dates and are fundamentally not capable of coming to a reliable indication of enterprise value on February 13, 2019 or April 2, 2019.

---

[39]    *See* "32 Equity General Information," *PitchBook*, https://pitchbook.com/profiles/investor/120628-09#overview; R. Goodell Dep., 14:2-14:10 (September 27, 2014); C. Ebersol Dep., 117:5-117:15 (September 20, 2024).

[40]    *See, e.g.*, C. Ebersol Dep., 43:22-45:1 (September 19, 2024), C. Ebersol Dep., 89:14-84:19, 111:22-112:11 (Sep. 20, 2024). *See also* Wickersham, Sean, and Rothstein, Michael, "Inside the short, unhappy life of the Alliance of American Football," *ESPN.com*, 6/13/19, https://www.espn.com/espn/print?id=26957796; Orr, Conor, "The Curious Rise and Spectacular Crash of the Alliance of American Football," *Sports Illustrated*, 5/1/19, https://www.si.com/nfl/2019/05/01/alliance-american-football-aaf-collapse-charlie-ebersol-tom-dundon.

[41]    *See* AAF Promotional Slide Deck, DCP Parties0005, at pg. 20.

[42]    *See* AAF Promotional Slide Deck, DCP Parties0005 at pg. 12.

[43]    *See* AAF Promotional Slide Deck, DCP Parties0005 at pg. 14.

[44]    See 32 Equity Agreement, TR0001648047-TR0001648055, at TR0001648047- TR0001648048.

[45]    *See* 32 Equity Agreement, TR0001648047 - TR0001648055, at TR0001648049.



Document Page 470 of 154

    **2)**   **The Desai Report's income approach analyses are based on forecasts replete with unreliable and erroneous inputs, rendering them unreliable**

        **a)**    **The Desai Purported April EV relies entirely on a financial forecast that is replete with unrealistic assumptions, baseless inputs, and outright errors**

36.    The Desai Purported April EV of $66.3 million is based entirely on the income approach,[46] which in turn is based on the revenues and expenses projected in the Revised AAF Pro Forma.[47]

37.    Ms. Desai posits that she can reasonably assume that "the Revised AAF Pro Forma represented the anticipated economic benefits of the AAF on or around April 2, 2019, which includes the effect of all the alleged wrongful acts of the Defendants that occurred from February 14, 2019 to at least the date the Revised AAF Pro Forma was finalized."[48]  She also says that she can reasonably assume that "[t]he Revised AAF Pro Forma represented the expected financial performance of the AAF on or around the conclusion of Mr. Dundon's involvement in the AAF."[49]

38.    Neither of these assumptions is reasonable.  The Revised AAF Pro Forma is rife with unsupported and unreasonable assumptions, inputs and errors that, in nearly every case, serve to overstate projected revenues and understate projected costs.  These unreasonable assumptions, inputs and errors undermine the credibility of the Desai Purported April EV.

39.    **League Revenue:** The Revised AAF Pro Forma assumes that the AAF would earn $7.0 million in "League Revenue" in 2019: $6.0 million in "National Sponsorship" revenue and $1.0 million in "League Merchandise."[50]  In subsequent years, the Revised AAF Pro Forma assumes that League Revenue will increase by 100.0 percent in 2021, 75.0 percent in 2022, 50.0 percent in 2023, and so on, increasing by a cumulative 2,216.1 percent between 2019 and 2028.[51]  These figures are unsupported and overstated.

        a.    I am not aware of any record evidence that the AAF had earned National Sponsorship revenues anywhere near $6.0 million or League Merchandise revenues of $1.0 million. There is no support for these hard-coded figures in the Revised AAF Pro Forma.  On the contrary, I understand from Ms. Lee that the records that form the basis of the Revised AAF Pro Forma captured the large majority of all revenues actually earned by the AAF as ticket sales and sponsorship deals at the team level.[52]

---

46    *See* Desai Report, Exhibit B, Schedule 1.

47    I understand from discussions with Ms. Lee that she had been asked to prepare an analysis of AAF revenues and costs in March 2019 (TR0001900142), which AAF employee Alan Kantowitz used to produce the Revised AAF Pro Forma (TR0002012126) on or around March 27, 2019.

48    *See* Desai Report, at ¶ 101.

49    *See* Desai Report, at ¶ 101.

50    *See* Revised AAF Pro Forma, tab "Summary P&L," row 5 and tab "League Level," column D.

51    *See* **Exhibit 2**.

52    Discussions with Ms. Lee; Analysis of AAF revenues and costs as of March 2019, TR0001900142.



478

    b.    The Revised AAF Pro Forma assumes that the AAF would earn $15.5 million in "League
Revenue" including $1.5 million in "League Merchandise" in 2020.[53]  These figures
represent dramatic growth over the unsupported 2019 National Sponsorship and League
Merchandise figures based on no support or evidence.

    c.    The Revised AAF Pro Forma further assumes that the AAF would earn $5.0 million in
"Broadcast Revenue" in 2020 without support or citation, just as a hard-coded number.[54]
In 2019, the AAF paid broadcasters to show its games: broadcasting was a cost center,
not a revenue center.[55]  I note that AAF viewership declined after the first week to
approximately half a million viewers or less per game.[56]  Given the AAF's limited
viewership, I am aware of no testimony or evidence that supports the expectation that
the AAF had a realistic path to finding a partner who would pay $5.0 million, or any
amount of money, to broadcast AAF games in 2020.  On the contrary, I understand CBS
told the AAF that it would not consider paying to broadcast AAF games in 2020.[57]

    d.    I am aware of no testimony or evidence that would support the assumption of 2,216.1
percent cumulative growth in League Revenue between 2019 and 2028.[58]

40.   **Team Revenue**: The Revised AAF Pro Forma includes $21.3 million in 2019 "Team
Revenue,"[59] a figure which dramatically exceeds actual recorded 2019 revenues.  The Revised AAF Pro
Forma's 2019 Team Revenue of $21.3 million is calculated for each of the eight AAF teams as the sum of
(a) actual and projected ticket revenue for the regular 10-game season  plus (b) assumed merchandise
revenue ($350,000 per team) plus (c) sponsorship revenue per team.[60]  Each of these three figures is
overstated and unreliable.

    a.    The Revised AAF Pro Forma contains actual ticket sales for six games, and projects that
ticket revenue for the last four regular season games would earn the average revenue
of previous games.[61]  This assumption may overstate but-for attendance in the face of
the declining attendance the league experienced.  As shown in **Exhibit 1**, for example,
paid attendance fell dramatically after Week 2, declining to 62.3 percent of Week 1 by

---

[53]  *See* Revised AAF Pro Forma, tab "Summary P&L," row 5 and tab "League Level," column E.

[54]  *See* Revised AAF Pro Forma, tab "League Level," column E.

[55]  *See, e.g.,* Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Vendor.xlsx, rows 5310-5324 (bills, expenses
and payments to the CBS Television Network) and rows 19777-19779 (bills from the NFL Network); T. Dundon Dep., 258:19-
259:4 (December 2, 2024); email chain from Charlie Ebersol, dated Feb. 13, 2019, TR0001650984 - TR0001650986.

[56]  *See* **Exhibit 3**.

[57]  *See* Wickersham, Sean, and Rothstein, Michael, "Inside the short, unhappy life of the Alliance of American Football," *ESPN.com,*
6/13/19,  https://www.espn.com/espn/print?id=26957796  (citing a CBS executive who told Dundon that "the revenue didn't
support anything beyond a time-buy.  Maybe next year we can discuss sharing production costs, McManus said.").

[58]  *See* **Exhibit 2**.

[59]  *See* Revised AAF Pro Forma, tab "Summary P&L," row 7.

[60]  *See* Revised AAF Pro Forma, tabs "Summary P&L," "Team Level Year 1," rows 11-13.

[61]  *See* Revised AAF Pro Forma, tabs "Summary P&L," "Team Level Year 1," row 11, and "Team Assumptions1" rows 22-39.



479

Week 6.[62]  In addition, ticket sale revenues appear to be recorded at a gross level without accounting for money owed to vendors or stadiums.

b.   The Revised AAF Pro Forma miscalculates and overstates the fraction of attendees who are season ticket holders as a percentage of total attendees.[63]  Since season ticket holders paid more per ticket than single-game tickets,[64] this error causes ticket revenues to be overstated.

c.   The Revised AAF Pro Forma assumes $350,000 in merchandise revenue per team with no link to any underlying support.[65]  I understand that actual team merchandise revenues in 2019 were immaterial.[66]

d.   The Revised AAF Pro Forma includes team-level sponsorship revenue totaling $8.9 million.[67]  This calculation has two serious flaws: it double-counts every sponsorship dollar,[68] and it includes the purported value of "trade" sponsorships as if they were revenue.[69]  The actual value of cash sponsorships in the Revised AAF Pro Forma underlying data is $1.7 million, not $8.9 million.[70]

e.   The Revised AAF Pro Forma further assumes without justification or basis, that in 2020:

   i.   average attendance for all teams and all games would roughly double over 2019;[71]

   ii.  merchandise sales would increase to $500,000 per team from the unsupported 2019 assumption of $350,000 per team;[72] and

   iii. the miscalculated measure of sponsorship revenue would increase by 50.0 percent.[73]

41.   As seen in **Exhibit 5**, the errors and overstatements in the Revised AAF Pro Forma cause the 2019 Team Revenue figure in the Revised AAF Pro Forma to be *almost double* actual and extrapolated

---

[62]   While the Revised AAF Proforma employed a "haircut" to forecasted ticket sales, the "haircut" amount is considerably less than the decline in attendance, let alone the other inputs and assumptions that artificially inflate the revenue forecast.

[63]   *See* Revised AAF Pro Forma, tab "Team Assumptions1," row 64.  The formula divides the sum of season ticket holders (rows 34-43) by the sum of single game tickets (rows 23-32).  The correct formula would divide the number of season ticket holders by the sum of all attendees.

[64]   *See* Revised AAF Pro Forma, tab "Team Assumptions1," rows 60-61.

[65]   See Revised AAF Pro Forma, tab " "Team Level Year 1," row 12.

[66]   Discussions with Ms. Lee.

[67]   *See* Revised AAF Pro Forma, tabs "Team Level Year 1" (row 13) and "Sponsorship Deals 2.8.19."

[68]   *See* Revised AAF Pro Forma, tab "Sponsorship Deals 2.8.19," column L ("Total").  Column L adds together column E ("2019 Revenue"), column G ("2019 Cash"), and column H ("2019 Trade").  Column E itself is a column of hard-coded values equal to the sum of columns G and H, meaning that every dollar in columns G and H is double-counted.

[69]   *See* Revised AAF Pro Forma, tab "Sponsorship Deals 2.8.19," column H ("2019 Trade").

[70]   *See* Revised AAF Pro Forma, tab "Sponsorship Deals 2.8.19," column G ("2019 Cash") and **Exhibit 4**.

[71]   *See* Revised AAF Pro Forma, tab "Team Assumptions2," row 57, versus Revised AAF Pro Forma, tab "Team Assumptions1," row 57.

[72]   *See* Revised AAF Pro Forma, tab "Team Assumptions2," row 12.

[73]   *See* Revised AAF Pro Forma, tab "Team Level year 2," row 13 and cell D13.  The 50% value is labelled "haircut" but the formula for Sponsorship Revenue actually *increases* purported sponsorship deals by 50 percent, rather than haircutting it by 50 percent.



480

Team Revenue through the end of the 10-game regular season. Even though actual information about 2019 actual Team Revenue was available, the Revised AAF Pro Forma drastically overstates the amount of Team Revenue. The combination of errors and overstatements observed in the calculation of Team Revenue call into question the quality (or lack thereof) of the entire projection. Indeed, for figures that we can verify, the number and impact of errors is staggering. This lack of reliability provides no comfort that the other inputs and assumptions that are not so readily validated can be relied upon whatsoever.

42. **Digital Revenue**: The Revised AAF Pro Forma assumes that $0 "Digital Revenue" in 2019 would leap to $17.1 million in Digital Revenue in 2020, and that Digital Revenue would rapidly grow in every subsequent year until it represented $149.9 million in annual Digital Revenue by 2028.[74]

    a. The dramatic growth expected in the Revised AAF Pro Forma is dramatic and totally unsupported. The AAF app did not have the capabilities shown in a prior demo[75] and earned no revenue for AAF; AAF representative Kevin Freedman testified that the AAF digital products could not receive revenue, and that he did not know when the AAF would have been able to start earning revenue.[76] Mr. Dundon testified that he didn't believe the technology had a lot of value,[77] and the app ultimately sold to MGM for $125,000.[78]

    b. The Revised AAF Pro Forma assumes that the AAF app would have 240,000 paying customers in 2020 and 396,900 paying customers in 2021,[79] which are aggressive assumptions. It assumes that as many or more people would be willing to pay for the AAF app in 2021 than were willing to watch AAF games on television for free throughout at least three weeks of 2019.[80]

    c. Almost every assumption about the expected growth of Digital Revenue is hardcoded and unsupported.[81] For example, key figures (such as the assumption that 2 percent of the entire fantasy sports market would download the AAF app,[82] or that 20 percent of

---

74   *See* Revised AAF Pro Forma, tab "Summary P&L" row 9, and tab "Digital Revenue."

75   *See* Orr, Conor, "The Curious Rise and Spectacular Crash of the Alliance of American Football," *Sports Illustrated*, May 1, 2019, https://www.si.com/nfl/2019/05/01/alliance-american-football-aaf-collapse-charlie-ebersol-tom-dundon.

76   *See* K. Freedman Dep., 231:15-233:17 (October 18, 2024)

77   *See* T. Dundon Dep., 254:3-254:9 (December 2, 2024).

78   *See* Williams, Charean, "MGM to acquire AAF's gambling app for $125,000," *Pro Football Talk*, 6/27/19, https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/mgm-to-acquire-aafs-gambling-app-for-125000. MGM also agreed to reduce its secured claim against AAF in exchange for the app and certain other AAF intellectual property. *See* Motion of the Chapter 7 Trustee for Approval of the Settlement Agreement with MGM Resorts International Operations, Inc. and Request for Relief (With 21-Day Language, dated June 26, 2019.

79   See Revised AAF Pro Forma, tab "Digital Revenue," cells I70-J170.

80   *See* **Exhibit 3**.

81   *See* Revised AAF Pro Forma, tab "Digital Revenue," rows 4-37.

82   *See* Revised AAF Pro Forma, tab "Digital Revenue," cell F22 (=60 [million purported US/CA Fantasy Market] * 2%).



people who download the app would participate in betting on AAF games[83]) are literally baseless.[84]

    d.    The Revised AAF Pro Forma erroneously relies upon gross revenue instead of net revenue (after payouts to vendors) in its revenue projections.[85]

43.    **League Level Expenses**: The Revised AAF Pro Forma's combined revenue assumptions mean that expected revenue in 2020 is 136.0 percent of 2019 revenue.[86] At the same time, total expected 2020 "League Level Expenses" *decrease* by 16.1 percent relative to 2019.[87] There is no explanation offered as to how the AAF would reasonably be expected to significantly increase its revenue while also dramatically reducing expenses.

    a.    The Revised AAF Pro Forma incorporates the assumption that in 2020 and beyond, the NFL will pay 50 percent of the salaries, employment taxes and benefits for 200 staff members. This would cost the NFL approximately $12.0 million in 2020.[88] I am not aware of any contract between the AAF and the NFL, let alone an agreement wherein the NFL agreed to pay half of the salaries for 200 members of AAF's staff.

    b.    League Level Expenses include a list of cost categories including employee compensation and benefits, corporate and professional related expenses, football ops related, and league SG&A, among others.[89] To estimate FY 2020 expenses, the Revised AAF Pro Forma applies a series of "Season 2 Discounts" to various line items to estimate FY 2020 expenses.[90] There is no apparent rhyme or reason to these purported discounts, and neither the Revised AAF Pro Forma nor the Desai Report offer any rationale for how the AAF would achieve cost category reductions ranging from 0.0 percent to 100.0 percent.

    c.    In future years after 2020, as the AAF is expected to double the number of teams from eight to sixteen, and increase revenues more than seven-fold,[91] the Revised AAF Pro Forma League Level Expenses do not scale up at a comparable rate. Instead, most League Level Expenses only grow by 3.0 percent per year after 2020.[92] There is no explanation offered as to how the league can add eight teams and grow revenues by

---

83    See Revised AAF Pro Forma, tab "Digital Revenue," cell F24
84    I also note that the figure of 60 million "US/CA Fantasy Market" appears to relate to all fantasy sports, not just football, in 2017 and 2022.  *See* Fantasy Sports & Gaming Association, "Industry Demographics," at https://thefsga.org/industry-demographics/.
85    See Revised AAF Pro Forma, tab "Digital Revenue," rows 88-90.
86    See **Exhibit 2**.
87    *See* **Exhibit 2**; Revised AAF Pro Forma, tab "Summary P&L," rows 14-22.
88    *See* **Exhibit 6.A**.
89    *See* Revised AAF Pro Forma, tab "League Level."
90    See Revised AAF Pro Forma, tab "League Level, column M.
91    See Revised AAF Pro Forma, tab "Summary P&L," **Exhibit 2**.
92    See Revised AAF Pro Forma, tab "Summary P&L."  Each League Level Expenses row except Digital Payment Fees have formulas in which they grow by 1+3.0% per year.



482

649.3 percent between 2020 and 2028 while league costs are only expected to grow by 89.4 percent over the same period.[93]

44. **Team Level Expenses**:

a. The Revised AAF Pro Forma assumes that teams with a roster of 53 players[94] would only need to pay for 41 "Non-NFL Football Players"[95] starting in 2020. This would cost the NFL approximately $8.9 million in 2020.[96]

b. Again, I am not aware of any contract between the AAF and the NFL, let alone an agreement wherein the NFL agreed to pay the full salaries of 96 football players. Neither the Revised AAF Pro Forma nor the Desai Report explain this assumption, or detail why the NFL would agree to absorb approximately $20.9 million in AAF personnel costs per year while receiving $0 from AAF revenue.[97]

c. The Revised AAF Pro Forma incorporates the assumption that only 30.0 percent of players will stay with the AAF for a second season, and no players will stay for three or more seasons. The Revised AAF Pro Forma assumes that in 2020, 70.0 percent of players would be new players, receiving a lower salary of $70,000, and only 30.0 percent of Season 1 players would stay with AAF for Season 2 and earn $80,000.[98] It also assumes no players would be in their third year (and earning $100,000), which makes sense for Season 2, but does not make sense in perpetuity. However, the model assumes that, into perpetuity, no players will ever make it to year 3 and earn the highest contract salary.[99]

45. In summary, the Revised AAF Pro Forma overstates projected revenues, understates projected costs, and contains mistakes and baseless assumptions. These significant shortcomings render any valuation calculated on the basis of the Revised AAF Pro Forma unreliable and overstated.

b) **The Desai Purported February EV calculates an "income approach" model based on a forecast replete with unreliable and erroneous inputs**

46. Although the Desai Report does not give any weight to the income approach in its calculation of the Desai Purported February EV,[100] it includes a purported valuation based on the income approach.[101]

---

93  *See* **Exhibit 2**.
94  See Revised AAF Pro Forma, tab "Team Assumptions1", row 196 ("Number of Football Players.")
95  See Revised AAF Pro Forma, tab "Team Assumptions2", row 195 ("Number of Football Players.")
96  See **Exhibit 6.A**.
97  See Revised AAF Pro Forma, tab "Headcount_Football," **Exhibit 6.A**.
98  *See* Revised AAF Pro Forma, tab "Team Assumptions2," rows 186-195.
99  *See* Revised AAF Pro Forma, tab "Team Assumptions2," rows 186-195.
100  *See* Desai Report, Exhibit A, Schedule 1, citing ESMG Financial Projections Model vF, DCP Parties0004.
101  *See* Desai Report, Exhibit A, Schedules 3-6.



This analysis is based on the AAF Pro Forma which was sent to Mr. Dundon by Mr. Ebersol on or around February 13, 2019.[102]

47.    Ms. Desai posits that she can reasonably assume that "the AAF Pro Forma represented the anticipated economic benefits of the AAF on or around February 13, 2019."[103]  She also says that she can reasonably assume that "[t]he AAF Pro Forma represented the expected financial performance of the AAF prior to Mr. Dundon's involvement in the AAF and prior to the Defendants obtaining *'effective control'* of the League."[104]

48.    As with the Revised AAF Pro Forma, neither of these assumptions is reasonable.  The AAF Pro Forma is rife with unsupported and unreasonable assumptions, inputs and errors that, in nearly every case, serve to overstate projected revenues and understate projected costs.  These unreasonable assumptions, inputs and errors undermine the credibility of any of the Desai Report's income approach calculations as of February 13, 2019.

49.    As such, the AAF Pro Forma relies on at least the following unreliable and outdated information in its projection that the AAF would earn $64.3 million in revenue in 2019.[105]

    a.    The AAF Pro Forma states that by the end of January 2019, the AAF had *already* earned $12.1 million in revenue.[106]  I understand that these figures are simply incorrect, and that the AAF had not earned material revenues by the end of January before any games had been played.[107]

    b.    The AAF Pro Forma assumes that the average AAF game in 2019 would have 17,500 paying ticket holders in attendance at an average ticket price of $50.[108]

        i.    By February 13, 2019, the AAF had already played its first game, which should have informed more realistic attendance and ticket price figures.  Average paid attendance for the first week's AAF games was 11,610 per game: this represented the highest average attendance that the AAF would ever achieve, but was just 66.3 percent of the expected 17,500 per-game season average.[109]  At its lowest (Week 4), average paid attendance was just 26.1 percent of the expected 17,500 paying ticket holders.[110]

---

[102]    *See* Desai Report, at ¶¶ 40, 69.
[103]    *See* Desai Report, at ¶ 70.
[104]    *See* Desai Report, at ¶ 70 (emphasis in original).
[105]    *See* AAF Pro Forma, tab "Summary P&L," row 11.
[106]    *See* AAF Pro Forma, tab "Monthly Summary," cells C11-E11.
[107]    Discussions with Ms. Lee.
[108]    *See* AAF Pro Forma, tab "Team Revenue," cells A5:B7.
[109]    *See* **Exhibit 1**. 11,610 (Week 1 total paid attendance) / 17,500 (expected attendance) = 66.3%.
[110]    *See* **Exhibit 1**. 4,576 (actual average) / 17,500 (expected average) = 26.1%.



ii.   Further, according to the Revised AAF Pro Forma, the average single ticket price in 2019 was $26, and the average season ticket price was $44,[111] both lower than $50.

iii.  While the AAF Pro Forma assumes that the average AAF game would bring in $875,000 in ticket revenue per game in their first year,[112] AAF games on average brought in less than 1/3 of that amount.[113]

c.   The AAF Pro Forma assumes that the AAF would receive $500,000 in playoffs broadcast revenues and $750,000 in championship broadcast revenues in its first year.[114] Not only are these figures entirely baseless and unsupported by any contracts, AAF knew by February 13, 2019 that it had to pay for its games to be broadcast.[115]

d.   The AAF Pro Forma assumes that the AAF would earn $4.2 million in digital revenues in 2019—including $1.4 million digital revenues for February 2019 alone—for an app that, as of February 13, 2019, was not capable of receiving money from fantasy football gambling.[116]

50.   For at least these reasons, the AAF Pro Forma's 2019 revenue projections were not merely overstated and unreliable but overstated in ways that contradict information that had been available to AAF by February 13, 2019.   The amount by which the AAF Pro Forma overstates prospective 2019 Team Revenue can be seen in **Exhibit 5**.   I show that a reasonable measure of Team Revenue, based on an extrapolation of the AAF's actual performance through week 6, represents just 26.0 percent of the AAF Pro Forma's 2019 Team Revenue forecast.   Stated another way, the AAF Pro Forma was overstated by nearly *four times* the revenue that would have been reasonably expected based on information known or knowable to the AAF at that time.   The Desai Report's reliance on these wildly overstated and erroneous projections is necessarily also overstated and erroneous, though compounded even further by other methodological errors as discussed further in this report.

51.   The AAF Pro Forma's overstated 2019 revenue projection forms the basis for a highly aggressive set of projections for future years.   The AAF Pro Forma forecasts that 2019 AAF revenues would double between 2019 and 2020, double again between 2020 and 2021 and would cumulatively increase more than seven-fold by 2024 and twelve-fold by 2028.[117]   Most of the inputs that lead to these very high growth expectations are hard-coded, unsupported and unexplained.

---

[111]   *See* **Exhibit 1**.

[112]   *See* AAF Pro Forma, tab "Team Revenue," cells A5:B7.   17,500 tickets * $50 per ticket = $875,000.

[113]   *See* **Exhibit 1**. $270,733 (actual) / $875,000 (forecast) = 30.9 percent.

[114]   *See* AAF Pro Forma, tab "League Revenue," column B.

[115]   *See, e.g.,* T. Dundon Dep., 258:19-259:4 (December 2, 2024); email chain from Charlie Ebersol, dated February 13, 2019, TR0001650984 - TR0001650986.

[116]   *See* AAF Pro Forma, tab "Monthly Summary," row 10; K. Freedman Dep., 231:15-233:17 (October 18, 2024).

[117]   *See* **Exhibit 7**.



52.     A key assumption in the AAF Pro Forma's revenue projections is the expectation that revenues will be multiplied by rapidly expanding the number of AAF team from eight teams in 2019 to sixteen teams in 2023, doubling the league in four years by adding approximately two markets and teams per year.[118]   I am not aware of any evidence that the AAF had taken any steps to find and lock down the new markets, stadiums, facilities, or players that would have been required to meet those growth projections, which would involve recruiting 416 new players in four years.

53.     Similarly, most of the AAF Pro Forma's cost forecasts are, fundamentally, the sum of a series of hard-coded, unsupported and unexplained inputs.  For example, the purported costs of developing the digital platform are based on a series of 65 hard-coded salaries[119] and monthly expenses[120] that have no sources, footnotes, or explanation.  The purported cost of marketing is based on 20 hard-coded salaries[121] and monthly expenses[122] that have no sources, footnotes, or explanation.

54.     The Desai Report shows no evidence that it applied any expert scrutiny to the AAF Pro Forma, or done anything more than wholly and uncritically adopt every figure and forecast in the AAF Pro Forma into its income approach model.[123]   The significant shortcomings in the AAF Pro Forma render any valuation calculated on its basis unreliable and overstated.

### c)     The Desai Report's income approach analysis relies on an unrealistic discount rate which understates DCP's "expected rate of return"

55.     The Desai Report uses a discount rate of 28.0 percent in its income approach calculations.[124]   According to the Desai Report, "[t]he Dundon Term Sheet provides evidence that Mr. Dundon and/or DCP's expected rate of return on its investment in the AAF was 20%.... it is reasonable to assume that the 20% preferred rate of return was Mr. Dundon's and/or DCP's expected rate of return (i.e., discount rate) for the investment in the AAF."[125]

56.     This is incorrect and understates DCP's expected rate of return.  According to the Term Sheet, DCP would "accrue dividends at a rate of 20% per annum based on its actual aggregate Series 2, with such amount payable either in cash or in kind, at the discretion of the Company."[126]   However, had the AAF succeeded, the 20 percent dividend rate constitutes a floor, not a ceiling.  As the owner of 75 percent of ESMG's capital stock, DCP would have benefited from increasing equity value.  Specifically, had the AAF

---

[118]   *See* AAF Pro Forma, tab "Summary P&L," row 4.

[119]   *See* AAF Pro Forma, tab "Digital Payroll," columns A-F.

[120]   *See* AAF Pro Forma, tab "Digital Expenses," columns A-R.

[121]   *See* AAF Pro Forma, tab "Marketing Payroll," columns A-F.

[122]   *See* AAF Pro Forma, tab "Marketing Expenses," columns A-R.

[123]   The only difference between the figures in the AAF Pro Forma, tab "Summary P&L" and Desai Report, Exhibit A, Schedule 4 appears to be the straight-line prorating of the AAF Pro Forma's 2019 revenues and expenses based on the portion of the year expired.

[124]   *See* Desai Report, at ¶¶ 72-76, 103 and Exhibit B, Schedule 3.

[125]   *See* Desai Report, at ¶ 75.

[126]   *See* Binding Term Sheet for Series 2 Preferred Stock Financing ("Term Sheet"), Dundon0015 - Dundon0018, at Dundon0015.



been sold, DCP would have enjoyed a 20 percent return in preference to other holders of preferred or capital stock, and then would have participated together with holders of common stock after all preferred stock preferences were paid. The presence of a 20 percent compounding dividend, the highest seniority among equity holders, and full participation together with holders of Common Stock on an as-converted Common Stock basis support an expected return well in excess of 20 percent.

57.    For these reasons, both the specific terms of the Term Sheet and valuation best practices indicate that in this case, 20 percent is *not* a reasonable indication of the Dundon Parties' expected rate of return (or discount rate) for its AAF investment. Furthermore, DCP's expected rate of return is not relevant for valuation purposes. Any given investor may have different investing requirements or parameters, but none is relevant for purposes of fair market value which require the consideration of a hypothetical buyer, not a specific one.

58.    Ms. Desai lists "characteristics of the AAF" that seemingly reduce its riskiness in her view: "For example: The unique assets owned by the AAF, such as wearable technology, real-time gaming analytics and sports betting platforms, would reduce the League's dependency on traditional football revenues."[127] I disagree that these "unique assets" were relevant to AAF's riskiness because at the time of the valuation, the AAF did not possess them. The AAF's "wearable technology" had been promised but did not function.[128] As of 2019, the "real-time gaming analytics and sports betting platforms" cited by Ms. Desai were non-functional,[129] provided no revenues,[130] and were eventually sold for $125,000.[131]

59.    On the other hand, the AAF had considerable company-specific risk on the valuation dates for a reason that the Desai Report does not consider: on both valuation dates, February 13, 2019 and April 2, 2019, the AAF was on the verge of collapse because it had run out of cash and unable to pay its immediate expenses. The Desai Report cites no source that states that a valuation practitioner should ignore the immediate financial peril of the valued firm, and I am aware of no such guidance.

60.    The AAF also had high levels of company-specific risk because it lacked adequate controls over its financial and accounting systems. As I opined in the Bramer Report, the DCP had at least $17.9 million in unrevealed liabilities at the time of the Term Sheet. According to Mr. Dundon and Ms. Lee, AAF management was incapable of producing reliable and timely information about its payables.[132] Mr. Dundon testified that he considered taking on additional third-party investors to be too risky because he couldn't

---

[127]    See Desai Report, at ¶ 76 and footnote 212.

[128]    *See* Michaelian, Tania, "Future Uncertain for AAF Betting Technology." *BettingUSA*, 8/10/19, https://www.bettingusa.com/future-aaf-technology/.

[129]    *See*, e.g., Orr, Conor, "The Curious Rise and Spectacular Crash of the Alliance of American Football," *Sports Illustrated*, 5/1/19, https://www.si.com/nfl/2019/05/01/alliance-american-football-aaf-collapse-charlie-ebersol-tom-dundon.

[130]    *See* Revised AAF Pro Forma, tab "Summary P&L," row 9.

[131]    *See* Williams, Charean, "MGM to acquire AAF's gambling app for $125,000," *Pro Football Talk*, 6/27/19, https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/mgm-to-acquire-aafs-gambling-app-for-125000.

[132]    *See*, e.g., T. Dundon Dep., 92:7-92:15, 140:22-141:9, 182:21-182:23 (December 2, 2024); E. Lee Dep., 64:5-65:1; 65:25-66:23; 106:13-108:3 (November 6, 2024).



487

provide real diligence or vouch for AAF's financial records.[133] The lack of reliable financial statements and controls represents a major form of company-specific risk that is not captured in the Desai Report's discount rate.

61.    The Desai Report also does not adequately capture the high level of industry risk. **Appendix C** to this report describes more than a dozen startup professional football leagues other than the AAF. The Desai Report does not consider that virtually every other startup professional football league has failed.[134]

62.    The Desai Report relies on venture capital rates—specifically, the very bottom of the range of venture capital rates. The Desai Report relies on the Pepperdine Private Cost of Capital survey (the "PCOC Survey") to quantify the discount rate for the company. The Desai Report states that "[s]tartup companies are generally valued using venture capital discount rates, which range from 28% to 43%, to account for the higher level or [sic] risks associated with the company's expected performance."[135] Ms. Desai's selected discount rate does not adequately capture the high level of industry risk and understates the discount rate, which is an extremely sensitive assumption in the valuation of the AAF at both valuation dates.

a.    For example, using the median venture capital rate of return reported in the PCOC Survey of 33.0 percent (and making no other adjustments or corrections), Ms. Desai's income approach calculations of the enterprise value would decrease by 60.2 percent as of February 13, 2019,[136] and would decrease by 93.9 percent as of April 2, 2019.[137]

b.    Using the high end of the range for venture capital rate of return reported in the PCOC Survey of 43.0 percent (and making no other adjustments or corrections), Ms. Desai's income approach calculations of the enterprise value would show a *negative* enterprise value as of both February 13, 2019 and April 2, 2019.[138]

c.    The income approach calculations of the enterprise value as of February 13, 2019 and April 2, 2019 are zero at discount rates of 38.4 percent and 34.2 percent, respectively.[139]

63.    Ms. Desai assumes that the Revised AAF Pro Forma provided "the expected financial performance of the AAF on or around the time" of the April 2, 2019 valuation date. However, in selecting a discount rate to apply to forecasted cash flows, it is important to differentiate between conditional cash flows (*i.e.*, those that are conditional upon the occurrence of specified events) or cash flows that represent the probability-weighted average of all possible future cash flows (*i.e.*, the expected cash flows). The

---

[133]   *See* T. Dundon Dep., 129:6-133:4, 233:2-234:13 (December 2, 2024).
[134]   *See* **Appendix C**. The only exception as I write this report is the UFL, an eight-team spring league which played a single season in 2024 and has announced that it intends to play again in 2025.
[135]   *See* Desai Report, at ¶ 73.
[136]   *See* **Exhibit 8.A**.
[137]   *See* **Exhibit 8.B**.
[138]   *See* **Exhibits 9.A-9-B**.
[139]   See **Exhibits 10.A-10.B.**



488

Revised AAF Pro Forma includes forecasted revenue and income that are conditional upon a number of events occurring that had not yet occurred, including but not limited to:

    a.    The expansion of the league from 8 teams in the 2019 season to 16 teams by the 2023 season;

    b.    The league receiving broadcast revenue (when in reality it paid to broadcast games);

    c.    A dramatic increase in ticket sales, prices and sponsorships;

    d.    Successful completion and monetization of the AAF app, including the adoption of the AAF app by 396,600 paying customers in 2021; and

    e.    The NFL agreeing to pay 50 percent of salaries, employment taxes, and benefits for 200 AAF staff and the full costs of 96 football players.

64.    The Desai Report does not probability-weight any of these conditional events; rather, it considers a single scenario in which a successful resolution of every uncertain risky event is assumed. In such situations, the fact that a risky outcome has been assumed to be favorably resolved in the estimate of future cash flows requires that the discount rate reflect the risk of any one of those assumptions not proving true. The Desai Report fails to do so.

65.    In summary, the Desai Report misrepresents DCP's expected rate of return on the AAF, and its reliance on venture capital rates—particularly the decision to apply the bottom of the range of venture capital rates—significantly understates the financial, operational, industry and company-specific risks associated with the AAF. At the time of both valuations, AAF was out of cash and on the verge of collapse, unable to reliably report its financial data, and attempting to build a business in an industry in which over a dozen startup leagues had failed. In light of these risk factors, and after considering more accurate information regarding DCP's expected rate of return, the Desai Report's use of a 28.0 percent discount rate significantly understates AAF's risk and consequently overvalues its EV.

    **d)    The Desai Report's income approach analyses contain other flaws and errors**

66.    I understand Ebersol Sports Media Group, Inc., a Delaware corporation, served as the parent company to a number of wholly owned subsidiaries, each of which was organized as a Delaware limited liability company.[140] Despite ESMG being organized as a Delaware corporation and the AAF operating in various jurisdictions around the U.S., Ms. Desai does not include any state taxes in her forecasted cash flows, instead employing only on a U.S. Federal Corporate Tax Rate of 21.0 percent.[141] Correcting the tax rate by incorporating the Delaware state corporate tax rate of 8.7 percent[142] at the time of the February

---

[140]  *See* Desai Report, at ¶ 10.

[141]  *See* Desai Report, Exhibit A, Schedule 4, footnote 5.

[142]  *See* State corporate tax rate brackets, https://taxfoundation.org/data/all/state/state-corporate-rates-brackets-2019/.



2019 valuation would result in a combined state and federal tax rate of approximately 27.9 percent.[143]  In **Exhibit 11** and **Exhibit 12**, I substitute the combined state and federal tax rate of 27.9 percent for the Desai Report's federal-only 21.0 percent tax rate (and make no other adjustments or corrections), which decreases Ms. Desai's February income approach conclusion by 16.1 percent and decreases her April income approach conclusion by 67.7%, all else equal.[144]

67.    Ms. Desai estimates the residual value using the Gordon Growth Model, a methodology wherein a residual value beyond the discrete forecast period is calculated by capitalizing expected economic income at a direct capitalization rate equal to the weighted average cost of capital ("WACC") less the long-term growth rate.[145]  However, Ms. Desai incorrectly capitalizes debt-free net income rather than net cash flow, inconsistent with the rest of the income approach analysis.  This error results in a terminal value that fails to consider incremental working capital needs in the terminal period.

68.    The AAF Pro Forma and Revised AAF Pro Forma documents relied upon by Ms. Desai do not include forecasted working capital requirements and the accompanying annual changes in net working capital ("NWC") that are required to estimate projected net cash flows.[146]  Accordingly, Ms. Desai adjusts the AAF Pro Forma and Revised AAF Pro Forma to incorporate a normalized debt-free NWC level (and corresponding annual changes used to derive cash flow estimates) of 10.0 percent of revenue.[147]  The selected 10.0 percent of revenue is based on the upper quartile indication for a set of 8 industries or aggregated industries as published by Professor Aswath Damodaran of the NYU Stern School of Business.[148]  Ms. Desai states that "[d]ue to the diversified operations of the AAF, the upper quartile was determined to be representative of the NWC of the AAF."[149]  However, it is unclear how or why the upper quartile is most representative of the required normalized NWC of the AAF, particularly when one of the 8 aggregated categories included within the NYU data set was for a segment labeled as "Diversified."[150]

69.    The NYU Stern School of Business website cited in the Desai Report indicates the working capital percentages are calculated using data as of January 2024.[151]  Ms. Desai does not present any rationale as to why industry average NWC information as of January 2024 is a reasonable proxy for the valuation of the AAF as of February 13, 2019 or April 2, 2019.

---

[143]  Calculated as the U.S. Federal corporate tax rate of 21.0 percent plus Delaware state rate of 8.7 percent multiplied by one minus the U.S. Federal corporate tax rate: 21.0% + 8.7% x (1 - 21.0%) = 27.9%.

[144]  *See* **Exhibit 11-11.A** and **Exhibit 12-12.A**.

[145]  *See* Desai Report, Exhibit A, Schedule 3, and Desai Report, Exhibit B, Schedule 3.

[146]  Similarly, the AAF Pro Forma and Revised AAF Pro Forma documents relied upon by Ms. Desai contain no forecast of capital expenditures and the Desai Report makes no effort to determine the capital expenditures that would be necessary to support the extremely high growth inherent in the forecast.

[147]  *See* Desai Report, Exhibit A, Schedule 5, footnote 2, and Desai Report, Exhibit B, Schedule 5, footnote 2.

[148]  *See* Desai Report, Exhibit A, Schedule 5, footnotes 2 and 3, and Desai Report, Exhibit B, Schedule 5, footnotes 2 and 3.

[149]  *See* Desai Report, Exhibit A, Schedule 5, footnote 3, and Desai Report, Exhibit B, Schedule 5, footnote 3.

[150]  *See* Desai Report, Exhibit A, Schedule 5, and Desai Report, Exhibit B, Schedule 5.

[151]  See Desai Report, Exhibit A, Schedule 5, footnote 3, and Desai Report, Exhibit B, Schedule 5, footnote 3, citing https://pages.stern.nyu.edu/~adamodar/New_Home_Page/datafile/wcdata.html.



70.     In summary, the Desai Report income approach analyses for both the February 13, 2019 and April 2, 2019 valuation dates contain flaws, errors, omissions, and unsupported assumptions and cannot be relied upon as reliable indications of value at the respective valuation dates.

### 3)     The Desai Purported EVs are inconsistent with each other and fundamentally flawed

#### a)     The Desai Purported February EV improperly relies only on the market approach while ignoring the income approach

71.     In the income approach analysis as of February 13, 2019, Ms. Desai relies upon the AAF Pro Forma that was sent to various potential and actual investors in the AAF, including Mr. Dundon, from January 28, 2019 to February 14, 2019.[152]

72.     Despite her professed confidence in the financial projections included in the AAF Pro Forma,[153] Ms. Desai ultimately chose not to place any weight on the income approach in the Desai Purported February EV, saying she has "…yet to determine what adjustments, if any, were necessary to account for differences in the economic benefits from January 28, 2019 (date the AAF Pro Forma was prepared) and February 13, 2019 (valuation date)."[154]

73.     Ms. Desai's own conclusions are contradictory.  She states, "[t]he financial projections included in the AAF Pro Forma represented the anticipated economic benefits of the AAF on or around February 13, 2019" and acknowledges actual investors relied upon the AAF Pro Forma in making investment decisions on and around that time.[155]  She later considers the results of the income approach to be not conclusive due to the AAF Pro Forma being prepared "prior to the start of the season" and approximately 16 days prior to the February 13, 2019 valuation date.[156]

74.     Instead, Ms. Desai relies entirely on a crude implied valuation from a previous financing round occurring more than two months prior to the February 13, 2019 valuation date, while deeming the income approach as not conclusive.[157]

---

[152] *See* Desai Report, at ¶ 69.

[153] *See* Desai Report, at ¶ 70 ("Given the AAF Pro Forma was sent to investors and utilized for purposes of raising capital from January 28, 2019 to February 14, 2019, it is reasonable to assume at least the following: The financial projections included in the AAF Pro Forma represented the anticipated economic benefits of the AAF on or around February 13, 2019," *etc.*).

[154] *See* Desai Report, at ¶ 98.

[155] *See* Desai Report, at ¶ 70.

[156] *See* Desai Report, at ¶ 98.

[157] *See* Desai Report, at ¶ 98.



491

### b) The Desai Purported April EV improperly relies only on the income approach while ignoring the market approach

75.    At the April 2, 2019 valuation date, Ms. Desai reverses course from the Desai Purported February EV and relies solely on the income approach.

76.    The Desai Purported April EV Income Approach analysis relies on financial projections presented in the Revised AAF Pro Forma, which was provided to potential investors on or around March 27, 2019.[158]  As previously noted, Ms. Desai chose not to rely on the income approach at the February 13, 2019 valuation date due to her inability to "determine what adjustments, if any, were necessary to account for differences in the economic benefits from January 28, 2019 (date the AAF Pro Forma was prepared) and February 13, 2019 (valuation date),"[159] while showing no such concern regarding the one week period between the finalization of the Revised AAF Pro Forma and the April 2, 2019 valuation date.

77.    As the AAF struggled to fund continued operations, I understand Mr. Ebersol and other AAF executives presented Mr. Dundon with options that would keep the AAF operational, including four "go forward options" for the league in an email dated March 27, 2019, the same date the Revised AAF Pro Forma was believed to be provided to potential investors.[160]  In the March 27, 2019 email from Mr. Ebersol to Mr. Dundon and several other recipients, Mr. Ebersol stated:

> To summarize, there is an ~$20M difference between lowest additional investment needed (option 1, ~$19M incremental investment from today) and highest (option 4, ~$40M incremental).  I've done my best to lay out the different impact and risks for each option, though there may be other risks or unintended consequences we can't identify right now.[161]

78.    Despite warnings from league leadership of additional risks, unintended consequences, and significant differences between the additional capital investment required between the lowest and highest go forward options, Ms. Desai both relies on the Revised AAF Pro Forma as the sole basis for the Desai Purported April EV and continues to utilize the same 28.0 percent discount rate as she deemed appropriate as of February 13, 2019, ignoring obvious financial and operational risks.

79.    For these reasons and the deficiencies described herein, the Desai Purported April EV fails to properly consider the financial and operational risks facing the AAF as of April 2, 2019 and cannot be relied upon as a reliable indication of value.

---

[158]    *See* Desai Report, at ¶ 101.
[159]    *See* Desai Report, at ¶ 98.
[160]    *See* email from Charlie Ebersol, dated March 27, 2019, TR0001056957.
[161]    *See* email from Charlie Ebersol, dated March 27, 2019, TR0001056957.



C.   **The Desai Report's projections, together with record evidence, indicate that $250 million in capital was inadequate for the AAF to reach viability**

80.   I have been asked by counsel to analyze whether the AAF would have reasonably been expected to achieve viability if the Dundon Parties had contributed another $180 million on top of the $70 million contributed.  To do so, I rely on the same projected profit and loss analysis used in the Desai Purported April EV after correcting for a few of the errors and inappropriate assumptions in the Revised AAF Pro Forma described herein.

81.   In the first scenario in **Exhibit 13**, I recalculate the projected profit and loss statement in the Desai Report[162] with several key corrections (which do not represent an exhaustive list of possible corrections to errors and overstatements):

   a.   As shown in **Exhibit 13**, the Revised AAF Pro Forma significantly overstates 2019 Team Revenue.  Actual and projected 2019 Team Revenue for a ten-game regular season would have been just 54.7 percent of the 2019 Team Revenue figure listed in the Revised AAF Pro Forma.  For the purposes of this analysis, I apply this 54.7 percent factor to the projected revenues in the Revised AAF Pro Forma in order to adjust for overstatements and errors for revenue categories.

   b.   I add back the personnel expenses that the Revised AAF Pro Forma assumes without basis would be paid by the NFL.[163]

82.   After making these adjustments, the AAF would not be expected to have any profitable years between 2019 and 2028.[164]  Under this model, a hypothetical $180 million capital contribution would be completely spent by 2021, leaving the AAF unviable without additional capital.[165]  It is unclear whether the AAF would ever achieve viability in this scenario regardless of the amount of additional investment, as its projected costs exceed projected revenues every year through 2028.

83.   In the second scenario in **Exhibit 14**, I recalculate the projected profit and loss statement in the Desai Report[166] with different key corrections (which do not represent an exhaustive list of possible corrections to errors and overstatements):

   a.   In the absence of any evidence that the AAF had any realistic prospects of earning broadcast revenue, I remove "broadcast revenue" from forecast League Revenue.

   b.   I apply the observed 54.7 percent factor observed in 2019 Team Revenue[167] to projected Team Revenue (but not other revenues).

---

162   *See* Desai Report, at Exhibit B, Schedule 4.
163   *See* **Exhibit 13**.
164   *See* **Exhibit 13**.
165   *See* **Exhibit 13**.
166   *See* Desai Report, at Exhibit B, Schedule 4.
167   *See* **Exhibit 14**.



Page 28 of 33

493

c.  I make no adjustments to Digital Revenue.

d.  I add back the personnel expenses that the Revised AAF Pro Forma assumes without basis would be paid by the NFL.[168]

84.  After making these adjustments, a hypothetical $180 million contribution would be completely spent by 2021, leaving the AAF unviable without approximately $274 million in additional investment on top of the Dundon Parties' hypothetical $250 million net investment.[169]

**D.  Other opinions and observations regarding the Desai Report**

**1)  The Desai Report's purported tracing does not employ commonly accepted tracing methodologies, rendering its conclusions speculative**

85.  Ms. Desai states she was "asked to trace the funds that were invested into the AAF as a result of the Dundon Term Sheet."[170]  Based on her purported "tracing," Ms. Desai concludes that she has "determined that the damages incurred by the AAF from DCP's alleged breach of the contract (*i.e.*, Dundon Term Sheet) is $450,000."[171]  However, her conclusion is speculative, and thus, unreliable as she has not put forth any commonly accepted tracing analyses to support her findings.

86.  Ms. Desai identifies 16 wire transfers from DDFS Partnership to ESMG's SVB 2308 Account between February 14, 2019 and April 16, 2019 totaling $69.7 million.[172]  She then concludes the $450,000 paid to Bracewell and PwC was sourced from DDFS Partnership's $69.7 million wire transfers without considering any bank activities that occurred in the SVB 2308 Account from February 14, 2019 to April 16, 2019.[173]

87.  For example, Ms. Desai shows $21.4 million (out of $69.7 million) was deposited into ESMG's SVB 2308 Account from DDFS Partnership in February 2019.[174]  This $21.4 million represents about 75 percent of total deposits made into ESMG's SVB 2308 Account in February 2019.[175]  In other words, Ms. Desai fails to consider whether any of the remaining 25 percent (or about $7.0 million) of deposits

---

[168]  *See* **Exhibit 14**.

[169]  *See* **Exhibit 14**.  In this scenario, the lowest value of cumulative adjusted EBITDA is *negative* $454.0 million in 2025.  Negative $454.0 million, offset by $180.0 million in hypothetical additional investment from the Dundon Parties, means that at least $274.0 million in additional investment would be required in this scenario to prevent the AAF from completely running out of cash, making no other changes.  Furthermore, this likely understates cash needs as it considers only operating cash flow (*i.e.*, EBITDA) and no capital expenditures.

[170]  *See* Desai Report, at ¶ 111.

[171]  *See* Desai Report, at ¶ 128.

[172]  *See* Desai Report, at ¶ 113.

[173]  *See* Desai Report, at ¶ 128.

[174]  *See* Desai Report, at ¶ 112.

[175]  *See* ESMG's Silicon Valley Bank Statement for account number 2308 for February 2019, TR0002022967 at pdf page 239.



unrelated to DDFS Partnership were the source of the $450,000 that was ultimately paid to Bracewell and PwC in March 2019.[176]

88.    I understand "the point of tracing is to follow the particular entrusted assets, <u>not simply to identify some assets</u>,"[177] as money is fungible.[178]  In other words, money is not distinguishable from similar or identical assets deposited in a bank account.  As such, the only way to unwind commingled funds and quantify amounts owned by or associated with a party (*i.e.*, DDFS Partnership) is to apply the process of tracing.[179]  The commonly accepted tracing methodologies include FIFO, LIFO, Lowest Intermediate Balance Rule, and Proportionality.[180]  Ms. Desai has performed none of these, but rather simply assumes that the DDFS Partnership's wire transfers are the only funds available to source the disbursement of $450,000 to Bracewell and PwC, a conclusion she offers without any support whatsoever from generally accepted cash-tracing methodologies.

### 2)    DCP was not "unjustly enriched" by losing $70 million

89.    The Desai Report's third opinion is that "Mr. Dundon has been unjustly enriched by at least the tax benefits he received from DCP and/or DDFS Partnership's $70 million investment in the AAF."[181]

90.    I understand that courts may award restitution damages "based on the defendant's ill-gotten gains rather than the plaintiff's loss and [seek] to return the benefit conferred."[182]  In this case, the Desai Report appears to ignore the Dundon Parties' $70 million loss in order to illogically claim a "benefit" that represents a fraction of those losses.  There is clearly no "benefit of the bargain" for an investment in which DCP lost far more than it offset in tax write-offs.[183]

91.    The Desai Report never attempts to support the logic of the claim that the Dundon Parties benefitted from a transaction in which the Dundon Parties were clearly not enriched, justly or unjustly.  It

---

[176]  According to Uniform Commercial Code Article 9 § 9-315 (b)(2), proceeds that are commingled with other property are identifiable proceeds "… to the extent that the secured party identifies the proceeds by a method of tracing, including application of equitable principle, that is permitted under law …."  *See* Uniform Commercial Code § 9-315. Secured Party's Rights on Disposition of Collateral and In Proceeds.

[177]  *See Conn. Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F. 2d 612 (1st Cir. 1988) (emphasis added).

[178]  Fungible is defined as commercially interchangeable with other property of the same kind.  *See* Garner, Bryan A., Editor in Chief, *Black's Law Dictionary*, 10th ed., 2014.

[179]  I understand "tracing" is the process used to identify and segregate property that has been mingled with other property in such a manner that it has lost its identity.  *See* "Tracing" definition, *Thomson Reuters Practical Law*, https://content.next.westlaw.com/ practical-law/document/I3f4a45d3e8db11e398db8b09b4f043e0/Tracing?viewType=FullText&transitionType=Default& contextData=(sc.Default).

[180]  FIFO assumes that the first funds deposited into an account are the first to be withdrawn.  LIFO assumes the last funds deposited into an account are the first to be withdrawn.  Lowest intermediate balance rule assumes the accountholder spends their money before spending the other commingled funds.  Proportionality assumes each party is entitled to a portion of commingled funds based on its percentage contribution to the account. *See* Davis, Melissa, "Tracing Commingled Funds in Fraud Cases," *American Bankruptcy Institute*, 6/21/17.  *See also*, Lowenthal, Daniel, "Navigating Asset Tracing Challenges in Bankruptcy," *Law360*, 12/11/23.

[181]  *See* Desai Report, at p. 60.

[182]  *See* Weil, Roman L., et al*., Litigation Services Handbook: The Role of the Financial Expert,* 5th ed., 2012, at p. 4-6.

[183]  *See* T. Dundon Dep. 396:1-396:7 (December 3, 2024) ("If you lose $70 million and you save 14 of it, you lose 56.  So there's -- I don't think that's a benefit in the way I use the word 'benefit.'").



Page 30 of 33

also never attempts to connect the purported "benefit" to any of Plaintiffs' asserted claims. I am not aware of how any of Plaintiffs' claims support the inherent premise of Ms. Desai's opinion that the Dundon Parties' $70 million investment in AAF was somehow inherently unjust.

92.     I note that the award sought by the Plaintiffs, if awarded, may be taxed as ordinary income. By the logic of Ms. Desai's third opinion, the Plaintiffs would be *injured* should they receive monetary damages because the award would increase their tax liabilities.

**3)     To the extent that the Debtors' Estate was damaged as a result of $82.4 million in outstanding claims against it, this damage was minimized by Mr. Dundon's decision to cease business operations**

93.     The Desai Report states that "[t]he Debtor's Estate has been damaged as a result of the $82.4 million of outstanding claims granted to the Settling Class members in the Settlement Agreement."[184]  The Desai Report does not attribute this purported damage to any actions of the Dundon Parties, and does not argue that there is a causal link between outstanding claims against the Debtor's Estate and any actions by the Dundon Parties.

94.     I note that the link between the Debtor Parties and these claims would be difficult to prove. The Dundon Parties did not cause the Plaintiffs to start a risky football league, and many of the key decisions that affect the expenses incurred by the AAF (contract terms, wages, broadcast time-buys, etc.) were made prior to the Dundon Parties' involvement with the AAF. For that reason, I am aware of no plausible argument as to why all outstanding claims would be attributable to the Dundon Parties.

95.     I also note that according to the Desai Report, the decision to shutter the AAF, particularly at a time when expected revenues were far lower than expected operating expenses for the rest of the season, caused the Debtor's Estate to incur roughly $30 million less in claims than it would have incurred had it finished the 2019 season by Ms. Desai's own calculations.[185]

## V.     Analysis of Petrucelli Report

96.     The Petrucelli Report acknowledges that the financial reporting regarding the Dundon Parties' assets imposed significant limitations on any analysis of liquidity ("Dundon has provided no formal accounting books indicating the tax and accounting treatment of the funds DDFS Partnership wired over time to the AAF and/or how Dundon's $250 million commitment would be accounted for…" and "the information and financial and tax reporting provided by Dundon for himself and his affiliated entitles DDFS,

---

[184]   *See* Desai Report, at p. 62.
[185]   *See* Desai Report, at Schedule B, Schedule 4.



DCP and DDFS Management is significantly lacking and even where produced excludes or does not include significant important information"[186]).  Nonetheless, the Petrucelli Report affirmatively states that:

> As of February 2019, Dundon, based on the documentation provided, indicates that his near-term liquidity to honor the unfunded portion of the $250 million commitment, beyond approximately $70 million, without the approximate $200 million Opportunity Zone credits, was impaired.[187]

97.    It is unclear what evidence underlies Mr. Petrucelli's conclusion.  However, this conclusion is inconsistent with the balance sheet of the consolidated Dundon Entities as of March 31, 2019 (the "Dundon March 2019 Balance Sheet").[188]  The Dundon March 2019 Balance Sheet shows that as of March 31, 2019, the consolidated Dundon Entities had $143.3 million in cash and cash equivalents, as well as "Top Liquid Investments" with a combined value of $175.0 million.[189]  Based on this information, the consolidated Dundon Entities could have obtained $180 million in liquidity by simply selling a relatively small portion of their liquid investments.[190]

98.    Mr. Petrucelli's conclusion also contradicts both Mr. Dundon's testimony and my discussions with Matthew Turney, Chief Financial Officer of Dundon Capital Partners.[191]  Mr. Dundon testified that while he only committed to invest $70 million in the AAF, $250 million was available to him if he needed it,[192] and that he had multiple assets with adequate liquidity to fund a $250 million investment if he had chosen to do so.[193]  This testimony is consistent with the Dundon March Balance Sheet and with my conversation with Mr. Turney, who told me that in 2019, the Dundon Parties had a number of significant assets that could have been leveraged, including the Carolina Hurricanes.[194]  According to Mr. Turney, the ability of the Dundon Parties to access incremental liquidity of $180 million would not have been a problem.

99.    I also note that the Term Sheet defines the funding commitment as such:

> During the period from the effectiveness of this Binding Term Sheet **through June 30, 2019**, the Company will have the right to submit an equity funding request to the Investor, which shall state the amount of funding requested and include a supporting budget, subject to a maximum cumulative commitment of $70,000,000.[195]

---

[186]   *See* Petrucelli Report, at pp. 5, 10.

[187]   *See* Petrucelli Report, at p. 10.

[188]   *See* Dundon March 2019 Balance Sheet *(*Requisite Capital Management Balance Sheet for Consolidated Dundon Entities, 12-31-2018 to 3-31-2019).

[189]   *See* Dundon March 2019 Balance Sheet, p. 1.

[190]   I am aware of no scenario relevant to Plaintiffs' claims in this matter in which the Dundon Parties' ability to raise $180 million *all at one time* at or around the end of March 2019 is relevant.  However, the Dundon March 2019 Balance Sheet illustrates that achieving such liquidity would have been possible for the Dundon Parties.

[191]   *See* website page, "Team," *Dundon Capital Partners,* https://www.dundoncapitalpartners.com/team/.

[192]   *See* T. Dundon Dep., 192:13-192:24 (December 2, 2024).

[193]   *See* T. Dundon Dep., 226:17-227:23 (December 2, 2024).

[194]   *See also*, Dundon March 2019 Balance Sheet, p. 1.

[195]   *See* Term Sheet, Dundon0015- Dundon0018, at Dundon0015 (emphasis added).



100.   Under the Term Sheet—temporarily putting aside that the AAF was out of money by the beginning of April 2019 and unable to cover its immediate expenses—the Dundon Parties would have had three months (April, May, and June 2019) to raise additional liquidity for investment, had they been obligated to do so.  Based on my review of the Dundon March Balance Sheet and my discussions with Mr. Turney, in April 2019, three months would have been more than enough time for the Dundon Parties to use their cash, sell assets, and/or obtain a loan secured by assets sufficient to raise $180 million by June 30, 2019.

Erica Bramer, CFA, CVA, CIRA
BVA Group
Managing Partner

# APPENDICES

# APPENDIX A – CURRICULUM VITAE



## ERICA BRAMER, CFA, CVA, CIRA
*Managing Partner*

Erica Bramer is deeply experienced in finance and valuation, having supported a wide variety of clients in disputes/litigation, restructuring, and management consulting assignments.  Ms. Bramer has testified dozens of times as an expert witness on matters of finance, valuation, damages, and solvency in venues across the country and internationally.

Ms. Bramer has provided expert opinions and other litigation consulting in the context of claims such as breach of contract, breach of fiduciary duty, misappropriation of trade secrets, patent and copyright infringement, trademark and/or trade dress infringement, tortious interference, fraud, wrongful death/termination, antitrust, preferences and fraudulent conveyance, and securities law violations.  Ms. Bramer has a particular interest in international disputes and has been engaged on several high-profile international matters.

Ms. Bramer has also provided valuation expertise for purposes of buy/sell agreements, solvency opinions, lending decisions, and tax support.  Ms. Bramer has participated in various cash-tracing and financial forensic investigations, including money-laundering investigations in Colombia.

Ms. Bramer has been actively involved in the restructuring of various entities, both within the Chapter 11 process as well as out-of-court workouts and has worked as a management consultant to advise companies on many aspects of strategy and operations.

Ms. Bramer also has years of experience working in Latin America, Europe, and Asia as a financial restructuring advisor and/or management consultant, advising on issues such as profit improvement, working capital optimization, and strategic negotiations with suppliers and lenders.  For example, Ms. Bramer worked on the restructuring of a large Thai conglomerate at the onset of the Asian financial crisis of the 1990s.  She participated on one of the seminal cases which contributed to the establishment of Thai restructuring and insolvency law, as the Thai economy was frozen in a collective state of insolvency without laws allowing for options other than liquidation.  She also participated in a money-laundering investigation in Colombia, led a team of consultants on a pro-bono project in Guatemala, and testified on a number of high-profile international arbitration matters.  Ms. Bramer also has such experience in Mexico, El Salvador, Guatemala, Colombia, Peru, Chile, Argentina, Brazil, and Spain; she is a fluent Spanish speaker and has basic proficiency in Brazilian Portuguese.

Ms. Bramer earned dual graduate degrees from the Wharton School (Master of Business Administration) and the University of Pennsylvania (Master of Arts in International Studies and Spanish).  Ms. Bramer graduated with high honors, Phi Beta Kappa, and Beta Gamma Sigma from the University of Texas with dual degrees in Liberal Arts (Plan II Honors) and Business (Honors Business Program and Finance).

Ms. Bramer is active in a variety of local and international charitable endeavors.  In 2013, Ms. Bramer was recognized by the Dallas Business Journal as one of the region's "40 under 40" business and community leaders.  She is a member of the National Association of Certified Valuation Analysts, the CFA Institute, the Association of Insolvency and Restructuring Advisors, the International Women's Insolvency and Restructuring Confederation, the American Bankruptcy Institute, and the Turnaround Management Association.

**Direct** *+1.214.619.5591*
**Mobile** *+1.214.207.0249*
**Email** *ebramer@bvagroup.com*

bva group® | Valuation. Disputes. Advisory.

**ERICA BRAMER,** CFA, CVA, CIRA
*Managing Partner*

---

## TESTIMONY HISTORY

**DEPOSITION (last four years):**

*Newmark Real Estate of Dallas, LLC v. David Fasano, Jeffrey Ross Sanders, and Berkadia Real Estate Advisors, LLC*
Cause No. DC-23-06101
192nd Judicial District Court, Dallas County, Texas

*Right Value Drug Stores, LLC d/b/a Carie Boyd's Prescription Shop n/k/a Carie Boyd Pharmaceuticals v. BioTE Medical, LLC*
Cause No. DC-24-01642
162nd Judicial District Court, Dallas County, Texas

*Caliber Home Loans, Inc. v. Lee Cove and Cardinal Financial Company, LP*
Civil Action No. 3:22-cv-02298-M
United States District Court for the Northern District of Texas, Dallas Division

*EBG, LLC v. Meyer Capital, Ltd. and Jerry Meyer, individually v. EBG Growth Corporation, et al.*
Case No. 01-23-0000-5605
American Arbitration Association

*Capital Storage Holdings, LLC v. SpareBox Self Storage, LLC, et al.*
Cause No. 2022-71323
151st Judicial District Court, Harris County, Texas

*Mayor & City Counsel of Baltimore v. Purdue Pharma L.P., et al.*
Case No. 24C18000515
Circuit Court of Maryland for Baltimore City

*Meridian Bank v. Sandy Spring Bank, et al.*
Case No. 22-cv-03951
United States District Court for the Eastern District of Pennsylvania

*Extreme Technologies, LLC, et al. v. Stabil Drill Specialties, LLC*
Civil Action H-19-1977
United States District Court for the Southern District of Texas, Houston Division

*BioTE Medical, LLC v. Dr. Gary S. Donovitz and Lani Hammonds Donovitz, individually and dba Lani D. Consulting; Dr. Gary S. Donovitz and Lani Hammonds Donovitz, individually and dba Lani D. Consulting v. BioTE Medical, LLC, Teresa S. Weber, and Mary Elizabeth Conlon*
Cause No. DC-22-08737
134th Judicial District Court, Dallas County, Texas

*Everett Financial, Inc. d/b/a Supreme Lending v. Steven Cantrell, et al.*
Cause No. DC-21-15697
44th Judicial District Court, Dallas County, Texas

*Nabors Drilling Technologies USA, Inc. v. Helmerich & Payne Int'l Drilling Co., Helmerich & Payne Technologies, LLC, and Motive Drilling Technologies, Inc.*
Civil Action No. 3:20-cv-03126-M
United States District Court for the Northern District of Texas, Dallas Division

CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT

**bva**group | Valuation. Disputes. Advisory.

**ERICA BRAMER,** CFA, CVA, CIRA
*Managing Partner*

---

*J. Kelly Gray v. Dominion Harbor Enterprises, LLC*
Case No. DC-21-08821
134th Judicial District Court, Dallas County, Texas

*Estate of James Monroe Freeman, Deceased*
*Joshua James Freeman and Jacob Monroe Freeman v. Jerald Wayne Freeman, Jr. and Freeman Financial Company*
No. PR-19-00041-3
Probate Court No. 3 of Dallas County, Texas

*In re: The LaSalle Group, Inc., Debtor*
*Diane G. Reed, Chapter 7 Trustee v. TIB – The Independent BankersBank*
Case No. 19-31484-SGJ-7
United States Bankruptcy Court, Northern District of Texas, Dallas Division

*State of Georgia v. Purdue Pharma L.P., et al.*
Case No. 19-A-00060-2
Superior Court, Business Case Division of Gwinnett County, Georgia

*State of Nevada v. McKesson Corporation, et al.*
Case No. A-19-796755-B
District Court, Clark County, Nevada

*Traxcell Technologies, LLC v. Cello Partnership d/b/a Verizon Wireless and Ericsson Inc.*
Case No. 6:20-cv-01175-ADA
United States District Court, Western District of Texas, Waco Division

*Hi Technology Corp. f/k/a InComm Holdings, Inc. v. Quality Investment Properties Suwanee, LLC*
Civil Action File No. 20-A03466-2
Superior Court of Gwinnett County, State of Georgia

*State of New Mexico, ex rel., Hector Balderas, Attorney General v. Purdue Pharma, L.P., et al.*
Case No. D-101-CV-2017-02541
First Judicial District Court, County of Santa Fe, State of New Mexico

*Stiles E2 Ohio Holding GP and E2 Ohio B Holdings GP v. EnLink Midstream Operating LP and E2 Ohio Compression, LLC*
Case No. DC-20-07004
191st Judicial District Court, Dallas County, Texas

*In Re: Black Elk Energy Offshore Operations, LLC, Debtor*
*Richard Schmidt, Litigation Trustee v. Barbara Nordlicht, as Representative of the Estate of Jules Nordlicht, et al.*
Case No. 15-34287 (MI)
United States Bankruptcy Court Southern District of Texas, Houston Division

*State of West Virginia ex rel. Patrick Morrisey, Attorney General, v. Teva Pharmaceutical Industries, Ltd., et al.*
Civil Action No. 19-C-104
The Circuit Court of Kanawha County, West Virginia

*Maxus Liquidating Trust v. YPF S.A., et al.*
Adversary Proceeding No. 18-50489 (CSS)
United States Bankruptcy Court for the District of Delaware

---

CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT

**bva**group® | Valuation. Disputes. Advisory.

**ERICA BRAMER,** CFA, CVA, CIRA
*Managing Partner*

---

*The City and County of San Francisco, California and The People of The State of California, Acting by and Through San Francisco City Attorney, Dennis J. Herrera v. Purdue Pharma L.P., et al.*
Case No. 3:18-cv-07591-CRB
United States District Court, Northern District of California

*State of Florida, Office of the Attorney General, Department of Legal Affairs v. Purdue Pharma L.P., et al.*
Case No. 2018-CA-001438
The Circuit Court of the 6th Judicial Circuit, Pasco County, West Pasco Division, New Port Richey, Florida

*Triton Value Partners, LLC, Donald Gasgarth, Paul Freischlag Jr., and Jeff Zwitter v. Steve Urvan, TVP Investments, LLC, Gunbroker.com, LLC, IA Tech, LLC.*
Civil File Action No. 18104869
The Superior Court of Cobb County, State of Georgia

*EMR (USA Holdings) Inc., et al. v. Richard Goldberg, et al.*
Cause No. DC-17-14064
160th Judicial District Court, Dallas County, Texas

*EMR (USA Holdings) Inc., et al. v. Ken Goldberg and Neil Goldberg*
Case No. 1:18-cv-07849-ER
United States District Court Southern District of New York

*Eddystone Rail Company, LLC v. Julio Rios, Jeremy Gamboa, Bridger Logistics, LLC, Ferrellgas, L.P., et al.*
Civil Action No. 17-CV-00495
United States District Court for the Eastern District of Pennsylvania

*Ronald Lickteig v. Cerberus Capital Management, L.P., Covis Pharmaceuticals, Inc. Covis Management Investors LLC, and Covis Holdings, L.P.*
Case No. 1:19-cv-05263-GWH
United States District Court Southern District of New York

*Heritage Plastics, Inc. v. Gaston Construction, Inc., Glenn E. Stockdale, Christopher E. Varnado, and Plastical LLC*
Case No. 1:20-cv-374-CLM
United States District Court for the Northern District of Alabama

*Dallas Police & Fire Pension System v. Townsend Holdings, LLC. d/b/a The Townsend Group, Richard Brown, Martin Rosenberg, and Gary B. Lawson*
Cause No. DC-17-11306
298th Judicial District Court, Dallas County, Texas

**TRIAL AND HEARING (last four years)**

*Right Value Drug Stores, LLC d/b/a Carie Boyd's Prescription Shop n/k/a Carie Boyd Pharmaceuticals v. BioTE Medical, LLC*
Cause No. DC-24-01642
162nd Judicial District Court, Dallas County, Texas

*Melissa D. Abel f/k/a Melissa Hicks v. Texas Capital Bankcshares, Inc. and Texas Capital Bank, N.A.*
JWA No. 3370-A 2022
Judicial Workplace Arbitrations

CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT

**ERICA BRAMER,** CFA, CVA, CIRA
*Managing Partner*

---

*United States of America v. David Gentile and Jeffry Schneider*
Case No. 1:21-cr-00054
United States District Court, Eastern District of New York

*J. Kelly Gray v. Dominion Harbor Enterprises, LLC*
Case No. DC-21-08821
134th Judicial District Court, Dallas County, Texas

*Nabors Drilling Technologies USA, Inc. v. Helmerich & Payne Int'l Drilling Co., Helmerich & Payne Technologies, LLC, and Motive Drilling Technologies, Inc.*
Civil Action No. 3:20-cv-03126-M
United States District Court for the Northern District of Texas, Dallas Division

*Eddystone Rail Company, LLC v. Julio Rios, Jeremy Gamboa, Bridger Logistics, LLC, Ferrellgas, L.P., et al.*
Civil Action No. 17-CV-00495
United States District Court for the Eastern District of Pennsylvania

*Enterprise Financial Group, Inc. v. Santander Consumer USA, Inc.*
Cause No. DC-18-08119
193rd Judicial District Court, Dallas County, Texas

*Dallas Police & Fire Pension System v. Townsend Holdings, LLC. d/b/a The Townsend Group, Richard Brown, Martin Rosenberg, and Gary B. Lawson*
Cause No. DC-17-11306
298th Judicial District Court, Dallas County, Texas

*Heritage Plastics, Inc. v. Gaston Construction, Inc., Glenn Stockdale, Christopher Varnado, and PlastiCal LLC*
Civil Action No. 1:20-cv-00374-CLM
United States District Court for the Northern District of Alabama, Eastern Division

*In Re: Morrow Park Holding LLC*
Consolidated Civil Action No. 2017-0036-PAF
The Court of Chancery of the State of Delaware

**PRESENTATIONS AND PUBLICATIONS (last ten years)**

Contributing author, along with James Hitchner and others, *Financial Valuation: Applications and Models, 5th Edition*, December 2024.

Contributor, "Bridging the Gap: Practical Resources and Suggestions for Promoting and Retaining Female Attorneys in the Legal Profession," *Dallas Women Lawyers Association*, October 2017 - http://dallaswomenlawyers.org/bridging-the-gap/

*Managing the Courtroom*, panel presentation with Craig Simon and Matthew Cavenaugh, AIRA 33rd Annual Bankruptcy & Restructuring Conference, Irving, TX, June 2017.

*Numbers for First Day Hearings and Confirmation*, panel presentation with Judge Marvin Isgur, Judge Tony Davis, and Rakhee Patel, State Bar of Texas Bankruptcy Law Section's Forensic Finance: Better Bankruptcies Through Better Numbers CLE, Austin, TX, September 2016.

*International Arbitration: A Topical Update*, presentation to the Dallas Bar Association International Law and Alternative Dispute Resolution Sections, Dallas, TX, September 2016.

**CONFIDENTIAL DO NOT DISTRIBUTE WITHOUT CONSENT**

**bva**group® | Valuation. Disputes. Advisory.

# APPENDIX B-1 – INFORMATION CONSIDERED

# In re: Legendary Field Exhibitions, LLC, et al.
## Appendix B-1 - Information Considered [*]

**Bates range*:**

| Bates Begin** | Bates End** |
|---|---|
| 0010019 | 0010019 |
| 0017023 | 0017023 |
| 0017333 | 0017333 |
| DCP Parties0004 | DCP Parties0005 |
| Dundon0002350 | Dundon0002350 |
| Dundon0015 | Dundon0018 |
| Ebersol 00031 | Ebersol 00058 |
| OSHCTRL0000002230 | OSHCTRL0000002230 |
| TR0000003994 | TR0000004066 |
| TR0000006135 | TR0000006176 |
| TR0000560187 | TR0000560192 |
| TR0001056957 | TR0001056957 |
| TR0001342414 | TR0001342415 |
| TR0001343161 | TR0001343168 |
| TR0001493087 | TR0001493088 |
| TR0001648047 | TR0001648055 |
| TR0001650984 | TR0001650986 |
| TR0001900142 | TR0001900142 |
| TR0002010447 | TR0002010637 |
| TR0002012126 | TR0002012126 |
| TR0002014459 | TR0002014459 |
| TR0002022928 | TR0002023855 |
| TR0002023367 | TR0002023367 |
| TR0002026521 | TR0002042434 |
| TR0002036200 | TR0002036200 |
| TR0002036471 | TR0002036471 |
| TR0002037579 | TR0002037579 |
| TR0002037583 | TR0002037583 |

*Bates range may include documents labeled as deposition exhibits.

**Court Documents - In re: Legendary Field Exhibitions, LLC, et al., Debtors, United States Bankruptcy Court Western District of Texas, San Antonio Division, Case No. 19-50900-CAG:**

(1) Official Form 201 - Voluntary Petition for Non-Individuals Filing for Bankruptcy with Schedules, dated April 17, 2019
(2) Official Form 207 - Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy, dated April 17, 2019
(3) Official Form 410 - Proof of Claim of Dundon Capital Partners, LLC, dated June 24, 2019
(4) Official Form 410 - Proof of Claim of Thomas G. Dundon, dated June 24, 2019
(5) Motion of the Chapter 7 Trustee for Approval of the Settlement Agreement with MGM Resorts International Operations, Inc. and Request for Relief (With 21-Day Language, dated June 26, 2019
(6)
(7) Joint Stipulation and Request for Dismissal of All Remaining Claims, dated April 29, 2022
(8) Proof of Claim Nos. 305-742
(9) In re Legendary Field Exhibitions, LLC and Ebersol Sports Media Group, Inc., Case No. 15-50900-CAG Claims Register

**Court Documents: In re: Ebersol Sports Media Group, Inc., Debtor, United States Bankruptcy Court for the Western District of Texas (at San Antonio), Case No. 19-50904-cag:**

(1) Proof of Claim No. 23-2, dated June 26, 2020

**Court Documents - Dundon Capital Partners LLC v. Charles Ebersol, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05077-CAG:**

(1) Plaintiff's Original Complaint, dated November 14, 2022
(2) Defendant Charles Ebersol's Initial Disclosures Pursuant to FRCP 26(a)(1), dated February 5, 2024
(3) Defendant Charles Ebersol's Responses to Plaintiff Dundon Capital Partners' First Request for Production, dated March 25, 2024
(4) Defendant Charles Ebersol's Responses to Plaintiff Dundon Capital Partners' First Set of Interrogatories, dated March 25, 2024



## In re: Legendary Field Exhibitions, LLC, et al.
### Appendix B-1 - Information Considered [*]

    (5) Plaintiff Dundon Capital Partners, LLC's Objections and Responses to Defendant Charles Ebersol's First Request for Admission, dated June 14, 2024

**Court Documents - Randolph N. Osherow, Chapter 7 Trustee and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LFE 2, LLC; and We Are Realtime, LLC v. Thomas Dundon, John Zutter, and Dundon Capital Partners, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05078-CAG-7:**

    (1) Original Complaint, dated November 14, 2022

    (2) First Amended Complaint, dated November 27, 2023

    (3) Chapter 7 Trustee's Initial Disclosures Pursuant to FRCP 26(a)(1), dated February 5, 2024

    (4) Plaintiff Randolph N. Osherow, Trustee's Answers and Objections to Defendants Thomas Dundon, John Zutter and Dundon Capital Partners, LLC's First Set of Interrogatories, dated March 21, 2024

    (5) Plaintiff Randolph N. Osherow, Trustee's Answers and Objections to Defendants Thomas Dundon, John Zutter and Dundon Capital Partners, LLC's First Request for Production, dated March 21, 2024

    (6) Defendant Thomas Dundon's Amended Objections and Answers to Randolph N. Osherow, Trustee's Interrogatories (Set One), dated April 29, 2024

    (7) Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding) for Elisa Lee, dated October 24, 2024

    (8) Chapter 7 Trustee's Notice of Videotaped Deposition of Elisa Lee, dated October 24, 2024

    (9) Chapter 7 Trustee's Notice of Videotaped Deposition of Defendant Thomas Dundon, dated October 24, 2024

    (10) Chapter 7 Trustee's Notice of Video Deposition of Defendant Dundon Capital Partners, LLC's Employee Jeff Vanderbilt, dated October 24, 2024

    (11) Chapter 7 Trustee's Notice of Video Deposition of Defendant John Zutter, dated October 24, 2024

    (12) Chapter 7 Trustee's Notice of Videotaped Deposition of Kevin Farrell, dated October 24, 2024

    (13) Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding) for Elisa Lee, dated October 25, 2024

    (14) Chapter 7 Trustee's Notice of Videotaped Deposition of Elisa Lee, dated October 25, 2024

    (15) Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding) for Kevin Ferrell, dated November 4, 2024

    (16) Chapter 7 Trustee's Notice of Videotaped Deposition of Defendant Thomas Dundon, dated November 13, 2024

    (17) Chapter 7 Trustee's Designation of Expert Witnesses, dated December 2, 2024

    (18) Chapter 7 Trustee's Supplemental Disclosures Pursuant to FRCP 26(a)(1) and Disclosures Pursuant to FRCP 26(a)(2), dated December 13, 2024

    (19) Plaintiff Randolph N. Osherow, Trustee's Supplemental Answers and Objections to Defendants Thomas Dundon, John Zutter and Dundon Capital Partners, LLC's First and Second Sets of Interrogatories, dated December 13, 2024

**Court Documents: Colton Schmidt, Individually and on Behalf of Others Similarly Situated; and Reggie Northrup, Individually and on Behalf of Others Similarly Situated v. AAF Players, LLC, Thomas Dundon, Charles "Charlie" Ebersol, Legendary Field Exhibitions, LLC, AAF Properties, LLC, Ebersol Sports Media Group, Inc. and Does 1 through 200, Inclusive; United States Bankruptcy Court for the Western District of Texas, San Antonio Division; Adversary No. 19-05053:**

    (1) Plaintiffs', Trustee's, and Joint Motion to (1) Preliminarily Approve the Settlement Agreement; (2) Grant Class Certification Pursuant to Settlement Agreement; (3) Appoint Class Counsel and Class Representatives Pursuant to Settlement Agreement; (4) Approve the Form and Manner of Notice to Class Members; (5) Set a Deadline for Objections to the Settlement; and (6) Schedule a Hearing for the Final Consideration and Approval of the Settlement, dated August 21, 2021

    (2) Plaintiffs', Trustee's, And Ebersol's Joint Motion To (1) Preliminarily Approve the Settlement Agreement; (2) Grant Class Certification Pursuant to Settlement Agreement; (3) Appoint Class Counsel and Class Representatives Pursuant to Settlement Agreement; (4) Approve the Form and Manner of Notice to Class Members; (5) Set a Deadline for Objections to the Settlement; and (6) Schedule a Hearing for the Final Consideration and Approval of the Settlement, dated August 24, 2021

    (3) Order (1) Preliminarily Approving the Settlement Agreement; (2) Granting Class Certification Pursuant to Settlement Agreement; (3) Appointing Class Counsel and Class Representatione Pursuant to Settlement Agreement; (4) Approving the Form and Manner of Notice to Class Members; (5) Setting a Deadline for Objections to the Settlement; and (6) Scheduling a Hearing for the Final Consideration and Approval of the Settlement, dated November 3, 2021

    (4) Plaintiffs', Trustee's, and Joint Motion to (1) Final Approval of the Settlement Agreement; (2) Class Certification Pursuant to Settlement Agreement; (3) Appointment of Class Counsel and Class Representatives Pursuant to Settlement Agreement; and (4) Approval of Compensation for Class Counsel and Service Awards for Class Representatives, dated February 3, 2022

    (5) Order for (1) Final Approval of the Settlement Agreement; (2) Class Certification Pursuant to Settlement Agreement; (3) Appointment of Class Counsel and Class Representatives Pursuant to Settlement Agreement; and (4) Approval of Compensation for Class Counsel and Service Awards for Class Representatives, dated February 9, 2022

    (6) Partial Final Judgment Under Rule 54(b), dated March 15, 2022



# In re: Legendary Field Exhibitions, LLC, et al.
## Appendix B-1 - Information Considered [*]

**Depositions - Randolph N. Osherow, Chapter 7 Trustee and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LFE 2, LLC; and We Are Realtime, LLC v. Thomas Dundon, John Zutter, and Dundon Capital Partners, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05078-CAG-7:**

    (1) Deposition of Kellie Vugrincic, Vol. 1, and Exhibits, dated September 13, 2024

    (2) Deposition of Kellie Vugrincic, Vol. 2, dated September 16, 2024

    (3) Deposition of Charles Ebersol and Exhibits, dated September 19, 2024

    (4) Deposition of Charles Ebersol and Exhibits, dated September 20, 2024

    (5) Deposition of Roger Goodell and Exhibits, dated September 27, 2024

    (6) Deposition of Megan Hanson and Exhibits, dated September 30, 2024

    (7) Deposition of Craig Kessler and Exhibits, dated October 1, 2024

    (8) Deposition of Kevin Freedman and Exhibits, dated October 18, 2024

    (9) Deposition of Kevin Farrell, Exhibits, and AI Smart Summary, dated November 4, 2024

    (10) Deposition of Elisa Lee, Exhibits, and AI Smart Summary, dated November 6, 2024

    (11) Deposition of Daniel Miller and Exhibits, dated November 6, 2024

    (12) Deposition of Gabriel Giordano and Exhibits, dated November 7, 2024

    (13) Deposition of Jeffrey Vanderbilt, Exhibits, and AI Smart Summary, dated November 11, 2024

    (14) Deposition of John Zutter, Exhibits, and AI Smart Summary, dated November 12, 2024

    (15) Deposition of Jason Kulas and Exhibits, dated November 14, 2024

    (16) Deposition of Erik Anderson, Vol. 1, and Exhibits, dated November 19, 2024

    (17) Deposition of Tom Veit and Exhibits, dated November 25, 2024

    (18) Deposition of Thomas Dundon Volume 1, Exhibits, and AI Smart Summary, dated December 2, 2024

    (19) Deposition of Thomas Dundon Volume 2 and Exhibits, dated December 3, 2024

    (20) Deposition of Michael Sundheim and Exhibits, dated December 5, 2024

    (21) Glen Johnson Depo Exhibit Number 500

**Depositions - Dundon Capital Partners, LLC v. Charles Ebersol, United States Bankruptcy Court for the Western District of Texas, San Antonio Division, Adversary No. 22-05077-CAG-7:**

    (1) Deposition of Dawn Belt and Exhibits, dated November 8, 2024

**Other:**

    (1) ATT00001.htm

    (2) ATT00002.htm

    (3) ATT00003.htm

    (4) ebersol-sports-media-group-inc_2019+02+11_summary_cap_intermediate_cap.xlsx

    (5) ESMG Financial Projections Model vF.xlsx

    (6) ESMG Updated Investor Deck_2019.02.pdf

    (7) AP Tracker_030619.xlsx

    (8) Cash Flow_Week of 2.18.19 (1).xlsx

    (9) Cash Flow_Week of 2.18.19 (2).xlsx

    (10) Cash Flow_Week of 2.18.19.xlsx

    (11) Cash Flow_Week of 2.25.19v3.xlsx

    (12) ESMG Financials_1.31.2019_DRAFT (1).xlsx

    (13) ESMG Financials_1.31.2019_DRAFT.xlsx

    (14) Team Sponsorship Deals 2.8.19.xlsx

    (15) Vendor Settlement Tracker_2019.02.26 (1).pdf

    (16) Vendor Settlement Tracker_2019.02.26.pdf

    (17) Legendary+Field+Exhibitions+LLC_Trial+Balance.xlsx

    (18) Legendary+Field+Exhibitions+LLC_Vendor+Contact+List (1).xlsx

    (19) Rog-2 01384a Legendary+Field+Exhibitions+LLC_AP+Aging+Detail.xlsx

    (20) Rog-2 01385 Legendary+Field+Exhibitions+LLC_AR+Aging+Detail_as of 11.23.2021.xlsx

    (21) Rog-2 01386 Legendary+Field+Exhibitions+LLC_Balance+Sheet.xlsx

    (22) Rog-2 01387 Legendary+Field+Exhibitions+LLC_Bill+Payment+List (1).xlsx

    (23) Rog-2 01388 Legendary+Field+Exhibitions+LLC_Bills+and+Applied+Payments (2).xlsx

    (24) Rog-2 01389 Legendary+Field+Exhibitions+LLC_Check+Detail (4).xlsx



## In re: Legendary Field Exhibitions, LLC, et al.
### Appendix B-1 - Information Considered [*]

(25) Rog-2 01390 Legendary+Field+Exhibitions+LLC_Invoices+and+Received+Payments_as of 11.23.2021.xlsx

(26) Rog-2 01391 Legendary+Field+Exhibitions+LLC_Invoice+List+by+Date_as of 11.23.2021.xlsx

(27) Rog-2 01392 Legendary+Field+Exhibitions+LLC_Journal.xlsx

(28) Rog-2 01393 Legendary+Field+Exhibitions+LLC_Open+Invoices_as of 11.23.2021.xlsx

(29) Rog-2 01394 Legendary+Field+Exhibitions+LLC_Open+Purchase+Order+List+by++Vendor.xlsx

(30) Rog-2 01395 Legendary+Field+Exhibitions+LLC_Open+Purchase+Orders+Detail.xlsx

(31) Rog-2 01396 Legendary+Field+Exhibitions+LLC_Transaction+Detail+by++Account.xlsx

(32) Rog-2 01397 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Customer.xlsx

(33) Rog-2 01398 Legendary+Field+Exhibitions+LLC_Transaction+List+by++Vendor.xlsx

(34) Rog-2 01399 Legendary+Field+Exhibitions+LLC_Transaction+List+by+Date.xlsx

(35) Rog-2 01400 Legendary+Field+Exhibitions+LLC_Transaction+List+with+Splits.xlsx

(36) Rog-2 01402 Legendary+Field+Exhibitions+LLC_Unpaid+Bills.xlsx

(37) Rog-2 01403 Legendary+Field+Exhibitions+LLC_Vendor+Balance+Detail.xlsx

(38) Ex. 208 - 3.27.19 Valuation Model,XLSX

(39) CONCORDANCE.dat

(40) OPTICON.opt

(41) 2019-3-27 ESMG Valuation Model v02

(42) Requisite Capital Management Balance Sheet for Consolidated Dundon Entities, 12-31-2018 to 3-31-2019

**Treatises Cited:**

(1) Weil, Roman L., et al., *Litigation Services Handbook: The Role of the Financial Expert, 5th, 2012*

(2) Garner, Bryan A., Editor in Chief, Black's Law Dictionary, 10th ed., 2014

(3) Weil, Roman L., et al., *Litigation Services Handbook: The Role of the Financial Expert,* 6th ed., 2017

**Articles and Websites:**

(1) Orr, Conor, "The Curious Rise and Spectacular Crash of the Alliance of American Football," *Sports Illustrated* , 5/1/18, https://www.si.com/nfl/2019/05/01/alliance-american-football-aaf-collapse-charlie-ebersol-tom-dundon

(2) Salgado, Gabe, "AAF Football: 2019 Season Schedule for Alliance of American Football," *Athlon Sports,* 3/28/19, https://athlonsports.com/aaf/aaf-season-schedule-alliance-american-football-2019

(3) Wickersham, Seth and Rothstein, Michael, "Inside the short, unhappy life of the Alliance of American Football," *ESPN.com* , 6/13/2019, https://www.espn.com/espn/print?id=26957796

(4) Williams, Charean, "MGM to acquire AAF's gambling app for $125,000," *Pro Football Talk* , 6/27/19, https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/mgm-to-acquire-aafs-gambling-app-for-125000

(5) Michaelian, Tania, "Future Uncertain for AAF Betting Technology." *BettingUSA*, 8/10/19, https://www.bettingusa.com/future-aaf-technology/

(6) Lowenthal, Daniel, "Navigating Asset Tracing Challenges in Bankruptcy," *Law360*, 12/11/23

(7) "About," Dundon Capital Partners, https://www.dundoncapitalpartners.com/about/

(8) "Team," Dundon Capital Partners, https://www.dundoncapitalpartners.com/team

(9) "AAF Football: 2019 Season Schedule for Alliance of American Football," Athlon Sports, 5/28/19, https://athlonsports.com/aaf/aaf-season-schedule-alliance-american-football-2019

(10) "32 Equity General Information," *PitchBook* , https://pitchbook.com/profiles/investor/120628-09#overview

(11) Press release, "Arizona Man And Israeli Woman Charged In Connection With Providing Shadow Banking Services To Cryptocurrency Exchanges," *United States Attorney's Office, Southern District of New York* , 6/30/19

(12) Murphy, Margi, et al., "Revealed: London bank accounts that could hold key to dead crypto tycoon's lost millions," *The Telegraph*, 3/15/20, https://www.telegraph.co.uk/technology/2020/03/15/revealed-london-bank-accounts-could-hold-key-dead-crypto-tycoons/?ICID=continue_without_subscribing_reg_first

(13) "American Society of Appraisers Business Valuation Committee Special Topics Paper #3, The Use of Management's Prospective Financial Information by a Valuation Analyst," *Business Valuation Review* , Volume 36, Number 1, Spring 2017

(14) State corporate tax rate brackets, https://taxfoundation.org/data/all/state/state-corporate-rates-brackets-2019/

(15) Uniform Commercial Code § 9-315. Secured Party's Rights on Disposition of Collateral and In Proceeds

(16) *Conn. Gen. Life Ins. Co. v. Universal Ins. Co* ., 838 F. 2d 612 (1st Cir. 1988)

(17) "Tracing" definition, *Thomson Reuters Practical Law,* https://content.next.westlaw.com/practical-law/document/I3f4a45d3e8db11e398db8b09b4f043e0/Tracing?viewType=FullText&transitionType=Default&contextData=(sc.Default)

(18) Davis, Melissa, "Tracing Commingled Funds in Fraud Cases," *American Bankruptcy Institute* , 6/21/17

(19) "SFL Annual Meeting," *Stars Football League* , https://starsfootballleague.com/news/sfl-2014-annual-meeting/

(20) Major League Football, Inc., Form 10-K, *Securities and Exchange Commission* , 4/30/19



510

## In re: Legendary Field Exhibitions, LLC, et al.
### Appendix B-1 - Information Considered [*]

(21) Gardner, Chuck, "World Football League - A Brief History," *World Football League*, http://wfl.charlottehornetswfl.com/pages_wfl/history.php#

(22) "Gone but not Forgotten," *OurSportsCentral,* https://www.oursportscentral.com/services/defunct/professional-spring-football-league/l-190

(23) Adamson, Scott, "The A-11 Football League," *AdamsonMedia.com* , https://adamsonmedia.com/the-a-11-football-league/

(24) Speck, Mark, "In Detroit, Where the Wheels Fell Off," *The Coffin Corner*, 19:3, 1997, https://profootballresearchers.org/archives/Website_Files/Coffin_Corner/19-03-701.pdf

(25) Pugh, Jason, "Knight cancel Saturday home finale," *The Times* , 6/4/1999, https://www.newspapers.com/article/the-times-knights-cancel-saturday-home-f/27691432/

(26) "SFL Report," *The Associated Press News Service*, 2000, https://web.archive.org/web/20161001213131/https://sites.google.com/site/rememberthesfl/news

(27) Jurgens, Roy, "Dragons Start Off on Wrong Foot," *Los Angeles Times* , 4/30/00, https://www.latimes.com/archives/la-xpm-2000-apr-30-sp-25185-story.html

(28) Masonnueve, Andrew, "The United National Gridiron League On The Edge Of Financial Collapse," *Bleacher Report* , 6/18/09, https://bleacherreport.com/articles/202126-the-united-national-gridiron-league-on-the-edge-of-financial-collapse

(29) Harris, Michael, "New Orleans Jazz is back ... as part of new professional football league," *The Times-Picayune* , 7/22/11, https://www.nola.com/sports/new-orleans-jazz-is-back-as-part-of-new-professional-football-league/article_a341e321-5f5a-5177-bc4f-0c25bcad42a2.html

(30) Heater, Jay, "Top Story — March: Major League Football's inaugural season in doubt," *Observer Media Group* , 12/24/16, https://www.yourobserver.com/news/2016/dec/24/top-story-march-major-league-footballs-inaugural-season-in-doubt/

(31) Kaplan, Daniel, and Ourand, John, "A comeback for XFL, but can it win?" *Sports Business Journal*, 1/29/18, https://www.sportsbusinessjournal.com/Journal/Issues/2018/01/29/Leagues-and-Governing-Bodies/XFL.aspx

(32) Sanjay, "History of the XFL," *XFL News Hub* , 3/8/18, https://xflnewshub.com/xfl-news/history-of-the-xfl

(33) Wells, Adam, "Vince McMahon Sells Roughly $270M in WWE Stock to Fund XFL, Alpha Entertainment," *Bleacher Report* , 3/27/19, https://bleacherreport.com/articles/2828226-vince-mcmahon-sells-roughly-270m-in-wwe-stock-to-fund-xfl-alpha-entertainment

(34) Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups

(35) Mitchell, Mike, "The Spring League Positioned To Capitalize On The XFL's Uncertain Future," *XFL News Hub* , 4/12/21, https://xflnewshub.com/xfl-news/the-spring-league-positioned-to-capitalize-on-the-xfls-uncertain-future/

(36) Schad, Tom, "Days after laying off employees, XFL files for Chapter 11 bankruptcy," *USA Today*, 4/13/20, https://www.usatoday.com/story/sports/xfl/2020/04/13/xfl-files-chapter-11-bankruptcy-days-after-laying-off-employees/2984278001/

(37) Schad, Tom, "Dwayne 'The Rock' Johnson becomes part owner of XFL; joins group to purchase league for $15 million," *USA Today* , 8/3/20, https://www.usatoday.com/story/sports/xfl/2020/08/03/xfl-gets-new-part-owner-dwayne-the-rock-johnson/5571640002/

(38) Collins, Terry, "Ex-Minnesota Vikings co-owner sent to prison in $700M cryptocurrency [*sic*] shadow bank scam," *USA Today*, 6/5/23, https://www.usatoday.com/story/news/nation/2023/06/05/ex-nfl-owner-sentenced-prison-crypto-scheme/70290248007/

(39) Perry, Mark, "MLFB Cancels 2023 Summer Season, Talks Fan Owned Teams In 2024," *XFL News Hub* , 8/9/23, https://xflnewshub.com/alt-football/mflb-cancels-2023-summer-season-talks-fan-owned-teams-in-2024/

(40) Reineking, Jim, "UFL (the XFL-USFL merger) aims to not join long line of failed start-up pro football leagues," *yahoo!sports*, 12/31/23, https://sports.yahoo.com/2023-xfl-usfl-aim-again-120008549.html?guccounter=1&guce_referrer=aHR0cHM6Ly9jaGF0Z3B0LmNvbS8&guce_referrer_sig=AQAAAN5DnKSGo11KNvC9M2HcG33mSBmURp5UmHwE00NaaiCWG-AOvD3PcBArz2NT-w0jalSAcwElPBwgVXpMEaFaNK-6wqjRFessInDbFEEPNfC3OXMCz-duyci3EZ6tQRyv1ekqmoBFzUq8p6cQBgBPRjHojEVWSRpQvL0pwqBXUnTa

(41) Sager, Kacy, "Unique History of USFL: Past, Present, Future," *Sports Illustrated* , 1/5/24, https://www.si.com/fannation/ufl/news/unique-history-of-usfl-past-present-and-future

(42) Flores, Lucas, "Spring football is on the rise and may be here to stay," *The Crimson*, 5/3/24, https://www.bhscrimson.com/10361/opinions/spring-football-is-on-the-rise-and-may-be-here-to-stay/#:~:text=The%20SFL%20that%20failed%20a,large%20support%20of%20the%20XFL

(43) Mitchell, Mike, "UFL Expected To Release 2025 Season Schedule On FOX/ESPN Before New Year Arrives," *Sports Illustrated* , 12/16/24, https://www.si.com/fannation/ufl/ufl-news/ufl-expected-to-release-2025-season-schedule-on-fox-espn-before-new-year-arrives

(44) Weekly Sports TV Rank Ratings 2.4-2.10.2019, 2/12/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-4-2-10-2019.html.

(45) Weekly Sports TV Rank Ratings 2.11-2.17.2019, 2/20/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-11-2-17-2019.html.

(46) Weekly Sports TV Rank Ratings 2.18-2.24.2019, 2/26/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-18-2-24-2019.html.

(47) Weekly Sports TV Rank Ratings 2.25-3.3.2019, 3/5/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-25-3-3-2019.html.

(48) Weekly Sports TV Rank Ratings 3.4-3.10.2019, 3/12/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-4-3-10-2019.html.

(49) Weekly Sports TV Rank Ratings 3.11-3.17.2019, 3/19/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-11-3-17-2019.html.



## In re: Legendary Field Exhibitions, LLC, et al.
### Appendix B-1 - Information Considered [*]

(50) Weekly Sports TV Rank Ratings 3.18-3.24.2019, 3/26/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-18-3-24-2019.html.

(51) Weekly Sports TV Rank Ratings 3.25-3.31.2019, 4/2/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-25-3-31-2019.html.

*In addition to documents referenced in this appendix, I was granted access to the Relativity database system.



**APPENDIX B-2 – PRODUCTION DOCUMENTS**

## In re: Legendary Field Exhibitions, LLC, et al.
### Appendix B-2 - Production Documents (Database)

**Bates range\*:**

| Bates Begin\*\* | Bates End\*\* |
|---|---|
| DCP Parties0001 | DCP Parties2121 |
| DCP Parties02122 | DCP Parties32850 |
| DCP Parties 26050 | DCP Parties 26263 |
| DCP Third Party Subpoena 0001 | DCP Third Party Subpoena 0021 |
| Ebersol 00001 | Ebersol 00221 |
| TR0000000001 | TR0002044197 |

\*Bates range may include documents labeled as deposition exhibits.
\*\*Certain documents may contain overlapping Bates numbers or be labelled with multiple Bates numbers with different Bates prefixes.  The above reflects documents to which I had access and could search.



514

# APPENDIX C –STARTUP PRO FOOTBALL LEAGUES

CONFIDENTIAL

**In re: Legendary Field Exhibits, LLC, et al.**
<u>**Appendix C – Startup Pro Football Leagues**</u>

### A.    World Football League ("<u>WFL</u>")

1.    The WFL was launched in October 1973, and by February 1974, twelve WFL franchises were established across the U.S. and Canada.[1]  The WFL's opening games in July 1974 drew significant crowds, but by August these crowds were already dwindling.[2]  By September, many teams began withholding their players' paychecks, and by October, two teams were disbanded.[3]  Even while facing bankruptcy, the WFL continued on throughout its first season, and even began a second season in July of 1975.[4]  On October 22, 1975, though, the ten league managers decided to terminate the league.[5]  The short-lived success of the World Football League led to the demise of two other short-lived leagues, the Atlantic Coast Football League and Seaboard Football League, as their players were recruited away to the WFL.[6]

### B.    United States Football League ("<u>USFL</u>")

2.    In 1983, the USFL began play.[7]  The USFL's first season was successful, but the league quickly faced issues after seeking to challenge the NFL with a fall schedule.[8]  Following the 1985 season, and only four days after an unsuccessful NFL lawsuit, the USFL's operations were suspended.[9]

3.    Many other USFL leagues were proposed afterwords, but a league by its name did not operate again until 2022.[10]  The new USFL, an eight-team spring league hosted largely in Birmingham, Alabama, operated for two seasons before merging with the XFL under the United Football League ("<u>UFL</u>") name.[11]

---

[1]    *See* Gardner, Chuck, "World Football League - A Brief History," *World Football League*, http://wfl.charlottehornetswfl.com/pages_wfl/history.php#.

[2]    *See* Gardner, Chuck, "World Football League - A Brief History," *World Football League*, http://wfl.charlottehornetswfl.com/pages_wfl/history.php#.

[3]    *See* Gardner, Chuck, "World Football League - A Brief History," *World Football League*, http://wfl.charlottehornetswfl.com/pages_wfl/history.php#.

[4]    *See* Gardner, Chuck, "World Football League - A Brief History," *World Football League*, http://wfl.charlottehornetswfl.com/pages_wfl/history.php#.

[5]    *See* Gardner, Chuck, "World Football League - A Brief History," *World Football League*, http://wfl.charlottehornetswfl.com/pages_wfl/history.php#.

[6]    *See* Kaplan, Daniel, and Ourand, John, "A comeback for XFL, but can it win?" *Sports Business Journal*, 1/29/18, https://www.sportsbusinessjournal.com/Journal/Issues/2018/01/29/Leagues-and-Governing-Bodies/XFL.aspx; Speck, Mark, "In Detroit, Where the Wheels Fell Off," *The Coffin Corner*, 19:3, 1997, https://profootballresearchers.org/archives/Website_Files/Coffin_Corner/19-03-701.pdf.

[7]    *See* Sager, Kacy, "Unique History of USFL: Past, Present, Future," *Sports Illustrated*, 1/5/24, https://www.si.com/fannation/ufl/news/unique-history-of-usfl-past-present-and-future.

[8]    *See* Sager, Kacy, "Unique History of USFL: Past, Present, Future," *Sports Illustrated*, 1/5/24, https://www.si.com/fannation/ufl/news/unique-history-of-usfl-past-present-and-future.

[9]    *See* Sager, Kacy, "Unique History of USFL: Past, Present, Future," *Sports Illustrated*, 1/5/24, https://www.si.com/fannation/ufl/news/unique-history-of-usfl-past-present-and-future.

[10]    *See* Sager, Kacy, "Unique History of USFL: Past, Present, Future," *Sports Illustrated*, 1/5/24, https://www.si.com/fannation/ufl/news/unique-history-of-usfl-past-present-and-future.

[11]    *See* Sager, Kacy, "Unique History of USFL: Past, Present, Future," *Sports Illustrated*, 1/5/24, https://www.si.com/fannation/ufl/news/unique-history-of-usfl-past-present-and-future.



516

CONFIDENTIAL

**In re: Legendary Field Exhibits, LLC, et al.**
**Appendix C – Startup Pro Football Leagues**

**C.   Arena Football League ("AFL")**

4.   The AFL operated from 1987 until 2019, besides a cancelled 2009 season.[12]   Though the league was successful in the 1990s and early 2000s, it later faced financial problems, forcing the AFL to declare bankruptcy twice, in 2009 and in 2019.[13]   After the league's 2019 bankruptcy, the AFL ceased operations indefinitely.[14]

**D.   Professional Spring Football League**

5.   The Professional Spring Football League was a proposed football league that was slated to begin in 1992.[15]   The league ceased operations after hosting a training camp but before playing a game.[16]

**E.   Regional Football League ("RFL")**

6.   The RFL, a six-team spring league, existed for a single season in 1999, losing more than $6 million before the league folded.[17]   Before the season ended, the league was already facing issues, including cancelled games due to financial pressure.[18]

**F.   Spring Football League ("SFL")**

7.   The SFL was a four-team spring league that played its only season in 2000.[19]   The league did not continue in 2001.[20]

---

[12]   *See* Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups.

[13]   *See* Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups.

[14]   *See* Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups.

[15]   *See* "Gone but not Forgotten," *OurSportsCentral,* https://www.oursportscentral.com/services/defunct/professional-spring-football-league/l-190.

[16]   *See* "Gone but not Forgotten," *OurSportsCentral,* https://www.oursportscentral.com/services/defunct/professional-spring-football-league/l-190.

[17]   *See* Kaplan, Daniel, and Ourand, John, "A comeback for XFL, but can it win?" *Sports Business Journal,* 1/29/18, https://www.sportsbusinessjournal.com/Journal/Issues/2018/01/29/Leagues-and-Governing-Bodies/XFL.aspx.

[18]   *See* Pugh, Jason, "Knight cancel Saturday home finale," *The Times,* 6/4/1999, https://www.newspapers.com/article/the-times-knights-cancel-saturday-home-f/27691432/.

[19]   *See* "SFL Report," *The Associated Press News Service,* 2000, https://web.archive.org/web/20161001213131/https://sites.google.com/site/rememberthesfl/news.

[20]   *See* Flores, Lucas, "Spring football is on the rise and may be here to stay," *The Crimson,* 5/3/24, https://www.bhscrimson.com/10361/opinions/spring-football-is-on-the-rise-and-may-be-here-to-stay/#:~:text=The%20SFL%20that%20failed%20a,large%20support%20of%20the%20XFL.



CONFIDENTIAL

**In re: Legendary Field Exhibits, LLC, et al.**
**Appendix C – Startup Pro Football Leagues**

### G.    XFL 1 and XFL 2

8.    In 2001, WWE personality Vince McMahon partnered with NBC Sports chairman Dick Ebersol to create the XFL, a football league engineered to rival the NFL.[21] Though the XFL initially drew widespread publicity, rankings plummeted thereafter, and the league reportedly lost $70 million.[22] McMahon ultimately ceased XFL operations on May 10, 2001.[23]

9.    From 2018 through 2020, McMahon attempted to reboot the XFL.[24] The XFL ultimately filed for Chapter 11 bankruptcy in April of 2020.[25]

10.    In August of 2020, Dwayne "The Rock" Johnson, Dany Garcia, and RedBird Capital purchased Alpha Entertainment for $15 million and attempted to reboot the XFL.[26] The again-rebooted XFL completed its first and only season in the Spring of 2023, announcing it would not undergo a second season.[27] In December of 2023, the XFL and USFL announced their plans to merge under the UFL name.[28]

### H.    United National Gridiron League

11.    The United National Gridiron League was a proposed league that never played a debut season.[29] The United National Gridiron league faced financial collapse before a game was played.[30]

---

[21]    *See* Sanjay, "History of the XFL," *XFL News Hub*, 3/8/18, https://xflnewshub.com/xfl-news/history-of-the-xfl/.

[22]    *See* Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups.

[23]    *See* Sanjay, "History of the XFL," *XFL News Hub*, 3/8/18, https://xflnewshub.com/xfl-news/history-of-the-xfl/.

[24]    *See* Wells, Adam, "Vince McMahon Sells Roughly $270M in WWE Stock to Fund XFL, Alpha Entertainment," *Bleacher Report*, 3/27/19,    https://bleacherreport.com/articles/2828226-vince-mcmahon-sells-roughly-270m-in-wwe-stock-to-fund-xfl-alpha-entertainment

[25]    *See* Schad, Tom, "Days after laying off employees, XFL files for Chapter 11 bankruptcy," *USA Today*, 4/13/20, https://www.usatoday.com/story/sports/xfl/2020/04/13/xfl-files-chapter-11-bankruptcy-days-after-laying-off-employees/2984278001/.

[26]    *See* Schad, Tom, "Dwayne 'The Rock' Johnson becomes part owner of XFL; joins group to purchase league for $15 million," *USA    Today*,    8/3/20,    https://www.usatoday.com/story/sports/xfl/2020/08/03/xfl-gets-new-part-owner-dwayne-the-rock-johnson/5571640002/.

[27]    *See* Reineking, Jim, "UFL (the XFL-USFL merger) aims to not join long line of failed start-up pro football leagues," *yahoo!sports*, 12/31/23, https://sports.yahoo.com/2023-xfl-usfl-aim-again-120008549.html?guccounter=1&guce_referrer=aHR0cHM6Ly9jaGGF 0Z3B0LmNvbS8&guce_referrer_sig=AQAAAN5DnKSGo11KNvC9M2HcG33mSBmURp5UmHwE00NaaiCWG-AOvD3PcBArz 2NT-w0jalSAcwElPBwgVXpMEaFaNK-6wqjRFessInDbFEEPNfC3OXMCz-duyci3EZ6tQRyv1ekqmoBFzUq8p6cQBgBPRjHojE VWSRpQvL0pwqBXUnTa.

[28]    *See* Reineking, Jim, "UFL (the XFL-USFL merger) aims to not join long line of failed start-up pro football leagues," *yahoo!sports*, 12/31/23, https://sports.yahoo.com/2023-xfl-usfl-aim-again-120008549.html?guccounter=1&guce_referrer=aHR0cHM6Ly9jaGGF 0Z3B0LmNvbS8&guce_referrer_sig=AQAAAN5DnKSGo11KNvC9M2HcG33mSBmURp5UmHwE00NaaiCWG-AOvD3PcBArz 2NT-w0jalSAcwElPBwgVXpMEaFaNK-6wqjRFessInDbFEEPNfC3OXMCz-duyci3EZ6tQRyv1ekqmoBFzUq8p6cQBgBPRjHojE VWSRpQvL0pwqBXUnTa.

[29]    *See* Masonnueve, Andrew, "The United National Gridiron League On The Edge Of Financial Collapse," *Bleacher Report*, 6/18/09, https://bleacherreport.com/articles/202126-the-united-national-gridiron-league-on-the-edge-of-financial-collapse.

[30]    *See* Masonnueve, Andrew, "The United National Gridiron League On The Edge Of Financial Collapse," *Bleacher Report*, 6/18/09, https://bleacherreport.com/articles/202126-the-united-national-gridiron-league-on-the-edge-of-financial-collapse.



518

CONFIDENTIAL

**In re: Legendary Field Exhibits, LLC, et al.**
**Appendix C – Startup Pro Football Leagues**

### I.    Original UFL

12.    The original UFL was launched in the fall of 2009 with four teams.[31]   Unlike many other alternative professional football leagues, the UFL opted to play in the fall, competing with NCAA football and NFL broadcasts.[32]  The league, from its founding, continually dealt with financial issues, and the league collapsed in 2012 amid lawsuits from its own coaches and players.[33]  The league name was inactive until December 2023, when the USFL and XFL merged under the UFL name.[34]  So far, one UFL season has been completed, and the second season is planned to begin in Spring 2025.[35]

### J.    Stars Football League

13.    The Stars Football League began its first season in July of 2011.[36]  The Stars Football League website has not announced further seasons since 2014.[37]

### K.    A-11 Football League

14.    Founded in 2013, the A-11 Football League was established as a league that would allow the A-11 offense, a scheme that is illegal in the NFL.  The league was renamed in 2014 and ultimately abandoned in February 2015 before a game was played.[38]

### L.    Fall Experimental Football League ("FXFL")

15.    The FXFL was a professional football minor league that played two seasons in 2014 and 2015.[39]  The league sought to partner with and receive funding from the NFL, ultimately hoping to function

---

[31]   *See* Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups.

[32]   *See* Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups.

[33]   *See* Barrabi, Thomas, "XFL, USFL, other pro football leagues that took on the NFL," *Fox Business*, 2/6/20, https://www.foxbusiness.com/sports/xfl-usfl-aaf-nfl-pro-football-startups.

[34]   *See* Reineking, Jim, "UFL (the XFL-USFL merger) aims to not join long line of failed start-up pro football leagues," *yahoo!sports*, 12/31/23, https://sports.yahoo.com/2023-xfl-usfl-aim-again-120008549.html?guccounter=1&guce_referrer=aHR0cHM6Ly9jaGF0Z3B0LmNvbS8&guce_referrer_sig=AQAAAN5DnKSGo11KNvC9M2HcG33mSBmURp5UmHwE00NaaiCWG-AOvD3PcBArz2NT-w0jalSAcwEIPBwgVXpMEaFaNK-6wqjRFessInDbFEEPNfC3OXMCz-duyci3EZ6tQRyv1ekqmoBFzUq8p6cQBgBPRjHojEVWSRpQvL0pwqBXUnTa.

[35]   *See* Mitchell, Mike, "UFL Expected To Release 2025 Season Schedule On FOX/ESPN Before New Year Arrives," *Sports Illustrated*, 12/16/24, https://www.si.com/fannation/ufl/ufl-news/ufl-expected-to-release-2025-season-schedule-on-fox-espn-before-new-year-arrives.

[36]   *See* Harris, Michael, "New Orleans Jazz is back ... as part of new professional football league," *The Times-Picayune*, 7/22/11, https://www.nola.com/sports/new-orleans-jazz-is-back-as-part-of-new-professional-football-league/article_a341e321-5f5a-5177-bc4f-0c25bcad42a2.html.

[37]   *See* "SFL Annual Meeting," *Stars Football League*, https://starsfootballleague.com/news/sfl-2014-annual-meeting/.

[38]   *See* Adamson, Scott, "The A-11 Football League," *Adamsonmedia.com*, https://adamsonmedia.com/the-a-11-football-league/.

[39]   *See* Mitchell, Mike, "The Spring League Positioned To Capitalize On The XFL's Uncertain Future," *XFL News Hub*, 4/12/21, https://xflnewshub.com/xfl-news/the-spring-league-positioned-to-capitalize-on-the-xfls-uncertain-future/.



519

22-05077-cag Doc#204-15 Filed 06/24/25 Entered 06/24/25 18:04:29 Exhibit 15 Senated
Report Document Page 5 of 154

In re: Legendary Field Exhibits, LLC, et al.
Appendix C – Startup Pro Football Leagues

CONFIDENTIAL

as a feeder system for the NFL, but the FXFL never received this funding.[40]  After its 2015 season, the league ceased operations.[41]

### M.    Major League Football ("__MLFB__")

16.    The MLFB was a publicly traded football league that planned on hosting its debut season in 2016.[42]  After a major investor withheld a previously-committed $20 million investment, the league's launch was repeatedly delayed.[43]  In 2019, MLFB announced in their 10-K that they planned to host their inaugural season in May, June, and July 2020.[44]  MLFB repeatedly delayed their plans, announcing in their 2022 10-K that they would host their debut season in Spring 2023.[45]  Following the cancellation of their 2023 season, MLFB announced plans to transition team ownership to fans while further delaying their inaugural season.[46]

---

[40]    *See* Mitchell, Mike, "The Spring League Positioned To Capitalize On The XFL's Uncertain Future," *XFL News Hub*, 4/12/21, https://xflnewshub.com/xfl-news/the-spring-league-positioned-to-capitalize-on-the-xfls-uncertain-future/.

[41]    *See* Mitchell, Mike, "The Spring League Positioned To Capitalize On The XFL's Uncertain Future," *XFL News Hub*, 4/12/21, https://xflnewshub.com/xfl-news/the-spring-league-positioned-to-capitalize-on-the-xfls-uncertain-future/.

[42]    *See* Heater, Jay, "Top Story — March: Major League Football's inaugural season in doubt," *Observer Media Group*, 12/24/16, https://www.yourobserver.com/news/2016/dec/24/top-story-march-major-league-footballs-inaugural-season-in-doubt/.

[43]    *See* Heater, Jay, "Top Story — March: Major League Football's inaugural season in doubt," *Observer Media Group*, 12/24/16, https://www.yourobserver.com/news/2016/dec/24/top-story-march-major-league-footballs-inaugural-season-in-doubt/.

[44]    *See* Major League Football, Inc., Form 10-K, Filed July 29, 2019, at p. 4.

[45]    *See* Major League Football, Inc., Form 10-K, Filed July 29, 2019, at p. 4.

[46]    *See* Perry, Mark, "MLFB Cancels 2023 Summer Season, Talks Fan Owned Teams In 2024," *XFL News Hub*, 8/9/23, https://xflnewshub.com/alt-football/mflb-cancels-2023-summer-season-talks-fan-owned-teams-in-2024/.



520

# EXHIBITS

**In re: Legendary Field Exhibitions, LLC, et al.**
**Exhibit Index**

| Exhibit Number | Exhibit Title |
|---|---|
| 1 | Weekly Paid Attendance for AAF Games |
| 2 | Summary of Revised AAF Pro Forma Profit and Loss Forecast |
| 3 | Reported Weekly TV Ratings for AAF Games |
| 4 | 2019 Cash Sponsorship Revenue |
| 5 | AAF Actual and Projected Team Revenue |
| 6.A | Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing - Summary |
| 6.B | Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing - Detail |
| 7 | Summary of AAF Pro Forma Profit and Loss Forecast |
| 8.A | Desai Report February Income Approach Sensitivity to Median Startup Discount Rate |
| 8.B | Desai Report April Income Approach Sensitivity to Median Startup Discount Rate |
| 9.A | Desai Report February Income Approach Sensitivity to High-End Startup Discount Rate |
| 9.B | Desai Report April Income Approach Sensitivity to High-End Startup Discount Rate |
| 10.A | Desai Report February Income Approach Zero EV Discount Rate |
| 10.B | Desai Report April Income Approach Zero EV Discount Rate |
| 11 | Desai Report February Income Approach Sensitivity to Combined State and Federal Tax Rate |
| 11.A | Desai Report February Income Forecast With Combined State and Federal Tax Rate |
| 12 | Desai Report April Income Approach Sensitivity to Combined State and Federal Tax Rate |
| 12.A | Desai Report April Income Forecast With Combined State and Federal Tax Rate |
| 13 | Adjustments to Desai Report Schedule 4 |
| 14 | Alternate Adjustments to Desai Report Schedule 4 |



**Exhibit 1**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Weekly Paid Attendance for AAF Games**

| | | Atlanta Legends | Arizona Hotshots | Birmingham Iron | Memphis Express | Orlando Apollos | Salt Lake Stallions | San Antonio Commanders | San Diego Fleet | Total | Average | Attendance as a % of Week 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Single Game Paid Attendance (1)** | | | | | | | | | | | | |
| Week 1, Feb. 9-10 | A | | 4,782 | 6,236 | | 11,018 | | 12,874 | | 34,910 | 8,728 | 100.0% |
| Week 2, Feb. 16-17 | B | | | 5,198 | 5,648 | | | 12,244 | 10,066 | 33,156 | 8,289 | 95.0% |
| Week 3, Feb. 23-24 | C | 6,493 | | | | 6,336 | 3,153 | | 5,159 | 21,141 | 5,285 | 60.6% |
| Week 4, Mar. 2-3 | D | | 3,600 | 2,116 | 4,180 | | 1,595 | | | 11,491 | 2,873 | 32.9% |
| Week 5, Mar. 9-10 | E | 1,977 | 3,332 | 3,446 | | | | | 7,391 | 16,146 | 4,037 | 46.3% |
| Week 6, Mar. 16-17 | F | 2,117 | | | | 6,695 | 1,788 | | 7,547 | 18,147 | 4,537 | 52.0% |
| Total | G = Sum(A-F) | 10,587 | 11,714 | 16,996 | 9,828 | 24,049 | 6,536 | 25,118 | 30,163 | 134,991 | 16,874 | |
| **Season Ticket Holder Paid Attendance (1)** | | | | | | | | | | | | |
| Week 1, Feb. 9-10 | H | | 1,365 | 2,116 | | 3,734 | | 4,314 | | 11,529 | 2,882 | 100.0% |
| Week 2, Feb. 16-17 | I | | | 2,116 | 1,398 | | | 4,314 | 4,226 | 12,054 | 3,014 | 104.6% |
| Week 3, Feb. 23-24 | J | 877 | | | | 3,734 | 1,791 | | 4,226 | 10,628 | 2,657 | 92.2% |
| Week 4, Mar. 2-3 | K | | 1,365 | 2,116 | 1,398 | | 1,933 | | | 6,812 | 1,703 | 59.1% |
| Week 5, Mar. 9-10 | L | 843 | 1,365 | 2,116 | | | | | 4,226 | 8,550 | 2,138 | 74.2% |
| Week 6, Mar. 16-17 | M | 843 | | | | 3,734 | 1,999 | | 4,226 | 10,802 | 2,701 | 93.7% |
| Total | N = Sum(H-M) | 2,563 | 4,095 | 8,464 | 2,796 | 11,202 | 5,723 | 8,628 | 16,904 | 60,375 | 7,547 | |
| **Total Paid Attendance** | | | | | | | | | | | | |
| Week 1, Feb. 9-10 | O = A + H | | 6,147 | 8,352 | | 14,752 | | 17,188 | | 46,439 | 11,610 | 100.0% |
| Week 2, Feb. 16-17 | P = B + I | | | 7,314 | 7,046 | | | 16,558 | 14,292 | 45,210 | 11,303 | 97.4% |
| Week 3, Feb. 23-24 | Q = C + J | 7,370 | | | | 10,070 | 4,944 | | 9,385 | 31,769 | 7,942 | 68.4% |
| Week 4, Mar. 2-3 | R = D + K | | 4,965 | 4,232 | 5,578 | | 3,528 | | | 18,303 | 4,576 | 39.4% |
| Week 5, Mar. 9-10 | S = E + L | 2,820 | 4,697 | 5,562 | | | | | 11,617 | 24,696 | 6,174 | 53.2% |
| Week 6, Mar. 16-17 | T = F + M | 2,960 | | | | 10,429 | 3,787 | | 11,773 | 28,949 | 7,237 | 62.3% |
| Total | U = Sum(O-T) | 13,150 | 15,809 | 25,460 | 12,624 | 35,251 | 12,259 | 33,746 | 47,067 | 195,366 | 24,421 | |
| Average Price Per Single Game Ticket (2) | V | $ 23 | $ 28 | $ 23 | $ 24 | $ 26 | $ 27 | $ 35 | $ 25 | | $ 26 | |
| Average Price Per Season Ticket Holder (2) | W | $ 46 | $ 39 | $ 44 | $ 49 | $ 43 | $ 39 | $ 54 | $ 34 | | $ 44 | |
| Sum of Single Ticket Revenues, Weeks 1-6 | X = V * G | $ 243,501 | $ 327,992 | $ 390,908 | $ 235,872 | $ 625,274 | $ 176,472 | $ 879,130 | $ 754,075 | $ 3,633,224 | $ 454,153 | |
| Sum of Season Ticket Revenues, Weeks 1-6 | Y = W * N | 118,574 | 160,319 | 374,447 | 137,200 | 483,254 | 223,369 | 463,410 | 567,805 | 2,528,378 | 316,047 | |
| Total Revenue | Z | $ 362,075 | $ 488,311 | $ 765,355 | $ 373,072 | $ 1,108,528 | $ 399,841 | $ 1,342,540 | $ 1,321,880 | $ 6,161,602 | $ 770,200 | |



**Exhibit 1**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Weekly Paid Attendance for AAF Games**

| | | Atlanta Legends | Arizona Hotshots | Birmingham Iron | Memphis Express | Orlando Apollos | Salt Lake Stallions | San Antonio Commanders | San Diego Fleet | Total | Average | Attendance as a % of Week 1 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Number of Games With Attendance Records | AA = Count(A-F) | 3 | 3 | 4 | 2 | 3 | 3 | 2 | 4 | | | |
| Average Revenue Per Game | BB = Z / AA | $ 120,692 | $ 162,770 | $ 191,339 | $ 186,536 | $ 369,509 | $ 133,280 | $ 671,270 | $ 330,470 | $2,165,866 | $ 270,733 | |
| Expected Season Revenue (5 Home Games Per Regular Season) (3) | CC = BB * 5 | 603,458 | 813,852 | 956,694 | 932,679 | 1,847,547 | 666,401 | 3,356,350 | 1,652,350 | 10,829,332 | 1,353,666 | |
| After 20% Haircut in Revised AAF Pro Forma (4) | DD = CC * 80% | $ 482,766 | $ 651,082 | $ 765,355 | $ 746,143 | $1,478,038 | $ 533,121 | $2,685,080 | $1,321,880 | $8,663,465 | $1,082,933 | |
| Extrapolated full season as a fraction of Weeks 1-6 | EE = CC / Z | | | | | | | | | 175.8% | | |

**Sources and Notes:**
(1) See Revised AAF Pro Forma, tab "Team Assumptions1," rows 23-43.
(2) See Revised AAF Pro Forma, tab "Team Assumptions1," rows 60-61.
(3) See Revised AAF Pro Forma, tab "Team Assumptions1," row 48.
(4) See Revised AAF Pro Forma, tab "Team Level Year 1," cell D11.

bvagroup

524

**Exhibit 2**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Summary of Revised AAF Pro Forma Profit and Loss Forecast**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | | |
| League Revenue (1) | $ 7,000,000 | $ 15,500,000 | $ 31,000,000 | $ 54,250,000 | $ 81,375,000 | $ 101,718,750 | $ 122,062,500 | $ 140,371,875 |
| *YOY % growth* | N/A | 121.4% | 100.0% | 75.0% | 50.0% | 25.0% | 20.0% | 15.0% |
| *Cumulative % growth* | N/A | 121.4% | 342.9% | 675.0% | 1062.5% | 1353.1% | 1643.8% | 1905.3% |
| Team Revenue (1) | 21,273,793 | 34,109,228 | 53,295,668 | 66,619,585 | 91,905,027 | 105,725,281 | 135,680,778 | 149,248,856 |
| *YOY % growth* | N/A | 60.3% | 56.3% | 25.0% | 38.0% | 15.0% | 28.3% | 10.0% |
| *Cumulative % growth* | N/A | 60.3% | 150.5% | 213.2% | 332.2% | 397.0% | 537.8% | 601.6% |
| Digital Revenue (1) | - | 17,125,200 | 26,492,848 | 36,660,195 | 49,074,609 | 64,430,911 | 82,443,573 | 102,527,387 |
| *YOY % growth* | N/A | N/A | 54.7% | 38.4% | 33.9% | 31.3% | 28.0% | 24.4% |
| *Cumulative % growth* | N/A | N/A | 54.7% | 114.1% | 186.6% | 276.2% | 381.4% | 498.7% |
| **Total Revenue** | $ 28,273,793 | $ 66,734,428 | $ 110,788,516 | $ 157,529,780 | $ 222,384,637 | $ 271,874,942 | $ 340,186,851 | $ 392,148,118 |
| *YOY % growth* | N/A | 136.0% | 66.0% | 42.2% | 41.2% | 22.3% | 25.1% | 15.3% |
| *Cumulative % growth* | N/A | 136.0% | 291.8% | 457.2% | 686.5% | 861.6% | 1103.2% | 1287.0% |
| **Expenses:** | | | | | | | | |
| Total League Level Expenses (1) | 75,140,436 | 63,034,577 | 67,670,532 | 72,609,878 | 78,289,585 | 84,921,024 | 92,421,643 | 100,619,177 |
| *YOY % growth* | N/A | -16.1% | 7.4% | 7.3% | 7.8% | 8.5% | 8.8% | 8.9% |
| *Cumulative % growth* | N/A | -16.1% | -9.9% | -3.4% | 4.2% | 13.0% | 23.0% | 33.9% |
| Total Team Level Expenses (1) | 112,693,235 | 76,077,423 | 95,096,778 | 95,096,778 | 114,116,134 | 114,116,134 | 133,135,490 | 133,135,490 |
| *YOY % growth* | N/A | -32.5% | 25.0% | 0.0% | 20.0% | 0.0% | 16.7% | 0.0% |
| *Cumulative % growth* | N/A | -32.5% | -15.6% | -15.6% | 1.3% | 1.3% | 16.7% | 18.1% |
| **Total Expenses** | $ 187,833,671 | $ 139,111,999 | $ 162,767,310 | $ 167,706,656 | $ 192,405,719 | $ 199,037,158 | $ 225,557,132 | $ 233,754,667 |
| **Total Operating Income (Loss)** | $ (159,559,878) | $ (72,377,572) | $ (51,978,794) | $ (10,176,876) | $ 29,978,918 | $ 72,837,784 | $ 114,629,719 | $ 158,393,451 |
| **Cumulative Net Cash Flow** | $ (159,559,878) | $ (231,937,450) | $ (283,916,243) | $ (294,093,119) | $ (264,114,201) | $ (191,276,417) | $ (76,646,699) | $ 81,746,752 |

**bva**group®

525

**Exhibit 2**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Summary of Revised AAF Pro Forma Profit and Loss Forecast**

| | | 2027 | | 2028 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| League Revenue (1) | $ | 154,409,063 | $ | 162,129,516 |
| YOY % growth | | 10.0% | | 5.0% |
| Cumulative % growth | | 2105.8% | | 2216.1% |
| Team Revenue (1) | | 179,098,627 | | 188,053,558 |
| YOY % growth | | 20.0% | | 5.0% |
| Cumulative % growth | | 741.9% | | 784.0% |
| Digital Revenue (1) | | 123,633,745 | | 149,867,941 |
| YOY % growth | | 20.6% | | 21.2% |
| Cumulative % growth | | 621.9% | | 775.1% |
| **Total Revenue** | **$** | **457,141,434** | **$** | **500,051,015** |
| YOY % growth | | 16.6% | | 9.4% |
| Cumulative % growth | | 1516.8% | | 1668.6% |
| **Expenses:** | | | | |
| Total League Level Expenses (1) | | 109,202,554 | | 119,407,098 |
| YOY % growth | | 8.5% | | 9.3% |
| Cumulative % growth | | 45.3% | | 58.9% |
| Total Team Level Expenses (1) | | 152,154,845 | | 152,154,845 |
| YOY % growth | | 14.3% | | 0.0% |
| Cumulative % growth | | 35.0% | | 35.0% |
| **Total Expenses** | **$** | **261,357,400** | **$** | **271,561,943** |
| **Total Operating Income (Loss)** | **$** | **195,784,035** | **$** | **228,489,072** |
| **Cumulative Net Cash Flow** | **$** | **277,530,787** | **$** | **506,019,859** |

**Sources and Notes:**
(1) See Revised AAF Pro Forma, tab "Summary P&L."

**bva**group®

**Exhibit 3**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Reported Weekly TV Ratings for AAF Games**

*Reported in thousands of viewers*

| | Week: | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|---|
| | Footnote: | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) |
| CBS | | 3,250 | - | - | - | - | - | - | - |
| NFL Network (Sat.) | | - | 424 | 491 | 409 | - | 354 | - | - |
| NFL Network (Sun.) | | 640 | 425 | 515 | 450 | 300 | - | - | - |
| TNT | | - | 1,018 | - | - | 457 | - | 340 | 469 |
| **Total Reported Viewers** | | **3,890** | **1,867** | **1,006** | **859** | **757** | **354** | **340** | **469** |
| **Average Reported Viewers** | | **1,945** | **622** | **503** | **430** | **379** | **354** | **340** | **469** |

**Sources and Notes:**

(1) See SKEDBALL: Weekly Sports TV Rank Ratings 2.4-2.10.2019, 2/12/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-4-2-10-2019.html.
(2) See SKEDBALL: Weekly Sports TV Rank Ratings 2.11-2.17.2019, 2/20/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-11-2-17-2019.html.
(3) See SKEDBALL: Weekly Sports TV Rank Ratings 2.18-2.24.2019, 2/26/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-18-2-24-2019.html.
(4) See SKEDBALL: Weekly Sports TV Rank Ratings 2.25-3.3.2019, 3/5/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-2-25-3-3-2019.html.
(5) See SKEDBALL: Weekly Sports TV Rank Ratings 3.4-3.10.2019, 3/12/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-4-3-10-2019.html.
(6) See SKEDBALL: Weekly Sports TV Rank Ratings 3.11-3.17.2019, 3/19/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-11-3-17-2019.html.
(7) See SKEDBALL: Weekly Sports TV Rank Ratings 3.18-3.24.2019, 3/26/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-18-3-24-2019.html.
(8) See SKEDBALL: Weekly Sports TV Rank Ratings 3.25-3.31.2019, 4/2/2019, www.showbuzzdaily.com/articles/skedball-weekly-sports-tv-ratings-3-25-3-31-2019.html.

bva group

527

**Exhibit 4**
**In re: Legendary Field Exhibitions, LLC, et al.**
**2019 Cash Sponsorship Revenue**

| Team | Partner | 2019 Cash Sponsorship Revenue |
|---|---|---|
| ARZ | A College Bar | $ - |
| ARZ | AC Marriott Tempe | - |
| ARZ | ALSCO | 12,000 |
| ARZ | AM/PM | - |
| ARZ | Arizona Family KTVK 3 | - |
| ARZ | Asset Acquisitions | 1,000 |
| ARZ | Carl's Jr. | - |
| ARZ | Casino Arizona | 110,000 |
| ARZ | CBCB | 3,000 |
| ARZ | Coca-Cola | - |
| ARZ | Diamond Resorts | 2,400 |
| ARZ | Fitzmaurice Hand Institute | 20,000 |
| ARZ | Fry's Food | - |
| ARZ | Hubbard Radio | - |
| ARZ | Lyft | 10,000 |
| ARZ | New Amsterdam Vodka | 5,000 |
| ARZ | Papa John's Pizza | - |
| ARZ | Portillo's | - |
| ARZ | ProCopy | - |
| ARZ | Sagicor | 45,000 |
| ARZ | Smirnoff Ice Smash | - |
| ARZ | Spellbound Entertainment | 3,000 |
| ARZ | The UPS Store | - |
| ARZ | Varsity Tavern | - |
| ARZ | White Water | - |
| ATL | Atlanta Beverage | 10,000 |
| ATL | DAS BBQ | - |
| ATL | Diamond Resorts | 4,000 |
| ATL | DSI, Inc. | - |
| ATL | Emory Healthcare | - |
| ATL | Georgia's Own Credit Union | - |
| ATL | Jimmy Johns | 3,000 |
| ATL | LA Fitness | - |
| ATL | Outback Steakhouse | - |
| ATL | Smartbox Solutions | - |
| ATL | Taco Mac | - |
| ATL | Ultimate Tailgating | - |
| BIR | Alabama Power | 60,000 |
| BIR | Back Forty | - |
| BIR | Birmingham Zoo | - |
| BIR | Blue Cross and Blue Shield | 34,500 |
| BIR | Brookwood Baptist Health | 260,000 |
| BIR | Business Electronics | - |
| BIR | Champion Sports Medicine | 50,000 |
| BIR | Coca Cola | 50,000 |
| BIR | CraneWorks | 1,400 |
| BIR | Gulf Distributing | 10,000 |
| BIR | iheart Media | - |
| BIR | Jim n Nicks | - |
| BIR | KAMTECK | 20,000 |
| BIR | Papa John's Pizza | 10,000 |
| BIR | Piggly Wiggly | - |



528

**Exhibit 4**

**In re: Legendary Field Exhibitions, LLC, et al.**

**2019 Cash Sponsorship Revenue**

| Team | Partner | 2019 Cash Sponsorship Revenue |
|---|---|---|
| BIR | Precision Orthopedic | - |
| BIR | Royal Cup | - |
| BIR | Taco Mamma | - |
| MEM | Across The Board | - |
| MEM | Buffalo Wild Wings | - |
| MEM | Campbell Clinic | 100,000 |
| MEM | Camus | 30,000 |
| MEM | City Gear | 6,500 |
| MEM | CORT Furniture | 8,000 |
| MEM | DEX Imaging | 2,333 |
| MEM | Exline's Pizza | 10,000 |
| MEM | Hog Wild | 22,500 |
| MEM | Holiday Inn | 4,000 |
| MEM | Ladd's | - |
| MEM | Main Event | 3,000 |
| MEM | Memphis Marriot East | 8,000 |
| MEM | Second Line | - |
| MEM | ServiceMaster by Stratos | 25,000 |
| MEM | Sonesta Es Suites | 20,000 |
| MEM | Swain Wealth Partners | 15,000 |
| ORL | Ace Cafe | 3,500 |
| ORL | Apollos Chariots | - |
| ORL | Burger U | 10,000 |
| ORL | Christner's Prime Steak and Seafood | - |
| ORL | City Beverages | 50,000 |
| ORL | Coke | - |
| ORL | DEX Imaging | - |
| ORL | Diamond International | 3,500 |
| ORL | Ford Insurance Agency | 7,500 |
| ORL | Hub International | 35,000 |
| ORL | iheart Media | - |
| ORL | Liv UrbanScape | 10,000 |
| ORL | McDonald's | - |
| ORL | OAI | 3,000 |
| ORL | Royal Carribean | 10,000 |
| ORL | Sir Speedy | 2,500 |
| ORL | The Morgan Law Group | 15,000 |
| ORL | Top Golf | 1,500 |
| SA | Alamo Beer | 7,500 |
| SA | DOCUmation | 10,000 |
| SA | DoubleTree | 50,000 |
| SA | Golds Gym | - |
| SA | H-E-B | 50,000 |
| SA | Holiday Inn Riverwalk | 30,000 |
| SA | K1 Speed | 5,000 |
| SA | LeafFilter | 3,500 |
| SA | Margaritaville | 15,000 |
| SA | Methodist Health System | 50,000 |
| SA | Pizza Hut | - |
| SA | Red McCombs | 15,000 |
| SA | Resort Vacations Inc. | 5,000 |
| SA | Southern Journey | 5,000 |



**Exhibit 4**
**In re: Legendary Field Exhibitions, LLC, et al.**
**2019 Cash Sponsorship Revenue**

| Team | Partner | 2019 Cash Sponsorship Revenue |
|---|---|---|
| SA | Spectrum | - |
| SA | STRIC | 15,000 |
| SA | TX Dot-Don't Mess With Texas | 2,500 |
| SA | TX Dot-Southwest Impaired Driving | 40,000 |
| SA | Via | 7,500 |
| SA | Walk-On's | 7,500 |
| SD | Amethys Beverage | 153,000 |
| SD | Bully's East | 6,000 |
| SD | Cali Comfort | - |
| SD | Fox 5 | - |
| SD | Hub International | 35,000 |
| SD | iheart Media | - |
| SD | Logic Copy | - |
| SD | Moral, Welfar, and Rec | - |
| SL | AB - General Distributing | - |
| SL | Bout Time | 5,000 |
| SL | Embassy Suites | 5,040 |
| SL | ESPN700 Broadway Media | - |
| SL | Industrial Supply | 15,000 |
| SL | Les Olson | - |
| SL | People Ready | 21,500 |
| SL | Sparrow Electric | 5,000 |
| | **Total Cash Sponsorship Revenue** | **$ 1,694,173** |

**Sources and Notes:**
(1) See Revised AAF Pro Forma, tab "SponsorshipDeals2.8.19."

**Exhibit 5**
**In re: Legendary Field Exhibitions, LLC, et al.**
**AAF Actual and Projected Team Revenue**

| | Actual (6 Weeks) | | Extrapolated to a 10 Week Season | | Revised AAF Pro Forma (4) | | AAF Pro Forma (5) |
|---|---|---|---|---|---|---|---|
| | | | | **2019** | | | |
| Actual and Projected Ticket Revenue | $ 6,161,602 (1) | $ | 8,663,465 (1) | $ | 9,535,496 | $ | 35,000,000 |
| Merchandise Revenue | - | | - | | 2,800,000 | | 4,200,000 |
| Sponsorship Revenue | 1,694,173 (2) | | 2,977,596 (3) | | 8,938,296 | | 5,600,000 |
| **Total Team Revenue** | **$ 7,855,775** | **$** | **11,641,061** | **$** | **21,273,793** | **$** | **44,800,000** |
| 2019 Actual and Projected Team Revenue Extrapolated to a 10 Week Season as a Percent of 2019 Team Revenue as Represented By Revised AAF Pro Forma | | | | | **54.7%** | | **26.0%** |

**Sources and Notes:**
(1) See Exhibit 1.
(2) See Exhibit 4.
(3) Calculated by multiplying Actual (6 Weeks) Sponsorship Revenue by 175.8% as calculated in Exhibit 1.
(4) See Revised AAF Pro Forma, tab "Team Level Year 1", cells P11-P13.
(5) See AAF Pro Forma, tab "Team Revenue," column B.  Per-team revenue multiplied by 8 teams.

bvagroup

531

**Exhibit 6.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing - Summary**

**Improperly Presumed NFL Spend for Non-Player Compensation:**

| | | | 2020 |
|---|---|---|---|
| Number of Improperly Presumed NFL Shared Employees (1) | A | | 200 |
| Insurance Spending ($7,500 per Employee) (1) | B = A * $7,500 | $ | 1,500,000 |
| Improperly Presumed Total Net Base Salary to NFL (2) | C | | 9,727,811 |
| Social Security (6.20% of Salary) (3) | D = C * 6.20% | | 603,124 |
| Medicare (1.45% of Salary) (4) | E = C * 1.45% | | 141,053 |
| **2020 Improperly Presumed NFL Spend for Non-Player Compensation (3)** | **F = Sum(B-E)** | **$** | **11,971,988** |

**Improperly Presumed NFL Spend for Player Compensation:**

| | | | 2020 |
|---|---|---|---|
| Number of football players in 2019 (5) | G | | 424 |
| Number of "Non NFL" Football Players in 2020 (6) | H | | 328 |
| Improperly Presumed NFL Covered Football Players in 2020 (7) | I = G - H | | **96** |
| Average Football Player Salary (7) | J | $ | 73,000 |
| Total Salary of Improperly Presumed NFL Covered Football Players in 2020 | K = I * J | | 7,008,000 |
| Insurance Benefits ($10,000 per Player) (8) | L = I * $10,000 | | 960,000 |
| Workers Compensation ($10,000 per Player) (9) | M = I * $10,000 | | 960,000 |
| **Total Improperly Presumed NFL Spend for AAF Personnel Expenses** | **N = Sum(K-M)** | **$** | **8,928,000** |
| **Total Operating Expenses After Adding Back Improperly Presumed NFL Spend** | **O = F + N** | **$** | **20,899,988** |

**Sources and Notes:**
(1) See Revised AAF Pro Forma, tab "Team Level Year 2," cell J23.
(2) See Exhibit 6.B.
(3) See Revised AAF Pro Forma, tab "Team Level Year 2," cell C25.
(4) See Revised AAF Pro Forma, tab "Team Level Year 2," cell C26.
(5) See Revised AAF Pro Forma, tab "Team Assumptions1," row 196.
(6) See Revised AAF Pro Forma, tab "Team Assumptions2," row 195.
(7) Calculated as the average football player's projected salary in 2020. See Revised AAF Pro Forma, tab "Team Assumptions2," rows 186 ($2,993,000 in football players salary per team) / 41 "Non-NFL" players per team = $73,000.
(8) See Revised AAF Pro Forma, tab "Team Level Year 2," cell C33.
(9) See Revised AAF Pro Forma, tab "Team Level Year 2," cell C36.



Exhibits - Page 11 of 37

**Exhibit 6.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing – Detail**

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Robinson | Cortez | 392.075 (Head Equipment Manager) | Football Ops | ATL | Yes | $ 90,000 | 0% | $ 90,000 | $ - |
| Layman II | Rickey | 392.078 (Assistant Video Director) | Football Ops | ATL | Yes | 60,000 | 0% | 60,000 | - |
| Berry | Jacob | 392.077 (Video Director) | Football Ops | ATL | Yes | 75,000 | 0% | 75,000 | - |
| Gladden | Jessica | 392.076 (Assistant Equipment Manager) | Football Ops | 0 | Yes | 60,000 | 0% | 60,000 | - |
| Tice | Nathan | 392.079 (Personnel Director) | Football Ops | ATL | Yes | 60,000 | 0% | 60,000 | - |
| Thompson | Christopher | 392.022 Director Football Operations | Football Operations | ATL | Yes | 75,000 | 0% | 75,000 | - |
| Morris | Robert | 392.113 (Personnel Director) | Football Operations | SA | Yes | 85,000 | 0% | 85,000 | - |
| Peterson | John | 392.022 Director Football Operations | Football Ops | SA | Yes | 85,000 | 0% | 85,000 | - |
| Beacham | Sterling-Michael | 392.076 (Assistant Equipment Manager) | Football Ops | SA | Yes | 50,000 | 0% | 50,000 | - |
| Kadri | Dustin | 392.077 (Video Director) | Football Ops | SA | Yes | 75,000 | 0% | 75,000 | - |
| Sternberg | Brad | 392.078 (Assistant Video Director) | Football Ops | SA | Yes | 60,000 | 0% | 60,000 | - |
| Nash | David | 392.077 (Video Director) | Football Ops | SD | Yes | 80,000 | 0% | 80,000 | - |
| Taylor | Brendan | 392.078 (Assistant Video Director) | Football Ops | SD | Yes | 65,000 | 0% | 65,000 | - |
| MaGee | Darryl | 392.075 (Head Equipment Manager) | Football Ops | SD | Yes | 90,000 | 0% | 90,000 | - |
| Brown | Peter | 392.023 (Dir. Football Operations (CA)) | Football Ops | SD | Yes | 75,000 | 0% | 75,000 | - |
| Mostowsky | Jared | 392.076 (Assistant Equipment Manager) | Football Ops | SD | Yes | 50,000 | 0% | 50,000 | - |
| Monos | James | 392.079 (Personnel Director) | Football Ops | SD | Yes | 75,000 | 0% | 75,000 | - |
| James | Nicholas | Coach | Football | SL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Lappano | Timothy | Coach | Football | SL | Yes | 190,000 | 50% | 95,000 | 95,000 |
| Henderson | Henry | Coach | Football | SL | Yes | 215,000 | 50% | 107,500 | 107,500 |
| Lee | Ronnie | 392.040 Coach | Football | SL | Yes | 115,000 | 50% | 57,500 | 57,500 |
| thomas | lamar | Coach | Football | SL | Yes | 115,000 | 50% | 57,500 | 57,500 |
| Gray | Michael | Coach | Football | SL | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Cozzetto | Daniel | Coach | Football | SL | Yes | 115,000 | 50% | 57,500 | 57,500 |
| Bodkin | Michelle | 392.130 (Coaching Assistant) | Football | SL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Ataimalo | Nicholas | Coach | Football | SL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Fouch | Ronald | Coach | Football | SL | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Creehan | Dennis | Coach | Football | SL | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Savage Jr | Phillip | 392.062 (General Manager) | Football | BIR | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Boller | David | 392.062 (General Manager) | Football | ARZ | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Neuheisel JR | Richard | Coach | Football | ARZ | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Martz | Michael | Coach | Football | SD | Yes | 500,000 | 0% | 500,000 | - |
| Lewis | Will | 392.062 (General Manager) | Football | SL | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Ruskell | Timothy | 392.062 (General Manager) | Football | ORL | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Spurrier | Stephen | Coach | Football | ORL | Yes | 500,000 | 0% | 500,000 | - |
| Vick | Michael | Coach | Football | ATL | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Devaney | William | 392.062 (General Manager) | Football | BIR | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Lewis | Timothy | Coach | Football | SL | Yes | 500,000 | 0% | 500,000 | - |
| Erickson | Dennis | Coach | Football | SA | Yes | 500,000 | 0% | 500,000 | - |
| Riley | Michael | Coach | Football | ATL | Yes | 500,000 | 0% | 500,000 | - |
| Coyle | Kevin | Coach | Football | SA | Yes | 500,000 | 50% | 100,000 | 100,000 |
| Johnston | Daryl | 392.062 (General Manager) | Football | MEM | Yes | 500,000 | 0% | 500,000 | - |
| Singletary | Michael | Coach | Football | SL | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Mueller | Randall | 392.063 (General Manager (WA)) | Football | BIR | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Pendry | Joseph | 392.062 (General Manager) | Football Ops | BIR | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Selesky Jr | Ronald | 392.022 (Dir. Football Operations) | Football Ops | BIR | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Hofmaier | David | 392.076 (Assistant Equipment Manager) | Football Ops | BIR | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Wick | Robert | 392.075 (Head Equipment Manager) | Football Ops | ATL | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Brown | Theotis | 392.098 (EVP, Football Operations) | Football Operations | | Yes | 175,000 | 50% | 87,500 | 87,500 |
| Graham Jr | Stephan | 392.135 (Videographer) | Football | | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Lawson | Benjamin | 392.077 (Video Director) | Football Operations | BIR | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Welter | Jenifer | Coach | Football | ATL | Yes | 80,000 | 50% | 40,000 | 40,000 |



Exhibit 6.B
In re: Legendary Field Exhibitions, LLC, et al.
Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing - Detail

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Robinson Jr | Miles | Coach | Football | ATL | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Robinson | James | Coach | Football | ATL | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Woods | Corey | Coach | Football | ATL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Anderson | Tyler | Coach | Football | ATL | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Thompson | Leroy | Coach | Football | ATL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Goldman | Dennis | Coach | Football | ATL | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Johnson | John | Coach | Football | ATL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Metzelaars | Peter | Coach | Football | ATL | Yes | 150,000 | 50% | 75,000 | 75,000 |
| Ciolfi | Sigismondo | Coach | Football | ATL | Yes | 150,000 | 50% | 75,000 | 75,000 |
| Horton | Jarren | Coach | Football | ATL | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Criner | Mark | Coach | Football | ATL | Yes | 140,000 | 50% | 70,000 | 70,000 |
| Amey | Vincent | 392.024 Coach | Football | ARZ | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Ktna | Matthew | Coach | Football | ARZ | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Mamie | Larry | Coach | Football | ARZ | Yes | 225,000 | 50% | 112,500 | 112,500 |
| MacDuff | Larry | Coach | Football | SD | Yes | 125,000 | 50% | 62,500 | 62,500 |
| Allen | Eric | Coach | Football | SD | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Hakim | Azzahir | 392.024 Coach | Football | SD | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Murray | Tynan | 392.130 (Coaching Assistant) | Football | SD | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Becht | Anthony | Coach | Football | SD | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Jordan | LaMont | 392.024 Coach | Football | SD | Yes | 75,000 | 50% | 37,500 | 37,500 |
| DeBord | Michael | Coach | Football | SD | Yes | 20,000 | 50% | 10,000 | 10,000 |
| Morris | Patrick | 392.024 Coach | Football | SD | Yes | 125,000 | 50% | 62,500 | 62,500 |
| Watson Sr | Kenneth | Coach | Football | SA | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Bryant | Bradley | 392.130 (Coaching Assistant) | Football | SA | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Grobe | Jim | Coach | Football | SA | Yes | 150,000 | 50% | 75,000 | 75,000 |
| McInerney | Jeffrey | Coach | Football | SA | Yes | 135,000 | 50% | 67,500 | 67,500 |
| Williams | Keith | Coach | Football | SA | Yes | 135,000 | 50% | 67,500 | 67,500 |
| Himebauch | Jonathan | Coach | Football | SA | Yes | 150,000 | 50% | 75,000 | 75,000 |
| Oglesby | Joshua | Coach | Football | SA | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Rodgers Jr | James | Coach | Football | SA | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Moevao | Lyle | Coaching Assistant | Football | SA | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Bradley | William | Coach | Football | SA | Yes | 135,000 | 50% | 67,500 | 67,500 |
| Troxel | Matthew | Coach | Football | SA | Yes | 135,000 | 50% | 67,500 | 67,500 |
| Widner | Teresa | 392.130 (Coaching Assistant) | Football | MEM | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Lee | Bill | Coach | Football | MEM | Yes | 175,000 | 50% | 87,500 | 87,500 |
| Johnson | Thomas | Coach | Football | MEM | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Singletary | Matt | Coach | Football | MEM | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Marshall | Stephen | Coach | Football | MEM | Yes | 155,000 | 50% | 77,500 | 77,500 |
| Gibson | Thomas | Coach | Football | MEM | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Knott | Ty | Coach | Football | MEM | Yes | 140,000 | 50% | 70,000 | 70,000 |
| Thurman | Dennis | Coach | Football | MEM | Yes | 180,000 | 50% | 90,000 | 90,000 |
| Mason | Thomas | Coach | Football | MEM | Yes | 155,000 | 50% | 77,500 | 77,500 |
| Atogwe | Oshiomogho | Coach | Football | MEM | Yes | 85,000 | 50% | 42,500 | 42,500 |
| Blizzard | Robert | Coach | Football | MEM | Yes | 130,000 | 50% | 65,000 | 65,000 |
| Mogulla | Akshith | 392.022 Director Football Operations | Football Ops | ARZ | Yes | 45,000 | 50% | 22,500 | 22,500 |
| Roller | Scott | 392.075 (Head Equipment Manager) | Football Ops | ARZ | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Maccracken III | Alan | 392.079 (Personnel Director) | Football Ops | ARZ | Yes | 105,000 | 50% | 52,500 | 52,500 |
| Crooks | Christopher | 392.077 (Video Director) | Football Ops | ARZ | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Norris | Travis | 392.078 (Assistant Video Director) | Football Ops | ARZ | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Holland | Ben | 392.076 (Assistant Equipment Manager) | Football Ops | ARZ | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Hand | Matthew | 392.079 (Personnel Director) | Football Ops | SL | Yes | 70,000 | 50% | 35,000 | 35,000 |
| Dolan | Benjamin | 392.075 (Head Equipment Manager) | Football Ops | SL | Yes | 75,000 | 50% | 37,500 | 37,500 |

bvagroup®

**Exhibit 6.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing - Detail**

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Hollern | Ryan | 392.022 Director Football Operations | Football Ops | SL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Hollister | Sean | 392.077 (Video Director) | Football Ops | SL | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Woodall | Brayden | 392.078 (Assistant Video Director) | Football Ops | SL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Kuehn | Christopher | Asst Equipment Manager | Football Ops | SL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Aiken | Ronald | Coach | Football | ARZ | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Reinert | Christopher | Coach | Football | ARZ | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Axman | Stephen | Coach | Football | ARZ | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Weidinger | Andrew | Coach | Football | ARZ | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Arbuckle | Charles | Coach | Football | ARZ | Yes | 100,000 | 50% | 50,000 | 50,000 |
| King | Jennifer | Coach | Football | ARZ | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Hundley | Timothy | Coach | Football | ARZ | Yes | 130,000 | 50% | 65,000 | 65,000 |
| Aliotti | Nicholas | Coach | Football | ARZ | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Burton | Brandon | 392.130 (Coaching Assistant) | Football | ARZ | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Gillhamer | Michael | Coach | Football | ARZ | Yes | 100,000 | 50% | 50,000 | 50,000 |
| Wagner | Jennifer | 392.130 (Coaching Assistant) | Football | ORL | Yes | 70,000 | 50% | 35,000 | 35,000 |
| Stephens | Jimmy | Coach | Football | ORL | Yes | 120,000 | 50% | 60,000 | 60,000 |
| Jackson Jr | Willie | Coach | Football | ORL | Yes | 105,000 | 50% | 52,500 | 52,500 |
| Sheppard | Lito | Coach | Football | ORL | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Abraham | Nathaniel | Coach | Football | ORL | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Reaves | John | Coach | Football | ORL | Yes | 105,000 | 50% | 52,500 | 52,500 |
| Spurrier | Scott | Coach | Football | ORL | Yes | 105,000 | 50% | 52,500 | 52,500 |
| Washington | Todd | Coach | Football | ORL | Yes | 105,000 | 50% | 52,500 | 52,500 |
| Collins | James | Coach | Football | ORL | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Sanders Jr. | Robert | Coach | Football | ORL | Yes | 200,000 | 50% | 100,000 | 100,000 |
| Jeffcoat Jr. | James | 392.130 (Coaching Assistant) | Football | ORL | Yes | 120,000 | 50% | 60,000 | 60,000 |
| Mortensen | Alexander | Coach | Football | BIR | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Hamilton | Raymond | Coach | Football | ORL | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Minter | Richard | Coach | Football | BIR | Yes | 180,000 | 50% | 90,000 | 90,000 |
| Cottrell | Theodore | Coach | Football | BIR | Yes | 105,000 | 50% | 52,500 | 52,500 |
| Rychleski | Raymond | Coach | Football | BIR | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Magazu | David | Coach | Football | BIR | Yes | 150,000 | 50% | 75,000 | 75,000 |
| Logan | Stephen | 392.130 (Coaching Assistant) | Football | BIR | Yes | 210,000 | 50% | 105,000 | 105,000 |
| Donovan | Brendan | Coach | Football | BIR | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Meyer | Stephen | Coach | Football | BIR | Yes | 70,000 | 50% | 35,000 | 35,000 |
| Locust | Lori | Coach | Football | BIR | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Brown | Gerald | Coach | Football | MEM | Yes | 85,000 | 50% | 42,500 | 42,500 |
| Rivers | Thaddeus | 392.022 Director Football Operations | Football Ops | ORL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Leichtfuss | Drake | 392.076 (Head Equipment Manager) | Football Ops | ORL | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Sheppard | Kyle | 392.076 (Assistant Equipment Manager) | Football Ops | ORL | Yes | 70,000 | 50% | 35,000 | 35,000 |
| Levy Jr | David | 392.077 (Video Director) | Football Ops | ORL | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Black | Christina | 392.078 (Assistant Video Director) | Football Ops | ORL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Hinch | Joshua | 392.079 (Personnel Director) | Football Ops | ORL | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Barrington | Brian | 392.022 Director Football Operations | Football Ops | MEM | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Bower | Jeff | 392.075 (Head Equipment Manager) | Football Ops | MEM | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Beddingfield | Donald | 392.022 Director Football Operations | Football Ops | MEM | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Tajalle | Nathan | 392.076 (Assistant Equipment Manager) | Football Ops | MEM | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Clark | Colin | 392.077 (Video Director) | Football Ops | MEM | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Yowarsky | Michael | 392.079 (Personnel Director) | Football Ops | MEM | Yes | 70,000 | 50% | 35,000 | 35,000 |
| McReynolds | Matthew | 392.135 (Videographer) | Football Ops | MEM | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Everett Jr | Robert | 392.078 (Assistant Video Director) | Football Ops | MEM | Yes | 75,000 | 50% | 37,500 | 37,500 |
| Mitchell | Carly | 392.111 (Office Manager) | Business Operations | SD | Yes | 50,000 | 0% | 50,000 | - |
| Castillo | Johnny | 392.120 (VP, Team Marketing) | Business Operations | SD | No | | 0% | | - |



535

**Exhibit 6.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing – Detail**

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Hubert | Katie | 392.066 (Team VP, Sponsorships) | Business Operations Corporate Development | SD | Yes | 105,000 | 0% | 105,000 | - |
| Kirk | Justin | 392.122 (VP, Team Ticket Sales) | Business Operations Sales | SD | Yes | 120,000 | 0% | 120,000 | - |
| Levis | Ariel | 392.102 (Marketing Coordinator) | Business Operations | SD | Yes | 50,000 | 0% | 50,000 | - |
| Aye-Darko | Adrian | 392.107 (Mgr, Social Media) | Business Operations | SD | Yes | 50,000 | 0% | 50,000 | - |
| Goldberg | Jeffrey | 392.154 (Team Reporter) | Business Operations | SD | Yes | 50,000 | 0% | 50,000 | - |
| Brunt | James | Content Creator | Business Operations | SD | Yes | 50,000 | 0% | 50,000 | - |
| Perez | Kristina | 392.074 (Promotions Coordinator (CA)) | Business Operations | SD | No | | 0% | | - |
| Virgen | Jose | 392.110 (Mgr, Ticket Operations) | Business Operations | SD | No | | 0% | | - |
| Frank | Stephen | 392.067 (Sr. Account Executive) | Business Operations Sales | SD | Yes | 49,920 | 0% | 49,920 | - |
| Motsenbocker | Ryan | 392.068 (Account Executive) | Business Operations Sales | SD | No | | 0% | | - |
| Sendiak | Kayra | 392.068 (Account Executive) | Business Operations Sales | SD | Yes | 49,920 | 0% | 49,920 | - |
| Bowling | David | 392.068 (Account Executive) | Business Operations Sales | SD | Yes | 49,920 | 0% | 49,920 | - |
| Godwin Jr | Clinton | 392.068 (Account Executive) | Business Operations Sales | SD | No | | 0% | | - |
| McDaniel | Amy | 392.090 (Dir, of Premium Sales) | Business Operations Sales | SD | Yes | 60,000 | 0% | 60,000 | - |
| Knapp | Robert | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | SD | No | | 0% | | - |
| Garner | Jeffrey | 392.033 (Team President (WFH)) | Business Operations | SD | Yes | 200,000 | 0% | 200,000 | - |
| Junkermann | Kelly | 392.135 (Videographer) | Business Operations | ARZ | Yes | 40,000 | 0% | 40,000 | - |
| Denogean | Angela | 392.107 (Mgr, Social Media) | Business Operations | ARZ | No | | 0% | | - |
| Demarest | Kaci | 392.068 (Account Executive) | Business Operations | ARZ | No | | 0% | | - |
| Romero | Jose | 392.140 (Mgr, Content Production) | Business Operations | ARZ | Yes | 35,000 | 0% | 35,000 | - |
| McGlynn | Mary | Team Reporter | Business Operations | ARZ | No | | 0% | | - |
| Parcell | Kyle | 392.110 (Mgr, Ticket Operations) | Business Operations Sales | ARZ | No | | 0% | | - |
| Levine | Brett | 392.068 (Account Executive) | Business Operations Sales | ARZ | Yes | 30,000 | 0% | 30,000 | - |
| DeFoon | James | 392.068 (Account Executive) | Business Operations Sales | ARZ | No | | 0% | | - |
| Nuckols | Justin | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | ARZ | No | | 0% | | - |
| Matthews | Nicholas | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | ARZ | No | | 0% | | - |
| Stesiak | Haley | Business Ops Coordinator | Business Ops | ARZ | Yes | 34,000 | 0% | 34,000 | - |
| Selman | Kathleen | Manager Corporate Partnerships | Business Operations Corporate Development | ARZ | No | | 0% | | - |
| Drevalas | Brent | 392.164 (Communications Coordinator) | Business Operations | ARZ | Yes | 30,000 | 0% | 30,000 | - |
| Seifert | Ethan | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | ARZ | No | | 0% | | - |
| Harris | Michael | 392.120 (VP, Team Marketing) | Business Operations | ORL | No | | 0% | | - |
| Kashuck | Kyle | 392.085 (Dir, Corporate Partnerships) | Business Operations Corporate Development | ORL | Yes | 50,000 | 0% | 50,000 | - |
| Johnson | Stacie | 392.110 (Mgr, Ticket Operations) | Business Operations | ORL | Yes | 45,000 | 0% | 45,000 | - |
| Weins | Sean | 392.068 (Account Executive) | Business Operations Sales | ORL | No | | 0% | | - |
| Mastando | Michael | 392.090 (Dir, of Premium Sales) | Business Operations Sales | ORL | Yes | 40,000 | 0% | 40,000 | - |
| Boliek | Adam | 392.095 (Dir, Tickets Sales) | Business Operations Sales | ORL | Yes | 40,000 | 0% | 40,000 | - |
| Liette | Olivia | 392.105 (Mgr, Group & Tourism Sales) | Business Operations Sales | ORL | Yes | 35,000 | 0% | 35,000 | - |
| Glass | Josie | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | ORL | No | | 0% | | - |
| Haller | Cassidy | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | ORL | No | | 0% | | - |
| Crawford | Kwasi | Account Executive | Business Operations Sales | ORL | No | | 0% | | - |
| Shah | Amar | 392.087 (Dir, Digital Content) | Business Operations | ORL | Yes | 55,000 | 0% | 55,000 | - |
| Jung | Cayla | 392.088 (Dir, Marketing & Fan Engagement) | Business Operations | ORL | Yes | 45,000 | 0% | 45,000 | - |
| Chicoski | Kaylee | 392.108 (Mgr, Social Media & Analytics) | Business Operations | ORL | Yes | 35,000 | 0% | 35,000 | - |
| Walker | Elijah | 392.139 (Content Creator) | Business Operations | ORL | Yes | 45,000 | 0% | 45,000 | - |
| Eubanks | Mary | 392.091 (Dir, Office Operations) | Business Operations | ORL | Yes | 40,000 | 0% | 40,000 | - |
| Brown | Christopher | 392.131 (Dir, Stadium Operations) | Business Operations | ORL | Yes | 50,000 | 0% | 50,000 | - |
| Wise | Amy | 392.118 (VP, Corporate Development) | Business Operations Corporate Development | ORL | Yes | 100,000 | 0% | 100,000 | - |
| Bridges | Robert | 392.122 (VP, Team Ticket Sales) | Business Operations Sales | ORL | Yes | 126,000 | 0% | 126,000 | - |
| Waddell | Michael | 392.061 (Team President) | Business Operations | ORL | Yes | 150,000 | 0% | 150,000 | - |
| Malloy | Megan | 392.106 (Mgr, Promotions) | Business Operations | BIR | No | | 0% | | - |
| Jackson | Matthew | 392.109 (Mgr, Sponsorship Sales) | Business Operations Corporate Development | BIR | Yes | 40,000 | 0% | 40,000 | - |
| Briggs | Jaclyn | 392.110 (Mgr, Ticket Operations) | Business Operations | BIR | Yes | 45,000 | 0% | 45,000 | - |

 bvagroup

536

**Exhibit 6.B**
In re: Legendary Field Exhibitions, LLC, et al.
Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing – Detail

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Fields | Caroline | 392.068 (Account Executive) | Business Operations Sales | BIR | Yes | 30,000 | 0% | 30,000 | - |
| Pugh | Samuel | 392.068 (Account Executive) | Business Operations Sales | BIR | Yes | 30,000 | 0% | 30,000 | - |
| White | Bradley | 392.068 (Account Executive) | Business Operations Sales | BIR | No | | 0% | | - |
| Thrasher | Daniel | 392.068 (Account Executive) | Business Operations Sales | BIR | No | | 0% | | - |
| Gadson | Nicolas | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | BIR | No | | 0% | | - |
| Smith | Benjamin | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | BIR | No | | 0% | | - |
| Hooven II | Joseph | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | BIR | No | | 0% | | - |
| Dunn | Gregory | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | BIR | No | | 0% | | - |
| Torrance | Godfrey | 392.135 (Videographer) | Business Operations | BIR | Yes | 37,500 | 0% | 37,500 | - |
| Burnett | Marquavius | 392.154 (Team Reporter) | Business Operations | BIR | Yes | 40,000 | 0% | 40,000 | - |
| Reesor | Michaela | 392.050 (Executive Assistant) | Business Operations | BIR | Yes | 40,000 | 0% | 40,000 | - |
| Ford | Sarah | 392.050 (Executive Assistant) | Business Operations | BIR | No | | 0% | | - |
| Roberson Jr | James | 392.117 (VP, Community Relations) | Business Operations | BIR | Yes | 75,000 | 0% | 75,000 | - |
| Fahr | Matthew | 392.064 (Team VP, Ticket Sales) | Business Operations Sales | BIR | Yes | 100,000 | 0% | 100,000 | - |
| Swope | John | 392.121 (VP, Team Sponsorships) | Business Operations Corporate Development | BIR | Yes | 100,000 | 0% | 100,000 | - |
| Priem | Nicole | 392.120 (VP, Team Marketing) | Business Operations | ATL | No | | 0% | | - |
| Lord | Tyler | 392.131 (Dir, Stadium Operations) | Business Operations | ATL | Yes | 50,000 | 0% | 50,000 | - |
| Thomas | David | Manager Corporate Partnerships | Business Operations Corporate Development | ATL | Yes | 42,000 | 0% | 42,000 | - |
| Fillmore | Scott | 392.094 (Dir, Team Partnerships) | Business Operations Sales | ATL | No | | 0% | | - |
| Ried | Mitchell | 392.122 (VP, Team Ticket Sales) | Business Operations Sales | ATL | Yes | 125,000 | 0% | 125,000 | - |
| Johnson | Britani | 392.110 (Mgr, Ticket Operations) | Business Operations Sales | ATL | Yes | 50,000 | 0% | 50,000 | - |
| Hager | Jeffrey | 392.068 (Account Executive) | Business Operations Sales | ATL | Yes | 30,000 | 0% | 30,000 | - |
| Orendorff | Alex | 392.068 (Account Executive) | Business Operations Sales | ATL | No | | 0% | | - |
| Akins | Lauren | 392.068 (Account Executive) | Business Operations Sales | ATL | No | | 0% | | - |
| Gilbert | Kelsey | 392.068 (Account Executive) | Business Operations Sales | ATL | No | | 0% | | - |
| Douglas | Philicia | 392.095 (Dir, Tickets Sales) | Business Operations Sales | ATL | No | | 0% | | - |
| Stagg | Ellen Carter | 392.087 (Dir, Digital Content) | Business Operations | ATL | Yes | 75,000 | 0% | 75,000 | - |
| Posso | Daniela | 392.102 (Marketing Coordinator) | Business Operations | ATL | Yes | 28,500 | 0% | 28,500 | - |
| Kemp | Julie | 392.144 (Marketing Manager) | Business Operations | ATL | Yes | 45,000 | 0% | 45,000 | - |
| Woodfork | Bryan | 392.006 (In Game Presentation) | Business Operations | ATL | No | | 0% | | - |
| Livingston | Walter | 392.033 (Team President (WFH)) | Business Operations | ATL | No | | 0% | | - |
| Kramer | Courtney | 392.133 (Social Media Coordinator) | Business Operations | BIR | Yes | 35,000 | 0% | 35,000 | - |
| Phillips | Madison | 392.064 (Team VP, Ticket Sales) | Business Operations Sales | MEM | No | | 0% | | - |
| Schwartz | Samuel | 392.073 (Social Media Manager) | Business Operations | MEM | Yes | 35,000 | 0% | 35,000 | - |
| Blair | Bryan | 392.102 (Marketing Coordinator) | Business Operations | MEM | Yes | 35,000 | 0% | 35,000 | - |
| Striker | Adam | 392.142 (Digital Content Producer) | Business Operations | MEM | Yes | 45,000 | 0% | 45,000 | - |
| Huntman | Justin | 392.110 (Mgr, Ticket Operations) | Business Operations Sales | MEM | Yes | 48,000 | 0% | 48,000 | - |
| Amar | Devin | 392.067 (Sr. Account Executive) | Business Operations Sales | MEM | Yes | 40,000 | 0% | 40,000 | - |
| Moran | Daniel | 392.068 (Account Executive) | Business Operations Sales | MEM | Yes | 40,000 | 0% | 40,000 | - |
| Dombek | Marc | 392.068 (Account Executive) | Business Operations Sales | MEM | Yes | 30,000 | 0% | 30,000 | - |
| Boggs | Khalil | 392.068 (Account Executive) | Business Operations Sales | MEM | No | | 0% | | - |
| Williams | Ceirra | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | MEM | Yes | 35,000 | 0% | 35,000 | - |
| Kelly | Tina | 392.094 (Dir, Community Relations) | Business Operations | MEM | Yes | 65,000 | 0% | 65,000 | - |
| Ekema-Agbaw | Joy | 392.111 (Office Manager) | Business Operations | MEM | Yes | 36,500 | 0% | 36,500 | - |
| Herring | Gregory | 392.120 (VP, Team Marketing) | Business Operations | MEM | No | | 0% | | - |
| Waters | Ashley | 392.132 (Dir, Operations) | Business Operations | MEM | Yes | 50,000 | 0% | 50,000 | - |
| Brewster | Scott | 392.121 (VP, Team Sponsorships) | Business Operations Corporate Development | MEM | Yes | 90,000 | 0% | 90,000 | - |
| Widerschein | Jacob | 392.122 (VP, Team Ticket Sales) | Business Operations Sales | MEM | Yes | 110,000 | 0% | 110,000 | - |
| Greer Jr | Mark | 392.094 (Dir, Team Partnerships) | Business Operations Sales | MEM | No | | 0% | | - |
| Irby | Andraveka | 392.033 (Team President (WFH)) | Business Operations | MEM | Yes | 200,000 | 0% | 200,000 | - |
| Rogers III | Leo | 392.132 (Dir, Operations) | Business Operations | SA | Yes | 50,000 | 0% | 50,000 | - |
| OShea | Christopher | 392.110 (Mgr, Ticket Operations) | Business Operations | SA | Yes | 45,000 | 0% | 45,000 | - |


bvagroup

**Exhibit 6.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing – Detail**

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Faesser | Andrew | 392.110 (Mgr, Ticket Operations) | Business Operations | SA | Yes | 40,000 | 0% | 40,000 | - |
| Ables | Paul | 392.067 (Sr. Account Executive) | Business Operations Sales | SA | Yes | 40,000 | 0% | 40,000 | - |
| Stafford | Kyle | 392.068 (Account Executive) | Business Operations Sales | SA | No | | 0% | | - |
| Gilvens | Christopher | 392.068 (Account Executive) | Business Operations Sales | SA | Yes | 30,000 | 0% | 30,000 | - |
| Hernandez | Christopher | 392.068 (Account Executive) | Business Operations Sales | SA | Yes | 30,000 | 0% | 30,000 | - |
| Williams | Shelby | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | SA | No | | 0% | | - |
| Contreras | Mariah | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | SA | No | | 0% | | - |
| Maxwell | Haley | 392.073 (Social Media Manager) | Business Operations | SA | Yes | 35,000 | 0% | 35,000 | - |
| Baxter | Courtney | 392.102 (Marketing Coordinator) | Business Operations | SA | Yes | 50,000 | 0% | 50,000 | - |
| Reyes | Joshua | 392.106 (Mgr, Promotions) | Business Operations | SA | Yes | 45,000 | 0% | 45,000 | - |
| Mendoza | Eric | 392.135 (Videographer) | Business Operations | SA | Yes | 45,000 | 0% | 45,000 | - |
| Thompson | Cole | 392.154 (Team Reporter) | Business Operations | SA | Yes | 35,000 | 0% | 35,000 | - |
| Juarez | Daniel | 392.104 (Mgr, Corporate Partnerships) | Business Operations Corporate Development | SA | Yes | 45,000 | 0% | 45,000 | - |
| Gregovits | Victor | 392.033 (Team President (WFH)) | Business Operations | SA | Yes | 175,000 | 0% | 175,000 | - |
| Bronaugh | Michelle | 392.120 (VP, Team Marketing) | Business Operations | SA | Yes | 110,000 | 0% | 110,000 | - |
| Poteet | Joshua | 392.164 (Communications Coordinator) | Business Operations | SA | No | | 0% | | - |
| Bankhead | Ellen | Manager Administration | Business Operations | SA | Yes | 55,000 | 0% | 55,000 | - |
| Ashton | Evan | 392.121 (VP, Team Sponsorships) | Business Operations Corporate Development | SA | Yes | 100,000 | 0% | 100,000 | - |
| Kovach | Cameron | 392.064 (Team VP, Ticket Sales) | Business Operations Sales | SA | Yes | 100,000 | 0% | 100,000 | - |
| Dobbins | Katherine | 392.073 (Social Media Manager) | Business Operations | SL | Yes | 40,000 | 0% | 40,000 | - |
| Braun | James | 392.121 (VP, Team Sponsorships) | Business Operations Corporate Development | SL | Yes | 90,000 | 0% | 90,000 | - |
| Calkins | Brett | 392.135 (Videographer) | Business Operations | SL | Yes | 62,500 | 0% | 62,500 | - |
| Williams | Lea | 392.144 (Marketing Manager) | Business Operations | SL | Yes | 50,000 | 0% | 50,000 | - |
| Buchi | Chantel | 392.154 (Team Reporter) | Business Operations | SL | Yes | 35,000 | 0% | 35,000 | - |
| Proctor | Sarah | 392.085 (Dir, Corporate Partnerships) | Business Operations Corporate Development | SL | Yes | 50,000 | 0% | 50,000 | - |
| Tieso | John | 392.110 (Mgr, Ticket Operations) | Business Operations | SL | Yes | 45,000 | 0% | 45,000 | - |
| Ostrander | Elizabeth | 392.120 (VP, Team Marketing) | Business Operations | SL | No | | 0% | | - |
| Brown | Bryan | 392.068 (Account Executive) | Business Operations Sales | SL | Yes | 30,000 | 0% | 30,000 | - |
| Leishman | Benjamin | 392.068 (Account Executive) | Business Operations Sales | SL | Yes | 30,000 | 0% | 30,000 | - |
| Chipoletti | Cheyenne | 392.068 (Account Executive) | Business Operations Sales | SL | No | | 0% | | - |
| Lords | Brock | 392.068 (Account Executive) | Business Operations Sales | SL | No | | 0% | | - |
| Stobbe | David | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | SL | No | | 0% | | - |
| Howell | Tyler | 392.033 (Team President (WFH)) | Business Operations | SL | Yes | 200,000 | 0% | 200,000 | - |
| Yates | Cristi | 392.050 (Executive Assistant) | Business Operations | SL | Yes | 40,000 | 0% | 40,000 | - |
| Darrington | Randy | 392.132 (Dir, Operations) | Business Operations | SL | Yes | 50,000 | 0% | 50,000 | - |
| Murbrook | Richard | 392.122 (VP, Team Ticket Sales) | Business Operations Sales | SL | Yes | 110,000 | 0% | 110,000 | - |
| Meyer | Matthew | 392.162 (Promotions Coordinator (UT)) | Business Operations Sales | SL | Yes | 45,000 | 0% | 45,000 | - |
| King Jr | Tyrone | 392.068 (Account Executive) | Business Operations Sales | BIR | Yes | 30,000 | 0% | 30,000 | - |
| Sovacki | Hayden | Asst Stadium Ops Assistant | Business Operations | ARZ | Yes | 7,150 | 0% | 7,150 | - |
| Roush | Tanner | 392.068 (Account Executive) | Business Operations Sales | ARZ | Yes | 30,000 | 0% | 30,000 | - |
| Zubiate | Adam | 392.068 (Account Executive) | Business Operations Sales | ARZ | Yes | 30,000 | 0% | 30,000 | - |
| Furmanski | Joseph | 392.095 (Dir, Tickets Sales) | Business Operations Sales | ARZ | Yes | 40,000 | 0% | 40,000 | - |
| Vasquez | Charlene | 392.103 (Mgr, Business Operations) | Business Operations | ARZ | Yes | 50,000 | 0% | 50,000 | - |
| Hawkins | Carlton | 392.120 (VP, Team Marketing) | Business Operations | ARZ | No | | 0% | | - |
| Artigue Jr | Ray | 392.132 (Dir, Operations) | Business Operations | ARZ | Yes | 50,000 | 0% | 50,000 | - |
| Martin | Tyrone | 392.121 (VP, Team Sponsorships) | Business Operations Corporate Development | ARZ | Yes | 100,000 | 0% | 100,000 | - |
| Kiese | Robert | 392.064 (Team VP, Ticket Sales) | Business Operations Sales | ARZ | No | | 0% | | - |
| Brubaker | Scott | 392.033 (Team President (WFH)) | Business Operations | ARZ | No | | 0% | | - |
| Zucco | Bethany | 392.024 Director Stadium Operations | Business Operations | SD | Yes | 50,000 | 0% | 50,000 | - |
| Alexander | Thomas | 392.154 (Team Reporter) | Business Operations | ORL | Yes | 35,000 | 0% | 35,000 | - |
| Thompson | Jaylon | 392.154 (Team Reporter) | Business Operations | ATL | Yes | 35,000 | 0% | 35,000 | - |
| Agusta | Robert | 392.068 (Account Executive) | Business Operations Sales | ATL | No | | 0% | | - |



**Exhibit 6.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing - Detail**

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Myrick | Roscoe | 392.139 (Content Creator) | Business Operations | ATL | Yes | 50,000 | 0% | 50,000 | - |
| Hannah | Dennis | 392.123 (Temp Ticket Sales Rep) | Business Operations Sales | MEM | No | - | 0% | - | - |
| Rubino | Dylan | 392.154 (Team Reporter) | Business Operations | MEM | Yes | 37,500 | 0% | 37,500 | - |
| Brown | Lucas | 392.068 (Account Executive) | Business Operations Sales | MEM | Yes | 30,000 | 0% | 30,000 | - |
| Jolley | Tiffany | 392.068 (Account Executive) | Business Operations Sales | SA | Yes | 30,000 | 0% | 30,000 | - |
| Provence | Matthew | 392.024 Director Team Comms | Communications | SA | Yes | 75,000 | 0% | 75,000 | - |
| Heppding | Eric | Director Team Comms | Communications | SL | Yes | 65,000 | 0% | 65,000 | - |
| Kurish | Daniel | Director, Team Comms | Communications | ARZ | Yes | 60,000 | 0% | 60,000 | - |
| Lunsford II | Greg | Director Comms | Communications | ORL | Yes | 60,000 | 0% | 60,000 | - |
| Klena | Francis | Director Comms | Communications | ATL | Yes | 60,000 | 0% | 60,000 | - |
| Fosnes | Cavan | Director, Team Comms | Communications | MEM | Yes | 60,000 | 0% | 60,000 | - |
| Bays | Cody | Director Team Comms | Communications | SA | Yes | 60,000 | 0% | 60,000 | - |
| Nelson | Jule | Director, Team Comms | Communications | BIR | Yes | 60,000 | 0% | 60,000 | - |
| Chastain | Amy | 392.044 (Communications Coordinator) | Communications | SD | Yes | 30,000 | 0% | 30,000 | - |
| Juarez | Ryan | 392.024 Athletic Trainer | Player Relations | SD | Yes | 137,500 | 50% | 68,750 | 68,750 |
| Allred | John | Assistant Strength Coach | Player Relations | SD | Yes | 50,000 | 50% | 25,000 | 25,000 |
| Bergman | Cory | Assistant Strength Coach | Player Relations | SD | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Peck | Nathan | Athletic Trainer | Player Relations | SD | Yes | 138,000 | 50% | 69,000 | 69,000 |
| Krein | Darren | Strength and Conditioning Coach | Player Relations | SD | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Hauler | Christopher | Asst Athletic Trainer | Player Relations | BIR | Yes | 90,000 | 50% | 45,000 | 45,000 |
| McMillen | Leo | 392.138 (Head Athletic Trainer) | Player Relations | BIR | Yes | 140,000 | 50% | 70,000 | 70,000 |
| Dennis | Chad | Strength and Conditioning Coach | Player Relations | BIR | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Sharpe | Rachel | Athletic Trainer | Player Relations | ATL | Yes | 140,000 | 50% | 70,000 | 70,000 |
| Carter | Casey | Athletic Trainer | Player Relations | MEM | Yes | 145,000 | 50% | 72,500 | 72,500 |
| Nielson | Kristen | Athletic Trainer | Player Relations | SA | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Hedrick | Phillip | 392.138 (Head Athletic Trainer) | Player Relations | SA | Yes | 140,000 | 50% | 70,000 | 70,000 |
| Zetter | Brian | Athletic Trainer | Player Relations | SL | Yes | 135,000 | 50% | 67,500 | 67,500 |
| Mcllece | Chris | Athletic Trainer | Player Relations | SL | Yes | 40,000 | 50% | 20,000 | 20,000 |
| Porter | Scott | 392.137 (Lead Physical Therapist(NonCA)) | Player Relations | BIR | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Ryen | Trever | Strength and Conditioning Coach | Player Relations | BIR | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Franklin | Kelley | 392.159 (Massage Therapy Coordinator) | Player Relations | BIR | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Meigs | Levi | 392.159 (Massage Therapy Coordinator) | Player Relations | BIR | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Williams | Kristie | Massage Therapist | Player Relations | BIR | Yes | 43,000 | 50% | 21,500 | 21,500 |
| Engard | Katelin | 392.040 Assistant Strength Conditioning Coach | Player Relations | ARZ | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Johnson | Sarah | 392.148 (Certified Athletic Trainer) | Player Relations | ARZ | Yes | 80,000 | 50% | 40,000 | 40,000 |
| Rodriguez | Simon | 392.148 (Certified Athletic Trainer) | Player Relations | ARZ | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Garduno | Anna | 392.148 (Certified Athletic Trainer) | Player Relations | ARZ | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Champlin | Todd | 392.138 (Head Athletic Trainer) | Player Relations | ARZ | Yes | 140,000 | 50% | 70,000 | 70,000 |
| Rogucki | Robert | Strength and Conditioning Coach | Player Relations | ARZ | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Hilgendorf | Tiffany | Massage Therapist | Player Relations | ARZ | Yes | 42,000 | 50% | 21,000 | 21,000 |
| Pace | Jeremy | Physical Therapist | Player Relations | ARZ | Yes | 115,000 | 50% | 57,500 | 57,500 |
| Picardi | Dante | 392.148 (Certified Athletic Trainer) | Player Relations | SD | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Plantz | Alyssa | 392.148 (Certified Athletic Trainer) | Player Relations | SD | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Sierer | Erin | 392.156 (Lead Physical Therapist) | Player Relations | SD | Yes | 111,000 | 50% | 55,500 | 55,500 |
| Radlich | Jacob | Athletic Trainer | Player Relations | SD | Yes | 94,000 | 50% | 47,000 | 47,000 |
| LeDuc | Dana | 392.024 Strength and Conditioning Coach | Player Relations | SD | Yes | 132,000 | 50% | 66,000 | 66,000 |
| Witty | Mark | 392.024 Massage Therapist | Player Relations | SD | Yes | 59,000 | 50% | 29,500 | 29,500 |
| Crouse | Valdez | 392.148 (Certified Athletic Trainer) | Player Relations | ORL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Evans | Josh | 392.148 (Certified Athletic Trainer) | Player Relations | ORL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Micca | Michael | 392.156 (Lead Physical Therapist) | Player Relations | ORL | Yes | 115,000 | 50% | 57,500 | 57,500 |
| Smith | Dillon | Assistant Athletic Trainer | Player Relations | ORL | Yes | 87,000 | 50% | 43,500 | 43,500 |
| Diaz | Desmond | 392.159 (Massage Therapy Coordinator) | Player Relations | ORL | Yes | 62,402 | 50% | 31,201 | 31,201 |



**Exhibit 6.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Revised AAF Pro Forma Assumptions Regarding NFL Cost Sharing - Detail**

| Last Name | First Name | Position Title | Department Name | Team | Keep in 2020 | Base Salary | NFL Share | Net Base Salary to | Net Base Salary to NFL |
|---|---|---|---|---|---|---|---|---|---|
| Thompson | Stephen | 392.159 (Massage Therapy Coordinator) | Player Relations | ORL | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Smith | Lydia | 392.159 (Massage Therapy Coordinator) | Player Relations | ORL | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Giglio | Karen | Massage Therapist | Player Relations | ORL | Yes | 43,000 | 50% | 21,500 | 21,500 |
| Thomas | Michael | 392.137 (Lead Physical Therapist(NonCA)) | Player Relations | ATL | Yes | 115,000 | 50% | 57,500 | 57,500 |
| Kolbjornsen | Deanna | 392.137 (Lead Physical Therapist(NonCA)) | Player Relations | ATL | Yes | 42,000 | 50% | 21,000 | 21,000 |
| Fallace | Frank | Athletic Trainer | Player Relations | ATL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| McAdams | Daniel | Athletic Trainer | Player Relations | ATL | Yes | 82,500 | 50% | 41,250 | 41,250 |
| Gerch | Brett | Strength and Conditioning Coach | Player Relations | ATL | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Dell | Catherine | 392.159 (Massage Therapy Coordinator) | Player Relations | ATL | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Hawf | Mary | 392.159 (Massage Therapy Coordinator) | Player Relations | ATL | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Inzillo | Anthony | 392.137 (Lead Physical Therapist(NonCA)) | Player Relations | MEM | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Lazalde | Richard | 392.148 (Certified Athletic Trainer) | Player Relations | MEM | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Nutsch | Josh | 392.148 (Certified Athletic Trainer) | Player Relations | MEM | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Boyette | Dalis | Athletic Trainer | Player Relations | MEM | Yes | 87,500 | 50% | 43,750 | 43,750 |
| Osborne | Robert | Assistant Strength Coach | Player Relations | MEM | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Hollister III | Joseph | Strength and Conditioning Coach | Player Relations | MEM | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Hamilton | Julius | 392.159 (Massage Therapy Coordinator) | Player Relations | MEM | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Evans | Kristin | Massage Therapist | Player Relations | MEM | Yes | 45,000 | 50% | 22,500 | 22,500 |
| Giegel | Christopher | 392.137 (Lead Physical Therapist(NonCA)) | Player Relations | SA | Yes | 91,500 | 50% | 45,750 | 45,750 |
| Eveland | Paden | 392.148 (Certified Athletic Trainer) | Player Relations | SA | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Hancock | Jill | 392.148 (Certified Athletic Trainer) | Player Relations | SA | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Stickelbault | David | 392.148 (Certified Athletic Trainer) | Player Relations | SA | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Przybyla | Austin | Strength and Conditioning Coach | Player Relations | SA | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Clark | Michael | Strength and Conditioning Coach | Player Relations | SA | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Valdez | Laura | 392.159 (Massage Therapy Coordinator) | Player Relations | SA | Yes | 62,402 | 50% | 31,201 | 31,201 |
| Derrough | Jarian | Massage Therapist | Player Relations | SA | Yes | 44,000 | 50% | 22,000 | 22,000 |
| Perigo | Sotero | 392.148 (Certified Athletic Trainer) | Player Relations | SL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Blaszka | Christopher | 392.148 (Certified Athletic Trainer) | Player Relations | SL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Hardison | Tiffany | 392.156 (Lead Physical Therapist) | Player Relations | SL | Yes | 90,000 | 50% | 45,000 | 45,000 |
| Scaramuzzo | Madeleine | Assistant Athletic Trainer | Player Relations | SL | Yes | 85,000 | 50% | 42,500 | 42,500 |
| Jones | Ian | Strength and Conditioning Coach | Player Relations | SL | Yes | 110,000 | 50% | 55,000 | 55,000 |
| Cannon-Miles | Tyler | Strength and Conditioning Coach | Player Relations | SL | Yes | 60,000 | 50% | 30,000 | 30,000 |
| Schultz Ms | Heidi | Massage Therapist | Player Relations | SL | Yes | 45,000 | 50% | 22,500 | 22,500 |

Count of Employees with 50% "NFL Share":     200

Sum of Improperly Presumed NFL Spend for Non-Player Compensation    $    9,727,811

**Sources and Notes:**
(1) See Revised AAF Pro Forma, tab "Headcount_Football."

bvagroup

540

**Exhibit 7**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Summary of AAF Pro Forma Profit and Loss Forecast**

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | | |
| League Revenue (1) | $ 15,350,000 | $ 25,421,000 | $ 59,355,988 | $ 75,716,459 | $ 94,948,776 | $ 111,040,843 | $ 139,630,046 | $ 163,499,565 |
| YOY % growth | N/A | 65.6% | 133.5% | 27.6% | 25.4% | 16.9% | 25.7% | 17.1% |
| Cumulative % growth | N/A | 65.6% | 286.7% | 393.3% | 518.6% | 623.4% | 809.6% | 965.1% |
| Team Revenue (1) | 44,800,000 | 74,690,000 | 151,488,288 | 204,041,470 | 263,292,963 | 283,819,076 | 301,140,562 | 319,536,591 |
| YOY % growth | N/A | 66.7% | 102.8% | 34.7% | 29.0% | 7.8% | 6.1% | 6.1% |
| Cumulative % growth | N/A | 66.7% | 238.1% | 355.4% | 487.7% | 533.5% | 572.2% | 613.3% |
| Digital Revenue (1) | 4,160,760 | 32,796,547 | 56,200,033 | 81,501,047 | 108,333,025 | 136,821,987 | 167,108,060 | 199,347,193 |
| YOY % growth | N/A | 688.2% | 71.4% | 45.0% | 32.9% | 26.3% | 22.1% | 19.3% |
| Cumulative % growth | N/A | 688.2% | 1250.7% | 1858.8% | 2503.7% | 3188.4% | 3916.3% | 4691.1% |
| **Total Revenue** | $ 64,310,760 | $ 132,907,547 | $ 267,044,309 | $ 361,258,975 | $ 466,574,765 | $ 531,681,906 | $ 607,878,668 | $ 682,383,348 |
| YOY % growth | N/A | 106.7% | 100.9% | 35.3% | 29.2% | 14.0% | 14.3% | 12.3% |
| Cumulative % growth | N/A | 106.7% | 315.2% | 461.7% | 625.5% | 726.7% | 845.2% | 961.1% |
| **Total Expenses (1)** | $ 190,345,793 | $ 249,538,201 | $ 292,791,038 | $ 335,617,002 | $ 386,955,283 | $ 410,341,879 | $ 426,890,091 | $ 444,410,469 |
| **Total Operating Income (Loss)** | $ (126,035,033) | $ (116,630,654) | $ (25,746,729) | $ 25,641,973 | $ 79,619,482 | $ 121,340,028 | $ 180,988,577 | $ 237,972,879 |
| **Cumulative Net Cash Flow** | $ (126,035,033) | $ (242,665,687) | $ (268,412,416) | $ (242,770,443) | $ (163,150,962) | $ (41,810,934) | $ 139,177,643 | $ 377,150,522 |

bvagroup®

541

Exhibit 7

In re: Legendary Field Exhibitions, LLC, et al.

**Summary of AAF Pro Forma Profit and Loss Forecast**

| | | 2027 | | 2028 |
|---|---|---|---|---|
| **Revenues:** | | | | |
| League Revenue (1) | $ | 206,112,494 | $ | 241,654,125 |
| *YOY % growth* | | 26.1% | | 17.2% |
| *Cumulative % growth* | | 1242.8% | | 1474.3% |
| Team Revenue (1) | | 339,075,036 | | 359,828,148 |
| *YOY % growth* | | 6.1% | | 6.1% |
| *Cumulative % growth* | | 656.9% | | 703.2% |
| Digital Revenue (1) | | 233,713,076 | | 270,399,291 |
| *YOY % growth* | | 17.2% | | 15.7% |
| *Cumulative % growth* | | 5517.1% | | 6398.8% |
| **Total Revenue** | **$** | **778,900,607** | **$** | **871,881,564** |
| *YOY % growth* | | 14.1% | | 11.9% |
| *Cumulative % growth* | | 1111.2% | | 1255.7% |
| **Total Expenses (1)** | **$** | **462,986,329** | **$** | **482,710,455** |
| **Total Operating Income (Loss)** | **$** | **315,914,278** | **$** | **389,171,109** |
| **Cumulative Net Cash Flow** | **$** | **693,064,800** | **$** | **1,082,235,910** |

Sources and Notes:
(1) See AAF Pro Forma, tab "Summary P&L."

**bva**group®

**Exhibit 8.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report February Income Approach Sensitivity to Median Startup Discount Rate**

| Fiscal years ending May 31, | Projected fiscal years ending May 31, | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
| Debt-Free Net Income | $ (56,973,873) | $(116,630,654) | $ (25,746,728) | $ 24,565,011 | $ 76,275,462 | $ 116,243,745 | $ 146,775,691 | $ 187,998,576 | $ 249,572,280 | $ 307,445,176 | $ 316,975,977 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (4,612,690) | (8,656,134) | (13,391,543) | (9,405,921) | (10,514,201) | (6,499,971) | (7,607,103) | (7,438,175) | (9,635,800) | (9,282,754) | (2,698,373) |
| Net Cash Flow | $ (61,586,563) | $(125,286,788) | $ (39,138,271) | $ 15,159,090 | $ 65,761,261 | $ 109,743,774 | $ 139,168,587 | $ 180,560,401 | $ 239,936,480 | $ 298,162,423 | $ 314,277,604 |
| Discount Period (Years) | 0.15 | 0.80 | 1.80 | 2.80 | 3.80 | 4.80 | 5.80 | 6.80 | 7.80 | 8.80 | |
| Present Value Factor | 0.9585 | 0.7966 | 0.5990 | 0.4504 | 0.3386 | 0.2546 | 0.1914 | 0.1439 | 0.1082 | 0.0814 | |
| 33.0% Present Value of Cash Flow | $ (59,031,013) | $ (99,808,607) | $ (23,442,975) | $ 6,827,042 | $ 22,267,831 | $ 27,940,620 | $ 26,640,706 | $ 25,988,151 | $ 25,965,549 | $ 24,260,654 | |

| | |
| --- | --- |
| Present Value of Cash Flows | (22,392,041) |
| Present Value of Residual Value | 86,259,066 |
| **Enterprise Value (Rounded)** | **$ 63,900,000** |

**Residual Value**

| | |
| --- | --- |
| Residual Cash Flow | 316,975,977 |
| Residual Cash Flow Growth Rate | 3.1% |
| Residual Value | 1,060,120,323 |
| Discount Factor | 0.081 |
| Present Value of Residual Value | 86,259,066 |

**February EV Sensitivity to discount rate:**

| 28.0% | 33.0% | 38.0% | 43.0% |
| --- | --- | --- | --- |
| 160,600,000 | 63,900,000 | 3,500,000 | (35,900,000) |

**Sources and Notes:**
See Desai Report, Exhibit A, Schedule 3, reconstructed with different present value factor.

bva group®

543

**Exhibit 8.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report April Income Approach Sensitivity to Median Startup Discount Rate**

| Fiscal years ending May 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Projected fiscal years ending May 31, | | | | | | |
| Debt-Free Net Income | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 28,719,802 | $ 69,778,598 | $ 107,930,338 | $ 125,130,826 | $ 154,669,388 | $ 180,506,368 | $ 186,102,065 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (1,103,436) | (5,558,995) | (4,398,140) | (4,666,414) | (6,474,784) | (4,940,865) | (6,819,919) | (5,187,553) | (6,488,608) | (4,283,878) | (1,547,600) |
| Net Cash Flow | $ (31,551,464) | $ (77,936,566) | $ (56,376,933) | $ (14,843,290) | $ 22,245,018 | $ 64,837,734 | $ 101,110,418 | $ 119,943,273 | $ 148,180,780 | $ 176,222,490 | $ 184,554,465 |
| Discount Period (Years) | 0.08 | 0.66 | 1.66 | 2.66 | 3.66 | 4.66 | 5.66 | 6.66 | 7.66 | 8.66 | |
| Present Value Factor | 0.9769 | 0.8275 | 0.6222 | 0.4678 | 0.3517 | 0.2645 | 0.1988 | 0.1495 | 0.1124 | 0.0845 | |
| Present Value of Cash Flow | $ (30,822,692) | $ (64,493,737) | $ (35,077,293) | $ (6,943,895) | $ 7,824,455 | $ 17,147,371 | $ 20,105,458 | $ 17,932,561 | $ 16,657,379 | $ 14,894,450 | |

33.0%

| | |
|---|---|
| Present Value of Cash Flows | (42,775,943) |
| Present Value of Residual Value | 52,606,953 |
| Enterprise Value (Rounded) | $ 9,800,000 |

**Residual Value**

| | |
|---|---|
| Residual Cash Flow | 186,102,065 |
| Residual Cash Flow Growth Rate | 3.1% |
| Residual Value | 622,414,933 |
| Discount Factor | 0.085 |
| Present Value of Residual Value | 52,606,953 |

**April EV Sensitivity to discount rate:**

| 28.0% | 33.0% | 38.0% | 43.0% |
|---|---|---|---|
| 66,600,000 | 9,800,000 | (25,200,000) | (47,800,000) |

**Sources and Notes:**
See Desai Report, Exhibit B, Schedule 3, reconstructed with different present value factor.

bva group®

**Exhibit 9.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report February Income Approach Sensitivity to High-End Startup Discount Rate**

| Fiscal years ending May 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Projected fiscal years ending May 31, | | | | | | |
| Debt-Free Net Income | $ (56,973,873) | $(116,630,654) | $ (25,746,728) | $ 24,565,011 | $ 76,275,462 | $ 116,243,745 | $ 146,775,691 | $ 187,998,576 | $ 249,572,280 | $ 307,445,176 | $ 316,975,977 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (4,612,690) | (8,656,134) | (13,391,543) | (9,405,921) | (10,514,201) | (6,499,971) | (7,607,103) | (7,438,175) | (9,635,800) | (9,282,754) | (2,698,373) |
| Net Cash Flow | $ (61,586,563) | $(125,286,788) | $ (39,138,271) | $ 15,159,090 | $ 65,761,261 | $ 109,743,774 | $ 139,168,587 | $ 180,560,401 | $ 239,936,480 | $ 298,162,423 | $ 314,277,604 |
| Discount Period (Years) | 0.15 | 0.80 | 1.80 | 2.80 | 3.80 | 4.80 | 5.80 | 6.80 | 7.80 | 8.80 | |
| Present Value Factor | 0.9482 | 0.7519 | 0.5258 | 0.3677 | 0.2571 | 0.1798 | 0.1257 | 0.0879 | 0.0615 | 0.0430 | |
| Present Value of Cash Flow    43.0% | $ (58,398,448) | $ (94,203,695) | $ (20,579,189) | $ 5,573,958 | $ 16,909,263 | $ 19,733,240 | $ 17,499,421 | $ 15,877,018 | $ 14,753,895 | $ 12,821,158 | |

| | |
|---|---|
| Present Value of Cash Flows | (70,013,378) |
| Present Value of Residual Value | 34,160,783 |
| **Enterprise Value (Rounded)** | **$ (35,900,000)** |

**Residual Value**

| | |
|---|---|
| Residual Cash Flow | 316,975,977 |
| Residual Cash Flow Growth Rate | 3.1% |
| Residual Value | 794,426,006 |
| Discount Factor | 0.043 |
| Present Value of Residual Value | 34,160,783 |

*February EV Sensitivity to discount rate:*

| 28.0% | 33.0% | 38.0% | 43.0% |
|---|---|---|---|
| 160,600,000 | 63,900,000 | 3,500,000 | (35,900,000) |

**Sources and Notes:**
See Desai Report, Exhibit A, Schedule 3, reconstructed with different present value factor.

bvagroup®

**Exhibit 9.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report April Income Approach Sensitivity to High-End Startup Discount Rate**

| Fiscal years ending May 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Projected fiscal years ending May 31, | | | | | | |
| Debt-Free Net Income | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 28,719,802 | $ 69,778,598 | $ 107,930,338 | $ 125,130,826 | $ 154,669,388 | $ 180,506,368 | $ 186,102,065 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (1,103,436) | (5,558,995) | (4,398,140) | (4,666,414) | (6,474,784) | (4,940,865) | (6,819,919) | (5,187,553) | (6,488,608) | (4,283,878) | (1,547,600) |
| **Net Cash Flow** | **$ (31,551,464)** | **$ (77,936,566)** | **$ (56,376,933)** | **$ (14,843,290)** | **$ 22,245,018** | **$ 64,837,734** | **$ 101,110,418** | **$ 119,943,273** | **$ 148,180,780** | **$ 176,222,490** | **$ 184,554,465** |
| Discount Period (Years) | 0.08 | 0.66 | 1.66 | 2.66 | 3.66 | 4.66 | 5.66 | 6.66 | 7.66 | 8.66 | |
| Present Value Factor | 0.9711 | 0.7886 | 0.5515 | 0.3857 | 0.2697 | 0.1886 | 0.1319 | 0.0922 | 0.0645 | 0.0451 | |
| **Present Value of Cash Flow** | 43.0% | **$ (30,640,129)** | **$ (61,463,233)** | **$ (31,091,347)** | **$ (5,724,430)** | **$ 5,999,275** | **$ 12,228,067** | **$ 13,334,903** | **$ 11,062,004** | **$ 9,556,827** | **$ 7,947,804** |

| | | | | | Residual Value | |
|---|---|---|---|---|---|---|
| | | | | | Residual Cash Flow | 186,102,065 |
| | | | | | Residual Cash Flow Growth Rate | 3.1% |
| | | | | | Residual Value | 466,421,216 |
| | | | | | Discount Factor | 0.045 |
| | | | | | Present Value of Residual Value | 21,036,047 |

| | |
|---|---|
| Present Value of Cash Flows | (68,790,258) |
| Present Value of Residual Value | 21,036,047 |
| **Enterprise Value (Rounded)** | **$ (47,800,000)** |

| April EV Sensitivity to discount rate: | | | | |
|---|---|---|---|---|
| 28.0% | 33.0% | 38.0% | 43.0% | 43.0% |
| 66,600,000 | 9,800,000 | (25,200,000) | (47,800,000) | |

**Sources and Notes:**
See Desai Report, Exhibit B, Schedule 3, reconstructed with different present value factor.

bva group®

546

**Exhibit 10.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report February Income Approach Zero EV Discount Rate**

| Fiscal years ending May 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | Projected fiscal years ending May 31, | | | | | | |
| Debt-Free Net Income | $ (56,973,873) | $(116,630,654) | $ (25,746,728) | $ 24,565,011 | $ 76,275,462 | $ 116,243,745 | $ 146,775,691 | $ 187,998,576 | $ 249,572,280 | $ 307,445,176 | $ 316,975,977 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (4,612,690) | (8,656,134) | (13,391,543) | (9,405,921) | (10,514,201) | (6,499,971) | (7,607,103) | (7,438,175) | (9,635,800) | (9,282,754) | (2,698,373) |
| **Net Cash Flow** | $ (61,586,563) | $(125,286,788) | $ (39,138,271) | $ 15,159,090 | $ 65,761,261 | $ 109,743,774 | $ 139,168,587 | $ 180,560,401 | $ 239,936,480 | $ 298,162,423 | $ 314,277,604 |
| Discount Period (Years) | 0.15 | 0.80 | 1.80 | 2.80 | 3.80 | 4.80 | 5.80 | 6.80 | 7.80 | 8.80 | |
| Present Value Factor | 0.9929 | 0.7719 | 0.5578 | 0.4031 | 0.2913 | 0.2105 | 0.1522 | 0.1100 | 0.0795 | 0.0574 | |
| **Present Value of Cash Flow** | $ (58,684,638) | $ (96,706,886) | $ (21,832,535) | $ 6,111,194 | $ 19,159,027 | $ 23,106,470 | $ 21,176,068 | $ 19,855,326 | $ 19,067,826 | $ 17,124,118 | |

38.4%

| | |
|---|---|
| Present Value of Cash Flows | (51,624,030) |
| Present Value of Residual Value | 51,611,458 |
| **Enterprise Value (Rounded)** | $ - |

**Residual Value**

| | |
|---|---|
| Residual Cash Flow | 316,975,977 |
| Residual Cash Flow Growth Rate | 3.1% |
| Residual Value | 898,650,521 |
| Discount Factor | 0.057 |
| Present Value of Residual Value | 51,611,458 |

**February EV Sensitivity to discount rate:**

| 28.0% | 33.0% | 38.0% | 43.0% |
|---|---|---|---|
| 160,600,000 | 63,900,000 | 3,500,000 | (35,900,000) |

**Sources and Notes:**
See Desai Report, Exhibit A, Schedule 3, reconstructed with different present value factor.

bvagroup®

547

22-05077-cag Doc#201-15 Filed 06/24/23 Entered 06/24/23 19:14:29 Exhibit 15 Separated Report Document Part 6 Pg 99 of 154

**Exhibit 10.B**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report April Income Approach Zero EV Discount Rate**

| Fiscal years ending May 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Projected fiscal years ending May 31, | | | | | |
| Debt-Free Net Income | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 28,719,802 | $ 69,778,598 | $ 107,930,338 | $ 125,130,826 | $ 154,669,388 | $ 180,506,368 | $ 186,102,065 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (1,103,436) | (5,558,995) | (4,398,140) | (4,666,414) | (6,474,784) | (4,940,865) | (6,819,919) | (5,187,553) | (6,488,608) | (4,283,878) | (1,547,600) |
| Net Cash Flow | $ (31,551,464) | $ (77,936,566) | $ (56,376,933) | $ (14,843,290) | $ 22,245,018 | $ 64,837,734 | $ 101,110,418 | $ 119,943,273 | $ 148,180,780 | $ 176,222,490 | $ 184,554,465 |
| Discount Period (Years) 34.2% | 0.08 | 0.66 | 1.66 | 2.66 | 3.66 | 4.66 | 5.66 | 6.66 | 7.66 | 8.66 | |
| Present Value Factor | 0.9762 | 0.8226 | 0.6130 | 0.4569 | 0.3405 | 0.2537 | 0.1891 | 0.1409 | 0.1050 | 0.0782 | |
| Present Value of Cash Flow | $ (30,800,220) | $ (64,113,777) | $ (34,561,655) | $ (6,781,195) | $ 7,573,416 | $ 16,450,150 | $ 19,117,053 | $ 16,899,891 | $ 15,559,043 | $ 13,789,081 | |

**Residual Value**

| | |
|---|---|
| Residual Cash Flow | 186,102,065 |
| Residual Cash Flow Growth Rate | 3.1% |
| Residual Value | 598,610,077 |
| Discount Factor | 0.078 |
| Present Value of Residual Value | 46,840,122 |

| | |
|---|---|
| Present Value of Cash Flows | (46,868,212) |
| Present Value of Residual Value | 46,840,122 |
| Enterprise Value (Rounded) | $ - |

**April EV Sensitivity to discount rate:**

| 28.0% | 33.0% | 38.0% | 43.0% |
|---|---|---|---|
| 66,600,000 | 9,800,000 | (25,200,000) | (47,800,000) |

**Sources and Notes:**
See Desai Report, Exhibit B, Schedule 3, reconstructed with different present value factor.

bva group®

548

**Exhibit 11**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report February Income Approach Sensitivity to Combined State and Federal Tax Rate**

| Fiscal years ending May 31, | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Debt-Free Net Income | $ (56,973,873) | $(116,630,654) | $ (25,746,728) | $ 24,211,152 | $ 75,176,713 | $ 114,569,253 | $ 135,534,314 | $ 171,578,447 | $ 227,774,195 | $ 280,592,370 | $ 289,290,733 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (4,612,690) | (8,656,134) | (13,391,543) | (9,405,921) | (10,514,201) | (6,499,971) | (7,607,103) | (7,438,175) | (9,635,800) | (9,282,754) | (2,698,373) |
| Net Cash Flow | $ (61,586,563) | $(125,286,788) | $ (39,138,271) | $ 14,805,231 | $ 64,662,512 | $ 108,069,281 | $ 127,927,210 | $ 164,140,273 | $ 218,138,395 | $ 271,309,616 | $ 286,592,360 |
| Discount Period (Years) | 0.15 | 0.80 | 1.80 | 2.80 | 3.80 | 4.80 | 5.80 | 6.80 | 7.80 | 8.80 | |
| Present Value Factor | 0.9940 | 0.8214 | 0.6417 | 0.5013 | 0.3917 | 0.3060 | 0.2390 | 0.1868 | 0.1459 | 0.1140 | |
| Present Value of Cash Flow | $ (59,368,131) | $(102,904,675) | $ (25,114,324) | $ 7,422,071 | $ 25,325,177 | $ 33,066,803 | $ 30,580,382 | $ 30,653,859 | $ 31,826,740 | $ 30,925,395 | |

28.0%

| Present Value of Cash Flows | 2,413,298 |
|---|---|
| Present Value of Residual Value | 132,429,655 |

| Enterprise Value (Rounded) | $ 134,800,000 |
|---|---|

**Residual Value**

| Residual Cash Flow | 289,290,733 |
|---|---|
| Residual Cash Flow Growth Rate | 3.1% |
| Residual Value | 1,161,810,173 |
| Discount Factor | 0.114 |
| Present Value of Residual Value | 132,429,655 |

| Desai Report EV | 160,600,000 |
|---|---|
| Difference | (25,800,000) |
| % Change | -16.1% |

**February EV Sensitivity to discount rate:**

| 28.0% | 33.0% | 38.0% | 43.0% |
|---|---|---|---|
| Enterprise Value: | | | |
| 134,800,000 | 46,300,000 | (8,900,000) | (44,900,000) |

**Sources and Notes:**
See Exhibit 11.A and Desai Report, Exhibit A, Schedule 3.

bvagroup

Exhibits - Page 28 of 37

549

**Exhibit 11.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report February Income Forecast With Combined State and Federal Tax Rate**

| Fiscal years ending May 31, | | 2019F | 2020F | 2021F | 2022F | 2023F | 2024F | 2025F | 2026F | 2027F | 2028F | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue (1)** | | | | | | | | | | | | |
| League Revenue | A | $ 11,726,304 | $ 25,421,000 | $ 59,355,988 | $ 75,716,459 | $ 94,948,776 | $ 111,040,843 | $ 139,630,046 | $ 163,499,565 | $ 206,112,494 | $ 241,654,125 | |
| Team Revenue | B | 30,960,000 | 74,690,000 | 151,488,288 | 204,041,470 | 263,292,963 | 283,819,076 | 301,140,562 | 319,536,591 | 339,075,036 | 359,828,148 | |
| Digital Revenue | C | 3,516,833 | 32,796,547 | 56,200,033 | 81,501,047 | 108,333,025 | 136,821,987 | 167,108,060 | 199,347,193 | 233,713,076 | 270,399,291 | |
| **Total Revenue** | D = Sum(A-C) | $ 46,203,137 | $ 132,907,547 | $ 267,044,309 | $ 361,258,976 | $ 466,574,764 | $ 531,681,906 | $ 607,878,668 | $ 682,383,349 | $ 778,900,606 | $ 871,881,564 | $ 898,909,892 |
| **Expenses (1)** | | | | | | | | | | | | |
| Digital Expenses | E | $ 7,329,071 | $ 15,973,761 | $ 18,128,379 | $ 18,490,947 | $ 18,860,766 | $ 19,237,981 | $ 19,622,741 | $ 20,015,196 | $ 20,415,500 | $ 20,823,810 | |
| Football Expenses | F | 35,682,556 | 84,949,056 | 99,818,399 | 114,967,382 | 130,154,470 | 130,677,739 | 131,211,473 | 131,755,881 | 132,311,178 | 132,877,581 | |
| Player Relations Expenses | G | 874,586 | 3,424,446 | 3,436,068 | 3,447,922 | 11,177,334 | 11,189,667 | 11,202,247 | 11,215,078 | 11,228,166 | 11,241,516 | |
| Marketing/Branding Expenses | H | 10,314,689 | 21,861,356 | 22,240,810 | 22,685,626 | 23,139,339 | 23,602,126 | 24,074,168 | 24,555,651 | 25,046,764 | 25,547,700 | |
| Production Expenses | I | 7,759,192 | 16,049,106 | 16,366,889 | 16,684,007 | 17,017,687 | 17,358,041 | 17,705,201 | 18,059,305 | 18,420,491 | 18,788,901 | |
| League Expenses | J | 17,661,369 | 33,500,880 | 38,271,789 | 43,090,061 | 47,911,251 | 48,114,353 | 48,322,812 | 48,536,656 | 48,755,916 | 48,980,630 | |
| Team Expenses | K | 16,073,813 | 38,026,520 | 45,631,824 | 53,237,128 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | |
| Medical Expenses | L | 2,961,479 | 13,462,096 | 15,414,093 | 17,367,186 | 19,321,397 | 27,115,228 | 27,174,542 | 27,235,043 | 27,296,753 | 27,359,698 | |
| Corporate Expenses | M | 2,848,759 | 6,712,620 | 6,797,790 | 6,933,746 | 7,072,421 | 7,213,869 | 7,358,147 | 7,505,309 | 7,655,416 | 7,808,524 | |
| League Payment Fees | N | 1,055,050 | 9,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,804,158 | 70,113,923 | 81,119,787 | |
| AAF Player Digital Distributions | O | 615,446 | 5,739,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 | |
| **Total Expenses** | P = Sum(E-O) | $ 103,177,010 | $ 249,538,201 | $ 292,791,037 | $ 335,617,002 | $ 386,955,284 | $ 410,341,880 | $ 426,890,091 | $ 444,410,468 | $ 462,986,327 | $ 482,710,455 | $ 497,674,479 |
| % of Revenue | | 223.3% | 187.8% | 109.6% | 92.9% | 82.9% | 77.2% | 70.2% | 65.1% | 59.4% | 55.4% | 55.4% |
| **EBITDA** | Q = P - D | $ (56,973,873) | $(116,630,654) | $ (25,746,728) | $ 25,641,974 | $ 79,619,480 | $ 121,340,026 | $ 180,988,577 | $ 237,972,881 | $ 315,914,279 | $ 389,171,109 | $ 401,235,413 |
| % of Revenue | R = Q / D | -123.3% | -87.8% | -9.6% | 7.1% | 17.1% | 22.8% | 29.8% | 34.9% | 40.6% | 44.6% | 44.6% |
| Other Income/(Expense)(1) | S | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Profit Before Taxes** | T = Q + S | $ (56,973,873) | $ (116,630,654) | $ (25,746,728) | $ 25,641,974 | $ 79,619,480 | $ 121,340,026 | $ 180,988,577 | $ 237,972,881 | $ 315,914,279 | $ 389,171,109 | 401,235,413 |
| NOL Balance (2) | U | (56,973,873) | (173,604,527) | (199,351,255) | (178,837,676) | (115,142,092) | (18,050,071) | | | | | |
| NOL Benefit (3) | | (56,973,873) | (116,630,654) | (25,746,728) | (20,513,579) | (63,695,584) | (97,072,021) | (18,070,071) | | | | |
| **Taxable Income** | W = T + V | $ (56,973,873) | $ (116,630,654) | $ (25,746,728) | $ 5,128,395 | $ 15,923,896 | $ 24,268,005 | $ 162,918,506 | $ 237,972,881 | $ 315,914,279 | $ 389,171,109 | $ 389,171,109 |
| Federal Income Taxes | X = W * Y | (56,973,873) | (116,630,654) | (25,746,728) | 1,430,822 | 4,442,767 | 6,770,773 | 45,454,263 | 66,394,434 | 88,140,084 | 108,578,739 | 111,944,680 |
| Estimated Tax Rate (4) | Y | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% |
| **Net Income** | Z = T - X | $ (56,973,873) | $(116,630,654) | $ (25,746,728) | $ 24,211,152 | $ 75,176,713 | $ 114,569,253 | $ 135,534,314 | $ 171,578,447 | $ 227,774,195 | $ 280,592,370 | $ 289,290,733 |
| % of Revenue | AA = Z / D | -123.3% | -87.8% | -9.6% | 6.7% | 16.1% | 21.5% | 22.3% | 25.1% | 29.2% | 32.2% | 32.2% |

**Sources and Notes:**
(1) See Desai Report, Exhibit A, Schedule 4.
(2) Net Operating Loss ("NOL") calculated as cumulative sum of annual pre-tax losses+ 80% of annual pre-tax profits. NOL values are limited to zero or negative figures.
(3) NOL Benefit calculated as the current year's NOL minus the previous year's NOL. NOL Benefits are limited to zero or negative figures.
(4) Calculated as the U.S. Federal corporate tax rate of 21.0 percent plus Delaware state rate of 8.7 percent multiplied by one minus the U.S. Federal corporate tax rate: 21.0% + 8.7% x (1 − 21.0%) = 27.9%.

bva group

**Exhibit 12**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report April Income Approach Sensitivity to Combined State and Federal Tax Rate**

| Fiscal years ending May 31, | Projected fiscal years ending May 31, | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | Residual |
| Debt-Free Net Income | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 28,306,093 | $ 68,773,437 | $ 105,729,113 | $ 114,201,678 | $ 141,160,289 | $ 164,740,622 | $ 169,847,581 |
| Less: Depreciation/Amortization | - | - | - | - | - | - | - | - | - | - | - |
| Less: Capital Expenditures | - | - | - | - | - | - | - | - | - | - | - |
| Add/Less: Incremental NWC | (1,103,436) | (5,558,995) | (4,398,140) | (4,666,414) | (6,474,784) | (4,940,865) | (6,819,919) | (5,187,553) | (6,488,608) | (4,283,878) | (1,547,600) |
| Net Cash Flow | $ (31,551,464) | $ (77,936,566) | $ (56,376,933) | $ (14,843,290) | $ 21,831,309 | $ 63,832,572 | $ 98,909,193 | $ 109,014,125 | $ 134,671,682 | $ 160,456,744 | $ 168,299,981 |
| Discount Period (Years) | 0.08 | 0.66 | 1.66 | 2.66 | 3.66 | 4.66 | 5.66 | 6.66 | 7.66 | 8.66 | |
| Present Value Factor | 0.9900 | 0.8488 | 0.6632 | 0.5181 | 0.4048 | 0.3162 | 0.2470 | 0.1930 | 0.1508 | 0.1178 | |
| 28.0% Present Value of Cash Flow | $ (30,919,628) | $ (66,155,470) | $ (37,386,600) | $ (7,690,148) | $ 8,836,380 | $ 20,184,917 | $ 24,434,942 | $ 21,040,083 | $ 20,306,309 | $ 18,901,780 | |

| Present Value of Cash Flows | (28,447,436) |
| --- | --- |
| Present Value of Residual Value | 80,353,492 |

| Enterprise Value (Rounded) | $ 51,900,000 |
| --- | --- |

| Desai Report EV | 160,600,000 |
| --- | --- |
| Difference | (108,700,000) |
| % Change | -67.7% |

**Residual Value**

| Residual Cash Flow | 169,847,581 |
| --- | --- |
| Residual Cash Flow Growth Rate | 3.1% |
| Residual Value | 682,118,799 |
| Discount Factor | 0.118 |
| Present Value of Residual Value | 80,353,492 |

**April EV Sensitivity to discount rate:**

| 28.0% | 33.0% | 38.0% | 43.0% |
| --- | --- | --- | --- |
| 51,900,000 | (100,000) | (32,200,000) | (52,800,000) |

**Sources and Notes:**
See Exhibit 12.A and Desai Report, Exhibit B, Schedule 3.

bvagroup

**Exhibit 12.A**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Desai Report April Income Forecast With Combined State and Federal Tax Rate**

| Fiscal years ending May 31, | | 2019F | 2020F | 2021F | 2022F | 2023F | 2024F | 2025F | 2026F | 2027F | 2028F | Residual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue (1)** | | | | | | | | | | | | |
| League Revenue | A | $ 2,736,392 | $ 15,500,000 | $ 31,000,000 | $ 54,250,000 | $ 81,375,000 | $ 101,718,750 | $ 122,062,500 | $ 140,371,875 | $ 154,409,063 | $ 162,129,516 | $ 515,552,596 |
| Team Revenue | B | 8,316,205 | 34,109,228 | 53,295,668 | 66,619,585 | 91,935,027 | 105,725,281 | 135,680,778 | 149,248,856 | 179,098,627 | 188,053,558 | |
| Digital Revenue | C | - | 17,125,200 | 26,492,848 | 36,660,195 | 49,074,609 | 64,430,911 | 82,443,573 | 102,527,387 | 123,633,745 | 149,867,941 | |
| **Total Revenue** | D = Sum(A-C) | $ 11,052,597 | $ 66,734,428 | $ 110,788,516 | $ 157,529,780 | $ 222,384,636 | $ 271,874,942 | $ 340,186,851 | $ 392,148,118 | $ 457,141,435 | $ 500,051,015 | $ 515,552,596 |
| **Expenses (1)** | | | | | | | | | | | | |
| Employee Compensation and Benefits | E | $ 4,167,773 | $ 13,891,484 | $ 14,308,228 | $ 14,737,475 | $ 15,179,599 | $ 15,634,987 | $ 16,104,037 | $ 16,587,158 | $ 17,084,773 | $ 17,597,316 | |
| Corporate and Professional Services Expenses | F | 3,270,163 | 13,825,901 | 14,240,678 | 14,667,898 | 15,107,935 | 15,561,173 | 16,028,009 | 16,508,849 | 17,004,114 | 17,514,238 | |
| Football Ops Related Expenses | G | 6,957,858 | 23,886,895 | 24,603,502 | 25,341,607 | 26,101,855 | 26,884,911 | 27,691,458 | 28,522,202 | 29,377,868 | 30,259,204 | |
| Technology Related Expenses | H | 370,080 | 1,300,000 | 1,339,000 | 1,379,170 | 1,420,545 | 1,463,161 | 1,507,056 | 1,552,268 | 1,598,836 | 1,646,801 | |
| League SG&A | I | 834,715 | 1,721,257 | 1,772,895 | 1,826,082 | 1,880,865 | 1,937,290 | 1,995,409 | 2,055,271 | 2,116,930 | 2,180,437 | |
| Material Third-Party Services | J | 559,314 | 1,971,480 | 2,030,624 | 2,091,543 | 2,154,289 | 2,218,918 | 2,285,485 | 2,354,050 | 2,424,671 | 2,497,411 | |
| Digital Payment Fees | K | - | 4,237,560 | 6,955,604 | 9,904,103 | 13,516,297 | 17,999,563 | 23,267,067 | 29,141,945 | 35,308,185 | 42,995,795 | |
| AAF Player Digital Distributions | L | 441,887 | 2,200,000 | 2,420,000 | 2,662,000 | 2,928,200 | 3,221,020 | 3,543,122 | 3,897,434 | 4,287,178 | 4,715,895 | |
| Total Employee Compensation and Benefits | M | 17,268,899 | 56,364,733 | 70,455,916 | 70,455,916 | 84,547,100 | 84,547,100 | 98,638,283 | 98,638,283 | 112,729,466 | 112,729,466 | |
| Total Football-Related Expenses | N | 17,373,716 | 18,338,036 | 22,322,545 | 22,932,545 | 27,507,054 | 27,507,054 | 32,091,563 | 32,091,563 | 36,676,072 | 36,676,072 | |
| Total SG&A | O | 256,220 | 1,374,653 | 1,718,317 | 1,718,317 | 2,061,980 | 2,061,980 | 2,405,644 | 2,405,644 | 2,749,307 | 2,749,307 | |
| **Total Expenses** | P = Sum(E-O) | $ 41,500,625 | $ 139,117,999 | $ 162,767,309 | $ 167,706,656 | $ 192,405,719 | $ 199,037,157 | $ 225,557,133 | $ 233,754,667 | $ 261,357,400 | $ 271,561,942 | $ 279,980,362 |
| % of Revenue | | 375.5% | 208.5% | 146.9% | 106.5% | 86.5% | 73.2% | 66.3% | 59.6% | 57.2% | 54.3% | 54.3% |
| | | | | | | | | | | | | |
| **EBITDA** | Q = P - D | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 29,978,917 | $ 72,837,785 | $ 114,629,718 | $ 158,393,451 | $ 195,784,035 | $ 228,489,073 | $ 235,572,234 |
| % of Revenue | R = Q / D | -275.5% | -108.5% | -46.9% | -6.5% | 13.5% | 26.8% | 33.7% | 40.4% | 42.8% | 45.7% | 45.7% |
| | | | | | | | | | | | | |
| Other Income/(Expense)(1) | S | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **Profit Before Taxes** | T = Q + S | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 29,978,917 | $ 72,837,785 | $ 114,629,718 | $ 158,393,451 | $ 195,784,035 | $ 228,489,073 | $ 235,572,234 |
| NOL Balance (2) | U | $ (30,448,028) | $ (102,825,599) | $ (154,804,392) | $ (164,981,268) | $ (140,998,134) | $ (82,727,906) | $ - | | | | |
| NOL Benefit (3) | V | | | | | (23,988,134) | (58,270,228) | (82,727,906) | | | | |
| | | | | | | | | | | | | |
| Taxable Income | W = T + V | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 5,995,783 | $ 14,567,557 | $ 31,901,812 | $ 158,393,451 | $ 195,784,035 | $ 228,489,073 | $ 235,572,234 |
| Federal Income Taxes | X = W · Y | | | | | 1,672,824 | 4,064,348 | 8,900,605 | 44,191,773 | 54,623,746 | 63,748,451 | 65,724,653 |
| Estimated Tax Rate (4) | Y | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% | 27.9% |
| **Net Income** | Z = T - X | $ (30,448,028) | $ (72,377,571) | $ (51,978,793) | $ (10,176,876) | $ 28,306,093 | $ 68,773,437 | $ 105,729,113 | $ 114,201,678 | $ 141,160,289 | $ 164,740,622 | $ 169,847,581 |
| % of Revenue | AA = Z / D | -275.5% | -108.5% | -46.9% | -6.5% | 12.7% | 25.3% | 31.1% | 29.1% | 30.9% | 32.9% | 32.9% |

**Sources and Notes:**
(1) See Desai Report, Exhibit A, Schedule 4.
(2) Net Operating Loss ("NOL") calculated as cumulative sum of annual pre-tax losses+ 80% of annual pre-tax profits. NOL values are limited to zero or negative figures.
(3) NOL Benefit calculated as the current year's NOL minus the previous year's NOL. NOL Benefits are limited to zero or negative figures.
(4) Calculated as the U.S. Federal corporate tax rate of 21.0 percent plus Delaware state rate of 8.7 percent multiplied by one minus the U.S. Federal corporate tax rate: 21.0% + 8.7% x (1 - 21.0%) = 27.9%.

bvagroup
552

**Exhibit 13**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Adjustments to Desai Report Schedule 4**

| | | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|
| **Revenues: (1)** | | | | | | | | |
| League Revenue | A | 2,736,392 | 15,500,000 | 31,000,000 | 54,250,000 | 81,375,000 | 101,718,750 | 122,062,500 |
| Team Revenue | B | 8,316,205 | 34,109,228 | 53,295,668 | 66,619,585 | 91,935,027 | 105,725,281 | 135,680,778 |
| Digital Revenue | C | - | 17,125,200 | 26,492,848 | 36,660,195 | 49,074,609 | 64,430,911 | 82,443,573 |
| **Total Revenues** | D = Sum(A-C) | 11,052,597 | 66,734,428 | 110,788,516 | 157,529,780 | 222,384,637 | 271,874,942 | 340,186,851 |
| Adjustment Factor Based on Revised AAF Pro Forma's Overstatement of Team Revenues in 2019 (2) | E | 54.7% | 54.7% | 54.7% | 54.7% | 54.7% | 54.7% | 54.7% |
| **Total Adjusted Revenue from Desai Report** | F = D * E | 6,048,003 | 36,517,210 | 60,623,694 | 86,200,606 | 121,689,311 | 148,770,504 | 186,150,915 |
| **Expenses: (1)** | | | | | | | | |
| Employee Compensation and Benefits | G | 4,167,773 | 13,891,484 | 14,308,228 | 14,737,475 | 15,179,599 | 15,634,987 | 16,104,037 |
| Corporate and Professional Services Expenses | H | 3,270,163 | 13,825,901 | 14,240,678 | 14,667,898 | 15,107,935 | 15,561,173 | 16,028,009 |
| Football Ops Related Expenses | I | 6,957,858 | 23,886,895 | 24,603,502 | 25,341,607 | 26,101,855 | 26,884,911 | 27,691,458 |
| Technology Related Expenses | J | 370,080 | 1,300,000 | 1,339,000 | 1,379,170 | 1,420,545 | 1,463,161 | 1,507,056 |
| League SG&A | K | 834,715 | 1,721,257 | 1,772,895 | 1,826,082 | 1,880,865 | 1,937,290 | 1,995,409 |
| Material Third-Party Services | L | 559,314 | 1,971,480 | 2,030,624 | 2,091,543 | 2,154,289 | 2,218,918 | 2,285,485 |
| Digital Payment Fees | M | - | 4,237,560 | 6,955,604 | 9,904,103 | 13,516,297 | 17,999,563 | 23,267,067 |
| AAF Player Digital Distributions | N | 441,887 | 2,200,000 | 2,420,000 | 2,662,000 | 2,928,200 | 3,221,020 | 3,543,122 |
| **Total League Level Expenses** | O = Sum(G-N) | 16,601,790 | 63,034,577 | 67,670,532 | 72,609,878 | 78,289,585 | 84,921,024 | 92,421,643 |
| Total Employee Compensation and Benefits | P | 17,268,899 | 56,364,733 | 70,455,916 | 70,455,916 | 84,547,100 | 84,547,100 | 98,638,283 |
| Total Football-Related Expenses | Q | 7,373,716 | 18,338,036 | 22,922,545 | 22,922,545 | 27,507,054 | 27,507,054 | 32,091,563 |
| Total SG&A | R | 256,220 | 1,374,653 | 1,718,317 | 1,718,317 | 2,061,980 | 2,061,980 | 2,405,644 |
| **Total Football-Related Expenses** | S = Sum(P-R) | 24,898,835 | 76,077,423 | 95,096,778 | 95,096,778 | 114,116,134 | 114,116,134 | 133,135,490 |
| **Total Operating Expenses** | T = O + S | 41,500,625 | 139,111,999 | 162,767,310 | 167,706,656 | 192,405,719 | 199,037,158 | 225,557,132 |
| **Add Back: Improperly Presumed NFL Spend for AAF Personnel** | | | | | | | | |
| 2020 Improperly Presumed NFL Spend for Non-Player Compensation (3) | U | - | 11,971,988 | | | | | |
| Growth Factor from Revised AAF Pro Forma (4) | V | N/A | N/A | 3.0% | 3.0% | 3.0% | 3.0% | 3.0% |
| **Total Improperly Presumed NFL Spend for Non-Player Expenses** | W = U * (1 + V) | - | 11,971,988 | 12,331,148 | 12,701,082 | 13,082,115 | 13,474,578 | 13,878,816 |
| 2020 Improperly Presumed NFL Spend for Player Compensation (3) | X | - | 8,928,000 | - | - | - | - | - |
| Expected Number of AAF Teams (5) | Y | 8 | 8 | 10 | 10 | 10 | 12 | 14 |
| Expected Team Growth | Z | N/A | 0.0% | 25.0% | 25.0% | 50.0% | 50.0% | 75.0% |
| **Total Improperly Presumed NFL Spend for Player Personnel Expenses** | AA = X * (1 + Z) | - | 8,928,000 | 11,160,000 | 11,160,000 | 13,392,000 | 13,392,000 | 15,624,000 |
| **Total Improperly Presumed NFL Spend for AAF Personnel Expenses** | BB = W + AA | - | 20,899,988 | 23,491,148 | 23,861,082 | 26,474,115 | 26,866,578 | 29,502,816 |
| **Total Operating Expenses After Adding Back Improperly Presumed NFL Spend** | CC = T + BB | 41,500,625 | 160,011,988 | 186,258,458 | 191,567,739 | 218,879,834 | 225,903,736 | 255,059,948 |
| **Adjusted EBITDA** | DD = F - CC | (35,452,622) | (123,494,777) | (125,634,763) | (105,367,132) | (97,190,522) | (77,133,232) | (68,909,033) |
| **Cumulative Adjusted EBITDA** | EE = Sum(DD) | (35,452,622) | (158,947,399) | (284,582,163) | (389,949,295) | (487,139,817) | (564,273,050) | (633,182,082) |

**Exhibit 13**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Adjustments to Desai Report Schedule 4**

| | | 2026 | 2027 | 2028 |
|---|---|---:|---:|---:|
| **Revenues: (1)** | | | | |
| League Revenue | A | $ 140,371,875 | $ 154,409,063 | $ 162,129,516 |
| Team Revenue | B | 149,248,856 | 179,098,627 | 188,053,558 |
| Digital Revenue | C | 102,527,387 | 123,633,745 | 149,867,941 |
| **Total Revenues** | D = Sum(A-C) | $ 392,148,118 | $ 457,141,434 | $ 500,051,015 |
| Adjustment Factor Based on Revised AAF Pro Formas Overstatement of Team Revenues in 2019 (2) | E | 54.7% | 54.7% | 54.7% |
| **Total Adjusted Revenue from Desai Report** | F = D * E | $ 214,584,223 | $ 250,148,694 | $ 273,628,901 |
| **Expenses: (1)** | | | | |
| Employee Compensation and Benefits | G | 16,587,158 | 17,084,773 | 17,597,316 |
| Corporate and Professional Services Expenses | H | 16,508,849 | 17,004,114 | 17,514,238 |
| Football Ops Related Expenses | I | 28,522,202 | 29,377,868 | 30,259,204 |
| Technology Related Expenses | J | 1,552,268 | 1,598,836 | 1,646,801 |
| League SG&A | K | 2,055,271 | 2,116,930 | 2,180,437 |
| Material Third-Party Services | L | 2,354,050 | 2,424,671 | 2,497,411 |
| Digital Payment Fees | M | 29,141,945 | 35,308,185 | 42,995,795 |
| AAF Player Digital Distributions | N | 3,897,434 | 4,287,178 | 4,715,895 |
| **Total League Level Expenses** | O = Sum(G-N) | $ 100,619,177 | $ 109,202,554 | $ 119,407,098 |
| Total Employee Compensation and Benefits | P | 98,638,283 | 112,729,466 | 112,729,466 |
| Total Football-Related Expenses | Q | 32,091,563 | 36,676,072 | 36,676,072 |
| Total SG&A | R | 2,405,644 | 2,749,307 | 2,749,307 |
| **Total Football-Related Expenses** | S = Sum(P-R) | $ 133,135,490 | $ 152,154,845 | $ 152,154,845 |
| **Total Operating Expenses** | T = O + S | $ 233,754,667 | $ 261,357,400 | $ 271,561,943 |
| **Add Back: Improperly Presumed NFL Spend for AAF Personnel** | | | | |
| 2020 Improperly Presumed NFL Spend for Non-Player Compensation (3) | U | - | - | - |
| Growth Factor from Revised AAF Pro Forma (4) | V | 3.0% | 3.0% | 3.0% |
| **Total Improperly Presumed NFL Spend for Non-Player Expenses** | W = U * (1 + V) | $ 14,295,180 | $ 14,724,036 | $ 15,165,757 |
| 2020 Improperly Presumed NFL Spend for Player Compensation (3) | X | - | - | - |
| Expected Number of AAF Teams (5) | Y | 14 | 16 | 16 |
| Expected Team Growth | Z | 75.0% | 100.0% | 100.0% |
| **Total Improperly Presumed NFL Spend for Player Expenses** | AA = X * (1 + Z) | $ 15,624,000 | $ 17,856,000 | $ 17,856,000 |
| **Total Improperly Presumed NFL Spend for AAF Personnel Expenses** | BB = W + AA | $ 29,919,180 | $ 32,580,036 | $ 33,021,757 |
| **Total Operating Expenses After Adding Back Improperly Presumed NFL Spend** | CC = T + BB | $ 263,673,847 | $ 293,937,435 | $ 304,583,700 |
| **Adjusted EBITDA** | DD = F - CC | $ (49,089,624) | $ (43,788,741) | $ (30,954,799) |
| **Cumulative Adjusted EBITDA** | EE = Sum(DD) | $ (682,271,707) | $ (726,060,448) | $ (757,015,247) |



Exhibit 13

In re: Legendary Field Exhibitions, LLC, et al.

Adjustments to Desai Report Schedule 4

Sources and Notes:

(1) See Desai Report, at Exhibit B, Schedule 4.
(2) See Exhibit 5.
(3) See Exhibit 6.A.
(4) See Revised AAF Pro Forma, tab "Summary P&L," row 14.
(5) See Revised AAF Pro Forma, tab "Summary P&L," row 37.

bvagroup®

**Exhibit 14**
**In re: Legendary Field Exhibitions, LLC, et al.**
**Alternate Adjustments to Desai Report Schedule 4**

| | | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | | |
| League Revenue (1) | A | $ 2,736,392 | $ 15,500,000 | $ 31,000,000 | $ 54,250,000 | $ 81,375,000 | $ 101,718,750 |
| Broadcast Revenue Adjustment (2) | B | - | (5,000,000) | (10,000,000) | (17,500,000) | (26,250,000) | (32,812,500) |
| Assumed Growth Factor (3) | C | N/A | N/A | 100.0% | 75.0% | 50.0% | 25.0% |
| **Adjusted League Revenue** | D = A + B | $ 2,736,392 | $ 10,500,000 | $ 21,000,000 | $ 36,750,000 | $ 55,125,000 | $ 68,906,250 |
| Team Revenue (1) | E | 8,316,205 | 34,109,228 | 53,295,668 | 66,619,585 | 91,935,027 | 105,725,281 |
| Adjustment for 2019 Overstatement (4) | F | 54.7% | 54.7% | 54.7% | 54.7% | 54.7% | 54.7% |
| **Adjusted Team Revenue** | G = E * F | $ 4,550,644 | $ 18,664,637 | $ 29,163,495 | $ 36,454,368 | $ 50,307,028 | $ 57,853,082 |
| Digital Revenue (1) | H | - | 17,125,200 | 26,492,848 | 36,660,195 | 49,074,609 | 64,430,911 |
| **Total Adjusted Revenue** | I = D + G + H | $ 7,287,036 | $ 46,289,837 | $ 76,656,343 | $ 109,864,564 | $ 154,506,637 | $ 191,190,243 |
| **Expenses: (1)** | | | | | | | |
| Employee Compensation and Benefits | J | 4,167,773 | 13,891,484 | 14,308,228 | 14,737,475 | 15,179,599 | 15,634,987 |
| Corporate and Professional Services Expenses | K | 3,270,163 | 13,825,901 | 14,240,678 | 14,667,898 | 15,107,935 | 15,561,173 |
| Football Ops Related Expenses | L | 6,957,858 | 23,886,895 | 24,603,502 | 25,341,607 | 26,101,855 | 26,884,911 |
| Technology Related Expenses | M | 370,080 | 1,300,000 | 1,339,000 | 1,379,170 | 1,420,545 | 1,463,161 |
| League SG&A | N | 834,715 | 1,721,257 | 1,772,895 | 1,826,082 | 1,880,865 | 1,937,290 |
| Material Third-Party Services | O | 559,314 | 1,971,480 | 2,030,624 | 2,091,543 | 2,154,289 | 2,218,918 |
| Digital Payment Fees | P | - | 4,237,560 | 6,955,604 | 9,904,103 | 13,516,297 | 17,999,563 |
| AAF Player Digital Distributions | Q | 441,887 | 2,200,000 | 2,420,000 | 2,662,000 | 2,928,200 | 3,221,020 |
| **Total League Level Expenses** | R = Sum(J-Q) | $ 16,601,790 | $ 63,034,577 | $ 67,670,532 | $ 72,609,878 | $ 78,289,585 | $ 84,921,024 |
| Total Employee Compensation and Benefits | S | 17,268,899 | 56,364,733 | 70,455,916 | 70,455,916 | 84,547,100 | 84,547,100 |
| Total Football-Related Expenses | T | 7,373,716 | 18,338,036 | 22,922,545 | 22,922,545 | 27,507,054 | 27,507,054 |
| Total SG&A | U | 256,220 | 1,374,653 | 1,718,317 | 1,718,317 | 2,061,980 | 2,061,980 |
| **Total Football-Related Expenses** | V = Sum(S-U) | $ 24,898,835 | $ 76,077,423 | $ 95,096,778 | $ 95,096,778 | $ 114,116,134 | $ 114,116,134 |
| **Total Operating Expenses** | W = R + V | $ 41,500,625 | $ 139,111,999 | $ 162,767,310 | $ 167,706,656 | $ 192,405,719 | $ 199,037,158 |
| **Add Back: Improperly Presumed NFL Spend for AAF Personnel** | | | | | | | |
| 2020 Improperly Presumed NFL Spend for Non-Player Compensation (5) | X | - | 11,971,988 | | | | |
| Growth Factor from Revised AAF Pro Forma (6) | Y | N/A | N/A | 3.0% | 3.0% | 3.0% | 3.0% |
| **Total Improperly Presumed NFL Spend for Non-Player Expenses** | Z = X * (1 + Y) | $ - | $ 11,971,988 | $ 12,331,148 | $ 12,701,082 | $ 13,082,115 | $ 13,474,578 |
| 2020 Improperly Presumed NFL Spend for Player Compensation (5) | AA | - | 8,928,000 | | | | |
| Expected Number of AAF Teams (7) | BB | 8 | 8 | 10 | 10 | 12 | 12 |
| Expected Team Growth | CC | N/A | 0.0% | 25.0% | 25.0% | 50.0% | 50.0% |
| **Total Improperly Presumed NFL Spend for Player Expenses** | DD = AA * (1+CC) | $ - | $ 8,928,000 | $ 11,160,000 | $ 11,160,000 | $ 13,392,000 | $ 13,392,000 |
| **Total Improperly Presumed NFL Spend for AAF Personnel Expenses** | EE = Z + DD | $ - | $ 20,899,988 | $ 23,491,148 | $ 23,861,082 | $ 26,474,115 | $ 26,866,578 |
| **Total Operating Expenses After Adding Back Improperly Presumed NFL Spend** | FF = W + EE | $ 41,500,625 | $ 160,011,988 | $ 186,258,458 | $ 191,567,739 | $ 218,879,834 | $ 225,903,736 |
| **Adjusted EBITDA** | GG = I - FF | $ (34,213,589) | $ (113,722,151) | $ (109,602,115) | $ (81,703,175) | $ (64,373,196) | $ (34,713,493) |
| **Cumulative Adjusted EBITDA** | HH = Sum(GG) | $ (34,213,589) | $ (147,935,740) | $ (257,537,855) | $ (339,241,030) | $ (403,614,227) | $ (438,327,720) |

bvagroup®

Exhibit 14
In re: Legendary Field Exhibitions, LLC, et al.
Alternate Adjustments to Desai Report Schedule 4

| | | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| League Revenue (1) | A | $ 122,062,500 | $ 140,371,875 | $ 154,409,063 | $ 162,129,516 |
| Broadcast Revenue Adjustment (2) | B | (39,375,000) | (45,281,250) | (49,809,375) | (52,299,844) |
| Assumed Growth Factor (3) | C | 20.0% | 15.0% | 10.0% | 5.0% |
| **Adjusted League Revenue** | D = A + B | $ 82,687,500 | $ 95,090,625 | $ 104,599,688 | $ 109,829,672 |
| Team Revenue (1) | E | 135,680,778 | 149,248,856 | 179,098,627 | 188,053,558 |
| Adjustment for 2019 Overstatement (4) | F | 54.7% | 54.7% | 54.7% | 54.7% |
| **Adjusted Team Revenue** | G = E * F | $ 74,244,789 | $ 81,669,268 | $ 98,003,121 | $ 102,903,278 |
| Digital Revenue (1) | H | 82,443,573 | 102,527,387 | 123,633,745 | 149,867,941 |
| **Total Adjusted Revenue** | I = D + G + H | $ 239,375,862 | $ 279,287,280 | $ 326,236,554 | $ 362,600,891 |
| **Expenses: (1)** | | | | | |
| Employee Compensation and Benefits | J | 16,104,037 | 16,587,158 | 17,084,773 | 17,597,316 |
| Corporate and Professional Services Expenses | K | 16,028,009 | 16,508,849 | 17,004,114 | 17,514,238 |
| Football Ops Related Expenses | L | 27,691,458 | 28,522,202 | 29,377,868 | 30,259,204 |
| Technology Related Expenses | M | 1,507,056 | 1,552,268 | 1,598,836 | 1,646,801 |
| League SG&A | N | 1,995,409 | 2,055,271 | 2,116,930 | 2,180,437 |
| Material Third-Party Services | O | 2,285,485 | 2,354,050 | 2,424,671 | 2,497,411 |
| Digital Payment Fees | P | 23,267,067 | 29,141,945 | 35,308,185 | 42,995,795 |
| AAF Player Digital Distributions | Q | 3,543,122 | 3,897,434 | 4,287,178 | 4,715,895 |
| **Total League Level Expenses** | R = Sum(J-Q) | $ 92,421,643 | $ 100,619,177 | $ 109,202,554 | $ 119,407,098 |
| Total Employee Compensation and Benefits | S | 98,638,283 | 98,638,283 | 112,729,466 | 112,729,466 |
| Total Football-Related Expenses | T | 32,091,563 | 32,091,563 | 36,676,072 | 36,676,072 |
| Total SG&A | U | 2,405,644 | 2,405,644 | 2,749,307 | 2,749,307 |
| **Total Football-Related Expenses** | V = Sum(S-U) | $ 133,135,490 | $ 133,135,490 | $ 152,154,845 | $ 152,154,845 |
| **Total Operating Expenses** | W = R + V | $ 225,557,132 | $ 233,754,667 | $ 261,357,400 | $ 271,561,943 |
| **Add Back: Improperly Presumed NFL Spend for AAF Personnel** | | | | | |
| 2020 Improperly Presumed NFL Spend for Non-Player Compensation (5) | X | - | - | - | - |
| Growth Factor from Revised AAF Pro Forma (6) | Y | 3.0% | 3.0% | 3.0% | 3.0% |
| **Total Improperly Presumed NFL Spend for Non-Player Expenses** | Z = X * (1 + Y) | $ 13,878,816 | $ 14,295,180 | $ 14,724,036 | $ 15,165,757 |
| 2020 Improperly Presumed NFL Spend for Player Compensation (5) | AA | - | - | - | - |
| Expected Number of AAF Teams (7) | BB | 14 | 14 | 16 | 16 |
| Expected Team Growth | CC | 75.0% | 75.0% | 100.0% | 100.0% |
| **Total Improperly Presumed NFL Spend for Player Expenses** | DD = AA * (1+CC) | $ 15,624,000 | $ 15,624,000 | $ 17,856,000 | $ 17,856,000 |
| **Total Improperly Presumed NFL Spend for AAF Personnel Expenses** | EE = Z + DD | $ 29,502,816 | $ 29,919,180 | $ 32,580,036 | $ 33,021,757 |
| **Total Operating Expenses After Adding Back Improperly Presumed NFL Spend** | FF = W + EE | $ 255,059,948 | $ 263,673,847 | $ 293,937,435 | $ 304,583,700 |
| **Adjusted EBITDA** | GG = I - FF | $ (15,684,086) | $ 15,613,433 | $ 32,299,119 | $ 58,017,191 |
| **Cumulative Adjusted EBITDA** | HH = Sum(GG) | $ (454,011,806) | $ (438,398,373) | $ (406,099,254) | $ (348,082,063) |


bvagroup

557

**Exhibit 14**

**In re: Legendary Field Exhibitions, LLC, et al.**

**Alternate Adjustments to Desai Report Schedule 4**

**Sources and Notes:**
(1) See Desai Report, at Exhibit B, Schedule 4.
(2) See Revised AAF Pro Forma, tab "League Level," row 13.
(3) See Revised AAF Pro Forma, tab "Summary P&L," row 6.
(4) See Exhibit 5.
(5) See Exhibit 6.A.
(6) See Revised AAF Pro Forma, tab "Summary P&L," row 14.
(7) See Revised AAF Pro Forma, tab "Summary P&L," row 37.



## Privileged Attorney-Client Work Product

## <u>Expert Report of Robert J. Whitsitt</u>

**Prepared for the Defendants in:**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

RANDOLPH N. OSHEROW,
Chapter 7 Trustee, and the Bankruptcy Estates of
Legendary Field Exhibitions, LLC; AAF Players, LLC;
AAF Properties, LLC; Ebersol Sports Media Group, Inc.;
LFE 2, LLC; and We Are Realtime, LLC

      Plaintiffs

        v.

THOMAS DUNDON; JOHN ZUTTER; and
DUNDON CAPITAL PARTNERS, LLC

      Defendants

**Adv. Proc. No.:** 22-05078

**Robert J. Whitsitt**                          1617 73rd Ave. NE
bob@whitsittenterprises.com          Medina, WA 98039
(425)241-8009

1

EXHIBIT 2

# INTRODUCTION

I have been retained to opine on why the Alliance of American Football (AAF) league failed in 2019 and whether Dundon Capital Partners (DCP) exercised good business judgment after acquiring operational control of the league.

My report is the product of reliable principles and methods based on my many years of working in professional sports management.

# QUALIFICATIONS

I am an attorney and best-selling author with 40+ years of experience in professional sports management and operations. I negotiated the purchase of the NFL Seattle Seahawks for Paul Allen and led a successful statewide referendum which provided $300 million of public funding for construction of a new $450 million football/soccer and exhibition stadium in downtown Seattle, Washington. While serving as President of the Seahawks and First and Goal, Inc.—the stadium/exhibition center management company—for nine seasons I was a member of the NFL Expansion and Relocation Committee.

During my 25 years in the NBA, I worked nine seasons as President and General Manager of the Portland Trail Blazers and eight seasons as President and General Manager of the Seattle Supersonics.

During my tenure with the Sonics our team made the playoffs seven times. I was **selected NBA Executive of the Year** in 1994 for building the team with the best record in the NBA (63-19).

During my nine seasons in Portland, the Trail Blazers made the playoffs every year.  Our team ranked in the top quartile in NBA attendance and was the first, and only, sports franchise to win the Points of Light Foundation for corporate and community service for the good deeds and positive impact the Blazers Community Builders made in Portland.

The past three years I have been a member of the Diamond Sports Group Board of Managers.  Our company owns 16 regional sports networks in the United States and has produced and televised more professional sporting events —MLB, NBA, NHL— than any other company.

A more detailed Curriculum Vitae describing my work experiences is attached at the end of this report.

Here are my conclusions.

## I.    The AAF failed for many reasons.

(1) <u>The AAF business model was flawed</u>. The AAF was not on a path to becoming financially self-sustaining due to its dependence upon external funding and its inability to secure a significant media rights fee agreement. Attendance was weak and sponsor revenue minimal, due in part to a lack of star power and no affiliation with the National Football League (NFL).

(2) <u>The AAF management rushed the launch.</u>  The league launched in 2019 to pre-empt the 2020 launch of another Spring football minor league— the XFL. The AAF lacked sufficient lead time to sell sponsorships, solidify operations, negotiate affordable vendor agreements, and create brand awareness through community outreach.  The AAF burned through cash faster than anticipated due to a lack of revenue and the high costs associated with player salaries, insurance, travel, stadium rentals, staffing, and marketing.

(3)  The <u>AAF was launched in a very saturated sports market.</u>  The AAF was launched against a plethora of established sports leagues and events which existed during the months of February – April.  The AAF had difficulty gaining traction because it was just "the next" of the many football minor leagues that had already failed.

3

## II. Dundon Capital Partners used good business judgment while they were in control of the AAF.

The AAF was out of cash and ready to fold prior to Dundon Capital Partners (DCP) injecting capital into the business. The DCP cash infusion was just a short-term band aid because there was no time to implement meaningful changes. DCP's investment occurred when the AAF season was approximately 20% completed. DCP took prudent financial steps during the remaining weeks of operations to slow the cash burn and generate revenue. Initiatives included negotiating a reduction in accounts payable, attracting potential new broadcast advertisers, and proposing a partnership with the NFL Players Association.

## III. Documents Reviewed. Here are the documents and publications I reviewed in preparing this report:

Plaintiff's Complaint filed November 27, 2023;

CSTV Term Sheet with AAF dated March 14, 2018,

CSTV Networks, Inc. Agreement with AAF dated January 22, 2019;

Turner Sports, Inc. Term Sheet with AAF dated January 1, 2019;

NFL Enterprises, LLC Term Sheet with AAF dated January 30, 2019;

Software License Agreement between NFL Enterprises, LLC and AAF dated October 15, 2018;

Waiver & Release of Liability and Covenant not to Sue Agreement between NFL Enterprises, LLC and AAF dated February 8, 2019;

NFLPA Draft Term Sheet;

AAF Standard Player Agreement and Standard Commercial Likeness Agreement;

Plaintiff's Expert Witness Report of Sonia Desai dated December 2, 2024; Plaintiff's Expert Witness Report of Joseph R. Petrucelli dated December 2, 2024;

Deposition of Charlie Ebersol dated September 19, 2024 and accompanying Exhibits 17-20, 22, 24, 26, 27;

Deposition of Kevin Farrell dated November 4, 2024 and accompanying Exhibits 100-114, 116-130, 131-133, 133A;

Deposition of Elisa Lee dated November 6, 2024;

Deposition of Daniel Miller dated November 6, 2024;

Deposition of Gabriel Giordano dated November 7, 2024;

Deposition of Jeffrey James Vanderbilt dated November 11, 2024;

Deposition of John Zutter dated November 12, 2024;

Deposition of Tom Veit dated November 25, 2024;

Deposition of Thomas Dundon dated December 2 & 3, 2024 and accompanying Exhibits 251, 300, 362-376, 378-381, 383-390, 393, 398, 401, 405-408, 412, 413, 416-423, 426-434, 437, 439-441, 443, 447, 449, 450;

Deposition of Mark Teitelman dated December 6, 2024;

<u>Football Stadium Report</u>. "From USFL to AAF: A History of Spring Football" by Jesse Goldberg-Strassier, January 25, 2019;

<u>TV News Check, The Business of Broadcasting.</u> "TV Sports Advertising Shifts Into Juggernaut Mode" by John Consoli, January 12, 2022;

<u>The Sporting News.</u> "How Much do XFL players get paid? Breaking down salary structure for the new league" by Jordan Heck, February 15, 2020;

<u>The Sporting News.</u> "NFL practice squad salaries: Minimum salary, eligibility rules and more to know for 2024" by Jacob Camenker, August 22, 2024;

ESMG Financial Projections.

IV.   **Background.**  The idea of developing a professional football minor league was not a new concept created by the founders of the AAF.  The sports market had seen many minor leagues come and go without enjoying any success.

During the past forty years there have been many attempts to make Spring professional football successful.  Each attempt has failed miserably. The chronology of Spring football minor leagues prior to the AAF formation in 2019 include:

(i)     The United States Football League (USFL) played three seasons from 1983-1985. Despite having a broadcast contract with ESPN, the league folded because it was overextended financially, faced legal challenges and lacked the funds to continue operations.

(ii)    In 1991 the World League of American Football (WLAF) began playing Spring football. This leagued was backed by the NFL and had a broadcast agreement with ABC.  The league lost money in each of its first two seasons.  The WLAF went dormant the next two seasons and resurfaced in in 1995 as NFL Europe.  The league was owned by the NFL and Fox and was based solely in Europe because the NFL determined Spring football in the United States did not work.

(iii)   The Professional Spring Football League folded after its inaugural training camp in 1992.

(iv)    Spring Football League, Inc. proposed a four-game schedule in 2000 but folded after just two games.

6

(v)     Vince McMahon introduced the Xtreme Football League (XFL) in 2001. The league had a television contract with NBC and drew a 9.5 rating for its first game on Saturday, February 3, 2001.  Ratings declined in subsequent weeks. "As Eisner Communications senior VP Abe Novic noted, 'It was suppose to be rougher on the field and more risque' with the cheerleaders.  In fact, it is plain old boring. There is no there there.' There was no XFL there, either, after the season.  It lost its NBC and UPN television contracts as well as $70 million."[1]

**V.     AAF Failure.**  The AAF failed in 2019 for many reasons including:

(i)     <u>Football Fatigue.</u>  Sports fans watch college and NFL football from August until the first week in February.  Football fans watch the best players and biggest stars in the NFL and college for seven months culminating with the Super Bowl in February.  Throughout the years, these fans have shown no appetite to watch two more months of "minor league" football.

(ii)     <u>Poor Quality.</u>  The players in the AAF were not good enough to make the "end of the bench" on the worst NFL team.  Fans are not interested in watching unskilled football players with no name recognition. Successful sports leagues rely on star power and the AAF was void of marquee players.

(iii)     <u>Sports Competition.</u>  Sports fans are inundated with quality sports programming from February- April which is when the AAF held its season.  Sports programming during this time period included the NBA regular season and playoff games, NHL regular season and playoff games, NCAA basketball, NCAA "March Madness" Basketball Tournament, Major League Baseball, NFL Draft, and the Master's Golf Tournament.  The AAF season also fell within the Spring (Easter) vacation period which may have reduced fan interest.  This intense competition for sports viewership limited the available audience for the AAF.

---

[1] Jesse Goldberg-Strassler, "From USFL to AAF: A History of Spring Football." Football Stadium Report, January 25, 2019.

(iv)  <u>Market Size.</u>  The AAF games were played in small markets which resulted in lower ticket prices and fewer sponsorship opportunities.  Only one of the eight AAF teams —Atlanta— played in a city with an existing NFL team.  The other markets — Birmingham, Memphis, Orlando, Tempe, Salt Lake City, San Antonio, San Diego—were small and lacked the football fan base created by having a local NFL team.

(v)  <u>Emotional Investment.</u>  Fans usually have a deep-rooted loyalty to NFL and college football teams. This fandom is generational and built over decades.  The AAF start-up league lacked any history or emotional connection with fans.  The AAF season was short—only 10 games—and lacked any "must see" playoff season.

**(vi)**  <u>Management.</u>  The AAF founders relied on a business plan that was based on financial survival.

A.  <u>AAF Broadcasts.</u>  It is customary for successful professional sports leagues to receive a guaranteed rights payment from at least one broadcast company to air its games.  As part of the rights fee, the broadcast company is responsible for all production costs and commits significant resources to the promotion and marketing of the games to be broadcast.

The AAF did not receive any guaranteed rights fees from CBS, Turner or NFL Network.  On the contrary, the AAF paid millions of dollars to acquire airtime on these networks to televise its games.  In addition, the AAF was responsible for all the production costs which were approximately $250,000- 350,000 *per game*.  This unusual arrangement was a financial gamble because (1) on one hand a start-up league requires quality game telecasts to attract viewers and fans; and (2) the costs to buy airtime and produce the telecasts represented the largest line item (excluding player payroll) in the budget.

Despite the huge financial risk taken by the AAF, the league was not entitled to keep all the advertising revenue from the game broadcasts.  The AAF shared advertising revenues with the networks after enough inventory was sold to recoup production costs.

8

The NFL and NBA national media contracts represent their single largest source of league revenue.  To the contrary, the AAF received *no guaranteed revenue* from its' national media contracts.  The league was obligated to spend millions of dollars to have its' games televised.  In essence, the AAF was buying airtime from the networks to run a "football minor league infomercial."

Throughout my career, I was responsible for team broadcast rights agreements.  This included televising NBA games in Indiana, Kansas City, Sacramento, Seattle and Portland as well as preseason games for the NFL Seattle Seahawks.  I have also been a board member of Diamond Sports Group (DSG) the past three years.  DSG produces local broadcasts for NBA, NHL and MLB games in approximately 16 markets in the United States.  DSG produces the telecasts and sells advertising for over 1,000 professional baseball, basketball and hockey games each year.

My experience with sports telecasts has been that most media buys and sponsorship sales are sold *prior to the first game being played.*  "Right now, most sports telecasts are sold out through their respective seasons, after an upfront selling period last summer where as much as 90% of all ad avails were sold in advance of this season."[2]

DCP became involved in the AAF a few days before the week 2 games of the 10-game season. This provided very little time and opportunity to sell game broadcast advertising.

Broadcast advertising is *perishable* leaving a finite amount of time to gain any financial benefit from the game inventory. The preferred use of broadcast inventory, in order, is: (1) to sell advertising for an amount equal to the published rate card; (2) to sell advertising at a discounted rate; (3) to acquire goods or services the organization would otherwise pay cash for through the bartering of broadcast advertising; or (4) to attract new advertisers by giving prospective companies broadcast airtime at no charge.

---

[2] John Consoli, "*TV Sports Advertising Shifts Into Juggernaut Mode,.*" TV News Check, The Business of Broadcasting , January 12, 2022.

Because the season was already under way DCP was only able to
implement the last strategy. DCP's action of providing companies airtime
at no charge accomplished several things. First, it allowed a potential
advertiser the opportunity to sample the AAF product by measuring the
value derived from in-game advertising. Second, it allowed AAF account
executives to tell prospective advertisers the game inventory was "sold
out" with an advertising lineup of "blue chip" companies. Announcing a
telecast is sold-out can help create a demand with other clients interested in
purchasing advertising. Third, having quality companies advertising
within AAF game broadcasts gave the telecast a "major league" feel which
is the look a minor league sport craves.

The no charge advertising strategy is analogous to NBA teams
providing celebrities with free game tickets. Having celebrities in
attendance at a game helps other fans enjoy the game experience better
because the arena is perceived as "the place to be." The most famous
example of the "place to be" effect is the Los Angeles Lakers filling
courtside seats with celebrities like Jack Nicholson.

As of March 4, 2019, the AAF broadcast advertising commitments
totaled only $2,509,819 which was well short of the Ebersol Sports Media
Group Annual Financial Projections of $15,350,000. DCP provided
advertising at no charge to nine advertising prospects—AT&T, Sony
Pictures, SAP, AutoZone, Morgan Stanley, Carvana, Top Golf, Paramount,
and Chrysler/Dodge.

AT&T took advantage of the no charge advertising with an open
mind of becoming a future AAF sponsor. "If we can send a couple of spots
to Tom [Dundon], he will get it to his team and run them on games this
weekend at no charge to us. After the fact, lets value it for trade in kind at
a later date."[3]

SAP took advantage of the no charge advertising, while DCP also
emphasized the importance of airing quality advertising in the AAF

---

[3] Thomas Dundon deposition 12/3/24, Exhibit 428, Memo from John Donovan of AT&T Communications, Inc.
dated 2/22/2019.

broadcast. "Dan [Fleetwood of SAP]. Send us your best commercial spot. T[Dundon]."[4]

DCP's no charge strategy was working but there was little time to reap much benefit.  The AAF Partnership Sales Update as of 3/4/2019 showed three of the nine no charge advertising prospects — Sony Pictures, SAP, Paramount—were seriously considering purchasing AAF game advertising in the future.[5]

B. <u>Early Launch</u>.  The AAF management rushed into the market earlier than planned because of a concern another Spring football league was set to start in 2020.  "And if I remember correctly he [Charlie Ebersol] was going to launch it [AAF] later but then when he found out the XFL was going to do it, he moved the launch up a year and so it became, 'Hey, we're going to do this now.'"[6]

Rushing the launch made it more difficult to hire experienced staff, create awareness, sell sponsorships, build community outreach, and establish the AAF brand.  Just months before the inaugural season, AAF was still hiring people, establishing operational procedures and burning through cash.

Kevin Farrell was hired as a consultant in September 2018 to assist in operational matters.  Farrell became a full-time AAF employee near the end of 2018.

"They needed help. They were trying to build—we were trying to build something fast, and there was need for hiring, onboarding, provisioning, getting up vendor---setting up vendors, paying vendors, so there was a lot of operational and logistical items that needed support, and that's where I come into."[7]

C. <u>Lack of Cash.</u>  The AAF business model was flawed from the

---

[4] Dundon deposition 12/3/24. Exhibit 432. Memo from Tom Dundon to Dan Fleetwood of SAP dated 3/5/2019.

[5] Dundon deposition 12/3/24. Exhibit 433.

[6] Deposition of Mark Teitelman on, December 6, 2024, p.13, lines 14-17.

[7] Kevin Farrell deposition on 11/4/24. Page 18, lines 13-19.

outset.  The league was scrambling to set up its operation and lacked the cash needed to make it through one season.

Farrell was surprised when the AAF received some money from Reggie Fowler on December 24 or 25, 2018.  Without those funds they would not have been able to start training camps or operations in 2019.  In February 2019 Farrell described the AAF accordingly, "there was a period of time when we were close to insolvency . . . fighting to see whether we could continue operations of the league because there were vendor payments that needed to be made.  If we didn't make those vendor payments, we would not be able to host games, we would not be able to support the league anymore."[8]

Three weeks before the season started Farrell said AAF leadership was aware the league would be out of cash after week 1.  In addition, as of February 12, 2019, the AAF football operations credit cards were all maxed out and unusable.  Alan Kantowitz confirmed the cash short fall in a January 22, 2019 memorandum to Charlie Ebersol, "By my estimation, and based on this analysis, if MGM funds their $3.5m, we will need another $7m to get through the first weekend."[9]

D. <u>Cost Structure</u>. The AAF could have done a better job controlling its' expenses.

(1) **Standard Player Agreement ("SPA").**  I believe the AAF SPAs were of little value to the business because: (a) the AAF was paying above market rate for player services; (b) the AAF received no compensation if a player terminated his SPA to play in the NFL; (c) the Standard Commercial License Agreement did not preclude the NFL from using former AAF Players' commercial likeness rights; and (d) there were many former College football players available to play in the AAF or other football minor leagues.

(2) **Player Salaries**.  AAF players were overpaid<u>.</u>  The AAF was

---

[8] Farrell deposition. Page 32, lines 19-25.
[9] Charlie Ebersol deposition of September 19, 2025, Exhibit 19.

paying its players approximately twice the market rate and these players lacked star power. Without any marquee appeal it's likely AAF customers would have purchased tickets regardless of which former college players were on the teams. The AAF was burning cash, and its player payroll was the league's largest expense item.

The average AAF player salary in 2019 was $70,000 and contracted to increase to $80,000 the following year. By comparison, the average XFL player salary in 2020 was only $38,836. (The XFL salary calculation is based on a bi-weekly paycheck of $2,080, a game activation fee of $1,685 and a victory bonus every other game of $2,222.).[10] In addition, the AAF was obligated to pay its players the $70,000 salary despite how poorly they played. If the AAF had negotiated player salaries in 2019 comparable to what the XFL did in 2020 costs would have been reduced by **$14,023,800.**

**(3) No compensation for movement to the NFL or other "Competitive Alternative Leagues.** "The SPA contained several non-compete clauses which are common in contracts with professional athletes. These clauses were important because they prohibited AAF players from participating in a professional football league other than the AAF.

Examples of work restriction clauses included in the SPA were found in:

Exhibit A, ¶2(b) which states, "Player shall not play football or attempt to play any type of football for any team, league or association of teams other than the team to which Player is allocated by the Alliance, except with the prior written consent of the Alliance, which may be given or withheld in the Alliance's sole and absolute discretion."

Exhibit A, ¶5(a)(ii) which states, "Player grants to the Alliance the exclusive right to his services as a professional football player, including but not limited to, playing professional football, including but not limited to, playing professional football, practicing and training to play

---

[10] Jordan Heck, The Sporting News. "How much do XFL players get paid? Breaking down salary structure for the new league." February 15, 2020.

professional football and such other rights and services typically attendant to a person playing professional football."

Also included in the SPA was a clause which allowed the AAF to assign player contracts to any subsequent professional spring football league.  Exhibit A ¶12(f) Assignment states, "The Alliance may assign the SPA and Player's services thereunder to any successor to the Alliance or to any other team in the Alliance."

Restricting an AAF player from participating in other football leagues was a benefit for the AAF.  The restriction clauses can dissuade potential bidding wars for player services and give the AAF leverage in any player contract renegotiation.

AAF player contracts also included a Standard Commercial License Agreement("SCLA").  The SCLA provided the AAF extensive and exclusive player licensing rights for the term of the SPA even if a player chose to play in a different football minor league.

The benefits realized by the AAF work restriction and exclusive licensing rights clauses were nullified by the "Authorized Alternative League Release ("AALR").  This AALR contained in the SPA allowed an AAF player to terminate his contract to "play football in a 'Competitive Alternative League' that plays all its' games, except such league's championship game, in or between August through January." The AALR negated any benefit the AAF derived from the other SPA work restriction clauses because it allowed players to terminate their SPA, *without compensating the AAF,* to play in the NFL.

In addition, when a player executed an AALR the NFL was allowed to use the former AAF player's commercial license rights *without compensating the AAF.*  "Notwithstanding anything herein to the contrary, upon Player's written request, Alliance Properties may grant Player written permission to grant use of Player's Likeness to an Authorized Alternative League, provided: (1) such Authorized Alternative League has teams playing in no fewer than 25 professional football markets; and (2) Player presents Alliance Properties with suitable evidence of a contract offer from

14

such a team in such Authorized Alternative League and, within three (3) days of its complete execution, Player provides Alliance Properties with a copy of the fully executed contract to play in such Authorized Alternative League."[11]

NFL rosters are allowed a maximum of 70 players consisting of 53 players on the active list and up to 17 players on the practice squad. Depending on team needs each NFL team is allowed to activate between 46-48 players on game day. Players on an NFL practice squad with 2 or fewer years of NFL experience are paid $12,500 per week.[12] If a player is on the practice squad for the entire 18 week season the minimum salary earned is $225,000—significantly more than the 2019 AAF salary of $70,000.

Because NFL teams have up to 24 inactive players available to fill in for injured players during the season it would not be a common occurrence for an NFL team to sign an AAF player. However, in the rare instance an NFL team wanted a player from the AAF, the NFL team would not be deterred because of compensation due the AAF. NFL compensation to the AAF would likely come in the form of a cash payment.

However, the AAF negotiated away the most valuable benefit included in its' SPA—the right to be compensated by the NFL. In my opinion the AALR made the future value of AAF SPA and Standard Commercial License Agreements almost worthless.

**(4) Plethora of former college football players.** Each year approximately 3,000 college football players are eligible for the NFL Draft. The 32- team NFL's annual draft consists of 7 rounds plus 32 compensatory picks. Therefore, approximately 256 players get drafted each year which is less than 10% of all eligible major college football players. In addition, only 1.6% of all NCAA football players make it to the NFL. This means there are thousands of good college football players for football minor leagues to employ *every year*. There is also a pool of former professional players (NFL and Canada) available for leagues like the AAF to put on its rosters.

---

[11] Alliance of American Football Standard Commercial License Agreement, Par. 4.
[12] Jacob Camenker, The Sporting News. "NFL practice squad salaries: Minimum salary, eligibility rules and more to know for 2024." August 22, 2024.

**(5) Vendor Contracts.**  The AAF could have negotiated more favorable arrangements with many of its' vendors.  When DCP took control of the AAF it reviewed existing payables to determine which vendors "had to be paid" for the games to be played.  The remaining payables were analyzed and prioritized to (a) determine if the AAF was being charged a fair price, and (b) if the payable could be negotiated to a lower amount in order to allow operating cash to be used as efficiently as possible to try to make it through the first season of operations.

The DCP representatives responsible for accounts payables were John Zutter and Jeff Vanderbilt.  Kevin Farrell was the AAF accounts payable liaison.  Farrell believed Zutter and Vanderbilt were acting in the best interests of the league when they reviewed and renegotiated accounts payables.

"Question- At any point in time did you observe Mr. Vanderbilt take any actions or give any directions that were not in the best interest of the league?  Farrell- No. Nothing stood out or—there might have been a bill they didn't approve, but I- I was- there wasn't anything I – like hey, this is going to damage the league. No, There was nothing like that.  Question- What about Mr., Zutter?  Farrell - Anything that would damage the league?  I don't think that was his intent.  He made changes as was his right and ability to do. But I think they were intended to be positive for the league, not negative."[13]

By March 15, 2019, DCP was able to negotiate reduced payments owed vendors for services already rendered by 12%.  DCP's renegotiations reduced AAF's payables by **$367,297.**[14]

The Ebersol Sports Media Group Annual Financial Projections budgeted for league expansion of two teams each year until the AAF had 16 teams.  Professional sports leagues rarely, if ever, expand before they have matured and reached franchise stability in each market.  The 2019 AAF proforma budgeted $44.8 million in revenue which was an average of

---

[13] Kevin Farrell deposition dated November 4, 2024, page 211.
[14] Dundon deposition dated 12/3/24. Exhibit 422. March 15, 2019. Memo from Jeff Vanderbilt to Tom Dundon.

$5.6 million per team.  The 2020 AAF budget projected a 33% increase in revenue per team and the projected 2021 budget increased team revenue 69% per team.

The projected team revenue increases were extremely unrealistic especially considering the huge disparity from the 2019 budgeted revenue of $44.8 million versus the 2019 actual revenue of $18.5 million.[15]  To achieve the 2020 budgeted revenue projection, the AAF would have to increase the 2019 actual revenues by 400%!

Adding two expansion teams in 2020 would be an extremely difficult and expensive task. The AAF launched its original 8 teams in the best markets available.  Since some of the original teams—Salt Lake City, Tempe— were having trouble selling tickets it seems highly unlikely the AAF could find new markets that would fare any better.  The AAF would have to find two new cities with available stadiums, negotiate facilities and vendor rental agreements, hire staff, sell tickets and sponsorships and fund start-up expenses.  The AAF accounted for the 2020 expansion by simply increasing the projected budget expenses by $59,013,000 over its 2019 forecast.

 (E) Lack of Revenue.  The AAF developed no legitimate revenue model.  The league lacked any significant media rights agreement and had no relationship with the NFL.  In addition, league attendance was low during the first 8 weeks, averaging only about 15,000 people per game.

As of April 2, 2019, AAF actual sponsorship revenue was $4,469,148 consisting of $1,694,174 cash and $2,774,975 trade.[16] This was well short of the Ebersol Sports Media Group Financial Projections forecast of $ 15,350,000.  Despite having two successful markets—San Antonio at 27,000 per game and Orlando at 20,000 per game— the AAF had other markets such as Salt Lake City and Arizona which averaged less than 10,000 fans per game.  These attendance figures represent "announced"

---

[15] Ebersol Sports Media Group Valuation Model prepared by Elisa Lee, dated December 2, 2024 showed projected revenue of 8 AAF teams at $18,471,214.
[16] Ebersol Sports Media Group Valuation Model prepared by Elisa Lee, dated December 2, 2024.

attendance that was much higher than the actual paid attendance which only averaged between 4-5,000 per game.

In its' June 2018 business plan, the AAF acknowledged one of its primary sources of revenue would be FANchise preferred acquisition licenses ("PALs"). These PALs would be sold to individuals in the eight AAF team cities. The business plan stated, "we have created a FANchise License, allowing a local investor to buy a 10- year license to be the local face of the team, lead fan engagement activities, and passively participate in the team's local revenue. While we don't intend to market these until after the 1st season, we have already closed our first license for the San Diego FANchise for a total of $14 million and are in final negotiations for the Phoenix FANchise for $15 million."

Despite having "closed on its first license" in June of 2018, AAF founder Charlie Ebersol confirmed the league never received any PAL payment from either a San Diego or Phoenix licensee.

"Question- And we are in the end of June 2018, how many fanchises had been sold by that time? Ebersol- One. Question- How much revenue had the AAF received for those – that fanchise agreement? Ebersol- Zero. Question- Did that money ever come in from that fanchise agreement? Ebersol- No."[17]

The AAF hired Gabriel Giordano to sell FANchise license agreements. After convincing his high school friend Dan Miller, and a group of investors including a company called Remar, to sign a license agreement for the San Diego FANchise, no other license agreements were executed.

"Question- To your knowledge, are there any other signed FANchise agreements other than the one we discussed relating to San Diego? Giordano - Not signed."[18]

---

[17] Charlie Ebersol deposition dated 9/19/24, page 93.
[18] Gabriel Giordano deposition dated 11/7/24, page 171.

The failure to collect FANchise revenue would be very troubling for any potential future investor as the AAF projected an economic benefit of approximately $80-120 million in proceeds from selling PALs to the 8 teams in the league.

The AAF tried to develop a relationship with the NFL prior to its inaugural season. Many AAF executives and investors had NFL ties and the initial investor — Reggie Fowler — had previously owned part of an NFL team. Analogous to the strategy used by the WNBA, the support of the NFL would have given the AAF financial and marketing support and much needed credibility. Unfortunately for the AAF it was unsuccessful in developing a business relationship with the NFL prior to the start of the 2019 season.

DCP used good business judgment when it tried one last attempt to form a relationship with the NFL by advancing the AAF's previously held discussions with the NFLPA. Attempting to gain NFL support, Tom Dundon sent a proposal to the National Football League Players Association Executive Director, DeMaurice Smith on March 18, 2019. The proposed terms included the right of the NFLPA to purchase warrants equal to 15% of the AAF. The warrant rights were conditioned on the AAF and NFL agreeing on an arrangement for NFL players to participate in the AAF.

The relationship with the NFLPA (and the NFL) never materialized despite Charlie Ebersol reaching out to Tom Condon of Creative Artists Agency on March 25, 2019 for assistance. "Tom [Condon], Per our conversation, attached is the LOI that we negotiated with D Smith. This non-binding deal outlines the tenants of what the NFL said they would agree to and gives Tom Dundon (copied) the confidence to move forward funding the league. Anything you can do to get the PA back on track with signing this would be great. Thank you. C [Charlie Ebersol]"[19]

In a memo to Tom Dundon, Jason Kulas, and John Zutter on March 27, 2019, Charlie Ebersol confirmed that the NFLPA had rejected the

---

[19] Exhibit 401 from Thomas Dundon deposition dated 12/2/24.

Dundon proposal. "NFLPA has indicated that time is the primary reason for their reservation, rushing them into signing has led them to a 'no'."[20]

 (F) Business Structure.  The AAF chose to operate as a single entity business structure.  The advantages of this model include cost control, risk sharing, uniformity and stability.

The largest cost control benefit would be eliminating a bidding war by individual franchises for players.  All financial risks are shared equally eliminating "haves" and "have nots" with individual franchise ownership. A single-entity structure ensures consistent branding, marketing and decision making across the league.

The disadvantage of a single-entity model is a lack of team autonomy.  Individual teams have less operational control and less incentive to invest.  Franchise owners tend to spend more aggressively when they capture franchise appreciation in the ownership model.

A single entity league structure can be successful, but it requires deep financial pockets, strategic partners and a lot of patience.  An example is the WNBA which was formed in 1997 as a single-entity league. The WNBA had the perfect strategic partner as its owner, the NBA.  The league started with 8 teams and only operated in NBA cities by existing NBA owners.

I was president of the expansion WNBA team in Portland, OR from 2000-2002.  The NBA and the Portland Trail Blazers provided marketing, promotional and sponsorship support for the WNBA Portland Fire franchise.  Attendance was good— ranking in the top half of the league with an average crowd of 8,319 per game.  Despite our loyal fan base and synergies provided by the Trail Blazers and the NBA, the Portland Fire lost approximately $1 million each season.

In 2002, the WNBA expanded to 16 teams and transitioned to an independent franchise ownership model while continuing to receive financial and marketing support from the NBA. During this time, the

---

[20] Exhibit 27 from Charlie Ebersol deposition dated 9/19,24.

Portland Fire and the Miami Sol were both "owned" by billionaires. However, each franchise folded after 2002 because the business model was not profitable and neither team was perceived as valuable.

The AAF had to combat many more challenges than the WNBA. For example, the AAF was stuck with the negative stigma of previous football minor leagues. These failed football leagues made it more difficult for the AAF to attract fans because the potential marketing sizzle of a new league had long been exhausted.

Operating a football league is very expensive. Player salaries, coaching salaries, stadium rentals, insurance, staffing and marketing requires cash liquidity.

The AAF model was too capital intensive and burned through cash faster than anticipated. *The model was not self-sustaining.* From day one the AAF financial model was dependent upon external financing. "AAF didn't have the ability to take debt, so it's—it's hard to be efficient."[21]

**VI.   Profitable vs. Valuable.**   A profitable league is one that generates consistent positive operating income on an annual basis. Profitability is based on:

A. Strong revenue streams including media rights payments, ticket sales, sponsorship sales, merchandise and concession sales.

B.  Disciplined cost controls and well negotiated agreements with vendors.

C. Quality management that understands player acquisition and payroll, marketing, development of the necessary infrastructure without overextending financial commitments.

D. Maintaining little or no debt that requires servicing from operational cash flow.

---

[21] Thomas Dundon deposition, December 2, 2024. Page 62, lines 20-22.

   A professional sports league can have a high enterprise value (the
total net worth of the league) irrespective of its year-to-year profitability if
some, or all, of the following conditions exist:

   A. The league has a strong media rights agreement, robust sponsorship
opportunities and historically strong ticket, merchandise and concession
sales.

   B. The league has teams located in major cities/regions with strong fan
bases and a strong corporate base.

   C. Sports franchises within high value leagues are limited in supply and
are often seen as trophy assets.

   D. League and team valuations increase if individual franchises have
potential for a new stadium, real estate development, or new (untapped)
revenue streams.

   E. League and franchise valuations increase if the entities have built-up
brand equity such as a loyal fan base, global recognition, star player(s) and
consistently high television ratings.

   A league can be both profitable and valuable. Conversely a league
can be profitable but not valuable or valuable but not profitable.
Understanding theses distinctions can influence decisions on long term
investments versus immediate returns.

   The AAF model was not financially sustainable, and revenue was far
below the ESMG Financial Projections prepared by the AAF founders.  The
AAF was neither profitable nor valuable.  Despite using the proper
business strategies to decrease cash burn and drive revenue, DCP could not
fix the broken financial model.  The AAF was beyond repair.  Therefore, in
my expert opinion a bankruptcy filing the only reasonable option for DCP.

The contents in this report are true to the best of my knowledge and belief.

_____

Robert J. Whitsitt

Date: December 30, 2024.

23

# WHITSITT CURRICULUM VITAE

**Game Changer**                                        2023 - present

Bob Whitsitt is the best-selling author of *Game Changer, An Insider's Story of the Sonics' Resurgence, the Trail Blazers' Turnaround, and the Deal that Saved the Seahawks.*

**Diamond Sports Group**                               2022 - present

DSG established an independent board in May 2022 consisting of five members including Bob Whitsitt. DSG is the leading provider of local sports programming in the United States.  DSG operates 16 regional sports networks, "RSNs" allowing over 40 million fans across the nation to watch their favorite NBA, MLB, and NHL team's games.

**Whitsitt Law PLLC**                                  2021.- present

Bob Whitsitt is an attorney specializing in negotiation, transactions, and settlement. Whitsitt has negotiated over 1,000 contracts and will represent clients throughout any issue including negotiations, drafting and contract executions.

**Wildcat Capital Management**                         2018 - 2021

Bob Whitsitt was the chief sports advisor for ownership and management during the construction of a $1 billion sports and entertainment arena in downtown Seattle and the development of the $650 million Seattle Kraken NHL expansion team.

**Whitsitt Enterprises, LLC**                          2005 – present

Founder/CEO- Company provides consulting services in negotiation, sports franchise acquisitions and management, business development, marketing and media relations.  In addition, Whitsitt does public speaking for businesses, non-profits, college courses and commencements.

**Seattle Seahawks (NFL)**                             1996 - 2005

President- Led the development of a $450M football/soccer and exhibition stadium in Seattle, Washington.  Sold out every game for nine years and assembled a championship caliber team that played in the Super Bowl.

**First and Goal, Inc.**                                    1996 - 2005
President- Company managed the Seahawks Stadium and Exhibition center.

**Portland Trail Blazers (NBA)**                            1994 – 2003
President and General Manager- Trail Blazers made the playoffs all nine seasons, averaging 50 wins per year**.** The team was ranked in top 5 in NBA attendance and was winner of Points of Light Foundation Award for Corporate and Community Excellence in 1999.

**Oregon Arena Corporation**                               1994 – 2003
President- Company managed Rose Garden Arena and Memorial Coliseum in Portland, Oregon.

**Seattle Supersonics (NBA)**                              1986 - 1994
President and General Manager- The franchise was profitable every year and made the playoffs in seven of eight seasons.  Supersonics had the best record in NBA (63-19) in 1994 and Whitsitt selected **NBA Executive of the Year**.

**Other-**                                                 1996 – 2003
President- Portland Fire (WNBA)
President- Rose City Radio, KXL in Portland, OR
President- Radio Northwest (network of 25 radio stations)
President- Action Sports Media (20 Major Universities)
President- Action Sports Cable Network (24/7 cable channel)
President- Action Sports Entertainment & Mobile (HDTV production truck)
President- TBI Airports (Portland, OR, Burbank, CA, San Diego, CA)
President- Razor Sharp Promotions (arena events)
President- Blazers on Broadway (retail store)

**Kansas City/Sacramento Kings (NBA)** 1982 – 1986

Vice President/Assistant General Manager- Whitsitt led the successful relocation of the Kings' franchise to Sacramento.  He developed and sold the first ever arena naming rights sponsorship-Arco Arena.

**Indiana Pacers (NBA)** 1978 – 1982

Assistant General Manager

## EDUCATION

J.D.  Mitchell Hamline School of Law, *magna cum laude*
M.A.  Sports Administration, The Ohio State University
B.S.  Communications, University of Wisconsin-Stevens Point

## TEACHING

**University of Washington, Milgard School of** Spring 2024
**Business Sports Enterprise Management, Tacoma, WA**
Adjunct Lecturer, *The future of RSNs and the NIL impact on College Sports.*

**University of Washington, Milgard School of** Fall 2023
**Business Sports Enterprise Management, Tacoma, WA**
Adjunct Lecturer, *Game Changer, An Insider's Story of the Sonics' Resurgence, the Trail Blazers' Turnaround, and the Deal that Saved the Seahawks.*

**Mitchell Hamline School of Law, St. Paul, MN** Summer 2023
Adjunct Lecturer, *The Anatomy of a RSN Bankruptcy: Diamond Sports Group.*

**University of Washington, Milgard School of** Fall 2022
**Business Sports Enterprise Management, Tacoma, WA**
Adjunct Lecturer, *Sports Marketing, Evolution of Arena Title Sponsorships.*

**Mitchell Hamline School of Law, St. Paul, MN**    Summer 2022
   Adjunct Lecturer, *Legal Landmarks in the NBA.*

**Seattle University, Seattle, WA**    Fall 2008
   Adjunct Professor, *Inside the Front Office.*

## PUBLICATIONS

*Game Changer, An Insider's Story of the Sonics' Resurgence, the Trail Blazers' Turnaround, and the Deal that Saved the Seahawks.* (October 10, 2023).

## BOARDS

Diamond Sports Group Board of Managers    (2022- present)
U.W. Milgard School of Business Sports Enterprise Mgt.    (2022- present)

## MEMBERSHIPS

American Bar Association
Washington State Bar Association
King County Bar Association
Young President's Organization

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 19-50900-CAG |
| LEGENDARY FIELD EXHIBITIONS, LLC, | § | |
| | § | CHAPTER 7 |
| DEBTOR. | § | |
| | § | |
| _____ | § | |
| | § | |
| RANDOLPH N. OSHEROW, Chapter 7 Trustee, and the Bankruptcy Estates of Legendary Field Exhibits, LLC; AAF Players, LLC; AAF Properties, LLC; Ebersol Sports Media Group, Inc.; LLF 2, LLC; and We Are Realtime, LLC, | § | ADVERSARY NO. 22-05078-CAG-7 |
| | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | |
| | § | |
| THOMAS DUNDON; JOHN ZUTTER; AND DUNDON CAPITAL PARTNERS, LLC, | § | |
| | § | |
| DEFENDANTS. | § | |

## EXPERT REPORT PREPARED BY MICHAEL J. QUILLING

### Introduction

I have been asked by Jeffrey Lowenstein of Bell Nunnally & Martin LLP and Brent Hockaday of K&L Gates LLP to prepare an expert report with respect to whether or not certain actions and inactions taken by their respective clients, Tom Dundon ("Dundon") and John Zutter ("Zutter"), constitute breaches of fiduciary duties as alleged by the Trustee in his First Amended Complaint. As more fully referenced below, many of the allegations are just that – allegations – without any supporting documents or deposition testimony that I have been able to locate and as such the allegations do not constitute a breach of any kind. Other of the allegations are so vague and lacking of any specificity that it is impossible to call something a breach. Finally, as to some of the allegations which have at least some specificity, the facts and circumstances coupled with the deposition testimony of various individuals, in my opinion, clearly negates any claim of breach of fiduciary duty.

**EXHIBIT 3**

586

In accordance with Federal Rule of Bankruptcy Procedure 7026, I provide the following:

**(i)**     <u>**A complete statement of all opinions the witness will express and the basis and reasons for them;**</u>

<div align="center">Experience Basis for Opinions</div>

In forming my opinions set forth below, I have assumed that fiduciary duties as generally alleged by the Trustee exist under Delaware law and that Dundon and Zutter do not contest the existence of those duties. In short, the issue is whether there was a breach not whether the duty exists. All of my opinions are based upon my 42+ years of practicing law in the civil trial and business bankruptcy arenas which focused, to a large extent, on large multinational financial frauds where I served as receiver or trustee. I am and have been for many years a business owner and have had extensive experience in fiduciary roles, the most recent of which was serving as the trustee of what I was told was the largest publicly-reporting trust in the United States. It is my belief that my experience, both as one who civilly prosecutes breaches of fiduciary duty on behalf of victims and one who exercises fiduciary roles on a daily basis, renders me qualified to opine on whether conduct constitutes a breach of a fiduciary duty.

<div align="center">Factual Basis for Opinions</div>

The allegations relating to a breach of fiduciary duty by Dundon and Zutter are found in the Trustee's First Amended Complaint Count V at pages 44-53, paragraphs 164-184. Virtually all of the Trustee's allegations are hotly contested by Dundon and Zutter. Contrary to the Trustee's version of things, they contend – with ample support – that they were not told the entire financial story when the investment was sought by Charlie Ebersol ("Ebersol") from Dundon and that within hours after the initial $5.1 million was wired, the Dundon team began to learn the true financial mess they had inherited.

Specifically, Dundon and Zutter stepped into controlling the board for a company that had no concept of its financial situation. Dundon and Zutter testified that they were led to believe that the AAF had lost a major funder which put it in a position of having insufficient cash to pay $5.1 million of player salaries for playing the first week of the season. What Dundon and Zutter learned in the days and weeks following the initial investment and execution of a Term Sheet was a league that had not put into place any controls or monitoring sufficient to provide it any concept of how much cash it took to operate the league or a realistic picture of existing revenue streams. Given the emergency nature of the situation, DCP's $70 million funding commitment was being rapidly depleted at the same time the league was attempting to put on games and while Zutter and Dundon were trying to get a handle on the financial condition of the league. Ebersol represented to Dundon that $55 million to $70 million would be sufficient to get the AAF through the end of the season, but it became readily apparent that neither Ebersol nor anyone else from the AAF side had any idea what the league's cash needs truly were and that $70 million would not be sufficient.

Dundon and Zutter acted almost immediately to assess the league's finances and attempt to put controls in place for understanding all of the existing commitments and outstanding debts of the league. They discovered that the AAF had a very decentralized process for incurring and

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING            Page 2

tracking expenses and that no one from the AAF team had any idea of the true extent of the league's commitments and liabilities. Kevin Ferrell admitted that even he (who was understood to be the person that should know) was not aware of all of the obligations of the league. For example, he was unaware of what contracts individual teams were signing with vendors until invoices, usually delinquent invoices, were forwarded to him. Dundon and Zutter required financial leaders of the AAF to create a vendor tracking process whereby they would identify vendors, outstanding accounts payable to those vendors and rank the priorities of paying those vendors in a way that would increase the likelihood of being able to continue presenting games. Dundon and Zutter required a similar process in preparing "cash flow" statements to explain the amounts being sought from DCP for funding and which prioritized those expenses to be able to continue to put on football games. Undermining this process was a constant inflow of additional vendors that were owed money that were threatening to take away essential services from the presentation of games. Dundon and Zutter, with their team, appeared to have acted as quickly as possible to gain an understanding of the league's condition. Unfortunately, the AAF burned through all of the available funds in seven weeks, which was not nearly enough time for Dundon and Zutter to get sufficient controls in place to make the league sustainable.

Based on my substantial experience over 42 years in observing, prosecuting and participating in challenging board of director situations, it is my opinion that Dundon and Zutter at all times appeared to be acting in the best interest of the AAF, with due care and prudence that were entirely consistent with the fulfillment of their duties to the league. Dundon could have and probably should have pulled out after he and his team learned of the truly dire condition of the league, but they stuck it out until the entire DCP commitment was exhausted and appeared to have done everything they could to resuscitate the league that was on death's door when they entered the picture.

Since I am not the trier of fact, for the purposes of my report I am assuming that Dundon and Zutter will be able to prove at trial their version of the facts or something very close thereto. Of particular note, I assume the trier of fact will find that the only contractual obligation to provide funds was limited to $70 million and that upon discovering the true extent of existing payables, the actions taken by the Dundon team as described above were a valiant attempt to stretch the $70 million to the end of the first season.

<u>Statement of Opinions</u>

## I.    ALLEGATIONS AGAINST DUNDON AS TO THE DEBTORS

The Trustee contends the following actions/inactions by Dundon each constitute a separate breach of his fiduciary duties of loyalty, care and fair dealing owed to the Debtors and I will address each in order:

> *a.  By failing to provide funding to the Debtors as promised in exchange for, among other things, his director position and control of the Debtors;*

In my opinion, the Term Sheet sets forth the funding "promised" by Dundon. The evidence shows the vast majority of the funding "promised" was provided even in light of the deepening

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING                                    Page 3

hole of insolvency and the fact that it had to be known that the funds provided would likely never be recovered. In my opinion the refusal (because there was no contractual obligation) to continue throwing good money after bad was a shining example of the proper exercise of fiduciary duties as opposed to a breach of those duties. There was no breach of any duty by Dundon and he, perhaps regrettably but certainly in furtherance of his fiduciary duties, fulfilled his "promise" to provide funding. If the Trustee has some viable cause of action for this aspect of his allegations it lies in contract, not tort.

b. *By making decisions regarding finances and operations of one or more Debtors that were motivated by his self-interest and served his self-interest (both to benefit himself personally and his other entities, such as DCP) rather than the interests of the Debtors;*

This allegation borders on being hopelessly vague. The who, what, when and where usually required to prove a tort is missing. My review of the deposition transcripts reveals that Dundon made decisions which were totally against his self interest not in furtherance. He lost $70 million in exchange for a directorship. The decisions made (while steadfastly funding a hopelessly insolvent enterprise) were an attempt to save AAF. His self interest was to to stop funding anything for any reason. That is not the path he pursued. There was no breach of any duty by Dundon.

c. *By misappropriating assets and resources of one or more Debtors for his personal benefit, such as the television airtime;*

Dundon's attempts to contact people he knew to try to get them to advertise during game broadcasts was a clever attempt to create positive hype and increase the visibility of AAF. At that point, AAF had been unable to sell advertising to anyone at any price so getting others to advertise for free during dead airtime did not hurt the league and it had the potential to help the league. The fact (if true) that the desired effect did not materialize did not make the attempt a breach of fiduciary duty even if one or more of the advertisers was an entity in which Dundon owned an interest. The attempts to create advertising excitement by Dundon was designed to be a "win-win" situation not an underhanded attempt to usurp or misuse a corporate asset. There was no breach of fiduciary duty by Dundon.

d. *By self-dealing and concealing or failing to disclose his self-dealing from one or more Debtors;*

I have not been able to find any deposition support for this vague allegation. If it refers to airtime, that is addressed above and is not a breach of fiduciary duty. I have also not been able to find any evidence that Dundon hid the attempts to find advertisers from anyone.

e. *By entering into contracts, such as the Release Agreement, that were in the best interest of Dundon, and were not in the best interest of the Debtors and in fact were detrimental to the Debtors;*

I have not located any evidence that Dundon or Zutter entered into any contracts. The "Release Agreement" was not voted upon by Dundon as a director and instead was an action by the previous board of directors to allow the "Debtors" to provide the authority to accept the $70

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING                                      Page 4

million under the term sheet. In my opinion, the Release Agreement was in the best interest of the league and was not detrimental. There was no breach of fiduciary duty by Dundon.

    f.   *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by his failure to provide funding to the Debtors as promised;*

This is a repeat of I.(*a.*) above and changing the wording of the allegation does not breath life into an assertion that simply is not true. The obligation to fund was limited to $70 million and there was no breach of any fiduciary obligation to loan any amount beyond that.

The Trustee complains in this allegation and others that Dundon and Zutter did not make rational decisions and thereby breached their fiduciary duties by cutting certain expenses, negotiating with vendors, requiring approval of contracts with new vendors, considering reductions of force and triggering other expense control mechanisms. The league had blown through all of its available capital, maxed out its credit cards, and burned through all of its available debt financing. The $70 million was all that was available. Determining that cost cutting measures were necessary to prolong the life of the AAF was soundly within the reasonable discretion of Dundon and Zutter and they acted with due care in making those decisions. The Trustee's differing opinion on those decisions does not make it a breach of fiduciary duty. Their actions are no different than what turnaround management and restructuring professionals do when they are employed

    g.   *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by his failure to follow-through and complete previously-negotiated contracts in the best interest of the Debtors;*

Even though this allegation is lacking in specificity as to the "contracts", it makes no sense to attempt to fulfill contracts of any sort when you know that there is no way to pay for what the contract covers. To do so borders on fraud by intentionally taking services or products from someone knowing you cannot pay for it. It is a breach of fiduciary duties to do so and not a breach to refrain from doing so.

    h.   *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by his refusals to consider or accept additional investments or funding from sources other than himself, including other financiers, PAL Agreement opportunities and the NFLPA agreement, even after the time he decided not to provide additional funding as promised;*

This allegation at least has some specificity which, when considered in light of the facts as revealed in the deposition transcripts, show that refusing to consider or accept outside funding from any source for any reason was consistent with proper exercise of fiduciary duties as opposed to a dereliction. Given the financial unknowns being discovered each day by the Dundon team it would have amounted to fraud (as testified to by both Dundon and Zutter) to try to dupe some investor into putting money into the AAF. Defrauding a new round of investors is not an exercise

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING                         Page 5

of fiduciary duty, it is a breach of fiduciary duty and leads to both civil and criminal liability. Dundon should be applauded, not chastised for refusing to accept or pursue funds from others.

      i.   *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by his decision to cease operations and technology development in the middle of AAF's first season, breach contracts entered into by AAF, and instead place the Debtors into bankruptcy;*

The deposition testimony makes it clear that the Dundon team was trying to stretch the $70 million of funds to the end of the first season. Given the extent of the insolvency and the futility of trying to get to the end of season at the burn rate, some things simply could not be done and especially those that did not put football on the field. In short, there were far more important things to spend money on even assuming these unspecified "contracts" were important. There was no breach of fiduciary duty by Dundon in my opinion.

When it became clear that $70 million would likely not get the AAF to the ninth week of the season, Dundon and Zutter took action to safeguard the AAF, its shareholders and its creditors. First, they enlisted the help of Ebersol and his team to prepare a list of options of how best to stretch the remaining funds. Ebersol with the help of his team put together a number of options. None of those options allowed the AAF to get past week eight of the season without incurring substantial debts to players, employees, and vendors that it could not pay. Dundon and Zutter also enlisted the assistance of PWC and counsel to assess the options for going forward. Those options included consideration of cessation of operations or continuing operations in a Chapter 11. After considering all of that, Dundon and Zutter made the very rational decision and acted prudently in determining to initiate a Chapter 7 proceeding. There was no breach of fiduciary duty.

      j.   *By failing to act prudently in carrying out his duties to one or more Debtors, including but not limited to in the ways described above.*

This allegation is so hopelessly vague that I simply cannot offer an opinion on it other that to say that I do not believe Dundon breached any fiduciary duties with respect to his and his team's conduct during the 40 something days they were involved with the league. In fact, their conduct, in my opinion, is not at all different from what turnaround management consultants and restructuring professionals do when retained.

## II.   ALLEGATIONS AGAINST ZUTTER AS TO THE DEBTORS

The Trustee contends the following actions/inactions by Zutter each constitute a separate breach of his fiduciary duties of loyalty, care and fair dealing owed to the Debtors and I will address each in order:

      a.   *By failing to paper up Dundon's $250 million funding commitment to the AAF, as he was assigned to do in his role with ESMG;*

There was no legal obligation to fund $250 million so it cannot be a breach of fiduciary duty to not "paper up" that which does not exist nor a time frame for doing so. Zutter is not a

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING            Page 6

lawyer and would have to work with lawyers to "paper up" which requires the expenditure of funds the league did not have and thus could not pay for. It makes no sense to worry about printing the dinner menu for the captain's dinner table when the ship is sinking - rapidly. There was no breach of a fiduciary duty.

b. *By knowing that Dundon was not going to provide funding to the Debtors as promised in exchange for, among other things, the director positions of Dundon and Zutter, and failing to do anything to address this situation with Dundon, disclose this information to the Debtors, or to make decisions in the best interest of the Debtors knowing this information;*

As stated above in I.(*a.*) there was no legally enforceable obligation to loan or invest anything above the $70 million documented in the Term Sheet. The allegations border on silly but what was Zutter supposed to do to "address this situation with Dundon". Zutter knew there was no obligation to provide additional funds. Kevin Ferrell and Kevin Freedman both testified they knew that $70 million was the limit of the funds so what was Zutter supposed to tell them. Each of them knew this information and they all tried to stretch, without success, the funds they had until the end of the season. Zutter did not breach any fiduciary duty.

c. *By making decisions regarding finances and operations of one or more Debtors that were motivated by his self-interest and served his self-interest, including as a partner of Dundon's other ventures such as DCP, rather than the interests of the Debtors;*

I have been unable to find any deposition testimony or other evidence to support this allegation. Zutter had no self-interests at play in this transaction. He and the other members of the Dundon team tried to make the $70 million last until the end of the season and honor the written obligation that was in place. Losing $70 million hardly furthered some alleged partnership interest he had in the funding entit(ies). There was no breach of a fiduciary duty.

d. *By voting for the Debtors to enter into contracts, such as the Release Agreement, that were in the best interests of himself and Dundon, and were not in the best interest of the Debtors and in fact were detrimental to the Debtors;*

I have not located any evidence that Dundon or Zutter entered into any contracts. The "Release Agreement" was not voted upon by Zutter as a director and instead was an action by the previous board of directors to allow the "Debtors" to provide the authority to accept the $70 million under the term sheet. In my opinion, the Release Agreement was in the best interest of the league and was not detrimental. There was no breach of fiduciary duty by Zutter.

e. *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by supporting, as the only other voting director of the Debtors, Dundon's irrational decisions to fail to follow-through and complete previously-negotiated contracts in the best interest of the Debtors;*

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING                                   Page 7

In my opinion, Dundon did not make irrational decisions nor did his team. Whatever decisions were made were an attempt to stretch the funds available as far as possible and to not engage in fraud by taking goods and services from third parties knowing there was no way to pay for them. Continuing to act as if there was nothing amiss and money was not a problem would not have been a proper exercise of fiduciary duties but instead a dereliction.

    f.   *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by supporting, as the only other voting director of the Debtors, Dundon's irrational decisions to refuse to consider or accept additional investments or funding from sources other than Dundon, even after the time he knew Dundon would not provide additional funding as promised*;

In my opinion, Dundon did not make irrational decisions nor did his team. Given the desperate financial situation facing the league it would have been fraud to attempt to convince other investors to fund as both Dundon and Zutter testified. There is no evidence that a potential investor existed who could, without any due diligence, fund the large amounts needed. Any investor with that kind of capital ability would have rightfully wanted to conduct extensive due diligence which, if performed (assuming there was time to do so) would have sent them running. There was no breach of any fiduciary duty by Zutter.

    g.   *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by supporting, as the only other voting director of the Debtors, Dundon's irrational decisions to cease operations and technology development in the middle of the AAF's first season, breach contracts entered into by AAF, and instead place the Debtors into bankruptcy; and*

In my opinion, Dundon did not make irrational decisions nor did his team. Whatever decisions were made were an attempt to stretch the funds available as far as possible and to not engage in fraud by taking goods and services from third parties knowing there was no way to pay for them. Continuing to act as if there was nothing amiss and money was not a problem would not have been a proper exercise of fiduciary duties but instead a dereliction.

    h.   *By failing to act prudently in carrying out his duties to one or more Debtors, including but not limited to in the ways described above.*

This allegation is so hopelessly vague that I simply cannot offer an opinion on it other that to say that I do not believe Dundon breached any fiduciary duties with respect to his and his team's conduct during the 40 something days they were involved with the league. In fact, their conduct, in my opinion, is not at all different from what turnaround management consultants and restructuring professionals do when retained.

## III.   **ALLEGATIONS AGAINST DUNDON AS TO THE PLAYER CREDITORS**

The Trustee contends the following actions/inactions by Dundon each constitute a separate breach of his fiduciary duties of loyalty, care and fair dealing owed to the player creditors and I will address each in order.

   a. *By failing to provide funding to the Debtors as promised in exchange for, among other things, his director position, which deprived the player creditors of funds to satisfy their claims;*

In my opinion, the Term Sheet sets forth the funding "promised" by Dundon. The evidence shows the vast majority of the funding "promised" was provided even in light of the deepening hole of insolvency and the fact that it had to be known that the funds provided would likely never be recovered. In my opinion the refusal (because there was no contractual obligation) to continue throwing good money after bad was a shining example of the proper exercise of fiduciary duties as opposed to a breach of those duties. There was no breach of any duty by Dundon and he, perhaps regrettably but certainly in furtherance of his fiduciary duties, fulfilled his "promise" to provide funding. If the Trustee has some viable cause of action for this aspect of his allegations it lies in contract, not tort.

   b. *By making decisions regarding finances and operations of one or more Debtors that were motivated by his self-interest and served his self-interest (both to benefit himself personally and his other entities, such as DCP) rather than the interests of the Debtors and the player creditors;*

This allegation borders on being hopelessly vague. The who, what, when and where usually required to prove a tort is missing. My review of the deposition transcripts reveals that Dundon made decisions which were totally against his self-interest not in furtherance. He lost $70 million in exchange for a directorship. The decisions made (while steadfastly funding a hopelessly insolvent enterprise) were an attempt to save AAF. His self-interest was to stop funding anything for any reason. That is not the path he pursued. There was no breach of any duty by Dundon.

   c. *By misappropriating assets and resources of one or more Debtors for his personal benefit that depleted the amounts available to the player creditors;*

This allegation is addressed in I.(*c.*) above. In addition, any free advertising did not take or deplete any amounts that would have been available to players – the league could not sell the airtime to anyone for any price. Giving it away or not selling it at all does not change the equation. There is no breach of fiduciary duty.

   d. *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by his failure to provide funding to the Debtors as promised;*

This allegation is nothing but a rewording of the allegation in III.(*a.*) It still has no merit. In my opinion, the Term Sheet sets forth the funding "promised" by Dundon. The evidence shows the vast majority of the funding "promised" was provided even in light of the deepening hole of insolvency and the fact that it had to be known that the funds provided would likely never be recovered. In my opinion the refusal (because there was no contractual obligation) to continue throwing good money after bad was a shining example of the proper exercise of fiduciary duties

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING         Page 9

as opposed to a breach of those duties. There was no breach of any duty by Dundon and he, perhaps regrettably but certainly in furtherance of his fiduciary duties, fulfilled his "promise" to provide funding. If the Trustee has some viable cause of action for this aspect of his allegations it lies in contract, not tort.

    e. *By failing to employ a rational decision-making process in relation to the finances and operations of one or more of the Debtors, by his failure to follow-through and complete previously-negotiated contracts in the best interest of the Debtors;*

Even though this allegation is lacking in specificity as to the "contracts", it makes no sense to attempt to fulfill contracts of any sort when you know that there is no way to pay for what the contract covers. To do so borders on fraud by intentionally taking services or products from someone knowing you cannot pay for it. It is a breach of fiduciary duties to do so and not a breach to refrain from doing so.

    f. *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by his refusals to consider or accept additional investments or funding from sources other than himself, including other financiers, PAL Agreement opportunities, and the NFLPA agreement, even after the time he decided not to provide additional funding as promised;*

This allegation at least has some specificity which, when considered in light of the facts as revealed in the deposition transcripts, show that refusing to consider or accept outside funding from any source for any reason was consistent with proper exercise of fiduciary duties as opposed to a dereliction. Given the financial unknowns being discovered each day by the Dundon team it would have amounted to fraud (as testified to by both Dundon and Zutter) to try to dupe some investor into putting money into the AAF. Defrauding a new round of investors in not an exercise of fiduciary duty, it is a breach of fiduciary duty and leads to both civil and criminal liability. Dundon should be applauded, not chastised for refusing to accept or pursue funds from others.

    g. *By failing to employ a rational decision-making process in relation to the finances and operations of one or more Debtors, by his decision to cease operations and technology development in the middle of AAF's first season, breach contracts entered into by AAF, and instead placed the Debtors in bankruptcy, which adversely affected the player creditors.*

This allegation is so hopelessly vague that I simply cannot offer an opinion on it other than to say that I do not believe Dundon breached any fiduciary duties with respect to his and his team's conduct during the 40-something days they were involved with the league. In fact, their conduct, in my opinion, is not at all different from what turnaround management consultants and restructuring professionals do when retained.

**(ii)**     <u>**The facts or data considered by the witness in forming them;**</u>

In forming my opinions, I reviewed and considered the following documents:

1. The Trustee's First Amended Complaint;
2. Defendant John Zutter's Motion for Summary Judgment and Brief in Support [Dkt. 175];
3. Defendants' Motion for Summary Judgment and Brief [Dkt. 173];
4. DCP's Expert Disclosures Pursuant to FRCP 26(a)(2);
5. Ebersol's Response to Plaintiff DCP's First RFP;
6. Ebersol's Response to Plaintiff DCP's First ROGs;
7. Ebersol's Response to Plaintiff DCP's Second ROGs;
8. Trustee's Responses and Objections to DCP's First RFP;
9. Trustee's Answers and Objections to DCP's First ROGs;
10. Trustee's Answers and Objections to DCP's Second ROGs;
11. The deposition transcript of Elisa Lee;
12. The deposition transcript of Jeffrey Vanderbilt;
13. The deposition transcript of John Zutter;
14. The deposition transcript of Tom Dundon Day 1;
15. The deposition transcript of Tom Dundon Day 2;
16. The deposition transcript of Charlie Ebersol Day 1;
17. The deposition transcript of Charles Ebersol Day 2;
18. The deposition transcript of Kevin Freedman;
19. The deposition transcript of Kevin Farrell;
20. The deposition transcript of Jason Kulas;
21. The deposition transcript of Tom Veit

**(iii)**     <u>**Any exhibits that will be used to summarize or support them;**</u>

I do not anticipate that any exhibits will be needed at trial to summarize or support my opinion.

**(iv)**     <u>**The witness's qualifications, including a list of all publications authored in the previous 10 years;**</u>

My resume is attached to this report. I have not authored any publications in the last 10 years.

**(v)**     <u>**A list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition;**</u> **and**

During the last 4 years, I have not testified, by deposition or at trial, as an expert.

**(vi)**     <u>**A statement of the compensation to be paid for the study and testimony in the case.**</u>

I am being compensated at the rate of $650 per hour for my report. To date, the number of hours expended is 43.5 hours or $28,275.00. Should I need to testify by deposition or at trial my hourly rate shall increase to $1,000 per hour.

EXPERT REPORT PREPARED BY MICHAEL J. QUILLING        Page 11

Dated this _30th_ day of December 2024.

Respectfully submitted,

_____

Michael J. Quilling

# MICHAEL J. QUILLING

**EMAIL:** 1958mjq@gmail.com

| | |
|---|---|
| **Education** | University of Georgia School of Law (J.D. 1982) |
| | University of Georgia (B.A. 1979) |
| | |
| **Courts of Practice** | All Texas State Courts (1982) |
| | |
| | U. S. Federal District Courts |
| |     Northern District of Texas (1983) |
| |     Southern District of Texas (1993) |
| |     Eastern District of Texas (1985) |
| |     Western District of Texas (1984) |
| |     Western District of Michigan (2000) |

U. S. Federal Appellate Courts
    Fifth Circuit Court of Appeals (1984)
    Seventh Court of Appeals (2002)
    Ninth Circuit Court of Appeals (1990)
    Eleventh Circuit Court of Appeals (1989)

U.S. Supreme Court (2000)

**Specializations**
Texas Board of Legal Specialization
Civil Trial Law (1991)
Business Bankruptcy Law (1991)

**Professional**
AV rated since 1992
Best Business Lawyers in Dallas multiple years, D Magazine
Texas Super Lawyer, every year award given
Founding member and former director, National Association of
    Federal Equity Receivers
Fellow, Dallas Bar Foundation

**Recent Trustee Cases**

*In Re:  Life Partners Holdings, Inc., et al.*; Case No. 15-40289-mxm11 (N.D. Tex. BK)

*In Re:  Gulfstream Diagnostics, LLC*; Case No. 19-30159-sgj11 (N.D. Tex. BK)

## Selected Published Cases

*Quilling v. Marilyn Cristell*, 2006 WL 316981 (W.D.N.C. 2006)

*Quilling v. Grand Street Trust*, 2005 WL 1983879 (W.D.N.C. 2005)

*Michael J. Quilling, Receiver for Lennox Investment Group, Ltd. v. National City Bank of Michigal, Illinois, frk/a First of America Bank-Illinois, 2001 WL 1516732 (N.D.Ill)*

*Quilling v. Funding Resource Group*, 227 F. 3d 231 (5th Cir.2000)

*Peavy v. WFAA-TV, Inc.,* 221 F. 3d 158 (5th Cir. 2000)

*Goodspeed v. Harman*, 39 F. Supp. 2d 787 (N.D. Tex. 1999)

*Peavy v. Harman*, 37 F. Supp. 2d 495 (N.D. Tex. 1999)

*Peavy v. New Times, Inc.*, 976 F. Supp. 532 (N.D. Tex. 1997)

*In re Pro-Snax Distributors, Inc.*, 204 B.R. 492 (Bankr. N.D. Tex. 1996)

*In re Norriss Brothers Lumber Company, Inc.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991)

*Security Bank v. Dalton*, 803 S.W.2d 443 (Tex. App.--Fort Worth 1991)

*Myers v. Ginsburg*, 735 S.W.2d 600 (Tex. App.--Dallas 1987)

*Simpson v. MBank Dallas, N.A.* 724 S.W.2d 102 (Tex. App.--Dallas 1987)

*MBank Dallas, N.A. v. Sunbelt Manufacturing, Inc.*, 710 S.W.2d 633 (Tex. App.--Dallas 1986)

*Miller v. Miller*, 700 S.W.2d 941 (Tex. App.--Dallas 1985, writ ref'd n.r.e)

## Involvement in Significant SEC Cases

*In Re Future Communications*; Case No. 393-37680-SAF-7 (Bankr. N.D. Tex.)

*In Re Offshore Financial Corporation*; Case No. 396-37173-RCM-11 (Bankr. N.D. Tex.)

*Securities and Exchange Commission v. Forex Asset Management, L.L.C., et al*; Civil Action No. 3-99-CV-0256-P (N.D. Tex.)

**SIPC Trustee Cases**

*In Re: Northstar Securities, Inc.;* Adv. No. 01-37722-HCA (N.D. Tex.) [approx. 350 claimants]

**Counsel to SBA as Receiver Cases**

*United States of America v. SBIC Partners II, L.P.* (Civil Action No. 4:05-CV-192-Y) (N.D. Tex.)

*United States of America v. Trinity SBIC, L.P.* (Civil Action No. 4:04-CV-594-A) (N.D. Tex.)

*In Re: Gulf Coast Holdings, Inc., d/b/a Unidynamics, Inc., Debtor* (Civil Action No. 06-31695-BJH) (USBC N.D. Tex.)

**Selected Closed Receivership Cases**

*Securities and Exchange Commission v. Cornerstone Prodigy Group, et al.;* Civil Action No. 4:99-CV-0978-Y (N.D. Tex) [approx.. 3500 claimants]

*Lexford Properties Management, LLC v. Brentwood-Lexford Partners, LLC, et al.;* Cause No. 00-3198 (191st J.D. Dallas Cty, Tex.)

*Securities and Exchange Commission v. Lennox Investment Group, Ltd., et al.;* Civil Action No. 4:98-CV-536-Y (N.D. Tex.) [approx. 50 claimants]

*United States of America v. James A. Sharpe, et al.;* Case No. 3:03-CR-128-RV (N.D. Fl.)

*Securities and Exchange Commission v. Funding Resource Group, Et.al.;* Civil Action No. 3:98-CV-2689-M (N.D. Tex.) [approx. 2000 claimants]

*Securities and Exchange Commission v. Cash Link Systems, Inc, et al.*, Cause No3-04CV-1573L (N.D. Tex.) [approx. 700 claimants]

*In Re All Funds on Deposit in Account Number 000669829075 in The Bank of MM ACMC Banque de Commerce, Inc. at NationsBank, N.A. Consisting of $18,756,420.97, More or Less;* Cause No. 3:98- MC-96-McK (W.D. N.C.) [approx. 1000 claimants]

*Securities and Exchange Commission v. ABC Viaticals, Inc., C. Keith LaMonda,and Jesse W. LaMonda, Defendants and LaMonda Management Family Limited Partnership, Structured Life Settlements, Inc., Blue Water Trust and Destiny Trust, Relief Defendants;* Civil Action No. 3:06-CV-2136-P (N.D. Tex.) [approx. 4000 claimants and $120 million of investor funds]

*Securities and Exchange Commission v. Secure Investment Services, Inc.,
American Financial Services, Inc., Lyndon Group, Inc., Donald F.
Neuhaus, and Kimberly A. Snowden*, Civil Action No. 2:07-CV-01724
GEB CMK (E.D. Cal.) [approx. 600 claimants and $30 million of investor
funds]

*Securities and Exchange Commission v. Frederick J. Gilliland, Defendant
and MM ACMC Banque de Commerce, Inc., Relief Defendant;* Civil
Action No. 3:02-CV-128-McK (W.D. N.C.) [approx. 1000 claimants]

*Securities and Exchange Commission v. Megafund Corporation,
Stanley A. Leitner, Sardaukar Holdings, IBC, Bradley C. Stark, CIG,
Ltd., James A. Rumpf, Individually and d/b/a CILAK International,
and Pamela C. Stark, Relief Defendant;* Civil Action No. 3 :05-CV-
1328-L (N.D. Tex.) [approx. 400 claimants and $25 million of investor
funds]

*Michael J. Quilling, Receiver for the Estate of Frederick J. Gilliland v.
Frederick J. Gilliland, et al.;* Cause No. S034144 (Sup. Ct. of British
Columbia)

*Banc One Leasing Corporation v. Optovision Technologies, Inc., et al.*;
Cause No. 02-6667 (A-14th J.D. Dallas Cty, Tex.)

*Securities and Exchange Commission v. Megafund Corporation, Stanley
A. Leitner, Sardaukar Holdings, IBC, Bradley C. Stark, CIG, Ltd., James
A. Rumpf, Individually and d/b/a CILAK International, and Pamela C.
Stark, Relief Defendant;* Civil Action No. 3:05-CV-1328-L (N.D. Tex.)

*Michael J. Quilling, Receiver for Courtney Wallis Simpson, York Region
Realty, Inc., Wallis Simpson & Associates and Cameo Investments;* Court
File No. 05-CL-6159 (Ontario Superior Court of Justice) [approx. 100
claimants]

*Transamerica Life Insurance Company, Plaintiff v. Jefferson Estates at
Bellaire, L.P., NRFC WA Holdings, LLC, and Wachovia Bank, National
Association, Defendants* (Cause No. 09-07462) (101st District Court,
Dallas County, Texas)

*Transamerica Life Insurance Company, Plaintiff v. Jefferson at Falcon
Ridge, L.P., NRFC WA Holdings, LLC, and Wachovia Bank, National
Association, Defendants* (Cause No. 09-07464) (101st District, Dallas
County, Texas)

*Monumental Life Insurance Company, Plaintiff v. Jefferson West, L.P. and
NRFC WA Holdings, LLC, Defendants* (Cause No. 09-07466) (68th District
Court, Dallas County, Texas)

*First State Bank, Mesquite, Plaintiff v. David Scott Bailey, Defendant*; (Civil Action No. 08-05379-J) (191st District Court, Dallas County, Texas)

*John W. Costello, not individually, but as Litigation Trustee under the Comdisco Litigation Trust, Plaintiff v. John A. Blair, Defendant* (Civil Action No. 141-234178-08) (141st District Court, Tarrant County, Texas)

*Securities and Exchange Commission v. Larry Tyler and Advanced Financial Services, Inc., et al.;* Civil Action No. 3:03-CV-0282-F (N.D. Tex.) [approx. 450 claimants and $29 million of investor funds]

*Michael J. Quilling, Receiver for Advanced Financial Services, Inc. v. Trade Partners, Inc., et al.;* Civil Action No. 1:03-CV-0236 (W.D. Mich.) [approx.. 7000 claimants]

*U.S. v. Dale L. Graybill;* Criminal No. 3:05-CR-00152 (D. Conn.) [approx.. 500 claimants]

*Bidco I, LLC v. Fairways at La Reunion, LLC*; Cause No. DC-12-07140 (Dallas County, Texas)

*Ann Nosratieh, as Executrix on behalf of the Estate of Robert Laird Lindsay, as Representative Plaintiff - and - Strategic Metals Corp. and Capital Alternatives Inc., Defendants*; (Court of the Queen's Bench of Alberta, Judicial District of Calgary)

*Charles S. Cotropia and Ernest Hernandez v. Timothy L. Booth, et al.;* Cause No. 1-17-0002 (Rockwall County, Texas)

*Enterprise Bank & Trust v. Valley Vessel Fabricators LLC*; Cause No. C-3184-15-A (Hidalgo County, Texas)

*KeyBank National Association v. MLS, LLC and Mark XVI Transportation Solutions, Inc.*; Cause No. C-4713-17-B (Hidalgo County, Texas)

*UMB Bank, N.A. v. Kobi Electric, LLC, Fouad Saade a/k/a Frank Saade, and Michael Sawilowsky*; Cause *No.* 017-299994-18 (Tarrant County, Texas)

*In re: Paul Kensley Gabriel;* Case No. 22-60425; *Paul Kensley Gabriel v. Barbara Annemarie Hill and Happy Howler, LLC*; Adv. Proceeding No. 22-06021; (United States Bankruptcy Court for the Western District of Texas)

### Selected Family Law Cases

*In the matter of the marriage of Sarah Grant Felton, and Kristian Grant, et al.*; Cause No. DF-11-03477; 255th Judicial District Court, Dallas County, Texas

*In the* matter *of the marriage of Elysiann Bishop and Michael Bishop and in the interest of E.B., E.B., E.B., and E.B., Children*; Cause No. DF-17-06174; 255th Judicial District Court, Dallas County, Texas

*In the matter of the marriage of Bobby Layne Giblaint and Lisa Michele Hughes and in the interest of J.L.G., P.G., and M.G., Children*; Cause No. DF-15-23410; 254th Judicial District Court, Dallas County, Texas

*In* the *matter of the marriage of Carolyn Suzanne Brown and George Montague Brown*; Cause No. DF-99-02627; 254th Judicial District Court, Dallas County, Texas

*In the matter of the marriage of Derrick J. Hahn and Kala R. Dharma*; Cause No. DF-10-13791-R, 255th Judicial District Court, Dallas County, Texas

*In the matter of the marriage of Crystal Muranda and Joconia Muranda*; Cause No. DF-18-09756; 255th Judicial District Court, Dallas County, Texas

*In the matter of the marriage of Melissa R. Croasdale and Charles A. Croasdale*, Cause No. DF-19-8261; 302nd Judicial District Court, Dallas County, Texas

*In the matter of the marriage of D.C. and M.C. and in the interest of U.C., B.C. and V.C., Children*, Cause No. DF-19-11352; 255th Judicial District Court, Dallas County, Texas

*In the matter of the marriage of Fonda Tosh Bates and Bryan Douglas Bates and in the interest of S.D.B., a Child*; Cause No. 98760D; 378th Judicial District Court, Ellis County, Texas

*In the matter of the marriage of Angela Thompson and Steven Thompson and in the interest of Avery Grace Thompson, Alexia Brielle Thompson and Hartleigh Claire Thompson, Children*; Cause No. 22-9253-481; 481st Judicial District Court, Denton County, Texas

# HAND | BALDACHIN | ASSOCIATES LLP

LAW OFFICES

8 West 40th Street
12th Floor
New York, NY 10018

dir   212.956.9508
tel   212.956.9500
fax   212.376.6080
amichaels@hballp.com

July 31, 2018

**EXHIBIT**

**16**

**VIA EMAIL AND CERTIFIED MAIL**

Charles Ebersol, CEO
Ebersol Sports Media Group, Inc.
10866 Wilshire Blvd. #300
Los Angeles, CA 90024

Charles Ebersol, CEO
Legendary Field Exhibitions, LLC
149 New Montgomery St.
San Francisco, CA 94015

*Re: Bob Vanech's Ownership Interests in the Alliance of American Football*

Dear Mr. Ebersol:

We represent Bob Vanech in connection with his ownership interests in the Alliance of American Football ("AAF").

==The story being told to the public about the founding of the AAF is a lie. Charlie Ebersol and Bill Polian did not join forces to found the AAF; Charlie Ebersol and **Bob Vanech** did.== Vanech's seminal role in the conception and creation of the AAF has been hidden from history, and he has been deprived of the rights and benefits of ownership that belong to him.

As you are well aware, Vanech conceived the idea for a new football league and shared it with you in February 2017 with the purpose of forming a joint venture/partnership to commercialize the idea. Vanech and Ebersol did in fact form a joint venture/partnership for this purpose, explicitly agreeing in March 2017 that ownership would be split equally between Ebersol and Vanech, that Ebersol would serve as CEO and President, and that Vanech would serve as COO and CFO. Through this joint venture/partnership, Vanech and Ebersol began to develop the league now known as the AAF.

Although Vanech devised the idea for the league and fully performed all obligations in the joint venture/partnership, Ebersol turned his back on his friend and partner, pushed Vanech out of the business, and excluded Vanech from all participation, profit and interest in the joint venture/partnership. Ebersol's actions were part of a deliberate scheme to deprive Vanech of his rightful ownership interest in the joint venture/partnership and improperly benefit himself at Vanech's expense, in violation of his agreement with Vanech and other legal duties owed to Vanech.



Classified

DCP Parties23464

HAND BALDACHIN ASSOCIATES LLP

Charles Ebersol
Page 2
July 31, 2018

On behalf of our client, we are contacting you to seek accountability for your wrongful attempts to exclude Vanech from his ownership rights in the AAF. We demand that you and the AAF acknowledge Vanech's role in founding the league, cease all interference with his managerial rights, and restore Vanech's 50% ownership interest in the AAF.

### A.    Formation of the Joint Venture/Partnership

In any litigation, we would establish the following: Vanech is an entrepreneur with extensive operating and finance experience in the technology, digital media, entertainment and mobile app sectors. He is the former chairman and founding CFO of Zealot Networks, where he headed up the company's finance, corporate development, capital raising and venture investment efforts. Vanech has significant experience at the founding table, forming start-up joint ventures/partnership and developing business plans.

The irrefutable evidence would show that, in 2014, Vanech met Ebersol and they became fast friends. They socialized regularly and Vanech frequently hosted Ebersol at the Zealot offices where Ebersol sought advice on business affairs, as Ebersol's business experience was limited to television production. Vanech and Ebersol also occasionally discussed going into business together, exploring ideas where Zealot and Ebersol's production company, The Company, could collaborate.

In February 2017, the right business opportunity finally arose. Following the airing of Ebersol's documentary *This Was The XFL*, Vanech conceived of the idea to form a new football league branded as a resurrected XFL. On February 12, 2017, Vanech texted Ebersol to propose a joint venture/partnership: "I know how to make 2.0 work … Lets get into business together. I know how to raise the money, too." Ebersol replied seconds later: "Definitely worth a discussion."

Within days, Vanech and Ebersol were in constant communication about the joint venture/partnership. After one early discussion, Ebersol texted Vanech: "I'm excited to dive into it." The next day, in a series of texts, Vanech proposed "Ebersol Sports Media Ventures" as the name of the business and Ebersol agreed it would be a good placeholder.

As initially conceived, Vanech and Ebersol's football league would brand itself as a new version of the XFL, provided it could secure a licensing arrangement with World Wrestling Entertainment, Inc. and its CEO, Vince McMahon. Key features of the league included:

- 8 teams owned by the league and stakeholders
- 10 game season starting February 2019
- Deep integration with fantasy, linked to player compensation
- Player bonuses based on fans and performance
- Hometown heroes / local players



HAND BALDACHIN ASSOCIATES LLP

Charles Ebersol
Page 3
July 31, 2018

- Digital distribution

   The likely year one markets were San Diego, San Antonio, Memphis, Birmingham, and Orlando – home to five of the AAF's eight teams – as well as Columbus, Oakland and Oklahoma City.  In fact, these key elements of the league are shown in the business's marketing slides, which Vanech created in February 2017 and refined over time with input from Ebersol, as well as his father and AAF board member, Dick Ebersol.

   Many of the concepts of the league were collaborative, but some innovations were Vanech's novel, original and revolutionary ideas, as shown in the various iterations of the marketing slides that Vanech managed and updated on behalf of the joint venture/partnership, with Ebersol's approval and appreciation.  Some of Vanech's original ideas included over the top (OTT) digital distribution, fantasy integration via a mobile app, sourcing of local players for teams, and most notably, a league centered on player safety and fan involvement – concepts that evolved into some of the most publicly touted signature components of the AAF.  Indeed, the notion of a player-fan "alliance" itself would not be what it is at the AAF without Vanech's ideation and development of this cornerstone element.  Ebersol's chief contribution to the joint venture/partnership was a focus on "good football" and TV broadcast rights.  Given Vanech's decade of experience with digital media, Ebersol relied almost entirely on Vanech for that element of the business.

   As for ownership and operation of the joint venture/partnership, Vanech and Ebersol agreed that they would combine their expertise, effort and resources to develop the league and make important decisions about the league together.  They agreed they would be equal owners, with Ebersol serving as CEO, spokesman and the liaison to the football and linear broadcast world, and with Vanech serving as COO and CFO, heading up digital strategy, technology, partnerships, budgeting, planning, marketing and administration.  Ebersol and Vanech cemented this arrangement in an explicit oral agreement and handshake during a March 2, 2017 meeting at Ebersol's office in Beverly Hills.  The handshake nature of the agreement held particular signficance for Ebersol and Vanech because the joint venture between NBC Sports and the World Wrestling Federation forming the original XFL in the early 2000s was famously embodied in a handshake agreement between Dick Ebersol, then head of NBC Sports, and Vince McMahon.  Ebersol and Vanech celebrated the parallel between the handshake founding of the original XFL and the handshake founding of their joint venture/partnership with enthusiasm.  Their "handshake story" and agreement have since been shared by them with dozens of people.

   Vanech's contemporaneous notes from the March meeting reflect the equal-ownership arrangement, as well as the understanding that Ebersol would have final say on day-to-day decisions, and that no one other than Vanech or Ebersol would receive equity in the business unless both of them agreed.  (Ex. 1).  The equal ownership agreement is also reflected in the business's capitalization table showing Ebersol's and Vanech's initial ownership stakes at 50%. (Ex. 2).


hba

Classified
DCP Parties23466

HAND BALDACHIN ASSOCIATES LLP

Charles Ebersol
Page 4
July 31, 2018



| Name | Security Class | Amount/Consideration | Post Money Valuation | Founder | Seed | XFL Purchase | Scramble | Series A+ | Value at Close of Reg A+ | If we achieve 1/5th Value of NFL and HQ owns 25% of each team |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Ownership % of HQ Entity | | | | |
| Charlie | $1,000 | $4,000 | 50 | 48 | 38.4 | 35.328 | 28.2624 | $70,656,000 | $1,413,120,000 |
| Bob | $1,000 | $4,000 | 50 | 48 | 38.4 | 35.328 | 28.2624 | $70,656,000 | $1,413,120,000 |
| Seed Investor 1 | $1,000,000 | $25,000,000 | | 4 | 3.2 | 2.944 | 2.3552 | $5,888,000 | $117,760,000 |
| WWE | $12,500,000 | $125,000,000 | | | 10 | 9.2 | 7.36 | $18,400,000 | $368,000,000 |
| NBC | $12,500,000 | $125,000,000 | | | 10 | 9.2 | 7.36 | $18,400,000 | $368,000,000 |
| Scramble Investor | $10,000,000 | $125,000,000 | | | | 8 | 6.4 | $16,000,000 | $320,000,000 |
| Reg A+ | $50,000,000 | $250,000,000 | | | | | 20 | $50,000,000 | $1,000,000,000 |
| | | | 100 | 100 | 100 | 100 | 100 | $250,000,000 | $5,000,000,000 |

Notes:
Assumes Seed Round investor comes in before XFL deal is done
Assumes we buy XFL assets for $50MM and 50% is in stock priced at a 50% discount to the A+

Ebersol and Vanech held themselves out to the public as equal partners building the business together. The marketing slides, which were widely disseminated to potential investors and partners, refer to Ebersol's and Vanech's founding of "Charlie Ebersol Sports Media Inc."[1] and specifically identify Ebersol and Vanech as the "Founding Leadership Team" of the business, with Ebersol as "President & CEO" and Vanech as "COO & CFO." (Ex. 3).



---

[1] The name of the business evolved from the name Vanech proposed, Ebersol Sports Media Ventures, to Ebersol Sports Media, to Charlie Ebersol Sports Media, and ultimately to Ebersol Sports Media Group, which is the name of the entity that owns Legendary Field Exhibitions, LLC d/b/a Alliance of American Football.



Charles Ebersol
Page 5
July 31, 2018

### B.  Mr. Vanech's Substantial Contribution to the Joint Venture/ Partnership

From the start, Ebersol and Vanech worked together to develop the league, with Vanech contributing significantly to the effort. Text and email correspondence between the two documents their efforts.

On February 20, 2017, just days after proposing the joint venture/partnership, Vanech sent Ebersol a text message: "We linking up this week[?] Lots of progress on my end." Ebersol responded: "Yes. Ideally more than once."

Following a February 21, 2018 text message exchange concerning the role fantasy would play in the league, Vanech texted Ebersol: "Love it. Each morning I try to write down new ideas that will allow us to innovate, pioneer, and amaze. This canvas is so blank that it deserves a masterpiece." Ebersol was equally excited. On February 27, 2017, he texted Vanech: "We need to set up a Dropbox and also start a folder."

On March 9, 2017, Vanech travelled to New York City at his own expense on behalf of the joint venture/partnership to meet with Basil DeVito, president of the original XFL. The purpose of the meeting was to discuss a potential licensing arrangement with the WWE for the XFL name and related property, as well as to receive DeVito's guidance on potentially working with Vince McMahon and on avoiding the pitfalls that befell the XFL. After the meeting Vanech texted Ebersol: "Things went great with Basil... I wish the cameras were rolling. Learned so much. I will call you from the airport later. Thank you for including me in this magical opportunity. I am grateful." Ebersol responded: "I'm so excited." Ebersol then shared with Vanech a text he had just received from DeVito in which DeVito praised Vanech as "impressive" and expressed his hope that the meeting "was worthwhile for him/ you."

In March 2017, Vanech and Ebersol held a series of conference calls (and shared the joint venture/partnership's marketing slides) with Ken Schanzer, Dick Ebersol's former right hand man at NBC Sports. Vanech then met with alone with Schanzer and Schanzer's wife on April 1 at the Peninsula Hotel in Beverly Hills. The subject of the discussions with Schanzer included Vanech's capital raising ideas for the business, the involvement or not of Vince McMahon, and the role of cities as potential partners in the league. In a text message exchange following the meeting, Ebersol told Vanech: "Schanzer liked you a lot. Excited. Using we which is a great sign. He had similar reaction to the cities getting a piece."

On April 2, 2017, Ebersol texted Vanech to tell him know that Tom Veit – current AAF Director of Business Operations – was excited about the business and interested in joining: "On with Veit. He is PUMPED and 100% in." Later that day, Ebersol introduced Vanech and Veit via email so that they could coordinate a time to speak:



HAND BALDACHIN ASSOCIATES LLP

Charles Ebersol
Page 6
July 31, 2018

> "Bob meet Tom. We discussed the Phoenix project and he is very
> in. You too should set a time to chat modeling and biz plan!"

The next day Vanech and Veit spoke by phone for 45 minutes about business strategy. After the call, Veit followed up with an email, copying Ebersol: "Great to meet you and very excited about what the future may hold." Ebersol then emailed Vanech privately to say: "[s]o glad you two connected."

Several weeks later, Veit emailed Vanech, copying Ebersol, reporting that he had "a few notes" since they spoke earlier that month and he "[w]ould love to catch up." Vanech responded, copying Ebersol: "We are laser focused on the capital raise and associated plan … I have been working on the financial model and was going to ping you with questions."

On April 30, 2017, Vanech travelled to Miami, Florida at his own expense for a one-on-one meeting with Veit to discuss Veit's role in the joint venture/partnership, the digital distribution and broadcast plan Vanech conceived, and general business strategy for the joint venture/partnership. After the meeting, Veit emailed Vanech, copying Ebersol:

> "It was great to get to meet you in person hopefully I was able to
> provide some insight. I think you and Charlie have a great overall
> plan. Please let me know what I can do to be of further
> assistance."

Because of Vanech's experience with raising capital, Vanech took the lead with respect to financing for the business, including securing meetings between potential investors and the founding leadership team. Inner Circle Sports, an investment bank focused on the sports industry, was one such potential investor and, on April 11, 2017, Vanech and Ebersol met with Inner Circle Sports in New York to discuss potential financing arrangements. CrowdfundX, a financial marketing firm specializing in equity crowdfunding, was another potential partner Vanech identified, and several meetings among Vanech, Ebersol, and CrowdfundX were held at Ebersol's office in Beverly Hills in April 2017 and other locations.

At all times, Vanech covered his own expenses and was paid no monetary compensation for his work, in accordance with his role as a joint venture/partner in an enterprise that was not yet generating profits, as he was sharing equally in the risks and rewards of the business. Rather, Vanech and Ebersol agreed that they would accrue salaries when they began devoting "substantial time" and making the joint venture their main business endeavor.

They agreed to take the same salary when funded and discussed that it would be commensurate with what Ebersol led Vanech to believe was his $500,000 salary at the time. Ebersol said he could not make the league his full-time endeavor until he sorted out an agreement with his then business partner, Mr. Lanigan of The Company. Vanech had just finished a consulting project and began devoting over 60 hours per week to the joint

hba

HAND BALDACHIN ASSOCIATES LLP

Charles Ebersol
Page 7
July 31, 2018

venture/partnership starting in March of 2017.  Vanech and Ebersol agreed that Vanech would
accrue his salary in March, and likely Ebersol would begin to go "full time" after his planned
wedding in July 2017.

### C.    Mr. Vanech's Wrongful Ousting from the Business

In the summer of 2017, Vanech's relationship with Ebersol suddenly soured.  Ebersol
began ignoring most of Vanech's texts and emails and it soon became apparent that Ebersol had
made the decision to push Vanech out of the business.

In a July 5, 2017 text message exchange, Ebersol made his intent to oust Vanech from the
joint venture/partnership clear and, incredibly, even sought to deny that there ever was a joint
venture/partnership, falsely characterizing his work with Vanech as nothing more than
"exploratory conversations" and "high level discussions."

> CE:    I'm not connected to your plan. As always I'm open to
> discussing ideas and thoughts but I'm not bound by anything or to
> anyone. It's not to say in the future we couldn't end up doing
> something together [but] as of now it's just conversations. I say
> that because I don't want there to be a misunderstanding between
> you and I or any third party.

> BV:    I intend to honor our agreement as I make thing happen.
> And I expect you to try to retrade it if you go another way…and I
> will be cool with accepting a new deal…but things have changes
> since we last spoke and Vince and the XFL might just be less
> valuable than you think.

> I think the seed money can close this month….with $
> 10MM more in Q4. That is what makes this real. Are you saying
> you don't want your half of the equity if that…plus a distribution
> deal and plan is locked down?

> CE:    I don't want to devolve this into a fight but I do not
> acknowledge the existence of an agreement between you and I. It's
> essential that you understand that.

> That's great news but my response is unchanged.

> BV:    A disagreement doesn't have to be a fight. I am sure we
> have an agreement.



DCP Parties23470
610

HAND BALDACHIN ASSOCIATES LLP

Charles Ebersol
Page 8
July 31, 2018

So…are you saying that you don't have/want your equity? If that is the case, we probably ought to do some form of stock purchase agreement.

CE:    The nature of our discussions and what if anything I would be interested in potentially pursuing now or in the future are not only not aligned but not generally related. Our exploratory conversations and high level discussions do not constitute a deal. What's troubling to me is that

BV:    My handshake is my bond. Just like your Dad's and Vince's were. You need not worry about me honoring our agreement.

CE:    There wasn't even a handshake

BV:    Yes there was…with you making final call on major operational decisions..50-50 otherwise, partner. We shook in your office, but we roll differently…so you may not remember the details. Charlie..if my money and people don't want/need Vince or NBC we can amend the deal and pursue parallel paths.

Following this exchange, Ebersol cut off all communication with Vanech and has not returned a single text, email or phone call since.

In the ensuing months, Ebersol concocted a false narrative of the league's foundation that writes Vanech out of the picture entirely and falsifies the true circumstances of the creation of the AAF. In March 2018, when the AAF was publicly announced, Ebersol falsely claimed that the league was the brainchild of him and Bill Polian. Presumably, this is also the story presented to investors. Ebersol, together with Polian, have continued to misrepresent the true facts about the AAF on television, radio and podcasts.

**D.    Mr. Vanech is entitled to his 50% ownership interest of the AAF**

No one can dispute that Ebersol and Vanech formed a legally enforceable joint venture/partnership under California law. A "joint venture or partnership may be formed orally" or "assumed to have been organized from a reasonable deduction from the acts and declarations of the parties." *Weiner v. Fleischman*, 54 Cal.3d 476, 483, 816 P.2d 892, 895 (1991). The existence of a joint venture or partnership depends on whether the participants intended to "carry on as co-owners of a business for profit" and "the overall set of facts and circumstances of the business relationship." *Second Measure v. Kim*, 143 F. Supp. 3d 961, 972, 979 (N.D. Cal. 2015) (citations omitted).



HAND BALDACHIN ASSOCIATES LLP

Charles Ebersol
Page 9
July 31, 2018

The existence of a joint venture is a question of fact determined by a preponderance of the evidence. *Id*. Here, the facts and circumstances of Ebersol's and Vanech's communications, oral agreement and conduct will be found to evidence a clear intent to enter into business and co-own and co-operate a joint venture/partnership to develop a startup professional football league. There are numerous witnesses to these facts. At all relevant times, Ebersol and Vanech presented themselves to the world as co-venturers/partners, a fact that was not only documented, but which can be corroborated by dozens of individuals, including AAF Director of Business Operations Tom Veit, AAF Board member Dick Ebersol, long-time NBC sports executive Ken Schanzer, Ebersol's executive team and staff at The Company, and WWE executive Basil Devito, to name but a few.

Likewise, Ebersol indisputably breached the joint venture/partnership agreement he entered into with Vanech, as well as the fiduciary duties he owed to Vanech, when he ousted Vanech from the business in the summer of 2017. Ebersol's unlawful conduct in depriving Vanech of his ownership share in the business and his efforts to obstruct Vanech's right to manage, participate in, and profit from the operations of the business will, unless immediately remedied, form the basis of a vigorous lawsuit against Ebersol and the AAF.

Vanech demands the AAF now fully acknowledge his role in founding the league and restore to him the 50% ownership interest in the business he is entitled to under California law. In addition, Vanech also demands the salary accrued for his time working for the joint venture/partnership, as well as reimbursement of his expenses.

Please let me know on or before August 7, 2018 if you believe pre-litigation discussions are appropriate.

Very truly yours,

Adam B. Michaels

Attachments

hba

# Exhibit 1

Munch Meeting

Charlie and Bob

- Shook hands on 50-50

- Charlie gets final "say"
  on day-to-day decisions

- No one else gets equity
  unless we both agree

CA...

(Lerg...

Play...

Faws...

Local Op...

Lerg...
Loc...

1 P o -...

Team
Birm...

Public
Charlie
Bob+Sr...



# Exhibit 2

| Name / Security Class | Amount/Consideration | Post Money Valuation | Ownership % of HQ Entity | | | | | Value at Close of Reg A+ | If we achieve 1/5th Value of NFL and HQ owns 25% of each team |
|---|---|---|---|---|---|---|---|---|---|
| | | | Founder | Seed | XFL Purchase | Scramble | Series A+ | | |
| Charlie | $1,000 | $4,000 | 50 | 48 | 38.4 | 35.328 | 28.2624 | $70,656,000 | $1,413,120,000 |
| Bob | $1,000 | $4,000 | 50 | 48 | 38.4 | 35.328 | 28.2624 | $70,656,000 | $1,413,120,000 |
| Seed Investor 1 | $1,000,000 | $25,000,000 | | 4 | 3.2 | 2.944 | 2.3552 | $5,888,000 | $117,760,000 |
| WWE | $12,500,000 | $125,000,000 | | | 10 | 9.2 | 7.36 | $18,400,000 | $368,000,000 |
| NBC | $12,500,000 | $125,000,000 | | | 10 | 9.2 | 7.36 | $18,400,000 | $368,000,000 |
| Scramble Investor | $10,000,000 | $125,000,000 | | | | 8 | 6.4 | $16,000,000 | $320,000,000 |
| Reg A+ | $50,000,000 | $250,000,000 | | | | | 20 | $50,000,000 | $1,000,000,000 |
| | | | 100 | 100 | 100 | 100 | 100 | $250,000,000 | $5,000,000,000 |

Notes:

Assumes Seed Round investor comes in before XFL deal is done

Assumes we buy XFL assets for $50MM and 50% is in stock priced at a 50% discount to the A+

Classified

DCP Parties23476

# Exhibit 3

DCP Parties 23477



Classified



# Why Timing for a New League is Right

- America's love affair with football continues as the most popular US sport...by far.
- After high-school, college, and pro-football season all end, fans still crave more football.
- Tickets, TV packages, and merchandise all make billionaires more money off the sweat of average Americans.
- Technology innovations envisioned and pioneered by the XFL are now a reality.
- Digital distribution presents a new disruptive and lucrative monetization model.
- New capital formation techniques allow for innovative financing.
- Year-round demand football has been proven; other models that stalled can provide blueprints for success.



# **IMAGINE**

- A league designed for and dedicated to the fans set in iconic football cities, played by hometown heroes

- Faster, high-quality, compelling competitive football

- Premiering on digital networks with content residing on the WWE network, also offered in 'skinny bundles" with other OTT providers

- Fantasy betting encouraged, fully integrated in broadcast, and linked to player compensation



**TEAMS ARE OWNED BY FANS AND PLAYERS**

Classified

# TEAM OWNERSHIP
## Aligned Interests



- Voting stock and governance will sit at the league level

- Each team will have balanced representation on the boards





*Then, as now, the NFL was a witless behemoth, an institution that did right by all the wrong stakeholders and wrong by all the right ones. It moved too slowly except when it saw an opportunity to pander. It deserved and deserves much of the criticism it got and gets.*

*-Sports Illustrated reporter, Jack Dickey, on the NFL during the XFL's initial incarnation*

Classified
DCP Parties23483



**WHAT THE NFL IS ALL ABOUT**

# THE NFL OWNERS' INHERENT MISALIGNMENT WITH THE PLAYERS



- An estimated $100 Billion of market value is controlled by roughly 100 very wealthy individuals
- These billionaire shareholders control 100% of each team
- On an annual basis, between 38% to 50% of the $10B+ in revenue flows to players and operations, but the vast majority of the profits flow back to the owners
- This results in an exploitative dynamic where the owners are at odds with the players and other stakeholders

Classified
DCP Parties23485

## WHO ELSE IS THE NFL AT ODDS WITH?

- Fans who attend games
- The broadcast partners
- Many advertisers
- The refs
- The cheerleaders
- Many jilted cities
- Former players
- Health/safety-conscious stakeholders
- Many coaches



Classified



# WHAT THE XFL 2.0 IS ALL ABOUT

Classified

# WHAT WE ARE

- High-quality, competitive and compelling football - gameplay will be great
- New Spring/Summer league that meets the entertainment quality expected from fans
- Affordable for the average family to attend
- Focused on markets where football is a main attraction
- Innovative at every turn with regard to re-thinking established norms
- Modern play with a reverence for football history
- Built to last





Classified

## WHAT WE ARE NOT

- Not gimmicky
- Not a development league for the NFL
- Not dependent upon a big TV broadcast deal
- Not second-rate football
- Not exploitative in any way (e.g. We won't gouge the fans, exploit the players, or be at odds with our broadcast/distribution partners)
- Not salacious or low-brow





Classified



# WHAT WE CAN BE

- As big as the original concept envisioned, but better timed with much better execution
- A means to invert the power structure, giving the fans and players equity and agency
- Inclusive
- Populist
- Epic and permanent

...a phoenix rising from the ashes.

Classified



Classified

# KEY GAMEPLAY FEATURES

## LEGACY XFL RULES

- No coin flip: compete for possession
- No kicking PATs
- Must return kickoffs & punts
- One foot in for a catch

## XFL 2.0 INNOVATIONS

- Speed related
- New scoring possibilities
- Fewer penalties
- New ideas on kicking
- Fan involvement





# XFL 2.0 CORPORATE TIMELINE

Classified

**Feb 2017** ESPN's 30 for 30 "This Was the XFL" first airs

**March 2017** Charlie Ebersol Sports Media Inc. (CESM) is formed between Ebersol and Vanech

**May 2017** CESM purchases control of XFL assets and rights from Vince McMahon for $50MM in a combination of cash and stock

**May 2017** XFL 2.0 Files $450MM Regulation A+ financings with the SEC

**June 2017** $10MM Seed investment round opens

**June 2017** XFL 2.0 inks exclusive landmark distribution deal with WWE Network

**June 2017** XFL 2.0 HQ $50MM Reg A+ opens

**October 2017** 10 cities selected

**December 2017** HQ Reg A+ financing closes

**January –May 2018** Team Reg A+ financing campaigns are launched two per month

**July 2018** XFL Draft

**August 2018** Combine and Practice Begins

**September 2017** Cities franchise bids are due

**February 2019** XFL 2.0 Season Kicks-off

Classified

DCP Parties 23496



**ASSET PURCHASE OF THE ORIGINAL XFL**

DCP Parties23497

# THE DEAL

Asset Purchase of all 80% of XFL assets. WWE retains 20% stake in XFL 2.0.

Purchase price equal to $50MM paid as a combination of cash and stock. Stock will be issued at closing and priced at Series A valuation. Cash payment spread over three years.

Repurchase right for $1 if $100MM is not raised within 18 months or in the event of any material default.

WWE and other parties at the table will each be able to invest in Seed Round under "Scramble Rules". First party to fund $10MM will receive equity and option to convert at 50% discount to the Series A valuation.





Classified



**OUR MAIN GOAL**

*To drive more subscribers and revenue to the WWE Network and its OTT Platform and to support the WWE's Three Pillars*

# WWE Network Proposed Deal

Digital joint venture between the XFL and WWE

Three year deal where WWE Network will get exclusive broadcast/stream rights to its choice of two games per week

Fixed fee paid by WWE for exclusive broadcast/stream rights

Revenue share on eCPM uplift on digital

Freemium model with skinny- bundles under revenue share

First-look on all ancillary projects

WWE Network "Audience Extension" initiative

Classified
DCP Parties23501

# Digital Distribution and Monetization Model

**Delayed games and archived content**

(Free/ Ad-Supported)

**Gameday Live Season Package**

(43 live games plus archive)

**$43/season**

**Single Game Package**

**$5/game**

**Team Package (8 games plus playoffs if they make it!)**

**$20/season**

**All Access Year Round Premium**

(includes RedZone, reality shows, fantasy show, fan show, exhibition, draft, insider, archives)

**$3/month add-on to WWE**

**VR and Augmented Reality Package (TBD)**



**Classified**





## THE SEASON

- 8 game regular season
- 4 home games, 4 away games
- One "rivalry matchup" played twice
- 40 regular season games total
- 4 out of 10 teams make playoffs
- 3 postseason games
- No bye week

Classified



# GEOGRAPHIC PLAN

Classified



# WHERE TO PLAY

- Iconic football cities with growing MSAs
- Data-driven decisions
- Target certain XFL legacy cities/teams
- US-only in years 1-3
- Markets where we will be the main attraction
- Local markets must compete for a team
- Expansion of 2 teams/year
- Growing from 8 teams to 12

# LIKELY MARKETS IN YEAR ONE



**WEST**

Oakland, California

San Diego, California

San Antonio, Texas

Oklahoma City, Oklahoma

**EAST**

Memphis, Tennessee*

Birmingham, Alabama*

Columbus, Ohio

Orlando, Florida*

*legacy XFL cities

# POSSIBLE EXPANSION MARKETS IN FUTURE YEARS



Las Vegas, Ann Arbor, Portland,
Phoenix, St. Louis, Virginia, Carolinas

Classified

# FOUNDING LEADERSHIP TEAM



**Charlie Ebersol**
**President & CEO**
**Visionary and Creative**

Creator of hit television shows *"The Profit"* and
*"West Texas Investors Club"*
Produced and Directed
**ESPN 30 for 30** *"This Was the XFL"*

Devoted life and career to sports and media
Millennial
"Carrying the torch" of XFL legacy



**Bob Vanech**
**COO & CFO**
**Serial Entrepreneur and Operator**

CEO of Global Companies
Eureka Broadband and CADFORCE
Founder, Chairman and COO of Digital Media
Powerhouse Zealot Networks

Disruptor and Innovator
GenX-er with lifelong passion for football
Serious capital raiser, $200MM+ raised as founder



XFL 2.0 OPENING SEASON TIMELINE

DCP Parties

**October 31, 2018** Rosters locked

**November, 2018** Preseason begins

**February 20, 2019** Opening Day

**May 7, 2019** Regular season ends

**May 14, 2019** Playoff Weekend

**May 21, 2019** Season One Championship

Classified

DCP Parties23511



# GROUNDBREAKING TECHNOLOGY



### THE X-HELMET

The most advanced helmet in history with concussion sensors, microphones, heads-up-display, and cameras rolling



### VR / AR FEATURES

GPS, motion sensors, bio feedback, IoT-enabled geara in-game analytics, fan-controlled instant-replay



### FANTASY STAT INTEGRATION

Super stats, wagers, player/fan bonuses



### CAMERAS

BallCam, CoachCam, HuddleCam, HelmetCam, VRCam, SkyCam, RefCam, FanCam, and of course... BUBBA-CAM







Classified

# KEY FAN FEATURES

- Players and fans attend weekly Neighborhood Fan Dinner the night before games
- Deep, profound integration with online fantasy partner
- Fans compete in the "pregame scramble".
- Season ticket holders are automatic owners and treated as such
- Lottery for seats and luxury boxes
- Select fans on field





DISTRIBUTION STRATEGY

Classified



# EXPANDED
# DISTRIBUTION STRATEGY



- Digital first (WWE Network)
- XFL Go syndicated cross platform/cross device (Advertiser Direct)
- Unique local and extended broadcast strategy (Tues/Wed/Sat)
- Global distribution
- Deep social media integration





# OWNERSHIP AND CAPITAL RAISING PLAN

Classified

# OWNERSHIP AND CAPITAL RAISING PLAN







# MARKETING STRATEGY

- Massive earned media and PR
- Digital and mobile-first
- Social and viral
- Hyper-local / Hyper-targeted
- Select traditional media
- Super Fan/Influencer activation
- Fans and players as owners and "promoters"
- Season tickets sold out before a city gets a franchise
- Highly cost-effective plan
- Leverage WWE base



# INVESTMENT PLAN

- $10MM Series A (League)
- $10MM-$50MM Reg A+ (League)
- $200MM-$400MM total Reg A+ (8 teams)
- Debt/equity blend for expansion





**FOOTBALL OPERATIONS PLAN**

Classified

DCP Parties23525



**NCAA Attack Plan**





Classified



**Attorneys:**
Phillip J. Duncan*
James H. Bartolomei III***
Richard L. Quintus**
Wm. Rob Pointer*
Timothy P. Reed*
J. Reid Byrd*

*Licensed in AR
**Licensed in AR & FL
***Licensed in AR, CA, NY, FL, CT, & DC

**Case Manager:**
Wayne Duncan

Three Financial Centre
900 S. Shackleford
Suite 725
Little Rock, AR 72211

Phone: 501-228-7600
Toll Free: 877-6-DUNCAN
Fax: 501-228-0415

www.DuncanFirm.com

January 24, 2019

> **EXHIBIT**
>
> **17**

**Via Email to rollin.chippey@morganlewis.com &
baird.fogel@morganlewis.com & Fax 415-442-1001**

Mr. Rollin Chippey, Esq.
Baird Fogel, Esq.
Morgan, Lewis & Bockius LLP
One Market
Spear Street Tower
San Francisco, California 94105-1596

Re:   *Robert Vanech v. Charles Ebersol, et. al.*

Dear Sirs:

Please be advised that I represent Robert "Bob" Vanech as it relates to his ownership interest in the Alliance of American Football ("AAF") and related causes of action on this matter. My co-counsel, Christopher J. Gansen, Esq., is copied.

I write to confirm whether Morgan, Lewis & Bockius represents Charles Ebersol in his individual capacity as well as a member of the Board of Legendary Field Exhibitions LLC, Ebersol Sports Media Group, Inc., Legendary Field Exhibitions LLC (d/b/a Alliance of American Football), Duncan "Dick" Ebersol in his individual capacity as well as a member of the Board of Legendary Field Exhibitions LLC, Keith Rabois in his individual capacity as well as a member of the Board of Legendary Field Exhibitions LLC, William "Bill" Polian in his individual capacity, and Thomas Veit in his individual capacity.

Please be on notice that my client intends to file the attached complaint against each of the above parties. Please confirm who your firm represents and whether you intend to accept service on each of the above party's behalf. Please note that Mr. Vanech has authorized me to extend a deadline of January 29, 2019 (11:59pm PST) to resolve this matter before suit is filed so long as your client(s) extend a bona fide offer in writing by that date, and in good faith, cooperate to reduce any agreement in principal within 48 hours to writing.

On behalf of my client, I respectfully demand that your client(s) Legendary Field Exhibitions LLC (d/b/a Alliance of American football) et. al. do a search and preservation of information, documents, things etc. that they have both access to and control over, or that data is in their possession.

**As part of our ongoing investigation into the facts of this matter, I am asking you to instruct your client to immediately take steps to preserve all potential evidence related to the claims alleged in the attached draft complaint, irrespective of your client's policies regarding retention and disposal of documents and materials.**

Therefore, please be advised that you should preserve all evidence pertaining to the matters alleged in the draft complaint as well as the development of the football league that started in February 2017 through the present (the "matter"). Additionally, this evidence preservation demand notice includes, but is not limited to the time period from February 2017 until the present and on an ongoing basis: all investigative materials and steps the Board of Directors of the AAF took to investigate this matter; all copies of the XFL 2.0 or Project Phoenix Plan that Vanech and Ebersol created; all photographs and videos related to the matter; all tapes and recordings (whether audio or video) related to the incident; all correspondence related; all relevant policies and procedures; all e-mails and text messages (whether internal or to third parties) relating to the development of the football league; all notes or handwritten documents pertaining to the matter; work schedules for employees and/or third-party contractors that communicated with any of your clients in 2017, fees and expenses incurred for the matter, and any other evidence that may be relevant to anticipated litigation arising from this matter.

Should there be any questions about the nature or scope of this request, please contact me at (501) 228-7600.  I appreciate your timely attention to this request.   Please confirm receipt of this preservation and representation letter.

Sincerely,

/s/ James Bartolomei

James H. Bartolomei
James H. Bartolomei, III, P.A.
Of Counsel at Duncan Firm, P.A.
California Bar No. 301678

cc: Christopher J. Gansen, Esq. via chris@gansenlawgroup.com
    Robert Vanech bvanech@gmail.com

Classified                                                                                      DCP Parties25194

EXHIBIT

18

| From: | Jordan Roberts |
|---|---|
| Sent: | Monday, February 25, 2019 11:13 PM CST |
| To: | Dawn Belt; James A. Skochdopole |
| CC: | John Zutter; Charlie Ebersol; Peter J. Kosydar III |
| Subject: | RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176] |
| Attachments: | Change of Control - Gap Analysis - FW.DOCX |

Jim —

Following up on Dawn's email below, attached are just a few comments to the Gap Analysis document. Neither the Spring 2018 Convertible Note Facility nor the Fall 2018 Convertible Note Facility are still outstanding; all such Notes have converted into a mix of Series 1 Preferred Stock and Common Stock pursuant to their terms. The Series 1 Financing was a "Next Financing" under the Spring 2018 Convertible Note documents, so such Notes automatically converted. Additionally, all holders of the Fall 2018 Convertible Notes signed the Series 1 Financing documents, converting their Notes into equity as a result.

**JORDAN ROBERTS**

Associate | Fenwick & West LLP | 650-335-7149 | jroberts@fenwick.com
Admitted to practice only in California.

**From:** Dawn Belt
**Sent:** Monday, February 25, 2019 8:28 PM
**To:** James A. Skochdopole <JSkochdopole@bellnunnally.com>
**Cc:** John Zutter <jz@dundon.co>; Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>
**Subject:** Re: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Jim - Thank you for the time earlier this evening. Jordan is going to send over a few comments to your gap analysis summary - some of the notes that you listed have already converted in connection with the Fowler investment are are no longer outstanding. We also confirmed that no equity-related or control-related agreement with CBS was signed, so nothing further as far as change of control analysis is necessary on that front.

Finally, I spoke briefly with Charlie following our call. It sounds like he and John have been focused on blocking rights, whether they are derived from the charter/ownership or by contract. So, although there are certain events that are triggered by a COC, as you have summarized in your analysis, none of those amount to blocking rights as far as getting approval for any deal.

We're working through prioritizing these various obligations and then circle back on how to best address each of the counter parties.

Thanks,
Dawn

Direct Dial: (650) 335-7830



EXHIBIT

242

**Classified**

On Feb 25, 2019, at 5:07 PM, James A. Skochdopole <JSkochdopole@bellnunnally.com> wrote:

Thanks, Dawn.  It will be good to at least start the conversation.  – Jim.

**From:** Dawn Belt <dbelt@fenwick.com>
**Sent:** Monday, February 25, 2019 7:06 PM
**To:** James A. Skochdopole <JSkochdopole@bellnunnally.com>; 'John Zutter' <jz@dundon.co>
**Cc:** Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>
**Subject:** RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

I have to head out now for an event this evening, but I can call you from the road to just briefly connect.  I will not have had a chance to review the document.

Thanks,
Dawn

Dawn Belt
Direct: (650) 335-7830

**From:** James A. Skochdopole [mailto:JSkochdopole@bellnunnally.com]
**Sent:** Monday, February 25, 2019 5:05 PM
**To:** 'John Zutter' <jz@dundon.co>; Dawn Belt <dbelt@fenwick.com>
**Cc:** Charlie Ebersol <ce@aaf.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>
**Subject:** RE: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Dawn,

I'm available now if that works for you.  My directly dial is 214-740-1434 and my cell is 214-991-1387.

-- Jim.

**BN** BELLNUNNALLY

<image002.gif>

| ABOUT US | V-CARD |

**James A. Skochdopole** | Managing Partner
jskochdopole@bellnunnally.com
Tel 214-740-1434 | Fax 214-740-5734
**2323 Ross Avenue, Suite 1900 | Dallas, Texas 75201\***
www.bellnunnally.com
*Please note our new address*

IMPORTANT \ CONFIDENTIAL: This message contains information from the law firm of Bell Nunnally & Martin LLP that may be subject to the attorney-client or work product doctrine, or may be otherwise confidential and exempt from disclosure under applicable law. Unless expressly stated otherwise, nothing contained in this message should be construed as a digital or electronic signature, nor is this message intended to reflect an intention to make an agreement by electronic means. DO NOT COPY OR FORWARD TO UNAUTHORIZED PERSONS. If you are not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution, copying or forwarding of this communication is strictly prohibited. Unauthorized interception of this message may be in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq. If you have received this communication in error, please notify us immediately at our telephone number: (214) 740-1400.

IRS Circular 230 Notice: Unless expressly stated otherwise in the foregoing message, and to ensure compliance with requirements imposed by the IRS, we inform you that any advice

contained in this message (including any attachments) is not intended or written to be used, and may not be used by any person, for the purpose of (i) avoiding penalties imposed under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another person any transaction or matter addressed herein, within the meaning of IRS Circular 230.

Thank you.

**From:** John Zutter <jz@dundon.co>
**Sent:** Monday, February 25, 2019 7:00 PM
**To:** Dawn Belt <dbelt@fenwick.com>
**Cc:** Charlie Ebersol <ce@aaf.com>; James A. Skochdopole <JSkochdopole@bellnunnally.com>; Peter J. Kosydar III <pkosydar@bellnunnally.com>; Jordan Roberts <jroberts@fenwick.com>
**Subject:** Re: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]

Can you connect tonight? This is mission critical. Thanks.

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, TX 75201
Phone: (917) 861-5424

On Feb 25, 2019, at 6:58 PM, Dawn Belt <dbelt@fenwick.com> wrote:

> Thanks, John. We will take a look.
>
> Jim – can we set a time to talk on Wednesday between 9 and 12 Pacific? I'm completely booked tomorrow. Also adding Jordan from my team, who has been working closely with me on all ESMG matters.
>
> Thanks,
> Dawn
>
> Dawn Belt
> Direct: (650) 335-7830
>
> **From:** John Zutter [mailto:jz@dundon.co]
> **Sent:** Monday, February 25, 2019 4:35 PM
> **To:** Charlie Ebersol <ce@aaf.com>; Dawn Belt <dbelt@fenwick.com>; James Skochdopole <jims@bellnunnally.com>; pkosydar@bellnunnally.com
> **Subject:** Fwd: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]
>
> Dawn and Jim - please sync up.
>
> **John Zutter**
> Dundon Capital Partners LLC
> 2100 Ross Avenue, Suite 550

DCP Parties038073

Dallas, TX 75201
Phone: (917) 861-5424

Begin forwarded message:

> **From:** "James A. Skochdopole" <JSkochdopole@bellnunnally.com>
> **Date:** February 25, 2019 at 6:32:34 PM CST
> **To:** 'John Zutter' <jz@dundon.co>
> **Cc:** "Peter J. Kosydar III" <pkosydar@bellnunnally.com>
> **Subject: FW: Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]**
>
> John,
>
> Please see Peter's email below and the attached "gap analysis" we discussed earlier this afternoon.
>
> -- Jim.
>
> **From:** Peter J. Kosydar III
> **Sent:** Monday, February 25, 2019 6:19 PM
> **To:** James A. Skochdopole <JSkochdopole@bellnunnally.com>
> **Subject:** Ebersol Sports Media Group, Inc. - Change of Control Analysis [IWOV-LAWDOCS.FID1708176]
>
> Jim,
>
> Please see the attached summary of the provisions that would be triggered in the various investment documents upon a Change of Control of Ebersol Sports Media Group, Inc. (the "Company"). This summary is based on the financing documents uploaded to folder 008 in the data room, and the NFL term sheet we received from Fenwick.
>
> Assuming that the Company obtains the written consent of: (1) the Ebersol-Saint James Family Trust Date November 14, 2017, (2) F02 LLC, and (3) Teddy Bright Pictures, Inc., it will have the necessary stockholder consent to authorize the sale of the Company's asset pursuant to Section 271 of the Delaware General Corporation Law (which requires a resolution adopted by the holders of a majority of the outstanding stock of the corporation entitled to vote thereon).
>
> Thanks,
>
> Peter

Classified

-------------------------------------------
NOTICE:

This email and all attachments are confidential, may be legally privileged, and are intended solely for the individual or entity to whom the email is addressed. However, mistakes sometimes happen in addressing emails. If you believe that you are not an intended recipient, please stop reading immediately. Do not copy, forward, or rely on the contents in any way. Notify the sender and/or Fenwick & West LLP by telephone at (650) 988-8500 and then delete or destroy any copy of this email and its attachments. Sender reserves and asserts all rights to confidentiality, including all privileges that may apply.

**Note and Warrant Provisions Triggered Upon a Change of Control**

The following provisions would be triggered upon the sale of substantially all of the assets of Ebersol Sports Media Group, Inc. (the "Company"), which constitutes a Change of Control under all of the documents below. This summary does not address provisions in the investment documents listed below that would be triggered upon the issuance of additional equity in the Company.

[**2018 Note Financing: Issued April 2018 – September 2018 (Convertible Promissory Notes)**

- Pursuant to Section 2.3 of the Convertible Notes, upon a Change of Control, at the option of the Holder, either:

  a) Holder shall be entitled to be repaid, (i) the Principal Balance, all accrued and unpaid interest and all other amounts then outstanding under this Note plus (ii) an amount equal to twenty-five percent (25%) times the original Principal Balance of this Note, or

  b) the principal amount of this Note, all accrued and unpaid interest and all other amounts accrued under this Note shall be converted into that number of shares of Common Stock obtained by dividing (i) entire Balance by (ii) the Change of Control Conversion Price, rounded down to the nearest whole number of shares. If the Company shall not have received notice of Holder's election pursuant to the proceeding sentence prior to the closing of such Change of Control, then the entire Balance shall be converted pursuant to clause (b) above.

  "Change of Control Conversion Price" means the amount determined by dividing (a) $80,000,000 by (b) the total number of Common Stock Equivalents outstanding immediately prior to the closing of a Change of Control, and before giving effect to the conversion of the Notes.

- Pursuant to Section 5(a) of the Convertible Notes, a Change of Control constitutes an "Event of Default."

- Note: Pursuant to Section 6.8 of the Note Purchase Agreement executed in connection with the Convertible Notes, any term of Convertible Notes may be amended and the observance of any term of the Note Purchase Agreement and the Notes may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the <u>holders of Notes representing at least a majority of the aggregate Principal Balances</u> (as defined in the Notes) of all the Notes then outstanding (the "Majority Holders"). Any amendment or waiver effected in accordance with Section 6.8 of the Note Purchase Agreement shall be binding upon each holder of Convertible Notes then outstanding, each future holder of such securities, and the Company.][1]

**MGM Financing: Issued September 2018 and January 2019 (Notes and Warrants)**

- <u>Promissory Note 1</u>: Pursuant to Section 5(e), a Change of Control constitutes an Event of Default.

---

[1] NTD: This can be removed as the April 2018-September 2018 Notes are no longer outstanding. Since the Series 1 Financing was a "Next Financing" under such Notes, these Notes converted into a mix of Series 1 Preferred Stock and Common Stock pursuant to their terms.

DCP Parties03804

occur. During such notice period, Holder may exercise or convert this Warrant in accordance with its terms, whether or not exercise or conversion is contingent upon the happening of such event and/or existence of a minimum value of Shares receivable upon exercise or conversion as provided on Holder's exercise notice.

**Notes and Warrants: Issued January 2019**

- <u>Promissory Note</u> – Pursuant to Section 5(d), a Change of Control constitutes an Event of Default.

- <u>Warrant</u> (Series 1 Preferred Stock)

  - Section 1.6.2 and Section 1.6.3 contain the same language as described in Section 1.6.2 and Section 1.6.3 of the December 2018 Warrant.

**Notes and Warrants: Issued February 2019**

- <u>Promissory Note</u> – Pursuant to Section 5(d), a Change of Control constitutes an Event of Default.

- <u>Warrant</u> (Series 1 Preferred Stock)

  - Section 1.6.2 and Section 1.6.3 contain the same language as described in Section 1.6.2 and Section 1.6.3 of the December 2018 Warrant.

**Binding Term Sheet for TechCo and ESMG Warrants**
**(NFL Warrant for 15% of the Company's fully diluted capitalization at the time of exercise)**

- The NFL (i.e. 32 Equity) shall have the right to advance written notice as soon as reasonable practicable (and in any event at least 35 days' prior to the closing) of any change of control transaction, sale of all or substantially all assets, or any bona fide equity financing of the Company.

- In connection with any change of control or other liquidity event, the NFL shall have the right to elect to: (1) maintain the ESMG Warrant through the change of control; (2) exercise the applicable Warrant at or prior to the closing of such transaction; or (3) sell the applicable Warrant in such transaction.

Classified

Message

| | |
|---|---|
| **From**: | Alan Kantowitz [alan@aaf.com] |
| **Sent**: | 1/11/2019 6:31:44 PM |
| **To**: | Kevin Freedman [kevin@aaf.com] |
| **CC**: | Kevin Farrell [kevin.farrell@aaf.com] |
| **Subject**: | January Cash Requirements |
| **Attachments**: | January Cash Requirements.pdf |

**EXHIBIT**

**19**

Freedman - attached is PDF outlining cash requirements for the next two weeks. These are the critical payments that are either in here because they are absolutely necessary (items like payroll or mission critical to football success) or way overdue and are color coded accordingly. The second week was more of my best estimation based on payments I am aware of and estimates for housing hotels that I know are due, but Farrel should glance over when he gets a chance. Note this also does not include any CBS fees...

Best,
Alan

--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

EXHIBIT

20

| | |
|---|---|
| **Message** | |
| **From**: | Alan Kantowitz [alan@aaf.com] |
| **Sent**: | 2/6/2019 3:42:19 PM |
| **To**: | Kevin Freedman [kevin@aaf.com]; Kevin Farrell [kevin.farrell@aaf.com] |
| **CC**: | Charlie Ebersol [ce@aaf.com] |
| **Subject**: | Fwd: SMT and the Alliance |
| **Attachments**: | AAF-SMT_Agreement_for_2019_Season_final_1-4-2019_signed_by_SMT.pdf |

Kevin and Kevin,

FYI from SMT. Not sure what we can do here. But they are not happy. Gerard is the CEO. I have heard from their CFO and their accounting folks five or six times over the course of the past month or so and have done all I can to avoid and explain delay to the best of my ability. Farrell - do you want me to direct them to you to try and work out a payment plan? I was hesitant to do this because when I first brought this up to them they mentioned we already were on a payment plan with them...

Attached is our contract with them. Payment schedule is on the last page of the document. We are behind on the first two which calculate to ~$797k.

Let me know if/when you'd like to discuss.

Thanks,
Alan

---------- Forwarded message ---------
From: **Gerard Hall** <g.hall@smt.com>
Date: Wed, Feb 6, 2019 at 1:34 PM
Subject: SMT and the Alliance
To: ce@aaf.com <ce@aaf.com>, Alan Kantowitz <alan@aaf.com>, Ken Aagaard <cbtken@aol.com>
Cc: Robbie Louthan <r.louthan@smt.com>, Kirk Brown <kirk.brown@smt.com>, Allen Dickenson <a.dickenson@smt.com>

Gents

As of today, the Alliance has a past due balance to SMT of approximately **$797,000.**
That is a very big number for a company the size of SMT.

Repeated emails from SMT to various Alliance folk have failed to address and resolve
the issue – and the first Alliance weekend is rapidly approaching.

SMT has deployed over 27 full-time staff in the field and a boatload of equipment, all
moving in good faith, to ensure a seamless, successful debut of the Alliance this weekend.

SMT has been very patient with this situation but now my COO is having a heart attack.

Payment of this outstanding balance in full within 24 hours would be much appreciated.

I am happy to have my accounting department (cc'd above) send you SMT' bank wiring instructions.

Thank you for your attention to this **urgent** matter.

I look forward to hearing from you ASAP.

Best wishes for a successful launch.

Regards,

Gerard

GERARD J. HALL
CEO & Founder
3511 University Dr, Durham, NC 27707
g.hall@smt.com | www.smt.com
o: +1 919-354-4700 | m: +1 919-949-2087

The information transmitted in this e-mail and/or attachments is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material that may not be shared. This information and all attachments are for use only by the intended recipient. To the extent that the information contained in this e-mail or any attachment is proprietary, copyrighted, patented or trademarked, all rights are reserved. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is strictly prohibited. If you have received this email in error please contact the sender and delete and/or destroy all copies of the material.

--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

TR0001595393

Message

| | |
|---|---|
| **From:** | John Zutter [jz@dundon.co] |
| **Sent:** | 2/21/2019 3:34:38 PM |
| **To:** | Kevin Farrell [kevin.farrell@aaf.com] |
| **CC:** | Jeff Vanderbilt [jv@dundon.co]; Alan Kantowitz [alan@aaf.com] |
| **Subject:** | Re: Approval Request for $50K Georgia State University Stadium Payment Today |

<div style="border:1px solid black; text-align:center;">
EXHIBIT

**21**
</div>

Why wasn't this in the schedule?

**John Zutter**
Dundon Capital Partners LLC
2100 Ross Avenue, Suite 550
Dallas, TX 75201
Phone: (917) 861-5424

On Feb 21, 2019, at 2:11 PM, Kevin Farrell <kevin.farrell@aaf.com> wrote:

John, Jeff

Seeking your approval for this incremental payment for this week (not on previous Cash Flow tracker).

Our Stadium Agreement with GSU is $50K per game.  Total for the regular season is $250K.
This is the first payment.
Risk of non-payment is not being allowed to use the stadium this weekend.

No new funds from Dundon Group is required for this payment to be made.  I will work within the amount wired.

Separately, we will be sending you the Stadium schedule for all teams.

Thanks,
Kevin

| From: | Charlie Ebersol |
|---|---|
| Sent: | Wednesday, February 13, 2019 10:50 AM CST |
| To: | Tom Dundon |
| CC: | Kevin Freedman; alan@aaf.com; Dawn Belt |
| Subject: | Ebersol Sports Media Group // AAF |
| Attachments: | ESMG Updated Investor Deck_2019.02.pdf, ESMG Financial Projections Model vF.xlsx, ebersol-sports-media-group-inc_2019-02-11_summary_cap_intermediate_cap.xlsx |

Tom,

Per our conversation, here is the package on the company. The parent company is called Ebersol Sports Media Group (ESMG). ESMG controls 100% of the league, the technology company and all the IP.

We will be sending the term sheet for the $10M bridge as soon as it is drafted by our attorneys who are writing it right now. In the interest of time and simplicity, we will structure this as a convertible promissory note.

- Conversion price: 20% discount to pre-money valuation of next equity financing, with a cap of $90M
- Closing: today

**_Attached to this email are:_**

- Overview materials deck
- Financial projection model
- Cap Table

**_Opening Night Highlights_**

- *#1 trending sports app in the app in both the Apple and Google Play App Stores (#33 in full App Store)*
- *#1 PrimeTime television program on Saturday night; 2.1 rating on CBS (beat the PrimeTime NBA (OKC v Houston) game on ABC)*
- *125,000 active users on mobile*
- 5M users for the weekend (web and app)
- *Responsible for 11 of the 20 top trending topics on Twitter in the US during the opening weekend (and 5 of the top 10)*
- *San Antonio attendance: 27,875*
- *Orlando attendance: 21,187*
- History of the league https://vimeo.com/315016769/19a1eb31dd

Look forward to speaking soon.

All my best
C

Charlie Ebersol
Founder & CEO



AAF.com



DISCLAIMER:

This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

**NATIVE DOCUMENT PLACEHOLDER**

**Please review the native document DCP Parties0004_CLASSIFIED.xlsx**



**Confidential**

## ESMG: Combines the best of sports and technology



ESMG

Owned & Operated Football League
**Alliance of American Football**

Integrated Live Video, Data & Gaming
**PRODUCT**

2



Owned & Operated Football League
**Alliance of American Football**

3

**CLASSIFIED**

2:19-cv-00077-agg Doc#2-1 Filed 06/24/25 Entered 06/24/25 09:49:22 Exhibit Designated from C. Ebersol to T. Dundon 2:19-cv-00077-agg Doc#2-1 Filed 06/24/25 Entered 06/24/25 09:49:22 Exhibit Emailed Document 3 Pg 8 of 145 Marketing Mat Pg 7 of 32

# Fundamentals of the Alliance of American Football



**1**
Single Entity

**$35**
Quality Seats

**2**
Hour Games

**8**
Teams

**10**
Games

**Feb 9**
Launch on CBS

4

CLASSIFIED

# Alliance of American Football Executives

Led by some of the most experienced and respected football minds with over 475 years of NFL experience, the Alliance of American Football will include elite professional talent fueled by a dynamic alliance between players, fans and the game. We believe that putting high-quality, top-flight football on the field is of the utmost importance.



**Bill Polian**, *Co-founder, Head of Football*:
- Hall of Famer and the only 6x NFL executive of the year
- Oversees all league & game ops, rules & regulations as well as all coaching and player/personnel decisions



**Troy Polamalu**, *Head of Player Relations*:
- 2x Super Bowl champion and 5x Pro Bowler
- Oversees player health and wellness on and off the field



**Hines Ward**, *Head of Football Development*:
- 2x Super Bowl champion and 4x Pro Bowler
- Oversees player development and diversity hiring



**Tom Veit**, *Head of Business*:
- Former CRO of United Soccer League & fmr EVP of Global Events for WWE
- Oversees all live event revenue streams (including but not limited to ticket sales, merchandise and sponsorships), stadium and city negotiations, and recruitment of front office team personnel



**Mike Pereira**, *Head of Officiating*:
- FOX Sports NFL Rules analyst and former VP of NFL Officiating
- Oversees rules and regulations and manages officiating crews

5

22295077-agg Doc#2024-12 File 06/24/2025 Entered 06/24/25 19:04:22 Sort Desc Email
from C. Ebersol to T. Dundon 2 13-19-2020 146 Marketing Mat Pg 9 of 32

# Inaugural teams and identities launched

   

   

6

CLASSIFIED

2:22-cv-05077-cag Doc #202-1 Filed 06/24/25 Entered 06/24/25 19:04:22 Sworn Designated from C. Ebersol to T. Dundon 2:13 PM attaching Marketing Mat Pg 10 of 32

# Coaches and stadiums locked down

Multi-year stadium contracts in all our cities and with all 8 of our head coaches with complete staffs hired



**Dennis Erickson**
**Salt Lake City** *Stallions*
**Rice-Eccles Stadium**

**Mike Martz**
**San Diego** *Fleet*
**SDCCU Stadium**

**Rick Neuheisel**
**Phoenix** *Hot Shots*
**Sun Devil Stadium**

**Mike Riley**
**San Antonio**
**Commanders**
**Alamodome**

**Kevin Coyle**
**Atlanta** *Legends*
**Georgia State Stadium**

**Tim Lewis**
**Birmingham** *Iron*
**Legion Field**

**Steve Spurrier**
**Orlando** *Apollos*
**Spectrum Stadium**

**Mike Singletary**
**Memphis** *Express*
**Liberty Bowl**

2:22-cv-05077-cag Doc#2042-2 Filed 06/24/25 Entered 06/24/25 19:09:49 22-30077 D2 Email from C. Ebersol to T. Dundon 2:13 PM 692 of 1466 Marketing Mat Pg 11 of 32

# Secured partnerships with Las Vegas and San Antonio as well

**Championship Game in Las Vegas**
- Multi-year partnership with the city of Las Vegas to host the Alliance championship game
- Inaugural championship will be played in Sam Boyd Stadium, home of the Las Vegas Bowl and the UNLV Rebels airing on CBS, Saturday night April 27th



**Training Camp in San Antonio**
- All 8 of our teams will be in San Antonio from January 4th through 30th for training camp
- Ancillary shoulder content available to film and air throughout the course of training camp with coaches, players and league executives available



8

22-90577-cgg Doc#2024-12 Filed 06/24/22 Entered 06/24/22 19:04:42 Exhibit 22-90577-cgg Doc#2024-12 Filed 06/24/22 Entered 06/24/22 19:04:42 Exhibit Designated from C. Ebersol to T. Dundon re coaching Marketing Mat Pg 12 of 32 Document 13 Pg 693 of 1466

# Local business and operational structure and staff in place

- Each team's "local front office" is comprised of approximately 15-20 full-time staff supplemented by part-time/seasonal staff as needed

- The front office staff is responsible for overseeing: marketing, ticket sales, public relations, event presentation, electronic broadcast, sponsorship sales, etc.



9

22-95077eagg Doc#2124 12 Filed 06/24/12 25 Entered 06/24/12 25 19:04:49 22:50:37 Designated
from C. Ebersol to T. Dubosson 2:13 Branding Marketing Mat Pg 13 of 32

# League business operations in place as well

The League will provide each team with additional support at the team level through our team service unit

**Areas of support include:**
- Ticket Sales
- Ticket Operation
- Marketing
- Creative
- Broadcasting
- Media Buying
- Sponsorship Sales
- HR
- Finance



CLASSIFIED

22-90677-cag Doc#2024-12 Filed 05/24/25 Entered 05/24/25 19:09:49 Exhibit D2-Email from C. Ebersol to T. Dundon 2-13 Pg 695 of 1466 Document 2-13 Re Marketing Mat Pg 14 of 32

# Partnered with Iconic Brands

## MGM
- Partnership includes 3 year sponsorship as the official sports betting sponsor of The Alliance and exclusive gaming partner as well as an investment in the business



## STARTER
- Multi-year partnership with Starter to be the official on-field apparel and game day uniform supplier for all eight teams



## New Era
- Partnership with New Era as the official on-field headwear partner



11

22-2955077-agg Doc#2024122 Filed 05/24/25 Entered 05/24/25 11:09:49 22-3077 Designated
from C. Ebersol to T. Dundon Document 213 Pg 696 of 1466 Marketing Mat Pg 15 of 32

# And significant distribution and broadcast partners

<span style="color:red">All 43 of our games will be covered on broadcast</span>



## CBS and CBSSN
- 4 year deal with CBS with our first two games, one playoff game and Championship on CBS Network
- CBSSN will carry a weekly regular season game



## NFL Network
- NFL Network to televise 19 Alliance of American Football Games throughout the season



## Turner and B/R Live
- TNT will televise one regular season and one playoff game each season.
- B/R Live will carry a weekly regular season game





12

22-90577-cag Doc#202-12 Filed 06/24/25 Entered 06/24/25 19:04:22 Exhibit 2 - Email Document 13 Pg 697 of 1466

# Top Flight Production Team

Designed to deliver productions that fans are used to, excited by, and that test new grounds and talent



**Mark Teitelman**
Production
Fox Sports
NBC SNF

**Ken Aagaard**
Production
CBS Sports

**Dick Ebersol**
Board of Directors
NBC Sports, Chairman
SNL, Co-creator

13

Case 2:19-cv-05077 Document #202412 Filed 06/24/25 Entered 06/24/25 19:04:22 Exhibit D2 Email
from C. Ebersol to T. Dundon 2.13.19 698 of 16 Marketing Mat Pg 17 of 32

## ~700 players have signed with The Alliance

Including former NFL players and college stars like Trent Richardson, Denard Robinson and Zach Mettenberger



### Complementary to NFL
Season: Super Bowl to NFL Draft

"NFL-Out" clause in all contracts
Draft players in September after
NFL cuts ~800 players

### Player Safety and Support
Independent concussion group

Pro-level training

No on-side kicks or kickoffs

### Competitive Salary
3 year contracts worth $250k

Fan-integration bonuses

Earned Scholarships

### Regional Allocation
Creates fan affinity

League parity

QB draft

14

2:22-cv-05077-cagg Doc #:20-12 Filed: 06/24/25 Entered: 06/24/25 19:04:22 Exhibit 12 Email from C. Ebersol to T. Dundon et al. Page 688 of 1466 Document 13 Pg 698 of 1466 DCP Marketing Mat Pg 18 of 32

# A fan-centric experience at every touch point

**FASTER, BETTER GAMES**

No TV Time-Outs

No Extra Points

Onside kick out, 4th and 10 in

**GAMIFIED VIEWERSHIP**

In-Game fantasy

Tech-driven real time data

Live Social Experience

**LOCAL AFFINITY**

Regional draft

"Super Fan" participation

Brand name Head Coaches

**AFFORDABLE**

$35 quality seats

Free to play gaming

Free to watch

15

2:22-cv-05077 Doc#202-12 Filed 06/24/125 Entered 06/24/125 91:09:49 22:50:07 Desc Email from C. Ebersol to T. Dundon 2:13-cv-700 of 14 Marketing Mat Pg 19 of 32

# Player Relations: Led by Troy Polamalu

What makes us different? A unique player experience, on and off the field

**Player Participation Pool**
- Unique , first-of-its- kind bonus system based on both on-field performance and off-field

**Insurance and Care**
- Health insurance for players, their spouses, and their dependents at no cost to the players
- Dental insurance and vision coverage for players, their spouses, and their dependents at no cost to players
- Injury protection in the form of full wage continuation during the season in which an on-field injury occurs
- Workers compensation coverage for on-field injuries

**Additional Benefits**
- 401(k) program that allows players to save for retirement
- In-Season housing available to players at no cost
- Financial literacy and career development programs designed by industry leaders
- Post-secondary education program
- Year-round access to strength and conditioning staff
- Meals curated by top sports dietitians

16

700
DCP Parties0020

Case Doc #2:24-cv-12525 Entered 06/24/25 19:49:22 SDT Desig Email
from C. Ebersol to T. Dundon Document 13 Pg 701 of 1466 Marketing Mat Pg 20 of 32

# Player Points System and Bonusing

**Designed to track and measure an individual player's engagements with fans and commercial partners to enable AAF Properties to calculate a player's share of the Player Participation Pool**

- Points are earned through various actions designed to incentivize players and align interests with fans
- At the conclusion of the season, each player's points will be measured and used determine a player's share of the Player Participation Pool
- All of the Player Points will be tracked through the player database
- Each player has a unique ID where the associate data is stored
- Representatives at the team and league level are responsible for both the administration and advocation of the program



**Player Points Generation**

- Football Performance
- Alliance App Engagement
- Corp Social Responsibility
- Marketing & Promotion
- Merchandise Sales

**Program Administration & Tracking**

- League Admin
- Team Admin
- Player Database

17



Integrated Live Video, Data & Gaming
**PRODUCT**

18

22-30577 Document #20412 Filed 06/24/2025 Entered 06/24/2025 19:04:49 Exhibit D2 Email from C. Ebersol to T. Dundon 2:19-702 filing Marketing Mat Pg 22 of 32

# Current sports data ecosystem is outdated

NFL uses outmoded, latency filled systems with multiple intermediaries resulting in significant opportunity cost



19

CLASSIFIED

2:22-cv-05077-ag Doc #: 21-4 Filed: 06/24/25 Entered: 06/24/25 19:00:49 22-5077 D2 Email
from C. Ebersol to T. Dundon 2:13-cv-704 of 1466 Marketing Mat Pg 23 of 32

# Future of Sports Data

Proprietary data packaging and management platform creating reliable, scalable and actionable data



*Future of Data Capture, Manifestation, and Packaging*

ESMG System

*~0.3 seconds of latency*

20

CLASSIFIED

Case 2:22-cv-05077 Document #: 1412 Filed: 06/24/25 Entered: 06/24/25 19:04:22 Desig.... Email from C. Ebersol to T. Dundon Document 13 Pg 705 of 1466 Marketing Mat Pg 24 of 32

# The key elements to the future of the sports data ecosystem



CLASSIFIED

Case Doc #2142 Filed 06/24/25 Entered 06/24/25 19:04:22 Desc Email
from C. Ebersol to T. Dundon Document 13 Pg 706 of 1466 Marketing Mat Pg 25 of 32

# Our vision: Faster data capture, real-time unique stats, new revenue streams



CLASSIFIED

# The Alliance App



**News**

**Teams**



**Navigation Menu**

**Home**



**About**

**Schedule**

**Games**

CLASSIFIED

DCP Parties0027

# STATcast, DataCast, and the like are slow and limited...
## Significant latency & minimal information

### Scoring Summary

| | | | | NE | MIA |
|---|---|---|---|---|---|
| **FIRST QUARTER** | | | | **NE** | **MIA** |
| 🦅 | TD | 8:13 | James Develin 2 Yd Run *12 plays, 75 yards, 6:47* | 6 | 0 |
| 🐬 | TD | 5:32 | Kenny Stills 7 Yd pass from Ryan Tannehill (Jason Sanders Kick) *5 plays, 75 yards, 2:41* | 6 | 7 |
| **SECOND QUARTER** | | | | **NE** | **MIA** |
| 🦅 | TD | 14:14 | Julian Edelman 2 Yd pass from Tom Brady (Stephen Gostkowski Kick) *5 plays, 18 yards, 2:04* | 13 | 7 |
| 🐬 | TD | 13:26 | Brandon Bolden 54 Yd Run (Jason Sanders Kick) *2 plays, 75 yards, 0:48* | 13 | 14 |
| 🦅 | TD | 10:32 | Cordarrelle Patterson 37 Yd pass from Tom Brady (Stephen Gostkowski Kick) *6 plays, 75 yards, 2:54* | 20 | 14 |
| 🐬 | TD | 7:28 | Brandon Bolden 6 Yd Run (Jason Sanders Kick) *10 plays, 69 yards, 4:10* | 20 | 21 |
| 🦅 | TD | 3:49 | Rob Gronkowski 16 Yd pass from Tom Brady (Stephen Gostkowski Kick) *8 plays, 75 yards, 3:39* | 27 | 21 |
| **THIRD QUARTER** | | | | **NE** | **MIA** |
| 🐬 | TD | 3:58 | Brice Butler 23 Yd pass from Ryan Tannehill (Jason Sanders Kick) *4 plays, 68 yards, 2:23* | 27 | 28 |
| **FOURTH QUARTER** | | | | **NE** | **MIA** |
| 🦅 | FG | 6:45 | Stephen Gostkowski 32 Yd Field Goal *8 plays, 55 yards, 3:43* | 30 | 28 |
| 🦅 | FG | 0:16 | Stephen Gostkowski 22 Yd Field Goal *6 plays, 69 yards, 0:16* | 33 | 28 |
| 🐬 | TD | 0:00 | Kenyan Drake 69 Yd pass from Ryan Tannehill *1 play, 69 yards, 0:16* | 33 | 34 |



24

22-30507 Doc#20-41127 Filed 06/24/2025 Entered 06/24/2025 19:09:49 22:50:07 Desc Email from Charlson - Austin Update and Football Marketing Mat Pg 28 of 32

# Alliance app revolutionizes the sports experience
## Truly Real-time & Fully Animated Data with Predictive Analytics



**3D Players - AAF team textures**



**Playing Field - pre-snap camera angle**



**Game Flow - post snap camera angle**



**Game Flow - possession circle**



**Game Flow - football ballistics tail**

CLASSIFIED

# Digital teams with experience from seed to scale



**Erik Schwartz**
Platform
Bittorent LIVE, CPO
Early @YHOO



**Andrew Pedersen**
Product
SI Video, CPO
GSN Social Casino, CPO



**Mark Teitelman**
Production
Fox Sports
NBC SNF



**Bob Bowman**
Non-Executive Product Chair
MLBAM, CEO



**Mike Maquin**
Engineering
Bittorent LIVE
Tesla



**Jack Ahern**
Product
GSN Social Casino, Sr.
Designer



**Ken Aagaard**
Production
CBS Sports



**Kevin Freedman**
Operations
Quid CEO
Google, Paypal, eBay

26

22-09607 22-09607eagg Doc#203412 Filed 06/24/25 Entered 06/24/25 19:04:22 50 Doc 2 signated from C. Ebersol to T. Dubonnet Reg. Attaching Marketing Mat Pg 30 of 32

# APPENDIX

CLASSIFIED

# High margin business, with scaled revenue at kickoff

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| League Revenue | $15,350,000 | $25,421,000 | $59,355,988 | $75,716,459 | $94,948,776 | $111,040,843 | $139,630,046 | $163,499,565 | $206,112,494 | $241,654,125 |
| Team Revenue | 44,800,000 | 74,690,000 | 151,488,288 | 204,041,470 | 263,292,963 | 283,819,076 | 301,140,562 | 319,536,591 | 339,075,036 | 359,828,148 |
| Digital Revenue | 4,160,760 | 32,796,547 | 56,200,033 | 81,501,047 | 108,333,025 | 136,821,987 | 167,108,060 | 199,347,193 | 233,713,076 | 270,399,291 |
| **Total Revenue** | **$64,310,760** | **$132,907,547** | **$267,044,309** | **$361,258,975** | **$466,574,765** | **$531,681,906** | **$607,878,668** | **$682,383,348** | **$778,900,607** | **$871,881,564** |
| | | | | | | | | | | |
| Digital Expenses | $13,217,050 | $15,973,761 | $18,128,379 | $18,490,947 | $18,860,766 | $19,237,981 | $19,622,741 | $20,015,196 | $20,415,500 | $20,823,810 |
| Football Expenses | 65,792,852 | 86,096,189 | 100,988,475 | 116,160,859 | 131,371,817 | 131,919,432 | 132,478,000 | 133,047,739 | 133,628,873 | 134,221,630 |
| Player Relations Expenses | 2,227,900 | 3,424,446 | 3,436,068 | 3,447,922 | 11,177,334 | 11,189,667 | 11,202,247 | 11,215,078 | 11,228,166 | 11,241,516 |
| Marketing/Branding Expenses | 21,984,486 | 21,861,356 | 22,240,810 | 22,685,626 | 23,139,339 | 23,602,126 | 24,074,168 | 24,555,651 | 25,046,764 | 25,547,700 |
| Production Expenses | 17,999,418 | 16,049,106 | 16,356,869 | 16,684,007 | 17,017,687 | 17,358,041 | 17,705,201 | 18,059,305 | 18,420,491 | 18,788,901 |
| League Expenses | 28,536,717 | 33,636,693 | 38,434,764 | 43,280,199 | 48,128,551 | 48,331,653 | 48,540,112 | 48,753,956 | 48,973,216 | 49,197,930 |
| Team Expenses | 25,103,733 | 37,401,520 | 44,881,824 | 52,362,128 | 59,842,432 | 59,842,432 | 59,842,432 | 59,842,432 | 59,842,432 | 59,842,432 |
| Medical Expenses | 8,462,900 | 13,462,096 | 15,414,093 | 17,367,186 | 19,321,397 | 27,115,228 | 27,174,542 | 27,235,043 | 27,296,753 | 27,359,698 |
| Corporate Expenses | 5,986,000 | 6,712,620 | 6,797,790 | 6,933,746 | 7,072,421 | 7,213,869 | 7,358,147 | 7,505,309 | 7,655,416 | 7,808,524 |
| Digital Payment Fees | 1,248,228 | 9,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,804,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,133 | 5,739,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total Expenses** | **$191,287,416** | **$250,196,146** | **$293,374,088** | **$336,125,617** | **$387,389,929** | **$410,800,872** | **$427,373,918** | **$444,919,627** | **$463,521,324** | **$483,271,803** |
| | | | | | | | | | | |
| **Total Operating Income (Loss)** | **($126,976,656)** | **($117,288,599)** | **($26,329,780)** | **$25,133,358** | **$79,184,835** | **$120,881,034** | **$180,504,750** | **$237,463,721** | **$315,379,283** | **$388,609,760** |
| *% Margin* | *-197.4%* | *-88.2%* | *-9.9%* | *7.0%* | *17.0%* | *22.7%* | *29.7%* | *34.8%* | *40.5%* | *44.6%* |
| | | | | | | | | | | |
| **Cumulative Net Cash Flow** | **($126,976,656)** | **($244,265,255)** | **($270,595,035)** | **($245,461,677)** | **($166,276,842)** | **($45,395,807)** | **$135,108,942** | **$372,572,663** | **$687,951,947** | **$1,076,561,707** |

28

CLASSIFIED

DCP Parties0032

**NATIVE DOCUMENT PLACEHOLDER**

**Please review the native document DCP Parties0033_CLASSIFIED.xlsx**

# Deposition Transcript

Case Number: 19-50900-CAG-7

Date: September 19, 2024

In the matter of:

## RANDOLPH OSHEROW v DUNDON CAPITAL PARTNERS, LLC.

> **EXHIBIT**
> **23**

# Charlie Ebersol

# CONFIDENTIAL

**CERTIFIED COPY**

Reported by:
Michelle Somers



Steno
Official Reporters

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: Firm #108F

CHARLIE EBERSOL                                                JOB NO. 1174241
SEPTEMBER 19, 2024                    CONFIDENTIAL

```
 1        Q    Who would know that?

 2             MR. SALTZ:  Objection to form, answer if you

 3   know.

 4             THE WITNESS:  Alan Kantowitz, Kevin Freedman

 5   and other people that would have been on the finance

 6   side.

 7   BY MR. LOWENSTEIN:

 8        Q    So you don't know what historical or other

 9   information that Mr. Kantowitz or Freedman or other on

10   the finance side were referencing and creating those

11   projections?

12             MR. TREYSON:  Objection to form.

13             MR. SALTZ:  Same.  You can answer.

14             THE WITNESS:  I'm sorry, I'm not sure what

15   you're asking me.

16   BY MR. LOWENSTEIN:

17        Q    Presumably they didn't just sit down in a room

18   and just come up with these numbers, right?

19        A    I don't know.

20        Q    Okay.  You just have no idea how they derived

21   the projection for the league?

22             MR. SALTZ:  Objection to form.

23             THE WITNESS:  I apologize, are you asking me

24   how they did this?

25   BY MR. LOWENSTEIN:
```

10:42AM (lines 5, 10, 15)
10:43AM (lines 20, 25)

1      Q    Yeah.

2      A    No, I don't know.

3      Q    That's all I'm trying to get at.  Let me be

4  clear about something, Mr. Ebersol, I understand that

10:43AM 5  you don't know everything about everything I want to

6  know in this case, okay.  I am -- but I don't know as

7  I'm sitting here what you do and don't know.  So I'm

8  going to explore those issues today and if there's

9  things you don't know I'm gonna say great, I'm gonna

10:43AM 10  ask the other person and move on.  Okay.

11          So don't be concerned when I ask you a

12  question you don't know the answer to just tell me you

13  don't know and we'll -- that will close a door and

14  allow us to move on to something else, fair?

10:43AM 15      A    Yes.

16      Q    Okay.  So the ones that ask about financial

17  projections are Kantowitz and Freedman?

18          MR. SALTZ:  Is that a question or a statement?

19          MR. LOWENSTEIN:  Come on, Michael, you're

20  really gonna do this?

21          Do you understand that I was asking a question

22  and not just saying words out loud, Mr. Ebersol?

23          MR. SALTZ:  Are you confirmed that that was

24  his previous answer that he already gave 'cause that's

25  a whole mother objection.  I'm fine with you asking it

```
 1    look through it and verify exactly what it is, and

 2    mindful of that, there is a document where a couple of

 3    pages are paperclipped and it's attached to three other

 4    groups of pages that are paperclipped.

 5          This document has not been presented to

 6    Mr. Ebersol prior, and he does have a right to go ahead

 7    and review it.  If you would like to go off the record

 8    while he reviews it I have no problem --

 9          MR. LOWENSTEIN:  (Simultaneously speaking)

10    sure --

11          MR. SALTZ:  -- with that.

12          MR. LOWENSTEIN:  Let's go off the record.

13          VIDEOGRAPHER:  All right.  It is 11:21 a.m.

14    we're off the record.

15          (Pause in the proceedings.)

16          VIDEOGRAPHER:  It is 11:23 a.m., we're on the

17    record.

18    BY MR. LOWENSTEIN:

19       Q    Mr. Ebersol, did you get a chance to go

20    through Exhibit 6?

21       A    Yes.

22       Q    Is it a -- can you describe what the purpose

23    of the email you were sending Mr. Dundon was on

24    February 13th, 2019?

25       A    Tom asked me to send him an investigator dec
```

717

1   and projections following our phone call in the morning

2   of the 13th.

3        Q    And what was -- and the purpose of that phone

4   call was to assess Mr. Dundon's interest in the AAF?

11:23AM  5        MR. TREYSON:  Object to form.

6        THE WITNESS:  My purpose in sending or his

7   purpose in asking?

8   BY MR. LOWENSTEIN:

9        Q    What happened in the phone call that triggered

11:24AM 10   you to send this email in Exhibit 6?

11        A    I was -- it was the first time I'd met Tom, we

12   had a conversation, he asked me what I was in the

13   process of doing relative to the AAF, he watched the

14   first weekend of games and was excited about it.

11:24AM 15        He asked me -- based on his conversation with

16   Erik Anderson what his understanding was that I was

17   looking for a bridge loan of 10 million dollars in part

18   due to Reggie Fowler, whose name he had because of Erik

19   Anderson was inconsistent in his payments.

11:24AM 20        Q    Can I just pause you, I'm gonna get into this

21   conversation obviously in a lot of depth, but I don't

22   want to do that yet.  What I -- what I want to know is

23   what happened at the conversation that triggered you to

24   send the email?

11:24AM 25        MR. SALTZ:  He's answering your question.

1    Legendary Field Exhibition was the first one, the

2    purpose of it was when you were starting to form the

3    AAF, correct?

4        A    I believe that's correct.

11:48AM  5        Q    And then you formed Ebersol Sports Media Group

6    to be the parent entity of the other entities that

7    became the league?

8        A    I believe that's correct.

9        Q    What is We Are Realtime, LLC?

11:48AM  10       A    Excuse me.

11       Q    What is We Are Reatltime, LLC?

12       A    I don't know.

13       Q    Okay.  What is AAF Properties LLC?

14       A    I believe it was subsidiary of Ebersol Sports

11:48AM  15   Media Group.

16       Q    That did what?

17       A    I don't recall.

18       Q    What is Lfe 2, LLC?

19       A    I think that's Legendary Field Exhibitions,

11:48AM  20   Lfe.

21       Q    Well, there's a Legendary Field Exhibitions,

22   LLC and there's a Lfe 2, LLC, which I assume means

23   Legendary Field Exhibitions 2 but they just shortened

24   it to Lfe 2, so do you know what that entity did?

11:48AM  25       A    I don't know -- I don't recall.

| | |
|---|---|
| 1 | Q    And then the subsidiary of Legendary Field |
| 2 | Exhibitions is AAF Players LLC, and you understand that |
| 3 | was the entity that employed the players in the league, |
| 4 | or do you know? |
| 11:48AM  5 | A    That -- I -- I don't recall. |
| 6 | Q    Ultimately Ebersol Sports Media Group, Inc., |
| 7 | ended up owning 100 percent of all of those -- all of |
| 8 | the league entities, right? |
| 9 | A    I believe that's correct. |
| 10 | Q    And so when you were seeking investment |
| 11 | from -- investments loans, other things from outsiders |
| 12 | into the league, you were seeking that investment in |
| 13 | Ebersol Sports Media Group, Inc, correct? |
| 14 | A    I -- I'm sorry, restate the question again. |
| 11:49AM 15 | Q    You were selling stock, taking loans, doing |
| 16 | whatever for the league that was coming -- that was an |
| 17 | investment or loan to Ebersol Sports Media Group, the |
| 18 | parent entity? |
| 19 | A    I would say that's predominantly true, but I |
| 11:49AM 20 | do think the other entities took investments and there |
| 21 | were loans and other entities. |
| 22 | Q    Okay.  We'll put a pin in that and come back |
| 23 | to that.  With respect to -- so now look at Exhibit 15. |
| 24 | A    Mr. Lowenstein, this one (indicating)? |
| 25 | Q    Yes, that is a document you were flipping |

|  |  |
|---|---|
| 1 | for my factual memory of what's going on.  I can't tell |
| 2 | you with certainty what changed between June 28th and |
| 3 | February, five and a half years go in an area of |
| 4 | business that had to do with finance. |
| 12:11PM 5 | MR. LOWENSTEIN:  Yeah, can you read back my |
| 6 | question. |
| 7 | They're whispering off the record, ignore |
| 8 | them. |
| 9 | THE REPORTER:  Yeah, depending on what the |
| 12:10PM 10 | definition is, so -- let's just ask this, you have no |
| 11 | idea without speculating what would have caused a |
| 12 | nearly 50 percent increase in the projected revenues |
| 13 | for -- |
| 14 | MR. LOWENSTEIN:  Let me ask a new question |
| 15 | that's not what I asked.  Let me try again.  Thank you. |
| 16 | BY MR. LOWENSTEIN: |
| 17 | Q    I'm just gonna ask you the question from |
| 18 | scratch. |
| 19 | What was the reason the projections for the |
| 12:12PM 20 | AAF between June of 2018 and February 2019 decreased by |
| 21 | nearly 50 percent of revenue? |
| 22 | A    I don't know. |
| 23 | Q    So when you -- did you ever look at these |
| 24 | projections when you sent them to invest -- potential |
| 12:13PM 25 | investors -- strike that, let me get rid of the you. |

```
1   question you don't even know what it is, stop

2   interrupting.

3           MR. SALTZ:  Go ahead and ask it.

4           MR. LOWENSTEIN:  I'm really trying to get to

5   the answer and I think you know what I'm getting at,

6   which is you alone as Charlie Ebersol don't have the

7   ability to issue and sell stock of Ebersol Sports Media

8   Group, you never had that on your own to issue stock

9   and sell them on behalf of Ebersol Sports Media Group?

10          MR. TREYSON:  Objection --

11          MR. SALTZ:  -- form.

12          THE WITNESS:  I Charlie Ebersol personally did

13  not have the authority to issue stock in Ebersol Sports

14  Media Group.

15  BY MR. LOWENSTEIN:

16      Q    Who did have that authority?

17      A    I don't know.

18      Q    Okay.  In order for you to sign a document

19  where the Ebersol Sports Media Group was going to issue

20  stock, what authority did you need to get?

21          MR. TREYSON:  Objection to form.

22          THE WITNESS:  I don't recall exactly based on

23  this company, traditionally, I would require board

24  approval and some amount of preferred shareholders

25  depending on the make up of the preferred equity.
```

CHARLIE EBERSOL                                                JOB NO. 1174241
SEPTEMBER 19, 2024                    CONFIDENTIAL

```
 1    variety of sources.  Again, I would be remiss if I did

 2    not point out the following, we have about 8 million in

 3    invoices that are overdue and maybe and probably

 4    another 8 million that we will continue to push past

 5    opening weekend even though they will arise."

 6            Do you recall those kinds of discussions

 7    around January of 2019?

 8        A    I do.

 9        Q    Would you agree with me that in the absence of

10    outside funding, the league did not have the funds to

11    continue operating at that time?

12            MR. TREYSON:  Objection, form.

13            THE WITNESS:  In the absence of

14    outside -- when you say "outside funding," what do you

15    mean?

16    BY MR. LOWENSTEIN:

17        Q    Loans, investments?

18        A    Yes, I agree.

19        Q    Is there something in here you'd like to point

20    out?

21        A    Yes.

22        Q    What?

23        A    Well, you skipped one sentence in the entire

24    email.

25        Q    All right, tell me.
```

03:07PM (lines 5, 10, 15, 20, 25)

```
 1   record.

 2   BY MR. LOWENSTEIN:

 3       Q    All right.  Mr. Ebersol, let's try this

 4   without any paper in front of you.  Is it true that as

 5   of January 2019 the league was not receiving the money

 6   it was expecting to receive from Mr. Fowler?

 7       A    Yes.

 8       Q    And what affect did that have on the league?

 9       A    It created urgency to raise capital.

10       Q    Why?  What was going on that it was urgent?

11       A    The league was kicking off on February 9th.

12       Q    So I assume that means there was a

13   considerable amount of expenses piling up as the league

14   neared starting the season, fair?

15       A    I think that's fair.

16       Q    Okay.  And in addition, once the players

17   started their salary obligations kicked in as well,

18   right?

19       A    By January the players had already started.

20       Q    When did the players start?

21       A    They started preseason in January.

22       Q    When did they start -- when were they supposed

23   to start receiving game checks?

24       A    Game checks would have been after the first

25   game.
```

03:26PM (line 5)
03:27PM (line 10)
03:27PM (line 15)
03:27PM (line 20)
03:28PM (line 25)

22-cv-05037-agc Doc #204-1 23-md-3010  Filed 06/24/25 09/25/13 04 22950 Exhibit 18 Designated
Excerpts from the Deposition of Charlie Ebersol Volume 1 Pg 12 of 25
CHARLIE EBERSOL                                          JOB NO. 1174241
SEPTEMBER 19, 2024              CONFIDENTIAL

1      Q    Do you recall the amount of funding that

2   needed to be obtained before the start of the

3   season -- strike that.

4           After you stopped getting the funds you were

03:28PM 5   expecting from Fowler, do you recall knowing how much

6   the league was gonna need to get started, like week one

7   of the season?

8      A    Sitting here, I don't recall the exact amount.

9           MR. LOWENSTEIN:  Can I have (unintelligible.)

03:28PM 10          Is that 20.  I'm gonna show you what I've

11   marked Exhibit 20.  This is February 11, 2019 email

12   exchange.  I'm sorry it starts on February 10th it's an

13   exchange between you and Michael Kives at K5global.com.

14          (Deposition Exhibit 20 was marked for

03:29PM 15          identification, a copy of which is

16          attached hereto.)

17   BY MR. LOWENSTEIN:

18      Q    Do you see that?

19      A    Michael Kives.

03:29PM 20      Q    Okay.  Who's Michael Kives?

21      A    Michael is a friend who worked at CAA,

22   Creative Artists Agency and then created his own entity

23   which I believe is K5global, which was -- actually to

24   be honest, I don't know what it is.

03:29PM 25      Q    Okay.  In here --

         1    is right?

         2         A    Correct.  Thank you, sorry.

         3         Q    No, it's fair.  The -- do you know if

         4    Mr. Fowler put in any money after February 11, 2019?

03:31PM  5         A    Yes.

         6         Q    How much?

         7         A    To the best of my knowledge he put in an

         8    additional 1.75 million dollars later that week, I want

         9    to say on the 13th.  There may have been another

03:31PM  10   payment, but I don't remember at this time.

         11        Q    All right.  And then it says, "Essentially I

         12   need 10 million dollars to get through the next two

         13   weeks and an additional 60 million dollars to get

         14   through the end of the season."  So where you are in

03:31PM  15   time right now is February 10th, was after the first

         16   week of game play had completed, correct?

         17        A    I believe this was -- February 9th was the

         18   first game.

         19        Q    Okay.  So week one of games has happened as of

03:31PM  20   the time of your email, right?

         21        A    There may be a game still to be played, but

         22   essentially yes.

         23        Q    Okay.  And so when you're discussing the next

         24   two weeks -- strike that.

03:32PM  25             What -- when you said I need 10 million

1   dollars to get through the next two weeks, what was the

2   basis for saying that's what you needed?

3        A    Meaning, where did I come up with the number

4   10 million?

03:32PM  5        Q    Correct.

6        A    I assumed I got the number from Alan

7   Kantowitz, Kevin Freedman, Kevin Farrell, someone on my

8   team.

9        Q    You don't recall?

03:32PM 10        A    I don't.

11        Q    You relied on them to say that's the number

12   that we need?

13        A    I relied on them for financials.

14        Q    So you don't know what that 10 million dollars

03:32PM 15   was gonna be used for that you were saying you needed

16   to get through the next two weeks as of February 10th?

17        A    I do not.

18        Q    Okay.  And then you said an additional 60

19   million to get through the end of the season, you see

03:32PM 20   that?

21        A    I do see that.

22        Q    Okay.  So as of February 10th, 2019, but you

23   were telling Mr. Kives was that the league needed 70

24   million dollars to get through the end of the first

03:33PM 25   season, correct?

```
 1   am just...

 2           MR. LOWENSTEIN:  Mrs. Lowenstein of three

 3   months.

 4           MR. TREYSON:  Let's see if we get to four.

 5           MR. ENGEL:  That's -- that's, I am so sorry.

 6           MR. LOWENSTEIN:  All right.  Let's continue.

 7           MR. SALTZ:  It's on video.

 8   BY MR. LOWENSTEIN:

 9       Q    Good Lord, all right.  Collecting ourselves.

10           Let's do this, let's talk about you getting

11   introduced to Mr. Dundon.  Tell me about how that came

12   about.

13       A    On February 13th -- actually, I'm not sure,

14   either on February 12th or February 13th, Erik Anderson

15   reached out to me and said he had a person that he

16   thought would be interested in investing.

17       Q    This was not at the breakfast this was prior

18   to that?

19       A    I don't know what you're referring to.

20       Q    Were you having breakfast with Erik Anderson

21   when you -- oh, okay, all right.  Sorry.  How did

22   Mr. Erik Anderson tell you about Mr. Dundon here?

23       A    I think it was in a text message.

24       Q    Okay.  I think that's true.  Okay.  So somehow

25   you get connected with Mr. Dundon and you have a call
```

03:34PM (line 10)
03:34PM (line 15)
03:35PM (line 20)
03:35PM (line 25)

22-CV-10511-CFC/22-50073-CTG-Doc#1124-21 Filed 05/24/25 Page Entered 05/24/25 09:51:00 Desig Page 18 of 19 Desig nated
Excerpts from the Deposition of Charlie Ebersol Volume 1 Pg 16 of 25
Document Page 729 of 1466

```
          1      Q    And why was that the deadline it?

          2      A    Erik felt that Tom would be a -- Erik told me

          3  that he felt Tom would be attracted to the situation

          4  because it was -- again his words, not mine, a

03:39PM   5  distressed situation and that he would have an

          6  opportunity to -- again his words, "participate in a

          7  big way" based on my timing needs -- or excuse me,

          8  based on the timing needs of the Alliance of American

          9  Football/Ebersol Sports Media Group, et cetera.

03:39PM  10      Q    Did you disagree with the way -- any of the

         11  ways Erik told you he described things to Mr. Dundon?

         12      A    I don't believe so.

         13      Q    Anything else you recall in telling you about

         14  his conversation with Mr. Dundon?

03:40PM  15      A    That Tom was uniquely capable of moving

         16  quickly, that he liked sports -- that he was a highly

         17  liquid billionaire and interested in arbitrage, his

         18  word.

         19      Q    Whose word?

03:40PM  20      A    Erik Anderson's word.

         21      Q    What was magic about the morning of February

         22  14th in terms of the timing of the investment?

         23      A    Payroll, we had switched payroll companies and

         24  payroll -- to the new payroll company was due

03:41PM  25  uniquely -- it was due -- I believe the number was
```

           1    something like 5.1 million dollars and there was a

           2    strict timing by which the money had to come in to do

           3    it, which I believe was either 1:30 or 2:00 p.m. on the

           4    14th.

03:41PM    5        Q    And did Mr. Anderson tell Mr. Dundon that they

           6    needed the 5.1 million dollars for him or the league

           7    would not be able to make that payroll commitment?

           8        A    I don't -- I don't know if he said -- I

           9    wouldn't know if he said that.  He did not -- he did

03:42PM   10    not say that to -- I don't remember him saying that to

          11    me.

          12        Q    Did the league have sufficient funds to make

          13    that payroll commitment by 1:30 or 2:00 p.m. on

          14    February 14th, 2019?

03:42PM   15        A    Not without an investment.

          16        Q    And what was your understanding of what was

          17    going to happen if the league didn't make that payroll,

          18    didn't make payroll as of February 14th?

          19            MR. SALTZ:  Objection to form.

03:42PM   20            THE WITNESS:  What -- I'm sorry, what was my

          21    understanding?

          22    BY MR. LOWENSTEIN:

          23        Q    What was gonna happen if the league didn't

          24    make payroll on February 14th?

03:43PM   25        A    If the league did not make payroll it would

```
 1    remember from Anderson's that -- your conversation with

 2    Anderson about his conversation with Dundon?

 3        A    I don't believe so.

 4        Q    Okay.  And then the next thing that happens if

 5    you have a call with Mr. Dundon?

 6        A    Correct.

 7        Q    Okay.  Tell me when did that call happen?

 8        A    Very early in the morning on the 13th.

 9        Q    Where were you?

10        A    I am my home in San Francisco.

11        Q    Where was he?

12        A    I don't recall.

13        Q    Okay.  Tell me everything you remember about

14    the call?

15        A    Sure.  Erik introduced us via text message,

16    Tom asked me to called him I called him, he was a

17    person -- first and foremost it's a very long phone

18    call.  It was nearly an hour.  Tom asked me -- Tom had

19    watched -- he told me that he'd watched the first

20    weekend of games.  He's very impressed with the quality

21    of the games.  He said that he had had friends in the

22    media business who told him that this was exceptional

23    in terms of its outcome or whatever.

24            He told me that he had been looking at the

25    business, his words, for quite sometime because of
```

03:48PM (lines 5, 10, 15, 20)
03:49PM (line 25)

```
 1    said "I'll call you back I want to make a couple of

 2    these phone calls," and he hung up.

 3         Q     So in that call was there a discussion of the

 4    amount of money that Mr. Dundon was saying he was gonna

 5    put in the league?

 6         A     He said on the call -- he's like how much are

 7    you really asking for and I said "Well, I'm asking for

 8    10 million dollars, he said we'll I'll give you the 10

 9    million dollars just to take a deeper look at your

10    company.  I said okay great, I said do you want me to

11    send you that term sheet, he said perhaps potentially

12    something like that and -- but this is no where near

13    how much money I think you really need and I want to

14    think about that -- and I wanted to make a couple of

15    phone calls and the call ended somewhere around there.

16         Q     Okay.  Then what happened next?

17         A     I called --

18         Q     Let me just pause -- is that everything you

19    remember from the first call you had with Mr. Dundon on

20    February 13th?

21         A     Yeah, as you're seeing I'm -- I'm recounting

22    as it is coming to my memory so as a -- like right now,

23    yes, this is the best I can remember now but if you

24    came back to the question later I might remember more

25    based on your refreshing my memory with the questions.
```

| | |
|---|---|
| 1 | to get approval and opinions -- I don't really want to |
| 2 | go through every single conversation.  So what exactly |
| 3 | were you trying to get approval to do and do you think |
| 4 | you got that approval -- let's try that? |
| 04:41PM 5 | A    Yeah, I -- I was -- I think you're asking me |
| 6 | two questions. |
| 7 | Q    You're okay.  You're right, what were you |
| 8 | trying to get approval for? |
| 9 | A    One, in the event I needed it, though I did |
| 04:41PM 10 | not think I did approval to accept 10 million dollars |
| 11 | from Tom in a bridge loan whatever that -- that |
| 12 | instrument was.  The second thing was approval to |
| 13 | negotiate with Tom if he was serious about making a |
| 14 | larger investment that might be -- that would -- that |
| 04:42PM 15 | would go beyond the frame work of the convertible note |
| 16 | or bridge loan. |
| 17 | Q    And you did not approach the board or the |
| 18 | other investors with any other dollar amount of 10 |
| 19 | million dollars in those calls, correct? |
| 04:42PM 20 | MR. SALTZ:  Objection to form, go ahead. |
| 21 | THE WITNESS:  Either Tom or Erik had said that |
| 22 | Tom thought that we needed nine figures from a single |
| 23 | source from Tom. |
| 24 | BY MR. LOWENSTEIN: |
| 04:43PM 25 | Q    From Mr. Dundon?  Okay.  So other that nine |

```
 1      Q    Did -- did you say I'm gonna -- well, strike

 2   that.

 3           All right.  So you talked to those people

 4   after your last conversation with Tom and your

 5   conversation with the attorneys and your team.  What

 6   happened next?

 7      A    Tom had introduced -- Mr. Dundon had

 8   introduced me to John Zutter and I had an initial call

 9   with John Zutter and with some combination of Kevin

10   Freedman and Alan or thereof.  There were a series of

11   phone calls in a very short period of time between my

12   memory is between me, John Zutter with or without

13   Jordan Roberts, Alan Kantowitz and Kevin Freedman in

14   which time -- John Zutter said to me -- said to -- said

15   to the group Tom has instructed me to figure out a

16   mechanism to get you 1.5 million dollars by 1:30 today.

17           What do you have -- what documents do you have

18   prepared because we don't have a lot of time to get

19   this done.  And my memory is that John -- excuse me, my

20   memory is that either Alan or Jordan sent John Zutter a

21   abbreviated -- no, not abbreviated -- a term sh -- I

22   don't know what the word I'm looking for is a term

23   sheet that would facilitate it and John said on the

24   let's structure it for 70 million, and Jordan --

25           MR. ENGEL:  If it was a call that occurred
```

05:32PM (line 5)
05:34PM (line 20)
05:34PM (line 25)

| | | |
|---|---|---|
| | 1 | answer a belief at the moment. |
| | 2 | BY MR. LOWENSTEIN: |
| | 3 | Q    Did Fenwick draft these minutes? |
| | 4 | A    I think so. |
| 06:17PM | 5 | Q    Was there a board meeting on February 24th |
| | 6 | 2019? |
| | 7 | A    According to this document there was. |
| | 8 | Q    Okay.  Do you recall there being one where you |
| | 9 | and your father and Jeff Morad were present and Kevin |
| 06:17PM | 10 | Freedman and Alan Kantowitz and Dawn Belt were also |
| | 11 | present? |
| | 12 | A    I do. |
| | 13 | Q    Where did that occur? |
| | 14 | A    In a supply closet in the San Diego stadium |
| 06:18PM | 15 | football stadium. |
| | 16 | Q    Okay. |
| | 17 | A    Actually it may have been a security guard's |
| | 18 | room, but you get the idea. |
| | 19 | Q    Not expected but okay, and then -- so that was |
| 06:18PM | 20 | ten days after the term sheet was executed, right? |
| | 21 | A    Yeah, I think so. |
| | 22 | Q    All right? |
| | 23 | A    Yes.  Actually -- yes.  Yes. |
| | 24 | Q    The first part of these minutes refers to |
| 06:18PM | 25 | update on F02, LLC and you understand that was |

22-0507-cv-d... Doc#... Filed 06/24/25 Entered 06/24/25 09:19:04 Exhibit 18 Designated
Excerpts from the Depositions of Charlie Ebersol Volume 1 Pg 23 of 25
CHARLIE EBERSOL                          JOB NO. 1174241
SEPTEMBER 19, 2024                CONFIDENTIAL

```
 1            MR. SALTZ:  No, don't because let the record
 2    reflect his answer and then you can deal with it after
 3    he is done.
 4            MR. LOWENSTEIN:  I'm on limited time, and I'm
 5    getting tired of it so --
 6            MR. SALTZ:  (Simultaneously speaking) I'm not
 7    ---
 8    BY MR. LOWENSTEIN
 9       Q    (Simultaneously speaking) so just -- just --
10    just answer the question I just asked if you can
11    Mr. Ebersol if you need me to ask it again we can.
12            What I want to know is not what happened
13    first, second, third in this agreement.  I want to know
14    the total consideration each side was committing to in
15    the agreement.
16            MR. ENGEL:  Objection form.
17            MR. TREYSON:  Objection form.
18            MR. SALTZ:  Answer the question if you can.
19            MR. LOWENSTEIN:  Thank you for allowing that.
20            MR. SALTZ:  My pleasure.
21            THE WITNESS:  My understanding of this
22    document the binding term sheet for the series 2
23    preferred stock financing my understanding of this
24    document as I have read it is that in exchange for 5.1
25    million dollars, Dundon Capital Partners received among
```

06:35PM (line 15)
06:35PM (line 20)

| | |
|---|---|
| 1 | other things 75 percent of the company's fully diluted |
| 2 | stock and they had the right to invest up to 70 million |
| 3 | dollars. |

4  BY MR. LOWENSTEIN:

06:35PM 5      Q    Are you done?

6          MR. SALTZ:  Are you done?

7          THE WITNESS:  Oh, yes, sorry, yes.

8  BY MR. LOWENSTEIN:

9      Q    This says "The company will have -- the

06:35PM 10  company will have the right to submit an equity funding

11  request to investigator which shall state the amount of

12  funding requested and" --

13          MR. LOWENSTEIN:  Can you stop --

14          MR. SALTZ:  I --

06:35PM 15          MR. LOWENSTEIN:  -- you're such a goofball

16  with the bouncing your head --

17          MR. SALTZ:  -- I love it --

18          MR. LOWENSTEIN:  -- good lord --

19          MR. SALTZ:  -- no, you're reading exactly what

20  you should have read before you asked the question.

21          MR. LOWENSTEIN:  Sit there.

22          MR. SALTZ:  Go ahead and read that carefully.

23  BY MR. LOWENSTEIN:

24      Q    "The company will have the right to submit an

06:36PM 25  equity funding request to the investor, which shall

CHARLIE EBERSOL
SEPTEMBER 19, 2024                    CONFIDENTIAL                    JOB NO. 1174241

```
 1

 2                    REPORTER'S CERTIFICATION

 3

 4           I, Michelle Somers, Certified Shorthand

 5   Reporter in and for the State of California, do hereby

 6   certify:

 7

 8           That the foregoing witness was by me duly

 9   sworn; that the deposition was then taken before me at

10   the time and place herein set forth; that the testimony

11   and proceedings were reported stenographically by me

12   and later transcribed into typewriting under my

13   direction; that the foregoing is a true record of the

14   testimony and proceedings at that time.

15

16           IN WITNESS WHEREOF, I have subscribed my name

17   on this date:

18

19

20

21

22   _____

              Michelle Somers

23           Michelle Somers, CSR No. 13674

24

25
```

EXHIBIT

**24**

```
 1                    UNITED STATES DISTRICT COURT
 2                 FOR THE WESTERN DISTRICT OF TEXAS
 3                       SAN ANTONIO DIVISION
 4
 5     IN RE:                        ) Case No. 19-50900-CAG-7
                                     )
 6     LEGENDARY FIELD EXHIBITIONS,  )
       LLC, ET AL.,                  )
 7                                   )
                DEBTORS.             ) Chapter 7
 8     _____)
                                     )
 9     RANDOLPH N. OSHEROW, Chapter 7)
       Trustee of the Bankruptcy     )
10     Estates of Legendary Field    )
       Exhibitions, LLC; AAF Players,)
11     LLC; AAF Properties, LLC;     )
       Ebersol Sports Media Group,   )
12     Inc.; LFE 2, LLC; and We Are  )
       Realtime, LLC,               )
13                                   )
                PLAINTIFF,           )
14                                   )
            vs.                      ) ADV. PROC. NO. 22-05078-cag
15                                   )
       DUNDON CAPITAL PARTNERS, LLC; )
16     THOMAS DUNDON; AND JOHN       )
       ZUTTER,                       )
17                                   )
                Defendants.          )
18     _____) Volume II
19                    *** CONFIDENTIAL ***
20          VIDEO DEPOSITION OF CHARLES EBERSOL
21                    Encino, California
22               Friday, September 20, 2024
23     Reported by:
       Elaine Smith, RPR, RMR, CSR No. 5421
24
       Job No. CA 6931588
25     PAGES 1 - 126

                                              Page 1
```

```
 1      good representation of him.                      11:33:43

 2              And he agreed doing the press release, and

 3      then Monday morning we started getting calls about

 4      the press.  In front of me, he called another

 5      reporter and effectively said the same -- it may have  11:33:51

 6      been the same reporter.  It was a reporter in North

 7      Carolina.  It was -- excuse me.  It was a reporter in

 8      North Carolina.  And effectively said the same thing.

 9          Q    Which is what?

10          A    That the league was on the verge of       11:34:01

11      bankruptcy and that he saved the league with his

12      $250 million investment.

13          Q    Who -- who did he call?  Do you know?  The

14      one you overheard.

15          A    It was the re- -- it was a reporter in North  11:34:17

16      Carolina who is, I believe, a beat reporter for the

17      Carolina Hurricane.  I believe I then met him on the

18      night of the -- the following -- Tuesday, the 19th,

19      when he -- when Tom took me to North Carolina on his

20      plane.                                            11:34:35

21          Q    It's true that before Mr. Dundon's

22      investment that the league was in financial trouble;

23      right?

24          A    The league was seeking capital.

25          Q    And that the league was in need of        11:34:43
```

Page 71

```
 1    $5.1 million in a very short amount of time that he        11:34:48
 2    funded, that the DCP funded; right?
 3              MR. SALTZ:   Objection to form.
 4              THE WITNESS:   Dundon Capital Partners funded
 5    $5.1 million on February 14th.                             11:35:02
 6    BY MR. LOWENSTEIN:
 7         Q    And that was the money that was used to pay
 8    the players for playing football; right?
 9         A    The $5.1 million was used to pay, among
10    other things, the payroll for the players.                11:35:22
11         Q    All right.  So then you said -- I got it.
12              You said that Mr. Dundon contravened orders
13    between executives.  Did you overhear -- you gave me
14    the one example where you -- you talked about
15    Mr. Zutter and him saying he's my hatchet guy,            11:35:51
16    that -- that conversation.
17              What other -- did you overhear other
18    conversations where Mr. Dundon contravened orders
19    between executives?
20         A    Many.                                           11:36:03
21         Q    Can you summarize what those -- how -- how
22    that worked?
23         A    Speaking about the period of time from the
24    morning of February 15th to Tuesday the 19th, Tom --
25    I think I described this earlier.  There was a            11:36:29
```

Page 72

```
 1                    I, the undersigned, a Certified Shorthand Reporter

 2        of the State of California, do hereby certify:

 3                    That the foregoing proceedings were taken before

 4        me at the time and place herein set forth; that any

 5        witnesses in the foregoing proceedings, prior to testifying,

 6        were administered an oath; that a record of the proceedings

 7        was made by me using machine shorthand which was thereafter

 8        transcribed under my direction; that the foregoing

 9        transcript is a true record of the testimony given.

10                    Further, that if the foregoing pertains to the

11        original transcript of a deposition in a federal case,

12        before completion of the proceedings, a review of the

13        transcript was requested.

14                    I further certify I am neither financially

15        interested in the action nor a relative or employee of any

16        attorney or any party to this action.

17                    IN WITNESS WHEREOF, I have this date subscribed my

18        name.

19

20        Dated: 9/27/2024

21

22                    Elaine Smith

23                    ELAINE SMITH, RPR, RMR

                      CSR No. 5421

24

25
```

Page 123

**EXHIBIT**

**25**

```
 1              UNITED STATES BANKRUPTCY COURT
          FOR THE WESTERN DISTRICT OF TEXAS
 2                SAN ANTONIO DIVISION
 3    IN RE:                    §  CASE NO. 19-50900-CAG-7
                                §
 4    LEGENDARY FIELD           §
      EXHIBITIONS, LLC, ET AL., §  CHAPTER 7
 5                              §
                                §
 6         DEBTORS.             §
                                §
 7    _____

 8    RANDOLPH N. OSHEROW,      §
      Chapter 7 Trustee of the  §
 8    Bankruptcy Estates of     §
 9    Legendary Field           §
      Exhibitions, LLC; AAF     §
10    Players, LLC; AAF         §
      Properties, LLC; Ebersol  §
11    Sports Media Group, Inc.; §
      LFE 2, LLC; and We Are    §
12    Realtime, LLC,            §
                                §
13         PLAINTIFF,           §
                                §
14    v.                        §  ADV. PROC. NO. 22-05078-cag
                                §
15    DUNDON CAPITAL PARTNERS,  §
      LLC; THOMAS DUNDON; AND   §
16    JOHN ZUTTER,              §
                                §
17         DEFENDANTS.          §
18
                  ORAL AND VIDEOTAPED DEPOSITION OF
19
                           THOMAS DUNDON
20
                         Volume 1 of 2
21
                       December 2, 2024
22
                         Pages 1-290
23
24
25     Job No. 6990569


                                              Page 1
```

```
 1        Q.      They weren't immediate revenues?

 2        A.      Some were.

 3        Q.      And some weren't, correct?

 4        A.      Yes.

 5        Q.      Okay.  All right.  You mentioned, on the

 6   AAF, you didn't have time to do normal diligence.  What

 7   would you consider normal diligence for something that

 8   DCP invests in?

 9        A.      Well, I mean, like, normally you would

10   audit finance.  You'd get financials that you could go

11   check and make sure the numbers were accurate, all the

12   bills were paid, there were no lawsuits, they had

13   proper governance docs, you knew who the investors

14   were.  I think most investments -- most investments

15   follow a pretty standard protocol, and that wouldn't be

16   unique to us.

17        Q.      Does DCP have any kind of written policy or

18   procedure related to due diligence?

19        A.      No, not that I'm aware of.

20        Q.      Did you make the decision at the time to

21   not have normal diligence done on AAF?

22        A.      The way it was explained to me, that if

23   they didn't get money, they'd be out of business, so we

24   didn't have the -- it wasn't really a choice.  They

25   couldn't produce it and didn't have time to produce it.
```

Page 68

```
 1          A.     I don't.  You said "general" and

 2   "specific."  If you're asking generally, I can answer

 3   that.  I don't specifically remember what he said, but

 4   generally I do have a recollection of what I thought I

 5   was being told.

 6   BY MS. WILLIAMS:

 7          Q.     Okay.  And I want to separate those two

 8   things because I do want to know what you thought, but

 9   I -- I also want to know what was said.  Do you have

10   any recollection of what Mr. Ebersol said on the calls?

11          MR. LOWENSTEIN:  Object to form.

12          A.     Yeah.  I would say that what I thought is

13   based on what he said.  But no, I did not record the

14   phone calls.  I do not have the type of memory that

15   could quote his words.

16   BY MS. WILLIAMS:

17          Q.     Okay.  Do you remember what you said on any

18   of those calls?

19          A.     I do not.

20          Q.     Okay.  Now, you can tell me:  What did you

21   think after those calls?

22          A.     So what I thought was he needed money very,

23   very quickly and that he was very excited, and he was

24   -- my impression was that he was in trouble if he

25   didn't get money.  Like, he had employees that had to
```

Page 82

1    be paid, and that they had already spent a lot of money
2    to get it to this point, and that the amount of money
3    it took to keep the league going seemed reasonable.
4         Q.    Do you remember Mr. Ebersol mentioning that
5    he was talking to other potential investors besides
6    you?
7         A.    I think Mr. Ebersol consistently has had
8    that story.
9         Q.    Do you remember him saying that to you?
10        A.    I don't remember.
11        Q.    Do you remember Mr. Ebersol saying he could
12   put in the money for the next week if it was needed for
13   the league to keep going?
14        A.    I don't think that was the opinion me or my
15   team had about -- I don't think -- I don't think that
16   was a real option, so I don't remember if he said it or
17   not.  But I think the feeling we had was:  If we didn't
18   fund it, the opportunity would go away.
19             MS. WILLIAMS:  Okay.  I am going to object,
20   nonresponsive.
21   BY MS. WILLIAMS:
22        Q.    Do you recall Mr. Ebersol telling you that
23   he could and would put in the money to sustain the
24   league for another week if he needed to?
25        A.    I don't recall him saying it, and I don't

                                              Page 83

```
 1   believe he said that.
 2       Q.    Okay.
 3       A.    Because if he had said it, we would have
 4   let him.
 5       Q.    When you talked to Mr. Ebersol, did you
 6   ever talk about any due diligence that you wanted to do
 7   before making the investment?
 8       A.    I don't recall.  Normally, I would expect
 9   that Zutter and the team would be -- would work on
10   diligence, and it was about did we have time.
11       Q.    So you're saying normally Mr. Zutter would
12   work on diligence?
13       A.    Yes.
14       Q.    Did you ever handle diligence personally?
15       A.    No.
16       Q.    Did you handle any diligence personally in
17   this case?
18            MR. LOWENSTEIN:  Object to form.
19       A.    Diligence is a broad --
20   BY MS. WILLIAMS:
21       Q.    Let me correct the question because that
22   was a bad question.
23            Did you personally work on any diligence on
24   the AAF investment?
25       A.    So diligence of calling people to say,
```

Page 84

1  "What do you think of the TV product," but diligence in

2  this -- what I'm speaking of is:  Do they actually own

3  the shares?  Do they have accounts receivable, accounts

4  payable, normal sort of financial diligence?  That's

5  not what I would be working on.  And so if we use the

6  word "financial diligence," no, I didn't do -- we

7  didn't have time to do financial diligence.  And we

8  were 100 percent certain, based on the conversations,

9  that if we didn't fund, that there was -- employees

10  weren't going to get paid.

11      Q.     That was an internal conclusion that you

12  came up with at DCP?

13      A.     Based on conversations with Charlie.

14      Q.     Okay.

15      A.     So that when you tell me -- when you tell

16  -- when you ask if -- if Charlie told me he would fund,

17  of course not.

18      Q.     But you can't remember any of the specifics

19  of the conversations with Mr. Ebersol that led you and

20  the DCP team to reach that internal conclusion?

21      A.     The conclusion we reached was:  If we

22  didn't fund, they wouldn't be able to make payroll.

23      Q.     I understand that.  But can you recall any

24  of the specific things that got said that led to that

25  conclusion?

Page 85

```
 1        A.      No, I don't have -- once again, I can't
 2   quote the conversation but.  If you're -- you implied a
 3   second ago that he was willing and able to fund, it's
 4   just not true.
 5        Q.      But not based on anything specific that you
 6   can remember --
 7        A.      Based on --
 8        Q.      -- about that conversation?
 9        A.      Based on if we didn't fund, no one was
10   getting paid, and you would ruin the credibility and
11   the league would be over and all the players would
12   leave.  That's what I recall.
13        Q.      That's what you recall the internal
14   conclusion at DCP being?
15        A.      No.  That's what I recall our conclusion
16   being on conversations with Charlie.  I can't quote to
17   you exactly how -- the words he used, but there was
18   never a time where there was any thought that if we
19   didn't do this very quickly, that those people would
20   get paid.
21        Q.      And you think Charlie expressed that idea
22   to you?
23        A.      Absolutely.
24        Q.      Do you remember anything about that idea
25   other than your conclusion from it?
```

Page 86

```
 1          A.      I assume you can go back and look at emails
 2    and texts, but they were very, very, very worried we
 3    wouldn't get the money there in time.  And as a matter
 4    of fact, I recall the money got there a little late and
 5    people had to be told they weren't getting paid until
 6    the next day.  That's what I recall.
 7          Q.      Anything else you recall about those
 8    conversations with Mr. Ebersol that you have not told
 9    me?
10              MR. LOWENSTEIN:  Object to form.
11          A.      Yeah, I -- nothing specific.
12    BY MS. WILLIAMS:
13          Q.      Okay.  You said one of the things that you
14    thought after your conversations was that a lot of
15    money had already been spent.  Can you tell me anything
16    more specific about that?
17          A.      Yeah.  The -- you know, they had to do
18    training camp and get locations and make rules and buy
19    equipment, and so there was some amount of money to get
20    the league past week one.  And, you know, the -- the
21    way we were -- the way we were told is, they had a dire
22    need to pay the players.  And up to that point, they
23    had funded this league to this point but they didn't
24    have the money for the players.
25          Q.      Okay.  And there's certain -- especially
```

Page 87

1  with you being the owner of another sports franchise,

2  there's certain expenses that come along with a sports

3  league that you understand, right?

4       A.    Yes.

5       Q.    Like, you have to pay the players, for

6  example?

7       A.    I always have.

8       Q.    Okay.  And you're going to need some kind

9  of stadium arrangement; that's going to cost money to

10 have a place to play, right?

11      A.    Yes.

12      Q.    You're going to need coaching staff,

13 correct?

14      A.    Yes.

15      Q.    You're going to need somewhere for the

16 players to stay when they are at away games, right?

17      A.    Yes.

18      Q.    You're going to need some way for the

19 players to get to away games, correct?

20      A.    Yes.

21      Q.    You're going to need -- whether or not how

22 important you think it is, you're going to need some

23 kind of advertising for the games, correct?

24      A.    Yes.

25      Q.    You're going to need some sort of

                                           Page 88

1  production element to put on the games in a

2  professional manner, correct?

3      A.      Yes.

4      Q.      You are going to need back office staff to

5  do all the things that aren't on the field, correct?

6      A.      All the things you're listing are things

7  exactly -- you're exactly right.  We thought those

8  things had all been paid for and the only thing not

9  paid for was this player payroll from the prior week.

10     Q.      You thought all those things had been

11 prepaid?

12     A.      I thought -- well, not prepaid.  Up to that

13 point.  "Prepaid" implies for the next game.  Talking

14 about up to that point.

15     Q.      Okay.  What led you to believe that?

16     A.      Charlie.

17     Q.      What specifically did Mr. Ebersol say

18 that --

19     A.      He said --

20     Q.      -- you say led you to believe?

21     A.      That -- he said, "We just -- we're -- we're

22 in great shape.  We just need the money for the

23 payroll.  We've come this far."

24     Q.      Okay.  So now do you remember specific

25 things Mr. Ebersol said --

                                        Page 89

```
 1    talked about specifically about the vehicle Mr. Ebersol
 2    proposed to you?
 3         A.    I don't remember.
 4         Q.    Okay.  Do you remember proposing any
 5    vehicle back to Mr. Ebersol in that conversation?
 6         A.    I don't remember.
 7         Q.    Do you remember any specific amount that
 8    Mr. Ebersol asked you for on that call?
 9         A.    I don't -- I thought -- yeah, I don't know
10    if it was 10 million or 5 million, but I remember there
11    was some amount of money that he needed for payroll to
12    pay the players.
13         Q.    And that's the number you recall coming up
14    on that pre-investment call with Mr. Ebersol?
15              MR. LOWENSTEIN:  Object to form.
16         A.    I just don't remember the exact numbers.
17    But that was -- it was some amount of money and it was
18    mostly around, "We're not gonna make payroll."
19    BY MS. WILLIAMS:
20         Q.    Okay.  So at some point pre-investment, a 5
21    to $10 million number came up?
22         A.    Yes.
23         Q.    Do you recall any other number that
24    Mr. Ebersol --
25         A.    I don't remember.
```

                                                    Page 98

```
 1    years.
 2         Q.    Okay.  Do you recall any conversation you
 3    had with him about the AAF?
 4         A.    No.
 5         Q.    Earlier, when we were talking about the $70
 6    million number in the term sheet, I think you said that
 7    that number came from conversations that you and Zutter
 8    and Mr. Ebersol had; is that correct?
 9         A.    I -- I think the amount of money we needed
10    would have come from Charlie.  And then I'm assuming
11    during diligence, Zutter added to it.  But most
12    everything that we knew came from Charlie.
13         Q.    Do you have a specific recollection of
14    Mr. Ebersol giving anyone the $70 million number?
15         A.    I mean, I think it was that 5 million a
16    week.  So, it was like 55 million, and could be 70.
17    And it was a little more of there are a lot of moving
18    parts.  But, yeah, Charlie was pretty adamant that that
19    was how much it took to get through a season.
20         Q.    The 70 million?
21         A.    55 to 70, I would say, were the
22    conversations.  I don't think he had -- as you probably
23    are aware, I don't think he had an exact grasp on the
24    exact dollar amount.
25         Q.    Do you ever recall Mr. Ebersol saying a $90
```

Page 148

1    Q.    If you look at the third page of this
2    document, you can see Mr. Ebersol's DocuSign signature.
3          Do you see that?
4    A.    Yes.
5    Q.    And I don't have one for DCP.  And I think
6    you already answered this, but let me just be clear
7    while you're looking at it.  Do you remember signing
8    this document?
9    A.    I don't remember.  It was funded, the
10   money.  So, we executed -- we acted as if we signed the
11   documents.  I'm assuming we signed the document.
12   Q.    Okay.  But you don't know if anyone
13   actually signed this document from DCP?
14   A.    I don't remember.
15   Q.    Okay.
16         THE WITNESS:  Document...
17         MR. LOWENSTEIN:  Just answer the questions,
18   please.
19   BY MS. WILLIAMS:
20   Q.    When Mr. Ebersol signed this term sheet, do
21   you remember any conversations you had with Mr. Ebersol
22   about his authority to do so?
23   A.    I don't remember.  But the way I understood
24   how the business ran, is he ran the day-to-day
25   operations and -- and, you know, he was in my -- what I

                                        Page 157

```
 1    BY MS. WILLIAMS:

 2         Q.    To determine --

 3         A.    How would I --

 4         Q.    -- a valuation.  To --

 5         A.    To who?

 6         Q.    -- determine if they had market value?

 7         A.    I didn't -- I don't believe they did.  But

 8    I don't know how you would value them.  To who?

 9         Q.    You don't believe they did.  What's that

10    based on exactly?

11         A.    Just I was running a league that couldn't

12    find any money, that couldn't pay its bills and didn't

13    -- didn't have any ideas.  There was no "sell this, do

14    that," which would have been great because I could have

15    not lost $70 million.  It didn't seem to me, in my

16    judgment, that there was any value in those assets.

17         Q.    Okay.  Other than your judgment, do you

18    have any basis for there not being any value in the

19    player contracts?

20         A.    I mean, besides the fact that they were

21    going out of business when I met them?

22         Q.    That -- that could be something you

23    considered.

24         A.    Yeah.

25         Q.    Okay.  Anything else?
```

Page 253

```
 1              REPORTER'S CERTIFICATION

 2              DEPOSITION OF THOMAS DUNDON

 3                   December 2, 2024

 4              I, Joseph D. Hendrick, Notary Public and

 5     Certified Shorthand Reporter in the State of Texas,

 6     hereby certify to the following:

 7              That the Witness, THOMAS DUNDON, was duly

 8     sworn by the officer and that the transcript of the

 9     oral deposition is a true record of the testimony given

10     by the witness;

11              I further certify that pursuant to FRCP

12     Rule 30(f)(1) the signature of the deponent:

13                   X       was requested by the deponent or

14     a party before the completion of the deposition and is

15     to be returned within 30 days from date of receipt of

16     the transcript;

17              _____ was not requested by the

18     deponent or a party before the completion of the

19     deposition;

20              I further certify that I am neither counsel

21     for, related to, nor employed by any of the parties or

22     attorneys in the action in which this proceeding was

23     taken;

24              Further, I am not a relative or employee of

25     any attorney of record, nor am I financially or
```

Page 285

1    otherwise interested in the outcome of the action.

2              Subscribed and sworn to on this date:

3    December 5, 2024.

4

5

6

7

8

9

10              *Joseph D. Hendrick*

11

              Joseph D. Hendrick, CSR #947

12              Expiration Date: 04/30/2025

              Notary Comm. Exp. 02/13/27

13

14

15

16    Attorney times:

        Nicole Williams - 04:33:13

17      All Other Counsel - 00:00:00

18

19

20

21

22

23

24

25

                                    Page 286

**EXHIBIT**

**26**

```
 1              UNITED STATES BANKRUPTCY COURT
            FOR THE WESTERN DISTRICT OF TEXAS
 2                  SAN ANTONIO DIVISION
 3   IN RE:                    )
                               ) Case No. 19-50900-CAG-7
 4   LEGENDARY FIELD           )
     EXHIBITIONS, LLC, ET AL., ) CHAPTER 7
 5                             )
             Debtors.          )
 6                             )
     _____  ) _____
 7                             )
                               )
 8   RANDOLPH N. OSHEROW,      )
     Chapter 7 Trustee of the  )
 9   Bankruptcy Estates of     )
     Legendary Field           )
10   Exhibitions, LLC; AAF     )
     Players, LLC; AAF         )
11   Properties, LLC; Ebersol  )
     Sports Media Group, Inc.; )
12   LFE 2, LLC; and We Are     )
     Realtime, LLC,            )
13                             )
             Plaintiff,        )
14                             )
     VS.                       ) ADV. PROC. NO.
15                             ) 22-05078-cag
     DUNDON CAPITAL PARTNERS,  )
16   LLC; THOMAS DUNDON; AND   )
     JOHN ZUTTER,              )
17                             )
             Defendants.       )
18
19
20       -----------------------------------
21               CONTINUATION OF
22           ORAL AND VIDEO DEPOSITION OF
23            THOMAS DUNDON, VOLUME II
24               DECEMBER 3, 2024
25       -----------------------------------
```

                                    Page 290

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1    funding while you were learning those things, correct?
 2        A.  Yes.
 3        Q.  Did you ever ask Mr. Ebersol or anyone at the
 4    AAF to give you your money back?
 5        A.  I don't recall.  I mean, I -- Charlie often
 6    would say he had lots of interest in lots of things.
 7                And I would say:  If that's true, show it
 8    to me.
 9        Q.  Did you ever specifically tell Mr. Ebersol, "I
10    want my investment back"?
11        A.  I don't remember.
12        Q.  Did you ever offer to give Mr. Ebersol back
13    control of the league?
14        A.  Charlie didn't have money, so I don't know why
15    I would do that.  But I don't remember.
16        Q.  So you didn't do it?
17                MR. SALTZ:  Objection, nonresponsive.
18        A.  I don't remember.
19        Q.  (BY MS. WILLIAMS)  You don't remember ever
20    doing that?
21        A.  I don't remember.
22        Q.  Okay.  When did you first consider not
23    finishing the first season of the AAF?
24                MR. LOWENSTEIN:  Object to form.
25        A.  When I -- when we figured out the money that
```

                                          Page 350

1  was supposed to get through the first season was going

2  to not last.

3        Q.  (BY MS. WILLIAM)  And when was that?

4        A.  I don't recall.

5        Q.  Was it within the first two weeks?

6        A.  I don't remember.

7        Q.  You don't have any recollection of the date at

8  all?

9        A.  I don't.

10       Q.  Hadn't you been told that finishing the first

11  season was important to keep the value of the AAF, any

12  value of it intact?

13            MR. LOWENSTEIN:  Object to form.

14       A.  I -- I'm sure I was told that, and I agreed

15  with that.

16       Q.  (BY MS. WILLIAMS)  Okay.  When do you first

17  recall seriously considering putting the AAF into

18  bankruptcy?

19       A.  I don't recall.

20       Q.  You don't recall if that was in the first two

21  weeks as well?

22       A.  I don't remember.  There was a -- there

23  was -- there was a lot of bad news every day, so I can't

24  remember what the tipping point was where I started to

25  think it wasn't going to stop.

Page 351

```
 1                  Prior to taking it out, did DCP ask
 2    Mr. Ebersol what corporate governance documents needed
 3    to be amended that were referenced in the paragraph
 4    before taking it out or what investor documents needed
 5    to be amended in the paragraph before it was taken out?
 6                  MR. LOWENSTEIN:  Object to form.
 7        A.  I don't know specifically.  I think, you know,
 8    when you sign something saying you're taking
 9    $70 million, it -- it's assumed you have authority to do
10    so.  On our side, we would have assumed that.
11                  MR. SALTZ:  Objection, not responsive.
12        Q.  (BY MR. SALTZ)  I didn't ask what you think,
13    Mr. Dundon.  I asked if you know?
14        A.  I don't know.
15        Q.  After signing the term sheet -- after
16    Mr. Ebersol signed the term sheet, DCP transferred
17    $5.1 million to AAF; is that correct?
18        A.  I believe so.
19        Q.  And once the money was transferred, DCP took
20    over the AAF and its various entities, correct?
21                  MR. LOWENSTEIN:  Object to form.
22        A.  At some point after that.  I don't know the
23    exact timing of everything.
24        Q.  (BY MR. SALTZ)  Didn't the term sheet say it
25    was upon the transfer of the $5.1 million?
```

Page 378

```
 1    12:23 p.m.
 2              MR. SALTZ:  All right.  Thank you,
 3    Mr. Dundon.  I'm going to reserve the rest of my
 4    questions for trial.
 5              Pass the witness.
 6                        EXAMINATION
 7    BY MR. LOWENSTEIN:
 8       Q.  Mr. Dundon, at the time that Dundon Capital
 9    Partners entered into the term sheet with Ebersol Sports
10    Media Group -- let me re-ask that.
11              Before Dundon Capital Partners entered into
12    the term sheet with Ebersol Sports Media Group, did
13    Charlie Ebersol disclose to you that he had not received
14    approval from the board of directors to enter into the
15    term sheet?
16              MR. SALTZ:  Form.
17              MR. ENGEL:  Object to form.
18       A.  No.
19       Q.  (BY MR. LOWENSTEIN)  Did he disclose to you
20    that he had not a- -- received the approval of the
21    shareholders of Ebersol Sports Media Group to do the
22    term sheet?
23              MR. SALTZ:  Form.
24              MR. ENGEL:  Object to form.
25       A.  No.
```

Page  387

1          MR. ENGEL:  Let's just do one of us.  I'm
2    sorry.
3               All right.  Go ahead.
4               MR. SALTZ:  Apologize.
5      Q.  (BY MR. LOWENSTEIN)  Did he -- did Mr. Ebersol
6    disclose to you that he did not have the approval of
7    promissory note holders at the time of the term sheet?
8               MR. ENGEL:  Object to form.
9      A.  No.
10     Q.  (BY MR. LOWENSTEIN)  Did he tell you that he
11   hadn't received any waivers of the defaults that would
12   be triggered by the change of control contemplated under
13   the term sheet?
14              MR. ENGEL:  Object to the form.
15     A.  No.
16     Q.  (BY MR. LOWENSTEIN)  Did Mr. Ebersol tell you
17   that he did not receive the approval of -- well, strike
18   that.
19              Did Mr. Ebersol disclose to you that there
20   were warrant holders whose warrant rights would be
21   triggered by Ebersol Sports Media Group entering into
22   the term sheet?
23              MR. ENGEL:  Object to the form.
24     A.  No.
25     Q.  (BY MR. LOWENSTEIN)  Did he tell -- did

                                        Page 388

1  Mr. Ebersol tell you prior to entering into the term
2  sheet that the league did not have the actual shares
3  that he was contemplating selling you or DCP issued?
4              MR. ENGEL:  Object to form.
5      A.  No.
6      Q.  (BY MR. LOWENSTEIN)  Or even authorized?
7      A.  No.
8      Q.  At the time of the term sheet, did Mr. Ebersol
9  disclose to you that there were nearly $20 million in
10  unpaid vendor debts?
11      A.  No.
12      Q.  Did he tell you that there was a $5 million
13  loan from a man named David Patrup that he had promised
14  to repay shortly before your investment?
15      A.  No.
16      Q.  Did Mr. Ebersol tell you, prior to entering
17  the -- the term sheet, that the league's finance
18  committee had made a determination to reduce the
19  projected revenues of the league by $30 million for the
20  first season?
21      A.  No.
22      Q.  Did he tell you that the -- the finance
23  committee of the league, within a few weeks prior to
24  your investment, had determined that there would be no
25  digital revenue at all for 2019?

Page 389

```
 1            A.   No.

 2            Q.   When he provided the pro formas to you that

 3     showed millions of dollars of digital revenue, did he

 4     explain that that number was not correct?

 5            A.   No.

 6                 MR. ENGEL:   I'll object to the form of

 7     that.

 8                 I apologize for getting in late.

 9            Q.   (BY MR. LOWENSTEIN)   Did Mr. Ebersol disclose

10     to you, prior to entering into the term sheet, that

11     it -- Mr. Vanech had made a claim to 50 percent

12     interests in the AAF?

13                 MR. ENGEL:   Object to the form.

14            A.   No.

15            Q.   (BY MR. LOWENSTEIN)   Did he tell you that there

16     had been a July 31, 2018, demand letter from a lawyer

17     that represented Mr. Vanech?

18            A.   No.

19            Q.   Did he tell you that there had been a follow-up

20     letter from January 24, 2019, including a draft

21     complaint against the league and Charlie that had been

22     sent?

23            A.   No.

24            Q.   Did Mr. Ebersol tell you that the failure to

25     pay the vendors of the league had caused some of the
```

Page 390

1    crucial vendors that were involved in putting on games
2    to threaten to stop performing services for the league?
3                    MR. ENGEL:  Object to the form.
4        A.   No.
5        Q.   (BY MR. LOWENSTEIN)  Did he tell you that there
6    was media companies and advertising companies that were
7    refusing to put on advertising or do trade for
8    advertising prior to entering into the term sheet with
9    Dundon Capital Partners?
10                   MR. ENGEL:  Same objection.
11                   MR. SALTZ:  Form.
12       A.   No.
13       Q.   (BY MR. LOWENSTEIN)  Did Mr. Ebersol disclose
14   that they hadn't been paying CVS who was airing the
15   games?
16       A.   No.
17       Q.   Did Mr. Ebersol disclose that they hadn't been
18   paying for airlines and hotels and security companies
19   that were all crucial to moving players around and
20   putting on games?
21                   MR. ENGEL:  Object to the form.
22       A.   No.
23       Q.   (BY MR. LOWENSTEIN)  Was that -- were -- were
24   these items that we just went through about information
25   that was not disclosed to you prior to entering into the

                                            Page 391

```
 1    term sheet on behalf of DCP, was that important

 2    information?

 3         A.   Yes.

 4         Q.   Is that information you believe that

 5    Mr. Ebersol should have shared with you?

 6         A.   Yes.

 7                   MR. ENGEL:  Object to form.

 8                   Withdraw.  You just asked him his belief?

 9                   MR. LOWENSTEIN:  Yeah.

10                   MR. ENGEL:  Yeah, that's fine.

11         Q.   (BY MR. LOWENSTEIN)  Had Mr. Ebersol been

12    honest and disclosed the information that we just went

13    through that wasn't disclosed to you, would it have

14    changed DCP's decision on entering into the term sheet?

15                   MR. ENGEL:  Object to the form.

16         A.   Yes.

17         Q.   (BY MR. LOWENSTEIN)  How?

18         A.   Wouldn't have done it.

19         Q.   Did you rely on Mr. Ebersol's affirmative

20    representations concerning the amount of money it would

21    take to get through the season when you had DCP enter

22    the deal?

23                   MR. ENGEL:  Object to the form.

24         A.   Yes.

25                   MR. LOWENSTEIN:  Pass the witness.
```

Page 392

```
 1              CERTIFIED STENOGRAPHIC

 2           COURT REPORTER'S CERTIFICATE

 3

 4      I, Mercedes Arellano, Certified Shorthand Reporter

 5  in and for the State of Texas, hereby certify to the

 6  following:

 7

 8      That the witness, THOMAS DUNDON, was duly sworn by

 9  the officer and that the transcript of the oral

10  deposition is a true record of the testimony given by

11  the witness;

12

13      That the deposition transcript was submitted on

14  _____ to the witness or to the attorney

15  for the witness for examination, signature and return to

16  me by _____;

17

18      That pursuant to information given to the

19  deposition officer at the time said testimony was taken,

20  the following includes counsel for all parties of

21  record:

22

    FOR THE TRUSTEE:

23

        Nicole L. Williams

24      and Alexandra Rossetti

        THOMPSON COBURN, LLP

25      2100 Ross Avenue Suite 3200
```

Page 400

```
 1          Dallas, Texas 75201
            (972) 629-7113
 2          (972) 629-7171 (fax)
            nwilliams@thompsoncoburn.com
 3
      FOR THE PLAINTIFF:
 4
            Jonathon Farahi
 5          ABIR COHEN TREYZON SALO, LLP
            16001 Ventura Boulevard
 6          Suite 200
            Encino, California 91436
 7          (424) 288-4367
            jfarahi@actslaw.com
 8
      -and-
 9
            Brian S. Engel
10          BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP
            4004 Belt Line Road
11          Suite 100
            Addison, Texas 75001
12          (972) 833-8119
            brianengel@me.com
13
      FOR THE DEFENDANTS DUNDON CAPITAL PARTNERS, LLC,
14    THOMAS DUNDON, AND JOHN ZUTTER:
15          Brent D. Hockaday
            and Nigel Wheeler
16          K&L GATES LLP
            1717 Main Street
17          Dallas, Texas 75201
            (214) 939-5677
18          brent.hockaday@klgates.com
19    -and-
20          Jeffrey S. Lowenstein
            BELL NUNNALLY
21          2323 Ross Avenue
            Suite 1900
22          Dallas, Texas 75201
            (214) 740-1400
23          jlowenstein@bellnunnally.com
24    FOR CHARLIE EBERSOL:
25          Michael J. Saltz
```

                                        Page 401

```
 1        JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP
          1880 Century Park East
 2        Suite 900
          Los Angeles, California 90067
 3        (310) 446-9900
          msaltz@jrsnd.com
 4
     -and-
 5
          Thomas M. Horan II
 6        THOMPSON COE COUSINS & IRONS, LLP
          Twenty-Fifth Floor - Plaza of the Americas
 7        700 North Pearl Street
          Dallas, Texas 75201
 8        (214) 871-8241
          thoran@thompsoncoe.com
 9
10        That $_____ is the deposition officer's
11   charges to the Trustee for preparing the original
12   deposition transcript and any copies of exhibits;
13
14        I further certify that I am neither counsel for,
15   related to, nor employed by any of the parties or
16   attorneys in the action in which this proceeding was
17   taken, and further that I am not financially or
18   otherwise interested in the outcome of the action.
19
20        Certified to by me this 6th day of December, 2024.
21
22
23
24
     Mercedes Arellano, TEXAS CSR No. 8395
25   Expiration Date:  January 31, 2026
```

                                        Page 402

EXHIBIT

27

```
 1              UNITED STATES BANKRUPTCY COURT
 2           FOR THE WESTERN DISTRICT OF TEXAS
 3                   SAN ANTONIO DIVISION
 4                      ---oOo---
 5   IN RE:                        CASE NO.
                                   19-50900-CAG-7
 6   LEGENDARY FIELD
     EXHIBITIONS, LC, ET AL.,
 7                                 CHAPTER 7
          DEBTORS.
 8   _____/
 9   RANDOLPH N. OSHEROW, Chapter
     7 Trustee of the Bankruptcy
10   Estates of Legendary Field
     Exhibitions, LLC; AAF Players,
11   LLC; AAF Properties, LLC;
     Ebersol Sports Media Group, Inc.;
12   LFE 2, LLC; and We Are Realtime,
     LLC
13
          PLAINTIFF,
14   vs.
                                   ADV.PROC.NO.
15   DUNDON CAPITAL PARTNERS, LLC;  22-05078-cag
     THOMAS DUNDON; AND JOHN ZUTTER,
16
          DEFENDANTS.
17   _____/
18
19        VIDEOTAPED DEPOSITION OF KEVIN FARRELL
20
                  November 4, 2024
21
22
23   Reported by Diana L. Gonzalez, CSR No. 7935
24   Job No. 6990535
25   Pages 1 - 280
```

                                              Page 1

```
 1    conversations for him to invest or finance the

 2    league.

 3        Q.  Okay.  And what do you mean by "formative

 4    conversations"?  I'm sorry to ask; I just want to

 5    make sure.                                          09:37

 6        A.  Well, when it became something tangible

 7    that Dundon was a potential investor in the league.

 8        Q.  If I gave the date February 13th as what

 9    people in the case have testified as the first time

10    that Mr. Dundon and Mr. Ebersol spoke, does that    09:37

11    sort of square with your recollection?

12        A.  Well, again, here, I don't know when they

13    first spoke.  I know that around that time there

14    started to be real conversations about Dundon

15    putting money into the league that would make us    09:38

16    solvent to keep playing football.

17        Q.  What conversations do you remember from

18    that time?

19        A.  There was a period of time when we were

20    close to insolvency, like it's fair to say that, or 09:38

21    we were fighting to see whether we could continue

22    operations of the league because there was vendor

23    payments that needed to be made.  If we didn't make

24    those vendor payments, we would not be able to host

25    games; would not be able to support the league      09:38
```

                                                    Page 32

```
 1    anymore.
 2         So without an infusion of cash and the
 3    Reggie Fowler -- well, I don't know if it was ever
 4    liquid -- had fully dried up, so he wasn't an
 5    option, there was probably many conversations that    09:38
 6    Charlie was having with various investors.  I
 7    remember him talking about it frequently that he'd
 8    be searching for somebody to come in and invest in
 9    the league, and then Dundon started to become more
10    of the most likely person to make an investment in    09:39
11    the league, up to the point where he did invest in
12    the league.
13         Q.  Did that happen very quickly or over a
14    long period of time if you recall?
15         A.  I don't know the start date, again, the    09:39
16    first conversation with Charlie and Tom Dundon, but
17    I -- when it happened, to me it felt like it was
18    quick.
19         Q.  And that's actually what I was looking for
20    is your perception.                                  09:39
21         A.  Yeah.
22         Q.  Okay.  Have you ever in your life seen a
23    thing called a binding term sheet for a Series 2
24    preferred stock financing?
25         A.  I have not.  I know what a binding term    09:39
```

<div align="right">Page 33</div>

```
 1        A.  Alan was more on what I'd call the FP&A,
 2    the projected basis of the business, the things
 3    that would be the entity structure and the finance
 4    documents.  There were points of overlap where Alan
 5    would need some information from me about, again,       13:47
 6    the tactical assignments or the tactical activities
 7    I was working on, but it wasn't -- it was not part
 8    of the sort of forward-looking projection
 9    conversations.  That's where Alan and I had a
10    distinction in terms of what we talked to Charlie      13:47
11    about.
12        Q.  Understood.  When you were talking --
13    actually, strike that.
14            Did your level of communication with Alan
15    change at all after the investment by Dundon           13:47
16    Capital Partners?
17        A.  No.  It was pretty steady because
18    then his -- he might answer the question between
19    Charlie and redundant folks like I did, but -- but
20    my conversations with Alan had the same tenor.         13:47
21    They were more -- if I was -- my formative
22    conversations around getting payments out were with
23    Kevin Freedman, not with Alan.  So at -- before
24    Dundon, if I needed to get something approved for
25    payment, it would either be Kevin Freedman or          13:48
```

Page 167

1    Charlie.  Those are the two folks that could give

2    me approval of the pay vendors, so I needed to go

3    to them.  It wasn't Alan, but it was definitely

4    Kevin Freedman or Charlie.

5        Q.  So pretty fair to say or clear in your          13:48

6    mind that Kevin Freedman and Charlie Ebersol had

7    not only knowledge but also authority to decide

8    which vendors were paid before the Dundon Capital

9    investment?

10       A.  Yes.                                            13:48

11           MR. SALTZ:  Object to form.

12           MR. ENGEL:  Yeah.

13           MR. HOCKADAY:  I'm going to hand you what

14   we're going to mark -- this might have been already

15   introduced, but I don't have it.  I'm going to mark   13:48

16   this as Exhibit 116.

17           (Document marked Exhibit 116

18           for identification.)

19           MR. HOCKADAY:  Here you go, Brian.

20           MR. ENGEL:  Thank you.                          13:49

21   BY MR. HOCKADAY:

22       Q.  Here you go, Mr. Farrell.  What I'm

23   handing you here is an e-mail that Alan Kantowitz

24   sent to Mr. Ebersol and then copied you and Kevin

25   Freedman.  This was on January 22, 2019.              13:49

                                            Page 168

```
 1    possibly be delayed in order to keep the business
 2    moving forward.
 3         Q.  Understood.  Do you have any idea what
 4    he's referencing here when he says, "lack of
 5    accounting/invoice processing"?  Back on          14:09
 6    Exhibit 116.
 7         A.  I -- I'd be speculating to get into his
 8    words there.
 9         Q.  No, that's fair.
10              I want to direct your attention to the  14:09
11    next one, which obviously is the most stark one
12    because it's bold and underlined.  It says, "By my
13    estimation, and based on this analysis," period --
14    I think he meant a comma -- "if MGM funds their
15    3.5M, we will need another 7M to get through the   14:09
16    first weekend.  That can come from a variety of
17    sources," paren, "Dick, Dave, ticket sales, et
18    cetera."
19              Do you see that?
20         A.  Yes.                                      14:10
21         Q.  You understand those Ms to be million?
22         A.  Yes.
23         Q.  So at this point in time on January 22nd,
24    2019, is it fair to say that the AAF did not have
25    enough funds to get through the first weekend of   14:10
```

Page 185

```
1    football?

2         MR. ENGEL:  Objection to form.

3         MR. ONGARO:  Yeah.  I'm going to object;

4    calls for speculation.

5         But you can answer.                        14:10

6         THE WITNESS:  Did we have enough money?

7    Could we get through the first weekend of football

8    was one of the questions.  Did we have money in the

9    bank at that time?  I would say no to that.

10   BY MR. HOCKADAY:                                14:10

11       Q.  And according to Alan's words here, it

12   says, "We need another 7 million to get through the

13   first weekend."

14       Do you see that?

15       A.  Yes.                                    14:10

16       Q.  Okay.  So is it fair to say January 22nd

17   is approximately three weeks before the first

18   games -- is that your understanding -- which took

19   place February 9th, 2019?

20       A.  I think that's -- that lines up, yeah.  14:11

21       Q.  So roughly two and a half, three weeks?

22       A.  Yeah.

23       Q.  So two and a half, three weeks before the

24   season started, at the very least you,

25   Mr. Freedman, Mr. Ebersol and Mr. Kantowitz knew  14:11
```

Page 186

1   that there was not enough to cover after the first
2   week of the season; is that fair?
3           MR. ENGEL:  Object to the form.
4           THE WITNESS:  We were short funds.  But as
5   Alan notes here about the different financing          14:11
6   options that were in play, including ticket sales,
7   it'd be speculative to say that we didn't have
8   money to get there because we were looking for
9   inputs or inflows of cash -- which doesn't say
10  Reggie in here, but we were still at the time          14:11
11  thinking that Reggie was going to come through with
12  the part that he had committed to by word for
13  financing the league.  So we were running under
14  the -- the expectation that we would have money to
15  cover these debts and still get product on the        14:12
16  field.  Did we have money at that time in the bank
17  to cover all these?  I would say no.
18  BY MR. HOCKADAY:
19      Q.  And fair to say Mr. Ebersol was aware of
20  that, at least as of January 22nd, 2019?              14:12
21          MR. ENGEL:  Object to form.
22          MR. ONGARO:  Calls for speculation.
23          THE WITNESS:  Yeah, I --
24  BY MR. HOCKADAY:
25      Q.  He's part of the e-mail at least, right?      14:12

                                        Page 187

```
 1                REPORTER'S CERTIFICATE

 2

 3

 4          I, DIANA L. GONZALEZ, do hereby

 5     certify:

 6          That KEVIN FARRELL, in the foregoing

 7     deposition named, was present and by me sworn as a

 8     witness in the above-entitled action at the time

 9     and place therein specified;

10          That said deposition was taken before me

11     at said time and place, and was taken down in

12     shorthand by me, a Certified Shorthand Reporter of

13     the State of California, and was thereafter

14     transcribed into typewriting, and that the

15     foregoing transcript constitutes a full, true and

16     correct report of said deposition and of the

17     proceedings that took place;

18          IN WITNESS WHEREOF, I have hereunder

19     subscribed my hand this 9th day of November, 2024.

20

21

22

23

24          DIANA L. GONZALEZ, CSR NO. 7935
            State of California

25

                                        Page 280
```

EXHIBIT

**28**

```
 1                UNITED STATES BANKRUPTCY COURT
 2                 WESTERN DISTRICT OF TEXAS
 3                   SAN ANTONIO DIVISION
 4
 5    IN RE:                          *
                                      * NO. 19-50900-CAG-7
 6    LEGENDARY FIELD EXHIBITIONS,*
      LLC, ET AL,                     *
 7     DEBTORS.                       * CHAPTER 7
      _____
 8    RANDOLPH N. OSHEROW, CHAPTER*
      7 TRUSTEE OF THE BANKRUPTCY *
 9    ESTATES OF LEGENDARY FIELD   *
      EXHIBITIONS, LLC; AAF        *
10    PLAYERS, LLC; AAF            *
      PROPERTIES, LLC; EBERSOL     *
11    SPORTS MEDIA GROUP, INC.;    *
      LFE 2, LLC; AND WE ARE       *
12    REALTIME, LLC,               *
                                   *
13    VS.                          * NO. 22-05078-CAG
                                   *
14    DUNDON CAPITAL PARTNERS,     *
      LLC; THOMAS DUNDON; AND      *
15    JOHN ZUTTER                  *
16
17
                   -----------------------------
18         ORAL AND VIDEOTAPED DEPOSITION OF
                        JOHN ZUTTER
19                  NOVEMBER 12, 2024
                   -----------------------------
20
21
22
23
24
25
```

                                              Page 1

```
 1              A.    SVP.
 2              Q.    SVP stands for senior vice president?
 3              A.    Yes.
 4              Q.    How long did you stay at Santander
 5      Consumer Finance?
 6              A.    Less than two years.
 7              Q.    And what was your next job?
 8              A.    I joined Dundon Capital Partners.
 9              Q.    Was it 2017 or '16?
10              A.    I believe it was 2015 actually.
11              Q.    '15.   What was your job title when
12      you joined Dundon Capital Partners?
13              A.    Partner.
14              Q.    When you joined Dundon Capital
15      Partners in 2015, were you an equity partner or
16      was partner just a title?
17              A.    Just title.
18              Q.    Did that ever change to this day?
19              A.    No.
20              Q.    Okay.  A little bit more on the
21      ground rules.  You're here, as we mentioned, in
22      both capacities, individual and as a 30(b)(6)
23      witness.  When you're testifying as a 30(b)(6)
24      witness, you're testifying on behalf a business
25      entity.  When you're testifying in your
```

Page 25

```
 1              So Dundon Capital Partners is a
 2     Delaware LLC.  Is that your understanding?
 3         A.   I don't recall the state of
 4     jurisdiction or the state of domicile.
 5         Q.   Do you recall it being an LLC?
 6         A.   Yes.
 7         Q.   All right.  My understanding that the
 8     sole manager for Dundon Capital Partners is Tom
 9     Dundon an individual.  Is that your
10     understanding?
11         A.   Yes.
12         Q.   My understanding that the sole member
13     of Dundon Capital Partners is DDFS, Dundon -- I
14     think it's DDFS Management, LLC.  Is that your
15     understanding?
16         A.   Is?
17         Q.   Is.
18         A.   Is who?  You didn't complete --
19         Q.   I apologize.  Let me try this again.
20              My understanding is that the sole
21     member of Dundon Capital Partners is DDFS
22     Management, LLC.  Is that your understanding?
23         A.   I don't recall the specific corporate
24     organizational structure.
25         Q.   Okay.  My understanding that DDFS
```

Page 36

```
 1    deal that was acceptable to AAF and DCP has been
 2    reached in order for you to start working on the
 3    term sheet?
 4                    MR. HOCKADAY:  Objection,
 5         form.
 6         A.   I do not agree with that statement.
 7         Q    (BY MR. TREYZON)  Tell me what you
 8    disagree with.
 9         A.   That a term sheet definitionally
10    means agreement.
11         Q.   All right.  Let me walk you through
12    some terms.  Initial funding amount says
13    $5,100,000.  Do you see that?
14         A.   I do see that.
15         Q.   Where did that number come from?
16         A.   I don't recall.
17         Q.   Is it your testimony both as an
18    individual and a 30(b)(6) witness that you have
19    no recollection where the amount 5,100,000 came
20    from?
21         A.   I believe it had to do with the
22    amount of payroll that was due that week.  A
23    specific source of the 5.1 being from Party A,
24    B, or C in terms of the attribution of that
25    number I do not recall.  The 5.1, my
```

Page 71

1    understanding, both in my personal and in my
2    corporate position here, is that that
3    represented the estimate of the amount due that
4    the company needed to fund to make sure that it
5    could continue to make payroll and meet its
6    funding obligations.

7         Q.   Got it.

8         A.   Again, specific attribution of where

9    that number came from I do not recall.

10        Q.   I fully understand that.

11             It provides for an initial funding

12   amount.  Does that indicate to you that the

13   expectation, once a term sheet is executed, that

14   there would be subsequent funding amounts?

15        A.   No.

16        Q.   What does the word "initial" mean to

17   you?

18        A.   Initial means first.  But in this

19   context,

20   to -- to get to where I think you're going, it

21   doesn't necessarily imply that there must by a

22   subsequent.

23        Q.   Okay.  The way this term sheet is

24   formatted, and you as one of authors of this

25   term sheet, who would determine the need for

Page 72

```
 1    execution of the term sheets, can you tell me
 2    all communications that were undertaken by AAF
 3    to DCP that communicated any financial
 4    information that DCP relied on?
 5                      MR. HOCKADAY:  Objection,
 6          form.
 7          Q    (BY MR. TREYZON)  And that's a
 8    30(b)(6) witness question.
 9          A.   Can I tell you every communication
10    that AAF provided us?
11          Q.   Sure.
12          A.   I'm not sure I'm able to tell you
13    every communication that they provided us.
14          Q.   Can you tell me every communication
15    that you believe sitting here right now as a
16    30(b)(6) witness were not true?
17                      MR. HOCKADAY:  I'm going
18          to object to form.  And he's not --
19          he hasn't been designated on this
20          particular topic, so.  He's not the
21          witness to be presented for that.
22                      MR. TREYZON:  I appreciate
23          your objection.
24          Q    (BY MR. TREYZON)  Can you tell me in
25    your individual capacity what communications
```

Page 117

1    that were

2    done -- sent to DCP to induce it into enter an

3    agreement with AAF that you believe to be

4    untrue?

5               MR. HOCKADAY:  Objection,

6      form.

7      A.  So let me just clarify your

8    questions, restate it back.  You tell me if it's

9    right or not.

10      You're asking me what did AAF either

11    verbally, written or otherwise tell us that was

12    not correct?

13      Q  (BY MR. TREYZON)  To get you to agree

14    to a term sheet.

15      A.  That they had the authority to sign a

16    term sheet, that they needed $70 million to make

17    it through the rest of the season, that

18    5.1 million was the only obligations that they

19    had, that they had any sense of financial

20    accounting, that there were a lot of people that

21    wanted to come to the games, that the NFL wanted

22    to actually participate in it, the entire story.

23      Q.  Okay.  So let's break it down.  Who

24    told you these things?

25      A.  I am not aware.

Page 118

```
 1     prepare to be able to answer those questions?
 2         A.   I don't know what the questions are
 3     yet, so I'll let you know after.
 4         Q.   All right.  So let's start with an
 5     easy one.  I use the word "misrepresentation."
 6     How would you define misrepresentation?
 7         A.   Being told something that is no
 8     knowingly false, willfully misrepresentation,
 9     omissions of material information, things that
10     could lead you to draw a conclusion that is not
11     an appropriate conclusion given the facts and
12     circumstances.
13         Q.   And would you include in that things
14     that could lead you to take actions in reliance
15     on those --
16         A.   Sure --
17         Q.   -- representations?
18         A.   -- potentially.
19         Q.   Okay.  So let me back up and say --
20     ask the question again.
21              What do you contend were
22     misrepresentations made by or anybody acting on
23     behalf of AAF that materially induced you to
24     enter into the term sheet?
25         A.   I would give you a list.
```

                                    Page 122

1      Q.   If you can do it slowly because I'll

2   ask you about a question about each and every

3   item on the list so I want to write them down.

4      A.   Sounds good.

5      Q.   I'm sorry.  When I'm saying your

6   behalf, I'm saying DCP.

7      A.   Got it.

8           The league would survive for the

9   entirety of the season with $70 million, that

10  that was adequate to get it through not only

11  that season but into the next season.

12     Q.   Slow down.

13          Next?

14     A.   That the obligations that were

15  necessary to solve the immediate problem were

16  approximately $5.1 million.

17     Q.   Uh-huh.

18     A.   That the company had authorization to

19  enter into the term sheet from its shareholders,

20  representatives, whoever is required under its

21  operating agreements and legal documents.

22     Q.   Uh-huh.

23     A.   That it didn't have debts that were

24  not otherwise communicated.  Like it didn't have

25  obligations of any material amount, whether

Page 123

```
 1    definition, did DCP conduct any due diligence on
 2    AAF prior to committing?
 3            A.    Any due diligence?
 4            Q.    Any.
 5            A.    The receipt of any information is
 6    technically, like, would be any, but that's a
 7    pretty vague term.
 8            Q.    Got it.   So can you tell me what due
 9    diligence did DCP do prior to entering into an
10    agreement?
11            A.    We tried to understand what are the
12    obligations that the company has.   We were
13    informed that they had a $5.1 million obligation
14    with respect to keeping the lights on and paying
15    for payroll.   There were a variety of other
16    questions we asked.   We tried to understand what
17    is amount of capital that's going to be required
18    over the course of the season getting into the
19    next season.   We understand that to be
20    $70 million.   We asked are you authorized to do
21    this transaction.   Like, the term sheet
22    stipulated that they were in fact.   That what we
23    learned retrospectively is that virtually
24    everything that we were told leading up to the
25    term sheet was not in fact true.   It's hard for
```

Page 160

1    me to segregate the details of what we've

2    learned after because basically everything we

3    learned after is discordant what with me learned

4    before.  And so I -- I know that there is

5    millions of documents here and I assume the

6    lawyers will put it all together but...

7         Q.   And I presume that response was your

8    individual capacity because you're not a

9    30(b)(6) on due diligence.  I was just asking

10   your individual answer.  Is that correct?

11        A.   I don't know.

12        Q.   Okay.  When it says "Jeff is point

13   here," which Jeff are you referring to?

14        A.   I would assume Jeff Vanderbilt but --

15        Q.   Okay.  "Legal documentation - working

16   with Jim on this."  Do you see that?

17        A.   Yep.

18        Q.   What legal documentation are you

19   referring to?

20        A.   I don't remember.

21        Q.   Okay.  "We will leverage existing

22   documents but this one is more complicated."  Do

23   you see that?

24        A.   Yep.

25        Q.   Is that once again you don't remember

Page 161

1          read it again.  I think I know what
2          you said.  I just -- I want to talk
3          about.
4               MR. TREYZON:  Let me -- don't
5          worry about it.  Let me do it a
6          little bit different.
7               Q    (BY MR. TREYZON)  When is the first
8          time did you take a position that information
9          that was provided to you to induce you to enter
10         into the agreement was misrepresented to you?
11              A.   I don't recall precisely but within
12         several days after us initially funding, we
13         started finding out that there were material
14         incremental obligations of the company.
15              Q.   Do you recall ever communicating the
16         fact that there was a misrepresentation to
17         anybody prior to April 2nd, 2019?
18              A.   I think, as you're well aware, there
19         is millions of documents that have been produced
20         here.  Doing the best I can to remember
21         specifics.  But I would rely on counsel to
22         identify if I put anything in writing.
23              Q.   I'm not sure you can do that.
24              (Inaudible background speaker.)
25              MR. HOCKADAY:  Can't wait.

                                        Page 184

```
 1          Q     (BY MR. TREYZON)  I understand.  But
 2   when did it become unclear to you what the scope
 3   of obligations was?   Prior to entering into
 4   agreement or subsequent?
 5                    MR. HOCKADAY:   Object to
 6        form.
 7                When did it become unclear?
 8                MR. TREYZON:   No.
 9        Q     (BY MR. TREYZON)  When did it become
10   clear to you that you don't have visibility into
11   debt?
12        A.    The scope to which we were unclear on
13   what was or was not previously obligated to was
14   a positive slope line from the moment we did the
15   first thing until the moment that the company
16   entered into bankruptcy.
17        Q.    Got it.  So was it your understanding
18   at the time until you entered transaction that
19   once you write a check for $5.1 million, there
20   was nothing else on the liability side of the --
21   of the balance sheet?
22                    MR. HOCKADAY:   Object to
23        form.
24        A.    I don't think that's a reasonable
25   characterization.  But what we were aware of is
```

Page 201

1    that there were contractual obligations.  So let

2    me clarify, like, the nuance of I think what --

3    what I'm -- I would push back on in your

4    question.  We believe that there was an

5    obligation of 5.1 to keep the lights on, to make

6    payroll.  We knew that the company had contracts

7    associated with those same employees, which

8    meant -- when you say there is nothing else,

9    well, that person is going to work the next day

10   and then when we would have another okay.  What

11   we weren't aware of that was omitted throughout

12   the conversations was the scope and scale of

13   things that had existed before and the scope and

14   scale of things that continued to be assumed

15   from an obligation perspective without clarity

16   or transparency.

17        Q    (BY MR. TREYZON)  How much did you

18   think the company owed on currently payable

19   basis on February 14, 2019?

20        A.   $5.1 million.

21        Q.   And that's it?

22        A.   That's what we were aware of.

23        Q.   I understand.  So you felt it was

24   your understanding that once $5.1 million, there

25   was no other current AP or past due AP, correct?

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1          Q    So was one of the items discussed was
 2     the final outlines of the transaction will be
 3     determined at a later date?
 4          A.   I'm not sure those --
 5                     MR. HOCKADAY:  Object to
 6          form.
 7          A.   I don't see those specific words, but
 8     I'm not sure the words -- the nuance differed.
 9          Q    (BY MR. TREYZON)  Well, why do you --
10     why would you need additional documentation?
11          A.   I think I just answered that
12     question.
13          Q.   I thought you did, too, so I'm --
14          A.   Why did you ask it again?
15          Q.   Because I'm unclear about your
16     answer.  So let me try this again.
17               What -- what about this transaction
18     was an emergency rescue, as you called it?
19          A.   The company was out of money.
20          Q.   Okay.
21          A.   It needed to make payroll.
22          Q.   Okay.  Anything else -- it needed
23     $5.1 million, correct?
24          A.   Or it wasn't going to make payroll.
25          Q.   Right.  And so did you believe for
```

Page 210

```
 1      $5.1 million you were essentially getting
 2      75 percent of the entire company?
 3                      MR. HOCKADAY:   Object to
 4          form.
 5          A.   I believed that we were having -- in
 6      exchange for providing extremely rapid
 7      financing, we were getting control.  We were
 8      also providing a commitment up to $70 million
 9      contingent upon there being appropriate use
10      justification documentation, all the rest of it,
11      to continue investing in the business.
12          Q    (BY MR. TREYZON)  You were providing
13      $64.9 million at your discretion to the company
14      you had majority control of, correct?
15                      MR. HOCKADAY:   Object to
16          form.
17          A.   You're asking in my individual
18      capacity?
19          Q    (BY MR. TREYZON)  No, in your
20      corporate capacity, 30(b)(6).
21          A.   Okay.  I just thought we were going
22      to clarify each time.
23          Q.   Sure.
24          A.   The -- so, sorry, repeat your
25      question.
```

                                        Page 211

```
 1   precedent to this structure.
 2        Q.   I understand.  And when you were
 3   saying attracted -- attracting investors, what
 4   did you -- was there an effort under way during
 5   the 49 days that DCP was in charge to attract
 6   other investors?
 7        A.   Charlie was very focused on trying to
 8   attract as much interest in the business as he
 9   could, which included trying to find other
10   investors.  I'll leave it at that.
11        Q.   And do you know if Mr. Dundon
12   participated in any of the decisions whether to
13   accept or engage with any other potential
14   investors?
15        A.   I know that as a -- I am not going to
16   speak on behalf of Tom or what was going through
17   Tom's mind, but on behalf of the company, I
18   would say that we had conversations and what our
19   focus was was that we would not be in a
20   situation where we were defrauding future
21   investors and that we were not making material
22   misrepresentations or omissions to future
23   investors and that we wanted to understand what
24   we had and whether there was a going concern
25   viable business that could come out on the far
```

Page 236

1  side of the work we were doing.  And so our
2  efforts were to try and stabilize, identify, and
3  determine what the prospects were.  We were very
4  open to the concept of other investors coming
5  in, in particular towards the tail end of the
6  short duration of this investment, but we would
7  not allow for investors to come in without the
8  ability to provide them with complete,
9  realistic, and accurate information representing
10 the obligations of the business.
11        Q.    Got it.  And do you recall --
12        A.    We viewed that as our fiduciary duty.
13        Q.    To who?
14        A.    As part of our fiduciary duty to
15 those potential investors that might be coming
16 in, there's
17 a -- maybe fiduciary is the wrong legal term.  I
18 don't know.  I'm not a lawyer.  But we viewed
19 that as an ethical obligation, how about that.
20        Q.    Got it.  And who were those
21 investors, if any, that you recall?
22        A.    I don't recall their names off the
23 top of my mind.  I know there was a variety of
24 inbounds from -- that Charlie represented,
25 including Eminem and Mark Wahlberg and a variety

                                    Page 237

1    Q.    Was Charlie in charge of tracking the
2    bills, to the best of your knowledge?
3         A.    Charlie was the CEO of the company.
4    Q.    So what?
5         A.    The CEO is responsible for the
6    execution of the business.
7         Q.    Is Mr. Dundon CEO of Dundon Capital
8    Partners?
9         A.    No.
10        Q.    Who is?
11        A.    That entity doesn't have a CEO.
12        Q.    Who is its top officer?
13        A.    Dundon is a managing partner of
14   Dundon Capital Partners.  I was a nonequity
15   partner.
16        Q.    So who would be the role -- who would
17   play the role of CEO for Dundon Capital
18   Partners, whatever his title is?
19                    MR. HOCKADAY:  Object to
20        form.
21        A.    I think in a two-partner partnership,
22   the concept of CEO does not apply in the same
23   way it does in an operating business.  That
24   having been said, at the end of the day, Tom was
25   the ultimate decider of decisions made by Dundon

                                        Page 285

```
 1    different, correct?
 2         A.   They can be.  It depends on the facts
 3    and circumstances of the situation.
 4         Q.   Are you CEO of Lantern?
 5         A.   Yes, I am.
 6         Q.   Do you know every single bill that
 7    goes through Lantern?
 8         A.   I am responsible for every single
 9    bill that goes through Lantern.  I am
10    responsible for knowing where all the details
11    are.  I am responsible for being able to account
12    for that.  I am responsible for making sure that
13    my books and records are complete and
14    satisfactory.  At the end of the day, the buck
15    stops with me as the CEO from an operating
16    perspective and it stops with the board at the
17    -- in terms of delegating responsibilities to me
18    and, you know, what they've delegated to me
19    versus what they haven't delegated to me.
20         Q.   Is there a reason you left Charlie in
21    place as the CEO after February 14th if you
22    didn't think he was doing a good job?
23         A.   You just put words in my mouth.
24         Q.   Well, okay.  Did you leave Charlie in
25    his position as CEO?
```

Page 287

```
 1              -- based on this lack of information
 2    that you are talking about?
 3                    MR. HOCKADAY:  Object to
 4         form.
 5         A.   No, I do not agree.
 6         Q    (BY MR. TREYZON)  Tell me where the
 7    disagreement is.
 8         A.   Most of your sentence.
 9         Q.   Okay.  Did you try to raise money?
10         A.   I think -- what is the definition of
11    try to raise money?
12         Q.   Reaching out to potential investors
13    who have liquid capital to invest in the
14    business.
15                    MR. HOCKADAY:   Object to
16         form.
17         A.   There were a variety of conversations
18    between either the management team or members of
19    the board with a variety of stakeholders, but at
20    no point did we find that there was a credible
21    path that what have allowed for the company to
22    proceed while making accurate representations to
23    potential investors.
24         Q    (BY MR. TREYZON)  Would you agree
25    with me that the company provided you a
```

                                        Page 307

1    Q.   In the term in which you used it.

2    A.   I would have to go back and see what

3    I said to give you an accurate description.

4    Q.   I don't understand being that you

5    just told me you have a memory of how you used

6    it and then explained how you used it and I

7    asked you what do you mean.

8              MR. HOCKADAY:   What's the

9         question?

10   A.   I'm not sure either.  That's -- I'm

11   confused.

12   Q   (BY MR. SALTZ)   I said I don't

13   understand.

14   A.   That part I got, right.

15             MR. HOCKADAY:   Same.

16   Q   (BY MR. SALTZ)   Well, let's ask it

17   specifically then.  Would you describe the DCP

18   investment in the AAF an emergency deal?

19   A.   I think that the AAF had a -- was in

20   a situation of particular strain and required a

21   transaction to happen in a very short period of

22   time if they were to be able to live another

23   day.

24   Q.   And upon what information do you base

25   that opinion?

Page 352

1       A.   We were informed that the company
2  needed $5.2 million to be able to make payroll
3  in a matter of whatever it was, one or two days.
4  And being in a situation where you need
5  $5.2 million to be able to make payroll in 24 or
6  48 hours would constitute that sort of
7  circumstances.   What we didn't realize until
8  later i sit was dramatically more than 25
9  because of the omission of information that's
10  material.
11       Q.   Did Mr. Ebersol solicit DCP for an
12  investment or a loan?
13       A.   I believe that the answer is he asked
14  to both of those.  It's not an either/or.
15       Q.   And what do you base that on?
16       A.   Documentation.
17       Q.   What documentation?
18       A.   Those provided as part of discovery.
19       Q.   Specifically what?
20       A.   I don't recall the specific
21  document's title or exhibit number.
22       Q.   Is there any particular communication
23  of which you are aware in which Mr. Ebersol
24  solicited an investment from DCP versus a loan?
25       A.   I believe he --

Page 353

```
 1                UNITED STATES BANKRUPTCY COURT
 2                 WESTERN DISTRICT OF TEXAS
 3                   SAN ANTONIO DIVISION
 4
 5    IN RE:                          *
                                      * NO. 19-50900-CAG-7
 6    LEGENDARY FIELD EXHIBITIONS,*
      LLC, ET AL,                     *
 7     DEBTORS.                       * CHAPTER 7
      _____
 8    RANDOLPH N. OSHEROW, CHAPTER*
      7 TRUSTEE OF THE BANKRUPTCY *
 9    ESTATES OF LEGENDARY FIELD   *
      EXHIBITIONS, LLC; AAF        *
10    PLAYERS, LLC; AAF            *
      PROPERTIES, LLC; EBERSOL     *
11    SPORTS MEDIA GROUP, INC.;    *
      LFE 2, LLC; AND WE ARE       *
12    REALTIME, LLC,               *
                                   *
13    VS.                          * NO. 22-05078-CAG
                                   *
14    DUNDON CAPITAL PARTNERS,     *
      LLC; THOMAS DUNDON; AND      *
15    JOHN ZUTTER                  *
16                REPORTER'S CERTIFICATION
         DEPOSITION OF JEFFREY JAMES VANDERBILT, JR.
17                   NOVEMBER 11, 2024
18                I, GAIL SPURGEON, Certified
      Shorthand Reporter in and for the State of
19    Texas, hereby certify to the following:
20                That the foregoing deposition of
      JEFFREY JAMES VANDERBILT, JR. Was reported by me
21    stenographically at the time and place
      indicated, said witness having been placed under
22    oath by me, and that the transcript is a true
      record of the testimony given by the witness;
23
                  I further certify that the signature
24    of the deponent:
                  X  was requested by the deponent or
25    a party before the completion of the deposition
      and is to be returned within 30 days from date
```

                                              Page 381

```
1        of receipt of the transcript.  If returned, the
         attached Changes and Signature Page contains any
2        changes and the reasons therefor;
                     _____  was not requested by the
3        deponent or a party before the completion of the
         deposition;

4

         I further certify that the amount of time
5        used on the record:
6        BORIS TREYZON - 5:59
         MICHAEL J. SALTZ - 0:47

7

                     I further certify that I am neither
8        counsel for, related to, nor employed by any of
         the parties or attorneys in the action in which
9        this proceeding was taken, and further that I am
         not financially or otherwise interested in the
10       outcome of the action.
11                   Given under my hand this the
         15th day of NOVEMBER, 2024.
12
13
14
15
16
```



```
17            GAIL SPURGEON
              Texas CSR 1718
18            Expires: 11/30/24
19
20
21
22
23
24
25
```

                                        Page 382

**EXHIBIT**

**29**

```
 1              UNITED STATES BANKRUPTCY COURT
           FOR THE WESTERN DISTRICT OF TEXAS
 2                 SAN ANTONIO DIVISION
 3    IN RE: LEGENDARY FIELD      ) CASE NO. 19-50900-CAG-7
      EXHIBITIONS, LLC, ET AL.,   )
 4        DEBTORS                  ) CHAPTER 7
                                   )
 5                                 )
      RANDOLPH N. OSHEROW,         )
 6    Chapter 7 Trustee of the     )
      Bankruptcy Estates of        )
 7    Legendary Field             )
      Exhibitions, LLC; AAF        )
 8    Players, LLC; AAF            )
      Properties, LLC; Ebersol     )
 9    Sports Media Group, Inc.;    )
      LFE 2, LLC; and We Are       )
10    Realtime, LLC,               )
                                   )
11        PLAINTIFF,               )
                                   ) ADVERSARY PROC. NO.
12    v.                           ) 22-05078-cag
                                   )
13    DUNDON CAPITAL PARTNERS,     )
      LLC; THOMAS DUNDON; and      )
14    JOHN ZUTTER,                 )
                                   )
15        DEFENDANTS.              )
16
17    ********************************************************
18           ORAL AND VIDEOTAPED DEPOSITION OF
19                     JASON KULAS
20                    INDIVIDUALLY
21                        AND
22       AS 30(b)(6) of DUNDON CAPITAL PARTNERS, LLC
23                  NOVEMBER 14, 2024
24    ********************************************************
25
                                              Page 1
```

 1    ever had that conversation --

 2         Q.   (BY MR. TREYZON)  Perfect.

 3         A.   -- other than the documentation that was

 4    provided at the time.

 5         Q.   All right.

 6              MR. TREYZON:  Can I have the term sheet?

 7              MR. HOCKADAY:  Guys, can I take a quick

 8    restroom break?  I just spilled coffee all over me.

 9              (Sotto voce discussion.)

10              THE VIDEOGRAPHER:  We're off the record

11    at 9:56 a.m.  This is the end of file number 1.

12              (Break from 9:56 a.m. to 10:07 a.m.)

13              THE VIDEOGRAPHER:  We're back on the

14    record at 10:07 a.m.  This is the beginning of file

15    number 2.

16         Q.   (BY MR. TREYZON)  Mr. Kulas, do you understand

17    you're still under oath?

18         A.   Yes.

19         Q.   Prior to the transaction culminating in

20    February 14, 2019, was DCP told that a significant

21    investor of AAF has pulled out or was unable to make its

22    financial contribution?

23         A.   Yes.

24         Q.   Did -- prior to them -- prior to the deal

25    being culminated on February 14, 2019, did DCP -- and

                                        Page 45

```
 1    this is a question to you in the 30(b)(6) capacity --
 2    have an understanding that AAF had no accounts payable?
 3         A.   DCP was told that there were $5.1 million of
 4    payables that needed to be paid.
 5         Q.   $5.1 million represented a currently pending
 6    payroll, correct?
 7         A.   It was more than just that.
 8         Q.   Okay.
 9         A.   But it was --
10         Q.   Was DCP told by anyone that the entirety of
11    accounts payable was $5.1 million?
12         A.   DCP was told that 5.1 million was needed
13    immediately.
14         Q.   Okay.
15         A.   And 55 million in total was needed to meet all
16    obligations to get through the first season --
17         Q.   Okay.
18         A.   -- and the playoffs.
19         Q.   Okay.  Let's break it down a little bit.
20              Did DCP know the actual number of outstanding
21    accounts payable at the time it went forward with the
22    investment?
23         A.   DCP knew that there was a $55 million need in
24    total.
25         Q.   That's forward-looking, correct?
```

<div align="right">Page 46</div>

```
 1          A.   In total.  In total.

 2          Q.   So let's --

 3          A.   Inclusive of what's your question.

 4          Q.   I understand.  So I'm sorry, I'm going to have

 5     to try to pin you down.

 6               What was the amount of accounts payable that

 7     DCP was aware of outstanding at the time it made the

 8     investment?

 9               MR. HOCKADAY:   Objection, form, asked and

10     answered.

11               You can answer that.

12               THE WITNESS:   Okay.

13          A.   DCP was not in charge of payables for the

14     company, either before or after the investment, and had

15     to rely on representations from the league on things

16     that needed to be paid under the total of 55 million

17     that was communicated before the investment was made.

18          Q.   (BY MR. TREYZON)  Let's do this again.  I need

19     an amount from you.  Did DCP know what was accounts

20     payable outstanding at AAF at the time it made its

21     investment?  And you're answering as a 30(b)(6) witness.

22               MR. HOCKADAY:  He has answered as a

23     30(b)(6) witness now three times.  Objection, form.

24          A.   I've answered the question.

25          Q.   (BY MR. TREYZON)  You have not.  I need the
```

Page 47

```
 1    dollar amount from you.

 2              Outstanding -- February 14, 2019 investment

 3    is being made.  What is the total amount of accounts

 4    payable currently pending, including past dues and

 5    everything else, that is outstanding?

 6              MR. HOCKADAY:  Objection, form.

 7        A.   I'll repeat my answer, I guess.  DCP did not

 8    run payables for the league, either before or after its

 9    investment, and had to rely on the league to operate

10    under the total need of 55 million that was

11    communicated, inclusive of the 5.1 million that was

12    needed immediately.

13        Q.   (BY MR. TREYZON)  Are you refusing to answer

14    my question?

15              MR. HOCKADAY:  No, he's answered your

16    question five times.

17        Q.   (BY MR. TREYZON)  Is it your testimony that on

18    February 14, including payroll immediately payable on

19    February 14, DCP's understanding that that amount is

20    $5.1 million?

21        A.   We found out after the fact that there was an

22    additional 18 million that was not communicated to us

23    that would have been in addition to the 55 million that

24    was needed.  We also found out after the fact that there

25    was a $5 million loan that was not communicated.  But at
```

                                              Page 48

 1    the time of the investment, our understanding was that
 2    there was a $55 million need that met all obligations of
 3    the league, including payables.
 4         Q.   $55 million is a forward projection, correct?
 5         A.   It is.
 6         Q.   You have previously testified it's just a best
 7    estimate.  True?
 8                   MR. HOCKADAY:  Objection, form, misstates
 9    testimony.
10              You can answer.
11         A.   Yes.
12         Q.   (BY MR. TREYZON)  So were you communicated an
13    actual accounting verifiable number, this is what is
14    outstanding; and if you will transfer this amount, there
15    is no other accounts payable?
16                   MR. HOCKADAY:  Objection, form.  That's
17    now six times we're answering the same question.
18                   MR. ATKINS:  It's a different question.
19              Go ahead and answer it.
20         A.   We were told by the CEO of the company that
21    the need was 55 million.  Many times amounts that are
22    communicated will change slightly.  They changed much
23    more than slightly.
24         Q.   (BY MR. TREYZON)  I'm asking you to take a
25    position as a 30(b)(6) witness on the liability side of

                                             Page 49

```
 1    communicated to us before and faced with a decision to
 2    pay those previous bills that we didn't know about so
 3    that operations could continue.
 4              (Sotto voce discussion.)
 5         Q.   (BY MR. TREYZON)  Prior to entering an
 6    agreement, was DCP given access to a data room?
 7         A.   Prior to the agreement, DCP asked for all
 8    information that could be provided and was given the cap
 9    table, the presentation and the Excel file.
10         Q.   Was it given access to a data room?
11         A.   Not that I remember.
12         Q.   Did it ask for an access to a data room?
13         A.   Data room is sort of irrelevant.  We asked for
14    everything --
15         Q.   Okay.
16         A.   -- everything that could be provided.  And
17    whether that was provided through email or a data room,
18    we had no preference.
19         Q.   Okay.  Did you eventually get an access to a
20    data room?
21              MR. HOCKADAY:  Hold on.  Data room was
22    one of the topics that Elisa Lee already testified to
23    last week.  So if you're asking him in his individual
24    capacity, he can answer if he knows, but he's not a
25    30(b)(6) as to the data room.
```

Page 66

```
 1    you -- are you asking him in his individual capacity or
 2    his corporate capacity?
 3                   MR. TREYZON:  I'm asking corporate
 4    capacity, number 9, misrepresentations and defenses.
 5    One of the defenses to this is that you were misled.
 6                   MR. HOCKADAY:  Yes.
 7        Q.    (BY MR. TREYZON)  So I'm asking for a complete
 8    list of misrepresentations that were made to you to
 9    induce you to enter into a transaction with AAF?
10                   MR. HOCKADAY:  Okay.  That's a fair
11    question.  You can answer.
12                   THE WITNESS:  Okay.
13        A.    So --
14        Q.    (BY MR. TREYZON)  And it's a 30(b)(6) capacity
15    question.
16        A.    So I think I focus on misrepresentations by
17    omission, which would have been the 18 million and other
18    payables we found out about after executing this term
19    sheet that weren't disclosed, the $5 million loan that
20    was imminently due --
21        Q.    Hold on.
22        A.    -- that was also disclosed.
23        Q.    Hold on.  I'm not going to be able to do it
24    fast.
25        A.    Okay.
```

Page 78

```
 1      Q.   So 18 million -- these are misreps by
 2  omission, correct?
 3      A.   Yes.
 4      Q.   So $18 million in what would you call it?
 5      A.   In amounts payable to third parties.
 6      Q.   Amounts payable.  Okay.  That's one.  Two?
 7      A.   A $5 million loan that was due to an affiliate
 8  or family friend of Charlie's.
 9      Q.   Anything else?
10      A.   Well, we also didn't know about a lawsuit from
11  someone claiming to have ownership in the league.
12      Q.   Okay.
13      A.   And then also we later found out that Charlie
14  Ebersol did not have the authority to enter into this
15  transaction.
16      Q.   All right.  Anything else these are questions
17  of a 30(b)(6) witness.
18      A.   Yeah, those are the main things that come to
19  mind.
20      Q.   I have a problem with the category "main
21  things."  As a 30(b)(6) witness, I am entitled to ask
22  you all of your allegations and defenses.  So my
23  allegation -- you gave me four categories.  I want to go
24  through them.  I want to give you ample opportunity to
25  reflect on it, and let me know if there's anything else,
```

Page 79

```
 1   answered that it's contained in the term sheet, so I am
 2   trying to understand.
 3        A.   I've read it, just like you have.  It's 70
 4   million.
 5        Q.   (BY MR. TREYZON)  I got it.  Who came up with
 6   70 million?
 7        A.   Tom Dundon.
 8        Q.   Okay.  And that's your answer as a 30(b)(6)
 9   witness, right?
10             MR. HOCKADAY:  He's not a 30(b)(6)
11   witness to a binding term sheet.  That was John Zutter
12   who testified on Tuesday.
13             MR. TREYZON:  All right.
14        Q.   (BY MR. TREYZON)  What information do you have
15   available that Mr. Ebersol was aware of the falsity of
16   his representations at the time they were made, as a
17   30(b)(6) witness?
18             MR. HOCKADAY:  Objection, form.
19        A.   What we know is that he requested 55 million
20   to get through the season and the playoffs, and that was
21   his representation of the entirety of what was needed.
22   We don't know what would have motivated that or what
23   information he did or did not, you know, use to say that
24   number, but that's the number he gave us.
25             MR. TREYZON:  Madam Reporter, can you
```

Page 109

```
 1    read my question back again?
 2                    (Requested testimony read.)
 3                    MR. HOCKADAY:  You can answer that.
 4                    THE WITNESS:  Okay.
 5        A.    Yeah, so, I mean, we know that he knew about
 6    a $5 million loan that was due that he chose not to
 7    disclose.  We know that as CEO he knew about $18 million
 8    in payables he didn't disclose.  We know that he had a
 9    pending lawsuit with a person claiming to have ownership
10    in the league that would have been an issue for a new
11    investor wanting to own 75 percent of the company, that
12    he chose not to disclose.  And we know that he knew that
13    he didn't have the authority to enter into this
14    agreement but did it anyway.
15        Q.    (BY MR. TREYZON)  What leads you to believe
16    that he had actual knowledge, not that you expect him to
17    have the knowledge, that he actually had the knowledge?
18        A.    As the CEO of the company, he -- he's expected
19    to have that knowledge.
20        Q.    I'm not asking about your expectations.  I'm
21    asking as what information do you have available to you
22    as a 30(b)(6) witness that Mr. Ebersol was aware of the
23    falsity of these facts?
24        A.    It was not just my assumption.  It's the
25    expectation that the market, that the world would have
```

Page 110

```
 1              MR. HOCKADAY:  Form.

 2              (Requested testimony read.)

 3              MR. HOCKADAY:  You can answer that.

 4       A.   Correct.

 5       Q.   (BY MR. TREYZON)  Which parts of these

 6  representations were false?

 7       A.   Well, we know revenue was overstated,

 8  particularly digital revenue, and I can't tell you the

 9  specifics of the others.  I can only say it in context

10  of what was represented to us to give us the 55 in

11  conjunction with this, because they're separate

12  representations made that we later found out are not

13  really connected.

14       Q.   All right.  Are you able to point me to any

15  specific items in Exhibit 305 as a 30(b)(6) witness that

16  were, in fact, knowingly incorrect?

17              MR. HOCKADAY:  Form.

18       A.   I can point you to digital revenue.

19       Q.   (BY MR. TREYZON)  Other than digital revenue,

20  anything else?

21       A.   Only in the context of the 55 million --

22       Q.   Got it.

23       A.   -- request.

24       Q.   So basically --

25       A.   Yeah.
```

Page 138

```
 1        A.    Yes.
 2        Q.    Okay.   I was also told by various witnesses
 3   that there is no formal, like, written relationship
 4   regarding treasury functions between DDFS, LP and Dundon
 5   Capital Partners.   Are you aware of that?
 6        A.    I don't know what formal treasury relationship
 7   means.
 8        Q.    Some sort of a contract that says, hey, we
 9   will pay this on your behalf, you will reimburse us
10   later, or something like that?
11        A.    I am not aware of a contract that existed.
12        Q.    Got it.
13        A.    Yeah.
14        Q.    Did Dundon Capital Partners remit any funds to
15   AAF?
16              MR. HOCKADAY:   Hold on.   What topic is
17   this?
18              MR. TREYZON:   Claim.   Proofs of claim.
19              MR. HOCKADAY:   Oh.   Yeah, I guess he can
20   answer that.   I'm going to object to form the way the
21   question was asked and assumptions.
22              But you can answer.
23        Q.    (BY MR. TREYZON)  Let me ask a different
24   question.
25              Did any of the money that went to AAF
```

Page 145

```
 1          Q.   Mr. Kulas, from the time period from February
 2     14, 2019 until the filing of the bankruptcy, are you
 3     aware of any document, one single document, as you sit
 4     here right now, that would have documented the fact that
 5     $55 million was represented was enough for the rest of
 6     the season?
 7          A.   Not a document that says 55 million.
 8          Q.   From February -- and you're answering that as
 9     a 30(b)(6) witness, correct?
10          A.   Yes.
11          Q.   As a 30(b)(6) witness, are you aware of any
12     document that exists from February 14, 2019 until the
13     filing of the bankruptcy that says accounts payable were
14     misrepresented to us?
15               MR. HOCKADAY:  Form.
16          A.   Well, no, but I don't need a document for
17     that.  We learned of that as the process went forward.
18          Q.   (BY MR. TREYZON)  So let me ask the question
19     again.  I appreciate that.
20               I'm not asking if you know of it.  I'm not
21     asking when you learned of it.  I'm asking are you aware
22     of existence of a single document, either between DCP,
23     Mr. Dundon, Mr. Dundon and his wife, Mr. Dundon and his
24     parents, anybody, that says, hey, we were told it's
25     $55 million and it's misrepresented to us?
```

Page 151

1          A.    Well, there's documentation of draw requests
2    and amounts that were needed to be funded that aggregate
3    to a number that would very quickly tell you 55 million
4    wouldn't make it through the season.   And so that
5    information -- that's the reason I said, no, there's not
6    a single document, but there's information along the way
7    that started to make that apparent to us.
8          Q.    Is there any document out there that
9    enunciates the fact that the truth of the financial
10   condition of AAF is different than what you were led to
11   believe prior to making an investment?   This is a
12   30(b)(6) question.
13         A.    Yes.
14         Q.    What is that document?
15         A.    Well, one example is the documentation we have
16   between Puttruck and Charlie --
17         Q.    Between who?
18         A.    -- regarding --
19               Between Puttruck and Charlie.
20         Q.    Can you spell it for the reporter?
21         A.    I can't.
22         Q.    Okay.
23               MR. TREYZON:   P-O-T-R-U-C-K.
24               MR. ENGEL:   It's P-U-T-T-R-U-C-K.
25               MR. TREYZON:   I was close.

                                          Page 152

```
 1    misrepresentations the reasons why Mr. Dundon elected

 2    to shut down the league?

 3                    MR. HOCKADAY:  Form.

 4         A.   Mr. Dundon committed 70 million against a 55

 5    million number needed to complete the year.  And they

 6    spent -- they completely exhausted those funds prior to

 7    the -- to the end of the regular season.  There was no

 8    more money.  There was no decision to shut down the

 9    league.  There was no more money.  It was spent.

10         Q.   (BY MR. TREYZON)  Were you aware that

11    Mr. Dundon elected to shut down the league?

12                    MR. HOCKADAY:  Form.

13         A.   You may show me a document that says that, but

14    Mr. Dundon committed $70 million and he gave 70 million,

15    which should have gotten the league well into the second

16    year and didn't.

17         Q.   (BY MR. TREYZON) Were you participating in

18    the drafting of the letter to the employees of AAF?

19         A.   I think I was copied on some of the emails,

20    yes.

21         Q.   Okay.  Did you -- did you respond to it?  Did

22    you make any changes?

23         A.   I think there was a point where John Zutter

24    was reiterating that 70 million is 70 million, and he

25    asked for my confirmation of that.
```

Page 154

```
 1                    REPORTER'S CERTIFICATE

 2              The undersigned Certified Shorthand Reporter

 3      licensed in the State of Texas does hereby certify:

 4              I am authorized to administer oaths or

 5      affirmations, and prior to being examined, the witness

 6      was duly administered an oath by me.

 7              I am not a relative or employee or attorney or

 8      counsel of any of the parties, nor am I a relative or

 9      employee of such attorney or counsel, nor am I

10      financially interested in the outcome of this action.

11              I am the deposition officer who

12      stenographically recorded the testimony in the foregoing

13      deposition, and the foregoing transcript is a true

14      record of the testimony given by the witness.

15              Before completion of the deposition, review of

16      the transcript [X] was [ ] was not requested.  If

17      requested, any changes made by the deponent (and

18      provided to the reporter) during the period allowed are

19      appended hereto.

20              In witness whereof, I have subscribed my name

21      this 18th day of NOVEMBER, 2024.

22

23                    Julie C. Brandt

24

                      Julie C. Brandt, CSR, RMR, CRR

25                    TX CSR No. 4018, Exp. 10/31/25


                                          Page 181
```

EXHIBIT

**30**

```
 1              UNITED STATES BANKRUPTCY COURT
 2               WESTERN DISTRICT OF TEXAS
 3                 SAN ANTONIO DIVISION
 4
 5    IN RE:                        *
                                    * NO. 19-50900-CAG-7
 6    LEGENDARY FIELD EXHIBITIONS,*
      LLC, ET AL,                   *
 7     DEBTORS.                     * CHAPTER 7
      _____
 8    RANDOLPH N. OSHEROW, CHAPTER*
      7 TRUSTEE OF THE BANKRUPTCY  *
 9    ESTATES OF LEGENDARY FIELD    *
      EXHIBITIONS, LLC; AAF         *
10    PLAYERS, LLC; AAF             *
      PROPERTIES, LLC; EBERSOL      *
11    SPORTS MEDIA GROUP, INC.;     *
      LFE 2, LLC; AND WE ARE        *
12    REALTIME, LLC,                *
                                    *
13    VS.                           * NO. 22-05078-CAG
                                    *
14    DUNDON CAPITAL PARTNERS,      *
      LLC; THOMAS DUNDON; AND       *
15    JOHN ZUTTER                   *
16
17
                  ----------------------------
18                      CONFIDENTIAL
              ORAL AND VIDEOTAPED DEPOSITION OF
19             JEFFREY JAMES VANDERBILT, JR.
                    NOVEMBER 11, 2024
20                ----------------------------
21
22
23
24
25

                                           Page 1
```

```
 1    document before?
 2         A.   No.
 3         Q.   Did you have an opportunity to go
 4    through it right now?
 5         A.   I'm sorry?                            09:25
 6         Q.   Did you have an opportunity to go
 7    through it right now?
 8         A.   Yes, I've gone through it.
 9         Q.   Okay.  I'm also going to mark, as
10    Exhibit 249, a notice of 30(b)(6) topics.       09:25
11           (Exhibit No. 249 introduced.)
12         Q   (BY MR. TREYZON)  Are you aware that
13    you have been designated as the person most
14    knowledgeable on behalf of an entity to answer
15    certain questions?                              09:26
16         A.   Yes.
17                   THE VIDEOGRAPHER:  Pardon
18         me.
19           (Discussion off the
20         stenographic record.)                      09:26
21         Q.   (BY MR. TREYZON)  Mr. Vanderbilt, I
22    took the liberty of highlighting the topics that
23    is my understanding you've been designated as a
24    30(b)(6) witness for.  With your counsel's
25    permission and help, if you could let us know,   09:26

                                           Page 15
```

```
 1      please, if you have seen these topics and you
 2      are, in fact, a 30(b)(6) witness on these
 3      topics.
 4          A.   Correct.
 5          Q.   My understanding you're going to be a        09:26
 6      30(b)(6) witness for Topic No. 1, No. 5, No. 7,
 7      No. 11, No. 12, and No. 21.  Is my understanding
 8      correct?
 9          A.   Correct.
10          Q.   Did -- and you are testifying on            09:27
11      behalf of Dundon Capital Partners, correct?
12          A.   Correct.
13          Q.   What steps did you take to ascertain
14      that you are fully informed of all the
15      information you need in order to answer Topic       09:27
16      No. 1?
17                 MR. LOWENSTEIN:  And let
18            me intervene and just say our
19            discussions are privileged.
20                 THE WITNESS:  Okay.                       09:27
21                 MR. LOWENSTEIN:  And I
22            don't want you to talk about our
23            discussions.  To the extent that the
24            information was obtained through
25            counsel, I want you to be cautious            09:27
```

Page 16

```
 1              A.   I joined Mr. Dundon and Mr. Zutter at
 2       a company called Employer Direct Healthcare as
 3       the CFO, but then also worked on the family
 4       office at Dundon Capital Partners and a number
 5       of other entities.                              09:42
 6              Q.   If I was to ask you what is your job
 7       title in 2017, what would it be?
 8              A.   Chief financial officer.
 9              Q.   For Employer Direct?
10              A.   For Employer Direct, yes, but also   09:42
11       for Dundon Capital Partners.
12              Q.   All right.  Let's talk briefly about
13       Dundon Capital Partners if we could.  I would
14       like to understand the structure of that entity.
15       It -- what type of an entity is Dundon Capital   09:42
16       Partners?
17              A.   It's a limited liability company.
18              Q.   It's a limited liability company.  So
19       it's an LLC?
20              A.   Correct.                            09:42
21              Q.   Where is it domiciled?
22              A.   Is it a -- I believe it's a Delaware
23       formed entity.
24              Q.   Is it a single format LLC or is it a
25       series LLC?                                     09:42
```

                                              Page 32

1          A.   Single.

2          Q.   And was it, to the best of your

3    knowledge, created in 2017?

4          A.   I can't say it was 2017, but

5    somewhere around that time frame.                    09:43

6          Q.   Would I be correct in 2017 it was a

7    relatively new entity, 2016, 2015, or something

8    like that?

9          A.   Correct.

10         Q.   Okay.  Now, DCP being a Delaware LLC,   09:43

11   who

12   are -- who is the manager of DCP?

13         A.   Tom Dundon.

14         Q.   As an individual?

15              Let me back up and let me give you an    09:43

16   opportunity.  So I'm asking you some questions

17   that may lead to you making some sort of

18   statement as to your understanding.  I'm not

19   intending it to be a trick.  I'm not intending

20   to be a gotcha.  I just -- I'm trying to get an    09:44

21   understanding.

22              Right now when I ask you who is the

23   manager of Dundon Capital Partners, I'm asking

24   from the legal formation standpoint if you know.

25   Do you know who the manager of Dundon Capital      09:44

                                        Page 33

```
 1                    MR. LOWENSTEIN:  Can we
 2          take 20 seconds.
 3                    MR. TREYZON:  Let's go off
 4          the record.
 5                    THE VIDEOGRAPHER:  We're        09:46
 6          off the record at 9:45 a.m.
 7            (Recess 9:46 a.m. to 9:54 a.m.)
 8                    THE VIDEOGRAPHER:  We're
 9          back on the record at 9:54 a.m.
10          Q    (BY MR. TREYZON)  Mr. Vanderbilt, you  09:54
11   understand you're still under oath, correct?
12          A.   I do.
13          Q.   During the break did you review any
14   documents?
15          A.   No.                                 09:55
16          Q.   Let me back up and let you -- let me
17   give you an opportunity to, if necessary,
18   supplement your responses.
19               You previously have stated that the
20   manager for DCP, Dundon Capital Partners, is Tom  09:55
21   Dundon.  Is that still your understanding?
22          A.   Correct.
23          Q.   Can you tell me now who the members
24   of Dundon Capital Partners are?
25          A.   The sole member is DDFS Management,  09:55
```

                                          Page 36

```
  1      LLC.
  2           Q.    D --
  3           A.    DDFS Management, LLC.
  4           Q.    What kind of entity is
  5      DDFS Management, LLC, if you know?            09:55
  6           A.    Could you repeat the question.
  7           Q.    What kind of an entity is it?  And
  8      I'm not asking if it's an LLC.  That's in the
  9      name.  Is it a Delaware LLC?
 10           A.    I believe so.                      09:55
 11           Q.    Who is the manager of
 12      DDFS Management, LLC?
 13           A.    The manager of DDFS Management, LLC
 14      is Tom Dundon.
 15           Q.    Is it a single -- single structure 09:56
 16      LLC, or is it a series LLC?
 17           A.    I believe it's single.
 18           Q.    Okay.  You're familiar -- familiar
 19      with the Delaware series LLC structure?
 20           A.    Limited, yes.                      09:56
 21           Q.    Yes.  Who are the members of
 22      DDFS Management, LLC?
 23           A.    The members?  I believe that's Tom
 24      Dundon.
 25           Q.    So he's a manager and a member?    09:56
```

Page 37

```
 1              A.    Not to my knowledge.
 2              Q.    Is there such a thing as a board of
 3       members in DDFS Management, LLC?
 4              A.    Not to my knowledge.
 5              Q.    Are you familiar with an entity          09:59
 6       called DDFS Partnership, LP?
 7              A.    I am.
 8              Q.    Can you tell me what your -- what do
 9       you know about that entity?
10              A.    Could you maybe be a little more          09:59
11       specific?
12              Q.    Of course.  What kind of an entity is
13       it?
14              A.    A limited partnership.
15              Q.    Where is it domiciled?                    10:00
16              A.    I believe Delaware.
17              Q.    And who are the limited partners of
18       that entity?
19              A.    I do not recall.
20              Q.    Who are the general partners of that     10:00
21       entity?
22              A.    I do not recall.
23              Q.    Who makes decisions on behalf of that
24       entity?
25              A.    That would be Mr. Dundon.                 10:00
```

                                             Page 40

```
 1          Q.    And would I be correct when we're
 2    dealing with DCP, DDFS Management, LLC, the
 3    limited partnership we just discussed,
 4    Mr. Dundon is always the person that has sole --
 5    sole and exclusive decision-making ability on        10:00
 6    behalf of those entities?
 7          A.    Correct.
 8          Q.    So is he the person that can bind
 9    them to agreements, he is the person that make
10    investment decisions, things like that, correct?    10:01
11          A.    Correct.
12                    MR. LOWENSTEIN:
13          Objection, form.
14          Q    (BY MR. TREYZON)    Is there a formal
15    agreement that you are aware of between DCP and      10:01
16    DDFS other than the operating agreement?
17          A.    Not that I'm aware of.
18          Q.    Are you aware of any credit
19    agreements between DDFS agreement and DCP?
20          A.    No.                                      10:01
21          Q.    Are you aware of any written
22    agreements, other than the limited partnership
23    agreement, between DDFS Limited Partnership and
24    DDFS Management, LLC?
25          A.    No.                                      10:01
```

Page 41

1     Q.    Are you aware of any written
2  agreements between Limited Partnership and DCP?
3     A.    No.
4     Q.    Are there -- is there a capital call
5  agreement between DCP and DDFS Management, LLC?    10:02
6                    MR. LOWENSTEIN:   Object to
7        form.
8     Q    (BY MR. TREYZON)  Do you know what a
9  capital call is?
10    A.    I do know what cap call is.         10:02
11    Q.    Just for the sake of the record, let
12 me explain what I mean by it.  Your knowledge is
13 probably superior to mine.
14        Whenever an entity requires money,
15 there is a standby facility that it can call    10:02
16 upon its members to contribute.  Does that make
17 sense?
18    A.    It does.
19    Q.    Does that meet with your
20 understanding of a capital call agreement?    10:02
21    A.    I understand your definition, and
22 yes.
23    Q.    Is there any such agreement between
24 DCP and DDFS Management, LLC?
25    A.    Not to my recollection.         10:02

                                        Page 42

```
 1              A.    If that was the amount invested, then
 2       yes, we would have recorded it as such.
 3              Q.    And would Price Waterhouse team have
 4       been involved in setting up that structure?
 5              A.    Correct.                              01:10
 6              Q.    So as far as you know, would you
 7       agree with me that Price Waterhouse should be
 8       aware of how much money was actually moved into
 9       Dundon Opportunity Zone Fund?
10              A.    I do not recall if they were made     01:10
11       aware as to the amount of money.
12              Q.    Okay.  So DCP reported approximately
13       a $70 million loss on AAF investment, correct?
14              A.    That would make sense.
15              Q.    Yeah.  And that was done in the 2019   01:10
16       tax year, correct?
17              A.    I can't say for certain but that
18       would make sense.
19              Q.    I'll represent to you that my review
20       of tax records indicated that there was a, I      01:10
21       think, 69 million and change loss taken or on
22       about 2019.  Does that make sense?
23              A.    That would make sense.
24              Q.    I will also represent to you that in
25       our review of records, it appeared that all of    01:11
```

Page 140

```
 1    the funds for the AAF investment came from DDFS.
 2    That's how the wiring was done.
 3            A.    Partnership?
 4            Q.    Correct.  Does that make sense?
 5            A.    Yes.                               01:11
 6            Q.    How is that DCP is taking the loss
 7    for its investment if all the money came from
 8    DDFS?
 9                  MR. LOWENSTEIN:  Object to
10            form.                                   01:11
11            A.    DCP was the party making the
12    investment.  DDFS Partnership functioned as
13    treasury management.
14        Q    (BY MR. TREYZON)  All right.  So when
15    somebody functions a treasury management, there  01:11
16    has to be some sort of formal agreement that
17    says, I am making this investment on your
18    behalf, correct?
19            A.    I wouldn't say --
20                  MR. LOWENSTEIN:  Object to        01:11
21            form.
22            A.    I wouldn't say that's correct.
23        Q    (BY MR. TREYZON)  So if -- is there
24    some sort of a writing that exists between DDFS
25    and DCP that entitles either one of the entities  01:12
```

Page 141

```
1     to recognize the loss suffered in the AAF
2     investment?
3          A.   I believe it would be the party that
4     had made the investment.  In this instance, it
5     would be DCP.                                    01:12
6          Q.   Did DCP ever actually send any money
7     to AAF?
8                    MR. LOWENSTEIN:  Object to
9          form.
10         A.   Not to my knowledge.                   01:12
11         Q    (BY MR. TREYZON)  So is it your
12    understanding that even though DCP claims a loss
13    in the AAF investment, none of the money that
14    went into AAF came from DCP?
15                   MR. LOWENSTEIN:  Object to        01:12
16         form.
17         A.   Not directly, no.
18         Q    (BY MR. TREYZON)  Okay.  And you are
19    not aware of any document as you sit here right
20    now that would document the agreement or the     01:12
21    transaction between the two entities, correct?
22         A.   Not from recollection, no.
23         Q.   Previously when I asked you a
24    question about Exhibit 250, which is the press
25    release, you drew a distinction between a         01:13
```

<div align="right">Page 142</div>

```
 1            Q.    -- participating -- okay.
 2            A.    Sorry.
 3            Q.    Do you know if you had to prepare any
 4     documents for anybody affiliated with NFL
 5     pertaining to AAF?                                01:45
 6            A.    We did not.
 7            Q.    Did all of the funds that went into
 8     AAF come from DDFS Limited Partners?
 9            A.    I believe so.
10            Q.    Was there a resolution either in DCP   01:45
11     or DDFS or DDFS Limited Partnership or DDFS
12     Management Company to document or authorize
13     these investments?
14            A.    Not from recollection.
15            Q.    Was a decision made to conduct         01:45
16     layoffs of personnel in order to save money?
17            A.    There were discussions around every
18     category of expense -- expenditure.  I have to
19     imagine that included the census.
20            Q.    Did you participate in the discussion  01:46
21     about employee reductions?
22            A.    I have to imagine I did although I
23     don't recall specifics.
24            Q.    Do you know if there was a system of
25     deciding which employees would be reduced?       01:46
```

Page 165

```
 1                 UNITED STATES BANKRUPTCY COURT
 2                  WESTERN DISTRICT OF TEXAS
 3                    SAN ANTONIO DIVISION
 4
 5     IN RE:                          *
                                       * NO. 19-50900-CAG-7
 6     LEGENDARY FIELD EXHIBITIONS,*
       LLC, ET AL,                     *
 7      DEBTORS.                       * CHAPTER 7
       _____
 8     RANDOLPH N. OSHEROW, CHAPTER*
       7 TRUSTEE OF THE BANKRUPTCY *
 9     ESTATES OF LEGENDARY FIELD  *
       EXHIBITIONS, LLC; AAF       *
10     PLAYERS, LLC; AAF           *
       PROPERTIES, LLC; EBERSOL    *
11     SPORTS MEDIA GROUP, INC.;   *
       LFE 2, LLC; AND WE ARE      *
12     REALTIME, LLC,              *
                                   *
13     VS.                         * NO. 22-05078-CAG
                                   *
14     DUNDON CAPITAL PARTNERS,    *
       LLC; THOMAS DUNDON; AND     *
15     JOHN ZUTTER                 *
16                REPORTER'S CERTIFICATION
          DEPOSITION OF JEFFREY JAMES VANDERBILT, JR.
17                    NOVEMBER 11, 2024
18                I, GAIL SPURGEON, Certified
       Shorthand Reporter in and for the State of
19     Texas, hereby certify to the following:
20                That the foregoing deposition of
       JEFFREY JAMES VANDERBILT, JR. Was reported by me
21     stenographically at the time and place
       indicated, said witness having been placed under
22     oath by me, and that the transcript is a true
       record of the testimony given by the witness;
23
                  I further certify that the signature
24     of the deponent:
                  X  was requested by the deponent or
25     a party before the completion of the deposition
       and is to be returned within 30 days from date
```

Page 232

1    of receipt of the transcript.  If returned, the
     attached Changes and Signature Page contains any
2    changes and the reasons therefor;
                _____ was not requested by the
3    deponent or a party before the completion of the
     deposition;

4

        I further certify that the amount of time
5    used on the record:
6    BORIS TREYZON - 4:40
     MICHAEL J. SALTZ - 0:30

7

                I further certify that I am neither
8    counsel for, related to, nor employed by any of
     the parties or attorneys in the action in which
9    this proceeding was taken, and further that I am
     not financially or otherwise interested in the
10   outcome of the action.
11              Given under my hand this the
     13TH day of  NOVEMBER, 2024.
12

13

14

15

16              GAIL SPURGEON
                Texas CSR 1718
17              Expires: 11/30/24
18

19

20

21

22

23

24

25

                                            Page  233

EXHIBIT

**31**

## DECLARATION OF  EFF VANDERBILT

6.00

Signed by:

*Jeff Vanderbilt*

EA958BDG4DA14D5...

**EFF VANDERBILT**

Form **1040**
Department of the Treasury - Internal Revenue Service
**U.S. Individual Income Tax Return** (99) **2019** OMB No. 1545-0074 | IRS Use Only - Do not write or staple in this space.

**Filing Status**
Check only one box.
☐ Single ☒ Married filing jointly ☐ Married filing separately (MFS) ☐ Head of household (HOH) ☐ Qualifying widow(er) (QW)
If you checked the MFS box, enter the name of spouse. If you checked the HOH or QW box, enter the child's name if the qualifying person is a child but not your dependent. ▶

| Your first name and middle initial | Last name | Your social security number |
|---|---|---|
| THOMAS G. | DUNDON | |

| If joint return, spouse's first name and middle initial | Last name | Spouse's social security number |
|---|---|---|
| VERUSCHKA T. | DUNDON | |

Home address (number and street). If you have a P.O. box, see instructions. | Apt. no.
2100 ROSS AVENUE, SUITE 550

**Presidential Election Campaign**
Check here if you, or your spouse if filing jointly, want $3 to go to this fund. Checking a box below will not change your tax or refund. ☐ You ☐ Spouse

City, town or post office, state, and ZIP code. If you have a foreign address, also complete spaces below (see instructions).
DALLAS, TX 75201

| Foreign country name | Foreign province/state/county | Foreign postal code |
|---|---|---|
| | | |

If more than four dependents, see instructions and ✓ here ▶ ☒

**Standard Deduction**
Someone can claim: ☐ You as a dependent ☐ Your spouse as a dependent
☐ Spouse itemizes on a separate return or you were a dual-status alien

**Age/Blindness** You: ☐ Were born before January 2, 1955 ☐ Are blind Spouse: ☐ Was born before January 2, 1955 ☐ Is blind

**Dependents** (see instructions):

| (1) First name   Last name | (2) Social security number | (3) Relationship to you | (4) ✓ if qualifies for (see instructions): Child tax credit | Credit for other dependents |
|---|---|---|---|---|
| SEE STATEMENT 1 | | | | |
| | | | | |
| | | | | |
| | | | | |

Standard Deduction for -
● Single or Married filing separately, $12,200
● Married filing jointly or Qualifying widow(er), $24,400
● Head of household, $18,350
● If you checked any box under Standard Deduction, see instructions.

| | | | | | |
|---|---|---|---|---|---|
| 1 | Wages, salaries, tips, etc. Attach Form(s) W-2 ............... STMT 2 | | | 1 | |
| 2a | Tax-exempt interest | 2a | | b Taxable interest. Attach Sch. B if required | 2b |
| 3a | Qualified dividends | 3a | | b Ordinary dividends. Attach Sch. B if required | 3b |
| 4a | IRA distributions | 4a | | b Taxable amount | 4b |
| c | Pensions and annuities | 4c | | d Taxable amount | 4d |
| 5a | Social security benefits | 5a | | b Taxable amount | 5b |
| 6 | Capital gain or (loss). Attach Schedule D if required. If not required, check here ▶ ☐ | | | 6 | |
| 7a | Other income from Schedule 1, line 9 | | | 7a | |
| b | Add lines 1, 2b, 3b, 4b, 4d, 5b, 6, and 7a. This is your **total income** ............ ▶ | | | 7b | |
| 8a | Adjustments to income from Schedule 1, line 22 | | | 8a | |
| b | Subtract line 8a from line 7b. This is your **adjusted gross income** ........ ▶ | | | 8b | |
| 9 | **Standard deduction or itemized deductions** (from Schedule A) | 9 | | | |
| 10 | Qualified business income deduction. Attach Form 8995 or Form 8995-A | 10 | | | |
| 11a | Add lines 9 and 10 | | | 11a | |
| b | **Taxable income.** Subtract line 11a from line 8b. | | | 11b | |
| | If zero or less, enter -0- | | | | |

LHA **For Disclosure, Privacy Act, and Paperwork Reduction Act Notice, see separate instructions.** Form **1040** (2019)

913921 12-19-19

Exhibit A

exhibitsticker.com

19461014 149481 7000365389.I001       2019.04030 DUNDON, THOMAS G       70003653
CONFIDENTIAL                                                DCP Parties27857

840

Form 1040 (2019)  THOMAS G. & VERUSCHKA T. DUNDON                    Page **2**

| | | | | |
|---|---|---|---|---|
| **12a** | **Tax** (see inst.) Check if any from Form(s): 1 ☐ 8814  2 ☐ 4972  3 ☐ | **12a** | | |
| **b** | Add Schedule 2, line 3, and line 12a and enter the total ▶ | **12b** | | |
| **13a** | Child tax credit or credit for other dependents | **13a** | | |
| **b** | Add Schedule 3, line 7, and line 13a and enter the total ▶ | **13b** | | |
| **14** | Subtract line 13b from line 12b. If zero or less, enter -0- | **14** | | |
| **15** | Other taxes, including self-employment tax, from Schedule 2, line 10 | **15** | | |
| **16** | Add lines 14 and 15. This is your **total tax** ▶ | **16** | | |
| **17** | Federal income tax withheld from Forms W-2 and 1099 | **17** | | |
| **18** | Other payments and refundable credits: | | | |
| **a** | Earned income credit (EIC) | **18a** | | |
| **b** | Additional child tax credit. Attach Schedule 8812 | **18b** | | |
| **c** | American opportunity credit from Form 8863, line 8 | **18c** | | |
| **d** | Schedule 3, line 14 | **18d** | | |
| **e** | Add lines 18a through 18d. These are your **total other payments and refundable credits** ▶ | **18e** | | |
| **19** | Add lines 17 and 18e. These are your **total payments** ▶ | **19** | | |

- If you have a qualifying child, attach Sch. EIC.
- If you have nontaxable combat pay, see instructions

**Refund**
Direct deposit?
See instructions.

| | | | |
|---|---|---|---|
| **20** | If line 19 is more than line 16, subtract line 16 from line 19. This is the amount you **overpaid** | **20** | |
| **21a** | Amount of line 20 you want **refunded to you.** If Form 8888 is attached, check here ☐ ▶ | **21a** | |
| ▶ **b** | Routing number | **c** Type: ☐ Checking ☐ Savings | |
| ▶ **d** | Account number | | |
| **22** | Amount of line 20 you want **applied to your 2020 estimated tax** ▶ | **22** | |

**Amount You Owe**

| | | | |
|---|---|---|---|
| **23** | **Amount you owe.** Subtract line 19 from line 16. For details on how to pay, see instructions ▶ | **23** | |
| **24** | Estimated tax penalty (see instructions) ▶ | **24** | |

**Third Party Designee**
(Other than paid preparer)

Do you want to allow another person (other than your paid preparer) to discuss this return with the IRS? See instructions ☒ **Yes.** Complete below. ☐ **No**

Designee's name ▶ LAUREN W MARTIN   Phone no. ▶ 214-999-1400   Personal identification number (PIN) ▶

**Sign Here**
Joint return? See instructions. Keep a copy for your records.

Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

| Your signature | Date | Your occupation | If the IRS sent you an Identity Protection PIN, enter it here (see inst.) |
|---|---|---|---|
| | | CEO | |
| Spouse's signature. If a joint return, **both** must sign. | Date | Spouse's occupation | If the IRS sent your spouse an Identity Protection PIN, enter it here (see inst.) |
| | | HOMEMAKER | |

Phone no.          Email address

**Paid Preparer Use Only**

| Preparer's name | Preparer's signature | Date | PTIN | Check if: |
|---|---|---|---|---|
| ROB POPOVITCH | Rob Popovitch | 10/14/2020 | | ☐ 3rd Party Designee ☐ Self-employed |

Firm's name ▶ PRICEWATERHOUSECOOPERS LLP                Phone no. (214) 999-1400   Firm's EIN ▶
Firm's address ▶ 2121 N. PEARL STREET, SUITE 2000
DALLAS, TX 75201

Go to *www.irs.gov/Form1040* for instructions and the latest information.                    Form **1040** (2019)

913922 12-02-19

4

CONFIDENTIAL          DCP Parties27858

841

## 2019 Income from ==Passthroughs==

==DDFS - PARTNERSHIP, LP== - OTHER INCOME
I.D. NUMBER: ███████████
TYPE:  PARTNERSHIP

ACTIVITY INFORMATION:

DDFS - PARTNERSHIP, LP - OTHER INCOME

 TRADE OR BUSINESS - MATERIAL PARTICIPATION

  RENTAL REAL ESTATE INCOME (LOSS)
  OTHER DEDUCTIONS
  SEC 59(E)(2) -



     TOTAL NONPASSIVE INCOME (LOSS)


OTHER K-1 INFORMATION:

  INTEREST INCOME
  INTEREST FROM U.S. BONDS
  ORDINARY DIVIDENDS
  QUALIFIED DIVIDENDS
  NET SHORT-TERM CAPITAL GAIN (LOSS)          ==-69,966,595.==
  NET LONG-TERM CAPITAL GAIN (LOSS)
  INVESTMENT INTEREST EXPENSE - SCHEDULE A
  OTHER ITEMIZED DEDUCTIONS
  ROYALTY
  ROYALTY EXPENSES/DEPLETION
  INVESTMENT INCOME
  INVESTMENT EXPENSE
  NONDEDUCTIBLE EXPENSES



928021 04-01-19

19461014 149481 7000365389.I001      2019.04030 DUNDON, THOMAS G      70003653

CONFIDENTIAL                          DCP Parties27938

842

EXHIBIT
**32**

| | |
|---|---|
| **Message** | |
| **From:** | Michael Kives [mkives@k5global.com] |
| **Sent:** | 2/11/2019 1:53:16 AM |
| **To:** | Charlie Ebersol [ce@aaf.com] |
| **CC:** | alan@aaf.com; Kevin Freedman [kevin@aaf.com]; Bryan Baum [bbaum@k5global.com] |
| **Subject:** | Re: Per our conversation |

Got it
Let's talk tomorrow

We'll have a couple ideas
But will need to work out a deal of some sort on your end
Because too short of notice for us to take carry

On Feb 10, 2019, at 9:25 PM, Charlie Ebersol <ce@aaf.com> wrote:

Michael,

Obviously, this is very sensitive info, so please don't send it outside you and your partner. In short, there is an opportunity for a motivated investor to step in and get a great deal on a tested and proven league with significant tech.

We officially launched the Alliance of American Football league with our first two games broadcast nationally on CBS last night and our groundbreaking app in the Apple and Google Play stores (we're #1 in both stores). We had a great opening night on CBS in terms of ratings (we beat the NBA -Rockets/OKC - on ABC head to head) and got great buzz on twitter (5 of the top 10 trending topics) and in the press. As with most things in startup life, with all the greatness going on, we have our challenges. As we discussed, my primary investor, who was introduced to us by the NFL, has failed to live up to his obligations. We agreed he would fund on a schedule and while he has funded $22M of his $170M obligation thus far, he is currently delinquent on his most recent funding obligations. Essentially, I need $10M to get through the next 2 weeks and an additional $60M to get through the end of the season. I have investors who will follow a legitimate lead.

Below are a few highlights from last night and some recent press for your reference.

**Opening Night Highlights**

? #1 trending sports app in the app in both the Apple and Google Play App Stores

? #1 PrimeTime television program on Saturday night; 2.1 rating on CBS (beat the PrimeTime NBA game on ABC)

? 125,000 active users on mobile

? Responsible for 11 of the 20 top trending topics on Twitter in the US during the opening games

? San Antonio attendance: 27,875



Δ π EXHIBIT 20
Deponent OMKIS 07501
Date 12/29 13:47 Rptr
WWW.DEPOBOOK.COM

TR0001628256

843

? Orlando attendance: 21,187

**_Recent Press_**

? <!--[if !supportLists]--><![endif]-->_https://www.dailydot.com/upstream/san-antonio-commanders-vs-san-diego-fleet/_

? <!--[if !supportLists]--><![endif]-->_https://www.nytimes.com/2019/02/08/sports/football/alliance-of-american-football-betting-aaf.html_

? <!--[if !supportLists]--><![endif]-->_https://www.theringer.com/nfl/2019/2/8/18216486/aaf-new-football-league-christian-hackenberg-alliance-american_

All my best,

C

Charlie Ebersol
Founder & CEO

████████████

AAF.com

<image001.jpg>

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

<FullSizeRender.jpeg>
<IMG_3098.jpeg>
<IMG_3075.jpeg>
<ESMG Financial Projections Model vF.xlsx>

TR0001628257

EXHIBIT

**33**

1    VIDEOGRAPHER:  Okay.  Good morning.  Today is January

2   7th, 2025.  The time is 12:00 and my name is James Levine

3   with Law and motion.  Today we're providing video services

4   through remote electronic means and in person.  And the

5   case is legendary field exhibition versus Dunedin Capital

6   Partners, case number 2205077 CAG7.  And this is venued in

7   the United States District Court, the Western District of

8   Texas, San Antonio Division.  And today we are taking the

9   testimony of Alan Kantowitz.  And if we could have

10  everyone present identify themselves and please state your

11  name appearances for the record.

12      MR. LOWENSTEIN:  Jeff Lowenstein and Brent Hockaday

13  for the defendants.

14      MS. **

15      Speaker B:  Brian Engel and Jonathan Farahi for the

16  trustee, Loris Tron for the trustee.

17      Speaker A:  Jonathan Alon on behalf of the Ponent.

18  Thank you.

19      VIDEOGRAPHER:  Madam Court Reporter, would you please

20  swear on the witness?

21      COURT REPORTER:  My name is Ann Bonnette.  I'm a

22  California Certified shorthand reporter.  CSR license

23  number 6108.  Today's date is January 7, 2025.

24          Would the witness please raise his right hand.

25  Do you solemnly state or affirm that the testimony you're

1

1 about to give in.  This proceeding will be the truth, the.

2 Whole truth and nothing but the truth?

3          Yes.

4          You have been sworn in your under oath.

5     Q    Mr. Kantowitz, can you please introduce

6 yourself.

7     A    Sure.  My name is Alan Kantowitz.  I currently

8 reside in Los Angeles, California and I was a former

9 employee of the alliance of American Football.

10     Q    I'm going to try to work through background

11 things relatively quickly and I'm going to skip over the

12 ground rules for depositions.  I don't know if you've done

13 this before or not, but if we get tripped up on something,

14 I'll cover it.  Then can you just give a brief educational

15 and work background?

16     A    Sure.  I graduated from New York University in

17 late 2013.  My first job after that was at bank of America

18 doing investment banking.  I subsequently worked at a

19 private equity firm in New York called Providence Equity

20 Partners.  Subsequent to that I spent about 11 months

21 working at the alliance of American Football or a

22 Legendary Field exhibition exhibitions.  After that I

23 spent some time working at MSP Sports Capital and Sports

24 Private Equity.  And I currently work at a family office

25 based out here in la.

                                                              2

1    see the line that says number of teams.

2          A     Number of teams.  Yes.

3          Q     Green.  And it shows eight teams in 2019 and

4    2020 and then increasing two every other year up through

5    2028.

6          A     Yes.

7          Q     Do you recall who gave the input of that was the

8    growth plan for the league?

9          A     Not specifically.  Not.  Not specifically.

10         Q     Okay.  As of May of 2018, was your understanding

11   that that was the plan was to grow two teams every other

12   season?

13         A     My understanding was that was the plan subject

14   to change.

15         Q     Okay.  Certainly these pro forma.  This pro

16   forma was built around that assumption of adding two teams

17   every other year.

18         A     I think that was an input into this projection.

19   Projection model.

20         Q     Do you recall why that that changed at some

21   point?

22         A     I.  I don't even recall that it did change.

23         Q     It was previously marked as a tip at 139.  Come

24   on.  This is a.  This is an email from you to Dan Miller

25   from August of 2018; correct?

                                                              39

1     A    Yes.

2     Q    You recall that Dan Miller is the one that was

3  involved with the San Diego franchise?

4     A    I do now.

5     Q    Okay.  And this email from Dan Miller to the

6  team in the bottom part of the email, if you look at

7  paragraph two, it says increases in number of games has

8  large impact on revenue capital needs.  You should look at

9  trying to add teams sooner than later to juice the pro

10  forma.  You see that?

11     A    Yes.

12     Q    This is.  Although will require more money,

13  right?

14     A    Yes.

15     Q    Are you aware that.  Well, I'm going to show you

16  Exhibit 6, which includes the proforma that was sent to

17  Tom Dundee.

18     Speaker B:  It is this proceeding at a good pace for

19  you, Mr. Kendowitz?

20     A    Fine, buddy.

21     Q    I'm going to show you what was previously marked

22  Exhibit 6.  And this is the.  Includes the pro forma that

23  was included and sent to Mr. Dundon.  And can you see at

24  the top the number of teams?

25     Speaker B:  Go ahead.

40

1    for Mr. For the board as of August 2018 to decide to take

2    the advice of Mr. Miller to Juice to pro formas and double

3    the speed at which the team the league would be adding

4    teams?

5         A    I don't know.

6         Speaker B:  Let me.  Let me give my objection to

7    Foreman.  I almost feel like I should make it about 11

8    times, but just once will do.

9         A    I don't know that the board ever knew who Dan

10   Miller was or that he made the suggestion, or that the

11   change that you referenced between exhibits was made

12   because Dan Miller suggested it, or whether it was prudent

13   or not prudent.

14        Q    Do you know of any reason other than Mr.

15   Miller's suggestion that the decision was made to double

16   the speed at which the league was going to add teams?

17        Speaker B:  Object to form one?

18        A    Not that I can recall.  Again, I don't remember

19   when or why that assumption changed.

20        Q    You say in response to Mr. Miller's email that

21   you can walk through each of these items on our call in a

22   half an hour.  Do you remember anything about what you

23   discussed in the call with Mr. Miller in August 2018?

24        Speaker B:  Object to form?

25        A    I do not.

                                                              43

1    been achieved before.  People did the best to the best of
2    their abilities.
3        Q    I hear you, but I'm saying again, a projection
4    is a projection.  I'm asking in terms of a centralized
5    budget that you can compare to the capital available to
6    the league.  Was there ever a place where you, Alec
7    Nowitz, could go and see information.
8        Speaker B:  Like that Object to form?
9        A    Not to my recollection.
10       Q    There were certainly periods of time where you
11   understood, just based on general concepts, that there was
12   not sufficient cash to cover the expense needs of the
13   league.  Right.
14       A    I wouldn't classify it that way, but use your
15   words.  There were same objection.  There were times in
16   which I knew we didn't have sufficient funds to get
17   through a full season of football.  I don't recall ever
18   knowing specifically.  We right now cannot pay this bill
19   until, you know, much later on.
20       Q    What much later on end of 2018.
21       A    I don't recall specifically, but I would say
22   after launch, maybe around the time of launch.
23       Q    We'll get back to that.  Prior to the league
24   launching, were there any sources of revenue?
25       A    I think there were sponsorship sales maybe and

                                                        46

1    ticket sales.

2        Q    Some, yes.

3        A    Although I'm not sure you're allowed to

4    recognize that revenue until the games are played.

5        Q    Just from a cash standpoint, was there any cash

6    coming in from revenue sources prior to the league

7    launching objective?

8        A    There may have been from sponsorship, but I

9    don't recall.

10       Q    Do you remember it being anything significant?

11       A    Again, could have been a couple million bucks, a

12   couple hundred thousand, but again, I don't recall no more

13   than a.

14       Q    Couple million prior to the league launch.

15       A    I think that's probably a fair estimate.

16       Q    Okay.  So the league was almost exclusively

17   relying on outside funding to get through the time the

18   league was going to launch; correct?

19       A    Objection four, yes.

20       Q    And so the league knew that the funds available

21   to cover expenses were going to have to come from outside

22   investment or lending objective.

23       A    I think that's fair.

24       Q    And you get a good sense of what the cash

25   available was for expenses to get up to the time of the

                                                    47

```
 1    This email for Mr. Morad was December 7th.  I'm Strike
 2    that.  This email from Mr. Pottrick was December 7th.  You
 3    recall when you came to the opinion that Mr. Fowler was
 4    not to be trusted?  Object to form.
 5         A    Not specifically.
 6         Q    It did become clear at some point that Mr.
 7    Fowler was not going to follow through with his
 8    commitment.  His funding commitment.  Correct.
 9         A    It became clear that he was missing, I believe,
10    set dates that he was supposed to be funding certain
11    amounts, which was, you know, troubling.
12         Q    And the league was spending money and reliance
13    on that commitment, right?
14         A    I believe somewhat, yes.
15         Q    I mean, the league was incurring debts to
16    vendors without Mr. Fowler's cash in the bank, Right.
17         A    I can't answer specifically.
18         Q    This is the videographer.  When it's an
19    appropriate time, can you take a media break?  Yeah,
20    let's.  Can we do five minutes?
21         Speaker B:  Yep.
22         A    Five minutes work.
23         Q    Okay.
24         Speaker B:  We're off the record at 129.  All right.
25         Q    Do you have a copy for me, too?  Yeah.
```
                                                    56

1    Exhibit 518, Mr. Morad says Reggie and the two of us, to

2    be fair, also have a lot of questions about the revenue

3    and expense forecast for 2019 and beyond and believe we

4    need a board level conversation about this.  See that?

5         A    Yes.

6         Q    And if you skip a sentence, it goes frankly to

7    once again be direct.  The company's expense and salary

8    structure looks more to us like a 10 year mature company

9    rather than a first year startup.  You see that?

10        A    Yes.

11        Q    Do you recall having conversations with Mr.

12   Morad about the expenses and salary structure of the AAF?

13        A    No.

14        Q    Did you have an opinion about that?  Whether the

15   expense and salary structure of the league looked more

16   like a 10 year mature company than a startup Object to

17   form?

18        A    Not that I can recall.  Every startup is

19   different.

20        Q    Every what?

21        A    Every startup is different.

22        Q    Well, this was the first one you had been

23   involved with, right?

24        A    Yes.

25        Q    So you didn't really have anything to compare it

59

1   research on competitive leagues and what they were paying

2   coaches and players?

3        A    Not that I can recall.

4        Q    And you said in paragraph two of your email, you

5   say, agree we need to find a path forward with Reggie and

6   need to do our best to make this work.  However, shutting

7   down the business was not a threat and was never intended

8   to be one.  That was just the fact of our reality and

9   situation was.  Which was caused by Reggie.  What does

10  that mean?

11       A    I don't recall specifically what was meant by

12  that or who said shutting down the business.  What I do

13  recall is Reggie was not funding.  We were approaching the

14  season.  Capital was required to launch a league.  If you

15  don't have the capital, you can't have a product on the

16  field.

17       Q    And if you don't have the capital, you shouldn't

18  go forward with launching the league.  Right?

19       A    I don't know the right answer to that question.

20       Q    Well, your opinion was that shutting down wasn't

21  just a threat.  It was the reality if there was

22  insufficient capital to go forward.  Right.

23       A    Again, I don't recall exactly what shutting down

24  meant and what the conversations were at that point in

25  time.

                                                        64

```
 1        Q    You know what shutting down meant?  Objection.
 2        A    Argument?
 3        Q    Yes.
 4        A    I don't know if it meant temporarily,
 5   permanently shutting him down, pursuing other options.  I
 6   don't recall the context of what was occurring
 7   specifically at that point in time.
 8        Q    You do recall that in this time frame in
 9   December 2018, there was discussions about shutting down
10   the league and not pursuing starting football in 2019?
11   Right.  Form.  Asked an answer.
12        A    I thought he just asked an answer.
13        Q    You can.
14        A    You can still.
15        Q    I mean, he's zest.  Same question.
16        A    So I recall general nervousness around our
17   ability to have the funds to launch the league.
18        Q    And do you.  Around that time, and do you recall
19   that there were discussions about shutting down the league
20   and not plotting forward towards putting football on the
21   field at this time?  Objection.  And asked and answered.
22        A    I recall general discussions around various
23   options.  Certainly that could have been one of them.
24        Q    What were other options you remember other than
25   shutting down?  If Mr. Fowler didn't come through pursuing
```

<div align="right">65</div>

1   alarming to me.  You see that I do.  So certainly by this
2   point, December 23, 2018, you had serious concerns about
3   Mr. Fowler ever following through on his funding
4   commitment; correct?
5       A    This seems to reflect that, yes.
6       Q    And despite those concerns that you were sharing
7   with Charlie and were being expressed by Mr. Morad, the
8   AAF plowed forward with getting to the launch of the
9   league, didn't it?
10      Speaker B:  Object to form.
11      A    Despite this concern, at this specific time.
12      Q    The league launched and the league continued to
13  incur millions and millions of dollars of expenses to get
14  to launch, didn't.
15      A    It?  Did.  While also potentially getting more
16  funding from Reggie and others subsequently, as well.
17      Q    To this email being written, there was no other
18  substantial investor other than Mr. Fowler that stepped in
19  between December 23, 2018 and the launch of the league,
20  was there object to the form?
21      A    I don't recall.  There were other.  I think
22  there were other investors.
23      Q    Do you know what the amount totaled?
24      A    I do not.
25      Q    And you said in the next paragraph, just because

                                                        67

1   he was our only option does not mean we need to continue

2   forth with that option.  So it was your opinion as of

3   December 23, 2018, that Mr. Fowler was the only option for

4   the league to move forward?

5       Speaker B:  Object to form.

6       A    Can you.  Can you point me to where.

7       Q    Yeah, it's the next paragraph.  Jeff did.  It

8   says just because.  Do you see that?

9       A    And.  And please repeat the question.

10      Q    It says, just because he is our only option does

11  not mean we need to continue forth with that option.  So

12  it was your opinion as of December 23, 2018, that Mr.

13  Fowler was the only option for the AAF to go forward.

14  Correct.

15      A    At that point in time, he was the only

16  significant investor who had made a commitment.

17      Q    And then at the bottom of that page, you said,

18  we have been officially in business with this guy for a

19  month and has been an absolute nightmare.  He has done

20  absolutely nothing to earn the right, that right and

21  confidence.  And it is not only unfair, but in my opinion,

22  irresponsible to continue to write checks and make

23  commitments with partners without knowing exactly what is

24  going on with Reggie and how available this money is.  See

25  that?

                                                          68

1     Q     Did the lead.  Did the board of directors, the

2   AAF act responsibly in continuing to write checks and make

3   commitments leading up to the launch of the league?  In

4   your opinion, object to the form.

5     A     I don't recall when checks and commitments were

6   exactly made.

7     Q     In your.  In Charlie's response to your email on

8   the front of page of Exhibit 518, Charlie, Charlie says

9   additionally, Reggie's delinquency screwed us with respect

10   to revenue by killing our marketing.  Do you know what.

11   Do you have an opinion of what Mr. Eversole meant by that?

12     A     I don't know what he meant by that.

13     Q     Well, he makes a reference to killing our

14   marketing.  Do you have a memory of what happened with the

15   AF's marketing as it related to this time period?

16     A     I believe there was a plan to market the league.

17   You need dollars to buy those at, you know, Ad Times.  And

18   because we had limited funds, marketing was the first line

19   item, to my recollection, that we decided to not spend

20   money on.

21     Q     So as of December 23, the marketing efforts for

22   the AAF had been killed by the current board of the AAF at

23   that time, Right?

24     Speaker B:  Objection.  Form.

25     A     I recall marketing being limited by Charlie.  I

72

```
1    don't know.  I was never privy to board discussions.
2        Q     And that limiting by Charlie was.  Had happened
3    by the time of December 23, 2018.  Correct.
4        A     This document appears to reflect that.
5        Q     And Charlie's decision to kill the marketing is,
6    in his own opinion, screwed the league with respect to
7    revenue.  Fair objective.
8        A     It appears the decision to limit marketing and
9    Charlie's opinion led to a decrease in potential revenue.
10       Q     It screwed the league.  Is what he said.  Object
11   to form document speaks for itself.
12       A     Yeah, that's what Charlie wrote to me.
13       Q     You responded, agreed.  Although based on Jeff's
14   email From last week.  I think his concern with financials
15   are more budget focused and related to salaries being high
16   and the amount of people we plan to hire or even have
17   hired already.  And Charlie's response is?  No.  They
18   question the revenue projection, which is problematic.  Do
19   you recall having a conversation with Charlie, what he
20   meant by Jeff and Dick's.  I'm sorry, Jeff and David's
21   questioning of revenue projections being problematic?
22       A     No.
23       Q     Do you have an understanding of what he meant by
24   that?
25       A     My understanding currently is that the way I
```

73

1    Q    So was there a plan in place to fund the

2    additional $200 million that Mr. Morad references, to your

3    knowledge, as of December 2018?

4        Speaker B:  Objection.

5    A    I don't know what he's referencing.

6    Q    Are you aware of a plan to raise an additional

7    $200 million for the league as of December 2018 in

8    addition to what Mr. Fowler had committed?

9        Speaker B:  Same objection.

10   A    Not that I can recall.

11   Q    Exhibit 519.  There's an email with an

12   attachment, although it's not attached, from Mr. Farrell

13   to you, titled or with an attachment called Cash Flow

14   Projections.  Do you see that?

15   A    Which document number?

16   Q    I don't think you're looking at the same thing I

17   was asking.  What?  I think that's 520.  Oh, shoot.  Okay.

18   Sorry.  Let me see that one.  I just handed you this.

19   A    This?

20   Q    Yeah.  Mark 2:519s.  All right, I'm going to

21   show you.  It's been marked as Exhibit 520.  And for the

22   record, to make that clear, that's TR 1289611 is the Bates

23   number on the first page.  This is email from Kevin

24   Farrell to you on December 29, 2018; correct?

25   A    Yes.

                                                      77

1      Q    And so these cash flow projections were for all

2  money that was going to be spent before the first game

3  took place.  Correct.

4      A    It seems like expenses prior to the.

5      Q    First game occurring in the attachment under the

6  page that has projections.  12, 28, 19 at the top.  You

7  see that?

8      A    Yes.

9      Q    Okay.  So it says there are wires for the week

10  of December 24th that look like they totaled almost $2

11  million.

12      A    Yes.

13      Q    Then there's wires for the week of December or

14  for December 31st.  That is another $747,000.

15      A    Yes.

16      Q    So that looks like 2.7 million to be spent

17  through the end of December.

18      A    That appears to be correct.

19      Q    Okay, and then for the rest that.  The column on

20  the left, there's 24.4 million, which is largely going to

21  be spent in the first half of January of 2019.  Correct.

22      Speaker B:  Object to form.

23      A    Can you restate that?

24      Q    Yeah.  So this.  There's.  Based on what Mr.

25  Farrell was saying is he said projections are through mid

                                                     79

1    January, except where noted, for all of January.  So the

2    column on the left, the $24.4 million was money projected

3    to be spent in January 2019.  Correct.

4         A    That appears to be accurate.

5         Q    So, in total, the money to be spent from the

6    week of December 24th through January was about $27

7    million?

8         A    No.  Because I believe the 2.7 million you

9    referenced is included in the 24 million at the bottom of

10   this page.  If you look at the lines that say wires week

11   of December 24th.  C.  Table.

12        Q    Okay.

13        A    It includes.

14        Q    Fair enough.  So through January 2019, the

15   league was anticipating spending $24.4 million.

16        A    It appears that that was Kevin Farrell's

17   assessment.

18        Q    And in Kevin's email, he says there's some

19   buckets I am missing.  Do you know how much those missing

20   buckets totaled?  And there's some that are blank, like

21   training camp travel insurance run rate in his table.

22   Correct.

23        A    I'm not following.  Apologies.

24        Q    There are blanks in Mr. Farrell's table.  I'm

25   sorry.  They're for production, travel bookings and

                                                          80

1   Insurance run rate.

2       A    Those appear to be blank.

3       Q    Do you know what those total?

4       A    I do not.

5       Q    All right.  Show it's been marked as Exhibit

6   521.  This is an email, but this is a.  Emails in response

7   to that one that Kevin sent you with the cash flow

8   projections.  You see that?

9       A    Yes.

10      Q    And you.  You respond about, thanks, Kevin.

11  Really appreciate it.  So the left side is upcoming

12  projections, slash payments for January.  And then, Kevin,

13  I mean, sorry.  And then you respond again.  You said,

14  kevin, sorry to both you.  Again, I probably meant bother

15  with this, but I'm having trouble understanding the sheet

16  put together.  I'm trying to bridge the gap from the 13.4

17  million Reggie put in to whatever is left over from the

18  13.4 million.  The cells on the right only add up to less

19  than 3 million.  It was my understanding that we sent a

20  lot more than that out the door this past week.  You see

21  that?

22      A    Yes.

23      Q    So it looks like by this point, Mr. Fowler had

24  put in 13.4 million.  Correct.

25      A    That appears to be the case.

                                                    81

1      Q    And you were trying to get an understanding of

2  how that money had or was going to be spent?

3      A    I think that's an accurate reflection.

4      Q    All right.  And Mr. Farrell responds, I'm going

5  with the assumption that we ran our sbb.  That's the

6  Silicon Valley bank?

7      A    I think so.

8      Q    The one that was famously bailed out in the

9  recent past Object to form.

10     A    That appears to be the one.

11     Q    All right, it says, Mr. Farrell says, I'm going

12 with the assumption that we ran our SVB account to zero

13 with the final December payroll and the 500,000 set aside

14 for Aramark.  In running this down to zero, we also had

15 Doug into ticket sales money.  You see that?

16     A    Yes.

17     Q    Okay.  So does that tell you that according to

18 Mr. Farrell, Mr. Fowler's entire $13.4 million was going

19 to be gone by the end of December 2018?

20     A    Again, I'm just seeing this for the first time

21 in a while, but I think it implies the opposite, that

22 there was more money in the bank than I would have

23 thought, just based upon readiness.

24     Q    But he says, I'm going with the assumption that

25 we ran our SVB account to zero with the final December

                                                    82

1    payroll.  Right?

2        A    Yes, he says that.

3        Q    Okay.  So that leads me to believe that that

4    would be the end of the cash the League had by December

5    2018.

6        A    I think there were other bank accounts.  I

7    believe there were other bank accounts.

8        Q    What were the other bank accounts?

9        A    I don't know, but based on me reading this,

10   there may have been other bank accounts.  If I recall

11   correctly, there was a JP Morgan account that may have

12   been open Because SVB wasn't or couldn't accept wires from

13   hsbc.  I don't recall the exact specifics, but there were

14   more.  There's definitely more than one bank account for

15   the league or the company or whatever you want to call it

16   Was.

17       Q    The SBB account, the operating account for the

18   league.  I don't recall how much money was in the JP

19   Morgan account by on December 30, 2018.

20       A    Again, I don't recall if it was specifically JP

21   Morgan or Morgan Stanley or something else, and I don't

22   recall how.

23       Q    Much money was in any other AAF bank account as

24   of December 30, 2018.

25       Speaker B:  Objection.

                                                          83

```
 1      A    I don't recall.

 2      Q    Why would Mr. Farrell only talk about SVP if

 3  there was money sitting around in other accounts as of

 4  December 30, 2018?  Objection of form.

 5      A    My understanding of this email was that it

 6  looked like $2.7 million per prior line of questioning

 7  needed to go out by the end of December, that was somehow

 8  paid.  And there was, I think, based on this email, close

 9  to 13.4 million still available.  So I was asking Kevin

10  how that was possible because I thought more money had

11  gone out the door.  And based on this reading, it seems

12  like his response was that stuff was paid with what was in

13  the SVB account, not what was funded with Reggie in the

14  SVB account, plus ticket sales deposits.  Again, this was

15  six years ago, but that's my understanding of what

16  transpired or.

17      Q    Occurred here and I'm going to push back because

18  it's not what your email below says.  I am trying to

19  bridge the gap from the 13.4 million Reggie put in to

20  whatever is left over from the 13.4 million.  The cells on

21  the right only add up to less than 3 million and it was my

22  understanding that we sent a lot more than that out the

23  door the past week.  So you were under the understanding

24  that a lot more of Reggie's money had been spent than the

25  13.4 million?  Correct.
```

                                                          84

1     Speaker B:  Object to the form.

2     A    My understanding in this current moment because

3     of that line was I must have seen something or been told

4     there's a lot.  Maybe there's 10 million plus in the bank

5     account or 12 million.  How is that possible if we had to

6     spend other stuff?  And his response to me was those

7     obligations were paid from the SVB account, not Reggie's.

8     But again, I don't recall specifically what the context of

9     this email was and when I wasn't in charge of sending

10    money out the door.  So I can't tell you exactly what

11    happened or what this speaks or doesn't Speak.

12    Q    Do you know if any of Mr. Fowler's money was

13    ever in any bank account other than the SVB account

14    objective?

15    A    I don't know for sure.

16    Q    Can you testify under oath that one penny of it

17    was in any account other than the SVB account?

18    Speaker B:  I can to the form.

19    Q    Okay.  So you're speculating about there may

20    have been other accounts with money in it, aren't you?

21    A    Sure.

22    Q    Would Mr. Farrell be the best one to ask about

23    what the bank account balances were as of the end of

24    December 2018?

25    A    I don't know who the best person would be.

85

1    prior to the meeting occurring or after the meeting.

2        Q    Let's start with prior.  Did he tell you

3    anything about why he was going to meet with Vince

4    McMahon?

5        A    Yes.

6        Q    What did he tell you?

7        A    I believe, to the best of my recollection, the

8    meeting was going to explore potential options with of

9    Vince funding our league or merging, you know, the

10   potential future XFL with our operation.

11       Q    Did Charlie tell you why he wanted to have that

12   meeting with Mr. McMahon?

13       A    Not specifics other than what we already

14   referenced with respect to Reggie's foul, Reggie's funding

15   obligations and he and his family had a priority, positive

16   and existing relationship with Vince McMahon.

17       Q    What do you recall Charlie reporting back to you

18   after he met with Vince McMahon about what happened in the

19   meeting?

20       A    Not specifics other than it was pleasant, he

21   seemed interested, but it was going to be a long putt for

22   them.

23       Q    What does that mean?

24       A    Meaning they were, you know, already, I think,

25   well on their way to launching their own league.  And, you

                                                89

1   know, we're not interested at this point in merging the

2   two.

3       Q    And show you exhibit 522.  I can't tell from the

4   way this was printed whether you got Charlie's email that

5   he sent to the ESMG board.  You recall seeing this email

6   that Charlie sent about going to see Vince McMahon?

7       A    I do not.

8       Q    This is dated December 18, 2018.  In the fourth

9   paragraph, Charlie says, We currently have less than $2

10  million of usable capital in the bank.  We have 2 million

11  of ticket revenue that we plan to return to purchasers if

12  we do not play games with this cash.  Reserve and our

13  obligations to payroll for this week.  We do not have

14  enough capital to continue football operations after

15  Friday, and it will be difficult to continue digital

16  operations.  See that?

17      A    Yes.

18      Q    Do you have any reason to doubt that Charlie was

19  aware that the league had $2 million of usable capital as

20  of December 18, 2018?

21      A    Not necessarily.

22      Q    Did.  And he went to meet with Mr. McMahon and

23  there was no deal that came out of that; correct?

24      A    That's correct.

25      Q    Did any other substantial investors show up?

                                                        90

```
 1      A    I don't recall if no other outside substantial
 2   investor showed up.
 3      Q    And did the league cease operations on the
 4   Friday following December 18, 2018?
 5      A    No.
 6      Q    Did it cease operations after December 30, 2018?
 7      A    Ultimately, yes.
 8      Q    Fair.  Did it cease operations around the time
 9   of December 30, 2018?
10      A    No.
11      Q    Cease operations before it spent the 24.4
12   million referenced in the prior emails we looked at in
13   January.  Object to form 4.
14      A    I don't even know the total number that was
15   spent, but assuming it was 24 million or exceeded.  No.
16      Q    In the end of the next paragraph, Charlie says,
17   however, it is more likely that we will still be forced to
18   concede the 29th, 2019 season and hope to continue to
19   pursue the digital business while Vince acquires our
20   football organization to launch the xfl.  See that?
21      A    Sorry.  Now which.  Which paragraph?
22      Q    The next paragraph.  The last sentence.
23      A    Yes.
24      Q    So it was being contemplated by Charlie in his
25   discussion with the board by December 2018, either ceasing
```

91

```
 1   operations or delaying the start of the football season
 2   until after 2019.  Right.
 3        Speaker B:  Foundation objection.
 4        A    That appears to be the case from this email.
 5        Q    And instead of making that decision after
 6   getting this advice From Charlie in December 2018, the
 7   board at that time decided to press forward and launch the
 8   league.  Right.
 9        A    Is this advice from Charlie or is it just.
10        Q    It's an email from Charlie.
11        Speaker B:  You don't get to ask questions.  He'll
12   ask them.
13        Q    So we're confused.
14        A    He'll fix it.
15        Q    Yeah.  Let me ask.
16        A    Yeah, Sorry.
17        Q    After getting this email From Charlie in
18   December 2018, the board of the AAF did not cease
19   operations of the league, did it?
20        A    Not at that time.
21        Q    And it did not delay the launch of the league
22   until the 2020 season, did it?
23        A    No, it did not.
24        Q    And it did not have things squared away with
25   Reggie Fowler to where he funded his full commitment, did
```

92

1    it?

2        Speaker B:  Object to form?

3        A    Not at that point in time.

4        Q    And it did not have another substantial investor

5    to come in to help fund the league up to the launch of the

6    league, did it?

7        Speaker B:  Object to form.

8        A    Not at this point in time.

9        Q    And are you aware how much unpaid account

10   payable the league incurred between this point in time?

11   And the launch of the.  The league?

12       A    No.

13       Q    Would it surprise you that that number was in

14   the $20 million range of unpaid vendors up to the launch

15   of the league?

16       Speaker B:  Object to the form.

17       A    Wouldn't surprise me.

18       Q    Do you think that was responsible to incur $20

19   million of debt to vendors from this time forward without

20   the capital to pay it?

21       Speaker B:  Object to the form.

22       A    I don't know when that.  Again, I don't know

23   when those commitments were made and what exact amounts

24   they were.

25       Q    Well, forget the commitments.  When somebody

                                                        93

1    provides a service to the league, the league owes that

2    person money regardless of when the commitment was made.

3    Right.

4        Speaker B:  Object to the form.

5        A    Sure.

6        Q    And if the league accepts the service actually

7    has it performed, it's incurring a debt that needs to be

8    paid to that vendor.  Correct.

9        Speaker B:  Object to form.  Each to the form?

10       A    Yes.

11       Q    When did the league make the decision that it

12    was going to incur obligations and expenses with vendors

13    without paying?

14       A    It's possible that those decisions were made

15    well before this.  I don't know exactly when they were

16    made.

17       Q    Okay.  So there was a decision by the current

18    management of the league at or around the time of December

19    2018 that league was going to incur obligations with

20    vendors without having the capital pay them.  Right.

21        Speaker B:  Object to form.

22       A    I can't answer that.  I don't recall.

23       Q    It did happen at some point.

24        Speaker B:  Object to the form.  Form.

25       A    Can you clarify?

            94

1    Q    Okay, let's take a break.  In that logistics.

2  Okay, we're off the record at 2.

3    A    39.

4    Q    Here we go.  We're going backwards.  Yes.  Okay.

5  One moment, please.  Recording in progress.

6    A    Okay, Back on the record at 2.

7    Q    41.  Sure.  It's been previously marked as

8  exhibit 92.  Do you recall preparing a presentation to the

9  finance committee for the league regarding the adjustments

10  in the projections for the League?

11    A    No.

12    Q    Is Exhibit 92 a true and correct copy of an

13  email that you exchange you had with Kevin Farrell and on

14  January 7, 2019?  Objection.

15    A    Last Foundation.  It appears to be any with

16  Kevin Friedman, not Kevin Farrell.

17    Q    Sorry, my bad.  Kevin Friedman.  In your email

18  you say in your first email at the bottom you said

19  attached or overview slides that I put together.  And then

20  you start to describe the slides below.  You said, Slide

21  1, we were ahead by 2.5 million for December spending.  As

22  far as I can tell, major areas of savings were equipment

23  and marketing.  As we were able to push these to January,

24  February.  So there was a decision to push marketing

25  spending to January, February.  Is that correct?

96

1      A     That seems to be accurate.

2      Q     Okay.  And then it says insurance was an area of

3  increased spending due to the fact that we pushed payments

4  from October and there were upfront payments we did not

5  anticipate and spread across on annual basis in the

6  original model.  So slide one is describing that there was

7  expense savings, but mostly in terms of timing, not in

8  terms of whether it would ever be incurred.  Right.

9         Speaker B:  Object to form.

10     A     That could be accurate.

11     Q     And then slide two, you said projected to be

12  about 2 million ahead on spending for January.  Equipment

13  is the big one here, as we have pushed a lot of that of

14  this into the season as well.  So again, slide two is

15  saying we're head on expenses for January, but that's

16  because we're delaying the expense, right?

17     A     Yeah, that seems to be the case.

18     Q     Not cutting the expense.  Correct.

19     A     As far as I can recall.

20     Q     All right.  And then slide three and four, you

21  say just show the budget we showed Reggie in the documents

22  through through the end of the season and the revised

23  budget I have constructed.  So the exercise here was

24  comparing the projections you had presented to Mr. Fowler

25  with adjustments that you all are making based on what was

                                                        97

 1    actually going on.

 2        Speaker B:  Object to form.

 3        A    That seems to be reflective of what this is

 4    describing.

 5        Q    All right, and you says this shows that we are

 6    taking a hard look at spending and have cut $20 million

 7    from our anticipation anticipated spending.  Do you know

 8    what those cuts related to?

 9        A    I do not.

10        Q    Okay.  And then you said, however, revenue

11    projections have also taken a hit due to lack of marketing

12    and a rethinking of digital revenue.  And I'll go through

13    the details in the slides.  But what did you mean by a

14    rethinking of digital revenue?  Do you recall?

15        A    I do not.

16        Q    But the lack of marketing had by January 7,

17    2019, had an impact on the revenue projections for the

18    league, didn't it?

19        A    Object to form appears to have an impact on the

20    projections.

21        Q    Do you know what percentage of the marketing

22    that had been planned back when you started May of 2018

23    was actually done by Mr. Eversole on the board, working

24    under him through the launch of the league?

25        A    I do not.

                                                            98

1      Q      Certainly less than was anticipated.  Right.

2      A      I think that's fair.

3      Q      And then Kevin says, please add a summary slide

4    at the beginning that says something like.  Well, strike

5    that.  I'll.  I'll get to that.  Details of that.  All

6    right.  And let's look at what you actually sent to the

7    board.  18, previously marked as exhibit 93.  All right.

8    Let's look at the executive overview.  You said December,

9    January.  It says expenditures are tracking approximately

10   4.5 million ahead of plan, primarily due to delayed timing

11   of various expenses, most notably equipment and marketing.

12   That was consistent with what we saw in the email, right?

13     A      I think so.

14     Q      Okay.  And then you'd say revenue tracking 5.5

15   million.  And this is for December, January revenue

16   tracking 5.5 million behind plan due to lower than

17   budgeted ticket sales caused by a lack of awareness and

18   general marketing.  What did you mean by that?  Lacks

19   foundation.

20     A      I think I meant what the bullet says.  If I even

21   drafted that bullet.

22     Speaker B:  Okay, well, I think that was the

23   objection.

24     Q      How much lower than.  But, Brian.

25     Speaker B:  So you might want to ask him if he

                                                        99

877

1    drafted the bullets.

2        Q    I might and I will.  Let's try to stick to the

3    rules.  Did you drag rule adjacent?  Did you draft the

4    bullets on the executive overview?

5        A    I don't recall.

6        Q    Okay.  Did you have knowledge of how much lower

7    ticket sales were than what was budgeted for December,

8    January time frame?

9        A    I don't recall if I specifically did.

10        Q    And it says caused by a lack of awareness.  Do

11    you know what that was referring to?

12        A    Not specifically.

13        Q    Can you assume?  Well, I don't want you to

14    assume.  Was it the belief at the AAF that ticket sales

15    were lagging because there had been a lack of marketing up

16    to the launch of the league objective.

17        A    That'S fair among certain employees?  I would

18    say yes.

19        Q    What does that mean?

20        A    I think Charlie's perspective was that that was

21    the case.  I wasn't close enough to have my own opinion.

22        Q    And then it says net cash expenditures 30.3

23    million projected, 1 million unfavorable.  The plan.  Do

24    you know what that means?

25        A    Not specifically.

                                                      100

1    Q    And then?  And then it Says through end of

2  season one, expenditures projected to be 21 million

3  favorable to budget, largely due to reductions in

4  production, national marketing, player relations and

5  wellness departments and travel.  You see that?

6    A    Yes.

7    Q    Who drafted that bullet?

8    A    I don't recall.

9    Q    Who made the decision to cut $21 million from

10  the budget for production, national marketing, player

11  relations and wellness and travel?

12    A    I don't know who made this specific decision.

13  Charlie was a CEO.

14    Q    So he would have had ultimate say in that

15  decision to cut the expenses for production, national

16  marketing, player relations, wellness and travel; correct?

17    A    That's right.

18    Q    And then it says revenue projected to be 30

19  million unfavorable to budget.  And it goes into detail.

20  It says league revenue projected to be 15 million, which

21  is 7 million below what was projected to Mr. Fowler;

22  correct?

23    Speaker B:  Objection.

24    A    4.  Assuming that 22 million dollar number is in

25  reference to what was shown to Mr. Fowler.

101

1    Speaker B:  That's all I asked.

2    Q    And he picked that one up and knew exactly what

3 I was talking about.  So the coaching is unnecessary.

4    Speaker B:  I'm not as smart as him and I'm not

5 coaching.  And if you want me to coach, I will.

6    Q    Okay.  So.  And I'll call salts and have him

7 come fair.  I will not do that anymore.

8    A    There you go.

9    Q    So you look at the original budget.  Just.  Just

10 get these two pages out.  Original budget and revised

11 budget.  They're on either side of the same original

12 budget.  Okay.  If you follow league revenue through the

13 through season.  In the original budget, it says 22

14 million.  See that?

15    A    22.7.

16    Q    No.  Follow League Revenue all the way to the

17 end.

18    A    Oh, yes.

19    Q    22.148.

20    A    Yes.

21    Q    That was what the original budget was.  It's

22 been adjusted to League revenue of 15 million through the

23 season; correct?

24    A    Yes.

25    Q    And the description in the bullet of the reason

103

```
 1   for that is minus 7 versus the 22 million budgeted due to
 2   sponsorships lacking.  See that?
 3       A    Yes.
 4       Q    Okay.  What is your understanding of what's
 5   being referred to in sponsorships lacking?  As of this
 6   email, In January 2019.
 7       A    Sponsorship sales were slower than we
 8   anticipated by $7 million.  That's what it looks like.
 9       Q    And that was all sales that were occurring under
10   Mr. Ebersol and the board under his control?  Right.
11       A    There was another individual hired responsible
12   for sponsorship sales.  And to clarify, I don't know if we
13   were behind at 7 million at that point or behind by a
14   smaller amount that we were projecting forward.
15       Q    Got it.  Who was responsible for sponsorship
16   other than Mr. Eversole?
17       A    I believe his name was E.J.  johnson.  Eric
18   Johnson, maybe.
19       Q    Did he work for the league?
20       A    I think he was a third party independent
21   contractor and not an actual employee.
22       Q    Who oversaw sponsorship sales at the AAF.
23       A    Eric or E.J.  johnson, who I guess reported into
24   Charlie.
25       Q    And then it says digital revenue projected to be
                                                        104
```

1    4 million, which is 14 million behind.  What was the

2    budget shown to Mr. Fowler due to lack of marketing and

3    business model shift?  We've talked about lack of

4    marketing.  Well, actually we haven't.  Do you have an

5    understanding of what lack of marketing as it referenced

6    as it relates to the digital revenue product meant?

7        A    Only at the highest of levels, which was that we

8    were going to do sponsorship around the league and the

9    digital product would be tied into that.

10       Q    And that was falling behind in what your

11   projections were for the efforts that have been done up

12   through January 2019?  Correct.

13       A    That appears to be what the bullet indicates.

14       Q    What does business model shift mean under the

15   digital revenue projected?

16       A    I don't recall specifics other than certain

17   features that we were anticipating being part of the app

18   experience, which included player tracking and

19   interaction.  Potentially not being ready for season one.

20       Q    Was.  Did you understand at this point when they

21   would be ready, those digital features that would be

22   revenue generating?

23       A    No.

24       Q    Do you know if the league ever brought in a

25   single dollar from its digital products?

                                                          105

1    A    I don't know.

2    Q    Then it says team revenue projected to be 40

3  million, 10 million about or minus 10 million from the 49

4  million budgeted due to lack of local sponsorships.  You

5  see that?

6    A    Yes.

7    Q    Who was in charge of the local sponsorships up

8  to January of 2019.

9    A    My recollection is that it would have been a

10  combination of Tom Veet and.

11    Q    Eric Johnson, and they ultimately would report

12  to who?

13    A    Charlie?

14    Q    Now, I want you to take this exhibit 92.  I'm

15  sorry?  You're in 93, aren't you?  And the revised budget

16  from 92.  And I want you to find.  Is that the one, Tom?

17  No, that's not the one I want.  I don't want that one.  I

18  want the one for May.  The one.  The projections from May

19  of 2018, which were exhibit 516.

20    A    I don't have anything labeled 5 16.

21    Q    That one over.  So it was.  I think those got

22  separated.

23    A    Oh, wait, there's an email.  516.

24    Q    Yeah, but then this.  This was attached.

25  Whatever has that on it.  There you go.  Yes, that was the

106

1   attachment to 516.  So flip.  Find the.  Yours looks

2   different, though.

3       A    Yeah, mine has a green top.

4       Q    I know.  So does that.  There's no reds.

5       A    Council, can we take a five minute break?

6       Q    Yes, sure.  Take a break.

7       A    Off the record at 258.  Okay, we are back on the

8   record at 305.

9       Q    Okay, Mr. Kanowitz, we're going to compare the

10  revised budget that was in your January 7th email, which

11  was Exhibit 93, to the May 2018 budget that we looked at,

12  or projections that we looked at originally.  We're on the

13  record.  The.  In the projections From May of 2018, the

14  total revenue for the league through the end of 2019, if

15  you add 2018 and 2019, was going to be $176 million;

16  correct?

17      A    That appears to be correct.

18      Q    And in the revised budget that you sent to the

19  finance committee in January 2019, the total revenue

20  through the end of the 2019 season was predicted to be $59

21  million.

22      Speaker B:  Objection.

23      A    Can you point me to where that.

24      Q    Is reflecting you have the right price budget.

25      A    That looks to be the case.

107

884

1     Q    So that's a.  Between May of 2018 and January of

2    2019, that's a difference of projected revenue through

3    2019 of about $120 million, right?

4     A    Yes.  Although I haven't seen these documents in

5    a long time, and I don't know if these are calendar year,

6    fiscal year, you know, what, what month.  To be very

7    clear, I'm not exactly sure they line up.

8     Q    Fair enough.  Just simple math.  The difference

9    between the total revenue projected through season for

10   2019 versus the revenues projected for 2018 and 2019 and

11   Exhibit 516, that difference is $120 million.

12    A    Between the.  Between those two numbers you

13   describe.

14    Q    Yes.  And now I want you to look at Exhibit 6,

15   which were the projection include the projections that

16   were sent to Mr. Dungan.

17    A    Okay.

18    Q    What were the revenues projected through 2019 to

19   Mr. Denton?

20    A    Looks like 64 million.

21    Q    Okay.  Can you account for the difference

22   between the projections projected to Mr. Denton versus the

23   ones in the revised budget included in Exhibit 93?

24   Objection.

25    A    Lacks foundation.  The difference between the 64

                                                          108

1   and the 59 of revenue?  Not specifically.

2        Q    I'm going to show you mark as I got it.  Thank

3   you.  Show you to my mark as Exhibit 523.  For the record,

4   this is a spreadsheet that was included part of a

5   spreadsheet which was marked as TR2034372.  The first part

6   is a financial projection document, and the second part is

7   the document properties with that Excel spreadsheet.  Do

8   you see that?

9        A    Yes.

10       Q    And those document properties show that Alan

11  Kanowitz is the author?

12       A    Yes.

13       Q    And it says date last saved March 12, 2019?

14       A    Yes.

15       Q    Do you know when you created this set of

16  projections for the af?

17       A    I don't know when I created it.  No.

18       Q    Do you have any reason to doubt that it was

19  around the time of March 12, 2019, when it was last saved?

20       A    Well, yes.  I don't.  I don't know what this is.

21       Q    Okay.  So you let me ask the question again.  To

22  the extent it says it was Last saved on March 12, 2019, do

23  you have any memory that that would not be an accurate

24  date of the last time you made changes to this document?

25  Shin Lack's Foundation.

                                                        109

1       A    I don't know that this is the final form of any

2    document.

3       Q    Do you know when the last time that the document

4    that's marked as Exhibit 523 was modified?  Objection.

5    Max Foundation.

6       A    I do not.

7       Q    Do you have any reason to dispute that you were

8    the author of this document?

9       A    Yes.

10      Q    What's the reason?

11      A    When you save things and when someone creates a

12   document in Microsoft Excel, they are the author.  If you

13   save it in a shared file and someone else edits it or

14   tweaks it themselves, it doesn't automatically update them

15   as being the revised author.

16      Q    Do you have knowledge, do you have a

17   recollection of anyone other than you making edits to

18   Exhibit 523?  Jackson Lex Foundation?

19      A    Again, I don't know who created this.  It's

20   entirely possible it was me.  It's entirely possible it

21   was someone else who had access to the same shared drive

22   that I had.

23      Q    Do you know who else had access and would have

24   made changes to exhibit 523, other than you?  Objection.

25      A    Not specifically.  Other than that there likely

110

1    were other individuals.

2         Q    This document shows some changes or some

3    Differences from what we were looking at previously in the

4    other projections.  It looks like there was a change as

5    far as number of teams.  Teams.  Remember, we looked at

6    ones where there was an increase every two years of teams.

7    In the exhibit 523, it looks like there was a plan to have

8    eight teams for three seasons and then go up to 16 teams

9    in the fourth season.  You see that?  Just look at number

10   of teams at the top.

11        A    Yes.

12        Q    You recall when the discussion was had to make

13   that change and how the league was going to grow?

14        A    I don't.  And I don't know that that's

15   reflective of anyone's discussions about how the league.

16        Q    Was going to go.  Do you recall discussions that

17   there was going to be a change in plans to where rather

18   than grow two teams every season, that the league was

19   going to hold at eight teams for preseason?  Do you recall

20   who's the source of the projections that are in here for

21   revenue and expenses?  Exhibit 523?

22        A    Not specifically.  Other than what we already

23   established, which is that Tom Vete and other people had

24   assumptions around ticketing and those sorts of things.

25        Q    So do you know whose assumptions were built into

                                                         111

exhibit 523?  Objection.  Last foundation.

     A     Not specifically.

     Q     Okay.  In here it shows that by 2024, the cumulative net cash flow for the league would be a negative 550, $51 million.  Do you see that?

     A     Yes.

     Q     Which means that the league would have needed $551 million of outside investment in order to get to a break even point.  Right?

     Speaker B:  Objection.  Form.

     A     Can you repeat the question?

     Q     Yeah.  What does cumulative net cash flow suggest when there's a negative number like that?

     A     That capital is required to fund the business.

     Q     And it would be $551 million.  That would be required, right?

     Speaker B:  Objection 4.

     A     Depending on how much existing cash is on the balance sheet.  No.

     Q     According to this, there would be a total outside Investment required of $550 $51 million for the league; correct?

     Speaker B:  Objection Form.

     A     I believe that's correct.  Okay.

     Q     And that would suggest that deducting for.

                                                  112

 1       A    Existing cash on the balance sheet.

 2       Q    Sure.  But what cumulative net cash flow means

 3  is, is that cumulatively the league was going to need $551

 4  million of outside investment.  Right.

 5       Speaker B:  Object to form.

 6       Q    Assuming they had $0 on the balance sheet before

 7  2019.  Is that what you mean?

 8       A    Whenever this was created?

 9       Q    Okay.  And how many dollars did it have on its

10  balance sheet at the time that this document was created?

11  Last Foundation?

12       A    I don't know that this is final form document,

13  nor do I know when it was created or for what purpose.

14       Q    So you don't Know how much cash was on the

15  balance sheet at the time 523 was created; correct?

16       A    Correct.

17       Q    So, based on exhibit 523, if the.  You're

18  familiar with.  I don't know if you are or not.  We're

19  going to get to in a minute, but do you recall that there

20  was discussions around a $250 million investment or

21  commitment from Mr. Dundon?  Do you recall hearing that?

22       A    I recall that number being discussed or thrown

23  around.

24       Q    Let's say Mr. Dundon had put in $250 million.

25  According to this, that money would have been spent by the

                                                       113

1    2020 season.  Correct.

2        Speaker B:  Object to the form.

3        A    According to this, assuming no other cash

4    available on the balance sheet.  Yes.

5        Q    And another $300 million on top of the $250

6    million relating to Dundon would have been required to get

7    the lead to viability.  Right.

8        A    According to this, with no other changes.  Yes.

9        Q    And can you identify any person other than Alan

10   Kanowitz who would have had.  Who would have made edits to

11   Exhibit 523?  Foundation?

12       A    Not specifically.

13       Speaker B:  Are you done with that exhibit?

14       Q    Yeah.

15       Speaker B:  Can I have the Bates reference again?

16   Sorry, I couldn't write fast enough.

17       Q    Okay.  It's.

18       A    Can I give you a cup?

19       Q    Right here.  We were sharing one.  Look at the

20   same page.

21       Speaker B:  It's on the back.

22       Q    Yeah.  Top tr.  It's super big.

23       Speaker B:  Got it.  Got it.

24       Q    All right, that goes together, showing you it's

25   been marked Exhibit 524.  This is an email from you to

                                                        114

1    Kevin Friedman, Kevin Farrell, referencing January cash

2    requirements that you sent on January 11, 2019; correct?

3        A    Yes.

4        Q    It says Friedman attaches a PDF outlining cash

5    requirements for the next two weeks, which would been the

6    middle of the latter half of January 2019; correct?

7        A    That appears to be correct.

8        Q    Those are still cash.  That's still money to be

9    spent before the launch of the league, right?

10       A    Yes.

11       Q    And it says these are critical payments that are

12   either in here because they are absolutely necessary.

13   Necessary items like payroll or mission critical to

14   football success or way ever overdue, and are color coded

15   accordingly.  You see that?

16       A    Yes.

17       Q    So at least by January 11, 2019, the AAF was

18   aware that it was incurring, had incurred expenses that

19   were way overdue.

20       A    That appears to be accurate, and.

21       Q    Was planning to continue toward launching the

22   league as of January 11, 2019, right?

23       A    I believe that's correct.

24       Q    And it says the second week was more of my best

25   estimation based on payments I'm aware of and estimate for

                                                          115

```
 1   housing, hotels that I know are due.  But Farrell should
 2   glance over when he gets a chance.  Note, this also does
 3   not include any CBS fees.  Do you see that?
 4        A    Yes.
 5        Q    Do you know what how much in CBS fees were going
 6   to be incurred between January 11 and the end of January
 7   2019?
 8        A    I do not.
 9        Q    And if you look at that cash requirements for
10   January, the remainder of January, those total about $11
11   million; correct?
12        A    Yes.
13        Q    Did how much money did the AAF have in the bank
14   as of January 11, 2019?
15        A    I don't.  22.
16        Q    So under those ones that are marked red, you
17   said highly critical, over 30 days overdue.  You see that?
18        A    Yep.
19        Q    So the highly critical and or 30 days overdue
20   part of it was a January 15th payroll that would come due
21   of two and a half million dollars, right?
22        A    Yes.
23        Q    And then payroll for January week one and
24   January week two.  Two for the players, right?
25        A    That looks right.
```

                                                          116

```
 1        Q    So the players were obviously critical of the
 2   league; correct?
 3        A    Yes.
 4        Q    And had not been paid for January week one or
 5   January week two, had they?
 6        Speaker B:   Object to form four.
 7        A    I guess at this point in time.  No.
 8        Q    In the second one for week ending March, Friday,
 9   January 25, 2019.  You see that?
10        A    Yes.
11        Q    There's league marketing and there's a company
12   called McGarry Bowen.
13        A    Yes.
14        Q    And that was a 1.5 million dollar line item.  Do
15   you know how old the invoices were that made up that 1.5
16   million for McGarry Bowen, the marketing company?
17        A    I do not.
18        Q    Sure.  It's been marked as Exhibit 20,
19   previously marked as Exhibit 19.  This is an email from
20   you to Charlie and both Kevin's; correct?
21        A    Yes.
22        Q    Dated January 22, 2019; correct?
23        A    Yes.
24        Q    It says Farrell and I just spent the last few
25   hours going through this exercise.  By our estimation, it
```

                                                    117

```
1   looks like there will be about 10 to 11 million of
2   critical cash out the door between now and the opening
3   weekend.  And I don't have the Google sheet you're
4   referencing because I don't think the trustee was able to
5   get it from Google.  That's true.  The.  But that 10 to 11
6   million is close to the number we looked at in that
7   previous exhibit, isn't it?
8       A    Yes.
9       Q    That was exhibit.
10  Speaker B:  19.
11      Q    19.  No, the previous one.  524.  So say.
12  Please note that this is my estimation of what is critical
13  along with Feral as a second pair of eyes.  I did not
14  include the majority of CBS fees and other large vendors
15  like XOS and SMT that we owe.  Do you know how much was
16  owed to CBS and the other large vendors like XO and SMT as
17  of January 22nd?
18      A    I do not.
19      Q    Says I would consider these critical given they
20  have raised them to us and they are long overdue.  But in
21  the interest of this exercise and this game of Chicken.  I
22  have assumed we continue to push a bunch of these when in
23  reality, I have no clue whether or not we will be able to
24  see that.
25      A    Yes.
```

                                                          118

1     Q    Okay.  So you and Charlie and both Kevin's were
2  aware as of January 22 that there was a substantial amount
3  of money owing to critical vendors; correct?
4     A    Yes.
5     Q    And that you were trying to push them off so
6  that you could continue toward launching the league.
7     A    I would describe it as continuing to manage
8  accounts payable as we waited for Fowler to live up to his
9  funding obligation and launch the league.
10    Q    League?  Well, wait, we're in January 22, 2019.
11 We were still waiting around for Fowler to fund by then?
12    A    I believe so.
13    Q    And this was a month, as I recall.  And this was
14 a month after the emails where you all said you didn't.
15 Where you said you didn't trust him, you were still
16 waiting around for money from Fowler; correct?
17    A    Yes.  Although I believe $13.4 million also came
18 in subsequent to that, which bought him some goodwill.
19 But my dates are, you know, obviously hazy.  Five or six
20 years later, how much.
21    Q    Money was in the bank?  Oh, no, we get to that.
22 It's in here.  Well, you said I have assumed we continue
23 to push a bunch of these when in reality I have no clue
24 whether we want.  So the idea was continuing to push.
25 Push off the obligations to critical vendors like cbs, XO

                                                    119

1   and SMT for as long as you could.  Right.

2       A    Until we got.  Yeah.  Funds to pay them, sure.

3       Q    And it says there will also probably be several

4   critical invoices that pop up over the course of the next

5   three weeks that amount to about a million dollars that

6   are not accounted for in here, right?

7       A    That's what it says.

8       Q    So you've got the 10 to 11 million that you're

9   predicting, plus another probable million, and you didn't

10  account at all for cbs, xo, SMT, or other large vendors.

11  Is that a fair summary?

12      A    That's what this seems to say, yes.

13      Q    Okay.  You said by my estimation, and based on.

14  We're still looking at Exhibit 19.  By my estimation, and

15  based on this analysis, if MGM funds their 3.5 million, we

16  will need another 7 million to get through the first

17  weekend.  See that?

18      A    Yes.

19      Q    So you knew as of Jan.  22, as did Charlie, that

20  the league needed at least 7 million if it got the money

21  from MGM to get through the first week of play.

22  Objection.

23      A    That was my estimation.

24      Q    And you continued forward towards the league

25  launch and incurring these expenses without knowing where

                                                    120

1   that $7 million was coming from, Right?

2        Speaker B:  Objection, form.

3        A    I believe, assuming it was coming from Fowler or

4   other sources of state But.

5        Q    Well, you didn't say that.  You said that can

6   come from a variety of sources.  Dick, Dave, ticket sales,

7   etc.  You didn't include Reggie in that.

8        A    Okay.  So Dick, Dave and ticket sales.

9        Q    You didn't have any commitments for $7 million

10  as of January 22, 2019 from those sources, did you?

11       Speaker B:  Object to form.

12       A    I don't recall if we had firm commitments or not

13  from any of those individuals.

14       Q    And then you say.  Again, I would be remiss if I

15  did not point out the following.  We have about $8 million

16  of invoices that are overdue and maybe in probably

17  another.  About 8 million that will continue.  We will

18  continue to push past opening weekend even though they

19  will arise between now and then.  You see that I do.  So

20  this was a conscious plan to incur debts and push them off

21  without a known source of funds to cover them.  Right.

22       A    I don't know what you mean by.  By plan.  I

23  think it's just a statement that.  Here is what we hear.

24       Q    The debts that we've incurred and will continue

25  to incur.

                                                        121

 1      A    Objection.

 2      Q    Right.

 3      A    Ongoing incurment, I think.  I don't know if

 4  we're taking on additional obligations or not.

 5      Q    Say maybe.  And probably another 8 million that

 6  we will continue to push past opening weekend even though

 7  they will arise between now and then.  You see that?

 8      A    Meaning their payment date would have arise.

 9      Q    That's what your testimony is that that means?

10      A    I believe so.  I'm just reading this for the

11  first time.  I don't know.

12      Q    And you understood that there would be

13  additional expenses being incurred between the time of

14  this email and the League launch, right?

15      A    I think that's accurate.  Right.

16      Q    And the decision was made to press forward,

17  incurring those additional obligations, knowing these

18  other vendors were owed money without a clear source of

19  where the funds were going to come to cover all of that.

20  Right.

21      Speaker B:  Object to form.

22      A    I think that's accurate.

23      Q    And Charlie understood that that was the

24  decision that was being made by the AAF going forward from

25  January 22, 2019.  Right.

                                                    122

```
 1        Speaker B:  Objection.

 2        Q    Form.

 3        A    Charlie understood.  Would you mind repeating

 4   exactly what it is that Charlie.

 5        Q    You were telling Charlie in this email that the

 6   decisions you all were making was that you were going

 7   forward and going to be incurring debts knowing there was

 8   existing debts without a clear source of where the funds

 9   were going to come from to cover those debts.

10        Speaker B:  Objection.

11        A    Charlie made the decision to push forward with

12   the League knowing that we had incurred significant

13   liabilities that had not yet been paid and would continue

14   to be pushed.

15        Q    Pushed off without a clear source of where the

16   funds were going to come from to pay any of them, right?

17        Speaker B:  Objection to the form.

18        A    I think that's accurate.  It.

19        Q    And when you start football and bring the

20   players in, the expenses go up dramatically; correct?  Let

21   me strike that.  When you.  When you bring players in and

22   the coaches and the league and start playing games, the

23   expenses of the league jump dramatically, don't they?

24        Speaker B:  Object to form.

25        A    When training camp started, there were larger
```

<div align="right">123</div>

1    bills to pay.  It's how I would describe it.

2        Q    But when you actually start putting gains on the

3    field, you add player game checks, you add facility fees

4    and all of the production costs and everything else;

5    correct?

6        A    Correct.

7        Q    And at Charlie's direction, the league went

8    ahead and put the first week of games on the field, didn't

9    it?

10       Speaker B:  Object to the form?

11       A    Yes.

12       Q    Do you know how much that one week of games

13   alone cost?

14       A    Not specifically.

15       Q    And at the time that the decision was made to

16   put that first week of games on the field, the league had

17   no clear source of funds that were going to cover the

18   expenses for doing that, did it?

19       Speaker B:  Objection.

20       Q    The form.

21       A    The expenses.  To clarify the expenses.  Can you

22   clarify the question?

23       Q    Sure.  I mean, you, you.  You've already

24   outlined in Exhibit 19 all of the expenses that were going

25   to be required to get to the launch the first week of

                                                          124

1    games.  Right?  I need a yes or no because.  Translate.

2    Yes.

3         A    Although I don't recall the specific amounts and

4    what was being paid and what was being pushed.

5         Q    Right.  And.  And then you get to putting the

6    first games on there and you've got to move players around

7    the country, you've got to.  Got to get facilities, you

8    have to pay the players, you have to pay for the

9    production.  All of those expenses, just for week one

10   happened, right?

11        A    Yes.

12        Q    And that decision was made to incur all of those

13   expenses for that week one without any source of funds

14   known to the league that was going to cover those

15   expenses; correct?

16        Speaker B:  Object.

17        A    Yes.  Other than Reggie's commitment.

18        Q    Did you still feel like by the time that the

19   games were put on the field in week one, that Reggie was

20   going to show up with the check?

21        A    I don't recall specifically when, you know, in

22   my mind, I realized or came to the, you know, the high

23   probability that Regi was not going to live up to his

24   obligations.

25        Q    Do you think it was a good business decision to

                                                          125

1    sheet for Dun Capital Partners, right?

2         A    Yes, that appears to the case.

3         Q    And I'm just going to address one issue head on

4    there.  None of us have ever been able to find a sign a

5    version signed by Dun Capital Partners.  Was it your

6    understanding that the parties to this agreement both

7    agreed to the terms of it?

8         Speaker B:  Object to form.

9         A    Yes.  Assuming this is the final binding term.

10        Q    Sheet, you never heard anybody complain that

11   without Dun and Capital Partners that this was not an

12   important enforceable term sheet?

13        Speaker B:  Object to form.

14        A    Not to me specifically.  As far as I can recall.

15        Q    Into your knowledge of the parties to this

16   agreement, proceed forward as if it was an enforceable

17   agreement?

18        Speaker B:  Object to form.

19        A    Again, I need to read through all the terms, but

20   yeah, I think so.

21        Q    In the funding commitment part, it references a

22   maximum cumulative commitment of 70 million.  You see

23   that?

24        A    Yes.

25        Q    Do you have a recollection of how the parties

132

1   reach an agreement that the maximum cumulative commitment

2   would be $70 million for Dun Capital Partners?

3       Speaker B:   Object to form.

4       A     To the best of my recollection, that was

5   Charlie's estimate of the bare minimum to get through

6   season one.

7       Q     So that was a number Charlie told you?

8       A     I don't even know if he told it to me.  But, you

9   know, to the best of my knowledge, I remember hearing that

10  as a number being thrown out.

11      Q     That's not a number that John Zetter invented?

12      A     To my knowledge.  No, I don't.  I don't know.

13  Could have come from him to Charlie.  I'm not sure.

14      Q     The.  In the time frame where you were dealing

15  with this term sheet and John Zutter with the Dunn Capital

16  Partners group, do you recall any discussion of a $250

17  million number?

18      A     I remember hearing the $250 million number.  I

19  don't know when or how that number was arrived at

20  specifically either.  I put it in the same bucket as 70.

21      Q     Do you recall ever hearing the idea that there

22  was an agreement for something more than $70 million with

23  Mr. Dunn or Dunn, a capital partner?

24      A     I don't recall.  Specifics around term sheets,

25  definitive docs and agreements.  Everything was done very

                                                          133

1  quickly.

2  Q   Do you recall Mr. Ebersole objecting to only

3  including a 70 million dollar cumulative investment in

4  this term sheet?

5  Speaker B:  Object to the form.

6  A   I don't recall him making objections to me

7  personally.

8  Q   If there was in fact an agreement with Mr. Mr.

9  Dundon for a 250 million dollar investment, would Mr.

10  Eversole have failed in his duties on behalf of Eversol

11  Sports Media Group and signing a document for a maximum

12  cumulative commitment of $70 million?

13  Speaker B:  Object to the form.

14  A   I don't know how to appoint on that.

15  Q   What would your opinion be of Mr. Eversol

16  proceeding forward based on an oral agreement for $180

17  million on top of the $70 million?

18  Speaker B:  Object to the form.

19  A   That would have been a good deal.  Would be my

20  opinion.  I don't.

21  Q   I don't.  Would it be smart to do that without

22  doing it Writing Object to the the form.  Argumentative

23  too.

24  A   I don't know.  Always best to have things in

25  writing signed by both parties.  Also best to fund with a

134

1    signed document as well.

2        Q    Tell me more about that part.

3        Speaker B:  What part?

4        Q    The last thing you said it's best to fund with a

5    sign signed document.  What did you mean by that?

6        A    Meaning this document is not signed, but capital

7    was put into the business.

8        Q    You recall attending a board meeting where the

9    term sheet was approved by the board of Eversal Sports

10   meeting group?

11       A    I don't know if I was in a board meeting where

12   it was approved.  It's possible I was, but I wasn't on

13   board.

14       Q    Dun and Capital Partners did fund the $70

15   million set forth in that term sheet Object to form.

16       A    I actually don't know the full amount that they

17   funded or didn't fund when.  When the league was shut

18   down.  What I know for certain is they funded this 5.1

19   million to begin with and then subsequently funded some

20   more as well.

21       Q    Well, sure.  It's been previously marked Exhibit

22   245.  Are we.  Do you know who Jordan Roberts and Don Belt

23   are?

24       A    Yes.

25       Q    Who are they?

                                                            135

1   million was dis.  Discussed?

2       A    I don't recall a board meeting, no.

3       Q    You recall any meeting where 250 million dollar

4   agreement was discussed as between DCP or Mr. Dundon and

5   the AAF?

6       A    I vaguely recall being in rooms and meetings

7   with several individuals where the $250 million number was

8   thrown out.  I don't recall any specific me being present

9   for any specific agreement around that number or substance

10  around any of these numbers, frankly.

11      Speaker B:  You need to get your call.

12      A    Yeah.  Yes.

13      Q    Okay.  Off the record of 359 here, just start

14  getting these out.  Okay.

15      A    We're back on the record at 4.

16      Speaker B:  13.

17      Q    Mr. Kanowitz, I showed you what's been marked as

18  exhibit 20, previously marked as exhibit 20.  It's an

19  email.  Emails involving Mr. Michael Keeves.  Do you know

20  who that is?

21      A    Keybus?  Yes.

22      Q    Who is that?

23      A    He's.  He's an investor that runs a.  I don't

24  know if you would classify it as a growth equity fund or a

25  venture fund or ran a growth equity fund or venture fund

138

```
 1   who's been in.

 2        Q    The news recently for what he was.

 3        A    Involved with the FTX situation.

 4        Q    Is that what you're saying?

 5        A    So I don't know if his funds still exist.

 6        Q    Is that where you were smiling?

 7        A    Yes.

 8        Q    Got it.  Towards the end of that long paragraph

 9   that starts, we officially, it says we agreed he would

10   fund referencing Mr. Fowler on a schedule.  And while he

11   has funded 22 million of his 170 million dollar obligation

12   thus far, he is currently delinquent on his most recent

13   funding obligations.  You see that?

14        A    Yes.

15        Q    So does that refresh your recollection that by

16   February 10, 2019, that Mr. Fowler had only funded 22

17   million of the 50 million he committed in equity funding?

18        A    That seems to check out.

19        Q    Okay.  Then it goes on to say, and that 22

20   million would include the 13.4 million we talked about

21   earlier.  Right.

22        A    That makes sense to me.

23        Q    Okay.  Then it says, essentially, I need $10

24   million to get through the next two weeks and an

25   additional 60 million to get through the end of the
```

139

1    season.  You see that?

2         A    Yes.

3         Q    And not to be goofy, but 10 and 60 makes 70,

4    right?

5         A    Yes.

6         Q    Okay.  So as of this time, Mr. Eversole was

7    telling potential investors that moving forward from

8    February 11, 2019, and the league needed $70 million to

9    complete the season.

10        Speaker B:  Yes.

11        Q    And that's consistent with the 70 million that

12   ended up in the Dunn Capital Partners term sheet, right?

13        A    Seems to be.

14        Q    Do you know where Mr. Ebersol got this $70

15   million number?

16        A    I do not.

17        Q    Okay.  I think we looked at the $10 million that

18   were projected.  I'm not going to try to go back to it.

19   Did Mr. Ebersol, to your recollection, consult you on $60

20   million or $70 million being a sufficient amount of money

21   to get through the season going forward from February

22   11th?

23        A    I don't recall specifically, Joe, a general.

24        Q    Recollection that that number came from you?

25        A    No.

                                                          140

1      Q   Do you recall ever seeing a model where it was

2 predicted that $60 million would get the league through

3 the season from February 11th going forward?

4      A   No.

5      Q   Do you agree that $60 million would have gotten

6 the AAF through the inaugural season going forward from

7 February 11th?

8      Speaker B:  Object to form?

9      A   @ this point, I'm not sure.  And at that point

10 I'm not.  I was also not sure or I don't recall if I was

11 sure or not.

12      Q   Do you know if that $70 million included any of

13 the past due incurred expenses that the league.

14      A   Apologies.  I'm not.

15      Q   Wait, where are they?  Is this all them?

16      A   What's happened.

17      Q   Been marked as Exhibit 528?  It's an email from

18 you to John Zetter describing the structure of the AAF on

19 February 26, 2019.  See that yes.  You say ESMG parent

20 company, only one employee, Charlie.  Not operational

21 entity investment level.  Do you see that?

22      A   I do.

23      Q   And then it says lfe.  Do you know what that

24 stands for?

25      A   Legendary field exhibitions.

           141

1    Q   Okay.  And it says LFE operational subsidiary of

2  ESMG enters into all league related contracts including

3  leases, MSAs, non player employment agreements.  See that?

4    A   Yes.

5    Q   And that was true as of the time of Ms. Dunn and

6  Capital Partners investment in February 2019.

7    A   I seem to have represented.  That was in the

8  email.

9    Q   And so you're not aware of any contracts for

10  leases, MSAs or non non player employment agreements being

11  entered into by ESMG itself; correct?

12    A   To the best of my knowledge, no.

13    Q   Okay.  And then AAF Properties is the

14  intellectual property subsidiary of ESMG that owns all the

15  intellectual property assets, website, trademarks,

16  patents.  Do you believe that was correct?

17    A   I have no reason to believe otherwise.

18    Q   Okay.  And it says we are real time potential

19  employment subsidiary of ESMG for all tech related

20  employees.  Currently only a shell company was created in

21  preparation for techco split with respect to MGM and NFL

22  deals.  Do you know if that ever that split ever happened?

23    A   I don't and I don't remember.

24    Q   We are real time AAF Players is the subsidiary

25  of LFE which employs all the players.  Which means that

<div align="center">142</div>

1    under ESMG there was LFE and under that was AAF players.

2    Is that your understanding Object to form?

3        A    I think that's accurate.

4        Q    And that AAF Players was the entity that

5    actually entered into the contracts with the players

6    players.

7        A    I think that's accurate as well.

8        Q    ESMG did not enter into contracts with players;

9    correct?

10       A    I.  I don't recall specifically the legal and

11   the org chart.  My suspicion, and I hate that word, but is

12   that I asked the lawyers for this and they I copy and

13   pasted it into an email, but that checks out with me.

14       Q    Okay.

15       A    Not my area of expertise.

16       Q    Maybe it's the understood, but you believe this

17   to be accurate description at the time you sent this email

18   in February 2019?

19       A    Yes.

20       Q    And then LFE2 subsidiary of LFE employs all

21   California employees and players for insurance purposes.

22   So that was another layer below LFE that would employ the

23   California players.  Correct.

24       Speaker B:  Object to the form.

25       A    That seems to be accurate.

                                                    143

```
 1      Q    Okay.  So to your knowledge, did ESMG itself

 2   enter into any contracts or incur any debt in its name

 3   other than to Charlie as its one employee?  Objection.

 4      Speaker B:  Same.

 5      A    I don't know.  I don't know if they ever.  I.  I

 6   don't know who Reggie Fowler contracted with.  I can.  Or

 7   dcp.  I'm not.  I'm not sure.

 8      Q    Fair.  My question is the vendors and employees

 9   and all of that had contracted with entities that were not

10   Eversol Sports Media Group.

11      A    According to this email, it looks like they

12   contracted with LFE or anything.  Any subsidiary.

13   Subsidiary to lfe.

14      Q    Did LFE have a Board of Directors to your

15   knowledge?

16      A    To my knowledge.  Not a separate board of

17   directors.

18      Q    Did it have a board of directors?

19      A    I don't think so.

20      Q    Did LFE?  Was Charlie Eversole the CEO of LFE

21   Object to form 4?

22      A    I don't actually know.

23      Q    Was Charlie ever saw the president of Bella

24   Feed?

25      A    Again, I don't actually know.
```

144

1      Q    Do you know who the CEO or presidents were of

2   any of the other entities listed?  Other than esmg?

3      A    No.  I think all officers were.  I guess Charlie

4   was the CEO of these other entities.  I'm not sure.

5      Q    Did that ever change even after DCP came in and

6   made its investment object to the form?

7      A    Not to my knowledge.

8      Q    I'm sorry, I don't think I asked it.  So to your

9   knowledge, did AAF properties or AAF players or LFE or LFE

10  2 have a board of directors Object to form?

11     A    I don't know where the aforementioned board of

12  Directors that we spoke about which entity level that sat

13  at.  I assumed it was esmg.  But it's possible it was LFE

14  and not esmg?  I don't know.

15     Q    Well, as far as Dun, the Dunn Capital Partners

16  Group is.  What does it say about board of directors

17  there?

18     A    Well, using Exhibit 245, it appears that the

19  board of directors sat at the ESMG level.

20     Q    Okay.  And are you aware of LFE AAF properties,

21  AAF players or LFE2 having a board of directors?

22     A    No.

23     Q    Is it fair to say that when the Dundon team came

24  in that.  Well actually let me back up.  Your

25  understanding is that Mr. Zutter and Mr. Dundon were given

                                                        145

1    pocket that has now vanished.

2         Speaker B:  Okay.

3         Q    15 minutes.  If you remembered how that part

4    worked, we could skip it.

5         Speaker B:  This is really irritating.

6         Q    Can you go run and look and see if it's on the.

7    Let me see that.  It's just two pages and it's print out

8    with a cash flow.  Yep.  Thanks.  Is there other stuff you

9    want to ask about in the meantime?  There is, but it's

10   just going to throw me off and be less efficient.  But

11   the, the hang up is I'll just ask you a question.  Do you

12   recall and you can object to answered the process was you

13   all would submit something called a cash flow report.  No.

14   And in response to that that a Dunedin Capital Partners

15   would wire funds to the league.

16        Speaker B:  Objection.  Form.

17        A    Again, I don't recall if they would wire funds

18   to the league or to the vendors directly.

19        Q    And that's why I need to find this document so

20   that I can.  Do you have any knowledge that Dun and

21   Capital Partners actually ever paid a vendor directly?

22        A    No.

23        Q    Did Dun and Capital Partners have any control

24   over the AAF's bank accounts objective?

25        A    Not to my recollection.

                                                        148

1      Q    Do they have any ability to send funds from the

2   AAF bank accounts?

3      A    Not to my recollection.

4      Q    Do you think it was a good process based on

5   where things were that the legacy AAF people were the ones

6   that were Giving advice to Dun and Capital Partners on

7   what expenses should be prioritized going forward.

8      Speaker B:  Object to the form.

9      A    I don't have an opinion on that.

10      Q    Was there a time for Dun and Capital Partners to

11   come in and figure out on its own what vendors needed to

12   be paid to keep putting football on the field?

13      A    I would say everything happened very quickly.

14   So they were relying on the folks who had been around the

15   hoop, if you will, for the last six to 12 to 18 months and

16   had the relationships with the vendors to submit requests

17   for funding and prioritize things accordingly.

18      Q    So that was a reasonable approach to rely on the

19   legacy AAF people to provide the function of deciding what

20   vendors to pay and when.

21      Speaker B:  Object to the form to suggest what.

22      Q    What vendors to pay and in terms of what actual

23   vendors were paid from the funds that Dunlin Capital's

24   partners submitted.  The AAF legacy people actually made

25   those decisions too, didn't they?

149

1      A     Object to the form, made the suggestions.

2      Q     But when the money came in, like, as far as

3  sending the money out, they ultimately made the decision

4  of where that money was going to go by writing checks to

5  whoever was going to get them.

6      A     Again, I don't know that.  I don't know.

7      Speaker B:  Object to the form and ask an answer.  Go

8  ahead.

9      A     Now, I don't know that the AAF was ultimately

10  the party responsible for.  For sending out the dollars.

11      Q     It's not going to be in a folder.  It's

12  separate, sitting somewhere.  It's not your fault, it's

13  mine.  I don't know where it is.  Just want to be clear

14  for the record, I'm not blaming this on anyone but me.

15  What?  Okay, all right, fair enough.  Let me show you the

16  mark as exhibit.  You want to help me?

17      A     529.

18      Q     It's an exchange between you and Kevin Farrell

19  from March 1, 2019.  And this is a couple weeks after Mr.

20  Dundon's term sheet; correct?

21      A     Yes.

22      Q     And I don't have the attachment to this specific

23  email, but it says cash flow week of 3, 4, 19.  And it

24  says your email to Kevin says, let's discuss.  I'd really

25  like to get this down if at all possible.  That may not be

                                                     150

1  it is.  These are mainly go forward items with the number

2  of production bills coming due.  Keep in mind that we are

3  not paying all bills in the queue from week to week.  We

4  are short paying the list.  What did you understand that

5  he meant by bills in the queue?

6      A    Meaning we were prioritizing which vendors have

7  been waiting for 30, 60, 90, 120 days outstanding and

8  which vendors were continuously critical to put on

9  football games versus let's get through the season and

10  have the DCP team negotiate with, I don't know as an

11  example, I don't know that this is a true example.

12  Marriott and say we're going to give you more business in

13  seasons two and three.  So maybe, you know, let's recut

14  the deal from season one as a very broad example.

15      Q    So there were long past due debts to vendors

16  that the DCP team was working with the AAF team to get

17  dealt with during this time period.  Is that fair?

18      A    Correct.

19      Q    And so the money that DCP was putting in was not

20  just going for.  For toward the season forward.  It was

21  always having to pay old debts that were incurred before

22  DCP got involved.  Correct?

23      Speaker B:  Object to the form.

24      A    I think that's right.

25      Q    And maintaining those old debts with critical

152

1   vendors cut into how much money was available for spending

2   money going forward.  Right.

3       Speaker B:  Object to the form.

4       A    I think that's a fair representation.

5       Q    And that situation of having to spend Dun and

6   Capital Partners investment on old debts was a situation

7   that was created by the league under Charlie's control.

8   Right.

9       Speaker B:  Object to the fund.

10      A    Meaning existing liabilities.

11      Q    Yes.

12      A    Yeah.  There were existing liabilities before

13  Dundon got involved.

14      Q    And then in Exhibit 529 assignments, Mr. Farrell

15  goes on to Say, we cannot hide from our expenses, but I

16  understand your concerns.  There are many bills I am not

17  presenting.  We have a high burn rate.  You see that?

18      A    Yes.

19      Q    So Mr. Farrell and the AAF was making decisions

20  to not even present certain bills that were due and owing

21  by the AAF to Dun and Capital Partners.  Right.

22      A    In this format.

23      Q    What does that mean?

24      A    Meaning, I don't think.  All right.  Kevin

25  Farrell was never hiding bills.  The existence of bills, I

                                                    153

```
1    think we had to prioritize which ones are getting paid
2    this week.  And he was not including bills for this week
3    to keep things manageable or as low as, you know, he
4    deemed possible.  And clearly I was asking him to do even
5    more.
6         Q    But fair to say that if you're not including
7    bills, you're not giving the.  In these cash flow
8    requests, you're not giving a complete picture of the
9    total liabilities of the League, right?
10        A    No.  I think in this specific file, which I
11   don't have, that was not a representation of all the
12   liabilities that the League had incurred.  It was a
13   representation of the ones that Kevin thought needed to be
14   paid ASAP to keep things on the track.
15        Q    So the answer to my question is yes.  The cash
16   flow statements that were representing a certain number of
17   vendors and obligations to those vendors was not a
18   complete picture of the debts that had been incurred or
19   were being incurred by the af.  Right.
20        A    I don't have that.
21        Speaker B:  Got to take a breath to let the lawyers
22   work.
23        A    I don't have that sheet.  But it's possible that
24   that sheet did not list all of the other outstanding
25   liabilities beyond what Kevin was presenting in that
```

154

1    moment for that week.

2        Q    Wait like five minutes.  Okay.  Show it's been

3    marked as Exhibit 5.

4        A    30.

5        Q    Is another email from about 10 days later, March

6    11, 2019.  Same subject matter about forecasted cash flow.

7    You see that?

8        A    Yes.

9        Q    And here Kevin says, heads up.  My forecasted

10   flight cash flow for this week is about 14 million.  You

11   see that?

12       A    Yes.

13       Q    Your response is.  What was your response?

14       A    Yikes.

15       Q    Why?

16       A    My best estimate at this point is because that's

17   higher than the 9 million.

18       Q    From the week before and about double what your

19   understanding of what Dunning Capital Partners was

20   understanding weekly spend for going forward was going to

21   be.

22       Speaker B:  Objection.  Form squared.

23       A    Potentially.  I don't recall if it was supposed

24   to be 7 million and equal $10 million.  Installments or

25   lumpiness?  Seasonality.  I'm not sure.

                                                      155

1    Q    Still haven't found it.  It's not in there.  I'm
2  telling it.  There's been a lot of discussion about the
3  Dun and Capital Partners team pushing to reduce expenses
4  and negotiate down vendor obligations.  Did you think that
5  was reasonable for the Dunn and Capital Partners to insist
6  on that happening?
7       Speaker B:  Object to form?
8       A    Yes, I would say reasonable.
9       Q    Did you ever experience that Wade Dun and
10  Capital Partners interacted with the AAF people to be
11  unprofessional or detrimental to the business in any way?
12       Speaker B:  Object to form?
13       A    I don't know that I would classify it that way.
14       Q    What does that mean?
15       A    They had a more aggressive style to them.  We're
16  coming in at the 11th hour or 12th hour and we're not
17  football people.  So it didn't have, you know, a true or
18  television production people and didn't have, you know,
19  full time to do what I would call, you know, is
20  traditional diligence for a, you know, a venture deal or
21  private equity deal.  So they were learning a lot on the
22  fly.  And I think that created a lot of tension and I
23  think they had a lot of expectations about things that
24  could be done quickly or, you know, agreements that, you
25  know, could come to fruition sooner than maybe was

                                              156

1    pressing, practical.

2        Q    Given the urgency of the situation, did you

3    think it was feasible for Dun and Capital Partners to do

4    substantial or do diligence like you would typically see

5    in an investment deal?

6        Speaker B:   Objection to the form.

7        A    Just giving the timing.   No.

8        Q    And had Dun and Capital Partners insisted on

9    doing complete diligence before making its investment,

10   what would have happened?

11       A    I can't speculate on that.

12       Q    Well, what would have happened?   The league, the

13   week one games had already been played when Dunn and

14   Capital Partners came in; correct?

15       A    Yes.

16       Q    The players had already played the first game?

17       A    Correct.

18       Q    They were owed money for those first games?

19       A    Correct.

20       Q    And are you.   And if they hadn't been played,

21   paid for playing those first games, do you have an

22   understanding of whether they would have showed up to play

23   another game?

24       A    I don't know.

25       Q    Could the league have continued without Mr.

                                                          157

1    Dundon's or Dunn Capital Partners and investment that

2    happened on December 14, 2019?  February 14, 2019?

3         Speaker B:  Objection.

4         A    Not without other capital.

5         Q    Did it have other capital on that day?

6         A    Object to form, Same.  Not sufficient funds in

7    the bank.

8         Q    Do you need to drop.

9         A    Yes.

10        Q    Okay, let's take a break.

11        A    The record of 449.

12        Speaker B:  How much longer you got?

13        Q    I'm sorry, what was that?

14        A    I'm asking if you're ready to go on the record.

15        Q    Oh, this is Jocelyn Court.

16        A    Reporters ready.

17        Q    Right.  Okay.  Please stand by.  Recording in

18    progress.

19        A    Okay, back on the record of 5 13.

20        Q    Mr. Kanowitz, you recall at some point the

21   discussion of the AAF ceasing operations and considering

22   bankruptcy coming up?

23        A    Vaguely, yes.

24        Q    I show you some emails while we were at the

25   break that are in the early April 2019 time frame.  Is

                                                  158

1    that consistent with your memory of when the bankruptcy

2    discussion started?

3        Speaker B:  Jacked in the form?

4        A    Yes.  Right around then.

5        Q    Can you tell me broadly what your understanding

6    of the reasons were that the league was considering

7    bankruptcy at that time frame?

8        Speaker B:  Object to form.

9        A    My understanding was that the interest amongst

10    the NFL and CBS and some of the other partners in

11    renegotiating deals and making firmer commitments to the

12    league and a long term prospects of what the league might

13    look like underneath dcp's ownership and mounting losses.

14    I'll call it were.  You know, the com.  A combination of

15    those factors led DCP to shut things down.

16        Q    Did you disagree with that decision based on

17    what was going on?

18        Speaker B:  Object.

19        A    Wasn't my place to disagree.

20        Q    Did you have an opinion Object to form.

21        A    I understood their reasoning.

22        Q    So exhibit 531 is a series of emails that

23    involve AAF people, DCP people, PWC people and lawyers

24    from Bracewell.  You see that?

25        A    Yes.  I don't recall graceful was, but I see

                                                          159

```
 1    that.
 2        Q    Do you recall that Bracewell was the law firm
 3    that handled the bankruptcy?  Does that help you?
 4        A    No, but I believe you.
 5        Q    Okay.  So in having these discussions about
 6    bankruptcy, the DCP team included lawyers, the consulting
 7    firm of PwC and the legacy AAF people, didn't it?
 8        A    Yes.
 9        Q    And sought the advice of all of those people on
10    the decision to put the league into bankruptcy.
11        Speaker B:  Object to the form.
12        A    No.
13        Q    What did I say wrong there?
14        A    My advice wasn't sought on whether or not the
15    league should be put into bankruptcy.
16        Q    Okay.  As part of its decision to put the league
17    into bankruptcy, Legacy AAF people were involved, PWC was
18    involved and the Bracewell law firm was involved.  Is that
19    fair?
20        Speaker B:  Object to form.  I'm sorry?
21        A    People in the AAF were aware of the decision to
22    put the league into bankruptcy.  Subsequently, PWC folks
23    and I guess Bracewell folks were looped in as well.
24        Q    And in the top email for Mr. Vanderbilt he's
25    asking Bracewell and PDC for guidance relating to the
```

                                                          160

1    bankruptcy.  Correct objective.

2         A    That appears to be accurate.

3         Q    And do you recall there being discussions when

4    the league was heading towards bankruptcy about whether

5    there could be a Chapter 11 bankruptcy which would allow

6    the league to continue versus a Chapter 7 which would

7    require the shutting down of the league?

8         A    Very vaguely.

9         Q    Okay.  And that the DCP people sought the advice

10   of the Bracewell law firm in making that decision?

11        Speaker B:  Object to form.

12        A    Very vaguely.  Recall those discussions.

13        Q    And do you recall being involved in putting

14   together numbers for the people involved to look at to

15   decide whether a reorganization of the league was possible

16   versus shutting it down at a very high level?  Yes, I do.

17   And you remember the advice of the law firm being based on

18   what I'm seeing, a shutdown, is the option that you all

19   should go forward with Object to form.

20        A    Again, very vaguely.  At a high level, yes.

21        Q    All right.  Exhibit 532 is an email from you to

22   John Zutter and others dated April 3rd.  See that?

23        A    Yes.

24        Q    And you had a chance to read it while we were

25   off the record.  Do you recall that being kind of an

                                                         161

```
 1   analysis of how to use the remaining funds from DCP to get
 2   into the bankruptcy process?
 3        A    At a high level, yes.
 4        Q    Okay.  And your attachment is a summary of the
 5   funds that the league had received from DCP that appears
 6   to be.  Okay.  And you used total DCP funds today.  Do you
 7   see that?
 8        A    That's what it's labeled?  Yes.
 9        Q    And are you aware that the actual bank account
10   name on the accounts where the funds were transferred from
11   were an entity different than dcp?  Do you have any
12   knowledge of that?
13        A    No.
14        Q    Okay.  Did you ever hear anybody object to
15   receiving the funds from an entity other than DCP to
16   fulfill its commitment objective under the term sheet
17   Same.
18        A    No.
19        Q    And to your knowledge, was everyone's
20   understanding that the funds were DCP funds that the
21   league was receiving?
22        A    Object to form to my.  My understanding was they
23   were.
24        Q    All right.  And so it shows that as of April 2,
25   2019, the league had received 68,250,000 from DCP.
```

                                                        162

1    Correct to the form, yes.  And then you were estimating

2    salaries and benefits through April 3rd of 743,000 and

3    change.  Correct.

4         A    That appears to be accurate.

5         Q    So this would have been occurring after the

6    league operations were shut down.  Correct.  Object.

7         A    Can you remind me what.  What day that was?  The

8    delete operations or something?

9         Speaker B:  Oh, I see.

10        Q    It.  It was for this.

11        A    Okay.  I don't.  I don't.

12        Q    If you don't remember, it's fine.  I'm just

13   trying to.

14        A    Yeah, I'm just trying to get difficult.  I just.

15   Yeah, it's fine.

16        Q    And then it says 12 week plan funds required,

17   $545,610.  Do you see that?

18        A    Yes.

19        Q    And then it shows after that amount, there'd be

20   a leftover of 461,189 of the $70 million.  Fair.

21        A    Yes, I see that.

22        Q    All right.  And in your email, you confirm in

23   the last paragraph, this leaves us with about 460.

24   460,000 of cushion under the current plan.  Again, this

25   will be fluid, and there will be changes as we look to be

                                                            163

1  more efficient.  But given timing, we're requesting your

2  approval ASAP to move forward with the current plan.  See

3  that?

4      A   Yes.

5      Q   Did you get the approval from DCP to move

6  forward with that current plan or do you recall?

7      A   I don't recall.

8      Q   Okay.  Do you.  Do you know if the AAF ever made

9  a funding request for that remainder, remaining $460,000

10  referenced in your email?

11     A   I do.

12     Q   Wow.  Okay.  Regardless, that remaining $460,000

13  would be funds that were available for the league after it

14  went into bankruptcy, Right?  That was the understanding.

15     A   70 million less the 69, 5, 3, 8 8, 11, right?

16  Yes.

17     Q   Okay.  She was previously marked as exhibit 128.

18  And following up on that, this is April 15th.  This is an

19  exchange of emails.  You are not copied on it.  But your

20  reference, it says, Jeff Vanderbilt says, I plan to send

21  final Dunnon contribution wire either today or tomorrow.

22  Could you please review the attached.  Which I don't have

23  to verify that our numbers match.  And Mr. Farrell says.

24  Still checking with Alan, but I sorted out my discrepancy.

25  I was holding 500,000.  About 500,000 as buffer, meaning

                                                    164

EXHIBIT

**34**

Message

| | |
|---|---|
| From: | Michael Kives [mkives@k5global.com] |
| Sent: | 2/11/2019 1:53:16 AM |
| To: | Charlie Ebersol [ce@aaf.com] |
| CC: | alan@aaf.com; Kevin Freedman [kevin@aaf.com]; Bryan Baum [bbaum@k5global.com] |
| Subject: | Re: Per our conversation |

Got it

Let's talk tomorrow

We'll have a couple ideas
But will need to work out a deal of some sort on your end
Because too short of notice for us to take carry

On Feb 10, 2019, at 9:25 PM, Charlie Ebersol <ce@aaf.com> wrote:

Michael,

Obviously, this is very sensitive info, so please don't send it outside you and your partner. In short, there is an opportunity for a motivated investor to step in and get a great deal on a tested and proven league with significant tech.

We officially launched the Alliance of American Football league with our first two games broadcast nationally on CBS last night and our groundbreaking app in the Apple and Google Play stores (we're #1 in both stores). We had a great opening night on CBS in terms of ratings (we beat the NBA -Rockets/OKC - on ABC head to head) and got great buzz on twitter (5 of the top 10 trending topics) and in the press. As with most things in startup life, with all the greatness going on, we have our challenges. As we discussed, my primary investor, who was introduced to us by the NFL, has failed to live up to his obligations. We agreed he would fund on a schedule and while he has funded $22M of his $170M obligation thus far, he is currently delinquent on his most recent funding obligations. Essentially, I need $10M to get through the next 2 weeks and an additional $60M to get through the end of the season. I have investors who will follow a legitimate lead.

Below are a few highlights from last night and some recent press for your reference.

## Opening Night Highlights

? #1 trending sports app in the app in both the Apple and Google Play App Stores

? #1 PrimeTime television program on Saturday night; 2.1 rating on CBS (beat the PrimeTime NBA game on ABC)

? 125,000 active users on mobile

? Responsible for 11 of the 20 top trending topics on Twitter in the US during the opening games

? San Antonio attendance: 27,875



? ⸺ Orlando attendance: 21,187

***Recent Press***

? &lt;!--[if !supportLists]--&gt;&lt;![endif]--&gt;*https://www.dailydot.com/upstream/san-antonio-commanders-vs-san-diego-fleet/*

? &lt;!--[if !supportLists]--&gt;&lt;![endif]--&gt;*https://www.nytimes.com/2019/02/08/sports/football/alliance-of-american-football-betting-aaf.html*

? &lt;!--[if !supportLists]--&gt;&lt;![endif]--&gt;*https://www.theringer.com/nfl/2019/2/8/18216486/aaf-new-football-league-christian-hackenberg-alliance-american*

All my best,

C

Charlie Ebersol
Founder & CEO

(646) 591-5647
AAF.com

&lt;image001.jpg&gt;

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

&lt;FullSizeRender.jpeg&gt;
&lt;IMG_3098.jpeg&gt;
&lt;IMG_3075.jpeg&gt;
&lt;ESMG Financial Projections Model vF.xlsx&gt;

TR0001628257

EXHIBIT

35

Message

| | |
|---|---|
| From: | Alan Kantowitz [alan@aaf.com] |
| Sent: | 1/7/2019 2:24:05 PM |
| To: | Kevin Freedman [kevin@aaf.com] |
| Subject: | Re: Finance Materials |
| Attachments: | Finance Materials v3.pdf |

See attached.

On Mon, Jan 7, 2019 at 11:41 AM Kevin Freedman <kevin@aaf.com> wrote:
Thx.

Please add a summary slide at the beginning that's says something like:

Dec/Jan:
- expenditures tracking ~$4.5M ahead of plan primarily due to delayed timing of various expenses
- revenue tracking $5.5M behind plan due to lower than budgeted ticket sales
- net cash expenditures ($xx.xM) projected $1M unfavorable to plan

Through end of season 1:
- expenditures projected to be $xxM favorable to budget due to reductions in...
- revenue projected to blah blah.
-....

In meeting now.


Sent from mobile

On Jan 7, 2019, at 10:57 AM, Alan Kantowitz <alan@aaf.com> wrote:

Updated attached. Revenue projections for January came from Tom....

On Mon, Jan 7, 2019 at 9:42 AM Alan Kantowitz <alan@aaf.com> wrote:
Kevin - attached please find overview slides I put together. Happy to go into more detail and break this down further or create other charts/graphics but please understand this was an extremely manual process and was not easy to do given short notice. A lot of this was more art than science. I had to manually relabel/categorize the entire old model, new model, and sift through a data dump from accounting to categorize December spending as well. Hopefully this gets easier moving forward.

Additionally, I as dealing with Ken/Emerald yesterday on a production crisis for a few hours and trying to calm them down. Need to fill you in on that as well at some point. I am finishing up the NFL Network call but should be in the office shortly.

• Slide 1: We were ahead by ~$2.5m for December spending (as far a I can tell). major areas of savings were Equipment and Marketing as we were able to push these to January/February..Insurance was an area of increased spending due to the fact that we pushed payments from October and there were upfront payments we did not anticipate and had spread across on annual basis in the original model

• Slide 2: Projected to be ~$2m ahead on spending for January. Equipment is the big one here as we have pushed a lot of this in to the season as well. Same comment on medical as above



EXHIBIT
92
Freedman 10-1-24

- Slides 3 and 4 just show the budget we showed Reggie in the docs through the end of the season and the revised budget I have constructed. This shows that we are taking a hard look at spending and have cut ~$20m from our anticipated spending. However, revenue projections have also taken a hit due to lack of marketing and a rethinking of digital revenue.

Happy to try and flesh this out even further and add detail but I understand we are limited on time.

Thanks,
Alan

--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

<Finance Materials v2.pdf>

--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

TR0001342424



95

Job  : 188a 20190107 TR0001342423a TR0001342425.pdf

Host : SCAN3-PC

Date : 2024/10/14

Time : 02:10





January 7, 2019 Finance Committee Materials

TR0001342425

## Excutive Overview

**December/January:**
- Expenditures are tracking ~$4.5M ahead of plan primarily due to delayed timing of various expenses (most notably equipment and marketing)
- Revenue tracking $5.5M behind plan due to lower than budgeted ticket sale caused by a lack of awareness and general marketing
- Net cash expenditures ($30.3M) projected $1M unfavorable to plan

**Through end of season 1:**
- Expenditures projected to be $21M favorable to budget largely due to reductions in production, national marketing, player relations and wellness departments and travel
- Revenue projected to be $30M unfavorable to budget
- *League revenue projected to be $15M (-$7M vs. $22M budgeted due to sponsorships lacking)*
- *Digital revenue projected to be $4M (-$14M vs. $18M budgeted due to lack of marketing and business model shift)*
- *Team revenue projected to be $40M (-$10M vs $49M budgeted due to lack of local sponsorships)*

2

TR0001342426



## December 2018 spending ~$2.5m ahead of budget

3

TR0001342427

# January 2019 spending projected to be ~$2.0m ahead of budget



# Ticket Sales History and Projections Through January



October: $1,503,100
November: $461,533
December: $735,659
LTD: $2,700,292
January: $4,500,000
Through January: $7,200,292

*Budgeted $6.0m through December originally*

*Budgeted $12.7m through January originally*

5

TR0001342429

# Revised Budget Through Season

| | 1/31/19 | 2/28/19 | 3/31/19 | 4/30/19 | 5/31/19 | Through Season |
|---|---|---|---|---|---|---|
| League Revenue | $1,535,000 | $3,837,500 | $3,837,500 | $2,763,000 | $3,070,000 | $15,043,000 |
| Team Revenue | 5,376,000 | 7,616,000 | 8,960,000 | 8,960,000 | 8,960,000 | 39,872,000 |
| Digital Revenue | 0 | 1,386,920 | 1,386,920 | 1,386,920 | 0 | 4,160,760 |
| Total Revenue | $6,911,000 | $12,840,420 | $14,184,420 | $13,109,920 | $12,030,000 | $59,075,760 |
| | | | | | | |
| Digital Expenses | $719,000 | $2,620,000 | $2,620,000 | $2,620,000 | $685,500 | $9,264,500 |
| Football Expenses | 5,182,897 | 17,595,927 | 11,879,833 | 11,854,833 | 2,521,500 | 49,034,991 |
| Player Relations Expenses | 212,600 | 237,600 | 249,900 | 249,900 | 247,500 | 1,197,500 |
| Marketing/Branding Expenses | 4,059,700 | 4,850,700 | 3,018,700 | 4,443,700 | 253,700 | 16,626,500 |
| Production Expenses | 5,730,611 | 3,185,897 | 3,185,897 | 2,792,564 | 74,000 | 14,968,969 |
| League Expenses | 3,179,724 | 11,023,006 | 7,034,226 | 4,447,956 | 274,006 | 25,958,917 |
| Team Expenses | 1,707,755 | 4,407,459 | 6,002,459 | 6,002,459 | 1,707,755 | 19,827,889 |
| Medical Expenses | 2,261,320 | 1,430,760 | 737,000 | 737,000 | 721,000 | 5,887,080 |
| Corporate Expenses | 381,750 | 381,750 | 881,750 | 881,750 | 881,750 | 3,408,750 |
| Digital Payment Fees | 0 | 416,076 | 416,076 | 416,076 | 0 | 1,248,228 |
| AAF Player Digital Distributions | 0 | 242,711 | 242,711 | 242,711 | 0 | 728,133 |
| Total Expenses | $23,435,357 | $46,391,887 | $36,268,553 | $34,688,950 | $7,366,711 | $148,151,457 |
| | | | | | | |
| Total Operating Income (Loss) | ($16,524,357) | ($33,551,467) | ($22,084,133) | ($21,579,030) | $4,663,289 | |
| % Margin | -239% | -261% | -156% | -165% | 39% | |
| | | | | | | |
| Cumulative Net Cash Flow | ($16,524,357) | ($50,075,823) | ($72,159,956) | ($93,738,986) | ($89,075,697) | |

6

TR0001342430

# Original Budget Through Season

| | 1/31/19 | 2/28/19 | 3/31/19 | 4/30/19 | 5/31/19 | Through Season |
|---|---|---|---|---|---|---|
| League Revenue | $2,260,000 | $5,650,000 | $5,650,000 | $4,068,000 | $4,520,000 | $22,148,000 |
| Team Revenue | 6,624,000 | 9,384,000 | 11,040,000 | 11,040,000 | 11,040,000 | 49,128,000 |
| Digital Revenue | 0 | 6,013,400 | 6,013,400 | 6,013,400 | 0 | 18,040,200 |
| Total Revenue | $8,884,000 | $21,047,400 | $22,703,400 | $21,121,400 | $15,560,000 | $89,316,200 |
| | | | | | | |
| Digital Expenses | $769,000 | $2,670,000 | $2,670,000 | $2,670,000 | $735,500 | $9,514,500 |
| Football Expenses | 5,382,897 | 17,595,927 | 11,879,833 | 11,854,833 | 2,521,500 | 49,234,991 |
| Player Relations Expenses | 492,600 | 517,600 | 529,900 | 529,900 | 527,500 | 2,597,500 |
| Marketing/Branding Expenses | 4,666,700 | 8,157,700 | 3,825,700 | 5,650,700 | 360,700 | 22,661,500 |
| Production Expenses | 6,480,611 | 4,435,897 | 4,435,897 | 4,042,564 | 74,000 | 19,468,969 |
| League Expenses | 3,179,724 | 11,866,466 | 7,877,686 | 4,869,686 | 274,006 | 28,067,567 |
| Team Expenses | 1,123,928 | 3,731,898 | 5,326,898 | 5,326,898 | 1,123,928 | 16,633,551 |
| Medical Expenses | 3,109,320 | 1,954,760 | 1,117,000 | 1,117,000 | 1,101,000 | 8,399,080 |
| Corporate Expenses | 381,750 | 881,750 | 881,750 | 881,750 | 881,750 | 3,908,750 |
| Digital Payment Fees | 0 | 1,804,020 | 1,804,020 | 1,804,020 | 0 | 5,412,060 |
| AAF Player Digital Distributions | 0 | 1,052,345 | 1,052,345 | 1,052,345 | 0 | 3,157,035 |
| Total Expenses | $25,586,529 | $54,668,364 | $41,401,030 | $39,799,697 | $7,599,884 | $169,055,503 |
| | | | | | | |
| Total Operating Income (Loss) | ($16,702,529) | ($33,620,964) | ($18,697,630) | ($18,678,297) | $7,960,116 | |
| % Margin | -188% | -160% | -82% | -88% | 51% | |
| | | | | | | |
| Cumulative Net Cash Flow | ($16,702,529) | ($50,323,493) | ($69,021,123) | ($87,699,420) | ($79,739,303) | |

7

TR0001342431

Message

| | |
|---|---|
| **From:** | Charlie Ebersol [ce@aaf.com] |
| **Sent:** | 12/23/2018 10:38:24 PM |
| **To:** | Alan Kantowitz [alan@aaf.com] |
| **CC:** | Kevin [kevin@aaf.com] |
| **Subject:** | Re: Charlie Ebersol, Dick Ebersol, Kevin Freedman, Alan Kantowitz... |

<div style="border: 2px solid black; display: inline-block;">
EXHIBIT

**36**
</div>

No they question the revenue projections which is problematic.

Charlie Ebersol
Founder & CEO

(646) 591-5647
AAF.com

 **ALLIANCE** OF AMERICAN FOOTBALL

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

On Dec 23, 2018 at 8:37 PM, <Alan Kantowitz> wrote:

Agreed. Although, base on Jeff's email from last week, I think his concern with financials are more budget focused and related to salaries being high and the amount of people we plan to hire or even have hired already.

On Dec 23, 2018, at 11:32 PM, Charlie Ebersol <ce@aaf.com> wrote:

<mark>Additionally Reggie's delinquency screwed us with respect to revenue by killing our marketing.</mark>

Charlie Ebersol
Founder & CEO

(646) 591-5647
AAF.com

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-

mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

On Dec 23, 2018 at 8:20 PM, <Alan Kantowitz> wrote:

Charlie and Kevin,

I agree with much of what Dave and Jeff ourlined below. Reggie is the partner we chose to work with (whether or not we had other options does not matter at this point). I also agree that we need to revisit payroll and salaries in general. However, I think we need to make a few things clear which I have laid out below.

1. The model is based on preliminary projections at this point. We are still a start up and do not have revenue so the projections do not mean much. As I mentioned above, I believe salaries in general need to be revisited. However, it is important to note the following:

Football salaries, specifically coaching salaries, are high because they need to be. That is how we attracted the caliber of coaching that we have and will need to maintain that to remain competitive with other leagues like the XFL. As for tech, I think in the future we can have employees in other states, and lower these costs, but for now (as Kevin and I have discussed in the past) we need the team together in SF to build this thing properly, quickly and efficiently. There are other salaries, like those in Troy's department for example, that can be revisited but at this point they can be chalked up to growing pains in my view.

2. I agree, we need to find a path forward with Reggie and need to do our best to make this work. However, "shutting down" the business was not a threat and was never intended to be one. That was just the actual fact of our reality and situation which was caused by Reggie. The fact that he now has "questions" about the projections is ridiculous. He had ample time to review all the materials we sent him numerous times ahead of him signing the definitive docs. It is fine for him (along with Jeff and Dave) to have questions and opinions on our finances. That is the point of having a board. Moreover, that was always the plan with the finance steering committee, which Reggie asked for specifically. Funding was never contingent on that and should not be moving forward.

I agree we need to treat him like a partner, but to Charlie's point, he has not lived up to his side of the bargain and earned that from us. He needs to be a good partner and be transparent with us. He needs to earn our trust back at this point and explain what is going on on his side of thing. He has still not explained to us why the money on his side was locked up and why he had to liquidate stock and have it secured by a friend of his! Why was the money not readily available and why can we trust that it will be in the future? Why did his friend Jeffrey Marks need to underwrite those securities? Why was a check dropped into an ATM? These are questions that raise serious red flags? The fact that he does not appreciate that is extremely alarming to me.

Just because he is our only option does not mean we need to continue forth with that option. As much as we would all like to move forward, he needs to explain why we should feel comfortable doing so. That is not a threat, that is simply responsible management in my opinion.

I am all for putting our best fit forward, but the following language below did not sit well with me personally:

"The bottom line is this..... to make this work, we believe we need to evolve a consensus that we are willing to work with Reggie and help facilitate a mutually-acceptable funding schedule, irrespective of what lawyers or contracts suggest."

Reggie has done nothing to earn that right. Good partners get the benefit of the doubt to work around and outside the confines of a contract. But that is based on trust which is earned.
We have been officially in business with this guy for a month and it has been an absolute nightmare. He has done absolutely nothing to earn that right and confidence, and it is not only unfair but in my opinion irresponsible to continue

TR0001257054

to write checks and make commitments with partners without knowing exactly what is going on with Reggie and how available the money is.

I am clearly the most junior person on this team and not a member of the board so I did not send this to Jeff/Dave but feel free to send over to the two of them along with Dick. I just did not want to do so without your permission.

Best,
Alan

On Dec 23, 2018, at 9:57 PM, Charlie Ebersol <ce@aaf.com> wrote:

Jeff and Dave,

Thank you for this note. We will take it under advisement and respond in due course.

All my best
C

Charlie Ebersol
Founder & CEO

(646) 591-5647
AAF.com

<image001.jpg>

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

---

**From:** Jeff Moorad <jmoorad@mooradsportspartners.com>
**Date:** Sunday, December 23, 2018 at 6:43 PM
**To:** Charlie Ebersol <ce@aaf.com>, Dad <ebersol47@bright90t.com>, Kevin Freedman <kevin@aaf.com>, Alan Kantowitz <alan@aaf.com>
**Cc:** Dave Pottruck <dave@redeagleventures.com>
**Subject:** TO: Charlie Ebersol, Dick Ebersol, Kevin Freedman, Alan Kantowitz...

TO: Charlie Ebersol, Dick Ebersol, Kevin Freedman, Alan Kantowitz

FROM: Dave Pottruck/Jeff Moorad

RE: Path Forward With Reggie

Gentlemen:

TR0001257055

The two of us have spent considerable time talking this weekend about how to move forward successfully with our cornerstone investor. The following is our best assessment:

We're reminded of that wonderful phrase "it is what it is"....and, as Dick Ebersol so aptly observed several weeks ago, "Reggie is the horse we chose, and we need to make it work with him." Obviously, we share that belief and, given the lack of diversified funding at this stage, we believe we need to all toughen up and navigate through these headwinds.

The conversations we had with Reggie on Friday made it clear to us that he is committed to being a good partner and wants to put a realistic plan in place to address the funding requirements of the company. He is also extremely supportive of letting a monthly finance committee provide guidance to management as his money is drawn down by the company.

All we know is that, if we want to work with Reggie (and what choice do we have?), we need to work with him in a different fashion. Not horribly different, but simply in a way that respects that he intends to invest $170m and he has now asserted some specific ideas about how to manage this risk (of course, we know it would have been better if this had been documented this way in our contract). As Charlie has reminded more than once, [paraphrasing] "when/if he invests another $13m, he'll treat him with all the respect that $18m would suggest." We have to live by that and, to be direct, if the attitude post-$13.4m funding is Reggie " is nothing more than an LP with no rights" (as Charlie has also said a number of times), our failure will become a self-fulfilling prophecy.

Based upon what Reggie said to Dave and reiterated to Jeff yesterday, the following was read back to him and he agreed (this all assumes the $13.4m hits our account):

"We need to issue a funding request immediately after the $13.4m clears our account for January funds, which will be expected to be available and in our account in ten business days. Henceforth, we will hold meetings on the third Tuesday of the month, in person, in rotating locations. Funding requests can happen ahead of that but will be further validated at that meeting so new funds are available to the company by the 5th calendar day of every month. (he wanted the 5th calendar day so that the treasuries he purchased on a monthly basis could mature and not be sold prematurely).    We need to have a reserve so we are not operating hand to mouth each month. By the end of the first quarter we should shoot for a one month cash reserve. We reminded him that this one-month cash reserve would be coming out of his pocket and he agreed to that."

Now, this isn't satisfactory for January since ten business days from Dec. 24th is January 9th, and we need to secure as much capital as quickly as possible to pay for training camp expenses. So, we will need to work with Reggie to find a different solution for January.

Going forward, however, the notion we meet on the third Tuesday of each month and look at the month ahead and issue our funding notice isn't unreasonable, especially since Reggie has also acknowledged we need to establish corporate reserves, meaning that we put enough money into the company that every month we are not living hand to mouth. When Reggie made this suggestion, we made it clear to him that this corporate reserve would have to come from his money; he noted "yes, I understand that."

Reggie (and the two of us, to be fair) also have a lot of questions about the revenue and expense forecasts for 2019 and beyond, and believe we need a board level conversation about this. Digging into this will require an investment of time on behalf of board members and/or a subcommittee of the board. Frankly, to once again be direct, the company's expense and salary structure looks more to us like a 10-yr. mature company rather than a first-year startup. We are both reminded of the goal of most all startup CEOs to build a Minimum Viable Prototype (MVP), minimizing expenses and headcount along the way until fully built. Recognizing that there is a balance between managing expenses and maintaining a first-class outward-facing organization, we understand the task is not simple, but likely the best way to insure long-term viability as we continue to clear significant hurdles each day.

TR0001257056

Anyway, we would like to discuss this ASAP, as we should be prepared to take all necessary steps tomorrow. And, we need to handle this professionally if we want to get off on the right foot going forward; Charlie's conversation with Reggie yesterday was a great first step.

The bottom line is this..... to make this work, we believe we need to evolve a consensus that we are willing to work with Reggie and help facilitate a mutually-acceptable funding schedule, irrespective of what lawyers or contracts suggest. As importantly, we believe we need to stop discussions and, particularly the threats, of shutting the business down (beyond discussions, if necessary, between those of us on this email). As you all know, these discussions have permeated the employee ranks and have de-stabilized many. To be fair, we completely understand the need to quietly manage the downside and ultimate PR damage should we fail, but truly believe we have a viable (albeit a bit nontraditional) path to make this work with Reggie and, until we develop a path to get funds elsewhere, this is the best option we have. Our personal answer to this question is that we should work with Reggie, get rules in place that both he and the company is comfortable with, and while maybe not perfectly desirable, recognize the reality of the age old saying, "the guy with the money gets to make the rules."

Thank you for reading this with the understanding that we are both 100% committed to help all make this a huge success.

Best Regards,

Dave & Jeff

Sent from my iPhone

| | | |
|---|---|---|
| **Message** | | **EXHIBIT** |
| | | **37** |
| From: | Kevin Farrell [kevin.farrell@aaf.com] | |
| Sent: | 12/29/2018 10:09:19 PM | |
| To: | Alan Kantowitz [alan@aaf.com] | |
| Subject: | Check the last tab | |
| Attachments: | Cash Flow Projections_122918.xlsx | |

Hey Alan

This is how I am building the sheet

>Spending buckets–actuals, estimates and projections.
>Projections are through mid-Jan except where noted for all of Jan
>There are some buckets I am missing–but will work on these tomorrow.  PLEASE ADD WHAT YOU KNOW.
>You can back out Ticket Sales and Aramark as outlays–these are cash holds
>Highlighted items need to be confirmed
>I am getting the TC hotel total spend estimate
>We are also going to have to start spending on In Season lodging

IT IS A LOT OF $$$.  This is what it will take and then some.

Farrell

TR0001289611

Purchasing and Misc To Do

Hotel Contracts

| Mini Camp | Host | Hotel Contact | Card | | Notes |
|---|---|---|---|---|---|
| Orlando | | Noelia | Alan | | $30K coming on 12/17 |
| Memphis | | | | | |
| Birmingham | | | | | |
| Atlanta | | Brenda | Alan | | Charges going through to Alan's card |
| San Antonio | | | | | |
| Phoenix | | | | | |
| Salt Lake | | | | | |
| San Diego | | | | | |

**Training Camp**

| In Season | | | | | |
|---|---|---|---|---|---|
| Orlando | | | | | |
| Memphis | | | | | |
| Birmingham | | | | | |
| Atlanta | | Brenda | Alan | | Card placed as deposit--monthly invoicing in season |
| San Antonio | | | | | |
| Phoenix | | | | | |
| Salt Lake | | | | | |
| San Diego | | | | | |

**Consultants (Bill.com)**

| Consultant | Amount | Invoice Date | Notes | Calc | Status | Consultant | Amount | Invoice Date | Notes | Calc | Status |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |

**Lights on or off**
12.20.18

| Item | Timing | Status | All Off | Football Off | Who | Notes |
|---|---|---|---|---|---|---|
| Contingency Group Call | T = 0 | | x | x | Annie | CE, KF, KF, AG, DC, ES, SvD, AK, TV, MH |
| Establish Contingency Workgroup | T = 0 | | | | | |
| HR Call | T = 0 | | x | x | Tom | Anna |
| Charlie Calls | T = 0 | | x | x | Charlie | Roger, Sean, Hines, Troy, Ken/Emerald, T-Man |
| Communication Plan (Internal) | T = 0 | | x | x | Annie/Farrell | |
| WebPage | ASAP (>0) | | x | x | Annie | Erik? |
| Shut down Social Media | ASAP (>0) | | x | x | Ben | |
| Remove Contact Lists | T = 0 | | x | x | | |
| Notify Senior Staff | ASAP (>0) | | x | x | Annie | Ben, Troy, Hines, Toby, Dinn, Jake, JK, Chad, Ken, Emerald, T-Man, CEO at McGarry Bowen |
| Communication Plan (external) | ASAP (>0) | | | | Megan | Include Vendor Email |
| Pay Players | TBD | | x | x | Farrell | |
| Consultant Payments (December) | TBD | | tbd | tbd | Freedman/Farrell | |
| Calif WC Check | Send 12/20 | | ? | y | DC | |
| Holiday Party | TBD | | n | n | Farrell | |
| Cancel Tech Testing | ASAP (>0) | | x | x | Erik | Cancel with Brian Woods |
| Turn off Uber | ASAP (>0) | | x | ? | Annie | |
| Turn off FedEx | ASAP (>0) | | x | ? | Farrell | |
| Turn off Bank Cards | ASAP (>0) | | x | x | Farrell | |
| Recall Hotel Deposits | ASAP (>0) | | x | x | Farrell | |
| Call CoachComm | T = 1 | | x | x | Annie | |
| Call ProTravel | ASAP (>0) | | x | x | Farrell | |
| McGarry Bowen | ASAP (>0) | | call | call | Annie/Farrell | |
| Control Dynamics | | | | | | |
| SA Warehouse Control | ASAP (>0) | | y | y | Farrell | Security |
| Security Items--SIS | TBD | | ? | ? | Freedman/Farrell | |
| Aramark LC | TBD | | n | n | Farrell | Notify Aramark |
| Wilson Order | | | n | n | Farrell | |
| Urgent Wires List | | | Cancel | Review | Freedman/Farrell | Review and Approve |
| Asset Management Plan | | | Y | Y | Farrell | Computers, Equipment, Gear--WHERE? |
| IT Management--Out of Office | ASAP (>0) | | | | Farrell | With K2 |
| Cease Ticket Sales | ASAP (>0) | | | | Tom | |
| Tech Restructuring | ASAP (>0) | | y | y | Freedman/Erik | |
| SF Office Notifications | | | y | y | | White list of individuals in SF Office |
| Office shut down plans | ASAP (>0) | | | | Tom/Farrell | Checks, cash, assets >> SF |

## Projections (12.28.19)

| Category | Est Amount | Notes |
|---|---|---|
| 1/1/19 Staff Payroll | 2,250,000 | |
| 1/15/19 Staff Payroll | 2,400,000 | |
| Player payroll--January | 1,100,000 | Farrell to confirm with Anna (600 players * 4 weeks * $455) |
| Staff Benefits--January | 400,000 | |
| Consultant Payments (Jan--Monthly) | 400,000 | Farrell to confirm run rate with KBC |
| Ticket Sales (Hold-back) | 2,500,000 | Farrell to confirm with Tom, Jane |
| Aramark Letter of Credit (Hold-back) | 500,000 | Funds set aside for this LC to cover Aramark inventory exposure |
| Bank Card Balances (Dec 26th) | 575,000 | |
| Travel Expense reports to be submitted through 1.1.19 (Estimate) | 400,000 | |
| QB and MiniCamp Hotel settlements (Estimate) | 300,000 | |
| MiniCamp Medical (Estimates) | 100,000 | |
| December Player payments | 250,000 | Includes A Murray bonus |
| Training Camp Travel (projection) | 500,000 | Flights, travel fees and mileage reimbursements |
| Production Travel Bookings (for In Season) | | |
| Insurance Run Rate (January)--Does not include Staff Benefits | | |
| Marketing--Team Level | 1,600,000 | $200,000 per team * 8 teams |
| Marketing--League Level | 2,100,000 | McGarry Bowen |
| TC Hotel Deposits--1st Rd: Via Check | 1,100,000 | |
| Wires--Week of Dec 24th (See Table) | 1,963,200 | |
| Wires--December 31st (See Table) | 747,000 | Need to check for other wire requests |
| XOS Payment (To be confirmed) | 510,000 | NEEDS TO BE CONFIRMED |
| Vendor Payments--Week of Dec 24th | 1,200,000 | Need to check K Freedman Payments; Add $120K for Farrell |
| Vendor Payments--Freedman Past Due | 1,000,000 | Current queue >$20K--can pull detail if needed |
| Vendor Payments--Farrell Past Due (Current queue) | 2,500,000 | Less McGarry Bowen; Less Bills after 1.19.19 |
| | 24,395,200 | Total |

| Wires (Week of Dec 24th) | Amount |
|---|---|
| Wilson--Footballs for Training Camp | 36100 |
| McGarry Bowen--Marketing | 184300 |
| McGarry Bowen--Marketing | 153600 |
| G-III: Training Camp Apparel | 81800 |
| Control Dynamics--Coach to Player Radios | 75500 |
| Riddell--Helmets | 343400 |
| Hotel Deposit--Marriott | 250000 |
| | |
| Hotel Deposit--Landmark | 270000 |
| Hotel Deposit--Omni La Mansion | 250000 |
| Insurance Payment | 160000 |
| G-III: Training Camp Apparel | 158500 |
| | 1963200 |

| Wires & Payments (Dec 31st) | Amount |
|---|---|
| CoachComm: Coach to Coach Comms | 522000 |
| Henry Schien: Medical (50%) | 175000 |
| Hotel Deposit: Marriott NW | 50000 |
| | 747000 |

| Message | |
|---|---|
| **From:** | Charlie Ebersol [ce@aaf.com] |
| **Sent:** | 12/19/2018 10:38:39 AM |
| **To:** | Keith Rabois [krabois@gmail.com] |
| **CC:** | Kevin Freedman [kevin@aaf.com] |
| **Subject:** | Re: Ebersol Sports Media Board Update |

**EXHIBIT**

**38**

I agree with you. If we had any other option we certainly would have taken it. He has provided many excuses with varying degrees of probability.

Ultimately it's very unfortunate because in my view we have accomplished more than we ever thought we could and the war will seeming be lost for want of a nail.

I'll keep you updated as this unfolds.

Charlie Ebersol
Founder & CEO

(646) 591-5647
AAF.com

 **ALLIANCE** of AMERICAN FOOTBALL

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

On Dec 19, 2018 at 11:34 AM, <Keith Rabois> wrote:

This appears to be the right move. As you know, I never trusted this guy so even if he miraculously wires the money I don't think it is a good solution.

Have they provided an "excuse" for this?

Sent from my iPhone

On Dec 18, 2018, at 8:00 PM, Charlie Ebersol <ce@aaf.com> wrote:

Dear fellow ESMG Board Members,

As most of you know, I flying to New York as I write this email for a secret meeting with Vince McMahon tomorrow evening. The purpose of the meeting is to assess the viability of the Alliance of American Football and XFL forming a strategic relationship, up to and including the possibility of a full merger. The reason for this is because as of today, Reggie Fowler, our Series 1 investor has only funded $4.8M of his contractually required $15M (which is the first payment of the $170M he is committed to fund over the next two years).

Over the past three weeks, the $4.8M had dribbled in in various increments, causing significant concern and operational challenges to running the business. During that time, Board members Jeff Moorad and Dick Ebersol, alongside investor David Pottruck and several key senior staff members of ESMG have worked closely with Reggie, his bankers, financial managers, and legal representatives to resolve his breach of contract. We have gone as far as to accept $2M worth of bridge loans from Dick and David as recently as last week, which were offered against personal guarantees by Reggie and repeated commitments from his representatives that funds were en-route.

As of an hour ago, Reggie and his team have once again assured us that his payment will be forthcoming in the coming days. However, based on how the last few weeks have played out, it is my assessment as well as that of my head of operations Kevin Freedman and board members Dick and Jeff, that we cannot rely on Reggie's words and be confident the money is coming.

We currently have less than $2M dollars of useable capital in the bank (We have ~$2M of ticket revenue that we plan to return to purchasers if we do not play games). With this cash reserve, and our obligations to payroll for this week, we do not have enough capital to continue Football operations after Friday and it will be difficult to continue digital operations. (a particularly difficult outcome because we spoke with MLS's top executives and they are interested in potentially pursuing a deal to integrate our tech, and we heard from the NFL and NFLPA this week that they intend to pursue an investment in the digital business directly. The Feedback we have heard from all third parties is that our digital development far exceeds our competitors in ability and direction).

To that end, Dick reached out to Vince today and set up a private in person meeting tomorrow evening in Connecticut in which I plan to propose several strategic options, including a merger or acquisition. Although it is a longshot, ideally, he would step in and fund our 2019 season with the intent of merging the league ahead of 2020 when the XFL is scheduled to launch. We have the infrastructure and talent in place. However, it is more likely that we will still be forced to concede the 2019 season and hope to continue to pursue the digital business while Vince "acquires" our football organization to launch the XFL.

I will keep you all updated as it unfolds. Please let me now if you would like to jump on the phone in advance.

All my best
C

TR0001233923

Charlie Ebersol
Founder & CEO

(646) 591-5647
AAF.com

<image001.jpg>

DISCLAIMER:
This e-mail is only intended for the person(s) to whom it is addressed and may contain confidential information. Unless stated to the contrary, any opinions or comments are personal to the writer and do not represent the official view of the company. If you have received this e-mail in error, please notify us immediately by reply e-mail and then delete this message from your system. Please do not copy it or use it for any purposes, or disclose its contents to any other person. Thank you for your cooperation.

TR0001233924

EXHIBIT **39**

523

## EBERSOL SPORTS MEDIA GROUP ANNUAL FINANCIAL PROJECTIONS

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Teams | 8 | 8 | 8 | 16 | 16 | 16 | 16 | 16 | 16 | 16 |
| # of Players | 416 | 416 | 416 | 832 | 832 | 832 | 832 | 832 | 832 | 832 |
| | **2019** | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | **2026** | **2027** | **2028** |
| League Revenue | $15,350,000 | $25,421,000 | $59,355,988 | $75,716,459 | $94,948,776 | $111,040,843 | $139,630,046 | $163,499,565 | $206,102,494 | $241,654,125 |
| Team Revenue | 21,100,000 | 38,037,500 | 75,303,900 | 103,235,720 | 132,628,373 | 142,355,883 | 150,900,643 | 159,972,270 | 169,604,213 | 179,832,109 |
| Digital Revenue | 4,160,760 | 32,796,547 | 56,200,033 | 81,501,047 | 108,333,025 | 136,821,987 | 167,108,060 | 199,347,193 | 233,713,076 | 270,399,291 |
| **Total Revenue** | **$40,610,760** | **$96,255,047** | **$190,859,921** | **$260,453,226** | **$335,910,174** | **$390,218,713** | **$457,638,748** | **$522,819,027** | **$609,429,783** | **$691,885,525** |
| | | | | | | | | | | |
| Digital Expenses | $13,217,050 | $15,973,761 | $18,128,379 | $18,490,947 | $18,860,766 | $19,237,981 | $19,622,741 | $20,015,196 | $20,415,500 | $20,823,810 |
| Football Expenses | 64,668,212 | 84,949,076 | 99,818,399 | 114,967,382 | 130,154,470 | 130,677,739 | 131,211,473 | 131,755,881 | 132,311,178 | 132,877,581 |
| Player Relations Expenses | 2,227,900 | 3,424,446 | 3,436,068 | 3,447,922 | 11,177,334 | 11,189,667 | 11,202,247 | 11,215,078 | 11,228,166 | 11,241,516 |
| Marketing/Branding Expenses | 21,984,486 | 21,861,356 | 22,240,810 | 22,685,626 | 23,139,339 | 23,602,126 | 24,074,168 | 24,555,651 | 25,046,764 | 25,547,700 |
| Production Expenses | 17,999,418 | 16,049,106 | 16,356,869 | 16,684,007 | 17,017,687 | 17,358,041 | 17,705,201 | 18,059,305 | 18,420,491 | 18,788,901 |
| League Expenses | 28,428,067 | 33,500,880 | 38,271,789 | 43,090,061 | 47,911,251 | 48,114,353 | 48,322,812 | 48,536,656 | 48,755,916 | 48,980,630 |
| Team Expenses | 25,395,399 | 38,026,520 | 45,631,824 | 53,237,128 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 | 60,842,432 |
| Medical Expenses | 8,462,800 | 13,462,096 | 15,414,093 | 17,367,186 | 19,321,397 | 27,115,228 | 27,174,542 | 27,235,043 | 27,296,753 | 27,359,698 |
| Corporate Expenses | 5,986,000 | 6,712,620 | 6,797,790 | 6,933,746 | 7,072,421 | 7,213,869 | 7,358,147 | 7,505,309 | 7,655,416 | 7,808,524 |
| Digital Payment Fees | 1,248,228 | 9,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,804,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,133 | 5,739,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total Expenses** | **$190,345,793** | **$249,538,201** | **$292,791,038** | **$335,617,002** | **$386,955,283** | **$410,341,879** | **$426,890,091** | **$444,410,469** | **$462,986,329** | **$482,710,455** |
| | | | | | | | | | | |
| **Total Operating Income (Loss)** | ($149,735,033) | ($153,283,154) | ($101,931,117) | ($75,163,777) | ($51,045,109) | ($20,123,166) | $30,748,657 | $78,408,558 | $146,443,455 | $209,175,071 |
| *% Margin* | *-368.7%* | *-159.2%* | *-53.4%* | *-28.9%* | *-15.2%* | *-5.2%* | *6.7%* | *15.0%* | *24.0%* | *30.2%* |
| | | | | | | | | | | |
| **Cumulative Net Cash Flow** | ($149,735,033) | ($303,018,187) | ($404,949,304) | ($480,113,081) | ($531,158,189) | ($551,281,355) | ($520,532,698) | ($442,124,140) | ($295,680,685) | ($86,505,615) |

| *Memo: Expense Reporting* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Payroll | 90,037,450 | 136,944,319 | 160,064,463 | 181,835,010 | 211,368,455 | 220,016,066 | 220,946,235 | 221,895,008 | 222,862,757 | 223,849,860 |
| Professional Services | 1,699,661 | 1,870,659 | 1,955,135 | 2,040,255 | 2,126,031 | 2,160,185 | 2,195,022 | 2,230,555 | 2,266,800 | 2,303,769 |
| Advertising & Promotions | 20,741,953 | 19,484,292 | 19,986,478 | 20,496,207 | 21,013,631 | 21,413,904 | 21,822,182 | 22,238,626 | 22,663,398 | 23,096,666 |
| Travel | 23,529,116 | 26,870,073 | 30,213,224 | 33,559,205 | 36,908,454 | 37,129,886 | 37,357,042 | 37,589,956 | 37,828,668 | 38,073,221 |
| Office & Facility Costs | 4,009,592 | 5,811,834 | 6,880,945 | 7,950,264 | 9,019,794 | 9,030,790 | 9,042,006 | 9,053,446 | 9,065,115 | 9,077,017 |
| Other General & Administrative Costs | 48,351,661 | 42,978,665 | 46,995,777 | 51,023,065 | 55,060,730 | 55,600,604 | 56,151,276 | 56,712,961 | 57,285,880 | 57,870,258 |
| Digital Payment Fees | 1,248,228 | 9,838,964 | 16,860,010 | 24,450,314 | 32,499,908 | 41,046,596 | 50,132,418 | 59,804,158 | 70,113,923 | 81,119,787 |
| AAF Player Digital Distributions | 728,133 | 5,739,396 | 9,835,006 | 14,262,683 | 18,958,279 | 23,943,848 | 29,243,910 | 34,885,759 | 40,899,788 | 47,319,876 |
| **Total** | **$190,345,793** | **$249,538,201** | **$292,791,038** | **$335,617,002** | **$386,955,283** | **$410,341,879** | **$426,890,091** | **$444,410,469** | **$462,986,329** | **$482,710,455** |
| | | | | | | | | | | |
| *Payroll* | *47%* | *55%* | *55%* | *54%* | *55%* | *54%* | *52%* | *50%* | *48%* | *46%* |
| *Professional Services* | *1%* | *1%* | *1%* | *1%* | *1%* | *1%* | *1%* | *1%* | *0%* | *0%* |
| *Advertising & Promotions* | *11%* | *8%* | *7%* | *6%* | *5%* | *5%* | *5%* | *5%* | *5%* | *5%* |
| *Travel* | *12%* | *11%* | *10%* | *10%* | *10%* | *9%* | *9%* | *8%* | *8%* | *8%* |
| *Office & Facility Costs* | *2%* | *2%* | *2%* | *2%* | *2%* | *2%* | *2%* | *2%* | *2%* | *2%* |
| *Other General & Administrative Costs* | *25%* | *17%* | *16%* | *15%* | *14%* | *14%* | *13%* | *13%* | *12%* | *12%* |
| *Digital Payment Fees* | *1%* | *4%* | *6%* | *7%* | *8%* | *10%* | *12%* | *13%* | *15%* | *17%* |

| AAF Player Digital Distributions | 0% | 2% | | | | 6% | 7% | 8% | 9% | 10% |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Memo: Average Player Bonuses | $1,750 | $13,797 | $23,642 | $17,143 | $22,786 | $28,779 | $35,149 | $41,930 | $49,158 | $56,875 |



**EXHIBIT**

**40**

| | |
|---|---|
| **Message** | |
| **From:** | Alan Kantowitz [alan@aaf.com] |
| **Sent:** | 1/11/2019 6:31:44 PM |
| **To:** | Kevin Freedman [kevin@aaf.com] |
| **CC:** | Kevin Farrell [kevin.farrell@aaf.com] |
| **Subject:** | January Cash Requirements |
| **Attachments:** | January Cash Requirements.pdf |

Freedman - attached is PDF outlining cash requirements for the next two weeks. These are the critical payments that are either in here because they are absolutely necessary (items like payroll or mission critical to football success) or way overdue and are color coded accordingly. The second week was more of my best estimation based on payments I am aware of and estimates for housing hotels that I know are due, but Farrel should glance over when he gets a chance. Note this also does not include any CBS fees...

Best,
Alan


--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

| Week Ending Friday 1/18/19 | Priority | Notes | Category | Football / Tech / Corporate | Amount |
|---|---|---|---|---|---|
| 1/15/19 Payroll | | Estimate | Payroll | Corporate | $2,500,000 |
| Player Payroll - January Week 1 | | 600 players * 1weeks * $455 | Payroll | Football | $273,000 |
| Player Payroll - January Week 2 | | 600 players * 1weeks * $455 | Payroll | Football | $273,000 |
| Player travel reimbursement | | 600 players * $100 (petty cash) | Payroll | Football | $60,000 |
| 1/15/19 Consultant Payments | | Estimate | Professional Services | Corporate | $50,000 |
| QB and MiniCamp Hotel settlements | | Estimate | Travel/Lodging | Football | $200,000 |
| MiniCamp Medical | | Estimate | Medical/Wellness/Insurance | Football | $100,000 |
| Production Travel Bookings (for In Season) | | Estimate (flights, travel fees and mileage reimbursements) | Travel/Lodging | Football | $100,000 |
| SMT 1/1/18 Payment | | Production/Graphics | Production | Football | $465,185 |
| Marketing-Team Level | | $200,000 per team * 8 teams | Marketing | Football | $125,000 |
| TC Hotel Deposits | | TC Hotels w/ F&B: $7.5M (Est). $800K * 8; $200K * 2; 10% cont. | Travel/Lodging | Football | $600,000 |
| Miami' Air Charter | | Flights home from training camp | Travel/Lodging | Football | $525,000 |
| Training Camp Stadiums Fields | | Field Deposit | Facilities | Football | $100,000 |
| XOs Remaining Balance | | Coaching Video System | Equipment | Football | $590,000 |
| Isolynx second payment | | Tracking Telemetry Provider | Equipment | Technology | $104,000 |
| DV Sport | | Ref Review System | Equipment | Football | $78,000 |
| TeamWorks | | Team Communication System | Equipment | Football | $54,000 |
| Wengwise | | Office Rent | Professional Services | Corporate | $88,000 |
| Brownstein Legal Expenses | | MGM Legal Fees | Professional Services | Corporate | $50,000 |
| Ebersol Lannigan Company | | Production | Production | Football | $44,000 |
| Modco Media | | Marketing | Marketing | Football | $42,000 |
| SIS | | Security | Professional Services | Football | $55,000 |
| Propology | | Studio desks for SneakyBig | Production | Football | $47,000 |
| Infinate Scale & BlueMedia | | Stadium design and enhancement | Marketing | Football | $100,000 |
| In-season housing/hotel deposits | | In-season housing/hotel deposits | Travel/Lodging | Football | $200,000 |
| Total | | | | | $6,823,185 |

| Week Ending Friday 1/25/19 | Priority | Notes | Category | Football / Tech / Corporate | Amount |
|---|---|---|---|---|---|
| Player Payroll - January Week 3 | | 600 players * 1weeks * $455 | Payroll | Football | $273,000 |
| eClincial Works | | Medical Records System | Medical/Wellness/Insurance | Football | $100,000 |
| TC Hotel Deposits | | TC Hotels w/ F&B: $7.5M (Est). $800K * 8; $200K * 2; 10% cont. | Travel/Lodging | Football | $100,000 |
| League Marketing | | McGarryBowers | Marketing | Football | $1,500,000 |
| Corporate Insurance | | D&O, Property etc. | Medical/Wellness/Insurance | Corporate | $90,000 |
| Other Production Expenses (Cabling, Studio, Cameras, Crews) | | Estimate (Bexel, SkyCam, SneakyBig, etc.) | Production | Football | $500,000 |
| Production Travel Bookings (for In Season) | | Estimate (flights, travel fees and mileage reimbursements) | Travel/Lodging | Football | $100,000 |
| In-season housing/hotel deposits | | In-season housing/hotel deposits | Travel/Lodging | Football | $200,000 |
| Isolynx final payment | | Tracking Telemetry Provider | Equipment | Technology | $104,000 |
| STARTR/G-III Apparel | | Jerseys and Pants | Equipment | Football | $440,456 |
| KORE Software | | Ticketing Software and Analysis | Professional Services | Football | $85,000 |
| Silverman Group | | Branding (Logos, etc) | PR/Branding | Football | $34,000 |
| Diversa | | Recruiting | Professional Services | Corporate | $90,000 |
| MWW | | PR Company | PR/Branding | Football | $64,000 |
| Wan Worldwide | | Sponsorships | Professional Services | Football | $25,000 |
| Barsicle Brothers | | Production | Marketing | Football | $40,000 |
| Total | | | | | $4,145,456 |

Highly Critical (>30 days overdue)
Critical (15 to 30 days overdue)
<15 days overdue



TR0001384598

EXHIBIT

**41**

| | |
|---|---|
| **From:** | Alan Kantowitz[alan@aaf.com] |
| **Sent:** | Wed 4/3/2019 6:47:48 PM (UTC) |
| **To:** | John Zutter[jz@dundon.co] |
| **Cc:** | Charlie Ebersol[ce@aaf.com]; Kevin Farrell[kevin.farrell@aaf.com]; Kellie Vugrincic[KellieV@aaf.com]; Jason Kulas[jason.kulas@aaf.com]; Jeff Vanderbilt[jv@dundon.co]; Wood, Trey[trey.wood@bracewell.com]; Steven Fleming (US - ADVS)[steven.fleming@pwc.com]; Annie Gerhart[annie@aaf.com]; Brian Koluch (US - Advisory)[brian.koluch@pwc.com]; Kevin Freedman[kevin@aaf.com]; Cohen, Jason[jason.cohen@bracewell.com] |
| **Subject:** | Updated Plan - Requesting Immediate Approval |
| **Attachment:** | 12 Week Overview v4.xlsx |

John - attached please find the current plan as it stands. We just walked through these numbers with Jason and Jeff and are requesting your approval to move forward with this version of the employee retention plan with no changes since the last version. We understand this is a fluid situation and things might change but due to timing constraints we are requesting approval for this list for now. I have also made the below tweaks to the numbers since the prior version you saw last.

1. Included $25k per month for the Bankruptcy Committee fees
2. Included $15k one-time upfront payment for the U.S. Appointee
3. We also just heard that Miami Air will be refunding us ~$500k which I have included in the analysis as well.

This leaves us with about ~$460k of cushion under the current plan. Again, this will be fluid and there will be changes as we look to be more efficient but given timing we are requesting your approval ASAP to move forward with the current plan.

Please send your approval/confirmation.

Best,
Alan

--
Alan Kantowitz
Strategy Lead

516.680.0478
AAF.com

| Date | Amount | |
|---|---|---|
| 2/14/2019 | $5,100,000 | |
| 2/19/2019 | $8,500,000 | |
| 2/26/2019 | $6,250,000 | |
| 2/28/2019 | $1,500,000 | |
| 3/4/2019 | $5,000,000 | |
| 3/7/2019 | $4,000,000 | |
| 3/13/2019 | $4,000,000 | |
| 3/13/2019 | $6,800,000 | |
| 3/15/2019 | $2,300,000 | |
| 3/19/2019 | $7,800,000 | |
| 3/27/2019 | $7,200,000 | |
| 3/29/2019 | $2,850,000 | |
| 4/2/2019 | $6,950,000 | *Leftover* |
| **Total DCP funds to date:** | **$68,250,000** | *$1,750,000* |
| | | |
| Salary + Benefits for 4/1 through 4/3: | $743,202 | |
| **Funds required through 4/3:** | **$68,993,202** | *$1,006,798* |
| | | |
| 12 Week Plan Funds Required: | $545,610 | |
| **Total DCP Commitment:** | **$69,538,811** | *$461,189* |

**ESMG 12 Week Cash Flows**

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| # of employees | 61 | 61 | 20 | 20 | 9 | 9 | 9 | 9 | 0 | 0 | 0 | 0 | |
| Cash not yet received from invoices for local sponsorship | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $108,049 | $0 | $0 | $0 | $0 | $108,049 |
| Cash not yet invoiced for local sponsorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 252,625 | 0 | 0 | 0 | 0 | 252,625 |
| Cash not yet received from invoices for national sponsorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash not yet invoiced for national sponsorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 345,391 | 0 | 0 | 0 | 0 | 345,391 |
| Outstanding Merchandise Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 50,000 | 0 | 0 | 0 | 0 | 50,000 |
| Outstanding Ticket Sales Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Revenue Collection** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $756,064 | $0 | $0 | $0 | $0 | $756,064 |
| **Proceeds from sale of Assets** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $350,000 | $0 | $0 | $0 | $0 | $350,000 |
| **Miami Air Refund** | $0 | $0 | $500,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $500,000 |
| Employee Compensation | $0 | $151,596 | $0 | $87,067 | $0 | $70,400 | $0 | $70,400 | $0 | $0 | $0 | $0 | $379,462 |
| FICA | 0 | 11,673 | 0 | 6,704 | 0 | 5,421 | 0 | 5,421 | 0 | 0 | 0 | 0 | 29,219 |
| Insurance Benefits | 0 | 19,063 | 0 | 6,250 | 0 | 2,813 | 0 | 2,813 | 0 | 0 | 0 | 0 | 30,938 |
| **Total Employee Compensation and Benefits** | $0 | $182,331 | $0 | $100,021 | $0 | $78,633 | $0 | $78,633 | $0 | $0 | $0 | $0 | $439,618 |
| Retention Bonuses | $64,000 | $0 | $0 | $23,708 | $0 | $0 | $0 | $23,708 | $0 | $0 | $0 | $0 | $111,417 |
| Incentive Bonuses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Bonus Payout** | $64,000 | $0 | $0 | $23,708 | $0 | $0 | $0 | $23,708 | $0 | $0 | $0 | $0 | $111,417 |
| Bankruptcy Committee | $25,000 | $0 | $0 | $0 | $25,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $50,000 |
| U.S. Appointee | 15,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 15,000 |
| **Total Bankruptcy Administrative Fees** | $40,000 | $0 | $0 | $0 | $25,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $65,000 |
| Legal/Advisory Fees - Bracewell etc. | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $400,000 | $0 | $0 | $0 | $0 | $400,000 |
| Consulting Fees - PWC etc. | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 150,000 | 0 | 0 | 0 | 0 | 150,000 |
| DCP Transaction Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 280,810 | 0 | 0 | 0 | 0 | 280,810 |
| Player Exit Medical Evaluations | 50,000 | 50,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100,000 |
| **Total Professional Fees** | $50,000 | $50,000 | $0 | $0 | $0 | $0 | $0 | $830,810 | $0 | $0 | $0 | $0 | $930,810 |
| D&O Insurance | | | | | | | | | | | | | $0 |
| Other Insurance | | | | | | | | | | | | | 0 |
| Bills Due to Continue Employee Benefits | 210,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 210,000 |
| **Insurance** | $210,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $210,000 |
| Travel | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $0 | $0 | $0 | $0 | $40,000 |
| Rent/Storage | 0 | 0 | 0 | 50,000 | 0 | 0 | 0 | 50,000 | 0 | 0 | 0 | 0 | 100,000 |
| Utilities | 0 | 0 | 0 | 8,333 | 0 | 0 | 0 | 8,333 | 0 | 0 | 0 | 0 | 16,667 |
| Payroll Processing System (Paycor) | 0 | 305 | 0 | 100 | 0 | 45 | 0 | 45 | 0 | 0 | 0 | 0 | 495 |
| **Total SG&A** | $5,000 | $5,305 | $5,000 | $63,433 | $5,000 | $5,045 | $5,000 | $63,378 | $0 | $0 | $0 | $0 | $157,162 |
| Fedex/Shipping | $75,208 | $5,208 | $5,208 | $5,208 | $5,208 | $5,208 | $5,208 | $5,208 | $0 | $0 | $0 | $0 | $111,667 |
| Subscription services | 0 | 0 | 0 | 3,000 | 0 | 0 | 0 | 3,000 | 0 | 0 | 0 | 0 | 6,000 |
| Company Contingecy | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 0 | 0 | 0 | 0 | 120,000 |
| **Total Material Ancillary Services** | $90,208 | $20,208 | $20,208 | $23,208 | $20,208 | $20,208 | $20,208 | $23,208 | $0 | $0 | $0 | $0 | $237,667 |
| **Total Expenses** | $459,208 | $257,844 | $25,208 | $210,371 | $50,208 | $103,887 | $25,208 | $1,019,738 | $0 | $0 | $0 | $0 | $2,151,673 |
| **Total Cash Flow** | -$459,208 | -$257,844 | $474,792 | -$210,371 | -$50,208 | -$103,887 | -$25,208 | $86,325 | $0 | $0 | $0 | $0 | -$545,610 |

| Employee Name | Title | Full time Employee unless noted | Manager | Location | Base Salary | Bonus | Bonus Amount | Bonus due | Hire Date | Time in Role | Severance TBD | Key Focus Areas for Transition | 90-day Transition Salary Continuation | 60-day Transition Salary Continuation | 30-day Transition Salary Continuation | 2 week Transition Salary Continuation | Retention Bonus Amount (equivalent 1 month base) | 2 months' salary continuation (extend termination date) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Charlie Ebersol | Co-founder & CEO | | Board | San Francisco | $350,000 | | | | 3/1/2018 | 13 months | | Executive League Mgmt & IR | | $58,333 | | | | $29,167 |
| Alan Kantowitz | Strategy & Analytics Lead | | Charlie Ebersol | San Francisco | $175,000 | | $67,500 | 4/18/2019 | 4/18/2018 | 11 months | | Investor Relations & Financial Mgmt | | $29,167 | | | | $14,583 |
| Annie Gehrhart | Chief of Staff | | Charlie Ebersol | Remote - CA | $200,000 | | $15,000 | 4/2/2019 | 4/2/2018 | 11 months | | Business Operations | | | $15,667 | | | |
| Kevin Farrell | Head of Corporate Operations | | Charlie Ebersol | Tampa | $240,000 | | | | 1/31/2019 | 4 months | | Finance Operations | | | | | | $20,000 |
| Jane LeFevre | Interim Controller | Consultant Clifton Larson Allen | Kevin Farrell | Tampa | | | | | | | | Finance Operations | $40,000 | | | | | |
| Rosie Shmyel | Senior Accountant | | Kevin Farrell | Tampa | $80,000 | | | | 12/13/2018 | 3 months | | Accounting | | $41,600 | | | $12,000 | |
| | | | | | | | | | | | | | | | $13,333 | | $6,667 | |
| Kellie Vugrincic | Head of People | | Charlie Ebersol | Remote - TX | $250,000 | | | | 1/2/2019 | 3 months | | Employee & Org Transition | | $41,667 | | | | $20,833 |
| Anna Ciserano | VP People Operations | | Kellie Vugrincic | Tampa | $120,000 | | $15,000 | 6/11/2019 | 6/11/2018 | 9 months | | Employee Transitions | | | $13,333 | | $10,000 | |
| Jim Brantz | Payroll Manager | | Kellie Vugrincic | Tampa | $75,000 | | | | 2/14/2018 | 1 month | | payroll & compliance | | | | | | |
| Megan Hanson | Head of Communications | | Charlie Ebersol | Tampa | $150,000 | | $15,000 | 4/2/2019 | 4/2/2018 | 1 year | | Communications | | | $6,250 | | | |
| Kerwin Lonzo | VP Football Communications | | Megan Hanson | Tampa | $150,000 | | | | 9/4/2018 | 6 months | | Communications | | | $12,500 | | | |
| Jake Gellerman | Communications Manager | | Megan Hanson | Remote - NY | $80,000 | | | | 2/4/2019 | 2 months | | Communications | | | | $5,769 | | |
| Erik Schwartz | Head of Platform | | Charlie Ebersol | San Francisco | $200,000 | | | | 3/1/2018 | 1.1 years | | Technology transition | | | | $3,077 | | |
| Mike Mazuin | VP Engineering | | Erik Schwartz | San Francisco | $240,000 | | $24,000 | 6/1/2019 | 6/1/2018 | 10 months | | Technology transition | | $16,667 | | | | $16,667 |
| Kevin Killough | IT Manager | | Erik Schwartz | San Francisco | $115,000 | | | | 5/21/2018 | 10 months | | IT system administration | | | $20,000 | | | $20,000 |
| Jen Darmstadt-Holm | IT - System Administrator | | Erik Schwartz | San Francisco | $115,000 | | | | 1/2/2019 | 3 months | | IT system administration | | $19,167 | | $9,583 | | |
| Valerie Alou | VP, Legal & Worker's Comp | | Erik Schwartz | Tampa | $110,000 | | | | 11/1/2018 | 5 months | | Worker's Compensation administration | | | $9,583 | | | |
| Cody Sandowski | Worker's Comp manager | | Valerie Alou | Tampa | $65,000 | | | | 2/1/2019 | 2 months | | Worker's Compensation administration | | | $9,167 | | $9,167 | |
| Tom Veit | Head of Business | | Charlie Ebersol | Tampa | $250,000 | | $34,000 | 5/1/2019 | 5/1/2018 | 11 months | | Business Operations | | $20,833 | | $2,500 | | $20,833 |
| Brendan McQillan | VP, Consumer Products | | Tom Veit | Tampa | $150,000 | $150,000 | | | 10/29/2018 | 5 months | | winding down merchandise & licensing | | | | $5,769 | | |
| Jo Drigotta | VP, Business Operations | | Tom Veit | Tampa | $93,500 | | | | 4/10/2018 | 11 months | | operations winddown | | | | $3,596 | | |
| Eric Blanc | VP Team Logistics | | Tom Veit | Tampa | $130,000 | | | | 5/1/2018 | 11 months | | stadium property & operational windown | | | | $5,000 | | |
| Larry Antonucci | Director, Stadium Operations | | Tom Veit | Tampa | $120,000 | | | | 10/1/2018 | 6 months | | stadium property & operational windown | | | | $4,615 | | |
| Pat Burnham | Logistics Manager | | Tom Veit | Remote - FL | $60,000 | | | | 12/10/2018 | 4 months | | stadium property & operational windown | | | | $2,308 | | |
| Vic Gregovits | Team President | | Tom Veit | San Antonio | $175,000 | | | | 9/4/2018 | 7 months | | East region +A transition | | | | $6,731 | | |
| Jeff Garner | Team President | | Tom Veit | San Diego | $200,000 | | | | 9/4/2018 | 7 months | | West region transition | | | | $7,692 | | |
| Tyler Howell | placeholder Utah | | Tom Veit | Utah | $200,000 | | | | | | | local market transition | | | | $7,692 | | |
| Andraveka Irby | placeholder Memphis | | Tom Veit | Memphis | $200,000 | | | | | | | local market transition | | | | $7,692 | | |
| Scott Brubaker | placeholder Arizona | | Tom Veit | Arizona | $200,000 | | | | | | | local market transition | | | | $7,692 | | |
| Jay Robertson | placeholder Birmingham | | Tom Veit | Birmingham | $75,000 | | | | | | | local market transition | | | | $2,885 | | |
| Mike Wardell | placeholder Orlando | | Tom Veit | Orlando | $150,000 | | | | | | | local market transition | | | | $5,769 | | |
| David Livingston | place holder Atlanta | | Tom Veit | Atlanta | $175,000 | | | | | | | local market transition | | | | $6,731 | | |
| Russ Giglio | Director, Player Personnel | | Bill Pollan | Remote - NY | $125,000 | | | | 4/18/2018 | 11 months | | player /agent comms & contracts | | | | $4,808 | | |
| Joey Roberts | Sr. Admin , Player Personnel | | Bill Pollan | Remote - CA | $125,000 | | | | 5/1/2018 | 11 months | | player /agent comms & contracts | | | | $4,808 | | |
| Pat Kersey | Head of Medical | | Bill Pollan | Remote - IN | $200,000 | | | | 7/9/2018 | 9 months | | player physicals/medical transition | | | | $7,692 | | |
| Iain Nelson | Director Football Operations - League | | Bill Pollan | Remote - IN | $175,000 | | | | 12/1/2018 | 4 months | | football ops transition | | | | $14,583 | | |
| Chad Klunder | Director Football Operations - League | | Bill Pollan | Remote - IN | $175,000 | | | | 12/1/2018 | 4 months | | football ops transition | | | | $14,583 | | |
| Chris Thompson | DFO Atlanta | | Chad Klunder | Atlanta | $75,000 | | | | | | | local market transition | | | | $2,885 | | |
| Agshith Mogulla | DFO Arizona | | Chad Klunder | Arizona | $45,000 | | | | | | | local market transition | | | | $1,731 | | |
| Ron Selesky | DFO Birmingham | | Chad Klunder | Birmingham | $75,000 | | | | | | | local market transition | | | | $2,885 | | |
| Blake Beddingfield | DFO Memphis | | Chad Klunder | Memphis | $80,000 | | | | | | | local market transition | | | | $3,077 | | |
| Colin Clark | Video Director | | Chad Klunder | Memphis | $75,000 | | | | | | | local market transition | | | | $2,885 | | |
| Thaddeus Rivers | DFO Orlando | | Chad Klunder | Orlando | $80,000 | | | | | | | local market transition | | | | $3,077 | | |
| Ryan Hollern | DFO SLC | | Chad Klunder | Salt Lake City | $85,000 | | | | | | | local market transition | | | | $3,269 | | |
| Darwin Beacham | League Equipment Manager | | Bill Pollan | San Antonio | $110,000 | | | | 11/1/2018 | | | equipment/property mgmt Warehouse | $18,333 | | | | | |
| Sterling-Michael Beacham | Equipment/Asset Mgmt San Antonio | | | San Antonio | $50,000 | | | | | | | equipment/property mgmt Warehouse | | | $4,167 | | | |
| Cortez Robinson | Equipment/Asset Mgmt Atlanta | | | Atlanta | $90,000 | | | | | | | local market equipment return | | | | $3,462 | | |
| Scott Notier | Equipment/Asset Mgmt Arizona | | | Arizona | $80,000 | | | | | | | local market equipment return | | | | $3,077 | | |
| Bob Wick | Equipment/Asset Mgmt Birmingham | | | Birmingham | $100,000 | | | | | | | local market equipment return | | | | $3,846 | | |
| Jeff Bower | Equipment/Asset Mgmt Memphis | | | Memphis | $90,000 | | | | | | | local market equipment return | | | | $3,462 | | |
| Drake Leichtfuss | Equipment/Asset Mgmt Orlando | | | Orlando | $80,000 | | | | | | | local market equipment return | | | | $3,077 | | |
| Ben Dolan | Equipment/Asset Mgmt SLC | | | Salt Lake City | $75,000 | | | | | | | local market equipment return | | | | $2,885 | | |
| Darryl MaGee | Equipment/Asset Mgmt San Diego | | | San Diego | $90,000 | | | | | | | local market equipment return | | | | $3,462 | | |

| Employee Name | Title | Full time Employee unless noted | Manager | Location | Base Salary | Bonus | Bonus Amount | Bonus due | Hire Date | Time in Role | Severance TBD | Key Focus Areas for Transition | 90-day Transition Salary Continuation | 60-day Transition Salary Continuation | 30-day Transition Salary Continuation | 2 week Transition Salary Continuation | Retention Bonus Amount (equivalent 1 month base) | 2 months salary (continuation extend termination date) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Rachel Sharpe | Athletic Trainer Atlanta | | | Atlanta | $140,000 | | | | | | | conduct player physicals | | | | $2,692 | | |
| Todd Champlin | Athletic Trainer Arizona | | | Arizona | $140,000 | | | | | | | conduct player physicals | | | | $2,692 | | |
| Greg McMillen | Athletic Trainer Birmingham | | | Birmingham | $140,000 | | | | | | | conduct player physicals | | | | $2,692 | | |
| Casey Carter | Athletic Trainer Memphis | | | Memphis | $145,000 | | | | | | | conduct player physicals | | | | $2,788 | | |
| Nathan Peck | Athletic Trainer Orlando | | | Orlando | $138,000 | | | | | | | conduct player physicals | | | | $2,654 | | |
| Brian Zettler | Athletic Trainer SLC | | | Salt Lake City | $135,000 | | | | | | | conduct player physicals | | | | $2,596 | | |
| Phillip Hedrick | Athletic Trainer San Antonio | | | San Antonio | $140,000 | | | | | | | conduct player physicals | | | | $2,692 | | |
| Ryan Juarez | Athletic Trainer San Diego | | | San Diego | $137,500 | | | | | | | conduct player physicals | | | | $2,644 | | |
| | | | | | | | | | | | | | | | | | $47,417 | $142,083 |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | # of Employees | 0 | 9 | 11 | 41 | | |
| | | | | | | | | | | | | | Cummulative Employees | 0 | 9 | 20 | 61 | | |
| | | | | | | | | | | | | | Total Salary | $0 | $281,600 | $83,333 | $64,529 | | |
| | | | | | | | | | | | | | Total | $379,462 | | | | | |

**People Payments**
4.1.19

| | Amount | Notes |
|---|---|---|
| Players: Wk 8 | $3,607,620 | Week 8 |
| Referees | $200,000 | Week 7 & 8 |
| AAF Consultants | $320,192 | Details Below |
| Broadcast Talent | $619,310 | Total Billed through week 8; Additional $271K due but Not Billed; Details Below |
| Alliance Productions | $524,976 | Current outstanding balance due |
| Other Crewing | $117,817 | TRO ($900); Rhino ($13,088); Mountain Pics($21,729); PCS ($18,283); PPI ($63,817) |
| Commissions: Ticket Sales | $35,000 | Estimate; Was $42K for February |
| | $5,424,915 | Proposed People Payments for 4/2 |

**Consultants**

| | | |
|---|---|---|
| Suzan Ramsey | $4,960 | HR; Through March |
| Carmen Mason | $9,500 | Through March 24th |
| Michael Aagard | $7,200 | Through Week 7 |
| Paul Halsey | $12,560 | Camera Crewer: Current Due |
| Richard Darling | $6,250 | Through March |
| Aaron Young | $97,834 | Production Comms Support; Through Week 7 |
| Ken & Emerald Aagard | $60,000 | Production Leads; $15K/Month; Dec/Jan/Feb/Mar |
| Evan Hyde | $3,000 | IT support Memphis; Through March |
| Jordan Herald | $500 | Content Creator; Through March |
| Mark Seavey | $1,000 | X-Ray Support; March Games—ATL |
| Robert Hauxhurst (Crewline) | $750 | Production Asst.; Past Due |
| Brandon Thorn (Onin Staffing) | $2,142 | San Antonio—Street Team |
| Nate Conn (Robert Half) | $16,560 | Legal Clerk; Total Due; No future payments |
| Samuel Farber | $3,064 | Production Support for Preseason |
| Amar Shah | $676 | Print and Digital Media |
| Kellie Brady | $5,000 | HR Consultant; PayCor implentation Feb 1-15 |
| Trent Morue | $531 | AZ Marketing |
| Gary Brashear | $1,600 | BHAM Comms Setup |
| Chris Crocker | $1,200 | Through April 2nd |
| Randy Ribbeck | $10,500 | Football Ops ($1750/wk); Through March |
| Howard Balzer | $2,000 | Content Services (Dinn Mann) |
| Danny Devito | $1,225 | Graphics; Outstanding Invoices |
| L Michelle Walker | $8,280 | AAF Traffic Work (Sponsorships) |
| Edgar Evan | $2,925 | Shooter/Editor; Outstanding Balance |
| Chris Legaspi (Nerdmatics) | $26,275 | Engineering/Telmetry Support; Outstanding Balance |
| John McCrae | $4,500 | Production Logistics DBA Midway TV |
| Toby Graff | $15,000 | CSR for March |
| George Leland | $600 | Event promotions |
| Scott Moe | $960 | Copy Editing through March |
| Jessica Carter | $4,500 | DBA Goalline Comms; Atlanta |
| Carter Ellwood | $1,100 | Editing/Motion Graphics |
| Alaina Murray | $8,000 | Production Manager—March |
| | $320,192 | |

**FOR REVIEW: CE & AK**

| | | |
|---|---|---|
| McDowell Security Services | $4,787 | BHAM Security; Total Oustanding |
| CP Communications | $91,143 | Production People and Equipment; Current Due |
| Enfold IT | $8,875 | Engineering (Web) Consulting; Current Due |
| Sales Tax: Tickets | $285,660 | Below |

| Ticket Sales Tax | Tax | Due | |
|---|---|---|---|
| Atlanta Feb | | $13,158 | 3/15/2019 |
| Arizona Feb | | $13,899 | 3/15/2019 |
| Birmingham Feb | | $40,147 | 3/15/2019 |
| Memphis Feb | | $16,130 | 3/15/2019 |
| Orlando Feb | | $45,433 | 3/15/2019 |
| Salt Lake Feb | | $10,320 | 3/15/2019 |
| San Antonio Feb | | $99,339 | 3/15/2019 |
| San Diego Feb | | $47,234 | 3/15/2019 |
| | | $285,660 | |

| BROADCAST TALENT - Updated 4/1 | Due this week | Due Next week | Due by WK8 not billed |
|---|---|---|---|
| Adam Archuleta - Archuleta Entertainment | $7,910 | $7,500 | $7,500 |
| Alex Flangan - Aflanny Inc | $13,746 | $26,329 | |
| Andrew Siciliano - ADS Sports, Inc | $22,500 | | $15,000 |
| Ben Holden - WME Entertainment | $7,700 | | $15,000 |
| Dan Hellie - JDH Broadcasting | $47,206 | $7,805 | $7,500 |
| Jason Zone Fisher | $3,557 | $6,914 | |
| Mark Malone | $6,500 | $6,500 | $6,500 |
| Marvin Lewis | $75,000 | $60,617 | |
| Maurice Jones-Drew | $20,026 | | $40,000 |
| Rod Woodson | $40,000 | $40,000 | |
| Shaun O'Hara / 60 Soho Consulting, LLC | $100,000 | | |
| Steve Mariucci - The Montag Group | $20,000 | $20,000 | |
| Terrell Davis - ICM Partners | $48,000 | $24,000 | $48,000 |
| Rick Waltz - Big Ticket Inc | | $7,500 | |
| John Schriffen | | | $5,000 |
| Cynthia Frelund - WME Entertainment | | | $50,000 |
| Melanie Collins - Maxx Sports Entertainment Group Inc. | | | $4,000 |
| Kevin Carter - NOT SET UP | | | $22,500 |
| Matt Smith - NOT SET UP | | | $30,000 |
| Brock Huard - NOT SET UP | | | $15,000 |
| James Jones - NOT SET UP | | | $5,000 |
| Andrew Catalon - ICM Partners | | | |
| Brian Billick dba KB Productions | | | |
| Gary Danielson | | | |
| Jenny Dell - WME Entertainment | | | |
| Jamie Erdahl - WME | | | |
| Tiki Barber - Maxx Sports Entertainment Group Inc. | | | |

Trent Green - ICM Partners
Spero Dedes - The Montag Group
Kenneth (Mike) Smith dba Mike Smith

| | | | |
|---|---|---|---|
| **TOTAL** | $412,145 | $207,165 | $271,000 |
| **Total Billed through week 8** | | $619,310 | |
| **Total due through wk 8 including unbilled** | | | $890,310 |

| Payroll | Amount | Pay Date | Paid through Date | Daily Payroll |
|---|---|---|---|---|
| Player Payroll - Paycor | $3,607,620 | 2-Apr | 31-Mar | N/A |
| Players through 4/2 | $1,030,749 | | | |
| Coaches, Trainers, Equipment Managers payroll - Paycor | $145,800 | 2-Apr | 2-Apr | $73,000 |
| CA payroll - Paycor | $80,730 | 2-Apr | 2-Apr | $40,365 |
| CA Bi-weekly payroll - Paycor | $4,000 | | | |
| Other EEs payroll - Sequioa | $209,080 | 2-Apr | 2-Apr | $104,540 |
| Other EEs payroll - Sequoia - bi-weekly | $32,000 | 2-Apr | 2-Apr | TBD based on timesheets |
| taxes NY & FL - Sequoia | $2,180 | 2-Apr | 2-Apr | N/A |
| off cycle extra | $1,032 | 2-Apr | 2-Apr | N/A |
| FSA YTD thru 3/31 | $12,028 | 31-Mar | | |
| Dependent Care YTD thry 3/31 | $7,118 | 31-Mar | | |
| Baylor Students - non/exempt owed | $1,500 | 22-Mar | | |
| **TOTAL** | **$5,133,836** | | | **$217,905** |
| **Bills Due to Continue Employee Benefits** | | | | Estimate |
| Anthem | pending 4/2 | 2-Apr | | $150,000 |
| Kaiser | pending 4/2 | 2-Apr | | $15,000 |
| Delta Dental | pending 4/2 | 2-Apr | | $30,000 |
| VSP | pending 4/2 | 2-Apr | | $10,000 |
| BRI | pending 4/2 | 2-Apr | | $5,000 |
| **Outstanding commitments People team resource operations** | | | | |
| Hiregy (Jim Brantz, Carmen Mason) | $15,000 | now | | |
| Suz Ramsey | TBD checking w/ Jane | now | | |
| **Outstanding commitments per severance agreements** | | | | |
| Brad Childress | $1,437 | now | | |
| Emilio Rojas | $4,870 | now | | |
| Hal Mumme | $30,000 | now | | |
| Randy Campbell | $3,847 | now | | |

| Paycor | Cash Requirement | Modeled Assumption through Friday 4/5 (except players 3/31) | DAILY BURN |
|---|---|---|---|
| LFE2 Bi-weekly | $4,000 | Est. based on last bi-weekly being $7,400 | $286 |
| LFE2 CA Employees | $201,827 | | $40,365 |
| Player AZ | $421,163 | | |
| Player ATL | $459,657 | | |
| Player BIRM | $474,590 | | |
| Player MEM | $482,228 | | |
| Player ORL | $428,960 | | |
| Player SL | $489,698 | | |
| Player SA | $414,457 | | |
| Player SD | $436,870 | | |
| | $3,607,620.90 | Total 8 Player Payrolls | |
| Coaches, Trainers, Equipment Mgrs | $364,500 | | $72,900 |
| | | | |
| Paycor Total | $4,177,947 | | |
| | | | |
| Sequoia | | | |
| Staff Bi-weekly | $32,100 | Est based on 3/29 pay date | |
| Staff Semimonthly | $522,698 | Pay 40 hours and estimate tax and benefit liability | $104,540 |
| Off Cycle | $1,033 | | |
| SUI True up for FL and NY | $2,180 | | |
| | | | |
| Sequoia Total | $558,010 | | |
| | | | |
| GRAND TOTAL | $4,735,957 | | $218,091 |

**EXHIBIT**

**42**

Message

| | |
|---|---|
| **From:** | Alan Kantowitz [alan@aaf.com] |
| **Sent:** | 5/31/2018 8:59:14 PM |
| **To:** | Kevin Freedman [kevin@aaf.com] |
| **Subject:** | Cash Burn |
| **Attachments:** | LFXModel _20180504_Cash Burn.xlsx |

Kevin - attached please find a version of the model that includes a detailed tab on the cash burn analysis you asked for. Essentially what I did on this tab was pull in all of the various expenses throughout the model for June through December and assumed we have $5M in the bank as of June 1st.

I pushed out various expenses related to team personnel and hiring and also made assumptions around certain roles and expense items that we would probably hold off on for Year 1 given our liquidity needs. You can see this with the highlighted cells in Column N - and feel free to tweak the "switches" for each line/expense item as you see fit.

I also left comments in red in Column X for certain line items. These are mostly related to large items and asking you whether or not it is reasonable to push these out a bit, or whether or not the model is accounting for the timing of these payments correctly to begin with (i.e. benefits and bonuses).

As things currently stand we are scheduled to burn through the ~$5M towards the end of August or early September.

Let me know if you'd like to put some time on the calendar to talk through any of this after you have had a chance to review and play around with a few things.

Best,
Alan

--

*Alan Kantowitz*
*(516) 680-0478*
*alan@aaf.com*

Assumptions

## Key Revenue Assumptions

select which assumptions you want used in model from the drop-down below:
Base

| TEAM REVENUE DRIVERS | Baseline | Slow Ramp | Base | Aggressive |
|---|---|---|---|---|
| Tickets Sold | Baselines year 1 (XFL was 20K/game) | 15,000 | 17,500 | 22,500 |
| Tickets Sold years 2-3 | 16% baseline | 12% | 16% | 20% |
| Tickets Sold years 4-6 | 10% baseline | 9% | 10% | 12% |
| Tickets Sold years 7+ | 5% baseline | 4% | 5% | 7% |
| Ticket Sales Price Growth years 2-4 | 3% baseline | 2% | 3% | 5% |
| Tickets Sales Price Growth years 5+ | 4% baseline | 3% | 4% | 5% |
| Jersey Sponsorship year 1 | Baselines year 1 | 500,000 | 750,000 | 1,250,000 |
| Jersey Sponsorship years 2+ | 5% growth thereafter | 3% | 5% | 7% |
| In-Stadium year 1 | Baselines year 1 | 500,000 | 625,000 | 1,000,000 |
| In-Stadium years 2+ | 5% growth thereafter | 3% | 5% | 7% |
| Local TV/Digital Promo year 1 | Baselines year 1 | 500,000 | 625,000 | 1,000,000 |
| Local TV/Digital Promo years 2+ | 5% growth thereafter | 3% | 5% | 7% |
| Merchandise net per cap growth | 5% baseline | 3% | 5% | 7% |
| Average Ticket Price | | $40.00 | $50.00 | $60.00 |
| | | | | |
| NATIONAL REVENUE DRIVERS | | | | |
| National Sponsorships year 1 | Baselines year 1 | 5,000,000 | 12,250,000 | 20,000,000 |
| National Sponsorships years 2+ | 20% growth estimate thereafter | 8% | 20% | 15% |
| Broadcast years 3 & 4 | | 0 | 12,000,000 | 20,000,000 |
| Broadcast follow-on 2 year contracts | 50% growth estimate for each 2 year period thereafter | 25% | 50% | 75% |
| National Merchandise year 1 | Baselines year 1 | 1,000,000 | 1,250,000 | 1,500,000 |
| National Merchandise years 2+ | 10% growth thereafter | 8% | 10% | 15% |
| Playoff Ticket Sales Growth | 10% baseline | 8% | 10% | 15% |
| Playoff Tickets Sales Price Growth year 2 | 10% baseline in year 2 | 8% | 10% | 15% |
| Playoff Tickets Sales Price Growth years 3+ | 15% baseline in year 3 on | 10% | 15% | 20% |
| Playoff Merchandise net per cap growth | 5% baseline | 3% | 5% | 7% |
| Playoff Partnership Revenue growth | 50% year 2, 3% growth estimate thereafter | 2% | 3% | 5% |
| Playoff Ticket Sales Growth | 10% baseline | 8% | 10% | 15% |
| Championship Tickets Sales Price Growth year 2 | 15% baseline in year 2 | 10% | 15% | 20% |
| Championship Tickets Sales Price Growth years 3+ | 15% baseline in year 3 on | 10% | 15% | 20% |
| Championship Merchandise net per cap growth | 5% baseline | 3% | 5% | 7% |
| Championship Partnership Revenue growth | 10% baseline | 8% | 10% | 15% |
| | | | | |
| Digital Fantasy Drivers | | | | |
| US/CA Fantasy Market (M people) | | 59,300,000 | 59,300,000 | 59,300,000 |
| % Market Active | | 2% | 4% | 6% |
| % Active Paying | | 5% | 8% | 10% |
| ARPPU | baseline off tradtional fantasy in 2012 | $35.00 | $50.00 | $75.00 |

Assumptions

**Premium Data Drivers**

| | | | |
|---|---|---|---|
| % buying per game | 1% | 1% | 2% |
| per game price | $1.99 | $2.99 | $3.99 |
| % buying weekend package | 1% | 1% | 2% |
| per weekend price | $7.99 | $8.99 | $9.99 |
| Number of games | 43 | 43 | 43 |

**Gaming**

| | | | |
|---|---|---|---|
| % of Fantasy players active in gaming | 15% | 25% | 33% |
| Total weeks available | 12 | 12 | 12 |
| % of weeks user active | 8% | 25% | 33% |
| Avg. wager per week | $50.00 | $100.00 | $150.00 |
| League hold rate | 2% | 5% | 10% |
| Total gaming revenue | | | |

Assumptions

| Key Expense Assumptions | | | |
|---|---|---|---|
| League Operating Expenses Annual Escalation Factor | 4% | 3% | 2% |
| Team Operating Expenses Annual Escalation Factor | 4% | 3% | 2% |
| League Benefits as a % of Salary Expense | 20% | 20% | 20% |
| Team Benefits as a % of Salary Expense | 20% | 20% | 20% |
| LFE Tech Benefits as a % of Salary Expense | 25% | 25% | 25% |
| Team Front Office Bonus as a % of Salary Expense | 12% | 10% | 8% |
| Player Benefits as a % of Salary Expense | 23% | 20% | 18% |
| Player Workers Comp as a % of Salary Expense | 35% | 30% | 25% |
| % of Fantasy Revenue paid to Players | 25% | 25% | 20% |
| % of trivia game Revenue paid out to users | 35% | 35% | 30% |
| % of Fans qualifying for Super Fan status | 10% | 10% | 10% |
| % of digital revenue available for fan win bonus | 10% | 10% | 10% |
| % of Super Fan Revenue Paid out | 25% | 25% | 15% |

P&L Outputs

| | 2018 | | | | 2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 |
| League Revenue | $0 | $0 | $0 | $0 | $8 | $13 | $0 | $1 |
| Team Revenue | 0 | 0 | 0 | 0 | 34 | $17 | 0 | 5 |
| Digital Revenue | 0 | 0 | 0 | 0 | 12 | $6 | 0 | 0 |
| PAL Receipts | 0 | 0 | 0 | 80 | 0 | 0 | 0 | 0 |
| **Total Revenue** | $0 | $0 | $0 | $80 | $53 | $36 | $0 | $6 |
| | | | | | | | | |
| League Expense | $1 | $3 | $8 | $10 | $19 | $4 | $5 | $6 |
| Team Expense | 0 | 2 | 5 | 9 | 60 | 26 | 4 | 8 |
| Player/Fan payouts | 0 | 0 | 0 | 0 | 12 | 7 | 0 | 0 |
| Digital Opex | 0 | 1 | 2 | 5 | 17 | 7 | 3 | 3 |
| PAL Distributions | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13 |
| **Total Expenses** | $1 | $6 | $15 | $24 | $109 | $44 | $13 | $30 |
| | | | | | | | | |
| Net Cash Flow | ($1) | ($6) | ($15) | $56 | ($55) | ($8) | ($13) | ($24) |
| Cumulative Net Cash Flow | ($1) | ($7) | ($22) | $34 | ($21) | ($29) | ($42) | ($65) |
| | | | | | | | | |
| **Revenue:** | | | | | | | | |
| League Revenue | N/A | N/A | N/A | 0% | 15% | 37% | N/A | 21% |
| Team Revenue | N/A | N/A | N/A | 0% | 63% | 46% | N/A | 79% |
| Digital Revenue | N/A | N/A | N/A | 0% | 22% | 18% | N/A | 0% |
| PAL Revenue | N/A | N/A | N/A | 100% | 0% | 0% | N/A | 0% |
| **Total Revenue** | N/A | N/A | N/A | 100% | 100% | 100% | N/A | 100% |
| **Expenses:** | | | | | | | | |
| League Expense | N/A | N/A | N/A | 12% | 35% | 10% | N/A | 98% |
| Team Expense | N/A | N/A | N/A | 11% | 113% | 74% | N/A | 126% |
| Total Player/Fan Payouts | N/A | N/A | N/A | 0% | 23% | 19% | N/A | 0% |
| Digital Expense | N/A | N/A | N/A | 7% | 33% | 20% | N/A | 51% |
| PALs Payouts | N/A | N/A | N/A | 0% | 0% | 0% | N/A | 195% |
| **Total Expenses** | N/A | N/A | N/A | 30% | 203% | 122% | N/A | 470% |
| | | | | | | | | |
| **Total Operating Income (Loss)** | N/A | N/A | N/A | 70% | N/A | N/A | N/A | N/A |



| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| League Revenue | $0 | $23 | $33 | $60 | $69 | $86 | $100 | $126 | $146 | $184 | $215 |
| Team Revenue | 0 | 55 | 64 | 120 | 135 | 181 | 205 | 260 | 282 | 351 | 381 |
| Digital Revenue | 0 | 18 | 34 | 75 | 110 | 177 | 236 | 327 | 411 | 545 | 661 |
| PAL Receipts | 80 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Revenue** | **$80** | **$96** | **$131** | **$255** | **$313** | **$444** | **$540** | **$712** | **$839** | **$1,080** | **$1,257** |
| | | | | | | | | | | | |
| League Expense | $22 | $34 | $35 | $40 | $40 | $45 | $46 | $50 | $51 | $55 | $56 |
| Team Expense | 15 | 99 | 102 | 131 | 135 | 167 | 172 | 207 | 213 | 251 | 259 |
| Player/Fan payouts | 0 | 19 | 25 | 42 | 51 | 71 | 83 | 104 | 117 | 139 | 151 |
| Digital Opex | 8 | 31 | 31 | 36 | 36 | 40 | 41 | 45 | 46 | 50 | 51 |
| PAL Distributions | 0 | 13 | 15 | 31 | 25 | 21 | 25 | 32 | 35 | 45 | 49 |
| **Total Expenses** | **$46** | **$195** | **$207** | **$279** | **$288** | **$344** | **$367** | **$438** | **$462** | **$540** | **$566** |
| | | | | | | | | | | | |
| Net Cash Flow | $34 | ($100) | ($77) | ($25) | $26 | $100 | $174 | $274 | $377 | $540 | $691 |
| Cumulative Net Cash Flow | $34 | ($65) | ($142) | ($167) | ($141) | ($42) | $132 | $407 | $784 | $1,324 | $2,015 |

| *Revenue:* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| League Revenue | 0% | 24% | 25% | 23% | 22% | 19% | 18% | 18% | 17% | 17% | 17% |
| Team Revenue | 0% | 58% | 49% | 47% | 43% | 41% | 38% | 36% | 34% | 32% | 30% |
| Digital Revenue | 0% | 19% | 26% | 29% | 35% | 40% | 44% | 46% | 49% | 50% | 53% |
| PAL Revenue | 100% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| **Total Revenue** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** | **100%** |
| *Expenses:* | | | | | | | | | | | |
| League Expense | 28% | 36% | 26% | 16% | 13% | 10% | 8% | 7% | 6% | 5% | 4% |
| Team Expense | 19% | 103% | 78% | 52% | 43% | 38% | 32% | 29% | 25% | 23% | 21% |
| Total Player/Fan Payout | 0% | 20% | 19% | 16% | 16% | 16% | 15% | 15% | 14% | 13% | 12% |
| Digital Expense | 11% | 32% | 24% | 14% | 12% | 9% | 8% | 6% | 5% | 5% | 4% |
| PAL Payouts | 0% | 13% | 12% | 12% | 8% | 5% | 5% | 4% | 4% | 4% | 4% |
| **Total** | **57%** | **204%** | **159%** | **110%** | **92%** | **78%** | **68%** | **61%** | **55%** | **50%** | **45%** |
| | | | | | | | | | | | |
| **Total Operating Income (Loss)** | **43%** | **N/A** | **N/A** | **N/A** | **8%** | **22%** | **32%** | **39%** | **45%** | **50%** | **55%** |

| *Live Event & Traditional Media* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $80 | $78 | $97 | $180 | $204 | $267 | $305 | $385 | $428 | $535 | $596 |
| Expense | $37 | $146 | $152 | $202 | $200 | $233 | $243 | $289 | $300 | $351 | $364 |
| Live E & TM Income/(Loss) | $43 | ($68) | ($55) | ($22) | $3 | $34 | $62 | $96 | $129 | $184 | $232 |

| *Digital Business* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $0 | $18 | $34 | $75 | $110 | $177 | $236 | $327 | $411 | $545 | $661 |
| Expense | $8 | $50 | $56 | $77 | $87 | $111 | $124 | $149 | $162 | $189 | $202 |
| Digital business Income/(Loss) | ($8) | ($32) | ($22) | ($3) | $23 | $66 | $112 | $178 | $248 | $356 | $459 |



1.1 20180531 TR0000522110 TR0000522111.XLSX

P&L Outputs

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Football Revenue | $0 | $78 | $97 | $180 | $204 | $267 | $305 | $385 | $428 | $535 | $596 |
| Digital Revenue | 0 | 18 | 34 | 75 | 110 | 177 | 236 | 327 | 411 | 545 | 661 |
| **Total Revenue** | $0 | $96 | $131 | $255 | $313 | $444 | $540 | $712 | $839 | $1,080 | $1,257 |
| | | | | | | | | | | | |
| Digital Payouts | $0 | $19 | $25 | $42 | $51 | $71 | $83 | $104 | $117 | $139 | $151 |
| Football Expenses | 37 | 133 | 137 | 171 | 176 | 212 | 218 | 257 | 264 | 307 | 315 |
| Digital Expenses | 8 | 31 | 31 | 36 | 36 | 40 | 41 | 45 | 46 | 50 | 51 |
| **Total Expenses** | $46 | $183 | $192 | $248 | $263 | $323 | $342 | $406 | $427 | $496 | $517 |
| | | | | | | | | | | | |
| **Total Operating Income (Loss)** | ($46) | ($87) | ($62) | $6 | $51 | $121 | $199 | $306 | $413 | $585 | $740 |
| **% Margin** | N/A | N/A | N/A | 2.5% | 16.1% | 27.2% | 36.7% | 43.0% | 49.2% | 54.1% | 58.9% |
| | | | | | | | | | | | |
| Season | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| # of Teams | | 8 | 8 | 10 | 10 | 12 | 12 | 14 | 14 | 16 | 16 |
| Tickets Per Game (000s) | | 18 | 20 | 24 | 26 | 28 | 31 | 33 | 35 | 36 | 38 |
| # of Active Fantasy Players (000s) | | 2,372 | 2,965 | 3,558 | 4,151 | 4,744 | 5,337 | 5,930 | 6,523 | 7,116 | 7,709 |
| Digital ARPU | | $7.63 | $11.47 | $20.98 | $26.43 | $37.24 | $44.14 | $55.15 | $62.97 | $76.59 | $85.71 |
| | | | | | | | | | | | |
| PAL Receipts | $80 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| PAL Distributions | 0 | 13 | 15 | 31 | 25 | 21 | 25 | 32 | 35 | 45 | 49 |
| **PAL Related Income** | $80 | ($13) | ($15) | ($31) | ($25) | ($21) | ($25) | ($32) | ($35) | ($45) | ($49) |
| | | | | | | | | | | | |
| **Net Cash Flow** | $34 | ($100) | ($77) | ($25) | $26 | $100 | $174 | $274 | $377 | $540 | $691 |



Monthly Burn Model

**Summary P&L**

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | January-18 | February-18 | March-18 | April-18 | May-18 | June-18 | July-18 | August-18 | September-18 | October-18 | November-18 | December-18 | January-19 |
| Step-Up | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Year | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2019 |
| Quarter | 1 | 1 | 1 | 2 | 2 | 2 | 3 | 3 | 3 | 4 | 4 | 4 | 1 |
| # of Teams | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| | | | | | | | | | | | | | |
| Licenses Sold | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 |
| PALs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 8 |
| | | | | | | | | | | | | | |
| Total League Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,700,000 |
| Total Team Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,200,000 |
| Digital Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Licensing Income | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 80,000,000 | 0 |
| **Total Revenue** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 580,000,000 | $12,900,000 |
| | | | | | | | | | | | | | |
| Total League Expense | $117,000 | $212,000 | $562,000 | $799,800 | $927,013 | $1,291,013 | $1,417,313 | $1,853,413 | $5,175,612 | $4,050,079 | $2,651,812 | $2,965,146 | $9,705,146 |
| Total Team Expense | 0 | 0 | 0 | 0 | 208,000 | 1,376,000 | 1,896,000 | 1,484,000 | 1,484,000 | 1,484,000 | 1,684,000 | 5,764,000 | 15,656,250 |
| Total Player/Fan payouts | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Digital Opex | 0 | 0 | 170,012 | 245,484 | 360,484 | 472,776 | 485,692 | 592,317 | 713,817 | 1,405,526 | 2,096,151 | 1,919,276 | 6,859,983 |
| PALs Payout | | | | | | | | | | | | | |
| **Total Expenses** | $117,000 | $212,000 | $732,012 | $1,049,284 | $1,495,496 | $3,139,788 | $3,800,605 | $3,929,730 | $7,373,429 | $6,939,605 | $6,431,963 | $10,648,421 | $32,221,379 |
| | | | | | | | | | | | | | |
| Team Operating Income (Loss) | ($117,000) | ($212,000) | ($732,012) | ($1,049,284) | ($1,495,496) | ($3,139,788) | ($3,800,605) | ($3,929,730) | ($7,373,429) | ($6,939,605) | ($6,431,963) | $69,351,579 | ($19,321,379) |
| Cumulative Operating Income (Loss) | ($117,000) | ($329,000) | ($1,061,012) | ($2,110,296) | ($3,605,792) | ($6,745,580) | ($10,546,185) | ($14,475,914) | ($21,849,344) | ($28,788,949) | ($35,220,911) | $34,130,668 | $14,809,289 |
| COH | | | 5,340,929 | 4,291,645 | 2,796,149 | (343,639) | (4,144,244) | (8,073,974) | (15,447,403) | (22,387,008) | (28,818,971) | 40,532,608 | 21,211,230 |
| | | | | | | | | | | | | | |
| **Revenue:** | | | | | | | | | | | | | |
| Total League Revenue | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0% | 21% |
| Total Team Revenue | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0% | 79% |
| Digital Revenue | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0% | 0% |
| Licensing Income | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100% | 0% |
| **Total Revenue** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 100% | 100% |
| **Expenses:** | | | | | | | | | | | | | |
| Total League Expense | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 4% | 75% |
| Total Team Expense | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 7% | 121% |
| Total Player/Fan payouts | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0% | 0% |
| Digital Opex | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0% | 53% |
| Licensor Profit Share (if profitable) | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 0% | 0% |
| **Total Expenses** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 13% | 250% |
| | | | | | | | | | | | | | |
| **Total Operating Income (Loss)** | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | 87% | N/A |
| | | | | | | | | | | | | | |
| **Live Event & Traditional Media** | | | | | | | | | | | | | |
| Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $80,000,000 | $12,900,000 |
| Expense | $117,000 | $212,000 | $562,000 | $799,800 | $1,135,013 | $2,667,013 | $3,313,313 | $3,337,413 | $6,659,612 | $5,534,079 | $4,335,812 | $8,729,146 | $25,361,396 |
| Live E & TM Income/(Loss) | ($117,000) | ($212,000) | ($562,000) | ($799,800) | ($1,135,013) | ($2,667,013) | ($3,313,313) | ($3,337,413) | ($6,659,612) | ($5,534,079) | ($4,335,812) | $71,270,855 | ($12,461,396) |
| | | | | | | | | | | | | | |
| **Digital Business** | | | | | | | | | | | | | |
| Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Expense | $0 | $0 | $170,012 | $249,484 | $360,484 | $472,776 | $485,692 | $592,317 | $713,817 | $1,405,526 | $2,096,151 | $1,919,276 | $6,859,983 |
| Digital business Income/(Loss) | $0 | $0 | ($170,012) | ($249,484) | ($360,484) | ($472,776) | ($485,692) | ($592,317) | ($713,817) | ($1,405,526) | ($2,096,151) | ($1,919,276) | ($6,859,983) |

Monthly Burn Model

| | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | February-19 | March-19 | April-19 | May-19 | June-19 | July-19 | August-19 | September-19 | October-19 | November-19 | December-19 | | | | | | |
| | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | Year | 2018 | 2019 | 2020 | 2021 | |
| | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | Quarter | 4 | 4 | 4 | 4 | |
| | 1 | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 4 | 4 | 4 | | | | | | |
| | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | 8 | 0 | 2 | 0 | |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | |
| | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | | | | |
| | $2,700,000 | $2,700,000 | $2,700,000 | $10,450,000 | $0 | $0 | $0 | $0 | $0 | $0 | $1,350,000 | | $0 | $22,600,000 | $32,061,500 | $59,533,238 | |
| | 11,460,000 | 11,880,000 | 11,460,000 | 5,100,000 | 0 | 0 | 0 | 0 | 0 | 0 | 5,100,000 | | 0 | 55,200,000 | 63,733,600 | 120,391,158 | |
| | 5,051,326 | 6,735,102 | 5,691,326 | 1,262,832 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 18,100,586 | 13,995,463 | 74,637,548 | |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 80,000,000 | 0 | 0 | 0 | |
| | $19,211,326 | $21,315,102 | $19,211,326 | $16,812,832 | $0 | $0 | $0 | $0 | $0 | $0 | $6,450,000 | | $80,000,000 | $95,900,586 | $130,892,563 | $254,561,743 | |
| | $5,175,146 | $3,720,146 | $1,401,813 | $881,813 | $1,381,813 | $1,381,813 | $1,881,813 | $2,215,146 | $1,892,613 | $2,225,146 | $2,225,146 | | $22,022,799 | $34,067,548 | $34,536,861 | $39,572,448 | |
| | 22,477,463 | 22,077,463 | 18,837,463 | 6,209,000 | 1,444,000 | 1,644,000 | 1,444,000 | 1,444,000 | 1,444,000 | 1,444,000 | 5,209,000 | | 15,380,000 | 99,130,640 | 102,104,509 | 131,459,620 | |
| | 5,332,905 | 7,110,540 | 5,332,905 | 1,333,226 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 19,109,576 | 24,590,503 | 41,651,777 | |
| | 5,732,637 | 4,843,137 | 5,362,605 | 901,033 | 901,033 | 901,033 | 901,033 | 901,033 | 1,201,033 | 1,201,033 | 901,033 | | 8,466,533 | 30,605,630 | 31,065,729 | 35,531,428 | |
| | | | | | | | | | | | 12,590,000 | | 0 | 12,560,000 | 15,120,000 | 31,117,347 | |
| | $38,718,151 | $37,751,286 | $30,934,786 | $9,325,072 | $3,726,846 | $3,726,846 | $4,226,846 | $4,560,179 | $4,537,646 | $4,870,179 | $20,899,179 | | $45,869,332 | $195,494,394 | $207,449,823 | $279,332,620 | |
| | ($19,506,825) | ($16,436,184) | ($11,723,460) | $7,487,790 | ($3,726,846) | ($3,726,846) | ($4,226,846) | ($4,560,179) | ($4,537,646) | ($4,870,179) | ($14,449,179) | | $34,130,668 | ($99,593,808) | ($76,797,260) | ($24,770,877) | |
| | ($4,697,536) | ($21,133,720) | ($32,857,180) | ($25,369,421) | ($29,096,267) | ($32,823,113) | ($37,049,959) | ($41,610,137) | ($46,147,783) | ($51,017,962) | ($65,453,341) | | $34,130,668 | ($55,463,141) | ($143,270,400) | ($168,891,277) | |
| | 1,704,405 | (14,731,780) | (24,455,240) | (16,967,460) | (20,694,326) | (26,421,171) | (30,648,018) | (35,208,196) | (39,745,842) | (44,616,021) | (59,061,200) | | | | | | |
| | 14% | 13% | 14% | 52% | N/A | N/A | N/A | N/A | N/A | N/A | 21% | | 0% | 24% | 25% | 23% | |
| | 60% | 56% | 60% | 30% | N/A | N/A | N/A | N/A | N/A | N/A | 79% | | 0% | 58% | 49% | 47% | |
| | 26% | 32% | 26% | 8% | N/A | N/A | N/A | N/A | N/A | N/A | 0% | | 0% | 19% | 16% | 29% | |
| | 0% | 0% | 0% | 0% | N/A | N/A | N/A | N/A | N/A | N/A | 0% | | 100% | 0% | 0% | 0% | |
| | 100% | 100% | 100% | 100% | N/A | N/A | N/A | N/A | N/A | N/A | 100% | | 100% | 100% | 100% | 100% | |
| | 27% | 17% | 7% | 5% | N/A | N/A | N/A | N/A | N/A | N/A | 34% | | 28% | 35% | 26% | 16% | |
| | 117% | 104% | 98% | 37% | N/A | N/A | N/A | N/A | N/A | N/A | 81% | | 19% | 103% | 78% | 52% | |
| | 28% | 33% | 28% | 8% | N/A | N/A | N/A | N/A | N/A | N/A | 0% | | 0% | 20% | 19% | 16% | |
| | 30% | 23% | 28% | 5% | N/A | N/A | N/A | N/A | N/A | N/A | 14% | | 11% | 12% | 24% | 14% | |
| | 0% | 0% | 0% | 0% | N/A | N/A | N/A | N/A | N/A | N/A | 195% | | 0% | 13% | 12% | 12% | |
| | 202% | 177% | 161% | 55% | N/A | N/A | N/A | N/A | N/A | N/A | 324% | | 57% | 204% | 159% | 110% | |
| | N/A | N/A | N/A | 45% | N/A | N/A | N/A | N/A | N/A | N/A | N/A | | 43% | N/A | N/A | N/A | |
| | $14,150,000 | $14,580,000 | $14,160,000 | $15,550,000 | $0 | $0 | $0 | $0 | $0 | $0 | $6,450,000 | | $80,000,000 | $77,300,000 | $96,697,100 | $175,924,195 | |
| | $27,652,609 | $35,797,609 | $20,239,279 | $7,030,813 | $2,825,813 | $2,825,813 | $3,325,813 | $3,659,146 | $3,336,613 | $3,669,146 | $19,994,146 | | $37,402,799 | $145,778,188 | $151,821,500 | $202,169,415 | |
| | ($13,492,609) | ($11,217,609) | ($6,079,279) | $8,459,188 | ($2,825,813) | ($2,825,813) | ($3,325,813) | ($3,659,146) | ($3,336,613) | ($3,669,146) | ($13,544,146) | | $42,597,201 | ($67,978,188) | ($55,124,400) | ($27,245,220) | |
| | $5,051,326 | $6,735,102 | $5,051,326 | $1,262,832 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $18,100,586 | $33,065,463 | $74,637,548 | |
| | $11,065,542 | $11,953,677 | $10,695,510 | $2,234,260 | $901,033 | $901,033 | $901,033 | $901,033 | $1,201,033 | $1,201,033 | $901,033 | | $8,466,533 | $42,716,206 | $55,626,323 | $77,183,205 | |
| | ($6,014,216) | ($5,218,576) | ($5,644,184) | ($971,428) | ($901,033) | ($901,033) | ($901,033) | ($901,033) | ($1,201,033) | ($1,201,033) | ($901,033) | | ($8,466,533) | ($31,615,620) | ($21,638,859) | ($2,546,657) | |

981

Monthly Burn Model

| | Annual | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
| | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| | 2 | 0 | 2 | 0 | 2 | 0 | 0 |
| | $68,827,234 | $88,100,899 | $99,862,711 | $125,604,986 | $146,028,178 | $184,471,307 | $214,269,750 |
| | 134,812,917 | 183,318,135 | 204,877,773 | 259,760,346 | 282,354,930 | 350,830,515 | 381,499,467 |
| | 109,696,668 | 176,648,566 | 235,568,401 | 327,046,280 | 410,783,963 | 545,002,709 | 660,769,090 |
| | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | $313,336,820 | $444,087,599 | $540,308,884 | $712,411,612 | $839,166,472 | $1,080,304,531 | $1,257,238,306 |
| | $40,166,034 | $44,305,626 | $45,579,211 | $50,175,114 | $50,927,741 | $55,438,484 | $56,270,061 |
| | 135,409,409 | 167,358,613 | 172,379,371 | 207,142,545 | 213,356,821 | 251,153,458 | 258,686,002 |
| | 51,108,355 | 70,581,759 | 82,895,986 | 103,752,603 | 116,628,865 | 139,349,283 | 151,358,061 |
| | 36,064,399 | 40,319,969 | 40,924,769 | 45,051,882 | 45,727,151 | 49,777,272 | 50,523,932 |
| | 24,851,214 | 21,197,720 | 24,711,686 | 31,964,052 | 35,353,195 | 44,624,577 | 49,224,920 |
| | $287,605,451 | $364,363,717 | $366,511,042 | $438,085,697 | $461,993,775 | $540,341,074 | $566,062,975 |
| | $25,731,368 | $99,723,882 | $173,797,842 | $274,325,915 | $377,172,697 | $539,963,457 | $691,175,331 |
| | ($141,258,909) | ($41,536,027) | $132,261,815 | $406,587,730 | $783,760,427 | $1,323,723,884 | $2,014,899,215 |
| | 22% | 19% | 18% | 18% | 17% | 17% | 17% |
| | 43% | 41% | 38% | 36% | 34% | 32% | 30% |
| | 35% | 40% | 44% | 46% | 49% | 50% | 53% |
| | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| | 13% | 10% | 8% | 7% | 6% | 5% | 4% |
| | 43% | 38% | 32% | 29% | 25% | 23% | 21% |
| | 16% | 16% | 15% | 15% | 14% | 13% | 12% |
| | 12% | 9% | 8% | 6% | 5% | 5% | 4% |
| | 8% | 5% | 5% | 4% | 4% | 4% | 4% |
| | 92% | 78% | 68% | 61% | 59% | 50% | 45% |
| | 8% | 22% | 32% | 35% | 45% | 50% | 55% |
| | $203,640,152 | $267,436,033 | $304,740,483 | $385,365,332 | $428,382,800 | $535,301,822 | $596,465,217 |
| | $200,432,657 | $233,461,950 | $242,690,248 | $289,281,711 | $299,637,757 | $351,214,519 | $364,180,983 |
| | $3,207,495 | $33,977,074 | $62,050,235 | $96,083,621 | $128,745,052 | $184,087,303 | $232,288,234 |
| | $109,696,668 | $176,648,566 | $235,568,401 | $327,046,280 | $410,783,963 | $545,002,709 | $660,769,090 |
| | $87,172,795 | $110,901,758 | $123,820,794 | $148,803,986 | $162,356,019 | $189,126,555 | $201,881,992 |
| | $22,523,873 | $65,746,808 | $111,747,606 | $178,242,294 | $248,427,645 | $355,876,154 | $458,887,097 |

| | Quarterly | | | | | | |
|---|---|---|---|---|---|---|---|
| 2018 | 2018 | 2018 | 2018 | 2019 | 2019 | 2019 | 2019 |
| 1 | 2 | 3 | 4 | 1 | 2 | 3 | 4 |
| $0 | $0 | $0 | $0 | $8,100,000 | $13,150,000 | $0 | $1,350,000 |
| 0 | 0 | 0 | 0 | 33,540,000 | 16,560,000 | 0 | 5,100,000 |
| 0 | 0 | 0 | 0 | 11,786,428 | 6,314,158 | 0 | 0 |
| 0 | 0 | 0 | 80,000,000 | 0 | 0 | 0 | 0 |
| $0 | $0 | $0 | $80,000,000 | $53,426,428 | $36,024,158 | $0 | $6,450,000 |
| $891,000 | $3,017,825 | $8,445,937 | $9,467,037 | $18,600,437 | $3,665,418 | $5,478,771 | $6,342,904 |
| 0 | 1,584,000 | 4,884,000 | 8,932,000 | 60,211,177 | 26,490,463 | 4,332,000 | 8,097,000 |
| 0 | 0 | 0 | 0 | 12,443,445 | 6,666,131 | 0 | 0 |
| 170,012 | 1,062,743 | 1,792,827 | 5,420,952 | 17,435,758 | 7,164,672 | 2,703,100 | 3,303,100 |
| 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12,560,000 |
| $1,061,012 | $5,664,568 | $15,103,764 | $24,019,989 | $108,690,816 | $43,986,704 | $12,513,871 | $30,303,004 |
| ($1,061,012) | ($5,664,568) | ($15,103,764) | $55,980,012 | ($55,264,388) | ($7,962,546) | ($12,513,871) | ($23,853,004) |
| ($1,061,012) | ($6,745,580) | ($21,849,344) | $34,130,668 | ($21,133,720) | ($29,096,367) | ($41,610,137) | ($65,463,141) |

1.1 20180531 TRO000522110 TRO000522111.XLSX

| League Expenses: | | May-18 | June-18 | July-18 | August-18 | September-18 | October-18 | November-18 | December-18 |
|---|---|---|---|---|---|---|---|---|---|
| 1 | CEO | | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 |
| 0 | CMO | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | COO | | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 |
| 1 | CBO | | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 |
| 1 | Football Founder | | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 | 41,667 |
| 0 | General Counsel | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Head of Brand | | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 | 16,667 |
| 1 | SVP Partnership Sales | | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 |
| 1 | VP Human Resources | | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 0 | VP Team Services | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | VP Operations | | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 |
| 1 | Chief of staff business | | 7,083 | 7,083 | 7,083 | 7,083 | 7,083 | 7,083 | 7,083 |
| 0 | VP Operations | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Team Marketing | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Media Relations | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Team Ticket Sales | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Digital | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Social Media | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Creative Services | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Creative services Coordiantor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Dir IT | | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 |
| 0 | Dir Accounting | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Mdia Coordinators/Content | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Media Coordiantor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Media Coordiantor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Media Coordiantor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Content Writer | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Content Writer | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Video Content Coordiantor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Video Content Coordiantor | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Admin Coordinator | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Didgatal Talent./Host | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Interns | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Player Personel | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Senior Adimnastartor PP | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Dir Palyer Personel | | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 |
| 1 | Director of Scouting | | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 |
| 1 | Head of Football | | 22,917 | 22,917 | 22,917 | 22,917 | 22,917 | 22,917 | 22,917 |
| 1 | Dir Football Operation | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Dir of Equipement | | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 |
| 0 | Asitant Equipment | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Football Video | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | asst Video | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Medical Services | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | head of Officating | | 0 | 0 | 0 | 0 | 8,333 | 8,333 | 8,333 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total League Payroll | | $240,417 | $240,417 | $240,417 | $240,417 | $248,750 | $248,750 | $248,750 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | CEO | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 |
| 0 | CMO | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | COO | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 |
| 1 | CBO | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 | 4,167 |
| 1 | Football Founder | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | General Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Head of Brand | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 | 3,333 |
| 1 | SVP Partnership Sales | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| 1 | VP Human Resources | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Team Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | VP Operations | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Chief of staff business | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Operations | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Team Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Media Relations | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Team Ticket Sales | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Digital | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Social Media | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Creative Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Creative services Coordiantor | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Dir IT | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Accounting | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Media Coordinators/Content | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Media Coordinator | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Media Coordiantor | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Social Media Coordiantor | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Content Writer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Content Writer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Video Content Coordiantor | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Video Content Coordiantor | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Admin Coordinator | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Didgetal Talent /Host | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Interns | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Player Personel | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Senior Adiminastartor PP | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Dir Palyer Personel | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Director of Scouting | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Head of Football | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Dir Football Operation | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Dir of Equipement | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Asstant Equipment | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Dir Football Video | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | asst Video | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Medical Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | head of Officating | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Total League Bonuses** | $21,250 | $21,250 | $21,250 | $21,250 | $21,250 | $21,250 | $21,250 <-- When do these actually get paid |
| 20% | **Benefits & Taxes** | $52,333 | $52,333 | $52,333 | $52,333 | $54,000 | $54,000 | $54,000 <-- When do these actually get paid |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Launch Event | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| 1 | Fundraising | 0 | 0 | 0 | 0 | 0 | 0 | 200,000 | |
| 1 | Season build up media | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 0 | CAC | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | CBS Fees | 0 | 0 | 0 | 333,333 | 0 | 333,333 | 333,333 | <- What are these? |
| 1 | CBS SN Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | Season content production costs | 0 | 0 | 0 | 0 | 0 | 250,000 | 250,000 | |
| 1 | PR (MVW) | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | |
| 1 | Other PR | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | |
| 1 | Branding research and stuff | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | Launch event | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | Order Football Equipment | 0 | 0 | 0 | 2,000,000 | 2,000,000 | 0 | 0 | <- Can we push these out? |
| 1 | Training Equipment | 0 | 0 | 0 | 800,000 | 0 | 0 | 0 | <- Can we push these out and are these accurate at this point? |
| 1 | Training camp Payments | 500,000 | 500,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | 1,000,000 | <- Can we push this out? |
| 1 | Hiring fees/league relos | 25,000 | 50,000 | 0 | 50,000 | 50,000 | 50,000 | 0 | |
| 1 | Furniture | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | |
| 1 | Rent Orlando | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | 31,250 | |
| 1 | Rent LA | 14,063 | 14,063 | 14,063 | 14,063 | 16,063 | 14,063 | 14,063 | |
| 1 | General Office Supplies | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | |
| 1 | Computer Equipment | 11,200 | 5,600 | 1,600 | 8,800 | 1,600 | 0 | 0 | |
| 1 | City Launch Events | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | Unknown | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | |
| 1 | Monthly Legal Fees | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | 75,000 | |
| 1 | TV production costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | Digital Production costs | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | Music licensing | 0 | 0 | 0 | 0 | 0 | 20,000 | 0 | |
| 1 | Animation Package | 0 | 0 | 0 | 116,667 | 116,667 | 116,667 | 0 | |
| 1 | Crew Company | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | Charlie/Tom travel | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | |
| 0 | Football league | 0 | 0 | 0 | 0 | 0 | 0 | 0 | <- Not sure what this is |
| 1 | Consulting Services | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| 1 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| | **Total Other League Expenses** | $789,513 | $808,913 | $1,254,913 | $4,562,112 | $3,421,579 | $2,023,312 | $2,036,646 | |
| | **Total League Expenses** | $1,103,513 | $1,122,913 | $1,568,913 | $4,876,112 | $3,745,579 | $2,347,312 | $2,360,646 | |

**Team Expenses:**

| | | | | | |
|---|---|---|---|---|---|
| 1 | President | $116,667 | $116,667 | $116,667 | $116,667 |
| 1 | VP Marketing | 83,333 | 83,333 | 83,333 | 83,333 |
| 1 | VP Ticket Sales | 83,333 | 83,333 | 83,333 | 83,333 |
| 1 | VP Sponsorship Sales | 83,333 | 83,333 | 83,333 | 83,333 |
| 1 | Dir Operations | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Dir Finance | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Media Relations Manager | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Ticket Operations Manager | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Web Master | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Social Media Manager | 23,333 | 23,333 | 23,333 | 23,333 |
| 0 | Content Writer | 0 | 0 | 0 | 0 |
| 0 | Graphic Arts Coordinator | 0 | 0 | 0 | 0 |
| 0 | Promotions Coordinator | 0 | 0 | 0 | 0 |
| 1 | Senior Ticket Lead | 26,667 | 26,667 | 26,667 | 26,667 |
| 0 | Senior Ticket Lead | 0 | 0 | 0 | 0 |

985

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Ticket Account Executive | | | | 20,000 | 20,000 | 20,000 | 20,000 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 1 | Partnership Sales/Service | | | | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Video Coordinator | | | | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Admin Asst | | | | 26,667 | 26,667 | 26,667 | 26,667 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| | **Front Office Payroll** | $0 | $0 | $0 | $696,667 | $696,667 | $696,667 | $696,667 |
| 1 | President | | | | $0 | $0 | $0 | $0 |
| 1 | VP Marketing | | | | 0 | 0 | 0 | 0 |
| 1 | VP Ticket Sales | | | | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | VP Sponsorship Sales | | | | 33,333 | 33,333 | 33,333 | 33,333 |
| 1 | Dir Operations | | | | 0 | 0 | 0 | 0 |
| 1 | Dir Finance | | | | 0 | 0 | 0 | 0 |
| 1 | Media Relations Manager | | | | 0 | 0 | 0 | 0 |
| 1 | Ticket Operations Manager | | | | 0 | 0 | 0 | 0 |
| 1 | Web Master | | | | 0 | 0 | 0 | 0 |
| 1 | Social Media Manager | | | | 0 | 0 | 0 | 0 |
| 0 | Content Writer | | | | 0 | 0 | 0 | 0 |
| 0 | Graphic Arts Coordinator | | | | 0 | 0 | 0 | 0 |
| 0 | Promotions Coordinator | | | | 0 | 0 | 0 | 0 |
| 1 | Senior Ticket Lead | | | | 16,667 | 16,667 | 16,667 | 16,667 |
| 0 | Senior Ticket Lead | | | | 0 | 0 | 0 | 0 |
| 1 | Ticket Account Executive | | | | 13,333 | 13,333 | 13,333 | 13,333 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 1 | Partnership Sales/Service | | | | 13,333 | 13,333 | 13,333 | 13,333 |
| 1 | Video Coordinator | | | | 0 | 0 | 0 | 0 |
| 1 | Admin Asst | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| 1 | [] | | | | 0 | 0 | 0 | 0 |
| | **Front Office Commissions** | $0 | $0 | $0 | $110,000 | $110,000 | $110,000 | $110,000 <--When do these actually get paid out? |
| 1 | President | | | | $0 | $0 | $0 | $0 |
| 1 | VP Marketing | | | | 0 | 0 | 0 | 0 |
| 1 | VP Ticket Sales | | | | 0 | 0 | 0 | 0 |
| 1 | VP Sponsorship Sales | | | | 0 | 0 | 0 | 0 |
| 1 | Dir Operations | | | | 0 | 0 | 0 | 0 |
| 1 | Dir Finance | | | | 0 | 0 | 0 | 0 |
| 1 | Media Relations Manager | | | | 0 | 0 | 0 | 0 |
| 1 | Ticket Operations Manager | | | | 0 | 0 | 0 | 0 |



| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Web Master | | | | 0 | 0 | 0 | 0 |
| 1 | Social Media Manager | | | | 0 | 0 | 0 | 0 |
| 0 | Content Writer | | | | 0 | 0 | 0 | 0 |
| 0 | Graphic Arts Coordinator | | | | 0 | 0 | 0 | 0 |
| 0 | Promotions Coordinator | | | | 0 | 0 | 0 | 0 |
| 1 | Senior Ticket Lead | | | | 0 | 0 | 0 | 0 |
| 0 | Senior Ticket Lead | | | | 0 | 0 | 0 | 0 |
| 1 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 0 | Ticket Account Executive | | | | 0 | 0 | 0 | 0 |
| 1 | Partnership Sales/Service | | | | 0 | 0 | 0 | 0 |
| 1 | Video Coordinator | | | | 0 | 0 | 0 | 0 |
| 1 | Admin Asst | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| | **Front Office Bonuses** | $0 | $0 | $0 | $0 | $0 | $0 | $0 ←-When do these actually get paid out? |
| 20% | **Front Office Benefits & Taxes** | $0 | $0 | $0 | $161,333 | $161,333 | $161,333 | $161,333 ←-When do these actually get paid out? |
| 1 | Head Coach | | | | $0 | $0 | $0 | $833,333 |
| 1 | Coaches Pool | | | | 0 | 0 | 0 | 1,333,333 |
| 1 | Player Personnel | | | | 0 | 0 | 0 | 0 |
| 1 | GA | | | | 0 | 0 | 0 | 0 |
| 1 | GA | | | | 0 | 0 | 0 | 0 |
| 1 | Equipment Manager | | | | 0 | 0 | 0 | 66,667 |
| 1 | Asst Equip | | | | 0 | 0 | 0 | 53,333 |
| 1 | Trainer | | | | 0 | 0 | 0 | 100,000 |
| 1 | Asst Trainer | | | | 0 | 0 | 0 | 53,333 |
| 1 | Strength Coach | | | | 0 | 0 | 0 | 100,000 |
| 1 | Team Admin | | | | 0 | 0 | 0 | 66,667 |
| 1 | Admin Asst | | | | 0 | 0 | 0 | 53,333 |
| 1 | Video Coordinator | | | | 0 | 0 | 0 | 40,000 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| 1 | [ ] | | | | 0 | 0 | 0 | 0 |
| | **Coaches Payroll** | $0 | $0 | $0 | $0 | $0 | $0 | $2,706,000 |
| 20% | **Coaches Benefits & Taxes** | $0 | $0 | $0 | $0 | $0 | $0 | $540,000 ←-When do these actually get paid out? |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Players | | | | $0 | $0 | $0 | $0 |
| 1 | Marquee | | | | 0 | 0 | 0 | 0 |
| 1 | Scramble | | | | 0 | 0 | 0 | 0 |
| | Players Payroll | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| 1 | Players | | | | $0 | $0 | $0 | $0 |
| 1 | Marquee | | | | 0 | 0 | 0 | 0 |
| 1 | Scramble | | | | 0 | 0 | 0 | 0 |
| | Players Workers Comp | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| 20% | Players Benefits & Taxes | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| 1 | Marquee Player Personal Services | | $0 | $0 | $0 | $0 | $0 | $1,000,000 |
| 1 | 5 stadium rentals per season | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Travel to away games | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Stadium Deposit | | 600,000 | 0 | 0 | 0 | 0 | 0 |
| 1 | Monthly Rent | | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 |
| 1 | Office Build out | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Headcoach consulting contract | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 0 |
| 1 | referees Per Mike P. estimate | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Non-Season Travel | | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 | 48,000 |
| 1 | Medical Supplies | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Uniforms | | 0 | 0 | 0 | 0 | 200,000 | 0 |
| 1 | General Office | | 40,000 | 40,000 | 40,000 | 60,000 | 40,000 | 120,000 |
| 1 | employee communications | | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 | 40,000 |
| 1 | Local Advertising | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Game Staff | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Sales/Use Tax Event Expense | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Catering/Hospitality | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Other Game Costs | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Team Food & Beverages | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Player Housing | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Recruitment & Relocation | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Cost of Ticket Sales | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | [] | | 0 | 0 | 0 | 0 | 0 | 0 |
| | Total Other Team Expenses | $0 | $848,000 | $248,000 | $248,000 | $248,000 | $448,000 | $1,288,000 |
| | | | | | | | | |
| | **Total Team Related Expenses** | $0 | $848,000 | $248,000 | $1,216,000 | $1,216,000 | $1,416,000 | $5,496,000 |

Stadium Deposit — <=Can we push this out?

Tech Expenses:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 0 | GM | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 0 | VP Finance | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | VP Marketing | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Head of Platform | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 |
| 1 | Head of Product | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 |
| 1 | Director Engineering | 0 | 0 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 |
| 1 | VP, Engineering | 0 | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 | 20,833 |
| 1 | Senior Engineer | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 |
| 1 | Senior Engineer | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 |
| 1 | Senior Engineer | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 |

| | Role | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Engineer | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Engineer | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Engineer | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Engineer | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Engineer | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Product Manager | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 | 10,417 |
| 1 | QA | 9,583 | 9,583 | 9,583 | 9,583 | 9,583 | 9,583 | 9,583 |
| 1 | QA | 0 | 0 | 8,333 | 8,333 | 8,333 | 8,333 | 8,333 |
| 1 | QA | 0 | 0 | 0 | 0 | 8,333 | 8,333 | 8,333 |
| 0 | Business Analyst | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Business Analyst | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Visual Designer | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Visual Designer | 0 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Senior Engineer | 0 | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 | 13,750 |
| 1 | Engineer | 0 | 0 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Engineer | 0 | 0 | 0 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Engineer | 0 | 0 | 0 | 0 | 0 | 12,500 | 12,500 |
| 1 | Senior Engineer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Game Designer | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 |
| 1 | Game Designer | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 | 14,583 |
| 1 | Customer Support | 0 | 0 | 0 | 10,417 | 10,417 | 10,417 | 10,417 |
| 1 | Customer Support | 0 | 0 | 0 | 0 | 11,250 | 11,250 | 11,250 |
| 1 | Customer Support | 0 | 0 | 0 | 0 | 0 | 18,750 | 18,750 |
| 1 | Customer Support | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Controller | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | FP&A | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | General Counsel | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Lawyer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Lawyer | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | EA | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | EA | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Office Manager | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | PR | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Marketing Analyst | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Digital Marketing Analyst | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | **Total Tech Payroll** | $197,500 | $244,583 | $284,167 | $307,083 | $326,667 | $357,917 | $357,917 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 25% | Tech Benefits & Taxes | $49,375 | $61,146 | $71,042 | $76,771 | $81,667 | $89,479 | $89,479 <--When do these actualy get paid out? |
| 5% | Bonus Pool | $9,875 | $12,229 | $14,208 | $15,354 | $16,333 | $17,896 | $17,896 <--When do these actualy get paid out? |

| | Role | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 1 | Pre Season Events | $0 | $0 | $0 | $0 | $0 | $250,000 | $250,000 |
| 0 | Office Rent /Furniture | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Digital Operations | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | Photography/Digital Content | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | New Team Start-Up Cost | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Legal | 22,222 | 22,222 | 22,222 | 22,222 | 22,222 | 22,222 | 22,222 |
| 1 | Travel | 18,720 | 18,720 | 18,720 | 18,720 | 18,720 | 18,720 | 18,720 |
| 1 | Advertising and Promotion | 0 | 0 | 0 | 0 | 400,000 | 800,000 | 800,000 |
| 1 | Office Supplies/Equipment | 12,500 | 0 | 0 | 12,500 | 0 | 0 | 12,500 |
| 1 | Office Communcations Phone/Internet | 7,500 | 0 | 0 | 7,500 | 0 | 0 | 7,500 |
| 1 | Super Bowl commercial | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Football Training Equipment | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 1 | Other | 62,500 | 0 | 0 | 62,500 | 0 | 0 | 62,500 |
| 0 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 0 | [ ] | 0 | 0 | 0 | 0 | 0 | 0 | 0 |



League Revenue

| League Revenue | Start up 2018 | 2019 | 2020 | 2021 | 2022 | Regular Season 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| National Sponsorships | | $12,250,000 | $14,700,000 | $24,698,000 | $29,635,200 | $35,562,240 | $42,674,688 | $51,209,626 | $61,451,551 | $73,741,861 | $88,490,233 |
| Broadcasting | | 0 | 0 | 12,000,000 | 12,000,000 | 18,000,000 | 18,000,000 | 27,000,000 | 27,000,000 | 40,500,000 | 40,500,000 |
| Merchandise | | 1,250,000 | 1,375,000 | 2,117,500 | 2,329,250 | 2,562,175 | 2,818,393 | 3,100,232 | 3,410,255 | 3,751,280 | 4,126,408 |
| Season Revenue | | $13,500,000 | $16,075,000 | $38,815,500 | $43,964,450 | $56,124,415 | $63,493,081 | $81,309,858 | $91,861,806 | $117,993,141 | $133,116,641 |

| | | | | | | Playoffs | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ticket Sales | | | | | | | | | | | |
| Total Sold per game | | 25,000 | 37,500 | 30,259 | 33,275 | 36,603 | 40,263 | 44,289 | 48,718 | 53,590 | 58,949 |
| Average Price | | $60.00 | $66.00 | $75.90 | $87.79 | $100.38 | $115.43 | $132.75 | $152.66 | $175.56 | $201.90 |
| Number of Games | | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Total Ticket Revenue | | $3,000,000 | $7,250,000 | $9,183,900 | $11,617,634 | $14,696,306 | $18,590,828 | $23,517,397 | $29,749,507 | $37,633,126 | $47,605,905 |
| Merchandise | | | | | | | | | | | |
| Merchandise net per cap | | $10.00 | $10.50 | $11.03 | $11.58 | $12.16 | $12.76 | $13.40 | $14.07 | $14.77 | $15.51 |
| Total Per Season Revenue | | $500,000 | $1,155,000 | $1,334,025 | $1,540,799 | $1,779,623 | $2,055,464 | $2,374,061 | $2,742,041 | $3,167,057 | $3,657,951 |
| Partnership | Per Game | 2 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| National Sponsorships | $ 500,000 $ | 1,000,000 | $1,260,000 | $2,016,000 | $2,419,200 | $2,903,040 | $3,483,648 | $4,180,378 | $5,016,453 | $6,019,744 | $7,223,692 |
| Broadcasting | 500,000 | 1,000,000 | $3,000,000 | $3,090,000 | $3,182,700 | $3,278,181 | $3,376,526 | $3,477,822 | $3,582,157 | $3,689,622 | $3,800,310 |
| Total | | $2,000,000 | $4,200,000 | $5,106,000 | $5,601,900 | $6,181,221 | $6,860,174 | $7,658,200 | $8,598,810 | $9,709,365 | $13,024,003 |
| Playoff Revenue Totals | | $5,500,000 | $11,815,000 | $15,623,925 | $18,750,332 | $22,657,150 | $27,506,466 | $33,549,658 | $41,090,358 | $50,509,548 | $67,187,852 |

| | | | | | | Championship | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ticket Sales | | | | | | | | | | | |
| Total Sold per game | | 30,000 | 33,000 | 36,300 | 39,930 | 43,923 | 48,315 | 53,147 | 58,462 | 64,308 | 70,738 |
| Average Price | | $60.00 | $69.00 | $79.35 | $91.25 | $104.94 | $120.68 | $138.78 | $159.60 | $183.54 | $211.07 |
| Total Ticket Revenue | | $1,800,000 | $2,277,000 | $2,880,405 | $3,643,712 | $4,609,296 | $5,830,760 | $7,375,911 | $9,330,527 | $11,803,117 | $14,930,943 |
| Merchandise | | | | | | | | | | | |
| Merchandise net per cap | | $10.00 | $10.50 | $11.03 | $11.54 | $12.16 | $12.78 | $13.40 | $14.07 | $14.77 | $15.51 |
| Total Per Season Revenue | | $300,000 | $346,500 | $400,208 | $462,240 | $533,887 | $616,639 | $712,218 | $822,612 | $950,117 | $1,097,385 |
| Partnership | | | | | | | | | | | |
| National Sponsorships | $ | 750,000 | $825,000 | $907,500 | $998,250 | $1,098,075 | $1,207,883 | $1,328,671 | $1,461,538 | $1,607,692 | $1,768,461 |
| Broadcasting | | 750,000 | $825,000 | $907,500 | $998,250 | $1,098,075 | $1,207,883 | $1,328,671 | $1,461,538 | $1,607,692 | $1,768,461 |
| Total | | $1,500,000 | $1,650,000 | $1,815,000 | $1,996,500 | $2,196,150 | $2,415,765 | $2,657,342 | $2,923,076 | $3,215,383 | $3,536,922 |
| Championship Revenue | | $3,600,000 | $4,273,500 | $5,095,613 | $6,102,452 | $7,339,333 | $8,863,164 | $10,745,371 | $13,076,215 | $15,968,617 | $10,565,250 |

| Total League Revenue | | $22,800,000 | $32,963,500 | $59,533,025 | $88,837,234 | $86,120,898 | $99,862,711 | $125,604,988 | $146,028,378 | $184,471,307 | $210,869,750 |

Team Revenue

| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Ticket Sales** | | | | | | | | | | |
| Tickets sold per game | 17,500 | 20,300 | 23,548 | 25,503 | 28,493 | 31,342 | 32,910 | 34,555 | 36,283 | 38,097 |
| Average price | 50 | $51.50 | $53.05 | $54.64 | $56.28 | $58.53 | $60.87 | $63.30 | $65.83 | $68.47 |
| Number of games | 5 | 5 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 |
| Total Ticket Revenue | $4,375,000 | $5,227,250 | $8,743,728 | $9,906,641 | $11,224,226 | $12,840,513 | $14,021,840 | $15,311,849 | $16,720,539 | $18,258,829 |
| | | | | | | | | | | |
| **Merchandise** | | | | | | | | | | |
| Merchandise net per cap | $6.00 | $6.30 | $6.62 | $6.95 | $7.29 | $7.66 | $8.04 | $8.44 | $8.86 | $9.31 |
| Total Per Season Revenue | $525,000 | $639,450 | $1,090,390 | $1,259,401 | $1,454,608 | $1,680,072 | $1,852,279 | $2,042,138 | $2,251,457 | $2,482,231 |
| | | | | | | | | | | |
| **Team Sponsorship** | | | | | | | | | | |
| Jersey | $750,000 | $787,500 | $826,875 | $868,219 | $911,630 | $957,211 | $1,005,072 | $1,055,325 | $1,108,092 | $1,163,496 |
| In-Stadium | $625,000 | $656,250 | $689,063 | $723,516 | $759,691 | $797,676 | $837,560 | $879,438 | $923,410 | $969,580 |
| Local TV/Digital Promo | $625,000 | $656,250 | $689,063 | $723,516 | $759,691 | $797,676 | $837,560 | $879,438 | $923,410 | $969,580 |
| Total Team Sponsorship | $2,000,000 | $2,100,000 | $2,205,000 | $2,315,250 | $2,431,013 | $2,552,563 | $2,680,191 | $2,814,201 | $2,954,911 | $3,102,656 |
| | | | | | | | | | | |
| **Total Per Team Revenue** | $6,900,000 | $7,966,700 | $12,039,116 | $13,481,292 | $15,109,845 | $17,073,148 | $18,554,310 | $20,168,188 | $21,926,907 | $23,843,717 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Number of Teams | 8 | 8 | 10 | 10 | 12 | 12 | 14 | 14 | 16 | 16 |
| Total Revenue - all teams | $55,200,000 | $63,733,600 | $120,391,158 | $134,812,917 | $181,318,135 | $204,877,773 | $259,760,346 | $282,354,630 | $350,830,515 | $381,499,467 |

1.1 20180531 TR000D522110 TR000D522111.XLSX

| Digital revenue | Start up 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Fantasy** | | | | | | | | | | | |
| US/CA Fantasy Market (M people) | | 59,300,000 | 59,300,000 | 59,300,000 | 59,300,000 | 59,300,000 | 59,300,000 | 59,300,000 | 59,300,000 | 59,300,000 | 59,300,000 |
| % Market Active | | 4.0% | 5.00% | 6.00% | 7.00% | 8.00% | 9.00% | 10.00% | 11.00% | 12.00% | 13.00% |
| Total Active Fantasy Players | | 2,372,000 | 2,965,000 | 3,558,000 | 4,151,000 | 4,744,000 | 5,337,000 | 5,930,000 | 6,523,000 | 7,116,000 | 7,709,000 |
| % Active Paying | | 8.0% | 9.00% | 10.00% | 11.00% | 12.00% | 13.00% | 14.00% | 15.00% | 16.00% | 17.00% |
| Total Fantasy Payers | | 189,760 | 266,850 | 355,800 | 456,610 | 569,280 | 693,810 | 830,200 | 978,450 | 1,138,560 | 1,310,530 |
| ARPPU | | $50.00 | $55.00 | $60.50 | $66.55 | $73.21 | $80.53 | $88.58 | $97.44 | $107.18 | $117.90 |
| Total Fantasy Revenue | | $9,488,000 | $15,676,790 | $21,525,900 | $30,387,305 | $41,676,142 | $55,869,597 | $73,537,497 | $95,336,112 | $122,033,724 | $154,508,050 |
| | | | | | | | | | | | |
| **Premium Data Revenue** | | | | | | | | | | | |
| Total Active Fantasy Players | | 2,372,000 | 2,995,000 | 3,558,000 | 4,151,000 | 4,744,000 | 5,337,000 | 5,930,000 | 6,523,000 | 7,116,000 | 7,709,000 |
| % buying game package | | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% |
| game package price | | $2.99 | $2.99 | $3.29 | $3.29 | $3.62 | $3.62 | $3.98 | $3.98 | $4.38 | $4.38 |
| % buying weekend package | | 1.0% | 2.0% | 3.0% | 4.0% | 5.0% | 6.0% | 7.0% | 8.0% | 9.0% | 10.0% |
| weekend package price | | $8.99 | $8.99 | $9.89 | $9.89 | $10.88 | $10.88 | $11.97 | $11.97 | $13.16 | $13.16 |
| Number of games | | 43 | 43 | 75 | 75 | 89 | 89 | 89 | 89 | 89 | 89 |
| Number of weeks | | 12 | 12 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 |
| Total Premium Data Revenue | | $9,608,595 | $16,021,445 | $41,107,816 | $63,945,491 | $112,500,294 | $155,875,128 | $218,562,080 | $272,258,227 | $367,537,806 | $442,406,618 |
| | | | | | | | | | | | |
| **Super Fan Revenue** | | | | | | | | | | | |
| % of Super Fan tickets | | 10% | 12% | 14% | 16% | 18% | 20% | 22% | 24% | 26% | 28% |
| Total Super Fan Tickets | | 70,000 | 97,440 | 230,770 | 290,111 | 430,815 | 526,552 | 709,529 | 812,733 | 1,056,553 | 1,194,718 |
| Super Fan Revenue/ticket | | $40 | $40 | $40 | $40 | $40 | $40 | $40 | $40 | $40 | $40 |
| Total Super Fan Revenue | | $2,800,000 | $3,897,600 | $9,230,816 | $11,604,454 | $17,232,615 | $21,062,081 | $28,381,180 | $32,509,426 | $42,262,178 | $47,788,712 |
| | | | | | | | | | | | |
| **Gaming** | | | | | | | | | | | |
| % of Fantasy players active in gaming | | | 25.0% | 26.00% | 27.00% | 28.00% | 29.00% | 30.00% | 31.00% | 32.00% | 33.00% |
| Total gaming users | | | 56,713 | 92,508 | 123,285 | 159,398 | 201,205 | 249,060 | 303,320 | 364,339 | 432,475 |
| Total weeks available | | | 13 | 17 | 17 | 17 | 17 | 17 | 17 | 17 | 17 |
| % of weeks user active | | | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% |
| Avg. wager per week | | | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 | $100.00 |
| Total $ wagered | | | $21,681,563 | $39,815,900 | $52,395,998 | $67,744,320 | $85,512,083 | $105,850,500 | $128,910,788 | $154,844,160 | $183,801,833 |
| League hold rate | | | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% |
| Total gaming revenue | | | $1,084,078 | $1,966,795 | $2,619,800 | $3,387,216 | $4,275,604 | $5,292,525 | $6,445,539 | $7,742,208 | $9,190,092 |
| | | | | | | | | | | | |
| **Sponsorship** | | | | | | | | | | | |
| Total Active Fantasy Players | | 189,760 | 266,850 | 355,800 | 456,610 | 569,280 | 693,810 | 830,200 | 978,450 | 1,138,560 | 1,310,530 |
| eCPM | | $5.00 | $5.50 | $6.05 | $6.66 | $7.32 | $8.05 | $8.86 | $9.74 | $10.72 | $11.79 |
| advertiser clients per game | | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| # of games | | 43 | 43 | 75 | 75 | 89 | 89 | 89 | 89 | 86 | 89 |
| Total sponsorship revenue | | $204,992 | $415,550 | $807,221 | $1,139,527 | $1,854,499 | $2,486,188 | $3,272,419 | $6,242,497 | $5,330,345 | $6,875,605 |
| | | | | | | | | | | | |
| **Total Digital Revenue** | | $16,100,586 | $33,995,463 | $74,832,548 | $109,599,664 | $176,648,586 | $235,568,401 | $327,048,280 | $410,783,663 | $545,062,709 | $660,769,060 |

Payouts

| Payouts | Start up 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **General Stats** | | | | | | | | | | | |
| Number of teams | 8 | 8 | 10 | 10 | 12 | 12 | 14 | 14 | 16 | 16 | |
| Players per team | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | |
| Games per week regular season | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | |
| Total weeks of Regular Season | 10 | 10 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | |
| Total Playoff games | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | |
| Avg. Salary per Player | $50,000 | $51,500 | $53,045 | $54,636 | $56,275 | $57,964 | $59,703 | $61,494 | $63,339 | $65,239 | |
| **Player Win Bonus** | | | | | | | | | | | |
| % of Salary for regular season Win Bonus | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | 60% | |
| % of Salary for regular Playoff Win Bonus | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | |
| Total Player Salary | $20,000,000 | $20,600,000 | $26,522,500 | $27,318,175 | $33,765,264 | $34,778,222 | $41,791,850 | $43,045,585 | $50,670,803 | $52,190,927 | |
| Total Playoff Salary | $1,900,000 | $1,545,000 | $1,591,350 | $1,639,091 | $1,688,263 | $1,738,911 | $1,791,078 | $1,844,811 | $1,900,153 | $1,957,160 | |
| Total Win Bonuses to Players | $6,790,000 | $6,992,200 | $8,752,425 | $9,014,998 | $10,973,711 | $11,302,922 | $13,459,088 | $13,836,691 | $16,131,319 | $16,635,858 | |
| **Player Fantasy Bonuses** | | | | | | | | | | | |
| Total Fantasy Revenue | $7,116,000 | $11,301,098 | $17,005,461 | $24,613,790 | $34,489,538 | $47,488,988 | $63,977,622 | $84,849,140 | $111,047,504 | $143,802,495 | |
| % of Fantasy Revenue Paid to Players | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | 25.00% | |
| Total Fantasy Bonuses to Players | $1,779,000 | $2,825,274 | $4,251,365 | $6,153,448 | $8,647,385 | $11,872,247 | $15,994,406 | $21,212,285 | $27,761,876 | $35,923,724 | |
| **Coaches --> Players Bonus** | | | | | | | | | | | |
| Regular season weekly bonus pool per team | $50,000 | $52,500 | $55,125 | $57,881 | $60,775 | $63,814 | $67,005 | $70,355 | $73,873 | $77,566 | |
| Playoff bonus pool per team | $75,000 | $78,750 | $82,688 | $86,822 | $91,163 | $95,721 | $100,507 | $105,533 | $110,809 | $116,350 | |
| Total gaming revenue | $4,450,000 | $4,672,500 | $5,213,625 | $5,624,306 | $10,757,270 | $11,295,002 | $13,735,040 | $14,422,779 | $17,251,356 | $18,072,978 | |
| **Premium Data Bonuses** | | | | | | | | | | | |
| Premium Data revenue | $5,608,594 | $14,021,485 | $41,107,810 | $63,945,491 | $112,500,094 | $151,875,126 | $216,562,680 | $272,250,227 | $367,537,806 | $442,406,618 | |
| % Paid to Players | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | 5.0% | |
| Total | $280,430 | $701,074 | $2,055,391 | $3,197,275 | $5,625,005 | $7,593,756 | $10,828,134 | $13,612,511 | $18,376,890 | $22,120,331 | |
| **Super Fan win bonus** | | | | | | | | | | | |
| Total Super Fan Revnue | $2,100,000 | $3,001,152 | $7,292,345 | $9,399,808 | $14,303,070 | $17,902,772 | $24,691,508 | $28,933,302 | $38,458,535 | $44,443,502 | |
| % of Super Fan Rev paid out | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | 25.0% | |
| Avg. Payout per game | $15 | $15 | $16 | $16 | $17 | $17 | $17 | $18 | $18 | $19 | |
| Total Super Fan Win bonuses | $525,000 | $750,288 | $1,923,086 | $2,349,502 | $3,575,768 | $4,475,693 | $6,172,882 | $7,233,325 | $9,614,634 | $11,110,876 | |
| **Coaches Win Pool** | | | | | | | | | | | |
| % of Salary for regular season Win Bonus | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | 20% | |
| Total coaches Salary | $8,000,000 | $8,400,000 | $8,820,000 | $9,261,000 | $9,724,050 | $10,210,253 | $10,720,765 | $11,256,803 | $11,819,644 | $12,410,626 | |
| Total coaches win bonus | $800,000 | $840,000 | $882,000 | $926,100 | $972,405 | $1,021,025 | $1,072,077 | $1,125,680 | $1,181,964 | $1,241,063 | |
| **Vendor Payouts** | | | | | | | | | | | |
| % Charge | 25% | 23.0% | 21.0% | 19.0% | 17.0% | 15.0% | 13.0% | 11.0% | 9.0% | 7.0% | |
| App vendor charge | $4,525,147 | $7,818,957 | $15,673,885 | $20,812,167 | $30,030,256 | $35,335,260 | $42,516,016 | $45,186,203 | $48,050,344 | $46,253,836 | |
| **Total Payouts** | | | | | | | | | | | |
| Total Payouts to Players | $13,259,430 | $15,151,349 | $23,273,806 | $26,990,026 | $36,003,330 | $42,064,017 | $53,991,608 | $63,083,657 | $79,502,441 | $92,752,287 | |
| Total Payouts to Fans | $525,000 | $750,288 | $1,923,086 | $2,349,802 | $3,575,768 | $4,475,693 | $6,172,902 | $7,233,325 | $9,614,634 | $11,110,876 | |
| Total Payouts to Coaches | $800,000 | $840,000 | $882,000 | $926,100 | $972,405 | $1,021,025 | $1,072,077 | $1,125,680 | $1,181,964 | $1,241,063 | |
| Total Payouts to Vendors | $4,525,147 | $7,818,957 | $15,673,885 | $20,842,367 | $30,030,256 | $35,335,260 | $42,516,016 | $45,186,203 | $49,050,344 | $46,253,836 | |
| Total Payouts | $19,109,576 | $24,560,593 | $41,451,777 | $51,108,995 | $70,581,759 | $82,895,995 | $103,752,603 | $116,828,865 | $139,349,283 | $151,358,062 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Payouts as % of Digital Revenue** | | | | | | | | | | | |
| Total Payouts to Players | 73.3% | 44.6% | 51.3% | 24.6% | 20.4% | 17.9% | 16.5% | 15.4% | 14.6% | 14.0% | |
| Total Payouts to Fans | 2.9% | 2.2% | 2.4% | 2.1% | 3.0% | 1.9% | 1.9% | 1.8% | 1.8% | 1.7% | |
| Total Payouts to Coaches | 4.4% | 2.5% | 1.2% | 0.8% | 0.6% | 0.4% | 0.3% | 0.3% | 0.2% | 0.2% | |
| Total Payouts to Vendors | 25.0% | 23.0% | 21.0% | 19.0% | 17.0% | 15.0% | 13.0% | 11.0% | 9.0% | 7.0% | |

1.1 20180531 TR0000522110 TR0000522111.XLSX

Payouts

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Total Payouts | 105.6% | 72.2% | 55.8% | 46.6% | 40.0% | 35.2% | 31.7% | 28.3% | 25.6% | 22.9% |

League Expenses

Tech Operating Expenses

| League Payroll Assumptions: | # | Start Date | Base Salary | Commissions | Bonuses | Benefits Uplift | Total Benefits | Total |
|---|---|---|---|---|---|---|---|---|
| CEO | 1 | 1/1/2018 | $350,000 | $0 | $70,000 | 20% | $70,000 | $490,000 |
| CMO | 1 | 7/1/2018 | 250,000 | 0 | 50,000 | 20% | 50,000 | 350,000 |
| COO | 1 | 3/1/2018 | 250,000 | 0 | 50,000 | 20% | 50,000 | 350,000 |
| CBO | 1 | 3/1/2018 | 250,000 | 0 | 50,000 | 20% | 50,000 | 350,000 |
| Football Founder | 1 | 3/1/2018 | 500,000 | 0 | 0 | 20% | 100,000 | 600,000 |
| General Counsel | 1 | 7/1/2018 | 250,000 | 0 | 50,000 | 20% | 50,000 | 350,000 |
| Head of Brand | 1 | 5/1/2018 | 200,000 | 0 | 40,000 | 20% | 40,000 | 280,000 |
| SVP Partnership Sales | 1 | 6/1/2018 | 225,000 | 0 | 45,000 | 20% | 45,000 | 315,000 |
| VP Human Resources | 1 | 6/1/2018 | 150,000 | 0 | | 20% | 30,000 | 180,000 |
| VP Team Services | 1 | 6/1/2018 | 125,000 | 0 | 0 | 20% | 25,000 | 150,000 |
| VP Operations | 1 | 5/1/2018 | 125,000 | 0 | 0 | 20% | 25,000 | 150,000 |
| Chief of staff business | 1 | 5/1/2018 | 85,000 | 0 | 0 | 20% | 17,000 | 102,000 |
| VP Operations | 1 | 5/1/2018 | 130,000 | 0 | 0 | 20% | 26,000 | 156,000 |
| VP Team Marketing | 1 | 8/1/2018 | 150,000 | 0 | 0 | 20% | 30,000 | 180,000 |
| VP Media Relations | 1 | 4/1/2018 | 150,000 | 0 | 0 | 20% | 30,000 | 180,000 |
| Dir Team Ticket Sales | 1 | 7/1/2018 | 125,000 | 0 | 50,000 | 20% | 25,000 | 200,000 |
| Dir Digital | 1 | 7/1/2018 | 75,000 | 0 | 0 | 20% | 15,000 | 90,000 |
| Dir Social Media | 1 | 5/1/2018 | 75,000 | 0 | 0 | 20% | 15,000 | 90,000 |
| Dir Creative Services | 1 | 6/1/2018 | 75,000 | 0 | 0 | 20% | 15,000 | 90,000 |
| Creative services Coordinator | 1 | 6/1/2018 | 75,000 | 0 | 0 | 20% | 15,000 | 90,000 |
| Dir IT | 1 | 5/1/2018 | 100,000 | 0 | 0 | 20% | 20,000 | 120,000 |
| Dir Accounting | 1 | 5/1/2018 | 85,000 | 0 | 0 | 20% | 17,000 | 102,000 |
| Social Mdia Coordinators/Content | 1 | 5/1/2018 | 45,000 | 0 | | 20% | 9,000 | 54,000 |
| Social Media Coordinator | 5 | 6/1/2018 | 45,000 | 0 | 0 | 20% | 45,000 | 270,000 |
| Social Media Coordiantor | 1 | 6/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Social Media Coordiantor | 1 | 7/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Content Writer | 1 | 7/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Content Writer | 1 | 8/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Video Content Coordinator | 1 | 6/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Video Content Coordinator | 1 | 7/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Admin Coordinator | 1 | 7/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Didgatal Talent /Host | 1 | 7/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Interns | 10 | 9/1/2018 | 10,000 | 0 | 0 | 20% | 20,000 | 120,000 |
| VP Player Personel | 1 | 5/1/2018 | 250,000 | 0 | 0 | 20% | 50,000 | 300,000 |
| Senior Adiminastartor PP | 1 | 5/1/2018 | 100,000 | 0 | 0 | 20% | 20,000 | 120,000 |
| Dir Palyer Personel | 1 | 5/1/2018 | 125,000 | 0 | 0 | 20% | 25,000 | 150,000 |
| Director of Scouting | 1 | 5/1/2018 | 125,000 | 0 | 0 | 20% | 25,000 | 150,000 |
| Head of Football | 1 | 5/1/2018 | 275,000 | 0 | 0 | 20% | 55,000 | 330,000 |
| Dir Football Operation | 1 | 3/1/2018 | | 0 | 0 | 20% | 0 | 0 |
| Dir of Equipement | 1 | 5/1/2018 | 125,000 | 0 | 0 | 20% | 25,000 | 150,000 |
| Asstant Equipment | 1 | 9/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Dir Football Video | 1 | 10/1/2019 | 100,000 | 0 | 0 | 20% | 20,000 | 120,000 |
| asst Video | 1 | 10/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| VP Medical Services | 1 | 6/1/2018 | 150,000 | 0 | 0 | 20% | 30,000 | 180,000 |
| head of Officating | 1 | 10/1/2018 | 100,000 | 0 | 0 | 20% | 20,000 | 120,000 |

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | January-18 | February-18 | March-18 | April-18 | May-18 | June-18 | July-18 | August-18 | September-18 | October-18 | November-18 | December-18 | January-19 | February-19 |
| Step-Up | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Year | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2019 | 2019 |
| CEO | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 |
| CMO | $0 | $0 | $0 | $0 | $0 | $0 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| COO | $0 | $0 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| CBO | $0 | $0 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| Football Founder | $0 | $0 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 |
| General Counsel | $0 | $0 | $0 | $0 | $0 | $0 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| Head of Brand | $0 | $0 | $0 | $0 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| SVP Partnership Sales | $0 | $0 | $0 | $0 | $0 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| VP Human Resources | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| VP Team Services | $0 | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| VP Operations | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| Chief of staff business | $0 | $0 | $0 | $0 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| VP Operations | $0 | $0 | $0 | $0 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 |
| VP Team Marketing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| VP Media Relations | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Dir Team Ticket Sales | $0 | $0 | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| Dir Digital | $0 | $0 | $0 | $0 | $0 | $0 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| Dir Social Media | $0 | $0 | $0 | $0 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| Dir Creative Services | $0 | $0 | $0 | $0 | $0 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| Creative services Coordiantor | $0 | $0 | $0 | $0 | $0 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| Dir IT | $0 | $0 | $0 | $0 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| Dir Accounting | $0 | $0 | $0 | $0 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| Social Media Coordinators/Content | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Social Media Coordinator | $0 | $0 | $0 | $0 | $0 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| Social Media Coordinator | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Social Media Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Content Writer | $0 | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Content Writer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Video Content Coordiantor | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Video Content Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Admin Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Didgatal Talent /Host | $0 | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| Interns | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| VP Player Personel | $0 | $0 | $0 | $0 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| Senior Adiminastartor PP | $0 | $0 | $0 | $0 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| Dir Palyer Personel | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| Director of Scouting | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| Head of Football | $0 | $0 | $0 | $0 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 |
| Dir Football Operation | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir of Equipement | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| Asstant Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| Dir Football Video | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| asst Video | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| VP Medical Services | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| head of Officating | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |

1.1 20180531 TR0000522110 TR0000522111.XLSX

| 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| March-19 | April-19 | May-19 | June-19 | July-19 | August-19 | September-19 | October-19 | November-19 | December-19 | January-20 | February-20 | March-20 |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2020 | 2020 | 2020 |
| $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |

| 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
|---|---|---|---|---|---|---|---|---|
| April-20 | May-20 | June-20 | July-20 | August-20 | September-20 | October-20 | November-20 | December-20 |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 |
| $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 | $29,167 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 | $6,250 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 | $22,917 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |

| | 2018 | 2019 |
|---|---|---|
| | $350,000 | $350,000 |
| | $125,000 | $250,000 |
| | $208,333 | $250,000 |
| | $208,333 | $250,000 |
| | $416,667 | $500,000 |
| | $125,000 | $250,000 |
| | $133,333 | $200,000 |
| | $131,250 | $225,000 |
| | $87,500 | $150,000 |
| | $72,917 | $125,000 |
| | $83,333 | $125,000 |
| | $56,667 | $85,000 |
| | $86,667 | $130,000 |
| | $62,500 | $150,000 |
| | $112,500 | $150,000 |
| | $62,500 | $125,000 |
| | $37,500 | $75,000 |
| | $50,000 | $75,000 |
| | $43,750 | $75,000 |
| | $43,750 | $75,000 |
| | $66,667 | $100,000 |
| | $56,667 | $85,000 |
| | $30,000 | $45,000 |
| | $131,250 | $225,000 |
| | $26,250 | $45,000 |
| | $22,500 | $45,000 |
| | $22,500 | $45,000 |
| | $18,750 | $45,000 |
| | $26,250 | $45,000 |
| | $22,500 | $45,000 |
| | $22,500 | $45,000 |
| | $22,500 | $45,000 |
| | $33,333 | $100,000 |
| | $166,667 | $250,000 |
| | $66,667 | $100,000 |
| | $83,333 | $125,000 |
| | $83,333 | $125,000 |
| | $183,333 | $275,000 |
| | $0 | $0 |
| | $83,333 | $125,000 |
| | $16,667 | $50,000 |
| | $0 | $25,000 |
| | $12,500 | $50,000 |
| | $87,500 | $150,000 |
| | $25,000 | $100,000 |

1.1 20180531 TR0000522110 TR0000522111.XLSX

1000

League Expenses



| Total | $5,710,000 | $0 | $405,000 | $1,196,000 | $7,581,000 |

1.1 20180531 TR0000522110 TR0000522111.XLSX

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total League Payroll** | **$29,167** | **$29,167** | **$112,500** | **$125,000** | **$278,750** | **$371,667** | **$448,750** | **$465,000** | **$477,500** | **$490,000** | **$490,000** | **$490,000** | **$490,000** | **$490,000** |
| CEO | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 |
| CMO | $0 | $0 | $0 | $0 | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| COO | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| CBO | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| Football Founder | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| General Counsel | $0 | $0 | $0 | $0 | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| Head of Brand | $0 | $0 | $0 | $0 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 |
| SVP Partnership Sales | $0 | $0 | $0 | $0 | $0 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| VP Human Resources | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Team Services | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Operations | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Chief of staff business | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Operations | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Team Marketing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Media Relations | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Team Ticket Sales | $0 | $0 | $0 | $0 | $0 | $0 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| Dir Digital | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Social Media | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Creative Services | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Creative services Coordiantor | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir IT | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Accounting | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Social Mdia Coordinators/Content | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Social Media Coordiantor | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Social Media Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Social Media Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Content Writer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Content Writer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Video Content Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Video Content Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Admin Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Didgatal Talent /Host | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Interns | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Player Personel | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Senior Adiminastartor PP | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Palyer Personel | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Director of Scouting | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Head of Football | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Football Operation | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir of Equipement | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Asstant Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Football Video | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| asst Video | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Medical Services | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| head of Officating | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $490,000 | $490,000 | $490,000 | $490,000 | $490,000 | $490,000 | $490,000 | $498,333 | $498,333 | $498,333 | $498,333 | $498,333 | $498,333 |
| $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $498,333 | $498,333 | $498,333 | $498,333 | $498,333 | $498,333 | $498,333 | $498,333 | $498,333 |
| $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 | $5,833 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 | $3,333 |
| $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 | $3,750 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 | $4,167 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

22-050-05077-dagc#2001-124-Filed 06/24/25 16/26 Entered 06/24/25 10925011904 2295 Exhibit 48 Designated
D16_Kanto Pg 1905 3 of 1466

League Expenses

| | |
|---|---|
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| **$3,807,500** | **$5,905,000** |
| $70,000 | $70,000 |
| $25,000 | $50,000 |
| $41,667 | $50,000 |
| $41,667 | $50,000 |
| $0 | $0 |
| $25,000 | $50,000 |
| $26,667 | $40,000 |
| $26,250 | $45,000 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $25,000 | $50,000 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |

1.1 20180531 TR0000522110 TR0000522111.XLSX

| Benefits & Taxes Assumptions: | Rate |
|---|---|
| | 20% |

| Other Expense Items Assumptions: | Description | Category | |
|---|---|---|---|
| | Launch Event | Marketing, Advertisin | Individual Inputs Manually---> |
| | Fundraising | Professional Services | Individual Inputs Manually---> |
| | Season build up medi | Marketing, Advertisin | Individual Inputs Manually---> |
| | CAC | Marketing, Advertisin | Individual Inputs Manually---> |
| | CBS Fees | Broadcasting Fees | Individual Inputs Manually---> |
| | CBS SN Fees | Broadcasting Fees | Individual Inputs Manually---> |
| | Season content prodi | TV Production | Individual Inputs Manually---> |
| | PR (MWW) | Marketing, Advertisin | Individual Inputs Manually---> |
| | Other PR | Marketing, Advertisin | Individual Inputs Manually---> |
| | Branding research an | Photography / Digital | Individual Inputs Manually---> |
| | Launch event | Photography / Digital | Individual Inputs Manually---> |
| | Order Football Equip | Football Player Equip | Individual Inputs Manually---> |
| | Training Equipment | Football Training Equ | Individual Inputs Manually---> |
| | Training camp Payme | Training Camp | Individual Inputs Manually---> |
| | Hiring fees/league rel | Other | Individual Inputs Manually---> |
| | Furniture | Office Rent & Utilities | Individual Inputs Manually---> |
| | Rent Orlando | Office Rent & Utilities | Individual Inputs Manually---> |
| | Rent LA | Office Rent & Utilities | Individual Inputs Manually---> |
| | General Office Suppli | Office Supplies & Equ | Individual Inputs Manually---> |
| | Computer Equipment | Office Supplies & Equ | Individual Inputs Manually---> |
| | City Launch Events | Marketing, Advertisin | Individual Inputs Manually---> |
| | Unknown | Other | Individual Inputs Manually---> |
| | Monthly Legal Fees | Legal | Individual Inputs Manually---> |
| | TV production costs | TV Production | Individual Inputs Manually---> |
| | Digital Production co | TV Production | Individual Inputs Manually---> |
| | Music licensing | TV Production | Individual Inputs Manually---> |
| | Animation Package | TV Production | Individual Inputs Manually---> |
| | Crew Company | TV Production | Individual Inputs Manually---> |
| | Charlie/Tom travel | Travel | Individual Inputs Manually---> |
| | Football league | Travel | Individual Inputs Manually---> |
| | Consulting Services | Professional Services | Individual Inputs Manually---> |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |
| | [] | [] | |

22-030-05-07...dag-c#2001#124-F42...56240251...E/25...Ent06624025109...2591390422950E7hDes4g...nated
51do_Kents Fitz190 785 of 466

League Expenses

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Total League Bonuses** | $5,833 | $5,833 | $14,167 | $14,167 | $17,500 | $21,250 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 |
| **Benefits & Taxes** | $7,000 | $7,000 | $25,333 | $27,833 | $59,250 | $78,583 | $96,500 | $99,750 | $102,250 | $104,750 | $104,750 | $104,750 | $104,750 | $104,750 |
| Launch Event | | | $250,000 | | | | | | | | | | | |
| Fundraising | | | | | $75,000 | | | | | | | | | |
| Season build up media | | | | | | | | | | | | $200,000 | $500,000 | $300,000 |
| CAC | | | | | | | | | | | | $300,000 | $300,000 | $500,000 |
| CBS Fees | | | | | | | | | $333,333 | | $333,333 | $333,333 | | $333,333 |
| CBS SN Fees | | | | | | | | | | | | | | $80,000 |
| Season content production costs | | | | | | | | | | | $250,000 | $250,000 | | |
| PR (MWW) | | $35,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| Other PR | | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| Branding research and stuff | | $50,000 | $50,000 | $50,000 | $50,000 | | | | | | | | | |
| Launch event | | | | $300,000 | | | | | | | | | | |
| Order Football Equipment | | | | | | | | | $2,000,000 | $2,000,000 | | | | |
| Training Equipment | | | | | | | | | $800,000 | | | | | |
| Training camp Payments | | | | | $500,000 | $500,000 | $1,000,000 | | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $4,500,000 | $0 |
| Hiring fees/league relos | | | | | $75,000 | $25,000 | $50,000 | | $50,000 | $50,000 | $50,000 | | | |
| Furniture | | | | | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| Rent Orlando | | | | | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 |
| Rent LA | | | | | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 |
| General Office Supplies | | | | | $30,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | | $0 | $0 |
| Computer Equipment | | | | $800 | $70,000 | $70,000 | $11,200 | $5,600 | $8,800 | $1,600 | $1,600 | $0 | $0 | $0 |
| City Launch Events | | | | | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| Unknown | | | | | | | | | | | | | | |
| Monthly Legal Fees | 75000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 |
| TV production costs | | | | | | | | | | | | | $1,100,000 | $1,000,000 |
| Digital Production costs | | | | | | | | | | | | | $1,800,000 | $1,800,000 |
| Music licensing | | | | | | | | | | | $20,000 | | | |
| Animation Package | | | | | | | | | $116,667 | $116,667 | $116,667 | | | |
| Crew Company | | | | | | | | | | | | | $290,000 | $280,000 |
| Charlie/Tom travel | | | | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| Football league | | | | $30,000 | $30,000 | $30,000 | $30,000 | | | | | | | |
| Consulting Services | | | | | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| [] | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | |
| **Total Other League Expenses** | $75,000 | $170,000 | $410,000 | $632,800 | $571,513 | $819,513 | $838,913 | $1,254,913 | $4,562,112 | $3,421,579 | $2,023,312 | $2,336,646 | $9,076,646 | $4,546,646 |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 |
| $104,750 | $104,750 | $104,750 | $104,750 | $104,750 | $104,750 | $104,750 | $106,417 | $106,417 | $106,417 | $106,417 | $106,417 | $106,417 |
| $500,000 | $500,000 | | | | | | | | | $500,000 | $300,000 | $0 |
| | | | | | | | | | | $300,000 | $500,000 | $500,000 |
| $333,333 | $0 | | | | | $333,333 | $0 | $333,333 | $333,333 | $333,333 | $333,333 | $333,333 |
| $80,000 | $20,000 | | | | | | | | | $0 | $80,000 | $80,000 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| $0 | $0 | $0 | $500,000 | $500,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $4,500,000 | $0 | $0 |
| $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 |
| $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 |
| $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $800 | $0 | $0 | $0 | $0 | $0 |
| $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 |
| $850,000 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,100,000 | $1,000,000 | $850,000 |
| $900,000 | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,800,000 | $1,800,000 | $900,000 |
| $175,000 | | | | | | | | | | $290,000 | $280,000 | $175,000 |
| $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| | | | | | | | | | | $0 | $0 | $0 |
| $3,091,646 | $773,313 | $253,313 | $753,313 | $753,313 | $1,253,313 | $1,586,646 | $1,254,113 | $1,586,646 | $1,586,646 | $9,076,646 | $4,546,646 | $3,091,646 |

League Expenses

| Col1 | Col2 | Col3 | Col4 | Col5 | Col6 | Col7 | Col8 | Col9 |
|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 | $33,750 |
| $106,417 | $106,417 | $106,417 | $106,417 | $106,417 | $106,417 | $106,417 | $106,417 | $106,417 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $500,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $333,333 | $0 | $333,333 | $333,333 |
| $20,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $500,000 | $500,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 | $31,250 |
| $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 | $14,063 |
| $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $800 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **$773,313** | **$253,313** | **$753,313** | **$753,313** | **$1,253,313** | **$1,586,646** | **$1,254,113** | **$1,586,646** | **$1,586,646** |

| | |
|---|---|
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| **$281,250** | **$405,000** |
| | |
| **$817,750** | **$1,262,000** |
| | |
| $250,000 | $0 |
| $75,000 | $0 |
| $200,000 | $800,000 |
| $300,000 | $1,800,000 |
| $999,999 | $1,999,998 |
| $0 | $180,000 |
| $500,000 | $0 |
| $285,000 | $300,000 |
| $110,000 | $120,000 |
| $200,000 | $0 |
| $300,000 | $0 |
| $4,000,000 | $0 |
| $800,000 | $0 |
| $6,000,000 | $10,500,000 |
| $300,000 | $0 |
| $24,000 | $36,000 |
| $250,000 | $375,000 |
| $112,500 | $168,750 |
| $51,000 | $36,000 |
| $40,800 | $800 |
| $140,000 | $0 |
| $450,000 | $600,000 |
| $900,000 | $900,000 |
| $0 | $2,950,000 |
| $0 | $4,500,000 |
| $20,000 | $0 |
| $350,000 | $0 |
| $0 | $745,000 |
| $198,000 | $264,000 |
| $120,000 | $0 |
| $140,000 | $240,000 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| **$17,116,299** | **$26,515,548** |

League Expenses

| Total League Expenses | $117,000 | $212,000 | $562,000 | $799,800 | $927,013 | $1,291,013 | $1,417,913 | $1,853,413 | $5,175,612 | $4,050,079 | $2,651,812 | $2,965,146 | $9,705,146 | $5,175,146 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expense Summary:** | | | | | | | | | | | | | | |
| Payroll, Benefits & Bonus | $42,000 | $42,000 | $152,000 | $167,000 | $355,500 | $471,500 | $579,000 | $598,500 | $613,500 | $628,500 | $628,500 | $628,500 | $628,500 | $628,500 |
| Marketing, Advertising & Promotion | $0 | $45,000 | $285,000 | $105,000 | $105,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $535,000 | $835,000 |
| Professional Services | $0 | $0 | $0 | $0 | $75,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Broadcasting Fees | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $333,333 | $0 | $333,333 | $333,333 | $333,333 | $413,333 |
| TV Production | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $116,667 | $116,667 | $386,667 | $250,000 | $3,190,000 | $3,080,000 |
| Photography / Digital Content | $0 | $50,000 | $50,000 | $350,000 | $50,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Football Player Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,000,000 | $2,000,000 | $0 | $0 | $0 | $0 |
| Football Training Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $800,000 | $0 | $0 | $0 | $0 | $0 |
| Training Camp | $0 | $0 | $0 | $0 | $0 | $500,000 | $500,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $4,500,000 | $0 |
| Player Related Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Office Rent & Utilities | $0 | $0 | $0 | $0 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 |
| Office Supplies & Equipment | $0 | $0 | $0 | $800 | $41,200 | $14,200 | $8,600 | $4,600 | $11,800 | $4,600 | $3,000 | $3,000 | $3,000 | $3,000 |
| Other | $0 | $0 | $0 | $50,000 | $125,000 | $75,000 | $100,000 | $50,000 | $100,000 | $100,000 | $100,000 | $50,000 | $50,000 | $50,000 |
| Legal | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 |
| Travel | $0 | $0 | $0 | $52,000 | $52,000 | $52,000 | $52,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| Game Related Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Check | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | | |
| Payroll, Benefits & Bonus | 36% | 20% | 27% | 21% | 38% | 37% | 41% | 32% | 12% | 16% | 24% | 21% | 6% | 12% |
| Marketing, Advertising & Promotion | 0% | 21% | 51% | 13% | 11% | 3% | 2% | 2% | 1% | 1% | 1% | 18% | 9% | 16% |
| Professional Services | 0% | 0% | 0% | 0% | 8% | 2% | 1% | 1% | 0% | 0% | 1% | 1% | 0% | 0% |
| Broadcasting Fees | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 6% | 0% | 13% | 11% | 3% | 8% |
| TV Production | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 2% | 3% | 15% | 8% | 33% | 60% |
| Photography / Digital Content | 0% | 24% | 9% | 44% | 5% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Football Player Equipment | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 39% | 49% | 0% | 0% | 0% | 0% |
| Football Training Equipment | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 15% | 0% | 0% | 0% | 0% | 0% |
| Training Camp | 0% | 0% | 0% | 0% | 0% | 39% | 35% | 54% | 19% | 25% | 38% | 34% | 46% | 0% |
| Player Related Expenses | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Office Rent & Utilities | 0% | 0% | 0% | 0% | 5% | 4% | 3% | 3% | 1% | 1% | 2% | 2% | 0% | 1% |
| Office Supplies & Equipment | 0% | 0% | 0% | 0% | 4% | 1% | 1% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Other | 0% | 0% | 0% | 6% | 13% | 6% | 7% | 3% | 2% | 2% | 4% | 2% | 1% | 1% |
| Legal | 64% | 35% | 13% | 9% | 8% | 6% | 5% | 4% | 1% | 2% | 3% | 3% | 1% | 1% |
| Travel | 0% | 0% | 0% | 7% | 6% | 4% | 4% | 1% | 0% | 1% | 1% | 1% | 0% | 0% |
| Game Related Expenses | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Check | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

22-030-05070-dagc#2001-124-filed 06/24/2510/25 entered 06/24/2510/25 19042295 Exhibit 40 Designated
5.16_Kents Fitz Pg 1 of 1 of 86
League Expense

| $3,720,146 | $1,401,813 | $881,813 | $1,381,813 | $1,381,813 | $1,881,813 | $2,215,146 | $1,892,613 | $2,225,146 | $2,225,146 | $9,715,146 | $5,185,146 | $3,730,146 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $628,500 | $628,500 | $628,500 | $628,500 | $628,500 | $628,500 | $628,500 | $638,500 | $638,500 | $638,500 | $638,500 | $638,500 | $638,500 |
| $535,000 | $535,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $835,000 | $835,000 | $535,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| $413,333 | $20,000 | $0 | $0 | $0 | $0 | $333,333 | $0 | $333,333 | $333,333 | $333,333 | $413,333 | $413,333 |
| $1,925,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,190,000 | $3,080,000 | $1,925,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $500,000 | $500,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $4,500,000 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 |
| $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,800 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 |
| $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 |
| $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 17% | 45% | 71% | 45% | 45% | 33% | 28% | 34% | 29% | 29% | 7% | 12% | 17% |
| 14% | 38% | 4% | 3% | 3% | 2% | 2% | 2% | 2% | 2% | 9% | 16% | 14% |
| 1% | 1% | 2% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 0% | 1% |
| 11% | 1% | 0% | 0% | 0% | 0% | 15% | 0% | 15% | 15% | 3% | 8% | 11% |
| 52% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 33% | 59% | 52% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 36% | 36% | 53% | 45% | 53% | 45% | 45% | 46% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1% | 3% | 5% | 3% | 3% | 3% | 2% | 3% | 2% | 2% | 0% | 1% | 1% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1% | 4% | 6% | 4% | 4% | 3% | 2% | 3% | 2% | 2% | 1% | 1% | 1% |
| 2% | 5% | 9% | 5% | 5% | 4% | 3% | 4% | 3% | 3% | 1% | 1% | 2% |
| 1% | 2% | 2% | 2% | 2% | 1% | 1% | 1% | 1% | 1% | 0% | 0% | 1% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| $1,411,813 | $891,813 | $1,391,813 | $1,391,813 | $1,891,813 | $2,225,146 | $1,892,613 | $2,225,146 | $2,225,146 |
|---|---|---|---|---|---|---|---|---|
| $638,500 | $638,500 | $638,500 | $638,500 | $638,500 | $638,500 | $638,500 | $638,500 | $638,500 |
| $535,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 | $35,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| $20,000 | $0 | $0 | $0 | $0 | $333,333 | $0 | $333,333 | $333,333 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $500,000 | $500,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 | $48,313 |
| $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,000 | $3,800 | $3,000 | $3,000 |
| $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 | $50,000 |
| $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 | $75,000 |
| $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 | $22,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 45% | 72% | 46% | 46% | 34% | 29% | 34% | 29% | 29% |
| 38% | 4% | 3% | 3% | 2% | 2% | 2% | 2% | 2% |
| 1% | 2% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| 1% | 0% | 0% | 0% | 0% | 15% | 0% | 15% | 15% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 36% | 36% | 53% | 45% | 53% | 45% | 45% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 3% | 5% | 3% | 3% | 3% | 2% | 3% | 2% | 2% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 4% | 6% | 4% | 4% | 3% | 2% | 3% | 2% | 2% |
| 5% | 8% | 5% | 5% | 4% | 3% | 4% | 3% | 3% |
| 2% | 2% | 2% | 2% | 1% | 1% | 1% | 1% | 1% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

League Expenses

| | |
|---|---|
| $22,022,799 | $34,087,548 |
| | |
| $4,906,500 | $7,572,000 |
| $1,285,000 | $3,020,000 |
| $215,000 | $240,000 |
| $999,999 | $2,179,998 |
| $870,000 | $8,195,000 |
| $500,000 | $0 |
| $4,000,000 | $0 |
| $800,000 | $0 |
| $6,000,000 | $10,500,000 |
| $0 | $0 |
| $386,500 | $579,750 |
| $91,800 | $36,800 |
| $750,000 | $600,000 |
| $900,000 | $900,000 |
| $318,000 | $264,000 |
| $0 | $0 |
| $0 | $0 |
| | |
| 22% | 22% |
| 6% | 9% |
| 1% | 1% |
| 5% | 6% |
| 4% | 24% |
| 2% | 0% |
| 18% | 0% |
| 4% | 0% |
| 27% | 31% |
| 0% | 0% |
| 2% | 2% |
| 0% | 0% |
| 3% | 2% |
| 4% | 3% |
| 1% | 1% |
| 0% | 0% |
| 100% | 100% |

Team Operating Expenses

| Front Office Payroll Assumptions: | # | Start Date | Base Salary | Commissions | Bonuses | Benefits Uplift | Total Benefits | Total |
|---|---|---|---|---|---|---|---|---|
| | | | | | 0% | | | |
| President | 1 | 5/1/2018 | $175,000 | $0 | $0 | 20% | $35,000 | $210,000 |
| VP Marketing | 1 | 6/1/2018 | 125,000 | 0 | 0 | 20% | 25,000 | 150,000 |
| VP Ticket Sales | 1 | 6/1/2018 | 125,000 | 50,000 | 0 | 20% | 25,000 | 200,000 |
| VP Sponsorship Sales | 1 | 6/1/2018 | 125,000 | 50,000 | 0 | 20% | 25,000 | 200,000 |
| Dir Operations | 1 | 8/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Dir Finance | 1 | 8/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Media Relations Manager | 1 | 8/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Ticket Operations Manager | 1 | 6/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Web Master | 1 | 6/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Social Media Manager | 1 | 6/1/2018 | 35,000 | 0 | 0 | 20% | 7,000 | 42,000 |
| Content Writer | 1 | 5/1/2018 | 35,000 | 0 | 0 | 20% | 7,000 | 42,000 |
| Graphic Arts Coordnator | 1 | 8/1/2018 | 40,000 | 0 | 0 | 20% | 8,000 | 48,000 |
| Promotions Coordinator | 1 | 8/1/2018 | 45,000 | 0 | 0 | 20% | 9,000 | 54,000 |
| Senior Ticket Lead | 1 | 6/1/2018 | 40,000 | 25,000 | 0 | 20% | 8,000 | 73,000 |
| Senior Ticket Lead | 1 | 6/1/2018 | 40,000 | 25,000 | 0 | 20% | 8,000 | 73,000 |
| Ticket Account Executive | 1 | 6/1/2018 | 30,000 | 20,000 | 0 | 20% | 6,000 | 56,000 |
| Ticket Account Executive | 1 | 6/1/2018 | 30,000 | 20,000 | 0 | 20% | 6,000 | 56,000 |
| Ticket Account Executive | 1 | 6/1/2018 | 30,000 | 20,000 | 0 | 20% | 6,000 | 56,000 |
| Ticket Account Executive | 1 | 6/1/2018 | 30,000 | 20,000 | 0 | 20% | 6,000 | 56,000 |
| Partnership Sales/Service | 1 | 6/1/2018 | 50,000 | 20,000 | 0 | 20% | 10,000 | 80,000 |
| Video Coordinator | 1 | 6/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Admin Asst | 1 | 6/1/2018 | 40,000 | 0 | 0 | 20% | 8,000 | 48,000 |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| Total | 22 | | $1,295,000 | $250,000 | $0 | | $259,000 | $1,804,000 |

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | January-18 | February-18 | March-18 | April-18 | May-18 | June-18 | July-18 | August-18 | September-18 | October-18 | November-18 | December-18 | January-19 | February-19 | March-19 |
| Step-Up | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Year | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2019 | 2019 | 2019 |
| # of Teams | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| President | $0 | $0 | $0 | $0 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 |
| VP Marketing | $0 | $0 | $0 | $0 | $0 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 |
| VP Ticket Sales | $0 | $0 | $0 | $0 | $0 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 |
| VP Sponsorship Sales | $0 | $0 | $0 | $0 | $0 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 |
| Dir Operations | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Dir Finance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Media Relations Manager | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Ticket Operations Manager | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Web Master | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Social Media Manager | $0 | $0 | $0 | $0 | $0 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 |
| Content Writer | $0 | $0 | $0 | $0 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 |
| Graphic Arts Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| Promotions Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| Senior Ticket Lead | $0 | $0 | $0 | $0 | $0 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| Senior Ticket Lead | $0 | $0 | $0 | $0 | $0 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| Partnership Sales/Service | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Video Coordinator | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Admin Asst | $0 | $0 | $0 | $0 | $0 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Front Office Payroll | $0 | $0 | $0 | $0 | $140,000 | $706,667 | $706,667 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 |
| President | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Marketing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Ticket Sales | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| VP Sponsorship Sales | $0 | $0 | $0 | $0 | $0 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| Dir Operations | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Finance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Media Relations Manager | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ticket Operations Manager | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Web Master | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Social Media Manager | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Content Writer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| April-19 | May-19 | June-19 | July-19 | August-19 | September-19 | October-19 | November-19 | December-19 | January-20 | February-20 | March-20 | April-20 | May-20 |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2020 | 2020 | 2020 | 2020 | 2020 |
| 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 |
| $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 |
| $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 |
| $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| 30 | 31 | 32 | 33 | 34 | 35 | 36 | | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|
| June-20 | July-20 | August-20 | September-20 | October-20 | November-20 | December-20 | | | |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | | |
| 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | | | |
| 8 | 8 | 8 | 8 | 8 | 8 | 8 | | | |
| $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | $116,667 | | $933,333 | $1,400,000 |
| $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | | $583,333 | $1,000,000 |
| $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | | $583,333 | $1,000,000 |
| $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | $83,333 | | $583,333 | $1,000,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $166,667 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $166,667 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $166,667 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $233,333 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $233,333 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $163,333 | $280,000 |
| $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | | $186,667 | $280,000 |
| $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | $23,333 | | $133,333 | $320,000 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | | $150,000 | $360,000 |
| $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | $30,000 | | $186,667 | $320,000 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | | $186,667 | $320,000 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | | $140,000 | $240,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | | $140,000 | $240,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | | $140,000 | $240,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | | $140,000 | $240,000 |
| $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | | $233,333 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $233,333 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $186,667 | $320,000 |
| $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | $26,667 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | $863,333 | | $5,870,000 | $10,360,000 |
| | | | | | | | | | |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $233,333 | $400,000 |
| $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | $33,333 | | $233,333 | $400,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Graphic Arts Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Promotions Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Senior Ticket Lead | $0 | $0 | $0 | $0 | $0 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| Senior Ticket Lead | $0 | $0 | $0 | $0 | $0 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| Partnership Sales/Service | $0 | $0 | $0 | $0 | $0 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| Video Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Admin Asst | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Front Office Commissions** | $0 | $0 | $0 | $0 | $0 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 |
| | | | | | | | | | | | | | | | |
| President | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Marketing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Ticket Sales | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| VP Sponsorship Sales | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Operations | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Dir Finance | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Media Relations Manager | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ticket Operations Manager | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Web Master | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Social Media Manager | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Content Writer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Graphic Arts Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Promotions Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Senior Ticket Lead | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Senior Ticket Lead | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Ticket Account Executive | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Partnership Sales/Service | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Video Coordinator | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Admin Asst | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| [] | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Front Office Bonuses** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 | $166,667 |

(Second section — all values $0)

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

(... rows of $0 repeated throughout the second block ...)

| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | | $116,667 | $200,000 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | | $116,667 | $200,000 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | | $93,333 | $160,000 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | | $93,333 | $160,000 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | | $93,333 | $160,000 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | | $93,333 | $160,000 |
| $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | $13,333 | | $93,333 | $160,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| **$166,667** | **$166,667** | **$166,667** | **$166,667** | **$166,667** | **$166,667** | **$166,667** | | **$1,166,667** | **$2,000,000** |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | | **$0** | **$0** |

1023

| Front Office Benefits & Taxes Assumptions: | Rate | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 20% | | | | | | | |

| Coaches Payroll Assumptions: | # | Start Date | Base Salary | Commissions | Bonuses | Benefits Uplift | Total Benefits | Total |
|---|---|---|---|---|---|---|---|---|
| Head Coach | 1 | 12/1/2018 | $625,000 | $0 | $0 | 20% | $125,000 | $750,000 |
| Coaches Pool | 1 | 12/1/2018 | 1,000,000 | 0 | 0 | 20% | 200,000 | 1,200,000 |
| Player Personnel | 1 | 12/1/2018 | | 0 | 0 | 20% | 0 | 0 |
| GA | 1 | 12/1/2018 | | 0 | 0 | 20% | 0 | 0 |
| GA | 1 | 12/1/2018 | | 0 | 0 | 20% | 0 | 0 |
| Equipment Manager | 1 | 12/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Asst Equip | 1 | 12/1/2018 | 40,000 | 0 | 0 | 20% | 8,000 | 48,000 |
| Trainer | 1 | 12/1/2018 | 75,000 | 0 | 0 | 20% | 15,000 | 90,000 |
| Asst Trainer | 1 | 12/1/2018 | 40,000 | 0 | 0 | 20% | 8,000 | 48,000 |
| Strength Coach | 1 | 12/1/2018 | 75,000 | 0 | 0 | 20% | 15,000 | 90,000 |
| Team Admin | 1 | 12/1/2018 | 50,000 | 0 | 0 | 20% | 10,000 | 60,000 |
| Admin Asst | 1 | 12/1/2018 | 40,000 | 0 | 0 | 20% | 8,000 | 48,000 |
| Video Coordinator | 1 | 12/1/2018 | 30,000 | 0 | 0 | 20% | 6,000 | 36,000 |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| [] | | | | | | | | |
| Total | 13 | | $2,025,000 | $0 | $0 | | $405,000 | $2,430,000 |

| Coaches Benefits & Taxes Assumptions: | Rate | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 20% | | | | | | | |

| | | | | 30% | | | | |
|---|---|---|---|---|---|---|---|---|
| Players Payroll Assumptions: | # | Start Date | Per Player | Workers Comp | Bonuses | Benefits Uplift | Total Benefits | Total |
| Players | 50 | 1/1/2019 | $50,000 | $15,000 | $0 | 20% | $10,000 | $3,750,000 |
| Marquee | 0 | 1/1/2019 | 250,000 | 75,000 | 0 | 20% | 50,000 | 0 |
| Scramble | 0 | 1/1/2019 | 10,000 | 0 | 0 | 20% | 2,000 | 0 |
| Total | 50 | | $310,000 | $90,000 | $0 | | $62,000 | $3,750,000 |

| Players Benefits & Taxes Assumptions: | Rate | |
|---|---|---|
| | 20% | |

| Other Expense Items Assumptions: | Description | Category |
|---|---|---|
| | Marquee Player Pers| Marketing, Advertising & Promotion |
| | 5 stadium rentals per | Game Related Expenses |
| | Travel to away game | Travel |
| | Stadium Deposit | Game Related Expenses |
| | Monthly Rent | Office Rent & Utilities |
| | Office Build out | Office Rent & Utilities |
| | Headcoach consulting | Professional Services |
| | referees Per Mike P. | Game Related Expenses |
| | Non-Season Travel | Travel |

1024

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | C9 | C10 | C11 | C12 | C13 | C14 | C15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Front Office Benefits & Taxes | $0 | $0 | $0 | $0 | $28,000 | $174,667 | $174,667 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 |
| Head Coach | | | | | | | | | | | | $833,333 | $833,333 | $833,333 | $833,333 |
| Coaches Pool | | | | | | | | | | | | $1,333,333 | $1,333,333 | $1,333,333 | $1,333,333 |
| Player Personnel | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| GA | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| GA | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| Equipment Manager | | | | | | | | | | | | $66,667 | $66,667 | $66,667 | $66,667 |
| Asst Equip | | | | | | | | | | | | $53,333 | $53,333 | $53,333 | $53,333 |
| Trainer | | | | | | | | | | | | $100,000 | $100,000 | $100,000 | $100,000 |
| Asst Trainer | | | | | | | | | | | | $53,333 | $53,333 | $53,333 | $53,333 |
| Strength Coach | | | | | | | | | | | | $100,000 | $100,000 | $100,000 | $100,000 |
| Team Admin | | | | | | | | | | | | $66,667 | $66,667 | $66,667 | $66,667 |
| Admin Asst | | | | | | | | | | | | $53,333 | $53,333 | $53,333 | $53,333 |
| Video Coordinator | | | | | | | | | | | | $40,000 | $40,000 | $40,000 | $40,000 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| [] | | | | | | | | | | | | $0 | $0 | $0 | $0 |
| Coaches Payroll | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $2,700,000 | $2,700,000 | $2,700,000 | $2,700,000 |
| Coaches Benefits & Taxes | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $540,000 | $540,000 | $540,000 | $540,000 |
| Players | | | | | | | | | | | | | $5,000,000 | $5,000,000 | $5,000,000 |
| Marquee | | | | | | | | | | | | | $0 | $0 | $0 |
| Scramble | | | | | | | | | | | | | $0 | $0 | $0 |
| Players Payroll | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $5,000,000 | $5,000,000 | $5,000,000 |
| Players | | | | | | | | | | | | | $1,500,000 | $1,500,000 | $1,500,000 |
| Marquee | | | | | | | | | | | | | $0 | $0 | $0 |
| Scramble | | | | | | | | | | | | | $0 | $0 | $0 |
| Players Workers Comp | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,500,000 | $1,500,000 | $1,500,000 |
| Players Benefits & Taxes | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,000,000 | $1,000,000 | $1,000,000 |
| Marquee Player Personal Services | | | | | | | | | | | | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |
| 5 stadium rentals per season | | | | | | | | | | | | | | $1,200,000 | $1,200,000 |
| Travel to away games | | | | | | | | | | | | | | $3,200,000 | $3,200,000 |
| Stadium Deposit | | | | | | | $600,000 | | | | | | | | |
| Monthly Rent | | | | | | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 |
| Office Build out | | | | | | $120,000 | | | | | | | | | |
| Headcoach consulting contract | | | | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | | | | |
| referees Per Mike P. estimate | | | | | | | | | | | | | $190,250 | $311,463 | $311,463 |
| Non-Season Travel | | | | | | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | | | |

| $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $833,333 | $833,333 | | | | | | | $833,333 | $833,333 | $833,333 | $833,333 | $833,333 | $833,333 |
| $1,333,333 | $1,333,333 | | | | | | | $1,333,333 | $1,333,333 | $1,333,333 | $1,333,333 | $1,333,333 | $1,333,333 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $66,667 | $66,667 | | | | | | | $66,667 | $66,667 | $66,667 | $66,667 | $66,667 | $66,667 |
| $53,333 | $53,333 | | | | | | | $53,333 | $53,333 | $53,333 | $53,333 | $53,333 | $53,333 |
| $100,000 | $100,000 | | | | | | | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| $53,333 | $53,333 | | | | | | | $53,333 | $53,333 | $53,333 | $53,333 | $53,333 | $53,333 |
| $100,000 | $100,000 | | | | | | | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 | $100,000 |
| $66,667 | $66,667 | | | | | | | $66,667 | $66,667 | $65,667 | $66,667 | $66,667 | $66,667 |
| $53,333 | $53,333 | | | | | | | $53,333 | $53,333 | $53,333 | $53,333 | $53,333 | $53,333 |
| $40,000 | $40,000 | | | | | | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 |
| $2,700,000 | $2,700,000 | $0 | $0 | $0 | $0 | $0 | $0 | $2,700,000 | $2,700,000 | $2,700,000 | $2,700,000 | $2,700,000 | $2,700,000 |
| $540,000 | $540,000 | $0 | $0 | $0 | $0 | $0 | $0 | $540,000 | $540,000 | $540,000 | $540,000 | $540,000 | $540,000 |
| $5,000,000 | | | | | | | | | $5,000,000 | $5,000,000 | $5,000,000 | $5,000,000 | |
| $0 | | | | | | | | | $0 | $0 | $0 | $0 | |
| $0 | | | | | | | | | $0 | $0 | $0 | $0 | |
| $5,000,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $5,000,000 | $5,000,000 | $5,000,000 | $5,000,000 | $0 |
| $1,500,000 | | | | | | | | | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 | |
| $0 | | | | | | | | | $0 | $0 | $0 | $0 | |
| $0 | | | | | | | | | $0 | $0 | $0 | $0 | |
| $1,500,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,500,000 | $1,500,000 | $1,500,000 | $1,500,000 | $0 |
| $1,000,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $0 |
| $1,000,000 | $1,000,000 | | | | | | | | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 | $1,000,000 |
| $600,000 | | | | | | | | | $0 | $1,200,000 | $1,200,000 | $600,000 | $0 |
| $1,600,000 | | | | | | | | | $0 | $3,200,000 | $3,200,000 | $1,600,000 | $0 |
| | | | | | | | | | $0 | $0 | $0 | $0 | $0 |
| $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 |
| | | | | | | | | | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | $0 | $0 | $0 | $0 | $0 |
| $311,463 | | | | | | | | | $190,250 | $311,463 | $311,463 | $311,463 | $0 |
| | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $0 | $0 | $0 | $0 | $48,000 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $206,000 | $1,407,333 | $2,472,000 |
| | | | | | | $833,333 | $833,333 | $5,000,000 |
| | | | | | | $1,333,333 | $1,333,333 | $8,000,000 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $66,667 | $66,667 | $400,000 |
| | | | | | | $53,333 | $53,333 | $320,000 |
| | | | | | | $100,000 | $100,000 | $600,000 |
| | | | | | | $53,333 | $53,333 | $320,000 |
| | | | | | | $100,000 | $100,000 | $600,000 |
| | | | | | | $66,667 | $66,667 | $400,000 |
| | | | | | | $53,333 | $53,333 | $320,000 |
| | | | | | | $40,000 | $40,000 | $240,000 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | $0 | $0 |
| | | | | | | $0 | | |
| $0 | $0 | $0 | $0 | $0 | $0 | $2,700,000 | $2,700,000 | $16,200,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $540,000 | $540,000 | $3,240,000 |
| | | | | | | | $0 | $20,000,000 |
| | | | | | | | $0 | $0 |
| | | | | | | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $20,000,000 |
| | | | | | | | $0 | $6,000,000 |
| | | | | | | | $0 | $0 |
| | | | | | | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $6,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $4,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,000,000 | $5,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $3,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $600,000 | $0 |
| $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $580,000 | $960,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $120,000 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $280,000 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,124,640 |
| $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $336,000 | $384,000 |

1.1 20180531 TR0000522110 TR0000522111.XLSX

| Medical Supplies | Football Player Equipment |
| Uniforms | Football Player Equipment |
| General Office | Office Supplies & Equipment |
| employee communic: | Office Supplies & Equipment |
| Local Advertising | Marketing, Advertising & Promotion |
| Game Staff | Game Related Expenses |
| Sales/Use Tax Event I | Game Related Expenses |
| Catering/Hospitality | Game Related Expenses |
| Other Game Costs | Game Related Expenses |
| Team Food & Bevera; | Player Related Expenses |
| Player Housing | Player Related Expenses |
| Recruitment & Reloc: | Player Related Expenses |
| Cost of Ticket Sales | Game Related Expenses |
| [] | |
| [] | |
| [] | |
| [] | |
| [] | |
| [] | |
| [] | |
| [] | |
| [] | |

Team Expenses

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Medical Supplies | | | | | | | | | | | | | $300,000 | $150,000 | $160,000 |
| Uniforms | | | | | | | | | | | $200,000 | | $200,000 | $80,000 | $80,000 |
| General Office | | | | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $120,000 | $120,000 | $40,000 | $40,000 |
| employee communications | | | | | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | | $40,000 | $40,000 | $40,000 |
| Local Advertising | | | | | | | | | | | | | $700,000 | $700,000 | $700,000 |
| Game Staff | | | | | | | | | | | | | | $800,000 | $800,000 |
| Sales/Use Tax Event Expense | | | | | | | | | | | | | | $480,000 | $480,000 |
| Catering/Hospitality | | | | | | | | | | | | | | $160,000 | $160,000 |
| Other Game Costs | | | | | | | | | | | | | | $240,000 | $240,000 |
| Team Food & Beverages | | | | | | | | | | | | | | $160,000 | $160,000 |
| Player Housing | | | | | | | | | | | | | | $400,000 | $400,000 |
| Recruitment & Relocation | | | | | | | | | | | | | | $400,000 | |
| Cost of Ticket Sales | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,050,000 | $1,050,000 | $1,050,000 |
| [] | | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | | |
| [] | | | | | | | | | | | | | | | |
| **Total Other Team Expenses** | $0 | $0 | $0 | $0 | $40,000 | $328,000 | $848,000 | $248,000 | $248,000 | $248,000 | $448,000 | $1,288,000 | $3,680,250 | $10,501,463 | $10,101,463 |
| **Total Team Related Expenses** | $0 | $0 | $0 | $0 | $208,000 | $1,376,000 | $1,896,000 | $1,484,000 | $1,484,000 | $1,484,000 | $1,684,000 | $5,764,000 | $15,656,250 | $22,477,463 | $22,077,463 |

**Expense Summary:**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll, Benefits & Bonus | $0 | $0 | $0 | $0 | $168,000 | $1,048,000 | $1,048,000 | $1,236,000 | $1,236,000 | $1,236,000 | $1,236,000 | $4,476,000 | $11,976,000 | $11,976,000 | $11,976,000 |
| Marketing, Advertising & Promotion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,000,000 | $1,700,000 | $1,700,000 | $1,700,000 |
| Professional Services | $0 | $0 | $0 | $0 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $0 | $0 | $0 | $0 |
| Broadcasting Fees | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TV Production | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Photography / Digital Content | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Football Player Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $200,000 | $0 | $500,000 | $240,000 | $240,000 |
| Football Training Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Training Comp | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Player Related Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $960,000 | $560,000 |
| Office Rent & Utilities | $0 | $0 | $0 | $0 | $0 | $200,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 |
| Office Supplies & Equipment | $0 | $0 | $0 | $0 | $0 | $40,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $160,000 | $160,000 | $80,000 | $80,000 |
| Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Legal | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Travel | $0 | $0 | $0 | $0 | $0 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $0 | $3,200,000 | $3,200,000 |
| Game Related Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $600,000 | $0 | $0 | $0 | $0 | $0 | $1,240,250 | $4,241,463 | $4,241,463 |
| Check | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll, Benefits & Bonus | 0% | 0% | 0% | 0% | 81% | 76% | 55% | 83% | 83% | 83% | 73% | 78% | 76% | 53% | 54% |
| Marketing, Advertising & Promotion | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 17% | 11% | 8% | 8% |
| Professional Services | 0% | 0% | 0% | 0% | 19% | 3% | 2% | 3% | 3% | 3% | 2% | 0% | 0% | 0% | 0% |
| Broadcasting Fees | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| TV Production | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Photography / Digital Content | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Football Player Equipment | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 12% | 0% | 3% | 1% | 1% |
| Football Training Equipment | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Training Comp | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Player Related Expenses | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 4% | 3% |
| Office Rent & Utilities | 0% | 0% | 0% | 0% | 0% | 15% | 4% | 5% | 5% | 5% | 5% | 1% | 1% | 0% | 0% |
| Office Supplies & Equipment | 0% | 0% | 0% | 0% | 0% | 3% | 4% | 5% | 5% | 5% | 5% | 3% | 1% | 0% | 0% |
| Other | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Legal | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Travel | 0% | 0% | 0% | 0% | 0% | 3% | 3% | 3% | 3% | 3% | 3% | 1% | 0% | 14% | 14% |
| Game Related Expenses | 0% | 0% | 0% | 0% | 0% | 0% | 32% | 0% | 0% | 0% | 0% | 0% | 8% | 19% | 19% |
| Check | 0% | 0% | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $80,000 | | | | | | | | | $300,000 | $160,000 | $160,000 | $80,000 | $0 |
| $40,000 | | | | | | | | | $200,000 | $80,000 | $80,000 | $40,000 | $0 |
| $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | | $120,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 |
| $700,000 | | | | | | | | | $700,000 | $700,000 | $700,000 | $700,000 | $0 |
| $400,000 | | | | | | | | | $0 | $800,000 | $800,000 | $400,000 | $0 |
| $240,000 | | | | | | | | | $0 | $480,000 | $480,000 | $240,000 | $0 |
| $80,000 | | | | | | | | | $0 | $160,000 | $160,000 | $80,000 | $0 |
| $120,000 | | | | | | | | | $0 | $240,000 | $240,000 | $120,000 | $0 |
| $80,000 | | | | | | | | | $0 | $160,000 | $160,000 | $80,000 | $0 |
| $400,000 | | | | | | | | | $0 | $400,000 | $400,000 | $400,000 | $0 |
| | | | | | | | | | $0 | $400,000 | $0 | $0 | $0 |
| $1,050,000 | $525,000 | $0 | $0 | $0 | $0 | $0 | $0 | $525,000 | $1,050,000 | $1,050,000 | $1,050,000 | $1,050,000 | $525,000 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $6,861,463 | $1,733,000 | $208,000 | $208,000 | $208,000 | $208,000 | $208,000 | $208,000 | $733,000 | $3,680,250 | $10,501,463 | $10,101,463 | $6,861,463 | $1,733,000 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $18,837,463 | $6,209,000 | $1,444,000 | $1,444,000 | $1,444,000 | $1,444,000 | $1,444,000 | $1,444,000 | $5,209,000 | $15,656,250 | $22,477,463 | $22,077,463 | $18,837,463 | $6,209,000 |

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $11,976,000 | $4,476,000 | $1,236,000 | $1,236,000 | $1,236,000 | $1,236,000 | $1,236,000 | $1,236,000 | $4,476,000 | $11,976,000 | $11,976,000 | $11,976,000 | $11,976,000 | $4,476,000 |
| $1,700,000 | $1,000,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $1,700,000 | $1,700,000 | $1,700,000 | $1,700,000 | $1,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $120,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $550,000 | $240,000 | $240,000 | $120,000 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $480,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $960,000 | $560,000 | $480,000 | $480,000 | $0 |
| $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 |
| $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $160,000 | $80,000 | $80,000 | $80,000 | $80,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $1,600,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $0 | $3,200,000 | $3,200,000 | $1,600,000 | $48,000 |
| $2,801,463 | $525,000 | $0 | $0 | $0 | $0 | $0 | $0 | $525,000 | $1,240,250 | $4,241,463 | $4,241,463 | $2,801,463 | $525,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 64% | 72% | 86% | 86% | 86% | 86% | 86% | 86% | 86% | 75% | 53% | 54% | 64% | 72% |
| 9% | 16% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 11% | 8% | 8% | 9% | 16% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 3% | 1% | 1% | 1% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 3% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 4% | 3% | 3% | 0% |
| 0% | 1% | 6% | 6% | 6% | 6% | 6% | 6% | 2% | 1% | 0% | 0% | 0% | 1% |
| 0% | 1% | 6% | 6% | 6% | 6% | 6% | 6% | 2% | 1% | 0% | 0% | 0% | 1% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 8% | 1% | 3% | 3% | 3% | 3% | 3% | 3% | 1% | 0% | 14% | 14% | 8% | 1% |
| 15% | 8% | 0% | 0% | 0% | 0% | 0% | 0% | 10% | 8% | 19% | 19% | 15% | 8% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $700,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $200,000 | $400,000 |
| $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | | $360,000 | $550,000 |
| $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | $40,000 | | $240,000 | $480,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $2,800,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $2,000,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $1,200,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $400,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $600,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $400,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $1,200,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $525,000 | | $0 | $400,000 |
| | | | | | | | | $0 | $5,250,000 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |
| | | | | | | | | $0 | $0 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $208,000 | $208,000 | $208,000 | $208,000 | $208,000 | $208,000 | $733,000 | | $3,696,000 | $34,858,640 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $1,444,000 | $1,444,000 | $1,444,000 | $1,444,000 | $1,444,000 | $1,444,000 | $5,209,000 | | $15,380,000 | $99,130,640 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $1,236,000 | $1,236,000 | $1,236,000 | $1,236,000 | $1,236,000 | $1,236,000 | $4,476,000 | | $11,684,000 | $64,272,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $1,000,000 | $7,800,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $280,000 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $200,000 | $1,100,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $2,000,000 |
| $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | | $680,000 | $960,000 |
| $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | $80,000 | | $600,000 | $1,040,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |
| $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | $48,000 | | $336,000 | $8,384,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $525,000 | | $600,000 | $13,574,640 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | | $0 | $0 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 86% | 86% | 86% | 86% | 86% | 85% | 86% | | 76% | 65% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 7% | 8% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 2% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 1% | 1% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 2% |
| 6% | 6% | 6% | 6% | 6% | 6% | 2% | | 4% | 1% |
| 6% | 6% | 6% | 6% | 6% | 6% | 2% | | 4% | 1% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | | 0% | 0% |
| 3% | 3% | 3% | 3% | 3% | 3% | 1% | | 2% | 8% |
| 0% | 0% | 0% | 0% | 0% | 0% | 10% | | 4% | 14% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | | 100% | 100% |

Tech Operating Expenses

| Tech Payroll Assumptions: | # | Start Date | Base Salary | Commissions | Bonuses | Benefits Uplift | Total Benefits | Total |
|---|---|---|---|---|---|---|---|---|
| GM | 1 | 8/1/2018 | $300,000 | $0 | $0 | 25% | $75,000 | $375,000 |
| VP Finance | 1 | 7/1/2018 | 175,000 | 0 | 0 | 25% | 43,750 | 218,750 |
| VP Marketing | 1 | 10/1/2018 | 175,000 | 0 | 0 | 25% | 43,750 | 218,750 |
| Head of Platform | 1 | 3/1/2018 | 225,000 | 0 | 0 | 25% | 56,250 | 281,250 |
| Head of Product | 1 | 4/1/2018 | 175,000 | 0 | 0 | 25% | 43,750 | 218,750 |
| Director Engineering | 1 | 8/1/2018 | 225,000 | 0 | 0 | 25% | 56,250 | 281,250 |
| VP, Engineering | 1 | 7/1/2018 | 250,000 | 0 | 0 | 25% | 62,500 | 312,500 |
| Senior Engineer | 1 | 4/1/2018 | 175,000 | 0 | 0 | 25% | 43,750 | 218,750 |
| Senior Engineer | 1 | 4/1/2018 | 165,000 | 0 | 0 | 25% | 41,250 | 206,250 |
| Senior Engineer | 1 | 6/1/2018 | 165,000 | 0 | 0 | 25% | 41,250 | 206,250 |
| Engineer | 1 | 3/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Engineer | 1 | 4/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Engineer | 1 | 4/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Engineer | 1 | 5/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Engineer | 1 | 5/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Product Manager | 1 | 5/1/2018 | 125,000 | 0 | 0 | 25% | 31,250 | 156,250 |
| QA | 1 | 5/1/2018 | 115,000 | 0 | 0 | 25% | 28,750 | 143,750 |
| QA | 1 | 8/1/2018 | 100,000 | 0 | 0 | 25% | 25,000 | 125,000 |
| QA | 1 | 10/1/2018 | 100,000 | 0 | 0 | 25% | 25,000 | 125,000 |
| Business Analyst | 1 | 1/1/2020 | 130,000 | 0 | 0 | 25% | 32,500 | 162,500 |
| Business Analyst | 1 | 6/1/2020 | 130,000 | 0 | 0 | 25% | 32,500 | 162,500 |
| Visual Designer | 1 | 4/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Visual Designer | 1 | 7/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Senior Engineer | 1 | 7/1/2018 | 165,000 | 0 | 0 | 25% | 41,250 | 206,250 |
| Engineer | 1 | 8/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Engineer | 1 | 9/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Engineer | 1 | 11/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Senior Engineer | 1 | 2/1/2019 | 165,000 | 0 | 0 | 25% | 41,250 | 206,250 |
| Game Designer | 1 | 4/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| Game Designer | 1 | 4/1/2018 | 175,000 | 0 | 0 | 25% | 43,750 | 218,750 |
| Customer Support | 1 | 9/1/2018 | 125,000 | 0 | 0 | 25% | 31,250 | 156,250 |
| Customer Support | 3 | 10/1/2018 | 45,000 | 0 | 0 | 25% | 33,750 | 168,750 |
| Customer Support | 5 | 11/1/2018 | 45,000 | 0 | 0 | 25% | 56,250 | 281,250 |
| Customer Support | 5 | 2/1/2019 | 45,000 | 0 | 0 | 25% | 56,250 | 281,250 |
| Controller | 1 | 7/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| FP&A | 1 | 10/1/2018 | 150,000 | 0 | 0 | 25% | 37,500 | 187,500 |
| General Counsel | 1 | 12/1/2018 | 250,000 | 0 | 0 | 25% | 62,500 | 312,500 |
| Lawyer | 1 | 8/1/2018 | 200,000 | 0 | 0 | 25% | 50,000 | 250,000 |
| Lawyer | 1 | 1/1/2019 | 200,000 | 0 | 0 | 25% | 50,000 | 250,000 |
| EA | 1 | 3/1/2018 | 135,000 | 0 | 0 | 25% | 33,750 | 168,750 |
| EA | 1 | 9/1/2018 | 85,000 | 0 | 0 | 25% | 21,250 | 106,250 |
| Office Manager | 1 | 6/1/2018 | 110,000 | 0 | 0 | 25% | 27,500 | 137,500 |
| PR | 1 | 3/1/2018 | 125,000 | 0 | 0 | 25% | 31,250 | 156,250 |
| Marketing Analyst | 1 | 10/1/2018 | 125,000 | 0 | 0 | 25% | 31,250 | 156,250 |
| Digital Marketing Analyst | 1 | 12/1/2018 | 125,000 | 0 | 0 | 25% | 31,250 | 156,250 |
| **Total Tech Paroll** | **55** | | **$6,800,000** | **$0** | **$0** | | **$1,812,500** | **$9,062,500** |

1.1 20180531 TR0000522110 TR0000522111.XLSX

Tech Expenses

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month | January-18 | February-18 | March-18 | April-18 | May-18 | June-18 | July-18 | August-18 | September-18 | October-18 | November-18 | December-18 | January-19 |
| Step-Up | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Year | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2019 |
| GM | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| VP Finance | $0 | $0 | $0 | $0 | $0 | $0 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| VP Marketing | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $14,583 | $14,583 | $14,583 | $14,583 |
| Head of Platform | $0 | $0 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| Head of Product | $0 | $0 | $0 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| Director Engineering | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| VP, Engineering | $0 | $0 | $0 | $0 | $0 | $0 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| Senior Engineer | $0 | $0 | $0 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| Senior Engineer | $0 | $0 | $0 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| Senior Engineer | $0 | $0 | $0 | $0 | $0 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| Engineer | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Engineer | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Engineer | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Engineer | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Engineer | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Product Manager | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| QA | $0 | $0 | $0 | $0 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 |
| QA | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| QA | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $8,333 | $8,333 | $8,333 | $8,333 |
| Business Analyst | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Business Analyst | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Visual Designer | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Visual Designer | $0 | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Senior Engineer | $0 | $0 | $0 | $0 | $0 | $0 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| Engineer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Engineer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Engineer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 |
| Senior Engineer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Game Designer | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| Game Designer | $0 | $0 | $0 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| Customer Support | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| Customer Support | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $11,250 | $11,250 | $11,250 | $11,250 |
| Customer Support | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $18,750 | $18,750 | $18,750 |
| Customer Support | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Controller | $0 | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| FP&A | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $12,500 | $12,500 | $12,500 | $12,500 |
| General Counsel | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $20,833 |
| Lawyer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| Lawyer | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $16,667 |
| EA | $0 | $0 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 |
| EA | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| Office Manager | $0 | $0 | $0 | $0 | $0 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 |
| PR | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| Marketing Analyst | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,417 | $10,417 | $10,417 | $10,417 |
| Digital Marketing Analyst | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,417 | $10,417 |
| **Total Tech Payroll** | $0 | $0 | $52,917 | $160,417 | $205,417 | $228,333 | $302,500 | $383,750 | $413,750 | $470,833 | $502,083 | $533,333 | $550,000 |

1.1 20180531 TR0000522110 TR0000522111.XLSX

| 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| February-19 | March-19 | April-19 | May-19 | June-19 | July-19 | August-19 | September-19 | October-19 | November-19 | December-19 | January-20 | February-20 |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2020 | 2020 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $10,833 | $10,833 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $582,500 | $582,500 | $582,500 | $582,500 | $582,500 | $582,500 | $582,500 | $582,500 | $582,500 | $582,500 | $582,500 | $593,333 | $593,333 |

| 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
|---|---|---|---|---|---|---|---|---|---|
| March-20 | April-20 | May-20 | June-20 | July-20 | August-20 | September-20 | October-20 | November-20 | December-20 |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 | 2020 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 | $9,583 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 | $8,333 |
| $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 |
| $0 | $0 | $0 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 | $10,833 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 | $13,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,583 | $14,584 | $14,583 | $14,583 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 | $18,750 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 | $12,500 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 | $16,667 |
| $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 | $11,250 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 | $9,167 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 | $10,417 |
| $593,333 | $593,333 | $593,333 | $604,167 | $604,167 | $604,167 | $604,167 | $604,167 | $604,167 | $604,167 |

| | 2018 | 2019 |
|---|---|---|
| | $125,000 | $300,000 |
| | $87,500 | $175,000 |
| | $43,750 | $175,000 |
| | $187,500 | $225,000 |
| | $131,250 | $175,000 |
| | $93,750 | $225,000 |
| | $125,000 | $250,000 |
| | $131,250 | $175,000 |
| | $123,750 | $165,000 |
| | $96,250 | $165,000 |
| | $125,000 | $150,000 |
| | $112,500 | $150,000 |
| | $112,500 | $150,000 |
| | $100,000 | $150,000 |
| | $100,000 | $150,000 |
| | $83,333 | $125,000 |
| | $76,667 | $115,000 |
| | $41,667 | $100,000 |
| | $25,000 | $100,000 |
| | $0 | $0 |
| | $0 | $0 |
| | $112,500 | $150,000 |
| | $75,000 | $150,000 |
| | $82,500 | $165,000 |
| | $62,500 | $150,000 |
| | $50,000 | $150,000 |
| | $25,000 | $150,000 |
| | $0 | $151,250 |
| | $112,500 | $150,000 |
| | $131,250 | $175,000 |
| | $41,667 | $125,000 |
| | $33,750 | $135,000 |
| | $37,500 | $225,000 |
| | $0 | $206,250 |
| | $75,000 | $150,000 |
| | $37,500 | $150,000 |
| | $20,833 | $250,000 |
| | $83,333 | $200,000 |
| | $0 | $200,000 |
| | $112,500 | $135,000 |
| | $28,333 | $85,000 |
| | $64,167 | $110,000 |
| | $104,167 | $125,000 |
| | $31,250 | $125,000 |
| | $10,417 | $125,000 |
| | **$3,253,333** | **$6,957,500** |

1036

| Tech Benefits & Taxes Assumptions: | Rate | |
|---|---|---|
| | 25% | |

| Bonus Pool Assumptions: | Rate | |
|---|---|---|
| | 5% | |

| Other Expense Items Assumptions: | Description | Category | |
|---|---|---|---|
| | Pre Season Events | Marketing, Advertisir | Individual Inputs Manually---> |
| | Office Rent /Furnitur | Office Rent & Utilitie | Individual Inputs Manually---> |
| | Digital Operations | Game Related Expens | Individual Inputs Manually---> |
| | Photography/Digital ( | Photography / Digital | Individual Inputs Manually---> |
| | New Team Start-Up C | Other | Individual Inputs Manually---> |
| | Legal | Legal | Individual Inputs Manually---> |
| | Travel | Travel | Individual Inputs Manually---> |
| | Advertising and Prom | Marketing, Advertisir | Individual Inputs Manually---> |
| | Office Supplies/Equip | Office Supplies & Equ | Individual Inputs Manually---> |
| | Office Communcatio | Office Supplies & Equ | Individual Inputs Manually---> |
| | Super Bowl commerc | Marketing, Advertisir | Individual Inputs Manually---> |
| | Football Training Equ | Football Training Equ | Individual Inputs Manually---> |
| | Other | Other | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |
| | [ ] | | Individual Inputs Manually---> |

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | C9 | C10 | C11 | C12 | C13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tech Benefits & Taxes | $0 | $0 | $13,229 | $40,104 | $51,354 | $57,083 | $75,625 | $95,938 | $103,438 | $117,708 | $125,521 | $133,333 | $137,500 |
| Bonus Pool | $0 | $0 | $2,646 | $8,021 | $10,271 | $11,417 | $15,125 | $19,188 | $20,688 | $23,542 | $25,104 | $26,667 | $27,500 |
| Pre Season Events | | | | | | | | | | | $250,000 | $250,000 | |
| Office Rent /Furniture | | | | | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $58,333 |
| Digital Operations | | | | | | | | | | | | | $100,000 |
| Photography/Digital Content | | | | | | | | | | $300,000 | $300,000 | | |
| New Team Start-Up Cost | | | | | | | | | | | | | |
| Legal | | | | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $25,000 |
| Travel | | | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $23,400 |
| Advertising and Promotion | | | | | | | | | $400,000 | $800,000 | | $800,000 | $889,500 |
| Office Supplies/Equipment | | | $12,500 | | | | $12,500 | | | $12,500 | | $12,500 | $2,083 |
| Office Communcations Phone/Internet | | | $7,500 | | | | $7,500 | | | $7,500 | | $7,500 | $5,000 |
| Super Bowl commercial | | | | | | | | | | | | | $5,000,000 |
| Football Training Equipment | | | | | | | | | | | | | |
| Other | | | $62,500 | | | | $62,500 | | | $62,500 | | $62,500 | $41,667 |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| [ ] | | | | | | | | | | | | | |
| **Total Other Tech Expenses** | $0 | $0 | $101,220 | $40,942 | $93,442 | $175,942 | $93,442 | $93,442 | $175,942 | $793,442 | $1,443,442 | $1,225,942 | $6,144,983 |
| **Total Tech Expenses** | $0 | $0 | $170,012 | $249,484 | $360,484 | $472,776 | $486,692 | $592,317 | $713,817 | $1,405,526 | $2,096,151 | $1,919,276 | $6,859,983 |

**Expense Summary:**

| | C1 | C2 | C3 | C4 | C5 | C6 | C7 | C8 | C9 | C10 | C11 | C12 | C13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Payroll, Benefits & Bonus | $0 | $0 | $68,792 | $208,542 | $267,042 | $296,833 | $393,250 | $498,875 | $537,875 | $612,083 | $652,708 | $693,333 | $715,000 |
| Marketing, Advertising & Promotion | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $400,000 | $1,050,000 | $1,050,000 | $5,889,500 |
| Professional Services | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Broadcasting Fees | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| TV Production | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Photography / Digital Content | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $300,000 | $300,000 | $0 | $0 |
| Football Player Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Football Training Equipment | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Training Camp | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Player Related Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Office Rent & Utilities | $0 | $0 | $0 | $0 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $52,500 | $58,333 |
| Office Supplies & Equipment | $0 | $0 | $20,000 | $0 | $0 | $20,000 | $0 | $0 | $20,000 | $0 | $0 | $20,000 | $7,083 |
| Other | $0 | $0 | $62,500 | $0 | $0 | $62,500 | $0 | $0 | $62,500 | $0 | $0 | $62,500 | $41,667 |
| Legal | $0 | $0 | $0 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $22,222 | $25,000 |
| Travel | $0 | $0 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $18,720 | $23,400 |
| Game Related Expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $100,000 |
| Check | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Payroll, Benefits & Bonus | 0% | 0% | 40% | 84% | 74% | 63% | 81% | 84% | 75% | 44% | 31% | 36% | 10% |
| Marketing, Advertising & Promotion | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 28% | 50% | 55% | 86% |
| Professional Services | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Broadcasting Fees | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

| $145,625 | $145,625 | $145,625 | $145,625 | $145,625 | $145,625 | $145,625 | $145,625 | $145,625 | $145,625 | $145,625 | $148,333 | $148,333 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $29,125 | $29,125 | $29,125 | $29,125 | $29,125 | $29,125 | $29,125 | $29,125 | $29,125 | $29,125 | $29,125 | $29,667 | $29,667 |
| | | | | | | | | $150,000 | $150,000 | | $0 | $0 |
| $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 |
| $2,447,904 | $2,447,904 | $3,263,872 | | | | | | | | | $100,000 | $2,447,904 |
| | | | | | | | | $150,000 | $150,000 | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $23,400 | $23,400 | $23,400 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $23,400 | $23,400 |
| $2,372,000 | $1,482,500 | $1,186,000 | | | | | | | | | $889,500 | $2,372,000 |
| $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 |
| $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| | | | | | | | | | | | $5,000,000 | $0 |
| | | | | | | | | | | | $0 | $0 |
| $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| | | | | | | | | | | | $0 | $0 |
| **$4,975,387** | **$4,085,887** | **$4,605,355** | **$143,783** | **$143,783** | **$143,783** | **$143,783** | **$143,783** | **$443,783** | **$443,783** | **$143,783** | **$6,144,983** | **$4,975,387** |
| **$5,732,637** | **$4,843,137** | **$5,362,605** | **$901,033** | **$901,033** | **$901,033** | **$901,033** | **$901,033** | **$1,201,033** | **$1,201,033** | **$901,033** | **$6,916,317** | **$5,746,721** |

| $757,250 | $757,250 | $757,250 | $757,250 | $757,250 | $757,250 | $757,250 | $757,250 | $757,250 | $757,250 | $757,250 | $771,333 | $771,333 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $2,372,000 | $1,482,500 | $1,186,000 | $0 | $0 | $0 | $0 | $0 | $150,000 | $150,000 | $0 | $5,889,500 | $2,372,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $150,000 | $150,000 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $23,400 | $23,400 | $23,400 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $23,400 | $23,400 |
| $2,447,904 | $2,447,904 | $3,263,872 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $100,000 | $2,447,904 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 13% | 16% | 14% | 84% | 84% | 84% | 84% | 84% | 63% | 63% | 84% | 11% | 13% |
| 41% | 31% | 22% | 0% | 0% | 0% | 0% | 0% | 12% | 12% | 0% | 85% | 41% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| $148,333 | $148,333 | $148,333 | $151,042 | $151,042 | $151,042 | $151,042 | $151,042 | $151,042 | $151,042 |
| $29,667 | $29,667 | $29,667 | $30,208 | $30,208 | $30,208 | $30,208 | $30,208 | $30,208 | $30,208 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $150,000 | $150,000 | $150,000 |
| $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 |
| $2,447,904 | $3,263,872 | $0 | $0 | $0 | $0 | $0 | $0 | $150,000 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $150,000 | $150,000 | $0 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $23,400 | $23,400 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 |
| $1,482,500 | $1,186,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 | $2,083 |
| $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 | $5,000 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **$4,085,887** | **$4,605,355** | **$143,783** | **$143,783** | **$143,783** | **$143,783** | **$143,783** | **$443,783** | **$443,783** | **$143,783** |
| **$4,857,221** | **$5,376,689** | **$915,117** | **$929,200** | **$929,200** | **$929,200** | **$929,200** | **$1,229,200** | **$1,229,200** | **$929,200** |
| $771,333 | $771,333 | $771,333 | $785,417 | $785,417 | $785,417 | $785,417 | $785,417 | $785,417 | $785,417 |
| $1,482,500 | $1,186,000 | $0 | $0 | $0 | $0 | $0 | $150,000 | $150,000 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $150,000 | $150,000 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 | $58,333 |
| $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 | $7,083 |
| $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 | $41,667 |
| $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 | $25,000 |
| $23,400 | $23,400 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 | $11,700 |
| $2,447,904 | $3,263,872 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| 16% | 14% | 84% | 85% | 85% | 85% | 85% | 64% | 64% | 85% |
| 31% | 22% | 0% | 0% | 0% | 0% | 0% | 12% | 12% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |

Tech Expenses

| | |
|---|---|
| $813,333 | $1,739,375 |
| | |
| $162,667 | $347,875 |
| | |
| $500,000 | $300,000 |
| $420,000 | $700,000 |
| $0 | $8,259,680 |
| $600,000 | $300,000 |
| $0 | $0 |
| $200,000 | $300,000 |
| $187,200 | $187,200 |
| $2,000,000 | $5,930,000 |
| $50,000 | $25,000 |
| $30,000 | $60,000 |
| $0 | $5,000,000 |
| $0 | $0 |
| $250,000 | $500,000 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $4,237,200 | $21,561,880 |
| | |
| $8,466,533 | $30,606,630 |
| | |
| $4,229,333 | $9,044,750 |
| $2,500,000 | $11,230,000 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $600,000 | $300,000 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $0 | $0 |
| $420,000 | $700,000 |
| $80,000 | $85,000 |
| $250,000 | $500,000 |
| $200,000 | $300,000 |
| $187,200 | $187,200 |
| $0 | $8,259,680 |
| $0 | $0 |
| | |
| 50% | 30% |
| 30% | 37% |
| 0% | 0% |
| 0% | 0% |

1.1 20180531 TR0000522110 TR0000522111.XLSX

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TV Production | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Photography / Digital Content | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 21% | 14% | 0% | 0% |
| Football Player Equipment | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Football Training Equipment | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Training Camp | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Player Related Expenses | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Office Rent & Utilities | 0% | 0% | 0% | 0% | 15% | 11% | 11% | 9% | 7% | 4% | 3% | 3% | 1% |
| Office Supplies & Equipment | 0% | 0% | 12% | 0% | 0% | 4% | 0% | 9% | 3% | 0% | 0% | 1% | 0% |
| Other | 0% | 0% | 37% | 0% | 0% | 13% | 0% | 0% | 9% | 0% | 0% | 3% | 1% |
| Legal | 0% | 0% | 0% | 9% | 6% | 5% | 5% | 4% | 3% | 2% | 1% | 1% | 0% |
| Travel | 0% | 0% | 11% | 8% | 5% | 4% | 4% | 3% | 3% | 1% | 1% | 1% | 0% |
| Game Related Expenses | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 1% |
| Check | 0% | 0% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 12% | 12% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1% | 1% | 1% | 6% | 6% | 6% | 6% | 6% | 5% | 5% | 6% | 1% | 1% |
| 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 0% |
| 1% | 1% | 1% | 5% | 5% | 5% | 5% | 5% | 3% | 3% | 5% | 1% | 1% |
| 0% | 1% | 0% | 3% | 3% | 3% | 3% | 3% | 2% | 2% | 3% | 0% | 0% |
| 0% | 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 0% | 0% |
| 43% | 51% | 61% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 1% | 43% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 12% | 12% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 1% | 1% | 6% | 6% | 6% | 6% | 6% | 5% | 5% | 6% |
| 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| 1% | 1% | 5% | 4% | 4% | 4% | 4% | 3% | 3% | 4% |
| 1% | 0% | 3% | 3% | 3% | 3% | 3% | 2% | 2% | 3% |
| 0% | 0% | 1% | 1% | 1% | 1% | 1% | 1% | 1% | 1% |
| 50% | 61% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |

Tech Expenses

| | | |
|---|---|---|
| 0% | | 0% |
| 7% | | 1% |
| 0% | | 0% |
| 0% | | 0% |
| 0% | | 0% |
| 0% | | 0% |
| 5% | | 2% |
| 1% | | 0% |
| 3% | | 2% |
| 2% | | 1% |
| 2% | | 1% |
| 0% | | 27% |
| 100% | | 100% |

PALs Model

## PALs Model

| | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 12/31/2024 | 12/31/2025 | 12/31/2026 | 12/31/2027 | 12/31/2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Licenses Sold | 8 | 0 | 0 | 2 | 0 | 2 | 0 | 2 | 0 | 2 | 0 |
| PALs at Year End | 8 | 8 | 8 | 10 | 10 | 12 | 12 | 14 | 14 | 16 | 16 |
| Expense Escalator | | | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% | 3% |
| PAL Value @ Year End | $10,000,000 | $12,500,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

### Summary P&L

| | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 12/31/2024 | 12/31/2025 | 12/31/2026 | 12/31/2027 | 12/31/2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total League Revenue | $ - | $ 22,600,000 | $ 32,963,500 | $ 59,533,038 | $ 68,827,234 | $ 86,120,898 | $ 99,862,711 | $ 125,604,986 | $ 146,028,178 | $ 184,471,307 | $ 214,969,750 |
| Total Team Revenue | - | 55,200,000 | 63,733,600 | 120,391,158 | 134,812,917 | 181,318,135 | 204,877,773 | 259,760,346 | 282,354,630 | 350,830,515 | 381,499,467 |
| Digital Revenue | - | 18,100,586 | 33,995,463 | 74,637,548 | 109,696,668 | 176,648,566 | 235,568,401 | 327,046,280 | 410,783,663 | 545,002,709 | 660,769,090 |
| **Total Revenue** | $ - | $ 95,900,586 | $ 130,692,563 | $ 254,561,743 | $ 313,336,820 | $ 444,087,599 | $ 540,308,884 | $ 712,411,612 | $ 839,166,472 | $ 1,080,304,531 | $ 1,257,238,306 |
| Total League Expense | $ 22,022,799 | $ 34,087,548 | $ 34,598,861 | $ 39,572,448 | $ 40,166,034 | $ 44,905,626 | $ 45,579,211 | $ 50,175,114 | $ 50,927,741 | $ 55,436,484 | $ 56,270,061 |
| Total Team Expense | 15,380,000 | 99,130,640 | 102,104,559 | 131,459,620 | 135,403,409 | 167,358,613 | 172,379,371 | 207,142,545 | 213,356,821 | 251,151,458 | 258,686,002 |
| Total Player/Fan payouts | - | 19,109,576 | 24,560,593 | 41,651,777 | 51,108,395 | 70,581,759 | 82,895,996 | 103,752,603 | 116,628,865 | 139,349,283 | 151,358,061 |
| Digital Opex | 8,466,533 | 30,606,630 | 31,065,729 | 35,531,428 | 36,064,399 | 40,319,999 | 40,924,799 | 45,051,382 | 45,727,153 | 49,777,272 | 50,523,932 |
| **Total Expenses** | $ 45,869,332 | $ 182,934,394 | $ 192,329,743 | $ 248,215,273 | $ 262,742,237 | $ 323,165,997 | $ 341,779,376 | $ 406,121,645 | $ 426,640,581 | $ 495,716,497 | $ 516,838,055 |
| **Total Operating Income (Loss)** | $ (45,869,332) | $ (87,033,808) | $ (61,637,180) | $ 6,346,470 | $ 50,594,582 | $ 120,921,602 | $ 198,529,508 | $ 306,289,967 | $ 412,525,891 | $ 584,588,034 | $ 740,400,251 |

### JV Assumptions/Inputs:

| | |
|---|---|
| Active Case: | 3 |
| Initial Investment: | $10,000,000 |
| % Invested by JV | 100% |
| % Invested by AAF | 0% |
| Management Fee | 1% |
| Max. Management Fee | $500,000 |

### Cash Flow Model and IRR

| | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 12/31/2024 | 12/31/2025 | 12/31/2026 | 12/31/2027 | 12/31/2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Profit Share | | $6,900,000 | $7,966,700 | $12,039,116 | $13,481,292 | $15,109,845 | $17,073,148 | $18,554,310 | $20,168,188 | $21,926,907 | $23,843,717 |
| **JV Partner** | | | | | | | | | | | |
| Total Invested | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) | ($10,000,000) |
| Capital Balance | ($10,000,000) | ($7,930,000) | ($5,539,990) | ($1,928,255) | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Memo: Share of Profits Calc | | $2,070,000 | $2,390,010 | $3,611,735 | $4,044,388 | $4,532,953 | $5,121,944 | $5,566,293 | $6,050,456 | $6,578,072 | $7,153,115 |
| Catch Up Profits | | $2,070,000 | $2,390,010 | $3,611,735 | $1,928,255 | $0 | $0 | $0 | $0 | $0 | $0 |
| Promote | | $0 | $0 | $0 | $1,058,066 | $2,266,477 | $2,560,972 | $2,783,147 | $3,025,228 | $3,289,036 | $3,576,558 |
| Management Fee | | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) | ($500,000) |
| **Total Capital Returned to JV** | ($10,000,000) | $1,570,000 | $1,890,010 | $3,111,735 | $2,486,321 | $1,766,477 | $2,060,972 | $2,283,147 | $2,525,228 | $2,789,036 | $3,076,558 |

1.1 20180531 TR0000522110 TR0000522111.XLSX

PALs Model

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| IRR | 18.0% | | | | | | | | | | |
| MoM | 2.4x | | | | | | | | | | |
| Paid Back in Year: | 4 | | | | | | | | | | |

**AAF**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Management Fee to AAF by Each Team | | $500,000 | $500,000 | $500,000 | $500,000 | $500,000 | $500,000 | $500,000 | $500,000 | $500,000 | $500,000 |
| Profit Share to AAF by Each Team | | $4,830,000 | $5,576,690 | $8,427,381 | $10,494,970 | $12,843,368 | $14,512,176 | $15,771,164 | $17,142,960 | $18,637,871 | $20,267,159 |
| Total Capital Returned to AAF | | $42,640,000 | $48,613,520 | $89,273,810 | $109,949,703 | $160,120,415 | $180,146,107 | $227,796,294 | $247,001,436 | $306,205,938 | $332,274,547 |
| Check | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |

| Offsets/Case Assumptions and Inputs | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|

| Profit Share Calc: | $0 | $55,200,000 | $63,733,600 | $120,391,158 | $134,812,917 | $181,318,135 | $204,877,773 | $259,760,346 | $282,354,630 | $350,830,515 | $381,499,467 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenue | $0 | $95,900,586 | $130,692,563 | $254,561,743 | $313,336,820 | $444,087,599 | $540,308,884 | $712,411,612 | $839,166,472 | $1,080,304,531 | $1,257,238,306 |
| Total Revenue (Excl. Digital) | $0 | $77,800,000 | $96,697,100 | $179,924,195 | $203,640,152 | $267,439,033 | $304,740,483 | $385,365,332 | $428,382,809 | $535,301,822 | $596,469,217 |
| Team Revenue | $0 | $55,200,000 | $63,733,600 | $120,391,158 | $134,812,917 | $181,318,135 | $204,877,773 | $259,760,346 | $282,354,630 | $350,830,515 | $381,499,467 |
| Total EBITDA | ($45,869,332) | ($87,033,808) | ($61,637,180) | $6,346,470 | $50,594,582 | $120,921,602 | $198,529,508 | $306,289,967 | $412,525,891 | $584,588,034 | $740,400,251 |
| Total EBITDA (Excl. Digital) | ($37,402,799) | ($55,418,188) | ($40,006,320) | $8,892,128 | $28,070,709 | $55,174,794 | $86,781,901 | $128,047,673 | $164,098,247 | $228,711,881 | $281,513,154 |
| Team EBITDA | ($15,380,000) | ($43,930,640) | ($38,370,959) | ($11,068,462) | ($590,491) | $13,959,522 | $32,498,401 | $52,617,801 | $68,997,810 | $99,679,057 | $122,813,466 |
| Low Rev Mix Case | $0 | $66,500,000 | $80,215,350 | $150,157,676 | $169,226,535 | $224,378,584 | $254,809,128 | $322,562,839 | $355,368,720 | $443,066,169 | $488,984,342 |
| Middle Rev Mix Case | $0 | $73,950,059 | $91,855,771 | $172,504,691 | $197,403,010 | $263,573,665 | $303,331,646 | $386,668,713 | $432,954,131 | $543,684,266 | $608,803,688 |
| High Rev Mix Case | $0 | $82,325,147 | $105,195,966 | $198,583,582 | $231,064,319 | $311,601,175 | $363,632,584 | $467,126,902 | $531,078,725 | $671,552,499 | $761,661,489 |

| JV Catch up %: | 30% |
|---|---|
| Total Revenue | 20% |
| Total Revenue (Excl. Digital) | 35.5% |
| Team Revenue | 30.0% |
| Total EBITDA | 30% |
| Total EBITDA (Excl. Digital) | 40% |
| Team EBITDA | 50% |
| Low Rev Mix Case | 20% |
| Middle Rev Mix Case | 36% |
| High Rev Mix Case | 30% |

| JV Promote %: | 15% |
|---|---|
| Total Revenue | 10% |
| Total Revenue (Excl. Digital) | 18% |
| Team Revenue | 15.0% |
| Total EBITDA | 15% |
| Total EBITDA (Excl. Digital) | 20% |
| Team EBITDA | 25% |
| Low Rev Mix Case | 10% |
| Middle Rev Mix Case | 18% |
| High Rev Mix Case | 15% |

1.1 20180531 TR0000522110 TR0000522111.XLSX

PALs Model



| % of League Revenue Share | |
|---|---|
| Low Rev Mix Case | 50% |
| Middle Rev Mix Case | 75% |
| High Rev Mix Case | 100% |

| % of Team Revenue Share | |
|---|---|
| Low Rev Mix Case | 100% |
| Middle Rev Mix Case | 100% |
| High Rev Mix Case | 100% |

| % of Digital Revenue Share | |
|---|---|
| Low Rev Mix Case | 0% |
| Middle Rev Mix Case | 10% |
| High Rev Mix Case | 25% |

**AAF Officals Budget**

| Officals | Expenses | Game Fee | Per Diem | Hotel - Parking Car Rental | Estimated Travel | Misc. | Total |
|---|---|---|---|---|---|---|---|
| Referee | | $1,750.00 | $200.00 | $320.00 | $450.00 | | $2,720.00 |
| Umpire | | 1,500.00 | 200.00 | 320.00 | 450.00 | | 2,470.00 |
| Headlines | | 1,500.00 | 200.00 | 320.00 | 450.00 | | 2,470.00 |
| Line judge | | 1,500.00 | 200.00 | 320.00 | 450.00 | | 2,470.00 |
| Field judge | | 1,500.00 | 200.00 | 320.00 | 450.00 | | 2,470.00 |
| Side judge | | 1,500.00 | 200.00 | 320.00 | 450.00 | | 2,470.00 |
| Back judge | | 1,500.00 | 200.00 | 320.00 | 450.00 | | 2,470.00 |
| Replay official | | 1,000.00 | 200.00 | 320.00 | 450.00 | | 1,970.00 |
| Communicator | | 750.00 | 200.00 | 320.00 | 450.00 | | 1,720.00 |
| Technical Advisor - Game Grading | | 0.00 | 0.00 | 0.00 | 0.00 | 500.00 | 500.00 |
| Fee per Game | | $12,500.00 | $1,800.00 | $2,880.00 | $4,050.00 | $500.00 | $21,730.00 |

| | |
|---|---|
| Cost of Officials for 43 Games | $934,390.00 |

| Additional Expenses: | |
|---|---|
| Arbiter Sports Assigning License | 4,000.00 |
| Hudl Software License | 3,000.00 |
| Supervisor of Officials | 50,000.00 |
| Training Camps | 62,250.00 |
| Clinics for Officials | 65,000.00 |
| Rule Books-Mechanics Manuals-Training Materials | 6,000.00 |
| Uniforms | TBD |
| Replay Equipment & Technician | TBD |
| Subtotal | $190,250.00 |
| **Grand Total** | **$1,124,640.00** |

| | |
|---|---|
| Approximate Cost per Team | $140,580.00 |
| Approximate cost per game | $26,154 |

## Individual Team Monthly P&L

| Period | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Month | January-18 | February-18 | March-18 | April-18 | May-18 | June-18 | July-18 | August-18 |
| Step-Up | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Year | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 | 2018 |
| # of Teams | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| | | | | | | | | |
| Tickets | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Merchandise | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Team Sponsorship | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total Team Revenue | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Front Office Payroll | $0 | $0 | $0 | $0 | $17,500 | $88,333 | $88,333 | $107,917 |
| Front Office Commissions | 0 | $0 | $0 | $0 | $0 | $20,833 | $20,833 | $20,833 |
| Front Office Bonuses | 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Front Office Benefits & Taxes | 0 | $0 | $0 | $0 | $3,500 | $21,833 | $21,833 | $25,750 |
| Coaches Payroll | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Coaches Benefits & Taxes | 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Players Payroll | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Players Workers Comp | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Players Benefits & Taxes | 0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | |
| Total Other Team Expenses | $0 | $0 | $0 | $0 | $5,000 | $41,000 | $106,000 | $31,000 |
| | | | | | | | | |
| Total Team Related Expenses | $0 | $0 | $0 | $0 | $26,000 | $172,000 | $237,000 | $185,500 |
| Net Income | $0 | $0 | $0 | $0 | ($26,000) | ($172,000) | ($237,000) | ($185,500) |

| 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| September-18 | October-18 | November-18 | December-18 | January-19 | February-19 | March-19 | April-19 | May-19 | June-19 | July-19 | August-19 | September-19 |
| 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| 2018 | 2018 | 2018 | 2018 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 | 2019 |
| 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 | 8 |
| $0 | $0 | $0 | $0 | $875,000 | $875,000 | $875,000 | $875,000 | $437,500 | $0 | $0 | $0 | $0 |
| 0 | 0 | 0 | 0 | 0 | 157,500 | 210,000 | 157,500 | 0 | 0 | 0 | 0 | 0 |
| 0 | 0 | 0 | 0 | 400,000 | 400,000 | 400,000 | 400,000 | 200,000 | 0 | 0 | 0 | 0 |
| $0 | $0 | $0 | $0 | $1,275,000 | $1,432,500 | $1,485,000 | $1,432,500 | $637,500 | $0 | $0 | $0 | $0 |
| $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 | $107,917 |
| $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 | $20,833 |
| $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 | $25,750 |
| $0 | $0 | $0 | $337,500 | $337,500 | $337,500 | $337,500 | $337,500 | $337,500 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $67,500 | $67,500 | $67,500 | $67,500 | $67,500 | $67,500 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $625,000 | $625,000 | $625,000 | $625,000 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $187,500 | $187,500 | $187,500 | $187,500 | $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $125,000 | $125,000 | $125,000 | $125,000 | $0 | $0 | $0 | $0 | $0 |
| $31,000 | $31,000 | $56,000 | $161,000 | $460,031 | $1,312,683 | $1,262,683 | $857,683 | $216,625 | $26,000 | $26,000 | $26,000 | $26,000 |
| $185,500 | $185,500 | $210,500 | $720,500 | $1,957,031 | $2,809,683 | $2,759,683 | $2,354,683 | $776,125 | $180,500 | $180,500 | $180,500 | $180,500 |
| ($185,500) | ($185,500) | ($210,500) | ($720,500) | ($682,031) | ($1,377,183) | ($1,274,683) | ($922,183) | ($138,625) | ($180,500) | ($180,500) | ($180,500) | ($180,500) |

Individual Team P&L

| 22 | 23 | 24 |
|---|---|---|
| October-19 | November-19 | December-19 |
| 0% | 0% | 0% |
| 2019 | 2019 | 2019 |
| 8 | 8 | 8 |

| | | | | 2018 | 2019 |
|---|---|---|---|---|---|
| $0 | $0 | $437,500 | | $0 | $4,375,000 |
| 0 | 0 | 0 | | 0 | 525,000 |
| 0 | 0 | 200,000 | | 0 | 2,000,000 |
| $0 | $0 | $637,500 | | $0 | $6,900,000 |
| | | | | | |
| $107,917 | $107,917 | $107,917 | | $733,750 | $1,295,000 |
| $20,833 | $20,833 | $20,833 | | $145,833 | $250,000 |
| $0 | $0 | $0 | | $0 | $0 |
| $25,750 | $25,750 | $25,750 | | $175,917 | $309,000 |
| $0 | $0 | $337,500 | | $337,500 | $2,025,000 |
| $0 | $0 | $67,500 | | $67,500 | $405,000 |
| $0 | $0 | $0 | | $0 | $2,500,000 |
| $0 | $0 | $0 | | $0 | $750,000 |
| $0 | $0 | $0 | | $0 | $500,000 |
| | | | | | |
| $26,000 | $26,000 | $91,625 | | $462,000 | $4,357,330 |
| | | | | | |
| $180,500 | $180,500 | $651,125 | | $1,922,500 | $12,391,330 |
| ($180,500) | ($180,500) | ($13,625) | | ($1,922,500) | ($5,491,330) |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE | § | |
| | § | CASE NO. 19-50900-CAG |
| LEGENDARY FIELD EXHIBITIONS, LLC, | § | |
| | § | CHAPTER 7 |
| DEBTOR. | § | |

| | | |
|---|---|---|
| DUNDON CAPITAL PARTNERS LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Adversary No. 22-05077-cag |
| v. | § | |
| | § | udge: Craig A. Gargotta |
| CHARLES EBERSOL, | § | |
| | § | |
| Defendant. | § | |

ORDER DENYING DEFENDANT CHARLES EBERSOL'S
MOTION FOR SUMMARY  UDGMENT

Defendant Charles Ebersol filed a Motion for Summary Judgment. ECF 102. Having

considered the Motion, the evidence, and the law, the Court finds the Motion should be denied.

1

**SO ORDERED.**

**Prepared and submitted by:**

**BELL NUNNALLY & MARTIN LLP**

/s/ *Beverly A. Whitley*
Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
Sydnie A. Shimkus
Texas Bar No. 24093783
sshimkus@bellnunnally.com

2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

**ATTORNEYS FOR PLAINTIFF
DUNDON CAPITAL PARTNERS LLC**

10470835.1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| *Debtor.* | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **ADV. NO. 22-05077** |
| **CHARLES EBERSOL,** | § | |
| *Defendant.* | § | **Judge: Craig A. Gargotta** |

## DEFENDANT CHARLES EBERSOL'S OBJECTION TO DUNDON CAPITAL PARTNERS, LLC'S EVIDENCE IN SUPPORT OF SUMMARY JUDGMENT RESPONSE

Defendant Charles Ebersol ("Ebersol") files this Objection to Dundon Capital Partner, LLC's ("DCP") evidence in support of Summary Judgment Response ("Motion"). Ebersol objects to certain evidence attached to DCP's Response to Ebersol's Motion for Summary Judgment (Doc. #124). Ebersol respectfully requests that this Court sustain his objections and exclude the improper portions of evidence filed by DCP in support of its response.

### I.    LEGAL STANDARD

Ebersol relies on the Federal Rules of Evidence in support of his objections. Under Federal Rule of Civil Procedure 56(c)(2), incorporated by Federal Rule of Bankruptcy Procedure 7056, "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Advisory committee notes on the 2010 amendment to Rule 56(c)(2) instruct:

*a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated.*

## II.      OBJECTIONS

Ebersol objects to the following evidence submitted by DCP in support of its response to Ebersol's motion for summary judgment:

- Ex. 33 at 64:4-16, 65:18-23, 68:10-16, 92:17-93:8: DCP cites these lines as evidence that Ebersol questioned whether the AAF should have gone forward with only Fowler as an investor. Ebersol objects that the cited testimony is irrelevant as it makes no reference to Ebersol and therefore should be struck.

- Ex. 33 at 101:1-17: DCP cites these lines as evidence that "Ebersol completely undermined the league's future by cutting production and national marketing and sponsorship at the most critical juncture when the league needed to raise awareness, sell advertising, sell tickets, and sell sponsorships." The testimony, however, was that the witness, Alan Kantowitz, did not know who made the decision to cut production and marketing. Ebersol objects that the cited testimony is misleading and irrelevant and therefore should be struck.

- Ex. 36; Ex. 33 at 72:7-73:12: DCP cites an email from Ebersol (Ex. 36) and testimony (Ex. 33 at 72:7-73:12) in support of its factual assertion that "Ebersol made the decision to cut marketing, which in his words 'screwed' the AAF." The email and testimony, however, states that "Reggie's delinquency screwed us with respect to revenue killing our marketing. Additional testimony (Ex. 33 at 98:10-15, 98:21-99:2, 99:7-13) does not reference ~~Ebbersol~~Ebersol. Ebersol objects that the cited email and testimony are misleading and irrelevant and therefore should be struck.

- Ex. 33 at 100:14-21 – DCP cites this testimony in support of the proposition that Ebersol believed that ticket sales were lagging due to a lack of marketing. Kantowitz, however, testified that he didn't have his own opinion and "[he thought]" that was Ebersol's perspective. Ebersol objects that the cited testimony is speculative, lacks foundation, and is irrelevant and should be struck.

- Ex. 9, Ex. 40, Ex. 33 at 114:24-119:9, 119:21-120:23, 122:12-22, 123:5-18, 125:5-17: DCP cites emails from Kantowitz (Ex. 9, Ex. 40) financial documents (Ex. 39), and deposition testimony (Ex. 33 at 114:24-119:9, 119:21-120:23, 122:12-22, 123:5-18, 125:5-17) in support of the proposition that "by mid-January, the league, at Ebersol's direction, still had no committed investor, continued pushing off obligations to critical vendors, and continued making commitments to incur new debts to players, vendors, stadiums and all the others required to put games on the field." Exhibits 9, 33, 39, 40 make no reference that Ebersol gave any direction for the league to push off obligations or that he directed the league to incur new debts. Ebersol objects this evidence is therefore misleading and irrelevant and should be struck.

- Ex. 23 at 199:9-24, 201:11-202:8: DCP cites the testimony related to Ebersol contacting Dundon. Ebersol objects that the cited testimony is irrelevant as it makes no reference to Ebersol and therefore should be struck.

- Ex. 23 at 261:3-24: DCP cites this testimony in support of the proposition that Dundon introduced Ebersol to John Zutter, who further negotiated the structure of a potential deal between DCP and ESMG. The cited testimony, however, does not reference structuring a potential deal. Ebersol objects that the cited testimony is irrelevant and therefore should be struck.

---

- Ex. 25 at 68:20-25, Ex. 28 at 210:17-211:11, 352:16-353:10, Ex. 33 at 149:10-17: DCP cites this testimony in support of the proposition that DCP failed to do due diligence because DCP relied on Ebersol's representations that the AAF needed funds immediately, and that any delay would essentially result in the league's collapse. However, the cited testimony does not reference Ebersol or any reliance. Ebersol objects that the cited testimony is irrelevant and therefore should be struck.

- Ex. 29 at 47:6-17, 66:5-18, Ex. 28 at 160:8-161:1: DCP cites this testimony is support of the proposition that DCP asked Ebersol to provide it with all documentation relevant to any potential investment. However, the cited testimony does not reference Ebersol. Ebersol objects that the cited testimony is irrelevant and therefore should be struck.

- Ex. 28 at 25:11-19; Ex. 24 at 261:3-24: DCP cites this testimony is support of the proposition that a term sheet was executed. However, the cited testimony does not reference any terms sheets. Ebersol objects that the cited testimony is irrelevant and therefore should be struck.

- Ex. 30 at 37:11-14: DCP cites this testimony in support of the proposition that Dundon owns and serves as manager for DDFS Management. The cited testimony, however, does not state that Dundon own DDFS. Ebersol objects that the cited testimony is irrelevant and/or misleading and therefore should be struck.

- Ex. 30 at 40:5-41:11; DCP cites this testimony in support of the proposition that DDFS Partnership is a Delaware limited partnership owned by Dundon, the Dundon Children's Trust, and DDFS Management. Mr. Vanderbilt, however, makes no mention of ownership in the cited testimony and in fact admits he does not know the limited or general partners.

Ebersol objects that the cited testimony lacks foundation, speculative, and is irrelevant and/or misleading and therefore should be struck.

- Ex. 31: Ebersol objects to paragraphs 3, 4, and 6 of Jeffery Vanderbilt's declaration as conclusory, and irrelevant. The statement is not supported by any substantive evidence as to the entities' legal status, tax identity, structure, bylaws, or articles of incorporation/formation that would allow the Court the opportunity to ascertain the reliability of such statements. *See Lechuga v. Southern Pacific Transp. Co.,* 949 F.2d 790, 798 (5th Cir. 1992) (conclusory statements in affidavits do not provide facts that will counter summary judgment evidence). The statements also constitute legal conclusions for which Vanderbilt is unqualified to offer.

- Ex. 31 ¶ 6, Ex. A: DCP claims that Dundon's tax return shows that the loss related to the ESMG investment was claimed by him. The tax return, however, is silent as to DCP. Ebersol objects that the cited testimony is irrelevant and/or misleading and therefore should be struck.

- Ex. 28 at 184:7-14: DCP cites this testimony in support of its claim that after entering the Term Sheet, it learned that Ebersol had made misrepresentations. The cited testimony, however, does not state that misrepresentations were made or that Ebersol made any misrepresentations. Ebersol objects that the cited testimony is irrelevant and/or misleading and therefore should be struck.

- Ex. 13 at 7-8, 10-12, Ex. 23 at 140:12-25, Ex. 26 at 387:11-388:9; Ex. 29 at 79:9-15: DCP cites these exhibits and testimony for the proposition that Ebersol failed to disclose his lack of authority to DCP prior to DCP entering into the term sheet. The undisputed evidence

demonstrates that DCP never entered into the term sheet. Ebersol objects that the cited exhibits and testimony are irrelevant and/or misleading and therefore should be struck.

- Ex. 23 at 201:11-202:10: DCP cites this testimony for the proposition that Ebersol did not know the basis for representing to potential investors that $70 million was needed to complete the first season. Ebersol, however, testified that he assumed he was provided the number by someone on his team. Ebersol objects that the cited testimony is irrelevant and/or misleading and therefore should be struck.

- Ex. 14: DCP cites to the report of its expert Erica Bramer to support the proposition that Ebersol did not disclose that an additional $23 million at a minimum would have been required to cover the delinquent accounts payable and immediately due debt. Bramer's report is hearsay and unreliable in its own right as argued by Ebersol in his separately filed *Motion to Exclude* (Doc. #). Notwithstanding, Ebersol objects that this evidence/allegation lacks foundation and assumes facts not in evidence; specifically, that Ebersol was aware that there was additional $23 million at minimum required to cover the delinquent accounts payable and immediately due debt.

- Ex. 28 at 71:17-72:6; 117:24-118:22; 122:21-123:16; Ex. 25 at 87:13-89:16: DCP cites this testimony for the proposition that prior to DCP entering the Term Sheet, Ebersol disclosed to Dundon that the AAF needed $5.1 million to cover player salaries and related expenses for the first week of games that had already been played. The undisputed evidence demonstrates that DCP never entered into the term sheet. John Zutter (the deponent for the cited testimony is Ex. 28) stated in the referenced testimony that he did not know who provided the $5.1 million number and he did not mention Ebersol provided that number.

Ebersol objects that the cited testimony is irrelevant and/or misleading and therefore should be struck.

- Ex. 3; Ex. 32: DCP claims that the cited exhibits demonstrate that Ebersol told Dundon (as that $10 million would get the league through week two of the season. Neither exhibit contains any such statements from Ebersol. Ebersol objects that the cited exhibits are irrelevant and/or misleading and therefore should be struck.

- Ex. 16 – Ebersol objects that the Vanach letter lacks authentication and constitutes hearsay.

- Ex. 17 – Ebersol objects that the Vanach letter lacks authentication and constitutes hearsay.

- Ex. 26 at 388:19-389:7, 390:9-23; Ex. 29 at 79:9-15; Ex. 7 – Ebersol objects that these exhibits lack foundation and assumes facts not in evidence. Specifically, that there were valid competing stock rights or claims to ownership that Ebersol was aware of and had an obligation to disclose.

- Ex. 26 at 390:24- 392:24 - Ebersol objects that these exhibits lack foundation and assumes facts not in evidence. Specifically, that the AAF had failed to pay airlines, hotels, security companies, and CBS, the network that was airing its games. The cited testimony instead is the byproduct of an impermissible leading examination by DCP's attorney eliciting responses from his own witness and therefore should be struck.

- Ex. 25 at 89:4-23.; Ex. 26 at 389:8-15; Ex. 29 at 78:7-79:8 - Ebersol objects that these exhibits lack foundation and assumes facts not in evidence. Specifically, that Ebersol was aware of the specific nature of such debts and/or had a duty to disclose such information. Ebersol further objects that the cited testimony is irrelevant and/or misleading as no reference is made to Ebersol specifically.

- Ex. 4 at 12; Ex. 12 at 2; Ex. 41 at 2 – DCP cites these exhibits for the proposition, among other things, that DCP signed the Term Sheet. These exhibits make no reference to DCP signing the Terms Sheet. Ebersol objects that the cited exhibits are irrelevant and/or misleading and therefore should be struck.

- Ex. 23 at 207:21-208:4; 208:12-15; Ex. 24 at 71:21-72:10; Ex. 25 at 87:13-89:16; Ex. 29 at 45:24-46:16; 48:17-49:3: DCP cites this testimony in support of its claim that Ebersol represented to DCP that the only previously incurred obligation that remained outstanding was $5.1 million for player payroll and related week one expenses.. The cited testimony, however, does not state Ebersol made any representations or misrepresentations. Ebersol objects that the cited testimony is irrelevant and/or misleading and therefore should be struck.

- Ex. 29 at 109:14-110:14; Ex. 27 167:14-168:10; Ex. 28 at 285:1-6; 287:4-19: DCP cites this testimony in support of its claim that as CEO of ESMG, Ebersol knew about an additional $18 million in accounts payable. Ebersol objects that this evidence/allegation lacks foundation, is based on speculation, and assumes facts not in evidence; specifically, that Ebersol was aware that there was additional $18 million in accounts payable.

- Ex. 22: DCP cites this exhibit for the proposition that on February 13, 2019, Ebersol provided DCP with projections related to the AAF, representing an honest belief in their accuracy. The exhibit, however, makes no representations about accuracy. Ebersol objects that the cited testimony is irrelevant and/or misleading and therefore should be struck.

### III.    CONCLUSION AND PRAYER

For the reasons set forth above, Ebersol respectfully requests that the Court sustain his objections to the above-identified evidence proffered by DCP in support of its Response to

Ebersol's Motion for Summary Judgment and exclude such evidence from consideration by the Court.

Respectfully submitted,

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**

By: */s/ Michael J. Saltz*
       Michael J. Saltz
       Admitted *pro hac vice*
       msaltz@jrsnd.com

1800 Century Park East, Suite 900
Los Angeles, California 90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909

**THOMPSON, COE, COUSINS & IRONS, LLP**

By: */s/ Thomas M. Horan II*
       Thomas M. Horan II
       State Bar No. 24063938
       thoran@thompsoncoe.com

700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209

**ATTORNEYS FOR DEFENDANT CHARLES EBERSOL**

## CERTIFICATE OF SERVICE

I hereby certify that, on January 21, 2025, a true and correct copy of the foregoing was delivered to the following counsel of record by electronic service:

| | |
|---|---|
| Brett D. Hockaday | Jeffrey S. Lowenstein |
| K&L GATES LLP | Beverly A. Whitley |
| 1717 Main Street, Suite 2800 | Brent A. Turman |
| Dallas, Texas 75201 | Sydnie A. Shimkus |
| | BELL NUNALLY & MARTIN, LLP |
| | 2323 Ross Avenue, Suite 1900 |

Dallas, Texas 75201

Nicole L. Williams
Katherine B. Clark
THOMPSON COBURN LLP
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201

Brian S. Engel
Steve P. Turner
BARRETT DAFFIN FRAPPIER TURNER & ENGEL,
LLP
580 La Ventana Boulevard
Driftwood, Texas 78619

Boris Treyzon
Jonathon Farahi
ABIR COHEN TREYZON SALO, LLP
16001 Ventura Boulevard, Suite 200
Encino, California 91436

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS,** | § | |
| **LLC,** | § | **CASE NO. 19-50900-CAG** |
| | § | **CHAPTER 7** |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| Plaintiff, | § | |
| | § | **ADV. NO. 22-05077** |
| v. | § | |
| | § | **Judge: Craig A. Gargotta** |
| **CHARLES EBERSOL,** | § | |
| Defendant. | § | |

**ORDER DEFENDANT CHARLES EBERSOL'S OBJECTION TO DUNDON CAPITAL**
**PARTNERS, LLC'S EVIDENCE IN SUPPORT OF SUMMARY JUDGMENT**
**RESPONSE**

The Court, having considered Objection to Dundon Capital Partner, LLC's ("DCP") evidence

in support of Summary Judgment Response (the "Motion"), any responsive pleadings and other

1

documents, and the arguments of counsel, finds that Ebserol's objections should be and are

sustained as set forth below:

- Ex. 33 at 64:4-16
- Ex. 33 at 65:18-23,
- Ex. 33 at 68:10-16
- Ex. 33 at 92:17-93:8
- Ex. 33 at 101:1-17
- Ex. 36
- Ex. 33 at 72:7-73:12
- Ex. 33 at 100:14-21
- Ex. 9
- Ex. 40
- Ex. 33 at 114:24-119:9,
- Ex. 33 at 119:21-120:23
- Ex. 33 at 122:12-22
- Ex. 33 at 123:5-18
- Ex. 33 at 125:5-17
- Ex. 23 at 199:9-24
- Ex. 23 at 201:11-202:8
- Ex. 23 at 261:3-24
- Ex. 25 at 68:20-25
- Ex. 28 at 210:17-211:11
- Ex. 28 at 352:16-353:10
- Ex. 33 at 149:10-17
- Ex. 29 at 47:6-17,
- Ex. 29 at 66:5-18
- Ex. 28 at 160:8-161:1
- Ex. 28 at 25:11-19
- Ex. 24 at 261:3-24
- Ex. 30 at 37:11-14
- Ex. 30 at 40:5-41:11
- Ex. 31 at paragraphs 3, 4, and 6 and Exhibit A
- Ex. 28 at 184:7-14
- Ex. 13 at 7-8, 10-12
- Ex. 23 at 140:12-25
- Ex. 26 at 387:11-388:9
- Ex. 29 at 79:9-15
- Ex. 23 at 201:11-202:10
- Ex. 14
- Ex. 28 at 71:17-72:6
- Ex. 28 at 117:24-118:22

2

- Ex. 128 at 122:21-123:16
- Ex. 25 at 87:13-89:16
- Ex. 3
- Ex. 32
- Ex. 16
- Ex. 17
- Ex. 26 at 388:19-389:7
- Ex. at 390:9-23
- Ex. 29 at 79:9-15
- Ex. 7
- Ex. 26 at 390:24- 392:24
- Ex. 25 at 89:4-23.
- Ex. 26 at 389:8-15
- Ex. 29 at 78:7-79:8
- Ex. 4 at 12
- Ex. 12 at 2
- Ex. 41 at 2
- Ex. 23 at 207:21-208:4
- Ex. 23 at 208:12-15
- Ex. 24 at 71:21-72:10
- Ex. 25 at 87:13-89:16
- Ex. 29 at 45:24-46:16
- Ex. 29 at 48:17-49:3
- Ex. 29 at 109:14-110:14
- Ex. 27 167:14-168:10
- Ex. 28 at 285:1-6
- Ex. 28 at 287:4-19
- Ex. 22

**IT IS FURTHER, ORDERED the** Court hereby sustains the above objections to DCP's

evidence, and hereby excludes such evidence from consideration by the Court.

### END OF ORDER ###

**Prepared by:**

Michael J. Saltz
Admitted *pro hac vice*
**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**
1800 Century Park East, Suite 900
Los Angeles, California  90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909
msaltz@jrsnd.com

-        **and –**

Thomas M. Horan, II
State Bar No. 24063938
**THOMPSON, COE, COUSINS & IRONS, LLP**
700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas  75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209
thoran@thompsoncoe.com

**ATTORNEYS FOR DEFENDANT
CHARLES EBERSOL**

4

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| | § | |
| *Debtor.* | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **ADV. NO. 22-05077** |
| | § | |
| **CHARLES EBERSOL,** | § | **Judge: Craig A. Gargotta** |
| | § | |
| *Defendant.* | § | |

**DEFENDANT CHARLES EBERSOL'S REPLY IN**
**SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

Defendant Charles Ebersol submits this Reply Memorandum in Support of his Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

## I.  SUMMARY OF REPLY

In its response, DCP concedes that DDFS Partnership, LP ("DDFSP") paid all of the funds at issue to ESMG and that there is no legal relationship between it and DDFSP that would give it any right to rely on the injury suffered by DDFSP to support Article III standing. Rather, DCP argues that it has standing because it "owned" these funds, which it alleges were paid on its behalf, and that it "owns" the claims it is asserting against Ebersol, which it contends is sufficient to confer standing. Both arguments should be rejected: the former is unsupported by the evidence, while the latter reflects a fundamental misunderstanding of Article III standing jurisprudence. Because DCP has suffered no injury in fact, it lacks standing to pursue its claims against Ebersol.

---

Moreover, the express language of the TSA is clear that an actual conveyance of securities must occur for a securities fraud claim thereunder to be actionable, and the Texas Supreme Court and U.S. Court of Appeals for the Fifth Circuit have held there must be an actual conveyance of stock for a statutory fraud claim to be actionable. Because DCP has submitted no evidence that it received any stock in ESMG, its securities fraud and statutory fraud claims fail as a matter of law and summary judgment on them in favor of Ebersol is proper.

Finally, despite submitting over eight-hundred pages of exhibits in support of its response, many of which are objectionable and/or do not stand for the propositions for which they have been offered, DCP has not submitted any significant probative evidence that any of Ebersol's alleged misrepresentations are actionable under Texas law, that he had any duty to disclose the information or documents he allegedly concealed from DCP, or that he possessed the requisite fraudulent intent to support DCP's claims. DCP has also failed to submit any evidence to support its allegation that it relied on Ebersol's misrepresentations and omissions by entering into the Term Sheet and paying monies thereunder because it is undisputed that DCP *never* executed the Term Sheet or paid *any* monies to the League, and DCP admits in its response that it failed to perform even the most basic level of diligence to protect its own interests. Lastly, DCP has submitted no evidence of damages. Accordingly, even if this Court holds that DCP has standing, which it should not, DCP's claims nonetheless fail as a matter of law.

## II.  ARGUMENTS AND AUTHORITIES

### A.  DCP FAILS TO DEMONSTRATE IT HAS SUFFERED ANY INJURY IN FACT

#### 1.  DCP Fails to Produce Any Evidence of Ownership of the Funds or Agreement Between It and DDFSP Concerning the $70 Million Investment

DCP's own response confirms the lack of any legal relationship between DCP and DDFSP that would give rise to standing. Specifically, DCP confirms it has no direct ownership interest in

DDFSP and that its sole owner is DDFS Management, a separate and distinct entity from DDFSP. Doc. No. 124, pp. 12, ¶ 15. In other words, **DCP is not a partner of DDFSP, and DDFSP is not a member of DCP.** Yet, even if one of these entities held an ownership interest in the other, that would not *per se* give it any ownership rights to the other entity's property, as Texas and Delaware law presume that separate legal entities have distinct legal identities and that property belonging to one entity is the property of that entity, not of its individual owners. *See* TEX. BUS. ORGS. CODE § 154.001(c); 6 DEL. CODE § 15-501.

Moreover, DCP does not dispute that DDFSP is the entity that disbursed the approximately $70 million in funds to ESMG. Instead, DCP, relying on Vanderbilt's deposition testimony and declaration, argues it "owned" the funds because (1) DDFSP and DCP are "pass-through" entities and (2) DDFSP functions as DCP's "treasury management." Both arguments are misleading and mischaracterize Vanderbilt's testimony. First, while Vanderbilt has testified that DDFSP and DCP are both pass-through entities, DCP has submitted no evidence that they are pass-through entities *for each other*, nor can it submit such evidence because a pass-through entity passes its profits and losses onto its *owners*, and it is undisputed that DCP and DDFSP do not hold ownership interests in each other. Second, while Vanderbilt testified that DDFSP functions as "treasury management," he did not testify that DDFSP functions as treasury management *for DCP*. Rather, he testified that DDFSP, in the abstract, generally performs treasury management services, without specifically connecting any of those services to the funds at issue in this case. And the portions of Vanderbilt's deposition transcript upon which DCP relies are devoid of any specific testimony that DCP owned any of the monies that were wired by DDFSP to the League.

Finally, even after being given an opportunity to do so, DCP has submitted no evidence of *any* agreement between DCP and DDFSP that assigns the entirety of DDFSP's rights to the $70

million investment to DCP, such as a services agreement or a contractual assignment of claims. DCP has also submitted no evidence of any agreement whereby DDFSP agreed to hold these funds in trust for DCP, and there is simply no scenario in this world where an entirely different entity with an entirely different ownership structure would voluntarily hold onto property for the benefit of another entity absent an agreement to do so. This lack of evidence, combined with the portions of Vanderbilt's deposition transcript cited to in the Motion, demonstrates that no such agreement exists between DCP and DDFSP. And DDFSP's declaration of these losses on its business tax return further demonstrates that it treated the funds as its own and that DDFSP, not DCP, bore the financial harm and suffered the injury at issue here. *See* Doc. No. 102, Exhibit D.

### 2. The Cases Do Not Support DCP's Standing Argument

DCP's attempts to distinguish the cases Ebersol relies upon in his Motion—*Indemnified Capital Investments* and *W.R. Huff Asset Management Co.*—are also unsuccessful. As set forth in the Motion, the *Indemnified Capital* court held that the plaintiff lacked standing to prosecute claims on behalf of its clients because the clients, and not the plaintiff, had suffered the losses at issue. 12 F.3d 1406, 1409 (7th Cir. 1993). DCP argues that *Indemnified Capital* is distinguishable because the plaintiff in that case had "not alleged in its complaint that it owned the funds in its customer accounts, that it was injured by the losses in those accounts, that it might suffer some future loss of business, or that its customers assigned their claims to [the plaintiff,]" whereas DCP alleges that it *did* own the funds wired by DDFSP. *Id.* As set forth above in Section II.A.1., there is no evidence supporting DCP's ownership allegation, and the fact that it has merely "alleged" in its response— and not in its complaint—that it owned these funds is insufficient to survive summary judgment. *Accord Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). There is also no evidence that DCP was injured by the alleged $70 million loss—that injury was

suffered by DDFSP, if at all—or that DDFSP assigned DCP its claims for the loss. Thus, contrary to DCP's argument, *Indemnified Capital* is completely applicable to this case, and thus this Court should conclude that DCP also lacks standing.

Relatedly, in *W.R. Huff*, the plaintiff argued its alleged injury was suffered not by it, but by its clients, and alleged its power of attorney "empowered" it to bring a lawsuit on their behalf. 549 F.3d 100, 104 (2d Cir. 2008). Yet because the power of attorney was not a valid assignment to the plaintiff of its clients' claims, it lacked standing to pursue them. *Id.* at 109. Likewise, DCP has submitted no evidence demonstrating that DDFSP assigned to DCP any of its claims arising from the alleged loss or that DCP has any authority to pursue those claims on DDFSP's behalf.

DCP further attempts to distinguish *Indemnified Capital* and *W.R. Huff* by arguing that it has standing because it owns its "claims" against Ebersol. This argument reflects a fundamental misunderstanding of Article III standing jurisprudence. While ownership of the claims is necessary to establish standing, as the U.S. Court of Appeals for the Second Circuit in *W.R. Huff* and the U.S. Supreme Court in *Sprint Communications Co. v. APCC Services, Inc.* observed, it is not sufficient. Even if a party owns the claims it is asserting, it must still demonstrate it has suffered an injury in fact. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009) (holding that respondents, who alleged they had been deprived of certain procedural rights, lacked standing because they failed to demonstrate the deprivation had caused them to suffer an injury in fact). Thus, even if DCP owns its claims against Ebersol, it still lacks standing because it has suffered no injury in fact.

DCP also relies on *Kakabadze v. M5 International Co.* for the proposition that a party has standing to recover funds paid under a contract on its behalf by a third party. This is not what the *Kakabadze* court held. In *Kakabadze*, the plaintiff, who was an authorized agent for the Ministry of Internal Affairs of the Republic of Georgia, had purchased certain armaments and munitions

from the defendant *with his own funds* and delivered them to his principal (who later reimbursed him), and then sued the defendant for fraud in connection with the purchase contract. 2014 WL 2547767, at *1 (S.D. Tex. June 5, 2014). The principal never made any direct payments to the defendant. *See id.* In its motion to dismiss, the defendant argued the plaintiff lacked standing because he had been fully reimbursed. *Id.* at *3. The court rejected this argument because it was undisputed that the plaintiff had paid the funds under the contract *out of his own pocket* and therefore had suffered an injury in fact, regardless of whether he had been reimbursed. *Id.* at *4. That is not what happened here: DCP did not pay any monies to ESMG; DDFSP did.

Finally, DCP analogizes the relationship between it and DDFSP to the relationship between a college student who enters a contract to purchase a car and the student's parents who wire funds to the salesperson to pay for it, arguing that the student, like DCP, would still have standing to sue the salesperson in connection with the purchase even though the funds did not originate from them. However, DCP cites to no case law in support of this proposition, gives this Court no basis upon which to believe it is legally correct, and provides no argument as to why the relationship between a child and their parents is at all similar to the relationship between two distinct corporate entities that lack common ownership. The Court should thus disregard this argument as pure conjecture.

Accordingly, because DCP has failed to submit any significant probative evidence that it owned the monies that were disbursed to ESMG or that it has any right, title, or interest in those monies by way of agreement with DDFSP, it has not demonstrated it has suffered an injury fact and thus lacks Article III standing.

**B.     DCP'S ARGUMENTS THAT SECURITIES FRAUD AND STATUTORY FRAUD CLAIMS DO NOT REQUIRE AN ACTUAL CONVEYANCE OF STOCK TO BE ACTIONABLE ARE UNPERSUASIVE**

At the outset, DCP's response is devoid of any meaningful argument that the TSA does not require a conveyance of securities in order for a claim thereunder to be actionable. Indeed, DCP

cannot make such an argument because the TSA expressly contemplates that, in a securities fraud

action against a seller of securities, the securities must have been actually conveyed to the buyer.

*See* Tex. Gov't Code § 4008.057(a) (observing that a buyer's damages are calculated in part by

reference to the value of the security at the time the buyer disposed of it); *see also Chase v. Hodge*,

2021 WL 19848470, at *9 (W.D. Tex. May 14, 2021) (noting that an actual sale of securities must

have occurred for a securities fraud claim under the TSA to be actionable).

Rather, DCP's response is largely dedicated to the argument that an actual conveyance of

real estate or stock is not required in order for it to maintain its statutory fraud claim under Section

27.01(a) of the TBCC. DCP's argument is twofold. First, it argues that none of the cases on which

Ebersol relies specifically involve a contract to buy stock. This is a distinction without a difference,

as statutory fraud encompasses conveyances of stock *and* real estate. *See* Tex. Bus. & Com. Code

§ 27.01(a) ("Fraud in a transaction involving real estate or stock . . . consists of . . ."). Both *Stanfield*

and *Mouton* involved contracts to sell real property that was ultimately never conveyed. *Stanfield*

*v. O'Boyle*, 462 S.W.2d 270, 271 (Tex. 1971); *Okumus v. Mouton*, 2020 WL 6278664, at *5 (Tex.

App.—Houston [14th Dist.] Oct. 27, 2020, no pet.). More importantly, both *Kimmons* and *Laird*

involved contracts to convey stock: *Kimmons* involved an alleged oral contract for the conveyance

of stock in exchange for the plaintiff's performance of consulting services, while *Laird* involved

an employment contract under which the plaintiff would earn stock options provided he met certain

conditions precedent. *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 402 (5th Cir. 2000); *Stephanz v.*

*Laird*, 846 S.W.2d 895, 898 (Tex. App.—Houston [1st Dist.] 1993, writ denied). In each case, the

claimants' statutory fraud claims were dismissed for lack of conveyance of the disputed property,

regardless of whether the property was real estate or stock.

---

1076

Second, DCP argues that the more on-point case is *Tukua Investments, LLC v. Spenst*, in which the El Paso Court of Appeals allowed a statutory fraud claim to proceed despite the fact that no property was actually conveyed. 413 S.W.3d 786, 797 (Tex. App.—El Paso 2013, pet. denied). The court arrived at this conclusion by adopting a "looser" interpretation of Section 27.01(a), even though the Texas Supreme Court has counseled that Section 27.01(a) "is penal in nature and must be strictly construed." *Westcliff v. Wall*, 267 S.W.2d 544, 546 (Tex. 1954); *see also Kimmons*, 228 F.3d at 406. Given that the Texas Supreme Court and the U.S. Court of Appeals for the Fifth Circuit have held that an actual conveyance of real estate or stock is required to maintain a statutory fraud claim, and given that the *Tukua* court appears to be only Texas state court that has interpreted Section 27.01(a) to not require actual conveyance, this Court should decline to follow its lead.

The facts of *Tukua* are also materially distinguishable from the facts of this case because the purchase agreement at issue there had been executed by, and thus was binding on, both parties. 413 S.W.3d at 792-94. In contrast, the Term Sheet was never signed by DCP, who never became bound by its terms. Doc. No. 102, Exhibits I, I-1, and I-2. Moreover, the plaintiffs in *Tukua*, who were attempting to purchase a 1031 exchange replacement property from the defendant, suffered actual damages as a result of the defendant's alleged fraud because they were required to pay taxes on the other property they had sold. 413 S.W.3d at 793. If the court had required actual conveyance, the plaintiffs, who had terminated the agreement themselves, would have been unable to recover the damages they had incurred in relying on the defendant's representations, and thus there are policy reasons supporting the court's interpretation of Section 27.01(a). In contrast, DCP has not incurred any damages and is instead seeking to recover monies paid by a third party.

Accordingly, because DCP has failed to submit any evidence that it ever actually received any of the stock contemplated by the Term Sheet, which it did not sign and thus which never

became binding, its securities fraud and statutory fraud claims fail as a matter of law and summary judgment should be granted in favor of Ebersol on them.

## C. DCP FAILS TO SUBMIT SIGNIFICANT PROBATIVE EVIDENCE SHOWING A TRIABLE ISSUE OF FACT ON THE ELEMENTS OF ITS FRAUD CLAIMS AGAINST EBERSOL

### 1. No Evidence Ebersol Made Any Actionable Misrepresentations

To prevail on its fraudulent inducement, statutory fraud, and securities fraud claims, DCP must establish that Ebersol made an actionable misrepresentation. *See, e.g.*, *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Fidelity Nat'l Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 632 (E.D. Tex. 2011); *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). For a misrepresentation to be actionable, the allegedly false information must concern an "existing fact," not a promise of future conduct. *AKB Kendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 237 (Tex. App.—Dallas 2013, no pet.). And the representation must have been false at the time it was made. *See Casstevens v. Smith*, 269 S.W.3d 222, 232 (Tex. App.—Texarkana 2008, pet. denied).

In its response, DCP contends Ebersol made misrepresentations to it in the following ways: (1) by providing DCP with financial projections that were false; (2) by falsely representing that a $55-$70 million investment from DCP would allow the League to survive its inaugural season; (3) by falsely representing that the only outstanding obligation previously incurred by the League was the $5.1 million player payroll obligation; (4) by falsely representing his authority to enter into the Term Sheet on behalf of the various AAF entities; and (5) by falsely representing that DCP would be able to obtain seventy-five percent of ESMG's undiluted capital stock. None of DCP's proffered evidence supports these allegations.

First, regarding DCP's contention that the financial projections Ebersol provided to DCP, as well as his alleged representations that between $55 million and $70 million would allow the

League to survive its inaugural season, were misrepresentations, Texas courts have routinely held that these kinds of "future predictions" cannot form the basis for fraud as a matter of law because, at their core, they are merely opinions. *E.g.*, *Zar v. Omni Indus., Inc.*, 813 F.2d 689, 693 (5th Cir. 1987) ("In order to effect a sale, induce the making of a contract, or place a proposed investment in a favorable light, it is quite common to make representations as to future value, productiveness, efficiency, or economy, or as to expected earnings or profits. But since that which lies in the future cannot be a matter of certain knowledge, . . . such representations must be taken and understood **as mere expressions of opinion**, and therefore cannot be treated as fraud.") (quoting *Lloyd v. Junkin*, 75 S.W.2d 712 (Tex. Civ. App.—Dallas 1931, no writ) (emphasis added); *Maness v. Reese*, 489 S.W.2d 660, 663 (Tex. Civ. App.—Beaumont 1972, writ ref'd n.r.e.). Thus, both the financial projections and Ebersol's alleged statements regarding the amount it would take for the League to get through its inaugural season, were not misrepresentations of *existing* facts but rather opinions as to the League's *future* performance and therefore are not actionable as a matter of law.

Second, even though DCP contends that Ebersol represented the League's *only* outstanding previously incurred obligation to be the $5.1 million player payroll obligation, this contention is not supported by the evidence DCP has submitted with its response. The portions of Ebersol's deposition transcript to which DCP cites merely reflect that Ebersol told Dundon that the League needed the $5.1 million to pay its players, not that that amount was its only outstanding debt. Doc. No. 124, Exhibit 23, 207:21-208:4, 208:12-208:15; Exhibit 24, 71:21-72:10. The same is true of Dundon's deposition, in which he testified that Ebersol told him that he needed the $5.1 million "for the payroll," which was true. *Id.*, Exhibit 24, 72:4-72:10; Exhibit 25, 89:21-89:23. And Jason Kulas, even after being asked whether DCP was ever told that the entirety of the League's accounts payable was $5.1 million, did not answer in the affirmative but rather testified that "DCP was told

that [$5.1 million] was needed immediately." *Id.*, <u>Exhibit 29</u>, 46:10-46:13. Together, this evidence is completely insufficient to establish that Ebersol ever represented that the League's outstanding debt consisted exclusively of the $5.1 million player payroll obligation prior to his signing of the Term Sheet.

Third, regarding DCP's contention that Ebersol misrepresented his authority to enter into the Term Sheet on behalf of the AAF entities, DCP offers no evidence that Ebersol, either orally or in writing, ever made such a misrepresentation and instead argues that his act of *signing* the Term Sheet was itself a misrepresentation. Texas law does not support this proposition; rather, the defendant must have made a statement to the plaintiff that was false or misleading. *E.g.*, *Italian Cowboy Partners, Ltd. v. Prud. Ins. Co. of Am.*, 341 S.W.3d 323, 328, 337 (Tex. 2011) (holding that property manager's statement that deficient building was in "perfect condition" was actionable misrepresentation); *Padgett v. Bert Ogden Motor's, Inc.*, 869 S.W.2d 532, 535 (Tex. App.—Corpus Christi 1993, writ denied) (holding that mechanic's statement that defective car had been "completely repaired" was actionable misrepresentation). DCP has submitted no evidence of any statement made by Ebersol prior to his signing of the Term Sheet wherein he misrepresented his authority, and the Term Sheet itself contains no provision to that effect either.

Finally, the record does not support DCP's contention that the representation in the Term Sheet that DCP would receive seventy-five percent of ESMG's undiluted stock was false. Rather, it demonstrates that certain procedural steps needed to be taken in order for the stock to be formally conveyed to DCP. While the subsequent failure to take these steps may theoretically give rise to a breach of contract claim, for example, they do not render this representation false at the time it was made. And DCP has offered no evidence demonstrating that the stock conveyance was impossible.

### 2. No Evidence Ebersol Owed DCP Any Duty to Disclose

Where a plaintiff's fraud claim is based on a failure to disclose, the plaintiff must show the defendant owed them a duty to disclose. *See White v. Zhou Pei*, 452 S.W.2d 527, 537 (Tex. App.— Houston [14th Dist.] 2014, no pet.). In general, there is no duty to disclose absent a confidential or fiduciary relationship. *Ins. of N. Am. v. Morris*, 981 S.W.2d 667, 674 (Tex. 1998). A fiduciary duty arises as a matter of law in certain formal relationships, such as attorney-client, partnership, and trustee relationships. *Id.* A confidential relationship is one wherein the "parties have dealt with each other in such a manner for a long period of time that one party is justified in expecting the other to act in its best interest." *Id.*

In its response, DCP contends Ebersol concealed and/or failed to disclose several material facts, including the League's open accounts payable and that the League had been threatened with litigation by a former partner who was seeking a declaration that he owned a fifty percent interest in the League. Doc. No. 124, pp. 29-30. However, there is no genuine dispute that Ebersol and DCP had a fiduciary or confidential relationship that would give rise to a duty to disclose these facts, as the Term Sheet was the product of an arm's-length, commercial transaction. *Id.*, pp. 10.

Given the clear absence of any fiduciary duty or confidential relationship between Ebersol and DCP, DCP argues that Ebersol owed it a duty to disclose these facts because Ebersol made a partial disclosure that created a false impression. *Id.*, pp. 27. However, the Texas Supreme Court has never adopted this duty. *E.g.*, *Bradford v. Vento*, 48 S.W.3d 749, 755-56 (Tex. 2001) ("Several courts of appeals have held that a general duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. . . . The Restatement (Second) of Torts section 551 also recognizes a general duty to disclose facts in a commercial setting. . . . In such cases, a party does not make an affirmative

misrepresentation, but what is said is misleading because other facts are not disclosed. **We have never adopted section 551**.") (italics omitted and emphasis added); *Mercedes-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 563 (Tex. 2019) (emphasizing continued refusal to accept section 551 where partial disclosure was claimed to trigger duty to disclose). This Court should follow the Texas Supreme Court and hold that no such duty to disclose exists under Texas law.

Moreover, as the record demonstrates, DCP could have reasonably discovered the facts it now alleges Ebersol concealed through its own investigation. "**In an arm's-length transaction, the party alleging fraud must have exercised ordinary care to protect its own interests** and cannot blindly rely on the defendant's reputation, representations, or conduct where the plaintiff's knowledge, experience, and background warrant investigation." *Mercedes-Benz*, 583 S.W.3d at 563 (emphasis added); *see also Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962) (observing that, in an arm's-length transaction, a party's failure to exercise ordinary care to protect its own interests "is not excused by mere confidence in the honesty and integrity of the other party"). Here, once Dundon, a seasoned investor and experienced business owner, told Ebersol he was interested in making a larger investment in the League, Ebersol offered to give him access to the League's virtual data room, which contained the League's income and cash flow statements, balance sheets, and financing agreements with earlier investors, and to connect him with key personnel to discuss any League issues in greater detail. Doc. No. 102, Exhibit A, 214:1-214:8. Dundon rejected this offer and only asked to see the League's investor deck and financial projections. *Id.*, 214:23-215:3, 215:17-215:20. And DCP has produced no specific evidence demonstrating that Dundon or any other DCP representative attempted to request any additional information or documentation *from Ebersol* before Ebersol executed the Term Sheet.

Because DCP failed to exercise the most basic level of diligence before executing the Term Sheet, it is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person similarly situated[,]" which includes the information it now complains Ebersol did not disclose. *Mercedez-Benz*, 583 S.W.3d at 563 (internal citation omitted). Accordingly, under these circumstances, Ebersol owed DCP no duty to disclose.

### 3. No Evidence Ebersol Possessed the Requisite Fraudulent Intent

Even assuming, *arguendo*, the misrepresentations allegedly made by Ebersol are actionable and that he had a duty to disclose the information DCP alleges he concealed, the record does not raise a triable issue of fact as to whether he made these alleged misrepresentations and omissions with the requisite intent. To establish fraudulent intent, a plaintiff must prove the defendant either knew their representations were false or made them recklessly, intending for the plaintiff to rely on them. *Anderson v. Durant*, 369 S.W.3d 605, 614 (Tex. 2018); *Zorilla v. Aypco Constr. II*, 369 S.W.3d 143, 153 (Tex. 2015). A defendant makes a representation recklessly if it knows it lacks sufficient information to support the representation or if it believes it does not know whether the representation is true at the time the representation is made. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.3d 507, 527 (Tex. 1998). A representation is not made recklessly simply because it is later discovered to be false. *Landers v. Aurora Loan Servs.*, 434 S.W.3d 291, 297 (Tex. App.—Texarkana 2014, no pet.).

First, none of DCP's evidence creates a triable issue of fact as to whether Ebersol *knew* he did not have authority to sign the Term Sheet. All that DCP proffers is an excerpt from Ebersol's deposition wherein Ebersol testified he lacked authority to sell ESMG stock *without approval* and the minutes from a February 24, 2019 ESMG board meeting, at which the board formally approved the Term Sheet, which DCP has never signed. However, not only do these minutes merely reflect

the ESMG board's *formal* approval of the Term Sheet, they also demonstrate that the board was fully aware that Ebersol had previously discussed the Term Sheet with Dundon and had signed it and that it had ratified those actions. Doc. No. 124, Exhibit 23, pp. 12.

Nor does the evidence before the Court create a triable issue of fact as to whether Ebersol *knowingly* concealed any information or documents regarding the League's outstanding accounts payable from DCP before he signed the Term Sheet. Kevin Ferrell's deposition testimony merely suggests that Ebersol may have known which vendors needed to be paid, not that he knew the amount of the debts that needed to be paid or that he knowingly concealed these debts from DCP. Doc. No. 124, Exhibit 27, 167:14-168:10. Zutter testified that Ebersol had constructive knowledge of the League's debt obligations by virtue of being ESMG's Chief Executive Officer. *Id.*, Exhibit 28, 285:1-285:6. Even if this is true, that a defendant *should* have been aware of information they failed to disclose is factually insufficient to support a finding of fraud. *See Johnson & Higgins*, 962 S.W.2d at 527 (holding that argument that defendant "should have known" his representations may have been incorrect was insufficient to establish fraudulent intent). Jason Kulas flatly testified that Ebersol "knew" of these debts but the excerpts of his deposition transcript to which DCP cites are devoid of any specific evidence supporting this allegation. Doc. No. 124, Exhibit 29, 110:5-110:14. And while DCP relies on Kulas's testimony to support the contention that it "asked Ebersol to provide it with all documentation relevant to any potential investment in the League" before the signing of the Term Sheet, Kulas did not specifically testify that DCP made that request to Ebersol. *Id.*, Exhibit 29, 66:5-66:18. Finally, Ebersol himself testified that he offered to give Dundon and his team unfettered access to the League's financial documents, which offer Dundon rejected. Doc. No. 102, Exhibit A, 215:17-215:20. There is a simply no evidence showing that Ebersol undertook any efforts to hide this information from DCP or failed to produce it to DCP after it was requested.

Third, none of DCP's evidence creates a triable issue of fact as to whether Ebersol *knowingly* misrepresented that he had a basis for his projected estimate that between $55 million and $70 million was needed for the League to survive its inaugural season. Notwithstanding the fact that the record is devoid of any testimony that Ebersol ever made such a representation, it is clear that this estimate was based on financial projections that had been prepared by members of his team, and DCP's own response indicates that Ebersol held an honest belief in the accuracy of this estimate. Doc. No. 124, pp. 29. And even though DCP contends that Ebersol was aware of "substantial discrepancies" between the projections and reality, the evidence it has submitted does not even remotely support this contention. Moreover, even if this estimate later proved to be "false," which as a matter of law it could not have, that is insufficient to establish fraudulent intent. *Landers*, 434 S.W.3d at 297 (Tex. App.—Texarkana 2014, no pet.) (observing that a representation is not made recklessly simply because it is later found to be false).

Fourth, and finally, none of DCP's evidence creates a triable issue of fact as to whether Ebersol *knowingly* concealed any information from DCP regarding the lawsuit his former partner, Robert Vanech, had threatened to bring against the League. Dundon and Jason Kulas both simply testified that Dundon had not been told of this claim until after Ebersol had signed the Term Sheet. Doc. No. 124, Exhibit 26, 390:9-390:23; Exhibit 29, 79:9-79:15. And the e-mail message sent by Kevin Freedman to DCP does not demonstrate that the first time DCP was told about this claim was February 20, 2019; rather, it is a written memorialization of conversations between Ebersol and DCP that had occurred previously. *Id.*, Exhibit 11. And, again, the only documents Dundon requested from Ebersol prior to February 14, 2019 were the League's investor deck and financial projections. Doc. No. 102, Exhibit A, 213:23-214:3. Ebersol could not have knowingly concealed information from DCP that he was not expressly asked to provide.

---

Accordingly, because DCP has not submitted any significant probative evidence to support the element of fraudulent intent, this Court should grant summary judgment in favor of Ebersol.

**4.     No Evidence of Reliance**

To prevail on a fraud claim, a "plaintiff [must] show actual and justifiable reliance." *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). The element of justifiable reliance is negated as a matter of law "when circumstances exist under which reliance cannot be justified." *Mercedez-Benz USA, LLC v. Carduco, Inc.*, 583 S.W.3d 553, 558 (Tex. 2019). In determining whether justifiable reliance is negated as a matter of law, courts "must consider the nature of the [parties'] relationship and the contract." *AKB Hendrick, LP v. Musgrave Enters., Inc.*, 380 S.W.3d 221, 232 (Tex. App.—Dallas 2013, no pet.).

In its complaint, DCP alleges that it actually relied on Ebersol's alleged misrepresentations and omissions by signing the Term Sheet, thereby entering into it, and paying monies to the League thereunder. Doc. No. 1, ¶¶ 4, 31, 48, 64, 84, 99. Both of these allegations are demonstrably false. First, it is undisputed that the Term Sheet needed to be executed by both parties to be binding. Doc No. 102, Exhibit H, pp. 2. Yet DCP has submitted no evidence that it ever signed the Term Sheet— to the contrary, DCP acknowledges it merely *treated* the Term Sheet as a binding document—nor has it submitted any evidence or argument that the parties agreed to waive the condition under the Term Sheet requiring full execution. Because DCP did not sign the Term Sheet, it never became binding and thus DCP could not have entered into it. *See Chubb Lloyds Ins. Co. of Texas v. Buster & Cogdell Builders, LLC*, 668 S.W.3d 145, 152 (Tex. App.—Houston [1st Dist.] 2023, no pet.) ("[A] signature is not required to make a contract binding and enforceable **unless the parties explicitly require signatures as a condition of their mutual assent**.") (internal citation omitted) (emphasis added). Second, DCP did not pay any monies to ESMG; rather, those monies were paid

by DDFS, an unrelated entity. Accordingly, contrary to the allegations raised in its complaint, DCP never signed (and thus never entered into) the Term Sheet, did not pay any of the funds it alleges it paid, and has therefore failed to establish the element of actual reliance.

However, even assuming, *arguendo*, there is sufficient evidence to show that DCP entered into the Term Sheet and invested monies into the League, which there is not, DCP could only have invested $5.1 million based on Ebersol's conduct. By its own admission, DCP became aware of the alleged misrepresentations and omissions a few days after the $5.1 million payment was sent to ESMG, which "awareness" was informed by DCP's review of the League's finances. Doc. No. 124, pp. 13, ¶ 18. Despite this awareness, DCP continued to cause payments to be made to ESMG, without ever making a demand for rescission of the Term Sheet or for restitution. Accordingly, to the extent Ebersol made any misrepresentations to or concealed information from DCP, DCP did not actually rely on those actions in causing the remaining $64 million to be invested in ESMG, because, as DCP concedes, it was fully aware of those alleged misrepresentations and omissions.

Moreover, DCP's reliance is not justifiable as a matter of law because DCP admits it failed to undertake even the most basic level of diligence before it allegedly entered into the Term Sheet. DCP's principal, Dundon, is a seasoned, sophisticated investor and experienced business owner, which includes his ownership of the Carolina Hurricanes National Hockey League club. Although DCP had not previously done business with Ebersol or the League, it was sufficiently sophisticated to take the necessary action to protect its own interests, including conducting a detailed review of, and speaking with League personnel who were knowledgeable about, the League's finances. It admits it did neither.

In an effort to excuse its utter lack of diligence, DCP argues it simply did not have the opportunity to conduct any in-depth investigation into the League's finances because Ebersol

allegedly convinced it that the League's investment needs were "extremely urgent." The record

does not support this assertion; rather, it demonstrates the only urgency that Ebersol communicated

to Dundon was the need to meet the player payroll deadline. *See* Doc. No. 102, Exhibit A, 213:12-

213:20, 217:6-217:15. Yet even if Ebersol had told Dundon that the League's overall financial

situation was dire, this would not have relieved DCP of its duty to use ordinary care to protect its

own interests, as it was under no obligation whatsoever to make *any* purported investment in the

League. *See Smith v. Nat'l Resort Cmtys., Inc.*, 585 S.W.2d 655, 658 (Tex. 1979). This is especially

true for all monies DCP alleges it invested *after* it assumed control of the League, as it controlled

the decision of whether or not to fund. Accordingly, under these circumstances, any reliance by it

on Ebersol's alleged representations was not justifiable as a matter of law. *Accord Lewis v. Bank

of Am. NA*, 343 F.3d 540, 546-47 (5th Cir. 2003) ("Viewing the circumstances in their entirety,

including [appellant's] access to professional accountants, the amount of money involved in the

transaction, and the ambiguous nature of [appellee's] "assurance," [appellant's] decision to enter

into the transaction without undertaking additional investigation into its tax consequences was not

justifiable.").

### 5.    No Evidence of Damages

Finally, for the reasons set forth above in Section II.A. of this Reply, DCP has not submitted

any evidence that it suffered the damages of which it complains. Rather, to the extent any damages

were suffered at all, those damages were suffered by DDFSP, the payor of the monies in dispute.

## III.    CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Defendant Charles Ebersol's

Memorandum in Support of his Motion for Summary Judgment, this Court should enter an order

granting summary judgment in favor of Defendant Charles Ebersol and dismissing the claims of

Plaintiff Dundon Capital Partners, LLC with prejudice.

Respectfully submitted,

JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP

By: */s/ Michael J. Saltz*
     Michael J. Saltz
     Admitted *pro hac vice*
     msaltz@jrsnd.com

1800 Century Park East, Suite 900
Los Angeles, California 90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909

THOMPSON, COE, COUSINS & IRONS, LLP

By: */s/ Thomas M. Horan II*
     Thomas M. Horan II
     State Bar No. 24063938
     thoran@thompsoncoe.com

700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209

**ATTORNEYS FOR DEFENDANT CHARLES EBERSOL**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on January 21, 2024, a true and correct copy of the foregoing was delivered to the following counsel of record by electronic service:

Brett D. Hockaday
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201

Jeffrey S. Lowenstein
Beverly A. Whitley
Brent A. Turman
Sydnie A. Shimkus
BELL NUNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201

Nicole L. Williams
Katherine B. Clark
THOMPSON COBURN LLP
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201

Boris Treyzon
Jonathon Farahi
ABIR COHEN TREYZON SALO, LLP
16001 Ventura Boulevard, Suite 200
Encino, California 91436

Brian S. Engel
Steve P. Turner
BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP
580 La Ventana Boulevard
Driftwood, Texas 78619

*/s/ Thomas M. Horan II*
Thomas M. Horan II

# UNITED STATES BANKRUPTCY COURT
## Western District of Texas

|  |  |
|---|---|
|  | Bankruptcy Case No.: 19–50900–cag |
|  | Chapter No.: 7 |

IN RE: **Legendary Field Exhibitions, LLC and AAF Properties, LLC** , Debtor(s)

|  |  |
|---|---|
|  | Adversary Proceeding No.: 22–05077–cag |
|  | Judge: Craig A Gargotta |

**Dundon Capital Partners LLC**
Plaintiff

v.

**Charles Ebersol**
Defendant

## NOTICE OF HEARING

**PLEASE TAKE NOTICE** that a hearing will be held

at    S.A. Courtroom 3, Hipolito F. Garcia Fed Bldg & Courthouse, 615 E. Houston St., San Antonio, TX 78205

on    **1/31/25 at 08:30 AM**

Hearing to Consider and Act Upon the Following: (related document(s): 137 Objection to Dundon Capital Partners, LLC's Evidence in Support of Summary Judgment Response Filed by Michael J Saltz, Tom Horan for Defendant Charles Ebersol. Related document(s) 124 Response (Adversary) filed by Plaintiff Dundon Capital Partners LLC. Hearing Scheduled For 1/31/2025 at 08:30 AM at SA Courtroom 3 (Mujica, Roxanne)

Dated: 1/22/25

Barry D. Knight
Clerk, U. S. Bankruptcy Court

**[Hearing Notice (AP)]** [NtchrgAPap]

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 22-05077-CAG-7** |
| | § | |
| **CHARLES EBERSOL,** | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S NOTICE OF FILING REVISED RESPONSE TO DEFENDANT
CHARLES EBERSOL'S MOTION FOR SUMMARY JUDGMENT**

Attached hereto as Exhibit 1 is Plaintiff Dundon Capital Partners, LLC revised response to Defendant Charles Ebersol's motion for summary judgment. The revised response revises ECF 124. At the time DCP filed its original response [Doc. 124], DCP had only the rough draft of the transcript of the Alan Kantowitz deposition taken on January 7, 2025. The revised response contains updated excerpts from the final version of the Kantowitz deposition and redline changes showing the differences in the citations. A revised version of Exhibit 33 to ECF 124 is attached to the revised response as Exhibit A. It contains excerpts from the final version of the Kantowitz deposition transcript.

1

Respectfully submitted,

By:      *Beverly A. Whitley*

**K&L GATES LLP**

Brent D. Hockaday
Texas Bar No. 24071295
Brent.hockaday@klgates.com
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5677
(214) 939-5849 Fax

**BELL NUNNALLY & MARTIN LLP**

Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Beverly A. Whitley
Texas Bar No. 21374500
bwhitley@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
Sydnie A. Shimkus
Texas Bar No. 24093783
sshimkus@bellnunnally.com
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

**ATTORNEYS FOR DCP PARTIES**

## CERTIFICATE OF SERVICE

The undersigned certifies a true and correct copy of the foregoing pleading was served by delivering the same to the person listed below in the manner and on the date indicated.

William N. Radford
Thomas M. Horan II
Thompson Coe
700 N. Pearl Street, 25th Floor
Dallas, TX 75201
wradford@thompsoncoe.com
thoran@thompsoncoe.com

Michael Saltz
Jacobson, Russell, Saltz, Nassim & De La Torre, LLP
1880 Century Park East, Suite 900
Los Angeles, CA 90067
msaltz@jrsnd.com

***Attorneys for Charles Ebersol***

Dated this the 22nd day of January 2025.

/s/ Beverly A. Whitley
Beverly A. Whitley

10498987 / 04251-00029

3

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 22-05077-CAG-7** |
| | § | |
| **CHARLES EBERSOL,** | § | |
| | § | |
| Defendant. | § | |

## REVISED PLAINTIFF DUNDON CAPITAL PARTNERS, LLC'S RESPONSE TO DEFENDANT CHARLES EBERSOL'S MOTION FOR SUMMARY JUDGMENT

**K&L GATES LLP**

Brent D. Hockaday
Texas Bar No. 24071295
Brent.hockaday@klgates.com
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5677
(214) 939-5849 Fax

**BELL NUNNALLY & MARTIN LLP**

Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Beverly A. Whitley
Texas Bar No. 21374500
bwhitley@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
Sydnie A. Shimkus
Texas Bar No. 24093783
sshimkus@bellnunnally.com
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

**ATTORNEYS FOR**
**DUNDON CAPITAL PARTNERS LLC**

**EXHIBIT**

**1**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. 3

SUMMARY OF RESPONSE ............................................................................................... 5

BACKGROUND ................................................................................................................. 8

ARGUMENT AND AUTHORITIES ................................................................................. 17

    A.    DCP has standing to prosecute its claims because DCP owns the claims. ...............18

    B.    DCP suffered a loss of $70 million. ..........................................................................23

    C.    Ebersol offered and sold securities by means of untrue statements .........................24

    D.    The summary judgment evidence supports each element of DCP's claims
        against Ebersol. .......................................................................................................26

        1.    Ebersol made knowingly false representations to DCP and failed to
                disclose material facts. ....................................................................................27

        2.    Ebersol made the representations and omissions to induce DCP to enter
                the Term Sheet and invest in ESMG. ...............................................................30

        3.    DCP relied on Ebersol's misrepresentations and omissions when it
                entered the Term Sheet and invested in ESMG. ..............................................31

        4.    DCP was damaged by Ebersol's conduct. ........................................................31

CONCLUSION .................................................................................................................. 31

PRAYER FOR RELIEF ..................................................................................................... 31

CERTIFICATE OF SERVICE ........................................................................................... 33

1096

# TABLE OF AUTHORITIES

**CASES**                                                                                                          **PAGE**

*Alt Platform, Inc. v. Beckett Collectibles, LLC*,
    No. 3:22-CV-02867-N, 2024 WL 4376156 (N.D. Tex. Oct. 1, 2024) ...................................18

*Anderson v. Durant*,
    550 S.W.3d 605 (Tex. 2018)............................................................................................26

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................................17

*Beijing Metals & Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*,
    993 F.2d 1178 (5th Cir. 1993) .......................................................................................27

*Chase v. Hodge*,
    No. 1:20-CV-0175-RP, 2021 WL 1948470 (W.D. Tex. May 14, 2021) ..........................24, 25

*Matter of Davidson*,
    947 F.2d 1294 (5th Cir. 1991) .......................................................................................22

*Fid. Nat. Title Ins. Co. v. Doubletree Partners, L.P.*,
    866 F. Supp. 2d 604 (E.D. Tex. 2011), *aff'd in part, rev'd in part and
    remanded sub nom. Lawyers Title Ins. Corp. v. Doubletree Partners, L.P.*, 739
    F.3d 848 (5th Cir. 2014) ................................................................................................27

*Indemnified Capital Invs., SA v. R. J. O'Brien & Assocs., Inc.*,
    12 F.3d 1406 (7th Cir. 1993).....................................................................................18, 19

*Kakabadze v. M5 Int'l Co.*,
    No. H-12-3701, 2014 WL 2547767 (S.D. Tex. 2014)..........................................................22

*Kubbernus v. ECAL Partners, Ltd.*,
    574 S.W.3d 444 (Tex. App.—Houston [1st Dist.] 2018, pet. denied)...................................27

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................................17

*McCardell v. U.S. Dep't of Hous. & Urban Dev.*,
    794 F.3d 510 (5th Cir. 2015) .........................................................................................18

*Okumus v. Mouton*,
    No. 14-18-00220-CV, 2020 WL 6278664 (Tex. App.—Houston [14th Dist.]
    Oct. 27, 2020, no pet.)....................................................................................................25

*Reeves v. Sanderson Plumbing Prods., Inc.*,
    530 U.S. 133 (2000)........................................................................................................17

3

**CASES** (continued)      **PAGE**

*In re Skyport Glob. Comms., Inc.*,
No. 08-36737, 2011 WL 111427 (Bankr. S.D. Tex. Jan. 13, 2011), *aff'd sub nom. In re SkyPort Glob. Comms., Inc.*,
528 B.R. 297 (S.D. Tex. 2015), *aff'd in part sub nom. In re Skyport Glob. Comms., Inc.*, 642 Fed. Appx. 301 (5th Cir. 2016), *aff'd sub nom. Matter of Skyport Glob. Comms., Inc.*,
661 Fed. Appx. 835 (5th Cir. 2016).................................................................24

*Sprint Communications Co. v. APCC Servs., Inc.*,
554 U.S. 269 (2008)..................................................................................19

*Stephanz v. Laird*,
846 S.W.2d 895 (Tex. App.—Houston [1st Dist.] 1993, writ denied) ...................25

*Stanfield v. O'Boyle*, 462 S.W.2d 270 (Tex. 1971).......................................................25

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021)..................................................................................18

*Tukua Investments, LLC v. Spenst*,
413 S.W.3d 786 (Tex. App.—El Paso 2013, pet. denied) ....................................25

*U.S. Quest Ltd. v. Kimmons*,
228 F.3d 399 (5th Cir. 2000) ....................................................................25

*Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*,
247 F.3d 574 (5th Cir. 2001) ...............................................................26, 27

*W.R. Huff Mgmt. Co. v. Deloitte & Touche LLP*,
549 F.3d 100 (2nd Cir. 2008)......................................................................19

**STATUTES AND RULES**

Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 27.01 .......................................................................24

Tᴇx. Gᴏv. Cᴏᴅᴇ § 4008.052.............................................................................27

Fᴇᴅ. R. Bᴀɴᴋʀ. P. 7056 ...............................................................................17

Fᴇᴅ. R. Cɪᴠ. P. 56 ......................................................................................17

**MISCELLANEOUS**

https://www.irs.gov/forms-pubs/about-form-1065 .......................................................12

4

### SUMMARY OF RESPONSE

No attempt to start a professional spring football league has ever succeeded. The AAF never had a chance to be the exception to that rule because of the poor decisions and gross mismanagement of the league by Charlie Ebersol and the board of Ebersol Sports Media Group, Inc. (ESMG") that ran the league prior to the investment by Dundon Capital Partners LLC ("DCP").

Ebersol and his board rushed to put football on the field following the 2019 Super Bowl to beat the premiere of the XFL slated for 2020. In May of 2018 (just 8 months before its intended launch), the league was still in a formative phase. It had little of its infrastructure put together, lacked a legitimate funding source, and had not cemented any relationships with the NFLPA or broadcast partners. Worse yet, Ebersol and his team did not try to build a start-up. Instead, the AAF was described by one of its board members as having an expense and salary structure that looked more like a 10-year mature company than a first-year startup.

To make matters worse, the AAF, which was almost entirely reliant on outside funding, bet its future on a $170 million funding commitment from Reggie Fowler to fund the league to viability. Ebersol and his board did virtually no diligence on Fowler but learned in December 2018 that Fowler had defaulted on tens of millions in debts and had been involved in litigation as a result. Fowler ultimately ended up in federal prison as a result of financial crimes.

Two months before Ebersol made the decision to go forward with launching the AAF's football season, Fowler had defaulted on his funding obligations, but Ebersol and his board plowed forward, incurring tens of millions in debts to critical vendors without cash in the bank or any legitimate source of outside funding. Ebersol considered shuttering the league in December 2018 or delaying its opening to 2020, but pride got in the way, and he pressed forward. Ebersol slashed

1099

marketing efforts and ran up millions of dollars in bills with critical vendors that would be essential to putting football on the field in February 2019. The result of Ebersol plowing forward with a league structured as a 10-year mature company, with no money in the bank and no legitimate funding source, destroyed the league's projected revenues but did little to reduce the expenses required to get football on the field.

In May 2018, the AAF's projected revenues were $176 million for 2018 and 2019. By January of 2019, just weeks before launching the inaugural games, the projected revenue was closer to $59 million. But the expenses had not been substantially reduced. Ebersol conceded that the cratering projected revenues were the result of a lack of marketing, failure to sell sponsorship, and a lack of ticket sales due to a general unawareness of the AAF in the marketplace. Despite all of this, Ebersol had 400+ players, referees and other football related staff show up to play games in the first week of February. He made commitments to stadiums, broadcast partners, and countless others to pay them for their services to put on football. Yet there was still not enough money in the bank or a funding source in place to cover any of that. Ultimately, the AAF, with Ebersol at the helm, had dug a more than $20 million hole before the first snap was taken in a football game. The hole was simply too large to ever dig out of. The AAF was dead, and Ebersol should have followed through with his plan to shutter the league in December 2018, but ego won out.

In an effort to prolong the inevitable, Ebersol desperately reached out to investors to dump more money in the league. Ebersol knew that disclosing the true picture about the state of things and the destructive path he had put the AAF on would scare off any investor. So, instead, he carefully crafted a story to get someone else to come in and continue dumping funds into a lost cause. DCP and Dundon entered the picture after the first week of games. All Ebersol told them was that the league needed $5.1 million to pay the players and related expenses for the first week

6

1100

of games, $55 to $70 million total to finish the first season, and that the ratings were great. Ebersol hid that the league's projected revenues had fallen by $120 million as a result of his decisions to cut marketing and sponsorships, that there was no digital product in place that could generate revenue, that ticket sales were far below expectations, and that there was a general lack of awareness of the AAF. He hid that, in addition to the $5.1 million owed for player salaries and related expenses, there was another $18 million owed to critical vendors and a $5 million note that was immediately due. Ebersol withheld information about legal claims and contracts in place that would make it impossible for the league to deliver the 75% of the company it promised. And Ebersol knew he had no authority at the time he signed the term sheet with DCP from the board, the shareholders, the lenders, or the warrant holders of the AAF to do the deal he promised. He also knew that given the urgency of the situation, Dundon and DCP would have no time to dig in and do sufficient diligence to find out the truth.

The deal went forward. DCP poured $12 million into the AAF within four days of signing the term sheet. When DCP's team finally got a chance to start digging into the reality of the AAF, it was too late. DCP made a commitment and followed through with it. The AAF burned through the entire $70 million agreed to in the term sheet in just 46 days. By that point, considering the quickly waning interest in the AAF and the realistic revenue and expense projections, and not the fantasy Ebersol had envisioned, it became clear that more than $550 million was the reality of the outside funding needed to get the AAF to viability. More likely, there was no amount of money that would have gotten the AAF to viability given that every prior attempt at spring football had failed, the 2020 Covid outbreak, and the XFL entering the scene. Shutting it down in April 2019, when the AAF again ran out of funding, was precisely what needed to be done and what should

7

have been done in December 2018 before the long list of vendors and lenders amassed were duped by Ebersol.

DCP and Dundon were lied to and never would have invested anything in the AAF had Ebersol disclosed the true state of the league's affairs. DCP filed this suit to recoup its $70 million based on Ebersol's false representations about the league and his failure to disclose the real facts. The evidence of those facts (detailed below) precludes summary judgment on the fraud claims.

Ebersol also argues that DCP lacks standing because the $70 million payment was wired from a bank account in the name DDFS Partnership, LP, an entity related to DCP by common ownership and control. Ebersol's origin of funds theory is not supported by law or fact because DCP entered the Term Sheet with ESMG, DCP owns the right to sue Ebersol, and DCP sustained an injury in fact because of Ebersol's false representations.

## BACKGROUND

1.      Charles Ebersol was CEO of "ESMG" from December 2017 to April 2019. ECF 102, Ex. K ¶ 2. ESMG owned and operated the AAF and its subsidiaries, each of which are debtors in this action. Ex. 23 at 89:5-90:9.

2.      The AAF was structured to rely almost exclusively on outside investment up to the time of the league launch in February 2019. Ex. 33 at ~~47:16-23~~59:2-12.[1] The AAF had no significant investor until Reggie Fowler agreed to fund up to $170 million through a combination of debt and equity. Case No. 22-05078-cag ECF 173, Ex. 4. The AAF built its go forward plan on Fowler's promise to fund the league, but Fowler almost immediately defaulted on his funding

---

[1] Exhibit 33 contains excerpts from the rough draft of the deposition of Alan Kantowitz. The deposition was taken on January 7, 2025, and only a rough draft was available in time to file with this response. This version of the Response contains updated excerpts of his deposition and redline changes showing the differences in the citations forecast in the original filing. A revised Exhibit 33 is attached hereto as Exhibit A. It contains excerpts from the final version of the Kantowitz Deposition transcript and the pages cited in this revised response.

1102

obligations and at least some of the board members and leaders of the AAF did not believe the AAF should trust that Fowler would fulfill his funding commitment. Ex. 34; Ex. 36 at 2; Ex. 33 at 82:11-14 ~~67:1-5~~, 83:25-84:18 ~~68:17-69:1~~. And many (including Ebersol) questioned whether the AAF should press forward with launching the league, given that Fowler was the only significant investor who had made a commitment. Ex. 33 at 78:16-79:3 ~~64:4-16~~, 80:17-24 ~~65:18-23~~, 83:25-84:7 ~~68:10-16~~, 113:10-114:2 ~~92:17-93:8~~. Ebersol was aware of the dire financial condition of the AAF in December 2018. Ex. 38 at 2; Ex. 33 at 110:14-112:19 ~~90:8-91:15~~.

3. Despite direct personal knowledge of the financial condition of the league, Ebersol pressed forward. But along the way, Ebersol completely undermined the league's future by cutting production and national marketing and sponsorship at the most critical juncture when the league needed to raise awareness, sell advertising, sell tickets, and sell sponsorships. Ex. 5; Ex. 33 at 124:5-23 ~~101:1-17~~. Instead, Ebersol made the decision to cut marketing, which in his words "screwed" the AAF. Ex. 36 at 1; Ex. 33 at 88:18-90:8, 120:20-121:1 ~~72:7-73:12, 98:10-15~~, 121:9-16 ~~98:21-99:2~~, 121:23-122:9 ~~99:7-13~~; Ex. 93. Revenues were also trailing far behind projections based on other factors entirely within the Ebersol run AAF's control, including having no revenue generating digital products available and falling way behind on ticket sales and sponsorships. Ex. 5; Ex. 33 at 123:16-25 ~~100:14-21~~, 127:17-130:18 ~~103:25-106:13~~. As a result, the AAF went from projecting in May 2018 that the AAF would earn $176 million in revenue through the end of 2019, to projecting in January 2019 only $59 million in revenue through the end of the 2019 season. Ex. 33 at 131:24-132:17 ~~107:9-25~~, 133:9-22 ~~108:14-24~~; Ex. 42 at 6.

4. At the end of December, Ebersol's team projected the league would run its bank account down to $0 by the end of December but needed more than $24 million to get through most of January 2019, which was still the month before the league launch. Ex. 37 at 6; Ex. 33 at

9

1103

97:4-979:1-4, 98:21-2480:14-17, 99:8-1380:24-81:4.  By mid-January, the league, at Ebersol's direction, still had no committed investor, continued pushing off obligations to critical vendors, and continued making commitments to incur new debts to players, vendors, stadiums and all the others required to put games on the field. Ex. 9; Ex. 39; Ex. 40; Ex. 33 at 141:15-146:22114:24-119:9, 147:11-148:17119:21-120:23, 150:19-151:5122:12-22.  All of these decisions were made at Ebersol's direction. Ex. 9; Ex. 33 at 151:15-152:4, 153:21-154:8123:5-18, 125:5-17.  And Ebersol doubled down by pressing to incur all of the expenses of the first week of play again without any committed funding source.  Ex. 33 at 152:16-25124:2-11.  This was the condition of the AAF after the first week of play and Ebersol was aware of every detail.

5.     One week into its only season, the AAF under Ebersol's leadership did not have sufficient funds to pay players or any of the other expenses for the first week of games and had virtually no funds to start the second week.  Ex. 2; Ex. 23 at 208:12-15; Ex. 24 at 71:21-72:10; Ex. 25 at 84:23-86:12, 87:13-88:7, 98:7-18; Ex. 27 at 185:10-187:17; Ex. 28 at 210:17-24.

6.     Ebersol sought additional capital for the league, and, through a mutual acquaintance, was introduced to Tom Dundon as a potential source of capital.  Ex. 23 at 199:9-24, 201:11-202:8, 204:10-16.

7.     On February 13, 2019, Ebersol and Dundon spoke for the first time, and discussed a potential financial aid scenario. Ex. 23 at 212:4-8, 217:3-15. During a series of calls, Ebersol conveyed to Dundon that the AAF needed money very quickly to pay players and that, if the league could not quickly secure additional funds, the league would be in trouble.  Ex. 25 at 82:20-83:3. Ebersol represented to Dundon that the AAF needed an immediate injection of $5.1 million to cover payroll and related expenses for services performed during the first week of the season.  Ex. 23 at 207:21-208:4, 208:12-15; Ex. 24 at 71:21-72:10.

10

8.  Later that day, Ebersol sent Dundon marketing materials consisting of an investor deck, a cap table, and financial projections for the league attached to an e-mail touting the league's ratings from the first week of play.  Ex. 23 at 78:19-79:2; Ex 3 at 1, 3-60.

9.  During a series of phone calls over the ensuing 24 hours, Ebersol and Dundon discussed multiple financial aid scenarios.  Ex. 23 at 232:7-16.  Dundon introduced Ebersol to John Zutter, who further negotiated the structure of a potential deal between DCP and ESMG.  Ex. 23 at 261:3-24.

10.  Because Ebersol represented the AAF needed funds immediately, and that any delay would essentially result in the league's collapse, DCP lacked time to perform the due diligence it normally would perform on an investment with a longer time horizon and justifiably relied on Ebersol's representations as he was ESMG's CEO.  Ex. 25 at 68:20-25; Ex. 28 at 210:17-211:11, 352:16-353:10; Ex. 33 at 183:16-25~~149:10-17~~.

11.  DCP asked Ebersol to provide it with all documentation relevant to any potential investment in the league and conducted due diligence to the extent it was able considering the time constraints.  Ex. 29 at 66:5-18. Ex. 28 at 160:8-161:1.  Ebersol provided only a limited amount of documentation in response to DCP's requests.  Ex. 29 at 47:6-17.  But, given the time constraints, DCP was largely forced to rely on Ebersol's representations concerning the league.  Ex. 29 at 47:6-17; Ex. 27 at 392:19-24.

12.  Negotiations culminated in ESMG and DCP entering the Term Sheet.  Ex. 1; Ex. 28 at 25:11-19; Ex. 24 at 261:3-24.

13.  The Term Sheet contemplated that DCP would fund an initial amount of $5.1 million by 1:30 p.m. PST on February 14, 2019; ESMG had the right to submit equity funding requests to DCP up to "a maximum cumulative commitment of $70 million."  Ex. 1 at 1.  Ebersol

11

1105

executed the Term Sheet on behalf of ESMG, and DCP treated the Term Sheet as a binding document and performed its obligations set out in the agreement. Ex. 1 at 6; Ex. 25 at 157:1-11.

14.     DCP transferred $5.1 million to ESMG after the Term Sheet was entered. Ex. 26 at 378:15-18. While another entity ultimately controlled by Tom Dundon (DDFS) wired the funds to ESMG, it did so in the performance of a treasury relationship with DCP. Ex. 30 at 141:6-13. Nevertheless, DCP made the investment, and DCP was the party to the Term Sheet. Ex. 30 at 140:12-141:13, 165:7-9.

15.     DCP is a Delaware LLC; Dundon is its manager. Ex. 28 at 36:7-11. DDFS Management, LLC is DCP's sole member. Ex. 30 at 32:12-33:13, 36:23-37:3. Dundon owns and serves as manager for DDFS Management. Ex. 30 at 37:11-14. DDFS Partnership is a Delaware limited partnership owned by Dundon, the Dundon Children's Trust, and DDFS Management. Ex. 30 at 40:5-41:11. The graphic below illustrates how the entities are related.



DCP and DDFS are pass-through tax entities. Ex. 31 ¶ 3. Neither of them pays federal taxes or takes deductions. *Id.; See* https://www.irs.gov/forms-pubs/about-form-1065 ("A partnership does not pay tax on its income but "passes through" any profits or losses to its partners. Partners must include partnership items on their tax or information returns."). DCP's and DDFS's income and losses ultimately show up on the individual tax return for their owners. *Id.* Dundon's tax return

1106

shows that the loss related to the ESMG investment was claimed by him. Ex. 31 ¶ 6, Ex. A.

16. On February 24, 2019, Ebersol and ESMG's other board members held a board meeting, during which the Term Sheet was formally approved by the company. Ex. 2 at 285:5-12. The meeting minutes state:

> Mr. Charlie Ebersol and Ms. Belt[2] presented a summary of the Series 2 Preferred Stock binding term sheet negotiated with Dundon Capital Partners LLP ("DCP"), as well as an update on the funding to date from DCP.

Ex. 4 at 12. The minutes confirm that ESMG had, at that time, already received $12 million from DCP. *Id.* Conspicuously absent from the meeting minutes is any reference to DDFS Partnership or any claim or contention that DCP failed to fund the $5.1 million in compliance with its obligations in the Term Sheet.

17. Absent any funding, the AAF would have folded within days. Ex. 23 at 192:6-18; Ex. 27 at 32:17-33:12; Ex. 28 at 210:17-24.

18. After entering the Term Sheet, DCP quickly learned that key representations Ebersol made between February 13th and 14th were false and that Ebersol had failed to disclose a host of material information relevant to any potential investment in the league. Ex. 28 at 184:7-14.

19. Ebersol had represented that he was authorized to execute the Term Sheet by signing it. Ex. 1. But Ebersol failed to obtain authority from the ESMG board or the stockholders until after he signed the Term Sheet, as evidenced by the board minutes and the stockholder agreement. Ex. 4 at 12; Ex. 12 at 2. Ebersol failed to disclose his lack of authority to DCP. Ex. 26 at 387:11-388:9; Ex. 29 at 79:9-15. Ebersol never obtained authority to enter the Term Sheet

---

[2] Dawn Belt was a partner at Fenwick & West. She specializes in startup financing and acted as secretary for the ESMG board meeting.

13

from the other debt holders and acknowledged that he lacked the authority to sell ESMG stock without approval. Ex. 13 at 7-8, 10-12; Ex. 23 at 140:12-25.

20.     Ebersol had falsely led Dundon to believe that expenses previously incurred by the league from inception through the first week of play—for items such as stadium fees, hotel accommodations for players, advertising expenses, and back-office expenses—had already been paid and that the only remaining previously incurred obligation that remained outstanding was $5.1 million for player payroll. Ex. 25 at 87:13-89:16; Ex. 29 at 45:24-46:16; 48:17-49:3. In reality, at the time the Term Sheet was signed, the league had more than $18 million in delinquent accounts payable in addition to the $5.1 million it needed for payroll. Ex. 29 at 48:17-49:3.

21.     Ebersol falsely represented that between $55 million and $70 million was enough capital for the AAF to make it through the rest of the first season. Ex. 25 at 148:5-24; Ex. 29 at 45:24-46:16, 151:20-152:7; Ex. 26 at 350:22-351:2. Ebersol did not know the basis for representing to potential investors that $70 million was needed to complete the first season. Ex. 23 at 201:11-202:10. And, even if it were true that the AAF only needed $70 million to complete the season, Ebersol did not disclose that an additional $23 million at a minimum would have been required to cover the delinquent accounts payable and immediately due debt. Ex. 14 at 11 ¶ 8. This meant that the best-case scenario was that $93 million at a minimum would have been required to complete the first season.

22.     The marketing materials Ebersol sent to Dundon contained projections that were materially overstated and unrealistic. Ex. 29 at 138:5-18. Ebersol had no idea how the league projections were derived although he was aware that there were substantial discrepancies between the projections and reality. Ex. 23 at 62:20-63:2; Ex. 5 at 3. ESMG's finance committee met a month before the Dundon investment. In that meeting, there was a determination that season one

1108

revenue had been grossly overestimated and needed substantial adjustment to revenue expectations due to a variety of factors discussed above, including substantial cuts Ebersol had made to national marketing and production, lagging ticket sales and sponsorship, and a failure to develop a digital product that would be ready to generate revenue in the first season. Ex. 5 at 3; Ex. 35 at 1. Inaccuracies in the projections were far-reaching, and the projections did not disclose how Ebersol's decisions to make the substantial cuts weeks before had damaged the league. Ex. 15 at 21, 29-37.

23.      Ebersol knew about the discrepancies but hid them from DCP. With respect to omissions, before DCP entered the Term Sheet, Ebersol disclosed to Dundon that the AAF needed $5.1 million to cover player salaries and related expenses for the first week of games that had already been played. Ex. 28 at 71:17-72:6; 117:24-118:22; 122:21-123:16; Ex. 25 at 87:13-89:16; Ex. 6. Ebersol also told Dundon (as well as another potential investor) that $10 million would get the league through week two of the season. Ex. 3; Ex. 32. Although Ebersol may not have known the full extent of the delinquent accounts payable the AAF had incurred up through the time of the DCP investment, he understood the AAF was in a deep whole to vendors and had been continuing to incur obligations at a staggering rate. Ex. 29 at 109:14-110:14; Ex. 27 at 167:14-168:10; Ex. 28 at 285:1-6, 287:4-19; Ex. 8 at 7. Just a few weeks prior to DCP's investment, Alan Kantowitz, the person Ebersol relied on to track financials, reported to Ebersol exactly what he believed the league financial condition would be after the start of the season. Ex. 9 ("If MGM funds their $3.5m, we will need another ~$7m to get through the first weekend . . . I would be remiss if I did not point out the following. We have about $8m of invoices that are overdue and maybe and probably another ~$8m that we will continue to push past opening weekend eve[n] though they will arise between now and then."). Consistent with Kantowitz's estimations, the league had delinquent

15

1109

accounts payable to vendors of approximately $18 million by February 14, 2019. Ex. 14 at 11 ¶ 8. Ebersol failed to disclose these facts to DCP.

24.     Ebersol represented that DCP would receive 75% of ESMG's undiluted stock pursuant to the terms of the Term Sheet. Ex. 1 at 1. At the time Ebersol made the representation, there was an existing claim from Bob Vanech that he owned 50% of the AAF. Ex. 16 at 1, 3, 9; Ex. 17. There were warrant holders and other contractual stock rights that conflicted with the AAF's ability to fulfill the 75% obligation. Ex. 13 at 7, 8; Ex. 18 at 4, 6-7.   Ebersol received Vanech's initial demand letter. Exs. 16, 17. He was also signatory to each agreement issuing the competing stock rights.   He knew that his representation that ESMG could issue 75% of its undiluted stock was impossible. And he hid any information related to the competing stock rights and claims to ownership from DCP. Ex. 26 at 388:19-389:7, 390:9-23; Ex. 29 at 79:9-15; Ex. 7 (first disclosure of Vanech to Dundon was on January 20, 2019).

25.     Additional debts at the time the Term Sheet was executed included amounts owed to unpaid vendors, including media companies that had threatened to stop performing services. Exs. 19, 20, 21. The AAF had also failed to pay airlines, hotels, security companies, and CBS, the network that was airing its games. Ex. 26 at 390:24- 392:24; Ex. 8 at 1, 7. Ebersol also knew of at least another $5 million obligation. *See* Ex. 11 at 1 (referencing an additional $5 million due a week after the Term Sheet was executed). Ebersol had also received an email from Kantowitz on January 22, 2019, stating that there would be "~$10m-$11m of critical cash out the door between now and opening weekend," and referring to the league pushing debts — meaning delaying payment — as a "game of chicken." Ex. 9. Ebersol failed to disclose any of these other debts to DCP. Ex. 25 at 89:4-23.; Ex. 26 at 389:8-15; Ex. 29 at 78:7-79:8.

26.     Had DCP known about the delinquent debts, the faulty projections, the inability of Ebersol to deliver the 75% ownership in ESMG, and how the failure to secure financing had obliterated league revenue projections, DCP would not have entered the Term Sheet, nor would it have invested in the AAF.  Ex. 26 at 392:11-24.

27.     Between February 14, 2019, and April 16, 2019, ESMG submitted funding requests to DCP, and DCP responded to the requests.  ECF 102 at 2.

28.     Despite DCP's best efforts, the AAF's preexisting debts were insurmountable, and the AAF exhausted DCP's $70 million long before the end of the season. To make matters worse, the AAF had no viable revenue sources.  Ex. 28 at 201:1-202:22; 236:11-237:19; 307:9-23.

29.     With no viable path to sustainability moving forward or alternative source of capital, ESMG filed for bankruptcy protection. Ex. 28 at 307:9-23.

30.     DCP ultimately invested and lost approximately $70 million in the league.  Ex. 29 at 154:10-16; Ex. 25 at 253:9-16.

31.     The evidence in the appendix attached is incorporated by reference.

### ARGUMENT AND AUTHORITIES

Rule 7056 of the Federal Rules of Bankruptcy Procedure adopts Rule 56 of the Federal Rules in adversary proceedings.  In considering a motion for summary judgment, courts view inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Courts "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000).  Even if a moving party satisfies the standards of Rule 56, a court may, as a matter of discretion, deny a motion for

1111

summary judgment if it finds that "the better course would be to proceed to a full trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

**A.      DCP has standing to prosecute its claims because DCP owns the claims.**

DCP entered a contract with ESMG by which DCP agreed to invest a maximum cumulative amount of $70 million in ESMG in exchange for majority ownership and control of ESMG. Though the Trustee claims DCP fell almost $300,000 short of the $70 million commitment, no one disputes that DCP fulfilled at least $69.7 million of it.  In its Complaint, DCP seeks to recover for the loss of its investment caused by Ebersol's failure to disclose the true nature of the league's financial problems before DCP entered the term sheet.  ECF 1 at 16 ¶ 64.

Despite the foregoing, Ebersol claims that DCP lacks standing to assert a claim for the lost investment.  Standing generally requires proof of (1) an injury in fact, (2) caused by the defendant's conduct, (3) that is redressable by a favorable court decision.  *Alt Platform, Inc. v. Beckett Collectibles, LLC,* No. 3:22-CV-02867-N, 2024 WL 4376156, at *5 (N.D. Tex. Oct. 1, 2024).  The only standing element Ebersol challenges is injury in fact.  ECF 102 at 10-15.  The injury in fact must be both concrete and particularized as well as actual or imminent.  *Id.*  "If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *Id.* (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021)).  "In reviewing standing at the summary judgment stage, any specific facts . . . set forth by affidavit or other evidence . . . will be taken to be true." *McCardell v. U.S. Dep't of Hous. & Urban Dev.*, 794 F.3d 510, 518 (5th Cir. 2015) (internal citations omitted).

Ebersol bases his standing argument on two broker cases in which the courts held that non-owner brokers could not sue to recover losses suffered by their customers.  ECF at 102 at 14-15. In *Indemnified Capital Invs., SA v. R. J. O'Brien & Assocs., Inc.*, 12 F.3d 1406 (7th Cir. 1993), the broker-plaintiff sued to recover losses to its customers' accounts.  The broker did not allege that it

owned the accounts that lost money, it did not allege that it was injured by the losses to those accounts, and it did not allege that customers had assigned their claims to the broker. *Id.* at 1409. The court held that the broker lacked standing to pursue claims that belonged to its customers. *Id.* at 1409-10.

Similarly, in *W.R. Huff Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100 (2nd Cir. 2008), the broker sued to recover losses to its customers' accounts. The court held that the broker could not pursue claims for its clients' losses absent an assignment of ownership of the claims. *Id.* at 108. Relying on the Supreme Court opinion in *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269 (2008), the *W.R. Huff* court concluded that an injury-in-fact requires the plaintiff to have legal title to or a proprietary interest in the claim asserted. 549 F.3d at 108. The *Sprint* court held that a plaintiff with legal title to a claim acquired by assignment could sue even if the original claim owner retained a beneficial interest in the proceeds of the litigation. 554 U.S. at 285. None of the above cases focuses on the origin of funds used to acquire the injured interest.

In this case, DCP entered the Term Sheet (and thereby acquired an interest in ESMG). Ex. 1. No one — not even Ebersol — has ever claimed that DDFS acquired an interest in ESMG or had an obligation to transfer funds to ESMG. DCP negotiated the term sheet with ESMG. The distinction between *RJ O'Brien* and *W.R. Huff* and this case is that, in those cases, the plaintiffs were attempting to recover monies invested by their clients for the clients' own benefit, whereas, here, DCP seeks to recover funds that originated from a DDFS Partnership account for the purpose of fulfilling a contractual obligation of DCP (*i.e.*, funds delivered on DCP's behalf). In *R.J. O'Brien* and *W.R. Huff,* the clients would reap the rewards of any successful investment, whereas, here, regardless of who wired the funds, DCP—the party to the Term Sheet who obtained an equity interest in ESMG—owned the benefit of the agreement DDFS fulfilled by wiring the funds.

Jeffrey Vanderbilt of DCP testified that the reason that the wire transfers to ESMG came from a DDFS Partnership account, rather than a DCP account, was that DDFS Partnership functioned as treasury management for DCP:

> Q.  I will also represent to you that in our review of records, it appeared that all of the funds for the AAF investment came from DDFS. That's how the wiring was done.
>
> A.  Partnership?
>
> Q.  Correct. Does that make sense?
>
> A.  Yes.
>
> Q.  How is [sic] that DCP is taking the loss for its investment if all the money came from DDFS?
>
> A.  DCP was the party making the investment. DDFS Partnership functioned as treasury management.

Ex. 30 at 15:9-16; 16:5-12; 140:24-141:13.

The money DDFS sent to ESMG was sent to satisfy DCP's obligation in the term sheet. The minutes of the ESMG board meeting and the stockholder agreement confirm receipt of funds as a result of DCP signing the Term Sheet.  Ex. 4 at 12; Ex. 12 at 2.

Who paid ESMG is not the issue because the payments were identified by the payor and the payee as being sent pursuant to the contract.  DDFS paid the money to ESMG on behalf of DCP, not as a gift from DDFS to ESMG.  The result would be the same if a car salesman duped a college student into buying a lemon (of a car).  If the student's parents wired the funds for the purchase, the student would nonetheless have standing to sue the salesman for fraudulent inducement.  The student would have an injury in the form of the loss of price of the car even though the money came from his parents.  The injury would have been caused by the salesman, and a favorable decision in the form of a monetary judgment would remedy the injury.

Ebersol argues nonetheless that "DCP has testified there are no agreements of any kind between DCP and DDFS, written or oral, that would tie or connect DCP in any manner to said funds wired by DDFS to ESMG or otherwise allow DCP to receive any benefits therefrom" to show that DCP lacked any interest in the funds paid by DDFS. In support of this argument, Ebersol references testimony by Vanderbilt that no formal agreement exists between DCP and DDFS. ECF 102 at 8. But Ebersol never explains why the origin of funds makes a difference in the injury in fact determination. DCP made a written commitment to provide funds. The funds were provided, and ESMG accepted the funds and acknowledged those funds as a fulfillment of DCP's commitment. There is no legal requirement that the beneficiary of a transfer of funds have a formal agreement with the transferor, especially when the transferor is a related entity with common ownership and control.

Ebersol also references testimony by Jason Kulas that he is unaware of a "formal . . . written relationship regarding treasury functions" between "DDFS, LP and Dundon Capital Partners." Ex. 29 at 145:2-11. There is no legal requirement that related entities have written agreements to govern internal dealings.

Vanderbilt testified a treasury relationship exists between DCP and DDFS and disputed that a formal agreement would be required to document that relationship:

> Q.     All right. So when somebody functions a treasury management, there has to be some sort of formal agreement that says, I am making this investment on your behalf, correct?
>
> A.     I wouldn't say that's correct.

Ex. 30 141:14-22 (cleaned up and emphasis added).

Finally, Ebersol argues that an informational federal tax form prepared by DDFS Partnership that references the AAF loss somehow proves that DCP lacks any right, title, or interest

21

in the funds. There is no explanation for why the Court should hold DCP responsible for what DDFS reported on an informational form. Nonetheless, it appears from Ebersol's argument that he is asking the Court to invoke tax estoppel against DCP.

Tax estoppel is a form of quasi-estoppel that prevents a party from taking an inconsistent position from a characterization of income or expenses on its tax return if it accepted a benefit from the characterization (in the form of a deduction, for instance). *See generally Matter of Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991). The doctrine is often used in divorce cases (like *Davidson*) on the issue of whether past payments were alimony or something else. *See generally id.* Because tax estoppel is based on quasi-estoppel, the party asserting it must show that the party against whom the doctrine is invoked took the prior inconsistent position and accepted a benefit from it. *Id.* Ebersol has shown neither. DDFS is responsible for the information on the form attached to Ebersol's motion, not DCP—meaning that DCP did not take a prior inconsistent position. DCP got no benefit from DDFS reporting the loss for the ESMG investment. DCP did not file a return because it is a pass-through entity. Vanderbilt Decl. ¶ 4. The loss ended up on Dundon's return as shown in the exhibits to the Vanderbilt declaration. *Id.* at ¶ 6, Ex. A. Tax estoppel does not apply in this case because DCP got no benefit from a prior inconsistent position.

Ebersol's argument that DCP lacks any right, title, or interest in the funds paid on its behalf is premised on the assumption that a party to a contract cannot recover funds paid thereunder if the funds came from a third party. In *Kakabadze v. M5 Int'l Co.,* No. H-12-3701, 2014 WL 2547767, at *15 (S.D. Tex. 2014), the court rejected the argument that Kakabadze had not suffered damages and did not have standing to assert a claim because he was fully reimbursed by a third party. Kakabadze had entered the contract at issue in his own name, though he did so as an agent

1116

for others.  The court held that Kakabadze could sue in his own name (even though his principals ultimately paid for his losses) because Kakabadze was the party to the contract.  *Id.*

Ebersol has not shown a lack of an injury in fact as a matter of law, and Ebersol has not conclusively disproved Vanderbilt's testimony that DCP, not DDFS Partnership, invested its own funds in ESMG and suffered the losses at issue.  Because standing in the sense argued by Ebersol turns on ownership, and because none of Ebersol's cases depend on the origin of funds as the basis for determining ownership of a claim or standing, the Court should deny Ebersol's motion for summary judgment.

**B.**     **DCP suffered a loss of $70 million.**

Ebersol next argues that DCP suffered no loss because DDFS conveyed the money to ESMG.  Like his standing argument, this argument depends on the Court accepting that DDFS sending the money to ESMG means that DCP had nothing to do with the funding.  DDFS had no contract with ESMG and did not send ESMG a $70 million gift.  Vanderbilt testified that DDFS sent the funding as part of treasury management for DCP, an entity with common ownership.  Ex. 30 at 141:6-13. The technical source of the wire is not proof that DCP did not own the funds or suffered no loss, especially where Vanderbilt identified DCP as the contracting party, testified that DCP suffered the loss, and explained why DDFS originated the wire to ESMG.  Also, ESMG recognized the funds received as coming from DCP and fulfilling DCP's commitment in the Term Sheet.  Ex. 4 at 12; Ex. 12 at 2; Ex. 41 at 2.  There is no basis upon which Ebersol could argue that DDFS owns the position of DCP with respect to the Term Sheet.  DCP signed up to fund the league up to $70 million and caused that commitment to be paid.  How DDFS and DCP handle allocation of the monies internally does not negate DCP's claim of a loss.

23

C.     **Ebersol offered and sold securities by means of untrue statements.**

Ebersol made material misrepresentations and failed to disclose multiple material facts when he offered and sold an equity interest in ESMG to DCP. Ex. 26 at 387:11- 392:24; Ex. 29 at 78:7-79:15. There is no real dispute about whether DCP purchased an equity interest in ESMG. Ebersol's own sworn testimony demonstrates his understanding of that fact:

> Q.     What I was to know is not what happened first, second, third in this agreement, I want to know the total consideration each side was committing to in this agreement.

> A.     My understanding of this document the binding term sheet for the series 2 preferred stock financing…is that in exchange for 5.1 million dollars, Dundon Capital Partners received among other thing 75 percent of the company's fully diluted stock…"

Ex. 23 at 301:12-302:3.

Section 27.01 of the Texas Business and Commerce Code requires proof that a person relied on a false statement in entering a contract to buy stock. TEX. BUS. & COM. CODE § 27.01(a)(1)(B). The language of Section 27.01 considers only the events up to and including the execution of the contract. *In re Skyport Glob. Comms., Inc.*, No. 08-36737, 2011 WL 111427, at *49 (Bankr. S.D. Tex. Jan. 13, 2011), *aff'd sub nom. In re SkyPort Glob. Comms., Inc.*, 528 B.R. 297 (S.D. Tex. 2015), *aff'd in part sub nom. In re Skyport Glob. Comms., Inc.*, 642 Fed. Appx. 301 (5th Cir. 2016), *aff'd sub nom. Matter of Skyport Glob. Comms., Inc.*, 661 Fed. Appx. 835 (5th Cir. 2016). Nothing in Section 27.01 requires issuance and delivery of a stock certificate as a condition to suit.

Ebersol nonetheless argues that because no shares of stock were physically issued, no sale occurred. ECF 102 at 18. None of the cases Ebersol cites require a physical issuance of stock. In *Chase v. Hodge*, No. 1:20-CV-0175-RP, 2021 WL 1948470, at *9 (W.D. Tex. May 14, 2021), report and recommendation adopted, No. 1:20-CV-175-RP, 2021 WL 8017993 (W.D. Tex. June

23, 2021), Chase alleged that he and the defendant, Hodge, agreed to treat a limited liability company, Helping Hands Capital, LLC, as an equal partnership. Chase's pleading acknowledged that Hodge retained a 100% interest in Helping Hands. *Id*. at 9. The court held that because Helping Hands was not a seller, the Texas Securities Act did not apply. *Id*. *Stephanz v. Laird*, 846 S.W.2d 895, 905 (Tex. App.—Houston [1st Dist.] 1993, writ denied), held that Section 27.01(a) of the Texas Business and Commerce Code did not apply to unvested stock options where the conditions precedent to vesting had not occurred. *Okumus v. Mouton*, No. 14-18-00220-CV, 2020 WL 6278664, at *5 (Tex. App.—Houston [14th Dist.] Oct. 27, 2020, no pet.), held that "for a real estate transaction to be actionable under section 27.01 . . . an actual conveyance of real property must occur."

None of Ebersol's cases involved a sale of securities where the buyer entered a contract to buy stock and paid the price for the security. In *Chase*, Chase merely thought he would be an owner of the company at issue. 2021 WL 1948470, at *9-10. In *U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000), there was no contract to buy stock, only an alleged agreement by which a party could earn stock. *Stanfield v. O'Boyle*, 462 S.W.2d 270 (Tex. 1971), was a case about conveyance of stock as collateral, not a sale.

This case is more like *Tukua Investments, LLC v. Spenst*, 413 S.W.3d 786, 797 (Tex. App.—El Paso 2013, pet. denied), involving a claim for fraud in a real estate transaction based on Section 27.01 of the Texas Business and Commerce Code. In *Tukua*, the parties signed an agreement to buy real estate, but the buyer withdrew from it prior to the sale because of nondisclosures by the real estate agent. The court held that the contract for sale enabled the buyers to invoke Section 27.01 because Section 27.01 required only that the party suing enter a contract.

The court added that the statute applies to a transaction, not a consummated sale with a transfer of title. *Id.*

The main distinction between this case and the cases Ebersol cites is that DCP paid for the purchase of a security and there was a written contract that required ESMG to convey the security. The sales transaction was consummated by DCP's payment of the price. The board of ESMG approved the transaction, and ESMG accepted the funds and spent them. Thus, under the Texas Securities Act and Section 27.01 of the Texas Business and Commerce Code, DCP has satisfied the requirement that a transaction for the sale of a security occurred.

### D.     The summary judgment evidence supports each element of DCP's claims against Ebersol.

The no-evidence sections of Ebersol's motions address DCP's fraud claims. The elements of DCP's fraud claims are similar. Fraudulent inducement requires:

> (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury.

*Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). Fraud may also arise from a failure to disclose. *Union Pac. Res. Group, Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 586 (5th Cir. 2001) (examining fraud claim under Texas law.

> A duty to speak arises by operation of law when (1) a confidential or fiduciary relationship exists between the parties; or (2) one party learns later that his previous affirmative statement was false or misleading; or (3) one party knows that the other party is relying on a concealed fact, provided that the concealing party also knows that the relying party is ignorant of the concealed fact and does not have an equal opportunity to discover the truth; or (4) one party voluntarily discloses some but less than all material facts, so that he must disclose the whole truth, i.e., all material facts, lest his partial disclosure convey a false impression.

*Id.*

Section 27.01 of the Business and Commerce Code requires that:

(1) there was a transaction involving real estate or stock, (2) during the transaction [the defendant] made a false representation of fact, a false promise, or benefitted by not disclosing that a third party's representation or promise was false, (3) the false representation or promise was made for the purpose of inducing [the plaintiff] to enter into a contract, (4) [the plaintiff] relied on the false representation or promise by entering into the contract, and (5) the reliance caused [the plaintiff] injury.

*Fid. Nat. Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 632 (E.D. Tex. 2011),

*aff'd in part, rev'd in part and remanded sub nom. Lawyers Title Ins. Corp. v. Doubletree Partners,*

*L.P.*, 739 F.3d 848 (5th Cir. 2014). The Texas Securities Act requires:

The security was sold by means of (1) an untrue statement of material fact or (2) an omission to state a material fact that is necessary in order to make the statements made not misleading.

*Kubbernus v. ECAL Partners, Ltd.,* 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018,

pet. denied). DCP must also show Ebersol offered or sold the security at issue. *See* TEX. GOV.

CODE § 4008.052.

Courts rarely grant summary judgment in fraud cases. *See generally Beijing Metals &*

*Minerals Imp./Exp. Corp. v. Am. Bus. Ctr., Inc.*, 993 F.2d 1178, 1185 (5th Cir. 1993) (analyzing a

fraud claim under Texas law). Fraud turns on intent, which may be shown by circumstantial

evidence, and which is a question of fact that depends on the credibility of witnesses and the weight

given their testimony. *Id.* A court should not grant summary judgment in a fraud case where the

nonmovant offers evidence that the defendant made a partial but misleading disclosure that the

plaintiff relied on in entering an agreement. *Union Pac. Res. Group, Inc.*, 247 F.3d at 587.

### 1. **Ebersol made knowingly false representations to DCP and failed to disclose material facts.**

Ebersol's false representations and omissions support each of the claims at issue. First,

Ebersol represented that he was authorized to execute the Term Sheet by signing it. Ex. 1. Ebersol

failed to obtain authority until after he signed the Term Sheet, as evidenced by the board minutes and the stockholder agreement. Ex. 4 at 11-12; Ex. 12 at 2. At the time, the Series 2 preferred stock did not even exist and had not even been authorized. Ebersol failed to disclose his lack of authority to DCP. Ex. 26 at 387:11-388:9; Ex. 29 at 79:9-15. Ebersol never obtained authority to enter the Term Sheet from the other debt holders. Ex. 13 at 7-8, 10-12. Ebersol acknowledged that he lacked the authority to sell ESMG stock without approval. Ex. 23 at 140:12-25. Together, these facts show that Ebersol knew he did not have authority to enter the Term Sheet when he made the representation to the contrary.

Ebersol represented to DCP that the only previously incurred obligation that remained outstanding was $5.1 million for player payroll and related week one expenses. Ex. 23 at 207:21-208:4; 208:12-15; Ex. 24 at 71:21-72:10; Ex. 25 at 87:13-89:16; Ex. 29 at 45:24-46:16; 48:17-49:3. In reality, at the time the Term Sheet was signed, the league had more than $18 million in delinquent accounts payable in addition to the $5.1 million it needed for payroll. Ex. 29 at 48:17-49:3; Ex. 14 at 11 ¶ 8. As CEO of ESMG, Ebersol knew about an additional $18 million in accounts payable. Ex. 29 at 109:14-110:14; Ex. 27 167:14-168:10; Ex. 28 at 285:1-6; 287:4-19. The additional debts included unpaid vendors and media companies that had threatened to stop performing services. Exs. 19, 20, 21. The AAF had failed to pay airlines, hotels, security companies, and CBS, the network that was airing its games. Ex. 26 at 390:24- 392:24; Ex. 9. Ebersol knew of at least another $5 million obligation. *See* Ex. 11 at 1 (referencing an additional $5 million due a week after the Term Sheet was executed). Ebersol had received an email from Kantowitz on January 22, 2019, stating that there would be "~$10m-$11m of critical cash out the door between now and opening weekend," that the league had $8 million in overdue invoices, and that the league had another $8 million that would be incurred through the first weekend of play.

1122

Ex. 9. Ebersol failed to disclose any of these other debts to DCP. Ex. 25 at 89:4-23; Ex. 26 at 389:8-15; Ex. 29 at 78:7-798. Thus, Ebersol knew his representation that only $5.1 million was required to keep the AAF afloat was false. Ex. 29 at 48:17-49:3.

Ebersol represented that between $55 million and $70 million was enough capital for the AAF to make it through the rest of the first season. Ex. 25 at 148:5-24; Ex. 29 at 45:24-46:16; 151:20-152:7; Ex. 26 at 350:22-351:2. Ebersol did not know the basis for representing to potential investors that $70 million was needed to complete the first season. Ex. 23 at 201:11-202:10. And, even if it were true that the AAF only needed $70 million to complete the season moving forward, Ebersol did not disclose that any additional $23 million at a minimum would have been required to cover the delinquent accounts payable and immediately due debt. Ex. 14 at 11 ¶ 8. This meant that the best-case scenario was that the league needed $93 million to complete the first season. These facts demonstrate that Ebersol knowingly misrepresented that he had a basis for the $70 million requested from DCP.

On February 13, 2019, Ebersol provided DCP with projections related to the AAF, representing at least an honest belief in their accuracy. Ex. 22. The projections were materially overstated and unrealistic. Ex. 29 at 138:5-18; Ex. 15 at 21, 29-37. Ebersol had no idea how the league projections were derived although he was aware that there were substantial discrepancies between the projections and reality. Ex. 23 at 62:20-63:2; Ex. 5 at 3. Ebersol failed to disclose that recent changes had been made to the projected revenues, including the decision to reduce projected revenues of the league by $30 million for the first season due to lack of marketing and the failure to develop digital products. Ex. 15 at 76; Ex. 5 at 3; Ex. 26 at 389:16-390:5; Ex. 10 at 1. All Ebersol disclosed was the need for funds to pay the players and that the league had good ratings in week one. Ex. 3 at 1. He said nothing about the crippling effect his mismanagement

and the lack of funding had had on the league in the year-plus he spent running it. Ebersol's actions in making incomplete and misleading disclosures demonstrate that he made them knowingly and intended that DCP would rely on what he did disclose.

Ebersol represented that DCP would receive 75% of ESMG's undiluted stock, pursuant to the terms of the Term Sheet. Ex. 1. At the time Ebersol made that representation, there was an existing claim from Vanech that he owned 50% of the AAF. Ex. 16 at 1, 3, 9. There were also warrant holders and other contractual stock rights that conflicted with the AAF's ability to fulfill the 75% obligation. Ex. 13 at 7-8; Ex. 18 at 4, 6-7. Vanech sent his initial demand letter to Ebersol. Ex. 16, 17. He was also signatory to each agreement issuing the competing stock rights. He knew that his representation that ESMG could issue 75% of its undiluted stock was impossible without the agreement of competing claims to equity in the league, which in large part were never obtained. Ex. 13 at 7-12. And he intentionally hid information related to the competing stock rights and claims to ownership. Ex. 26 at 388:19-389:7; 390:9-23; Ex. 29 at 79:9-15; Ex. 7 (first disclosure of Vanech to Dundon was on January 20, 2019).

### 2. Ebersol made the representations and omissions to induce DCP to enter the Term Sheet and invest in ESMG.

Facts supporting Ebersol's intent to induce DCP to enter the Term Sheet and invest in ESMG include Ebersol's testimony that, when he sought DCP's investment in the league, he was seeking an investment in ESMG. Ex. 23 at 90:6-21. Ebersol testified that he was trying to "urgently raise capital" the week he solicited Dundon's investment. Ex. 23 at 198:3-15. And Ebersol did, in fact, seek investment in ESMG. Ex. 25 at 68:20-25.

1124

**3.    DCP relied on Ebersol's misrepresentations and omissions when it entered the Term Sheet and invested in ESMG.**

Because Ebersol represented the AAF needed funds immediately, and any delay would essentially result in the league's collapse, DCP was unable to perform the due diligence it normally would perform on an investment with a longer time horizon. Ex. 25 at 68:20-25; Ex. 28 at 210:17-211:11, 352:16-353:10. Ebersol provided only a limited amount of documentation in response to DCP's requests. Ex. 29 at 47:6-17. Given the time constraints, DCP was largely forced to rely on Ebersol's representations concerning the league. Ex. 29 at 47:6-17; Ex. 26 at 392:19-24. Had DCP known the truth, it would not have entered the Term Sheet, nor would it have invested in the AAF. Ex. 26 at 392:11-24.

**4.    DCP was damaged by Ebersol's conduct.**

DCP ultimately invested and lost approximately $70 million in the league. Ex. 29 at 154:10-16; Ex. 25 at 253:9-16.

### CONCLUSION

The evidence cited above shows that Ebersol made disclosures to Dundon that were either false or misleading because they were incomplete. DCP relied on Ebersol's disclosures in investing $70 million in the league, which DCP eventually lost. There is no legal bar to DCP's recovery as a result of DCP having directed the wire to come from DDFS instead of sending it directly, especially where the evidence plausibly explains what happened. Based on these facts, the Court should deny Ebersol's summary judgment.

### PRAYER FOR RELIEF

**WHEREFORE,** Defendant Dundon Capital Partners LLC prays the Court deny Charles Ebersol's motion for summary judgment in its entirety, and grant such other and further relief, legal or equitable, to which DCP may be justly entitled or the Court deems proper.

Respectfully submitted,

**K&L GATES LLP**

By:    */s/Brent D. Hockaday*
        Brent D. Hockaday
        Texas Bar No. 24071295
        Brent.hockaday@klgates.com
        1717 Main Street, Suite 2800
        Dallas, Texas 75201
        (214) 939-5677
        (214) 939-5849 Fax

and

**BELL NUNNALLY & MARTIN LLP**

    */s/ Beverly A. Whitley*
    Jeffrey S. Lowenstein
    Texas Bar No. 24007574
    jlowenstein@bellnunnally.com
    Beverly A. Whitley
    Texas Bar No. 21374500
    bwhitley@bellnunnally.com
    Brent A. Turman
    Texas Bar No. 24077506
    bturman@bellnunnally.com
    Sydnie A. Shimkus
    Texas Bar No. 24093783
    sshimkus@bellnunnally.com
    2323 Ross Ave., Ste. 1900
    Dallas, Texas 75201
    (214) 740-1400
    (214) 740-1499 Fax

**ATTORNEYS FOR**
**DUNDON CAPITAL PARTNERS LLC**

## CERTIFICATE OF SERVICE

The undersigned certifies a true and correct copy of the foregoing was served by delivering the same to the person listed below in the manner and on the date indicated.

William N. Radford
Thomas M. Horan II
Thompson Coe
700 N. Pearl Street, 25th Floor
Dallas, TX 75201
wradford@thompsoncoe.com
thoran@thompsoncoe.com

Michael Saltz
Jacobson, Russell, Saltz, Nassim & De La Torre, LLP
1880 Century Park East, Suite 900
Los Angeles, CA 90067
msaltz@jrsnd.com

***Attorneys for Charles Ebersol***

Dated January 22, 2025.

*/s/ Beverly A. Whitley*
Beverly A. Whitley

10498991.1  04251-00029

1127

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

```
IN RE:                             )
LEGENDARY FIELD EXHIBITIONS,       )
LLC,                               )  Case No.
                                   )     19-50900-CAG-7
              Debtor               )
_____)
                                   )
DUNDON CAPITAL PARTNERS, LLC,      )
                                   )
              Plaintiff,           )  Adv. Proc. No.
                                   )     22-05077
v.                                 )
                                   )
CHARLES EBERSOL,                   )
                                   )
              Defendant.           )
_____)
```

VIDEOTAPED DEPOSITION OF ALAN KANTOWITZ,

taken on behalf of the Plaintiff, at 16001 Ventura

Boulevard, Suite 200, Encino, California, commencing at

12:00 p.m., Tuesday, January 7, 2025, before ANN BONNETTE,

California C.S.R. No. 6108, Louisiana C.C.R. No. 85135,

Registered Professional Reporter No. 22501, Certified

LiveNote Reporter No. 060604-01, Certified Manager of

Reporting Services, AAERT Certified Digital Court Reporter

and Transcriptionist No. D-368, pursuant to Subpoena.

**EXHIBIT**

**A**

1

1128

ALAN KANTOWITZ - January 7, 2025

```
01:13   1        A    I think that's probably a fair estimate.

        2        Q    Okay.  So the league was almost exclusively

        3   relying on outside funding to get through the time the

        4   league was going to launch; correct?

01:13   5        MR. ENGEL:  Objection.  Form.

        6        THE WITNESS:  Yes.

        7   BY MR. LOWENSTEIN:

        8        Q    And so the league knew that the funds available

        9   to cover expenses were going to have to come from outside

01:13  10   investment or lending?

       11        MR. ENGEL:  Object to the form.

       12        THE WITNESS:  I think that's fair.

       13   BY MR. LOWENSTEIN:

       14        Q    And you had a good sense of what the cash

01:14  15   available was for expenses to get up to the time of the

       16   league launch?

       17        MR. ENGEL:  Object to form.

       18        THE WITNESS:  I think the team, Kevin Freedman

       19   probably and Charlie, best positions, but I think they had

01:14  20   a decent sense of cash on hand at, you know, any given

       21   time.

       22   BY MR. LOWENSTEIN:

       23        Q    Okay.  And so they, Charlie and Kevin Freedman,

       24   would have been aware that this is the cash we have to

01:14  25   spend if we don't want to get behind with our vendors;
```

ALAN KANTOWITZ - January 7, 2025

01:39  1       MR. ENGEL:  Object to the form.

2       THE WITNESS:  Not specifically.

3  BY MR. LOWENSTEIN:

4       Q    Okay.  Are you aware of anybody at the AAF doing

01:39  5  research on what competitive leagues were paying coaches

6  and players?

7       A    I don't recall.  And the XFL hadn't launched

8  yet.

9       Q    Do you know if the XFL had deals in place for

01:40 10  their players or coaches at that point?

11       A    I don't recall.

12       Q    Do you recall seeing the results of anybody's

13  research on competitive leagues and what they were paying

14  coaches and players?

01:40 15       A    Not that I can recall.

16       Q    And you said, in paragraph 2 of your email, you

17  say, "agree, we need to find a path forward with Reggie

18  and need to do our best to make this work.  However,

19  'shutting down" the business was not a threat and was

01:40 20  never intended to be one.  That was just the fact of our

21  reality and situation which was caused by Reggie."

22            What does that mean?

23       A    I don't recall specifically what was meant by

24  that or who said shutting down the business.  What I do

01:41 25  recall is Reggie was not funding.  We were approaching the

1130

ALAN KANTOWITZ - January 7, 2025

01:41  1   season.  Capital was required to launch a league.  If you
       2   don't have the capital, you can't have a product on the
       3   field.
       4       Q    And if you don't have the capital, you shouldn't
01:41  5   go forward with launching a league; right?
       6       MR. ENGEL:  Object to form.
       7       THE WITNESS:  I don't know the right answer to that
       8   question.
       9   BY MR. LOWENSTEIN:
01:41 10       Q    Well, your opinion was that shutting down wasn't
      11   just a threat; it was the reality if there was
      12   insufficient capital to go forward; right?
      13       MR. ENGEL:  Object to the form.
      14       THE WITNESS:  Again, I don't recall exactly what
01:41 15   shutting down meant and what the conversations were at
      16   that point in time.
      17   BY MR. LOWENSTEIN:
      18       Q    You know what "shutting down" meant?
      19       MR. ENGEL:  Objection to form and argumentative.
01:41 20       MR. ALON:  Objection, yes.
      21       THE WITNESS:  I don't know if it meant temporarily,
      22   permanently shutting him down, pursuing other options.  I
      23   don't recall the context of what was occurring
      24   specifically at that point in time.
01:42 25   BY MR. LOWENSTEIN:

ALAN KANTOWITZ - January 7, 2025

1      Q    You do recall that in this time frame in

2  December 2018 there was discussions about shutting down

3  the league and not pursuing starting football in 2019;

4  right?

5      MR. ALON:  Objection to form.  Asked and answered.

6      THE WITNESS:  I thought I just asked and answered.

7  BY MR. LOWENSTEIN:

8      Q    You can --

9      MR. ALON:  You can still -- I mean, he's asked the

10  same question so...

11      THE WITNESS:  I recall general nervousness around our

12  ability to have the funds to launch the

13  league --

14  BY MR. LOWENSTEIN:

15      Q    And do you --

16      A    -- around that time.

17      Q    And do you recall that there were discussions

18  about shutting down the league and not plotting forward

19  towards putting football on the field at this time?

20      MR. ENGEL:  Object to form.

21      MR. ALON:  Objection.  Asked and answered.

22      THE WITNESS:  I recall general discussions around

23  various options.  Certainly that could have been one of

24  them.

25  BY MR. LOWENSTEIN:

22-05077-cag Doc#202-2 Filed 06/24/25 Entered 06/24/25 09:09:19 Exhibit 7 - Designated
Kantowitz Deposition Excerpts Pg 183 of 46

ALAN KANTOWITZ - January 7, 2025

01:44  1    locked up and why he had to liquidate stock and have it

2    secured by a friend of his!  Why was the money not readily

3    available and why can we trust that it will be in the

4    future?  Why did his friend Jeffrey Marks need to

01:44  5    underwrite those securities?  Why was a check dropped into

6    an ATM?  These are questions that raise serious red flags.

7    The fact that he does not appreciate that is extremely

8    alarming to me.

9            You see that?

01:44  10   A    I do.

11   Q    So certainly by this point, December 23, 2018,

12   you had serious concerns about Mr. Fowler ever following

13   through on his funding commitment; correct?

14   A    This seems to reflect that, yes.

01:44  15   Q    And despite those concerns that you were sharing

16   with Charlie and were being expressed by Mr. Moorad, the

17   AAF plowed forward with getting to the launch of the

18   league, didn't it?

19        MR. ENGEL:  Object to form.

01:45  20        THE WITNESS:  Despite this concern, at this specific

21   time, the league launched.

22   BY MR. LOWENSTEIN:

23   Q    And the league continued to incur millions and

24   millions of dollars of expenses to get to launch, didn't

01:45  25   it?

ALAN KANTOWITZ - January 7, 2025

01:45  1       A    It did while also potentially getting more
       2  funding from Reggie and others subsequently, as well to
       3  this email being written.
       4       Q    There was no other substantial investor other
01:45  5  than Mr. Fowler that stepped in between December 23, 2018,
       6  and the launch of the league, was there?
       7       MR. ENGEL:  Object to the form.
       8       THE WITNESS:  I don't recall.  There were other -- I
       9  think there were other investors.
01:45 10  BY MR. LOWENSTEIN:
      11       Q    Do you know what the amount totaled?
      12       A    I do not.
      13       Q    And you said in the next paragraph, "Just
      14  because he is our only option does not mean we need to
01:46 15  continue forth with that option."
      16            So it was your opinion as of December 23, 2018,
      17  that Mr. Fowler was the only option for the league to move
      18  forward?
      19       MR. ENGEL:  Object to the form.
01:46 20       THE WITNESS:  Can you -- can you point me to where --
      21  BY MR. LOWENSTEIN:
      22       Q    Yeah.  It's the next paragraph.  It says, "Just
      23  because."  Do you see that?
      24       A    And -- and please repeat the question.
01:46 25       Q    It says, "Just because he is our only option

1134

ALAN KANTOWITZ - January 7, 2025

01:46  1  does not mean we need to continue forth with that option."

2          So it was your opinion as of December 23, 2018,

3  that Mr. Fowler was the only option for the AAF to go

4  forward; correct?

01:46  5      MR. ENGEL:  Object to the form.

6      THE WITNESS:  At that point in time, he was the only

7  significant investor who had made a commitment.

8  BY MR. LOWENSTEIN:

9      Q    And then at the bottom of that page, you said,

01:47 10  "We have been officially in business with this guy for a

11  month and has been an absolute nightmare.  He has done

12  absolutely nothing to earn that right and confidence.  And

13  it is not only unfair, but in my opinion, irresponsible to

14  continue to write checks and make commitments with

01:47 15  partners without knowing exactly what is going on with

16  Reggie and how available this money is."

17          See that?

18      A    Yes.

19      Q    Despite what you said there, did the AAF

01:47 20  continue to write checks and make commitments without

21  knowing what was going on with Mr. Fowler?

22      MR. ENGEL:  Object to form.

23      THE WITNESS:  I don't recall what commitments and

24  what checks were written.

01:47 25  BY MR. LOWENSTEIN:

ALAN KANTOWITZ - January 7, 2025

01:50  1  when those things actually occur; right?

2       MR. ENGEL:  Objection to the form.

3       THE WITNESS:  No.  I don't know when players were

4  supposed to be paid or not paid.  It could have been two

01:50  5  months later; it could have been a per diem at that point.

6  I don't know.  And as for facilities, I don't recall.

7  There may have been deposits paid up front.  I'm not sure

8  what the contracts look like.

9  BY MR. LOWENSTEIN:

01:51  10     Q    Did the league -- did the board of directors of

11  the AAF act responsibly in continuing to write checks and

12  make commitments leading up to the launch of the league,

13  in your opinion?

14     MR. ENGEL:  Object to the form.

01:51  15     THE WITNESS:  I don't recall when checks and

16  commitments were exactly made.

17  BY MR. LOWENSTEIN:

18     Q    In your -- in Charlie's response to your email

19  on the front of page of Exhibit 518, Charlie says,

01:51  20  "Additionally Reggie's delinquency screwed us with respect

21  to revenue by killing our marketing."

22          Do you know what -- do you have an opinion of

23  what Mr. Ebersol meant by that?

24     A    I don't know what he meant by that.

01:51  25     Q    Well, he makes a reference to "killing our

ALAN KANTOWITZ - January 7, 2025

```
01:51   1    marketing."  But do you have a memory of what happened
        2    with the AAF's marketing as it related to this time
        3    period?
        4        A    I believe there was a plan to market the league.
01:52   5    You need dollars to buy those ad, you know, ad times.  And
        6    because we had limited funds, marketing was the first line
        7    item, to my recollection, that we decided to not spend
        8    money on.
        9        Q    So as of December 23rd the marketing efforts for
01:52  10    the AAF had been killed by the current board of the AAF at
       11    that time; right?
       12        MR. ENGEL:  Objection.  Form.
       13        THE WITNESS:  I recall marketing being limited by
       14    Charlie.  I don't know.  I was never privy to board
01:52  15    discussions.
       16    BY MR. LOWENSTEIN:
       17        Q    And that limiting by Charlie was -- had happened
       18    by the time of December 23, 2018; correct?
       19        MR. ENGEL:  Object to the form.
01:52  20        THE WITNESS:  This document appears to reflect that.
       21    BY MR. LOWENSTEIN:
       22        Q    And Charlie's decision to kill the marketing is,
       23    in his own opinion, screw the league with respect to
       24    revenue; fair?
01:53  25        MR. ENGEL:  Object to the form.
```

ALAN KANTOWITZ - January 7, 2025

01:53 1    THE WITNESS:  It appears the decision to limit

2    marketing and Charlie's opinion led to a decrease in

3    potential revenue.

4    BY MR. LOWENSTEIN:

01:53 5    Q    It screwed the league, is what he said.

6    MR. ENGEL:  Object to form.

7    MR. ALON:  Document speaks for itself.

8    THE WITNESS:  Yeah.  That's what Charlie wrote to me.

9    BY MR. LOWENSTEIN:

01:53 10    Q    You responded, "Agreed.  Although, based on

11    Jeff's email from last week, I think his concern with

12    financials are more budget focused and related to salaries

13    being high and the amount of people we plan to hire or

14    even have hired already."

01:53 15        And Charlie's response is "No.  They question

16    the revenue projections which is problematic."

17        Do you recall having a conversation with

18    Charlie, what he meant by Jeff and Dick's -- I'm sorry,

19    Jeff and David's questioning of revenue projections being

01:54 20    problematic?

21    A    No.

22    Q    Do you have an understanding of what he meant by

23    that?

24    A    My understanding currently is that the way I

01:54 25    read their email was that they were concerned with

ALAN KANTOWITZ - January 7, 2025

| | | |
|---|---|---|
| 02:04 | 1 | Q    The first games were in early February 2019; |
| | 2 | right? |
| | 3 | A    Yes.  That's correct. |
| | 4 | Q    And so these cash flow projections were for all |
| 02:04 | 5 | money that was going to be spent before the first game |
| | 6 | took place; correct? |
| | 7 | MR. ENGEL:  Object to the form. |
| | 8 | THE WITNESS:  It seems like expenses prior to the |
| | 9 | first game occurring. |
| 02:04 | 10 | BY MR. LOWENSTEIN: |
| | 11 | Q    In the attachment under the page that has |
| | 12 | "Projections (12.28.19)" at the top, you see that? |
| | 13 | A    Yes. |
| | 14 | Q    Okay.  So it says there are wires for the week |
| 02:04 | 15 | of December 24th that look like they totaled almost |
| | 16 | $2 million. |
| | 17 | A    Yes. |
| | 18 | Q    Then there's wires for the week of December -- |
| | 19 | or for December 31st.  That is another $747,000. |
| 02:04 | 20 | A    Yes. |
| | 21 | Q    So that looks like 2.7 million to be spent |
| | 22 | through the end of December? |
| | 23 | A    That appears to be correct. |
| | 24 | Q    Okay.  And then for the rest that -- the column |
| 02:05 | 25 | on the left, there's 24.4 million, which is largely going |

ALAN KANTOWITZ - January 7, 2025

02:05  1    to be spent in the first half of January of 2019; correct?

2         MR. ENGEL:  Object to form.

3         THE WITNESS:  Can you restate that?

4    BY MR. LOWENSTEIN:

02:05  5    Q    Yeah.  So this -- there's -- based on what Mr.

6    Farrell was saying is he said projections are through mid

7    January, except where noted, for all of January.

8         So the column on the left, the $24.4 million,

9    was money projected to be spent in January 2019; correct?

02:05  10   A    That appears to be accurate.

11   Q    So, in total, the money to be spent from the

12   week of December 24th through January was about $27

13   million?

14   A    No.  Because I believe the 2.7 million you

02:06  15   referenced is included in the 24 million at the bottom of

16   this page.  If you look at the lines that say "Wires week

17   of December 24th, See Table" --

18   Q    Okay.

19   A    -- it includes --

02:06  20   Q    Fair enough.

21        So through January 2019 the league was

22   anticipating spending $24.4 million.

23   A    It appears that that was Kevin Farrell's

24   assessment.

02:06  25   Q    And in Kevin's email, he says, "There's some

ALAN KANTOWITZ - January 7, 2025

02:06  1  buckets I am missing."

2         Do you know how much those missing buckets

3  totaled?

4      A    I do not.

02:06  5      Q    And there's some that are blank, like training

6  camp travel, insurance run rate in his table; correct?

7      A    I'm not following.  Apologies.

8      Q    There are blanks in Mr. Farrell's table -- I'm

9  sorry.  They're for production travel bookings, and

02:07  10  insurance run rate.

11      A    Those appear to be blank.

12      Q    Do you know what those total?

13      A    I do not.

14      Q    All right.  Show what's been marked as

02:07  15  Exhibit 521.

16              (Exhibit Number 521 was marked for

17              identification and is attached hereto.)

18  BY MR. LOWENSTEIN:

19      Q    This is an email -- well, this is emails in

02:08  20  response to that one that Kevin sent you with the cash

21  flow projections.

22              You see that?

23      A    Yes.

24      Q    And you -- you respond about, "Thanks, Kevin.

02:08  25  Really appreciate it.  So the left side is upcoming

ALAN KANTOWITZ - January 7, 2025

02:20  1      A    Meaning they were, you know, already, I think,

       2   well on their way to launching their own league and, you

       3   know, we're not interested at this point in merging the

       4   two.

02:21  5      Q    Show you Exhibit 522.  I can't tell from the way

       6   this was printed whether you got Charlie's email that he

       7   sent to the ESMG board.

       8           (Exhibit Number 522 was marked for

       9            identification and is attached hereto.)

02:21 10   BY MR. LOWENSTEIN:

      11      Q    You recall seeing this email that Charlie sent

      12   about going to see Vince McMahon?

      13      A    I do not.

      14      Q    This is dated December 18, 2018.

02:21 15           In the fourth paragraph, Charlie says, "We

      16   currently have less than $2 million of usable capital in

      17   the bank.  We have 2 million of ticket revenue that we

      18   plan to return to purchasers if we do not play games.

      19   With this cash reserve, and our obligations to payroll for

02:21 20   this week, we do not have enough capital to continue

      21   football operations after Friday and it will be difficult

      22   to continue digital operations."

      23           Do you see that?

      24      A    Yes.

02:22 25      Q    Do you have any reason to doubt that Charlie was

ALAN KANTOWITZ - January 7, 2025

02:22  1   aware that the league had $2 million of usable capital as

2   of December 18, 2018?

3        A    Not necessarily.

4        Q    Did -- and he went to meet with Mr. McMahon and

02:22  5   there was no deal that came out of that; correct?

6        A    That's correct.

7        Q    Did any other substantial investors show up?

8        MR. ENGEL:  Object to the form.

9        THE WITNESS:  I don't recall if no other outside

02:22 10   substantial investor showed up.

11   BY MR. LOWENSTEIN:

12        Q    And did the league cease operations on the

13   Friday following December 18, 2018?

14        A    No.

02:23 15        Q    Did it cease operations after December 30, 2018?

16        A    Ultimately, yes.

17        Q    Fair.

18             Did it cease operations around the time of

19   December 30, 2018?

02:23 20        A    No.

21        Q    Cease operations before it spent the 24.4

22   million referenced in the prior emails we looked at in

23   January?

24        MR. ENGEL:  Object to form.

02:23 25        THE WITNESS:  I don't even know the total number that

ALAN KANTOWITZ - January 7, 2025

02:23 1  was spent, but assuming it was 24 million or exceeded, no.

2  BY MR. LOWENSTEIN:

3      Q    In the end of the next paragraph, Charlie says,

4  "However, it is more likely that we will still be forced

02:23 5  to concede the 2019 season and hope to continue to pursue

6  the digital business while Vince 'acquires' our football

7  organization to launch the XFL."

8          See that?

9      A    Sorry.  Now which -- which paragraph?

02:23 10     Q    The next paragraph, the last sentence.

11     A    Yes.

12     Q    So it was being contemplated by Charlie in his

13  discussion with the board by December 2018 either ceasing

14  operations or delaying the start of the football season

02:24 15  until after 2019; right?

16         MR. ALON:  Objection.  Lacks foundation.

17         MR. ENGEL:  Object to the form.

18         THE WITNESS:  That appears to be the case from this

19  email.

02:24 20  BY MR. LOWENSTEIN:

21     Q    And instead of making that decision after

22  getting this advice from Charlie in December 2018 the

23  board at that time decided to press forward and launch the

24  league; right?

02:24 25         MR. ENGEL:  Object to the form.

ALAN KANTOWITZ - January 7, 2025

02:24  1      THE WITNESS:  Is this advice from Charlie or is it

2   just --

3   BY MR. LOWENSTEIN:

4      Q   It's an email from Charlie.

02:25  5      MR. ENGEL:  You don't need to ask questions.  He'll

6   ask them.  If you're confused, he'll fix it.

7   BY MR. LOWENSTEIN:

8      Q   Yeah.  Let me ask a different --

9      A   Yeah.  Sorry.

02:25 10      Q   After getting this email from Charlie in

11  December 2018, the board of the AAF did not cease

12  operations of the league, did it?

13     A   Not at that time.

14     Q   And it did not delay the launch of the league

02:25 15  until the 2020 season, did it?

16     A   No, it did not.

17     Q   And it did not have things squared away with

18  Reggie Fowler to where he funded his full commitment, did

19  it?

02:25 20     MR. ENGEL:  Object to the form.

21     THE WITNESS:  Not at that point in time.

22  BY MR. LOWENSTEIN:

23     Q   And it did not have another substantial investor

24  to come in to help fund the league up to the launch of the

02:25 25  league, did it?

ALAN KANTOWITZ - January 7, 2025

02:25  1         MR. ENGEL:  Object to the form.

       2         THE WITNESS:  Not at this point in time.

       3   BY MR. LOWENSTEIN:

       4         Q    And are you aware how much unpaid account

02:26  5   payable the league incurred between this point in time and

       6   the launch of the league?

       7         A    No.

       8         Q    Would it surprise you that that number was in

       9   the $20-million range of unpaid vendors up to the launch

02:26 10   of the league?

      11         MR. ENGEL:  Object to the form.

      12         THE WITNESS:  Wouldn't surprise me.

      13   BY MR. LOWENSTEIN:

      14         Q    Do you think that was responsible to incur $20

02:26 15   million of debt to vendors from this time forward without

      16   the capital to pay it?

      17         MR. ENGEL:  Object to the form.

      18         THE WITNESS:  I don't know when that -- again, I

      19   don't know when those commitments were made and what exact

02:26 20   amounts they were.

      21   BY MR. LOWENSTEIN:

      22         Q    Well, forget the commitments.

      23              When somebody provides a service to the league,

      24   the league owes that person money regardless of when the

02:26 25   commitment was made; right?

ALAN KANTOWITZ - January 7, 2025

| | |
|---|---|
| 02:32 | 1 |

02:32  1     Q   Not cutting the expense; correct?

2     A   As far as I can recall.

3     Q   All right.  And then Slide 3 and 4, you say,

4  "Just show the budget we showed Reggie in the documents

02:33  5  through the end of the season and the revised budget I

6  have constructed."

7     So the exercise here was comparing the

8  projections you had presented to Mr. Fowler with

9  adjustments that you all are making based on what was

02:33  10  actually going on; fair?

11     MR. ENGEL:  Object to form.

12     THE WITNESS:  That seems to be reflective of what

13  this is describing.

14  BY MR. LOWENSTEIN:

02:33  15     Q   All right.  And you said, "This shows that we

16  are taking a hard look at spending and have cut $20

17  million from our anticipated spending."

18     Do you know what those cuts related to?

19     A   I do not.

02:33  20     Q   Okay.  And then you said, "However, revenue

21  projections have also taken a hit due to lack of marketing

22  and a rethinking of digital revenue."

23     And I'll go through the details in the slides.

24  But what did you mean by "a rethinking of digital

02:34  25  revenue"; do you recall?

1147

ALAN KANTOWITZ - January 7, 2025

02:34  1          A      I do not.

       2          Q      But the lack of marketing had -- by January 7,

       3     2019, had an impact on the revenue projections for the

       4     league, didn't it?

02:34  5          MR. ENGEL:  Object to form.

       6          THE WITNESS:  Appears to have an impact on the

       7     projections.

       8     BY MR. LOWENSTEIN:

       9          Q      Do you know what percentage of the marketing

02:34 10     that had been planned back when you started May of 2018

      11     was actually done by Mr. Ebersol on the board working

      12     under him through the launch of the league?

      13          A      I do not.

      14          Q      Certainly less than was anticipated; right?

02:34 15          MR. ENGEL:  Object to the form.

      16          THE WITNESS:  I think that's fair.

      17     BY MR. LOWENSTEIN:

      18          Q      And then Kevin says, "Please add a summary slide

      19     at the beginning that says something like" -- well, strike

02:34 20     that.  I'll get to the details of that.

      21               All right.  And let's look at what you actually

      22     sent to the board.

      23               Previously marked as Exhibit 93.

      24               (Exhibit Number 93 was marked for

02:35 25                identification and is attached hereto.)

1148

ALAN KANTOWITZ - January 7, 2025

```
02:35    1   BY MR. LOWENSTEIN:
         2        Q    All right.  Let's look at the executive
         3   overview.  You said -- December/January, it says,
         4   "Expenditures are tracking approximately 4.5 million ahead
02:36    5   of plan primarily due to delayed timing of various
         6   expenses (most notably equipment and marketing)."
         7             That was consistent with what we saw in the
         8   email; right?
         9        A    I think so.
02:36   10        Q    Okay.  And then you say, "Revenue tracking 5.5
        11   million.  And this is for December/January -- "Revenue
        12   tracking 5.5 million behind plan due to lower than
        13   budgeted ticket sales caused by a lack of awareness and
        14   general marketing."
02:36   15             What did you mean by that?
        16        MR. ALON:  Lacks foundation.
        17        THE WITNESS:  I think I meant what the bullet says,
        18   if I even drafted that bullet.
        19        MR. ENGEL:  Okay.  Well, I think that was the
02:36   20   objection.
        21   BY MR. LOWENSTEIN:
        22        Q    How much lower than -- but -- Brian.
        23        MR. ENGEL:  So you might want to ask him if he
        24   drafted the bullets.
02:36   25        MR. LOWENSTEIN:  I might and I will.
```

ALAN KANTOWITZ - January 7, 2025

02:36  1                  Let's try to stick to the rules.

      2     BY MR. LOWENSTEIN:

      3          Q     Did you draft -- rule adjacent.

      4                Did you draft the bullets on the executive

02:37  5     overview?

      6          A     I don't recall.

      7          Q     Okay.  Did you have knowledge of how much lower

      8     ticket sales were than what was budgeted for

      9     December/January time frame?

02:37 10          A     I don't recall if I specifically did.

     11          Q     And it says "caused by a lack of awareness."

     12                Do you know what that was referring to?

     13          A     Not specifically.

     14          Q     Can you assume -- well, I don't want you to

02:37 15     assume.

     16                Was it the belief at the AAF that ticket sales

     17     were lagging because there had been a lack of marketing up

     18     to the launch of the league?

     19          MR. ENGEL:  Object to the form.

02:37 20          THE WITNESS:  That's fair.  Among certain employees I

     21     would say yes.

     22     BY MR. LOWENSTEIN:

     23          Q     What does that mean?

     24          A     I think Charlie's perspective was that that was

02:37 25     the case.  I wasn't close enough to have my own opinion.

ALAN KANTOWITZ - January 7, 2025

| | | |
|---|---|---|
| 02:38 | 1 | Q And then it says, "Net cash expenditures 30.3 |
| | 2 | million. projected 1 million unfavorable to plan." |
| | 3 | Do you know what that means? |
| | 4 | A Not specifically. |
| 02:38 | 5 | Q And then -- and then it says, "Through end of |
| | 6 | season 1, expenditures projected to be 21 million |
| | 7 | favorable to budget largely due to reductions in |
| | 8 | production, national marketing, player relations and |
| | 9 | wellness departments and travel." |
| 02:38 | 10 | You see that? |
| | 11 | A Yes. |
| | 12 | Q Who drafted that bullet? |
| | 13 | A I don't recall. |
| | 14 | Q Who made the decision to cut $21 million from |
| 02:38 | 15 | the budget for production, national marketing, player |
| | 16 | relations and wellness and travel? |
| | 17 | A I don't know who made this specific decision. |
| | 18 | Charlie was the CEO. |
| | 19 | Q So he would have had ultimate say in that |
| 02:39 | 20 | decision to cut the expenses for production, national |
| | 21 | marketing, player relations, wellness and travel; correct? |
| | 22 | MR. ENGEL: Objection to form. |
| | 23 | THE WITNESS: That's right. |
| | 24 | BY MR. LOWENSTEIN: |
| 02:39 | 25 | Q And then it says, "Revenue projected to be 30 |

ALAN KANTOWITZ - January 7, 2025

02:41  1  these two pages out, original budget and revised budget.

2  They're on either side of the same --

3       A    Original budget.

4       Q    Okay.  If you follow league revenue through

02:41  5  the -- through season, in the original budget, it says

6  22 million.  See that?

7       A    22.7?

8       Q    No.  Follow league revenue all the way to the

9  end.

02:41  10      A    Oh, yes.

11      Q    22.148.

12      A    Yes.

13      Q    That was what the original budget was.  It's

14  been adjusted to league revenue of 15 million through the

02:41  15  season; correct?

16      A    Yes.

17      Q    And the description in the bullet of the reason

18  for that is minus 7 versus the 22 million budgeted due to

19  sponsorships lacking.

02:42  20           See that?

21      A    Yes.

22      Q    Okay.  What is your understanding of what's

23  being referred to in sponsorships lacking as of this email

24  in January 2019?

02:42  25      A    Sponsorship sales were slower than we

ALAN KANTOWITZ - January 7, 2025

02:42 1    anticipated.

2          Q    By $7 million?

3          A    That's what it looks like.

4          Q    And that was all sales that were occurring under

02:42 5    Mr. Ebersol and the board under his control; right?

6          MS. POYOUROW:  Objection to form.

7          MR. ENGEL:  Objection to form.

8          THE WITNESS:  There was another individual hired

9    responsible for sponsorship sales.  And to clarify, I

02:42 10   don't know if we were behind at 7 million at that point or

11   behind by a smaller amount that we were projecting

12   forward.

13   BY MR. LOWENSTEIN:

14         Q    Got it.

02:42 15        Who was responsible for sponsorship other than

16   Mr. Ebersol?

17         A    I believe his name was E.J. Johnson.  Eric

18   Johnson, maybe.

19         Q    Did he work for the league?

02:43 20        A    I think he was a third party independent

21   contractor and not an actual employee.

22         Q    Who oversaw sponsorship sales at the AAF?

23         A    Eric or E.J. Johnson, who I guess reported in to

24   Charlie.

02:43 25        Q    And then it says:  Digital revenue projected to

ALAN KANTOWITZ - January 7, 2025

02:43 1  be 4 million, which is 14 million behind what was the

2  budget shown to Mr. Fowler due to lack of marketing and

3  business model shift.

4          We've talked about lack of marketing.  Well,

02:43 5  actually, we haven't.

6          Do you have an understanding of what lack of

7  marketing as it referenced as it relates to the digital

8  revenue product meant?

9      MR. ENGEL:  Objection to form.

02:43 10     THE WITNESS:  Only at the highest of levels, which

11  was that we were going to do sponsorship around the league

12  and the digital product would be tied into that.

13  BY MR. LOWENSTEIN:

14     Q    And that was falling behind in what your

02:44 15  projections were for the efforts that have been done up

16  through January 2019; correct?

17     A    That appears to be what the bullet indicates.

18     Q    What does business model shift mean under the

19  digital revenue projected?

02:44 20     A    I don't recall specifics other than certain

21  features that we were anticipating being part of the app

22  experience, which included player tracking and interaction

23  potentially not being ready for season one.

24     Q    Did you understand at this point when they would

02:44 25  be ready, those digital features that would be revenue

ALAN KANTOWITZ - January 7, 2025

| | |
|---|---|
| 02:44 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 02:44 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 02:45 | 10 |

02:44   1   generating?

2        A    No.

3        Q    Do you know if the league ever brought in a

4   single dollar from its digital products?

02:44  5        MS. POYOUROW:  Objection.  Form.

6        THE WITNESS:  I don't know.

7   BY MR. LOWENSTEIN:

8        Q    Then it says:  Team revenue projected to be 40

9   million, 10 million about or minus 10 million from the 49

02:45 10   million budgeted due to lack of local sponsorships.

11            You see that?

12       A    Yes.

13       Q    Who was in charge of the local sponsorships up

14   to January of 2019?

02:45 15       A    My recollection is that it would have been a

16   combination of Tom Veit and Eric Johnson.

17       Q    And they ultimately would report to who?

18       A    Charlie.

19       Q    Now, I want you to take this Exhibit 92 -- I'm

02:45 20   sorry.  You're in 93, aren't you? -- and the revised

21   budget from 92.  And I want you to find -- is that the

22   one --

23            No, that's not the one I want.

24            I don't want that one.  I want the one for May.

02:46 25            The one -- the projections from May of 2018,

ALAN KANTOWITZ - January 7, 2025

02:46  1    which were Exhibit 516.

       2        A    I don't have anything labeled 516.

       3        Q    That one over.  So it was -- I think those got

       4    separated.

02:46  5        A    Oh, wait.  There's an email, 516.

       6        Q    Yeah, but then this -- this was attached.

       7    Whatever has that on it.

       8             There you go.  Yes, that was the attachment to

       9    516.

02:47 10             So flip -- find the -- yours looks different,

      11    though.

      12        A    Yeah.  Mine has a green top.

      13        Q    I know.  So does that.

      14        MR. ALON:  There's no reds.

02:47 15        MS. POYOUROW:  Counsel, can we take a five-minute

      16    break?

      17        MR. LOWENSTEIN:  Yes.  Sure.  Take a break.

      18        VIDEOGRAPHER LEVINE:  Off the record at 2:58.

      19             (A recess was taken from 2:58 p.m.

02:47 20              to 3:05 p.m.)

      21        VIDEOGRAPHER LEVINE:  Okay.  We are back on the

      22    record at 3:05.

      23    BY MR. LOWENSTEIN:

      24        Q    Okay.  Mr. Kantowitz, we're going to compare the

02:47 25    revised budget that was in your January 7th email, which

ALAN KANTOWITZ - January 7, 2025

02:47  1  was Exhibit 93, to the May 2018 budget that we looked at,

2  or projections that we looked at originally.

3          We're on the record.

4          In the projections from May of 2018, the total

02:48  5  revenue for the league through the end of 2019, if you add

6  2018 and 2019, was going to be $176 million; correct?

7     A   That appears to be correct.

8     Q   And in the revised budget that you sent to the

9  finance committee in January 2019, the total revenue

02:48  10  through the end of the 2019 season was predicted to be

11  $59 million.

12     MR. ENGEL:  Object to form.

13     THE WITNESS:  Can you point me to where that is

14  reflected?

02:48  15  BY MR. LOWENSTEIN:

16     Q   You have the right budget --

17     A   That looks to be the case.

18     Q   So that's -- between May of 2018 and January of

19  2019, that's a difference of projected revenue through

02:49  20  2019 of about $120 million; right?

21     A   Yes.  Although I haven't seen these documents in

22  a long time, and I don't know if these are calendar year,

23  fiscal year, you know, what month.  To be very clear, I'm

24  not exactly sure they line up.

02:49  25     Q   Fair enough.

ALAN KANTOWITZ - January 7, 2025

02:49  1          Just simple math, the difference between the
2    total revenue projected through season for 2019 versus the
3    revenues projected for 2018 and 2019 in Exhibit 516, that
4    difference is $120 million?

02:49  5          A    Between the --

6          MR. ENGEL:  Object to form.

7          THE WITNESS:  Between those two numbers you describe?

8    BY MR. LOWENSTEIN:

9          Q    Yes.

02:49  10          And now I want you to look at Exhibit 6, which
11   were the projection -- include the projections that were
12   sent to Mr. Dundon.

13         A    Okay.

14         Q    What were the revenues projected through 2019

02:50  15   to Mr. Dundon?

16         A    Looks like 64 million.

17         Q    Okay.  Can you account for the difference
18   between the projections projected to Mr. Dundon versus the
19   ones in the revised budget included in Exhibit 93?

02:50  20         MR. ALON:   Objection.  Lacks foundation.

21         THE WITNESS:  The difference between the 64 and the
22   59 of revenue?  Not specifically.

23   BY MR. LOWENSTEIN:

24         Q    I'm going to show you what I'll mark as -- I got

02:50  25   it.  Show you what's been marked as Exhibit 523.

ALAN KANTOWITZ - January 7, 2025

| | | |
|---|---|---|
| 02:59 | 1 | MR. ALON:  Lacks foundation. |
| | 2 | THE WITNESS:  Not specifically. |
| | 3 | MR. ENGEL:  Are you done with that exhibit? |
| | 4 | MR. LOWENSTEIN:  Yeah. |
| 02:59 | 5 | MR. ENGEL:  Can I have the Bates reference again? |
| | 6 | Sorry.  I couldn't write fast enough. |
| | 7 | MR. LOWENSTEIN:  Okay. |
| | 8 | MR. ALON:  It's right here.  We were sharing one. |
| | 9 | MR. LOWENSTEIN:  Look at the same page. |
| 02:59 | 10 | MR. ENGEL:  It's on the back? |
| | 11 | MR. LOWENSTEIN:  Yeah.  Top TR.  See it?  It's super |
| | 12 | big. |
| | 13 | MR. ENGEL:  I got it. |
| | 14 | BY MR. LOWENSTEIN: |
| 03:01 | 15 | Q    All right.  Showing you what's been marked |
| | 16 | Exhibit 524. |
| | 17 | (Exhibit Number 524 was marked for |
| | 18 | identification and is attached hereto.) |
| | 19 | BY MR. LOWENSTEIN: |
| 03:01 | 20 | Q    This is an email from you to Kevin Freedman, |
| | 21 | Kevin Farrell, referencing January cash requirements that |
| | 22 | you sent on January 11, 2019; correct? |
| | 23 | A    Yes. |
| | 24 | Q    It says, "Freedman, attached is PDF outlining |
| 03:01 | 25 | cash requirements for the next two weeks," which would |

ALAN KANTOWITZ - January 7, 2025

03:01 1    been the middle of the latter half of January 2019;
2    correct?
3         A    That appears to be correct.
4         Q    Those are still cash -- that's still money to be
03:01 5    spent before the launch of the league; right?
6         A    Yes.
7         Q    And it says, "These are critical payments that
8    are either in here because they are absolutely necessary
9    (items like payroll or mission critical to football
03:01 10   success) or way overdue and are color coded accordingly."
11             You see that?
12        A    Yes.
13        Q    So at least by January 11, 2019, the AAF was
14   aware that it was incurring -- had incurred expenses that
03:02 15   were way overdue.
16        A    That appears to be accurate.
17        Q    And was planning to continue toward launching a
18   league as of January 11, 2019; right?
19        A    I believe that's correct.
03:02 20        Q    And it says, "The second week was more of my
21   best estimation based on payments I'm aware of and
22   estimate for housing hotels that I know are due, but
23   Farrell should glance over when he gets a chance.  Note,
24   this also does not include any CBS fees."
03:02 25             Do you see that?

ALAN KANTOWITZ - January 7, 2025

03:02  1        A    Yes.

       2        Q    Do you know how much in CBS fees were going to

       3   be incurred between January 11 and the end of January

       4   2019?

03:03  5        A    I do not.

       6        Q    And if you look at that cash requirements for

       7   January, the remainder of January, those total about $11

       8   million; correct?

       9        A    Yes.

03:03 10        Q    How much money did the AAF have in the bank as

      11   of January 11, 2019?

      12        A    I don't know.

      13        Q    So under those ones that are marked red, you

      14   said highly critical, over 30 days overdue.

03:04 15             Do you see that?

      16        A    Yes.

      17        Q    So the highly critical and/or 30 days overdue,

      18   part of it was a January 15th payroll that would come due

      19   of two and a half million dollars; right?

03:04 20        A    Yes.

      21        Q    And then payroll for January week one and

      22   January week two for the players; right?

      23        A    That looks right.

      24        Q    So the players were obviously critical of the

03:04 25   league; correct?

ALAN KANTOWITZ - January 7, 2025

03:04  1          A    Yes.

2          Q    And had not been paid for January week one or

3    January week two, had they?

4          MR. ENGEL:  Object to the form.

03:04  5          THE WITNESS:  I guess at this point in time, no.

6    BY MR. LOWENSTEIN:

7          Q    And the second one for week ending March --

8    Friday, January 25, 2019, you see that?

9          A    Yes.

03:05  10         Q    There's league marketing and there's a company

11   called McGarry Bowen.

12         A    Yes.

13         Q    And that was a 1.5 million dollar line item.

14         A    Uh-huh.

03:05  15         Q    Do you know how old the invoices were that made

16   up that 1.5 million for McGarry Bowen, the marketing

17   company?

18         A    I do not.

19         Q    Show you what's been marked as Exhibit 20 --

03:05  20   previously marked as Exhibit 19.

21              (Exhibit Number 19 was marked for

22               identification and is attached hereto.)

23   BY MR. LOWENSTEIN:

24         Q    This is an email from you to Charlie and both

03:06  25   Kevins; correct?

ALAN KANTOWITZ - January 7, 2025

03:06  1        A    Yes.

       2        Q    Dated January 22, 2019; correct?

       3        A    Yes.

       4        Q    It says, "Farrell and I just spent the last few

03:06  5   hours going through this exercise.  By our estimation, it

       6   looks like there will be about 10 to 11 million of

       7   critical cash out the door between now and the opening

       8   weekend."

       9             And I don't have the Google sheet you're

03:06  10  referencing because I don't think the trustee was able to

       11  get it from Google.

       12       MR. ENGEL:  That's true.

       13  BY MR. LOWENSTEIN:

       14       Q    But that 10 to 11 million is close to the number

03:06  15  we looked at in that previous exhibit, isn't it?

       16       A    Yes.

       17       Q    And that was Exhibit --

       18       MR. ENGEL:  19.

       19       MR. LOWENSTEIN:  -- 19.  No, the previous one.

03:06  20       MR. ENGEL:  524.

       21       MR. LOWENSTEIN:  524.

       22  BY MR. LOWENSTEIN:

       23       Q    So it says, "Please note that this is my

       24  estimation of what is critical along with Farrell as a

03:07  25  second pair of eyes.  I did not include the majority of

ALAN KANTOWITZ - January 7, 2025

03:07  1    CBS fees and other large vendors like XOs and SMT that we

2    owe."

3              Do you know how much was owed to CBS and the

4    other large vendors like XO and SMT as of January 22nd?

03:07  5    A    I do not.

6    Q    Says, "I would consider these 'critical' given

7    they have raised them to us and they are long overdue.

8    But in the interest of this exercise and this game of

9    chicken, I have assumed we continue to push a bunch of

03:07 10   these when in reality, I have no clue whether or not we

11   will be able to."

12             See that?

13   A    Yes.

14   Q    Okay.  So you and Charlie and both Kevins were

03:07 15   aware as of January 22nd that there was a substantial

16   amount of money owing to critical vendors; correct?

17   A    Yes.

18   Q    And that you were trying to push them off so

19   that you could continue toward launching a league?

03:08 20   A    I would describe it as continuing to manage

21   accounts payable as we waited for Fowler to live up to his

22   funding obligation and launch the league.

23   Q    Well, wait.  We're in January 22, 2019.  Were

24   you still waiting around for Fowler to fund by then?

03:08 25   A    I believe so.

22-05077-cag  Doc#202-2  Filed 06/24/25  Entered 06/24/25 09:09:19  Exhibit A Designated
Kantowitz Deposition Pg 165 of 168 of 46

Document Page 68 of 46

ALAN KANTOWITZ - January 7, 2025

03:08  1      Q    And this was a month --

2      A    As far as I recall.

3      Q    And this was a month after the emails where you

4  all said you didn't -- where you said you didn't trust

03:08  5  him.  You were still waiting around for money from Fowler;

6  correct?

7      A    Yes.  Although I believe $13.4 million also came

8  in subsequent to that, which bought him some goodwill.

9  But my dates are, you know, obviously hazy five or six

03:08 10  years later.

11      Q    How much money was in the bank -- oh, no, we'll

12  get to that.  It's in here.

13           Well, you said, "I have assumed we continue to

14  push a bunch of these when in reality I have no clue

03:09 15  whether we want."

16           So the idea was continuing to push off the

17  obligations to critical vendors like CBS, XO, and SMT for

18  as long as you could; right?

19      A    Until we got, yeah, funds to pay them.  Sure.

03:09 20      Q    And it says, "There will also probably be

21  several critical invoices that pop up over the course of

22  the next three weeks that amount to about a million

23  dollars that are not accounted for in here"; right?

24      A    That's what it says.

03:09 25      Q    So you've got the 10 to 11 million that you're

ALAN KANTOWITZ - January 7, 2025

03:09  1    predicting, plus another probable million, and you didn't

2    account at all for CBS, XO, SMT, or other large vendors.

3    Is that a fair summary?

4        A    That's what this seems to say, yes.

03:10  5        Q    Okay.  You said, "By my estimation and based

6    on" -- we're still looking at Exhibit 19.

7            "By my estimation, and based on this analysis,

8    if MGM funds their 3.5 million we will need another 7

9    million to get through the first weekend."

03:10  10           See that?

11       A    Yes.

12       Q    So you knew as of January 22, as did Charlie,

13   that the league needed at least 7 million if it got the

14   money from MGM to get through the first week of play?

03:10  15       MS. POYOUROW:  Objection to form.

16       MR. ENGEL:  Same.

17       THE WITNESS:  That was my estimation.

18   BY MR. LOWENSTEIN:

19       Q    And you continued forward towards the league

03:10  20   launch and incurring these expenses without knowing where

21   that $7 million was coming from; right?

22       MR. ENGEL:  Objection.  Form.

23       THE WITNESS:  I believe, assuming it was coming from

24   Fowler or other sources as stated there but --

03:11  25   BY MR. LOWENSTEIN:

ALAN KANTOWITZ - January 7, 2025

03:11  1        THE WITNESS:  I don't know what you mean by -- by

     2  plan.  I think it's just a statement that here is what

     3  we -- here are the debts that we've incurred.

     4  BY MR. LOWENSTEIN:

03:12  5        Q    And will continue to incur?

     6        MS. POYOUROW:  Objection.  Form.

     7  BY MR. LOWENSTEIN:

     8        Q    Right?

     9        A    Ongoing incurrment, I think.  I don't know if

03:12 10  we're taking on additional obligations or not.

    11        Q    You say, "maybe and probably another 8 million

    12  that we will continue to push past opening weekend even

    13  though they will arise between now and then."

    14             You see that?

03:12 15        A    Meaning their payment date would have arised.

    16        Q    That's what your testimony is that that means?

    17        A    I believe so.  I'm just reading this for the

    18  first time.  I don't know.

    19        Q    And you understood that there would be

03:12 20  additional expenses being incurred between the time of

    21  this email and the league launch; right?

    22        A    I think that's accurate; right.

    23        Q    And the decision was made to press forward,

    24  incurring those additional obligations, knowing these

03:12 25  other vendors were owed money without a clear source of

ALAN KANTOWITZ - January 7, 2025

03:12   1    where the funds were going to come to cover all of that;
        2    right?
        3       MR. ENGEL:   Object to form.
        4       MS. POYOUROW:   Object to form.
03:12   5       THE WITNESS:   I think that's accurate.
        6    BY MR. LOWENSTEIN:
        7       Q    And Charlie understood that that was the
        8    decision that was being made by the AAF going forward from
        9    January 22, 2019; right?
03:13   10       MS. POYOUROW:   Objection.   Form.
      11       MR. ENGEL:   Objection.   Form.
      12       THE WITNESS:   Charlie understood.   Would you mind
      13    repeating exactly what it is that Charlie --
      14    BY MR. LOWENSTEIN:
03:13   15       Q    You were telling Charlie in this email that the
      16    decisions you all were making was that you were going
      17    forward and going to be incurring debts knowing there was
      18    existing debts without a clear source of where the funds
      19    were going to come from to cover those debts.
03:13   20       MR. ENGEL:   Objection to form.
      21       THE WITNESS:   Charlie made the decision to push
      22    forward with the league knowing that we had incurred
      23    significant liabilities that had not yet been paid and
      24    would continue to be pushed up -- pushed off.
03:13   25    BY MR. LOWENSTEIN:

ALAN KANTOWITZ - January 7, 2025

03:13  1          Q    Without a clear source of where the funds were

2    going to come from to pay any of them; right?

3          MR. ENGEL:  Objection to the form.

4          THE WITNESS:  I think that's accurate.

03:13  5    BY MR. LOWENSTEIN:

6          Q    And when you start football and bring the

7    players in, the expenses go up dramatically; correct?

8                Let me strike that.

9                When you -- when you bring players in and the

03:14 10    coaches and the league and start playing games, the

11    expenses of the league jump dramatically, don't they?

12          MR. ENGEL:  Object to the form.

13          THE WITNESS:  When training camp started, there were

14    larger bills to pay.  It's how I would describe it.

03:15 15    BY MR. LOWENSTEIN:

16          Q    But when you actually start putting games on the

17    field, you add player game checks, you add facility fees

18    and all of the production costs and everything else;

19    correct?

03:15 20          A    Correct.

21          Q    And at Charlie's direction, the league went

22    ahead and put the first week of games on the field, didn't

23    it?

24          MR. ENGEL:  Object to the form.

03:15 25          THE WITNESS:  Yes.

ALAN KANTOWITZ - January 7, 2025

| | | |
|---|---|---|
| 03:15 | 1 | BY MR. LOWENSTEIN: |
| | 2 | Q   Do you know how much that one week of games |
| | 3 | alone cost? |
| | 4 | A   Not specifically. |
| 03:15 | 5 | Q   And at the time that the decision was made to |
| | 6 | put that first week of games on the field, the league had |
| | 7 | no clear source of funds that were going to cover the |
| | 8 | expenses for doing that, did it? |
| | 9 | MR. ENGEL:  Objection to form. |
| 03:15 | 10 | THE WITNESS:  The expenses -- to clarify the |
| | 11 | expenses.  Can you clarify the question? |
| | 12 | BY MR. LOWENSTEIN: |
| | 13 | Q   Sure.  I mean, you -- you -- you've already |
| | 14 | outlined in Exhibit 19 all of the expenses that were going |
| 03:16 | 15 | to be required to get to the launch the first week of |
| | 16 | games; right? |
| | 17 | A   Uh-huh. |
| | 18 | Q   I need a yes or no because it doesn't translate. |
| | 19 | A   Yes, although I don't recall the specific |
| 03:16 | 20 | amounts and what was being paid and what was being pushed. |
| | 21 | Q   Right.  And -- and then you get to putting the |
| | 22 | first games on there and you've got to move players around |
| | 23 | the country, you've got to get facilities, you have to pay |
| | 24 | the players, you have to pay for the production.  All of |
| 03:16 | 25 | those expenses, just for week one, happened; right? |

ALAN KANTOWITZ - January 7, 2025

```
03:16   1        A    Yes.
        2        Q    And that decision was made to incur all of those
        3   expenses for that week one without any source of funds
        4   known to the league that was going to cover those
03:16   5   expenses; correct?
        6        MR. ENGEL:  Object to form.
        7        MS. POYOUROW:  Object to form.
        8        THE WITNESS:  Yes.  Other than Reggie's commitment.
        9   BY MR. LOWENSTEIN:
03:16  10        Q    Did you still feel like by the time that the
       11   games were put on the field in week one that Reggie was
       12   going to show up with the check?
       13        A    I don't recall specifically when, you know, in
       14   my mind, I realized or came to the, you know, the high
03:17  15   probability that Reggie was not going to live up to his
       16   obligations.
       17        Q    Do you think it was a good business decision to
       18   press forward and incur all those expenses in the hope
       19   that Reggie was going to show up with money?
03:17  20        MR. ENGEL:  Object to the form.
       21        MS. POYOUROW:  Object to form.
       22        THE WITNESS:  I don't know.
       23   BY MR. LOWENSTEIN:
       24        Q    You think that was sound business judgment to do
03:17  25   that?
```

ALAN KANTOWITZ - January 7, 2025

```
03:54   1   over the AAF's bank accounts?
        2       MR. ENGEL:  Object to the form.
        3       THE WITNESS:  Not to my recollection.
        4   BY MR. LOWENSTEIN:
03:55   5       Q    Do they have any ability to send funds from the
        6   AAF bank accounts?
        7       A    Not to my recollection.
        8       Q    Do you think it was a good process, based on
        9   where things were, that the Legacy AAF people were the
03:55  10   ones that were giving advice to Dundon Capital Partners on
       11   what expenses should be prioritized going forward?
       12       MS. POYOUROW:  Objection.  Form.
       13       MR. ENGEL:  Object to the form.
       14       THE WITNESS:  I don't have an opinion on that.
03:55  15   BY MR. LOWENSTEIN:
       16       Q    Was there a time for Dundon Capital Partners to
       17   come in and figure out on its own what vendors needed to
       18   be paid to keep putting football on the field?
       19       MR. ENGEL:  Object to form.
03:55  20       THE WITNESS:  I would say everything happened very
       21   quickly.  So they were relying on the folks who had been
       22   around the hoop, if you will, for the last 6 to 12 to 18
       23   months and had the relationships with the vendors to
       24   submit requests for funding and prioritize things
03:55  25   accordingly.
```

```
 1  STATE OF CALIFORNIA      )
                             ) ss.
 2  COUNTY OF LOS ANGELES    )

 3

 4        I, ANN BONNETTE, C.S.R. No. 6108, do hereby

 5  certify:

 6        That prior to being examined, the witness named in

 7  the foregoing deposition, ALAN KANTOWITZ, was by me

 8  administered an oath to testify the truth, the whole

 9  truth, and nothing but the truth;

10        That said deposition was taken before me at the

11  time and place therein set forth and was taken down by me

12  in shorthand and transcribed into computer-generated text

13  under my direction and supervision; and I hereby certify

14  the foregoing transcript of my shorthand notes so taken.

15        I further certify that I am neither counsel for nor

16  related to any party to said action nor in any way

17  interested in the outcome thereof.

18        IN WITNESS WHEREOF, I have hereunto subscribed my

19  name this 16th day of January, 2025.

20

21

22                         _____

23                                   ANN BONNETTE

24

25
```

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DUNDON CAPITAL PARTNERS, LLC, ) | CASE NO: 22-05077-cag | |
| ) | ADVERSARY | |
| Plaintiff, ) | | |
| ) | San Antonio, Texas | |
| vs. ) | | |
| ) | Friday, January 31, 2025 | |
| CHARLES EBERSOL, ET AL, ) | | |
| ) | 8:53 a.m. to 10:57 a.m. | |
| Defendants. ) | 12:20 p.m. to 4:57 p.m. | |
| RANDY OSHEROW, IN HIS CAPACITY ) | | |
| AS CHAPTER 7 TRUSTEE, ET AL, ) | | |
| ) | | |
| Plaintiffs, ) | CASE NO: 22-05078-cag | |
| vs. ) | ADVERSARY | |
| ) | | |
| THOMAS G. DUNDON, ET AL, ) | | |
| ) | | |
| Defendants. ) | | |

LEAD CASE: 19-50900-cag
LEGENDARY FIELD EXHIBITIONS, LLC
AND AAF PROPERTIES, LLC

MOTIONS HEARING

BEFORE THE HONORABLE CRAIG A. GARGOTTA,
CHIEF UNITED STATES BANKRUPTCY JUDGE

CALENDARED MOTIONS:        SEE PAGE 2

APPEARANCES:        SEE PAGES 2, 3

Deputy Clerk:        Roxanne Mujica

Court Reporter:        Recorded

Transcribed by:        Exceptional Reporting Services, Inc.
                      P.O. Box 8365
                      Corpus Christi, TX 78468
                      361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>CALENDARED MOTIONS</u>:

RE 22-05077-cag:

    MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF
                    [DKT.NO.102];

      MOTION TO EXCLUDE EXPERT TESTIMONY OF ERICA BRAMER
                    [DKT.NO.129];

OBJECTION TO DUNDON CAPITAL PARTNERS, LLC'S EVIDENCE IN SUPPORT
        OF SUMMARY JUDGMENT RESPONSE [DKT.NO.137];


RE 22-05078-cag

      MOTION FOR SUMMARY JUDGMENT AND BRIEF [DKT.NO.173];

        MOTION FOR SUMMARY JUDGMENT [DKT.NO.175]


<u>APPEARANCES</u>:

For Charles Eberson:     TOM HORAN, ESQ.
                      Thompson Coe Cousins & Irons
                      700 N. Pearl Street
                      Suite 2500
                      Dallas, TX 75201
                      214-871-8241

                      MICHAEL J. SALTZ, ESQ.
                      Jacobson Russell Saltz Nassim, et al.
                      1800 Century Park East
                      Suite 900
                      Los Angeles, CA 90067
                      310-446-9900


For Chapter 7 Trustee:   BRIAN S. ENGEL, ESQ.
                      Barrett Daffin Frappier Turner & Engel
                      3809 Juniper Trace
                      Suite 205
                      Austin, TX 78738
                      512-687-2500

3

**APPEARANCES:**                    CONTINUED

For Chapter 7 Trustee:     NICOLE WILLIAMS, ESQ.
                           JOHN P. ATKINS, ESQ.
                           KATHARINE B. CLARK, ESQ.
                           Thompson Coburn

                           2100 Ross Avenue
                           Suite 3200
                           Dallas, TX 75201
                           972-629-7113

                           JONATHON S. FARAHI, ESQ.
                           Abir Cohen Treyzon Sala
                           16001 Ventura Boulevard
                           Suite 200
                           Encino, CA 91436
                           424-288-4367

Also appearing:            SIMONE ALEXANDERDLY, ESQ.

For DCP Parties:           JEFFREY S. LOWENSTEIN, ESQ.
                           GWEN I. WALRAVEN, ESQ.
                           Bell Nunnally & Martin
                           2323 Ross Ave.
                           Suite 1900
                           Dallas, TX 75201
                           214-740-1410

                           BRENT D. HOCKADAY, ESQ.
                           K&L Gates
                           1717 Main St.
                           Suite 2800
                           Dallas, TX 75201
                           214-939-5677

                           LAURA LAVERNIA, ESQ.

4

22-05077-cag Doc#181-1 Filed 02/06/25 Entered 02/06/25 59:19:19 Main Document Pg 4 of
Documents Page 177 of 1466

1          **San Antonio, Texas; Friday, January 31, 2025; 8:53 a.m.**

2                            **(Call to Order)**

3          **THE COURT:**  This is our 8:30 docket.  We have several

4    matters set on the docket this morning.

5          In Adversary 22-05077, Dundon Capital Partners, LLC

6    versus Ebersol.  We've got ECF Number 102, the Motion for

7    Summary Judgment and Brief, filed by Defendant Ebersol; ECF

8    129, the Motion to Exclude Expert Testimony of Erica Bramer;

9    ECF 137, the Objection to Dundon Capital's Evidence in Support

10   of Summary Judgment Response.

11         And on Page 2, Adversary 22-05078, Osherow, as

12   Chapter 7 Trustee, versus Dundon, et al.  ECF Number 173, the

13   Motion for Summary Judgment filed by Defendant Thomas Dundon,

14   Dundon Capital Partners; ECF 175, the Motion for Summary

15   Judgment filed by Defendant John Zutter.

16         All right.  Let's take appearances, shall we?

17         **MR. HORAN:**   Tommy Horan and Michael Saltz on behalf

18   of Charley Ebersol.

19         **MR. SALTZ:**  Good morning, Your Honor.

20         **THE COURT:**  Good morning.

21         **MR. ENGEL:**  Good morning, Your Honor.

22         **THE COURT:**  Good morning.

23         **MR. ENGEL:**  Brian Engel for the trustee.  I'm here

24   with Nicole Williams, John Atkins, Katharine Clark of the

25   Thompson Coburn law firm.  And Simone -- and I'm going to

1   butcher your last name, Simone.

2           **MS. ALEXANDERDLY:**  Alexanderdly (phonetic).

3           **MR. ENGEL:**  What she said **--** and Jonathon Farahi, all

4   on the trustee's side of the ledger, Your Honor.

5           **THE COURT:**  Okay.  Are you all going to be speaking

6   this morning?

7           **MR. ENGEL:**  I believe I will not have a role this

8   morning.  I don't **--**

9           **THE COURT:**  That should save some time.

10      (Laughter)

11          **MR. ENGEL:**  You know what, Judge?  I'm going to take

12  that like a man.  It's done out of love, I'm sure.

13          **THE COURT:**  It is.

14          **MS. WILLIAMS:**  Your Honor, the plan is for Nicole

15  Williams, Katharine Clark and John Atkins to be (inaudible).

16          **THE COURT:**  All right.  Go ahead, please.

17          **MR. LOWENSTEIN:**  Good morning, Your Honor.  Jeff

18  Lowenstein, Brent Hockaday, Gwen Walraven and she's a new one

19  showing up in your court.  I'll spell that last name,

20  W-a-l-r-a-v-e-n, and Laura Lavernia, L-a-v-e-r-n-i-a, all

21  representing the DCP parties, including Dundon Capital

22  Partners, Tom Dundon and John Zutter.

23          **THE COURT:**  All right.  Thank you.

24          So where do we start this morning?  I believe

25  Mr. Horan, you wanted to go first and I'm happy to accommodate

6

1  that but we also have objection to summary judgment evidence.

2  So how do we proceed?

3        MR. HORAN:   Yes, sir.  My suggestion would be to

4  start with the motion to exclude.

5        THE COURT:  Okay.

6        MR. HORAN:  And then the objections, I've conferred

7  with opposing counsel.  I think that we're fine, Judge, with

8  you listening to all the evidence today, take everything

9  advisement and then you can rule accordingly on those.  I don't

10  believe argument is needed unless you would like argument on

11  some of those objections.

12        THE COURT:  I'd like to get done today and I say that

13  with no silliness intended.  There's a lot to work through.  It

14  would be easier to make a record so I don't have to go through

15  and have my law clerks write one by one on all this stuff.  I

16  mean some of the objections are line items, right?

17        MR. HORAN:  They are, Your Honor.

18        THE COURT:  But if you want me to -- if you want to

19  proceed and then -- I mean what are you looking for in terms

20  from the Court?  Do you see what I'm saying?  Because I can go

21  grant it, deny, grant it, deny, but if you're looking for a

22  more fulsome rendition from the Court and you want me to do

23  that in connection with summary judgment, it'll lengthen the

24  process a little bit for me to issue an order.

25        MR. HORAN:  Maybe a --

2:22-cv-05077-eaq   Doc #1581   Filed 02/06/25   Entered 02/06/25 09:19:19   Main Document Designated Page of
Documents Pg 1180 of 1466

7

1   **THE COURT:**  Do you see what I'm saying, Mr. Holzer?

2   **MR. HORAN:**  We'll just have you rule, Judge.

3   **THE COURT:**  You don't want to argue anything?

4   **MR. HORAN:**  Argue three of them.

5   **THE COURT:**  I'm sorry?

6   **MR. HORAN:**  I'll argue three of them.

7   **THE COURT:**  Okay.

8   **MR. HORAN:**  There's (indisc.).  And they aren't the

9   line items.  They're actually exhibits and so that should be

10  fairly --

11  **THE COURT:**  Straightforward.

12  **MR. HORAN:**  -- straightforward, pretty simple.

13  **THE COURT:**  Okay.  So do we want to -- so we want to

14  take up the motion to exclude first, right?

15  Okay.  A housekeeping matter.  And I may have told

16  you-all this the last time you were here.

17  I have it's noon Eastern Time but 11:00 o'clock our

18  time, a board meeting I really need to make.  So we're going to

19  adjourn early for our lunchbreak.  I apologize for that.  Maybe

20  you had a fulsome breakfast this morning, you might not be too

21  hungry.  I'm hoping an hour and 15 minutes should allow me to

22  do that and eat and then I'll have you back and then you'll

23  have the duration of the afternoon.  I'm sorry for that but

24  it's a commitment I made, it's my second of three jobs that I'm

25  currently doing.  So and my editor and chief is it's Judge

 1  Michelle Hunter out of Maryland and she's very focused.  So I'd

 2  like to make that board meeting so my apologies if we start

 3  early.

 4         So all right.  So you want to argue the -- let's make

 5  sure we're on the record on this.

 6         Who's going to be responding to the motion to exclude

 7  the testimony?

 8         **MR. LOWENSTEIN:**  I will, Your Honor.

 9         **THE COURT:**  All right.  Very good.

10         So this is just for the record because we've got a

11  lot of moving parts here.  This is ECF Number 129, the motion

12  to exclude expert testimony of Erica -- is it Bramer or Bramer

13  (pronunciation)?  I'm sorry, I don't know how to pronounce it.

14         **MR. HORAN:**  I believe it's Bramer, right?

15         **MR. LOWENSTEIN:**  Bramer, Your Honor.

16         **THE COURT:**  Thank you so much.

17         This is in Case Number 22-05077.  Thank you.

18         For the record, please?

19         **MR. HORAN:**  Yes, sir.  Tommy Horan on behalf of

20  Charles Ebersol.

21         **THE COURT:**  Go ahead, sir.

22         **MR. HORAN:**  Good morning, Your Honor.

23         The first matter we are here on today is Defendant

24  Ebersol's motion to exclude the testimony of Ms. Bramer.  We

25  are moving on two grounds, Your Honor.

2:22-cv-05077-eag Doc #1381 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Designated Documents Page 1182 of 1466

1       The first is that the testimony is unreliable and

2   irrelevant and the second is that it is unnecessary for the

3   Court to consider in this matter.

4       Your Honor, I think it might be helpful to start with

5   what Ms. Bramer's -- says her opinion is and that's found on

6   Exhibit A, Your Honor, of our motion.  And for reference, the

7   bottom of the page says Exhibit C, Page 11 since there's

8   multiple labels on there.

9       **THE COURT:**  Okay.  Let me go to it real quick,

10  please.

11      **MR. HORAN:**  And I believe that might be Binder 3 or I

12  don't know what Your Honor is ...

13      **THE COURT:**  Just one second.  Okay.  I've got it up

14  here on my screen so what --

15      **MR. HORAN:**  Thank you, sir.  I'm looking at Paragraph

16  7.

17      **THE COURT:**  And which exhibit are you looking at

18  again, please?

19      **MR. HORAN:**  This is Exhibit A to our motion.

20      **THE COURT:**  All right.  Thank you.  This will be, as

21  you can see, I'm running out of space up here and it is what it

22  is.  And so these are the -- what page again?

23      **MR. HORAN:**  I'm on page -- at the bottom, Your Honor,

24  it might say Exhibit C, Page 11 of 87.

25      **THE COURT:**  Okay.  We have a disconnect here because

```
 1    what I'm looking at -- oh, okay, I see.

 2         MR. HORAN:  I'm not going to make you flip back and

 3    forth too much.

 4         THE COURT:  Thank you.  And the page again, I'm

 5    sorry?

 6         MR. HORAN:  Page 11 of 87.

 7         THE COURT:  All right.  Thank you.  Go ahead.

 8         MR. HORAN:  And I'm at Paragraph 7, Your Honor, and

 9    this is how Ms. Bramer characterizes what she was asked to do.

10              "I've been asked to perform certain analysis [sic]

11              relevant to DCP's claim that DCP would not have made

12              its 70 million dollar capital investment into AAF on

13              February 14th, 2019 had Mr. Ebersol individually and

14              on behalf of the debtors made accurate financial

15              represations [sic] and made full proper disclosure."

16         Your Honor, we contend that on its face I don't

17    really know what Ms. Bramer is going to add to this matter.

18    Using her own words it appears as though she has been asked to

19    say what DCP would or would not have done based on -- in the

20    transaction.

21         I don't know that -- well, one, Ms. Bramer did not

22    interview or review any depositions from the DCP parties.

23         THE COURT:  Doesn't that go to the weight, though?  I

24    mean did he have to look at the depositions to form an opinion?

25              MR. HORAN:  She doesn't have to, Your Honor, but that
```

11

1    would also then move into the second point to which is the

2    reliability issue.  If there's evidence out there as far as

3    what they would or wouldn't have done, you would have expected

4    her to review that.  You would have expected her to review

5    whether or not there was testimony about who paid the funds.

6    She didn't review any of that.  Was there testimony about

7    whether or not a contract was actually entered into?  She

8    didn't review any of that.  So that goes straight to the

9    question of, are her opinions reliable and are they relevant?

10           Your Honor, we cited caselaw in our response and it's

11   the -- let me find it for you.  It's the Guillory versus Domtar

12   Industries case, Your Honor.  That's 95 F.3d 1320.

13           **THE COURT:**  What page are you on?

14           **MR. HORAN:**  I'm on Page 5 of my response, Your

15   Honor -- or motion, Your Honor.  It says:

16           "Certainly nothing in Rule 703 requires a court to

17           admit an opinion based on facts that are indisputably

18           wrong.  Even if Rule 703 will not require the

19           exclusion of such an unfounded opinion, general

20           principles of relevance will.  In other words, an

21           opinion based totally on incorrect facts will not

22           speak to the case at hand and hence will be

23           irrelevant."

24           So Your Honor, I think there is room for you to

25   consider whether or not -- now I agree with you.  There is the

1   question of weight versus admissibility but in this instance,

2   with the evidence that's before the Court as far as DCP's own

3   parties admitting they did not pay the money and Ms. Bramer's

4   entire opinion is based upon, well DCP entered into this

5   contract and they paid this money.

6           There's undisputable evidence that that did not

7   happen.  She did not consider that at all.  Our argument will

8   be therefore it renders her entire opinion irrelevant and

9   unreliable.

10          **THE COURT:**  Okay.  Anything else?

11          **MR. HORAN:**  No, Your Honor.  I'll allow a response.

12          **THE COURT:**  All right.  Thank you.  For the record,

13  please?

14          **MR. LOWENSTEIN:**  Jeff Lowenstein, Your Honor.

15          **THE COURT:**  Go ahead, Mr. Lowenstein.

16          **MR. LOWENSTEIN:**  Looking at Ms. Bramer's opinion,

17  what Mr. Horan cited to.  What she says is:

18          "I've been asked to perform certain analysis relevant

19          to DCP's claim."

20          It doesn't say I have an opinion on the mental state

21  of the parties or whether they relied or anything like that but

22  what her opinions are as she calculated undisclosed -- well,

23  she didn't even get into undisclosed.  She said, "I understand

24  there was not disclosed debts.  What I did is went and looked

25  through the records of the debtors and calculated that those

13

1   debts as of this date totaled 18 million dollars." That's what

2   her opinion is in this. And had you added those 18 million

3   dollars to Mr. Ebersol's represented amount needed to complete

4   the season, it would -- the money would have run out in this

5   amount of time.

6           THE COURT: And why is that relevant for the Court's

7   consideration?

8           MR. LOWENSTEIN: Because we have a fraud claim both

9   in built into our claim against the estate and against

10  Mr. Ebersol. And this is Mr. Ebersol's motion so one of the --

11  and we'll get into this in the summary judgment but one of the

12  issues there is that what Mr. Ebersol told Mr. Dundon and DCP

13  is that there was 5.1 million dollars needed to cover player

14  salaries and that everything else -- I'll show you Mr. Dundon's

15  actual words when we get to the summary judgment on this exact

16  issue -- that they had funded the league up to that point and

17  ran out as Mr. Fowler went away and didn't fund the 5.1 million

18  they needed for players. That's the testimony. What we

19  discovered after the fact is that there was 18 million dollars

20  of vendor debt owed and another five million dollars of

21  immediately due lender debt that was not disclosed.

22          THE COURT: All right. And so as a result

23  Ms. Bramer -- how would her testimony assist the Court?

24          MR. LOWENSTEIN: She's the one that calculated it

25  because I did not want to go through the effort nor do I think

1    I could have of going through all of the records, the two

2    million-plus pages of documents that were produced by the

3    trustee, to go through the invoices and the exercise of

4    everything else to figure out what was due before February 14,

5    2019 when this deal happened.  And so she went through all of

6    that.  She explains there's different categories of things that

7    she excluded.  She had to make some estimations based on ones

8    that were kind of a mid-month February obligation and

9    allocating some before and after.  It --

10         **THE COURT:**  Forgive me.  And you answered my

11   question.  I'm sorry to interrupt you.

12         So she's being offered on a fairly limited basis.

13   Would that be accurate?

14         **MR. LOWENSTEIN:**  With respect to the Ebersol claim,

15   yes.

16         **THE COURT:**  Okay.  Is she being offered as an expert

17   on other issues as well?

18         **MR. LOWENSTEIN:**  In the trustee's case she has been

19   offered on other issues.  She had a rebuttal report to the

20   trustee's expert so she's being offered in rebuttal to the

21   trustee's expert on the evidence.

22         **THE COURT:**  And very briefly, what is the rebuttal

23   testimony that she's going to provide to the Court if allowed?

24         **MR. LOWENSTEIN:**  She rebuts -- so the trustee's

25   expert has a whole lot of opinions but the primary ones that

15

1  Ms. Bramer is going to respond to relate to the value of the

2  league at two different points in time, February 13th, 2019

3  right before Mr. Dundon ad DCP's investment and April 2nd, 2019

4  when the league was shut down.  And so she offers two opinions

5  on value of the company or of the AAF of the debtors and those

6  two different times.  And I don't know if she's going to try to

7  give an opinion on whether of causation there or not but she

8  gives opinions on amounts.  So Ms. Bramer went in and critiques

9  the significant issues with those damage opinions.

10        **THE COURT:**  Does Mr. Horan's motion go to that as

11  well?  I mean is he moving to exclude all of it?  Mr. Horan?

12        **MR. HORAN:**  No, Your Honor, I'm not.  Just as to the

13  opinions related to Mr. Ebersol in --

14        **THE COURT:**  That's what I -- I read it.  I just

15  wanted to understand.  So thank you, sir.

16        Go ahead, Mr. Lowenstein.

17        **MR. LOWENSTEIN:**  And I'm not actually -- I think what

18  Mr. Ebersol's motion goes to in excluding Ms. Bramer is that

19  they think they're going to win on their summary judgment.  And

20  if they win on their summary judgment then Ms. Bramer won't be

21  necessary and that's probably true.

22        **THE COURT:**  But that's --

23        **MR. LOWENSTEIN:**  But that's not a basis for excluding

24  an expert.

25        **THE COURT:**  Understood.  Anything else you wish

1  7to --

2       **MR. LOWENSTEIN:** No, Your Honor.

3       **THE COURT:** All right. Mr. Horan?

4       **MR. HORAN:** Yes, Your Honor. As I understand it,

5  Ms. Bramer is being offered for some causation issues as far as

6  what DCP would or would not have done. To the extent she's

7  being offered as far as, well, how much was the actual alleged

8  amount not disclosed, that's not only relevant to the case,

9  Your Honor, or their claims because whether it was a dollar or

10 a hundred million dollars, it's not as though she's -- they're

11 seeking damages related to any of her opinions. So whatever

12 she calculated, it's neither here nor there. The question is,

13 based on their claims is they're going to have to prove was

14 there a misrepresentation made by Mr. Ebersol? They contend

15 there was. And so I don't know what Ms. Bramer actually adds

16 to the case at this point.

17       **THE COURT:** All right. Thank you.

18       So I hadn't had a motion to exclude expert testimony

19 in my court -- no, I mean, a little war story here -- for

20 years, for years. And then I have a case filed here by a

21 trustee in a case and we had all sorts of experts and I had

22 multiple motions on whether to exclude or not exclude and

23 things like that. And so I'm not telling you-all something you

24 don't know.

25       The first thing obviously is it's a question of

1   gatekeeping.  And when you have a non-jury trial, the deference

2   given to the trier of fact, which is the Court, the judge, it's

3   understood that the judge can sit through and make the

4   appropriate determination as to whether or not, for example,

5   something is relevant to the inquiry or if it's unreliable and

6   so the court can do that.  That's what I'm supposed to do every

7   day.

8           The second thing really goes to the issue of weight.

9   And I say this all the time.  You'll just have to indulge me.

10          Right as I took the bench, John Akard, former

11  bankruptcy judge -- I refer to him as "Class of '54," I'm class

12  of "80" -- said, "Craig, remember.  Sometimes you can let stuff

13  in and give it the appropriate weight.  And if you let it in

14  but don't give it any weight, it really doesn't matter."  And I

15  thought, gosh, that's really smart.  And so some of this goes

16  to the weight of the testimony.  And I'm really not going to

17  know that until I really get to hear it whenever that point may

18  or may not be.

19          I did review your moving papers.  While I understand

20  why there was a motion to exclude testimony, there's a couple

21  things that aren't contested.  There's no issue that she's not

22  competent, that she doesn't have the proper credentials to do

23  this type of work, it's just a question of whether or not her

24  work will or will not assist the Court in the ultimate

25  factfinding determination.

1          Based upon what's presented to the Court, I view this

2    more as a relevancy and weight issue and I'll make that

3    determination at the appropriate time.  So for the reasons I've

4    expressed on the record, the motion to exclude is denied.

5          **MR. HORAN:**  Thank you, Your Honor.

6          **THE COURT:**  Thank you.  What's next?

7          **MR. HORAN:**  The objection to summary judgment

8    evidence, Your Honor.

9          **THE COURT:**  All right.  So one moment.  So what I'm

10   going to do just for the record is I'm going to watermark the

11   proposed order as denied for the reasons stated on the record.

12         Okay, let me catch up with you.  Could you give me

13   song and verse, please.  Which exhibit are we looking at?

14         **MR. HORAN:**  Yes, sir.

15         **THE COURT:**  I mean which pleading are we looking at?

16         **MR. HORAN:**  This is Dundon's response, Your Honor.

17         **THE COURT:**  Okay.  So which objections are we looking

18   at?

19         **MR. HORAN:**  We're looking at Exhibits 16, 17 and 31.

20         **THE COURT:**  Okay.  So -- I'm sorry, ECF number if you

21   would, please?

22         **MR. HORAN:**  Yes, sir.  It's my document is 137.

23         **THE COURT:**  Got it.  Okay.  So 137.  And now that I

24   have that before me, the attachments are to which response,

25   please?

1          **MR. HORAN:**  It would be to Dundon's response to our

2    motion for summary judgment.

3          **THE COURT:**  And what's that number, please?

4       **(Counsel confers)**

5          There's a reason I'm asking these questions.  It

6    helps keep the record if we know what we're talking about.

7          That's fine, take your time.

8          **MR. HORAN:**  It's on that binder.

9          **THE COURT:**  I'm trying to avoid going through the

10   binder if I can.

11         The response to the **--** because that's the exhibits

12   that were attached.

13         **UNIDENTIFIED SPEAKER:**  142-1.

14         **THE COURT:**  All right.  So basically what this

15   objection relates **--** well, okay.  To 142?

16         **MR. HORAN:**  One-forty-two and then it'd be Exhibit

17   16, 17 and 31.

18         **THE COURT:**  I only see two exhibits.  That's why I'm

19   asking.  I see Exhibit 1, the Revised Plaintiff Dundon Capital

20   Partners' Response and Exhibit A, the Corrected Cantowitz

21   (phonetic) Deposition Excerpts.

22         **MR. HORAN:**  Judge, I think it's 124 is the document

23   that we should be on.

24         **MR. LOWENSTEIN:**  Your Honor, I think we filed **--** and

25   I don't know how this works but I'm just going to say it.  The

20

1    exhibits were done like the -- the Exhibit 16 is filed as ECF

2    Number 124-16.  Is that right?

3              MR. HORAN:  Yes.

4              MR. LOWENSTEIN:  And then 17 would be 124-17.  What's

5    the other one?  Thirty-one?

6              MR. HORAN:  Thirty-one.

7              MR. LOWENSTEIN:  Would be 124-31.

8              THE COURT:  Okay.  So I've got 124 and we're trying

9    to keep a record so for purposes of the record this is ECF 124

10   in Adversary 05077.  And specifically you want the Court to

11   look at which exhibit?

12             MR. HORAN:  Exhibit 16, Your Honor.

13             THE COURT:  All right.  And would you identify it on

14   the record, please?

15             MR. HORAN:  Yes, sir.  This is a letter to

16   Mr. Ebersol, dated July 31st, 2018 from the Law Firm of Hand

17   Baldachin Associates, LLP.

18             THE COURT:  The Court has that so go ahead, please.

19             MR. HORAN:  Your Honor, simple objection, hearsay.

20   This is not a letter from Mr. Ebersol, it's a letter to

21   Mr. Ebersol.  It's hearsay on its face, Your Honor.

22             THE COURT:  All right.  So do you want to go one by

23   one and I'll let the other side respond and that might make it

24   easier?

25             MR. HORAN:  Yeah.

22-05077-cag Doc#258-1 Filed 02/06/25 Entered 02/06/25 09:17:19 Main Document Designated Page 21
Documents Pg 0194 of 1466

21

1          **THE COURT:**  Because point by point.  So let me hear,

2    why isn't this hearsay?

3          **MS. WALRAVEN:**  Do you want me to approach, Your

4    Honor?

5          **THE COURT:**  You-all get along well enough so you can

6    share the podium, right?  Otherwise it's going to make it

7    very --

8          **MR. HORAN:**  Not a problem.

9          **THE COURT:**  -- burdensome to do this.

10         **MR. HORAN:**  And Your Honor, for the record, 17 is

11   another letter and so I think 16 and 17 could be taken up at

12   the same time.

13         **THE COURT:**  That's fine, I agree.

14         **MS. WALRAVEN:**  Okay.  And Your Honor, it goes to --

15         **THE COURT:**  For the record, you are, please?  Excuse

16   me.

17         **MS. WALRAVEN:**  I'm sorry?

18         **THE COURT:**  Would you identify yourself for the

19   record?

20         **MS. WALRAVEN:**  Gwen Walraven.

21         **THE COURT:**  All right.  Go ahead, Ms. Walraven.

22         **MS. WALRAVEN:**  Okay.  So Exhibit 16, 124-16, as to

23   the hearsay objection it goes to notice.  That would be the

24   same for Exhibit 17 which is 124-17.

25         **THE COURT:**  Notice as to what?

22-05077-cag Doc#258-1 Filed 02/06/25 Entered 02/06/25 15:09:11 Main Document Pg 40 of 21 22-05077 Designated Documents Page 1195 of 1466

22

1    MS. WALRAVEN:  Notice as to the demand of a pending

2  lawsuit.

3    THE COURT:  Okay.  Your response?

4    MR. HORAN:  As far as notice, Your Honor, I mean I'm

5  not really sure.  I might have to brush up on my hearsay

6  exceptions but I'm not sure that that's necessarily an

7  exception to the hearsay rule.

8    THE COURT:  That was going to be my question.  So is

9  it or is it not an exception to the hearsay rule?

10    MR. HORAN:  I don't believe it is.  I mean I think

11  it's being offered for the truth of the matter asserted which

12  is there were claims asserted against Mr. Ebersol that he knew

13  about and so I don't believe that is an exception.

14    THE COURT:  Your response?

15    MS. WALRAVEN:  Well, Your Honor, it doesn't go for

16  the truth of the matter asserted, it goes to his knowledge.

17    THE COURT:  His knowledge of what?

18    MS. WALRAVEN:  Knowledge of the claims and the

19  potential for the claims.

20    THE COURT:  No, it's hearsay and the objection's

21  sustained.

22    MR. HORAN:  Is that for 16 and 17?

23    THE COURT:  So I'm sure somebody is going to be

24  taking notes for me so I'm going to get a proposed form of

25  order on what's allowed and what isn't okay?  We've had **--**

1  trust me, we've got plenty of work to do so you're going to

2  help the Court out a little bit.

3          So that objection is sustained.

4          Go ahead, please.

5          **MR. HORAN:**  Your Honor, 17 is the next one.  It's

6  another letter from the same law firm.

7          **THE COURT:**  Ms. Walraven, your response is?

8          **MS. WALRAVEN:**  Same argument, Your Honor.

9          **THE COURT:**  All right.

10         **UNIDENTIFIED SPEAKER:**  Before you sustain it can I --

11 are you okay with --

12         **THE COURT:**  No.  One by one.

13         **UNIDENTIFIED SPEAKER:**  All right.  Can I whisper in

14 her ear?

15         **THE COURT:**  Sure.  You can do that.

16     **(Pause)**

17         **MS. WALRAVEN:**  Your Honor, we're not offering 17 for

18 purposes of saying the claim was legitimate, just that he had

19 notice of the claims against ESMG.

20         **THE COURT:**  And you think that's an exception to the

21 hearsay rule?

22         **MS. WALRAVEN:**  Yes.

23         **THE COURT:**  Based on which provision?  So let's pull

24 out our rules.

25     **(Pause)**

24

1        So 803 is the exceptions to the rule against hearsay.

2   So which provision makes this under notice?

3        **MS. WALRAVEN:**  It doesn't meet the definition of

4   hearsay, Your Honor.

5        **UNIDENTIFIED SPEAKER:**  I think it's gonna -- sorry,

6   Your Honor.

7        **THE COURT:**  I mean if you-all are going to make these

8   evidentiary objections, presumably you want me to rule on the

9   rules.  I'm not being sarcastic.  So you think it's 802, the

10  rule against hearsay?  Because you would admit as an initial

11  matter, it's hearsay.  It's an out-of-court statement, right?

12  Sounds like party opponent.

13       **UNIDENTIFIED SPEAKER:**  Absolutely.

14       **MS. WALRAVEN:**  But we're not offering it for the

15  truth of the matter asserted.

16       **THE COURT:**  I hear that all the time but you want to

17  get it in so why are you trying to get it in?  What's the

18  evidentiary effect of this document?  Call your cocounsel.

19       **(Pause)**

20       **MS. WALRAVEN:**  Your Honor, it goes to his state of

21  mind, Mr. Ebersol's state of mind that he had notice of a claim

22  against half of a company he was purporting to sell.

23       **THE COURT:**  Okay.  Your response?

24       **MR. HORAN:**  Your Honor it's as far as his state of

25  mind, it is a -- again, it's being offered to prove that

1  Mr. Ebersol knew that there were these claims out there --

2  which is exactly what they just propounded -- which is not

3  being offered for the truth of the matter asserted.  You knew

4  about these claims that are contained within this letter and so

5  it remains to be hearsay.  They've admitted it was hearsay.

6          THE COURT:  Okay.  That's closer but I still agree

7  with you.  I think it's hearsay so the objection is sustained.

8          MR. HORAN:  Is that on 16 and 17, Your Honor?

9          THE COURT:  Sixteen and 17, yes, sir.

10         MR. HORAN:  Okay.  The next exhibit is 31, Your

11  Honor.

12         THE COURT:  All right.  Let's identify it for the

13  record, please.

14         MR. HORAN:  This is a declara -- this is Exhibit 31

15  to Dundon's response document 124, the declaration of Jeff

16  Vanderbilt (phonetic).

17         THE COURT:  And who is Mr. Vanderbilt for the record,

18  please?

19         MR. HORAN:  I believe Mr. Vanderbilt was a CFO or is

20  a CFO of Dundon Capital Partners, the plaintiff in this matter.

21         THE COURT:  And your objection is what?

22         MR. HORAN:  It's Paragraph 3, Your Honor.

23  Mr. Vanderbilt sets forth a declaration saying:

24              "During the period at issue, DDFS and DCP were

25              passthrough entities for federal tax purposes.  A

```
 1              passthrough entity does not pay federal income taxes

 2              or take deductions through federal tax returns.  The

 3              federal income tax objections and benefits that

 4              relate to a passthrough entity are ultimately part of

 5              the individual tax return of the owner."

 6         Your Honor, we're objecting to this on multiple

 7    grounds.  That it's conclusory, it's offers a legal opinion,

 8    there is a complete lack of foundation for any of these

 9    opinions; and therefore we believe that that portion of his

10    affidavit or declaration should be struck.

11         THE COURT:  Okay.  And your response, Counsel, when

12    you're ready?

13         MS. WALRAVEN:  Yes, Your Honor.  So first off, with

14    respect to lack of foundation, I'll start there.  As the CFO

15    tax issues and the existence of a passthrough entity and how

16    that is treated is well within Mr. Vanderbilt's purview.

17         Additionally, with respect to legal opinion and

18    conclusory, I mean he's simply explaining how tax works with

19    respect to passthrough entities and phantom income.

20         THE COURT:  Okay.  So is it an accounting opinion or

21    a tax opinion?  I'm not being silly.  I mean he can give --

22         MS. WALRAVEN:  Well, it's not an opinion, it's an

23    explanation.

24         THE COURT:  Okay.

25         MS. WALRAVEN:  Of how the taxes worked for the period
```

 1   at issue with DDFS and DCP.  So he's just explaining that this

 2   is how a passthrough entity works.

 3           THE COURT:  All right.  Your response?

 4           MR. HORAN:  Doesn't say in there I'm a CPA.  Doesn't

 5   say in there that I've got knowledge of these regulations.

 6   Your Honor, this is a highly complicated taxing's regulation

 7   scheme and all we know is that he's a CFO and that does not

 8   pass muster as far as giving his qualifications or credentials

 9   in offering such an opinion.

10           THE COURT:  I'm satisfied with the response so that

11   objection is overruled.  I agree.

12           MR. HORAN:  All right.  That concludes, Your Honor.

13   Thank you.

14           THE COURT:  That's it?

15           MR. HORAN:  Yep.

16           THE COURT:  Can I get a form of order on your

17   objection?

18       (Inaudible response)

19           And who'll be responsible for that, please?

20           MR. HORAN:  I will, Your Honor.

21           THE COURT:  Thank you, Mr. Horan.  You understand why

22   I'm doing this.  We've got lots of moving parts and I don't

23   know, I'm going to go out on a limb.  If we get to trial --

24   don't read anything into it but whatever the disposition in

25   this case, someone might appeal me.  And the district court

1  might say, did you role on those objections?  So now we have a

2  record of it.  So thank you.

3          So what's next for the Court, please?

4          **MR. HORAN:**  I believe it will be Ebersol's motion for

5  summary judgment which will be handled by Mr. Saltz.

6          **THE COURT:**  All right.  Thank you.  And Mr. Saltz, if

7  you would kindly identify the ECF numbers so we can keep track

8  of things that would be great.

9          **MR. SALTZ:**  I will do my best, Your Honor.

10         **THE COURT:**  Thank you.

11         **MR. SALTZ:**  Good morning, Your Honor.  Michael Saltz

12  on behalf of the Defendant Charley Ebersol and the moving

13  party.

14         **THE COURT:**  And which summary judgment motion are you

15  arguing?

16         **MR. SALTZ:**  We are arguing the summary judgment

17  motion brought by Mr. Ebersol.  That would be 102.

18         **THE COURT:**  One-o-two?

19         **MR. SALTZ:**  And for the record, the opposition is

20  going to be at 124.

21         **UNIDENTIFIED SPEAKER:**  There's a revised one filed

22  that was 142, Your Honor  And we've got the final cites from

23  Mr. Cantowitz (phonetic).

24         **THE COURT:**  And then there was a reply, correct?

25         **MR. SALTZ:**  There is a reply, Your Honor, and I

```
 1    believe that is 138.

 2            THE COURT:  All right.  Thank you.  Go ahead.

 3            MR. SALTZ:  Well I'll begin from the top, to the

 4    extent I do believe this court is very thorough and with regard

 5    reading all the papers.

 6            So I'll present from the beginning the main issue

 7    here is that DCP lacks standing and that would begin with the

 8    term sheet.

 9            THE COURT:  Okay.

10            MR. SALTZ:  DCP does not argue a different standard

11    applies for standing so we all are working off of the Spokeo,

12    Inc. versus Robin standard.  Article III --

13            THE COURT:  And for the record which is -- go ahead,

14    please.

15            MR. SALTZ:  Yes.  Article III standing requires three

16    components.  One, that the plaintiff suffered an injury in

17    fact.  Two, that is fairly traceable to the defendant's

18    conduct.  And three, that is likely to be addressed by a

19    favorable decision.  And I believe that appears on Page 338 of

20    Spokeo, Inc. versus Robins which is 578 U.S. 330.

21            Here, the complaint only alleges two injuries in

22    fact.  First, is the signing of the term sheet so we're going

23    to focus on that to begin.

24            Paragraph 4 of the complaint says:

25            "DCP signed a binding term sheet for Series 2
```

1          Preferred Stock financing outlining DCP's commitment

2          to fund the league."

3   And then it defines it as "the term sheet".

4          Then at Paragraph 64 in the first cause of action it

5   says:

6          "DCP relied on Ebersol's misrepresentations and

7          omissions to its detriment.  DCP entered the term

8          sheet and invested 70 million into the AAF when but

9          for Ebersol's representations and omissions, DCP

10          would not have entered the term sheet or invested

11          money into the AAF."

12          That's the anchor of the complaint.

13          However, it is undisputed that DCP did not sign the

14   term sheet.  That's Slide 6.

15          In fact, DCP concedes in Paragraph 13 on Page 11 of

16   its response --

17          **THE COURT:**  Hang on just a minute and I'll follow

18   along with you.

19          **MR. SALTZ:**  Thank you.

20          **THE COURT:**  One moment -- aah, got it.  Go ahead,

21   please.

22          **MR. SALTZ:**  Page 11, Paragraph 13 of its response.

23          **THE COURT:**  May I ask?  Have you provided these

24   slides to the Court?

25          **MR. SALTZ:**  I have not, Your Honor.  I'm kind of

1  doing them on the fly.  I can -- whichever ones you see -- or I

2  can shut it down.  Depends on --

3        **THE COURT:**  No, no, that's okay, I'll follow along.

4  I just -- respectfully, I've got lots of stuff up here and I

5  just wanted to know if that was one of the things if you had

6  provided to the Court.  If you went through the effort of doing

7  it, then I was going to use it.  But we can follow along and if

8  I need something, I'm sure you'll provide it.  So go ahead.

9  I'm sorry, Mr. Saltz.

10        **MR. SALTZ:**  No problem, Your Honor.

11        Again, Page 11, Paragraph 13 of the response admits

12 that DCP never signed the term sheet and as you see on the

13 screen is the confirmation from DocuSign saying that DCP never

14 signed the term sheet.

15        The response at Paragraph 13 says:

16        "Ebersol executed the term sheet on behalf of ESMG

17        and DCP treated the trademark as a binding document

18        and performed its obligations set out in the

19        agreement."

20 They don't say they signed it.

21        As such it's undisputed that DCP cannot prove the

22 material allegations of Paragraph 4 of its complaint or its

23 allegation of reliance in Paragraph 62 that it actually signed

24 the term sheet and became bound by its terms.

25        To be certain, the term sheet, which is attached as

1    Exhibit 1 to Plaintiff's opposition papers expressly states on

2    its face that it cannot become binding on any of the parties.

3              You can bring up the term sheet.

4              The first paragraph states:

5              "This binding term sheet shall be a binding agreement

6              of the signatories below, enforceable by one party

7              against the other as set forth below upon the

8              companies as defined below.  Receipt of the initial

9              funding amount as defined below by 2:00 p.m. PST on

10             February 14, 2019 and each party hereto executing

11             this binding term sheet."

12             Then under the Investor Ownership section it

13   expressly states that there are two conditions precedent that

14   must be met before Series 2 shares are to transfer to DCP and

15   the very first one is under Investor Ownership it says:

16             "Upon the execution of this agreement" -- and then

17   Number 2 is: "And funding of the initial investment."

18             Likewise, the agreement also states that the term

19   sheet will only be effective and become binding on the parties

20   after execution and delivery.

21             If you go to that last -- that paragraph there at the

22   bottom under "Confidentiality" it says:

23             "The binding term sheet shall be effective upon the

24             investor's funding of the initial funding amount and

25             upon execution and delivery hereof by all the parties

33

1          hereto, and may be executed in two or more

2          counterparts, including but not limited to in .pdf

3          portable document format and via facsimile, each of

4          which may be executed by one or more of the parties

5          but all of which when taken together shall constitute

6          an agreement binding upon all of the parties hereto."

7      **THE COURT:**  And again, for the record, the parties to

8   this binding term sheet are whom?

9          **MR. SALTZ:**  Are DCP and ESMG.

10          **THE COURT:**  Okay.  Go ahead, please.

11          **MR. SALTZ:**  Thank you.

12      At no point has DCP ever cited evidence that it

13   executed this term sheet.

14      DCP's argument in Paragraph 13 on Page 11 of the

15   opposition that it treated the term sheet as a binding document

16   and performed its obligations set out in the agreement is

17   likewise not proper.

18      DCP's voluntary actions doesn't change the fact that

19   the term sheet states three times that DCP's signature on the

20   term sheet is required to bind the parties.

21      Additionally, the evidence is undisputed that DCP did

22   not perform its obligations under the term sheet.  In fact, if

23   you look at closing section --

24          **MR. SALTZ:**  There you go.

25          -- and the counsel and expense sections of the term

34

1   sheet it states in both of them that the investor shall provide

2   definitive documentation as soon as practical and investors

3   shall provide definitive documents.  No evidence that they ever

4   did that.

5           DCP did --

6           **THE COURT:**  When you say "no evidence," no summary

7   judgment evidence on this, right?

8           **MR. SALTZ:**  That is -- well, yeah.  There's no

9   evidence in the universe and there's no evidence here also on

10  the summary judgment record that they actually performed these

11  particular terms.  Like they can't just arbitrarily say, we

12  filed them and not show that they performed the functions which

13  were at bare minimum required of them which were conditions

14  precedent.

15          Additionally, the evidence is undisputed that DCP did

16  not present evidence that it complied with this obligation, in

17  addition to not executing the term sheet.  As DCP did not

18  suffer any injury related to the term sheet because it did not

19  sign it and therefore it did not become legally bound or

20  obligated under its terms.

21          Now, mind you --

22          **THE COURT:**  If I may?

23          **MR. SALTZ:**  Yes.

24          **THE COURT:**  Of the three elements that you put on the

25  record, it's whether there's sufferable injury that's the

 1  focus, right?

 2          **MR. SALTZ:**  Correct.  And that was the first thing

 3  that it alleged was that it became legally bound to its terms.

 4  Now, understand that the complaint only alleges one contract,

 5  the term sheet.  Although there may be other agreements to

 6  which they entered, the only one they're suing on is the term

 7  sheet.  And they said but for the misrepresentations, they

 8  would not have entered into the term sheet.

 9          And I'm glad you brought that up because they

10  specifically do mention that it's because they felt legally

11  bound to the term sheet that they paid the money, not because

12  of any representations by Mr. Ebersol.  Specifically the second

13  claim of injury is that they said they lost 70 million dollars.

14  Now we dispute this and will show you later with regard to the

15  evidence that they didn't actually lose 70 million dollars.

16          But let's go ahead and go to the complaint first at

17  Paragraph 31 where it says:

18          "On February 14th, 2019, DCP and Dundon completed the

19          term sheet and DCP wired 5.1 million to the AAF the

20          next day to allow the AAF to make payroll."

21          The complaint also alleges in Paragraph 64:

22          "That DCP relied on Ebersol's misrepresentations and

23          omissions.  And to its detriment, DCP entered the

24          term sheet and invested 70 million into the AAF when

25          but for Ebersol's representations and omissions, DCP

```
1              would not have entered the term sheet or invested

2              money into the AAF."

3         Couple things wrong with this.

4         First thing wrong is that the monies DCP alleges it

5    sent to the AAF are actually not an injury, in fact that was

6    incurred in reliance upon anything Mr. Ebersol said.  DCP's

7    opposition now makes it abundantly clear that the monies DCP

8    allegedly sent to the AAF are just a byproduct of DCP's

9    mistaken belief that it was legally bound to the term sheet.

10   And it is this mistaken belief and not the reliance by

11   Mr. Ebersol or his statements that is the actual cause of DCP's

12   only singular claimed financial loss.  Remember the second

13   element, they have to tie it to something Mr. Ebersol did.

14        Now, don't take my word for it, DCP's own words

15   expressly admit this.  If you look at Page 20 of DCP's response

16   it says, quote:

17             "The money DDFS sent to ESMG was sent to satisfy

18             DCP's obligation in the term sheet."

19        Page 21 of DCP's response says:

20             "DCP made a written commitment to provide funds.  The

21             funds were provided and ESMG accepted the funds and

22             acknowledged those funds as a fulfilment of DCP's

23             commitment."

24        Page 23 says:

25             "DCP signed up to fund the league up to 70 million
```

37

1          and caused the commitment to be paid."

2          And the coup de grace on Page 19, DCP states:

3          "In this case, DCP entered the term sheet and thereby

4          acquired an interest in ESMG.  DCP seeks to recover

5          funds that originated from a DDFS partnership account

6          for the purpose of fulfilling a contractual

7          obligation of DCP; i.e. funds delivered on DCP's

8          behalf."

9          Again, as previously shown, no ownership in the AAF

10   transferred under the term sheet because the stated conditions

11   precedent weren't met.  And there is no binding term sheet

12   because the term sheet states three times that it will not be

13   binding unless signed.

14          No other agreement is alleged to exist in the

15   complaint.  DCP admits the monies were only sent in reliance

16   upon their mistaken belief that they were contractually bound

17   by term sheet to do so, not based on any reliance on anything

18   specific that Mr. Ebersol said.

19          **THE COURT:**  Let me ask you a question.

20          **MR. SALTZ:**  Yes.

21          **THE COURT:**  So there's caselaw that says:

22          The question whether a written contract must be

23          signed to be binding is a question of the party's

24          intent.  And so generally, signatures are not

25          required as long as the parties give their consent to

1          the terms of the contract.  And there is no evidence

2          of an intent to require both signatures as a

3          condition precedent to becoming effective as a

4          contract.  The party attempting to enforce an

5          unsigned agreement has the burden to show that the

6          parties intended to be bound, whether or not the

7          contract was signed by both parties.

8     And this is a case out of El Paso which also

9  apparently was cited by the Western District of Texas so there

10 is caselaw out there that says they don't have to sign it,

11 right?

12     **MR. SALTZ:**  In those particular instance the contract

13 at issue doesn't expressly state that it cannot become binding

14 on the parties.

15     Remember, this isn't a lawsuit where you are suing a

16 party who signed the contract.  This is one in which the party

17 that didn't sign it is seeking to enforce rights thereunder

18 without showing that they executed it.

19     And remember, this document on its face says that

20 such a situation is not going to happen.  This particular

21 document under its particular terms cannot be one that is

22 adopted by the parties.  That's not to say that the parties are

23 not free to engage in entering into another agreement based on

24 other terms.  But when the document states on its face in order

25 to avoid that exact scenario, that it can't be binding on the

1    parties unless it's signed.

2         **THE COURT:**  Okay.

3         **MR. SALTZ:**  And also, Your Honor, the <u>Huckaba versus</u>

4    <u>Ref-Chem, LP</u> case, 892 F.3d 686, specifically at Page 690,

5    holds:

6              "Where writings contractual force is expressly

7              conditioned on the signature and delivery by all the

8              parties, no contract based on the writing forms

9              unless the condition is satisfied."

10        **THE COURT:**  May I have that cite again, please?

11        **MR. SALTZ:**  Huckaba, H-u-c-k-a-b-a, versus Ref-Chem,

12   C-h-e-m, LP; 892 F.3d 686, jump cite 690 and that's Fifth

13   Circuit 2018.

14        **THE COURT:**  Go ahead, please.

15        **MR. SALTZ:**  Thank you.

16        The second thing wrong with DCP's claim of lost money

17   is it's undisputed that DCP never wired the funds.  It was DDFS

18   Partnership, an unrelated entity.

19        Let's go to the complaint, Paragraph 31 of DCP's

20   complaint where it says that DCP claims that on February 14th,

21   2019, DCP and Dundon completed the term sheets and DCP wired

22   5.1 million to the AAF the next day to allow the AAF to make

23   payroll.  It's undisputed that every portion of this allegation

24   is untrue.

25        Paragraph 45, likewise in the complaint states that

1    DCP transferred 61 million of its 70 million dollar commitment.

2    Again, this is untrue.

3           THE COURT:  So could DCP be considered the agent of

4    DDFS?

5           MR. SALTZ:  Not without evidence, Your Honor.

6           THE COURT:  Okay.  What evidence would the Court

7    need?

8           MR. SALTZ:  It would need some sort of evidence

9    brought forward by DCP showing that it can trace its money into

10   DDFS partnership's account.  Understand that they have a

11   different ownership structure, entirely unrelated.  Although

12   both companies may be passthroughs, there's nothing connecting

13   them sideways and there's no agreement or anything establishing

14   that there's any type of relationship between the two where one

15   is bound to act on the other's behalf.

16           And it's most interesting that DCP tries to argue in

17   its response that while another entity ultimately controlled by

18   Tom Dundon wired funds to ESMG, it did so in the performance of

19   a treasury relationship with DCP.  Not only does this series of

20   events not appear in the complaint but there's absolutely no

21   evidence of such a relationship existing and applying to the

22   very funds at issue.

23           THE COURT:  Let's go back to my earlier question.  So

24   are you saying it's not enough that these entities have common

25   ownership so there's not apparent authority to give rise to

1    agency.  Is that what you're saying?

2            **MR. SALTZ:**  No.  There has to be evidence of the

3    agency.

4            **THE COURT:**  And you're saying there's no evidence at

5    all.

6            **MR. SALTZ:**  There's none whatsoever.  And I'll point

7    to the one area in which they try to do a little bit of sleight

8    of hand in order to say that there is some evidence.

9            Specifically the testimony that they put forward with

10   regard to Jeff Vanderbilt of DCP.  He testified that a

11   potential reason as to why DCP would report the 70 million as a

12   loss on taxes.  Because remember, the evidence is undisputed

13   that it was DDFS partnership that declared the loss on its tax

14   form, not DCP.  And that it was DDFS that pushed it out.  And

15   this is crucial because the testimony that he gave was one in

16   an attempt to try to explain an incorrect hypothetical to which

17   he was presented.

18           Specifically, the question which was posed by

19   Mr. Treyzon was:

20           "I will also represent to you that in our review of

21           records --

22   And mind you that this was before certain tax records were

23   provided.

24           "-- it appeared that all of the funds for the AAF

25           investment came from DDFS.  That's how the wiring was

```
 1          done.
 2          ANSWER:  "Partnership?"
 3          "Correct.  Does that make sense?"
 4          "Yes."
 5          "How is that DCP, taking the loss for its investment
 6          if all the money came from DDFS?"
 7          And it says: "DCP was the party making the
 8          investment, DDFS Partnership functioned as treasury
 9          management."
10          That's an answer to a hypothetical that doesn't
11 exist.  DCP didn't take the loss.  DDFS did.
12          Really what they should be trying to explain is if
13 the money belongs to DCP.  And if DDFS is merely the treasury
14 function, then how is it that all these entities controlled by
15 Tom Dundon would show that it was DDF's [sic] money to lose and
16 not DCP's?  And if there was no connection between the two,
17 then why didn't DCP also file for information saying that it
18 was their money lost?  There's no evidence tying that money
19 whatsoever.  No tracing, no nothing, no agreements, no
20 resolutions.  All we have is that DDFS claimed the loss and
21 that's something they cannot do if it's not their money.
22          THE COURT:  So you're not saying that DCP had a loss
23 by not getting the transfer of the stock?  Is that what you're
24 saying?
25          MR. SALTZ:  I'm saying that the money is not DCP's.
```

1        **THE COURT:**  Right.  But if they didn't get the stock,

2   don't they have a loss for the 70 million?  Can't they -- I

3   mean isn't that something that the Court could consider?

4        **MR. SALTZ:**  They would still have to declare the

5   loss.

6        **THE COURT:**  Okay.  And you're saying they didn't.

7        **MR. SALTZ:**  They didn't.

8        **THE COURT:**  Okay.

9        **MR. SALTZ:**  Only DDFS declared the loss.

10       **THE COURT:**  And that's clear from the documents that

11  it provided to the Court.

12       **MR. SALTZ:**  Undisputed.  So much so that DCP argued

13  to the Court, quote, on Page 22, quote:

14           "There is no explanation for why the Court should

15           hold DCP responsible for what DDFS reported on an

16           information form."

17           DDFS is responsible for the information on the form

18  attached to Ebersol's motion, not DCP.  But DCP has no

19  documentation whatsoever declaring the loss, not through the

20  passthrough, not through any other means.  The only loss on

21  those tax returns related to this transaction was reported by

22  DDFS on that form going up to Dundon as a passthrough on an

23  unrelated entity with separate ownership.

24           In addition, Texas law forbids the partnership theory

25  of property.  Property of the partnership is not the property

1    of the partner.

2         **THE COURT:**  So that's an interesting point.  So one

3    of the things that we wanted to ask was can a partner of a

4    partnership take money from the partnership to pay obligations

5    for another entity when all the partners to the partnership are

6    ultimately owned by the same person?

7         **MR. SALTZ:**  But that's not the situation here.

8         **THE COURT:**  Why not?

9         **MR. SALTZ:**  DCP is owned **--** if you look at the chart

10   on Page 12 of the opposition **--** DCP is a wholly-owned

11   subsidiary of DDFS Management which is then wholly-owned by

12   Thomas Dundon.

13        DDF Management **--** DDFS Management **--** excuse me **--** is

14   a partial partner of DDFS Partnership, along with Tom Dundon,

15   the individual, and the Dundon Trust.  So it's not wholly owned

16   all by one person.  And this is kind of weird because that

17   would be the individual saying, please, don't respect my

18   corporate formalities, ignore them because it's all me but at

19   the same time they argue that they shouldn't be held

20   responsible for what the reporting that DDFS does and that it's

21   DDFS that's responsible for the information on the form, not

22   DCP.  So they can't have it both ways, Your Honor.  They can't

23   argue, treat us all the same; by the way, we're not the same.

24        And the law forbids it in any event.  The law says

25   the partnership ownership is important.  The manner in which we

1   hold title to something is important and we must respect that

2   law.  A partner just can't come in and say, this is mine now

3   and treat it as it's their own little personal (indisc.).  And

4   that's not just Texas law, that's Delaware law too and those

5   statutes are cited in the papers.

6           **THE COURT:**  Okay.  Go ahead, please.

7           **MR. SALTZ:**  There's no allegation in the complaint

8   that DDFS and DCP have any relationship.  There is no evidence

9   in the record that DCP has any right, title or interest in the

10  property of a separate and unrelated entity.  There is no

11  evidence of the treasury function other than testimony related

12  to an incomplete hypothetical.  DCP never signed the agreement,

13  never took the loss.  DDFS took the loss and someone acting as

14  a treasury management isn't the one taking the loss.

15          There is nothing in the record confirming any of

16  these funds belong to DCP.  There's no record of deposit,

17  there's no record of trust, there's no record of anything.

18  There's no (inaudible) explanation to explain a hypothetical

19  that is incorrect but that's not evidence.  And there's no

20  evidence that DCP transferred money to DDFS to hold, and

21  there's no evidence of any assignment taking place between DCP

22  and DDF as partnerships.

23          The facts here are therefore similar to the W.R. Huff

24  and the indemnified capital cases that we cited in our papers.

25  Where in both cases the Court found that absent any allegations

1   in the complaint that there was ownership of the accounts for

2   which the monies were paid or an assignment of rights thereto,

3   there's no standing.

4        And interestingly enough, in response to those cases

5   on Page 19 of DCP's response, they base their entire argument

6   trying to distinguish those cases upon its claim that DCP

7   entered the term sheet which it didn't.

8        Furthermore, despite the infirmity of not having the

9   term sheet, DCP attempts also to distinguish the W.R. Huff case

10  and the indemnified capital cases by citing the -- I always

11  pronounce this different every time -- but the *Kakabadze* case,

12  K-a-k-a-b-a-d-z-e.  And in *Kakabadze* the Court found the

13  plaintiff had standing despite the fact that the plaintiff was

14  acting as an agent for another and the plaintiff had been fully

15  reimbursed for the losses.  But the holding in Kakabadze is

16  actually bad for them, good for us.  It's not helpful for DCP

17  because the decision was based on certain facts, not the least

18  of which was that the contract was in Kakabadze's name, in

19  addition to the fact that all the monies came from Kakabadze's

20  account.  That's not the situation here.

21       **THE COURT:**  So do you disagree with the Court's

22  reasoning or the fact that the case is factually different than

23  the one before the Court today?

24       **MR. SALTZ:**  I think the reasoning is perfect in

25  Kakabadze's.  I think that the situation in Kakabadze has

47

1    everything to do with upholding the fact that DCP is not a

2    party.  I have a term sheet that is ghosts of a contract

3    negotiated but never executed.

4            And in the caselaw cited, can't ever be agreed upon

5    orally.  Other contracts can.  There could very well be other

6    agreements but DCP didn't choose to sue on any of those

7    agreements.  They didn't choose to sue for promissory estoppel

8    even to the extent that they couldn't prove that an agreement

9    existed.  In fact they misrepresented the facts in their

10   complaint and now can't prove the allegations in the complaint

11   wherein it says they signed it.

12           **THE COURT:**  Just as an aside, why -- we all agree.

13   You can raise standing at any time, right?

14           **MR. SALTZ:**  Correct.

15           **THE COURT:**  So why now?  Why -- and I literally had

16   this come up again.  A different case I have where it occurred

17   to the Court and I think the parties -- well, I'm not going to

18   comment on what I think the parties are up to -- but the Court

19   raised the question of standing.  So why now?  You can do that.

20   I want to be abundantly clear.  What was the -- forgive the use

21   of the word "epiphany" that said, oh, gosh, there's no

22   standing?

23           **MR. SALTZ:**  It was the testimonies that took place at

24   the depositions in December.  And ultimately --

25           **THE COURT:**  Specifically from whose depositions?

1      **MR. SALTZ:**  When we took the deposition of Thomas

2    Dundon and Zutter and Vanderbilt, nobody could confirm the

3    representations being made in the complaint that the document

4    was signed.  In fact, at every turn it was represented to us by

5    counsel that the document was signed.

6      **THE COURT:**  So why not **--** why didn't this **--** forgive

7    me and you're answering my question.  I don't recall this being

8    raised at the MTD **--** at the motion to dismiss stage.  Was there

9    a particular reason why you didn't raise it?

10      **MR. SALTZ:**  We didn't file a motion to dismiss.

11      **THE COURT:**  Okay, yes, that's true.

12      **MR. SALTZ:**  So there was nothing to raise at that

13    time and the allegation was taken as true.  This is about the

14    evidence.  And the ultimate piece was also in December,

15    DocuSign finally responded to a subpoena confirming that

16    despite the representations of counsel and the complaint, it

17    actually was never signed.

18      **THE COURT:**  Okay.

19      **MR. SALTZ:**  So then we had conclusive proof in

20    December and it was in December that we said, there's no

21    agreement, there's no term sheet.  And although they may have

22    had the mistaken belief by individuals thinking through the

23    sloppiness within which they handled this whole transaction,

24    failing to document it at every turn, failing to go ahead and

25    sign the term sheet.  Perhaps that's the reason why but the

22-05077-cag Doc#258-1 Filed 02/06/25 Entered 02/06/25 05:11:19 Main Document Pg 40 of 1466 Designated Documents Page 49

49

1   fact remains it's undisputed now.  It's not signed.

2          **THE COURT:**  With all due respect and I might get --

3   let me emphasize, I may be getting this confused -- but how

4   does this affect the argument about the validity of the term

5   sheet and the oral contract that the party -- your argument

6   you're making right now, how does your argument -- what's the

7   word I'm looking for?  Are you consistent in what you're

8   arguing to the Court now as opposed to what I've heard from the

9   trustee about the existence of an oral contract and that there

10  was -- I thought the trustee said there was a binding term

11  sheet.

12          **MR. SALTZ:**  Whether they believed that or not,

13  they're not a party necessarily with regard to our lawsuit.

14  Our lawsuit is that DCP is attempting to enforce this binding

15  term sheet.

16          **THE COURT:**  I hear that but I'm going to ask my

17  question again.

18          So in one lawsuit we're arguing there was a binding

19  term sheet and a binding oral contract.  You're telling me in

20  this lawsuit there isn't, right?

21          **MR. SALTZ:**  I'm telling you that in all circumstances

22  and under the law, that there isn't with regard to this binding

23  term sheet that is the subject matter of the lawsuit, that DCP

24  is attempting to claim is the one they entered into that caused

25  them damage.

50

1          **THE COURT:**  Okay.  You understand that --

2          **MR. SALTZ:**  I understand wholeheartedly and --

3          **THE COURT:**  I've got to be consistent in how I rule

4    on this.

5          **MR. SALTZ:**  And you should.  With regard to the

6    trustee's case --

7          **THE COURT:**  We agree on that (laughs).

8          **MR. SALTZ:**  I'm not asking you to do anything out of

9    line.  The problem is the issue with the trustee's case is that

10   there are more than just the term sheet contracts.  There is

11   the contract that Mr. Dundon agreed that he had entered into

12   with regard to 250 million.  That's Mr. Dundon, not DCP.

13         **THE COURT:**  Okay.

14         **MR. SALTZ:**  To the extent that DCP is involved in

15   other contracts, whether they be oral or part of some other

16   writing, that's not before me.  I am living within the four

17   corners of the complaint that has gone this far unamended.  And

18   that lawsuit is seeking to claim that they signed this term

19   sheet, they didn't.

20         **THE COURT:**  Okay.

21         **MR. SALTZ:**  Then they're saying, this -- they're

22   backtracking in the opposition which they can't do.  They

23   didn't amend their complaint to allow them to do that.  They

24   said they entered into it, now they're saying, well, we treated

25   it as such.  But the law prevents this court from finding that.

1    We just cited the case to this court.

2           The agreement on its face, no less than three times,

3    says, under no circumstances are they allowed to come in or are

4    we allowed to come in and hold anybody responsible and bound by

5    this term sheet on its face --

6           **THE COURT:**  Okay.

7           **MR. SALTZ:**  -- absent it being signed by all the

8    parties.

9           And that brings us to -- that'll conclude the issue

10   with regard to standing on the common law fraud.  We still have

11   the issues with regard to statutory fraud.

12          **THE COURT:**  Okay.

13          **MR. SALTZ:**  Paragraph 98 of the complaint --

14          **THE COURT:**  Let's take just -- I want to ask my law

15   clerk something in chambers so we'll take like a five-minute

16   recess and then I'll come back.  I'm sorry to interrupt you

17   but --

18          **MR. SALTZ:**  That's okay, Your Honor.

19          **THE COURT:**  If you-all need to step away for a minute

20   then please do so but I just want to confirm my understanding

21   on something and I can't do it -- I've got to do it in person.

22          All right.  Ladies and gentlemen, a very short recess

23   about five minutes.  Thank you.

24          **THE CLERK:**  All rise.

25          **(Recess taken at 10:01 a.m.; reconvened at 10:15 a.m.)**

52

1          **THE COURT:**  Thank you for the accommodation,

2    Mr. Saltz, go ahead.

3          **MR. SALTZ:**  Thank you, Your Honor.

4          Your Honor, before I go into the statutory fraud

5    issues, I have citations for you with regard to the Texas and

6    Delaware law, both of which presume that separate legal

7    entities have distinct legal identities and that property

8    belonging to one entity is not the property -- sorry, is the

9    property of that entity and not of its individual owners.

10          **THE COURT:**  Okay.

11          **MR. SALTZ:**  So specifically I point the Court to

12    Texas Business and Organizations Code, Section 154.001(c) and 6

13    Delaware Code Section 15-501.  And that can be found also in

14    our reply papers which is Document 138 on Page 3.

15          **THE COURT:**  Thank you for your courtesy.  Go ahead,

16    please.

17          **MR. SALTZ:**  My pleasure, Your Honor.  And in that

18    last question you asked is the Court is not going to be

19    inconsistent in ruling that the term sheet, which is the only

20    agreement mentioned in our case, is not a binding agreement on

21    either of the parties because although the trustee has put

22    forward other contracts, different contracts, the 250 million

23    dollar contract and whatnot, those are not the contracts that

24    appear in the Ebersol case.

25          **THE COURT:**  Okay.

53

1           **MR. SALTZ:**  Those contracts are not the ones being

2    used by DCP as a shield to try to say there is a 70 million

3    dollar cap.  So that term sheet on its face is not enforceable

4    as a matter of law.  The money did not come from DCP and there

5    is no evidence in the record that DCP has a claim to that

6    money.  In fact, the evidence in the record is that DDFS

7    declared the loss, not DCP.  That DDFS filed the information

8    saying it was their loss.  And there's no record that DCP also

9    simultaneously said no, it's our loss.  DDFS cannot declare it

10   to be their loss if it's DCP's money.

11          With regard to the statutory fraud claim, Paragraph

12   98 of the complaint says that Ebersol made false

13   representations causing DCP to enter into a contract, a/k/a the

14   term sheet.

15          Page 24 of the response argues that DCP relied on

16   representations to enter into the term sheet.

17          With regard to 2701, which is this statute for

18   statutory fraud, the main element of the claim is that it

19   requires proof that an individual relied on the representations

20   in entering into a contract.

21          I read from the statute under A, 2701-A:

22          "Fraud in a transaction involving real estate or

23           stock in a corporation or joint stock company

24           consists of one, false representations of a past or

25           existing material fact when the false representation

54

1              is, (a), made to a person for the purpose of inducing

2              that person to enter into a contract; and (b), relied

3              on by that person in entering into that contract."

4              There's no contract.

5              Another reason why summary judgment is absolutely

6    required for the statutory fraud claim is that 2701 only

7    applies when there has been an actual conveyance of real

8    property or stock.

9              **THE COURT:**  And here we're talking stock, obviously,

10   right?

11             **MR. SALTZ:**  Correct.

12             **THE COURT:**  Go ahead.

13             **MR. SALTZ:**  The U.S. Quest Ltd. versus Kimmon's case,

14   228 F.3d 399; specifically the jump cite at 2406 says that the

15   Section 27.01(a) applies only to situations where there is an

16   actual conveyance of the stock.  That's a Fifth Circuit case.

17             Likewise, Stanfield versus O'Boyle, 462 S.W.2d 270;

18   specifically at 271, a Texas 1971 case says failure to state a

19   claim when a conveyance of the property has been made and not

20   where there is merely a contract to convey.

21             **THE COURT:**  Is the record clear that there was no

22   conveyance of stock?

23             **MR. SALTZ:**  That's correct.  It is undisputed that

24   stock was never issued.

25             **THE COURT:**  Okay.

1      **MR. SALTZ:**  And I point out that it's also undisputed

2  that the conditions precedent identified in the term sheet for

3  the stock to be issued never occurred.

4          DCP tries to rely on a case called Takua (phonetic).

5  Takua is an appellate case in Texas.  And under the doctrine of

6  how federal courts are to interpret state statutes as stated

7  in -- I'll give you a cite, <u>Packard versus OCA, Inc</u>.  It's not

8  in our papers but it is a reminder for the Court as to its

9  duties with regard to interpreting state statues.  That cite is

10  624 F.3d 726.  It's a 2010 case.  That case reminds the Court

11  that when determining questions of Texas law, a federal court

12  looks to the decisions of the Texas Supreme Court which are

13  binding.  And the decisions of Texas intermediate appellate

14  courts may provide guidance but are not controlling.  So on its

15  face, Takua is not controlling.

16          Both Stanfield and the Mouton (phonetic) case, which

17  were cited, the Oakmiss (phonetic) versus Mouton is a 2020 WL

18  -- the cite is in our papers -- involved contracts to sell real

19  property that was ultimately never conveyed.

20          And in the cases that are cited, the Kimmons and

21  Laird case (phonetic) which is also cited in our papers, dealt

22  with contracts to convey stock.  Now the Kimmons case is

23  interesting because it involved an alleged oral contract for

24  the conveyance of stock in exchange for the plaintiff's

25  performance of consulting services, while Laird involved an

1  employment contract under which the plaintiff would earn stock

2  options provided he met certain conditions precedent.

3          **THE COURT:**  Were there any stock options in this

4  case?

5          **MR. SALTZ:**  No.  In each case the claim in statutory

6  fraud claims were dismissed for lack of conveyance of the

7  disputed property, regardless of whether the property was real

8  estate or stock.

9          And by the way, I think that I made mention of this

10  by the citation but the *Stanfield* case that we cite that says

11  there has to actually be a conveyance for the statute to apply,

12  aside from the fact that there also has to be a contract, is a

13  Texas Supreme Court case.

14          **THE COURT:**  So to your argument, if a contract is

15  actually executed to convey stock, the parties sign off on it

16  but there's no actual conveyance in the stock then there can be

17  no fraud?

18          **MR. SALTZ:**  No.  There can be common law fraud as --

19          **THE COURT:**  But not statutory fraud.

20          **MR. SALTZ:**  Not 2701.  It's a penal statute.  And

21  because it's a penal statute, it's supposed to be strictly

22  construed.  That is what the Supreme Court said.  And to that

23  regard they gave it a narrow reading.

24          Now, although DCP tries to argue that Takua, which is

25  a messed up set of facts in that case, where the Court did

1    ultimately find that there was a contract between the parties.

2    And although the real estate was never conveyed, the Court did

3    find because of the nature of a 1031 exchange there was actual

4    injury in fact due to the increased taxes that needed to be

5    paid because of missing of the 1031 deadline, the case is

6    distinguishable all over the place.  The fact remains that for

7    the purposes of us in federal court, it is the Supreme Court's

8    ruling that a conveyance actually has to occur under 2701 for

9    2701 to apply.  And the Takua court, although it might be

10   interesting reading for this court, is not controlling.

11          **THE COURT:**  I've done enough reading so I don't need

12   any interesting reading (chuckles).  Go ahead, please.

13          **MR. SALTZ:**  Thank you, Your Honor.

14          **THE COURT:**  I interrupted you.  So the reason why I

15   can't -- again, the reason why I can't rely on Takua is what?

16          **MR. SALTZ:**  Is because it's a lower state court.  And

17   this court, as stated in *Packard*, is required to follow the

18   rulings of the highest court in the state with regard to the

19   interpretation and to not give deference to outlier or cases

20   that are not from the highest court in the state.  To the

21   extent that the Texas Supreme Court has spoken on the issue

22   with regard to requiring that conveyance actually occur before

23   they allow a 2701 case to proceed, that is the law of the land,

24   that is the law that the federal courts are bound by.  And any

25   decision from a lower court is one that the Court is not bound

```
 1   by.

 2          THE COURT:  No matter how persuasive.

 3          MR. SALTZ:  No matter how persuasive.  Look.  You can

 4   go ahead and read it but you are bound, as I said in the

 5   Packard case, bound by the rulings of the state court which has

 6   exclusive jurisdiction to determine how state statutes are to

 7   be interpreted in the state.  The federal court is bound by the

 8   ruling of the Texas Supreme Court.  So -- and even so the Takua

 9   case is so distinguishable on so many grounds, the fact is is

10   that you don't even have to get there because, as I stated, you

11   have to have the contract entered into in both instances before

12   you even get to the issue of the conveyance.  So pick your

13   poison.

14          With regard to the Texas statutory fraud claim, with

15   regard to the Securities Act, that in and of itself is also not

16   applicable.  I believe that is known as Section 4008.052 with

17   regard to offeror or seller liability.  And what's interesting

18   about this statute is it's makeup.

19          To begin with, the Texas Securities Act or TSA, is

20   not applicable, mostly because we don't even get into it.

21   DCP never entered into a contract for the sale of the stock,

22   never paid the funds, never effectuated the sale by

23   transferring the stock, especially since the conditions

24   precedent of the transfer in the term sheet of the stock were

25   never met.  The TSA expressly contemplates that in a securities
```

```
 1   fraud action against a seller of securities, the securities

 2   must have been actually conveyed to the buyer.

 3          I point the Court to the Chase versus Hodges [sic]

 4   case -- sorry Hodge case, H-o-d-g-e.  This is Western District

 5   of Texas, 2021 case.  And that is cited in the papers and it's

 6   noted that an actual sale of securities must have occurred for

 7   a securities fraud claim under the TSA to be actionable.  As we

 8   said there's no term sheet, there's no sale.

 9          And also if you look at the remedies, the TSA limits

10   the remedies.  So what it says is that the buyer, assuming that

11   there is a contract, may sue for (1) recission;  or (2) damages

12   if the buyer no longer owns the security.  So there's only two

13   things that you can do under the TSA.  You can sue to rescind

14   the contract that doesn't exist or you can sue for the damages

15   only if you had the security and no longer own the security.

16   That's it.  Those are the only two remedies to which you are

17   entitled under 4008.052.

18          THE COURT:  So if there's no remedy -- indulge the

19   hypothetical.  If there's no remedy, even if there was an

20   underlying contract, what does the Court do?

21          MR. SALTZ:  In our particular situation, grant

22   summary judgment.  In any other situation where the party

23   properly pled alternative theories, they sue for common law

24   fraud.  But statutory fraud is a creature of specific elements,

25   none of which are met, not in the 2701 and not here.
```

22-05077-cag Doc#251-1 Filed 02/06/25 Entered 02/06/25 09:11:19 Main Document Pg 60
Documents Pg 40 of 1466
Documents Pg 1233 of 1466

60

1        The law provides all manner of remedies.  DCP could

2   very well have sued for promissory estoppel if it couldn't pay

3   the contract, if it in fact had acted upon certain things.  But

4   there's no evidence in the record that it did.  All this case

5   is is that DCP is trying to fit a square peg into a round hole

6   and that's just not happening.

7        With regard to the remainder of the issues, if the

8   Court is so inclined, as to the lack of evidence, again we have

9   the fact that a number of the claims in the opposition explain

10  that they're relying upon statements, assuming they entered

11  into the contract based upon representations made by

12  Mr. Ebersol.  And assuming that the monies were spent or

13  transferred from DCP -- which they weren't -- in reliance upon

14  representations made by Mr. Ebersol and not because there was a

15  mistaken belief that they thought that they were duty bound to

16  do so under a term sheet to which they did not enter.

17       The representations at issue for the most part are

18  ones of opinion.  They claim Mr. Ebersol said that, oh, yeah,

19  you can go ahead and do this for 70 million.  Oh, yeah, the

20  projections are such.  Those are opinions.  Those are

21  projections.  And according to the caselaw, promises with

22  regard to future conduct or opinions are not actionable.

23       **THE COURT:**  Aren't there exceptions to that though?

24       **MR. SALTZ:**  You would have to show various facts but

25  normally no, you can't be sued if someone's necessarily relying

61

1    on your opinion.  But that also comes to the question with

2    regard to a duty to disclose.

3           There's no exception that if what you're saying is

4    speculative.  Mr. Ebersol doesn't control the weather.

5    Mr. Ebersol doesn't control all the employees.  He doesn't

6    control necessarily all the hiccups that can run along the way.

7    Projections are not actionable.

8           **THE COURT:**  Okay.

9           **MR. SALTZ:**  So for instance, the Fifth Circuit in

10   Zar versus Omni Industries, Incorporated, 813 F.2d 689, jump

11   cite 693, which quotes from Lloyd versus Junkin, 75 S.W.2d 712,

12   says:

13              "In order to effect a sale, induce the making of a

14              contract or place a proposed investment in a

15              favorable light, it is quite common to make

16              representations as to future value, productiveness,

17              efficiency or economy or to expected earnings or

18              profits.  But since that which lies in the future

19              cannot be a matter of certain knowledge, such

20              representations much be taken and understood as mere

21              expressions of opinion and therefore cannot be

22              treated as fraud."

23          And with regard to the known exception, you have to

24   know something in the future for certain.  And there's no

25   evidence that's been presented that anything having to do with

1  the projections or profitability or anything of that nature is

2  an absolute known.

3          With regard to no duty to disclose where a

4  plaintiff's fraud claim is based on a failure to disclose, the

5  plaintiff must show the defendant owed them a duty to disclose.

6  That's the White versus Zhou Pei case, 452 S.W.2d 527, jump

7  cite 537.

8          **THE COURT:**  Let me read to you from a Fifth Circuit

9  case on one of my opinions.  And it quotes the following case,

10  Trenhome versus Radcliffe (phonetic), 646 S.W.2d 927 930, Texas

11  1983, and the Fifth Circuit writes:

12          "However, longstanding Texas law also establishes

13          that a discretion of opinion can serve as a basis for

14          fraud under certain circumstances, including if the

15          speaker has knowledge of the opinion's falsity, if

16          the opinion pertains to the happening of the future

17          event and the speaker purports to have special

18          knowledge of facts that will occur or exist in the

19          future; or (3), if the opinion is based on past or

20          present facts.  All three exceptions apply even in

21          the context of predictions and opinions regarding

22          profitability."

23          Does that apply here?

24          **MR. SALTZ:**  Does the law apply here?  Yes.  Does the

25  exception apply here?  No.

63

1          **THE COURT:**  That's why I asked you earlier.  So you

2    don't think notwithstanding what the Fifth Circuit told me in

3    one of my cases, the exceptions don't apply here.

4          **MR. SALTZ:**  The exceptions don't apply here because

5    there's no evidence of that with regard to the claims of future

6    facts.

7          For instance, we dispute that these things were even

8    said but to the extent that we assume that for purposes of

9    summary judgment that they are said, there's any number of

10   things that can be done for the league to have been fully

11   funded with regard to 70 million, not the least of which is

12   other investment from other people.  And at no point does it

13   specifically say that other investment from other people was

14   tried and failed.  There's nothing in there that says that the

15   amount of sales wasn't necessarily going to go up.  There's

16   nothing in there that said that Mr. Ebersol knew certain facts

17   that would make the representations untrue.  All that's said is

18   that it wasn't disclosed that there was debts owed.  But what's

19   interesting about that is the complaint specifically alleges

20   that they knew that they were in dire financial straits and

21   they didn't do their due diligence.  And you can't waive them

22   coming in and not doing their due diligence.

23         In fact that brings us to the reliance standard.

24         To prevail on a fraud claim, a plaintiff must show

25   actual and justifiable reliance.  That's the Grant Thornton,

1   LLP versus Prospect High Income Fund case.  The element with

2   regard to justifiable reliance is negated as a matter of law,

3   quote, "When circumstances exist under which reliance cannot be

4   justified."  That's the Mercedes Benz case that's also cited in

5   the papers versus Carduka (phonetic), 583 S.W.3d 553 with the

6   jump cite 558.

7            In determining whether justifiable reliance is

8   negated as a matter of law, courts must consider the nature of

9   the party's relationship and the contract.  That's AKB

10  Hendrick, LP case versus Musgrave Enterprises, Inc.

11           And in the Lewis versus Bank of America case

12  (phonetic), the Fifth Circuit said:

13           "Viewing the circumstances in their entirety,

14           including the appellant's access to professional

15           accountants, the amount of money involved in the

16           transaction and the ambiguous nature of the

17           appellee's assurance, the appellant's decision to

18           enter into the transaction without undertaking

19           additional investigation into its tax consequences

20           was not justified."

21           In this particular instance -- and it determined that

22  as a matter of law, Your Honor.  And in this particular

23  instance it was said that no due diligence was initiated in a

24  transaction which if you believed the contract was 70 million

25  dollars to buy an entire football league.

1          And in this regard, there's no evidence that said

2    that DCP or Dundon or anybody had to invest.  They could have

3    said no.  They didn't have anything riding on it.  This was

4    something that they went into with their eyes wide open as to

5    figuring out what it was that they were buying.  And by the

6    way, the papers say that they quickly found out and then

7    continued to fund another 60-some-odd million dollars.  That

8    type of record establishes under the <u>Lewis versus Bank of</u>

9    <u>America</u> case that the reliance that they allege to enter into a

10   contract which was not in there and to pay the monies which was

11   also not subject to DCP paying it and DCP didn't claim that it

12   lost it is not justifiable reliance.

13          And with that, Your Honor, I'll reserve for rebuttal

14   unless you have any further questions.

15          **THE COURT:**  No, that's fine.

16       **(Pause)**

17          **MR. LOWENSTEIN:**  Your Honor, can I approach with some

18   caselaw and an updated version of this PowerPoint because we

19   had some tweaks that --

20          **THE COURT:**  How many copies do you have?

21          **MR. LOWENSTEIN:**  No, no, I'm sorry, just caselaw.

22   I've got two copies of each case that --

23          **THE COURT:**  That young lady over there should get one

24   set and if you'll tender it to Ms. Mujica, she'll tender it up.

25       **(Documents tendered)**

1          **MR. LOWENSTEIN:**  I wanted to --

2          **THE COURT:**  One moment.  Did you have a question?

3       (Court and Clerk confer)

4          **THE COURT:**  Okay, thank you.  Go ahead, sir.  For the

5    record, first of all, please?

6          **MR. LOWENSTEIN:**  Sorry?  Oh, Jeff Lowenstein, Your

7    Honor.

8          **THE COURT:**  Yes, sir.

9          **MR. LOWENSTEIN:**  For I guess just DCP with respect to

10   this motion.

11          So I wanted to start with a little law.  Your Honor

12   came upon I guess through the case that you mentioned on the

13   Fifth Circuit the Trenhome case (phonetic) and I actually

14   brought that one and included it in your stack.  It's a Supreme

15   Court of Texas 1983.  This is not in order of what my actual

16   argument is going to be but I just wanted to cover these cases

17   before I forgot about it.

18          The Trenhome case deals with this issue of fraud.  In

19   that case somebody argued that some representations were

20   matters of opinions or predictions of future events.  And the

21   Trim Colton (phonetic) case touched on many of the issues that

22   Mr. Saltz raised.  It says:

23          "An opinion may constitute fraud -- I'm sorry.  The

24   cite is 646 S.W.2d 927 and I'm referring to -- I'm trying to

25   find the page.  It's a short case.  It's in the first couple of

1    pages.

2            "An opinion may constitute fraud if the speaker has

3            knowledge of its falsity.  Additionally, when an

4            opinion is based on past or present facts and action

5            for fraud may be maintained."

6            And the Court found here that the defendant's

7    representation was not merely an expression of an opinion, had

8    to do with the trailer park being moved in the future.  He

9    falsely represented that the trailer park had been sold and

10   that notices had been given to the tenants.  These are direct

11   representation of present facts which are so intertwined with

12   the future prediction that the whole statement amounted to

13   representation of facts.

14           That court goes on to say -- address the issue of the

15   ongoing performance by DCP even after discovering the fraud.

16   And what the Court said there is it addressed that issue and

17   said if the party who discovered the fraud abandons it, they

18   could lose rights so that was a fact issue of their continued

19   performance.  It says:

20           "The fact that Trenhome purchased lots after the

21           discovery of the fraud as he was obligated to do

22           under the agreement does not conclusively establish

23           as a matter of law that Trenhome did not rely on

24           Ratcliffe's representation or alternatively that he

25           waived claim of fraud."

1          So continuing performance under a contract when you

2   found out you've been defrauded is not conclusive evidence that

3   you've somehow waived the fraud.

4          That court also addressed this issue of diligence,

5   what obligation is on the person being defrauded and that court

6   said under Headnote 15:

7              "Where one has been induced to enter into a contract

8              by fraudulent representations, the person committing

9              the fraud cannot defeat a claim for damages based

10             upon a plea that the party defrauded might have

11             discovered the truth by the exercise of proper care."

12         So I think Trenhome addresses a lot of those issues

13  in the fraud realm.

14     **THE COURT:**  So help me out on that point.  You're

15  exactly right what it says.  Regrettably, I'm real familiar

16  with that case on appeal and you can figure out why I'm saying

17  that.

18         So this is a lot of money, right?  Big transaction.

19  Why wouldn't the average person say, hmm, I might want to look

20  into this.  This is a startup league and I might want to do a

21  little due diligence.  Why wouldn't that have occurred?

22     **MR. LOWENSTEIN:**  Because they were given 24 hours and

23  told that if there's not funding of the players by 2:00 p.m. --

24  it's in the contract.  The exact time of that 5.1 million, if

25  it's not funded by then -- let me back up.

1          Mr. Dundon and Mr. Ebersol talked for the very first

2    time on February 13th.  The alleged agreement was reached on

3    the morning of February 14th so that funding could be done by

4    2:00 p.m. on February the 14th.  Mr. Cantowitz's testimony is

5    in there that there was not time for anyone to do any kind of

6    diligence and reliance on Mr. Ebersol was all they had time to

7    do.

8          **THE COURT:**  Okay.

9          **MR. LOWENSTEIN:**  I agree with you.  It was a lot of

10   money on a short amount of notice, trusting somebody to be

11   honest with what they were telling them to get a deal done to

12   keep this league alive as long as it could be kept alive.

13         The other issue is the Ginsburg case which was not

14   cited in our briefs but I came across after I was struggling

15   with the issue under this 2710 -- 27.01 relating to this Texas

16   Supreme Court case that said there has to be an actual

17   conveyance of stock, a statute that clearly says there just has

18   to be a contract and how that all works.

19         So Judge Fitzwater in the Northern District answered

20   this question in a case in 2017 which is included in the packet

21   which is Ginsburg -- it's Ginsburg versus ICC Holdings.

22         **THE COURT:**  I don't see it.

23         **MR. LOWENSTEIN:**  Okay.  Can I?  I've got more.

24         **THE COURT:**  Sure.  Please.

25       (Pause; document tendered)

70

1          **UNIDENTIFIED SPEAKER:**  We don't have it either.

2          **MR. LOWENSTEIN:**  You can have my copy when I'm done.

3          Ginsberg versus ICC Holdings.  Again, from Judge

4     Fitzwater.  2017 WL 5467688.  If you look at the end of the

5     star page 19, there is a quote.

6          **(Pause)**

7          Sorry, Your Honor.

8          **THE COURT:**  That's all right.

9          **MR. LOWENSTEIN:**  Let me **--**

10          **THE COURT:**  I think you maybe want me **--** you

11     highlighted Page 18.

12          **MR. LOWENSTEIN:**  Yeah.  Let me get back to that one,

13     Your Honor.  I'll address it later.

14          Our position is the statute very clearly says 2701 is

15     about a contract.  The version of the statute that the Supreme

16     Court **--** and this is what's discussed in that case.  The

17     version of the statute that the Supreme Court was relying on

18     in **--** sorry.  The **--** in the U.S. Quest case, the statute

19     changed.  It was a 1983 amendment to the statute.  The pre-

20     statute version limited the remedy to a difference in change in

21     price and stock between what you received and what you **--** what

22     it was worth versus what it was represented.

23          The **--** it was later changed to the remedy is now

24     actual damages and so the argument in my opinion is that the

25     U.S. Quest is mooted because the statute has changed and the

1    Texas Supreme Court has not addressed it.  And I think that's

2    what Judge Fitzwater says that it has not been addressed.  That

3    is that point.

4           Okay.  Now let's get back to -- oh, one other case

5    thing is I had a chance to look up the Huckaba case which was

6    cited for this no signature issue.  That is an arbitration

7    argument provision in the Huckaba case and we know that there's

8    very strict standards around enforceability of arbitration

9    agreements.

10          And there is later Western District caselaw called

11   Escalera, 2023 WL 8112499 that says that signatures are not

12   required as long as the parties consent to the terms.

13          Okay.  Now let me get to the factual stuff.

14          All right.  Was there standing, was DCP damaged?

15          So the case cited by Mr. Ebersol is:

16          "Injury in fact requires the plaintiff to have legal

17           title to or a proprietary interest in the claim

18           asserted."

19          And there is ample authority that says being the

20   named party on a contract, including the -- I have the same

21   struggle with the name of that case but the case that starts

22   with a "K".  Kakabadze case refers to the Tufco versus Marathon

23   (phonetic) case and both talk about the party to the contract

24   under the agency theory or under any other theory has standing

25   is injured.  There's no question here that the allegation is

1    that Mr. Ebersol made misrepresentations to DCP that induced it

2    to do something.  And I guess the theory is to get its

3    affiliated entity to gift 70 million dollars to the league.  I

4    mean that's the only theory that would be left if there's no

5    breach of contract claim.

6           And I will note, contrary to what you were told, the

7    trustee in this case in Paragraph 148 of its complaint -- which

8    is Docket Number 56, its first amended complaint -- Paragraph

9    148 says:

10          "The term sheet attached as Exhibit B --

11          Which is the term sheet everybody's looking at --

12    which does not have DCP's signature on it.

13          " -- constitutes a valid and binding agreement

14          between DCP and ESMG.  The term sheet included an

15          offer, acceptance of the offer, consideration, mutual

16          assent and an intent to be bound sufficient to find a

17          meeting of the minds."

18          And the trustee sued DCP for breach of that term

19    sheet and is claiming the rest of the balance under that term

20    sheet.

21          So the answer to your question is, you can't find for

22    Ebersol and find for the trustee because they have opposite

23    versions of whether this is enforceable.

24          **THE COURT:**  Okay.  So I am following along.  So I'm

25    sure on rebuttal I'll get an explanation but it seems to me

22-05077-cag Doc#251-1 Filed 02/06/25 Entered 02/06/25 15:09:11 19-11971 Main Document Designat... Pg 73
Documents Pg 1246 of 1466

73

1    inconsistent but I could be persuaded otherwise.

2            **MR. LOWENSTEIN:**  And let me show you factually.

3            So you saw the testimony from Mr. Vanderbilt.  This

4    goes to where the funds came from.  It's undisputed -- and I'll

5    show you -- actually, let me skip ahead to that evidence.  It's

6    undisputed that the league, ESMG, Mr. Ebersol, everybody

7    believed that DCP's commitment was being fulfilled under the

8    term sheet and it was accepting that money.  That is

9    undisputed.  There is no witness in this case and you will not

10   see any where anybody ever said, I don't think there was an

11   enforceable term sheet.  You will not find it.  Or that anybody

12   thinks the fact that DDFS was sending money was not in

13   fulfilment of DCP's obligation.

14           This is a meeting of the board of directors that

15   Mr. Ebersol, along with a woman named Dawn Belt (phonetic) --

16   who was a sophisticated startup financing lawyer from Fenwick

17   and West in California -- they ran this meeting and made a

18   presentation to the board on February 24th, 10 days after the

19   term sheet.  And in there the underlying part says:

20               "The corporation has already received over 12 million

21               dollars from Dun and Capital Partners under these

22               terms.  This is an action by written consent of the

23               stockholders of Ebersol Media Sports."

24           This is all the way towards the end of -- right

25   before the league is shutting down on March 27th.  This is the

74

1  stockholders signed this agreement.  They say it.

2        The corporation has already received approximately 50

3  million dollars from DCP under these terms.

4        This is from a man named Kevin Ferrell (phonetic)

5  which is his summary at the very end when there's a

6  conversation going on between DCP and Ebersol Sports Media

7  Group about the money that has been received and he says:

8        "Total DCP funds to date --

9  And if you add that up, the 68 two million and what's left

10 over, that's 70 million dollars.

11       -- and total DCP commitment."

12 Sixty-nine million dollars and change, you add the 461, that is

13 70 million dollars.

14       So you want some evidence that somebody thought that

15 this money was coming from DCP, it's clear that all the parties

16 agreed that regardless of the treasury relationship between DCP

17 and DDFS partnership, the parties all agreed that this money

18 was coming to fulfill DCP's investment and that DCP was

19 entering into this term sheet and funding this term sheet with

20 the expectation that it was receiving 75 percent interest of

21 the equity of this company.

22       And that is the position that the trustee has taken

23 that not only was this term sheet binding but that the results

24 of it was DCP did receive controlling interest of the company,

25 that DCP did get two board seats, and that as a result of that,

 1  it did all these allegedly harmful things to the company.  So

 2  you've got to -- in order to grant Mr. Ebersol's motion, you

 3  would have to strip away all of the trustee's ideas that this

 4  contract was effectuated, that DCP did get control of this

 5  company as a result of it.

 6          And so flipping back to what our claim is against

 7  Mr. Ebersol, it's a fraud claim.  It's a fraud claim that they

 8  misrepresented facts, that Mr. Ebersol misrepresented facts to

 9  DCP that induced it to enter into this relationship.  The idea

10  that there's not a binding term sheet, I think the Court can

11  dispense of because it's clear that all the parties acted as if

12  there was one, including Mr. Ebersol.  And you will not see --

13  because I think I asked every witness I could remember to ask,

14  "Did anybody ever act like this term sheet wasn't binding?"

15  And nobody said yes, not the lawyer, not the witnesses, not

16  Mr. Ebersol, not anybody.  This is lawyer-created fiction with

17  the convenience that nobody on the DCP side actually signed it.

18          Which is an interesting argument because typically,

19  the non-signatory is the one being sued and saying, I shouldn't

20  be bound by this because I didn't sign it.  This is the

21  opposite.

22          **THE COURT:**  Right.

23          **MR. LOWENSTEIN:**  ESMG signed it.  It's the non-

24  signatory that's seeking relief which is, I want my money back

25  because I was defrauded into this deal by Mr. Ebersol.

76

```
 1            So the state securities fraud claim, I addressed that

 2    but --

 3            THE COURT:  Let me do this.  I'm sorry to interrupt

 4    you but we're going to take a break now.  12:15.  You're going

 5    to get an early lunch.  Is that okay?  Okay.  Mr. Horan, did

 6    you --

 7            MR. HORAN:  I was saying yes, Your Honor.

 8            THE COURT:  Okay.

 9            MR. HORAN:  I felt like you were looking for

10    acknowledgement.

11            THE COURT:  Okay.  So let's -- the courtroom will be

12    locked.  You can leave your stuff here, it'll be reopened at

13    noon and we'll try and start at 12:15.  I am so sorry to

14    interrupt you in the middle of your presentation.

15            MR. LOWENSTEIN:  It's fine.  That's a perfect

16    stopping point.

17            THE COURT:  But it does give us some things to think

18    about too so -- over the lunchbreak.  So we'll have you back

19    and then you'll have the duration of the afternoon.

20            All right.  Thank you ladies and gentlemen.  We're on

21    a lunchbreak.

22            THE CLERK:  All rise.

23        (Lunch recess taken at 10:57 a.m.; reconvened at

24    12:20 p.m.)

25            THE COURT:  Are we ready to resume?
```

1          MR. LOWENSTEIN:  Yes, Your Honor.

2          THE COURT:  Thank you.  And I appreciate you all

3    indulging my schedule.  For the record, please.

4          MR. LOWENSTEIN:  Jeff Lowenstein for the DCP parties.

5          THE COURT:  Hi, Mr. Lowenstein.

6          MR. LOWENSTEIN:  Going back to that Ginsburg case,

7    Your Honor, just because I was fumbling around with it and

8    wanted to give some more clarity, the plaintiff in that case

9    presented to Judge Fitzwater that the Stanfield case, which was

10   the Texas Supreme Court case that the U.S. -- Fifth Circuit

11   case relied on, was based on a prior version of the statute,

12   and that the statute had changed in 1983.

13          Judge Fitzwater says, well, cases after 1983 from the

14   Fifth Circuit were still looking at the Stanfield case.  So he

15   says they didn't present controlling authority from the Fifth

16   Circuit that was relying on a case post-amendment of the

17   statute.  And what Judge Fitzwater said was, in the single case

18   on which Ginsburg relies, which is that Takua case, the Texas

19   Court of Appeals held that a contract to convey real estate

20   constitutes a transaction under 27.1, even if an actual

21   conveyance of real estate does not occur.  And Fitzwater says,

22   but even assuming arguendo that it is sufficient for purposes

23   of a claim under 27.1 to allege a contract to convey stock

24   rather than actual conveyance of stock, the party there hadn't

25   pled a contract to convey stock.

EXCEPTIONAL REPORTING SERVICES, INC

1          So I think it leaves as an open issue what the Fifth

2     Circuit would say had someone brought to its attention the

3     amendment and that the Texas Supreme Court case from 1971 that

4     looked at the old statute really was looking at a different

5     statute.  And I think at least they suggest an openness at the

6     federal court level to look at the amended statute and say

7     Texas Supreme Court's precedent.

8          Granted, the U.S. Quest case is post-amendment and

9     still looked at the pre-amendment case.  So I think it's

10    instructive that it is an open issue, but the statute itself is

11    very clear that inducement to enter into a contract and relied

12    on by that person in entering the contract, the statute doesn't

13    address the actual conveyance issue.  And the Stanfield case

14    came down on the issue of there has to be a conveyance because

15    the way the remedy was worded in that version of the statute.

16         So I think there's a good argument for looking at the

17    post-amendment Texas cases and the only one, the Takua case is

18    the one that we've cited to that said the conveyance is enough.

19         But even suggesting that, if you actually look at the

20    term sheet, Your Honor, it says that in the investor ownership

21    section, and this is Exhibit 1 to our response, upon the

22    execution of this agreement and funding of the initial funding

23    amount, the company will issue, and we've got the dispute on

24    the execution issue, but I think there's clearly a fact issue

25    at best on that, the initial funding amount, I don't think

1    there's a dispute that there was $5.1 million sent.  Again,

2    there's a fact issue on whether DDFS sending it makes a

3    difference.  The company will issue the investor a number of

4    shares of Series 2 such that immediately after the closing, the

5    investor will own 75 percent.  So there's clearly a contract

6    for the conveyance of stock.

7             THE COURT:  Notwithstanding, the contract wasn't

8    signed.

9             MR. LOWENSTEIN:  Yes.  Notwithstanding, the contract

10   wasn't signed because everybody operated as if it was an

11   effective, and they in fact gave DCP control of the board

12   consistent with being the majority owner under the terms of

13   that agreement immediately.  And that's a big part of the

14   Trustee's case is that Dundon and Zutter took immediate control

15   of the company and acted as the majority owner in making the

16   decisions for the company.

17             So I think there is more than sufficient evidence

18   that there was a binding agreement, that all the parties and

19   all the actual people involved considered a binding agreement.

20   The fact that there was not a signature does not somehow make

21   it unbinding under controlling precedent and all of the facts

22   in the case.

23             THE COURT:  Would you agree, this may seem

24   simplistic, but indulge me, would you agree or disagree that at

25   a minimum there has to be an intent to have a binding

1   agreement, everyone has to act on that, because if there's not

2   a binding agreement, it ain't going, right?

3          MR. LOWENSTEIN:  Well, if there's not a binding

4   agreement with respect to the fraud, the statutory fraud claim,

5   I completely agree.  It does not -- I'm sorry, I didn't mean to

6   talk over you.

7          THE COURT:  You didn't.  Go ahead, please.

8          MR. LOWENSTEIN:  It does not get rid of the common

9   law fraud claim, which is the issue here.  I mean, based on

10  these negotiations and the form of this agreement, they got $69

11  million and change and gave Dundon and Zutter control of the

12  board and got their board and stockholders and everybody else

13  to approve the deal.

14         And I forgot to mention they even ratified the term

15  sheet, the board did, and that's the now therefore provision,

16  it says, "The board hereby approves and ratifies the term

17  sheet."  I think the term ratify closes the door on that issue.

18         THE COURT:  Okay.

19         MR. LOWENSTEIN:  Okay.  So I talked through this in

20  the term sheet, which is it's effective upon the execution of

21  the agreement and funding of the initial funding amount, and

22  that was the $5.1 million was given, it was received, it was

23  accepted and spent in addition to all the subsequent funding.

24  And this is Mr. Ebersol's testimony from his deposition in

25  September about his understanding of the agreement.  He says in

1    exchange for $5.1 million, Dundon Capital Partners received,

2    among other things, 75 percent of the company's fully diluted

3    stock.

4           Okay.  So let's talk about fraud.  Does the Court

5    have any questions on the statutory claim?

6           **THE COURT:**  No, I think -- I understand your

7    argument.  Thank you sir.

8           **MR. LOWENSTEIN:**  So let's talk about fraud.  So the

9    allegations of fraud against Mr. Ebersol was that he had

10   authority to execute the term sheet, the AAF had funded its

11   operations except for $5.1 million owed for the players and

12   related expenses up to the time of the term sheet, that $55 to

13   $70 million was sufficient capital to complete the 2019 season,

14   and that Ebersol Sports Media Group would be able to issue DCP

15   the 75 percent of its equity.

16          So the first issue is representation of authority.

17   Mr. Ebersol signed the term sheet on behalf of Ebersol Sports

18   Media Group, and that alone is sufficient under the law to be a

19   misrepresentation of authority.  He represented that he was

20   able to bind ESMG to that term sheet when he signed it.

21          What we found out later was that it took a lot more,

22   several more actions for him to bind the company, and there

23   were certain defaults that it created that were never fixed.

24   So it was a big problem that his authority issue wasn't

25   resolved prior to him entering the deal.  So the Tandan case

22-05077-cag Doc#258-1 Filed 02/06/25 Entered 02/06/25 09:11:19 Main Document Designated Page 82 Documents Pg 1255 of 1466

82

1   affirmed -- this is in the stack of new cases, Your Honor.  It

2   is <u>Tandan v. Affordable Power</u>, 377 S.W.3d 889, and <u>Weiss v.</u>

3   <u>Commission for Lawyer Discipline</u>, 981 S.W.2d 8, both which say

4   if you sign an agreement saying you have authority and you

5   don't, that is a misrepresentation.  That is an issue that was

6   challenged.

7           And what Mr. Ebersol said is I personally -- I,

8   Charlie Ebersol, personally did not have the authority to issue

9   stock in Ebersol Sports Media Group.  In order for you to sign

10  a document where the Ebersol Sports Media Group was going to

11  issue stock, what authority did you need to get?  And he said,

12  I don't recall exactly.  Based on this company, traditionally I

13  would require a board approval and some amount of preferred

14  shareholders, depending on the makeup of the preferred equity.

15          And what happened subsequently after the deal was he

16  went to the board and got them to approve the term sheet with

17  the help of counsel.  He went to the -- which should have fixed

18  the issue.  It did fix the issue in terms of it ratified the

19  agreement and made it enforceable, but what it didn't fix was

20  the problems with him not getting the proper authority to do

21  it, which is why there's harm.

22          This is Jordan Roberts, who is an associate of Don

23  Belt, who you saw earlier from February 27th.  This is 13 days

24  after the term sheet was entered.  And he's explaining the

25  problem with Charlie not getting authority to do this deal

 1  ahead of time, and he says they prepared an omnibus amendment

 2  and waiver document.  And it says the purpose of this document,

 3  prepared by ASMG's counsel, is that it waives all events of

 4  default under all notes that have occurred to date or may occur

 5  in the future through May 2019 in connection with our

 6  transaction.

 7           So what he did in entering this deal without going to

 8  the lenders and the shareholders and the board first was

 9  created -- caused these defaults as a result of this change of

10  control, and there's no evidence that that ever got remedied.

11  So that was a direct harm that was dropped into the lap of DCP

12  as a result of this, and you'll see other evidence that there

13  was a loan from someone named David Patrak (phonetic) that was

14  -- went into default, may -- was probably already in default

15  that was not disclosed, that was caused by this change of

16  control.  And there was notes with other parties that are

17  addressed in the exhibit that's attached to this 124.13 that

18  were caused by Mr. Ebersol misrepresenting his authority to do

19  this deal.

20           Next, he talks about that -- the $5.1 million that

21  he's requesting, this emergency funding.  Essentially, the

22  evidence was Mr. Fowler had been the main investor in the

23  company.  He, for a bunch of reasons, is now in federal prison,

24  and the funding that he was given, he started defaulting in

25  December of 2018, which is a full two months before Mr. Dundon

22-05077-cag Doc#258-1 Filed 02/06/25 Entered 02/06/25 05:11:19 Main Document Designated Page 84 Documents Pg 1257 of 1466

84

1   gets involved.  He did the deal in November and quickly it was

2   apparent, and there's evidence in there, Mr. Kanowitz talks

3   about it, that it was very clear very quickly he was shady and

4   that they were questioning whether they should do business with

5   him, and they kept going forward, despite the fact that his

6   money was either coming or not coming.  None of that was

7   disclosed to Mr. Dundon.  What he was told is in his

8   deposition, he said -- he was told they had a dire need to pay

9   the players, and up to that point, they had funded this league

10  to this point, but they didn't have the money for the players.

11   That was the representation to Mr. Dundon.

12          Mr. Dundon also said, he said, we just were in great

13  shape, we just need the money for the payroll, we've come this

14  far.  So --

15          THE COURT:  This is Mr. Ebersol speaking?

16          MR. LOWENSTEIN:  This is Mr. Dundon speaking --

17          THE COURT:  Okay.  That's what --

18          MR. LOWENSTEIN:  -- about what was said to him.

19          THE COURT:  Okay.  Now, I understand.

20          MR. LOWENSTEIN:  Both of these are the

21  representations that he said were made to him by Mr. Ebersol

22  about the financial condition of the league, and that

23  Mr. Fowler had gone away and they needed -- they didn't have

24  the money to pay the players for the first week of play.

25          And then Mr. Koulos (phonetic), who is -- was the

22-05077-cag Doc#258-1 Filed 02/06/25 Entered 02/06/25 09:11:19 Main Document Designated Page 85
Documents Pg 1258 of 1466

85

1   designated representative for DCP on some of the issues in the

2   case, he was asked, is your testimony that on February 14th,

3   including payroll immediately payable on February 14th, DCP's

4   understanding that that amount is 5.1 million, and Mr. Koulos

5   said, we found out after the fact that there was an additional

6   18 million that was not communicated to us.

7           So that goes to what DCP was told and what its

8   knowledge was and what it wasn't told about relating to that.

9   And I think there's been a defense, at least Mr. Ebersol said

10  in his deposition, that he didn't know the financial condition

11  of the company as it related to unpaid expenses at the time.

12  Well, this is an email to Mr. Ebersol from Mr. Kanowitz on

13  January 22nd, 2019, which is a couple of weeks before the

14  Dundon deal, where Mr. Kanowitz goes through in detail and

15  outlines for Mr. Ebersol the financial condition of the

16  company.  And he talks about, we're going to need this much

17  money to get through the opening weekend.  And remember, this

18  is when Mr. Fowler has gone away and they don't have a

19  committed funding source.  And you'll see in Mr. Kanowitz's

20  deposition testimony that he is recognizing we did not -- we

21  kept plowing forward and I'll get to that in a second, without

22  a known funding source.

23          **THE COURT:**  So to that point, at the risk of

24  restating the obvious, Fowler is out, there's a gap of period

25  of time, Dundon steps in.

1          MR. LOWENSTEIN:  Yeah.

2          THE COURT:  All right.

3          MR. LOWENSTEIN:  The gap of period of time and the

4   lack of when Fowler fell out and what harm that caused is an

5   issue we'll get to in our other motion on the DCP issue.

6          THE COURT:  I can hardly wait.

7          MR. LOWENSTEIN:  So Mr. Kanowitz goes on to say, I

8   did not include the majority of CBS fees, which is the one that

9   was broadcasting some of their games, and other large vendors

10  like Exos and SMT that we owe.  I would consider these

11  critical, given they have remained, raised them to us and they

12  are long overdue.  But in the interest of this exercise and

13  this game of chicken, I have assumed we would continue to push

14  a bunch of these when in reality I have no clue whether or not

15  we will be able to.

16         THE COURT:  Can I interrupt you just for a minute.

17  So Exos, what's that nomenclature for?

18         MR. LOWENSTEIN:  It's a vendor.

19         THE COURT:  It's a vendor.  What about SMT?

20         MR. LOWENSTEIN:  SMT was also a vendor that dealt

21  with the broadcasting.  The league had to pay for its own

22  production and that was part of the production.

23         THE COURT:  So for the benefit of maybe the two law

24  clerks that I think were in law school or maybe undergraduate

25  school at the time of this, what's notable about this, just to

1  put this on the record for their benefit is CBS wasn't paying

2  AAF to broadcast, AAF was paying CBS for their right to

3  broadcast.

4         **MR. LOWENSTEIN:**  Correct.  AAF was paying for all of

5  its production and broadcast to all of the networks it was

6  producing with, including the on-air talent it was paying for.

7         **THE COURT:**  Right.  Okay.  Thank you.  I knew that,

8  but I just, like I said, we've gone through a couple of law

9  clerks since this started, so.

10        **MR. LOWENSTEIN:**  Fair enough, Your Honor.  Feel free

11  to stop me whenever.

12        Anyway, so they're pushing off those expenses.  He

13  doesn't even include that in his math.  He's just assuming we

14  can continue to play chicken with those.  He says, over the

15  next three weeks, there's probably another million unaccounted

16  for.  And he said, by my estimation and based on this analysis,

17  if MGM Funds, who was someone that was lending them money under

18  a deal they had with MGM, we'll need another seven million to

19  get through the first week.  That can come from a variety of

20  sources.  And he says, again, I would be remiss if I did not

21  point out the following.  We have about eight million of

22  invoices that are overdue and maybe and probably another eight

23  million that we will continue to push past opening weekend,

24  even though they will arise between now and then.

25        So that is the knowledge Mr. Ebersol had going into

88

 1   those communications with Mr. Dundon, where he said, we are --

 2   up to that point, they had funded this league to this point,

 3   but they didn't have the money for the players.  So clearly,

 4   they had not done that.  They needed way more than $5.1 million

 5   to catch up on where they were to that point.  And Mr. Ebersol

 6   had actual knowledge of that.  And none of that was disclosed

 7   to Mr. Dundon.

 8          And then this is Mr. Kanowitz's summary of the

 9   situation.  He says, you were telling Charlie in this email,

10   the one I was just showing you, that the decisions you all were

11   making was that you were going forward and going to be

12   incurring debts knowing there was existing debts without a

13   clear source of where the funds were going to come from to

14   cover those debts.  He said, Charlie made the decision to push

15   forward with the league, knowing that we incurred significant

16   liabilities that had not yet been paid and would continue to be

17   pushed off.

18          So there's knowledge, understanding of the

19   significance of it.  We know it's not just a food vendor or

20   something like that.  These are critical vendors that are being

21   pushed off and not being paid.  And they clearly had no idea

22   what the impact of that would be going forward.

23          **THE COURT:**  Forgive me.  Just again, clarity on the

24   record.  There was no other income coming into the league.  It

25   was either it was through capital infusion, right?  That was

1    the only way the league was going to be financed.

2         MR. LOWENSTEIN:  There was by this point a small

3    amount of tickets and sponsorship revenue that had been at

4    least accrued, especially with the tickets.  There's later

5    evidence you'll see where Mr. Ebersol said, well, probably it's

6    in December of 2018.  We may have to return about $2 million to

7    ticket holders that have prepaid for tickets.  So it was

8    accrued revenue with respect to that.  I think there was a

9    dribble of sponsorship revenue by that point.  I don't believe

10   there was any other.  That's one of the issues that

11   Ms. Braymore (phonetic) will address.

12         THE COURT:  All right.  Go ahead, please.

13         MR. LOWENSTEIN:  Okay.  So this is Mr. Friedman.

14         THE COURT:  And Mr. Friedman, for the record --

15         MR. LOWENSTEIN:  Mr. Friedman was one of the key

16   people that worked under Mr. Ebersol, part of the legacy AAF

17   team that was under Mr. Ebersol.  This is from January 24th,

18   2019.

19         I'm sorry.  This is from to Charlie from that -- this

20   is the Mr. Patrak (phonetic) I was talking about.  He had

21   loaned the league when Mr. Fowler went away.  He actually made

22   some emergency loans to them.  And this answers your previous

23   question.  He put in $2 million right at the end to help float

24   things after he had already put in the previous amount of

25   money.

1          And Mr. Ebersol, in this email, according to

2    Mr. Patrak on January 24th, in the highlighted part, he says,

3    the new terms are all premised on your assertion to me that

4    this new loan should be outstanding for less than a week.  This

5    is January 24th, 2019.  It was not disclosed to Mr. Dundon that

6    there was going to be an immediately due $5 million payable to

7    Mr. Patrak as soon as he got in as well.

8          So that's the $18 million in vendor debt, $5 million

9    to Mr. Patrak.  All of that is in addition to the $5 million

10   that was going to go to the players.  So of that $70 million

11   that he was told was going to get the league through the end of

12   the season, that's $28 million just to get in the door on day

13   one.  And you saw that the previous, where he put in $12

14   million, or DCP did, put in $12 million four days within

15   getting into this deal.

16         Okay.  And then there's argument about the partial

17   disclosure discussion.  I think we worked through that on the

18   Trenholm case, so I don't plan on spending much more time on

19   that.  But there's other cases we've cited.

20         And a new one I included, which is a Texas Supreme

21   Court case, which is the Bombardier case, which is 572 S.W.3d

22   213, which, again, talks about making a partial disclosure that

23   created a false impression, or voluntarily disclosing some

24   information creating a duty to disclose the whole truth.

25         So when Mr. Ebersol says, we need $5.1 million and a

1    total of 70 to get through the season, leaving out the, oh,

2    there's 23 million that we owe, and we may not have critical

3    vendors if we don't pay them, that was clearly something that

4    was triggered the duty to disclose more information.

5           So one of the other representations was that

6    Mr. Ebersol told Mr. Dundon, we need 55 to $70 million to get

7    through the season.  They had played week one, so they had

8    weeks 2 through 10 in the regular season, and then two weeks of

9    playoffs.  And he was told that amount of money of outside

10   capital would get them through the season.  He denied saying

11   that in his deposition, so I included this exhibit from three

12   days before Mr. Dundon's deal on February 11th to a different

13   investor, Michael Keeves (phonetic), where Mr. Ebersol says

14   almost precisely what he told Mr. Dundon, which is essentially,

15   I need $10 million to get through the next two weeks, which

16   was -- and an additional 60 million to get through the end of

17   the season.  So he made the same misrepresentation to

18   Mr. Keeves about what the company really needed and left out

19   the whole concept of, I have $23 million of other debt that's

20   immediately due, or we may not be able to put football on the

21   field.

22          And they argued that this idea of what the future

23   need, cost expense need, or capital needs of the company are

24   somehow speculation or opinion that are not enforceable in a

25   fraud claim.  And we cited the Texas Industrial Trust case.  It

92

1    says an opinion may constitute fraud if the speaker has

2    knowledge of its falsity.  And I think there's at least some

3    evidence that Mr. Ebersol knew that the $70 million of go-

4    forward money was not going cover what they needed to pay these

5    vendors.

6         And you will see a theme in the Trustee's claim about

7    things that Mr. Zutter and Dundon didn't do with respect to

8    these vendors.  Well, all of these debts were incurred with

9    these vendors and these vendors were cut off and marketing was

10   stopped and all of that long before Mr. Dundon and Zutter got

11   involved.  That was all under Charlie's control and I'll get

12   into that in a minute.

13        This is what was represented in writing to

14   Mr. Dundon, which was this pro forma, this high margin

15   business, which suggested that they believed that $64 million

16   of revenue was going to come in because the financial needs of

17   this company were to cover $191 million in expenses for the

18   first year.  64 million was supposed to come from revenue and

19   the rest would have to be outside investment.

20        Well, these numbers are just wrong and Mr. Ebersol

21   knew they were wrong.  And here's the evidence of that.  This

22   is Mr. Kanowitz.  He said -- I asked him in the projections for

23   May of 2018, the total revenue for the league through the end

24   of 2019, if you add 2018 and 2019, was going to be 176 million.

25   He says that appears to be correct.  And then they revised the

1  budget and you sent that to your finance committee in January

2  2019.  The total revenue through the end of 2019 season was

3  predicted to be 59 million.  So in January 2019, they told

4  their finance committee internally, the predicted revenue at

5  that point was 59 million.  What they sent to Mr. Dundon says

6  64 million.  It's just wrong.

7       Also, it shows $4 million in digital revenue that

8  they're expecting.  And the evidence, and let me get to that.

9  Here is Mr. Kanowitz talking to Mr. Ebersol on January 2nd

10  about the digital revenue.  And he says, we need to be

11  extremely careful here to -- not to mislead players and lose

12  their trust.  No one will be making hundreds of thousands of

13  dollars in year one.  Maybe a few players will make over

14  $100,000.  And he says, our digital revenue projections are way

15  lower than we thought.  Frankly, we do not even have a business

16  model set in stone for that side of the business.

17       And he concludes with saying that Kevin thinks it

18  will be closer to a million.  The reality is, and that doesn't

19  necessarily matter, the reality is they had nothing in place to

20  make any money from digital revenue in 2019.

21       **THE COURT:**  Let's stop just for a minute, again,

22  education.  So the premise of the league was you brought in all

23  these players, they all got paid the same, same contract,

24  right?  It didn't matter whether you were running back, tackle,

25  wide receiver, they all got paid the same for three years, is

1   that correct?

2          MR. LOWENSTEIN:  Yes, with the exception of this

3   bonus program, which is being discussed here.

4          THE COURT:  Right, that's what I'm coming to next.

5   So the bonus program was what?  Could you just briefly explain

6   that on the record?

7          MR. LOWENSTEIN:  Yeah, so the bonus program was they

8   were going to develop this digital project, and I can't tell

9   you exactly how it was going to work, but somehow, if there was

10  something done with specific players that they could share in

11  the revenue earned relating to their likeness being used in

12  that process somehow.

13         THE COURT:  So like a version of NIL?

14         MR. LOWENSTEIN:  I think so, but I'm not sure.  It

15  may have been, I mean, Mr. Ebersol's here, he could probably

16  explain it better than anybody here, but there was some tie

17  between the revenue that was going to be earned through the

18  digital project related to that player, and they would somehow

19  share in the profits of that.

20         THE COURT:  So this, just again, not to confuse the

21  record, there is a point to my question.  So this is for the

22  use of their likeness, correct?  On some level.

23         MR. LOWENSTEIN:  That is my understanding without

24  actually knowing that that is 100 percent correct.

25         THE COURT:  That's fine.  Does this have any -- so

```
1    this has nothing to do with the betting component?

2           MR. LOWENSTEIN:  It may have.

3           THE COURT:  It may have.

4           MR. LOWENSTEIN:  Yes.

5           THE COURT:  So that's another part of the alleged

6    income would be people -- I thought that was the big appeal of

7    the league was that people could bet on players' performances

8    and things like that, and that was where it was going to be

9    really innovative.

10          MR. LOWENSTEIN:   That was the plan when I deposed

11   Mr. Friedman, who was the number two, or the guy that was

12   brought in to be right underneath Mr. Ebersol.  He said we did

13   not have anything in place that he could recall to earn revenue

14   from any of the digital products, and there's regulatory things

15   that are required around gambling, and none of that had been

16   conquered, even up to the point where we came in.

17          THE COURT:  Because I do recall early on in the case,

18   Mr. Osherow came in, and I remember his description, and I'm

19   not in any way being silly, about how he learned that coaches,

20   maybe players, I don't know, like carted off TV screens and

21   equipment, things like that, and so Mr. Osherow, one of the

22   first things he had to do in the case, and I'll be making my

23   point in just a minute, was that he had to get a couple of

24   semi-trucks and retain possession of the equipment so that he

25   could ultimately sell it, and then there was the suggestion
```

22-05077-cag Doc#258-1 Filed 02/06/25 Entered 02/06/25 15:09:19 Main Document Designation Page 96
Documents Pg 1269 of 1466

96

 1   about, now he had the contract license, whatever it was, for

 2   this betting component to the league, and the Court received

 3   some argument about what that was worth, and ultimately, it

 4   didn't sell for anything, if my memory's correct.

 5          MR. LOWENSTEIN:    I think it sold for $125,000.   MGM

 6   came in and bought the digital rights, and I don't have a

 7   complete appreciation for the full scope of that.   I know there

 8   was patents that came out of it that MGM pursued, and I know

 9   there was dispute about whether there was intellectual property

10   claims, adverse claims to that, that Mr. Osherow brought up in

11   that proceeding as well.

12          THE COURT:   All right, thank you. Go ahead, please.

13          MR. LOWENSTEIN:    Okay.  So here is just a little bit

14   on what happened to these revenues to where the idea that they

15   had any chance of earning $64 million was ludicrous and the

16   actions that caused it.   This was part of the report to the

17   Finance Committee on January 7th.

18          It says that revenue's tracking behind due to lower-

19   than-budgeted ticket sales caused by a lack of awareness in

20   general marketing, and these are all themes you're going to

21   hear in the Trustee's claim against Mr. Dundon and Mr. Zutter,

22   and this is all occurring well before Mr. Dundon and Mr. Zutter

23   got involved.

24          There are going to be savings on projected

25   expenditures of $21 million, and here's why.  There are

1    reductions in production and national marketing.  So this is

2    all being made under Mr. Ebersol's leadership.  League revenue

3    projected to be 15 million, or 7 million behind the projected

4    due to sponsorships lacking.  Digital revenue, $14 million

5    behind budget due to lack of marketing and business model

6    shift.  And team revenue projected $10 million below budget due

7    to lack of local sponsorships.

8         So just remember this theme of failures in marketing

9    and sponsorship and where it all started and how much that

10   impacted the league going forward.  The idea that they had the

11   ability to project the $64 million when all of these things

12   that happened at that point is just not believable and

13   certainly evidence of fraud.

14        This one -- I'm skipping these ones because you took

15   those out of the evidence, so I'm going to skip over that.

16        **THE COURT:**  I do that.

17        **MR. LOWENSTEIN:**  But I've already covered this.  The

18   other representation was that Mr. Ebersol had the ability to

19   deliver this 75 percent and that caused a whole host of issues.

20   They went through and did the deal and confirmed it, but it

21   caused defaults with lenders and it caused the triggering of

22   warrant rights for people that were holding warrants and other

23   things like that, which made it a monumental challenge to

24   effectuate the term sheet.

25        And this idea -- there were stages of this that had

1   to occur.  The first thing that had to happen was they spent

2   all the way up until March 27th just getting the shareholders

3   to approve the term sheet.  The next step before the league

4   failed was going to be actually documenting the rest of the

5   deal relating to the issuance of the stock, which required

6   modifying the controlling documents of the company.

7            One other thing I want to touch on is, I just wanted

8   to direct the Court to some testimony.  You asked questions

9   about Mr. Dundon's ultimate control over DDFS partnership and

10  DCP.  And then -- this is Exhibit 124-30.

11       **(Pause)**

12       **MR. LOWENSTEIN:**  This is Mr. Vanderbilt's testimony

13  and he's asked about DDFS partnership and all of these other

14  entities.  And he's asked, who makes decisions on behalf of

15  that entity?  That would be Mr. Dundon.  That's in specific

16  reference to DDFS partnership.

17           I'm sorry, this is page 40 and 41 of his transcript.

18  And would I be correct when we're dealing with DCP, DDFS

19  management LLC, the limited partnership, which was the

20  reference to DDFS partnership?  We just discussed, Mr. Dundon

21  is always the person as the sole and exclusive decision-making

22  ability on behalf of those entities.  Correct.  So, if the

23  person that can bind them to agreements, he is the person that

24  can make investment decisions, things like that, correct?

25  Correct.

1          Just on the funding, where the money came from and

2     the funding deal that's relevant to that.  The -- whatever case

3     that is that starts with a K, it cites to a <u>Tufco</u> case.  And in

4     both of those cases, the signatory to the party, to the

5     contract that was suing in the case, had made payments and been

6     reimbursed for those payments so that it was not out of pocket

7     any.  And the Court in both cases said they had standing and

8     had title to the claim to pursue it.  This is just essentially

9     the reverse, which is the idea that the money came from

10    somebody else, although the evidence is that DDFS partnership

11    was merely acting as a treasury function for DCP.

12         **THE COURT:**  When you say treasury function, what does

13    that mean?

14         **MR. LOWENSTEIN:**  It means assisting with its cash

15    when it needs to put cash somewhere.

16         **THE COURT:**  So, is that a loan?  How would you

17    describe the obligation for accounting purposes?

18         **MR. LOWENSTEIN:**  I think it's -- Mr. Dundon, who is

19    the ultimate owner of all of this, was directing that funds

20    from this entity be transferred on behalf of this entity.

21         **THE COURT:**  Right, but I mean, other than to that

22    point, there's not a credit or a loan or any other type of

23    accounting result of that.  It'd be like if I have three

24    checking accounts, taking money from one account and

25    transferring it to the other, would that be the analogy?

2:20-cv-05077-eag Doc #1381 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Pg 100
Documents Pg 40 1273 of 1466

100

1    **MR. LOWENSTEIN:**  Yeah, and of course, there's the

2  arguments about, does that violate the corporate formality if

3  the entities are anything like that?  I don't know, but I don't

4  see anywhere in any other cases where that matters.

5       What happened was DCP made a commitment and an

6  agreement and funds came from the accounts in the name of DDSF

7  Partnership to fund that commitment.  The backend negotiations

8  between them or the relationship is really not relevant because

9  one, the agency issue you raised, I think is apt, which is this

10  treasury relationship, at least implies that.  Additionally,

11  the DCP was the party to the agreement.  DCP was the one that

12  was defrauded.  DCP was the one that was supposed to receive 75

13  percent equity in this company that was worth $70 million and

14  it didn't get that.  So it is harmed.  It was the one that was

15  defrauded.

16       And under -- if you take their argument to the

17  logical conclusion, DDFS partnership couldn't bring the claim

18  because Aerosol didn't make representations to DDFS Partnership

19  and DCP couldn't make the claim because somebody else forwarded

20  the money.

21       We gave the example of if your parents gave you money

22  to go buy a car and it was a lemon or you were lied about its

23  condition, they cracked the thing and moved the mileage, that

24  the person that had title to the car and bought the car would

25  not be able to bring a claim because the money came from

```
 1   elsewhere.  And that's just not -- it's not in the law that

 2   they've cited anywhere that that is the case.

 3           And the case that starts with a K and the Tufco case

 4   it cites both stand for the proposition of it's just a reverse

 5   flip, which is in that instance the company -- the plaintiff

 6   fronted the money and was reimbursed for it.  In this one,

 7   someone else fronted the money but it's the same ultimate

 8   result.

 9           THE COURT:  Do you think there's agency?

10           MR. LOWENSTEIN:  For sure there's agency.  And

11   there's also common ownership in the Tufco case and the

12   Kakabadze case both address common ownership.

13           THE COURT:  So is it under Texas or Delaware law?

14           MR. LOWENSTEIN:  The -- this is fraud so it's Texas

15   law.  That's all, Your Honor.

16           THE COURT:  All right.  Thank you.

17           Mr. Saltz, I'm confident you have some rebuttal.

18           MR. SALTZ:  Yes, Your Honor.  I'll try to be as brief

19   as possible.

20           THE COURT:  That would be lovely.

21           MR. SALTZ:  I'm aware that everybody here has things

22   to do.

23           THE COURT:  No, you're going to get all the time you

24   need.  It's just that, you know, we might not finish today.  I

25   don't know.
```

1          **MR. SALTZ:**  Well, as far as we know, Your Honor.

2          **THE COURT:**  I thought Mr. Horan had an obligation.

3          **MR. SALTZ:**  He does and I'm going to try to get him

4    out as soon as possible.

5          **MR. HORAN:**  Yeah.  I appreciate it, Your Honor.  I

6    might sneak out today on how long he takes.

7          **THE COURT:**  That's fine, sir.  I believe it's with

8    one of your children, is that correct?

9          **MR. HORAN:**  It is.  Father daughter dance.  Dancing

10   shoes on.

11         **THE COURT:**  You cannot miss that.  As a parent of

12   adult children, those memories go fast.  So I certainly hope

13   you can take advantage of that.

14         **MR. HORAN:**  Thank you, sir.

15         **THE COURT:**  So leave when you need to.  You're

16   excuse.

17         So, Mr. Saltz, this won't shock you, but not

18   surprisingly, which has been the theme throughout these

19   proceedings, which is just people -- lawyers doing their job,

20   Mr. Lowenstein pretty much disagrees with everything you said.

21   You're me -- I mean, you know, sometimes what you need to do

22   for the Court, obviously, is you hear a lot of competing

23   arguments.  You've got to get the Court to focus on what is the

24   issue the Court needs to decide, whether it's going to be one

25   side or the other.  Can you do that for me?

2:20-cv-05077-eag Doc #1531-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Designation 03 Documents Pg 1276 of 1466

103

1      **MR. SALTZ:**  I can try, Your Honor.

2      **THE COURT:**  Please.

3      **MR. SALTZ:**  Well, to begin with, Mr. Lowenstein is

4  great at what he does by attempting to muddle the issues, but

5  at the end of the day, nothing he said changes the facts.

6      We are here to deal with the fact that we have the

7  facts that we have, and that is we have a term sheet that is

8  the only agreement in the complaint.  Now, Mr. Lowenstein might

9  have presented evidence of some sort of other issue, but that's

10  not what's in the complaint.  Mr. Lowenstein might have, I

11  think I wrote it down, he said, this is injury to us that we

12  didn't have the authority to enter into this agreement, but

13  that's not what's alleged.

14      The injury that's alleged, the injury, in fact, is

15  that they became legally bound to a contract, which they

16  didn't, and that they gave up money because of the false belief

17  that they were legally bound to do so, which we will go into

18  because they weren't legally bound to give $70 million like

19  they like to represent.

20      The first thing that we're going to do, though, is

21  we're going to, I'm glad that Mr. Lowenstein had the

22  opportunity to backtrack with regard to his representation on

23  Ginsburg, not the least of which is that we have the counsel

24  here in the court who argued the case and won, and whose name

25  is actually on the front page, and it was counsel who pointed

1    out that the Ginsburg case was represented to the Court for a

2    false premise, and the false premise was that there was somehow

3    a departure from what we said the law is, and what counsel

4    cited to this Court was the very argument that was submitted

5    that the Court rejected, and the highlighted portion of the

6    Ginsburg case has this argument that talks about the Texas

7    Supreme Court's opinion in Stanfield, which I told this Court

8    it was bound to, and then it tries to distinguish how, well,

9    that is based upon the previous codification of the law.  And

10   then what the Ginsburg court said was yeah, Ginsburg cites to

11   no binding authority, however, and --

12           **THE COURT:**  Excuse me.  What page are you reading

13   from?

14           **MR. SALTZ:**  Do you want the handout, or do you want

15   the actual case?  From the handout, it's page 18.

16           **THE COURT:**  That's where I thought.  Go ahead,

17   please.  I can follow you.

18           **MR. SALTZ:**  Thank you.  So right underneath the

19   highlighted portion that this case was presented to the Court,

20   the highlighted portion is someone's argument that was

21   rejected.  They're literally quoting, Ginsburg neither alleges

22   nor argues in his brief that defendants actually conveyed an

23   ICC stock.  He instead maintains that the case's defendants

24   cite in support of their argument are outdated because they

25   predate the 1983 amendment to the statute.  Then it cites the

1  brief at page 17.  Ginsburg contends that, and then there's

2  that quote that tries to get this Court to believe that it's

3  not supposed to follow the law, as we said Packard requires the

4  court to do.  And then as soon as they're done citing page 17

5  of the appellant's brief, it says, Ginsburg cites to no binding

6  authority, however, in support of this position.  Numerous

7  cases, including the Fifth Circuit's decision in U.S. Quest

8  postdate the 1983 amendment in 2701 and hold that an actual

9  conveyance of stock must occur in order for there to be an

10  actionable claim under the statute.

11        And then it proceeds to continue to support the

12  position that we had earlier argued and not the position that

13  was rejected.  With regard to --

14        **THE COURT:**  Does it matter that Ginsburg was a

15  stocked option case?  Does that matter at all?

16        **MR. SALTZ:**  It only matters because that was a second

17  reason.  That's when you turn the page and it gets into where

18  Mr. Lowenstein tries to salvage the mistake of presenting this

19  case by saying that the court put in as arguendo, let's assume

20  for a second that we are to follow the Takua case, excuse me,

21  which is the case that the brief asks you to follow and we tell

22  you you can't because it's a lower court.

23        So the Court says that assuming arguendo that, but

24  even, page 19, Your Honor, but even assuming arguendo in

25  italics that it is sufficient for purposes of a claim under

1  Section 2701 to allege a contract to convey stock rather than

2  an actual conveyance of stock, meaning that let's assume for a

3  second you don't have to issue the stock, and they go on to say

4  that because it's the wrong type of agreement, which is

5  specifically prohibited by the statute, you don't pass go, you

6  don't collect $200.

7      So all Mr. Lowenstein has done from what I have seen

8  has bolstered our argument and I'll try to identify these

9  particular issues.

10     First off, this court really is concerned and I think

11  the primary issue is how did we get here?  Well, I'll tell you

12  exactly how we got here.  DCP filed a lawsuit first and DCP in

13  that lawsuit right up front says they signed the term sheet.

14  They didn't say they thought it was signed.  They didn't allege

15  that they acted as if it was signed or all the parties acted it

16  was signed.  They flat out tell the Court and all the parties

17  here the term sheet was signed.  They had no choice.  The term

18  sheet on its face says you can't use me unless I'm signed.

19  Fifth Circuit case law says if the contract says on its face it

20  needs to be signed, you can't interpret that it is.

21     Now, did the parties act in a certain way in which

22  it's believed that they have agreements?  Of course they did.

23  The Trustee is here pursuing a myriad of those agreements, not

24  the least of which is one against Mr. Dundon for $250 million.

25  But for my limited universe, I live within the four corners of

 1  the complaint that DCP filed before the Trustee even had an

 2  opportunity to file its claim and before I was even served.

 3  Not I was served, my client was served.  I was served on behalf

 4  of my client.

 5         And in that regard, I was presented with a pleading

 6  that again said that it was signed.  And throughout all this

 7  litigation, it was represented as it was back then that this

 8  document was signed.  But it was really interesting, Your

 9  Honor.  One of the exhibits Mr. Lowenstein put up was 124-4.

10  And I'm sorry I don't have the slide ready.  But 124-4 **--**

11         **THE COURT:**  I have it.

12         **MR. SALTZ:**  **--** minutes of the special board meeting

13  of the board of directors of Ebersol Sports Media Group.  Well,

14  if the Court looks as to who are the directors present and

15  directors absent, you will notice that Dundon and Zutter are

16  not on there.  If they truly thought that the term sheet was

17  signed and executed, and they were acting as if it was, then I

18  point the Court to the first exhibit.

19         124-1, which says upon the execution of this

20  agreement, the authorized size of the board shall immediately

21  be set at four members, two of which shall be voting members

22  and two shall be non-voting members, consisting of members, two

23  voting members designated by the holders of a majority of the

24  series two initially, John Zutter and Tom Dundon, and two non-

25  voting members designated by Charlie Ebersol.

2:22-ap-50077-eag Doc#1581-1 Filed 02/06/25 Entered 02/06/25 59:19:19 Main Document Design Pg 08
Documents Pg 1281 of 1466

108

1       The only people on February 24, 2019 should have been

2   Zutter and Dundon, but Mr. Lowenstein put this up on the screen

3   to show as absolute proof that there's no term sheet and that

4   no one followed the terms of the binding term sheet because

5   this is a document that is attempting to give the authorization

6   for it, but it's still not signed, and they're still not acting

7   according to it.

8       How is it that on February 24, 2019 there is minutes

9   of a special meeting that is occurring when it's Dundon and

10  Zutter that are in control and they're not mentioned on there

11  as being the only voting board members.  So if the term sheet

12  does exist as they say, then there's only two people who can

13  pass this.  With regard to the fact that they claim they were

14  only given 24 hours as to why they didn't do their due

15  diligence.

16      **THE COURT:**  I was hoping you would comment on that.

17  So go ahead.

18      **MR. SALTZ:**  Well, I got a comment on it.  This is not

19  a deal of life and death for Mr. Dundon.  Mr. Dundon invests in

20  distressed assets.  It's what he does.  This is a dream come

21  true.  To the extent that he invests in it, he's doing so with

22  eyes wide open.  And to that end, he doesn't have to do this

23  deal.  No one's saying he has to do the deal. In fact, he's

24  given a number of interviews saying that he just saw it, he

25  liked it and he went through it.  He's also responded to

1  discovery saying that he never opened the pro forma that he was

2  sent.  So he didn't even rely upon the representations that

3  they claim Mr. Ebersol made.  But more importantly, I point the

4  court to the Mercedes Benz USA, LLC v. Carduco, Inc.

5  case, 583 S.W.3d 553.  And specifically, I believe the jump

6  site is, if you'll excuse me while I find it on here.  563.

7          And immediately under Roman Numeral IV, the Court

8  says in Orca Assets, we said that "in determining whether

9  justifiable reliance is negated as a matter of law, courts must

10 consider the nature of the party's relationship and the

11 contract."  And then it gives the cite to the Orca Assets case

12 if you would like that and the AKB Hendricks LP case that I had

13 cited earlier.

14         Then it says, in an arm's length transaction, the

15 party alleging fraud must have exercised ordinary care to

16 protect its own interests and cannot blindly rely on the

17 defendant's reputation, representations, or conduct where the

18 plaintiff's knowledge, experience, and background warrant

19 investigation.  "And when a party fails to exercise such

20 diligence, it is charged with the knowledge of all facts that

21 would have been discovered by a reasonably prudent person

22 similarly situated."

23         Mr. Dundon is claiming to be a victim of Mr. Ebersol.

24 Markedly missing from the record, and Mr. Lowenstein kind of

25 skated over it, are that almost every single one of the claims

1   of misrepresentation, and this is also in our evidentiary

2   objections where we point this out.  So to the extent that the

3   Court would like a full and complete list for when you review

4   it, you can still look at our motion with regard to the

5   objections to evidence.  But in there is a long list of

6   representations in the response saying that Mr. Ebersol said X,

7   citing to a deposition, testimony, transcript, portion and

8   nowhere in that testimony does it say Mr. Ebersol said

9   anything.  It refers to other people saying things.  It refers

10  to things being disclosed, but the evidence is not presented

11  that Mr. Ebersol actually said anything.  No one could point to

12  anything that Mr. Ebersol said, something in particular.  And

13  not even with regard to the 70 million or the 50 million.

14  These are things that they're claiming that were said.

15          But with regard to that, it's interesting.  As I

16  point the Court to an undisputed fact as stated in DCP's

17  response on page 13, paragraph 18.  And this is really

18  interesting because we're then going to bounce back to Exhibit

19  1.  But what this says is that after entering the term sheet,

20  DCP quickly learned that key representations Ebersol made

21  between February 13th and 14th were false and that Ebersol had

22  failed to disclose a host of material or information relevant

23  to any potential investment in the league.  Isn't that cute

24  that they don't tell you the date that they learned it, but

25  they do say it was quickly.  No, that begs the question.

1          Going back to Exhibit 1, Mr. Lowenstein likes to say

2   that this exhibit shows that DCP was bound to invest $70

3   million.  That's not what this exhibit says.  What this exhibit

4   says is that the funding commitment specifically says initial

5   funding amount, the investor will invest 5,100,000, defining

6   that as the initial funding amount by 1:30 p.m. PST on February

7   14th, 2019.

8          Then it goes on to say, during the period from the

9   effectiveness of this binding term sheet through June 30th,

10  2019, by the way, the effectiveness never went into effect, but

11  in any event, the company will have the right to submit an

12  equity funding request to the investor, which shall state the

13  amount of funding requested and include a supporting budget

14  subject to a maximum cumulative commitment of $70 million.

15         So according to this, the only money that was spent

16  is 5.1, and then the rest is going to be requested.  But as I

17  just pointed out, who's making the request?  Again, the board

18  of directors and governance section says, the only people who

19  have control to make the request are John Zutter and Tom

20  Dundon, so they control the ask.

21         So if they control the ask under this term sheet, and

22  they think that they're bound by the term sheet, and they

23  quickly find out that they -- they admit that they quickly find

24  out that they believe the things that Mr. Ebersol represented

25  to them were false, that means that over $60 million -- 64

1 million and change, was invested after they found out that

2 things weren't as represented and they had no requirement to

3 ask themselves for the money.

4 Now, I thought we were done when Mr. Lowenstein said

5 Dundon decided to go ahead and pick from whatever companies he

6 had in order to pay the debt. Your Honor, you were very astute

7 in saying, where's the agreement? There has to be some sort of

8 agreement. What is a treasury function?

9 Well, the treasury function is that someone pays the

10 bills for the other. How does that happen? I don't know,

11 Mr. Dundon just goes ahead and takes from that checking account

12 to put into that checking account. But the law prohibits that.

13 Remember, we cited Texas law and Delaware law, saying

14 the property of the partnership does not belong to the partner.

15 So Mr. Lowenstein just said to the Court that you're obliged to

16 grant summary judgment because he just told the Court it was

17 Dundon and not DCP, it was Dundon and not DDFS that went around

18 just grabbing funds from wherever.

19 It's also important to note that the facts as stated

20 in the opposition are that at this particular moment in time

21 when there's conversations between Mr. Ebersol and Mr. Dundon,

22 Mr. Ebersol's looking for a $5.1 million bridge loan. He

23 wasn't trying to get someone to come in. And for the record on

24 top of that, it was also misrepresented that there were no

25 sources of income. Now, I know this Court asked the question.

22-50577-cag Doc#1381 Filed 02/06/25 Entered 02/06/25 59:19:19 Main Document Designated Pg 113
Documents Pg 1286 of 1466

113

1    I can play, bingo, collect these later.

2         **UNIDENTIFIED SPEAKER:**  Sorry, Judge, I just did all

3    I'm doing today.

4         **MR. SALTZ:**  If he went ahead and, excuse me --

5         **THE COURT:**  Do you need to confer with counsel?

6         **MR. SALTZ:**  No, no, it just took me off, so I'm

7    sorry.

8         The Court asked the question with regard to funding.

9    And the Court asked, what were the sources of funding?  DCP

10   fails to tell you that Mr. Fowler was still funding up through

11   and to February 11th.  $1.5 million came in from Mr. Fowler on

12   February 11th.  He was still funding.  He just wasn't funding

13   in the amounts that he was supposed to do when he was supposed

14   to do, but money was still coming in.  And it was to get a loan

15   to supplement Mr. Fowler, not replace him.  It was Dundon who

16   is the one that pitched Mr. Ebersol.  You need a better

17   investor.  I'm your guy.  The offer was made by Mr. Dundon, not

18   by Mr. Ebersol.  Mr. Ebersol didn't offer stock.  Mr. Dundon

19   said, I'm your investor.  I'm your series infinity.

20        **THE COURT:**  Hold on.  Hold on.  Where is this in the

21   record?  Is there evidence?

22        **UNIDENTIFIED SPEAKER:**  There's your evidence right

23   here.

24        **UNIDENTIFIED SPEAKER:**  It was so powerful.  Oh, I'm

25   fine, yeah.  I was stretching, because I was at the edge of my

222-0567777-eag Doc#1581-1-Filed 02/06/25 25 nfered 02/06/25 15:59:19 Main Docum Desig Page14
Documents Pg 4 1287 of 1466

114

 1   seat with this impassioned speech, so.

 2          **MR. SALTZ:**  So the evidence --

 3          **THE COURT:**  Let's -- take a breath.  Let's -- we're

 4   going to break this down a little bit.

 5          **MR. SALTZ:**  Yes.

 6          **THE COURT:**  So the first thing is, what caught my

 7   attention is I specifically asked Mr. Loewenstein, so was there

 8   a gap in time between what Fowler was doing and what Dundon was

 9   doing?  And he said, sure, there was some time between that.

10   That's why we needed Dundon to come on board.

11          What you're saying, which then goes to, is there any

12   record evidence on this?  That's not exactly correct.

13   Mr. Fowler did provide some money, and the funding that was

14   provided by Mr. Dundon was more of a supplemental nature, which

15   frankly, maybe I've missed it, is the first time I've heard

16   this argument.  Is there testimony to this fact?

17          **MR. SALTZ:**  Yes, Your Honor.  The fact is that they

18   were only looking for the $5.1 million bridge loan.  They were

19   just trying to make payroll.  They weren't looking to replace

20   him, and in the record --

21          **THE COURT:**  No, that's not the question.  Hold on,

22   that's not the question I asked.  The question I asked was you

23   said, in response to Mr. Lowenstein, was really what Dundon was

24   after was to provide supplemental financing.  Did he say that?

25   Did he know that?  I'm just curious where that came from.

1    MR. SALTZ:  In here is the release agreement that

2  they had Mr. Fowler sign, and I'm trying to pull that up for

3  you, Your Honor.

4          THE COURT:  Sure.

5          MR. SALTZ:  Release agreement looks like it is

6  Exhibit 4 -- 124-4.

7          THE COURT:  Okay.

8          MR. SALTZ:  And it's also in Mr. Ebersol's

9  deposition, but in this particular instance, the letter sent

10  with regard to breach.

11          THE COURT:  Let me catch up to you, okay?

12          MR. SALTZ:  Yes.

13          THE COURT:  The fact that I really want -- grabbed

14  onto this is you really want me to read this.  Okay, so don't

15  go too fast.  I appreciate you're trying to answer my question.

16   So, this is -- what did you tell me again, please?

17          MR. SALTZ:  120 -- well, my document in here is 124-

18  4.  I believe there -- that might have also been updated to,

19  was it 142-4?

20          MR. LOWENSTEIN:  It's still 124-4.

21          MR. SALTZ:  So, 124-4.

22          THE COURT:  And for the record, this is -- can you

23  identify what the exhibit is for the record, please?

24          MR. SALTZ:  I'm sorry?

25          THE COURT:  Can you identify for the record what the

2:20-cv-05077-eag Doc #1301 Filed 02/06/25 Entered 02/06/25 09:19:19 Main Document Design Page 16
Documents Pg 1289 of 1466

116

```
 1   exhibit is, please?

 2          MR. SALTZ:  Exhibit 4 at document 124-4, it is the

 3   release agreement as put forward by DCP.

 4          THE COURT:  Okay.  Go ahead.

 5          MR. SALTZ:  This release agreement says that there

 6   wasn't a letter declaring a breach until February 18th, 2019.

 7          THE COURT:  All right.  Okay.

 8          MR. SALTZ:  Mr. Fowler signs it.  I'm looking for the

 9   date.

10          THE COURT:  Okay.  Do you see a date?

11          MR. SALTZ:  Well, the -- there's a minutes of special

12   board meeting to which that is attached as an exhibit, also

13   part of 124-4.  And that makes reference that Mr. Fowler did

14   not resign from the board until February 23rd, 2019.

15          THE COURT:  Okay.  So going back to what you were

16   saying earlier, what does this tell me?  What's the point

17   you're trying to make?  You're -- I'm not being sarcastic.

18   You're very animated about this.

19          MR. SALTZ:  I appreciate that, Your Honor.

20          THE COURT:  So tell me what the point is.

21          MR. SALTZ:  The point is, is that the facts as

22   represented, especially with regard to the payments, that

23   there's also no record from Mr. Lowenstein and DCP with regard

24   to no monies coming in.  And the Court had asked that question

25   regardless of the record.  My assumption was it was for the
```

1    Court's edification.

2         **THE COURT:**  Yes.

3         **MR. SALTZ:**  So that evidence is presented with regard

4    to that.  And yes, there's ample evidence, especially within

5    the Trustee's records as to Mr. Fowler's contributions.  And

6    the last one being for 1.5 million on February 11th.

7         The point being is that Mr. Fowler was not honoring

8    his commitment, not that he wasn't funding.  He wasn't funding

9    pursuant to his agreement.  And that is also articulated in the

10   undisputed facts that he wasn't performing, but it doesn't say

11   that he also wasn't funding.

12        So also with regard to the claim that there's common

13   ownership between DCP and DDFS partnership, although one of the

14   partners is involved in both, both do not have the same

15   ownership.  So that is a distinction with a difference.

16        DDFS partnership has at least three other partners.

17   DCP only has one owner.  And that owner only has one owner.  So

18   to the extent that there is a pass-through, the pass-through

19   only flows through the stream one way.  It doesn't take a right

20   turn and flow into somebody else's stream in order to go up

21   there.

22        And as the Court noted, with regard to a treasury

23   function, at bare minimum, there's going to be some element of

24   trust.  There's going to be an agreement that one is going to

25   satisfy the debts of the other, or one's going to pay the debts

1   of the other.  The companies have to come to this agreement.

2          To the extent that there's no evidence of this

3   agreement, to the extent that Mr. Lowenstein just admitted that

4   it was just an arbitrary thing that Mr. Dundon decided to do in

5   violation of Texas and Delaware law, with regard to him

6   exercising his own control over the assets of the individual

7   partnerships, the monies did not come from DCP, and DCP does

8   not have a legitimate claim of right, title, or interest in the

9   monies from DDFS.

10          If that were the case, there would have to be an

11  assignment, at bare minimum.  And the complaint doesn't allege

12  that there's an assignment, and nor was any evidence presented

13  of one.

14          With regard to -- I've covered the other revenue.

15  With regard to Mr. Koulis, the testimony that they brought up

16  with regard to him says they found out after the fact.  Again,

17  with regard to the representations, as I pointed out, also the

18  response says that they found out quickly, and yet continued to

19  fund, pursuant to the Mercedes case, pursuant to the Orca

20  Assets case, and the AKB Hendricks case, all of that

21  establishes that, number one, their lack of diligence is

22  unreasonable, and it establishes that they didn't rely upon

23  Mr. Ebersol's representations to the extent he made any of

24  those representations, or omissions for that matter, because

25  they continued to fund thereafter with eyes wide open.

1    As far as this Court saying that there has to be

2  intent to have an agreement, and I found that question very

3  poignant, because I agreed there does have to have an intent to

4  have an agreement, and there very well, most likely, was an

5  intent to have an agreement.  As demonstrated by the conduct of

6  the parties, that agreement is most likely another agreement,

7  wherein the parties were dealing with one another, most likely

8  either the Dundon agreement for 250 million, or whether it was

9  another agreement that the parties entered into, but none of

10  that has anything to do with the agreement that's in front of

11  us today, and that is this one particular term sheet that is

12  the only agreement alleged to have existed for the purposes of

13  obtaining relief, and it is that agreement that establishes

14  what the intent of the parties are on its face, and it is that

15  agreement that says, unless both of us sign this document, this

16  document does not become binding on the parties.

17    Also, with regard to the evidence stating that

18  everybody believed that the agreement was in effect, well, that

19  may be true, that everybody did believe the agreement was in

20  effect, and as we stated, that was the representation that was

21  being made by the party who did not sign the agreement.  The

22  representation was that it was signed.  The representation was

23  made all the way through discovery that it was signed.  In

24  fact, it was alleged that it was signed.  So for the parties to

25  believe, or to be given some false sense that they are subject

1    to an agreement doesn't change the fact that they're not.  It

2    changes -- what it does is it establishes that the parties

3    were, in fact, incorrect, and just because I believe something

4    to be true doesn't make it true, or just because I've been

5    misled that something is true, that doesn't mean that all of a

6    sudden it is made true.

7            So in that, Your Honor, we submit that at no point is

8    there a binding agreement.  It appears now that DCP agrees that

9    there's no binding agreement because they didn't sign it, so

10   the agreement that they claim is there injury, in fact, in the

11   complaint that's before us, unamended, is not an injury of

12   fact.  And the revelations made during oral argument is the

13   admission that the monies didn't belong to DCP.

14           It is undisputed DDFS took the loss.  It is

15   undisputed DCP did not take the loss.  And it is undisputed

16   that the law is that Mr. Dundon can't just arbitrarily exercise

17   dominion and control over the property of a partnership, even

18   if he is a partner.

19           So with that, we submit, Your Honor.

20           **THE COURT:**  All right.  Thank you.

21           So let's take a short break, and -- which one are we

22   going to argue next?

23           **MR. LOWENSTEIN:**  The DCP Dundon motion for summary

24   judgment, Your Honor, which is, I don't have the number.

25           **THE COURT:**  You can give it to me when we get back --

1          **MR. LOWENSTEIN:**  Okay.

2          **THE COURT:**  But we'll start with that one next.  It's

3    going to be a short recess, like 10 minutes, and we'll come

4    back, and then we'll proceed on that and see how the afternoon

5    plays out.

6          Thank you, ladies and gentlemen, a short recess.

7          **THE CLERK:**  All rise.

8      **(Recessed at 1:32 p.m.; to reconvene at 1:56 p.m.)**

9          **THE COURT:**  I'm not going to rule right now, but I

10   think we have clarity on what we need to do.  Okay?  But I want

11   to be careful in how I rule.  So we'll take it under

12   advisement.  I may do a written order.  I may do an oral

13   ruling, but we'll get back with you.

14         And, yes, I know there's a trial date of March 10th

15   right up here.  I haven't forgotten that, rats.  So --

16         **UNIDENTIFIED SPEAKER:**  Remember, I tried to tell you,

17   Your Honor, that you don't have to decide every motion.

18         **THE COURT:**  I don't know.

19         **UNIDENTIFIED SPEAKER:**  You need to remember that.

20         **THE COURT:**  I don't know that's a good idea because

21   then you don't know what to try.  Right?

22         **UNIDENTIFIED SPEAKER:**  Everything, Judge.

23         **THE COURT:**  Yeah.  Yeah, I get that.  Because the

24   summary judgment motions are against your client, right?

25         **UNIDENTIFIED SPEAKER:**  Well, no.  I mean, they are,

122

```
 1   but --

 2             THE COURT:  Yeah.

 3             UNIDENTIFIED SPEAKER:  -- but it doesn't matter.

 4             THE COURT:  No.  I will say this.  Don't read

 5   anything into this other than the following, which is, we now

 6   have -- the oral argument was very helpful.  So we now have an

 7   understanding of what we need to do.  Okay.  Who's up next?

 8             MR. LOWENSTEIN:  More of me, Your Honor.

 9             THE COURT:  All right.  That's fine.

10             MR. LOWENSTEIN:  Jeff Lowenstein for the DCP parties,

11   representing the motion for summary judgment filed by DCP and

12   Dundon, which is, is it 173?

13             THE COURT:  Yes.

14             MR. LOWENSTEIN:  Okay.  And then the response is -- I

15   don't have any of these.  196.  Thank you.

16             THE COURT:  And the reply?

17             MR. LOWENSTEIN:  And the reply, 229.

18             THE COURT:  All right.  Thank you.

19             MS. WILLIAMS:  Your Honor, we did file just a

20   handful -- Nicole Williams.  We did file --

21             THE COURT:  Are we picking Ms. Williams up?  You need

22   to get closer to the microphone, ma'am.

23             MS. WILLIAMS:  I just wanted to note, we did file a

24   handful of objections at ECF No. 195.  The parties are both

25   fine to have those on submission, but if you wanted to hear
```

1295

1  them, Mr. Atkins is ready to argue.

2         **THE COURT:**  Let's do it now.

3         **MR. LOWENSTEIN:**  Well, can I just add some clarity to

4  that?  I was going to address our objections because my main

5  objection is on the parole evidence rule, which is both a

6  substantive and evidentiary issue.  So I was going to go

7  through, give it more context in my argument on the main

8  motion, and just note for the Court that our parole evidence

9  objection and the exhibits that relate to that.

10        I can do it now.  I would love the benefit of putting

11  it in context for the Court before I ask the Court to rule on

12  that objection.

13        **THE COURT:**  Mr. Engel?

14        **MR. ENGEL:**  I will say, Judge, that Mr. Lowenstein

15  and I had some conversation about objections because he's

16  lodged, you know, 55 or 60 objections that we think, between us

17  having discussed it, are probably just better given to you

18  because they're going to require you to look at individual

19  lines of testimony and things of that sort, probably.

20        I'm perfectly fine with Jeff's proposal that, since

21  it is a mixed substantive and other question on parole

22  evidence, it's probably best to be heard within the context of

23  the argument.  And --

24        **THE COURT:**  Go ahead, and then I have a question.  Go

25  ahead.

```
1     MR. ENGEL:  Yeah, and then I think Ms. Williams

2   accurately characterized our view on the rest.  My goal for

3   today, Judge, would be to get through the arguments on this

4   thing and, you know, pick up the ancillary issues later because

5   everybody's here.  I'm sorry, Judge, I cut you off.

6     THE COURT:  No, no, no, it's fine.  So just follow

7   along.  So what I have in my hand are an 05078 ECF 195, the

8   Chapter 7 Trustees' omnibus objections, the Defendant's motion

9   for summary judgment evidence as it relates to 173.

10     MR. ENGEL:  I think that's right, Judge.  I don't

11   have the numbers in my head.

12     THE COURT:  And then I have Defendant's omnibus

13   objections evidence cited, Chapter 7 Trustees' response to

14   Defendant's John Zutter's motion at ECF No. 231, which there is

15   a great deal of detail, line item by line item.  Can you see my

16   handwriting on this?

17     MR. ENGEL:  Yeah.

18     THE COURT:  No, I didn't want you to see my

19   handwriting on this, where you don't want the Court to rule on

20   these objections right now.

21     MR. ENGEL:  Well, I think that's right.  They're

22   going to take a long time.  I have a written response prepared.

23    It's due today.  I just haven't filed it yet because I had to

24   get down here.

25     THE COURT:  And so how, to that point, I'm sorry to
```

125

 1 | belabor the record, how do you want the Court to rule, if I may

 2 | finish, because I haven't ruled on the objections, so you're

 3 | making an argument that might rely on evidence that is subject

 4 | to objection.

 5 | **MR. ENGEL:** Well, I'm going to share a thought with

 6 | you that Judge Monroe, something he said to me many years ago,

 7 | which I thought was particularly apropos in bankruptcy court.

 8 | As a young lawyer, I used to get up all the time and make

 9 | hearsay objections. And Monroe would, you know, he had those

10 | little square glasses. They would always come down like this.

11 | And then I knew I was in for it. And he would say, how can I

12 | rule on hearsay until I hear him say it? Sit down and don't do

13 | this to me again.

14 | That's just a funny story about Judge Monroe because

15 | I miss him. But I think in bankruptcy court, you're a bench

16 | trier of fact. You, as you're going through, can look to the

17 | evidence, can look to the objection, and probably handle it

18 | more efficiently with better context for those hearsay

19 | authenticity kind of objections, it seems to me.

20 | The ones Mr. Lowenstein are talking about have a true

21 | flavor of substance in them, and I think the Court will be

22 | aided by the argument probably in full context. And I know

23 | we're prepared to do that over here. So that's all I've got to

24 | say on it, Judge. I'm mindful of the admonition you made

25 | earlier today about saving time. I'm still stinging from it.

2:22-cv-05057-reag Doc #1581-1 Filed 02/06/25 Entered 02/06/25 59:19:19 Main Document Design Page 26
Documents Pg 1299 of 1466

126

1          **THE COURT:** Okay. So I'm going to get a response to

2    the objections to evidence today; is that correct?

3          **MR. ENGEL:** Yeah. It's going to be filed when I get

4    back to my house.

5          **THE COURT:** So I think that answers the question.

6          **MR. ENGEL:** Yeah.

7          **THE COURT:** I need to see what the response is.

8    Okay. Thank you.

9          **MR. ENGEL:** Thanks.

10          **THE COURT:** All right.

11          **MR. LOWENSTEIN:** All right. Can I begin?

12          **THE COURT:** Yes, you may. Please.

13          **MR. LOWENSTEIN:** That's not a very formal. If it

14    pleases the Court, that would be a more formal way to say this.

15          Okay. So we're going to split up this argument if

16    it's okay with the Court. I'm going to handle the breach of

17    contract-related issues or oral contract, contract-related

18    issues, and Mr. Hockaday is going to handle the balance of our

19    motion, just because I had a finite amount of energy to get rid

20    of all of these things, which I'm sure the Court appreciates.

21    So my portion is going to cover the contract-related claims.

22          **THE COURT:** All right.

23       **(Pause)**

24          **MR. LOWENSTEIN:** All right. So the term sheet is the

25    only contract. Let me walk you through a timeline to explain

1    to you why that has to be the case.  We know from testimony

2    that on February 13th and 14th of 2019 is when Mr. Ebersol and

3    Mr. Dundon talked for the very first time, and in Mr. Ebersol's

4    words, the agreement was formed on late morning on the 14th of

5    February 2019.  And the agreement that Mr. Ebersol says was

6    reached, in his words, were, Tom Dundon agreed to invest $250

7    million for majority of Ebersol Sports Media Group and its

8    subsidiaries' total control of the board, and I believe that's

9    it.

10        So 250 million in exchange for majority of the

11   company and total control of the board.  That was reached on

12   the morning of February 14th.  And then asked for clarification

13   by Mr. Ebersol.  So in your conversation with Mr. Dundon, let's

14   get the deal done for $250 million.  The actual structure of

15   what that would be, whether debt or equity, was not agreed to,

16   correct?  That is correct.  And that is consistent with what's

17   in the Trustee's complaint, which is it was undecided whether

18   it be debt or equity.

19        And so about next steps after this oral agreement,

20   Mr. Ebersol testifies, and I said to him, meaning Ebersol to

21   Dundon, I have to take you at your word on this call right now

22   because I have to represent to my board that the company is

23   agreeing to give up majority control for effectively your word

24   that you're going to invest $250 million.  And he said, meaning

25   Mr. Dundon, you have my word.  This is the deal.  You can tell

1  your board and investors this is my agreement, my commitment.

2   Okay?  That is Mr. Ebersol's testimony on what happened in

3  this agreement on the morning of February 14th.  It's obviously

4  disputed, but we're moving for summary judgment.  So just

5  assume what Mr. Ebersol said for the purposes of this process

6  is right.  I think the court has to.

7          THE COURT:  Well, it's a statement under penalty of

8  perjury, right?

9          MR. LOWENSTEIN:  Yeah, but it's completely

10 inconsistent with the other party to the call.  But for

11 purposes of this motion, you have to assume that this is the

12 evidence, because you have to take evidence.

13         THE COURT:  Right.  I'm --

14         MR. LOWENSTEIN:  So I am saying that I'm not arguing

15 he was lying in this motion, and I will do it when I put him on

16 the stand at trial.

17         So he says, and the important part here is he says, I

18 need you to tell me what we're doing because I need to take it

19 to my board.  And then I asked him, so when you went to the

20 board, did you raise -- I said, you could have raised in the

21 board meeting to the board that your understanding of the deal

22 was it was for $250 million, but you didn't raise that, did

23 you?  I did not raise that.  And what happened with the board

24 is really important.

25         So timestamp, we know the alleged agreement for $250

129

1   million was the morning of February 14th.  We know later on

2   February 14th, the term sheet was done.  And we know what's in

3   the term sheet is a deal between Dundon Capital Partners and

4   Ebersol Sports Media Group for $70 million total maximum

5   commitment.  I mean, that's the key language is where it talks

6   about the commitment, subject to a maximum cumulative

7   commitment of $70 million.  And it says that upon execution for

8   that 70 million, Dundon Capital Partners will get 75 percent of

9   the company's fully diluted stock.  And on the next page, two

10  voting members designated by the holders of a majority of the

11  Series 2 stock to start with would be Dundon and Zutter.

12        So morning of February 14th, you've got this alleged

13  oral discussion when it comes to actually putting it down into

14  writing and executing it, setting aside Mr. -- I just did the

15  naming the lawyer thing.  I'm not going to do that.  Setting

16  aside Mr. Ebersol's arguments about the signature issue, which

17  I think we've addressed sufficiently, and the Trustee's

18  certainly take the position that this is a binding, fully

19  executed document.  That was the deal as of the afternoon. The

20  only thing put down in writing was this.

21        So then there's the question of, okay, well, then

22  Dundon and Ebersol go on this media thing, where they're

23  telling the world there's a $250 million deal.  Our parole

24  evidence objection is, for reasons laid out in the case law and

25  all of that, that all of the statements about $250 million are

1   inadmissible because the written agreement controls and you

2   can't offer evidence.  But I'm not going to argue more about

3   that.  I just wanted to note for the Court that's the basis of

4   the parole evidence rule.

5          So between February 18th and -- that's not right.  I

6   will edit this orally, but the press that went on with press

7   releases and tweets and interviews and all of that where

8   Mr. Dundon and Mr. Ebersol talked about $250 million happens

9   between February 18th and February 22nd.  This says the 19th,

10  but if you look at all of the exhibits in footnotes 40 and 41

11  of the response, that's all of the press releases they're

12  relying on and media statements and other things.  That occurs

13  between February 18th and 19th.  So that's in 22nd.

14         So after the media -- I'm going to call it media

15  blitz.  After the media blitz, about the $250 million, which

16  comes after the written term sheet, is the February 24th board

17  of directors meeting.  And this board of directors meeting, as

18  laid out in the evidence, happens with Mr. Ebersol and other

19  board members.  They're in one of the games at a stadium when

20  they conduct this board meeting.  Ms. Belt, the company's

21  lawyer, appears by phone, and she's the secretary of the

22  meeting.  This is after the statements about the 250 million.

23         **THE COURT:**  And -- were a sufficient number of board

24  members present at that meeting to conduct business?

25         **MR. LOWENSTEIN:**  Yes.  They note that in the board

1    minutes, but it was everybody except for Mr. Rabois was present

2    in the meeting.

3              **THE COURT:**  Okay.

4              **MR. LOWENSTEIN:**  So they have this board meeting.

5    Dundon and Zutter don't attend because the purpose of the

6    meeting is to approve the term sheet, to bring them in as board

7    members officially.  There's certainly evidence that they

8    jumped in and got involved immediately and started funding

9    immediately.

10             You see in the board minutes that by the time they

11   even get to this board meeting, the company's already accepted

12   $12 million from DCP.  So they're up and running before this is

13   done, but it needed to be done because it wasn't even actually

14   officially approved until this board meeting.  But that was the

15   first step in approving it.

16             But notably, there's statements about Zutter and

17   Dundon somehow forcing Ebersol and the other board members to

18   do this board meeting and to enact these things and do all of

19   this.  But the actual communications that come from it is in

20   173-5, and this is excerpted from that exhibit.  But

21   Mr. Zutter, on February 24th, asks Mr. Ebersol, can you provide

22   us with documentation on both the RGI (phonetic) thing, which

23   was the release we looked at before in a voting agreement, and

24   the board resolutions?  Thanks, Charlie.  This is important.

25   Now, we just need to get MGM, and that's a related but separate

2:22-cv-05077-eag Doc #1381-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 182
Documents Pg 1305 of 1466

132

1   issue relating to some of the default issues that happen.

2        And Mr. Ebersol then forwards these documents to

3   Mr. Zutter upon his request, which included the board meeting

4   minutes.  So the evidence does not support the idea that there

5   was some strong arming, or Mr. Zutter is saying, where are the

6   documents to support this?  And, again, these documents are

7   being put together by Dawn Belt, the ESMG's legacy counsel that

8   was engaged to help get this deal confirmed.  And it shows that

9   she was present, Charlie Ebersol, Dick Ebersol, Jeff Morad were

10  all present as directors.

11       This is where they approved and ratified the release

12  agreement and the Holder Voting Agreement relating to Fowler,

13  and then they approved the term sheet.

14       And the important thing here is this term sheet is

15  very specific about what -- oh, I'm sorry, I didn't point this

16  out.  At the beginning of it, it says, Mr. Charlie Ebersol and

17  Ms. Belt presented a summary of the Series 2 preferred stock

18  binding term sheet to the board.  So this was their

19  presentation of the lawyer and Charlie to the board, and in

20  this presentation, they talk about the deal and then elicit

21  these whereas clauses from the board.  And it says, whereas the

22  term sheet provides for an investment of up to $70 million from

23  Dundon Capital Partners on terms that significantly dilute the

24  ownership and significantly impact the economic and control

25  rights of the corporation and existing stockholders, and the

1    corporation has already received over $12 million from Dundon

2    Capital Partners.

3           So this is Mr. Ebersol and Ms. Belt's representation

4    to the board that this was for an investment of up to $70

5    million.  And then it gives the explanation for why they're

6    doing this specific deal.  And why they're doing this specific

7    deal is, meaning exchanging 75 percent of the company's equity

8    and the control of the board in exchange for $70 million, which

9    is expressed in the agreement, is that the board believes that

10   -- oh, I'm sorry, let me read the whole thing.

11          Given the corporation's financial position, cash

12   reserves, accrued but unpaid liabilities, near and long-term

13   prospects, strategic goals and objectives, current product

14   development and business development efforts, financing

15   alternatives, and other relevant consideration, the board

16   believes that it is advisable and in the best interest of the

17   corporation and its stockholders to raise additional working

18   capital and effective recapitalization of the corporation's

19   capital stock in accordance with the term sheet.

20          So it does not -- and nowhere in here I've asked

21   every single witness who was involved, did anybody ever bring

22   up $250 million.  I showed you Mr. Ebersol's, but Ms. Belt

23   couldn't remember anybody bringing it up, and Mr. Friedman, who

24   was there, Mr. Kanowitz, nobody could remember anybody even

25   saying, wait a minute, what about $250 million?  But that's not

222 05077 eag Doc#1581 Filed 02/06/25 Entered 02/06/25 59:17:19 Main Document Design Page 34
Documents Pg 4 1307 of 1466

134

 1   the end of the story.  There's more paper.

 2          And this is all after they'd just been out telling

 3   the media and the press about the $250 million.  This is what

 4   they went to the board with.  And remember Mr. Ebersol said, I

 5   need to go to my board with this deal, and he didn't go to the

 6   board with the $250 million deal.  He went to the board with

 7   the $70 million deal.  And this idea that it was Dundon or

 8   Zutter's idea that $70 million was the deal, I showed you that

 9   Mr. Ebersol, three days earlier, was out talking to other

10   investors about $70 million.  They didn't come up with the

11   number.

12          So that's not the end of the story.  On February

13   27th, there is -- the lawyers on both sides are talking about

14   this change of control caused by the term sheet triggered a

15   whole bunch of things, which was defaults under promissory

16   notes, and it triggered some conversion of warrant rights where

17   there was other people that were going to get more stock

18   automatically because of this change of control, and it created

19   a big mess that needed to be worked out.  So the Fenwick

20   lawyers went about creating this omnibus waiver, which we

21   talked about earlier, to try to repair all of that.  It never

22   got signed.  But the importance is, and again, this is the

23   lawyers for ESMG on February 27th prepare this document.  And

24   in this document, they say, in connection with and pursuant to

25   that certain binding term sheet for Series 2 preferred stock,

135

1    buying between Dundon Capital Partners and the company, and

2    this is why this document is important, the lawyers put in

3    there Dundon Capital Partners or one or more of its affiliates,

4    including affiliates of Thomas G. Dundon, collectively Dundon,

5    has committed to invest up to $70 million in the company in

6    exchange for Dundon receiving, among other things, 75 percent

7    of the company's fully diluted stocks.

8          So to the extent there was any confusion about who

9    was involved, what was involved, what the consideration was,

10   the lawyer for the company is submitting to the Dundon side

11   this document that says, we're going to try to get this fixed,

12   and here's our description of the deal.

13         So you've got one thing prepared by the lawyers on

14   the 24th, another one on the 27th, and again, no mention of

15   $250 million anywhere.  Now, fast forward all the way to March

16   27th, which is days before all the money's been -- days before

17   the league is going to be shut down, a week.  And again, they

18   put together a stockholder agreement, because if you recall,

19   Mr. Dundon -- or Mr. Ebersol's testimony was, I believe I need

20   approval from -- well, it actually doesn't matter because it's

21   in the document.  So let me just show you.

22         So now this is a stockholder agreement signed by the

23   shareholders of ESMG, approving the term sheet.  And it talks

24   about the board previously approved it.  It says the term sheet

25   provides for an investment of up to $70 million.  This is a

136

1   month and a half after this has been going on, a month and a

2   half after the media, a full month after the media statements,

3   and this is the representation of the shareholders of the deal.

4   The corporation has already received approximately $50 million

5   from DCP under these terms.  And then it goes on to explain

6   that the written consent of affirmative vote of the holders is

7   required to implement certain of the transactions described in

8   the term sheet.  So there's much ado about we didn't get to the

9   point where there was the definitive documents for the transfer

10  of the equity and other things like that, share certificates.

11  It's because we're all the way at the end of the league's life,

12  and they're just now getting the stockholders to approve the

13  deal.

14          And then it represents the requisite majority is

15  approving this deal.  So this is all the way at the end.  We're

16  still talking about 70, and I asked every witness I could

17  remember to ask, did anybody bring up $250 million in this

18  process?  And the answer was always, I don't recall that

19  happening.

20          Okay, and then you've got Charlie's own email.  So

21  this is also on February 27th when the discussions are being

22  had.  We're running out of the Dundon Capital Partners' $70

23  million, and we're not going to make it to the end of the

24  season.  Here's how much money is left.  How do we get to the

25  end of the season?  And they task Charlie and Charlie's guys

 1   with coming up with plans and potential plans.

 2          And everywhere in this email, the reference is to $70

 3   million and then talks about additional funding.  Hang on a

 4   second.  In here in the second bullet point under global notes,

 5   and this is to Tom Dundon and John Zutter and Jason Koulos,

 6   where Mr. Ebersol is presenting this, and he says under global

 7   notes, the more time we have to close potential investors,

 8   buyers, and the more of the season that is completed, the

 9   higher likelihood of their investing.

10          So in this email, at the very end, when they're

11   talking about shutting down the league, he's not saying, where

12   is your $250 million?  What about the $250 million?  We had an

13   agreement for $250 million.  He's saying, here's the options to

14   try to keep the league alive as long as possible so that we can

15   look for other investors.  And everything in here references

16   $70 million and talks about potentially more than that needed

17   to be done.  But in those discussions, for instance, here under

18   option four, it says that this is the plan of what it would

19   have cost to get to the end of the season as originally

20   contemplated.

21          What are the risks, he says?  Increased risk with

22   debtors, significant AP will continue to grow, meaning he

23   understands that the funding of DCP is about to run out, and if

24   we spend this extra money, we're going to do what we did before

25   Dundon came in, which is dig another $20 million hole.

1    It's just beyond explanation for why throughout this

2    whole process, after what was said to the media, that if

3    somebody really believed there was an agreement for $250

4    million that actually happened, why they're not pounding on the

5    table at this last hour saying, where is the $250 million?

6    Where is it?  What happened to that deal?  It just doesn't

7    happen because nobody believed it until it became a theme in

8    this case after the players brought their class action suit

9    that there was a contract for $250 million.  That is, I love my

10   opposing counsel, that is a lawyer-created thing, not the fact

11   witnesses that were involved that really believed that.

12   Mr. Ebersol said it in his deposition after there was

13   a settlement in the players' case, where he agreed that he

14   would testify.  But other than him, and even in his own

15   contemporaneous emails, it's just --there's never anywhere

16   where somebody brings up the $250 million and starts pounding

17   on the table and saying, why aren't we talking about that?

18   Where's the other $180 million, Dundon?

19   And then I showed you before on April 2nd, even after

20   that, Mr. Farrell, in conversation with Mr. Zutter, is talking

21   about the winding up of the league and what to do with the

22   funding amount that's left under the $70 million commitment.

23   And he says, we've gone through this analysis.  We're asking

24   for approval for some funding right now.  And he says in his

25   email, this leaves us -- oh, I'm sorry, it's April 3rd, not

139

1   April 2nd.  This leaves us with about $460,000 of cushion under

2   the current plan.  And then Mr. Kanowitz, on his own, shows

3   these totals of Dundon total funds to date and Dundon total DCP

4   commitment.  This is on April 3rd, and if you add those numbers

5   up, the 69 million and change and the 461 and change, it's

6   exactly $70 million.  No reference to $250 million anywhere.

7   Mr. Kanowitz is nobody saying, what about that funding?

8          Okay.  So that is the evidence of the only agreement

9   is the term sheet and the Texas Supreme Court precedent that

10  we've cited, which is the Nation's Bank.  I'm sorry, that's a

11  Fifth Circuit case.  The Nation's Bank v. Perry Brothers is a

12  Fifth Circuit case, and then West v. Quintanilla, which is a

13  Supreme Court case, which are both cited in the briefs.  Both

14  say when you have an alleged oral agreement or an oral

15  statement that is inconsistent with the terms of a written

16  agreement, it can't be admitted to modify the terms of that

17  agreement.

18          MS. WILLIAMS:  I'm sorry, Mr. Lowenstein.  Can we --

19  where is this from?  Because I don't believe this is attached

20  to your motion for summary judgment.  I apologize if I missed

21  it.

22          MR. LOWENSTEIN:  It's ECF No. -- it says 124.41.  Is

23  that wrong?

24          MS. WILLIAMS:  Well, 124 is not the ECF for this.

25  And there were only 19 exhibits to your motion for summary

2:22-cv-05077-cg Doc #1581 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Pg 140 Documents Pg 313 of 1466

140

 1   judgment.

 2            **UNIDENTIFIED SPEAKER:**  Is there a separate appendix?

 3            **MR. LOWENSTEIN:**  This may be, this may have been, but

 4   I think it was included in the Ebersol response.

 5            **MS. WILLIAMS:**  Okay, well -- sorry, Your Honor, let

 6   me get near a microphone.  I just want to put this on the

 7   record because it was an issue I was going to raise in my

 8   introduction.

 9            There have been references to things that are only in

10   the Ebersol MSJ record, and our position is if they're not in

11   the MSJ record for our motion, or their motion in our case,

12   that that's not appropriate evidence for consideration here.

13    So I just want to say that for the record.

14            **THE COURT:**  Okay, so just so I'm following along, you

15   believe that some of the documents contained in the summary

16   judgment motion are not in -- were not attached to the summary

17   judgment, they were attached to another summary judgment

18   motion?

19            **MS. WILLIAMS:**  Correct, Your Honor.  And to be clear,

20   they're also not referenced in the motion for summary judgment.

21   These are new things that are outside of the summary judgment

22   record, and I would need to go check each one of them, but I

23   know this ECF number is wrong, and I know there were only 19

24   exhibits, so Exhibit 41, correct, Your Honor.  So 41 doesn't

25   make sense, but I also don't remember this one specifically.

1    So I just want to, you know -- if we need to address them one

2    by one, I will, but I thought this might be an issue when I

3    heard some reference in the Ebersol argument to things they

4    were going to say here that I knew were not things attached for

5    this record.

6            **THE COURT:**  We'll -- at some point, we'll get it

7    cleaned up.

8            **MS. WILLIAMS:**  Okay, thank you, Your Honor.

9            **THE COURT:**  But thank you for identifying it.  And of

10   course, you'll get a chance to respond.  Go ahead, please.  At

11   the appropriate time.

12           **MR. LOWENSTEIN:**  So I think I was on parole evidence

13   that the non-written statements that are allegedly agreement,

14   and specifically that Tom and I had a deal for $250 million on

15   February 14th, the subsequent written agreement that was

16   ratified, agreed to, talked about over and over again for $70

17   million commitment, makes those statements not enforceable as a

18   separate agreement.

19           And so then let's talk about what's missing from the

20   oral agreement.  It just fails, and the Court addressed this in

21   the motion to dismiss, but I think you've got a whole lot more

22   context now about what agreements look like that Ebersol Sports

23   Media Group was doing and the significant features of those

24   agreements to Ebersol Sports Media Group and to anyone invested

25   in that.

2:22-cv-05077-eag Doc #1381-1 Filed 02/06/25 Entered 02/06/25 09:19:19 Main Document Design Page 42
Documents Page 1315 of 1466

142

1        So we don't know for the $250 million deal, we know

2   who the $70 million was.  We don't know who the $250 million

3   deal was supposed to be with.  I think their allegation is it

4   was Mr. Dundon, but there's no evidence that Mr. Dundon -- that

5   anybody had the impression that Mr. Dundon himself was ever

6   going to be entering an agreement.  That's just the Trustee's

7   claim.

8        Was it equity or debt?  You saw the evidence that

9   they didn't know.  They're going to talk about testimony where

10  Mr. Dundon said, I thought it was equity.  I was talking about

11  equity.  Mr. Ebersol said, I don't know if it was debt or

12  equity, and in their complaint they said, I don't know if it

13  was debt or equity, and certainly that is a significant

14  material term, even knowing what kind of investment it is.

15       What was the investor lender getting in return?  This

16  is the crucial part, and I'm going to skip ahead to this

17  exhibit.  So DCP, in the term sheet, in exchange for a maximum

18  cumulative commitment of $70 million, and I think, in fact,

19  whoever is arguing this will point out the actual transfer of

20  the interest occurred after the initial funding, and then DCP

21  was on the hook to the extent funding requests were made for up

22  to $70 million.

23       In exchange for that, DCP received 75 percent of the

24  equity and the two voting board seats.  So that consideration

25  was given to DCP for the $70 million commitment.

143

1          So if there's an argument -- and we know that's all

2   DCP is ever on the hook for because, one, that's all they're

3   being sued for is the $70 million commitment; and two, it says

4   that's their maximum cumulative commitment.  So if there's a

5   separate deal, separate contract out there with Dundon for $250

6   million or the other $180 million, what is he getting in

7   exchange?  There's no evidence that there was something that he

8   was going to get.

9          I mean, one of the things could be interest and

10  payback.  It could be new, different equity.  It could be all

11  kinds of things, but there was no discussion of that.  You saw

12  Mr. Ebersol's statement, which was we were going to get -- his

13  understanding was Dundon was going to get the 75 percent and

14  the control of the board for $250 million, but that's not what

15  happened.  They gave that consideration to DCP, and it was gone

16  once that term sheet was done.  And this idea that, well,

17  Dundon was on the hook for another 180 million, and he wasn't

18  going to get any new consideration on top of that, that's just

19  not how the law works, and that's the whole purpose of this

20  parole evidence.

21         When you've got conflicting consideration, one oral

22  and one ends up in a written agreement, they can't both exist.

23  They're impossible to exist together.

24         Other questions I asked was, you know, the specifics

25  about if it was an equity deal, what were you getting in

1   exchange?  In the record are Mr. Fowler's deal and Mr. Dundon's

2   deal, and you can see there is all kinds of features that come

3   with these equity deals relating to preference rights and all

4   these things that got triggered when the change of control

5   happened.  There's preference rights.  There's the opportunity

6   to invest alongside.  There are pricing issues.  There's

7   valuation issues.  There's all these things that are necessary

8   to figure out if I come in and invest this more money, what am

9   I going to get, and how are you going to address your other

10  shareholders and your lenders and all of those things?  None of

11  that stuff was addressed, which it all was addressed with

12  Mr. Fowler and his deal and addressed in the Series 2 term

13  sheet.

14          And they bought this idea that Mr. Dundon said,

15  media, this is Series Infinity.  Well, we know what the Series

16  1 term sheet looked like.  We know what the Series 2 term sheet

17  looked like.  It has a whole bunch of material terms in there.

18  So it implies that there's a Series 3, 4, or 5, but all of

19  those have to be terms that are agreed to to figure out what

20  those look like because everyone has to fit in together to even

21  work.

22          And then or if it was debt, and you can look at

23  Mr. Fowler's deal because it's $50 million of equity and $120

24  million of debt, to be instructive as to the kind of things

25  that these parties, the ESMG at least, would have been

1    expecting for a deal like this.  And you have to have in a debt

2    deal repayment terms, interest rate, maturity date, things like

3    that.

4           And then when and how would the funds be requested?

5    We know that the term sheet said the way you get funds from DCP

6    is you submit a funding request with a budget that shows how

7    much money we need and then you get it back.  Not even that was

8    agreed to in this deal.  That is the conclusion of the contract

9    part with the exception of the good faith and fair dealing

10   issue.  I think the general issue is under the Delaware law,

11   under the term sheet, oh, I'm sorry, I totally skipped

12   something.  Let me back up.

13          We moved on there being no default under the term

14   sheet itself.  The Trustee has claimed that there was a default

15   under the term sheet because DCP either didn't fund the entire

16   $70 million or some of the funding that was sent was used for

17   paying PWC or others.

18          **THE COURT:**  Right.

19          **MR. LOWENSTEIN:**  There is no evidence that there was

20   a funding request that went to Dundon that was not fulfilled.

21   Their argument is there was back and forth about what was going

22   to go into that funding request because there was disagreement

23   on the operating entity side of what money should be

24   prioritized and paid.  But that's not a term of the term sheet.

25   The term sheet says you will get a funding request with a

1 budget, a supporting budget, and then you will fund.  And the

2 undisputed evidence is that they funded, because I think it's

3 in the Trustee's pleading, $69 million and change.  And there's

4 no evidence that was put in of a funding request that was sent

5 with a budget that wasn't fulfilled.

6           And then on a good faith and fair dealing, we cited

7 to the Glaxo case, which is a Supreme Court of Delaware, <u>Glaxo</u>

8 <u>v. DRIT</u>.  And the general concept with good faith and fair

9 dealing is if all you're seeking is what the contract says, the

10 good faith fair dealing cannot be invoked when the contract

11 addresses the contact at issue.

12           And candidly, it's in paragraphs 153 through 158 of

13 the Trustee -- and the damages the Trustee is seeking is $180.3

14 million, which is the 180 million for the oral agreement, which

15 is exactly what that agreement contemplates.  And then $300,000

16 under the term sheet that they say Dundon fell short in

17 funding.  I think the exact amount is 280,000.  But that is

18 merely what they're saying each of the contracts require the

19 contracting party to do.

20           So the relief being sought is merely what the

21 contract says.  I don't think there's any -- it doesn't invoke,

22 according to the Glaxo case, the duty of good faith and fair

23 dealing.  I think that's it on my part.

24           Now, Mr. Hockaday, if you want to do it this way, is

25 going to take over and complete the rest of the issues in our

2:20-cr-00077-eag Doc #1381 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 47
Documents Page 1320 of 1466

147

 1  motion.

 2          **THE COURT:**  That's fine.

 3          **MR. HOCKADAY:**  I'll try to keep my feet, Your Honor.

 4          **THE COURT:**  Do you have a PowerPoint also?

 5          **MR. HOCKADAY:**  It's the same PowerPoint, Your Honor.

 6  And we actually, for Mr. Zutter as well, to keep things simple,

 7  we kept it on the same document.

 8          **THE COURT:**  So was it on the Zutter one?  Because I

 9  put that one back in my office.

10      **(Pause)**

11          **MR. HOCKADAY:**  Your Honor, may I approach?

12          **THE COURT:**  Yes, you may.

13          **MR. HOCKADAY:**  Okay.

14          **THE COURT:**  We just need two.  Well, I'm working on

15  -- I just need one.  Well, give it to the young lady right

16  there.  All right.  Thank you.

17          **MR. HOCKADAY:**  And, Your Honor, I just switched to

18  farsighted.  Apparently, in the last 96 hours, Ms. Walraven was

19  kind enough to let me borrow her readers, too.  So if I put

20  these on occasionally.  I'm not trying to be Clark Kent, but --

21          **THE COURT:**  You reached that age in life?

22          **MR. HOCKADAY:**  I think so.  One of my best friends is

23  an eye doctor, and he told me I'm within the range.  So --

24          **THE COURT:**  They used to say about -- I'm not saying

25  what your age is -- about 40 is when it starts happening.

2:22-cv-05077-eag Doc #1381-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Desig Page 48
Documents Page 1321 of 1466

148

1      **MR. HOCKADAY:**  Nailed it.  I'm a protected class,

2  Your Honor.

3          May it please the Court.  Thank you.  So, Your Honor,

4  I'm going to talk about -- we're going to shift gears a little

5  bit, going from the contract-related claims to some of these

6  tort claims.  And, in fact, all of these tort claims.

7          And, as Your Honor may recall from previous hearings

8  that we've had, there's kind of these buckets of claims.  We've

9  got fraud claims and those that are related, and then we have

10  the fiduciary claims.  So I'm going to -- before we get into

11  that, though, what I do want to talk about is the issue of the

12  economic loss rule, because I think that's a really good --

13  here we go.  I think that's a really good place to start to

14  level set.  It kind of explains on a global basis what our

15  position is that is really seen throughout a lot of the claims

16  here.

17          And, as Your Honor may recall, initially when we

18  filed our motion to dismiss, we moved to dismiss several claims

19  on the economic loss rule for that.  And Your Honor did grant

20  that motion but allowed the Trustee the opportunity to re-

21  plead, so long as they weren't asserting contract claims as a

22  basis for the tort damages.

23          **THE COURT:**  Correct.

24      **MR. HOCKADAY:**  And while we haven't moved on that

25  since, that is still present here.  And I just plucked out of

```
 1   this -- I think the court -- it's not part of our record, but

 2   it is cited in theirs.  I believe the court can take judicial

 3   notice, it's ECF 54 in this matter.

 4         So looking at the economic -- sorry, let me push

 5   back.  All right.  I'm going to shift to start talking about

 6   promissory estoppel.  So as Your Honor may be aware, the

 7   standard in promissory estoppel is that you must rely to your

 8   detriment on an otherwise enforceable promise.  And in order

 9   for that to go through, it must be reasonable and justified.

10   And it's only when a promise is sufficiently specific enough

11   and definite, that it's reasonable to rely on.

12         So in this case, they're relying on the

13   representation of a $250 million deal.  They've got to make

14   sure that it's specific and reasonable enough.  Now, the

15   problem that the Trustee has as far as the evidentiary record

16   is concerned, and Mr. Lowenstein touched on this kind of at the

17   end of his contract claim, is the promise wasn't specific and

18   definite because outside of this $250 million figure, there are

19   so many material terms that were left untouched.  And if you

20   look at the record, Mr. Ebersol testified that Tom said he

21   would pay $250 million, and I had his word.

22         He did reference control of the league generally, but

23   there wasn't any specificity as to, one, who the actual parties

24   were.  Was it going to be DCP?  Was it going to be some of

25   these other affiliates?  Was it going to be ESMG?  I don't
```

150

1    think we knew that ESMG existed at that time.  So there was no

2    clarity as far as who the parties of the agreement were.

3           The second piece is the timeframe.  If Your Honor

4    looks at the term sheet, one of the things that's really

5    important there is it gives an actual timeframe as to when the

6    funding requests can be made and when they must be fulfilled.

7    That's a material term in any kind of investment.

8           The other thing, too, Mr. Lowenstein touched on was

9    composition.  Was it debt?  Was it equity?  If it's equity, do

10   we know the price per share?  Is it a combo?  Is it a series

11   raise?  Is it a one-time injection?  On the debt piece, what's

12   the interest rate?  What are the terms?  Do you have to repay?

13   Is it a balloon note?  Those sort of things.

14          And the promise that they rely on to support their

15   promissory estoppel claim is just not sufficiently definite.

16   And under the Gilman decision, which is cited in the papers,

17   vague or indefinite promises that aren't specific enough to

18   form a contract are too indefinite to form the basis for

19   promissory estoppel or satisfy justifiable reliance.

20          Now, the Trustee's response in their papers really

21   kind of focused on Your Honor's position in the motion to

22   dismiss.  Now, I'm not blind to the irony, maybe nearsighted

23   presently, but not to the irony of me showing the motion to

24   dismiss on the front end.  But as Your Honor knows, ruling on a

25   motion to dismiss is based on the face of the pleadings.

1  There's no evidence required.

2  Now we have the benefit of evidence.  Everybody's

3  been able to testify.  And Ebersol's the only one who was

4  allegedly present there, and he testified to a 250 figure and

5  vague references to other things that didn't satisfy those

6  areas that we just discussed.

7  And the salient point here, too, that I think even if

8  you were to consider Mr. Ebersol's statement to be definite

9  enough or his allegation of Tom's promise to be definite

10  enough, is that there is a term sheet in a written agreement

11  that negates the oral promise.

12  So under the McCobb opinion, which is also cited in

13  the papers, reliance on an oral statement that contradicts the

14  terms of an unambiguous written agreement is unjustified as a

15  matter of law, and direct contradiction isn't required.  So, in

16  other words, you don't need to have exact terms, but if you're

17  covering the same basis in a written agreement, you can't come

18  back on the back end and say, well, you promised me something

19  different, and I relied on it to my detriment.

20  And if we look here at the difference between the

21  oral representations, what we have in the record is Mr. Ebersol

22  testified, alleged there was a promise to invest $250 million,

23  give up majority of equity kind of generally, not specific like

24  we discussed, and he wanted board seats.  If you look at the

25  actual term sheet, it specifically outlines the $70 million in

152

1    equity funding requests that are available, 75 percent of fully

2    diluted preferred stock, and only two voting board seats.  I

3    think they said there were going to be four board seats, two of

4    which would be voting.  Mr. Dundon was going to take one, and

5    then Mr. Zutter took the other.

6            And what this shows here is not only is there a

7    direct contradiction that would negate the promise, it also

8    makes the promise impossible because in the term sheet they're

9    already giving up 75 percent of the preferred stock.  So how

10   are they going to give up majority ownership in the oral

11   representation?  And that kind of plays into the fraud

12   argument, which we'll touch on here in a second.

13           Now, the other case that I'd like to just direct the

14   Court's attention to when it's going back and looking, and this

15   in the papers, is the Barrow-Shaver (phonetic) decision. And

16   what they held was that in an arm's length transaction,

17   justifiable reliance requires the party to exercise ordinary

18   care to protect its own interests and cannot blindly rely on

19   the reputation, representations, conduct, where the plaintiff

20   otherwise has experience or background.

21           Now, interestingly enough, too, Mr. Ebersol's

22   testimony is that he also -- he received the term sheet from

23   Mr. Zutter, and he noticed that it said 70 million and not 250

24   million, and he raised that with Mr. Zutter.  And what his

25   testimony was, hey, why doesn't this say 250?  And he claims

1   Mr. Zutter told him, you need to talk to Tom about that, and

2   then he signed it anyways.  Then, of course, you saw earlier

3   the lack of any reference or indication of this $250 million

4   deal after that took place.  So I think that's a really

5   important point to also consider.

6           And then, finally, on the promissory estoppel issue,

7   the Trustee is effectively arguing that they need to receive

8   the benefit of the bargain.  And the benefit of the bargain

9   here would be $250 million.  They're claiming that was the

10  contract.  So one, economic loss rule would apply.  But more

11  directly to the promissory estoppel issue is that promissory

12  estoppel is limited to reliance damages.  So it's not an

13  eligible category of damages.  And if that's what they're

14  seeking here, then they have no redress.

15          Now, if we shift gears and go to the fraud claim, we

16  moved on to fraud and fraudulent inducement causes of action.

17  The Trustee pointed out that we weren't necessarily clear in

18  our which cause of action we were moving on.  We were moving on

19  all the causes of action, and that's because each one of them

20  requires justifiable reliance.  And that was the basis for

21  which we were moving.

22          And I pulled a couple cases here just to direct to

23  Your Honor that I think are instructive.  The first one was

24  from the Fifth Circuit, where it says, when experienced

25  executives represented by counsel voluntarily sign a contract

1   whose terms they know, they should not be allowed to claim

2   fraud in any earlier oral statement inconsistent with a

3   specific contract provision.  And then there's the McCobb

4   decision, which also touched on fraud.

5          Now, going through the fraud allegation, the basis of

6   that is the $200 million funding.  There's allegations of

7   "series infinity" and keeping the league open the first year.

8   Again, this contradicts the plain language of the term sheet.

9          If we go back to that Barrow-Shaver case, where you

10  do a comparison between what the oral representation was to the

11  term sheet, there's no justifiable reliance when those two

12  conflict.  The term sheet's going to trump, especially when it

13  was after the fact.

14         The other argument that the Trustee cites, like with

15  the promissory estoppel, is that the Court already made its

16  decision on this.  So just my only comment on that is that was

17  based on the face of the pleadings, not the actual evidence

18  that's in the record, which, as Your Honor knows, are two

19  different standards.

20         And then there's also the Mercedes case and the JP

21  Morgan case, which we cited that stand for the same

22  proposition.

23         Now, if we shift gears a little bit and go to

24  negligent misrepresentation, that's the kind of wild card one,

25  but it's close enough to the fraud, so in my brain I kind of

1   loop them in there.  We move for dismissal on Count 8, which is

2   a negligent misrepresentation case.  And in our brief, we cited

3   to the restatement and cited a couple Texas cases that

4   recognized the restatement.  The Trustee accurately said that

5   the Supreme Court has not adopted it as binding authority, but

6   there is authority in Texas under the Houston Area Safety

7   Council v. Mendez, which is 671 S.W.3d 580, and the Lawn STV v.

8   Martin KEB Construction, 435 S.W.3d, where the Texas Supreme

9   Court actually used its reasoning to come to its decision.

10          So, yes, it's not binding authority per se, but Texas

11  courts have recognized, and I think that's why we put in our

12  papers that it's reasonable to presume that they will adopt it.

13  But setting that aside, the only damages that are available in

14  a negligent misrepresentation case are out-of-pocket expenses,

15  and what we don't have here in this case is any evidence of

16  out-of-pocket expenses.

17          I think the damage that they seek are loss of the

18  league, usurped assets, lost opportunities, and contract.  None

19  of those are recoverable.  I believe the economic loss rule

20  also comes into play on that last one.  So there just isn't

21  evidence of out-of-pocket expenses as far as we've been able to

22  deduce.

23          And then the only other position that the Trustee

24  really took, other than the Texas Supreme Court hasn't adopted,

25  was that they claim that they seek damages to the extent they

1  are unrelated to the contract.  So they can allege something

2  vague like that, but the fact of the matter is those damages

3  categories that we talked about that they did specify are not

4  out-of-pocket expenses, and that's just kind of a catch-all to

5  cover everything.

6         And I think that is a good transition to the

7  fiduciary duty claims because a lot of the back-and-forth that

8  we have is which bucket or component or subdivision of a

9  fiduciary duty claim is attributed to the alleged wrong, and I

10 want to talk about that.

11        So I think if we look at the fiduciary duty claims,

12 Your Honor, we can really group them into three categories of

13 what they alleged. I t's paragraphs 172, I believe, A through

14 F, against Mr. Dundon, and then 173, also A through F, against

15 Mr. Zutter.  And if I missed a subpart, I think there's a G

16 maybe for Dundon as well.

17        But essentially, that lays out what their allegations

18 are.  And if you look through that, the three kind of buckets

19 that they fall under are either these contractual ones, which

20 Economic Loss Rule precludes.  Also, Delaware Supreme Court has

21 held that it's effectively a contort.  You cannot get contract

22 damages for the tort claims.  The damage remedies are

23 effectively found in the contract.

24        The second one is a duty of care, and as Your Honor

25 probably saw from the papers, there is a waiver in the

1  Secretary of State filing with the State of Delaware on claims

2  for the duty of care.  There's an exculpatory clause that

3  nullifies any liability to Mr. Dundon or Mr. Zutter as it

4  pertains to duty of care.  And then there's these duty of

5  loyalty ones.

6          And the important thing that we would ask Your Honor

7  to focus on when you're considering duty of loyalty is this

8  note, this language of a specific transaction.  Allegations

9  related to self-dealing or doing things in your self-interest,

10 that would fall kind of under the duty of loyalty realm.

11 However, in order for them to succeed or pursue a claim or

12 succeed on a claim, they have to show a specific transaction.

13 And we'll talk through that and why that doesn't apply here.

14         So the first one is I have for 172(a), it says,

15 failing to provide funding to the Debtors as promised in

16 exchange for, among other things, his director position and

17 control of Debtors.  So I think Your Honor is pretty well

18 versed at this point.  The funding issue is the $250 million

19 issue.  And whether or not Mr. Dundon had an obligation to fund

20 $250 million, whether he did fund $250 million, whether he

21 funded $70 million completely pursuant to equity funding

22 requests, those are all contract-based remedies.  Those are all

23 things that fall under that contract that are not recoverable

24 in a fiduciary claim.  And we cited the Edinburgh Holdings case

25 for that proposition, which is in the papers as well.

222-10577-cag Doc#1531-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 158
Documents Pg 1331 of 1466

158

1          Now, on the duty of care piece, I pulled this up.  I

2   believe it's Exhibit I in our motion.  This is the carve-out.

3   It's on pages 25 and 26.  And as Your Honor can see, it's been

4   permitted by law to directors of the corporation or its

5   stockholders for monetary damages for breach of fiduciary duty

6   as a director.

7          Now, there is a carve-out for duty of loyalty and

8   good faith, which is a subset of duty of loyalty, which we'll

9   talk about in a little bit.  But the subset F here, failing to

10  employ rational decision-making process in relations to

11  finances, operations of the Debtors, that's clearly duty of

12  care.  To the extent the Trustee wants to claim that that hits

13  that transaction piece, there's no specific transaction that is

14  identified with that.  And I'll get into that law here in a

15  second when we go there.  So for those reasons, I think you can

16  dispense of that portion of their fiduciary claim as well.

17         Now, the big one is duty of loyalty.  And the four

18  that we extracted were B, C, D, and E.  And of these, the only

19  one that really specifies a specific transaction is the release

20  agreement.  And that was the release agreement that the Board

21  approved ES&G sign vis-à-vis Mr. Fowler.

22         Now, under Delaware law, the business judgment rule,

23  essentially, it prevents courts from unreasonably injecting

24  themselves into corporate affairs.  Your Honor is probably very

25  well familiar with that.  There is a presumption that directors

1    operate in the best interest of the business.  Now, in order to

2    rebut that, you've got to establish two things.  One, that the

3    director is interested in the transaction at issue, or the

4    second is that he lacked independence to oppose the

5    transaction's consummation.

6         **THE COURT:**  Is it clear under the law that this

7    standard applies in this situation?

8         **MR. HOCKADAY:**  I believe so, Your Honor, because

9    Delaware law is applicable in this matter for the fiduciary

10   claims.

11        **THE COURT:**  Okay.  For the fiduciary claims.

12        **MR. HOCKADAY:**  Yes.

13        **THE COURT:**  Go ahead, please.

14        **MR. HOCKADAY:**  And just to be clear as well, the

15   business judgment rule should, like, within the scope of

16   Delaware law applying, the business judgment rule also applies

17   to the events and the allegations here, as it pertains to

18   Mr. Dundon and then Mr. Zutter, which we'll discuss.  All

19   right.

20        If we go here and we look at kind of what the

21   definitions are for the standard, the big two things that jump

22   out are materiality and independence.  In order for the

23   materiality to apply, it's got to be an alleged benefit that

24   it's significant enough to make it improbable that the director

25   can perform the duties without being influenced.  And then the

1   independence consideration is whether the director's decision

2   resulted from the director being controlled by another.  So

3   that's the framework we're looking at if we are not going to

4   apply the business judgment rule, kind of the exceptions to

5   them.

6          And, you know, going back to the first three of

7   these, B, C, and D, there's not a specific transaction.  So if

8   we weren't going to look at the business judgment rule and we

9   were going to look at kind of these exceptions, there's not a

10  specific transaction that is applicable to any three of these.

11         Now, the Trustee's argument in their briefing is

12  that, well, we allege that this could be duty of care, duty of

13  loyalty, or breach of duty of good faith and fair dealing.  But

14  they don't assign or connect the dots between which applies to

15  which.  They kind of scattershot it on the front end.

16         So if we're looking at the plain language of the

17  actual allegations, there's no specific transaction that's

18  identified.  And if you look at self-interest referenced in B,

19  misappropriating unidentified assets and resources, self-

20  dealing, concealing, or failing to disclose his self-dealing,

21  all that is purporting to accuse Mr. Dundon of breaching his

22  duty of loyalty.  And absent a specific transaction that's tied

23  to that, they can't move forward and prevail.

24         Now if we look at the actual release agreement, which

25  is -- if we look at the release agreement, first of all,

1   Mr. Lowenstein referenced this kind of in his timeline when he

2   was walking through it, but Mr. Dundon wasn't a party to that.

3   He wasn't part of the decision-making apparatus.  Mr. Saltz got

4   up here this morning or early this afternoon after lunch and

5   specifically pointed out that Mr. Dundon was not part of that

6   decision-making that took place at the board meeting right

7   after.

8          So as a result, they're effectively trying to fashion

9   Mr. Dundon with responsibility for a vote in a decision that he

10  didn't participate in.  Now their argument is that, well, it

11  doesn't matter whether he participated in it because he had

12  this control.  At the moment, the term sheet went into effect,

13  he assumed control.  Everybody assumed he had control of the

14  situation.  But even if we were to entertain that kind of

15  notion, the one thing that's missing there is how it was

16  harmful to the league.

17         So the Fowler waiver and the term sheet were a

18  benefit to the league.  If the term sheet doesn't get entered

19  and the $70 million in funding doesn't -- or availability of

20  funding doesn't come into play, the league doesn't exist.  They

21  needed Fowler.  And without that, it would have led to a

22  situation where Charlie didn't have the vote or the approval in

23  order to execute it.  And that was kind of the problem with

24  this on the front end, is that Mr. Ebersol tried to make this

25  deal without having the proper authority, and that's why they

1   had to go back and get the board approval ten days later.

2        And if you look at the board meeting minutes, which

3   Mr. Lowenstein pulled up, I'll read the quote from it. It

4   says, "Given the corporation's financial position, cash

5   reserves, accrued but unpaid liabilities, near and long-term

6   prospects, strategic goals and objectives, current product

7   development and business development efforts, financing

8   alternatives, and other relevant considerations, the board

9   believes that it is advisable and in the best interest of the

10   corporation and its stockholders to raise additional working

11   capital and effect a recapitalization of the corporation's

12   capital stock in accordance with the term sheet. They weren't

13   going to be able to do that if the Fowler release didn't --

14   wasn't entered.

15        Now, shifting gears a little bit outside of the

16   fiduciary context, we also moved for dismissal on Count 15,

17   which is the unjust enrichment claim. We'll talk about

18   Mr. Zutter when it's time for that. But as Your Honor may

19   know, unjust enrichment is restitution of a benefit that -- or,

20   excuse me, the Trustee is arguing that its restitution of the

21   benefit that it conferred, that it believes Mr. Dundon

22   conferred. Mr. Dundon didn't receive any benefits here. He

23   lost $70 million.

24        There's a tax theory that you'll hear about that I

25   can talk about here in a second. But generally speaking,

1   Mr. Dundon sank $70 million into the endeavor, and there is no

2   amount of tax offset that put him in a better position than

3   losing $70 million in cash.

4           Here also, it was DCP and not Mr. Dundon that

5   received the 75 percent preferred stock.  So if they want to

6   argue that there was a stock benefit that he received, he did

7   not receive that in his individual capacity.  In fact, he got

8   nothing.

9           And similar to the negligent misrepresentation claim,

10  unjust enrichment is limited to reimbursement for expenses,

11  benefit conferred, or return of the performance or its actual

12  value.  There's none of that here.  There's no evidence here of

13  that.

14          The specific stuff that I believe the Trustee cites

15  is one of their experts, Mr. Petruccelli (phonetic), he cites a

16  couple of tax forms in here and mentions that there's -- it's

17  through footnotes, so you kind of have to follow along.  But on

18  page 633, he notes that there are no formal agreements between

19  or among AAF and DDFS or how the $250 million commitment would

20  be accounted for.

21          Well, there's no evidence that there was a $250

22  million commitment, and absent in Mr. Dundon's returns is

23  anything talking about a $250 million commitment.  And then if

24  you look at 645, which they talk about, the K-1, first of all,

25  that's not Mr. Dundon, and it shows an income loss of $1.4

1   million.  And there's a $12 million gain.  I don't want to get

2   into specifics on numbers, but the fact of the matter is all

3   that falls well below $70 million of cash, or $69.7 million in

4   cash, which is what he injected.  And they can't identify a

5   specific benefit.

6          And then finally, Your Honor, we're also moving for

7   summary judgment on their allegation or their claim that they

8   should disallow the claims.  Their only basis for subordination

9   are the claims identified in Counts 5, 11, and 12.  Those are

10  ones that we're moving on for summary judgment.  If Your Honor

11  grants our summary judgment for that, likewise the disallowance

12  should follow.

13         And very similar to the equitable subordination, if

14  you grant our motion for summary judgment on fraud or the

15  fiduciary duties for the same reason, then it's our position

16  that the court should also grant it on that basis.

17         **THE COURT:**  Okay, I do have a -- this actually goes

18  to this motion for summary judgment and then the Zutter.

19         So in the opinion -- I mean, the order, excuse me, on

20  granting of Part 9, or this is in 05078, ECF No. 54 on page 30,

21  the Court discusses at length the standard.  And the court

22  writes, in sum, both parties spent considerable time arguing as

23  a matter of law that the breach of fiduciary claims should or

24  should not be dismissed as a matter of law.  An official

25  reading of the complaint supports the court finding that a

1    breach of fiduciary duties by Dundon and Zutter were clearly

2    delineated in the complaint.  Further, the complaint is replete

3    with allegations surrounding Dundon and Zutter's alleged breach

4    of fiduciary duties to debtors and the players.

5            The parties have presented conflicting

6    interpretations of the applicable law that are best reserved

7    for summary judgment (if at all) or after trial.

8            So I probably should have reached it, didn't, but you

9    all are on notice that this is going to be an open-ended issue.

10   My apologies.

11           So you argue business judgment.  Why does that

12   standard apply?  Because there are other standards that could

13   apply here, right, under Delaware law?

14           **MR. HOCKADAY:**  Yes, Your Honor.  Yes.

15           So business judgment is, first of all, the default

16   standard.  That's the starting point here.

17           **THE COURT:**  Lowest also.

18           **MR. HOCKADAY:**  It is the lowest, yes.

19           **THE COURT:**  Thank you.  Go ahead.

20           **MR. HOCKADAY:**  Yes.  So under Delaware law, it is

21   presumed that the directors operated in the best interest of

22   the business.  Let me pull up my notes.  Just one second.

23           **THE COURT:**  So you don't think we should apply the

24   fairness test?

25           **MR. HOCKADAY:**  Correct, Your Honor.  I think here the

166

1　business judgment rule is applicable.  However, if you are to

2　rebut it, you have to show -- you have to allege facts that

3　they were interested in a specific transaction.

4　　　　　THE COURT:  Okay.

5　　　　　MR. HOCKADAY:  So that kind of goes to the argument

6　on the transaction issue.  If you look at what their

7　allegations are, they don't allege a specific transaction

8　outside of the Fowler release, as it pertains to Mr. Dundon.

9　　　　　THE COURT:  Because I'm going to ask Mr. Lowenstein

10　the same question, as it relates to the Zutter motion for

11　summary judgment.  Okay.

12　　　　　So you think it's the business judgment standard

13　because that's the default standard, and then it's transaction-

14　based; is that correct?

15　　　　　MR. LOWENSTEIN:  Can I get my position now?

16　　　　　THE COURT:  Sure.

17　　　　　MR. LOWENSTEIN:  I think this is all the Extreme

18　case, which lays it out really well.  So --

19　　　　　THE COURT:  Which case is it?

20　　　　　MR. LOWENSTEIN:  The Extreme.

21　　　　　THE COURT:  Oh, okay.

22　　　　　MR. LOWENSTEIN:  So business judgment is there.  The

23　way you get to a higher -- so which is its own -- I was

24　thinking of it as a standard of review, like a strict scrutiny

25　constitutional review kind of thing.  So business judgment rule

1   is like the reasonable basis test, which is the lowest.  That

2   is the standard.  But if there is a relationship of some sort

3   that comes into play, you move up to a higher standard in

4   reviewing that action, which is usually the fairness test, the

5   complete fairness.  I can't think of the words right now.  So

6   you move up to that higher standard.

7          So my opinion is, and I think what our position is,

8   the only time you move to that higher standard is if they're

9   talking about a specific transaction where the relationship

10  that is in play, which is they're interested in the transaction

11  or they have control or are being controlled, you move into

12  that higher analysis, the total fairness test, but only with

13  respect to a specific transaction.  Because what you have to do

14  with those specific transaction is connect the dots between

15  that relationship and the transaction and show how that was

16  impacted.

17         So these broad allegations -- can you go back to --

18  oh, right here.  These broad allegations of they were just bad

19  guys and doing bad things, those are business judgment rule

20  standards because they're not talking about a specific

21  transaction.

22         **THE COURT:**  But it's a standard of conduct.  You

23  concede that, right, what their conduct is?

24         **MR. LOWENSTEIN:**  Business judgment rule is a standard

25  of conduct.  The -- when you move out of the business judgment

1    rule and you want to focus on the -- having an interest in the

2    transaction or being conflicted in the transaction, then you

3    have to focus on a specific transaction and you have to talk

4    about why that specific transaction was tainted by that

5    relationship.

6         So take for example the waiver -- I'm sorry, I didn't

7    mean to talk over you.

8         **THE COURT:**  No, go ahead.

9         **MR. LOWENSTEIN:**  Take for example the waiver, their

10   allegation is, the facts don't support it, but their allegation

11   is Dundon forced this idea of this waiver being done or he was

12   in control of the company when it happened.  And he somehow

13   benefitted from it because he was interested in the transaction

14   in some way.

15        So that, if you are going to analyze the fairness of

16   that transaction, that's when you would apply that higher

17   standard and they focused on that specific transaction.  Our

18   position is he wasn't involved in that transaction and they

19   didn't show how it was unfair.

20        Because what -- it's kind of like a fraud claim, in

21   that you've actually got to connect the dots.  You've got to

22   connect the relationship, the interest in the transaction,

23   whatever to a decision and show how that decision was somehow

24   tainted by that and then how that person either benefitted from

25   it or was acting in bad faith or whatever.

1      So these broad allegations of making unidentified

2  decisions, I mean, by itself says you're not talking about a

3  transaction, you're just talking about a course of conduct,

4  there's no way for the Court to analyze this higher level

5  fairness standard, entire fairness standard because there's not

6  a specific act where they're connecting the dots.

7      For instance, the decision to cut spending on

8  marketing.  Is that in there?  Let's see.  Entering -- sorry,

9  operations.  Hold on let me look at a specific one.  Making

10  unidentified decisions relating to finances.  So that's -- this

11  goes to -- they cut spending on marketing or didn't pay,

12  continue in the same way that Ebersol did and not paying for

13  marketing, because their money needed to be spent other ways.

14      The trustee has argued this all falls within the duty

15  of loyalty.  Okay.  So if Dundon and Zutter made the decision

16  to cut spending on marketing and they had a relationship

17  because they were on both sides of the funder and operating

18  side, how do those things connect?

19      Let's assume it was a bad decision, which is a duty -

20  - a business judgment kind of analysis, but let's assume it was

21  a bad decision, how was their relationship, how did that taint

22  that decision and how did they benefit from it or how was it

23  done in bad faith?  And that's the kind of analysis of specific

24  decisions for specific transactions that required when you're

25  looking at it under this higher standard.

1          What our position is, is they pled at the top of 172,

2     breaches of the duty of care, loyalty and bad faith.  They

3     didn't parse those out.  And what most of these are are pled

4     like duty of care cases.

5          And duty of care cases are analyzed under the

6     business judgment rule unless they talk about a specific

7     transaction that was somehow tainted.

8               **UNIDENTIFIED:**  Loyalty cases.

9               **MR. LOWENSTEIN:**  Sorry?

10              **UNIDENTIFIED:**  Loyalty.

11              **MR. LOWENSTEIN:**  And to the duty of loyalty standards

12    or bad faith standards.

13              So does that make sense?

14              **THE COURT:**  Yes.

15              **MR. LOWENSTEIN:**  Okay.  So, yes, the business

16    judgment rule applies unless there's a specific transaction

17    that was tainted by this relationship with the or control or

18    everything is like that.

19              **THE COURT:**  Okay.

20              **MR. HOCKADAY:**  And our position, Your Honor, is that

21    the only specific transaction that Mr. Dundon's accused of

22    doing that was in violation of his duty of loyalty was the

23    release agreement.  And for the reasons discussed earlier, that

24    isn't -- that doesn't get them to showing a specific harm

25    that's tied to any actions that he took.

171

```
 1              THE COURT:  Okay.  All right.  Thank you.

 2              MR. HOCKADAY:  Anything else?

 3              THE COURT:  That's fine.

 4              MR. HOCKADAY:  Thank you.

 5              THE COURT:  You ready?

 6              MS. WILLIAMS:  Yes, Your Honor.  Nicole Williams.

 7   And similarly, we've split this argument up against myself,

 8   Mr. Atkins and Ms. Clark.  So I'm going to do an introduction

 9   and kind of orient us and we have some PowerPoints, I think

10   Your Honor at this point I love a chart, so there's a lot of

11   charts in these PowerPoints.

12              THE COURT:  I like charts too.

13              MS. WILLIAMS:  So I'm going to --

14              THE COURT:  I'm disturbed this chart looks really

15   thick so.

16              MS. WILLIAMS:  It's multiple charts.

17              THE COURT:  Okay.  Fair enough.

18              MS. WILLIAMS:  So I'm going to do an interim sort of

19   orient us and then turn it over to Mr. Atkins to start talking

20   about the world contract issues but I think it's really

21   important to focus us procedurally for a few reasons and I know

22   that Your Honor knows this, but a motion for summary judgment

23   is a very specific proceeding with a very specific record and

24   that record is very important to what's being done here.  And I

25   did look up Docket No. 124 is DCP's response to Ebersol's
```

1   motion for summary motion.

2          So some of this presentation is a mixture of the

3   summary judgment record in Ebersol and the one in ours and the

4   position of the trustee is the only appropriate record to look

5   at is the record in this case --

6          **THE COURT:**  Right.

7          **MS. WILLIAMS:**  -- on the trustee's claims.

8          **THE COURT:**  Are these two different documents?  Okay.

9   Got it.

10         **MS. WILLIAMS:**  Oh, yes, Your Honor, we printed a blue

11  that was not easy to read, so we reprinted it in yellow.

12         **THE COURT:**  So again, thank you I appreciate that.  I

13  just wanted to make sure that I was -- it was one document you

14  wanted me to look at.

15         **MS. WILLIAMS:**  Yes, Your Honor.  I would personally

16  read the yellow one because with my over 40 bad eyes, I could

17  not read the blue one.

18         **THE COURT:**  Thank you so much.  Go ahead, please.

19         **MS. WILLIAMS:**  Okay.  Another thing that's important

20  to note in addition to the record is that the Court is only

21  deciding the issues that have actually been brought forth in

22  the motion for summary judgment.

23         And one of the requirements of Rule 56 is that you

24  identify which claims and elements you're moving on and we did

25  drop a footnote here that there were times where we really

Case 22-50073 Doc 1581 Filed 02/06/25 Entered 02/06/25 09:17:19 Main Document Design Page 173
Documents Page 1346 of 1466

173

1   couldn't tell.

2           A good example is in reference to the fraud claim.

3   They moved on a fraud claim with no reference to any counts.

4   We actually have a count for fraud and we have a count for

5   fraudulent inducement.  Our position is that argument that

6   contains no reference to fraudulent inducement or that count

7   isn't sufficient to challenge that count.

8           So the first chart I have here for Your Honor is our

9   chart of the arguments and the responses.  And so we've put

10  them, the economic loss doctrine is the only argument that

11  applies to multiple claims.  So I put that at the top and the

12  rest we go by claim with our understanding of what argument

13  they made and then what our response is and where you can find

14  those in the various motions.

15          Our presentation is combined for Dundon and Zutter.

16  So when you see the references to 173, those are Dundon, 175 is

17  Zutter, 196 is our response to Dundon DCP and 197 is our

18  response to Zutter.

19          **THE COURT:**  Okay.

20          **MS. WILLIAMS:**  So that's how you can tell the

21  difference there.  But they're the same arguments.  There's

22  nothing new conceptually in the Zutter motion, there's just

23  some different evidence.

24          The next chart I wanted to show Your Honor is on

25  slide 4 and that was that we did raise Your Honor's decision on

174

1    the motion to dismiss and wanted to be clear, we don't think

2    that's evidence, it's simply a decision in this case that's

3    relevant as the law of the case.  And one of the reasons it's

4    particularly --

5           **THE COURT:**  The defendant say it's not.  They -- one

6    of their responses was, well that's not governing law of this

7    case, why not, why shouldn't it be?  And I think the argument

8    is because the Court was not -- didn't have the benefit of the

9    evidence that's now has been adduced.  Does it change the law

10   of the case?

11          **MS. WILLIAMS:**  It doesn't change the law of the case,

12   Your Honor, and also importantly, in many parts of this motion

13   they do not present evidence at all.  They are merely arguing

14   about the trustee's pleadings in this case.  So we're actually

15   looking at exactly what we were looking at in the motion to

16   dismiss.  And even though I don't think we had to, because

17   where they only challenged the pleading, I think we're only

18   obligated to address the pleading, we also provided evidence

19   that supports all of the allegations that we made that are

20   relevant.

21          So if you look, for example, in that fiduciary duty

22   section, we have a footnote that shows evidence of each of

23   those types of things we allege.  So even if they weren't just

24   cited in the pleadings, which is all they cite, we've also now

25   presented evidence.  And they didn't do anything in this

1   motion.  They haven't filed like a general no evidence and said

2   we can't meet all the -- they never shifted the burden back to

3   us to prove our entire case, even though that's kind of how I

4   heard the argument just made, oh, the trustee has to prove

5   everything.

6          No, they challenge very specific things.  We

7   responded to those.  We presented evidence on those and as Your

8   Honor knows we only have 50 pages, and I can tell you it was a

9   bear to get it down to that.  And I know our appendices are

10  extensive, but the trustee has thousands of pages of evidence

11  of what is pled.

12         And their argument isn't what's in the allegations

13  isn't true, see X, Y and Z.  That's just not what it is.  And

14  so those rulings Your Honor made in the motion to dismiss are

15  applicable, just as they were that day, to what's now going to

16  be presented to the Court.

17         And we can address those more specifically when we

18  get count by count.  I know Your Honor knows these, but I just

19  wanted to briefly hit the legal standards.

20         They're required to identify what they're doing.  We

21  believe we have accurately identified and responded to anything

22  that we were fairly on notice of.  There is a burden shifting

23  thing here.  They can't just say, for example, on the merger

24  doctrine which we're going to discuss extensively, merger is an

25  affirmative defense.

176

1          THE COURT:  Right.

2          MS. WILLIAMS:  They can't just say, hey, we think

3   these merged, trustee, prove your case, although we think that

4   we have, they actually have an affirmative duty to present

5   evidence and to prove that that's true conclusively and we

6   don't think that they've done that.

7          Similarly the exculpation clause and the executory

8   contract issue.  They've raised several things that are

9   actually more in the nature of an affirmative defense, but

10  again the trustee's tried to do both things.

11         THE COURT:  Forgive me.

12         MS. WILLIAMS:  Yeah.

13         THE COURT:  So in the answer, was there an

14  affirmative defense raised?

15         MS. WILLIAMS:  A merger, no, Your Honor.

16         THE COURT:  Okay.  So under Fifth Circuit law, what

17  should the Court do?

18         MS. WILLIAMS:  We believe it's barred.  Because not

19  only was it not in the answer, it's not disclosed in discovery

20  as well.

21         THE COURT:  That was going to be my other question.

22         MS. WILLIAMS:  And that's -- Mr. Atkins has a slide

23  on that so he can show you.

24         THE COURT:  So hang on, while it's -- and you want me

25  to be thinking about this stuff.  Okay.

2:22-cv-00507-eag Doc #1381 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 177 Documents Pg 1350 of 1466

1          **MS. WILLIAMS:** I do, I do, Your Honor.

2          **THE COURT:** Okay. So if merger is an affirmative

3    defense, it's not pled, how does that affect the Court's

4    consideration of their summary judgment? What's the end result

5    of that?

6          **MS. WILLIAMS:** The end result is it should be denied

7    on that grounds, Your Honor.

8          **THE COURT:** The entirety or just on the contract?

9          **MS. WILLIAMS:** It relates to the oral contract --

10          **THE COURT:** Right. And --

11          **MS. WILLIAMS:** -- so it would cause it to be denied

12    on that claim.

13          **THE COURT:** Okay. So the other claims it wouldn't

14    apply to, you acknowledge that.

15          **MS. WILLIAMS:** Correct. Then we look at the other

16    ones, the exculpatory clause and affirmative defense, but they

17    have pled, but we don't believe they've proven good faith and

18    I'll talk about that when -- there's so many counts.

19          But I think it's just important to keep in mind that

20    standard and we'll point out which ones we think that applies

21    to.

22          **THE COURT:** Okay. Go ahead, please.

23          **MS. WILLIAMS:** All right. The Court's not to make

24    credibility determinations or weigh evidence, aspersions are

25    being cast at Mr. Ebersol's testimony but it is what it is.

178

1  And if Mr. Ebersol and Mr. Dundon disagreed then that's a fact

2  issue for trial.  And so the trustee's position is that you're

3  going to see when you look at all the evidence that there are

4  fact issues abounding.

5       One other thing I just want to point out about the

6  PowerPoint, before I hand it over to Mr. Atkins.  We had a six

7  page table of authorities, we've got thousands of pages here, I

8  know it's a lot of material.  We tried within this PowerPoint

9  to pull out each of the cases, the full site that we think are

10 the key cases for the Court to read on those issues, as well as

11 citing the specific footnotes for each argument in one place,

12 which I think will help the Court look at the evidence a little

13 faster.  We're going to show some of it, but if you're finding

14 all this unwieldly, I think the PowerPoint will be very useful.

15      **THE COURT:**  Okay.  And that's exactly why you do a

16 PowerPoint because you said you got it down to 50 pages.  I

17 went back and you all forgot my admonition.  Let me see before

18 you yielded, the last footnote of the opinion, on the order,

19 the parties are admonished that any subsequent 12 rule motion

20 responsive reply will be strictly governed by Local Rule

21 7007(a).  Well, we blew that, didn't we?

22      **MS. WILLIAMS:**  Apologies, Your Honor.  But I will say

23 at the time you issued the ruling it was at 75, so I'm pretty

24 proud of the less than 50.

25      **THE COURT:**  All right.  Go ahead.

EXCEPTIONAL REPORTING SERVICES, INC

1          MS. WILLIAMS:  I'll turn it over to Mr. Atkins to

2    address the oral agreement.

3          THE COURT:  Okay.  Mr. Atkins, when you're ready,

4    sir.

5          MR. ATKINS:  We're on slide 21?  This one here.

6          May it please the Court, Your Honor, John Atkins for

7    trustee.  I actually have the oral agreement and then I have

8    some related issues, sort of alternative to you and along with

9    that, which include the promissory estoppel and negligent

10   misrepresentation and fraud areas that relate to the question

11   of whether this oral agreement was formed.

12         But the thing that I wanted to start with because I

13   think this is a good way to get into this, and because I think

14   this is as Mr. Lowenstein pointed out, this is both a

15   substantive issue and an evidence issue.

16         The merger fails in this case.  We've explained --

17         THE COURT:  Which slide number are you at?

18         MR. ATKINS:  I'm sorry.  This is slide No. 21, I'm

19   skipping around a little because --

20         THE COURT:  Okay.  I'll find it, go ahead.

21         MR. ATKINS:  I'm sure as everyone in this room knows,

22   no plan survives contact with the enemy.  You've got to move

23   stuff around.

24         THE COURT:  Fair enough.

25         MR. ATKINS:  The first argument that I wanted to

1   point out is simply that the merger fails because as our

2   argument is made and as the allegations in the complaint show

3   and as we believe the evidence shows, the contracts that are

4   alleged to merger are not between the same parties.  And that

5   is just flatly sufficient for merger not to apply.

6        And we had a case that we've cited here, this is

7   Fisher v Tandy Corporation and we have the relevant quote

8   there, this is a case in which there was a letter agreement and

9   a distribution agreement that were arguably inconsistent.  One

10   was signed by an individual as the -- in his individual

11   capacity.  The other was signed by that same individual as

12   president for technology stores.  Mr. Fish (phonetic),

13   individually is not the same as the technology company in the

14   second contract.  The merger doesn't apply.

15        And I'd like to note that one of the cases that

16   opposing counsel cites in their brief, Carr v Weiss in the same

17   area of the law has an almost identical holding on an almost

18   identical issue.  This should be on page -- this is Carr v

19   Weiss, 984 SW2d 753 and there again, a maintenance agreement

20   was entered into between Van Weiss Carpet Cleaning, Inc. but

21   not with Mr. Weiss individually.  And so the fact that there

22   was an agreement between Mr. Weiss, individually and the party

23   and the carpet cleaning company and the party meant that they

24   were not between and among the same parties vesicating merger.

25        We also pointed out you can -- I'll go to the

22-05077-cag Doc#1381-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 181
Documents Pg 1354 of 1466

181

1   previous line actually, I think this would be 20.  We do have

2   an argument that merger was waived by not having pleaded to an

3   affirmative defense in Texas, Rule 18-1 requires that

4   affirmative defenses be pleaded and unpleaded affirmative

5   defenses raised first time at summary judgment are ordinarily

6   waived.

7           Our view is that in addition to it not having been

8   disclosed in discovery and not pleaded, it's also just not

9   applicable.  But I want to point out that merger in addition to

10  all of this, merger is an effect of the parole evidence rule.

11  So that's another thing that Mr. Lowenstein was talking about.

12          Merger is what happens, and I'm actually -- I'm

13  sorry.  Go to -- it's number 23, the very next one.  There we

14  go.  Yes.

15          So merger is what happens when you apply the parole

16  evidence rule to bar the introduction of a prior contract, or

17  to bar evidence of a prior agreement that you allege merged

18  into the later agreement.  And this is the Fish case talking

19  about this is an analog of the parole evidence rule.  Actually

20  Carr v Weiss the case I just cited has the same language.

21          Another case that opposing counsel cites, Spangler v

22  Leiss (phonetic), you see the parenthetical there, describing

23  merger is the use of the parole evidence rule to preclude

24  enforcement of prior agreements.  And with the full citation

25  there.

1        The point is simply this, if the oral agreement does

2   not merge into the term sheet and for all of these reasons, our

3   argument is that they can't merge, then the parole evidence

4   rule doesn't have any separate application to these facts,

5   because the evidence that we are using to show the existence of

6   the oral agreement wouldn't it be applied to vary or expand or

7   alter the terms of the term sheet, they're being used to

8   describe the oral agreement, which hasn't merged.

9        And so the point is that this eliminates the parole

10  evidence rule issue.  Once there are two agreements that

11  haven't merged, we can prove the oral agreement.  We are

12  entitled to present evidence to prove the oral agreement.  And

13  because it's an oral agreement necessarily that evidence is

14  going to be parallel evidence, it's going to be the evidence of

15  what parties said to each other and how they agreed with one

16  another.

17        And I wanted to start there because the next thing

18  that I'm going to cover is actually going to my first slide,

19  which is let's talk about what that oral contract was.  So this

20  is -- for me it's 6.  Right.  Okay.

21        So I want to briefly just repeat what Ms. Williams

22  said about the idea -- Mr. Ebersol's testimony is what it is.

23  And obviously it's, you know, a fact finder can decide to

24  believe some witnesses and not believe other witnesses.

25        At summary judgment that is not the question that is

1   being asked.  And so the question of whether you believe

2   Mr. Ebersol and Mr. Dundon, the question of whether

3   Mr. Ebersol's testimony is consistent with other things that

4   happened in the case or documents in the case may weigh on the

5   credibility of Mr. Ebersol's testimony at trial, but it doesn't

6   eliminate the existence of weight to Mr. Ebersol's testimony.

7   It still has to be given weight and at the summary judgment

8   stage, all that is necessary is that scintilla.

9           That said and I want to sort of make a point here,

10  this is not Ebersol's word, Mr. Ebersol's word against

11  Mr. Dundon's word.  So that's just for different witnesses who

12  testified that Dundon in their presence -- Mr. Ebersol,

13  Mr. Deit (phonetic), Ms. Lagrinwich (phonetic) and Ms. Hansen

14  (phonetic) who testified that in their presence Mr. Dundon

15  specifically talked about the $250 million.

16          We have in there, in addition and we'll get to these

17  on the next couple of slides, we'll give the excerpts of this.

18  But Mr. Dundon's statements at a) press releases that

19  Mr. Dundon edited; on podcasts and radio shows, in print media.

20  And I want to be clear, it is not in fact the case that all of

21  these happened between February 18th and February 19th.

22          We have in Appendix 080187 of our omnibus appendix

23  you will find a USA Today article dated February 22nd, 2019 in

24  which Mr. Dundon is continuing to make statements about this

25  $250 million commitment he made to the League.

1    The Rich Eisen (phonetic) interview, which the

2    transcript of which appears at Appendix 0128 was on February

3    22nd, 2019.  We also have at Appendix 0192 a First Business

4    Journal article dated May 4th, 2019 in which Mr. Dundon -- I'm

5    sorry, March 4th, 2019, in which Mr. Dundon is still saying

6    that he has $250 million commitment.

7         And those are not the only admissions in the case.

8    We have importantly, it's a -- go ahead, go to the very next

9    slide.  This is examples of his testimony.  Mr. Deit testified,

10            "Dundon said I'm investing $250 million and

11            conveyed that he had more than enough to support

12            the League."

13         There's the appendix citation.  Ms. Lagrinwich, Kelly

14    Lagrinwich, another AAF employee,

15            "The $250 million was discussed by Dundon and

16            AAF personnel during the February 18th, 2019

17            meetings."

18         Four days after Mr. Ebersol signed the term sheet.

19    Mr. Hanson and Mr. Dundon's own testimony,

20            "I had a commitment of $250 million under

21            certain conditions."

22         It is certainly the case that Mr. Dundon's testimony

23    in this case is not that he had a binding agreement.  Of

24    course, Mr. Dundon does not think that he had a binding -- or

25    is not testifying in this case that he had a binding agreement

1    to commit, to provide $250 million.

2           But what is important is that Mr. Dundon does not

3    deny that he committed $250 million.  His testimony is

4    consistent that he did do that.  So the question is whether

5    that was an enforceable agreement, not whether the $250 million

6    commitment was made.  It was.  Or at least both Mr. Dundon and

7    Mr. Ebersol agree that that commitment was made.

8           So the question is enforceability, the question is

9    sufficient deference of terms.

10          And then we can go to Mr. Ebersol's testimony.  So I

11   want to make an important point here that is somewhat ancillary

12   to the points that I had thought we would be making in the

13   summary judgment hearing in part because as Ms. Williams

14   pointed out we prepared for the summary judgment hearing, we

15   prepared our response based on the motion.

16          And there are things that have come up over the

17   course of this that seem to be a little outside the scope of

18   that motion, particularly, you know, a bunch of material

19   related to what might be argued to be credibility of

20   Mr. Ebersol.  Which again, credibility at this stage is not a

21   determination that the Court needs to make, but the important

22   thing to remember is that the deal, the $250 million idea, the

23   testimony is that that was Mr. Dundon's idea.

24          $250 million is a number that comes from Mr. Dundon

25   according to Charlie Ebersol in the record.  And it's important

```
 1   also to note that it appears that everyone agrees that

 2   Mr. Ebersol was asking for $5.1 million or a $10 million

 3   bridge, a loan to get the AAF through a couple of weeks.

 4        Mr. Dundon who turned it in to a purchase of the

 5   entire league.  You can stay back on that last one.  A purchase

 6   of the entire league.  And why, one question I think you gave

 7   Mr. Lowenstein in the prior motion was a question about why

 8   wasn't -- you know, why wasn't due diligence done.  I think

 9   Mr. Lowenstein gave the impression that Mr. Dundon was rushed,

10   because he had very little time.

11        There was, in fact, only about 24 hours between the

12   first call and the call where they bind the agreement, where we

13   say the $250 million agreement was bound.  And it's true, there

14   was a very short period of time, but the deal for $250 million

15   only had to be made in that time period because Mr. Dundon

16   wanted that agreement done within that time period.

17        Mr. Ebersol is the one who needs $5.1 million right

18   now.  AAF is the one who needs $5.1 million right now.

19   Mr. Dundon could have just given them $5.1 million and done as

20   much due diligence as he liked.  Instead and the evidence in

21   the record seems to be pretty clear on this, Mr. Dundon wanted

22   to turn AAF's need for $5.1 million into leverage to make sure

23   he was able to acquire AAF, which is not what Mr. Ebersol

24   intended at the beginning of the call.  That's not what he was

25   looking for.  It is what he got.
```

2:20-cv-05077-eag Doc #1581-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 87 Documents Pg 1360 of 1466

187

1          And the evidence there -- so on confidential Appendix

2    0837 to 0839, is the testimony by Mr. Ebersol that the $250

3    million was Mr. Dundon's idea, confidential Appendix 1006

4    relates to Mr. Dundon's own testimony that he essentially

5    rejected the request for a loan and instead decided to buy the

6    League.

7          Importantly he gave statements to the press related

8    to this specifically at confidential Appendix 0840, he

9    explained why he did this.  He said, obviously getting control

10   was something that I had to have and he had to give.

11         Mr. Dundon leveraged this opportunity.  Mr. Ebersol's

12   rapid need for cash into an opportunity to buy the League, at

13   least there is a fact issue supported by the evidence showing

14   that that's what happened.

15         The $250 million is Mr. Dundon's decision.  He had no

16   pressure on him to put $250 million or $70 million into the

17   League within 24 hours.  He had an option to put in 5.1 and

18   take as much time as he needed.  The pressure was all on the

19   AAF.  It was all on Mr. Ebersol.

20         So we can move to the next one.  Just quickly, this

21   is just a few of the examples from our appendix of the many,

22   many, many times Mr. Dundon told everyone who would listen that

23   he had put $250 million into the League.

24         All right.  Okay.  So let's talk about the two

25   principal arguments on the oral agreement.  The first was

188

1   merger and I've explained why in our view merger doesn't apply.

2   The second is sufficient definiteness.  And so can we go to --

3   this is cut off on the -- actually, let's go to slide 13.

4           Perfect.  Okay.  So I want to quickly make sure that

5   I have it pulled up in front of me because I want to read

6   Mr. Ebersol's testimony to the Court just to make sure that

7   it's clear.

8           But there are -- the reason this list is the list it

9   is, the list on the left-hand side here is because that's the

10  set of allegedly indefinite essential terms that opposing

11  counsel had in their motion for summary judgment, which

12  entities would be involved in contributing the money.  It's not

13  clear to trustee why the specific entities that Mr. Dundon

14  controlled, from whom the money would be drawn, in order to

15  meet this commitment would be an essential term for the

16  purposes of binding the oral agreement.

17          The time frame question.  It's actually -- we

18  actually have pretty good evidence in the record on this.

19  Among other things, Mr. Dundon made clear where that number,

20  that $250 million number came from.  We know why Mr. Dundon

21  thought that.  And if you can go 14 just briefly.  We're going

22  to come back here in just a second, but.

23          In both of Mr. Dundon's depositions, he testified

24  that that $250 million is because that that's the number he

25  believed it would take to get the AAF to profitability.  So go

1   back for just a second.

2          So the reason it was $250 million and also the reason

3   that the price per share, quantity of shares is not the

4   critical question is because Mr. Dundon is contributing an

5   amount that he knows will get a huge majority, the thing that

6   he wants is a majority, and he's going to get a huge majority

7   out of this.  What he's going to end up with is essentially

8   complete control except for the minority ownership of the

9   investors, one of the terms that Mr. Ebersol did negotiate, was

10  that the prior investors would remain in.

11         He's going to get nearly everything in this business.

12  He's going to have complete control.  The thing that matters to

13  him is that the AAF will reach profitability.  At that level,

14  he's going to -- the value of the business ultimately is going

15  to be the thing that matters, not the number of individual

16  shares or anything like that.

17         Importantly, equity or debt it's true that

18  Mr. Ebersol testified that he wasn't sure whether it would be

19  equity or debt, but he also testified that what Mr. Dundon

20  wanted was ownership or complete ownership and control of the

21  League and it's really clear in Mr. Ebersol's testimony that

22  that was the thing that Dundon demanded.

23         Dundon doesn't have ownership of the League if all or

24  if he's contributing through generating debt.  A loan doesn't

25  give him that ownership.  It doesn't give him that control.

1  And so it's -- and additionally, it's extremely clear because

2  we have an e-mail demonstrating that Mr. Dundon knew and let me

3  make sure that I have it directly in front of me, that there

4  would be a necessity to dilute prior shareholders by the

5  commitment that he was making.

6       So Mr. Ebersol may not be, you know, may not have in

7  the moment, he was answering one of many questions, he was

8  asked during the course of the deposition, remembered the

9  correct -- you know, remembered his view of debt versus equity,

10 but he later clearly said, this question is about ownership.

11 This question is about control.  And so I'm going to make sure

12 that I have that language directly in front of me.

13      Okay.  My apologies by changing the order in which

14 I'm doing things.  I have slightly altered where I have to go

15 in my presentation.

16      Here we are.  Okay.  So, for instance -- okay.  So

17 this is on page confidential Appendix 0843.  The company needs

18 $5.1 million by 1:30 and I need to know if I'm going to spend

19 on my own money.  No, I will -- so that's where Charlie is

20 saying, you know I might have to put in my own money.  Dundon

21 says, no, I'll take care of the $5.1 million, deal with John

22 Zutter on that, but you need to go for $250 million (indisc.)

23 to agree.  And so I need majority control, I need the Board, if

24 you can agree to that, we can get a deal done.  If you tell me

25 you are willing to put $250 million for control of the company

Case 2:22-cv-05077-cag   Doc #1381   Filed 02/06/25   Entered 02/06/25 15:59:19   Main Document   Design Page 191
Documents Pg 1364 of 1466

191

1  but my investors get to keep some piece of the company I can

2  get that deal done with my Board and my investors.

3          I think Mr. Lowenstein presented some argument that

4  at a later Board meeting this particular number wasn't

5  mentioned, but it's important to note that Mr. Ebersol

6  testified that he, in fact, spoke to and secured approval of

7  the Board members and again, this is confidential Appendix 0844

8  to 0845.

9          **THE COURT:**  So is that reflecting the corporate

10 minutes?  Where is that reflected?

11         **MR. ATKINS:**  This is --

12         **THE COURT:**  In the testimony?

13         **MR. ATKINS:**  No, it isn't reflected in the corporate

14 minutes, it's only reflected in Mr. Ebersol's testimony.

15         **THE COURT:**  All right.  Go ahead.

16         **MR. ATKINS:**  And that essentially he had to make a

17 mad dash to get a bunch of phone calls done to make sure

18 they're okay with the deal.

19         He got that done.  And ultimately that was the deal

20 that gets made.  And so you have a deal that ultimately has

21 terms that are $250 million for complete control of the Board

22 or voting control of the Board and a majority of equity.

23         And that agreement, the number, that $250 million is

24 important specifically because the idea was to get the League

25 to profitability.  But the time frame evidence here is specific

1   to that idea of getting the business to profitability.

2          The reason that it doesn't really make sense to ask

3   for the time frame to be specified as an essential term of the

4   agreement is because in his own discussions with people in

5   public about his $250 million commitment, Mr. Dundon continues

6   to go around saying that the reason is -- that that $250

7   million commitment is going to get them to profitability and

8   it'll be available as needed.  It depends on how quickly we

9   expand and what the ratings are.  This is the Sports Business

10  Journal Article that I talked about a little bit earlier that

11  was on March 4th of 2019, well after all of this was done.

12         He is absolutely clear that that's why there is a

13  specific time limit on when it's going to be spent.  It's going

14  to depend on how they move through their development of the

15  League.  And so that isn't, in fact, a particularly unclear

16  term.

17         So let's go to slide 16.  So that sort of just leaves

18  the question, did performance happen.  Well, it's very clear

19  that -- it's very clear in Mr. Ebersol's testimony that the

20  reason that he signed the term sheet is that he was told by

21  Mr. Dundon that that was the thing that he needed to do in

22  order to get to this $250 million.

23         He's told by Mr. Dundon that this first agreement is

24  what Mr. Zutter needs in order to get them a mechanism to pay

25  him, to get him to $5.1 million that he needs in order to fund

1   the League for the next week.  He does that.  That is the

2   initial performance of this agreement, the first thing he does

3   to try to make sure this happens.

4          I'm sorry, I've referred to this document more than

5   once, I just want to make sure that I actually put it on the

6   record, so that the Court understands it.  Because this is

7   another example -- I'm sorry.  You said -- this is the citation

8   to that document?

9          Okay.  So there's an e-mail which we have -- does

10  somebody just have a copy of it, because for whatever reason my

11  confidential Appendix seems to be glitching on me.

12          **MR. HOCKADAY:**  EBS e-mail?

13          **THE COURT:**  Why don't we take a five minute break for

14  you to find that.  Forgive me for asking this, do you think

15  we're going to be done by 5?

16          **MR. ATKINS:**  Yes.  I actually --

17          **THE COURT:**  And we know we've still got the Zutter

18  motion --

19          **MR. ATKINS:**  Oh, you're right.

20          **THE COURT:**  -- and motion for summary judgment.  So

21  do you think you'll -- you all will be done with your motion,

22  but I've still got the Zutter motion for summary judgment.

23          **MR. ATKINS:**  You're right.

24          **THE COURT:**  So I should know this, where did you all

25  fly from?  I thought mainly Dallas, but some people from the

```
 1    West Coast?

 2            MR. FARAHI:  Your Honor, I'll stay in this courtroom

 3    if we have to until Monday.

 4            THE COURT:  No, no, no, we're not going to do that.

 5            MR. FARAHI:  I'll sleep right here.

 6            THE COURT:  No, we're not going to do that.

 7            MR. ATKINS:  He's not flying until tomorrow, Judge.

 8            THE COURT:  Okay.  But is everyone else from Dallas,

 9    is that correct, or do I have that wrong?

10            MS. WILLIAMS:  Your Honor, I was just going to say

11    for efficiency purposes, I actually -- I'm doing the fiduciary

12    duty response and I combined Dundon and Zutter.  So we could

13    finish the part that Ms. Clark and Mr. Atkins are doing, argue

14    Zutter and then I can respond together on fiduciary duty unless

15    Your Honor wants to do it another way.

16            THE COURT:  Mr. Lowenstein?  I mean, I'm sorry,

17    Mr. Hockaday, excuse me.

18            MR. HOCKADAY:  All good.  Sorry.  Thank you, Your

19    Honor.  If -- I don't think we have an objection to mixing

20    that, but it's our motion so if that is the case then before --

21    I'm sure Ms. Williams doesn't have a problem with that, we

22    would like to then present our Zutter motion, whichever the

23    Court prefers.

24            MS. WILLIAMS:  That sounds fine.  And you can insert

25    yourself before I get back up, but it is your motion and it is
```

2:20-cv-05077-eag Doc #1381 Filed 02/06/25 Entered 02/06/25 59:19:19 Main Document Design Page 195
Documents P 4 0 368 of 1466

195

1    the Court's courtroom so anything you all want.

2         **THE COURT:**  Because some of the issues are the same,

3    right?

4         **MR. HOCKADAY:**  Yes.  There's quite a bit of overlap.

5         **THE COURT:**  Okay.  Thank you.  That's what I needed

6    to -- are you ready to go or can we --

7         **MR. ATKINS:**  Yes.

8         **THE COURT:**  We probably will take a break at some

9    point, but go ahead, please.

10        **MR. ATKINS:**  So I just want to make sure that I

11   actually put this on the record because I've referred to it a

12   few times.  The confidential Appendix 0247 we have an e-mail

13   chain including Mr. Zutter and Mr. Dundon in which, among other

14   things, they are discussing pre-existing investments or they're

15   discussing an equity term sheet involving CBS and the -- and

16   Mr. Dundon e-mails, this is on February 21, 2019, quote, they

17   have to be diluted from here by the 250 or it's not fair.

18   Let's figure this out in time.  So that's February 21, 2019

19   which is another reference to the $250 million that's well

20   after the term sheet and after the February 18th to February

21   19th time frame that Mr. Lowenstein put on the discussions of

22   the $250 million.

23        The important element here is that it is certainly

24   true that, you know, not everyone talks about or that not every

25   single person in the case was asked, had $250 million, you

2:24-cv-05077-eag Doc #1381-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Designation
Documents Pg 1369 of 1466

196

1    know, immediately on their mind, although as we noted, many,

2    many witnesses did.  Mr. Dundon definitely had $250 million on

3    his mind.

4         So the other -- the very next thing after obviously

5    signing the term sheet is that AAF, ESMG puts Dundon and Zutter

6    in control.  They have actual control immediately and we put a

7    good deal of evidence in the record on this point.  And I think

8    actually opposing counsel referenced that in the prior summary

9    judgment argument.  That there's quite a lot of evidence in the

10   record that Mr. Zutter, Mr. Dundon and DCP had actual very

11   granular control of the AAF --

12        **THE COURT:**  Respectfully, I don't know if there's any

13   dispute they got control.  The question is for how much and on

14   what basis, right?

15        **MR. ATKINS:**  Yes.

16        **THE COURT:**  15 million versus 250 million.  Do you

17   agree or disagree with that?

18        **MR. ATKINS:**  I agree, Your Honor, that's exactly

19   right.  And that's exactly what the question is.  And there's a

20   reason, in fact, that that you're describing it in this way.

21        The way that Mr. Dundon told Mr. Ebersol this was

22   working, was that that term sheet was the thing that Mr. Zutter

23   needed in order to get that initial payment done.  So

24   Mr. Dundon -- so Mr. Ebersol --

25        **THE COURT:**  I understand it.  So you used an

 1  interesting term and I'm cutting against my own interest to try

 2  to move you all along, but you said initial payment of 70

 3  million.  Anywhere in the documentation or anywhere in the

 4  evidence does the word initial payment be used?

 5           MR. ATKINS:  Your Honor, I want to be clear.  I don't

 6  know that that was for the initial payment of $70 million.

 7  What I mean is that Mr. Dundon's concern in that moment was to

 8  get the 5.1, that amount which is the initial funding amount

 9  discussed in the term sheet --

10           THE COURT:  Right.

11           MR. ATKINS:  -- but that amount is the amount he

12  needed immediately.  And he asks Mr. Dundon after the

13  discussion that I believe Mr. Lowenstein quoted with

14  Mr. Zutter, he goes to Mr. Dundon as Mr. Zutter told him to do

15  and asks Mr. Dundon about it, and he says, I'm a man of my

16  word, it's $250 million, whatever John has to do in order to

17  get this done, that's his business to get that initial -- to

18  get that payment.

19           And so he's doing that because he believes this is

20  oh, this is the first step for that $250 million agreement.

21  After all, you might end up doing this over the course of

22  several different influxes of cash, what mattered to him --

23           THE COURT:  Yeah, and that's exactly why I asked the

24  question.

25           MR. ATKINS:  Yeah.

1          THE COURT:  Is you seem to -- and -- you said initial

2     payment then we're talking about the 5.1, but isn't -- do I

3     misunderstand the argument is really when Mr. Dundon makes his

4     alleged representation of 250, it's not going to be immediate,

5     it's going to be over time, right?

6          MR. ATKINS:  Yes, Your Honor.

7          THE COURT:  Okay.  So with that in mind, how do I

8     view that 70 million?  Is that an initial payment to then go

9     through the difference of 180?  Do you see why I'm asking the

10    question?

11         MR. ATKINS:  Yes, I do and it's to open a unit of

12    capital from one of Mr. Dundon's entities, he has several, DCP

13    is one of them.  But it's to open that capital for them to

14    immediately start drawing from to provide that initial $5.1

15    million amount.

16         Now, I want to note one of the things that came up in

17    the other motion, which is not something briefed in our motion

18    is the question of although we do cite to some of the evidence

19    related to this, but fairly recent discovery of the non -- of

20    the fact that the term sheet appears not to have ever been

21    signed by the other sign and the potential consequences of

22    that.

23         In our view, it's not relevant.  In our view, it

24    doesn't alter the oral agreement claim, except to the extent

25    that merger were still an issue, obviously if there were no

1   term sheet, there could be -- that's another reason there could

2   be no merger.

3          **THE COURT:**  And you anticipated my next question, so

4   go ahead please.

5          **MR. ATKINS:**  Right.  But the point either way is,

6   because the oral agreement is a larger agreement not

7   inconsistent with the term sheet, that is to say nothing in the

8   term sheet says that no other Dundon entity that Dundon himself

9   or even that DCP can't contribute additional amounts or more

10  separately or pursuant to different term sheets, an agreement

11  that itself doesn't contain a merger clause.  None of that is

12  inconsistent with the existence of an additional oral

13  agreement.

14         So the reason I'm pointing out the performance

15  element is simply to note that, ESMG's perspective on what was

16  happening is that its performance of signing the term sheet and

17  giving control was its performance of its obligations under the

18  oral agreement.

19         So let's go ahead and move to the next slide.  So

20  this is a -- I just wanted to bring this up separately because

21  one, it actually -- because this relates to the performance

22  issue.  One argument that was made in the reply brief, I don't

23  believe this was in the original motion, but it's arguably just

24  a reply to an argument we made that points why their

25  performance argument wasn't great.

222095077 eag Doc#1581 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Part 200
Documents Pg 40 1373 of 1466

200

1      There's an argument in the reply brief that we can't

2   refer to performance of, you know, any -- of ESMG's terms of

3   the term sheet or anything like that in order to prove the

4   terms of the oral agreement because arguably such evidence must

5   be unequivocally referable to the oral agreement.  But there's

6   two different part performance ideas that exist in the case

7   law.  One of them relates to the question of sufficiency of

8   terms and the other relates to the extremely narrow judicially

9   created exception to the statute of frauds.

10      The West Oregon (phonetic) case which is cited by

11   opposing counsel in their reply brief cited there is a statute

12   of frauds case.  And I don't think anyone still thinks this is

13   a statute of frauds case, given the application of Texas

14   Business and Commerce Code Section 8.113, which is that --

15   which exempts stock transactions like this from the statute of

16   frauds.  But certainly none of that case law and Fisher v CGMI

17   is a good example of this, none of the case law that deals with

18   part performance as a means of proving the definiteness of a

19   contract, none of that case law refers to this unequivocally

20   referable standard.

21      So I just wanted to make sure that that is a thing we

22   said.  Because it was in the reply brief and so we wouldn't

23   have had an opportunity to respond except at the hearing.

24      Okay.  Let's go to -- all right.  Let's go to 18.

25   Okay.  That's the original colors.  They're not that way in the

222-cv-05077-eag  Doc #1381 Filed 02/06/25  Entered 02/06/25 15:59:19  Main Document Desig Pg 201
Documents Pg 40 1374 of 1466

201

1    version that I have.

2            **THE COURT:**  Okay.

3            **MR. ATKINS:**  That's the original colors.  I like

4    green checks better anyway.  These are the hallmarks of the

5    definite agreement, <u>Fisher v CGMI</u> is the case that we're citing

6    there.  And we have there the intention, sufficiently definite

7    to confirm that both parties actually intended to be

8    contractually bound.

9            Again, there we have Mr. Ebersol's testimony that

10   Mr. Dundon said, I will be bound if you agree to this majority

11   control and voting control and $250 million and Mr. Ebersol

12   said, I need to make sure my minority investors stay in and

13   they had that agreement.  That is given -- this is driven and

14   <u>Fisher</u> is the case that says this, among other things, by what

15   the parties believed to be the kind of terms that would be

16   essential.

17           Those are the things that mattered to them.  And

18   that's -- and it's for that specific reason that $250 million -

19   - that what Mr. Dundon cared about was complete control and the

20   number be sufficient to get to profitability that a lot of the

21   other terms that opposing counsel talked about aren't

22   particularly relevant.

23           Then we have clarity, can the Court understand the

24   parties' obligations to give an appropriate remedy.  And there

25   we have performance.  And again, those are the three elements

222-95077-cag Doc#1381-1 Filed 02/06/25 Entered 02/06/25 09:19:19 Main Document Design Page 202 Documents Pg 1375 of 1466

202

1    that we just showed.

2          I want to move to the -- I think it's 24.  I don't

3    think we need -- yeah, because we don't need to do merger

4    again.  So this is the other thing I want to point out.

5          There's an argument that the $70 million term sheet

6    is inconsistent with the existence of a $250 million deal.  And

7    the argument is essentially that, well look, they contributed

8    75 percent equity, what is there left to give with the

9    remaining $250 million.  But that's an inaccuratinistic

10   position.  It's inaccuratinistic for the reason that everybody

11   understood, even Mr. Dundon thought he was going to keep

12   putting money into the AAF.

13         His testimony in his own 2024 deposition is that he

14   was going to keep putting 200 -- money into the AAF.  His

15   testimony is just that he was only committed to do it if they

16   hit certain hurdles.  No one's testimony is that anyone thought

17   on February 14th or February 19th or February 20th that the $70

18   million was all of the money that Mr. Dundon, through his

19   entities or otherwise, would ever put in the AAF.

20         So the idea that there wasn't anything left to give

21   or that it would be inconsistent with there being a larger

22   contribution to the AAF or anything like that, that was not

23   inconsistent in the minds of the parties at the time.  They all

24   thought that they would continue to have money put in.

25         And the reason that that's the case is because nobody

1    thought $70 million was enough for the AAF to get to

2    profitability.  It was going to take more like $250 million.

3    And that's Mr. Dundon's testimony, that's Mr. Ebersol's

4    testimony.  That's all of the projections in the case.

5            So that number -- it had to be 250 million.  It never

6    could have been -- it could never have stopped at 70.

7            **THE COURT:**  But you'd acknowledge that the 180

8    doesn't get him anything more, right?

9            **MR. ATKINS:**  It could actually get him more.

10   Ultimately once Mr. Dundon and Mr. Zutter are in charge of the

11   Board they can dilute the original DCP 75 percent, put

12   additional amounts into other entities.  He could get 90

13   percent, he could get 95, but what he also gets and this is the

14   important thing to remember, because he now owns and controls

15   this business when he makes it successful with the $250 million

16   he's putting in, he gets all of the benefits that he thought

17   were important to that.  He talks about his reputation.  He

18   talks about --

19           **THE COURT:**  I can understand that.  But my point is,

20   for $70 million he gets control, right?

21           **MR. ATKINS:**  Yes, Your Honor.

22           **THE COURT:**  He gets control of the company.  And then

23   at that point in time he decides whether or not to put the

24   money in, right?

25           **MR. ATKINS:**  Well, I also want to point out in our

```
1   view he doesn't get control for $70 million.  He gets control

2   because he binds himself to the oral agreement that Mr. Ebersol

3   believed the first 70 million is the first thing he has to do

4   in order to access.  That he has to sign that dotted line in

5   order to get to the remainder of that money.

6        THE COURT:  So effectively then, let's track from

7   this perspective, well there's a minor dispute about it, was it

8   a full 70 million or not, right?

9        MR. ATKINS:  Yeah.

10       THE COURT:  $70 million to pay.  We're not fighting

11  about the fact that he remitted approximately $70 million; is

12  that correct?

13       MR. ATKINS:  Well on the oral agreement point we're

14  not fighting about that.

15       THE COURT:  Okay.  So then he takes over with Zutter,

16  right.  Basically he's in charge with Mr. Zutter.

17       MR. ATKINS:  Yes, Your Honor.

18       THE COURT:  Okay.  Mr. Ebersol is kind of squeezed

19  out at that point in time, isn't he?

20       MR. ATKINS:  Mr. Ebersol no longer has control of --

21  well, Mr. Ebersol and the other Board members no longer have

22  control of the SMG, that's right.

23       THE COURT:  So with that in mind, so I understand

24  your point about if he puts the $180 million in, and if the

25  League finishes, there might be further profitability, but what
```

205

1    I'm trying to understand is, what's the delta between the 70

2    and 250?  If he gets control and I -- he can dilute the stock

3    further, but I'm just trying to understand what -- why --

4    what's the incentive for him to do that notwithstanding what he

5    says, okay.  But he basically is in the same position, isn't

6    he?

7              **MR. ATKINS:**  I mean ultimately he's not in the same

8    position because if he -- oh, sorry.  Yeah, so I want to again

9    just quickly to go back.  It's our view that he doesn't get to

10   be in this position at all until he promised the $250 million.

11             **THE COURT:**  Right.

12             **MR. ATKINS:**  But the other thing to note is --

13             **THE COURT:**  So I -- let's talk about it.  So he

14   promises to give the 250, but effectively what happens is he

15   gets control.

16             **MR. ATKINS:**  Yes.

17             **THE COURT:**  Okay.

18             **MR. ATKINS:**  But the other thing, to be clear, if he

19   stops putting money in and particularly given that he was --

20   and all of this is evidence that we put into the record as

21   well, that he's saying, no, we're not going to have any other

22   investors.  If no other capital is coming into this business,

23   this business fails.

24             **THE COURT:**  That was going to be my next question.

25             **MR. ATKINS:**  So he doesn't have a going concern after

Case 22-50073 Doc#1381 Filed 02/06/25 Entered 02/06/25 09:19:14 Main Document Design Part 206
Documents Page 1379 of 1466

206

 1   that point.  And at that point he's certainly at least breached

 2   the oral agreement because --

 3              THE COURT:  Right.

 4              MR. ATKINS:  And so that's the argument that we'd

 5   make there.  He doesn't have the thing that he wanted, the

 6   business if he doesn't keep putting money in.

 7              THE COURT:  All right.

 8              MR. FARAHI:  Your Honor, may I have --

 9              MR. ATKINS:  What?

10              THE COURT:  He came all this way, I feel like I

11   should let him --

12              MR. ATKINS:  He did fly.  You've got to come up here.

13              THE COURT:  Identify who you are for the record,

14   please, sir.

15              MR. FARAHI:  Your Honor, Jonathan Farahi for the

16   record.  One thing to add in this control element is, he could

17   create a different share of stocks, a Class A, a Class 1 that

18   just sits on top of everyone else.  He can dilute everyone to a

19   point where he can strip the asset and take all the assets out,

20   keep the liabilities behind.

21              So this is just piece one, as -- so I just wanted to

22   have that point with Your Honor.

23              MR. ATKINS:  Can I -- can we go to slide 37?

24              So I wanted to talk, because some of these

25   technically merger and justifiable reliance are not the same

2:22-cv-05077-eag Doc #1581-1 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Pg 207
Documents Pg 1380 of 1466

207

1   argument but they have some of the same components in them.

2   One of the things I wanted to do is go to first promissory

3   estoppel.

4           **THE COURT:**  Okay.

5           **MR. ATKINS:**  Let's go to the very next slide here.

6   Okay.  So the motion, in fact, the list of indefinite -- of

7   quasi indefinite terms that is in the original MSJ is I believe

8   in the promissory estoppel section and not in the oral

9   agreement section.  But this is the -- essentially the same

10  answer happens here.

11          Their argument is because some terms were not

12  definitely settled, Mr. Ebersol couldn't rely on Mr. Dundon's

13  promises.  Again, the response that we provided with respect to

14  the sufficient definiteness of the agreement responds to that.

15  Obviously to the extent that we are relying on the idea that

16  the oral agreement is the promise, if Your Honor finds that the

17  oral agreement is a bound contract, Your Honor doesn't have to

18  find that -- it doesn't have to apply promissory estoppel.

19  Promissory estoppel is a quasi-contractual remedy.

20          **THE COURT:**  Right.

21          **MR. ATKINS:**  The -- they also argued that the term

22  sheet negates reliance because it contradicts the oral

23  agreement.  For substantially the reasons that Your Honor gave

24  in ECF 54, which I believe is the motion to dismiss order, they

25  aren't, in fact, inconsistent.  It's possible for Mr. Dundon to

1    continue to provide capital after June, it's possible for him

2    to provide capital through different entities.  And it's also

3    nothing in the term sheet bars DCP from contributing capital

4    through a mechanism outside of the term sheet.  It's nothing in

5    the term sheet says that.  And that's, of course, all assuming

6    that the term sheet is enforceable at all.

7          There is a new argument in the reply is that the

8    trustee had no evidence of actual reliance by ESMG and that

9    Ebersol's reliance on any of Mr. Dundon's statements, his

10   personal reliance on Mr. Dundon's statements is irrelevant.

11   And at least my understanding reading their motion for summary

12   judgment was that the promissory estoppel point was essentially

13   a reiteration of their pleading challenge.

14         And so going through the evidence, we didn't, you

15   know, immediately have a -- you know, we didn't have a response

16   to that because we didn't see it until the reply brief.  But if

17   you -- you can go on to the next slide.  We talked --

18         **THE COURT:**  Let's take a five minute break here

19   please, two reasons, one we've been out here for a little bit.

20   And second, I have people that might have commitments after 5

21   o'clock.

22         **MR. ATKINS:**  Understood.

23         **THE COURT:**  And you -- I'm not trying to rush you but

24   I do have people who have young children.  I have people that

25   might have a commitment.  I hope this has changed, but I don't

 1  know what my CSO's commitment is.  He can't leave as long as

 2  I'm here.  But furthermore, he might not get paid if we stay

 3  past 5 o'clock.  And, you know, he's not -- I just want to find

 4  out and see if people can stay and we can continue on.  All

 5  right?

 6          **MR. ATKINS:**  Understood.

 7          **THE COURT:**  So let's just take a five minute break

 8  and then we'll come back.

 9          **THE CLERK:**  All rise.

10     **(Recessed at 4:06 p.m.; reconvened at 4:16 p.m.)**

11          **THE COURT:**  So we can give you a little bit more

12  time, but it's -- let me just say this.  Respectfully, having

13  done this for 18 years now.  We're not going to get done, I

14  don't think, and I know Mr. Farahi wants to stay because as

15  good as the Mexican food is in Los Angeles, he wants some

16  TexMex in San Antonio and I don't blame him for that, so.

17          **MR. FARAHI:**  (Speaking in Spanish)

18          **THE COURT:**  There you go.  I don't think we're going

19  to be done by 5:30, maybe 6, but do you agree?

20          **MS. WILLIAMS:**  I agree, Your Honor, simply because on

21  fiduciary duty which I'm covering as to the Dundon and Zutter

22  there's a lot of law.

23          **THE COURT:**  Yes.

24          **MS. WILLIAMS:**  We were discussing in your absence and

25  obviously whatever the Court would like, but I do think what we

210

 1  can get through easily, probably by 5 is Mr. Atkins is almost

 2  done, Ms. Clark's is relatively short and then Mr. Lowenstein

 3  said he wanted to respond on the contract issues, if we did

 4  that, only Mr. Hockaday and myself would have to come back

 5  because we all those left and then we could come back at the

 6  Court's convenience.

 7          **THE COURT:**  What do you all think?  That's my other

 8  current concern, we've got a lot of people here and the clock

 9  is running and that's not lost on me.  I have one other thought

10  but go ahead please.

11          **MR. HOCKADAY:**  I'm not objecting -- it's the end of

12  the day.  I don't object to that in principle, I do want to

13  respond to whatever they say with -- I think Mr. Atkins is

14  covering reliance and I do want to respond to that at least if

15  he's going to cover that today.  But if we want to punt on

16  fiduciary, that's fine.  Do you think we need to be --

17          **MS. WILLIAMS:**  So we'd be coming on fiduciary duty,

18  good faith and all of Zutter.

19          **MR. HOCKADAY:**  And Zutter?

20          **MS. WILLIAMS:**  Uh-huh.  I took everything that was in

21  Mr. Zutter's motion for everybody.

22          **MR. HOCKADAY:**  Are we free to speak freely, Your

23  Honor?

24          **THE COURT:**  Sure.

25          **MR. HOCKADAY:**  Is this something too that you

2:20-cv-05077-eag Doc #1381 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 211 Documents Page 1384 of 1466

211

1    anticipate is going to require a trip back or is this something

2    that would be done remotely potentially?

3         **THE COURT:**  Well, that was going to be my second

4    argument is, let you go back and we finish this up remotely.  I

5    am not a fan of remote argument, but I think in this case,

6    given that I don't think we're going to get done today and I've

7    got the PowerPoints now and things like that, I could probably

8    go through this, did it during COVID for two years, it's always

9    better to be here with the judge, I always think that, but I

10   could have you come back remotely and then you wouldn't be

11   rushed.

12        **MS. WILLIAMS:**  I'm happy to do it either way, Your

13   Honor, I don't mind coming back.  If it's a flight in or back

14   or --

15        **MR. HOCKADAY:**  Yeah, depending on the day that's

16   doable for me, it would just depend on what your availability

17   is and Ms. Williams' availability.

18        **THE COURT:**  I'm talking next week.  I'll make myself

19   available.

20        **MS. WILLIAMS:**  I'll look at my calendar.  I don't

21   have anything I can't move because I know we all want to get

22   this done.

23        **MR. FARAHI:**  Your Honor saved me from California

24   fruits.

25        **THE COURT:**  All kidding aside, were you --

212

```
 1              MR. HOCKADAY:  I will make it work.  I will be --

 2              THE COURT:  No, my concern was did --

 3              UNIDENTIFIED:  Nicole, did you do --

 4              UNIDENTIFIED:  We were displaced for a little bit

 5    thankfully on --

 6              MS. WILLIAMS:  I just have -- probably two seconds.

 7              THE COURT:  Same time for that, I'm very pleased to

 8    hear that.

 9              UNIDENTIFIED:  Thank you, Your Honor.

10              MS. WILLIAMS:  Your Honor, we've conferred and we can

11    both do Tuesday.

12              THE COURT:  Good Tuesday?  Oh, splendid.  So do you

13    want to do it remotely?

14              MR. HOCKADAY:  In person.

15              MS. WILLIAMS:  We can come back.

16              THE COURT:  So, Mr. Farahi, would you like to monitor

17    remotely?  I'll let you do that.

18              MR. FARAHI:  I will be here, Your Honor.

19              THE COURT:  Oh, okay.  It's not a problem.

20              MR. FARAHI:  Not at all.

21              THE COURT:  You're sure.

22              MR. FARAHI:  Like 25 percent Texican, Your Honor.

23              THE COURT:  I'm good with that.  Could we stop now

24    and finish up or do you think we need to go on and then --

25              MS. WILLIAMS:  I'd like -- Ms. Clark had an oral
```

1    argument, so she needs to finish for --

2          **THE COURT:**  Okay.

3          **MS. WILLIAMS:**  I think -- you all have maybe what 15

4    minutes total?

5          **UNIDENTIFIED:**  I can be done in three slides, so.

6          **THE COURT:**  Okay.

7          **MR. HOCKADAY:**  And, Your Honor, my request then would

8    be if Mr. Atkins is covering promissory estoppel and fraud,

9    that I just reply briefly on the detrimental reliance issue.

10         **THE COURT:**  Okay.

11         **MR. HOCKADAY:**  So you've got to respond too.

12         **MS. WILLIAMS:**  Can we just -- I'm sorry.  I'm not

13   trying to conduct everything.  If we can let Ms. Clark go,

14   she's the one that can't come back.

15         **MR. HOCKADAY:**  Okay.

16         **MR. ATKINS:**  And if we do it virtually I'm also to

17   come back if that --

18         **MS. WILLIAMS:**  Yeah, understood.

19         **THE COURT:**  All right.  Go ahead, Mr. Atkins.

20         **MR. ATKINS:**  So I just wanted to -- so let's go ahead

21   and move to -- this should be slide 41.  So we have this --

22   this is with respect to the question of promissory -- I'm

23   sorry.  This is -- let's go to 40, sorry, let's go back to 40.

24         So this is the -- in the reply on promissory estoppel

25   in arguments that there's sort of no individual evidence of

**EXCEPTIONAL REPORTING SERVICES, INC**

1   justifiable reliance, this is the argument that Mr. Ebersol's

2   personal opinion is irrelevant, at least as I understood the

3   original motion, it was essentially a pleading challenge about

4   the articulation of reliance.  But to be clear, we did provide

5   evidence of reliance.

6          So first of all, as we note in our response we

7   respond to the arguments made, but we provided and those are

8   the notes in ECF 196 which is our response brief that contain a

9   substantial amount of evidence on that.

10          But additionally our argument is that the control

11   evidence, that is the fact that they have personnel immediately

12   taking orders from Mr. Dundon and Mr. Zutter is itself reliance

13   evidence.  It's self-evidence of a taking action and reliance

14   on the statements that were made and that's the citations to

15   the relevant notes in the relevant documents there.

16          And we also have Mr. Ebersol testifying that he and

17   the Board agreed because of these various same statements.

18   Those are the confidential appendix citations to that

19   testimony, some of the testimony that I just read to the Court

20   earlier.

21          The final item there is Mr. Ebersol's personal

22   opinion being irrelevant.  There wasn't a legal authority cited

23   for the proposition that Mr. Ebersol as CEO of the SMGs opinion

24   as to whether he relied or the statement that he did rely would

25   not be relevant to the question of whether, yes, if you relied

1    on a statement, so I just -- it's not clear to me why that

2    would be the case.

3           And so it's our view both that it's a new argument,

4    but even to the extent the Court were to entertain that, the

5    evidence is pretty clear, but at least there's plenty of

6    evidence in the record to form a fact issue on actual reliance

7    by the defendants or I'm sorry by ESMG, so defendants and

8    evidence reply argument doesn't fly.  And the last issue on

9    promissory estoppel was this question of reliance damages.

10          And so the argument in the motion was the depleted

11   benefit of bargain damages are improper and the case law cited

12   there, sort of relates to this idea that in a promissory

13   estoppel case you don't get benefit of the bargain damages.

14          But the articulated damages include things like the

15   loss of the league and what wasn't requested is, for instance,

16   the remaining 180 million which would be the benefit of bargain

17   damages if the argument were that, you know, the contract

18   should have been enforced and therefore we should have gotten

19   the rest of the money.  Instead what was argued is that, the

20   actions that were taken in reliance on this promise put this

21   company into the hands of Mr. Dundon who ultimately caused it -

22   - ultimately used that control through and finally through to

23   the Chapter 7 bankruptcy.

24          The pecuniary loss, the out of pocket damage caused

25   by the actions taken in reliance on that promise were the loss

1   of the league.  And so the argument there is not that the

2   damages articulated in the other categories of damages listed

3   in the brief, it's not that those damages exist because of the

4   existence of a contract or that they are the amount they would

5   have received had the contract been fulfilled, it's that they

6   are the sort of tort damages foreseeably caused by the injury.

7          And so that takes us to fraud, so this is 54.  And I

8   think the parties generally agree on this point that the

9   justifiable arguments as to fraud and as to negligent

10  misrepresentation and investor promissory estoppel, essentially

11  that question of one, the question of the writing, if there is

12  a written bound contract, does that bar reliance on anything

13  outside of that.

14         Well again, our argument is, to the extent you have

15  decided that there isn't a merger issue between our attempts to

16  prove the oral agreement and the term sheet, all of that

17  testimony with respect to what was said with respect to the

18  oral argument, all of that testimony with respect to what

19  Mr. Ebersol was told in order to induce him to getting or into

20  getting ESMG to sign the agreement.  All of that information is

21  outside the scope of these questions of the term sheet there.

22         And so the argument that we'd make is for essentially

23  the same reasons, that the term sheet doesn't contradict,

24  doesn't bar introduction of the oral agreement, it is also not

25  inconsistent with all of those other statements that we talked

1   about.

2          It's not inconsistent with contributing these

3   additional amounts.  It's not inconsistent with Dundon's

4   repeated statements that he has committed $215 million.  And so

5   there's nothing that makes justification or that would mean

6   that relying on those statements was not justified.

7          Particularly given the context that we talked about

8   where Mr. Dundon was the one who was essentially using time to

9   his advantage to force the transaction.

10          The final point, negligent misrepresentation.  Again,

11  we have the same since 55.  We have the same basic principles

12  with respect to this argument and I believe the same,

13  essentially the same damages argument, although the case law

14  between those two is a little bit different.  All of that is

15  obviously in the briefing.

16          But the major thing that I wanted to hit here is that

17  this was again what appears to us to be pretty clearly a

18  pleadings challenge and this Court has already ruled that the

19  pleadings support negligent misrepresentation.  And that's the

20  citation there.

21          And so those are the reasons that we would ask on the

22  specific points that I addressed, that the Court deny summary

23  judgment.

24          **THE COURT:**  All right.  Ms. Clark, are you going to

25  speak now?  Here it is, the hard task at the end of the day

1    trying to make it short to the point.

2         **MS. CLARK:** Yes, Your Honor, all of my issues that

3    I'm covering are relatively narrow.

4         For the record, I'm Katharine Clark. I'm going to

5    start on the breach of contract counts, Your Honor, but before

6    I do that I just wanted to ask briefly because they didn't

7    present it in there, or I -- at least I didn't hear it in their

8    presentation, is whether Your Honor has any questions, burning

9    questions for me with respect to their executory contract

10   argument that they make in their papers.

11        **THE COURT:** I -- you know, frankly I'm glad you

12   raised that. Maybe we ought to deal with it just a little bit.

13        **MS. CLARK:** Okay.

14        **THE COURT:** Because I don't -- I didn't recall that

15   was brought previously or did I just miss it?

16        **MS. CLARK:** Your Honor, there is an affirmative

17   defense with respect to prior breach in there. It's generally

18   pleaded in their pleadings, but the executory contract was the

19   new concept from my perspective.

20        And so at slide 25, we just had kind of an overview

21   of our position on this, Your Honor, which is just to say

22   starting from their argument is that because ESMG can't prove

23   that it performed and then the contract was rejected by

24   operation of law after the bankruptcy filing, we were

25   prohibited from suing for breach.

219

1        Your Honor, and so from my perspective, the issue of

2   executory contract is irrelevant to the breach of oral contract

3   claim that we have brought.  And that is because this is a pre-

4   bankruptcy breach of contract claim that came into the estate

5   as of the moment that the Chapter 7 bankruptcy estate was

6   formed and now we're simply presenting that to Your Honor.  And

7   so that's the way that we look at it.

8        They present a case called In Re Sunrunner to suggest

9   that the executory contract issue is important because this is

10  a future or excuse me, this is a financial accommodation and

11  that under the Code that cannot be assumed if the contract is

12  executory or whether the contract is executory or not, it can't

13  be assumed.

14       I don't think that this is a financial accommodation

15  contract, Your Honor.  To me this is -- there's a question for

16  trial about whether there was an oral contract to begin with --

17       **THE COURT:**  Right.

18       **MS. CLARK:**  -- was that contract breached.  And from

19  my perspective, in that Sunrunner case we are like the bank,

20  which I think was maybe Citibank which had a pre-existing

21  obligation.  From the perspective of the trustee, we're like

22  the bank that had a pre-existing obligation coming into the

23  bankruptcy, whereas the parties that were at issue before the

24  Court in Sunrunner were a floor plan company and the boat

25  manufacturer essentially, it's like a three part, a triangular

```
 1   type transaction where there's money loaned and it's just a

 2   different situation, Your Honor, and we have that in our

 3   papers.

 4          And so I guess the other point that we make in our

 5   papers and I just make briefly to Your Honor is that to the

 6   extent Your Honor thinks that the executory contract question

 7   is one that is relevant to this case, from our perspective,

 8   there really isn't -- this contract wouldn't have been

 9   executory, not just because it's not some sort of financial

10   accommodation type contract, but because it is a one way --

11   one -- performance was only remaining one way.

12          From our perspective, the league had done what it

13   needed to do and now what would be -- what we argue was

14   remaining was that last $180 million.  And so that's not an

15   executory contract, Your Honor, in this circuit.

16          And so those were our arguments in the papers and so

17   I just wanted to flag those in case Your Honor had questions

18   for me.

19          THE COURT:  I appreciate it, thank you.

20          MS. CLARK:  Okay.  So the next slide is 30 please.

21          And so that's closing out the oral contract piece,

22   Your Honor.  And so then what I am going to present on is our

23   response with respect to their breach of contract, motion for

24   summary judgment on the Count II breach of contract.

25          And basically they make two arguments in their
```

1    summary judgment motion.  One is that because no performance

2    was due there could not have been a breach.  And basically they

3    state that because the trustee cannot identify an unfunded

4    funding request, it cannot prevail on its claim for breach of

5    the term sheet.

6           And then they also talked about the arguments that we

7    make for breach of contracting wrong as a matter of fact.  They

8    point out that there's a $280,000 -- $280,810 invoice which

9    negates any breach shortfall and that the bankruptcy

10   professional fees that we complain about were an expense of

11   ESMG that they say that ESMG has enjoyed the benefits of and

12   hasn't repaid.

13          And so they base this argument around Delaware breach

14   of contract law that, actually I don't know if we're supposed

15   to be on -- but is the Miller v Trimont case.  I don't think

16   that case is particularly instructive to Your Honor.  Actually

17   27, I'm sorry.  But it does have the elements and they're very

18   straight forward that under Delaware law there's a contractual

19   obligation.  Was there a breach of the obligation by the

20   defendant and then the resulting damage to plaintiff.

21          And so from the perspective of the trustee, there is

22   a fact question on that second issue, did each complained of

23   action, the shortfall essentially, was there a breach of

24   contract.  And to us, there is a fact question with respect to

25   that element.

1    And we cite to in our papers evidence that would

2    suggest that there is a fact issue.  Because the only thing

3    that the defendants cite to in their motion is essentially our

4    pleading, we don't think that they've shifted the burden on

5    this, Your Honor, but like some of the other counts we wanted

6    to make sure that you understand that there are facts in the

7    record and we know we're getting close to trial, so we wanted

8    to make sure that Your Honor sees that there's citations in the

9    record.

10    But to this breach of contract issue in particular,

11    what they say in the motion is that DCP fulfilled each request

12    that ESMG made and they don't cite any evidence.  They cite our

13    complaint.  And what they cite for that is paragraph 103 of our

14    complaint.

15    But if you were to look at our complaint, Your Honor,

16    and I apologize, I didn't realize that this courtroom didn't

17    have an Elmo, but if you were look at it, that paragraph merely

18    lists out the 16 wire transfers that came into the League.  It

19    doesn't suggest in that paragraph that there were pending

20    funding requests and that at each time there was a wire that

21    satisfied a particular funding request or a particular set of

22    funding requests.

23    And if you back up just a bit in the complaint to

24    paragraphs 101 and 102, you'll see how we pleaded, Your Honor,

25    that essentially the whole process with respect to how funding

1   requests were made and then not really fulfilled is a breach of

2   the term sheet.  Because, and I believe that actually counsel

3   for the defendant stated this in their presentation to Your

4   Honor, which is the term sheet says, you make a request, you

5   attach a budget, there's -- it's going to be funded.

6          And what the evidence that we cite to in our brief

7   shows, Your Honor, is that that was not the process.  The

8   process was submit some things, we'll look at it, we'll decide

9   what we think is appropriate, we'll want more detail, we'll

10  hold back money maybe arbitrarily on some things.  For example,

11  there was a big push to make settlements with vendors to deny

12  them payment at the contract and to pay them less money.

13         And so the League went out, made these negotiations

14  with lenders, they agreed to take less money and then when the

15  amounts of those settlement agreements were put into the budget

16  and asked to be paid, that was denied, or they would try to

17  hold payment and so these vendors that had agreed to take less

18  money on the promise of a future relationship, et cetera, that

19  was not going to be funded.  So that's just one example we have

20  in our response for Your Honor.

21         And then with respect to the $280,000 number, Your

22  Honor, it's a relatively small issue in this case, but our

23  position on this summary judgment is that what they presented

24  with their brief is simply that there was an invoice that was

25  submitted for $280,000 from DCP to the League.  It's very plain

```
 1   vanilla.  That's I think Exhibit 11 to their brief and that's

 2   not -- you know, we say that merely would create a fact issue

 3   as to whether those could be considered transaction costs under

 4   the parties' agreement.

 5           Similarly, Your Honor, with respect to the bankruptcy

 6   professional fees, what we say is that those were not part of

 7   any funding requests with the budget attached that the League

 8   made to DCP.  Rather, and you can see this as an example, I'm

 9   just going to cite for the record, we cited to -- at footnote

10   101 we cite to confidential appendix 0278, which I think is

11   confidential Exhibit 44.  And that shows you that -- oh, I hope

12   that's the right exhibit, Your Honor.  I apologize, my notes

13   got a little jumbled.  Yes, that's correct.

14           And if you were to go to that exhibit, Your Honor,

15   you would see that personnel from the DCP camp is sending an e-

16   mail to the AAF and they're saying we're going to send in some

17   money that needs to be paid out to these professionals.  They

18   don't necessarily even say why.  And so that's just one example

19   of how we say that those professional fees were not part of the

20   term sheet, they didn't follow the prescribed method of

21   requesting funds, they don't count.

22           And overall with respect to this term sheet argument,

23   Your Honor, I mean that's -- this is just a -- at a minimum,

24   what we say was not done by DCP and Dundon.  So it's a lesser

25   included argument from our overall argument with respect to the
```

1 breach of the oral contract.  And then the last -- so that's

2 all that I had with respect to the breach of contract account.

3        And then the last piece that I had, Your Honor, was

4 with respect to economic loss.  And I think this argument

5 probably makes more sense after the last presentation, Your

6 Honor, but basically what -- let me get to this one, slide 59,

7 is that where you are?

8        **UNIDENTIFIED:**  Yes.

9        **MS. CLARK:**  Basically they -- and I think that they

10 eluded to this in their presentation, they reference Your Honor

11 back to the motion to dismiss order which essentially said that

12 we needed to replead on these -- as to the -- to address the

13 economic loss rule concerns as to all of our tort claims.

14        And then within their motion for summary judgment,

15 they basically assert that we haven't met that -- the pleading

16 standard when we repled in our first amended complaint.  And so

17 for Your Honor, there is -- just for example -- I'll go back.

18        The cases that they recite, like for example, the

19 Easylinks case that they cite from Delaware.  In that case, the

20 Court is very clear that the parties pled facts that supported

21 their tort claims.  But then they had ultimately a very general

22 claim for damages.  And so their claim could not withstand the

23 economic loss rule, according to the Easylinks case.

24        And so if you were to compare that with what our

25 complaint does, and just like I was saying for example, you

1   were to look at the -- I guess go to that next slide.  They are

2   very -- they basically point out that we've pled in the

3   alternative that if for any reason our contract claim are not -

4   - we're not successful as to contract claims, that we still

5   have damages that are separate and apart from the contract

6   claims.

7           And so -- I'm sorry, Your Honor, I'm tired and I'm

8   not feeling well, so I don't -- I'm trying to go fast and I

9   just need to --

10          **THE COURT:**  You're fine.

11          **MS. CLARK:**  What they're saying is that we only plead

12  damages for our tort claims that relate to contract.  And if

13  you were to go to our complaint and look at each one of these,

14  the breach of fiduciary duty, the fraud, the fraudulent

15  inducement and negligent representation and you look at these -

16  - the expanded paragraph citations, you'll see that we were

17  very careful to plead not just words on a page, but

18  specifically what the different damages are for the tort side

19  of this.

20          And it is true, and this is what I was trying to say

21  that we do include in the alternative, and we're very express

22  in that, that there may be contract damages that would be

23  appropriate on our tort claims, but that's only if the contract

24  claims are not successful or held not to apply.

25          And the opinion that we cite to in our papers, the In

2:22-cv-05077-eag Doc #1301-1 Filed 02/06/25 Entered 02/06/25 59:19:19 Main Document Design Part 7 Documents Pg 400 of 1466

227

1    Re Wagner Cattle, it's a Judge Jones' opinion out of Lubbock,

2    Your Honor, and I love reading his opinions.  I'm going to be

3    sad when he's not on the bench anymore, but he basically says

4    it's like impossible to make a decision on the economic loss

5    rule when you have questions about how that contract might be

6    interpreted.

7              And since here we have these fundamental questions

8    about what are the contracts, what are the terms, it's very

9    difficult to say at the pleading phase how things should come

10   out.  Because you don't even know what to look for in terms of

11   does one thing cancel out the other.

12             And so I would just say that I think that's a good

13   opinion for Your Honor to consider and we think that we've more

14   than met the pleading standard, Your Honor.  And we've cited to

15   multiple -- also to multiple instances of evidence with respect

16   to support for our damages.

17             And so while we think that the most that we have to

18   do to respond on this point, is to show that we have met the

19   pleading standard, again we've gone beyond that in our papers

20   and we cited Your Honor to summary judgment evidence.

21             **THE COURT:**  Thank you.

22             **MS. CLARK:**  Thank you.

23             **MR. LOWENSTEIN:**  Can you bring up ours quickly or is

24   it going to take time?

25        **(Pause)**

1      **MR. LOWENSTEIN:**  Your Honor, I want to try to cover

2  some of the topics, but I too am tired, so I'm going to get

3  through the ones I can.

4          **THE COURT:**  I'm not the only one.

5          **MR. LOWENSTEIN:**  I can get -- I'm going to get

6  through the ones I can stand up and do right now, because I

7  think there's some really important points to hit on.

8          So I neglected in my original argument to talk about

9  one of the key issues here, which is it's either meeting of the

10  minds or offer of an acceptance as the $250 million deal.  And

11  I guess it could be both.

12          Do you have our -- so Dunbelt (phonetic), the lawyer,

13  when I was talking to her about this issue, I asked, so what

14  you were -- and this relates to the Board of Directors meeting

15  on the 24th of February 2019.

16          I said,

17              "So what were you presenting to the Board of

18          Directors at this time was the term sheet that

19          provided for investment of up to 70 million,

20          correct?"

21          And she said,

22              "That's what it says here."

23          She was looking at the Board meeting minutes.

24              "And do you recall presenting anything else

25          to the Board of Directors at any time concerning

```
 1          an additional investment of $180 million or a total

 2          investment for $250 million?"

 3          She said,

 4              "I don't remember."

 5          And I said,

 6              "Well, do you recall presenting any --

 7          presenting and seeking approval for any investment

 8          from Mr. Dundon or any of his affiliates for any

 9          amount above 70 million?"

10          She said,

11              "No."

12          And I said,

13              "Why was the Board of Directors' consent

14          needed for the term sheet for $70 million?"

15          And she said,

16              "The Board would need to approve any material

17          transactions to the company."

18          And I said,

19              "And was the $70 million a material

20          transaction?"

21          She said,

22              "Yes."

23          I said,

24              "Would a $250 million investment be a material

25          transaction?"
```

22-05077-cag Doc #1381-1 Filed 02/06/25 Entered 02/06/25 59:17:19 Main Document Design Page 230
Documents Pg 1403 of 1466

230

1          She said,

2                  "Yes.

3                  "Would $180 million investment be a material

4          transaction?"

5          She said,

6                  "Yes."

7          So when Charlie Ebersol is talking to Tom Dundon on

8    February 13th and 14th he is Charlie Ebersol.  We presented

9    evidence where he said, I, Charlie Ebersol, on my own don't

10   have the authority to sell stock or do anything else, I need my

11   Board, Ms. Belt says,

12                  "It's a material transaction that must be

13                  agreed to by the Board."

14         So there is no evidence that anyone other than

15   Charlie Ebersol and Ms. Own (phonetic) ever agreed to a $250

16   million deal.  The only evidence, as far as a deal done between

17   ESMG, which is not Charlie Ebersol, it's the Board of Directors

18   and the shareholders and anyone on the Dundon side is the term

19   sheet.  Because that's -- after Charlie said, I need to go to

20   my Board, he didn't go to the Board with 250, he went to the

21   Board with 70.  And then he went to the stockholders with 70.

22   And then the lawyers trying to fix the issue with the defaults

23   talking about 70.

24         So there was no meeting of the minds.  There's no

25   offer and acceptance because if Dundon made the offer, that's

1   what they're saying of 250, Ebersol can't accept that, because

2   he's just Charlie Ebersol.

3           Ebersol Sports Media Group needed to accept that,

4   which means it was because it was a material transaction,

5   according to their lawyer and that never happened and there's

6   no evidence it ever happened.  So there can't be a meeting of

7   the minds, there can't be an agreement.

8           That is not a merger agreement -- argument, that's

9   not anything else, that is, there cannot be an agreement

10  because there was no meeting of the minds.

11          There's also all of the missing material terms and

12  both Mr. Farahi, he said, he had to say something because he

13  couldn't, I'm only saying out of love, not out of an attack on

14  you, but there were several arguments about what possible

15  things could have happened in exchange for the $180 million

16  additional.  And it's so like obvious that nobody knows,

17  because there wasn't an agreement.  This is at best an

18  agreement to agree.

19          They love the term commitment, because it sounds like

20  a contract, but commitment is not a contract.  Mr. Dundon said,

21  like I was in, I wanted this thing to last, I invested $70

22  million not because I wanted to throw it in a bankruptcy, I

23  invested $70 million because it was a passion project, I love

24  sports, I want this thing to thrive.  Of course, he was excited

25  about it, of course they went out to the media after there was

 1   some bad media about not paying the players and said, I've got

 2   this commitment.  But a commitment is not a contract.

 3          The contract is the meeting of minds between two

 4   parties on all -- that contain all the legal requirements for a

 5   contract and that's what they're suing for.  And there's none

 6   for anything other than the 70 million.

 7          And all of these open questions about could there be

 8   another series of stock, could be taking assets and putting

 9   them somewhere, I mean that just tells you there can't be a

10   contract for this other.

11          And otherwise, they're just saying Dundon was going

12   to give it as a gift because he already got all the

13   consideration and that's not an enforceable contract either.

14          We've got lots of grounds for not enforcing that,

15   other than merger, but I just want to note for the Court that

16   we didn't word it in terms of merger, I'm not going to

17   represent to the Court we did.

18          In our motion to dismiss before our answer was filed,

19   we spend several pages talking about -- if you look at ECF 18,

20   pages 19 and 20, several pages talking about how the terms of

21   the oral agreement were inconsistent with the terms of the term

22   sheet, which is a merger concept.  We did not use the words

23   merger, I don't want it to be confused later, I'm not using the

24   words merger, but we certainly brought into the concept in

25   front of the Court as the very first thing we filed, we did not

1   follow up and file an affirmative defense that says merger.  We

2   raised the issue of impossibility and ratification.

3          I think there's fair notice throughout this case that

4   that was an issue that we were raising.  If the Court does not

5   agree and thinks that we needed to have said the word merger,

6   then we would seek from the Court to amend our answer to add

7   the word merger.  I don't think there's any surprise or

8   prejudice there because we briefed the heck out of it

9   throughout the entire case.

10         Similarly, this issue of what's in the summary

11  judgment record and we can file a motion if the Court wants,

12  but the trustee filed an omnibus record that covered all of its

13  responses.  We broke ours up, cross-referenced them so if the

14  Court believes it's appropriate we would ask that all of the

15  evidence submitted with respect to the Ebersol motion or this

16  one since the cases are consolidated, be considered by the

17  Court.  And we can file a supplemental record that cross-

18  references or whatever, but I think that would be fair given

19  the omnibus record submitted by the trustee with 3,000 pages of

20  documents in it.

21         Consistent with this overall theme of what was Dundon

22  going to get, because remember there's been a lot of argument

23  that DCP and DDFS and Dundon are separate legal things, but

24  when it comes to this, they're somehow merged.

25         DCP got the interest in the company, the 75 percent.

1   Dundon did not.  He got a seat on the Board through his role at

2   DCP, but he didn't get anything.  And so this whole what was it

3   that he was going to get and it's even the -- number 192 or

4   page 192 in the trustee's appendix where they talk about this

5   article.  If you read that whole article it's very clear that

6   Mr. Dundon is saying, this is that March 2nd article, he said,

7   with so much going on I probably made a mistake in how we did

8   the release, I bought the League, I think 250 million is the

9   top end of what it would take to keep this thing -- League

10  viable for a long time.  If no one wants the League to exist in

11  two or three years, then no different than any business, I

12  don't know why we would keep it open.  Said every business can

13  shut down any time it wants.  So long as we get the ratings and

14  demand, then obviously we will keep putting in capital.

15      So that does not sound like somebody that's been --

16  has a contract in place that says you're putting in 250 million

17  and keep putting in capital that -- there's a lot of investors

18  in this case, in this company, and the many companies that come

19  back and put in more capital or putting more money as a loan,

20  they always get something in exchange.  They don't just show up

21  and write checks again.  If there's not an existing agreement

22  that covers it, whether it's a lender or a funder, if you're

23  going to put in more capital there has to be more that you get

24  back.  And it's true for this company that everyone that did

25  that got something more.

1          Mr. Palchek (phonetic) loaned more money, he got

2   additional promises of repayment and other things and that was

3   true for everybody.  That's all I have, Your Honor.

4          **THE COURT:**  All right.  Thank you.

5          **MR. HOCKADAY:**  Your Honor?

6          **THE COURT:**  Sure.

7          **MR. HOCKADAY:**  I'll see if I can get it in three.

8          Thank you, Your Honor.  Just to address the issues of

9   fraud, promissory estoppel and negligent misrepresentation.

10  First of all, Ms. Williams was nice enough to pull out the

11  standard on Rule 56.  One of the things that Rule 56 allows you

12  to do is move on if there is no actual evidence in the record.

13  As it pertains to the negligent misrepresentation case, out of

14  pocket expenses are the only viable damages for it.  There is

15  no evidence in their record of out of pocket expenses that I'm

16  aware of.  If I'm incorrect, they can point it to me.

17         Second, as we go to the issue of fraud and

18  detrimental reliance, I'd like to note to the Court if we go to

19  page -- excuse me, if we go to Exhibit 173-6, so Exhibit 6 of

20  our motion there's excerpts of Mr. Ebersol's deposition

21  testimony.  In there it says -- there's a long question,

22  there's a lot of discussion and on page 306, starting at 7,

23  Mr. Ebersol testifies,

24              "We reached an agreement late on the morning

25              of the 14th of February 2019 --"

 1                **THE COURT:**  I'm a little bit behind you, which

 2   exhibit please?

 3                **MR. HOCKADAY:**  It's Exhibit 6.

 4                **THE COURT:**  Okay.

 5                **MR. HOCKADAY:**  In our motion, it's 173-6.

 6                **THE COURT:**  Page?

 7                **MR. HOCKADAY:**  Page 306 -- it's 306 of the

 8   deposition, it's page 9 of 24 in that exhibit.

 9                **THE COURT:**  All right.  Sir, thank you.

10                **MR. HOCKADAY:**  Okay.  If you start at line 7 he says,

11                     "We reached an agreement late morning of the

12                14th of February 2019.

13                     "Q   To the best of your recollection, can you

14                please state all the terms of that agreement?

15                     "A   Tom Dundon agreed to invest $250 million

16                for a majority of Ebersol Sports Media Group and its

17                subsidiaries, total control of the Board and I

18                believe that's it."

19                That is Mr. Ebersol's testimony.  If you heard our

20   argument or the argument that we said earlier this afternoon,

21   detrimental reliance, whether it's under the fraud or

22   promissory estoppel claim, if there is an inconsistency between

23   what the oral representation was and what the actual written

24   agreement is, that is not just by reliance.

25                And if we go to the term sheet, 250 million, 70

1  million direct comparison.  The majority of the Board, he got

2  75 percent and the term sheet of fully diluted preferred stock

3  and total control of the Board.  DCP had the only two Board

4  seats.

5          So the actual evidence in the record that we cited

6  and that is there and that is available, conclusively negates

7  justifiable reliance as a matter of law.  And therefore, that

8  would eliminate their fraud claims, which we do identify in our

9  motion too, promissory estoppel as well as the disallowance and

10  equitable subordination.

11          **THE COURT:**  Thank you.

12          **MR. HOCKADAY:**  Thank you.

13          **THE COURT:**  We're coming back Tuesday; is that

14  correct?

15          **MS. WILLIAMS:**  Yes, Your Honor.

16          **MR. LOWENSTEIN:**  Yes, Your Honor.

17          **UNIDENTIFIED:**  Your Honor, I have three minutes.  Do

18  you mind if I do it now or do you want me to wait till Tuesday?

19          **THE COURT:**  I'm not going to force you to come back

20  on Tuesday unless you're going to be here.

21          **UNIDENTIFIED:**  I will be here Tuesday.

22          **THE COURT:**  I want to hear fresh.

23          **UNIDENTIFIED:**  Awesome.

24          **THE COURT:**  So just so you know, I have a contempt

25  motion at 9:30 that morning, along with other stuff that won't

238

```
 1   take very long.  That might take a little bit of time.  What

 2   time were you going to give them, Ms. Poneka (phonetic)?

 3            No, I mean, how much longer do you think it'll take?

 4   A couple of hours, 17 hours, in all seriousness how long do you

 5   think it's going to take?

 6            MS. WILLIAMS:  I think I have an hour, Your Honor.

 7            THE COURT:  Mr. Hockaday?

 8            MS. WILLIAMS:  Maybe a tiny bit over, but I think an

 9   hour.

10            MR. HOCKADAY:  My assumption is, let's just say two

11   hours.

12            THE COURT:  Total?

13            MR. HOCKADAY:  Total.

14            THE COURT:  All right.  Well, if you really feel

15   comfortable with that, Mr. Farahi, I'll give you a chance to

16   think.  We can come back at 1:30.  This matter could take five

17   minutes because the bad actor might not show up or it could

18   take a couple of hours because he's testified in front of me

19   multiple times.  So let's say 1:30 --

20            MS. WILLIAMS:  I'm a little concerned Mr. Hockaday

21   said two hours, but.

22            MR. HOCKADAY:  No, no, I meant total.

23            MS. WILLIAMS:  Oh, you meant total.

24            MR. HOCKADAY:  Yeah, I said if you have an hour, I

25   have an hour.  No, no, no, no.
```

2:20-cr-00077-eag Doc #1581 Filed 02/06/25 Entered 02/06/25 15:59:19 Main Document Design Page 239
Documents Page 1412 of 1466

239

```
 1              MS. WILLIAMS:  I was getting --

 2              MR. FARAHI:  I was just going to say I'll be here,

 3     but apparently you were talking about a different bad actor,

 4     thank the Lord.

 5              THE COURT:  Not you.

 6              MR. FARAHI:  My day's coming.

 7              THE COURT:  All right.  So may I excuse you all at

 8     this time?

 9              MS. WILLIAMS:  Yes, Your Honor.

10              THE COURT:  All right.

11              MS. WILLIAMS:  Thank you.

12              THE COURT:  You're welcome.  So we'll have you back

13     at 1:30 on February the 4th.  You have the duration of the

14     afternoon and I might have a few more questions for you all at

15     that point, but I think I'll excuse you all at this point.

16     We're going to go off the record, we're going to be in recess.

17     I'm going to tidy up my desk.

18         (Proceedings concluded at 4:57 p.m.)

19                          *  *  *  *  *

20

21

22

23

24

25
```

# CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____

Signed

**February 6, 2025**

Dated

*TONI HUDSON, TRANSCRIBER*

# UNITED STATES BANKRUPTCY COURT
## Western District of Texas
## San Antonio Division

Bankruptcy Case No.: 19–50900–cag

Chapter No.: 7

IN RE: **Legendary Field Exhibitions, LLC and AAF Properties, LLC** , Debtor(s)

Adversary Proceeding No.: 22–05077–cag

Judge: Craig A Gargotta

**Dundon Capital Partners LLC**
Plaintiff

v.

**Charles Ebersol**
Defendant

## NOTICE OF FILING OF TRANSCRIPT
## AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

A transcript of the proceeding held on **1/31/25** was filed on **2/6/25**. The following deadlines apply:

The parties have until **February 13, 2025** to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is **February 27, 2025**.

If a request for redaction is filed, the redacted transcript is due **March 10, 2025**.

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is **May 7, 2025** unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber **Exceptional Reporting Services 361 949 2988**, or you may view the document at the clerk's office public terminal.

Dated:  2/7/25

Barry D. Knight
Clerk, U. S. Bankruptcy Court
BY: Laurie Boyd

**[Notice of Filing of Transcript (AP)] [NtcftddlrrAPap]**



**IT IS HEREBY ADJUDGED and DECREED that the
below described is SO ORDERED.**

**Dated: February 21, 2025.**

_____
**CRAIG A. GARGOTTA
CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD EXHIBITIONS,** | § | |
| **LLC,** | § | **CASE NO. 19-50900-CAG** |
| | § | **CHAPTER 7** |
| Debtor. | § | |

| | | |
|---|---|---|
| | § | |
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| Plaintiff, | § | |
| | § | **ADV. NO. 22-05077** |
| **v.** | § | |
| | § | **Judge: Craig A. Gargotta** |
| **CHARLES EBERSOL,** | § | |
| Defendant. | § | |

**ORDER DEFENDANT CHARLES EBERSOL'S OBJECTION TO DUNDON
CAPITAL PARTNERS, LLC'S EVIDENCE IN SUPPORT OF
SUMMARY JUDGMENT RESPONSE**

The Court, having considered Objection to Dundon Capital Partner, LLC's ("DCP") evidence

in support of Summary Judgment Response (the "Motion"), any responsive pleadings and other

1

documents, and the arguments of counsel, finds that Ebersol's objections should be and are

**SUSTAINED** as to Exhibit 16 and Exhibit 17 and **OVERRULED** as to Exhibit 31.

**IT IS FURTHER, ORDERED the** Court hereby sustains the above objections to Exhibit

16 and Exhibit 17, and hereby excludes such evidence from consideration by the Court.

### END OF ORDER ###

**Prepared by:**

Michael J. Saltz
Admitted *pro hac vice*
**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**
1800 Century Park East, Suite 900
Los Angeles, California 90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909
msaltz@jrsnd.com

- **and –**

Thomas M. Horan, II
State Bar No. 24063938
**THOMPSON, COE, COUSINS & IRONS, LLP**
700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209
thoran@thompsoncoe.com

**ATTORNEYS FOR DEFENDANT**
**CHARLES EBERSOL**

1416

AO 435
(Rev. 10/23)

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**TRANSCRIPT ORDER**

*Please Read Instructions:*

FOR COURT USE ONLY

DUE DATE:

| | | |
|---|---|---|
| 1. NAME<br>Jonathon Farahi | 2. PHONE NUMBER<br>(424) 288-4367 | 3. DATE<br>2/27/2025 |

| 4. DELIVERY ADDRESS OR EMAIL<br>jfarahi@actslaw.com; swiley@actslaw.com | 5. CITY<br>Encino | 6. STATE<br>CA | 7. ZIP CODE<br>91436 |
|---|---|---|---|

| 8. CASE NUMBER<br>22-05077-cag | 9. JUDGE<br>Craig A. Gargotta | DATES OF PROCEEDINGS | |
| | | 10. FROM January 31, 2025 | 11. TO January 31, 2025 |

| 12. CASE NAME<br>Dundon Capital Partners, LLC v. Ebersol | LOCATION OF PROCEEDINGS | |
| | 13. CITY San Antonio | 14. STATE Texas |

15. ORDER FOR

| | | | |
|---|---|---|---|
| ☐ APPEAL | ☐ CRIMINAL | ☐ CRIMINAL JUSTICE ACT | ☒ BANKRUPTCY |
| ☐ NON-APPEAL | ☐ CIVIL | ☐ IN FORMA PAUPERIS | ☐ OTHER |

16. TRANSCRIPT REQUESTED (Specify portion(s) and date(s) of proceeding(s) for which transcript is requested)

| PORTIONS | DATE(S) | PORTION(S) | DATE(S) |
|---|---|---|---|
| ☐ VOIR DIRE | | ☐ TESTIMONY (Specify Witness) | |
| ☐ OPENING STATEMENT (Plaintiff) | | | |
| ☐ OPENING STATEMENT (Defendant) | | | |
| ☐ CLOSING ARGUMENT (Plaintiff) | | ☒ PRE-TRIAL PROCEEDING (Spcy) | |
| ☐ CLOSING ARGUMENT (Defendant) | | Defendant's MSJ (ECF No. 102) | January 31, 2025 |
| ☐ OPINION OF COURT | | | |
| ☐ JURY INSTRUCTIONS | | ☐ OTHER (Specify) | |
| ☐ SENTENCING | | | |
| ☐ BAIL HEARING | | | |

17. ORDER

| CATEGORY | ORIGINAL<br>(Includes Certified Copy to<br>Clerk for Records of the Court) | FIRST COPY | ADDITIONAL<br>COPIES | NO. OF PAGES ESTIMATE | COSTS |
|---|---|---|---|---|---|
| 30-Day | ☐ | ☐ | NO. OF COPIES | | |
| 14-Day | ☐ | ☐ | NO. OF COPIES | | |
| 7-Day | ☒ | ☐ | NO. OF COPIES<br>1 | | |
| 3-Day | ☐ | ☐ | NO. OF COPIES | | |
| Next-Day | ☐ | ☐ | NO. OF COPIES | | |
| 2-Hour | ☐ | ☐ | NO. OF COPIES | | |
| REALTIME | | | | | |
| CERTIFICATION (18. & 19.)<br>By signing below, I certify that I will pay all charges<br>(deposit plus additional). | | | ESTIMATE TOTAL | | 0.00 |

| 18. SIGNATURE<br>/s/ Jonathon Farahi | PROCESSED BY |
|---|---|
| 19. DATE<br>2/27/2025 | PHONE NUMBER |
| TRANSCRIPT TO BE PREPARED BY | COURT ADDRESS |

| ORDER RECEIVED | DATE | BY | |
|---|---|---|---|
| DEPOSIT PAID | | | DEPOSIT PAID | |
| TRANSCRIPT ORDERED | | | TOTAL CHARGES | 0.00 |
| TRANSCRIPT RECEIVED | | | LESS DEPOSIT | 0.00 |
| ORDERING PARTY NOTIFIED<br>TO PICK UP TRANSCRIPT | | | TOTAL REFUNDED | |
| PARTY RECEIVED TRANSCRIPT | | | TOTAL DUE | 0.00 |

**DISTRIBUTION:** COURT COPY   TRANSCRIPTION COPY   ORDER RECEIPT   ORDER COPY

## GENERAL

**Use.**  Use this form to order the transcription of proceedings.  Complete a separate order form for each case number for which transcripts are ordered.

**Completion**.  Complete Items 1-19.  Do *not* complete shaded areas which are reserved for the court's use.

**Order Copy.**  Keep a copy for your records.

**Submitting to the Court.**  Submit the form in the format required by the court.

**Deposit Fee.**  The court will notify you of the amount of the required deposit fee which may be mailed or delivered to the court.  Upon receipt of the deposit, the court will process the order.

**Delivery Time.**  Delivery time is computed from the date of receipt of the deposit fee or for transcripts ordered by the federal government from the date of receipt of the signed order form.

**Completion of Order.**  The court will notify you when the transcript is completed.

**Balance Due.**  If the deposit fee was insufficient to cover all charges, the court will notify you of the balance due which must be paid prior to receiving the completed order.

## SPECIFIC

Items 1-19.    These items should always be completed.
Item 8.    Only one case number may be listed per order.
Item 15.    Place an "X" in each box that applies.
Item 16.    Place an "X" in the box for each portion requested.  List specific date(s) of the proceedings for which transcript is requested.  Be sure that the description is clearly written to facilitate processing.  Orders may be placed for as few pages of transcript as are needed.
Item 17.    *Categories*.  There are six (6) categories of transcripts which may be ordered.  These are:
    <u>30-Day</u>.  A transcript to be delivered within thirty (30) calendar days after receipt of an order.  (Order is considered received upon receipt of the deposit.)
    <u>14-Day</u>.  A transcript to be delivered within fourteen (14) calendar days after receipt of an order.
    <u>7-Day</u>.  A transcript to be delivered within seven (7) calendar days after receipt of an order.
    <u>3-Day</u>.  A transcript to be delivered within three (3) calendar days after receipt of an order.
    <u>Next-Day</u>.  A transcript to be delivered following adjournment and prior to the normal opening hour of the clerk's office on the following morning whether or not it actually is a court day.
    <u>2-Hour</u>.  A transcript of proceedings ordered under unusual circumstances to be delivered within two (2) hours.
    <u>Realtime</u>.  A draft unedited transcript produced by a certified realtime reporter as a byproduct of realtime to be delivered electronically during proceedings or immediately following adjournment.

**NOTE**: Full price may be charged only if the transcript is delivered within the required time frame.  For example, if an order for an 7-day transcript is not completed and delivered within seven (7) calendar days, payment would be at the 14-day *delivery* rate, and if not completed and delivered within 14 calendar days, payment would be at the 30-day delivery rate.

    *Ordering*.  Place an "X" in each box that applies.  Indicate the number of additional copies ordered.
    <u>Original</u>.  Original typing of the transcript.  An original must be ordered and prepared prior to the availability of copies.  The original fee is charged only once.  The fee for the original includes the copy for the records of the court.
    <u>First Copy</u>.  First copy of the transcript after the original has been prepared.  All parties ordering copies must pay this rate for the first copy ordered.
    <u>Additional Copies</u>.  All other copies of the transcript ordered by the same party.
Item 18.    Sign in this space to certify that you will pay all charges.  (This includes the deposit plus any additional charges.)
Item 19.    Enter the date of signing.

Shaded Area.  Reserved for the court's use.



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: March 03, 2025.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 19-50900-CAG |
| | § | |
| LEGENDARY FIELD EXHIBITIONS, LLC, et al., | § | |
| | § | |
| | § | |
| Debtors. | § | CHAPTER 7 |

| | | |
|---|---|---|
| DUNDON CAPITAL PARTNERS, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| | § | Adversary NO. 22-05077-CAG |
| v. | § | |
| | § | |
| CHARLES EBERSOL, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 102)

On this date, the Court considers Charles Ebersol's ("Defendant") Motion for Summary

Judgment. (ECF No. 102).[1] For this ruling, the Court reviewed Dundon Capital Partner LLC's

---

[1] "ECF" refers to the electronic case file docket number.

1

("Plaintiff") Original Complaint (ECF No. 1), Plaintiff's Response to Defendant's Motion for

Summary Judgment (ECF No. 124), Plaintiff's Revised (ECF No. 142), and Defendant's Reply in

Support of His Motion for Summary Judgment (ECF No. 138). The Court took this matter under

advisement after hearing on January 31, 2025. For the reasons stated herein, Defendant Ebersol's

Motion for Summary Judgment is **GRANTED**.

<div align="center">J<small>URISDICTION</small></div>

As a preliminary matter, the Court has jurisdiction over this matter pursuant to 28 U.S.C.

§§ 1334, 157(a), and 157(b)(1). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B),

(K), and (O). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This case is referred to this Court

by the Standing Order of Reference entered in this District. All parties consent to the Court's entry

of final orders and final judgment. (ECF Nos. 14 & 18). This matter is within the Court's authority

and jurisdiction pursuant to the Supreme Court's ruling in ***Wellness Int'l Network, Ltd. v. Sharif***

***(In re Sharif)***, 575 U.S. 665 (2015).

<div align="center">F<small>INDINGS AND</small> C<small>ONCLUSIONS</small></div>

The findings and conclusions set forth herein constitute the Bankruptcy Court's findings

of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052(a), made

applicable to this hearing by Federal Rule of Bankruptcy Procedure 9014. To the extent that any

of the following findings of fact constitute conclusions of law, they are adopted as such. To the

extent that any of the following conclusions of law constitute findings of fact, they are adopted as

such.

<div align="center">L<small>EGAL</small> S<small>TANDARD</small></div>

Federal Rule of Civil Procedure 56 allows parties to move for summary judgment by

"identifying each claim or defense—or the part of each claim or defense—on which summary

<div align="center">2</div>

judgment is sought." FED. R. CIV. P. 56(a). Rule 56 is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. FED. R. BANKR. P. 7056

Summary judgment may be granted when there is no genuine issue of material fact, and the movant is entitled to judgment as a matter of law. *Id.* To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some element of the non-moving party's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992) (en banc). If the crucial issue is one for which the non-moving party will bear the burden of proof at trial, the movant must merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Id.*

Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Neither will "only a scintilla of evidence" meet the nonmovant's burden. *Liquid Air Corp.*, 37 F.3d at 1075. Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, a court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is

3

uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment and must review all facts in the light most favorable to the nonmoving party. *Id.* at 150; *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

<div align="center">FACTUAL AND PROCEDURAL BACKGROUND</div>

This case arises from the creation and dissolution of an alternative professional football league called Alliance of American Football ("AAF"). The idea for the AAF was conceived by Charles Ebersol ("Ebersol") and others as a developmental football league for highly touted collegiate players and former NFL players to gain exposure and garner interest from NFL teams.

Ebersol was the CEO of Ebersol Sports Media Group ("ESMG") which owned and operated the AAF and its subsidiaries. (ECF No. 102, Ex. K). The league was designed to introduce cutting-edge technology that would allow for collection of instantaneous metric data from the games for fans to view via the AAF's app. The AAF envisioned that this data—in addition to being used by the teams for scouting and player evaluation—would create enhanced wagering opportunities for fans. (ECF No. 124, Ex. 3). These new ideas made the AAF attractive to potential investors, which was the league's primary source of capital at the time. (*Id.*, Ex 28 at 236).

Initially, Reginald Fowler ("Fowler"), a former part owner of the Minnesota Vikings of the NFL, promised to financially back the AAF by committing to fund up to $170 million through a combination of debt and equity. (ECF No. 124, Ex. 33). During the pendency of the AAF's first season, Fowler's investment commitment fell through because of accusations of financial crimes against him. (*Id.*, Ex. 23 at 198). In the market for new investors, Ebersol eventually encountered Thomas Dundon ("Dundon") and proposed an investment opportunity that would provide the AAF

<div align="center">4</div>

with the funding it needed in the short term and potentially through the end of the season. (*Id.* at 79). Dundon is an owner of the Carolina Hurricanes National Hockey League club and representative of Dundon Capital Partners, LLC ("DCP"), which is the entity Dundon conducted negotiations on behalf of for the AAF investment deal. (*Id.*, Ex. 15).

Ebersol and Dundon spoke about the deal for the first time on February 13, 2019. (*Id.*, Ex. 23 at 212). The parties disputed the amount of capital required to stabilize AAF's finances. (*Id.*, at 232). Ebersol intimated to Dundon that a bridge loan of $10 million was necessary in the short term because the league needed an immediate $5.1 million monetary infusion to pay players and other expenses for the first week of games. (ECF No. 120, Ex. A). Later that day, Ebersol forwarded marketing materials to Dundon, including an investor deck, financial projections, and other documents for the league. (ECF No. 124, Ex. 3). After DCP conducted brief due diligence on the information Ebersol provided, Dundon, as a representative of DCP, agreed to cover the immediate payroll and expenses in exchange for majority control of ESMG.[2] (*Id.*, Ex. 28, at 160).

To help facilitate the parties' deal, John Zutter ("Zutter"), a partner of DCP, sent a draft term sheet ("Term Sheet") to Ebersol. (*Id.*, Ex. 6). The Term Sheet provided that DCP would fund an initial amount of $5.1 million and approve additional funding requests up to $70 million. (*Id.*, Ex. 1). The Term Sheet also stated that DCP would receive governance control of ESMG and 75 percent of ESMG's fully diluted capital stock. (*Id.*). The parties exchanged several variations of the Term Sheet, changing the funding amount and percent ownership DCP would take in ESMG. (*Id.*, Ex. 6). Each copy of the Term Sheet contained two identical provisions which required DCP pay the initial funding amount to ESMG and that both parties sign the Term Sheet to create a

---

[2] In a related adversary proceeding, Dundon disputes the max amount of money DCP agreed to inject into AAF. There, the Trustee alleges that DCP agreed to a total $250 million and that the $70 million listed in the Term Sheet was only part of the investment deal. (Adv. Case No. 22-05078, ECF No. 1).

5

binding agreement. (*Id.*). On February 14, 2019, Ebersol was the only party to sign the final iteration of the Term Sheet.[3] (*Id.*, Ex. 1).

Thereafter, ESMG received the initial funding from DDFS Partnership, LP ("DDFSP"), not DCP. (Def. Ex. K). On February 24, 2019, ESMG's board members formally approved the Term Sheet, confirming receipt of $12 million as of that date. (ECF No. 124, Ex. 4). Dundon and Zutter then took positions on ESMG's board of directors and began directing ESMG and the AAF. (*Id.*, Ex. 18). Despite this change in control of ESMG, no stock was ever issued or conveyed to DCP. (ECF No. 158, at 54). Throughout the following weeks, DDFSP wired a total of $69,966,695 to ESMG for the league. (ECF No. 124, Ex. 31) (showing capital loss from DDFSP passed through to Dundon individually).

Nevertheless, the significant value of capital injected by DDFSP did not resolve the AAF's financial issues, causing the AAF and its associated corporate entities to file for bankruptcy protection on April 17, 2019. (Bankr. Case No. 19-50900, ECF No. 1). The entities' bankruptcy cases were later consolidated. Thereafter, DCP initiated this adversary proceeding against Ebersol on November 14, 2022. (ECF No. 1).

DCP's complaint consists of three counts—fraudulent inducement, securities fraud, and statutory fraud. (ECF No. 1). The complaint alleges that Ebersol made various misrepresentations through omissions about the true financial standing of the AAF by not fully disclosing bills that were due at the time DCP allegedly made its investment. (*Id.* at 14–18). Furthermore, DCP claims Ebersol lacked authority to execute a contract to issue stock on behalf of ESMG or change the

---

[3] The parties previously used an email confirmation from DocuSign that indicated all parties executed the Term Sheet to prove that the Term Sheet was signed. (ECF No. 124, Ex. 1). Through discovery, however, DocuSign confirmed that it never received Dundon's signed version and no party claims to have seen a Term Sheet with both parties' signatures. (Def. Ex. I). The only version of the Term Sheet in evidence before the Court displays Ebersol's signature alone.

makeup of its board of directors. (*Id.*). As a result of these alleged misrepresentations, DCP claims

Ebersol caused DCP to enter the Term Sheet to DCP's detriment. (*Id.* at 2). Accordingly, DCP

alleges its damages are $70 million. (*Id.* at 18). After conducting discovery, Ebersol filed the

present Motion for Summary Judgment on December 13, 2024. (ECF No. 102).

<div align="center">THE PARTIES' ARGUMENTS</div>

Ebersol's Motion for Summary Judgment requests the Court dismiss this case for three

primary reasons: (1) because DCP lacks Article III standing based on an absence of injury in fact;

(2) because DCP did not justifiably rely on Ebersol's alleged misrepresentations to maintain a

cause of action for common law and statutory fraud; and (3) because two of DCP's claims require

a conveyance of stock and no stock was transferred to DCP. (*Id.*).

DCP responded, alleging that it possessed standing because it lost $70 million dollars and

was a party to the Term Sheet. (ECF No. 124, at 18). To support this position, DCP argues that its

signature under the Term Sheet was not a condition to creating a binding contract. (ECF No. 158,

at 71). Further, DCP claims all monies paid to ESMG were owned by DCP because they were

merely held by DDFSP for management purposes. (ECF No. 124, at 23). As to reliance, DCP

asserts that it justifiably relied despite a lack of due diligence because there was insufficient time

to properly review ESMG's finances due to the league's need for immediate funding. (ECF

No. 158, at 68). Finally, DCP alleges that stock does not need to be transferred for a cause of action

for securities or statutory fraud to arise. Rather, an attempt to transfer is sufficient. (ECF No. 124,

at 24).

<div align="center">ANALYSIS</div>

## I. DCP Lacks Standing

The first argument in Defendant's Motion alleges that DCP lacks Article III standing to

<div align="center">7</div>

maintain this adversary proceeding. (ECF No. 102, at 9). Article III standing requires a plaintiff

show "(1) an 'injury in fact' that is (2) 'fairly traceable' to the 'conduct complained of' and that is

(3) likely redressable by a favorable court decision." ***Earl v. Boeing Co.***, 53 F.4th 897, 901

(5th Cir. 2022) (citing ***Lujan v. Defs. of Wildlife***, 504 U.S. 555, 560–61 (1992)). Because Ebersol

only disputes the first element, the Court focuses on whether there is an injury in fact pled. (ECF

No. 102, at 10–15).

The Supreme Court has held an injury is sufficient for Article III standing when the injury

is "concrete" or "real, and not abstract." ***TransUnion LLC v. Ramirez***, 594 U.S. 413, 424 (2021).

In Texas, a "[p]laintiff does not lack standing simply because he cannot prevail on the merits of

his claim; he lacks standing because his claim of injury is too slight for a court to afford redress."

***Wallace v. Perry (In re Perry)***, 423 B.R. 215, 253 (Bankr. S.D. Tex. 2010) (citing

***DaimlerChrysler Corp. v. Inman***, 252 S.W.3d 299, 304–05 (Tex. 2008)). The party whose

"primary legal right has been breached" has standing under a contract. ***Id.***

Here, Ebersol argues DCP was not injured for two reasons. First, Ebersol claims the Term

Sheet never created a binding contract because DCP failed to sign it. (ECF No. 138, at 8–9).

According to Ebersol, DCP's signature was a condition precedent to forming a contract that DCP

can seek relief under. (*Id.*). Secondly, Ebersol claims that DCP was not damaged because DDFSP

was the entity that paid roughly $70 million allegedly under the Term Sheet. (ECF No. 102, at 10–

15). As such, Ebersol contends DCP lacks an injury in fact to satisfy the requirements of Article III.

(*Id.*).

DCP counters that it has standing because DCP owns the claims. (ECF No. 124, at 18).

DCP contends that executing the Term Sheet by signature was not a condition precedent and when

DDFSP sent the initial funding amount, DCP created a binding contract with ESMG. (ECF

No. 158, at 71). As such, DCP asserts that it is a party to the Term Sheet, stands to gain the benefit

under the Term Sheet, and thus has a right to sue under the Term Sheet. (ECF No. 124, at 19).

Further, DCP argues that DDFSP sent money to fulfill DCP's obligation and everyone accepted

the payments as such. DCP claims DDFSP was authorized to make these payments because

DDFSP operated as a treasury for the Dundon-related entities. (*Id.* at 23).

Accordingly, there are two primary issues the Court must assess to determine whether DCP

has standing—(1) whether DCP's signature on the Term Sheet was a condition precedent to

forming a binding contract and (2) whether DCP suffered an injury even though DCP never paid

money pursuant to the Term Sheet. The Court addresses these issues in turn.

> a. *The Term Sheet is Not a Binding Written Contract as a Matter of Delaware Law*
> *because DCP Failed to Sign it.*

Despite both parties presenting Texas case law on the issue of contract construction,

validity, and enforcement, the Term Sheet states such issues shall be determined in accordance

with Delaware law. (ECF No. 124, Ex. 1). The Court similarly applied Delaware law in a related

adversary proceeding for the same Term Sheet at issue here. (Adv. Case No. 22-05078, ECF

No. 54). Accordingly, the Court applies Delaware law to determine whether the parties' signatures

were a condition precedent to creating an enforceable contract.

In Delaware, the "primary goal in contract interpretation is to fulfill, as nearly as possible,

the reasonable shared expectations of the parties at the time they contracted." ***Schwartz v. Chase***,

No. 4274, 2010 WL 2601608, at *13 (Del. Ch. June 29, 2010). "Delaware adheres to the objective

theory of contracts and, [a]lthough the law . . . generally strives to enforce agreements in accord

with their makers' intent, [this theory] considers objective acts (word, acts and context) the best

evidence of that intent." ***Id.*** at 14–15 (internal quotations omitted). A contract will generally be

found when the parties' "objective conduct demonstrates, 'an offer, acceptance, and consideration.'" ***Astellas Pharma Inc. v. MSN Pharms Inc.***, No. 23-689, 2025 WL 254577 at *7 (D. Del. Jan. 21, 2025) (citing ***Trexler v. Billingsley***, 166 A.3d 101 (Del. 2017)).

Accordingly, "a signed and executed agreement is not a prerequisite for contract formation." ***Id.*** Delaware courts are "inclined toward finding the formation of a contract prior to the signing of the document unless the parties pretty clearly show that such a signing is a condition precedent to legal obligation." ***Annand v. Brookmeade, Inc.***, No. 5009, 1979 WL 4640, at *13 (Del. Ch. Sep. 18, 1979). Delaware Courts refer to the creation of a signature condition precedent as a "positive agreement"[4] which is an agreement between the parties that "there will be no binding contract until the formal document is executed." ***Loppert v. Windsortech, Inc.***, 865 A.2d 1282, 1287 (De. Ch. 2004). If the parties have a positive agreement, "no binding contract will arise until the conditions specified have occurred or been performed." ***Lockwood v. Capano***, 105 A.3d 989, 989 (Del. 2014).

Ebersol claims the first paragraph of the Term Sheet is a positive agreement requiring representatives from both DCP and ESMG to sign the Term Sheet before it can be enforced. That paragraph provides:

> This Binding Term Sheet shall be a binding agreement of the signatories below enforceable by one party against the other, as set forth below, upon the company's (as defined below) receipt of the Initial Funding Amount (as defined below) by 2 pm PST on February 14, 2019 and each party hereto executing this Binding Term Sheet.

(ECF No. 124, Ex. 1). This paragraph is also repeated toward the end of the agreement. *Id.* Ebersol argues these provisions require two conditions precedent—(1) paying funds by a date certain and

---

[4] "Positive is defined as follows: Laid down, enacted, or prescribed. Express or affirmative. Direct, absolute, explicit." ***Loppert v. Windsortech, Inc.***, 865 A.2d 1282, 1287 (Del. Ch. 2004) (internal quotations omitted) (quoting BLACK'S LAW DICTIONARY 1324 (4th ed. 1968)).

10

(2) executing the Term Sheet. According to Ebersol, this is a positive agreement. Nevertheless, DCP asks the Court to ignore these provisions because all parties acted like a contract existed. Under DCP's view, the conduct of the parties negates any signature requirement. Thus, the question before the Court is "whether the [p]arties positively agreed that there [would] be no binding contract until execution, either by both sides or by the Defendant." *Brady v. Huber*, No. 2019-0204, 2023 WL 3736371, at *16 (Del. Ch. May 31, 2023). "The intent of the parties is generally a question of fact." *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 155 (Del. 1998).

This test was applied in *Transamerican S.S. Corp v. Murphy* where the Court of Chancery of Delaware found a positive agreement between the parties to require the parties' signatures before being bound to a settlement agreement. No. 10511, 1989 Del Ch. LEXIS 13, at *7 (Del. Ch. Feb. 14, 1989). There, parties negotiated a settlement agreement and ultimately reached an agreement "upon all the substantive terms of a contract." *Id.* at *7. The court found, however, no binding contract because the parties made it "plain that they were not consenting to be bound by a contract until a writing, evidencing their agreement was executed." *Id.* at *1. According to the court, a party's insistence upon a writing was material to the creation of a binding contract and constituted a positive agreement that such writing would be signed before it became enforceable. *Id.* at *7; *see also Riblett v. Riblett*, No. 12786, 2018 WL 1352329, at *3 (Del. Ch. Mar. 15, 2018) (declining to enforce verbal agreements where the parties' mediation agreement required settlement agreements to be reduced to a signed writing).

An "observation that the parties manifested an intention that the . . . agreement would be memorialized in writing," however, is not enough to evidence a positive agreement to require signatures as a condition precedent. *Loppert*, 865 A.2d at 1288. For example, in *Brady v. Huber*, the Chancery Court of Delaware found an enforceable contract despite a lack of execution because

11

the only indication of a signature condition precedent "was in the final acceptance email" where "Defendant accepted the terms verbally, and just needed to sign." 2023 WL 3736371, at *18. Thus, if "the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract." *Universal Prods. Co. v. Emerson*, 36 Del. 553, 569 (1935).

In this case, the words of the Term Sheet are clear. The document would be binding "upon" (1) DCP paying funds by a date certain and (2) executing the Term Sheet.[5] Under Delaware law, "to execute" is generally synonymous with "to sign."[6] *See Brady*, 2023 WL 3736371 (using the word execute interchangeably with sign); *Astellas Pharma Inc.*, 2025 WL 254577 (providing same). The provision in the Term Sheet does not merely define the effective date but creates additional requirements for enforceability. *Brady*, 2023 WL 3736371, at *19 (finding the parties' request for a signature to be "a courtesy explanation that a signed document was forthcoming" rather than an additional requirement). "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions." *Manti Hldgs., LLC v. Authentix Acq. Co.*, 261 A.3d 1199, 1208 (Del. 2021). While the intent of the parties is generally a question of fact for trial, the unambiguous words in Term Sheet here require a signature from a representative of DCP to create a binding contract between the parties. Accordingly, the Court declines to consider the parties subsequent conduct because DCP failed to execute the Term Sheet.

This is further supported by the parties' dispute about the amount DCP intended to invest,

---

[5] Under Delaware law, there "are no particular words that must be used to create a condition precedent," but "a condition precedent must be expressed clearly and unambiguously." *Murphy Marine Servs. of Del. v. GT USA Wilm., LLC*, No. 2018-0664, 2022 WL 4296495, at *28 (Del. Ch. Sep. 19, 2022). "Parties' intent to set a condition precedent to performance may be evidenced by" a phrase that connotes an "intent for a condition rather than a promise." *Id.* (internal quotations omitted).

[6] This is contrary to the approach in Texas, where "execute" can mean more than "sign." *Gaskins v. Navigator Oil & Minerals, Inc.*, 670 S.W.3d 391, 405 (Tex. App.—Eastland 2023, pet. denied) ("The term 'execute' is not limited to only mean 'sign.'"). Because the Court is required to interpret the Term Sheet under Delaware law, however, the Court interprets the two words to mean the same thing.

12

1430

suggesting the parties did not have a meeting of minds before the agreement was put into writing and signed. In an email sent on February 13, 2019 (one day before the Term Sheet was purportedly executed), Ebersol lists the initial value of bridge loan to be $10 million. (ECF No. 124, Ex. 3). The next day, representatives from both parties continued to exchange emails and drafts of the Term Sheet concerning significant provisions such as funding amounts and the percentage ownership DCP would take in ESMG. (ECF No. 124, Ex. 6). These exchanges indicate the parties lacked a meeting of minds before the creation of the final draft. Additionally, each iteration retained the signature condition precedent and reflected a deadline for the initial funding amount to be deposited, revealing the provision was material to the deal and not boilerplate language. (*Id.*) Thus, the Term Sheet was not merely a convenient memorial of the parties' agreement, it was intended to serve as a binding contract when executed. As such, the Court concludes the signature provision was material to the parties' agreement and required execution by each side.

Because DCP failed to sign the Term Sheet, the Court finds that there is no binding written contract to provide DCP with standing to pursue this case. Additionally, DCP did not plead in its complaint or raise in its opposition to the Motion for Summary Judgment any potential defense to its failure to sign the Term Sheet or provide an alternative avenue for the Court to find a binding agreement. *Ali v. Coupe*, No. 15-1089, 2019 WL 6877906, at *11 (D. Del. Dec. 17, 2019) (citing *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.")); *see also Cutrera v. Bd. of Supervisors*, 429 F.3d 108, 113 (5th Cir. 2005) (providing same). Rather, DCP staunchly took the position that there was a written and signed contract. As such, the Court finds that there was no binding written contract in this case.

13

b. *DCP Cannot Prove Injury in Fact Because DCP Was Not the Party that Paid ESMG.*

While DCP may not rely on a contract to prove injury in fact, the Court must nevertheless determine if DCP can claim an injury in the form of money paid to ESMG. Ebersol argues that DCP lacks standing because DDFSP was the entity that paid roughly $70 million and thus DDFSP was the entity that suffered any alleged loss. (ECF No. 102, at 10–15). DCP counters that DDFSP played a treasury management function for the Dundon-related entities. (ECF No. 124, at 23). Because of this function, the money nevertheless was owned by DCP even though it originated from DDFSP. (*Id.*). According to DCP, the authorization for such an arrangement was evidenced by common ownership of the various entities. (*Id.*). Furthermore, DCP claims that because it was the party that stood to gain a benefit from the money, DCP has standing to bring a claim to recoup that money. (*Id.*).

The parties' arguments turn on issues of agency law. The general rule in Texas is "that one who contracts as an agent cannot maintain an action, in his own name and right, upon the contract." *Tinsley v. Dowell*, 87 Tex. 23, 27–28 (1894). There are four exceptions to this rule:

> [F]irst, where the agent contracts in his own name; second, where the agent does not disclose his principal, who is unknown; third, where by the usages of trade the agent is authorized to act as owner of the property; fourth, where the agent has an interest in the subject matter of the contract, and in this case whether he professed to act as agent or not.

*Id.* Because the Court finds that there is no contract, DCP cannot prevail under the first or fourth exception to the general rule.[7] *See Id.* ("To bring the case within the first exception, it must be held that this was Dowell's personal contract."). Similarly, DCP cannot prevail under the second

---

[7] DCP argued that the Court should follow *Kakabadze v. M5 Int'l Co.*, where the court found that the plaintiff could maintain his action (even though his principals ultimately paid for his losses), because the plaintiff contracted in his own name. No. h-12-3701, 2014 WL 2547767, at *15 (S.D. Tex. 2014). Such a reasoning is inapplicable here because the Court finds there was no written contract between the parties.

14

exception because there was no allegation that DDFSP was not disclosed as an alleged principal, and the summary judgment evidence indicates that all parties were aware DDFSP was involved in paying funds to ESMG. Accordingly, DCP must fall under the third exception to have standing to maintain this case.

"The exception [is] applicable where the agent is authorized to act as the owner of the property [and] arises frequently by virtue of the custom or usages of the particular trade involved." *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.*, 630 F.2d 250, 260 (5th Cir. 1980). The Fifth Circuit considered this exception in *Lubbock Feed Lots, Inc. v. Iowa Beef Processors, Inc.* and explained that the third exception requires "an additional aspect of the relationship, by reason of which the agent . . . may sue in his own name: as a party to the contract by virtue of being owed a performance." *Id.* There, the court found the exception applicable to the plaintiff because the plaintiffs were "authorized to collect payment" on behalf of their principals and "from those proceeds withhold reimbursement for any and all advances and charges arising from that agreement." *Id.* at 259. Although the principals were ultimately entitled to the purchase price under the contract, the plaintiffs were entitled to sue in their own name because "they had a beneficial interest by virtue of their advancements to their principals." *Id.*

In the instant case, DCP alleges a beneficial interest in the money paid by DDFSP by virtue of DDFSP's treasury management role for the Dundon-related entities. (ECF No. 124, at 20). To support this claim, DCP points to deposition testimony of Jeffery James Vanderbilt ("Vanderbilt") who testified on behalf of DCP as DCP's CFO. (ECF No. 124, Ex. 30). Vanderbilt explained that there was no formal agreement between DCP and DDFSP outlining the funding relationship for the investment, but claimed he did not believe one was necessary for such a relationship. (*Id.*). Instead, Vanderbilt stated the authorization for DDFSP's arrangement is evidenced by common

15

ownership and control of the Dundon-related entities. (*Id.*).

Ebersol countered that DDFSP was not paying on behalf of DCP because DDFSP reflected the investment loss on its tax forms, not DCP. (ECF No. 102, at 14). According to Vanderbilt, however, the entities were pass-through entities for federal tax purposes, meaning tax obligation and benefits are ultimately part of the individual tax return of the owner. (ECF No. 124, Ex. 31). Because DDFS and DCP are both partnerships, DCP claims that neither entity pays federal taxes or takes deductions. (*Id.*). Rather, income losses ultimately show up on the individual tax return for their owners. (*Id.*). This is supported by Dundon's individual tax return. (*Id.*).

Without more, the allegations that DDFSP operated as a treasury fails raise a fact issue concerning whether DCP had a legal right or interest in the money paid by DDFSP. Despite Vanderbilt denying that a written agreement is necessary for the entities' relationship, DCP cites no case law to help substantiate that claim or prove that a limited partnership can operate as a treasury. Even assuming no written agreement is necessary, DCP provides no evidence beyond Vanderbilt's testimony to support DDFSP's role as a treasury for the Dundon-related entities. There is no evidence of an agreement that DDFSP held money on behalf of DCP or how DCP would entrust money to DDFSP for DDFSP to manage.

There is not enough evidence to raise an issue of material fact on the issue of injury in fact for consideration of DCP's standing at trial. Rather, the uncontradicted evidence shows DDFSP paid ESMG and DDFSP took the loss, not DCP. Therefore, the Court finds DCP lacks an injury in fact under Article III and Ebersol's Motion for Summary Judgment is granted accordingly.

16

## II. Even if DCP Had Standing, Summary Judgment is Appropriate.

a. *DCP's Fraudulent Inducement Claim Fails Because No Contract Exists and Evidence Negates Justifiable Reliance as a Matter of Law.*

Count one in DCP's complaint requests relief for fraudulent inducement. (ECF No. 1, at 14–16). Ebersol argues that DCP lacks evidence to support this claim. (ECF No. 102, at 18–19). As the name implies, a claim for fraudulent inducement includes fraud which requires Plaintiff prove:

> (1) (a) a misrepresentation or (b) a concealment;(2) which is material to the transaction at hand; (3) (a) made with knowledge of its falsity or recklessness as to whether it is true or false (for a misrepresentation), or (b) calculated to deceive (for a concealment); (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) a resulting injury proximately caused by such reliance.

*SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 197 (3d Cir. 2022); *see also Tex. Architectural Aggregate, Inc. v. ACM-Texas, LLC (In re ACM-Texas, Inc.)*, 430 B.R. 371, 418 (Bankr. W.D. Tex. 2010) (applying the same standard).

Fraudulent inducement, however, is a specific kind of fraud that generally requires a plaintiff also prove the existence of a contract. *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001). Because the Court found no contract existed, the Court finds summary judgment appropriate on DCP's fraudulent inducement claim.

Even if the Term Sheet formed a binding contract, Ebersol argues that DCP did not justifiably rely on any representations or omissions made by Ebersol. (ECF No. 138, at 17). Ebersol bases his argument on the fact that DCP failed to undertake any diligence before allegedly entering the Term Sheet. (*Id.* at 18). DCP, on the other hand, contends that its failure to undertake due diligence was caused by the urgency of the deal. (ECF No. 158, at 68). The Court finds this excuse unavailing.

17

"Justifiable reliance implies a duty upon the party to whom the representation is made to exercise ordinary and reasonable due diligence to protect their own interests." *Artho v. Happy State Bank (In re Artho)*, 587 B.R. 866, 884 (Bankr. N.D. Tex. 2018). The Fifth Circuit has explained "that reliance is not shown if based on the 'plaintiff's individual characteristics, abilities, and appreciation of the facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part." *Anarkali Enters. v. BP Chaney, LLC*, No. 4:18-cv-00796, 2019 WL 5537241, at *19 (N.D. Tex. 2019) (quoting *N. Cypress Med. Ctr. Operating Co., Ltd. v. Aetna Life Ins. Co.*, 898 F.3d 461, 474 (5th Cir. 2018)). Thus, while justifiable reliance is "usually a question of fact," "the element can be negated as a matter of law when circumstances exist under which reliance cannot be justified." *N. Cypress Med. Ctr. Operating Co., Ltd.*, 898 F.3d at 474.

"In determining whether justifiable reliance is negated as a matter of law, courts 'must consider the nature of the [parties'] relationship and the contract." *BMC Software, Inc. v. IBM*, No. H-17-2254, 2022 WL 1733106, at *142 (S.D. Tex. 2022). A failure to exercise due diligence "is not excused by mere confidence in the honesty and integrity of the other party." *Nat'l Prop. Holdings, L.P. v. Westergran*, 453 S.W.3d 419, 425 (Tex. 2015). In the absence of reasonable diligence, the plaintiff is "charged with knowledge of all facts that would have been discovered by a reasonably prudent person reasonably situated." *AKB Hebdrick, LP v. Musgrave Enters.*, 380 S.W.3d 221, 232 (Tex. App.—Eastland May 29, 2015, pet. denied) (mem. op.).

ESMG and DCP are sophisticated entities with experience and knowledge in investment schemes. Importantly, the transaction at the heart of this case was no small deal. The Term Sheet listed a cost of up to $70 million and required an initial investment of $5.1 million.[8] (ECF No. 124,

---

[8] In a related adversary, there is a dispute that the investment was in fact for $250 million.

Ex. 1). "[W]orld-savvy participants entering into a complicated, multi-million-dollar transaction should be expected to recognize 'red flags' that the less experienced may overlook." *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., L.L.C.*, 546 S.W.3d 648, 656 (Tex. 2018). The main red flag here was that all parties knew the league was in dire need of funding to maintain operations. (ECF No. 124, Ex. 25 at 68, 82, 83, 85). DCP agreed to the investment deal understanding that the AAF's financial position was poor.

Dundon, as an owner of another professional sports team, understood the risks of running a league such as the AAF. (*Id.* at 87–89). He admitted that no financial due diligence was completed but claimed that it was not an option based on the urgency of the deal. Instead of reviewing documents to confirm any questions about the league, Dundon relied solely on the assumptions he came to during conversations with Ebersol. Dundon knew a sports team needed to pay for certain services and admitted that he assumed all bills were current. (ECF No. 124, Ex. 25, at 88–89). Nevertheless, DCP stated in the moving papers that it discovered the true financial condition of the league shortly after making its investment. (ECF No. 124, at 13). This suggests that despite the short time frame to accept ESMG's offer, DCP could have performed enough diligence to discover the financial issues it complains Ebersol failed to disclose or misrepresented. Moreover, there was no requirement that DCP make the investment. Dundon did express a concern about losing the opportunity to be a part of the new league if DCP did not agree to the investment, but Dundon's testimony shows that he merely assumed the AAF would cease without immediate additional funding. (*Id.*, Ex. 25 at 86). In fact, emails from Zutter indicate DCP intended to more "fullsome diligence" after the immediate needs of AAF were meet, revealing DCP was prepared to run the risk that Ebersol's statements may not have been accurate. (*Id.*, Ex. 6).

<div align="center">19</div>

Moreover, this was an arm's-length transaction. *See Arm's-Length Transaction*, BLACK'S LAW DICTIONARY (6th ed. 1990) ("Said of a transaction negotiated by unrelated parties, each acting in his or her own self-interest."). "The fact that negotiations took place at arm's length to create an agreement . . . has been held to be a red flag when analyzing justifiable reliance." *Ly v. Maya Walnut LLC*, No. 05-21-01140, 2024 WL 260761, at *18 (Tex. App. Dallas Jan. 24, 2024, pet. filed). ESMG and DCP have not previously executed deals with one another, and the evidence shows that neither have their representatives. There was no reason for DCP to trust Ebersol's statements based on previous dealings. Rather, Dundon placed trust in Ebersol's statements based on Ebersol's title as CEO of ESMG.

Given DCP's characteristics, abilities, and appreciation of facts and circumstances, "it is extremely unlikely that there is actual reliance" on Ebersol's statements or omissions. *See Ly v. Maya Walnut LLC*, No. 05-21-01140, 2024 WL 260761, at *16 (Tex. App. Dallas Jan. 24, 2024, pet. filed). Accordingly, the Court finds that even if the Term Sheet formed a binding contract between the parties, DCP's claim for fraudulent inducement fails as a matter of law because there was no justifiable reliance on any alleged misrepresentation made by Ebersol.

   b.  *DCP's Securities Fraud Claim Fails as a Matter of Law Because no Stock was Conveyed.*

Count two in DCP's complaint requests relief under section 33 of the Texas Securities Act ("TSA") which "establishes a cause of action for misrepresentations or omissions made in connection with a securities transaction." *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). The TSA provides:

> A person who offers or sells a security . . . by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which that are made, not misleading, is liable to the person buying the security from him, who may sue

20

either in law or in equity for rescission, or for damages if the buyer no longer
owns the security.

TEX. REV. CIV. STAT. ANN. art. 581-33(A)(2).

The parties dispute whether DCP is required to demonstrate that an actual sale of securities
occurred. Ebersol argues that a sale under the TSA requires an actual transfer of stock.[9] (ECF
No. 102, at 17). On the other hand, DCP believes Ebersol's offer to sell stock is sufficient to fall
in the purview of the Act. (ECF No. 124, at 27). Importantly, both parties agree that no stock of
ESMG was transferred to DCP. (ECF No. 158, at 54). Thus, the question before the Court is legal
rather than factual.

Ebersol is correct that the TSA contemplates an actual transfer of stock to the buyer before
a seller becomes liable under the TSA. "Although the statute uses the language 'attempt to sell'
and 'offer to sell' in its definition section, 'it is clear that article 581-33(1)(2) contemplates that
the sale must have been effected because the buyer may sue either at law or in equity for rescission,
or for damages.'" *Chase v. Hodge*, No. 1: 20-cv-0175, 2021 WL 1948470, at *27 (W.D. Tex.
2021). The phrase "one who offers" to sell refers to the individuals who are subject to liability for
misrepresentations in connection with the actual sale of securities such as third parties and
representatives. *See Rotstain v. Trustmark Nat'l Bank*, No. 3:09-CV-2384, 2022 WL 179609,
at *23–24 (N.D. Tex. 2022) (identifying various actors that qualify as a seller under the TSA even
though they are not "the person who actually passes title to the security"). It does not imply that
an action will lie where no transfer occurred, but rather contains broad language to reach a larger
group of people when there is a conveyance. *Id.*

Because there is no dispute that no securities were transferred to DCP, DCP's claim for

---

[9] "[S]tock is a security even when purchased pursuant to a contract requiring the purchaser to participate in
management of the company." *Adena Expl., Inc. v. Sylvan*, 860 F.2d 1242, 1254 (5th Cir. 1988).

relief under the TSA fails as a matter of law. Even if DCP had standing, summary judgment on count two in DCP's complaint is appropriate.

      c. *DCP's Statutory Fraud Claim Fails Because No Stock was Conveyed.*

Count three in DCP's complaint seeks relief under section 27 of the Texas Business and Commerce Code ("TBCC") which provides redress for fraud "in a transaction involving real estate or stock in a corporation." TEX. BUS. & COM. CODE § 27.01. "The elements of statutory fraud under section 27.01 are essentially identical to the elements of common law fraud except that the statute does not require proof of knowledge or recklessness as a prerequisite to the recovery of actual damages." ***Megatel Homes, LLC v. Moayedi***, No. 3:20-CV-00688, 2021 WL 5325919, at *25 (N.D. Tex. 2021) (quoting ***Brush v. Reata Oil & Gas Corp.***, 984 S.W.2d 720, 726 (Tex. App.— Waco 1998, pet. denied)).

The parties' arguments on statutory fraud are identical to the arguments made for securities fraud. Thus, the issue is whether the TBCC requires the actual conveyance of stock to maintain an action under section 27.01. The law is clear—"[n]umerous cases . . . hold that an actual conveyance of stock must occur in order for there to be an actionable claim under the statute." ***Ginsburg v. ICC Holdings, LLC***, No. 3:16-CV-2311, 2017 WL 5467688, at *57 (N.D. Tex. 2017). The Fifth Circuit has explained that a narrow reading of section 27.01 "is consistent with the Supreme Court of Texas' interpretation that the statute is penal in nature and thus must be strictly construed." ***U.S. Quest, Ltd. v. Kimmons***, 228 F.3d 399, 406 (5th Cir. 2000); *see also* ***Gin v. NCI Bldg. Sys.***, 472 S.W.3d 802, 823(Tex. App.—Houston [1st Dist.] 2015, no pet.) ("Courts have 'strictly' interpreted this requirement, holding that for fraud in a transaction to be actionable under section 27.01, the contract must 'actually effect conveyance' of real estate or stock between the parties . . . .").

<div align="center">22</div>

Here, there is neither a contract nor actual conveyance of stock for DCP to maintain statutory fraud under section 27.01. Accordingly, even if DCP had standing, count three in DCP's Complaint fails as a matter of law.

### CONCLUSION

Because the Term Sheet fails to create a binding written contract as a matter of Delaware law and because DCP lacks an injury in fact, the Court finds DCP lacks Article III standing. Furthermore, DCP's Original Complaint fails as a matter of law because DCP cannot show justifiable reliance on any alleged misrepresentation made by Ebersol and because no stock was conveyed to DCP.

It is therefore **ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 102) is **GRANTED**.

# # #

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| *Debtor*. | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | |
| | § | **ADV. NO. 22-05077** |
| **CHARLES EBERSOL,** | § | |
| *Defendant*. | § | **Judge: Craig A. Gargotta** |

DEFENDANT CHARLES EBERSOL'S
MOTION FOR ENTRY OF FINAL JUDGMENT

Defendant Charles Ebersol ("Ebersol") files this Motion for Entry of Final Judgment, and in support thereof would show the Court the following:

I.     INTRODUCTION AND RELEVANT BACKGROUND

1. Randolph N. Osherow filed Adversary Proceeding 22-05078 ("AP 05078") on November 14, 2022, alleging causes of action against Thomas G. Dundon ("Dundon"), Dundon Capital Partners, LLC ("DCP") and John Zutter ("Zutter") related to the funding and operation of the Alliance of American Football league ("AAF").

2. DCP filed separate Adversary Proceeding 22-05077 ("AP 05077") against Charlie Ebersol ("Ebersol") alleging that Ebersol made misrepresentations to DCP as those described in DCP's proofs of claim in the bankruptcy proceeding.

3. Following a status conference in AP 05077, the Court granted DCP's and Ebersol's joint motion to stay all deadlines stayed all deadlines in the action in expectation that AP 05077 and AP 05078 would be consolidated for pretrial proceedings. (Docket Nos. 24, 29 in AP 05077).

4.  After a status conference and with agreement of all parties in AP 05077 and AP 05078, the Court ordered that discovery and other pretrial matters in both actions proceed according to a unified scheduling order. (Docket Nos. 66 and 67 in AP 05078). Discovery and other pretrial matters proceeded on a consolidated basis.

5.  On November 26, 2024, the parties filed *Joint Motion to Consolidate Actions for Joint Trial*. (Docket No. 164 in AP 05078).

6.  Therein, the parties submitted that "conducting separate trials involving the substantially the same witnesses and evidence would create unnecessary cost and delay and that joining the cases for trial would reduce and avoid cost and delay," and specifically requested that the Court "procedurally consolidate AP 05078 and AP 05077 for joint trial" but ***"render separate findings and judgments."*** (Docket No. 164 in AP 05078) (emphasis added).

7.  On December 4, 2024, the Court entered an order reflecting that "Adversary Proceeding 22-05078 and related Adversary Proceeding 22-05077 are hereby consolidated for joint trial and otherwise to remain separate and maintain their separate identities for judgment." (Docket No. 167 in AP 05078).

8.  On March 3, 2025, the Court granted Ebersol's summary judgment as to all of Dundon Capital Partners, LLC's claim. (Docket. No. 171 in AP 05077).

## II.      ARGUMENT & AUTHORITIES

As a general rule, suits that are consolidated merely for reasons of convenience and judicial economy retain their separate character for purposes of appeal. *In re Transtexas Gas Corp.*, 303 F.3d 571, 577 (5th Cir.2002) (citing *Johnson v. Manhattan Ry. Co.*, 289 U.S. 479, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933)). However, if the suits have essentially merged so as to become a single action, this court will deny appellate jurisdiction in the absence of a Rule 54(b) certification.

*E.g., Rd. Sprinkler Fitters v. Cont'l Sprinkler,* 967 F.2d 145, 149-150 (5th Cir.1992).; *Ringwald v. Harris*, 675 F.2d 768, 771 (5th Cir.1982). In determining whether a Rule 54(b) certification is necessary, this court follows no "rigid rule," but rather "inquire[s] into the nature of and extent of consolidation intended by the court." *Rd. Sprinkler*, 967 F.2d at 149

Here, the parties' motion for consolidation and the Court's corresponding order make it abundantly clear that the intent of the consolidation was solely for the purposes of trial and conserving judicial resources and that the matters retained their separate identities for judgment. Accordingly, entry of final judgment as to DCP's claims against Ebersol is appropriate and necessary and Ebersol respectfully requests the Court to enter judgment as set forth in Exhibit A to this motion.

## PRAYER

THEREFORE, Defendant Charles Ebersol prays that this Motion for Entry of Final Judgment be granted, that Plaintiff take nothing against Ebersol, and that Ebersol be granted all such other and further relief to which he may be entitled.

Respectfully submitted,

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA
TORRE, LLP**

By: */s/ Michael J. Saltz*
     Michael J. Saltz
     Admitted *pro hac vice*
     msaltz@jrsnd.com

1800 Century Park East, Suite 900
Los Angeles, California 90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909


**THOMPSON, COE, COUSINS & IRONS, LLP**

By: */s/ Thomas M. Horan II*
     Thomas M. Horan II
     State Bar No. 24063938
     thoran@thompsoncoe.com

700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209

**ATTORNEYS FOR DEFENDANT
CHARLES EBERSOL**


## CERTIFICATE OF SERVICE

I hereby certify that, on April 10, 2025, a true and correct copy of the foregoing was
delivered to the following counsel of record by electronic service:

| | |
|---|---|
| Brett D. Hockaday | Jeffrey S. Lowenstein |
| K&L GATES LLP | Beverly A. Whitley |
| 1717 Main Street, Suite 2800 | Brent A. Turman |
| Dallas, Texas 75201 | Sydnie A. Shimkus |
| | BELL NUNALLY & MARTIN, LLP |
| | 2323 Ross Avenue, Suite 1900 |
| | Dallas, Texas 75201 |

Nicole L. Williams
Katherine B. Clark
THOMPSON COBURN LLP
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201

Boris Treyzon
Jonathon Farahi
ABIR COHEN TREYZON SALO, LLP
16001 Ventura Boulevard, Suite 200
Encino, California 91436

Brian S. Engel
Steve P. Turner
BARRETT DAFFIN FRAPPIER TURNER & ENGEL,
LLP
580 La Ventana Boulevard
Driftwood, Texas 78619

By: */s/ Thomas M. Horan II*
　　　 Thomas M. Horan II

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** § | |
| Plaintiff, § | |
| § | **ADV. NO. 22-05077** |
| **v.** § | |
| § | **Judge: Craig A. Gargotta** |
| **CHARLES EBERSOL,** § | |
| Defendant. § | |

---

### FINAL JUDGMENT

---

On March 3, 2025, this Court granted Defendant Charles Ebersol's Motion for Summary Judgment and Brief in Support Thereof. [Doc. 171, Mem, Op. & Order]. It is therefore ORDERED, ADJUDGED, AND DECREED that Plaintiff take nothing by its suit, that Plaintiff's claims are dismissed on the merits, and that Defendant recover costs from Plaintiff.

This is a FINAL JUDGMENT that disposes of all parties and all claims in the above-captioned case.

**SO ORDERED**

### END OF ORDER #

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| | § | |
| *Debtor*. | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| *Plaintiff*, | § | |
| | § | |
| **v.** | § | **ADV. NO. 22-05077** |
| | § | |
| **CHARLES EBERSOL,** | § | **Judge: Craig A. Gargotta** |
| *Defendant*. | § | |

**ORDER ON CHARLES EBERSOL'S
<u>MOTION FOR ENTRY OF FINAL JUDGMENT</u>**

On this day, the Court came to consider Defendant Charles Ebersol's Motion for Entry of

Final Judgment. Having considered the Motion and the arguments of counsel, if any, the Court

finds the Motion is meritorious and should be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Defendant Charles

Ebersol's Motion for Entry of Final Judgment is GRANTED.


### END OF ORDER ###


**Prepared by:**

Michael J. Saltz

Admitted *pro hac vice*

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**

1800 Century Park East, Suite 900

Los Angeles, California  90067

Telephone: (310) 446-9900

Facsimile: (310) 446-9909

msaltz@jrsnd.com

- **and** -

Thomas M. Horan, II

State Bar No. 24063938

**THOMPSON, COE, COUSINS & IRONS, LLP**

700 N. Pearl Street, Twenty-Fifth Floor

Dallas, Texas  75201

Telephone: (214) 871-8200

Facsimile: (214) 871-8209

thoran@thompsoncoe.com

**ATTORNEYS FOR DEFENDANT**
**CHARLES EBERSOL**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 22-05077-CAG-7** |
| | § | |
| **CHARLES EBERSOL,** | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF DUNDON CAPITAL PARTNERS, LLC'S
RESPONSE TO DEFENDANT CHARLES EBERSOL'S
MOTION FOR ENTRY OF FINAL JUDGMENT**

Plaintiff Dundon Capital Partners, LLC does not oppose Charles Ebersol's request for entry

of final judgment. ECF 176.

1.      This case was consolidated with Adversary Proceeding 22-05078 by order entered

December 4, 2024. Adv. No. 22-05079, ECF 167. The Order maintained the separateness of the

adversary proceedings for judgment. *Id.*

2.      The Court granted Ebersol's motion for summary judgment by order entered March

3, 2025. ECF 171.

3.      DCP intends to appeal the ruling.

2

4.      A party cannot appeal an order granting a summary judgment; the Court must enter a separate judgment to trigger the appellate deadlines. FED. R. CIV. P. 58(a).

5.      DCP agrees with Ebersol that Rule 54(b) does not require a certification in this case. *See generally* 10 WRIGHT, CHARLES A., *et al.*, FED PRAC. & PROC. § 2656 (Supp. 2025).  "Rule 54(b) addresses orders adjudicating fewer than all claims" in a multiclaim case; it does not apply when an order adjudicates all claims in a case consolidated for pretrial with another case. *Gelboim v. Bank of American Corp.*, 574 U.S. 405, 416 (2015) (examining final order in case consolidated for pretrial in multidistrict litigation).

6.      Because Rule 54(b) does not require a certification for finality, no impediment exists to the Court entering a final judgment in this case.

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

*/s/ Beverly A. Whitley*
Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Beverly A. Whitley
Texas Bar No. 21374500
bwhitley@bellnunnally.com
Brent A. Turman
Texas Bar No. 24077506
bturman@bellnunnally.com
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

and

**K&L GATES LLP**

By:     Brent D. Hockaday
        Texas Bar No. 24071295
        Brent.hockaday@klgates.com
        1717 Main Street, Suite 2800
        Dallas, Texas 75201
        (214) 939-5677
        (214) 939-5849 Fax

**ATTORNEYS FOR DEFENDANT
DUNDON CAPITAL PARTNERS LLC**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned certifies a true and correct copy of the foregoing was served by delivering the same to the person listed below in the manner and on the date indicated.

William N. Radford
Thomas M. Horan II
Thompson Coe
700 N. Pearl Street, 25th Floor
Dallas, TX 75201
wradford@thompsoncoe.com
thoran@thompsoncoe.com

Michael Saltz
Jacobson, Russell, Saltz, Nassim & De La Torre, LLP
1880 Century Park East, Suite 900
Los Angeles, CA 90067
msaltz@jrsnd.com

*Attorneys for Charles Ebersol*

Dated May 5, 2025.

                                        */s/ Beverly A. Whitley*
                                        Beverly A. Whitley

10691784 / 04251-00025

4



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 06, 2025.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| | § | |
| _Debtor_. | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| _Plaintiff_, | § | |
| | § | |
| **v.** | § | **ADV. NO. 22-05077** |
| | § | |
| **CHARLES EBERSOL,** | § | **Judge: Craig A. Gargotta** |
| _Defendant_. | § | |

### ORDER ON CHARLES EBERSOL'S
### <u>MOTION FOR ENTRY OF FINAL JUDGMENT</u>

On this day, the Court came to consider Defendant Charles Ebersol's Motion for Entry of

Final Judgment. Having considered the Motion and the arguments of counsel, if any, the Court

finds the Motion is meritorious and should be GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Defendant Charles

Ebersol's Motion for Entry of Final Judgment is GRANTED.


### END OF ORDER ###


**Prepared by:**
Michael J. Saltz
Admitted *pro hac vice*
**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**
1800 Century Park East, Suite 900
Los Angeles, California  90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909
msaltz@jrsnd.com

-    **and**    -

Thomas M. Horan, II
State Bar No. 24063938
**THOMPSON, COE, COUSINS & IRONS, LLP**
700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas  75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209
thoran@thompsoncoe.com

**ATTORNEYS FOR DEFENDANT
CHARLES EBERSOL**



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 07, 2025.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| Plaintiff, | § | |
| | § | **ADV. NO. 22-05077** |
| **v.** | § | |
| | § | **Judge: Craig A. Gargotta** |
| **CHARLES EBERSOL,** | § | |
| Defendant. | § | |

### FINAL JUDGMENT

On March 3, 2025, this Court granted Defendant Charles Ebersol's Motion for Summary Judgment and Brief in Support Thereof. [Doc. 171, Mem, Op. & Order]. It is therefore ORDERED, ADJUDGED, AND DECREED that Plaintiff take nothing by its suit, that Plaintiff's claims are dismissed on the merits, and that Defendant recover costs from Plaintiff.

This is a FINAL JUDGMENT that disposes of all parties and all claims in the above-captioned case.

**SO ORDERED**

### END OF ORDER #

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 22-05077-CAG-7** |
| | § | |
| **CHARLES EBERSOL,** | § | |
| | § | |
| Defendant. | § | |

NOTICE OF APPEAL

Dundon Capital Partners, LLC, the plaintiff in the above-captioned adversary proceeding, appeals the Judgment entered in the above-captioned adversary proceeding on May 7, 2025, by Judge Craig A. Gargotta, United States Bankruptcy Judge for the Western District of Texas, San Antonio Division. ECF 180. A true and correct copy of the Judgment is attached hereto as Exhibit A.

The names of all parties to the Judgment and the names, addresses, and telephone numbers of the respective attorneys are as follows:

1

**Dundon Capital Partners LLC**

Represented by:  Jeffrey S. Lowenstein
Texas Bar No. 24007574
jlowenstein@bellnunnally.com
Beverly A. Whitley
Texas Bar No. 21374500
bwhitley@bellnunnally.com
Gwen I. Walraven
Texas Bar No. 24047065
gwalraven@bellnunnally.com
Brent A. Turman
Texas State Bar No. 24077506
bturnam@bellnunnally.comm
Troy L. Hales, II
Texas State Bar No. 24099011
Thales@bellnunnally.com
Bell Nunnally & Martin LLP
2323 Ross Ave., Ste. 1900
Dallas, Texas 75201
(214) 740-1400
(214) 740-1499 Fax

Brent D. Hockaday
Texas Bar No. 24071295
Brent.hockaday@klgates.com
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5677
(214) 939-5849 Fax

2

**Charles Ebersol**

Represented by: Michael J. Saltz
*Pro Hac Vice*
msaltz@jrsnd.com
Simone E. Poyourow
spoyourow@jrsnd.com
Jacobson, Russell, Saltz, Nassim & De La
1800 Century Park East, Suite 900
Los Angeles, California 90067
(310) 446-9900
(310) 446-9909 Fax

and            Thomas M. Horan, II
State Bar No. 24063938
thoran@thompsoncoe.com
Thompson, Coe, Cousins & Irons, LLP
700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201
(214) 871-8200
(214) 871-8209

**Randolph N. Osherow, in his capacity as Chapter 7 Trustee**

Represented by: Brian S. Engle
State Bar No. 00789279
brianengel@me.com
Engle, PLLC
100 Commons Road Suite 7, Box 172
Dripping Springs, TX 78620
(512) 565-5521

Jonathon S. Farahi
JFarahi@actslaw.com
Boris Treyzon
btreyzon@actslaw.com
Abir Cohen Treyzon Salo, LLP
16001 Ventura Blvd., Suite 200
Encino, CA 91436

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:    <u>/s/ *Beverly A. Whitley*</u>
             Jeffrey S. Lowenstein
             Texas Bar No. 24007574
             jlowenstein@bellnunnally.com
             Beverly A. Whitley
             Texas Bar No. 21374500
             bwhitley@bellnunnally.com
             Gwen I. Walraven
             Texas Bar No. 24047065
             gwalraven@bellnunnally.com
             Brent A. Turman
             Texas State Bar No. 24077506
             bturman@bellnunnally.comm
             Troy L. Hales, II
             Texas State Bar No. 24099011
             Thales@bellnunnally.com

             2323 Ross Ave., Ste. 1900
             Dallas, Texas 75201
             (214) 740-1400
             (214) 740-1499 Fax

and

**K&L GATES LLP**

             Brent D. Hockaday
             Texas Bar No. 2407129
             Brent.hockaday@klgates.com
             K&L Gates LLP
             1717 Main Street, Suite 2800
             Dallas, Texas 75201
             (214) 939-5677
             (214) 939-5849 Fax

**ATTORNEYS FOR PLAINTIFF
DUNDON CAPITAL PARTNERS, LLC**

4

## CERTIFICATE OF SERVICE

The undersigned certifies a true and correct copy of the foregoing was served by delivering the same to the person listed below in the manner and on the date indicated.

Brian S. Engle
State Bar No. 00789279
brianengel@me.com
Engle, PLLC
100 Commons Road Suite 7, Box 172
Dripping Springs, TX 78620

Jonathon S. Farahi
JFarahi@actslaw.com
Boris Treyzon
btreyzon@actslaw.com
Abir Cohen Treyzon Salo, LLP
16001 Ventura Blvd., Suite 200
Encino, CA 91436

***Attorneys for Randolph N. Osherow, in his capacity as Chapter 7 Trustee***

Dated:  May 21, 2025

Thomas M. Horan II
thoran@thompsoncoe.com
Thompson Coe
700 N. Pearl Street, 25th Floor
Dallas, TX 75201

Michael Saltz
msaltz@jrsnd.com
Simone E. Poyourow
spoyourow@jrsnd.com
Jacobson, Russell, Saltz, Nassim & De La Torre, LLP
1880 Century Park East, Suite 900
Los Angeles, CA 90067

***Attorneys for Charles Ebersol***

/s/Beverly A. Whitley
Beverly A. Whitley

10702516.1 / 04251-00025



**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 07, 2025.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

_____

### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** § | | |
| Plaintiff, § | | |
| § | **ADV. NO. 22-05077** | |
| **v.** § | | |
| § | **Judge: Craig A. Gargotta** | |
| **CHARLES EBERSOL,** § | | |
| Defendant. § | | |

_____

### FINAL JUDGMENT
_____

On March 3, 2025, this Court granted Defendant Charles Ebersol's Motion for Summary Judgment and Brief in Support Thereof. [Doc. 171, Mem, Op. & Order]. It is therefore ORDERED, ADJUDGED, AND DECREED that Plaintiff take nothing by its suit, that Plaintiff's claims are dismissed on the merits, and that Defendant recover costs from Plaintiff.

This is a FINAL JUDGMENT that disposes of all parties and all claims in the above-captioned case.

**SO ORDERED**

### END OF ORDER #



## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |

---

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | **Adversary No. 22-05077-CAG-7** |
| | § | |
| **CHARLES EBERSOL,** | § | |
| | § | |
| **Defendant.** | § | |

### APPELLANT DUNDON CAPITAL PARTNERS, LLC'S
### DESIGNATION OF ISSUES AND RECORD ON APPEAL

Appellant Dundon Capital Partners , LLC designates the following issues and record for its appeal to the United States District Court for the Western District of Texas, San Antonio Division, from the Judgment entered in the above-captioned adversary proceeding on May 7, 2025. ECF No. 180.

### ISSUES TO BE PRESENTED ON APPEAL

1.      Whether the Bankruptcy Court erred in holding that no genuine issue of material fact exists with respect to whether Dundon Capital Partners, LLC sustained an injury in fact under Article III.

2.      Whether the Bankruptcy Court erred in holding that no genuine issue of material fact exists with respect to whether Dundon Capital Partners, LLC entered a binding contract with Ebersol Sports Media Group, Inc.

1

3. Whether the Bankruptcy Court erred in holding that no genuine issue of material facts exists as to whether Charles Ebersol fraudulently induced Dundon Capital Partners, LLC to enter an agreement with Ebersol Sports Media Group, Inc.

4. Whether the Bankruptcy Court erred in granting summary judgment in favor of Charles Ebersol on Dundon Capital Partners, LLC's claims based on Section 33 of the Texas Securities Act and Chapter 27 of the Texas Business and Commerce Code.

## RECORD ON APPEAL

5. The following items should be included in the record on appeal:

| NO. | DATE | DESCRIPTION |
|---|---|---|
| 1 | 11/14/2022 | Plaintiff's Original Complaint |
| 11 | 03/06/2023 | Defendant Charles "Charlie" Ebersol's Original Answer to Plaintiff's Original Complaint |
| 57 | 06/21/2024 | Modified Pre-Trial Scheduling Order |
| 85 | 11/26/2024 | Joint Motion to Consolidate Actions for Joint Trial |
| 102 | 12/13/2024 | Defendant Charles Ebersol's Motion for Summary Judgment and Brief in Support Thereof<br>• Exhibits B, C, D, E, F, H, I, and K-1 to the motion were filed under seal. ECF No. 106. |
| 124 | 01/10/2025 | Plaintiff Dundon Capital Partners, LLC's Response to Defendant Charles Ebersol's Motion for Summary Judgment |
| 137 | 01/21/2025 | Objection to Dundon Capital Partners, LLC's Evidence in Support of Summary Judgment Response |
| 138 | 01/21/2025 | Reply in Support of His Motion for Summary |
| 141 | 01/22/2025 | Hearing to Consider and Act Upon the Following related documents: Doc. 137 Objection to Dundon Capital Partners, LLC's Evidence in Support of Summary Judgment Response; Doc. 124 Plaintiff Dundon Capital Partners, LLC's Response to Defendant Charles Ebersol's Motion for Summary Judgment |
| 142 | 01/22/2025 | Plaintiff's Notice of Filing Revised Response to Defendant Ebersol's Motion for Summary Judgment |
|  | 01/31/2025 | [No Document] Hearing re Doc. 102 – Charles Ebersol's Motion for Summary Judgment and Brief in Support Thereof |
| 158 | 02/06/2025 | Transcript of Hearing on January 31, 2025. |
| 165 | 02/21/2025 | Order Regarding Doc. 161 – Dundon Capital Partners, LLC's Motion to Strike Ebersol's Notice of Errata and Advisory as |

2

| NO. | DATE | DESCRIPTION |
|---|---|---|
| | | Improper and Untimely Filed |
| 169 | 02/27/2025 | Transcript by Jonathon Farahi re Doc 102 Charles Ebersol's Motion for Summary Judgment and Brief in Support and Tom Horan |
| 131 | 03/03/2025 | Memorandum Opinion and Order Granting Defendant's Motion for Summary Judgment (ECF No. No. 102) |
| 176 | 04/10/2025 | Defendant Charles Ebersol's Motion for Entry of Final Judgment |
| 178 | 05/05/2025 | Plaintiff Dundon Capital Partners, LLC's Response to Defendant Charles Ebersol's Motion for Entry of Final Judgment |
| 179 | 05/06/2025 | Order on Charles Ebersol's Motion for Entry of Final Judgment |
| 180 | 05/07/2025 | Final Judgment |
| 183 | 05/20/2025 | Notice of Appeal |
| 244 in Adversary Proceeding 23-05078 | 02/06/2025 | Transcript of Hearing on February 4, 2025 |
| 194 | 06/03/2025 | Appellant Dundon Capital Partners, LLC's Designation of Issues and Record on Appeal |
| | | Court docket. |

## TRANSCRIPT

6.     The hearings held January 31, 2025, and February 4, 2025, have already been transcribed.  The Bankruptcy Court requested that the hearing on January 31, 2025, be transcribed, ECF No. 156, and it was filed on February 6, 2025, ECF No. 158.  The Bankruptcy Court requested that the hearing on February 4, 2025, be transcribed in a related proceeding, Adversary Proceeding 22-05078, ECF No. 242, and it was filed on February 6, 2025, in Adversary Proceeding 22-05078, ECF No. 244.

3

Respectfully submitted,

**BELL NUNNALLY & MARTIN LLP**

By:    /s/ *Beverly A. Whitley*
       Jeffrey S. Lowenstein
       Texas Bar No. 24007574
       jlowenstein@bellnunnally.com
       Beverly A. Whitley
       Texas Bar No. 21374500
       bwhitley@bellnunnally.com
       2323 Ross Ave., Ste. 1900
       Dallas, Texas 75201
       (214) 740-1400
       (214) 740-1499 Fax

**K&L GATES LLP**

Brent D. Hockaday
Texas Bar No. 2407129
Brent.hockaday@klgates.com
K&L Gates LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201
(214) 939-5677
(214) 939-5849 Fax

**ATTORNEYS FOR PLAINTIFF
DUNDON CAPITAL PARTNERS, LLC**

**CERTIFICATE OF SERVICE**

The undersigned certifies a true and correct copy of the foregoing was served by delivering the same to the person listed below in the manner and on the date indicated.

**VIA ECF**

Thomas M. Horan II
Thompson Coe
700 N. Pearl Street, 25th Floor
Dallas, TX 75201
thoran@thompsoncoe.com
Michael Saltz
Jacobson, Russell, Saltz, Nassim
  & De La Torre, LLP
1880 Century Park East, Suite 900
Los Angeles, CA 90067
msaltz@jrsnd.com
***Attorneys for Charles Ebersol***

Brian S. Engle
State Bar No. 00789279
Engle, PLLC
100 Commons Road Suite 7, Box 172
Dripping Springs, TX 78620
brianengel@me.com

Jonathon S. Farahi
JFarahi@actslaw.com
Boris Treyzon
btreyzon@actslaw.com
Abir Cohen Treyzon Salo, LLP
16001 Ventura Blvd., Suite 200
Encino, CA 91436
***Attorneys for Randolph N. Osherow***
***In his capacity as Chapter & Trustee***

Dated June 3, 2025.

/s/Beverly A. Whitley
Beverly A. Whitley

10702976.1 / 04251-00025

5