# U.S. Bankruptcy Court
## Western District of Texas (San Antonio)
## Adversary Proceeding #: 22–05078–cag

*Assigned to:* Chief Bkrpcy Judge Craig A Gargotta          *Date Filed:* 11/14/22
*Lead BK Case:* 19–50900
*Lead BK Title:* Legendary Field Exhibitions, LLC and AAF
Properties, LLC
*Lead BK Chapter:* 7
*Demand:*
  *Nature[s] of Suit:*    14 Recovery of money/property – other
                         02 Other (e.g. other actions that would have been brought in state court if unrelated to
                             bankruptcy)
                         81 Subordination of claim or interest
                         13 Recovery of money/property – 548 fraudulent transfer
                         72 Injunctive relief – other

*Plaintiff*
———————————————————
**Randolph N. Osherow, in his capacity as**      represented by **John P. Atkins**
**Chapter 7 Trustee**                                       Thompson Coburn LLP
                                                  2100 Ross Avenue
                                                  Suite 3200
                                                  Dallas, TX 75201
                                                  (972) 629–7100
                                                  Fax : (972) 629–7171
                                                  Email: jatkins@thompsoncoburn.com

**Katharine Battaia Clark**
Thompson Coburn LLP
2100 Ross Ave.
Ste 3200
Dallas, TX 75201
972–629–7100
Fax : 972–629–7171
Email: kclark@thompsoncoburn.com

**Brian S. Engel**
Barrett Daffin Frappier Turner & Engel
3809 Juniper Trace, Suite 205
Austin, TX 78738
512–687–2500
Fax : 512–477–1112
Email: brianen@bdfgroup.com

**Jonathon S. Farahi**
Abir Cohen Treyzon Sala, LLP
16001 Ventura Blvd., Suite 200
Encino, CA 91436
424–288–4367
Fax : 424–2288–4368
Email: JFarahi@actslaw.com

**Boris Treyzon**
Abir Cohen Treyzon Salo LLP
16001 Ventura Blvd.
Suite 200
Encino, CA 91436

424–288–4367
Fax : 424–288–4368
Email: btreyzon@actslaw.com

**Nicole Williams**
Thompson Coburn LLP
2100 Ross Avenue
Suite 3200
Dallas, TX 75201
972–629–7113
Fax : 972–629–7171
Email: nwilliams@thompsoncoburn.com

*Plaintiff*
────────────────────

**AAF Players, LLC**                    represented by **John P. Atkins**
4525 Macro                              (See above for address)
San Antonio, TX 78218
Tax ID / EIN: 83–1190440                **Katharine Battaia Clark**
                                        (See above for address)

                                        **Jonathon S. Farahi**
                                        (See above for address)

                                        **Boris Treyzon**
                                        (See above for address)

                                        **Nicole Williams**
                                        (See above for address)


*Plaintiff*
────────────────────

**AAF Properties, LLC**                 represented by **John P. Atkins**
4525 Macro                              (See above for address)
San Antonio, TX 78218
Tax ID / EIN: 00–0000000                **Katharine Battaia Clark**
                                        (See above for address)

                                        **Jonathon S. Farahi**
                                        (See above for address)

                                        **Boris Treyzon**
                                        (See above for address)

                                        **Nicole Williams**
                                        (See above for address)


*Plaintiff*
────────────────────

**Ebersol Sports Media Group, Inc.**    represented by **John P. Atkins**
4525 Macro                              (See above for address)
San Antonio, TX 78218
Tax ID / EIN: 82–3264796                **Katharine Battaia Clark**
                                        (See above for address)

                                        **Jonathon S. Farahi**
                                        (See above for address)

                                        **Boris Treyzon**

(See above for address)

**Nicole Williams**
(See above for address)

*Plaintiff*
————————————————
**LFE 2, LLC**
4525 Macro
San Antonio, TX 78218
Tax ID / EIN: 83–3545936

represented by **John P. Atkins**
(See above for address)

**Katharine Battaia Clark**
(See above for address)

**Jonathon S. Farahi**
(See above for address)

**Boris Treyzon**
(See above for address)

**Nicole Williams**
(See above for address)

*Plaintiff*
————————————————
**We Are Realtime, LLC**
4525 Macro
San Antonio, TX 78218
Tax ID / EIN: 00–0000000

represented by **John P. Atkins**
(See above for address)

**Katharine Battaia Clark**
(See above for address)

**Jonathon S. Farahi**
(See above for address)

**Boris Treyzon**
(See above for address)

**Nicole Williams**
(See above for address)

*Plaintiff*
————————————————
**Legendary Field Exhibitions, LLC**
4525 Macro
San Antonio, TX 78218
Tax ID / EIN: 82–4648964

represented by **John P. Atkins**
(See above for address)

**Katharine Battaia Clark**
(See above for address)

**Jonathon S. Farahi**
(See above for address)

**Boris Treyzon**
(See above for address)

**Nicole Williams**
(See above for address)

V.

*Defendant*
————————————————————

**Thomas G. Dundon**
5103 Southbrook Drive
Dallas, TX 75209–2223

represented by **Brent D. Hockaday**
K&L Gates, LLP
1717 Main St #2800
Dallas, TX 75201
214–939–5677
Fax : 214–939–5849
Email: brent.hockaday@klgates.com

**Laura K Lavernia**
Bell Nunnally
2323 Ross Avenue
Suite 1900
Dallas, TX 75201
214–740–1429
Fax : 214–740–1499
Email: llavernia@bellnunnally.com

**Jeffrey S Lowenstein**
Bell Nunnally & Martin LLP
2323 Ross Ave., Ste. 1900
Dallas, TX 75201
214–740–1410
Fax : 214–740–1499
Email: jlowenstein@bellnunnally.com

**Sydnie Alexis Shimkus**
Bell Nunnally & Martin
2323 Ross Avenue
Suite 1900
Dallas, TX 75201
214–740–1400
Fax : 214–740–1499
Email: sshimkus@bellnunnally.com

**Brent A. Turman**
Bell Nunnally & Martin
2323 Ross Avenue
Suite 1900
Dallas, TX 75201
214–740–1487
Fax : 223–740–1499
Email: bturman@bellnunnally.com

**Gwen Irene Walraven**
Bell Nunnally & Martin
2323 Ross Avenue
Suite 1900
Dallas, TX 75201
214–740–1400
Fax : 214–740–1499
Email: gwalraven@bellnunnally.com

**Beverly Whitley**
Bell Nunnally Martin LLP
2323 Ross Ave
Suite 1900
Dallas, TX 75201
214–770–1473
Email: bwhitley@bellnunnally.com

*Defendant*
−−−−−−−−−−−−−−−−−−−−−−−

**John Zutter**
8647 Wingate Drive
Dallas, TX 75209−1723

represented by **Brent D. Hockaday**
(See above for address)

**Laura K Lavernia**
(See above for address)

**Jeffrey S Lowenstein**
(See above for address)

**Sydnie Alexis Shimkus**
(See above for address)

**Brent A. Turman**
(See above for address)

**Gwen Irene Walraven**
(See above for address)

**Beverly Whitley**
(See above for address)

*Defendant*
−−−−−−−−−−−−−−−−−−−−−−−

**Dundon Capital Partners, LLC**
c/o Registered Agent Thomas G. Dundon
2100 Ross Avenue
Suite 800
Dallas, TX 75201

represented by **Brent D. Hockaday**
(See above for address)

**Laura K Lavernia**
(See above for address)

**Jeffrey S Lowenstein**
(See above for address)

**Sydnie Alexis Shimkus**
(See above for address)

**Brent A. Turman**
(See above for address)

**Gwen Irene Walraven**
(See above for address)

**Beverly Whitley**
(See above for address)

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 02/06/2025 | | 244 | Transcript regarding Hearing Held 2/4/25 THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 90 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 05/7/2025. Until that time the transcript may be viewed at the Bankruptcy Court or a copy may be obtained from the official court transcriber. Transcriber EXCEPTIONAL REPORTING, Telephone number 361 949−2988. − NAME OF PURCHASER: CHIEF JUDGE CRAIG A. GARGOTTA. Notice of Intent to Request Redaction Deadline Due By 02/13/2025. Redaction Request Due By02/27/2025. Redacted Transcript Submission Due By 03/10/2025. Transcript access will be restricted through 05/7/2025. (Hudson, Toni) |

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION


| | | |
|---|---|---|
| RANDY OSHEROW, IN HIS CAPACITY ) | CASE NO:  22-05078-cag |
| AS CHAPTER 7 TRUSTEE, ET AL, ) | ADVERSARY |
| ) | |
| Plaintiffs, ) | San Antonio, Texas |
| vs. ) | |
| ) | Tuesday, February 4, 2025 |
| THOMAS G. DUNDON, ET AL, ) | |
| ) | 1:40 p.m. to 4:26 p.m. |
| Defendants. ) | 4:46 p.m. to 5:12 p.m. |

LEAD CASE: 19-50900-cag
LEGENDARY FIELD EXHIBITIONS, LLC
AND AAF PROPERTIES, LLC


CONTINUED HEARING RE:


MOTION FOR SUMMARY JUDGMENT AND BRIEF [DKT.NO.173];
MOTION FOR SUMMARY JUDGMENT [DKT.NO.175]


BEFORE THE HONORABLE CRAIG A. GARGOTTA,
CHIEF UNITED STATES BANKRUPTCY JUDGE


**APPEARANCES**:                SEE PAGE 2


Deputy Clerk:            Roxanne Mujica


Court Reporter:          Recorded


Transcribed by:          Exceptional Reporting Services, Inc.
                         P.O. Box 8365
                         Corpus Christi, TX 78468
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

22-50078-cgb Doc#441-2 Filed 02/06/25 Entered 02/06/25 09:19:14 Main Document Transcript of from Hearing 2-4-2025 Pg 7 of 142

2

<u>APPEARANCES</u>:

For Chapter 7 Trustee:        BRIAN S. ENGEL, ESQ.
                              Barrett Daffin Frappier Turner & Engel
                              3809 Juniper Trace
                              Suite 205
                              Austin, TX 78738
                              512-687-2500

Also present:                 AARON MENDONSA

                              NICOLE WILLIAMS, ESQ.
                              Thompson Coburn
                              2100 Ross Avenue
                              Suite 3200
                              Dallas, TX 75201
                              972-629-7113

                              JONATHON S. FARAHI, ESQ.
                              Abir Cohen Treyzon Sala
                              16001 Ventura Boulevard
                              Suite 200
                              Encino, CA 91436
                              424-288-4367

For DCP Parties:              JEFFREY S. LOWENSTEIN, ESQ.
                              Bell Nunnally & Martin
                              2323 Ross Ave.
                              Suite 1900
                              Dallas, TX 75201
                              214-740-1410

                              BRENT D. HOCKADAY, ESQ.
                              K&L Gates
                              1717 Main St.
                              Suite 2800
                              Dallas, TX 75201
                              214-939-5677

1    <u>San Antonio, Texas; Tuesday, February 4, 2025; 1:40 p.m.</u>

2                     <u>(Call to Order)</u>

3         **THE COURT:**  Let's go on the record.  We're on the

4    record, right?

5         **MR. SPEAKER:**  Yes, sir.

6         **THE COURT:**  All right.  Mr. Hockaday, did you want to

7    ask the Court something?

8         **MR. HOCKADAY:**  Yes, Your Honor.

9         How would Your Honor prefer to view the slideshow?  I

10   don't know if this is the cord that connects to the screen or

11   not.  It's hard --

12        **THE COURT:**  I can see it up here on my monitor, --

13        **MR. HOCKADAY:**  Oh, you can, okay.

14        **THE COURT:**  -- if that's what you're asking.  So we

15   don't have to rely upon distance for me to see it.  I can see

16   it up here.

17        **MR. HOCKADAY:**  Understood.

18        **THE COURT:**  I've just got to hit a switch.

19        **(Discussion regarding cords.)**

20        **THE COURT:**  I haven't called the matter yet so bear

21   with me.  Okay.  Almost there.  Thank you for your patience.

22   Our matter this morning went a little bit long.

23        And I selfishly went and got lunch because I think I

24   told you all after we're done today, I have a law school class

25   from 5:30 to 7:40, so I get a tad grumpy if I don't eat;

4

1  certainly not with my law clerks, the courtroom deputy.

2       And I try not to do that with the lawyers either, but

3  it's just a fact of life.  Okay.  Bear with me and then I'll

4  call the matter.

5       Want to thank the parties for their patience.  This

6  is our 1:30 matter, page four of the Court's docket, adversary

7  22-05078, *Osherow, Chapter 7 Trustee, versus Dundon, et al.*

8       This is the continuation of the hearings on ECF

9  Number 173, the motion for summary judgment filed by Defendants

10 Thomas. G. Dundon and Dundon Capitals Partners, LLC, and

11 relatedly at 175, the motion for summary judgment filed by

12 Defendant John Zutter.

13      May I have appearances, first of all from the

14 Trustee?

15      **MR. ENGEL:**  Good afternoon, Judge.  Good afternoon.

16      **THE COURT:**  Good afternoon.

17      **MR. ENGEL:**  Brian Engel, B-R-I-A-N E-N-G-E-L, here on

18 behalf of the Trustee.  Nicole Williams is also here.

19      Last name?

20      **MR. MENDONSA:**  Mendonsa.

21      **MR. ENGEL:**  Aaron Mendonsa?

22      **MR. MENDONSA:**  Yes, sir.

23      **THE COURT:**  Aaron Mendonsa is also here with --

24      **THE COURT:**  Mr. Mendonsa, could you, as a courtesy to

25 the Court, spell your last name, sir?

1          **MR. MENDONSA:**  Yes, sir.  M-E-N-D-O-N-S-A.

2          **THE COURT:**  S-A?

3          **MR. MENDONSA:**  S-A, yes, Your Honor.

4          **THE COURT:**  Thank you.  Very good, go ahead.

5          **MR. ENGEL:**  And, Your Honor, Aaron is a law student

6  currently up at North Texas and is working with the Thompson

7  Coburn firm over the summer.  So you -- if you got pearls of

8  wisdom after, I'm sure he'll take them.  And --

9          **THE COURT:**  Welcome.

10          **MR. MENDONSA:**  Thank you, Your Honor.

11          **MR. ENGEL:**  And Mr. Farahi, Jonathon Farahi, F-A-R-A-

12  H-I, is also here, Judge.

13          **THE COURT:**  Thank you.  On behalf of the Dundon's

14  parties.

15          **MR. LOWENSTEIN:**  Jeff Lowenstein and Brent Hockaday

16  for the Dundon parties.

17          **THE COURT:**  Thank you.  All right.  Let's -- thank

18  you.  Let's -- I've just been told there's some on my desk.

19          Let's just kind of do a recap of where we are.  So,

20  Ms. Williams, first to you, what was your understanding what

21  was left to argue with regard to both these motions?  And I

22  assume you're going to be making the argument; is that correct?

23          **MS. WILLIAMS:**  Yes, Your Honor.

24          Mr. Fahari did have something he wanted to --

25          **THE COURT:**  Yes.  And I'm going to --

22-50578-cag Doc#441 Filed 02/06/25 Entered 02/06/25 09:19:19 Main Document Pg of
22-50578-cag Doc#441-1 Filed 02/06/25 Entered 02/06/25 09:21:19 Exhibit 2-5078 Transcript of
from Hearing 2-4-2025 Pg 11 of 142

6

 1          **MS. WILLIAMS:** -- submit.

 2          **THE COURT:** I do recall that. I'm --

 3          **MS. WILLIAMS:** Okay.

 4          **THE COURT:** -- going to let him make that -- sir, --

 5          **MS. WILLIAMS:** But other than Mr. Fahari's what I

 6   understand is his fairly short presentation he'd like to

 7   submit, my understanding of what was left was breach of

 8   fiduciary duty and unjust enrichment as to Mr. Dundon and

 9   Mr. Zutter.

10          **THE COURT:** So, I'm sorry, I didn't want my law clerk

11   to trip, and I didn't want to fall out of my chair.

12          **MS. WILLIAMS:** No problem, Your Honor.

13          **THE COURT:** So breach of fiduciary duty.

14          **MS. WILLIAMS:** Breach of fiduciary duty and unjust

15   enrichment as to both motions.

16          **THE COURT:** Okay.

17          **MS. WILLIAMS:** And then there was one slide on

18   negligent misrepresentation that Mr. Atkins skipped in his

19   haste to finish. It's a very small point that I was just going

20   to make on the record.

21          **THE COURT:** Okay. Is that your understanding as

22   well, Mr. Hockaday?

23          **MR. LOWENSTEIN:** I -- either way.

24          **THE COURT:** I'm sorry, I thought it was going to be

25   Mr. Hockaday. I know --

```
 1              MR. LOWENSTEIN:  No, he is going --

 2              THE COURT:  You're the better looking one so I always

 3   remember it's Mr. Lowenstein.

 4          (Laughter)

 5              MS. WILLIAMS:  Who is that directed at?

 6              THE COURT:  Go ahead, Mr. Lowenstein.

 7              MR. LOWENSTEIN:  I've never fallen out of a chair in

 8   a hearing.

 9              The -- so what I had down was Mr. Hockaday was going

10   to address the Trustee -- I mean the Zutter and Dundon motions

11   relating to unjust enrichment and fiduciary duty.

12              I had down that I did not get to, in response to all

13   the other arguments making, addressing good faith and fair

14   dealing in the contract setting, not the fiduciary duty side

15   but the contract-based good faith in fair dealing, or I did not

16   respond -- what is your co-counsel's name that argued about the

17   breach of the term sheet?

18              MS. WILLIAMS:  Ms. Clark.

19              MR. LOWENSTEIN:  Ms. Clark's -- I did not respond to

20   Ms. Clark's arguments about the breach of the term sheet

21   itself.

22              THE COURT:  All right.

23              MR. LOWENSTEIN:  And I wanted to address those

24   issues.

25              THE COURT:  Okay.
```

1          **MS. WILLIAMS:**  And, Your Honor, on good faith and

2     fair dealing, we did not actually argue that orally but we're

3     fine submitting it on the papers.  So I was not planning on

4     addressing it today.

5          **THE COURT:**  That's fine.  So also my notes, I'm

6     ashamed to admit, I did -- have been working a lot.  But one of

7     the things I neglected to look at, did you file your response,

8     Mr. Engel, to some of the evidentiary objections?

9          **MR. ENGEL:**  I did, Your Honor.  It's docket number

10    240.

11         **THE COURT:**  Okay.  And while that's before the Court,

12    is my memory correct, I ruled on one set of objections but

13    there were two other sets of objections remaining; is that

14    correct?

15         **MS. WILLIAMS:**  That's correct, Your Honor.

16         **MR. ENGEL:**  Right.

17         **THE COURT:**  Okay.  And how do you wish the Court to

18    rule on those?

19         **MR. ENGEL:**  As to the Defendants' objections to the

20    app sites in the Trustee's records, I think our understanding

21    is those go on the papers.

22         Ms. Williams had a couple of objections that we

23    had -- we, the Trustee had asserted as to their evidence.  And

24    my recollection of the hearing is that the Court was going to

25    take those up live or if the parties agreed, put them on the

2:22-cv-05070-GRB-JMW   Doc #:241   Filed: 02/06/25   Entered: 02/06/25 09:19:19   Main Document   Pg 9 of
from Hearing 2-4-2025   Pg 14 of 142

9

1   record.

2           Beyond that I'll let Ms. Williams speak to that,

3   Judge.

4           **THE COURT:**  Thank you.  Go ahead, Ms. Williams.

5           **MS. WILLIAMS:**  It was only objections to four

6   exhibits, Your Honor.  And we set forth the argument in the

7   objections so I'm fine for you to read the paper, or I'm fine

8   to pull the paper and address it now.

9           **THE COURT:**  All right.  Do you have a preference,

10  counsel?

11          **MR. LOWENSTEIN:**  I didn't bring my objection person

12  who is all prepared on those so I'm not -- I can try.  I'm just

13  not -- I was not prepared --

14          **THE COURT:**  Okay.

15          **MR. LOWENSTEIN:**  -- to address those.

16          **THE COURT:**  So in sum, you're asking the Court,

17  independent of argument, to rule on those objections; would

18  that be correct?

19          **MS. WILLIAMS:**  Yes, Your Honor.

20          **THE COURT:**  And so you understand I'm carrying those

21  objections that -- and I'll consider them at the time, on the

22  summary judgment arguments.

23          **MS. WILLIAMS:**  That's fine, Your Honor.

24          **THE COURT:**  Okay.  Very good.

25          The other thing I wanted to address with you all was

1  this merger argument or the lack thereof.

2         Your contention is they failed to plead merger

3  because what we've got is we've got a term sheet -- see, and

4  we're just going to kind of -- you know like when you watch TV

5  and you got like eight episodes, and you're in episode number

6  six, and we go back to try and remember what was covered in the

7  first five episodes?  So let's see if we can.

8         And if I get it wrong, don't panic.  I'm going from

9  memory.

10         So we have the term sheet to which as I understand it

11  the parties don't dispute that the term sheet -- the parties

12  executed a term sheet; would that be accurate?

13         **MS. WILLIAMS:**  That's no longer accurate, Your Honor,

14  with the --

15         **THE COURT:**  Okay.  So --

16         **MS. WILLIAMS:**  -- additional evidence we became aware

17  of recently.

18         **THE COURT:**  As after the hearing?

19         **MS. WILLIAMS:**  No, Your Honor.  It's in our summary

20  judgment briefing.  There's a footnote that explains the newly

21  discovered evidence that it wasn't fully executed.

22         **THE COURT:**  Okay.  So what -- that's right.  So we

23  have issue number one, term sheet not fully executed.

24         Number two, whether or not there was an oral

25  contract.

11

1          **MS. WILLIAMS:**  That is an issue, Your Honor, yes.

2          **THE COURT:**  All right.  Okay.  Number three, whether

3     or not those can or cannot be merged, right?

4          **MS. WILLIAMS:**  Yes.  That is also an issue.

5          **THE COURT:**  Okay.  That's also an issue.  Okay, so

6     far so good.

7          Then we had the whole discussion -- and this is where

8     I'm getting a little bit fuzzy -- what did we end with the

9     other day?  So what were the other counts that we argued?

10         **MS. WILLIAMS:**  We argued also fraud and promissory

11     estoppel.  And the chart and the -- go back to my chart, the

12     first chart in the PowerPoint I gave you has by count and by

13     argument.

14         **THE COURT:**  Right, okay.

15         **MS. WILLIAMS:**  But Mr. Atkins argued oral contract,

16     promissory estoppel, fraud, negligent misrepresentation.  Some

17     of those had very narrow arguments being made so we went pretty

18     quickly through them.

19         Ms. Clark had addressed breach of the written

20     agreement, the executory contract issue they'd raised, and the

21     economic loss doctrine.

22         **THE COURT:**  And, yes, I really did look at your

23     materials, and I'm going to look at it again.

24         So let's carry it down just a little bit further.  As

25     I understood the arguments, obviously it's factually different

1 as to between Mr. Zutter and Mr. Dundon, but basically the same

2 law on breach of fiduciary duty.  Would that be --

3      **MS. WILLIAMS:**  The same law, Your Honor, and somewhat

4 factually overlapping because Mr. Zutter is also a partner of

5 DCP, as is Mr. Dundon.  So the conflict of interest arguments

6 revolving around DCP actually apply to both of them.

7      **THE COURT:**  Okay.  And this is where I'm hoping my

8 law clerks are going to take some notes.

9      So let's work through the progression events.  If

10 there's no term sheet, what happens to the remaining claims?

11 So do they still exist?

12      Oh, Mr. Farrar, you want to jump up and address that?

13      **MR. FARAHI:**  Yes, Your Honor.

14      **MS. WILLIAMS:**  He can.  The answer is, yes, they do.

15      **THE COURT:**  All right.  So let's --

16      **MS. WILLIAMS:**  So the -- but that's what his

17 presentation was going to.

18      **THE COURT:**  Come on up, please, would you?

19      **MR. FARAHI:**  Yes, Your Honor.

20      **THE COURT:**  So I want to hear everything you have to

21 say, but just bear with me for a minute.

22      **MR. FARAHI:**  Of course.

23      **THE COURT:**  So if there's no term sheet, you believe

24 the remaining counts still remain for the Court to consider?

25      **MR. FARAHI:**  Your Honor, the way we view it is --

13

1          **THE COURT:**  Go ahead.

2          **MR. FARAHI:**  -- the -- whether or not the term sheet

3   was ever effective doesn't affect the Trustee's breach of oral

4   contract or promissory estoppel claims because what the

5   evidence that the Trustee believe shows is that the oral

6   agreement preceded the term sheet, and the term sheet was just

7   a mechanism in order to unlock the first tranche of that --

8          **THE COURT:**  Right.

9          **MR. FARAHI:**  -- $250 million oral contract.  And I

10  have something to show the Court on this point.

11         **THE COURT:**  So if there's no oral contract, where

12  does that leave the remaining counts?

13         **MR. FARAHI:**  Your Honor, if there is no oral contract

14  then there still is a promissory estoppel claim.

15         **THE COURT:**  Right.

16         **MR. FARAHI:**  And there still could be some fraudulent

17  inducement and other fraud.

18         **THE COURT:**  Okay.  So I'm not ruling this way.  Just

19  -- I'm just trying to focus because I know they're taking

20  really copious notes right now.  So no oral contract, no

21  equitable remedy for promissory estoppel.

22         Can the breach of fiduciary duty and these other

23  claims exist without the underlying contract?

24         **MR. FARAHI:**  I believe so.  But I will let

25  Ms. Williams --

2:22-cv-50078-eag Doc#2441 Filed 02/06/25 Entered 02/06/25 08:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 19 of 142

14

1        **THE COURT:**  Ms. Williams.

2        **MS. WILLIAMS:**  Yes, Your Honor.  And I just wanted to

3   be a little more precise in what we were saying.

4        So if the breach of written contract -- if the term

5   sheet's not effective, the breach of written contract claim

6   would go away, as with the good faith and fair dealing as to

7   only the written contract.  Those are the only two affected by

8   any decision on the term sheet.

9        If the Court were to rule, which obviously we hope it

10  does not, that there's no breach of oral agreement, it would

11  make that claim and the corresponding good faith and fair

12  dealing as to oral agreement go away.

13       The remaining tort claims, many of them are actually

14  alternative to the oral agreement --

15       **THE COURT:**  Where I was --

16       **MS. WILLIAMS:**  -- in the first place.

17       **THE COURT:**  -- going, so go ahead.

18       **MS. WILLIAMS:**  So the promissory estoppel, negligent

19  misrepresentation, fraud, all of those are probably not

20  fraudulent inducement.

21       I'd need to look at it a little closer.  But if

22  there's no contract, fraudulent inducement in the contract

23  would probably go away.  But all of the other frauds, we plead

24  several kinds, would stay.

25       So either way, a lot of counts remain in the case.

EXCEPTIONAL REPORTING SERVICES, INC

22-50787-cag Doc#441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 20 of 142

15

1   And the breach of fiduciary duty claim, which obviously we're

2   going to talk more about today, that arises upon being given

3   actual control of the company.

4           So regardless of whatever contracts there are or are

5   not, the evidence shows that Mr. Dundon and Mr. Zutter were

6   given actual control and exercised that over the AAF, and that

7   gives rise to the fiduciary duties alone.

8           **THE COURT:**  Okay.

9           **MS. WILLIAMS:**  So it's --

10          **THE COURT:**  Interesting.

11          **MS. WILLIAMS:**  -- not impacted.

12          **THE COURT:**  Okay.  And this is very helpful to the

13  Court in terms of focusing the Court's attention on certain

14  matters.

15          Was there anything else you wanted to say before I

16  hear from Mr. Farahi?

17          **MS. WILLIAMS:**  No, Your Honor, there's not.

18          **THE COURT:**  All right.

19          **MR. FARAHI:**  Your Honor, I'm going to be as quick as

20  possible.  There's a few points that I wanted to address.

21          **THE COURT:**  That's fine, sir.  My only limitation is

22  5:30 I've got to stop.  That's the only limitation I've got.

23          **MR. FARAHI:**  Understood, Your Honor.

24          And I wanted to make the most of my time here since

25  Friday, so what I did is I prepared for the Court some callouts

22-05087-cgg Doc#441-1 Filed 02/06/25 Entered 02/06/25 08:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 21 of 142

16

1  from the appendix.

2          **THE COURT:**  Okay.

3          **MR. FARAHI:**  I have three copies.

4          **THE COURT:**  Thank you.

5      **(Mr. Farahi/Mr. Speaker confer.)**

6          **MR. FARAHI:**  And, Your Honor, those are focused and

7   targeted based off the conversation we had on Friday pointing

8   to specific things in the appendix that I think will inform the

9   Court on some of the questions that it had.

10         **THE COURT:**  That's wonderful.  We -- and we still

11  need to address -- not pointing at you, I'm sorry -- this whole

12  -- the oral motion for merger because it wasn't raised as

13  affirmative defense, spoiler alert.  So we need to talk about

14  that.

15         **MR. FARAHI:**  Yes, Your Honor.

16         **THE COURT:**  Now, they may say it was in substance

17  raised, and we can debate that.

18         But let's assume for discussion purposes it was

19  improperly raised as an affirmative defense.  I believe

20  Mr. Lowenstein made an oral motion.  So I want to address that,

21  too, before we get into the arguments.  But you go first.

22         **MR. FARAHI:**  Okay.  And, Your Honor, I -- speaking to

23  the point that we just talked about, the Trustee's narrative

24  throughout the litigation has always the 250 was agreed upon on

25  the 13th or 14th of February 14, 2019.

1          And the evidence so far has shown that only two

2    people were on that phone call:  Mr. Dundon and Mr. Ebersol.

3          And the testimony has shown Mr. Ebersol, when

4    discussing the term sheet as to how it came about, Mr. Ebersol

5    testified --

6          **THE COURT:**  In your materials?

7          **MR. FARAHI:**  Yes, Your Honor.

8          **THE COURT:**  Okay.  What page?

9          **MR. FARAHI:**  That I can pull right now.

10          **THE COURT:**  So I -- the reason is, I say with

11    respect, I can't read that from there.

12          **MR. FARAHI:**  Yes, Your Honor.  It is -- unfortunately

13    I did not paginate these, and I apologize.

14          **THE COURT:**  That's okay.  If you go by the number in

15    the righthand corner, that's all I need.

16          **MR. FARAHI:**  Okay.

17          **THE COURT:**  Lower righthand corner.

18          **MR. FARAHI:**  I believe it is right there, 0847048,

19    Your Honor.

20          **THE COURT:**  Okay.  Go ahead, please.

21          **MR. FARAHI:**  And Mr. Ebersol discussed that the first

22    time the number 70 million appeared is after the conversation

23    that him and Mr. Dundon had for the $250 million.  And that

24    came via John Zutter redlining a term sheet that Mr. Ebersol

25    had said for that $10 million bridge loan.

2:20-50787eag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript
from Hearing on 4-2025 Pg 23 of 142

18

1    And Mr. Ebersol testified, I called Tom and I said,

2  John Zutter just said that you're investing $70 million.

3  That's not what I've discussed with my investors.

4    Are you changing the deal as we speak right now?  Can

5  you or can you not tell me that you are transferring $5.1

6  million to the company by 1:30?

7    And he said, you're fixated on the $5.1 million.  And

8  I said, yes, because it has to be paid by I think we were

9  saying 1:30.  But I think it was 2:00 o'clock because I had the

10  money, it had to go out.

11    And he said, you're fixing in on a number.  I will

12  give you that number.  Whatever John is trying to put together,

13  it's so we have a mechanism to pay you.

14    I said, but that number is not 250.  And he said,

15  referring to Mr. Dundon, I'm a man of my word.  I'm committing

16  that we're investing $250 million.

17    You can tell your board I'm putting in $250 million.

18  However John can get it together in the next insert however

19  many hours remaining is John's business.  But I'm telling you

20  we have a deal for 250.

21    And I said to him, I have to take you at your word on

22  this call right now because I have to represent to my board

23  that the company's agreeing to give a majority control for

24  effectively your word that you're going to invest $250 million.

25    And he said, you have my word.  This is the deal you

22:05:07-7-agg Doc #2441 Filed 02/06/25 Entered 02/06/25 28:09:29 in a 12-5078 Transcript 19
from Hearing 2-4-2025 Pg 24 of 142

19

1    can tell your board and investors.  This is my agreement.

2            So this is kind of what the evidence shows as to how

3    that 70 million came about.

4            And, further, on Friday you were shown this meeting

5    board minutes that the league had on the 24th approved that $70

6    million term sheet.  And there's two things to note on that,

7    Your Honor.

8            Number one, --

9            **MR. ENGEL:**  First give him the app site so he can --

10           **MR. FARAHI:**  Sure.  The app site, Your Honor, on this

11   exhibit is 087071.

12           **THE COURT:**  Okay.

13           **MR. FARAHI:**  And there's two points to make on this,

14   Your Honor.  I think the one thing that kind of has been

15   missing from Friday's discussion is as of February 14th, Tom

16   Dundon is in control of the AAF.  So --

17           **THE COURT:**  And what is that?  Why do you say that?

18           **MR. FARAHI:**  Effectively he is running day-to-day

19   operation -- number one, the term sheet gives them day-to-day

20   authority; whether or not that's effective is a different

21   question.

22           But the testimony has shown, Your Honor, that they

23   couldn't even offer broccoli to players without Mr. Dundon's

24   approval --

25           **THE COURT:**  Okay.

20

1          **MR. FARAHI:**  -- on planes.  That's the level of

2     detail.  I mean, flags being raised full staff or half staff

3     were part of his decision-making at that point.

4                So from February 14th, this separation between

5     Mr. Dundon and AAF is not real.  The AAF is Tom Dundon, and Tom

6     Dundon is the AAF.

7                So that February 24th board meeting is happening

8     under the direction and control of Mr. Dundon.  And to further

9     that, Mr. Lowenstein, while having the opportunity to question

10    Mr. Ebersol, asked about that specific document that you've

11    been shown.  And this is what Mr. Ebersol responded.

12               Why were you not slamming the table and saying we

13    need paper?  It's been ten days.  The emergency with the 5.1 is

14    gone.  It's been ten days.

15               Why aren't you slamming on the table and saying this

16    is a $250 million deal?  Why are you getting board approval for

17    a $70 million deal.

18               And Mr. Ebersol responds, well, first of all,

19    Mr. Dundon at that point had done half a dozen meetings, press

20    conferences in which he had said he invested 250 million.

21               Second, it's my understanding going into that board

22    meeting that the board meeting which I was being directed to do

23    by Mr. Dundon was kabuki theater because the term sheet clearly

24    said that the board was now Tom Dundon and John Zutter, and

25    that we were only being asked to do it because John Zutter and

22-90057-cag Doc#441-1 Filed 02/06/25 Entered 02/06/25 08:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 26 of 142

21

1 Tom Dundon insisted that we do it.

2         And I had Tom's word.  And Tom had conveyed his word

3 not only to me but to my executive team in Dallas, to my

4 understanding to the NFL, to CBS, to Turner, and their

5 leadership groups.

6         So that's dealing with that minutes that you saw,

7 Your Honor.

8         Shifting gears, Your Honor, there was this accusation

9 that the word 250 -- the $250 million agreement was lawyer-

10 driven.

11        Your Honor, the evidence has shown that there are

12 four nonparty witnesses who have testified that Mr. Dundon said

13 that he is investing $250 million directly to them.

14        Tom Veit, the business operations head of the league,

15 testifies on February 18th, 2019 Mr. Dundon --

16        **MR. ENGEL:**  App site.

17        **MR. FARAHI:**  App site is the Trustee's omnibus

18 appendix page 1,960.

19        And I asked Mr. Veit, what do you remember Mr. Dundon

20 saying about the amount of his commitment.

21        And Mr. Veit replied, Mr. Dundon said to me that he

22 was committed to 250 million in investment in the league, that

23 he was the one and only investor, that if anyone had concern,

24 he had more than enough money to run the league as long as he

25 wanted.

22

1          And, Your Honor, this is corroborated by Megan

2   Hanson, who's the league's head of PR, who states that she has

3   a history of not including specific financial numbers and press

4   releases.

5          But it was Mr. Dundon himself who insisted that the

6   $250 million number be included in press release, including,

7   Your Honor, the Carolina Hurricanes themselves sent out a press

8   release stating Dundon invests in Alliance of American

9   Football.

10          The Alliance of American Football today announced the

11   Carolina Hurricanes Chief Executive Officer Tom Dundon has

12   committed $250 million to the Alliance of American Football and

13   will serve as chairman of the Alliance board of directors.

14          Your Honor, Kelly Brugrenich (phonetic) has testified

15   that Mr. Dundon said his $250 million commitment in the same

16   meaning that Mr. Veit has testified to.

17          And Mr. Gabe Giordano (phonetic) has testified that

18   on February 22nd, in a company all-hands-on-deck, when speaking

19   to all the employees of the league, Mr. Dundon used that 250

20   number himself.

21          Besides the actual testimony that we have, Your

22   Honor, Mr. Dundon, starting on February 19th, he speaks to *USA*

23   *Today*.  He goes on 99.9, The Fan.  He states the words:  with

24   that 250 we can do a lot of things for many years to come.

25          He goes on the *Rich Eisen Show*, Your Honor, on

23

1   February 28th, 2019, four days after the minutes that you were

2   presented.  Your Honor, the app site to this is 0141.

3          Rich Eisen asks Mr. Dundon, so let me take this one

4   step at a time here, Tom.  AAF comes on air on CBS weekend

5   after the Super Bowl.

6          You're just sitting there watching it with your two

7   kids or you're just flip upon it, whatever, sitting there,

8   right there; you had no idea you were going to commit a quarter

9   of a billion dollars to that league two weeks later at all.

10         Mr. Dundon's response, none.  Wednesday morning at

11  breakfast after the first game was the first time I had heard

12  anything about it.

13         And by Thursday afternoon -- Mr. Eisen interrupts.

14  He says, you were committed.  Mr. Dundon responds, done, not

15  very smart.

16         So on February 28th, he's affirming that commitment

17  again.

18         Your Honor, even internally Mr. Dundon, on February

19  21st, when discussing a --

20         **THE COURT:**  Citation?

21         **MR. FARAHI:**  Citation is the confidential app, page

22  0085.

23         **THE COURT:**  Okay.

24         **MR. FARAHI:**  When discussing CBS potentially taking

25  an equity position in the league that had been discussed with

24

1  CBS prior to Mr. Dundon's involvement and being forwarded that

2  term sheet, Mr. Dundon replies directly to Mr. Zutter.  And I

3  quote:  They have to be diluted from here by the 250 or it is

4  not fair.  Let's figure this out tomorrow.

5        Your Honor, that doesn't dilute other investors.

6  Mr. Dundon is not using the $70 million figure in this.  He is

7  speaking about a $250 million equity investment to his own

8  staff in this email.

9        Further, Your Honor, there was this argument about

10 whether or not it was an agreement to agree.  Again, looking at

11 Mr. Dundon's own words, --

12        **MR. ENGEL:**  App cite.

13        **MR. FARAHI:**  App cite, classified confidential app

14 0089.  Mr. Dundon sends an email to the owner of Live Nation,

15 Mr. Michael Rapino.

16        He said, let's find a way to do something around the

17 football league, which Mr. Rapino responds back, what football

18 league are you referring to.

19        Mr. Dundon responds back, I bought the AAF.  This is

20 on February 24th, the same date as the board meeting.

21        So, Your Honor, as far as Mr. Dundon was concerned it

22 wasn't that he was going to buy the league.  It wasn't that he

23 was in the process of buying the league.  He's stating that he

24 purchased the AAF on February 24th.

25        Four days later he's also confirming that $250

25

1   million commitment to Rich Eisen and the public.

2         And, Your Honor, addressing another question that you

3   had was let's assume that the term sheet is effective.  What

4   does Mr. Dundon receive for the balance of the 180?

5         And if you turn to that second page of this booklet,

6   Your Honor, I want to note a few things on that question to

7   respond to it directly.

8       **(Mr. Farahi/Mr. Engel confer.)**

9         **MR. FARAHI:**  And, Your Honor, this chart on this page

10  is solely demonstrative.  It has no app citation.

11        **THE COURT:**  I understand.

12        **MR. FARAHI:**  But according to the term sheet, Your

13  Honor, Mr. Dundon was to receive series two preferred shares,

14  which is a form of hybrid debt and equity in the sense of the

15  liquidation process.

16        The common equity is not engaged per this term sheet.

17  It is fully available for further allocations or additional

18  issuances.

19        Another thing that's interesting about the term

20  sheet, Your Honor, is it lacks a purchase price.  So how do you

21  value the amount of shares, the price per share, the amount of

22  shares without that purchase price?  The term sheet only speaks

23  about timing and funding, not a purchase price or a valuation.

24        But, Your Honor, to answer that question, what is

25  available for the remaining 180, there's multiple options.

1          Number one, we can issue Mr. Dundon, now that he's in

2    control of both sides of this deal, can issue himself more

3    preferred shares which allow his liquidation preference to

4    increase but don't change the control he has.

5          He can convert some of his preferred to common stock

6    which will reduce the liabilities on the league's balance

7    sheet, improve -- he redeems his preferred, he's -- the common

8    shareholders get diluted, and now he gains a right to vote

9    under common equity.

10          Or he can just issue common stock, Your Honor.  He

11    becomes an owner of both the common stock and the preferred

12    shares, and he controls both layers of equity, the common and

13    preferred.

14          And the final thing, Your Honor, that Mr. Dundon can

15    do with the balance of the 180 is a potential asset

16    acquisition.  However, the issue with that is it depends an

17    independent committee given that he is on both sides of the

18    deal.

19          So there were multiple avenues if the Court finds

20    that the term sheet was effective.

21          If the term sheet was not effective, Your Honor, then

22    this problem solves itself.  And, again, it goes to the story

23    that the Trustee's presented from day one.

24          The first conversation that these two gentlemen have

25    to the -- to say kind of quickly, Your Honor, two men enter a

27

1   room, shake hands, and make a deal for $250 million for

2   control.  That's what this deal was always about.

3        And one thing that I am sure that Mr. Lowenstein and

4   Mr. Hockaday will raise, the statements to the press are not a

5   contract.

6        But that's not what the Trustee uses these statements

7   to the press as, not to show that those are the contract with

8   the league, but it shows to tell you what Mr. Dundon's state of

9   mind was at the time.

10       If his deal was for 70 million, Your Honor, and I

11  think you address this in your motion to dismiss, how after

12  even testifying in his deposition in 2021 where he states that

13  he had a oral agreement with Mr. Ebersol on February 13th and

14  14th, and that he had a commitment for $250 million under

15  certain conditions.

16       But he was asked what those conditions were.  He

17  couldn't identify them.  He said they were self-evidence.  When

18  asked who he told, he couldn't identify them.

19       So Mr. Dundon has himself testified under penalty of

20  perjury that there is a $250 million commitment that he orally

21  agreed to on February 13th and 14th, 2019.

22       And then there -- the final point I think, Your

23  Honor, that I want to make is there's this question of why

24  didn't anyone question the 70 million.

25       And, Your Honor, this is part of a longer email from

28

1  Moose Johnston to Mr. Dundon on April 4th, 2019.  But, Your

2  Honor, Moose has the same exact question that we all do.  When

3  did the 250 million become 70?

4         Because in meetings with the league executive,

5  Mr. Dundon is using the 250 million number; in the press he's

6  using the 250 million number.

7         The -- I know Mr. Lowenstein stated that in

8  depositions that no one had heard of the $250 million number.

9  Your Honor, I've sat through 20 depositions in this case.

10 outside of the DCP folks, legacy AAF staff have never heard of

11 that $70 million number.

12         **THE COURT:**  Did they hear of the 250?

13         **MR. FARAHI:**  Yes, Your Honor.

14         **THE COURT:**  Okay.

15         **MR. FARAHI:**  Four of them testified that they heard

16 it directly from Mr. Dundon's mouth.

17         **THE COURT:**  Okay.

18         **MR. FARAHI:**  With that, Your Honor, I have nothing

19 further.  And I appreciate your time.

20         **THE COURT:**  Of course.

21         **MR. LOWENSTEIN:**  Can I respond to his points?

22         **THE COURT:**  Of course.  Like I said, the only

23 limitation is 5:30.

24         **MR. LOWENSTEIN:**  Commitment and contract don't mean

25 the same thing.

29

```
 1          There is clearly a written agreement that was -- if
 2   you recall my timeline, Your Honor, from my PowerPoint, the --
 3   all of the exhibits, whether it's the discussion that you just
 4   saw of the 250 million, occur in the February 18th to February
 5   24th timeframe.
 6          Before that is the term sheet.  Following that is the
 7   meeting of the board of directors.
 8          THE COURT:  Forgive me.  And I probably should have
 9   asked Mr. Farahi this.  I'm just curious.  What -- you know,
10   I've had cases where we've gone back years.  And let's say the
11   people are of a certain age and their clarity of thought is
12   somewhat limited.
13          I'm not getting the sense -- it seems like based on
14   what you related to me, the witnesses seem to have a pretty
15   good recollection of what transpired; or is that incorrect?
16          MR. LOWENSTEIN:  So I will give you my -- the literal
17   answer and then I'll give you my suspicion.
18          My literal answer is the ones that had -- were
19   testifying organically could remember about as much as we would
20   from 2019.
21          THE COURT:  Right.
22          MR. LOWENSTEIN:  The others, such as Mr. Ebersol, had
23   a extremely detailed memory of conversations that occurred on a
24   phone call six years ago to a level -- and this is just fact
25   question and statements, but completely inconsistent with the
```

30

 1  other party to the conversation, but a level of detail that

 2  would throw suspicion on that kind of recollection.

 3          But many of the people did not remember all of the

 4  details, remembered some but not others.

 5          **THE COURT:**  Okay.

 6          **MR. HOCKADAY:**  Your Honor, may I --

 7          **THE COURT:**  Yes, if you get -- we got to be able to

 8  pick you up.  For the record, please.

 9          **MR. HOCKADAY:**  Brent Hockaday.

10          **THE COURT:**  Yes.

11          **MR. HOCKADAY:**  Just to add to Mr. Lowenstein's piece,

12  I deposed Ms. Brugrenchick (phonetic), Ms. Hanson, and I was

13  there for Mr. Veit.  I helped direct what the cross examination

14  was.  Not one of them could state the specifics.

15          Every one of them testified that they were not

16  present during any of these discussions.  Mr. Farahi just

17  argued, too, that there were only two people in the room.

18          And, more specifically, whenever the 250 issue was

19  brought up, they had no indication as to what the details were

20  for anything.  So if -- and I'm happy to point out deposition

21  testimony cites if needed.

22          **THE COURT:**  No.  You understand why I asked the

23  question.

24          **MR. HOCKADAY:**  I just wanted to add that clarity to

25  it.

31

1          **THE COURT:**  That's fine.

2          **MR. LOWENSTEIN:**  If you read all the depositions,

3    most people -- when we went and talked to Dawn Belt (phonetic),

4    the lawyer who was involved with all of these transactions, she

5    had the amount of memory you would think, which is I remember

6    some of this, I don't remember that ever coming up, I know what

7    these documents mean, I don't remember the details of this

8    conversation, which was about what my memory would be from that

9    long ago.

10          But there's other witnesses, like Mr. Ebersol, who

11   just had an uncanny ability to say verbatim what happened at

12   these discussions.  So I guess you just take it for what it is.

13          **THE COURT:**  Is Mr. Ebersol younger than the other

14   witnesses?

15          **MR. LOWENSTEIN:**  Some, yes; others, no.

16          **THE COURT:**  He looks to be a man about in his mid-

17   thirties.  Is that --

18          **MR. LOWENSTEIN:**  No, I think he's -- he just looks

19   great.  I can't take that away from him.  But, yeah, I think

20   he's 40.

21          **MR. SPEAKER:**  Something-ish.

22          **MR. LOWENSTEIN:**  Yeah.  I think he's --

23          **THE COURT:**  Forty something, okay.  Wish I had hair

24   that perfect but --

25          **MR. LOWENSTEIN:**  I wish I had any.

32

```
 1              THE COURT:  I'm -- go ahead.

 2              MR. LOWENSTEIN:  You have great hair compared to what

 3    I've got.

 4              So the timeline, you've got term sheet, you've got a

 5    few days of press releases and discussions, and then you've got

 6    a whole series of documents that involved legal counsel.

 7              And there is never a agreement put in place in

 8    writing for $250 million, which the lawyer said is a material

 9    transaction that has to be approved by a board.  And that

10    didn't happen.

11              And a commitment on a phone call saying I'll put in

12    $250 million is not a contract.  It can't be enforced like a

13    contract because there's no teeth to it.

14              And I think this slide, this chart that suggests all

15    these different things the other 180 could have been --

16              THE COURT:  Right.

17              MR. LOWENSTEIN:  -- is exactly the kind of material

18    terms that you would need in a contract to make it enforceable.

19              THE COURT:  I suspect you were going to say that.

20              MR. LOWENSTEIN:  So, I mean, this is Exhibit A for

21    why there's material terms missing, because you just don't know

22    what you're getting in exchange.  And without that you can't

23    have an enforceable agreement for anything above the $70

24    million.

25              As to the --
```

33

1       **THE COURT:**  And I don't know if -- do you disagree --

2   or let's assume you're right, no contract.  We've got equitable

3   -- in the alternative, we've got equitable claims for relief

4   and then we've got this breach of fiduciary duty and some other

5   claims.

6       Do those survive -- notwithstanding I say you're

7   right, I don't see there's a contract there, oral or otherwise,

8   there's still other claims for relief the Court would have to

9   address unless you win on summary judgment.

10       In other words, what I'm saying --

11       **MR. LOWENSTEIN:**  Yes.

12       **THE COURT:**  -- is I don't think it's dispositive of

13   all the issues.  I'm sorry I --

14       **MR. LOWENSTEIN:**  It is not --

15       **THE COURT:**  -- didn't let you answer.

16       **MR. LOWENSTEIN:**  It is absolutely not dispositive of

17   all the issues.

18       **THE COURT:**  Okay.

19       **MR. LOWENSTEIN:**  It does not -- I -- there is at

20   least a fact question whether with or without an enforceable

21   term sheet Mr. Zutter and Mr. Dundon were put in the position

22   of a board --

23       **THE COURT:**  Right.

24       **MR. LOWENSTEIN:**  -- and took on those duties.  So

25   that --

34

```
 1              THE COURT:  Exactly.

 2              MR. LOWENSTEIN:  -- the existence of that

 3    relationship is probably undisputed.  I don't think anybody --

 4              THE COURT:  We've got one agreement --

 5              MR. LOWENSTEIN:  I don't think anybody --

 6              THE COURT:  -- this afternoon.

 7              MR. LOWENSTEIN:  -- denies that they stepped in --

 8              THE COURT:  Right.

 9              MR. LOWENSTEIN:  -- and took control of the board.

10    Whether there's viable claims for breach of fiduciary duty

11    given the exculpatory clauses and other things, which everyone

12    else will get into, is a separate issue.

13              But those claims exist because that duty arose as a

14    result of taking on that relationship.

15              THE COURT:  What about like promissory estoppel and

16    fraud and things like that?

17              MR. LOWENSTEIN:  Promissory estoppel, I think -- I

18    mean, it exists separate from a contract claim.

19              THE COURT:  Right.

20              MR. LOWENSTEIN:  But it doesn't exist separate from

21    the concepts of is the promise sufficiently definite to be

22    enforceable.  But --

23              THE COURT:  Okay.

24              MR. LOWENSTEIN:  -- it is separate from a contract

25    claim for sure.
```

35

1          This point of -- now the Trustee's taking the

2    position that there's no enforceable term sheet.  I mean, if

3    you look at their response in the -- I mean, it's in their live

4    pleading that they're suing us under the term sheet, the DCP

5    under the term sheet.

6          And if you look at their response from pages 29 --

7    the response to the motion for summary judgment from pages 29

8    to 31, it's all about the breach of the term sheet and that

9    that term sheet had certain requirements and other things.

10          So the -- I don't think we're on fair notice that

11    there's a -- I mean, yes, they put into evidence a -- the idea

12    that there's not a countersignature on the document.  We showed

13    all the evidence and law for why that doesn't matter.

14          But the idea that the Trustee's not taking the

15    position that there's not an enforceable term sheet that

16    they're suing us under is -- seems inconsistent with

17    everything.

18          **THE COURT:**  All right.

19          **MR. LOWENSTEIN:**  The -- I think that was generally

20    it.

21          I mean, if you look at the idea of commitment and

22    what it means, and look at Mr. Dundon's testimony about, yeah,

23    I was committed to investing in this league -- he said it best

24    in one of the Trustee's exhibits, which is app -- I don't --

25    this is the non-confidential app 192 in an article from -- that

36

1  they cited from March of 4th where he says he probably made a

2  mistake in how they did the release about the $250 million.

3          And concludes with, so as long as we get the ratings

4  and the demand, then obviously we will keep putting in capital.

5  It -- the conditions were set.

6          The idea that he did not state conditions to anybody,

7  he said it to the public, to the same -- one of the same

8  writers for the sports business journal that he had said to

9  others about, yes, it's not -- I'm not just dumping in $250

10 million without conditions.  There has to be performance and

11 other things for us to be interested in continuing to do that.

12         **THE COURT:**  Okay.

13         **MR. LOWENSTEIN:**  Thank you.

14         **THE COURT:**  Thank you.

15         **MR. ENGEL:**  Your Honor, --

16         **THE COURT:**  Come to the podium before you speak.

17 Take your time, Mr. Engel, take your time.

18         **MR. ENGEL:**  Can I be heard for a moment?  I know it's

19 a little unconventional, Your Honor.

20         **THE COURT:**  It's fine.

21         **MR. ENGEL:**  But I appreciate the indulgence.  I want

22 to talk to you a second about this term sheet.

23         The first time that we received the term sheet was in

24 a production from -- under Rule 2004 from the Defendants back

25 originally whenever we did 2004's, long before this litigation.

37

1          **THE COURT:**  Okay.

2          **MR. ENGEL:**  It contains attached to it a DocuSign

3   form -- and, frankly, it's in the appendix -- that says the

4   document has been completed.

5          Everyone in the world that's in this case -- I don't

6   want to speak too broadly -- believed at that time that there

7   was an executed agreement.

8          **THE COURT:**  That's -- the Court operated under.

9          **MR. ENGEL:**  Right.  And let me talk about that.  So

10  as the parties are going through and doing discovery, we

11  deposed witnesses, witness after witness.

12         I asked them, other people asked them where is a copy

13  of Mr. Dundon's signature, where is a copy of Mr. Zutter's

14  signature.  Surely there's a copy of Mr. Zutter's and

15  Mr. Dundon's signature.

16         Heck, at one point in a deposition when the issue

17  became contentious, Mr. Lowenstein waved it around and said,

18  it's signed, see this piece of paper.  And --

19         **THE COURT:**  Hold your thought.

20         **MR. ENGEL:**  Yeah.

21         **THE COURT:**  Let's just go back in time for a minute.

22  I think when Mr. Lowe was appointed trustee and --

23         **MR. ENGEL:**  Mr. Osherow.

24         **THE COURT:**  I mean Mr. Osherow, excuse me, --

25         **MR. ENGEL:**  Yeah.

38

1          **THE COURT:**  -- was appointed Trustee and had to do

2     what he needed to do, did he have any difficulty in locating

3     the books and records of the Debtor?

4          **MR. ENGEL:**  Your Honor, it was my job to go get the

5     books and records --

6          **THE COURT:**  That's what I thought.

7          **MR. ENGEL:**  -- of the Debtor.  And I could talk to

8     you in great detail about how I did that job.

9          The books and records of the Debtor were primarily

10    not in paper.  In fact, Your Honor, there's been a lot of talk

11    about there being two million documents in the case.  I think

12    that's probably an accurate representation of how many pieces

13    of paper there are out there.

14         There is one banker's box of Immigration records that

15    is in paper.  It's sitting in my office.  I'd like to destroy

16    it frankly, but right now it's got books sitting on it.  One

17    box.

18         I had to go to various sources, mostly online.  For

19    example, all of the player contracts, nobody really knew where

20    those were.  I had to interview about ten different people.  I

21    figured it out.

22         Then I had to go work with Concord, the contract

23    management software who didn't want to give me the documents

24    and, you know, had to get a -- same thing with Google.

25         I don't know if Your Honor's ever tried to get

39

1    documents from Google, but it's approximately like, you know,

2    trying to punch out the Stay-Puft Marshmallow Man:  you hit it

3    and nothing.

4           But eventually I was able to get them.  And without

5    belaboring the point, the same thing's true with all kinds of

6    other documents.

7           So I went through all that process and collected all

8    of the business records of the Debtor which were in various

9    places because they were stored in cloud-based.

10          So ultimately I did find the emails that matched the

11   one that had been produced in the 2004 production.

12          **THE COURT:**  Okay.

13          **MR. ENGEL:**  So -- and we produced it.  Everybody

14   thought that that DocuSign envelope form that was attached

15   meant that it was signed.

16          And it struck me as we went through that it was odd

17   that nobody could remember signing it because you'd think from

18   Mr. Zutter and Mr. Dundon's perspective that they would

19   remember signing an agreement.  But nobody did.

20          So ultimately I gritted my teeth and, you know, had a

21   wrestling match with DocuSign to get the actual envelope that

22   was produced.

23          And lo and behold, it shows that Mr. Dundon and

24   Mr. Zutter and anybody at DCP didn't sign the document.  That's

25   also in the evidence when your law clerk gets along to working

40

1  on that production.  The document is unsigned.

2          Now, we had been told it was signed.  Everybody --

3  and, look, I don't take any issue with Mr. Lowenstein at all,

4  right?  He thought the same thing I did.  He wasn't hoodwinking

5  me by telling me it's signed.

6          But it wasn't signed.  We found that out in December.

7  I want to say DocuSign finally produced that document maybe

8  December 6th.  That's what I want to say but I would just kind

9  of beg your -- the record will show it, Judge.  I don't want to

10 misspeak but that's my memory of it.

11         From that point forward, of course, the parties were

12 engaged as Your Honor knows in, you know, sort of -- there's a

13 phrase I want to use here but I'm not going to.  They were very

14 busy.  The phrase had something to do with blanks and

15 alligators.

16         But everybody on both sides of the coin was in the

17 throes of working on a pretrial order, working on the motions

18 for continuance, working on all of that.

19         I ultimately determined that notwithstanding what we

20 had thought, there was no signed agreement.  That actually has

21 legal consequences.

22         And you saw the *Huckaba* (phonetic) case.  And that's

23 Fifth Circuit controlling law.  Judge Elrod wrote that opinion.

24 And in that opinion she makes clear that it's just an ordinary

25 question of State law whether an agreement that says it'll be

41

```
 1    signed and delivered by both parties can be effective.

 2              You know, we have an allegation in our first amended

 3    complaint, docket number 56, to be sure that says the term

 4    sheet's a binding and signed agreement.  That's not true.

 5              We're going to have to amend that pleading, Judge, on

 6    the facts.  That may very well have consequences for the

 7    written agreement as an independently enforceable contract on

 8    its own.  If it does, it does because the truth is just the

 9    truth here.

10              You'll recall, Your Honor, that our position has

11    always been, as Mr. Farahi stated it, that there was an

12    agreement to invest $250 million.  The Hurricanes press release

13    should tell you that, and the dozens and dozens and dozens of

14    other references to that.

15              While my colleague takes issue with Mr. Ebersol's

16    memory and says why it's a might too good, I'll point out two

17    things to you.

18              One, Mr. Ebersol was giving away the entirety of the

19    company he had created, giving it away so that it could

20    survive.

21              There's a man who probably remembers something if

22    we're, you know, just judging the value of inferences, right?

23    Maybe he just has a good memory.  Maybe he -- well, I don't

24    know what the maybes are.

25              But the point I want to make to you is now we're
```

46

1   talking about inferences, Judge.  And when you're in the

2   business of making inferences, I would hope that Your Honor

3   would be reminded that that is exactly the point at which you

4   can't be involved in the business of granting summary

5   judgments.

6          Mr. Dundon denies the agreement that appears in all

7   of his public statements and statements to Mr. Ebersol and

8   statements to the ladies and gentlemen who were in the

9   management.

10         It denies what he said to CBS where he says I have to

11  be diluted by the 250.  That's out of his mouth.  Denies all of

12  that.

13         But what he's asking you to do is to accept the

14  inference that he's right and Mr. Ebersol is wrong.  That's not

15  a summary judgment issue, Your Honor.  That's a trial issue.

16  And so I wanted to make that point to Your Honor.

17         I credit what my colleagues are saying.  We're in

18  litigation, right?  It's big ticket litigation.  People have

19  positions, they do.

20         Lawyers, and these are very good lawyers, have views

21  about the facts.  I'm probably not as good a lawyer but I have

22  views about the facts.

23         The only person's view about the facts that counts at

24  the end of the day, Your Honor, is sitting in front of me right

25  now wearing a robe.  This is not the time for that decision

1  because there are disputed issues of fact about what agreement

2  was formed.

3          With respect to the unsigned term sheet, why would

4  you invest $70 million and not tend to the signing of a term

5  sheet from Mr. Dundon's perspective if you wanted to enforce it

6  later?

7          He had a bevy of lawyers with names I can't even

8  spell, okay, who were in charge of helping him get through all

9  of these contractual issues.  Why did it not happen that they

10  tightened up the agreement?

11          Well, I don't want to be in the business too much of

12  speculation but I'll give you some here, Judge.  Because

13  Mr. Dundon didn't want it to.  He wanted to have flexibility to

14  change this deal to turn it into an asset deal.

15          And, look, Your Honor, just candidly, --

16          **THE COURT:**  Okay.  Go ahead.

17          **MR. LOWENSTEIN:**  We are way beyond actual evidence

18  (inaudible) --

19          **MR. ENGEL:**  Candidly, --

20          **MR. LOWENSTEIN:**  -- summary judgment record, Your

21  Honor.

22          **THE COURT:**  I agree.  I'll indulge it a bit further.

23          **MR. ENGEL:**  Candidly, --

24          **THE COURT:**  There's no jury here so --

25          **MR. ENGEL:**  Right.

22-90787-cag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 23:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 49 of 142

44

1          **MR. LOWENSTEIN:**  That's fair.  But I just wanted

2    to -- that's not in the record.

3          **THE COURT:**  Okay.  Go ahead.

4          **MR. ENGEL:**  Candidly, at trial there will be evidence

5    from witnesses who were deposed after all of these things were

6    done that talks about the things that I'm talking about.  It is

7    not in the summary judgment record what I just supposed.

8          On the other hand, my colleague Mr. Lowenstein, who I

9    adore, gave his suspicion moments ago about, you know, people's

10   motivations; not part of this proceeding, Judge, right?

11         **THE COURT:**  I agree.

12         **MR. ENGEL:**  Shouldn't be.  So what we're talking

13   about here is a battle of inferences.  That's the end of the

14   summary judgment story as it relates to the oral contract, Your

15   Honor, because there's a battle of inferences.

16         And, Your Honor, I think -- you know, I mean, I don't

17   need to tell you the law of summary judgment.  But it's pretty

18   clear that inferences at the summary judgment phase all run to

19   the non-movant because the summary judgment is not a substitute

20   for a trial before a factfinder, right?

21         The summary judgment evidence or the summary judgment

22   rule is a mechanism for the Court not to litigate claims but to

23   get rid of claims that are patently unproveable.

24         There's no world in which what you've heard over the

25   last few days gives rise to claims that are patently

45

1   unproveable.  Mr. Dundon's own words preclude that.

2           And, you know, I would respectfully say to Your Honor

3   about this issue that, you know, I'm going to have to amend my

4   pleadings now that we've found out what the real facts are.

5   And we found them out because I went searching for them --

6   nobody else did -- because I wanted to know.

7           I'm going to have to amend those pleadings because I

8   can't have pleaded facts that frankly everybody in this room

9   agrees are not true.

10          **THE COURT:**  So what does that do to the summary

11  judgment?

12          **MR. ENGEL:**  Well, I don't think summary judgment is

13  appropriate here at all, Your Honor, on the oral contract claim

14  in particular.  But --

15          **THE COURT:**  Understood.  But if you change the nature

16  of the pleadings, how does the Court evaluate the current

17  summary judgment motions?

18          **MR. ENGEL:**  Well, I think if I change the nature of

19  the pleadings, the written term sheet claim goes away, Judge.

20  I'll just say that to you.  I think it goes away.

21          **THE COURT:**  And so you're going to amend it and it's

22  going to be what?  What's the claim for relief (inaudible) --

23          **MR. ENGEL:**  So Count Seven would go away.  I think

24  it's Count Seven which was the written term sheet claim.

25          **THE COURT:**  Okay.

46

1          **MS. WILLIAMS:**  Count Two.

2          **THE COURT:**  Count Two is what I thought.

3          **MR. ENGEL:**  I'm sorry, I apologize, Your Honor.

4    Count Two probably goes away.

5          **THE COURT:**  Okay.  And if Count Two goes away, what's

6    the effect of the term sheet as it relates to the oral contract

7    (inaudible) --

8          **MR. ENGEL:**  Well, as -- I'm sorry, Judge.

9          **THE COURT:**  Go ahead, sir.

10         **MR. ENGEL:**  Yeah.  As you remember, the claim that

11   the -- or that the Plaintiffs make here, the Trustee makes, is

12   there was a deal.  It occurred on a phone call.

13         You saw Mr. Dundon confirm in writings that

14   Mr. Farahi showed you that he said, I moved really quickly,

15   probably not smart.  Okay.

16         There's an agreement that we contend that was $250

17   million for complete control and the ability to do anything

18   that essentially he wanted, right?  Majority ownership.

19         Mr. Dundon received those things.  The evidence is

20   really undisputed that he took control, that he exercised

21   control down to very small deals immediately, happened

22   immediately.

23         That agreement carried with it for Mr. Dundon the

24   right to do whatever the heck he wanted after to restructure

25   the business.  He had all the shares.  He could have issued

47

1   them to himself.  He had everything; could have done all of

2   that.

3          So what does it do to the oral contract claim?

4   Frankly, Judge, it makes it stronger.

5          **THE COURT:**  What about the merger argument now?

6          **MR. ENGEL:**  I don't think there is a merger argument

7   for the reasons that Mr. Atkins gave to the Court.  But --

8          **THE COURT:**  But does it matter if you remove Count

9   Two?

10         **MR. ENGEL:**  Well, then it's a formation question,

11  right, Judge?  Count One becomes a formation question.  Was

12  there an agreement.

13         I -- if Count Two is gone, I don't think merger is a

14  live issue in this case.

15         **THE COURT:**  Okay.

16         **MR. ENGEL:**  Right?  I think then it's for the Court

17  to determine what the agreement was.  And that simply can't be

18  done on summary judgment between two parties battling out like

19  warriors saying, accept my inferences.  And I look over there

20  and I go, accept my inferences and swing back.

21         We're doing the Court frankly a terrible service or a

22  terrible disservice, I'm not sure which one.  But it's

23  something that needs to resolve at trial and not based on

24  parties' arguments about inferences at this stage of the case,

25  Judge.

48

1          So that's all I wanted to, you know, kind of say

2    about that is that, you know, people find out things in

3    discovery.

4          Do you remember when we had the class action when we

5    ultimately found out that all the agreements were the same

6    after I was able to find things -- and that took a long time,

7    Judge, right?  We were in that case for a year and a half

8    before that got figured out.

9          That's what happens in discovery when lawyers do it.

10   So, I mean, I don't want to wrap myself up in the flag but I

11   also am not going to put facts that I know are incorrect in

12   front of the Court.  And so I feel sort of duty bound to amend

13   the pleading to correct the facts.

14         And I think that's going to have an adverse impact on

15   the written contract claim.  I just think it is.  And there's

16   not much I can do about that, right?  The truth is the truth.

17         But the law regarding effectiveness when an agreement

18   recites that it has to be signed and delivered by the parties

19   is as strong as mustard gas.

20         When we were talking about this on Friday,

21   Mr. Lowenstein, who hadn't had very much time to look at it,

22   got up and said, if you'll recall, Judge, well, there was an

23   arbitration provision involved here.

24         But if you go back and read *Huckaba*, Judge Elrod

25   says, so what, this is an ordinary question of State contract

1   law, and here's what the State contract law is as a matter of

2   law.

3        Where two parties are required to sign and deliver

4   for an agreement to be effective within the four corners of the

5   agreement, that's where the inquiry begins and that, as Judge

6   Elrod said, is where it ends.

7        **THE COURT:**  Of course I'm going to let you respond.

8   And then we'll get to where we were supposed to start today.

9        **MR. LOWENSTEIN:**  Yeah.

10        **(Laughter)**

11        **THE COURT:**  But let me say in all seriousness, you

12   know, this is not wasted breath.  I need to hear these

13   arguments.  So go ahead, please.

14        **MR. LOWENSTEIN:**  And I appreciate you hearing them,

15   Your Honor.

16        I -- the thing that is troubling is that there is a

17   written record of documents done by people that were not --

18   there is one quote from Mr. Ebersol saying that Mr. Dundon and

19   Mr. Zutter were somehow involved in the board meeting events.

20        It's not reflected in there.  The lawyer didn't

21   recall -- they're not reflected as having been involved in that

22   board meeting.

23        But then there's all these subsequent events that

24   were done by the ESMG counsel where they're documenting that

25   the league is not just talking about a $70 million investment.

50

1          It is talking in incremental ways that it is

2    receiving funds, the fulfillment of that $70 million term

3    sheet.  It's quoted over and over again.  In the board meeting

4    minutes they say, $12 million.

5          Then in the stockholder agreement all the way in

6    March 27th, they recognize that they're receiving $50 million

7    under the term sheet.  So you don't just have a contract that's

8    not signed and then somebody sues the other person for not

9    performing.

10          You've got a contract that was performed even by the

11    Trustee's own admission 69.7 out of $70 million, and the funds

12    were accepted all in recognition that they're accepted under

13    that $70 million term sheet which was ratified by the league as

14    referenced in the board meeting minutes and was approved by the

15    shareholders.

16          And there's not a drop of evidence that any of the

17    shareholders were influenced in any way by Mr. Zutter or

18    Mr. Dundon to sign off on that agreement.

19          So this idea that you've just got a unsigned

20    agreement and that's the end of the story and somebody

21    breached, that's not where we are.

22          This is a almost completely admitted performance

23    under the term sheet, which under any body of law -- and if we

24    need to go back into this we can, but under any body of law,

25    that partial performance and acceptance and partial performance

22-50073-cag Doc#441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 56 of 142

51

1  by both parties certainly creates a binding agreement.

2      So I -- and it's -- we've been litigating this case

3  now for years under there's a binding term sheet.  And the fact

4  that there's not a signature that DocuSign has, that doesn't

5  change the fact that no one's seen a signed version.

6      But also all of the people actually there at the time

7  that were doing this, the lawyers, the principals, and

8  everybody else, operated as if it was in effect.

9      This is only something that's come up -- and I don't

10  know the answer to why it didn't get signed or why we don't

11  have evidence of it getting signed or where a signed version

12  is.  But it doesn't matter legally is the point.

13          **THE COURT:**  Okay.

14          **MR. LOWENSTEIN:**  And, yes, I can't hide from the fact

15  that there's references to a $250 million commitment all over

16  the place.

17      But that doesn't create a binding agreement because

18  they're completing lacking in material terms and completely

19  lacking of consideration outside of the 70 million.

20          **THE COURT:**  All right.  Thank you.  So, Mr. Farahi, I

21  thought you wanted to jump up for a minute.

22          **MR. FARAHI:**  I do if you'll indulge me for ten

23  seconds.

24          **THE COURT:**  Ten seconds, really?

25          **MR. FARAHI:**  Ten seconds.

52

```
1              THE COURT:  All right.  I can live with ten --

2              MR. FARAHI:  And I'll do it from here to save the ten

3    seconds.

4              THE COURT:  All right.

5              MR. ENGEL:  You might want to go get the mic.

6              MR. FARAHI:  Okay.

7              THE COURT:  Yeah, come forward, please, sir.

8              MR. FARAHI:  Sure.

9              THE COURT:  And --

10             MR. FARAHI:  Your Honor, just --

11             THE COURT:  -- for the record, please identify

12   yourself.

13             MR. FARAHI:  Jonathon Farahi for the Trustee.

14             THE COURT:  Go ahead.

15             MR. FARAHI:  Your Honor, just to address this point

16   that everyone was operating on the theory that the term sheet

17   was signed, --

18             THE COURT:  Right.

19             MR. FARAHI:  -- I would give this to Your Honor.

20   It's just as equally of an inference that everyone was

21   operating under the assumption that the deal was for 250.

22             So it's hard to say that it was for 70 versus the 250

23   because people will testify in the league that they were

24   operating under the 250.  Thank you, Your Honor.

25             THE COURT:  All right.  Let's -- I've lost two people
```

Case 24-50792-hlb Doc 441 Filed 02/06/25 Entered 02/06/25 18:09:29 Page 53
of 305 Main Document Transcript
from Hearing 2-4-2025 Pg 58 of 142

53

1  would suggest to me that we need a comfort break.

2       **(Laughter)**

3          So we're going to take a comfort break.  It's 2:43.

4  We'll come back at 2:55, all right?  So we're in recess until

5  then.

6          **THE CLERK:**  All rise.

7       **(Recess taken at 2:43 p.m.; reconvened at 3:00 p.m.)**

8          **THE COURT:**  Okay.  I believe we're now going to

9  proceed to the remaining arguments.  Is that correct?

10         All right.  Who goes first?

11         Mr. Lowenstein, did you get a chance to finish

12  responding to what was discussed Friday?  Not a trick question.

13         **MR. LOWENSTEIN:**  I can't remember if we brought up --

14  I did not go with the breach of term sheet which I'm not sure

15  is a claim anymore but I had a few comments on that and then

16  the contract-related good faith and fair dealing, meaning the

17  implied covenant of good faith and fair dealing built into

18  contract, I wanted to address quickly those points.  I don't

19  know who and when they were raised but I can go after

20  Mr. Hockaday argues the fiduciary duties.

21         **THE COURT:**  Okay, that's fine.

22         All right.  So Ms. Williams, I think we are starting

23  with you, not at 1:30 but nonetheless.  Mr. Hockaday?  Sir?

24         **MS. WILLIAMS:**  Mr. Hockaday and I were just talking

25  about this.  They've argued Dundon breach of fiduciary duty but

54

1    not Zutter.

2            **THE COURT:**  Right.

3            **MS. WILLIAMS:**  And my response is combined so --

4            **THE COURT:**  That's fine.

5            **MS. WILLIAMS:**  -- it might make more sense to let him

6    argue Zutter and then I'll do both together.

7            **THE COURT:**  If you're okay with that I'm --

8            **MR. HOCKADAY:**  Yeah, we have no preference.  Thank

9    you, Your Honor.

10           **THE COURT:**  All right.  Fine.  Then I'll hear from

11   you first.

12           **MR. HOCKADAY:**  Thank you, Your Honor.

13       **(Pause)**

14           Your Honor, I may pivot back 'cause since we don't

15   have -- there's only two of us today.  I have the slide

16   (inaudible) and it's not ...

17       **(Pause)**

18           There aren't many slides, there's only like two or

19   three but ...

20           **THE COURT:**  Is that what you're looking for?

21           **MR. HOCKADAY:**  Yes, Your Honor.

22           **THE COURT:**  All right.  Very good.

23           **MR. HOCKADAY:**  Thank Your Honor, may it please the

24   Court?

25           We're here today as well to move to dismiss all the

2:22-cv-05078-eag Doc #2441-1 Filed 02/06/25 Entered 02/06/25 28:09:29 Main Document Transcript
from Hearing 2-4-2025 Pg 60 of 142

55

1   claims against John Zutter.  As Your Honor may recall, he is

2   also a separate defendant in this case.  And the only claims

3   that have survived as to Mr. Zutter are the breach of fiduciary

4   duty claims and an unjust enrichment claim.

5        So as to the breach of fiduciary duty, similar to

6   what we discussed with Mr. Dundon, we can kind of break them

7   down into categories as far as whether they are contract based,

8   duty of care or duty of loyalty.

9        As a threshold matter, I don't think it's disputed at

10  this point, at least going on the papers, although Ms. Williams

11  may correct me if I'm misstating anything, as it pertains to

12  the duty of care allegations, I think we are all in agreement

13  or at least there wasn't any protest in the trustee's response

14  that those are waived, pursuant to their certificate that was

15  part of the Secretary of State filing in the state of Delaware.

16  All officers of the organization of Ebersol Sports Media group,

17  there was a waiver of the duty of care as it pertained to them.

18  And as I understand, there was nothing in the response that

19  contested that one point.

20        The issue that we came up -- where we came crosswires

21  on was what was the duty of care?  Their position is that

22  certain of the allegations extend beyond the duty of care.

23  Those can also be considered duty of loyalty.

24        I want to just pull up for the Court if we can ...

25        **(Pause; Counsel conferring about slide)**

1          **THE COURT:**  Mr. Farahi, I was not setting you up for

2    a joke.

3         **(Laughter; pause)**

4          **MR. UNIDENTIFIED:** I'm actually constantly amazed by

5    Mr. Farahi's facility with all of these technology --

6         (Pause; Conferring)

7          **MR. HOCKADAY:**  So Your Honor, where I was picking up,

8    I think the position that we have and the position that the

9    trustee agrees with is that as it pertains to the duty of care,

10   those allegations are waived.  Now --

11         **THE COURT:**  And they're waived because why?

12         **MR. HOCKADAY:**  Because in the certificate that is

13   filed with the Delaware Secretary of State, there is a waiver

14   in there.  I can direct you to the exact location.

15         If you go to Exhibit I in Mr. Zutter's motion,

16   beginning on Page 25 and continuing on Page 26 under Article 8,

17   Director Liability.  And just like as with Mr. Dundon it says:

18              "To the fullest extent permitted by law, a director

19              of the corporation shall not be personally liable to

20              the corporation or its stockholders for monetary

21              damages, for breach of fiduciary duty as a director.

22              If the general corporation law or any other law the

23              State of Delaware has amended after approval of the

24              shareholders of this Article 8 to authorize corporate

25              actions, further eliminating or eliminating the

57

1          personal liability of directors, then liability of

2          the director of the corporation shall be eliminated

3          or limited to the fullest extent permitted by the

4          general corporation law as so amended."

5     The carveout for this was duty of loyalty or duty of

6 good faith fair dealing but if you look at the plain language

7 in their certificate, there is a waiver on there.

8     If we look at the six allegations as it pertains to

9 Mr. Zutter, there's 173-A through F, paragraphs in the

10 complaint.  I'm going to pull out 173-A, 173-B, 173-E and

11 173-F.  Each of these four is a duty of care allegation.

12    The first one, failing to paper up the alleged 250

13 million dollar deal.  That is an action that they are alleging

14 Mr. Zutter should have performed, that is a duty of care deal.

15 And even if we weren't to put it in the duty of care piece, the

16 damages arising from that are the alleged 250 million dollar

17 agreement which as we discussed at length on Friday and is in

18 our briefing, cannot be a basis for a fiduciary duty damage

19 claim because it's a contract claim.  And under Delaware law,

20 you cannot fit contract damages into a tort claim.

21    As it pertains to 173-B, it discusses failing to do

22 anything to address the situation of Mr. Dundon not papering up

23 this deal.  They're referencing again the 250 million dollar

24 deal.  The same issues apply there.

25    The other thing is this idea of disclosure of

2:22-cv-50078-eag Doc #2441-1 Filed 02/06/25 Entered 02/06/25 28:09:29:19 Main Document Transcript
from Hearing 2-4-2025 Pg 63 of 142

58

1   information to the debtors or making decisions in the best

2   interest of the league.  I think that's pretty clear that that

3   falls under the duty of care umbrella but setting that aside,

4   they haven't actually alleged anything specific and there's

5   nothing, there's actually no evidence in the record which is

6   permissible to argue under Rule 56 that would support these

7   claims.  And I'm going to talk about the evidentiary cites here

8   in a minute.

9           The third one where it's 173-E, failing to employ

10  rational decision-making process in relation to finances and

11  operations, that likewise is -- and I'm paraphrasing here in

12  the slides -- but likewise that is a duty of care allegation

13  and that would also be subject to the waiver.

14          And then the fourth one, 134-F, failing to act

15  prudently in carrying out his duties of one or more debtors,

16  that effectively spells it out right there.  So four out of the

17  six that are asserted against Mr. Zutter are duty of care

18  allegations.

19          Now, there was some back and forth a little bit.

20  Mr. Lowenstein came up and clarified a little bit as well on

21  Friday what happens when we're looking under the duty of

22  loyalty paradigm.  I just kind of want to reset here real quick

23  just so we're all on the same page as we discuss these two

24  other allegations as it relates to Mr. Zutter.

25          What the Xtreme Power case discussed was our starting

59

1  point and what we look at as the business judgment rule.  We

2  presume you as a director are operating in the best interest of

3  the business.

4          You elevate to that next level of scrutiny if you can

5  show that you are interested in a transaction or you lacked

6  independence to oppose the transaction's consummation.

7          What I don't think was clear on Friday -- and I want

8  to make abundantly clear here -- this applies to Mr. Zutter as

9  well as Mr. Dundon -- that is an interested in the specific

10 transaction that you claim was a violation of fiduciary duty.

11 So I don't get -- if I'm the plaintiff and I'm trying to make

12 an assertion that you violated your fiduciary duty and you

13 breached your duty of loyalty, you're engaged in self-dealing,

14 I have to show -- I have to connect the dots that you were

15 engaged in self-dealing as to that transaction.  If you're

16 talking about the Fowler release, I have to show and I have to

17 put evidence that you were self-dealing as it pertains to that

18 transaction.  I can't just scattershot and plead it globally

19 and not support it with evidence after the fact.  And as I

20 said, we'll get to that here in a second.

21         The duty of good faith.  That's another thing.

22         So the trustee's position is they put subset F and I

23 believe G -- oh, no, G was Mr. Dundon.  They put F as under the

24 duty of good faith.  The duty of good faith is a subset of the

25 duty of loyalty and effectively there's two scenarios there.

1    One focuses on intent.  Did you have the subjective intent to

2    cause harm and the second was kind of like a recklessness

3    standard.  Was there a conscious indifference?  Was I aware of

4    something and I chose to not act or not act in that light.

5         And if we look at the allegations as it pertains to

6    these two remaining, there's nothing that supports a specific

7    transaction.

8         **(Pause; counsel conferring)**

9         Your Honor, I'm just going to pull up a pleading

10   here.

11        **(Pause)**

12        Now, if we look at the two remaining subsets that

13   Mr. Zutter is accused of doing in his breach, subsets E and --

14   excuse me -- D and E, D is Mr. Zutter allegedly failed to -- or

15   breached his fiduciary duty by voting for the debtors to enter

16   into, quote, "contracts such as the release agreement that were

17   in the best interest of himself and Dundon and were not in the

18   best interest of debtors and were in fact detrimental to

19   debtors."  So that's one group.  The second one and final one

20   is by failing to employ rational decision-making process in

21   relation to finances and operations -- oh, wait, I'm sorry,

22   that was E.  C, by making decision regarding finances and

23   operations of one of more debtors that were motivated by his

24   self-interest or served his self-interest, including as a

25   partner of Dundon's in other ventures such as DCP rather than

1   interest of debtors. Okay.  So I want to talk about that one

2   first.

3          So under C, their allegation, that fits squarely

4   within the duty of loyalty paradigm.  The problem is here is

5   that the undisputed evidence shows that he's not an equity

6   partner of Dundon Capital Partners.

7          If we look at Exhibit A and we go to Page 25,

8   starting on Line 11 and going to Line 19, Mr. Treyzon asked

9   Mr. Zutter specifically -- and I didn't object to it -- what

10  his job title was when he was at Dundon Capital Partners.  And

11  he asked was he an equity partner or was it just a title and

12  Mr. Dundon -- or excuse me -- Mr. Zutter made unequivocally

13  clear that it was just a title.  The reality is is that

14  Mr. Zutter was a non-equity partner.  He had no profit sharing

15  interest, he had no rights to anything, he got no tax benefits

16  from being a, quote, "partner" with Dundon Capital Partners and

17  he certainly didn't benefit out of this deal which I'll get to

18  when we get to the unjust enrichment argument.  So that's -- I

19  know there were some allegation here earlier at the beginning

20  of that but it's just flat out wrong and there's no evidence to

21  indicate otherwise.

22         And what I think is important is Mr. Dundon has

23  produced thousands of pages of his tax returns in this case.

24  Nowhere in there is anything referencing Zutter or Zutter

25  getting a benefit.  There's no evidence in the record of

62

1   Zundon's -- Zundon -- of Zutter's tax returns or receiving any

2   kind of benefit from this deal otherwise.

3          **THE COURT:**  No tax benefits then, is that what you're

4   saying?

5          **MR. HOCKADAY:**  Correct.

6          **THE COURT:**  Okay.

7          **MR. HOCKADAY:**  It's just completely devoid from the

8   entire litigation, not even the summary judgment record.

9          **THE COURT:**  Okay.

10         **MR. HOCKADAY:**  Now, if we look at sub-D, that talks

11  about the release agreement.  I want to talk about the release

12  agreement because this applies equally to Mr. Dundon as it does

13  Mr. Zutter.

14         I agree with them that that is a specific transaction

15  but they cannot show that they were on both sides of the

16  transaction or that they got benefit from it.

17         If you look at the meeting minutes and if you look at

18  the term sheet, absent the Fowler release, there is no way that

19  the term sheet could have been consummated and there's no way

20  that ESMG could have performed under the term sheet.  And the

21  reason why is because they had to vote in -- or excuse me --

22  Mr. Ebersol had to rely on Mr. Fowler's vote as a proxy in

23  order to approve the term sheet after the fact.  If he doesn't

24  approve the term sheet, Dundon Capital Partners is not on the

25  hook for 70 million or anything and they can't complete the

22-90378-cag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript of Proceedings from Hearing 2-4-2025 Pg 68 of 142

63

1  deal.

2          And part of the term sheet, if Your Honor recalls,

3  it's on Appendix 11 I know in theirs but it's also an exhibit

4  to one of ours, is we get the two voting board seats.

5  Mr. Zutter and Mr. Dundon got it.  So it would have been

6  impossible for Dundon -- for ESMG to have received the benefits

7  from Dundon Capital Partners and survive an additional 46 days

8  rather than dying that Saturday on February 9th had the Fowler

9  release not been completed.  And there's just no evidence other

10 than Ebersol's claim that he felt that they were in control and

11 they had to do that.  I think the salient point is that it was

12 a good deal for the league because it was the only option for

13 the league.

14         Now, the 200 million dollar oral deal papering up, I

15 think that fits as it pertains to Mr. Zutter, that fits

16 squarely within the duty of care because it talks about his

17 obligations as an officer or as a director, I should say.  But

18 setting that aside, it can be thrown out because it is found in

19 contract, at least the damages for it.  But even if you look at

20 it here, there's no evidence that they were on both sides or

21 benefited from the deal because there was an arm's length

22 transaction that took place prior to Dundon and Zutter becoming

23 directors of the company.

24         As it pertains to the unjust enrichment claim against

25 Mr. Zutter, I think we touched on this on Friday too but

64

1   effectively at its core it requires the accused party to

2   receive some sort of benefit.  Mr. Zutter got no benefit from

3   this whatsoever.

4           He filed a declaration in support of the summary

5   judgment motion where he received no compensation or any kind

6   of monetary benefit related to his work as an officer -- excuse

7   me -- as a director of Dundon Capital Partners -- excuse me --

8   of ESMG and he certainly didn't get any kind of indirect

9   benefit, financial or otherwise, as a nonequity partner of

10  Dundon Capital Partners.  There's just no evidence of it.

11  Period.

12          And these vague references to benefits of other

13  companies, again that's not tied to actually anything and the

14  evidentiary record that the trustee has put together in

15  response to this is certainly devoid of any such benefits.

16          Now that is all I have for Mr. Zutter.  I am happy to

17  cede the podium to Ms. Williams and then if Your Honor will

18  hear any rebuttal we have as to their position for both

19  Mr. Dundon and Mr. Zutter, unless Your Honor has any questions.

20          **THE COURT:**  Was Mr. -- to you understanding, was

21  Mr. Zutter accused of being on both sides of the transaction

22  such that that would amount to self-dealing?  Isn't that one of

23  the allegations that have been raised in a breach of fiduciary

24  duty to obtain the release agreement?

25          **MR. HOCKADAY:**  No, Your Honor.  The allegation is by

222050787eagg Doc#2441-Filed 02/06/25 Entered 02/06/25 28:09:29:19 in a 13-50 08 Transcript from Hearing 2-4-2025 Pg 70 of 142

65

1    voting for the debtors to enter into contract such as release

2    agreement, they were in the best interest of himself and Dundon

3    and were not in the best interest of debtors and were in fact

4    detrimental to debtors.

5              THE COURT:  Okay.

6              MR. HOCKADAY:  Any other questions?

7              THE COURT:  No, sir.

8              MR. HOCKADAY:  Thank you.

9              MS. WILLIAMS:  I have to get my PowerPoint straight

10   as well, Your Honor.

11             THE COURT:  And this is the one you previously

12   provided to the Court; is that correct?

13             MS. WILLIAMS:  Correct.

14        **(Pause)**

15             THE COURT:  When you're ready.

16             MS. WILLIAMS:  Yes, Your Honor.

17             Before I hit breach of fiduciary duty I mentioned I

18   needed to address that one, the negligent misrepresentation

19   point.  It is in your slide deck.  And the issue is just their

20   argument relies on a specific section in the restatement

21   (indisc.) of torts.  It's section 5.5.  That I believe they

22   admitted in their argument the Texas Supreme Court hadn't

23   adopted but then suggested this court had some kind of

24   discretion.

25             And the two things I just wanted to point out were

66

 1   the Texas Supreme Court in 2014 in a case called LAN/STV, 435

 2   S.W.3d 234, actually did look at that section of the

 3   restatement and sort of used some of it and didn't use some of

 4   it and its analysis did not expressly adopt it.  And the Fifth

 5   Circuit had a chance to look at this in 2019 and the Fifth

 6   Circuit actually held that it could not use that restatement

 7   section.  It's very near the end, Your Honor, and I'm sorry, I

 8   don't know the slide number.

 9        **THE COURT:**  Okay.  I'm just trying to keep up with

10   you.  Go ahead, I'm listening.

11        **MS. WILLIAMS:**  Very near the end, yes.

12        So the Fifth Circuit case, it's called Correct RX,

13   945 F.3d 423.  The Fifth Circuit rejected application of this

14   exact restatement section saying there wasn't support for

15   having found the Texas Supreme Court to have adopted it.  So in

16   our mind that resolves the negligent misrepresentation issue

17   and we had just forgotten to mention that case on Friday.

18        So with that I will move to the breach of fiduciary

19   duty.  And like to told, Your Honor, I'm going to address

20   Dundon and Zutter together because a lot of it's the same

21   analysis but I will point out where there are some differences.

22        **THE COURT:**  Okay.

23        **MS. WILLIAMS:**  So if you look at Slide 43 in your --

24        **THE COURT:**  With that number that's the challenge

25   I've got.  On the bottom I don't --

67

1     **MS. WILLIAMS:**  Oh, I'm very sorry, Your Honor.

2     **THE COURT:**  And do you-all have it on yours?  Are

3  they numbered on yours?

4     **MS. WILLIAMS:**  They are numbered on mine, Your Honor.

5     **THE COURT:**  Well, bottom righthand corner, bottom

6  lefthand corner?

7     **MS. WILLIAMS:**  It was bottom right but we did have

8  some copies that were numbered and some that weren't so I

9  apologize that you got one that wasn't.

10     If you want to find it, I'm going to go in order from

11  this point forward.

12     **THE COURT:**  Right.  Let me find it and that way I'm

13  not distracted looking to keep up with you.  I'm a big

14  believer.  I like PowerPoints because they do help the Court, I

15  can make notes, it helps to focus but it doesn't do me any good

16  if I'm flipping through the PowerPoint and not listening to

17  you.  So bear with me.

18     **MS. WILLIAMS:**  Understood, Your Honor, and I'm sorry

19  that you got a bum copy.

20     **THE COURT:**  That's okay.  I do want to keep using

21  this version, okay.

22     **MS. WILLIAMS:**  They're in order of count and breach

23  of --

24     **THE COURT:**  Right.

25     **MS. WILLIAMS:**  -- fiduciary duty is Count 5.

**EXCEPTIONAL REPORTING SERVICES, INC**

68

1        THE COURT:  Right. I did pick up on that, yes, ma'am.

2        MS. WILLIAMS:  Okay.

3        THE COURT:  Yeah, I see.  Go ahead.

4        MS. WILLIAMS:  Found the second.  This is Slide 43

5   for reference.

6        All right.  So I think it's important first to set up

7   what we pled.  And it's also important I keep bringing us back

8   to the summary judgment record because it's important here and

9   I think it's important to note what was moved on and what

10  wasn't.

11       So the summary judgment argument that was made as to

12  fiduciary duty is made on the pleadings.  There has not been

13  affirmative evidence offered in the motion for summary judgment

14  of either Dundon or Zutter that shows some evidence that they

15  acted in good faith, for example.  They haven't brought forth

16  evidence of that.  They are relying on our pleadings.

17       The only evidence that they cite in all the fiduciary

18  duty sections relates to the timing of when Dundon became

19  appointed to the board which they say goes to the issue of when

20  the fiduciary duties arose.  And we're going to address that

21  issue but that is the only evidence so that means we're looking

22  at the pleadings.

23       And as Your Honor will recall from the motion to

24  dismiss stage, this is the count.  Everything they were showing

25  you in their PowerPoint and that I have on here, these are the

22-50708eag Doc#2441 Filed 06/06/25 Entered 06/06/25 15:09:29:19 Main Document Trans Pg 09 from Hearing on 4-28-25 Pg 74 of 142

69

1    counts that summarize all of the facts that preceded the counts

2    and so we don't dispute that these are what the counts say but

3    these aren't all the allegations in the complaint.  And I'll

4    even show you some other allegations within the count itself

5    that they haven't brought to your attention.

6         I also want to draw attention to subsection F because

7    every time they've shown it it has just said "failing to employ

8    rational decision-making process for finances and operations."

9    Everything else on my slide under F is also in that paragraph

10   of the complaint.  So all of the specific examples of actions

11   are also within that subsection.

12        They made three different arguments in their motions

13   for summary judgment and those arguments don't apply to every

14   subsection.  And again, why is this important?  It's important

15   because they can't raise arguments now that aren't made in the

16   briefing and also we didn't respond to arguments not made in

17   the briefing.  And I want to bring this up because I've heard

18   some things said Friday and today that don't actually match up

19   with what they did.  So the purpose of this chart was to show

20   what arguments were made in the MSJ.

21        The first argument that they made was that you can't

22   have breaches of fiduciary duty -- well actually if I'm going

23   in order of how they made them, the first one they made was

24   duty of care claims are waived.  As to Mr. Dundon, that only

25   applied to subsections F and G.  And I'll show you on the next

222050587eagg Doc#2441 Filed 02/06/25 Entered 02/06/25 28:09:29 Main 123-5078 Transcript 70 from Hearing 2-4-2025 Pg 75 of 142

70

1   slide what it applied to for Zutter.

2          The second argument that they made was that you can't

3   have fiduciary duties that are duplicative of contractual

4   claims as to Mr. Zutter.  That only applied to subsection A.

5          And then the third argument that they made was that

6   duty of loyalty claims do not relate to discreet transactions

7   in our pleading.  We're going to dispute that's the standard

8   and also the evidence but that applied to B through E.  So you

9   can see on Mr. Dundon, they only made one argument per

10  subsection and I just want the Court to keep that in mind

11  because we only disputed the arguments they actually made.

12         It's also important to note -- and I put that at the

13  top of the slide for ECF Number 56.  We allege that all of

14  these subsections breached the duties of loyalty, care and fair

15  dealing.  And that's going to be important when we get to the

16  waiver issue.

17         As to Mr. Zutter, similar, except on Mr. Zutter they

18  did argue two on a couple and then they completely left out C.

19  So I just heard Mr. Hockaday up here talking about subsection

20  C.  I went back to their motion and read that section again to

21  make sure I was correct.  There's nowhere in the three

22  subsection arguments that C is ever mentioned.  They

23  specifically say which ones they apply to and they don't

24  mention C.  So we didn't respond on C because there isn't

25  actually a summary judgment argument in there.

71

1          On A and B, they argued both waiver of duty of care

2   and duplicative of contractual duties.  That's all discussed.

3   That one's a little confusing to us because Mr. Zutter is not

4   alleged to have had any contractual duties.

5          On subsection D they argued the discreet transaction

6   as to the Fowler issue, and on E and F they argued waiver.  So

7   this is just setting up kind of where we are and the arguments

8   that I'm addressing here today.

9          So I'll start the exculpatory provision.

10          Mr. Hockaday is right that no one's disputing there

11   is an exculpatory provision within the ESMG charter.  And

12   that's in the summary judgment record I think from both sides.

13          What's important to note is Section 102.B7 of the

14   Delaware Code which provides what that exculpatory clause can

15   and can't do and it cannot eliminate any liability that's based

16   on a director or officer acting not in good faith, for

17   intentional misconduct or knowing violation of the law.  So the

18   waiver just can't operate in those circumstances which as we're

19   going to show we've alleged and have evidence of.

20          When you look at the caselaw, because there's a lot

21   of caselaw about, okay, well if you've waived everything you

22   can and people are pleading everything together -- which is

23   what we've done -- what is the Court supposed to do?  And I put

24   on this slide two of the key cases on that.

25          And the answer is, if an action is alleged to have

1  violated multiple duties and any one of those duties is not the

2  duty of care, the Court proceeds with the claim.  Because you

3  could say, for example, well F, to the extent of the duty of

4  care could be waived but F, to the extent of the duty of

5  loyalty isn't.  And what the Court holdings say is you don't

6  parse it out like that.  You keep the claim alive and you

7  decide at trial in light of all the evidence was this a care

8  issue or a loyalty issue?  And if it was a care issue, it's

9  waived; and if it's a loyalty issue, it's not.  But it's the

10 same conduct.  It could of course be violating both at the same

11 time but the courts keep those claims alive and that's what the

12 Court should do here in this case because it's clear from the

13 nature of what we're alleging and also our explicit language

14 that we'll show that loyalty's implicated.

15         So the next slide looks at this specifically so what

16 are the Court standards for when you have the duty of loyalty?

17 And Mr. Hockaday identified already the duty to act in good

18 faith is just a subset of the duty of loyalty.  So if you're

19 alleged in this case because we're just talking about the

20 pleadings to have acted in bad faith, not in good faith, not

21 with the best interest of the company at heart, we are talking

22 about a loyalty issue.

23         We're also talking about a loyalty issue when you act

24 with a purpose other than advancing the best interest of the

25 corporation.  And as Your Honor alluded to, in a conflict of

73

1    interest situation, that's exactly what we're alleging.  And as

2    I'll show, there is a serious conflict of issue -- sorry --

3    conflict of interest issue because Dundon and Zutter owed

4    duties to both DCP and ESMG AAF, however you want to look at it

5    at the same time.  And so that sort of has this in the

6    background, this ever-existing conflict of interest for both of

7    them.

8            It also can be not even just taking an action but

9    consciously disregarding your duties to the company, failing to

10   take an action that shows that your true devotion, your

11   faithfulness is not to the league in this instance.  And we

12   have the case cites there.

13           So if you look at what we've alleged against both

14   Dundon and Zutter, that's what's coming into play here.  And I

15   put on here these are the ones that they've challenged

16   specifically as to the duty of care just to show they're not

17   just duty of care.  So we're saying Dundon didn't fund as he

18   promised.  We're saying he failed to follow through and

19   complete contracts or he chose to breach contracts that were

20   already in place that would have been in the best interest of

21   debtors.  He refused to consider other investments.  I'll show

22   a deposition excerpt where Mr. Dundon said he wasn't ever going

23   to take anyone else's money for the AAF, even when it became

24   apparent that it wasn't going to work the way he was doing it,

25   and his decision to cease operations and technology development

74

1  before the first season ended which he had told would be

2  disastrous. And we're going to show that the bankruptcy didn't

3  come up in April when it actually happened as some sort of last

4  resort. Bankruptcy was something Mr. Dundon and Mr. Zutter

5  were talking about, even before the term sheet as a strategy

6  they had with how to deal with the league. All of these things

7  implicate the duty of loyalty, implicate acting in good faith

8  or bad faith and so therefore none of these are specifically

9  the duty of care and they can't be dismissed pursuant to that

10 waiver.

11       The next slide, Your Honor, is about the standard of

12 review which I know you were asking questions about on Friday.

13       So Delaware as you probably know has three standards

14 of review for fiduciary duty claims. Business judgment is the

15 lowest and that's the only thing that's argued in the motion

16 which means if Your Honor doesn't believe business judgment

17 applies on the pleadings, then we're done because that's all

18 they've moved for.

19       **THE COURT:** Right. So you need to tell me why we

20 shouldn't apply the business judgment rule.

21       **MS. WILLIAMS:** Absolutely, Your Honor.

22       So the business judgment rule can only apply where

23 you have disinterested and independent directors who are acting

24 in good faith and who have an undivided and unselfish loyalty.

25       The other two standards are on the slide and either

22-50687-cag Doc#441 Filed 02/06/25 Entered 02/06/25 28:09:29 Main Document - Transcript from Hearing 2-4-2025 Pg 80 of 142

75

1 would work for our purposes today but we believe entire

2 fairness is the right standard.

3          I've put four cases here at the bottom that talk

4 about these standards in detail but to summarize that they say

5 on the slide, if you have an actual conflict of interest --

6 we're under entire fairness -- the relationship where there are

7 competing duties for both Dundon and Zutter between DCP and the

8 league, creates an actual conflict of interest.  In addition to

9 that general ever existing actual conflict of interest, we'll

10 show other examples such as with the advertising where Dundon's

11 giving free advertising that normally isn't free to his own

12 companies, to companies he wants to have a relationship with

13 for other reasons.  Those are also actual conflicts of interest

14 that are arising separately from the ever inherent one.

15          These cases, specifically Frederick Kasu, talks about

16 if you're on both sides of something as a corporate fiduciary

17 and it's not just the transactional, we'll get to that too,

18 it's really any business decision, then you're under the entire

19 fairness standard.  You don't get the business judgment benefit

20 of the doubt when you actually owe competing duties of loyalty

21 to two different companies.

22          **THE COURT:**  So why, just for purposes of completing

23 the argument, why can't it be enhanced scrutiny?

24          **MS. WILLIAMS:**  It could be enhanced scrutiny, Your

25 Honor.  We don't -- I mean that's a potential conflict from

22-50787-cag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 81 of 142

76

 1   certain dynamics.  Whereas here, so that might exist, for

 2   example, if you had a duty of loyalty to a shareholder and you

 3   had a duty of loyalty to the company but that shareholder is

 4   not taking any direct action with respect to the company, you

 5   can just do things as a director that might benefit one

 6   shareholder more than the other.  That might be enhanced.

 7           THE COURT:  The only reason why I asked is you clear

 8   believe it's not business judgment.  I understand that and

 9   you've articulated that you think it's fairness but I'm just

10   asking the alternative if it was enhanced scrutiny, would the

11   MSJ still fail?

12           MS. WILLIAMS:  Yes, Your Honor, it would because they

13   have not argued that or attempted to present any evidence and

14   there's no presumption under enhanced scrutiny or entire

15   fairness that they can benefit from.

16           THE COURT:  That's why I asked the question.

17           MS. WILLIAMS:  Okay, yeah.  And they have to benefit

18   from a presumption because they haven't presented evidence that

19   they acted in good faith or these other things.

20           But unlike my example of maybe there's a shareholder

21   you also owe a duty to but that shareholder is not like

22   actively involved in anything maybe it's just enhanced, here

23   DCP was actively involved.  Every decision Dundon and Zutter

24   made about money, took money from DCP to the league.  And then

25   once it got to the league, they had the ability to decide how

22-90507-cag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 08:09:19 Main Document Transcript
from Hearing 2-4-2025 Pg 82 of 142

77

1    to spend that money and whether to prefer, for example, to

2    spend it on DCP's transaction costs, to spend it on things like

3    PWC looking how to organize the league in a way that might help

4    Dundon from a tax perspective versus do we need to make sure we

5    get through this first season?  Do we need to make sure we have

6    advertising deals?  Do we need to make sure we honor the

7    contracts we have with our key partners who are necessary for

8    the AAF to grow and be successful.  That's the decisions that

9    Dundon and Zutter were making every day.  And when you look at

10   the -- not just our pleadings which certainly support it, if

11   you look at the evidence we've presented, you can see that

12   every day they were not asking what was best for the league

13   which was the requirement for them.

14        To focus just on our pleading, we did very

15   specifically allege a non-business judgment mens rea so I've

16   put up here Paragraph 174 we say Dundon and Zutter acting

17   intentionally.  One-eighty-four we do on as to Dundon and say

18   he acted willfully and egregiously and with malice and fraud.

19        I want to point out here, Your Honor, because a lot

20   of their argument as to Zutter depends on this idea that Zutter

21   somehow didn't have any loyalty to DCP.  For that they cite one

22   provision of his affidavit that says, "I was a non-equity

23   partner in DCP so I didn't benefit from anything."  That is one

24   of the things we've objected to as conclusory.  Like I said, I

25   believe Your Honor can draw your own conclusion there but we

 1   assert --

 2           THE COURT:  Forgive me on that point.

 3           So if he's not getting any benefit, what was the

 4   point of Mr. Zutter being involved?  Just ask a basic question.

 5   If he's not getting any benefit, why was he involved other than

 6   he was the righthand man of Mr. Dundon?

 7           MS. WILLIAMS:  That's why he was involved, Your

 8   Honor.  He's referred to in the testimony as his righthand man,

 9   as his hatchet man, as the guy who gets all the business deals

10   done.  That's what Dundon called him.  And the law is you can

11   have lack of independence if you're sufficiently loyal to,

12   beholden to or otherwise interested in one of the other

13   parties.

14           So setting aside that, there are plenty of

15   arrangements in a nonequity partnership where you still get

16   benefits from that partnership doing well so that the nonequity

17   piece doesn't really matter.  He doesn't go on to explain he

18   didn't get -- continue to get whatever his normal salary or

19   distribution or however he's --

20           THE COURT:  And he's being compensated monetarily,

21   right?

22           MS. WILLIAMS:  Absolutely, Your Honor.  And what you

23   can tell from Mr. Zutter's testimony is he just bounces from

24   Dundon company and Dundon company, sometimes several at the

25   same time.  And he's beholden to Dundon.  That is who he works

79

 1  for.  And Mr. Dundon is DCP.  So there's no question there's a

 2  fact issue no matter what Mr. Zutter says about not caring

 3  about how anything went one way or the other.  That he is

 4  sufficient linked to Mr. Dundon and to DCP such that whatever

 5  issues Mr. Dundon may have, Mr. Zutter has as well.

 6       **THE COURT:**  So taking my focus away and trying to

 7  focus on benefits conventionally speaking, whether it's

 8  retirement benefits, tax benefits or anything like that, your

 9  contention is a little bit different then, right?  He

10  participated as -- I'm not going to use the words "hatchet man"

11  -- I think that might be construed as a finding -- but we'll

12  just say righthand man because that has a conventional sense to

13  it.  He got other benefits from participating, right?

14       **MS. WILLIAMS:**  That's one way to look at it, Your

15  Honor.  The other way to look at it is you can essentially

16  assume someone else's non-independence by showing that you're

17  sufficiently connected to them.  So for example, an independent

18  director supposed -- we're not -- Mr. Zutter was never

19  independent, he's a DCP appointed director, right?  But let's

20  say even if he was independent, if he somehow answered to

21  someone who wasn't independent by way of relying on them for

22  financial means or having other business deals that they need

23  to look out for them, those are the kinds of situations like in

24  Frederick Kasu (phonetic), where the Court has said you're not

25  really independent if you have to listen when that person calls

80

1    you and tells you what to do.  And that is absolutely what the

2    evidence shows is the position that Mr. Zutter was in with

3    Mr. Dundon.

4            **THE COURT:**  All right.  Thank you.  Please go ahead.

5            **MS. WILLIAMS:**  Also in addition to these very

6    specific pleadings about intent, if you just look at what we're

7    alleging, it's clearly intentional conduct.  I mean we've

8    alleged purposefully not providing funding, making decisions

9    for AAF as if he was going to fund the way he'd promised even

10   long after we now know his intention was not to do that.

11   Taking things for free that he knew other people didn't get for

12   free, and then just generally considering Dundon's own

13   interests, DCP's own interests over those of the AAF when he

14   was deciding how he was going to deal with people and what

15   would keep going and what wouldn't.

16           Before I talk more in detail about the conduct, I

17   want to address this idea that the conduct has to be some kind

18   of formal transaction because that's what's argued in the

19   motion and that's what I heard today too.

20           So as defendants are using the term they're saying

21   you've got to have something like the Fowler release where

22   there was an agreement and there's two parties to the agreement

23   and they're coming together.  Most of their cases that they

24   cite are merger transactions so of course there's a transaction

25   in that case and the Court uses the word "transaction".  But if

22-90578-cag Doc #2441-1 Filed 02/06/25 Entered 02/06/25 08:09:29 Main Document - Transcript from Hearing 2-4-2025 Pg 86 of 142

81

1 you actually look at the standards that are being applied, even

2 in those merger cases, there's no requirement for a transaction

3 to have a duty of loyalty.

4 So I pulled out on this slide the cases that you'll

5 actually see, the terms that you'll actually see and the cases,

6 decisions, actions, operations, responsibilities, strategies.

7 All of those things are things are things that duty of loyalty

8 applies to. You have to have loyalty every time you make a

9 decision, every time you take an action, every time you make a

10 strategy for the company. So you can't say, okay, Mr. Dundon

11 made a decision to breach this contract that absolutely

12 shouldn't have been breached, that the AAF was going to keep

13 being an ongoing concern. And then say, well that's not

14 transaction because the contract already existed and this was a

15 decision whether to breach it or not. That's not how the duty

16 of loyalty works.

17 And I want to talk about a few of these cases that

18 I've put on here to show that example.

19 So Bridgeport from the bankruptcy court in Delaware,

20 the duties breached in Bridgeport were knowingly failing to

21 make decisions, approaching the operation of the company with a

22 level of indifference that amounted to bad faith, consciously

23 regarding responsibilities. And actually what happened in that

24 case is a series of action by the board that led to a rush fire

25 sale of all the assets. So it wasn't even one thing. It was a

82

1  series of the way everybody was acting that ended up with the

2  company being fire sale'd which is not dissimilar to what's

3  happening here.

4          In Xtreme Power, which is a case the defendant cited

5  but we also use, there again was a series of action by the

6  directors that led to a bankruptcy being filed.  And according

7  to everyone -- or not everyone -- but according to the

8  pleadings in that case, the bankruptcy was filed so late and in

9  such a way that there was not actually going to be any way to

10 get the company out of bankruptcy where if it had happened

11 earlier, it probably could have gotten out of bankruptcy.  And

12 in that case the directors were alleged to have competing

13 interests to a related company that would be better off if that

14 company went into bankruptcy and didn't get saved.  So again,

15 another very similar situation to what we have here.

16         The Frederick Kasu case, there was a series of

17 actions and inactions taken by the directors where they

18 basically abandoned the growth strategy that the company had

19 and then started porting cash and selling assets.  And the

20 allegations were that that benefited one particular shareholder

21 over all the other shareholders which some of the directors

22 were beholden to.  So again, a similar question.

23         In Re Tower Air is the case that they cited in their

24 reply brief which is the main reason I wanted to address it

25 today because we don't have a response to that in writing but

222956787eag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 08:09:29:19 Main Document Transcript from Hearing 2-4-2025 Pg 88 of 142

83

1   that case allowed some claims to proceed and some claims not.

2   So in Tower Air, there were some generalized mismanagement

3   claims.  That's what the Court called it.  And those they did

4   dismiss finding that they were duty of care.  But all the other

5   specific things that were alleged were allowed to proceed and

6   those included times where a decision wasn't made at all and

7   decisions where they found they were in bad faith and decisions

8   that were personal benefits.

9           So one of the examples when we're looking at like how

10  broad is "transaction," quote/unquote, or what kind of conduct

11  can we look at, in In Re Tower Air there was a specific airline

12  route going from a place where one of the directors' family

13  members lived to somewhere else and it was found that it didn't

14  make any economic sense for the company to keep that route

15  going but that director wanted that route to keep going because

16  their family member took that route.  That survived this

17  question of is there a transaction, is there specific enough

18  conduct and does that go outside normal business operations

19  which I think just shows how broad this concept really is, not

20  narrow as the defendants are claiming.

21          So on Slide 50, I've just put here some of the

22  specific conduct we've alleged by Dundon and Zutter and this is

23  a little more specific than the subsections we've been looking

24  at the whole time but these concepts are elsewhere in the

25  complaint.  Or some of them are even specifically in Paragraphs

22-50687-cag Doc #2441 Filed 02/06/25 Entered 02/06/25 08:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 89 of 142

84

1   175 through 177 on the complaint that talk about damages

2   because as part of talking about what are the damages beyond

3   contract, we give some more specific conduct than is in the

4   subsections.

5           So each of these I've put up here's there's a lot of

6   evidence cited in all of these so I've just put the conduct

7   here with the footnotes where the evidence is to support,

8   although again, the motion's only made on the pleadings but as

9   belt and suspenders, we're responded not just on the pleadings

10  but on the evidence itself.

11          So Your Honor can look at this chart and go through

12  and we contend each one of these is a sufficient decision on

13  conduct to invoke the duty of loyalty.  And their pleadings

14  certainly allege it's bad faith, there's a conflict, other

15  loyalty issues.  And then even if you look at the evidence you

16  can see it as well.

17          Looking at these individual pieces is one way to look

18  at it.  And since they raised the transaction issue, that's how

19  I've broken it out but another way to look at this is a course

20  of conduct by Dundon and Zutter that led to the Chapter 7

21  bankruptcy in this case.  And so that, according to the cases

22  as well, you can look at it from a course of conduct

23  perspective also.

24          **THE COURT:**  Okay.

25          **MS. WILLIAMS:**  I just want to show a few examples of

22-50087-cag Doc#441 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 90 of 142

85

1    the evidence.  There's obviously more in those footnotes but I

2    thought it would be helpful to see a few.  You do not have

3    these on your slides.

4         THE COURT:  Okay.  You're just testing to see if I'm

5    paying attention which I am.

6         MS. WILLIAMS:  Yeah.  So some of this is from the

7    confidential appendix and I didn't want you to have to put that

8    PowerPoint in your safe so I left it out.

9         THE COURT:  That's fine.

10        MS. WILLIAMS:  Can you see the screen, Your Honor?

11        THE COURT:  Yes, I can see it right here.  Thank you.

12        MS. WILLIAMS:  So this one on Slide 51 is an example

13   of the --

14        THE COURT:  Forgive me.  Are we going to discuss

15   stuff that's confidential on the record?

16        MS. WILLIAMS:  I wasn't going to discuss any detail.

17        THE COURT:  Okay.  Because --

18        MS. WILLIAMS:  They can stop me if they object.  Is

19   that fair?

20        THE COURT:  All right.  Fair enough.

21        MS. WILLIAMS:  Okay.  Everything --

22        THE COURT:  Because then I'd have to seal the record.

23   You understand that.

24        MS. WILLIAMS:  I understand, Your Honor.

25        THE COURT:  All right.

86

1      **MS. WILLIAMS:**  Nothing that the trustee -- the

2  trustee is not asserting anything is confidential and a lot of

3  the confidentiality has been withdrawn by them but I honestly

4  don't know which is which so they can stop me if I --

5      **THE COURT:**  Yes, Mr. Hockaday?

6      **MR. HOCKADAY:**  Your Honor, just for expediency, why

7  don't Ms. Williams finish her presentation and if we hear

8  anything that might be confidential then subsequently can we

9  move to have the record sealed for that portion of it?

10      **THE COURT:**  We can.  I'd rather do it real time but

11  we'll see --

12      **MR. HOCKADAY:**  I'll pay attention then and jump up if

13  that --

14      **THE COURT:**  Please.

15      **MR. HOCKADAY:**  Sorry, Your Honor.  I didn't mean to

16  cut you off.

17      **THE COURT:**  That's fine.  Go ahead.

18      **MS. WILLIAMS:**  This one isn't because this is out of

19  our regular appendix.

20      So this is a document that shows -- it's a report, we

21  have several of the reports in the evidence but there's two

22  portions of the report and the top shows all the advertising

23  that was obtained by the AAF that was paid for.  So in this

24  particular report all the advertisements that they had from

25  these companies at the top added up to 2.5 million dollars in

22-90507eag Doc#2441-FiledFiled02/06/25/25nteeed02/06/25/2528:09:29:19aiaDocamenTranPgjB7
from Hearing 2e4-2825 Pg 92 of 142

87

1    revenue for the AAF.

2         At the bottom of this report there's a place called

3    "Added no charge advertisers."  And you can see that includes

4    companies Mr. Dundon had an interest in like --

5         **THE COURT:**  Oh you anticipated my next question so go

6    ahead.  Dundon has an interest at least I know on a couple of

7    these.

8         **MS. WILLIAMS:**  He does in Carvana and Topgolf.  He

9    has contacts at these other ones where he was either trying to

10   get some other deal done with DCP or he just has a friend

11   there.  Mr. Dundon testified in his deposition that every

12   single person on the no-charge advertiser's list was

13   attributable to him.

14        **THE COURT:**  Okay.

15        **MS. WILLIAMS:**  That he went and got those.

16        These are just a couple of emails that you can see.

17   The one on the right was his -- and they weren't even on the

18   report so this is a separate issue.  Invisalign was a sponsor

19   of the Carolina Hurricanes and Mr. Dundon went through the

20   Carolina Hurricanes' GM to offer them as a sponsor of the

21   Carolina Hurricanes' free advertising with the AAF.

22        On the left is a friend of his who had some kind of

23   movie coming out and Dundon went out of his way to follow up

24   with this individual several times, not just about advertising

25   but you can see at the bottom he also wanted to get them

1  (indisc.) at the end game and his friend responds, "I love

2  free," and then continues to follow up on, "Anxious to be able

3  to do this deal you sent me."

4          THE COURT:  And what does this show the Court?  The

5  import of these?

6          MS. WILLIAMS:  The import of these is that Dundon is

7  using assets of the AAF, the airtime that it otherwise could

8  have used to make revenue to give to his friends or to benefit

9  his own companies or people like sponsors of his other

10  enterprises that he'll also benefit --

11          THE COURT:  Would you characterize it as -- forgive

12  me, I'm leaning to read this.  Is it self-dealing?  How would

13  you characterize that?

14          MS. WILLIAMS:  I think it's self-dealing.  It's also

15  in some cases like Carvana and Topgolf being on both sides of

16  the transaction and having an actual conflict of interest.

17  It's also getting a personal benefit which is another way that

18  you can look at the duty of loyalty.

19          THE COURT:  All right.  Go ahead, please.

20          MS. WILLIAMS:  The next slide goes to the issue of --

21  sorry, Your Honor -- that Mr. Dundon was blocking other

22  investors in the league.  He wasn't following up with other

23  investors that had previously expressed interest.  And at the

24  time -- this is different from what he says in his depo -- at

25  the time, the implication from all the statements we have from

89

1   Mr. Dundon is, "League doesn't need any capital.  Why would I

2   talk to these people?"  The evidence also shows a theme of

3   Mr. Dundon wants control and control doesn't include adding a

4   whole bunch of other shareholders that you might have to worry

5   about or listen to.

6            At his deposition, Mr. Dundon changes his mind and

7   says, "Well, actually I wasn't going to let anybody invest

8   because I thought this thing was so messed up, no one should

9   invest in it."

10           But the important part of what he testified is that

11  from the beginning when he took control, he was never going to

12  let anyone else put any money in this.  And that becomes really

13  problematic when you pair that with his understanding that he

14  wasn't going to provide the 250 he had told everyone.  And it

15  gets even more problematic when we get towards the end and we

16  have Mr. Ebersol sending notes that say, "Look, we have to

17  finish the first season, we're going to lose all this value in

18  the player contracts, we're going to lose all the leverage,

19  we're going to lose all the momentum, we're going to lose all

20  the value and we only need four million dollars.  Mr. Dundon

21  won't even talk to the people who are interested in putting

22  that money in; instead, he wants to shove it into Chapter 7.

23  And those are things that don't make sense, from a business

24  standpoint, but beyond that, we allege that the evidence shows

25  it's in bad faith and it was to benefit Mr. Dundon and DCP to

22-50078-cag Doc#441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 95 of 142

90

1  get out of putting the rest of the money in that he didn't want

2  to put in for whatever reason anymore.

3         Here's another example of that.  This is right after

4  operations have been suspended and I think maybe the day the

5  bankruptcy was filed or the day before.  It's an email from

6  Dave Patrak (phonetic) and he was one of the early investors in

7  the AAF.  He was one of the people that when Mr. Dundon took

8  control, he wanted to make sure, kind of got sidelined.  And

9  Dave Patrak tried to come back and help at the end to stop what

10 he and Mr. Ebersol are saying in emails.  "It's going to be

11 catastrophic."  And he says there was a deal to be made of a

12 little more time but not with threats and trying to bully the

13 guys who holded [sic] the cards.

14         **THE COURT:**  So this is from this gentleman to

15 Charlie.

16         **MS. WILLIAMS:**  It's to Charlie.

17         **THE COURT:**  Okay.

18         **MS. WILLIAMS:**  After (inaudible).  There's evidence

19 and it's a little convoluted to go through because a lot of

20 it's in texts but it is in the record.

21         At the end, after Mr. Ebersol sends an email that we

22 probably cite 20 times in the response brief, sends an email to

23 Mr. Dundon and Mr. Zutter and says, "Here's all the options of

24 how we can avoid this bankruptcy, avoid breaching the player

25 contracts, avoid losing all the value here, we need -- and

91

1  there were several scenarios.  I believe the lowest was -- well

2  I think the lowest was to hurry up and finish the season

3  instead of continuing to go on.  So like declare the regular

4  season over, hold one playoff game and at least you finished

5  the first season.

6          THE COURT:  Well didn't they actually have a playoff

7  game at some point?  No.

8          MS. WILLIAMS:  I don't think they did.  No, Your

9  Honor, they --

10          MR. UNIDENTIFIED:  (inaudible).

11          MS. WILLIAMS:  -- they just ended the regular season

12  right before the playoffs.

13          THE COURT:  Okay.  I must be confusing this with one

14  of the other leagues where they folded and they said the heck

15  with it, we're going to have a playoff.  So my apology.

16          MS. WILLIAMS:  That's one of the things Mr. Ebersol

17  was pushing for but he also had scenarios where for as little

18  as four million more, a schedule could be made that would get

19  the league out.  And as part of that Mr. Ebersol is reaching

20  out to people like Mr. Patrak and others who had previously

21  invested in the AAF or expressed interest and were told to go

22  away after Dundon's commitment.  And Mr. Dundon didn't move

23  forward with those, we contend didn't make serious

24  consideration of that.  And I think his testimony backs that up

25  where he says he was never going to let anybody do anything, he

Case 22-50073 Doc#2441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript of Hearing 24-1365 Pg 97 of 142

92

1  was going to put it into Chapter 7 instead.

2        Go to the questions on marketing, Mr. Vate (phonetic)

3  was --

4        **THE COURT:**  Excuse me.  Just help me out.

5        **MS. WILLIAMS:**  Yeah.

6        **THE COURT:**  Just -- you know, the argument is one of

7  the things that's been in and out of the pleadings over time is

8  that he wrestled control, he never -- forgive me.  Mr. Dundon

9  wrestled control away from Mr. Ebersol, that he never had the

10  intention of filling his obligations to fund the League as

11  agreed upon, as you allege, that really he took an initial look

12  at it and fairly quickly reached a conclusion to file Chapter

13  7, file bankruptcy.  What's the benefit to him for doing all

14  that?

15        **MS. WILLIAMS:**  The benefit is not having to fulfill

16  the commitment he made.  One of two things, right.  He was

17  either going to have to fulfill, if the League survived,

18  continue to fulfill the commitment he made to the League if he

19  wanted to stay in control.

20        Or he was going to have to dilute his shares and let

21  other people come in and either have more people to answer to,

22  which he didn't want, or to lose control, which he also didn't

23  want.  He didn't want to be a minority owner.  he didn't even

24  want to be a barely majority owner.  He wanted to be the only

25  person involved.

93

1    And the evidence as a whole when you look at it,

2    shows that he got in, even before he got in, he and Zutter were

3    talking about what they really wanted was an asset deal.  What

4    they really wanted was to acquire AAF in the way that they

5    wanted to acquire it with assets, no liabilities, no other

6    shareholders, no commitments to anyone other than Dundon had

7    bound them to.

8    He came in and had a problem with everything.  He had

9    a problem with the contracts negotiated with the media.  He had

10   a problem with the contracts that had been negotiated with the

11   NFL.  He had a problem with the player contracts.  And so their

12   view, from the beginning appears to have been and I'll show you

13   in a second, it comes up constantly on February 26th, so by

14   everyone's content, Dundon and Zutter are already in charge of

15   the League, they don't even dispute that at this point in time.

16   What happens is a prior investor raises an issue

17   related to his prior investment.  And they're talking -- the

18   AAF people who are talking about this lawsuit are saying to

19   Zutter and Dundon, hey, can you help recommend counsel.  And

20   Zutter's response is, we can help with cheaper counsel, but the

21   question for me is, do we want to be involved at all, or do we

22   evaluate buying the assets and leaving this liability behind.

23   At this point, they are in charge of the League.  And

24   instead of addressing the situation the League is faced with,

25   instead Zutter is saying, do we even want to be involved.  What

Case 22-50087-eag Doc #2441-1 Filed 02/06/25 Entered 02/06/25 23:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 99 of 142

94

1   do you want to be involved, you are in control of the company.

2          **THE COURT:**  Yes, I understand what your argument is.

3   He's out $70 million, right?

4          **MS. WILLIAMS:**  Well, he took a 70 million write off

5   against other things and our tax expert --

6          **THE COURT:**  Okay.

7          **MS. WILLIAMS:**  -- has testified -- has a report and

8   we have some documentation about that.

9          **THE COURT:**  But remember, I'm a simple man.  So

10  indulge, just indulge me.

11         **MS. WILLIAMS:**  Sure.

12         **THE COURT:**  So I've been trying to think in listening

13  to your arguments it seems, it doesn't make sense to the Court

14  that accepting everything that you're saying is he goes in and

15  says the heck with this, I'm pulling the plug.  He still had

16  $70 million.  You acknowledge that, right?

17         **MS. WILLIAMS:**  I do.  But he also has the potential

18  180 million on the horizon that he's going to have to commit.

19         **THE COURT:**  Fair enough.  So basically I'm not going

20  to throw any more bad money after the 70 I've put in.

21         **MS. WILLIAMS:**  I'm not and I'm going to take a loss

22  and that's not insignificant, because the way that Mr. Dundon

23  runs his companies all of the losses roll up to Mr. Dundon

24  individually.

25         **THE COURT:**  Okay.  So that's the missing piece of the

95

1   puzzle.  I don't -- did you plead this?  Because --

2          **MS. WILLIAMS:**  I don't think we knew that when we

3   pled, but it's in the evidence --

4          **THE COURT:**  Okay.

5          **MS. WILLIAMS:**  -- in our tax expert's report and we

6   have now have the tax returns that show that it's rolling up.

7          **THE COURT:**  Okay.  So you contend, this is going to

8   be your allegation, I'm not making any findings that in

9   response to my question, because frankly, you want me to say

10  this, I've always been puzzled by the allegation is he comes

11  in, he puts $70 million in, we're not disputing that.  We can

12  make the argument about was it in furtherance of the 250,

13  independent of the 250, whatever it may be, at the bottom line

14  $70 million is put in.  In today's world, that's not an

15  insignificant amount of money.

16         And so I've always questioned internally, okay,

17  accepting everything is true, what benefit did he get, assuming

18  you're -- giving you the benefit of the doubt that he

19  immediately was going to pull the plug.  That he initially

20  reached the decision, I'm just pulling the plug.

21         And so you've given me one thing to think about it

22  is, he doesn't have to pay the 180, except in your theory and

23  then secondarily, you're going to be telling me if we get to

24  trial that really he looked it over and said I can get a tax

25  benefit out of this.

22-90507-cag Doc#441 Filed 02/06/25 Entered 02/06/25 28:09:29:19 Main Document Transcript from Hearing 2-4-2025 Pg 101 of 142

96

1         **MS. WILLIAMS:**  Right.  And there's a third option,

2   Your Honor.

3         **THE COURT:**  Enlighten me.

4         **MS. WILLIAMS:**  Which is the plan wasn't to go in and

5   hurt the League and throw it in Chapter 7 and have no one get

6   anything.  The plan was to turn this purchase, however you want

7   to call it, the plan was to turn the majority control and the

8   Board control that Ebersol gave him into an asset deal, into a

9   NCA 272, Mr. Zutter starts talking about a prepackaged

10  bankruptcy.

11        **THE COURT:**  Okay.  To sell to someone else?

12        **MS. WILLIAMS:**  No, it is sold to Dundon.

13        **THE COURT:**  Okay.

14        **MS. WILLIAMS:**  He wanted an asset deal.  He didn't

15  want what he got.  This wasn't a means to an end is our

16  allegation.  He wanted to get all the things and run it his way

17  without having to have the media contracts, without having to

18  have the things he didn't negotiate, without having to have any

19  other shareholders.

20        **THE COURT:**  But he would've terminated all the

21  contracts.

22        **MS. WILLIAMS:**  Correct.  And let me go back, Your

23  Honor.  there was one I skipped over, CA86, this is Zutter and

24  Mr. Dundon talking about this NFL media deal.  There's others

25  about other media deals that are in the appendix.  Bottom line,

22-50078-cag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 102 of 142

97

1  if you want to enforce the renegotiation of this, we need to do

2  an asset deal, not assume the contract and then go back to them

3  and start over.

4          **THE COURT:**  Just reject all the contracts --

5          **MS. WILLIAMS:**  Yes.

6          **THE COURT:**  -- and start over.

7          **MS. WILLIAMS:**  This is a theme throughout.  We can

8  see --

9          **THE COURT:**  And I'm not making any findings, I'm just

10  asking questions.

11          **MS. WILLIAMS:**  No, I understand, Your Honor, but yes,

12  that's what the evidence shows is that in the background,

13  whatever else may have been going on --

14          **THE COURT:**  Mr. Farahi is ready to jump out of his

15  shoes, but don't, Mr. Farahi.  Let her talk.  Let her talk.

16  Because you -- you know, at the end of the day I had a -- as an

17  aside, I had a law clerk several years ago did not work on this

18  case and his focus was always, what was the tactics, Judge, put

19  aside the law.  Why are they doing this, I don't understand why

20  they're doing this.  And of course we're all constrained by

21  what the statute and the rule of the law says.

22          And so you've touched on something that I've thought

23  about on and off over the years about, you know, the average

24  Joe, if I said to you, hey -- Judge Clark had a great analogy,

25  the average person in front of the Alamo and I said to them,

22-90378-cag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 18:09:29 Main Document Transcript from Hearing 2-4-2025 Pg 103 of 142

98

1  hey, would you put $70 million into something and then

2  immediately file bankruptcy, would you do that with the

3  understanding you might lose your investment.  And they all

4  would say of course not.  That's a lot of money.

5       But as you've explained, your theory is, that's not

6  really what was going on here, that's your argument, right?

7       **MS. WILLIAMS:**  Correct.  But then his actions that he

8  took caused it ultimately to go into Chapter 7 because

9  obviously for whatever reason it didn't go the way he wanted to

10  get into this asset deal.

11       **THE COURT:**  Just one last thing and then we'll get

12  back to the argument.

13       **MS. WILLIAMS:**  Yes.

14       **THE COURT:**  And I think actually, Mr. Lowenstein and

15  Mr. Hockaday, on occasion will share what I'm thinking, and so

16  I'm sharing with you all what I'm thinking whether it's good or

17  bad.  The other thing is, you talk about the assets, what are

18  we really talking about?  We had equipment, right, because the

19  League owned the teams, right?

20       **MS. WILLIAMS:**  Correct.

21       **THE COURT:**  So the League owns, which is an

22  interesting concept, so any contracts we had, any commercial

23  revenue we had, the physical assets were frankly fairly

24  limited, equipment, TVs, things like that.  But what hard

25  assets were there beyond it?  They didn't own real property it

2:19-cv-00787-eag Doc #:441-1 Filed: 02/06/25 Entered: 02/06/25 18:09:29 Main Document Page 99 from Hearing 2-4-2025 Pg 104 of 142

99

```
 1   was just personal property.

 2          MS. WILLIAMS:  They have the contracts for the --

 3          THE COURT:  They're jumping out of their shoes there

 4   and --

 5          MS. WILLIAMS:  Well, he wants me to talk about

 6   something that I'm --

 7          UNIDENTIFIED:  I was instructed to put that piece of

 8   paper in front of her, Judge --

 9          THE COURT:  All right.

10          UNIDENTIFIED:  -- and I seriously --

11          THE COURT:  It's one of these moments you just want

12   to focus on, you don't care what anyone else is saying, you

13   really want to just focus on what --

14          MS. WILLIAMS:  I actually really want to say what he

15   wrote down, but I'm not a hundred percent sure it's in the

16   summary judgment record and I need to make sure it is before I

17   say it to you, Your Honor --

18          THE COURT:  Okay.

19          MS. WILLIAMS:  -- which is why.  But the player

20   contracts, and in fact, in the summary judgment evidence there

21   is a memo from the general counsel of AAF talking about the

22   value of the player contracts and how this could have been

23   handled so that those contracts were merely suspended and not

24   breached.

25          And the reason they were important is they contained
```

1    exclusivity deals for all of those hundreds of players.  Where

2    if they wanted to go to, for the XFL, for example, which was

3    restarting back up at the time --

4            **THE COURT:**  Right.

5            **MS. WILLIAMS:**  -- if they wanted to do that, we had

6    them under contract so we could get money for that.  And

7    there's a lot of evidence from Mr. Ebersol and others that

8    those were probably the biggest asset that the League had.  But

9    the way that it was put into the bankruptcy took away any

10   argument that those had not just been breached and rejected,

11   leaving everyone free to do whatever they wanted to do with no

12   renumeration to the League.

13           **THE COURT:**  So you probably picked up on that I love

14   sports, I just love it.  I love my sons dearly, but we don't

15   talk sprots at all.  If we're going to talk cars or hunting or

16   guns, oh, then I've got their attention.  But if it comes to

17   sports they're not much interested.  And, of course, it doesn't

18   matter to me because I'm proud of them because they're good

19   people.

20           But I'm just riveted by this discussion.  And so your

21   contention is and I purposefully use the word, and I haven't

22   thought about this, is that really, and it makes sense on some

23   degree, again not a finding that they could monetize these

24   contracts.  Because I've always operated and I'll share this

25   with you, you're Jonathan Farahi and you were -- you played at

101

1 a -- you played football all your life.  Weren't good enough to

2 go to the NFL, but that was what you did your whole life and

3 then you realized that you aren't going to get drafted, you've

4 now got to go to law school and become a great lawyer.  Okay.

5 All well and good.

6        But then whenever it is, you get a whisper in your

7 ear, would you like to play football again and if you play

8 football again you might get a chance to get into the NFL.  I'm

9 sure all these guys were out of their mind with the prospect of

10 realizing their life's dream.

11        And so then we have the League and all that, and --

12 but the curious thing I hadn't thought about, to your credit

13 is, what the value of these player contracts is.  Because

14 you're right, a lot of these guys may have never seen the NFL,

15 but we've seen multiple leagues start up since.

16        **MS. WILLIAMS:**  We do.

17        **THE COURT:**  This demise of this league where these

18 guys could have gone and played somewhere else.

19        **MS. WILLIAMS:**  And also it's not nothing that on the

20 NFL practice logs, maybe they're never going to play on the

21 team, but the NFL practice logs are, I mean, they could have

22 been released a couple of times, that happened this year,

23 calling guys up who are sitting on the couch or working at an

24 investment firm, because they need people on the practice

25 field.

1    **THE COURT:**  Right.  And you're probably making decent

2  money then.  I mean not -- you know, you can beat up in

3  practice a few times and come home and do pretty well.  All

4  right.  So I'm sorry to get off on this but.

5    **MS. WILLIAMS:**  No, it's no problem, Your Honor.  But

6  talking about other assets and I know this came up Friday,

7  there were the technology assets and the --

8    **THE COURT:**  Right.

9    **MS. WILLIAMS:**  -- plans they were working on and all

10  of those things.  And I understand they went to MGM, right?

11    **THE COURT:**  MGM for a fairly --

12    **MS. WILLIAMS:**  MGM.

13    **THE COURT:**  -- nominal price.

14    **MS. WILLIAMS:**  Very little cash, but a pretty

15  significant claim reduction.

16    **UNIDENTIFIED:**  Yeah, it was -- just to be accurate,

17  Your Honor, I think maybe $125,000 cash and a 2 million

18  reduction in the claim.

19    **THE COURT:**  Right.

20    **UNIDENTIFIED:**  They were secured in the property,

21  that's the best we could negotiate in Chapter 7.

22    **THE COURT:**  Not criticizing your decision, just

23  technology and what you got for it.

24    **MS. WILLIAMS:**  Correct.  But that's not the end all

25  be all of that question because the breach of fiduciary duty

22-50578-cag Doc#2401-2 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Transcript
from Hearing 2-4-2025 Pg 108 of 142

103

1  question issue is at the time it was breached.  And one of the

2  decisions that's in the evidence that Mr. Dundon made was we're

3  not going to focus on the technology, we're not going to focus

4  on the setting thing like he quit putting resources into that,

5  he even said he didn't think, he was interested in the live

6  play not that.

7         And so the contracts that they had with the NFL to

8  facilitate that, kind of go by the wayside, the discussion

9  they're having with MGM which I may not have in here goes by

10 the wayside.  Mr. Dundon's blowing up contractual relationships

11 left and right that are key to these long term plans of the

12 League.

13        And so to say well when we finally got to Chapter 7

14 and everything had blown up and nothing had been put into this

15 and the partners, including MGM are being upset by Mr. Dundon's

16 actions, to say well then it wasn't worth anything isn't

17 evidence.  But it wasn't at the time that Mr. Dundon got the

18 League before he made all of these decisions.

19        **THE COURT:**  Okay.  Go back to your argument, please.

20        **MS. WILLIAMS:**  I'm trying to remember where I was,

21 Your Honor.

22        I don't want to repeat myself, so I'll cover some of

23 these.  One of the things Mr. Dundon came in and very quickly

24 did is cut off advertising revenue entirely.  You could already

25 see from the media deal e-mail he started questioning all the

22-50978-Craig Doc#2441-1 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Pg 104
from Hearing 2-4-2025 Pg 109 of 142

104

1    media deals and saying, do I even really have to do this.

2          He also directed there to be no advertising spending

3    in any way.  This e-mail that I'm showing that's confidential

4    Appendix 90 and 91 is from Tom Deit, who is the principal

5    marketing and sports side operation guide at AAF.  He has a lot

6    of experience in a lot of different sports leagues around the

7    world and they hired him to come in and be the expert on this.

8          And he, this is just one of the several e-mails,

9    where he is pleading with everyone, including Mr. Dundon and

10   Mr. Coolis (phonetic) who's on the DCP team, that we can't get

11   people to these games, we're not running any advertising

12   anymore.  We have a company directive on expenses.  You're not

13   paying our debts and so the media companies don't want to work

14   with us, they don't want to run our ads.  And of course, you've

15   also got Mr. Dundon running ads for Topped Off and Carvana

16   instead of advertising the League itself, which is another

17   thing that could have been done with those resources.  And

18   we're not paying these debts.

19         And you can see if we go back to where I was talking

20   about all the bankruptcy discussion e-mails, this one where he

21   says -- Tom Dundon says, are we better off doing a legal recap,

22   which I think is short for recapitalization.  And then Zutter

23   says, do you mean a prepackaged bankruptcy.  This is the line

24   of e-mails where they're talking about Dundon came in, demanded

25   the AAF team renegotiate all their contracts.  The AAF team

1    went and did that and part of the deal was, we're going to

2    renegotiate them and say that we're going to pay people.

3              And you can see from Vanderbilt's e-mail below and

4    again, Vanderbilt is on the DCP team, they're pushing that we

5    pay the negotiated amount ASAP as the promise for timely

6    payment was vital to getting the respective vendors to agree to

7    a discount.

8              So the team's done what Dundon asked, they've

9    renegotiated, they've gotten in some instances discounts, it's

10   time to pay and Dundon still doesn't want to pay.  Now we're

11   talking again about prepackaged bankruptcy.  Even with

12   discounts and promises to pay.

13             These are not insignificant vendors.  I mean we're

14   talking about the media and other folks that Mr. Deit was

15   talking about.  We're talking about stadium security.  There's

16   e-mails in the summary judgment record that it got to the point

17   where the night before a game the DCP team is telling AAF

18   operations, you might not have any security at your football

19   game because we're refusing to pay it, even after you

20   negotiated down with them.

21             So these are not e-mails of someone acting in good

22   faith to keep the League operating or to preserve the value of

23   the assets.

24             I think we talked about all the -- oh, one more and I

25   think Mr. Farahi, he showed you this one earlier, but I think

1   it's important enough that I show it again, CA85 on the left is

2   Dundon talking to Zutter.

3         And one of the deals that was sort of a linked media

4   investment deal was CBS was going to make an investment in the

5   AAF.  And part of their payment for that investment was some of

6   these media related time slots.  And if you'll recall the AAF

7   had actually some pretty prime TV space, especially for its

8   first game.

9         And so CBS is already performing under this term

10   sheet by playing the games.  And Dundon doesn't want to sign

11   the rest of the deal where they're going to get to be an

12   investor.  And this is the one where Mr. Dundon says they have

13   to be diluted from here by the 250 or it's not fair.  We've got

14   to figure this out.

15         And this was a very long discussion.  It's important

16   for the 250 number because there's no reason to be diluting

17   CBS's investment by an amount that Mr. Dundon hadn't committed

18   to invest.  And then when we go to the right, we're still

19   talking about this four days later.

20         If you read all of the chains, I mean, Charlie's

21   saying you can't blow it, Mr. Ebersol saying you can't blow up

22   this deal with CBS, it's a really important partner.  We have

23   this discussion, this was already all but signed.

24         And Mr. Zutter writes back on this one, my current

25   understanding is in the absence of a subordination agreement,

22-90378-cgag Doc#2401 Filed 02/06/25 Entered 02/06/25 09:19:14 Main Document Transcript
from Hearing 2-4-2025 Pg 112 of 142

107

1   and them agreeing to the deal as presented, we're not going to

2   fund for their money.

3          So here again we are on February 25th well past when

4   Mr. Zutter and Mr. Dundon admit that they're in control,

5   wanting to jettison this other shareholder and important deal.

6   And I'm sorry, they're right is about MGM.  They're similar

7   paths.  The rights about MGM.

8          So threatening relationships with CBS and MGM,

9   because Mr. Dundon either wants them diluted by the 250, he now

10  claims that he should never have had to invest or he wants them

11  subordinated to him.  And he's going to threaten not to put

12  money that the League needs to operate from DCP, even after

13  he's in control.

14         This is an actual conflict of interest.  This is both

15  sides of the deal, this is getting a personal benefit.  This is

16  all of the things that put it in the entire fairness

17  transaction column, Your Honor.

18         Okay.  So that sort of wraps up duty of loyalty and

19  I'm happy to answer questions if Your Honor has them.

20         The next argument that they made was related to

21  whether any of these breaches of duty can co-exist with

22  contractual duties.  And there's sort of three different issues

23  going on here.

24         The first is, Mr. Zutter is not a party to any

25  alleged contract.  It was only ever done in a DCP and if the

22-50578-cgb Doc#2441-1 Filed 02/06/25 Entered 02/06/25 09:19:14 Main Document Transcript 08 from Hearing 2-4-2025 Pg 113 of 142

108

 1   written contract claim goes away it's only Dundon.

 2          So Mr. Zutter has no contractual duties with which

 3   these breaches of fiduciary duty can conflict or somehow be

 4   subsumed by.

 5          Mr. Dundon disputes that the oral agreement exists

 6   and none of these breaches of fiduciary duty were related to

 7   the written term sheet.  Some of them are related to the $250

 8   million commitment, but Mr. Dundon can't dispute he even had a

 9   commitment for that and then turn around and say and also I

10   can't have any fiduciary duties based on that.  It's not

11   subsumed to a claim you don't admit exists.

12          But setting those two things aside, Delaware law,

13   which is what applies here because they're directors of a

14   Delaware chartered company, Delaware law says you can have the

15   same set of conduct, bring both a contract and a breach of

16   fiduciary duty claim, there just has to be some minor

17   difference.

18          So, for example, Shash (phonetic) at the bottom says,

19   you can have additional facts, you can have a broader scope of

20   what you're arguing, or you can have different remedies.  So

21   even if you have the same or similar conduct, if there are any

22   differences like that, then you can have both of these things

23   co-exist.  And then, of course, we have the damages piece which

24   I'll get to in a minute.

25          But here additional facts, so we don't just say

1  Dundon didn't pay the 250 and he should have.  We say Dundon,

2  at least at some point, had no intention of paying the 250 and

3  didn't disclose that to anyone, didn't follow up on any of the

4  investors that were offered, was unwilling to take money from

5  other people, was unwilling to look at other things that could

6  help save the League.  So he's acting as if he's going to, not

7  telling anyone he's not going to, despite having told everyone

8  he was going to before and then doesn't.

9          And that's a different kind of harm to the League,

10  because as Your Honor could imagine, had Mr. Ebersol had known

11  on February 15th or February 20th or March 1st that Mr. Dundon

12  wasn't going to pay the 250, had no intention of ever doing it,

13  and this again is something that will be talked about more on

14  trial, there are things that could have been done.

15          On April 4th when the League is already suspending

16  operations and jettisoning all the contracts of the players and

17  everything else, there's nothing to be done at that point.  So

18  if Mr. Dundon had disclosed or acted in a manner that was the

19  manner anybody would have acted that made sense, if he knew

20  that wasn't what he was going to do, stay true to that

21  commitment, that's different from just breaching the

22  commitment.

23          And we're not claiming that at trial if you find on

24  the oral agreement that we're going to get duplicative damages,

25  but again they're congesting all of that.

22-50578-cag Doc#2440-1 Filed 02/06/25 Entered 02/06/25 09:19:19 Main Document Pg 10
from Hearing 2-4-2025 Pg 115 of 142

110

1              I also want to point out, and Ms. Clark talked about

2    this a little bit when -- she talked about economic loss, but I

3    think it's important just because it got brought up again in

4    this argument.

5              If you look at our damages, which we repled after

6    Your Honor's motion to dismiss decision, they start at

7    paragraph 175 and they go through paragraph 178, it's three

8    whole pages of the complaint.

9              And it discusses all of the injuries independent of

10   the contractual harms.  So it talks about in paragraph 176

11   Dundon and Zutter's actions including the abrupt cessation of

12   advertising and technology activities, declining of

13   opportunities like the PAL agreements, the NFL/PA deal,

14   partnership with the NFL, all of these things.  It talks about

15   Dundon's refusal to explore alternative financing options or

16   revenue options, eroding the League's enterprise value, causing

17   the League's bankruptcy, substantial depreciation and ultimate

18   destruction of enterprise.  There's all these things listed

19   specifically in here.  Those are not contract damages.

20             And then in 178, which is the paragraph that actually

21   ties in their motion, we say, because defendants are disputing

22   the enforceability of the contracts, these additional damages

23   are alternatively breach of fiduciary duty.

24             So there's a whole two and a half pages of all the

25   things that happened due to this conduct that aren't the

22-50073-cag Doc#441-1 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Transcript from Hearing 2-4-2025 Pg 116 of 142

111

1  contractual 180 million and then there's an alternative

2  reference to that 180 million because there's a dispute here

3  about whether we even have a contract claim or not.  And even

4  though we think we do, we have an obligation to protect the

5  trustee's arguments on that point.

6       I'm nearing the end, Your Honor, if anyone's worried

7  about a break.

8       **THE COURT:**  Yes, that would help the Court and I'll

9  explain why in just a minute.

10       **MS. WILLIAMS:**  Okay.  Do you want me to stop or

11  finish?

12       **THE COURT:**  No, if you're going to get a couple of

13  more minutes, we're good.

14       **MS. WILLIAMS:**  Okay, perfect.  I want to briefly

15  address this timing issue, Your Honor, because specifically as

16  to the Fowler release, which is the release the League gave to

17  Mr. Fowler.

18       There's an argument made by Dundon that he did not

19  have control of the League before that happened.  And that

20  happened on -- let me look at the date, February 23rd.

21       So our contention and what we believe the evidence

22  showed is that Dundon had control, as early as February 14th at

23  least on February 15th.  And certainly before February 23rd

24  when the Fowler release became effective.

25       And what's important here because what Mr. Dundon and

1   Zutter are citing is the day of that official Board resolution,

2   which is February 24th I believe.  That's not the standard for

3   when you have a duty.  Fiduciary duties are established upon

4   control, which can include control of the Board, which is shown

5   by those official documents on that day or evidence of actual

6   control over operations.

7           We cite in our brief the Tornetta v Musk (phonetic),

8   which is 130 pages.  I would go to the PIN site on that one.

9   And we have a lot of evidence that they took over immediately.

10  A couple of the cites on my slide are transposed and I

11  apologize for that.

12          But confidential Appendix 1027 to 1028 in particular

13  talks about how they took control almost immediately.  Dundon

14  testified that he had control no later than February 20th.

15  There's an e-mail that says, all contracts of AAF have to go

16  through DCP.  That's a February 20th e-mail.  We've got the

17  folks that worked at AAF saying in that first week it was made

18  clear to them that all expenses and decisions were going

19  through Dundon and Zutter.

20          And also I wanted to point out, this is in our

21  Appendix 140 to 41, it's one of the quotes from Mr. Dundon in

22  an interview he did with Rich Eisen (phonetic).  The quote is,

23  and so within 24 hours we had a deal done where, you know, I

24  took control of the League in the sense of, you know, I'll put

25  up the money and I get to make the decisions.

1      So Mr. Dundon specifically has testified that he had

2   control of the League within the first 24 hours.  The February

3   20th quote was when I asked Mr. Dundon, there was a press

4   release that went out on the 20th and I said,

5              "Were you control of the League when this

6              press release went out?"

7      And he said,

8              "Yes."

9      So it's very clear on the 20th, but we also have

10  testimony that it was even shorter than that.  It was 24 hours.

11      And so he did have duties as to the Fowler release.

12  He's actually in control.  Him and Zutter are actually in

13  control when this happened on February 23rd.

14      The other thing they try to argue other than timing

15  is, well we didn't have anything to do with this because it was

16  approved in a Board resolution that we didn't signed, because

17  weren't formally on the Board.  They don't use the words

18  abstention doctrine but that's what the words are for that.

19  That's what the cases that they cite talk about.  And you can

20  only apply the abstention doctrine when one of the cases they

21  cited from the Chancery Court, says you play no role and you

22  totally abstain from anything to do with it.

23      And the evidence is not that Dundon and Zutter were

24  playing no role.  The evidence including testimony from

25  Mr. Ebersol and some e-mails is that Dundon and Zutter were

1   again threatening to withhold any other funding from the League

2   until this got done because they wanted it done.  And Ebersol

3   said they directed him to get it done.

4           So that's not playing no role.  Maybe that's a fact

5   issue as to what their role was or not, but that's not playing

6   no role, that's not the abstention doctrine and they were

7   actually in control of the League at that time.

8           All right.  The only thing that leaves, Your Honor,

9   is the unjust enrichment claim, which I don't think I need to

10  belabor because it's some of the same things we've been talking

11  about, about the taxes and their interest in DCP, the saving of

12  having to put any more funds in.

13          I will just say the argument of the defendants seem

14  to be less, there's no way you could have an unjust enrichment

15  claim because we agree it's alternative to the breach of the

16  contract claim.  Your Honor already found that.  We're not

17  arguing it's not a separate one.

18          They seem to be just saying, we don't think we got

19  anything of value.  And that's not a summary judgment issue,

20  the determination of value whether there was a benefit from

21  those tax write offs, whether there was a monetary equivalent

22  of that advertising, whether there was benefits to other things

23  that they did with AAF including routing funds right before the

24  bankruptcy to DCP instead of to AAF operations for those

25  quote/unquote transaction costs.

1          All of those things are something and there's just a

2     dispute as to their value.  And if they want to say they have

3     some kind of $70 million offset for the loss, again, argument

4     about value and not a summary judgment issue, Your Honor.

5          And if Your Honor doesn't have any questions, that's

6     what I have.

7          **THE COURT:**  Thank you.  We need to take a break.

8     This is because my ERO needs to do some internal work for back

9     up.  Every day we have to settle up on any money that comes in,

10    that requires two people.  And so he needs to fulfill that

11    obligation.  So we're going to take a short recess to allow

12    that to happen and then I'll let the defendants respond.  I'm

13    guessing ten minutes or so.  So that's why we're going to take

14    a break.

15         So recessed for about ten minutes or so.  Thank you.

16         **THE CLERK:**  All rise.

17    **(Recessed at 4:26 p.m.; reconvened at 4:46 p.m.)**

18         **THE CLERK:**  All rise.

19         **THE COURT:**  Okay.

20         **MR. HOCKADAY:**  Just looking at the time.

21         **THE COURT:**  Do you have enough time to finish?

22         **MR. HOCKADAY:**  Yes, I believe so.

23         **THE COURT:**  Okay.

24         **MR. HOCKADAY:**  Thank you.

25         **THE COURT:**  Go ahead, please.

1      **MR. HOCKADAY:**  Yes.  Thank you, Your Honor.  May it

2  please the Court.

3          Your Honor, I want to let this set for a second.  Tom

4  Dundon invested into the AAF because he loved sports, just like

5  you.  He was presented an option, it was an exciting

6  opportunity, and he invested into something that turned out to

7  not be what he was promised.  And that's effectively why we're

8  here.

9          Now, I heard a lot of -- I'd be remiss if I didn't at

10  least address a couple of the things that were discussed in the

11  last iteration here and if I understood Your Honor looking at

12  what kind of these motives or these benefits are, I just want

13  to address those here briefly on the front end and I think this

14  is relevant to the fiduciary duty claim, which I'll get to in a

15  second.

16          The first was this idea that there was a benefit by

17  not having to pay the additional annuity.

18      **THE COURT:**  I asked him what the thinking was on

19  that, so go ahead.

20      **MR. HOCKADAY:**  Yes.  So first off, I don't know how

21  the math works where it's okay to lose 70 but not 250 and

22  you're kind of playing in the negatives, but regardless if that

23  is what you're focusing on that is purely a remedy found in

24  contracts and that fits squarely within Delaware's exclusion of

25  contract benefits.  That does not include that additional facts

1    or those additional things that can be alleged or shown that

2    would allow something to go beyond that.

3           Effectively what I understood Ms. Williams to be

4    arguing was this idea that if the events come out of the common

5    I think it's nucleus of operative facts, if it's the same

6    nucleus of operative facts and that includes a contract, it is

7    a contract damage.  You have to plead or assert something in

8    addition to that.  And as it pertains to the 180, that is pure

9    contract.  That's the only way you get there is if there was an

10   oral contract.

11          The second was this tax benefit.  Now, the only

12   actual evidence in the summary judgment record are their expert

13   reports and the cites to the expert reports are, a lot of them

14   is the actual complaint allegations, it's not actual evidence.

15   But as it pertains to the tax thing, to your point, Your Honor,

16   the reason why you're asking that question to yourself and

17   perhaps others is because it does make no sense.  Nobody loses

18   $70 million for the purpose of getting some sort of credit or

19   an offset.  If you look at the actual raw dollar amount of

20   Mr. Petrocelli's (phonetic) report, it's showing potentially a

21   $14 million offset.  I think the raw numbers are 1 million.  I

22   know of no mathematical equation where 1 million, 12 million,

23   14 million are greater than 70 million to arise to such a

24   benefit or a motivation for it.

25          And the final piece was this asset sale.  I know we

1    saw some emails between Mr. Zutter and Mr. Dundon.  A lot of

2    these occurred right after it came in.  What happened --

3          **THE COURT:**  Okay, right after it came in, I didn't

4    understand.

5          **MR. HOCKADAY:**  Sorry.  Right after the investment was

6    financed.

7          **THE COURT:**  Okay.  Go ahead, sir.

8          **MR. HOCKADAY:**  Yes.  Thank you.  Sorry, it's the end

9    of the day.

10         One of the things that any business does when it

11   comes into a new operation or a new opportunity is it has to

12   see what it has.  And if you recall from Friday when we were

13   talking about the contract issue, one of the things that forced

14   the rush of this was the League was going to fail if we didn't

15   come in and do something.  So we didn't have the opportunity to

16   look under the hood until we were -- until the term sheet was

17   already entered and we started looking at everything that went

18   around.  And what the emails show that Ms. Williams focused on,

19   as well as really all the evidence -- and I actually prepared -

20   - I went through all the footnotes that addressed fiduciary

21   duty, duty of loyalty breach, where they look at factual

22   allegations.  I will spare the Court reading through them, but

23   they related to nothing but implications.  What I heard was

24   this implicates that he could be doing this, it implicates that

25   he could be operating in his best interests.  Implication is

22-50537-cag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 09:19:14 Main Document Pg 19
from Hearing 2-4-2025 Pg 124 of 142

119

1   not proof.  It doesn't establish an element and it does not --

2   it does not defeat summary judgment and certainly if it does

3   survive summary judgment it does not defeat trial.

4          What the Trustee has done is picked and chosen --

5   it's picking and choosing random miscellaneous emails and

6   reading them together and attributing some motive to them.

7   Nowhere in any of that evidence, because I've looked at it all,

8   I've seen it all, I've been in all but one of the 20 plus

9   depositions we've had, I've taken probably half of them or

10  defended half of them, nowhere in there does it show Tom Dundon

11  affirmatively stating this, nowhere in there does it show John

12  Zutter affirmatively stating that they were trying to drive the

13  League into the ground or that they're doing this for some sort

14  of asset deal.  It just doesn't exist.  And to play the

15  speculation game as it comes to TV advertising, blocking

16  investors is just disingenuous.

17         Your Honor, the TV deal that the AAF had with the

18  League was a time buy.  Your Honor may be familiar with this,

19  but in the sports world one of the ways that leagues make money

20  is networks pay for the privilege of airing their product.

21  That's how they do it.  The demo -- or excuse me, the economics

22  in this one were completely reversed.  The AAF was paying for

23  the privilege of being on TV.

24         **THE COURT:**  I understand that.

25         **MR. HOCKADAY:**  That is a net loss.  That is not a

1    benefit.

2         **THE COURT:**  That's the chance you take to get

3    exposure so somewhere down the road you're going to get

4    revenue.

5         **MR. HOCKADAY:**  And that's exactly why the

6    advertising, Mr. Dundon did what he did with the advertising.

7    They couldn't give away the advertising space.  It was

8    completely -- it wasn't -- they weren't giving things to

9    Carvana or Top Golf or AT&T for some sort of benefit, it was

10   dead air.  Effectively it would have been Life Alert

11   commercials or what you see on YouTube TV when they do that

12   Moment of Zen.  And whenever you are presenting something to an

13   audience you want to make it look good and look professional

14   and what Mr. Dundon did was made it look like the AAF was the

15   cool kids' table.  We got AT&T investing, we got Carvana

16   investing, we've got --

17         **(Indiscernible voice)**

18         **MR. HOCKADAY:**  Advertising, excuse me, not investing.

19   Thank you.

20         **THE COURT:**  I understood what you were saying.

21         **MR. HOCKADAY:**  Again end of the day.

22         We have them advertising.  These blue chip brands are

23   putting their reputation on the line and advertising on this so

24   that would attract others.  It's the same strategy Mr. Dundon

25   has deployed with pickleball, which is one of his other

22-05078-7-cag Doc#2401-1 Filed 02/06/25 Entered 02/06/25 09:19:14 Main Document Pg 1
from Hearing 2-4-2025 Pg 126 of 142

121

1  successful ventures, and it's worked like a charm.

2       So to say that miscellaneous emails that we saw on

3  the screen that show we need to cut this or we want to do this

4  or we want to do the deal, that that means that he breached his

5  fiduciary duty is a stretch.  All it is is implication.

6       And I want to talk a little bit about the standard

7  because I think you and Ms. Williams had a nice discussion on

8  that, you know, whether it should be business judgment, whether

9  it should be the fairness, whether that intermediate one.  I

10 think perhaps Ms. Williams and I are talking past each other in

11 a sense as far as with the standard.  I would encourage Your

12 Honor to look at it like this, I don't think we are disputing

13 that some duty of loyalty potentially arose, just the duty

14 part.

15      And that was part of our original presentation when

16 we were looking at what their allegations are, what they're

17 saying.  There's no question that a duty of loyalty arose.  The

18 issue is was there a breach.  And for them to survive summary

19 judgment, and if it passes, ultimately the trial, they've got

20 to prove that there was a breach.  And here they can't do that.

21 Nothing in the summary judgment record proves that there was a

22 breach.  And the single -- the transaction language, what Your

23 Honor and the Court should look at is, okay, if a duty exists

24 and we're evaluating whether there's a breach, if we are under

25 that heightened standard that isn't business judgment then we

1   need to connect the dots between a breach and a specific

2   transaction.  That is what the Xtreme case stands for.

3           So for each one of these breaches, what transaction?

4   Okay.  If you say it was advertising, how is that a breach?

5   How did that benefit you?  How was he on both sides of the

6   deal?  Those are things that are devoid from the record is what

7   we would submit to the Court.

8           Now, the case law that was cited, I think it's the

9   *Malpiede* (phonetic), the *Bridgeport*, the *Alidina* case, each one

10  of those centered on an actual transaction.  In the *Malpiede*

11  case there was a merger and stock purchase agreement.  In the

12  *Bridgeport* case, that was an asset sale.  In the *Alidina v.*

13  *Internet.com Corp*., interesting then but it was 2002, that was

14  a tender of an offer for shares following a merger.  And in *In*

15  *Re Cornerstone Therapies*, it was a merger and stock deal.  So

16  when those Courts were looking at whether or not there was a

17  breach they were looking at it in the context of the

18  transaction and they were connecting the dots between that

19  alleged breach and that transaction and that's what we submit

20  Your Honor should do here.

21          Now, as it pertains to Mr. Zutter, I would just --

22  just to correct the record, we did move, if you look at Page 7

23  on Exhibit 10, A and B did cover the contract argument as it

24  pertained to Mr. Zutter.  And Ms. Williams is right that C

25  wasn't addressed specifically.  It does relate to the unjust

1   enrichment claim.  So the basis of their unjust enrichment

2   claim against Mr. Zutter -- excuse me.

3            Forget the screens, Your Honor.

4            There we go.

5            I was going to read it to you, but I'll pull it up

6   here in a second, but the basis of the unjust enrichment claim

7   is that it was arising from Mr. Zutter's breach of fiduciary

8   duty.  So one thing that I saw that I thought was really

9   instructive here is on one of their last slides they said they

10  don't dispute that unjust enrichment is an alternative to a

11  contract claim.  If that's the case, there's no contract

12  involving Mr. Zutter with Mr. Zutter or where Mr. Zutter is a

13  party to that is at least material to this case or part of this

14  case.

15           On the negligent misrepresentation, just because

16  Ms. Williams touched that, if Your Honor looks at the *House*

17  (phonetic) case, which is 2024 Westlaw 396609, it specifically

18  says on Page -- I do better when I have a PDF to search -- 10

19  that the plaintiff -- plaintiff's damages for negligent

20  misrepresentation are limited to out-of-pocket damages.  I

21  referenced this at the very end of Friday, if you recall, Your

22  Honor, when we were talking about negligent misrepresentation,

23  promissory estoppel, and fraud.  Just like the promissory

24  estoppel and fraud argument where you can get rid of that claim

25  altogether if it contradicts the writing of the contract,

1  negligent misrepresentation if there's no out-of-pocket

2  expenses, you can also get rid of that here.  Devoid from the

3  record is any evidence of out-of-pocket expenses that would

4  support that claim.

5         And Your Honor, I want to be mindful of the time.

6  I'm happy to answer any questions you may have or go back into

7  anything, but I know we were able to present a lot of our stuff

8  on Friday as well, so….

9         **THE COURT:**  All right.  Stay there and I'll ask

10  Mr. Engel to step to the podium for just a minute, please.  I'm

11  just trying to understand this.  Take your time, Mr. Engel.

12         **MR. ENGEL:**  Have I done something wrong, Your Honor?

13         **THE COURT:**  No.  No, of course not.

14         **MR. ENGEL:**  Excellent.

15         **THE COURT:**  So you had mentioned earlier, and I'm

16  just -- forgive me, I'm just trying to think this through.

17         **MR. ENGEL:**  Yeah.

18         **THE COURT:**  I've got three summary judgment motions

19  under submission.  The last day I'm going to rule, it may be

20  that date on March 3rd, that's the conversation I'll have all

21  morning to discuss tomorrow, how we're going to allocate our

22  resources, and this isn't your problem but this is not the only

23  game I've got going on right now.

24         **MR. ENGEL:**  Understood.

25         **THE COURT:**  But we need to get you an answer by

 1  March 3rd, I would think.  I'm not big on carrying stuff to

 2  trial, so my game plan is to get you an answer then, around

 3  then, give you the answer, see whether or not we have a trial

 4  that's left to try.  That all makes sense, right?

 5        You made the observation earlier that, Judge, I

 6  thought there was -- the term sheet was signed, it isn't, and

 7  I'm going to have to amend the complaint.  Absent an agreement,

 8  you have to file a motion, he'll get a chance to answer, so

 9  where does that put me in terms of the trial date, which is

10  March 10th?

11        Do you see where I'm coming from?

12        **MR. ENGEL:**  I do see where you're coming from, Judge.

13  I was counting in my head the number of days between then and

14  now, which is about 32 or 33, something like that.  Here's my

15  thought on it, Judge.

16        First of all, amending will probably happen, that

17  motion to amend will probably be on file, we've been thinking

18  about it and talking about how to deal with it, so it's

19  probably out the door on Thursday.

20        **THE COURT:**  You're only amending one count, correct?

21        **MR. ENGEL:**  Correct.  And it will only be basically

22  with an eraser, Your Honor.  So I don't foresee that

23  Mr. Hockaday maybe even has the right to object to that and

24  force me to try it.  But even if he did have something, I

25  wouldn't think it would take him long to get a response on

22-50578-tag Doc#2441 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Transcript from Hearing 2-4-2025 Pg 131 of 142

126

1   file.  Even if he took ten days, and I don't know about the

2   Court's resources, but I would think that would be considered,

3   you know, pretty quickly.  I mean it doesn't seem like it takes

4   a ton of brain cells.  I'm always proved wrong.

5           So, you know, Your Honor, do I think we could still

6   make it to a March 10th trial date?  I do.  What I am much more

7   concerned with, Your Honor -- and I understand you don't like

8   carrying things to trial, I get that.  The reason I had

9   suggested that, because you get a different standard of proof

10  which is final when you do it at trial.

11          **THE COURT:**  But I -- if I may.  Hold that thought.

12          **MR. ENGEL:**  Yeah.

13          **THE COURT:**  But I think a party that files a motion

14  for summary judgment has the right to insist upon a

15  disposition.

16          **MR. ENGEL:**  Leaving that aside, Your Honor, I'm

17  calculating in my head again, what troubles me is what I

18  started with, is that the amount of wood to chop here is

19  significant and, you know, you're one beaver and, you know,

20  with a clerk --

21          **THE COURT:**  I have been referred to as the

22  Antichrist, but that's a story for another day by a litigant in

23  my court.  Not "the", "an".  I wanted to correct to just make

24  sure.

25          **MR. ENGEL:**  That was said out of love, Your Honor.

22-50073-7-cag Doc#2401-1 Filed 02/06/25 Entered 02/06/25 09:19:19 Main Document Pg 27
from Hearing 2-4-2025 Pg 132 of 142

127

1          **THE COURT:**  I'm sure.  No, it wasn't.  Go ahead.

2          **MR. ENGEL:**  But that's what concerns me more, is that

3   when you dig into this and start reading the law and a

4   3,000 page record, you know, which you have to grapple with.  I

5   mean they may be entitled to a disposition, but, you know, the

6   other side of that is I am entitled to have Your Honor fairly

7   deal with everything we have presented to the Court.

8          **THE COURT:**  So let me just stop you.  You guys aren't

9   going to want me to -- do you want me to carry the summary

10  judgment motions to the trial?

11         **MR. HOCKADAY:**  No, Your Honor.

12         **THE COURT:**  No, I wouldn't expect you to.  If I were

13  in your shoes I'd say absolutely not.

14         **MR. ENGEL:**  And I'm not --

15         **THE COURT:**  So let him finish and then I'll let you

16  respond.  Okay?  That's all we needed to get on the record, so

17  I'm not going to carry it.

18         **MR. ENGEL:**  Yeah, and I'm not complaining about that.

19  I heard Your Honor on Friday that you weren't going to do that.

20  So I do think we can still make March 10th, but it's going to

21  depend more on the Court than the parties.  There are actually

22  two or three depositions left to take in the case, something

23  like that.  Petrocelli and Osherow and your person?

24     **(Counsel speak with each other)**

25         **MR. ENGEL:**  But honestly, Your Honor, I mean you're

22-50073-cgb Doc#2441-1 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Pg 28
from Hearing 2-4-2025 Pg 133 of 142

128

1    Solomon on this.  I mean I don't -- I think it's a close call,

2    Judge.  You know, I have to be candid with you, and I think

3    March 10th is a close call.  But I -- this case needs to get to

4    trial if it's going to trial and that needs to happen.

5          **THE COURT:**  If there's going to be a trial, if, then

6    it needs to happen soon.

7          **MR. ENGEL:**  Right.

8          **THE COURT:**  Okay.

9          **MR. ENGEL:**  So I'm not sure how to advise you, Judge,

10   other than to say I want to get to March 10th and to be honest

11   and candid and say I think it's a close call because I think

12   you have more wood to chop than you think -- you may find than

13   you think you do.

14          Does that at all answer your question?

15          **THE COURT:**  Yes, sir, it does.

16          Mr. Hockaday or Mr. Lowenstein?

17          **MR. LOWENSTEIN:**  Your Honor, it is a sea change

18   addressing the motion for leave to amend the complaint.  We've

19   been litigating a case where, although Mr. Ebersol's recently

20   taken the position that there is no agreement for various

21   reasons, the Trustee has consistently insisted that there is an

22   enforceable term sheet from day one.  We will oppose vehemently

23   them just amending and removing that from the case and removing

24   it from the judicial admissions they've made in their pleading.

25   It's just not fair and we will oppose it on that basis.

22-50073-cgag Doc#2441-1 Filed 02/06/25 Entered 02/06/25 09:19:19 Main Document Pg 129
from Hearing 2-4-2025 Pg 134 of 142

129

1  Obviously if the Court grants that leave, we will deal with it,

2  but it is not just a simple thing.  It is a sea change in the

3  case and changes strategy and everything else if they just

4  remove a breach of contract claim where they've been insisting

5  that it was enforceable all along.

6         And this idea that it's news that there was not a

7  signature, nobody's ever seen one with a signature and in every

8  single deposition since the beginning of the case people have

9  asked have you seen a signed version and nobody ever said I

10 have seen a signed version.  So that's not new news.  The fact

11 that Mr. Engel was able to get to DocuSign and they confirmed

12 they didn't have one either, yes, that confirmed more

13 information, but that's not anything new.

14        And I don't think there's a legitimate argument that

15 there's not an enforceable agreement that everybody acted under

16 from day one.  But we will oppose that.

17        And coupled with that, I renew our motion to -- I

18 guess it somehow puts the burden to us now to prove the

19 existence of the enforceable term sheet to show that that is

20 the enforceable term sheet that means that there couldn't have

21 been a prior inconsistent agreement.  And to that point, we're

22 back at our oral motion for -- under the merger issue.  I

23 believe our motion to dismiss and answer covered the concept,

24 but we certainly never said the word we move on the oral

25 motion.  We can submit a written motion.  But there'll be a

22-05073-amc Doc#2441 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Pg 80 of 305 Pg 135 of 142

22-05073-amc Doc#2441-1 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Transcript from Hearing 2-4-2025 Pg 135 of 142

130

1   merger defense that we have alleged.

2           So what was your question?  How does that impact the

3   summary judgment?  I mean I think it completely impacts it, it

4   undermines it, and it's just --

5           **THE COURT:**  On every claim?

6           **MR. LOWENSTEIN:**  No, it doesn't.

7           **THE COURT:**  Okay.

8           **MR. LOWENSTEIN:**  It doesn't change the fact that

9   there cannot be an agreement for $250 million but it certainly

10  impacts, you know, the -- I'd have to think it through.  I mean

11  this is a surprise to me hearing this in the middle of this

12  hearing.  I haven't had the time to analyze it and think

13  through all of the implications of it and how it affects all of

14  the different claims.  But certainly believing that the Trustee

15  was going to stand by its word that there was a enforceable

16  agreement that it has sued our client on from day one changes

17  things.  And I don't know the full impact of it but we

18  certainly will oppose the motion for leave.

19          We want to get to trial, too.  I think we're entitled

20  to a ruling on a summary judgment based on the pleadings that

21  existed at the time we filed it.  And so I guess that's why we

22  would oppose the motion, because we've moved on the existing

23  pleadings that have existed since after Your Honor's partial

24  grant of the motion to dismiss --

25          **THE COURT:**  Okay.

22-50578-7-ag Doc #2-401 Filed 02/06/25 Entered 02/06/25 09:21:19 Main Document Transcript from Hearing 2-4-2025 Pg 136 of 142

131

1        **MR. LOWENSTEIN:**  -- and we relied on those.

2        **THE COURT:**  Mr. Hockaday, did you want to say

3   something?

4        **MR. HOCKADAY:**  No, Your Honor.  I think

5   Mr. Lowenstein covered it.  The one thing I will add to it,

6   just to kind of bolster the position that everybody's been

7   operating under this set of facts, is I believe the term sheet

8   is an attachment to the actual complaint.  So at the very

9   outset of this case, when this case started, we've all been

10   operating under an enforceable term sheet irrespective of a

11   signature.  And I think, as put in the briefing, that doesn't

12   change the enforceability or input -- import of it.  Sorry.

13        **THE COURT:**  So here's how we're going to do it.  If

14   you oppose them, their leave to amend or the Court consider a

15   merger, that's fine.  I'll make them file a motion and deal

16   with it.  And correspondingly, if you want to move for leave to

17   amend the complaint, I'll have you file a motion and then I'll

18   deal with it next week.

19        All right, that's all I can do at this time.

20        **MR. ENGEL:**  Judge, that makes perfect sense to me.

21        **THE COURT:**  All right.  Okay, so let's do this.  If

22   you -- file your motion for leave to assert the affirmative

23   defense and merger by the end of the week.  No replies.  You

24   can wax eloquently in court.  Same thing for you, if you want

25   to file a motion for leave to amend the complaint you file it

22-50507-ag Doc #441-1 Filed 02/06/25 Entered 02/06/25 09:19:14 Main Document Transcript
from Hearing 2-4-2025 Pg 137 of 142

132

1  by the end of the week.  And then I'll give you a setting.  I

2  know I have to -- well, no, I have -- probably next Friday.

3        What do you all think about that?  That will give you

4  a couple days to think about it.

5        No?

6     **(Clerk confers with Court)**

7        **THE COURT:**  I'm actually -- it's Valentine's Day.  I

8  got that.  I've already been given clemency from Mrs. Gargotta

9  because I'm judging Elliott Cup that weekend.  But I'm not

10 leaving until Saturday morning so I'm here Friday.

11       Is that problem for you, Ms. Williams?

12       **MS. WILLIAMS:**  It's not a problem, Your Honor.  I

13 just wanted to clarify --

14       **THE COURT:**  And I want to be clear.  I don't want to

15 stand in the way of love or harmonious relationships or

16 anything like that.  I want to be abundantly clear on that.

17 Just because I've been granted clemency, maybe that causes a

18 problem for you all.

19       **MS. WILLIAMS:**  It's no problem, Your Honor.  I just

20 wanted to clarify.  So motions and we get responses but no one

21 gets a reply --

22       **THE COURT:**  No.

23       **MS. WILLIAMS:**  -- or were you saying we shouldn't

24 respond.

25       **UNIDENTIFIED SPEAKER:**  Motions and argument.

22-50578-cag Doc#2401-1 Filed 02/06/25 Entered 02/06/25 09:21:14 Main Document Pg 83
from Hearing 2-4-2025 Pg 138 of 142

133

1              **THE COURT:**  Motions and argument.

2              **MS. WILLIAMS:**  Motions and argument.

3              **THE COURT:**  Respectfully, I've read enough.

4              **MS. WILLIAMS:**  I understand, Your Honor.

5              **THE COURT:**  I can do this on the fly.  This is in my

6      wheelhouse.

7              **MS. WILLIAMS:**  Okay.

8              **THE COURT:**  I can do that, so --

9              **MS. WILLIAMS:**  Just wanted to make sure.

10              **THE COURT:**  And again, you might come in and I'll go,

11      gosh, I wish I read that case, I'll deal with it.  But we've

12      got to move this thing along.  I'm still intent on trying this

13      case on March 10th.

14              Yes, sir, anything else?

15              **MR. ENGEL:**  No, Your Honor.  That's really it.

16              **THE COURT:**  Okay.  Do you all want to come in?  Do

17      you want to -- I'm happy to allow you to do this

18      telephonically.

19              All right.  So, we'll --

20          **(Indiscernible voice)**

21              **THE COURT:**  Okay.  Telephone okay?

22              **MR. HOCKADAY:**  Yeah, it works for me.

23              **THE COURT:**  You all get along fine on the phone and

24      you -- you're respectful of one another and to the Court so you

25      have a clean record.

134

1          So let's say your motion on file by noon of Friday of

2   this week.  Can you do that?

3          **MR. ENGEL:**  Yes, sir.

4          **THE COURT:**  So you can look at before then and I can

5   look at it and then we'll give you a hearing at what time on

6   the 14th, the day of love?

7          **MR. ENGEL:**  Tell us what it looks like, Judge.

8          **THE COURT:**  How about not too early, how about

9   10:00 o'clock?

10          **MR. ENGEL:**  Works for me, Judge.

11          **THE COURT:**  We're going to do it by phone.

12          And is it too much difficult in fact to have you file

13   it by noon on Friday, both of you all?

14          **MR. ENGEL:**  Not at all, Your Honor.

15          **THE COURT:**  Okay.  That would help --

16          **UNIDENTIFIED SPEAKER:**  Hear that last part.

17          **THE COURT:**  Is it going to pose any problems to get

18   your motion on file by noon on Friday?

19          **MR. HOCKADAY:**  No, Your Honor.

20          **MR. ENGEL:**  I think they're short motions.

21          **THE COURT:**  That way I can look at it and personally

22   think about it while I'm judging Elliott Cup and go from there.

23          That's all I can do at this point in time I think

24   under the circumstances and, as I said before, I do adhere to

25   the philosophy it's not like State Court, what, you know, those

135

1   judges can do, and I think the Federal Rules require me to act

2   on it.

3            So anything else before I excuse the parties?

4            **UNIDENTIFIED SPEAKER:**  I don't believe so, Your

5   Honor.

6            **UNIDENTIFIED SPEAKER:**  Not from us either, Your

7   Honor.

8            **THE COURT:**  All right.

9       **(Counsel thank the Court)**

10           **THE COURT:**  Of course, as always.  So I'm going to

11  excuse the parties.

12           Ms. Mujica, just leave my stuff up here.  I'll

13  retrieve it later.  You don't have to worry about it.  I'm

14  probably going to put it in the conference room.

15      **(Counsel speak among themselves)**

16           **THE COURT:**  We're not off the record yet, you all.

17           So we're going to go off the record --

18      **(Counsel speak among themselves)**

19           **THE COURT:**  Hang on, we're not off the record.

20           **UNIDENTIFIED SPEAKER:**  Sorry, Your Honor.

21           **THE COURT:**  We're now off the record.

22      **(This proceeding was adjourned at 5:12 p.m.)**

23

24

25

22-50507-cgag Doc#2401 Filed 02/06/25 Entered 02/06/25 09:21:14 Main Document Transcript
from Hearing 2-4-2025 Pg 141 of 142

136

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **February 6, 2025**

        Signed                                    Dated

<span style="color:blue">TONI HUDSON, TRANSCRIBER</span>

# UNITED STATES BANKRUPTCY COURT
## Western District of Texas
## San Antonio Division

|  |  |
|---|---|
|  | Bankruptcy Case No.: 19–50900–cag |
|  | Chapter No.: 7 |

IN RE: **Legendary Field Exhibitions, LLC and AAF Properties, LLC** , Debtor(s)

|  |  |
|---|---|
|  | Adversary Proceeding No.: 22–05078–cag |
|  | Judge: Craig A Gargotta |

**Randolph N. Osherow,
in his capacity as
Chapter 7 Trustee et al.**
Plaintiff

v.

**Thomas G. Dundon et al.**
Defendant

## NOTICE OF FILING OF TRANSCRIPT
## AND OF DEADLINES RELATED TO RESTRICTION AND REDACTION

A transcript of the proceeding held on **2/4/25** was filed on **2/6/25**. The following deadlines apply:

The parties have until **February 13, 2025** to file with the court a *Notice of Intent to Request Redaction* of this transcript. The deadline for filing a *request for redaction* is **February 27, 2025**.

If a request for redaction is filed, the redacted transcript is due **March 10, 2025**.

If no such notice is filed, the transcript may be made available for remote electronic access upon expiration of the restriction period, which is **May 7, 2025** unless extended by court order.

To review the transcript for redaction purposes, you may purchase a copy from the transcriber **Exceptional Reporting Services 361 949 2988**, or you may view the document at the clerk's office public terminal.

Dated: 2/7/25

Barry D. Knight
Clerk, U. S. Bankruptcy Court
BY: Laurie Boyd

**[Notice of Filing of Transcript (AP)]** [NtcftddlrrAPap]