

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **LEGENDARY FIELD** | § | **CASE NO. 19-50900-CAG** |
| **EXHIBITIONS, LLC** | § | **CHAPTER 7** |
| | § | |
| *Debtor.* | § | |

| | | |
|---|---|---|
| **DUNDON CAPITAL PARTNERS LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **ADV. NO. 22-05077** |
| | § | |
| **CHARLES EBERSOL,** | § | **Judge: Craig A. Gargotta** |
| | § | |
| *Defendant.* | § | |

**DEFENDANT CHARLES EBERSOL'S MOTION FOR**
**SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF**

Pursuant to Federal Rule of Civil Procedure 56, as made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7012(b), Defendant Charles Ebersol ("Ebersol") moves for summary judgment against Plaintiff Dundon Capital Partners LLC ("DCP"), as there is no triable issue of material fact and Ebersol is entitled to judgment as a matter of law.

In support of said Motion, Ebersol provides his Memorandum in Support, below:

## I. INTRODUCTION

This lawsuit arises from the failure of the Alliance of American Football (the "AAF" or the "League"), a professional football minor league that was intended to serve as a counterpart to the National Football League (the "NFL"). After the AAF's primary investor faltered on his financial commitments, Ebersol, one of the League's founders, began searching for alternative investment partners. As part of his efforts, Ebersol met Thomas Dundon ("Dundon"), a sophisticated investor

and principal of DCP, who negotiated on behalf of DCP to commit at least $70 million to the AAF in exchange for majority control of Ebersol Sports Media Group ("ESMG"), the parent company of several entities that together ran the AAF.[1] To document this commitment, DCP drafted a term sheet which, among other things, provided that DCP would approve funding requests submitted by ESMG, control ESMG's board of directors, and receive seventy-five percent of ESMG's stock upon execution. However, the term sheet was never executed, as DCP never signed it, DCP never paid to the AAF a single dollar, and DCP was never officially issued any ownership shares.

To be certain, from February 14, 2019 to April 16, 2019, ESMG submitted funding requests to DCP per Dundon's instructions. Although DCP managed these requests, it did not pay by wire or otherwise any of the requested funds to ESMG; instead, all of these funds were paid by DDFS Partnership, LP ("DDFS"), an entity that is legally distinct from DCP. Eventually, after determining that continued operation of the League was not financially feasible, DCP caused the League to file for bankruptcy without ever signing any agreements with ESMG or having any stock associated with the AAF issued to it. Years later, and despite the aforementioned undisputed facts, DCP filed this lawsuit, asserting claims for fraudulent inducement, securities fraud under the Texas Securities Act (the "TSA"), and statutory fraud under Section 27 of the Texas Business and Commerce Code (the "TBCC"). DCP's claims are premised on the allegation that Ebersol misrepresented, failed to disclose, and/or concealed material information concerning the League's financial viability.

As detailed below, summary judgment should be granted in favor of Ebersol for several reasons. At the outset, DCP lacks Article III standing to prosecute its claims, which are based on DCP's allegation that it lost $70 million due to Ebersol's allegedly fraudulent conduct. However, as the record shows, this allegation is false: even though DCP may claim to have made the decision

---

[1] The other entities are as follows: We Are Realtime, LLC; AAF Properties, LLC; Legendary Field Exhibitions, LLC; LFE Field Exhibitions, LLC; and AAF Players, LLC.

to invest in the League, it never actually invested any of its own funds pursuant to that decision; DDFS did. Accordingly, because DCP suffered no injury in fact, and because DCP cannot rely on any injury allegedly suffered by DDFS to provide standing for itself, its claims fail for lack of standing. Even assuming, *arguendo*, that DCP has standing, its claims fail on the merits. First, DCP's fraudulent inducement and statutory fraud claims fail for the same reason that it lacks standing: DCP did not suffer any injury. Its statutory and securities fraud claims also fail because no stock in ESMG was ever conveyed to it. Finally, DCP's fraudulent inducement, statutory fraud, and securities fraud claims fail because there is no competent evidence to support these claims.

## II. <u>SUMMARY JUDGMENT EVIDENCE</u>

In support of this Motion, Ebersol relies upon the following competent summary judgment evidence, which are attached to this Motion and fully incorporated herein by reference:

| | |
|---|---|
| **Exhibit A:** | Excerpts from Transcript of Deposition of Charles Ebersol taken on September 19, 2024 |
| **Exhibit B:** | Excerpts from Transcript of Deposition of Jeffrey Vanderbilt |
| **Exhibit C:** | Excerpts from Transcript of Deposition of Thomas Dundon taken on June 4, 2021 |
| **Exhibit D:** | Excerpts of 2018 Tax Return of DDFS Partnership, LP |
| **Exhibit E:** | Excerpts from Transcript of Deposition of Thomas Dundon taken on December 3, 2024 |
| **Exhibit F:** | Excerpts from Transcript of Deposition of John Zutter |
| **Exhibit G:** | Excerpts from Transcript of Deposition of Jason Kulas |
| **Exhibit H:** | Binding Term Sheet for Series 2 Preferred Stock Financing |
| **Exhibit I:** | E-mail message from DocuSign dated December 2, 2024 containing documents produced in response to subpoena |
| | **Exhibit I-1:** DocuSign Certificate of Completion |

**Exhibit I-2:**   DocuSign Envelope History

**Exhibit J:**   Investment Agreement between Carvana and DDFS

**Exhibit K:**   Sworn Declaration of Charles Ebersol

**Exhibit K-1:**  ESMG Banking Statements

## III.   STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.   EBERSOL AND OTHERS CREATE THE AAF; THE AAF BEGINS TO EXPERIENCE FINANCIAL ISSUES AFTER FUNDING FROM ITS PRIMARY INVESTOR FAILS TO MATERIALIZE**

Ebersol is the former Chief Executive Officer of ESMG, the parent company of several entities that together operated the AAF. The AAF was a springtime developmental football league that was intended, among other things, to provide its athletes with a potential path to play in or return to the NFL. Ebersol and others began developing the concept of the AAF in February, 2017.

From the inception of the AAF, its executives knew it would need investor support for at least its first five years and raised capital accordingly. One such investor was Reginald Fowler ("Fowler") who agreed to provide $50 million in equity financing and $120 million in convertible line of credit financing. Fowler's commitments, together with the proceeds of the AAF's other financing rounds, gave the AAF more than $200 million in capital as it entered its inaugural season.

However, beginning in or around November, 2018, Fowler's funding did not materialize as his financial commitments required; it was sporadic and in less than the requested amounts. This unpredictable funding became problematic for the AAF and created concerns that the AAF would not be able to pay its debts as they became due, including, and especially, player payroll liabilities.[2] Accordingly, as the opening day of the AAF's inaugural season—February 9, 2019—approached,

---

[2] Unbeknownst to Ebersol or the AAF, Fowler's wire transfers to the AAF were being intercepted by the United States Department of Justice due to Fowler's undisclosed criminal activity for which Fowler has since pleaded guilty. *See Former Co-Owner of Minnesota Vikings Sentenced to 75 Months In Prison for Providing Shadow Banking Services to Cryptocurrency Exchanges*, U.S. DEP'T OF JUSTICE (June 5, 2023), https://www.justice.gov/usao-sdny/pr/former-co-owner-minnesota-vikings-sentenced-75-months-prison-providing-shadow-banking.

the AAF began to seek new funding sources to ensure it had sufficient capital to fund its inaugural season, and particularly to pay its player payroll liabilities, which were due on a weekly basis.

**B.   EBERSOL AND DUNDON DISCUSS $10 MILLION BRIDGE LOAN TO COVER THE LEAGUE'S PLAYER PAYROLL OBLIGATIONS AND POSSIBILITY OF LARGER INVESTMENT**

As part of the AAF's efforts to find alternative investors, Ebersol contacted Erik Anderson ("Anderson"), an investor who had previously expressed interest in the AAF and who was familiar with its financial condition, about obtaining a $10 million bridge loan to cover the player payroll liabilities for the second and third weeks of the inaugural season. Anderson suggested that Dundon, a majority owner of the Carolina Hurricanes National Hockey League club and principal of DCP— a Delaware limited liability company whose sole member is DDFS Management, LLC—could provide a better investment solution than him. Exhibit A, 205:11-205:17; Exhibit B, 44:12-44:17.

On February 13, 2019, Ebersol and Dundon spoke for the first time. Exhibit C, 12:3-12:18. During that conversation, Dundon asked why Ebersol was only seeking $10 million, in response to which Ebersol told him the League had been unable to access the capital Fowler had committed and the $10 million was needed to cover player payroll obligations for the next two weeks. Exhibit A, 212:18-212:23, 213:12-213:20. Dundon stated he was willing to lend the $10 million Ebersol had requested but thought the League needed a long-term capital solution and asked what other data Ebersol could give him beyond what he had been given by Anderson to determine whether to make a larger investment. *Id.*, 214:1-214:8, 214:16-214:22, 215:23-216:9, 217:6-217:15. Ebersol responded by offering to send him the AAF's investor deck, which gave a general overview of the League, and financial projections for the AAF's first five seasons. *Id.*, 214:1-214:8. Ebersol also offered to give Dundon access to the League's virtual data room, which contained the League's income and cash flow statements, balance sheets, and financing agreements with earlier investors. *Id.*, 214:1-214:8. However, Dundon stated he did not want to need access to the data room, nor did

he need to speak with anyone on Ebersol's team. *Id.*, 214:23-215:3, 215:17-215:20. Ebersol later sent Dundon the League's investor deck, financial projections, and a summary capitalization table. *Id.*, 99:24-100:8, 101:4-101:14, 201:23-202:17, 220:15-221:13; Exhibit C, 40:3-40:15.

**C.    DUNDON PROPOSES $5.1 MILLION LOAN TO COVER PLAYER PAYROLL LIABILITIES AND $250 MILLION COMMITMENT IN EXCHANGE FOR MAJORITY CONTROL OF ESMG**

The next day, Ebersol had another conversation with Dundon in which Dundon threatened to withdraw his offer for the $10 million loan, calling it a "waste of time." Exhibit A, 252:15-253:1. Exasperated, Ebersol stated he needed at least $5.1 million by 1:30 p.m. to pay player salaries for that week or else he would have to pay for them with his own funds. *Id.*, 253:2-253:4.

In response, Dundon stated he would cover the $5.1 million provided that Ebersol agreed to a deal whereby Dundon invested $250 million into the League in exchange for majority control of ESMG. *Id.*, 253:4-253:12. Given the imminency of the payroll deadline, and given that Ebersol would have no option but to fund payroll himself if he rejected the offer, Ebersol agreed to the deal on behalf of ESMG. *Id.*, 253:13-253:17. Regarding the $5.1 million, Dundon told Ebersol to contact John Zutter ("Zutter"), who would work to transfer the funds to ESMG.[3] *Id.*, 253:4-253:6.

Later that morning, Zutter sent Ebersol a draft term sheet (the "Term Sheet") explaining the effect of the $5.1 million payment that was proposed to come from DCP and providing that DCP would approve funding requests submitted by a Dundon-controlled ESMG of up to $70 million. Exhibit H.[4] The Term Sheet also provided that DCP would obtain governance control of ESMG, receive seventy-five percent of ESMG's fully diluted capital stock upon execution of the Term Sheet, and draft and present for signing all required documentation to effectuate the change

---

[3] Although not relevant to this Motion, it is Ebersol's position that the entire commitment from Dundon was for $250 million and that the $70 million set forth in the Term Sheet represented a portion of that commitment.

[4] The Term Sheet provided that Dundon and another appointee by Dundon would have the only voting positions on ESMG's board and would therefore be in control of any and all requests for funds under the Term Sheet. Exhibit H.

in governance and the transfer of stock, all along with a long form agreement properly documenting the transaction. *Id.*; Exhibit F, 208:17-208:22. Even though the parties to the Term Sheet were ESMG and DCP, Dundon never told Ebersol he was negotiating on behalf of DCP. *See* Exhibit E, 373:20-372:6. When Ebersol later asked Dundon why the commitment was for $70 million rather than the $250 million he had agreed to commit, Dundon stated the amount in the Term Sheet was a formality to get the deal documented and ensure the League had the $5.1 million ahead of the player payroll deadline. Exhibit A, 266:4-266:24. Based on Dundon's representations, Ebersol, on behalf of ESMG, signed the Term Sheet; however, DCP did not sign the Term Sheet. Exhibit H; Exhibit I-1, Exhibit I-2. Later that afternoon, ESMG received the $5.1 million payment by wire. Yet, that payment did not come from DCP. Rather, it came from DDFS, a Delaware limited partnership and in which Dundon and DDFS Management, LLC, but not DCP, hold an interest.

On February 15, 2019, following ESMG's signing of the Term Sheet, Ebersol and several key AAF executives flew to Dundon's office, located at 2100 Ross Avenue, Suite 500 in Dallas, Texas to meet with him and his team to ensure a transition in leadership of the League from ESMG to DCP, which involved a review of the AAF's inner-most workings, including its finances and open accounts payable.[5] At no point during this period or in the following weeks did DCP complain about any issues with the data it reviewed or attempt to rescind the Term Sheet based on any alleged misrepresentations or nondisclosures. Exhibit E, 393:11-393:15, 394:22-394:19.

**D.  DCP CAUSES THE LEAGUE TO FILE FOR BANKRUPTCY AND LATER FILES SUIT AGAINST EBERSOL**

Over the next several weeks, ESMG submitted multiple funding requests to Zutter, one of Dundon's representatives and the Vice President of DDFS, each of which he approved. Exhibit G,

---

[5] The Court should take judicial notice of the fact that this is the same address listed as DDFS's address according to its business filings with the Office of the Texas Secretary of State.

273:19-274:6; Exhibit J. However, like the initial $5.1 million wire to ESMG, these funds came from DDFS. Exhibit K-1. Importantly, DCP has testified there are no agreements of any kind between DCP and DDFS, written or oral, that would tie or connect DCP in any manner to said funds wired by DDFS to ESMG or otherwise allow DCP to receive any benefits therefrom. Exhibit B, 41:14-41:20, 42:1-42:3, 141:23-142:22, 165:10-165:14; Exhibit G, 145:2-145:11.

During this time period, Dundon became pessimistic about the League's financial viability because, as he testified, the television broadcast ratings dropped and the League was unable to secure as many sponsorships as previously thought. Exhibit C, 94:10-95:7. As such, and in addition to DCP never paying ESMG any monies, no paperwork was ever presented to ESMG by DCP as delineated in the unsigned Term Sheet to effectuate the transfer of any shares of stock to DCP or to memorialize the transaction via a long-form agreement. *See* Exhibit K. Accordingly, on April 17, 2019, Dundon caused ESMG, as well as the other entities that operated the AAF, to file Chapter 7 bankruptcy petitions; the entities' estates were later consolidated and are being administered in this court under Case No. 19-50900-CAG. Two and a half years later, DCP filed this lawsuit.

## IV.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A "material" fact is one that might affect the outcome of the suit under the governing law. *Thomas v. Empire Indem. Ins. Co.*, 206 F. App'x 397, 399 (5th Cir. 2006). A dispute is "genuine if the evidence is such that a reasonable jury could return a verdict for the [nonmovant]." *Taylor v. HD & Assocs., L.L.C.*, 45 F.4th 833, 837 (5th Cir. 2022).

The movant bears the initial burden of informing the court of the basis for its motion, and identifying the portions of the record which show the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may either (1) submit summary judgment evidence which conclusively negates the existence of at least one material element of the nonmovant's claim, or (2) after adequate time for discovery has passed, identify at least one essential element of the nonmovant's claim for which the nonmovant has presented insufficient evidence to raise a genuine issue of material fact. *Id.* at 330.

Once the movant has identified the challenged elements of the nonmovant's claim, the burden shifts to the nonmovant to establish the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 585-87 (1986). To meet this burden, the nonmovant must come forward with significant probative evidence showing a triable issue of fact. *Celotex*, 477 U.S. at 325. Improbable inferences, conclusory allegations, unsubstantiated assertions, and unsupported speculation are insufficient to meet this burden. *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). Summary judgment is mandatory unless the nonmovant makes a sufficient showing on each challenged element. *Id.* at 322-25.

## V. ARGUMENTS AND AUTHORITIES

### A. EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON ALL OF DCP'S CLAIMS BECAUSE DCP LACKS STANDING TO PURSUE THEM

#### 1. Traditional Principles of Standing

Standing addresses the question of who may properly bring suit in federal court, and "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 590 (1992). Article III standing has three components: "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). The Supreme Court has repeatedly describe Article III standing

as a "bedrock requirement" for maintaining suit in federal court. *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks and citation omitted).

To establish injury in fact, "a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc.*, 578 U.S. at 338 (quoting *Lujan*, 504 U.S. at 560). For an injury to be "particularized," it "must affect the plaintiff in a personal and individual way," meaning the plaintiff must have suffered the alleged injury. *Id.*; *see also Warth v. Seldin*, 422 U.S. 490, 499 (1975) ("The Art[icle] III power exists only to redress or otherwise protect against injury to the complaining party."); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 224  n. 14 (1974) ("[T]o satisfy the Art[icle] III prerequisite the complaining party . . . [must] allege a specific invasion of [a] right *suffered by him*.") (emphasis added); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166 (1972) (observing a party may invoke the court's authority only in order to "seek redress for injury *done to him* . . . not [to] seek redress for injuries *done to others*") (emphasis added).

Each element of standing must be proved in the same way "as any other matter on which the plaintiff bears the burden of proof, with the same evidentiary requirements of that stage of litigation." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019). Thus, at the summary judgment stage, a plaintiff cannot rely on "mere allegations" but must set forth "by affidavit or other evidence specific facts" demonstrating standing. *Id.* Moreover, "[t]he plaintiff *must* establish standing *at the time [the] suit is filed* and cannot manufacture standing afterwards." *Pennell v. Global Trust Mgmt., LLC*, 990 F.3d 1041, 1044 (7th Cir. 2021) (emphasis added). Thus, the beginning of the case is the time to determine whether standing exists. *Id.*

### 2.    DCP Lacks Article III Standing Because It Did Not Suffer An Injury in Fact

As discussed above, Article III requires that the plaintiff, not some other party, has suffered the injury for which relief is sought. *See Warth*, 422 U.S. at 490; *Schlesinger*, 418 U.S. at 224 n. 14; *Irvis*, 407 U.S. at 166. In other words, a plaintiff must have a legal right to recover individually on the claims asserted in its complaint. Here, DCP alleges the actual damages it suffered are the approximately $70 million it paid to the AAF from February to April, 2019, which payments it alleges it made based on Ebersol's allegedly fraudulent conduct. Specifically, DCP alleges it wired $5.1 million on February 15, 2019, to cover the AAF's outstanding player payroll liabilities, and made payments over the next eight weeks, totaling approximately $64 million. Doc. No. 512, ¶¶ 32, 36, 45-46, 64, 83, 87. No other claims of damage are articulated. *Id.*

DCP's allegations are directly contradicted by the undisputed record, which shows that it suffered no injury, financial or otherwise, in connection with the AAF investment. Even though the parties to the Term Sheet were DCP and ESMG, each time funding requests submitted by the AAF, they were approved by individuals that worked at DDFS, and the requested funds were paid *by DDFS*, a wholly separate entity. Exhibit G, 273:19-274:6; Exhibit K-1. Indeed, Vanderbilt, whom DCP designated as its corporate representative for DCP to testify regarding all wire transfers made to the AAF, repeatedly testified during his deposition that even though DCP made the decision to invest in the AAF, it never paid any funds to the AAF:

> [BY MR. TREYZON] Did DCP ever actually send any money to AAF?
>
> [BY MR. LOWENTSEIN] Object to form.
>
> [BY MR. VANDERBILT] Not to my knowledge.
>
> [BY MR. TREYZON] So is it your understanding that . . . none of the money that went into AAF came from DCP?
>
> [BY MR. LOWENSTEIN] Object to form.
>
> [BY MR. VANDERBILT] Not directly, no.

*** 

[BY MR. TREYZON] Did all of the funds that went into AAF come from DDFS Limited Partners?

[BY MR. VANDERBILT] I believe so.

Exhibit B, 142:6-142:17, 165:7-165:9. Nor did DCP ever record the $70 million in payments it alleges it made to the AAF, which DCP would have done had it actually made those payments. *Id.* at 62:13-63.2.

Both Vanderbilt and Jason Kulas also testified during their respective depositions that they were unaware whether there is an agreement between DCP and DDFS that would obligate DCP to reimburse or otherwise pay DDFS for any of the funds it wired to the AAF, and there is no evidence to suggest that one exists:

[BY MR. TREYZON] Is there a formal agreement that you are aware of between DCP and DDFS other than the operating agreement?

[BY MR. VANDERBILT] Not that I'm aware of.

[BY MR. TREYZON] Are you aware of any credit agreements between DDFS . . . and DCP?

[BY MR. VANDERBILT] No.

*** 

[BY MR. TREYZON] Are you aware of any written agreements between [DDFS] and DCP?

[BY MR. VANDERBILT] No.

*** 

[BY MR. TREYZON] So if – is there some sort of a writing that exists between DDFS and DCP that entitles either one of the entities to recognize the loss suffered in the AAF investment?

[BY MR. VANDERBILT] I believe it would be the party that had made the investment. In this instance, it would have been DCP.

[BY MR. TREYZON] Okay. And you are not aware of any document as you sit here right now that would document the agreement or the transaction between the two entities, correct?

[BY MR. VANDERBILT] Not from recollection no.

***

[BY MR. TREYZON] Was there a resolution either in DCP or DDFS . . . to document or authorize those investments?

[BY MR. VANDERBILT] Not from recollection.
***

[BY MR. TREYZON] I was also told by various witnesses that there is no formal, like, written relationship regarding treasury functions between DDFS, LP and Dundon Capital Partners. Are you aware of that?

[BY MR. KULAS] I don't know what formal treasury relationship means.

[BY MR. TREYZON] Some sort of a contract that says, hey, we will pay this on your behalf, you will reimburse later, or something like that?

[BY MR. KULAS] I am not aware of a contract that existed.

*Id.* at 41:14-41:20, 42:1-42:3, 141:23-142:22, 165:10-165:14; Exhibit G, 145:2-145:11. And the Term Sheet, which DCP did not sign, imposes no such obligation on DDFS either. *See* Exhibit H; Exhibit I-1; Exhibit I-2. Consistent with such testimony that DCP has no right, title, or interest as a matter of law in the monies paid by DDFS to ESMG, it was DDFS—not DCP—that declared as business losses in its tax returns the monies that DDFS transferred to ESMG. *See* Exhibit D.

Moreover, to the extent DCP argues there is no legal distinction between whether the funds paid to the AAF were paid by DCP or DDFS because Dundon, either directly or indirectly, holds an interest in both entities, this argument also fails. Under Texas *and* Delaware law, partnership property belongs to the partnership itself and is not considered the property of individual partners.

TEX. BUS. ORGS. CODE § 154.001(c) ("A partner is not a co-owner of partnership property."); 6

DEL. CODE § 15-501 ("[A] partner is not a co-owner of partnership property and has no interest in

specific partnership property."). Thus, that Dundon and DDFS Management, LLC—the latter of

which Dundon is the sole member—are partners of DDFS is of no legal consequence because all

funds held by DDFS are its property, not the property of its individual partners—let alone a further

step removed such as the property of other businesses in which the individual partners may also

have a direct or indirect ownership interest.

As the above indisputably demonstrates, as a matter of law, DCP did not incur the damages

it alleges it did. Rather, DDFS incurred these damages, as every payment comprising DCP's

alleged $70 million investment was made by DDFS—an entirely separate entity that is not a party

to this suit, that has no legal interest in DCP, and that DCP has no obligation to compensate for the

funds it paid to the AAF. What is more, the applicable case law is firm in holding that DCP may

not rely on DDFS's injury to provide standing for itself. For example, in *Indemnified Capital

Investments, SA v. R.J. O'Brien & Associates, Inc.*, the plaintiff, a financial services firm, argued

it had standing to prosecute claims against a commodities futures trader to recover losses to

accounts it maintained for its clients. 12 F.3d 1406, 1407-08 (7th Cir. 1993). The Seventh Circuit

rejected this argument, observing a party may assert third-party standing "only in rare occasions"

and holding that only the named accountholders had standing to pursue claims seeking to recover

these losses. *Id.* at 1409.

The Second Circuit reached the exact same conclusion in *W.R. Huff Asset Management Co.

v. Deloitte & Touche, LP*. There, the plaintiff, an investment firm whose clients had invested in a

telecommunications company, sued a consortium of tax, law, and underwriting firms for allegedly

certifying inaccurate disclosures made by that company, whose collapse caused its clients to suffer

significant financial losses. 549 F.3d 100, 104 (2d Cir. 2008). In addressing the plaintiff's standing argument, the Court noted the "minimum requirement for an injury-in-fact is that the plaintiff have legal title to . . . the claim." *Id.* at 108 (internal citation omitted). Because the plaintiff had no legal interest in its clients' claims, the Court held it had no standing to pursue them. *Id.* at 109.

This Court should reach the same conclusion here. DCP's own testimony demonstrates that it made the decision to invest in the AAF but did not actually invest any of its own funds pursuant to that investment decision. Exhibit B, 142:6-142:17, 165:7-165:9. DCP likewise never was issued any shares of stock in ESMG or otherwise despite Dundon and his representatives having full control of ESMG, further confirming that DCP has never received any beneficial right, title, or interest in the monies paid by DDFS to ESMG. Exhibit K; Exhibit E, 376:21-376:24. Accordingly, because DCP has not suffered an injury in fact, it lacks Article III standing to pursue its claims.

**B.      EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S FRAUDULENT INDUCEMENT AND STATUTORY FRAUD CLAIMS BECAUSE DCP SUFFERED NO DAMAGES**

Even if this Court determines that DCP has standing, which it does not, DCP's fraudulent inducement and statutory fraud claims fail on the merits for the same reason: DCP was not injured by Ebersol's alleged conduct because it did not suffer any damages. In Texas, to prevail on a claim for fraudulent inducement, a plaintiff must prove they were injured by the fraud. *Ernst & Young*, 51 S.W.3d 573, 580 (Tex. 2001); *see also Med. Protective Co. v. Herrin*, 235 S.W.3d 866, 871 (Tex. App.—Texarkana 2007, no pet.) (reversing trial court's judgment that defendant was liable for fraudulent inducement because there was insufficient evidence plaintiff was injured by alleged fraud). Similarly, to prevail on a claim for statutory fraud under Section 27.01 of the TBCC, a plaintiff must prove they were injured by the defendant's misrepresentation or false promise. TEX. BUS. & COM. CODE § 27.01; *Fidelity Nat. Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 632 (E.D. Tex. 2011) (observing that "[i]n order to establish a cause of action for statutory

fraud, [a plaintiff] must prove . . . the reliance caused [the plaintiff] injury."); *see also Scott v. Sebree*, 986 S.W.2d 365, 371 (Tex. App.—Austin 1999, pet. denied) (same).

As discussed above, DCP suffered no injury attributable to Ebersol's allegedly fraudulent conduct because the approximately $70 million in funds it alleges it paid to ESMG were paid by DDFS, not DCP. Exhibit B, 142:6-142:17, 165:7-165:9; Exhibit K-1. This is further verified by the fact that DCP never was issued any shares of stock in ESMG or otherwise despite Dundon and his representatives having full control of ESMG, and DDFS—not DCP—claimed the subject monies as a business loss, thus further confirming DCP has never actually received any beneficial right, title, or interest in the monies paid by DDFS to ESMG. Exhibit K; Exhibit D; *see also* Exhibit E, 376:21-376:24. Thus, even if DCP can prove the remaining elements of its fraudulent inducement and statutory fraud claims, which it cannot, summary judgment is nonetheless proper on these claims because DCP cannot prove the essential element of damages for either claim.

## C.   EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S STATUTORY AND SECURITIES FRAUD CLAIMS BECAUSE NO STOCK WAS ACTUALLY SOLD OR CONVEYED TO DCP

The TSA applies to persons that offer or sell unregistered securities. *Flowers v. Dempsey-Tegeler & Co.*, 472 S.W.2d 112, 115 (Tex. 1971). Under Section 33 of the TSA, any person who offers or sells a security by means of an "untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading" is liable to the buyer. TEX. GOV'T CODE § 4008.052. Thus, to prevail on a securities fraud claim, a plaintiff-buyer must demonstrate that the defendant-seller sold a security by means of (1) an untrue statement of material fact or (2) an omission to state a material fact necessary to make the statement made not misleading in context. *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied).

Additionally, a plaintiff-buyer must demonstrate that an actual sale of securities occurred. *See Chase v. Hodge*, 2021 WL 1948470, at *9 (W.D. Tex. May 14, 2021) ("Although the [TSA] uses the language 'attempt to sell' and 'offer to sell' in its definition section, 'it is clear that [the TSA] contemplates that the sale *must have been effected* because the buyer may sue either law or in equity for rescission, or for damages.'") (quoting and citing *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 603-04 (S.D. Tex. 2003)) (emphasis added). Indeed, the TSA expressly contemplates that the disputed securities must have been conveyed by the seller to the buyer for a securities fraud claim under the TSA to be actionable:

> (a) In damages under this subchapter, a buyer . . . shall recover the consideration the buyer paid for the security plus interest on the consideration at the legal rate from the date the buyer made the payment, less the greater of:
>
> (1) the value of the security at the time the buyer *disposed of the security* plus . . . any income the buyer received on the security; or
>
> (2) the actual consideration received for the security at the time the *buyer disposed of the security* plus . . . any income the buyer received on the security.

TEX. GOV'T CODE § 4008.057(a) (emphasis added).

The same is true of a statutory fraud claim brought under Section 27 of the TBBC. As the Fifth Circuit and the Supreme Court of Texas have observed, Section 27.01(a) only applies when there has been an actual conveyance of real property or stock. *See U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000) ("Section 27.01(a) . . . applies only to situations where there is an actual conveyance of the stock, and not to situations where there is merely a breach of contract to convey stock."); *Stanfield v. O'Boyle*, 462 S.W.2d 270, 271 (Tex. 1971). In *Stanfield*, the defendant had pledged shares of stock in a company he owned to the plaintiff in consideration for a $50,000 loan. 462 S.W.2d at 270. The defendant later promised to sell real property he purported to own to the plaintiff in exchange for a release of those shares. *Id.* at 271. Yet, after the plaintiff released the

shares, he learned the defendant did not actually own the property, and thus the property was never conveyed to him. *Id.* The Supreme Court of Texas held that the plaintiff had failed to state a claim for statutory fraud because statutory fraud "is applicable *only when a conveyance of the property has been made*, and not where there is merely a contract to convey." *Id.* (emphasis added).

Various Texas courts of appeals have followed the *Stanfield* court's reasoning by strictly construing Section 27.01(a) to require an actual conveyance of real property or stock. For example, in *Stephanz v. Laird*, the First District Court of Appeals held that a former employee whose stock options failed to vest due to his failure to satisfy certain conditions precedent in his employment contract was barred from asserting a claim for statutory fraud. 846 S.W.2d 895, 905 (Tex. App.—Houston [1st Dist.] 1993, writ denied). And in *Okumus v. Mouton*, the Fourteenth District Court of Appeals reversed a trial court's finding the defendant had committed statutory fraud because even though the parties signed a real estate sale agreement, "an actual conveyance of real property never occurred." 2020 WL 6278664, at *5 (Tex. App.—Houston [14th Dist.] Oct. 27, 2020, no pet.).

Here, DCP alleges it entered the Term Sheet, which purported to issue seventy-five percent of ESMG's fully diluted capital stock to DCP upon execution, based on Ebersol's allegedly fraudulent conduct. Doc. No. 512, ¶¶ 67-101. Putting aside the fact that DCP never signed the Term Sheet, and thus the obligation to issue the stock referenced therein never became binding, it is undisputed that no stock shares in ESMG were ever issued to DCP, even after DCP assumed control of ESMG's board of directors. Exhibit K-1; *see also* Exhibit E, 376:21-376:24. Accordingly, because no conveyance of stock actually occurred, DCP's statutory and securities fraud claims are not actionable as a matter of law.

**D.** **EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S FRAUDULENT INDUCEMENT CLAIM BECAUSE THERE IS NO COMPETENT EVIDENCE OF ANY ELEMENT OF SUCH CLAIM.**

To prevail on its claim for fraudulent inducement, DCP must prove the following elements: (1) Ebersol made a material misrepresentation; (2) Ebersol knew the representation was false or made it recklessly; (3) Ebersol intended for DCP to rely or act on the misrepresentation; (4) DCP relied on the misrepresentation; and (5) DCP's reliance caused its injuries. *See Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018).

Here, DCP can produce no evidence to support the elements of its fraudulent inducement claim. Specifically, DCP can produce no evidence that Ebersol made a material misrepresentation, that he knowingly or recklessly made any alleged misrepresentations, that he intended for DCP to rely or act on any alleged misrepresentations, that DCP relied on any alleged misrepresentations, or that DCP's alleged reliance caused it to suffer any injuries. Accordingly, this Court should grant summary judgment in favor of Ebersol on DCP's fraudulent inducement claim.

E.     **EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S STATUTORY FRAUD CLAIM BECAUSE THERE IS NO COMPETENT EVIDENCE OF ANY ELEMENT OF SUCH CLAIM.**

To prevail on its claim for statutory fraud, DCP must prove the following elements: (1) there was a transaction involving real estate or stock; (2) during the transaction, Ebersol made a false representation of fact or false promise; (3) the false representation or promise was made for the purpose of inducing DCP to enter into a contract; (4) DCP relied on the false representation or promise by entering into the contract; and (5) the reliance caused DCP injury. *See* TEX. BUS. & COM. CODE § 27.01; *Fidelity Nat. Title Ins. Co. v. Doubletree Partners, L.P.*, 866 F. Supp. 2d 604, 632 (E.D. Tex. 2011). DCP must also prove there has been an actual conveyance of stock. *See U.S. Quest Ltd. v. Kimmons*, 228 F.3d 399, 406 (5th Cir. 2000).

Here, DCP can produce no evidence to support the elements of its statutory fraud claim. Specifically, DCP can produce no evidence that Ebersol made a false representation of fact or false promise during the transaction at issue, that the false representation or promise was made for the

purpose of inducing DCP to enter into a contract, that DCP relied on the false representation or promise by entering into a contract, that its alleged reliance caused it to suffer any injuries, or that there was an actual conveyance of stock to DCP. Accordingly, this Court should grant summary judgment in favor of Ebersol on DCP's fraudulent inducement claim.

F. **EBERSOL IS ENTITLED TO SUMMARY JUDGMENT ON DCP'S SECURITIES FRAUD CLAIM BECAUSE THERE IS NO COMPETENT EVIDENCE OF ANY ELEMENT OF SUCH CLAIM.**

To prevail on its claim for securities fraud, DCP must prove that (1) Ebersol was a "seller" within the meaning of the TSA and (2) Ebersol offered or sold a security to DSP by means of (a) an untrue statement of fact or (b) an omission to state a material fact that is necessary to make the statement made not misleading in context. *See* TEX. GOV'T CODE § 4008.052; *Kubbernus v. ECAL Partners, Ltd.*, 574 S.W.3d 444, 480 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). DCP must also demonstrate that an actual sale of securities occurred. *See Chase v. Hodge*, 2021 WL 1948470, at *9 (W.D. Tex. May 14, 2021); *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 603-04 (S.D. Tex. 2003).

Here, DCP can produce no evidence to support the elements of its securities fraud claim. Specifically, DCP can produce no evidence that Ebersol is a "seller" under the TSA or that Ebersol offered or sold a security to DCP by means of an untrue statement of fact or by an omission to state a material fact necessary to make the statement made not misleading in context. Accordingly, this Court should grant summary judgment in favor of Ebersol on DCP's securities fraud claim.

## VI. <u>CONCLUSION</u>

For the foregoing reasons, this Court should enter an order granting summary judgment in favor of Defendant Charles Ebersol and dismissing the claims of Plaintiff Dundon Capital Partners, LLC with prejudice.

Respectfully submitted,

**JACOBSON, RUSSELL, SALTZ, NASSIM & DE LA TORRE, LLP**

By: */s/ Michael J. Saltz*
      Michael J. Saltz
      Admitted *pro hac vice*
      msaltz@jrsnd.com

1800 Century Park East, Suite 900
Los Angeles, California 90067
Telephone: (310) 446-9900
Facsimile: (310) 446-9909

**THOMPSON, COE, COUSINS & IRONS, LLP**

By: */s/ Thomas M. Horan II*
      Thomas M. Horan II
      State Bar No. 24063938
      thoran@thompsoncoe.com

700 N. Pearl Street, Twenty-Fifth Floor
Dallas, Texas 75201
Telephone: (214) 871-8200
Facsimile: (214) 871-8209

**ATTORNEYS FOR DEFENDANT CHARLES EBERSOL**

## CERTIFICATE OF SERVICE

I hereby certify that, on December 13, 2024, a true and correct copy of the foregoing was delivered to the following counsel of record by electronic service:

Brett D. Hockaday
K&L GATES LLP
1717 Main Street, Suite 2800
Dallas, Texas 75201

Jeffrey S. Lowenstein
Beverly A. Whitley
Brent A. Turman
Sydnie A. Shimkus
BELL NUNALLY & MARTIN, LLP
2323 Ross Avenue, Suite 1900
Dallas, Texas 75201

Nicole L. Williams
Katherine B. Clark
THOMPSON COBURN LLP
2100 Ross Avenue, Suite 3200
Dallas, Texas 75201

Boris Treyzon
Jonathon Farahi
ABIR COHEN TREYZON SALO, LLP
16001 Ventura Boulevard, Suite 200
Encino, California 91436

Brian S. Engel
Steve P. Turner
BARRETT DAFFIN FRAPPIER TURNER & ENGEL, LLP
580 La Ventana Boulevard
Driftwood, Texas 78619